## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LOCKHEED MARTIN CORPORATION )
6801 Rockledge Drive )
Bethesda, MD 20817 )
)
    Plaintiff, ) Civil Action No. 1:08-cv-01160 (JR)
)
  vs. )
)
UNITED STATES OF AMERICA )
)
    Defendant. )
_____)

## FIRST AMENDED COMPLAINT FOR RECOVERY OF RESPONSE COSTS
## AND FOR DECLARATORY RELIEF

  1.  Lockheed Martin Corporation ("Lockheed Martin") complains against the United

States of America (the "Government") for cost recovery and declaratory relief under Section 107

of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), as amended, 42 U.S.C. § 9607.  These claims involve a facility at approximately

1500 Crafton Avenue in Mentone, California (the "Redlands Facility"), at which ammonium

perchlorate ("AP") and trichloroethylene ("TCE") have been detected in the soil and groundwater

downgradient of the facility.  These claims also involve operations associated with the Redlands

Facility that took place at sites in Beaumont, California, known as Beaumont 1 (also known as

Potrero) and Beaumont 2 (also known as LaBorde Canyon) (collectively known as the

"Beaumont Facilities").  The Beaumont Facilities are located approximately 70 miles east of Los

Angeles, and AP and TCE have been detected in the soil and groundwater underneath and

surrounding the facilities.  The claims also involve TCE that escaped from the Norton Air Force

Base.  Plaintiff seeks to recover investigation, response, remediation and cleanup costs, including, but not limited to, all costs incurred in the past and to be incurred in the future to clean up soil and groundwater contamination caused by the Government's ownership, operation, and disposal of waste at the Redlands Facility, the Beaumont Facilities, and Norton Air Force Base.

## THE PARTIES

2.      Plaintiff Lockheed Martin is a Maryland corporation doing business in the State of California.  Lockheed Propulsion Company ("LPC") was primarily engaged in the research, development, and production of rocket propulsion systems and rocket propellant at the Redlands Facility from 1961 through 1975.  In 1963, LPC became an operating division of Lockheed Aircraft Corporation.  In 1977, Lockheed Aircraft Corporation became the Lockheed Corporation, which in turn merged with Martin Marietta Corporation in 1995 to form Lockheed Martin Corporation.  Except where otherwise noted, the term "Lockheed Martin" will refer to LPC and any other Lockheed Martin affiliates with activities at the Redlands Facility and the Beaumont Facilities.

3.      Defendant United States resides, may be found, and has its principal office in the District of Columbia.  The Government conducts business in the District of Columbia through its various agencies, including the Environmental Protection Agency, the General Services Administration, and the Departments of Defense, the Army, the Air Force, and the Navy, and their predecessors in interest, and through its former agencies.  The Government is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21), and has waived its sovereign immunity pursuant to Section 120(a) of CERCLA, 42 U.S.C. § 9620(a).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to Sections 107(a) and 113(b) of CERCLA,

42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1331.

5.      Venue is proper in this judicial district pursuant to Section 113(b) of CERCLA,

42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (e), because the Defendant resides, may be

found, or has its principal office within this district.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS RELATED TO THE ESCAPE OF SUBSTANCES FROM THE REDLANDS FACILITY

6.      The "Redlands Facility" is the rocket propulsion system and propellant plant

located at approximately 1500 Crafton Avenue in Mentone, San Bernardino County, California.

7.      TCE and AP escaped into the environment in the course of operations at the

Redlands Facility and have come to be located in the local soil and groundwater.

8.      The "Redlands Site" is the area of groundwater and soil contamination, including

TCE and AP contamination, located downgradient from the Redlands Facility, and includes any

areas to which such groundwater and soil contamination have migrated or may migrate.

9.      Following the conclusion of World War II, the Government initiated numerous

projects calling for the development and testing of rocket motor propulsion systems for military

and space applications.  The Government accelerated the development and production of rocket

motor propulsion systems to compete with technological advancements by the Soviet Union that

resulted in both an arms race and a space race.

10.     In 1952, Charles Bartley, a pioneer in the development of solid rocket fuel,

established Grand Central Rocket Company ("GCR").  In 1954, GCR moved its operations to the

Redlands Facility, which was located in a remote area outside of Redlands, California,

approximately sixty miles east of Los Angeles.  GCR operated the Redlands Facility from 1954 until 1961.

11.     LPC operated the Redlands Facility for approximately fifteen years, from 1961 to 1975.  LPC was primarily engaged in the research, development, testing and manufacture of propellants and propulsion subsystems for various missile defense and space systems for the Government.  Virtually 100 percent of the products manufactured at the Redlands Facility by LPC were used in military and space exploration projects by the Government.  The Redlands Facility produced rocket motor propulsion systems and other rocket-related components on various programs, including, but not limited to, the SRAM, Nike Zeus, Apollo and Mercury launch escape motors, Explorer and Vanguard upper-stage motors, and the 120-inch and 156-inch Large Solid Rocket Motor Program.

12.     Many of the military specifications governing production by GCR and LPC at the Redlands Facility required the use of TCE and AP.  At certain times, TCE was used in vapor degreasing operations and in other manufacturing processes.  AP was used as an oxidizer and was a primary constituent of many of the solid-rocket propellants produced at the Redlands Facility.  GCR's and LPC's use, handling and disposal of TCE and AP at the Redlands Facility were all directed by the Government in the performance of military contracts and subcontracts that were vital to this nation's defense and to the Government's objectives in the space race.

13.     During the entire period of manufacturing at the Redlands Facility, the Government was directly involved in GCR's and LPC's day-to-day operations.  Throughout those years:

> a)     the Government determined the rate of production and delivery of the
>
> products;

b)     the Government determined the price of the products produced at the Redlands Facility;

c)     the Government determined who could purchase the products;

d)     the Government required the use of TCE and AP and gave Plaintiff no discretion to deviate from this choice;

e)     the Government specified how TCE and AP were to be used to manufacture the products it ordered;

f)     the Government closely supervised the manufacturing processes requiring the use of TCE and AP;

g)     the Government specified the operation of the equipment that handled such chemicals, including TCE degreasers and AP grinders;

h)     the Government specified precise disposal practices for TCE and AP, including the use of "evaporation pits" and "burn pits;"

i)     the Government took custody of waste AP and disposed of it at military bases;

j)     the Government owned equipment that used TCE from which  TCE escaped; and,

k)     the Government owned equipment and raw materials that were involved in the AP production processes from which AP escaped.

14.     GCR's and LPC's contracts with the Government and its subcontracts with other Government prime contractors were detailed and specific about the manufacturing processes they were to follow and the materials they were to use to produce the Government's rocket motors.  In all of its contracts with the Government and its subcontracts with Government prime

contractors, GCR and LPC were required to comply with numerous military and federal specifications and standards ("Government Specifications") that were incorporated into these contracts. These Government Specifications set forth requirements for procedures relating to design, engineering, quality assurance/quality control, manufacturing, facilities management, health and safety, environmental management, waste management, and product testing.

15.     Under the contract and subcontract terms imposed on GCR and LPC by the Government, any proposed change or deviation from the Government Specifications by the contractors, regardless of how slight, required the prior review and approval of Government officers or the prime contractor. Any unauthorized deviation could be a basis for termination of the contract or subcontract.

16.     Based upon these Government Specifications, GCR and LPC drafted internal engineering process specifications ("Process Specifications") to use in implementing the Government Specifications. Process Specifications were derived entirely from the Government Specifications and provided a more detailed description of the manufacturing processes required to comply with the Government Specifications. GCR and LPC were required to submit their internal Process specifications to the Government for review and approval by the Government. Moreover, Government officials were empowered to oversee GCR's and LPC's performance under its contracts and ensure compliance with the approved Process Specifications.

17.     Government military personnel and personnel working for other contractors operating under Government direction were stationed at the Redlands Facility during various times to oversee contract compliance. These personnel adopted many of the traditional functions of management including, without limitation, inspecting raw materials, overseeing manufacturing processes, directing contractor personnel, and testing completed equipment. Over

the years, numerous visiting Government personnel and personnel working for other contractors operating under Government direction also inspected the Redlands Facility's operations.

18.     Pursuant to federal procurement regulations and procurement contracts with the Government, all equipment, parts, tooling, supplies, raw materials and other materials acquired or manufactured at the Redlands Facility, the cost of which was chargeable to a government contract, became the property of the Government.  Under these regulations and contracts, the Government acquired ownership of materials, including TCE and AP, used to manufacture rocket motors and, therefore, owned any waste generated in the performance of these contracts.

19.     From 1954 to 1975, the Government owned plant equipment, tooling, and supplies under various facility contracts used in the production of rocket motors at the Redlands Facility, including but not limited to, the TCE vapor degreaser, propellant mixers, and equipment used in the grinding of AP.

20.     Upon completion of a production contract, personnel at the Redlands Facility were required to obtain the Government's approval for the disposition of Government-owned equipment, materials, tools, and supplies by either returning them to the Government, disposing of them or using them on another Government contract.

21.     Many aspects of the manufacturing processes employed by GCR and LPC at the Redlands Facility were dictated by the need to avoid explosion or detonation of inherently volatile and dangerous materials, such as AP, and were undertaken pursuant to and in compliance with the applicable Government safety manuals and directives.  Thus, underlying nearly all of GCR's and LPC's actions at the facility, including the use and disposal of TCE and AP, were extensive Government-sanctioned efforts to prevent the occurrence of an explosive disaster.

22.     The Government required GCR and LPC to use TCE through numerous federal specifications and referenced it in other contracting documents that controlled their work at the Redlands Facility.  The Government even dictated the specifications for the composition of TCE itself.

23.     The use of the TCE vapor degreaser at the direction of the Government at various times caused or contributed in part to the TCE contamination at the Redlands Facility through discharges from solvent reclamation equipment attached to the vapor degreaser.

24.     At the time that TCE escaped into the environment from the vapor degreaser at the Redlands Facility, the Government owned this equipment, and the degreaser was operated according to government provided specifications.

25.     The principal component in the construction of rocket motors is solid rocket propellant.  The propellant is a mixture of rocket fuel and oxidizer that is vacuum cast into a metal rocket motor casing and then cured in a large oven.  Just as normal combustion consumes oxygen, an oxidizer provides a concentrated form of oxygen to support combustion of rocket fuel once the rocket is ignited.

26.     The use of AP was required in most Government contracts for rocket propellant throughout the period that the Redlands Facility was in operation because it supports high-energy combustion and is relatively safe compared to other oxidizers that can prove unstable under certain conditions.

27.     Oxidizers are extremely flammable.  AP was treated as an explosive at the Redlands Facility because of the danger of unexpected combustion or detonation if it was accidentally ignited by static electricity or a stray spark.

28.     Because of the volatile nature of AP and because of the importance of the Government's rocket program to our nation's Cold War efforts, the Government placed strict controls on its use, storage and disposal.  At the Government's behest, GCR and LPC followed these explicit instructions.

29.     GCR and LPC were required to grind AP at the Redlands Facility to exacting particle diameters.  Different grinds of AP produced varying burn rates for the rocket motors. Under the SRAM program, the Government funded a research effort to produce a very fine grind of AP in order to achieve the high burn rates that were required to achieve SRAM operational parameters.  LPC was eventually able to grind AP to a size below 2 microns in diameter.  At this size, AP has the consistency of smoke, and it was virtually impossible to contain and collect all of the dust that was generated.  The Government maintained close supervision over AP grinding operations, including, but not limited to, specifications found in Air Force Manuals that were enforced by Government inspections.

30.     The grinding of AP generally, and the ultra-fine grinding required under the SRAM program in particular, contributed to the perchlorate contamination at and around the Redlands Facility.  Some small portion of the dust and "smoke" created by the grinding invariably escaped the collection process and entered the environment.  Eventually, this fugitive AP dust settled on soil and other surfaces from which it was transported by rain water down into groundwater.

31.     At the time that AP escaped into the environment from the grinding of AP at the Redlands Facility, the Government owned the equipment used in grinding operations, and the grinding equipment was operated according to government specifications.

32.     The Government directed GCR and LPC to employ specific disposal practices for the disposal of waste TCE and AP that was generated at the Redlands Facility.  Disposal of solvent wastes resulting from the use of degreasing equipment was accomplished pursuant to written procedures dictated by the Government.  In addition to offsite reclamation procedures that were used from time to time, these procedures entailed placing the spent solvent wastes into drums whose contents were deposited into an evaporation pit so that the volatile components could evaporate.  These disposal operations were conducted pursuant to written procedures dictated by the Government in written specifications, including specifications set out in U.S. Army and U.S. Air Force manuals and GCR/LPC Process Specifications that were approved by the Government.

33.     GCR's and LPC's maintenance of the evaporation ponds was also subject to the Government's direction and control.  The cost of any significant maintenance, including any work to repair, refurbish, re-line, re-construct or alter the evaporation ponds was passed on to the Government pursuant to Lockheed Martin's contracts and was thus subject to Government review and approval.

34.     Likewise, GCR and LPC followed Government-dictated disposal practices for waste streams resulting from the use of TCE to clean surfaces containing AP residue.  Cleaning the propellant mixers produced a solvent/propellant waste mixture.  These waste mixtures were deposited in wax cardboard cartons (referred to as "hamburger cartons") and taken to designated burn areas and incinerated.  The Government Specifications dictated the materials used to construct these disposal cartons.

35.     Throughout the relevant time period, Government manuals and directives regarding the disposal of excess propellant, including AP, provided that burning of the material

on bare ground was one of two or three acceptable methods of disposal (one of the other acceptable methods was dumping at sea). Burning on bare ground without a concrete liner was required because it would avoid the danger of shrapnel being created by AP explosions on wood or concrete floors. In 1973, during the peak of the SRAM production activity, the Air Force re-issued its manual relating to solid rockets and propellant. This manual provided that open burning is the "safest means of disposing of propellant waste."

36.     A burn pit was utilized to carry out the Government's AP disposal directives at the Redlands Facility. This procedure was sanctioned and approved by the Government. Military officers who monitored GCR's and LPC's operations were fully aware that the base of the burn pit was bare ground. This practice was fully approved by the Government and was consistent with all applicable Government directives and orders for the operation of the Redlands Facility.

37.     From time to time, state regulatory agencies and other third-parties have alleged that AP and TCE escaped through the operation of the burn pits at the Redlands Facility. To the extent that any court or other regulatory body concludes that chemicals escaped through operation of the burn pits at the Redlands Facility, the Government is liable for those releases because it operated the burn pits, owned the material being burned, or arranged for the disposal of waste there.

38.     The Government agreed to assume the risk of environmental contamination and the risk of third-party claims arising from such contamination in several contracts and subcontracts performed at the Redlands Facility. LPC relied upon these promises by the Government in agreeing to use the chemicals and processes necessary to engage in the development and production of solid-rocket motors that gave rise to the contamination at the Redlands Site.

39.     In addition, the Government agreed to reimburse GCR and LPC for certain damages and claims in the performance of numerous cost-reimbursement contracts performed at the Redlands Facility.  These risk-sharing contract clauses were inserted into various Lockheed Martin contracts according to required procurement statutes and regulations.

40.     Under these indemnification and risk-sharing contract clauses, the Government agreed to indemnify and to compensate GCR and LPC for the costs that it has incurred and will incur to remediate the AP and TCE contamination at the Redlands Site.

41.     In 1991, the Environmental Protection Agency ("EPA") and the Santa Ana Regional Water Quality Control Board ("RWQCB") issued reports indicating that TCE was present in the subsurface of the Redlands Site.

42.     In 1994, the RWQCB issued two Clean-up and Abatement Orders (Nos. 94-37 and 94-11) to Lockheed Martin.  One order required Lockheed Martin to define the extent of a TCE groundwater plume near the former Redlands Facility by monitoring groundwater, developing and implementing a work plan to monitor the movement of the TCE groundwater plume, submitting a remedial action plan, and remediating the groundwater plume.  The other order required Lockheed Martin to conduct subsurface soil investigations at potential source areas at the former Redlands Facility.

43.     Lockheed Martin has completed its investigation of the TCE plume and has analyzed several alternatives for remediating the plume.  The RWQCB has approved a remediation plan for TCE that calls for carbon treatment systems to be placed on wells located in a major municipal well field that is situated in the path of the plume.  The carbon treatment systems have been constructed and are currently in operation.  Lockheed Martin has incurred substantial costs to investigate the TCE plume and develop a remediation plan.  Lockheed Martin

has incurred and will continue to incur substantial costs to design, construct, operate, maintain, and decommission the facilities necessary to treat and remove TCE from groundwater at the Redlands Site.

44.     In 1997, the RWQCB issued a Clean-Up and Abatement Order (No. 97-58) directing Lockheed Martin to investigate the extent of AP contamination in the groundwater in the vicinity of the former Redlands Facility.  Lockheed Martin has incurred substantial costs to comply with this order and is in the process of developing a remediation plan to address the AP contamination found by the investigation.  Lockheed Martin has incurred and will continue to incur substantial costs to design, construct, operate, maintain, and decommission the facilities necessary to treat and remove AP from groundwater at the Redlands Site.  In addition, Lockheed Martin has entered into agreements with several purveyors to provide replacement water.

### GENERAL ALLEGATIONS COMMON TO ALL CLAIMS RELATED TO THE ESCAPE OF SUBSTANCES FROM THE BEAUMONT FACILITIES

45.     The "Beaumont Facilities" were purchased by LPC in the 1960s for use in conjunction with the Redlands Facility's operations.  Beaumont Site 1 is also referred to as the Potrero site and is approximately 9,100 acres.  Beaumont Site 2 is also referred to as the LaBorde Canyon site and is approximately 2,500 acres.  The two sites are separated by approximately 1.25 miles.

46.     TCE and AP escaped in the course of operations at the Beaumont Facilities and have come to be located in the local soil and groundwater.

47.     The "Beaumont Sites" are the area of groundwater and soil contamination, including TCE and AP contamination, located underneath and surrounding the Beaumont Facilities, and includes any areas to which such groundwater and soil contamination have migrated or may migrate.

48.     The Beaumont Facilities were used as an extension of the Redlands Facility to aid in the development and testing of solid-rocket motors, as well as for the disposal of waste. Specifically, certain solid-rocket motors were test fired at the Beaumont Facilities, and other production activities were accomplished there, including the mixing of propellant.  The Beaumont Facilities also included a burn pit for the disposal of AP and propellant-contaminated solvents such as TCE, and washout facilities for the reclamation of rocket casings and motors.

49.     LPC's activities at the Beaumont Facilities were also performed pursuant to government contracts and Government Specifications in the same manner as its operations at the Redlands Facility.

50.     The Government also arranged by contract, agreement, act, omission or otherwise, either directly or indirectly, for the acquisition, transportation, treatment, and/or disposal of TCE and AP, which were owned or possessed by the Government at the Beaumont Facility.

51.     As the result of these activities at the Beaumont Facilities, AP and TCE escaped into the environment and Lockheed Martin has incurred costs responding to this soil and groundwater contamination.

### GENERAL ALLEGATIONS COMMON TO ALL CLAIMS RELATED TO THE ESCAPE OF SUBSTANCES FROM NORTON AIR FORCE BASE

52.     "Norton Air Force Base" covers approximately 2,036 acres and is located near the City of San Bernardino, approximately 65 miles east of Los Angeles, California, bounded by the Santa Ana River to the south, Third Street to the north, Lena Road to the west, and Alabama Street to the east.

53.     The United States owned and operated Norton Air Force Base from 1942 until its closure on March 31, 1994.  Since its closure, the United States has either transferred or leased

the base to local entities for commercial purposes, including a public airport, aircraft maintenance, cargo handling, warehousing and distribution centers, and commercial development.

54.     TCE, volatile organic compounds, and other substances escaped from Norton Air Force Base and have come to be located in the local soil and groundwater.  United States' practices that resulted in this contamination include the burial of drums and other materials; disposal of waste oils, solvents, and paint residues into landfills, unlined pits, ponds and drying beds; storage in leaking underground tanks; spills and oils, solvents, PCBs, and acidic plating solutions.

55.     The "Norton Site" is the area of groundwater and soil contamination, including TCE and other contamination, located at, under and around Norton Air Force Base, and includes any areas to which such groundwater and soil contamination have migrated or may migrate.

56.     The United States has permitted the substances that escaped from Norton Air Force Base to migrate south and west of the facility, causing Lockheed Martin to expend costs responding to the contamination found in the Norton Site.

## FIRST CLAIM FOR RELIEF

(Owner/Operator Liability under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), and CERCLA § 113(f), 42 U.S.C. § 9613(f))

57.     Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 56 inclusive, as set forth in full.

58.     The Redlands Site, the Beaumont Sites, and the Norton Site are "facilities" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), where TCE, AP and other substances have come to be located.

59.     TCE and AP are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

60.     The "release and threatened release" of TCE and AP at the Redlands Site and the Beaumont Sites has caused Plaintiff to incur response costs, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff is incurring and will continue to incur additional response costs at these sites.

61.     The "release and threatened release" of hazardous substances, including TCE, at the Norton Site has caused Plaintiff to incur response costs, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff is incurring and will continue to incur additional response costs at the Norton Site.

62.     Plaintiff's response actions taken at the Redlands Site, the Beaumont Sites, and the Norton Site, and the costs incurred in connection therewith, were and are consistent with the National Contingency Plan, as codified at 40 C.F.R. Part 300 ("NCP").

63.     Plaintiff has satisfied any and all conditions precedent to the undertaking of response actions, the incurrence of response costs, and to the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

64.     The Government falls within the class of persons subject to contribution for past and future response costs under Section 107(a) of CERCLA, 42 U.S.C. §9607(a), because

> a)     the Government owned, operated and controlled the equipment and materials used in the production of the Government's rocket motors at the Redlands Facility and the Beaumont Facilities, and controlled the use, storage, transportation, and disposal of waste there.  As a result of the Government's control, operation and ownership of the Redlands Facility

and the Beaumont Facilities, TCE and AP have entered the environment and have caused Lockheed Martin to incur response costs, and

b)      the Government owned, operated and controlled the Norton Air Force Base at the time that substances such as TCE escaped from the facility.  As a result of the Government's control, operation and ownership of the Norton Air Force Base, TCE and other hazardous substances have entered the environment and have caused Lockheed Martin to incur response costs

65.     As an "owner" and "operator" at the time of disposal with respect to the contamination at the Redlands Site, the Beaumont Sites, and the Norton Site, the Government is liable to Plaintiff, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the response costs related to the Redlands Site and Norton Site that Plaintiff has incurred and will continue to incur in the future.

66.     Alternatively, to the extent that the Court determines that this action, or any portion of it, seeks contribution based upon previously filed CERCLA litigation, the Government is liable to Plaintiff, pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for the response costs related to the Redlands Site that Plaintiff has paid to others, incurred, and will continue to incur in the future.

## SECOND CLAIM FOR RELIEF

(Arranger Liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3), and CERCLA § 113(f), 42 U.S.C. § 9613(f))

67.     Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 65, inclusive as through set forth in full.

68.     The Redlands Site, the Beaumont Sites, and Norton Site are "facilities" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), where TCE, AP and other substances have come to be located.

69.     TCE and AP are "hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

70.     The "release and threatened release" of TCE and AP at the Redlands Site and the Beaumont Sites have caused Plaintiff to incur response costs, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff is incurring and will continue to incur additional response costs at the Redlands Facility.

71.     The "release and threatened release" of hazardous substances, including TCE, at the Norton Site has caused Plaintiffs to incur response costs, as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).  Plaintiff is incurring and will continue to incur additional response costs at the Norton Site.

72.     Plaintiff's response actions taken at the Redlands Site, and Beaumont Sites, and the Norton Site, and the costs incurred in connection therewith, were and are consistent with the National Contingency Plan, as codified at 40 C.F.R. Part 300 ("NCP").

73.     Plaintiff has satisfied any and all conditions precedent to the undertaking of response actions, the incurrence of response costs, and to the recovery of those costs under Section 107 of CERCLA, 42 U.S.C. § 9607.

74.     The Government falls within the class of persons subject to contribution for past and future response costs under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). Through operation of the government contracts, the Government arranged for the disposal of wastes used at the Redlands Facility, the Beaumont Facilities and Norton Air Force Base,

controlled operations there, directed and supervised the use, storage, transportation, and disposal of waste, and knew or should have known that the generation and disposal of wastes was inherent in the production processes which were performed for at the Government's direction. As a result of these activities, TCE, AP and other substances have entered the environment and have caused Lockheed Martin to incur response costs.

75.     As an "arranger" with respect to the contamination at the Redlands Site and the Norton Site, the Government is liable to Plaintiff, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for the response costs related to the Redlands Site and the Norton Site that Plaintiff has incurred and will continue to incur in the future.

76.     Alternatively, to the extent that the Court determines that this action, or any portion of it, seeks contribution based upon previously filed CERCLA litigation, the Government is liable to Plaintiff, pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), for the response costs related to the Redlands Site that Plaintiff has paid to others, incurred, and will continue to incur in the future.

### THIRD CLAIM FOR RELIEF

(Declaratory Relief Under CERCLA § 113(g), 42 U.S.C. § 9613(g))

77.     Plaintiff realleges and incorporates herein by reference the allegations in paragraphs 1 through 74 inclusive, as set forth in full.

78.     An actual legal controversy has arisen and now exists between Plaintiff and the Government, and Plaintiff seeks a judicial declaration of rights and legal relations with respect to the Government pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613 (g)(2) and 28 U.S.C. § 2201.  Plaintiff contends that the Government is strictly liable to Plaintiff under CERCLA

Section 107(a), 42 U.S.C. §§ 9607(a), and that the Government is liable to Plaintiff for its past, current, and future response costs related to the Redlands Site and Norton Site.

79.     Plaintiff is informed and believes, and based thereon alleges, that the Government contends in all respects to the contrary.

80.     A declaratory judgment is appropriate and is in the interests of justice because, among other reasons, it will obviate the need for multiple lawsuits, thereby providing a complete resolution of the disputes between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Lockheed Martin, prays for a judgment against the Government as follows:

a.     For cost recovery and/or contribution from the Government under CERCLA of all Plaintiff's response costs and damages relating to the Redlands Site, the Beaumont Sites, and the Norton Site, or that amount that is allocable to the Government, in an amount to be proven at trial;

b.     For a declaration that the Government is liable under CERCLA for all Plaintiff's past, current and future response costs and damages relating to the Redlands Site, or that amount that is allocable to the Government, in an amount to be proven at trial;

c.     For pre-judgment interest at the maximum rate allowable by law, from the time Plaintiff incurred its response costs and damages;

d.      For Plaintiff's reasonable attorney's fees and costs of investigating the potential

responsibility of the Government, and for conducting other reasonable and related investigations;

e.      For Plaintiff's costs of litigation; and,

f.      For such other and further relief as the Court may deem just and proper.


Dated:  November 14, 2008                    Respectfully submitted,

                                             ___/s/ Raymond B. Ludwiszewski_____
                                             Raymond B. Ludwiszewski, D.C. Bar 420540
                                             Email: RLudwiszewski@gibsondunn.com
                                             Michael K. Murphy, D.C. Bar 468907
                                             Email: MMurphy@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             1050 Connecticut Ave., N.W.
                                             Washington, DC 20036
                                             (202) 955-8500

                                             Alan Bick
                                             Email: ABick@gibsondunn.com
                                             GIBSON, DUNN & CRUTCHER LLP
                                             3161 Michelson Drive
                                             Irvine, California 92612-4412
                                             Telephone: (949) 451-3800

                                             *Counsel for Plaintiff Lockheed Martin Corporation*