UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,   .
                               .
          Plaintiff,           .
                               .  CA No. 08-1160 (ESH)
     v.                        .
                               .
UNITED STATES OF AMERICA,      .  Washington, D.C.
                               .  Monday, February 10, 2014
          Defendant.           .  2:10 p.m.
                               .
. . . . . . . . . . . . . . . .  Pages 122 - 240

DAY 1 - P.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**

For the Plaintiff:          MICHAEL K. MURPHY, ESQ.
                            JUSTIN A. TORRES, ESQ.
                            STACIE B. FLETCHER, ESQ.
                            Gibson, Dunn & Crutcher, LLP
                            1050 Connecticut Avenue, NW
                            Washington, DC 20036-5306
                            (202) 955-8238

For the Defendant:          JOHN E. SULLIVAN, ESQ.
                            ERICA M. ZILOLI, ESQ.
                            JESSICIA O'DONNELL, ESQ.
                            JUSTIN D. HEMINGER, ESQ.
                            JENNIFER E. POWELL, ESQ.
                            WILLIAM D. JOHNSON, ESQ.
                            U.S. Department of Justice
                            Environmental Defense Section
                            601 D Street, NW
                            Suite 8000
                            Washington, DC 20026-3986
                            (202) 305-0365

 Court Reporter:            PATRICIA A. KANESHIRO-MILLER, CRR
                            U.S. Courthouse, Room 4714
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3243

123

# CONTENTS

WITNESS                                                    PAGE

  GERALD OPPLIGER

      Redirect Examination                         130

      Recross-Examination                         142


  RICHARD JOHNSON

      Direct Examination                          145

      Cross-Examination                           148

1          THE COURT:  There is an exhibit, 1057, which is this

2    declaration of Mr. Speer, and in this declaration there's lots

3    of references to exhibits.  Is there any way I can find these

4    exhibits easily?  Obviously, this was written a long time ago,

5    so the exhibit numbers have nothing to do with this case.  Can

6    you translate these in any way?  You know what I'm talking

7    about?  It goes through 28.

8          MR. MURPHY:  The attachments, Your Honor, are very

9    voluminous so we weren't including them in the trial binder.

10   We can get you a full copy if you'd like.

11         THE COURT:  Are they on disk or anything?  Do they

12   translate to numbers of what we have?

13         MR. MURPHY:  Most of the documents attached are

14   documents other places in the record, Your Honor, but not

15   presented with the affidavit.  We can get you a full set if

16   you'd like.

17         THE COURT:  I'd just as soon use what I have, if I

18   could, instead of being inundated with more.  Like what I got

19   today, if it's already in the record someplace, especially in

20   these binders, I don't need duplicate copies of them.  That's

21   the whole point of having the binders.  But if you can

22   translate it in any way and we already have it, you don't need

23   to reproduce it.

24         MR. MURPHY:  Okay.

25         THE COURT:  Okay?  Whatever is simple.

1        MR. MURPHY:  We can look through it and see if there's

2   a cross-walk between --

3        THE COURT:  It's hard to read it otherwise.  It

4   doesn't make too much sense.

5        MR. MURPHY:  Okay, Your Honor.

6        THE COURT:  All right.  Go ahead.

7        MS. O'DONNELL:  Your Honor, I have no further

8   questions.

9        THE COURT:  I do, though.

10                    **GERALD OPPLIGER,**

11  having been previously duly sworn to tell the truth, the whole

12  truth and nothing but the truth, was examined further and

13  testified as follows:

14       THE COURT:  Sir, had you ever visited the building 91?

15       THE WITNESS:  Have I ever visited building 91?

16       THE COURT:  You need a mike, though.

17       THE WITNESS:  I am sure I have.  I don't remember

18  exactly what building 91 is.

19       THE COURT:  Is there some way we can refresh his

20  recollection?  I don't have one of those drawings handy.  Who

21  had the aerial photography pictures?  I'm going to ask the

22  same question as to building 77.

23       When you were going to work every day for these five

24  years, how much -- it's a big property, it's thousands of

25  acres; right?

-126-

```
 1              THE WITNESS:  It's not that big.

 2              THE COURT:  How --

 3              THE WITNESS:  Maybe, I would say a thousand acres

 4     maybe.

 5              THE COURT:  How much of your time there was spent

 6     visiting actual buildings as opposed to being whatever --

 7     where did you spend your time?

 8              THE WITNESS:  I probably spent 20 percent of my time

 9     visiting buildings.

10              THE COURT:  20 percent.  So you would -- sitting here

11     today, you don't know where building 91 or 77 is?

12              THE WITNESS:  Not anymore.  It's been 40-some years

13     now.

14              THE COURT:  Okay.

15              THE WITNESS:  Building 77 I think was the

16     oxidizer/grinding station.

17              THE COURT:  You're aware of something called the north

18     sump and the south sump?  Does that ring a bell?

19              THE WITNESS:  I'm sorry?

20              THE COURT:  The north sump and the south sump?

21              THE WITNESS:  It doesn't mean anything to me at all.

22              THE COURT:  Okay.  What about the degreaser?  Does

23     that mean anything to you?  Did you know where there was one

24     or if there was one?

25              THE WITNESS:  I don't anymore.
```

1          THE COURT:  Then looking at document 40151 in tab 2, I

2  take it this reflects the philosophy -- who is the author of

3  this document in tab 2?

4          Do you have it in front of you still?

5          This is -- the government prepared this document,

6  right, the AFRPL review?

7          THE WITNESS:  Oh, the AFRPL document?

8          THE COURT:  Yes.  This is prepared by the government.

9          THE WITNESS:  Okay.  I have it in front of me.

10          THE COURT:  Look at page 40151.  It says "Inspection."

11          THE WITNESS:  Okay.

12          THE COURT:  Would it be fair to characterize, at least

13  up to this point in time, the philosophy of the government is

14  that we inspect when you call us?  They didn't have a regular

15  procedure for coming in and inspecting?  If you wanted them,

16  they came?

17          THE WITNESS:  Give me your question again.

18          THE COURT:  Read the first couple of lines of the page

19  40151.  "The general philosophy of the inspection groups was

20  known to be 'Call us and we'll come and inspect.'"  These are

21  three groups, Lockheed, Boeing, and the government.

22          THE WITNESS:  Yes.

23          THE COURT:  Is that a fair statement of the philosophy

24  of the inspectors?

25          THE WITNESS:  Yes, it probably is.

1          THE COURT:  Okay.  So you had your own inspectors of

2     sorts?

3          THE WITNESS:  Yes.

4          THE COURT:  Safety inspectors?

5          THE WITNESS:  We had our own quality and safety

6     inspectors.

7          THE COURT:  How many of those were there?

8          THE WITNESS:  Gosh, I don't know.  Several.

9          THE COURT:  More than six or seven?

10         THE WITNESS:  Oh, yes.  Oh, yes.

11         THE COURT:  It says Boeing had six and DCAS had seven.

12         THE WITNESS:  Okay.

13         THE COURT:  So if no one calls them, no one inspects?

14         THE WITNESS:  I didn't hear that.  I didn't hear your

15    question.

16         THE COURT:  I'm saying is it not true that if no one

17    called an inspection group, no one came?

18         THE WITNESS:  No, that isn't true.  The people that

19    had inspection points in the manufacturing paperwork, it was

20    also their responsibility to be on site and be ready so they

21    didn't hold the job up.

22         THE COURT:  Who were those people?  Who are you

23    referring to?

24         THE WITNESS:  Those were the Lockheed Propulsion

25    inspectors and, if necessary, the Lockheed Propulsion safety

1    people, and the DCAS inspectors.  We didn't expect to wait on

2    an operation until they got there.  We expected them to be at

3    the operation and be ready.

4         THE COURT:  Did they have to come every time that you

5    reached a new step of something?  What do you mean, hold up

6    the works?  If they weren't coming regularly, how could they

7    be holding anything up?

8         THE WITNESS:  If they weren't supposed to be there,

9    then there wouldn't be anything held up.

10        THE COURT:  Do you recall -- I know there is one

11   instance where there was a question about holding things up.

12   Do you recall them holding things up any other time?

13        THE WITNESS:  I don't specifically recall, no.

14        THE COURT:  How about Boeing?  Did they ever hold

15   anything up because they were doing inspections?

16        THE WITNESS:  I don't recall any specific times when

17   anything was held up because of that.

18        THE COURT:  And when you read on here in this

19   paragraph, it says that Lockheed has few people inspecting

20   work station operations in spite of their seemingly large

21   product assurance department, and then they say inspection is

22   organized into the following.  This is inspection by Lockheed;

23   right?

24        THE WITNESS:  Yes.

25        THE COURT:  The following six.  And which one of them

1     would cover practices regarding waste disposal, if any?

2              THE WITNESS:  I don't really know.  I would guess

3     swing shift inspection would cover part of it.

4              THE COURT:  Swing shift?

5              THE WITNESS:  For the off shifts.  And probably

6     process and test inspection for the on shift.

7              THE COURT:  Okay.  Anything else?

8              MR. TORRES:  If I may, Your Honor, just a few

9     questions.

10                       **REDIRECT EXAMINATION**

11    BY MR. TORRES:

12    Q.  Mr. Oppliger, first of all, it's been 50 years since you

13    started working at the Redlands site; is that correct?

14    A.  Yes.

15    Q.  Would it be fair to say that if you don't remember a

16    specific standard or a specific process, that that may be sort

17    of lost to memory but it doesn't mean it doesn't exist?

18    A.  Yes, that's true, it's been 40-some years since I was

19    there.

20    Q.  Okay.  Let me ask you this question related to some of the

21    things that the judge was just talking about.  If you could go

22    to page -- to tab 3 in your witness binder.  Again, we're

23    talking about Plaintiff's Exhibit 577 here.  And I just want

24    to look --

25              THE COURT:  577?

1          MR. TORRES:  Plaintiff's Exhibit 577, Your Honor.

2    That is the AFRPL review.  We have it up here on the screen.

3          Let's go to the page that is Bates numbered LMCPRO

4    0040117.

5          THE WITNESS:  40117.

6    BY MR. TORRES:

7    Q.   I'll tell you that this is talking about conclusion and

8    recommendation 4 in this document.

9          So there is a reference in here to, as the judge was

10   describing earlier, a "call us and we'll come inspect"

11   philosophy has been practiced by all three sets of inspectors.

12   Is that correct?  Do you see that right there?

13   A.   Call us and we will come, yes.

14   Q.   And this is a recommendation to reevaluate that inspection

15   philosophy; is that correct?

16   A.   Yes.

17   Q.   Yes.  I believe you testified earlier on your direct

18   that -- and that's a recommendation -- I should predicate,

19   that's a recommendation to the three sets of inspectors, so

20   there is Boeing, there is LPC, and there is DCAS, and that's a

21   recommendation to all of them; is that correct?

22   A.   That's correct.

23   Q.   I believe you testified on your direct that to your

24   knowledge, these recommendations were actually implemented; is

25   that correct?

1   A.   Yes, as far as I know, they were.

2   Q.   Now, let me have you take a look at the first tab again in

3   your book, and that's United States Exhibit 264.  I want to

4   take you to the first page of that.  And if we could highlight

5   the date on that, we can just look and see that this is a

6   document from 18 February 1970, so it's in the same year as

7   this AFRPL review, the Air Force Rocket Propulsion Lab review.

8        Did you understand this document, which contains the

9   proposed new inspection points, as embodying this new

10   inspection philosophy, that we're going to reevaluate the way

11   we're going to inspect, and these inspectors are going to be

12   in the process, much more involved in inspecting the process?

13        MS. O'DONNELL:  Objection, Your Honor.  That lacks

14   foundation.  It assumes facts not in evidence.

15        THE COURT:  It's leading.

16        MS. O'DONNELL:  It is also leading.

17        THE COURT:  Sustained.  You can't do this.  He can

18   read the document just as well as you can.  You can't do this.

19        BY MR. TORRES:

20   Q.   Okay.  Let me ask you this.  Let me take you down to the

21   one, two, three -- fourth paragraph on that first page there.

22   "DCAS has had the test and shop paper for approximately one

23   week," it says.  "It is not known when his formal request will

24   be made on product assurance."

25        And there's actually -- if we could -- the two

1    paragraphs, the one that starts "Current qualification" and

2    "DCAS has had."

3           Let me have you take a look at some of the sentences

4    in here.  "Current qualification test procedures and shop

5    planning paper have been provided to the DCAS at his request,

6    so that he can better determine at which fabrication and

7    inspection points he can best implement the added inspection

8    demands being placed on him."

9    A.   Uh-huh.

10   Q.   Okay.  Now, first of all, you testified on your direct

11   about these inspection points.  What were these inspection

12   points again, if you could just refresh everyone's

13   recollection in the courtroom?  The inspection points that

14   DCAS was adding, that were being added, what were those?

15   A.   They were critical operations in the production of the

16   rocket motor.  The shop planning paperwork tells how to do

17   everything, and the DCAS had reviewed all the paperwork and

18   picked out what they thought were the critical processes, and

19   that's what they wanted to inspect.

20   Q.   And let me have you take a look at the paragraph just

21   below that.  "The DCAS has had the test and shop paper for

22   approximately one week.  It is not known when his formal

23   request will be made."

24           What was it at that point -- what is that sentence --

25           THE COURT:  Wait.  Finish the sentence.

1    BY MR. TORRES:

2    Q.   "It is not known when his formal request will be made on

3    product assurance."

4            THE COURT:  Product assurance is not what we're

5    talking about in this case, is it?  Do you know what product

6    assurance refers to?

7            THE WITNESS:  I'm sorry?

8            THE COURT:  Product assurance, in caps.

9            THE WITNESS:  It is referring to LPC product

10   assurance.

11           THE COURT:  What does that mean?

12           THE WITNESS:  It is our inspection organization, is

13   what it really was, product assurance organization.

14           THE COURT:  Okay.  But you had inspectors for both

15   quality assurance and safety; right?

16           THE WITNESS:  Uh-huh.

17           THE COURT:  So does this product assurance include

18   both?

19           THE WITNESS:  No, that's quality.

20           THE COURT:  That's quality?  Again, define that for

21   me.  Does that mean you've got a four-inch tube that goes here

22   or there?

23           THE WITNESS:  Quality just means the condition of the

24   part, is it good quality.

25           THE COURT:  Okay.

1        BY MR. TORRES:

2    Q.   So, let me just ask this:  What do you understand it to

3    mean that the DCAS has had the test and shop papers?  What is

4    DCAS looking at with the test and shop papers?

5    A.   They're looking at the steps required to make and produce

6    the rocket motors, and they're deciding on which steps they

7    want to add their inspection points.

8    Q.   Okay.  So in February of 1970, DCAS has the paperwork, and

9    they're deciding, we're going to start putting more inspection

10   points in; right?

11   A.   Yes.

12   Q.   And it's your understanding that those inspection points

13   are contained in this attachment that's in this paper?

14        MS. O'DONNELL:  Objection, Your Honor.  Leading.

15        THE COURT:  Sustained.

16        (Brief discussion off the record)

17        THE COURT:  Can I have the question again?

18        MS. O'DONNELL:  Your Honor, I had objected to the

19   question and it was sustained.

20        THE COURT:  Okay.  Let's have a new question.

21        BY MR. TORRES:

22   Q.   Mr. Oppliger, you testified on your direct, in your first

23   testimony before lunch, that you had an understanding about

24   the relationship of this attachment here that is dated

25   20 December 1969, and the first two pages of this document,

1    which is this memo dated 18 February 1970.  Do you recall that

2    testimony?

3    A.   Yes.

4    Q.   Okay.  So what is your understanding of the relationship

5    between this attachment and this memo?

6            THE COURT:  What is the date of the attachment?

7            MR. TORRES:  The date of the attachment, Your Honor,

8    is 20 December 1969.

9            BY MR. TORRES:

10   Q.   So Mr. Oppliger, I will repeat, what is your

11   understanding, what did you testify to on your direct about

12   how these two documents work together?

13   A.   The letter from Mr. Rhyme notifies everybody that the DCAS

14   is requesting additional inspection points from what they

15   already had.  And the attachment represents those additional

16   inspection points, and it basically includes the whole

17   production of the rocket motor.

18   Q.   So would it be fair, can you tell the Court, a fair

19   interpretation of these documents is that starting as early as

20   December 1969, and certainly in February of 1970, DCAS was

21   already proposing new substantial inspection points in the

22   process?

23           MS. O'DONNELL:  Your Honor --

24           THE COURT:  Sustained.  You're doing the direct here,

25   not the cross.

137

```
1              MR. TORRES:  Okay.

2              MS. O'DONNELL:  Your Honor, not only that, counsel has

3    established that the witness -- these events took place

4    50 years ago.  It lacks a foundation.

5              THE COURT:  Right.  But redirect is not the

6    opportunity to repeat what was on direct.  He already

7    testified about this.

8              MR. TORRES:  Okay, Your Honor.

9              THE COURT:  But it certainly can't be by leading

10   questions.

11             MR. TORRES:  Okay.

12             BY MR. TORRES:

13   Q.  Let me ask this:  Is it your understanding that prior to

14   August 1970, based on these documents --

15             THE COURT:  Which documents?  These three documents

16   here?

17             MR. TORRES:  These two documents we're talking about

18   here, the documents behind tab 2 and behind tab 3.

19             BY MR. TORRES:

20   Q.  First of all, let me just ask you this:  In time, which

21   came first?

22             MS. O'DONNELL:  Objection, Your Honor.

23             THE COURT:  The documents speak for themselves about

24   time.  One is August '70, the other one is March '70.  So I

25   assume March comes before August.
```

-138-

1           BY MR. TORRES:

2    Q.   Was it your understanding that before August 1970 DCAS was

3    adding additional inspection points into the process?

4    A.   Yes.

5           MS. O'DONNELL:  Objection, Your Honor, leading.

6           THE COURT:  Go ahead and answer.

7           He said "yes."

8           But do you know whether in fact they did it or didn't

9    do it?

10          THE WITNESS:  Pardon?

11          THE COURT:  Do you know whether in fact they did or

12   didn't do it?  Did they actually go to different points to

13   inspect?

14          THE WITNESS:  Oh, yes.

15          THE COURT:  So the level of inspection increased after

16   August?

17          THE WITNESS:  Yes, because the reason it would have

18   been is that would have been about the middle of the

19   qualification test program, and those motors were supposed to

20   be made exactly like the production motors were going to be

21   made, and the purpose then is to test them and make sure they

22   meet the government requirements made per the paperwork that

23   you're going to use to make the production motors.

24          BY MR. TORRES:

25   Q.   Mr. Oppliger, do you recall how many people worked at the

-139-

1    Redlands site?

2            THE COURT:  When?

3            BY MR. TORRES:

4    Q.   Do you recall how many people worked at the Redlands site

5    approximately the time of these documents, let's say?

6    A.   The total site?

7    Q.   Yes, at the total site, 1970, thereabouts.

8    A.   Maybe 400.

9    Q.   Did you know a lot of people at the site?

10   A.   I knew a lot of people.

11   Q.   How did you know people at the site?  What kind of

12   interactions did you have to get to know people at the site?

13   A.   All the engineering side of the house, basically we worked

14   with them, so you get to know them very well.  And the

15   inspection, quality assurance people, all the documentation

16   had to be reviewed by them before it could be released, so you

17   got to know those people.  The same way with safety, they had

18   to review everything you did before you did it, so you got to

19   know those people.  The production, manufacturing managers and

20   supervisors, you got to know because you were writing the

21   paperwork that they had to use, and their people were

22   reviewing the paperwork.  So, you know.  I didn't know

23   personally many of the operators, but I knew quite a few of

24   everybody else.

25           THE COURT:  I'm sorry.  Can you explain again to me --

1       not the witness; I'm asking you -- Exhibit 3, the

2       manufacturing process standards that were signed off by people

3       at Lockheed in March 1970.

4                   MR. TORRES:  Yes.

5                   THE COURT:  What am I supposed to focus on in

6       particular?  These are Lockheed's internal standards; right?

7                   MR. TORRES:  That's right, Your Honor.  Obviously

8       we're attempting to put building blocks out for you that are

9       going to be drawn together by other witnesses later.  There is

10      going to be testimony about government approval of various

11      standards, review of various standards, and there is going to

12      be testimony later that's offered about DOD and Air Force

13      standards relating to waste disposal that were guiding

14      operations at the site or part of contracts for programs that

15      were done at the site.  So the idea here is to lay out some

16      evidentiary building blocks for documents that are going to

17      draw together some of this material later about waste

18      disposal, which is specifically what we're focused on here.

19                  THE COURT:  Could you look at Exhibit 3, please.

20                  MR. TORRES:  Tab 3?

21                  THE COURT:  Tab 3.  The second page.  It says the

22      safety department.  That's Lockheed; right?

23                  THE WITNESS:  Yes.  Where are you looking?

24                  THE COURT:  I'm on -- the Bates stamp is 19312, 3.1.

25                  THE WITNESS:  Which document is that?

141

1          THE COURT:  Tab 3, second page.

2          MR. TORRES:  This, the manufacturing process.

3          THE WITNESS:  Okay.  And what number are you looking

4    at again?

5          THE COURT:  3.1.

6          THE WITNESS:  3.1.

7          THE COURT:  So Lockheed is responsible for cleaning

8    the tools, the items and equipment; right?

9          THE WITNESS:  Yes.

10         THE COURT:  They're supposed to monitor the

11   effectiveness of this cleaning process, they meaning Lockheed?

12         THE WITNESS:  Yes, ma'am.

13         THE COURT:  Okay.

14         BY MR. TORRES:

15   Q.  Mr. Oppliger, counsel asked you several questions about

16   whether you personally handled certain substances, propellant

17   or solvent, and the judge asked you several questions about

18   buildings you had been in.  Building 77, the oxidizer/grinding

19   building, was that a building that you were in during your

20   time --

21   A.  I'm sure I had been in the grind station at one time or

22   another, but I was never in there when the thing was

23   operating.

24   Q.  Right.  What was the -- let me ask this:  You said that

25   you knew a lot of people at the site.  Would you say that your

—142—

1    knowledge of the site was such that you could testify -- I'm

2    sorry.  Let me start that over, Your Honor.  Strike that.  My

3    apologies.

4           Would you say that, by and large, people in

5    departments knew what other people in other departments were

6    doing at the site?

7           MS. O'DONNELL:  Objection, Your Honor.

8           THE COURT:  I don't know how he can answer that.

9    Sustained.

10          Okay.  Thank you very much.

11          MR. TORRES:  Thank you, Mr. Oppliger.

12          MS. O'DONNELL:  Your Honor, I had just one or two

13   questions.

14          THE COURT:  Sorry.

15          MS. O'DONNELL:  Recross, Mr. Oppliger.  Sorry to hold

16   you up there.

17                     **RECROSS-EXAMINATION**

18          BY MS. O'DONNELL:

19   Q.  I will try to talk slower than I did the first time.

20   A.  I apologize.  I really can't hear very well.

21   Q.  No apology at all.  Like I said, attorneys, we sometimes

22   can be fire hoses.

23          THE COURT:  Okay?

24          BY MS. O'DONNELL:

25   Q.  So Mr. Oppliger, Judge Huvelle had asked you a question

—143—

1    about the second tab in your binder, the second page -- no,

2    I'm sorry.  She had asked you about the inspections page.

3    A.   The what?

4    Q.   The inspections page.

5         Excuse me just a minute.  Here it is.

6         If you look at the Bates number at the bottom

7    right-hand corner of the document, it has the number 40151 at

8    the bottom.

9         Mr. Oppliger, could you please look at page 40151.

10   A.   Okay.

11   Q.   Judge Huvelle had asked you which of those -- there are

12   several categories of inspectors listed on that sheet.  Judge

13   Huvelle had asked you which inspectors would have inspected

14   waste disposal activity.  But you don't have any knowledge of

15   which inspectors actually -- or whether -- excuse me.

16        Is it possible that -- isn't it possible that

17   inspectors did not --

18        THE COURT:  No, that's not going to fly.  Anything is

19   possible.

20        BY MS. O'DONNELL:

21   Q.   I had asked you earlier, Mr. Oppliger, whether you had any

22   specific recollection of processing standards that had

23   governed waste disposal activity.  You had said that you could

24   not identify any.  So isn't it possible that there were not

25   inspectors inspecting waste disposal activity at the Redlands

1    site?

2    A.   Yes, I suppose it's possible.  No, I don't think that's

3    very probable because everyone knows that this is a dangerous

4    material that we're working with.  Everybody that handles the

5    propellants and solvents and whatever is trained and knows

6    what to do, and there's always someone else -- there is --

7    there used to be always someone else with them at the time,

8    and they each had supervisors and managers.  So it is very

9    hard for me to think that something like that could go on

10   without being stopped.

11        THE COURT:  What something?  What do you mean,

12   something?  What are you referring to?

13        What are you assuming -- what are you saying didn't go

14   on?  I'm just not sure what you are referring to.

15        THE WITNESS:  Inspecting the waste I think was the

16   question.  Right?

17        MS. O'DONNELL:  Yes, that was the question.

18        THE COURT:  So you think there were inspections

19   conducted on waste disposal, but you don't remember who did

20   it?

21        THE WITNESS:  There had to have been, but I don't

22   remember who did it.

23        BY MS. O'DONNELL:

24   Q.   Those inspections you testified were to ensure the safety

25   of the employees?

1    A.   I'm sorry?

2         THE COURT:  This is not recross.  This is just going

3    over the same thing we went over.

4         MS. O'DONNELL:  Okay.  No further questions, Your

5    Honor.

6         THE COURT:  Okay.  Thank you, sir.  You may step down.

7         MR. MURPHY:  I would like to call our next witness,

8    Your Honor.  That is Dick Johnson.

9         THE COURT:  Which binder is he?  1 or 2?

10        MR. MURPHY:  I think number 1, Your Honor.  Our first

11   binder.

12                       **RICHARD JOHNSON,**

13   having been first duly sworn to tell the truth, the whole

14   truth and nothing but the truth, was examined and testified as

15   follows:

16                       **DIRECT EXAMINATION**

17        BY MR. MURPHY:

18   Q.   Mr. Johnson, did you prepare an affidavit in this case?

19   A.   Yes, sir, I did.

20   Q.   Is it your opinion -- giving your opinion within a

21   reasonable degree of scientific and professional certainty?

22   A.   Yes.

23        MR. MURPHY:  Your witness.

24        MR. JOHNSON:  Your Honor --

25        THE COURT:  One second, please.  These are more?

1      MR. JOHNSON:  I was about to explain that these are

2  not new exhibits, Your Honor, and I only anticipate using the

3  first three.  They're plaintiff's exhibits that were provided

4  by Lockheed, but for ease of reference, so that they'd be in

5  front of the witness and in front of yourself.

6      THE COURT:  Okay.  It's not going the way I was

7  hoping.  All I'm doing is being inundated with more paper.  My

8  goal is to have the key documents.  Now I'm losing -- are the

9  key documents the ones you're using with your witness?  I

10  don't want more and more paper and not -- it means that I

11  don't know whether I've read it or have to read it again.

12  We're trying to condense -- I was struck that you were able to

13  give me an opening that lasted an hour after all my questions.

14  But we only talked about five or six documents.  I don't know

15  whether I have seen these before.  Are they attached to his

16  affidavit?  I don't think so.

17      MR. JOHNSON:  Your Honor, the first three documents,

18  the ones that I know I will speak to, are cited in

19  Mr. Johnson's affidavit.  I can't actually recall whether they

20  were in the binder.

21      MR. MURPHY:  Your Honor, the binders are our

22  case-in-chief.  So as they're doing cross, they may be using

23  additional documents that we didn't put in our binder for

24  their case.  So I guess that's the difficulty we're having.

25      THE COURT:  Oh, this is the government's.  All right.

1    I find an exhibit I want to talk to the witness about, but

2    before I know it, I'm losing it.

3              One second.

4              (The court conferred with the law clerk.)

5              THE COURT:  So your exhibits, you say, are referenced

6    in but are not part of his affidavit?

7              MR. JOHNSON:  Your Honor, they're cited in his

8    affidavit, I believe in the text and then in a footnote.  I

9    just don't know if they were included on the disk.  Some of

10   the hyperlinks did not connect to documents, some did, but by

11   now they have all been provided.

12             THE COURT:  I'm trying to say where.

13             MR. JOHNSON:  I'm sorry.

14             THE COURT:  That's what I'm asking Mr. Murphy.  They

15   are PX documents, so all of them except the ones at the end

16   here...

17             MR. MURPHY:  These are the binders the United States

18   just gave me, Your Honor?

19             THE COURT:  Yeah.

20             MR. MURPHY:  I believe some of these -- the first

21   three documents, Your Honor, I think are in our "Control over

22   waste" section in binder 1.

23             THE COURT:  Okay.

24             MR. MURPHY:  And "Ownership of materials" in binder 1.

25             THE COURT:  Okay.  Go ahead.

1          MR. JOHNSON:  Thank you, Your Honor.

2                        **CROSS-EXAMINATION**

3          BY MR. JOHNSON:

4    Q.   Good afternoon, Mr. Johnson, it's good to see you again.

5    A.   Good to see you, sir.

6    Q.   Just a couple preliminaries.  When I refer to ammonium

7    perchlorate, I'm going to be using the acronym AP.

8    A.   AP, yes.

9    Q.   I just want to make sure we're clear on that.

10         Then, also, just to let you know, I may be using the

11   word "Lockheed" even though at the time it may have been Grand

12   Central Rocket or Lockheed Propulsion Company.  Okay?

13   A.   Understood.

14   Q.   Thank you.

15         Mr. Johnson, Lockheed performed hundreds of contracts

16   at the Redlands site, isn't that fair to say?

17   A.   It's likely it was hundreds, if not thousands.

18   Q.   It could have even been thousands?

19   A.   It could have been.

20   Q.   But you don't know exactly how many?

21   A.   We do not.

22   Q.   Now, of those hundreds, perhaps thousands of contracts,

23   you have seen less than 20?

24   A.   I have now seen perhaps three.  And let me explain that.

25   I recently reviewed a whole collection of what are called I

1   think MPOs.  They are not contract documents themselves, but

2   they describe identifiable contracts, and they are reasonably

3   reliable evidence that a contract of a certain nature was in

4   existence.

5   Q.   MPO, that is manufacturing -- excuse me.  Do you know what

6   MPO stands for?

7   A.   The acronym escapes me.

8   Q.   Okay.  But the MPO is not the contract itself; correct?

9   A.   Is not the contract itself.

10  Q.   Of the actual contracts you've seen, how many have you

11  seen that were complete?

12  A.   It's impossible -- virtually impossible to say that any

13  contract that we saw was complete because they're so old.

14  Contracts have modifications to them that may take place over

15  a period of years, and I don't think we saw those.  In some

16  cases, we saw only the modifications and not the original

17  contract.

18  Q.   So of the thousands, potentially thousands of contracts

19  that Lockheed performed at the site, you may not have seen one

20  complete contract?

21  A.   There is a very limited database in this case.

22  Q.   So you may not have seen one complete contract?

23  A.   I cannot assure you that any contract that I saw was

24  absolutely complete.

25  Q.   Okay.  And you believe that most of the contracts at the

1    Redlands site were government contracts; is that correct?

2    A.  I do, yes, or subcontracts.

3    Q.  I'm sorry?

4    A.  Or subcontracts.

5    Q.  So to be a government contract, it would have to be a

6    prime contract where Lockheed contracted directly with the

7    government?

8    A.  A prime contract would be between Lockheed and the

9    government, and a subcontract would be between Lockheed and a

10   government prime contractor.

11   Q.  And for instance, in this case, you know that Lockheed

12   contracted with Boeing, for instance, for the SRAM program;

13   correct?

14   A.  That is correct.

15   Q.  So Boeing contracted as the prime contractor with the

16   government, that was a government contract; correct?

17   A.  Yes.  I'm not sure we've seen that contract.

18   Q.  Understood.  Then Lockheed contracted with Boeing as a

19   subcontractor?

20   A.  That's correct.

21   Q.  Do you consider that contract a government contract?

22   A.  In the broadest sense, yes.

23   Q.  Okay.  And you can't say which percentage of the

24   government contracts in the broadest sense that Lockheed

25   performed were prime contracts?

1    A.   I cannot give you any kind of exact percentage.

2    Q.   And in the same vein, you can't give any kind of

3    percentage how many were fixed-price type contracts?

4    A.   That's correct.

5    Q.   But you do know that the government preferred fixed-price

6    type contracts?

7    A.   The government always prefers fixed-price type contracts.

8    Q.   And a fixed-price type contract is where the price is

9    negotiated in advance for certain products and services;

10   correct?

11   A.   The price is either negotiated in advance or, in some

12   cases, it's simply an advertised competitive contract in which

13   there is no negotiation.

14   Q.   And on the other side of that coin, the cost type contract

15   is where the government agrees to pay the costs incurred in

16   performing the contract; is that correct?

17   A.   It undertakes to pay the allocable and allowable cost.

18   Q.   Allocable and allowable to that particular contract;

19   right?

20   A.   Yes.

21   Q.   So you agree that the majority -- knowing that the

22   government prefers fixed-price contracts, and from the

23   documents you've reviewed, you believe the majority of the

24   government contracts Lockheed performed at Redlands site were

25   fixed-price type contracts?

1    A.   We have some evidence which is to that effect, and that

2    would be consistent with what I would expect.

3    Q.   Can I take that as a yes, that it is your opinion the

4    majority of the contracts performed by Lockheed at the

5    Redlands site were fixed-price contracts?

6    A.   Yes, I think that is a fair conclusion.  Excuse me.  Or

7    subcontracts.

8    Q.   Certainly.  And just as far as jumping ahead a little bit

9    to the title issue, you agree that if it is a fixed-price

10    contract without progress payments, the government never took

11    title over materials Lockheed used to perform the contract?

12    A.   No title transfers on a fixed-price contract unless the

13    progress payment clause is in there.

14    Q.   And progress payments are made; correct?

15    A.   Yes, that's true.

16    Q.   So even if the progress payment clause is in there, if no

17    progress payments are made, the government does not take title

18    over material?

19    A.   That would be true if that ever happened.

20    Q.   Understood.  I want to talk a little bit about residual

21    property.  You agree, first, that there is no such thing as

22    residual property for a fixed-price contract; right?

23    A.   No, there is residual property.  There is no question of

24    government ownership of it.

25    Q.   Okay.

1    A.   It exists.

2    Q.   So you agree there is no accountable residual property to

3    the government at the end of a fixed-price contract?

4         THE COURT:  Can I stop you?  We can cut short a whole

5    lot of things here.  Is there any debate -- the government

6    owns the degreaser; correct?

7         MR. JOHNSON:  Yes, Your Honor.

8         THE COURT:  The government owns the degreaser.  The

9    government owns the grinder?

10        MR. JOHNSON:  The United States owned a grinder.

11        THE COURT:  Was it the one in the building that we

12   talk about a lot, 77?

13        MR. JOHNSON:  Your Honor, I apologize.

14        THE COURT:  They call it facilities; right?  A certain

15   kind of equipment --

16        MR. JOHNSON:  Facilities contracts, Your Honor?

17        THE COURT:  Right.  So it's your position they owned

18   certain facilities, the degreaser, the grinder.  Anything

19   else?

20        MR. MURPHY:  Yes, Your Honor.  They owned mixers, dust

21   control equipment.  There is a whole list we have put forward.

22        THE COURT:  Who do you think owns the stuff that was

23   bought for the cleaning, chemical cleaning agent?  Do you have

24   an opinion?

25        THE WITNESS:  Yes, I do, Your Honor.  It depends on

154

1    which clauses were included in the contracts.  And we can

2    reach certain conservative judgments about that based on the

3    limited evidence that we have.  For example, we know that

4    in -- between 1966 and about 1970, there was a percentage of

5    cost type contracts and subcontracts in the plant that ranged

6    between, I think it was 14 and 28 or 30 percent.  All of those

7    contracts, and in my opinion all of the subcontracts that are

8    cost type, would have the government property clause for cost

9    contracts which transfers title to the government for all of

10    the material, direct or indirect, allocated to that contract.

11    So I think we know that.

12        THE COURT:  You said the majority were going to be

13    fixed price.  So what are we dealing with?  You can't quantify

14    it in terms of quantity of product; correct?

15        THE WITNESS:  No, you can't, because there's

16    insufficient data.

17        THE COURT:  Right.  And you can't even quantify it in

18    terms of how much of the contract price was going for, say, AP

19    or TCE?  All I am concerned about is TCE and AP; right?

20        THE WITNESS:  Right.  AP was in all likelihood a

21    direct charge property to the contract, and TCE was --

22        THE COURT:  If it was a cost type contract?

23        THE WITNESS:  On both kinds, because I didn't complete

24    my explanation.  If we're dealing with fixed-price contracts,

25    any sizable fixed-price contract -- and by that I mean over

1    about a million dollars and lasting beyond, say, six months --

2    would have contained a progress payment clause.  Because

3    contractors wanted progress payments, they were highly

4    desirable, and once that clause is in there, and as Darrell

5    said, a progress payment is made, then there is a transfer of

6    title.

7         THE COURT:  Okay.  What is your position on TCE at

8    these sites?  Or are you just talking about Redlands?

9         THE WITNESS:  Talking only about Redlands.

10        THE COURT:  What is your position about the title to

11   the TCE, which is just a cleaning agent?

12        THE WITNESS:  The TCE, in my opinion, would have been

13   charged indirect to the contracts, but the title passage

14   clauses that we are concerned with do pass title to an

15   allocable share of any indirect charged property.

16        THE COURT:  So are you saying it is your opinion that

17   the TCE was, before any use of this stuff, was owned by the

18   government?

19        THE WITNESS:  Not necessarily all of it, but a

20   substantial amount of it.

21        THE COURT:  And if I could just ask you this:  So

22   what?

23        THE WITNESS:  Well --

24        THE COURT:  I mean, the government pays for

25   everything.  They are paying for those people who are

1    representing Lockheed.  They're paying for the people over

2    there.  They're paying for me.  They're paying for you.  The

3    government is paying for everything.  So what difference does

4    it make where the title is?

5              THE WITNESS:  If the government has title, it is my

6    understanding -- and I'm not a person versed in CERCLA

7    matters -- that title is relevant.

8              THE COURT:  Okay.  So if you think that everything is

9    getting over and there is unused AP or TCE at the site, who is

10   supposed to -- I'm talking about unused -- not waste,

11   unused -- who does it go to?

12             You have containers filled with TCE or AP sitting at

13   the site in the '70s, unused.  It hasn't been used yet.  Who

14   has control over its disposition?  I'm not talking about

15   waste.  I'm talking about using the --

16             THE WITNESS:  It would probably be a mixture because

17   some of it would have been left over under government

18   contracts with title passage, and in that event, that residual

19   property would be the property of the government.  If not,

20   then it would be the contractor's property.

21             THE COURT:  So from your point of view, you don't know

22   whether 50 percent of this stuff over the course of use was

23   owned by the government or owned by the contractor?

24             THE WITNESS:  I can't give you a percentage, but I

25   have a judgment that it was substantial.

157

1          THE COURT:  I'm looking for -- you can't say within a

2   reasonable degree of certainty it was more than 50 percent

3   owned by the government?  Either compound?

4          THE WITNESS:  No, you cannot.

5          THE COURT:  And can you look at Exhibit 1067, please.

6   Can you put that on the screen for the witness.  It is PX

7   1067.  It was part of your binder.  This is a document dated

8   February 22, 1972.

9          Are you going to get to this, counsel.

10         MR. JOHNSON:  Your Honor, I had not intended to.

11         THE WITNESS:  Your Honor, I can't read it either on

12  this screen or the big screen.

13         THE COURT:  Here's my copy.  Look at paragraph 4 and

14  tell me what that tells you about the AP.

15         THE WITNESS:  Well, it tells me that there was

16  residual AP.

17         THE COURT:  Unused?

18         THE WITNESS:  Unused.  It doesn't tell us who owned it

19  except the fact that Lockheed is giving this information to

20  the Navy suggests to me that the Navy owned it and that

21  Lockheed is accounting for it.

22         THE COURT:  It says they want to return it to the

23  seller, don't they?

24         THE WITNESS:  For credit.  Then the credit belongs to

25  the Navy.

—158—

1          THE COURT:  Well, it doesn't say that.

2          THE WITNESS:  It doesn't say that, but that's the

3    inference I'm drawing from it.

4          THE COURT:  It's fair to say they're exercising

5    control over this unused AP, isn't it?  Lockheed?  Or not?

6          THE WITNESS:  Well, Lockheed has possession of it, but

7    that does not tell us who had title to it.  But that document

8    suggests to me strongly that it's owned by the government.

9    Otherwise, I don't see why Lockheed would be talking to the

10   Navy about it.

11         THE COURT:  Okay.  They're deciding where it's going.

12   Approximately 80,000 pounds was recycled in 1971.  That

13   already happened.  So what does that mean?  Recycled.  That

14   meant it went somewhere else to be reused by somebody; right?

15         THE WITNESS:  I don't know without reading the context

16   in which that is.  I can't . . .

17         All right.  It is outdated material that can't be

18   used.

19         THE COURT:  The 80,000 pounds?

20         THE WITNESS:  80,000 pounds.  What it is saying is I

21   think that they had already been able to recycle 80,000

22   pounds, and this is additional material.

23         THE COURT:  But that means, if it's recycled, it can

24   be used?

25         THE WITNESS:  It means the supplier is going to

1    recycle it and maybe the supplier can do something with it, so

2    the supplier probably pays some minor amount --

3              THE COURT:  You don't know.

4              THE WITNESS:  We don't know.  We can only infer from

5    what we read here.

6              THE COURT:  Okay.  So whoever had title to this stuff

7    that has been unused, they're trying to dump it back on to the

8    supplier and get money back.  I mean, title is hardly of great

9    legal significance.

10             THE WITNESS:  The money would go to the entity that

11   has title.

12             THE COURT:  Do you know that?

13             THE WITNESS:  Yes, I do know that.  If the government

14   had title to that amount, then it would be entitled to the

15   credit for the proceeds.

16             THE COURT:  They're certainly not asking permission

17   here.  They're just saying this is what we're going to do with

18   it.

19             THE WITNESS:  What I infer from that is if it was

20   Lockheed's property, they would have no reason to talk to the

21   Navy about it.

22             THE COURT:  Okay.  And after the stuff seeps into the

23   ground -- we know that it's seeped into the ground into the

24   water; there is no issue about that.

25             THE WITNESS:  Yes, ma'am.

1          THE COURT:  You agree?

2          THE WITNESS:  That's what I have been told.

3          THE COURT:  Right.  So who owns that stuff when it's

4    sloshing around in the ground in the water?

5          THE WITNESS:  The only way to answer that is to say

6    who had title to the material at the beginning and then follow

7    it through the process and see if there was any basis for

8    title to change under the clauses we're talking about.  And if

9    there wasn't, then title remains with the party who had it in

10   the first place.

11         THE COURT:  If I own a car and I have title to the

12   car, the car is demolished, what do I have title to?

13         THE WITNESS:  You still have title to, I think you

14   would call it the scrap.

15         THE COURT:  Which is useless, right?

16         THE WITNESS:  Not necessarily.  You're not going to

17   get a lot of money for it, but some scrap dealer is going to

18   give you something for it.

19         THE COURT:  Can I ask a question?  Is this title

20   question of any real interest to me?  I've got to say, it

21   absolutely eludes me.  You mean to tell me you can say the

22   government is X percent more responsible because somewhere or

23   another some of the stuff that is used on there is

24   government-owned, but then you're trying to give it back to

25   the supplier and maybe the government gets a credit.  We don't

1      know.  Can we all agree this is really not very useful?

2              MR. MURPHY:  It's arranger liability, Your Honor.

3      Under CERCLA, there is an arranger classification of

4      liability.  Congress said arranger should be liable.  That

5      arranger liability is whenever somebody owns a piece of

6      property and then gives it to someone else to dispose of, they

7      bear liability for giving it to someone else to dispose of.

8      Congress, in CERCLA, said, if you own material, you can't

9      somehow escape liability for that material by giving it to

10     somebody and having them dispose of it for you.

11             This is what the AISLIC decision is about, Your Honor.

12     The AISLIC decision looked at these same property clauses and

13     said this material was owned by the government at some point

14     in the process.  Because it was owned by the government, under

15     contract, the contractor then disposed of it for the military,

16     that makes it an arranger under CERCLA.

17             THE COURT:  We can look at the law, but I thought that

18     mere ownership was not enough.  You have to show that the

19     entity planned for disposal.  Knowledge alone is insufficient.

20             MR. MURPHY:  Where are you reading from, Your Honor?

21             THE COURT:  Burlington North and Santa Fe Railroad.

22             MR. MURPHY:  And that's a case, Your Honor, about

23     putting something into the stream of commerce.  It is not

24     relevant here.  Here, we have two people operating at a site

25     together.  We have the government owning materials while

162

1    they're being manufactured during the process.  We have a

2    contract telling us to dispose of it at our burn pits.  That

3    is what arranger liability is.

4            THE COURT:  I would like to see those contracts.  See,

5    you can't give me contracts.

6            MR. MURPHY:  Your Honor, the SRAM contracts are in the

7    record.  Those contracts incorporate the standard -- the

8    disposal clauses, Your Honor.

9            THE COURT:  Give me one example.

10           MR. MURPHY:  Of a government manual?

11           THE COURT:  The SRAM contracts you're referring to.

12   Point me to a page so I know what is significant.

13           I'm trying to get counsel to both help me figure out

14   what moves either party off the 50-50 line.

15           MR. MURPHY:  Your Honor, I'm looking for the SRAM

16   contract.  This will come out in the Nagle cross, Your Honor.

17   It will come out in this case, Your Honor.

18           Unfortunately, I think the Court is disadvantaged

19   because we haven't had findings of fact or conclusions of law.

20   Neither party has been able to sort of present their entire

21   story in a way that is helpful.

22           MR. JOHNSON:  May I speak to the issue, too, Your

23   Honor?

24           THE COURT:  Yeah, you have two minutes.  Then let's

25   get back to the witness who's sitting here.  I'm not blaming

1    the witness.

2           MR. JOHNSON:  Certainly.

3           THE COURT:  There is a lot of sort of speculating

4    about the this and the that, and its importance is eluding me.

5    And I'm the one that has to use these factors.

6           MR. JOHNSON:  I think the United States would agree

7    with the Court that this isn't helpful to the Court's

8    allocation case as far as any ownership imbued to the United

9    States due to title vesting clause or property clauses in

10   government contracts.

11          THE COURT:  Because?  It is not relevant to me because

12   I don't find it interesting or because of something else?

13          MR. JOHNSON:  Perhaps both, Your Honor.  The legal

14   reason it's not relevant is because CERCLA itself says that if

15   liability is -- that the PRP will not be found liable --

16   CERCLA states that if the potentially responsible party is an

17   owner solely by holding a secured interest in the property,

18   that does not amount to ownership.

19          THE COURT:  So you're saying you don't have ownership

20   because all you have is a secured interest in the property?

21          MR. JOHNSON:  Your Honor, what I'm saying is this is

22   analogous, or else there would be a motion on it.  But this is

23   an allocation phase where it's fairness.  And we say if you

24   look to the secured creditor exemption to CERCLA, that's

25   analogous to the situation here, where what they're trying to

164

1    do is create an analogy to arranger liability, when the only

2    reason the government had any interest in the property at all

3    was to either help finance the contractor's operations or to

4    secure its investment in the contractor's property.  It's not

5    helpful for making a waste disposal determination.

6           MR. MURPHY:  But, Your Honor, we're not here talking

7    about -- there's ownership of facilities from which the

8    release occurred, the grinder.

9           THE COURT:  You're the owner of the whole facility,

10   the equipment, and then I seem to be spending a lot of time on

11   who owns something that is not worthwhile -- worth anything.

12          MR. MURPHY:  But the question, Your Honor, is one --

13   you have to look at the arranger case law.  Burlington

14   Northern is the Supreme Court's latest decision on that.  They

15   were addressing putting products into the stream of commerce

16   in Burlington Northern, Your Honor.  Here you look at the

17   AISLIC decision on arranger and other standard arranger cases

18   out there.  It's clear that -- arranger was passed to close

19   this loophole, from having a party own waste and then not have

20   any responsibility from giving it to somebody to dispose for

21   them.

22          And that's what happened here, Your Honor.  These were

23   government-owned materials, that ownership is important to the

24   question of liability under CERCLA.  Because the government

25   owned it and we disposed of it for them, that doesn't mean

1       they're not liable under CERCLA anymore.  That means they're

2       an arranger because they contracted with us to dispose of it.

3               THE COURT:  Well, hypothetically -- and I am not

4       suggesting this is the case -- but they say you have to get

5       rid of this stuff at the end of the contract.  So apparently,

6       at least as to some of it, you tried to dump it back onto the

7       supplier, which is perfectly logical.  That might get you some

8       money back.

9               MR. MURPHY:  Yes.

10              THE COURT:  And then some of it lands back in the

11      ground.  Under your theory, the government -- if you had not

12      used best practices or had been negligent -- which is not the

13      claim, I understand -- but had you, you're going to say the

14      arranger should be responsible?  Hypothetically.

15              MR. MURPHY:  Hypothetically, Your Honor, if they can

16      point to anything that we did that potentially we shouldn't

17      have been doing at the time, then I could say yes, that could

18      enter into your equitable allocation.

19              THE COURT:  So would you say -- let's just say you

20      didn't do anything wrong, the burn pits were okay.  And I

21      understand your argument that that was -- I don't know how the

22      government is going to possibly tell me that you should have

23      been using burn pans.  I just don't see it.  I mean, burn

24      pits -- so Cape Canaveral was using burn pans.  But you used

25      burn pits, and it appears that that was not uncommon.

1           So you put all this stuff there.  So you disposed of

2     it.  So in some fashion, because the government owned this

3     stuff that you were putting there -- I mean, you can say the

4     government is liable because everybody is using burn pits so

5     we're at the 50 yard line.  But otherwise, who cares whether

6     the government owned the stuff you were putting in the burn

7     pits?

8           MR. MURPHY:  Because it makes them an arranger under

9     CERCLA.  And that's what Congress said, Your Honor.

10          THE COURT:  Can you write me a five-page memo on this?

11          MR. MURPHY:  Yes, Your Honor.

12          THE COURT:  Because this is not the law that's been

13     cited to me.

14          MR. MURPHY:  Okay.  Yes, Your Honor.

15          THE COURT:  If you could just do something about that.

16     Okay.  Go ahead.  I just feel as though I'm chasing

17     butterflies.  Okay.

18          And you base your opinion on five contracts out of a

19     thousand; is that --

20          THE WITNESS:  Not five, Your Honor.

21          THE COURT:  30?

22          THE WITNESS:  About 30.

23          THE COURT:  But there could be up to a thousand?

24          THE WITNESS:  There could be.  But we do have

25     evidence.  We know that some of the contracts were extremely

1     large and that they had -- for example, the SRAM subcontract,

2     which went on for six or seven years, was fixed price with a

3     progress payment clause.  It was a huge contract, I think

4     several hundred million dollars.

5              THE COURT:  Does the ownership, say, of any of these

6     chemicals at the end of the day, after all the progress

7     payments are made, who owns?  Still the government?

8              THE WITNESS:  All right.  When the progress payments

9     are paid back, title reverts to the contractor.

10             THE COURT:  When does that happen?

11             THE WITNESS:  It happens at the end of every contract.

12    But what we have here is, as a practical matter, overlapping

13    contracts, one on top of the other.

14             THE COURT:  If you assume with me that Lockheed is out

15    of this process and out of these sites and out of the

16    business, they lost the contract to some other company in

17    about mid-'75?

18             THE WITNESS:  At the end it reverted, title reverted

19    under the progress payment clause.

20             THE COURT:  So what does that mean in terms of your

21    analysis for what happened to the substances prior to '75?

22    You're saying the fact they had title in '69 is relevant even

23    if it reverted -- if the government had title in '69 under

24    your theory, but it reverted to Lockheed when the contract was

25    over in '75 -- I'm using '75 loosely -- then it goes back to

1   Lockheed.  So who cares --

2          THE WITNESS:  Well, it is not the same material, Your

3   Honor.  There's a constant flow --

4          THE COURT:  Flow.

5          THE WITNESS:  -- of materials, so that in 1965

6   Lockheed may have had fixed-price contracts with progress

7   payment clauses, and at the end of those contracts what's left

8   over would revert then to them, and you wouldn't have to wait

9   until 1972 when they closed the plant, whatever the year is

10  when they closed the plant.  You would have a constant pattern

11  of a contract finishing, progress payments are paid back,

12  title reverts, now there is a new contract.  Everything gets

13  allocated to the new contract.  And these contracts overlap

14  each other.  They don't -- they don't -- one doesn't end and

15  then the next day the second one begins.  They overlap like

16  shingles on a roof.

17         THE COURT:  Hypothetically, if you've got a contract

18  that is going from '66 to '68 --

19         THE WITNESS:  Yes.

20         THE COURT:  -- and you're buying this fluid, TCE, just

21  assume with me that this is what you are purchasing under the

22  contract with progress payments, and the end -- but you don't

23  use it all.  But then you get another contract that goes from

24  '66 to '69.  Does the TCE revert to the contractor in '68 or

25  does it go to a different contract?

1          THE WITNESS:  In my opinion, it would be allocated to

2     the new contract.  But I think that is a very simple example.

3     I mean, it is much more complicated than that because you have

4     a lot of contracts going on at the same time with different

5     clauses, so it gets very complex.

6          THE COURT:  It certainly does.  So at any point -- any

7     day you would be hard-pressed to know exactly who owned what?

8          THE WITNESS:  It depends on whether you're dealing

9     with the AP or the TCE.  The AP is charged, in my opinion -- I

10    think Mr. Nagle's opinion, it is charged direct to the

11    contract, so it is tracked.  You have a property record that

12    tracks that.  The TCE, if it is charged indirect -- and I

13    think we both agree on that -- you do not track it.  It's in

14    the plant, it gets used on everything, and you can't go to a

15    particular bucket of it, if that's what it is, and say, well,

16    that is the government's TCE.  You can't do that because of

17    the indirect cost problem.

18         THE COURT:  Let's go to the AP.  You have to bear with

19    me because I'm just learning all this now.

20         AP is charged directly to the contract.  It is

21    tracked.  So it is your position if the contract that governs

22    the -- if it is '65 to '68, at the end of the contract in '68,

23    does it go somewhere?

24         THE WITNESS:  Well, it depends if it's a cost contract

25    or fixed price.  If we're talking fixed price with progress

1    payments and AP is left over at the end of that contract, and

2    progress payments are paid back, then Lockheed reacquires the

3    title to that remaining AP.

4         Now, it may at that point be allocated to a new

5    government prime or subcontract.  We can't tell that.  But in

6    a plant that has a constant succession of contracts, that is a

7    likelihood.

8         THE COURT:  Is what?

9         THE WITNESS:  That it would just go on to the next

10   contract.

11        THE COURT:  I'm having trouble understanding the

12   difference that you're drawing, the distinction between AP and

13   TCE, when you say one is tracked and one is not tracked.

14        THE WITNESS:  It is a government contract cost

15   accounting concept.  It simply says that property -- materials

16   that are charged direct to a contract, the contractor has a

17   record of that and can always tell you how many pounds of this

18   material went on that contract.

19        When we're talking about TCE, in all likelihood

20   Lockheed purchases that and charges that amount to its

21   overhead account.  At that point, no one tracks -- nothing in

22   the accounting system tracks where that TCE is going to go.

23   And that's just an accounting device, that an indirect charged

24   property, you don't try to follow it around because it would

25   be an impossible task.

1          So at that point we lose sight of exactly where each

2    shipment of TCE went.  We only know it went into the plant,

3    that it was -- it was owned in part by the government if it

4    was a progress payment clause, and that it was used generally

5    in the plant, and some of it may have been left over at the

6    end.

7          MR. JOHNSON:  Your Honor, I do try and break this down

8    into bite-sized chunks.  I can't say for sure it will be more

9    understandable, but I can --

10         THE COURT:  I'm just trying to understand the

11   difference, and I think I do.

12         So at the AP, it says the supplier will not accept

13   ground AP or potentially contaminated material.  When they

14   grind it up is when the ammonium --

15         THE WITNESS:  Yes, I understand, right.

16         THE COURT:  So what, they're trying to get the

17   supplier to take -- they won't accept ground AP --

18         THE WITNESS:  I think you're dealing, Your Honor, with

19   scrap, and it is scrap AP, and it may have a value.  The

20   supplier -- apparently they're in some discussions with the

21   supplier about whether the supplier will take it back or not

22   take it back.

23         THE COURT:  Right.

24         THE WITNESS:  But it's scrap.

25         THE COURT:  So no one is tracking that?

—172—

1          THE WITNESS:  Well, they may well be tracking it

2     because we have a document that discusses -- as I understand

3     it, we have a document that discusses what Lockheed is

4     planning to do, and that's what suggests to me that the

5     government has an interest in it.

6          THE COURT:  Okay.

7          MR. JOHNSON:  Your Honor, if I could speak to the

8     document brought to the witness's attention, Plaintiff's

9     Exhibit 1067.  Unfortunately, the witness doesn't have a copy.

10    May I hand him this copy?

11         THE COURT:  What I just showed him?

12         MR. JOHNSON:  Yes, Your Honor.

13         THE COURT:  No, he doesn't have a copy.

14         MR. JOHNSON:  Do you mind if I approach and give him

15    this one?  May I approach the witness and give him this copy?

16         THE COURT:  Sure.  You don't have to ask for

17    permission.

18         BY MR. JOHNSON:

19    Q.   Mr. Johnson, directing your attention to the first

20    paragraph labeled 1, this letter written by the Lockheed

21    Propulsion Company says, "In response to your inquiry of

22    7 February 1972."

23         Did I read that correctly?

24    A.   Yes, I have that.

25    Q.   Now, you talked about an obligation on the part of the

1  contractor to track directly charged property; correct?

2  A.  Yes.  And --

3  Q.  Well, just --

4  A.  Just one tail on that.  Once the property goes into

5  production and if it produces scrap at the end, that may all

6  get commingled.

7  Q.  Certainly.  For a cost type contract, the contractor is

8  required to track directly charged property; correct?

9  A.  It knows how much directly charged property it put on any

10  particular contract, yes.

11  Q.  And at the end of that contract, it's required to provide

12  an inventory to the government of any residual property that

13  was directly charged to the contract; correct?

14  A.  That's correct, too.

15  Q.  So, first, if this was ammonium perchlorate, if this

16  letter was in response to ammonium perchlorate that had been

17  directly charged to a cost type contract of the government,

18  Lockheed would have been required to provide that inventory

19  schedule without an inquiry from the government; isn't that

20  correct?

21  A.  It depends whether the AP is a residual property or in the

22  nature of scrap.

23  Q.  Okay.

24  A.  But paragraph little i of the clause, I think it's the

25  1965 clause, gives explicit instructions on what to do; and

1    one of them is prepare an inventory of residual property.  And

2    then it also has language that says here's what you do about

3    scrap.

4    Q.   Right.  And scrap, they either have to include it on an

5    inventory schedule and request disposition instructions from

6    the government, or dispose of it in accordance with its

7    approved disposal procedures, selling it and crediting it to

8    the government?

9    A.   Yes.  You're paraphrasing some explicit language in

10   paragraph i of that clause.  I don't know if that is precisely

11   correct, but I think in substance that's what it says.  It

12   does say that in the case of certain types of scrap -- and it

13   includes in that definition waste -- the contractor can

14   basically accumulate it and try to dispose of it, and if the

15   contractor gets any money in return for it, that would get

16   credited to the government through overhead.

17   Q.   Okay.  Now, you don't know --

18            THE COURT:  How long do you think your cross will be?

19   I have to take a break for the reporter.

20            MR. JOHNSON:  Your Honor, about an hour, I'm thinking.

21            THE COURT:  We will take a break, ten minutes, please.

22            Please do not discuss your testimony.

23            THE WITNESS:  Yes, ma'am.

24            (Recess taken from 3:27 to 3:58 p.m.)

25            MR. JOHNSON:  Your Honor, to answer the Court's

1      question earlier, in the United States binder number 2, the

2      ownership attachment, we identify United States Exhibits 26,

3      27, and 28, indicating the United States did not own the

4      grinder in building 77.  There were two grinders owned by

5      Lockheed Martin Corporation in building 77.

6                  BY MR. JOHNSON:

7      Q.  Mr. Johnson, returning briefly back to Plaintiff's Exhibit

8      1067, the letter you had before you.  You have not seen the

9      inquiry from the government that was dated 7 February 1972;

10     correct?

11     A.  That's true.

12     Q.  You don't know what they were asking for or why?

13     A.  Well, I have a much better idea now because I was finally

14     able to read the entire document.

15                 THE COURT:  I'm sorry.  That's my fault.

16                 THE WITNESS:  And it's very clear what was going on

17     here, and it has absolutely nothing to do with who owns what.

18     It had nothing to do with title.  It has nothing to do with

19     Navy contracts.  It was a joint Army-Navy-Air Force task force

20     that was charged with looking into pollution from this type of

21     material, and it was basically doing a survey.  The document

22     does tell us a great deal about how Lockheed was handling some

23     of the stuff, but that's all it does.

24                 BY MR. JOHNSON:

25     Q.  Thank you.  Now, we were also talking a little bit about

176

1    when there is residual property to a cost type contract and

2    Lockheed Martin's responsibility to provide an inventory or

3    account for that property.  Do you recall that?

4    A.   Yes.

5    Q.   In that inventory, at times Lockheed Martin or a

6    contractor providing the inventory could make an offer to

7    purchase that residual property; correct?

8    A.   Yes, it could.

9    Q.   If the government accepted that offer, the contractor took

10   title over that property upon payment?

11   A.   If the contractor purchased it, of course.

12   Q.   Now, you also stated in response to the Court's question

13   that it is your opinion that AP was charged to the government

14   contracts as direct costs; correct?

15   A.   That's my opinion.  I think Mr. Nagle's opinion, too.

16   Q.   You can't say for sure whether ammonium -- sir, I would

17   ask you to restrict your answers to your own opinion.

18   Mr. Nagle will have an opportunity to testify, as well.

19        You can't say for certain whether AP was always

20   charged as a direct cost to government contracts; right?

21   A.   With absolute assurance, you can't do that.

22   Q.   Okay.  And a direct cost is one that is allocable only to

23   that particular contract; right?  Costs incurred for that

24   particular contract?

25   A.   It's a particular cost allocated only to that contract.

1    It represents an identifiable item.

2    Q.   Thank you.  And on the other side of it, indirect cost is

3    a cost incurred that, to use the parlance, is allocable to

4    multiple cost objectives, which could be multiple contracts or

5    independent research and development; right?

6    A.   That's very accurate, very good.

7    Q.   Thank you.  So assuming Lockheed had a government contract

8    to manufacture rocket motors, and as part of performing that

9    contract Lockheed purchased 500 pounds of ammonium

10   perchlorate, or AP, from a supplier, if that was a cost

11   reimbursement contract, Lockheed could charge the cost of that

12   ammonium perchlorate as a direct cost to that cost type

13   contract as soon as the cost was incurred, so long as all of

14   that cost was allocable to that contract; correct?

15   A.   Yes.

16   Q.   And pursuant to the government property clause for cost

17   reimbursement contracts, the government would take title of

18   that AP; right?

19   A.   That is correct.  It's paragraph C of that clause.

20   Q.   Okay.  And the timing of that would depend.  It could

21   either take title to that when the government was -- when the

22   government reimbursed the contractor for that cost, or when

23   the AP was delivered by the supplier, whichever is sooner;

24   correct?

25   A.   There's a number of triggers.  You've named two of them.

—178—

1    But in every case it's the earliest of whichever of those

2    triggers is pulled.  And it could be delivery by the vendor is

3    one trigger, allocation out of inventory is another trigger,

4    payment or reimbursement is yet another.

5    Q.   Okay.  I was going to speak to that, because that's what

6    I'm trying to do is point out that the timing of government

7    title and how long it lasts isn't always the same.  Lockheed

8    could choose, when it purchased that ammonium perchlorate for

9    that same cost type contract, to simply put that 500 pounds in

10   its own stores and charge it as an indirect cost as it

11   allocated the ammonium perchlorate to the contract; isn't that

12   correct?

13   A.   Not in my opinion, no.

14   Q.   And why not?

15   A.   Because in my opinion, the AP is properly only a direct

16   charge.

17   Q.   Okay.  But if they were performing multiple contracts and

18   Lockheed wanted to keep control over their allocation of that

19   500 pounds of ammonium perchlorate, they could purchase it and

20   place it in their own stores, retaining title and control over

21   that ammonium perchlorate; isn't that correct?

22   A.   As long as it was in their inventory, they would have

23   complete ownership and control of it.

24   Q.   And at that time, they could allocate a portion of the AP

25   to that cost type contract, and at that time the government

179

1   would take title?

2   A.   Would take title to the amount that was allocated to that

3   particular contract.

4   Q.   Thank you.  And we agree, and we spoke to this before, but

5   if Lockheed had purchased that AP to perform a fixed-price

6   contract, government contract with no progress payments,

7   Lockheed would have retained title over that AP throughout

8   production of the --

9   A.   No title would transfer in that case.

10  Q.   And if Lockheed had purchased that ammonium perchlorate,

11  or AP, to perform a fixed price contract with progress

12  payments, the government took title when a progress payment

13  was made?

14  A.   At the date of the first progress payment the government

15  would take title to everything.

16  Q.   But under that fixed-price contract with progress

17  payments, at the end of that contract, any residual AP not

18  incorporated into the end product would revert back to

19  Lockheed?

20  A.   Not only residual but any scrap that had not been disposed

21  of.

22  Q.   Thank you.

23       THE COURT:  I'm sorry.  You're saying if they bought a

24  bunch of -- 500 pounds of AP and put it in their inventory,

25  even if it was a cost reimbursement contract, the government

1    doesn't get ownership until the end of the contract?

2            THE WITNESS:  No, Your Honor.  The government gets

3    ownership as soon as any of that AP is allocated out of

4    inventory and put on a contract.

5            THE COURT:  But we have no idea whether any of that

6    happened here?

7            THE WITNESS:  We do know that contractors shy away

8    from having large inventories of this kind of material, or any

9    material, because it represents an investment of funds

10   entirely on their account with no productive use.  So

11   contractors do try to keep inventory as small as they possibly

12   can.

13           BY MR. JOHNSON:

14   Q.   Again, if they're performing fixed-price contracts with no

15   progress payments, the size of their inventory is going to be

16   borne by themselves anyway; is that correct?

17   A.   That's true.  There is no title transfer in a fixed-price

18   contract with no progress payments clause and no progress

19   payments.

20   Q.   And there is no title transfer when Lockheed purchases

21   ammonium perchlorate to perform its own independent research

22   and development work; isn't that correct?

23           THE COURT:  I can accept all these principles, but how

24   do we know what happened in fact?  Nobody really can answer

25   that.  I mean, all these hypotheticals are just hypotheticals

1    that there will be no facts about; right?

2             MR. JOHNSON:  Your Honor, the point of the

3    hypotheticals -- and I can certainly move forward --

4             THE COURT:  Yeah, is that no one knows.  He has some

5    feeling about certain contracts, but beyond that, he really

6    doesn't know.  I suspect your expert won't know either.

7             MR. JOHNSON:  Exactly.  What I'm trying to point out

8    is all the reasons that make it unknowable and unhelpful to

9    the Court.

10            THE COURT:  You don't have to persuade me about that.

11   I understand that.  It is unknowable.

12            MR. MURPHY:  On redirect, Your Honor, we will present

13   evidence of what happened at the facility and how they managed

14   this AP.

15            THE COURT:  On redirect of him?

16            MR. MURPHY:  Yes.

17            THE COURT:  All right.  Then wait and see.  I mean, I

18   understand it depends on whether it is contract A, B, C, D, E,

19   F type, and we don't really have much sense.  And I think I've

20   made the point that I understand this could have a lot to do

21   with liability, but how much it has to do with equity just

22   escapes me.  But go ahead.  Be merciful.

23            THE WITNESS:  I will try, Your Honor.  You asked IR&D.

24   That's normally a tiny percentage, it might be 1 percent,

25   1-1/2 percent of what is going on in the plant at any

1    particular time.  And my view has always been, which may be

2    erroneous, that title doesn't transfer to material that is

3    acquired for IR&D, but I have seen statements to the contrary.

4    Q.   Okay.  But we do know IR&D was conducted by Lockheed at

5    the Redlands site; correct?

6    A.   I don't know that as a fact, but it would be normal for

7    them to do so.

8    Q.   And just to reiterate the point made by the Court is you

9    can't shed any light on the percentage of ammonium perchlorate

10   or what proportion of the ammonium perchlorate or AP that was

11   used by Lockheed at the Redlands site to which the government

12   took title?

13   A.   You said can't shed any light.  I think I can shed light.

14   Q.   Let me say you can't quantify.

15   A.   I cannot quantify it in an exact amount.  I think I can

16   shed a lot of light.

17   Q.   You can't say, also, as far as when the government owned

18   any particular amount, any specific amount of AP at the site?

19   A.   Not any particular amount because we have no evidence here

20   of any particular amount.

21   Q.   Okay.  Moving to TCE, you believe that TCE was likely

22   charged as an indirect cost --

23   A.   That would be my opinion, yes.

24   Q.   And that's because TCE is a solvent that kind of has a

25   general purpose and can be used for multiple cost objectives,

—183—

1    as they say?

2    A.   Well, TCE is not, as I understand it, incorporated as a

3    component of rocket engines.  It is used as a solvent for

4    various purposes in the plant, and I'm not sure what all those

5    purposes are, but that would be consistent with it being

6    charged as an indirect cost.

7    Q.   And it is your opinion that the government took title to

8    the TCE even though the TCE was charged as an indirect cost to

9    the government when there was a cost type contract?

10   A.   It's my opinion that the government took title to an

11   indivisible percentage of TCE that is equivalent to the value

12   of the indirect cost of TCE that was allocated to government

13   contracts.  That's a kind of long answer, but that's the way

14   it is.

15   Q.   And that indivisible portion you cannot testify as to --

16   quantify that to say how much TCE the government may have

17   taken title to as a result of it being indirectly charged to

18   government cost reimbursement or fixed-price contracts with

19   progress payments?

20   A.   I cannot give you an exact percentage.  It comes back down

21   to shedding light or not shedding light.

22        THE COURT:  Does the government abandon its title ever

23   to these things?

24        THE WITNESS:  Yes, it can.  It can, Your Honor.  There

25   is a concept called abandonment, but in my opinion, it cannot

1    be done unilaterally; it requires consent.  And you can

2    imagine why that is the case, because the government could,

3    for example, to take an extreme case, the government could

4    have a leftover nuclear weapon and they just call Lockheed up

5    and say we would like to abandon this and you take care of it.

6    Lockheed would probably say, or Boeing or anybody, wait a

7    minute, that is going to cost me a lot of money and you can't

8    do that to me unilaterally.

9          THE COURT:  Just look at this document, which is

10   Plaintiff's 1073, and can you explain to me what is going on

11   there with the AP.

12         THE WITNESS:  Yes, Your Honor.  1073 is a perfect

13   example of this.  It is a letter from this DCAS outfit that's

14   been mentioned before, and it's talking about desiring to

15   abandon certain property to Lockheed.  We don't know what that

16   property is.

17         THE COURT:  Look at the schedule.  Doesn't it tell

18   you?

19         THE WITNESS:  It doesn't --

20         THE COURT:  Look on the back.

21         THE WITNESS:  -- tell us what it is.

22         THE COURT:  You have to look at the other pages.  I

23   gave you the whole thing.

24         THE WITNESS:  All right.  We've got one page, it looks

25   like aluminum, ammonium perchlorate and some other chemicals

1    and some miscellaneous items, and it is an abandonment.

2           THE COURT:  It is or is not?

3           THE WITNESS:  It is an abandonment, and the

4    interesting fact is that it requires the consent of Lockheed,

5    which is given at the bottom --

6           THE COURT:  They gave consent?

7           THE WITNESS:  They gave consent, but they didn't have

8    to give consent.

9           THE COURT:  But there's an instance where there is

10   some quantity of AP that the government no longer has title to

11   as of '75.

12          THE WITNESS:  That would be correct.  If Lockheed

13   accepted the abandonment, then it would acquire title.

14          THE COURT:  So as to at least -- I don't know what

15   quantities we're dealing with, but we have quantities -- 5,750

16   pounds, I think.  So if there are more of these, this

17   undercuts your statement about who owns what at the end of the

18   day.

19          THE WITNESS:  If there were more.  That's the only one

20   I have seen.

21          THE COURT:  But we all admit we don't have a complete

22   deck.

23          THE WITNESS:  We don't know.

24          THE COURT:  Okay.

25          BY MR. JOHNSON:

1    Q.   Just to shed a little bit more light with context to

2    Plaintiff's Exhibit 1073, we were talking earlier about --

3    that's the document you have right before you --

4    A.   I gave it back to Her Honor, so I don't have it anymore.

5    Q.   Let me hand you my copy.

6         THE COURT:   I think I've got what I want.  Don't I?

7    I've learned what I need to learn.

8         MR. JOHNSON:   Certainly, Your Honor.  The only thing I

9    want to make it clear, and I will do it with the question,

10   that's the inventory schedule, that was what was used to --

11        THE COURT:   Here.  Here you go.

12        BY MR. JOHNSON:

13   Q.   The inventory schedule that lists the AP and other items,

14   that's the document, or that's an inventory schedule that we

15   were discussing earlier that the contractor was required to

16   provide when there was residual property to a cost type

17   contract; correct?

18   A.   I haven't had a chance to review the inventory schedules,

19   and since I messed up on the earlier document, I'm very

20   hesitant to say what this is unless you allow me to actually

21   read it.

22        THE COURT:   It says it's an inventory schedule,

23   doesn't it?

24        BY MR. JOHNSON:

25   Q.   It would be fair to say an inventory schedule would not be

—187—

1    required for a fixed-price contract without progress payments;

2    correct?

3    A.    True.

4    Q.    And for --

5    A.    It wouldn't be required for a fixed-price contract with

6    progress payments either.

7    Q.    Right.  So the only reason would be if it was charged as a

8    direct cost to a cost reimbursement contract?

9    A.    I think that's correct.

10   Q.    Okay.

11   A.    These schedules, by the way, look like they deal with the

12   abandonment.  Whether they are the exact same schedule that

13   would be submitted at the end of a cost type contract, I can't

14   be sure.

15   Q.    Okay.  Thank you.

16         Taking -- what I would like to do is discuss the

17   results of your opinion that the government takes title -- the

18   Court will take back the exhibit.

19         The results of your opinion that the government takes

20   title to indirect charged materials.  Indirect charged

21   materials can include things like -- would include things like

22   lightbulbs or brooms and those kinds of things?

23   A.    It includes every physical item that is purchased with

24   overhead funds.

25   Q.    And --

1    A.   It gets ridiculous and --

2    Q.   Certainly.

3    A.   Yeah.

4    Q.   Focusing on the property aspect of it, according to the

5    contracting rules, accounting rules, indirect charged

6    materials are deemed consumed in the year that they are

7    allocated to a government contract; correct?

8    A.   That's an accounting convention that is followed in

9    government contract cost accounting.  And what it means is

10   once an item is charged to overhead, the accounting system

11   simply loses sight of it.  It can't go out and find it in the

12   plant.

13   Q.   Correct.

14   A.   So as a convention, it says we'll just assume that it was

15   all consumed by the end of the year in which the cost was

16   charged.

17   Q.   But in reality, certainly oftentimes that indirectly

18   charged property still exists?

19   A.   In reality, it can frequently -- certain types of it can

20   frequently continue to exist.

21   Q.   For instance, if it was a broom that was charged

22   indirectly to a government contract, at the end of that year,

23   Lockheed would still have the broom presumably?

24   A.   Lockheed would presumably still have it.  Perhaps not in

25   pristine condition.

1    Q.   Even after all the government contracts that were

2    allocated a portion of the cost of that broom had closed,

3    Lockheed could still have the broom?

4    A.   It's possible.

5    Q.   And Lockheed could continue to use the broom while

6    performing subsequent contracts?

7    A.   Yes, it could, because no control is exercised over it.

8    Q.   And no subsequent contracts, because all the costs

9    incurred for that broom -- Lockheed would not incur any

10   additional costs for that broom, no subsequent contract would

11   ever be allocated any cost associated with that broom;

12   correct?

13   A.   Well, if we're assuming that the government in an indirect

14   cost paid the cost of the entire broom, which would be

15   unlikely, I think the government's title now would persist.

16   Q.   Would persist?

17   A.   Even though from an accounting standpoint we don't look at

18   it anymore.  But the most likely thing is that the government

19   has only paid 40 percent or 60 percent or 20 percent of the

20   cost of that broom, so you can't go look at the broom and say

21   who owns what percentage of it.

22   Q.   Right.  But it's your opinion that the government's title

23   persists to it even though the contracts that were allocated a

24   portion of those funds had closed long before?

25   A.   That's my opinion.

1    Q.   And even though Lockheed would be free to discard the

2    broom if it chose to?

3    A.   It would in the normal course, certainly.

4    Q.   And even if Lockheed chose to sell the broom, Lockheed

5    would be free to sell the broom?

6    A.   That's an interesting question.  I really -- I don't know.

7    Q.   Okay.  And in your opinion, as you stated in your

8    affidavit, testimonial affidavit, you state that the

9    contracting regulations are silent as to reversion of consumed

10   property.  Correct?

11   A.   The regulations and the clauses are silent about it,

12   that's right.  And that's why I'm quite hesitant about what

13   happens to your broom and who can do what with your broom.

14   Q.   Understood.  Because that's why -- because they're silent

15   to it, your testimony is that it must be concluded that

16   government title persists in the broom --

17   A.   Well, not that it must be concluded.  It is my opinion

18   that government title persists, but I recognize that there

19   could be an argument to the contrary.

20   Q.   Okay.  So your testimony today is that you recognize that

21   there is an argument to the contrary saying government title

22   does not persist in that indirectly charged property?

23   A.   That's exactly what I said in my affidavit.

24   Q.   Okay.

25   A.   There is no change.

1            THE COURT:  Title is at disposal time, when it is

2     disposed, even as to scrap?

3            THE WITNESS:  If it is indirect charged property --

4            THE COURT:  That's what you say TCE is, so it's fair

5     to say it's unclear whether at the time that it was disposed

6     of, who had title?  Is that fair?

7            THE WITNESS:  It's impossible to say with certainty

8     who has title to what TCE, but you can make very reasonable

9     conclusions about it if you just look at the percentage of

10    government cost type contracts, fixed-price contracts with

11    progress payments and this kind of thing.

12           THE COURT:  You need a cost price with progress

13    payments; right?

14           THE WITNESS:  I'm sorry?

15           THE COURT:  In order to have the indirect, even any

16    part of it flow to the government, you need cost price with

17    progress payments?

18           THE WITNESS:  Fixed price with progress payments or

19    cost type.  It flows in both instances.

20           THE COURT:  Or what?  Or what?

21           THE WITNESS:  The title to indirect property transfers

22    both under the government property clause and under the

23    progress payment clause, in my opinion.

24           THE COURT:  And you would see an inventory -- again,

25    just repeat, when would you see these inventories?  Under what

1    kind of contract?

2           THE WITNESS:  The inventory could be under any kind of

3    contract, as we discussed.

4           THE COURT:  I thought you said it was not in any

5    contract.  Sorry.  Not required in the fixed-price contract.

6           THE WITNESS:  I'm sorry, Your Honor.  I was referring

7    to buying material for inventory.  I think you're using

8    "inventory" in another sense.

9           THE COURT:  Oh.  Okay.

10          THE WITNESS:  There's no requirement at the end of a

11   fixed-price contract that a contractor prepare a list of

12   leftover items.  I guess that's an inventory.

13          THE COURT:  The kind --

14          THE WITNESS:  I'm sorry that this is so confusing.

15          BY MR. JOHNSON:

16   Q.   Okay.  To be clear, I just want to clarify something from

17   your testimony just now and your testimony from your direct,

18   or your testimonial affidavit.  It's your testimony that the

19   fact that the contract and regulations are silent as to

20   reversion of title of consumed property -- excuse me.  Let me

21   rephrase.

22          I asked you if it was your opinion that because the

23   regulations are silent to title over consumed property, that

24   it must be concluded that government title persists, and

25   you're telling me that that is not your opinion; your opinion

-193-

1    is that --

2    A.   No, I don't think it's an absolute.  I think the wording I

3    used was I think it's the better result, but I can certainly

4    see an argument the other way.

5    Q.   Okay.

6    A.   And I don't know how to resolve that.  It's a very tiny, I

7    think a very tiny piece of what we're looking at.

8    Q.   Certainly.  I would like to direct your attention to your

9    affidavit, page 13, paragraph 22 of your affidavit, which I

10   have marked just for purposes of identification as U.S.

11   Exhibit 1196.

12            THE COURT:  His affidavit is in evidence.

13            MR. JOHNSON:  It is, Your Honor.  I wasn't sure, since

14   it didn't have a number --

15            THE COURT:  It's in evidence.  It's part of their

16   binder.  Let's just call it the affidavit.  Don't introduce

17   something else.

18            MR. JOHNSON:  Thank you, Your Honor.

19            THE COURT:  Calling it a government exhibit?  No, no.

20   Come on.  The Court of Appeals will be besides themselves.

21   It's in volume 1 of Lockheed's trial presentation binder.

22   They didn't give the affidavits -- but it's like his direct

23   testimony.  It's in.  You can use it on the screen if you

24   want.  But don't reference to this U.S. exhibit number,

25   please.

1          MR. JOHNSON:  Okay.  Thank you, Your Honor.

2          BY MR. JOHNSON:

3     Q.  Again, it's in your binder, again at the tab --

4     appropriate tab.  It's also on the screen.

5     A.  1196?

6     Q.  Well, we're not going to say that.  You recognize that as

7     your direct testimonial affidavit?

8          THE COURT:  It's in evidence.

9     Q.  Thank you.  If we could go to page 13, paragraph 22.  If

10    you go down towards the bottom of the page -- I'm sorry.

11    Bottom of the paragraph.

12    A.  I'm not with you yet.

13    Q.  Okay.  Are you at the correct page?

14    A.  Okay.  I have it.

15    Q.  It is paragraph 22 entitled "Consumption."  If you go to

16    the second to the last sentence of that paragraph -- I'm

17    sorry, it looks like it's the third to last paragraph, the

18    sentence starting, "There being no reversionary provision, it

19    must be concluded that government title persisted in the

20    released vapors and particles."

21          So can I take it from your testimony now here on

22    cross-examination that that is kind of a bit overstated?

23    A.  No.

24    Q.  What is different about that question than when I asked

25    you if it was your opinion that because the regulations are

1    silent as to title over consumed property, it must be

2    concluded that government title persists?

3    A.   We were talking about indirect charged property, and in

4    this paragraph I believe I'm talking about AP for the most

5    part, and --

6             THE COURT:  When you say "likewise, TCE was consumed."

7             THE WITNESS:  I will have to address that, but let me

8    do the AP first.  And we're dealing with the government

9    property clause for cost type contracts.  So what I'm saying

10   here is that the government had title to the AP and it has

11   title to it when it is presumably giving off these particles

12   or whatever it does, and I'm also saying that the government

13   had title to its allocable share of the TCE which is under

14   indirect costs.  And when that TCE is used and gives off

15   noxious vapors or whatever it does, the government has some

16   percentage of title to that or some -- title to some

17   percentage of that.  That's what I'm trying to say here.

18   Q.   As we walked through the example with the broom, which was

19   indirect charged property, we were left with a broom and no

20   surviving government contract, and my question was:  Because

21   the regulations are silent as to title over consumed property,

22   it must be concluded that government title consists --

23   persists in the broom, was my example, and you said you do not

24   agree with that.

25   A.   I think I explained to you that I think it's too extreme

1    in the case of the broom to say government title must persist.

2    Q.   Okay.

3    A.   I think it was my view that that is the better argument.

4    TCE is something of a slightly different nature.

5    Q.   It is also indirectly charged --

6    A.   Because we know -- it's indirectly charged, so it's the

7    same in that respect, but it is consumed in a different way

8    than brooms are consumed.

9    Q.   So you see --

10   A.   And in this case, if TCE is used in the process of

11   production, the government owns some share of that TCE, and I

12   can't tell you exactly how much.

13          THE COURT:  On what basis are we saying that the

14   government owns -- I mean if I take a cleaning agent and clean

15   my stove, it's finished.  Nothing left in the can.  So do I

16   own --

17          THE WITNESS:  Your Honor, you don't have these clauses

18   in your --

19          THE COURT:  I don't.  But I mean, what does the clause

20   say that when something doesn't exist anymore, ownership is

21   relevant or defined?  Is there a clause that says when there

22   is nothing to own, you own it?  I mean, really.  I'm not being

23   sarcastic.

24          THE WITNESS:  No --

25          THE COURT:  That's all I want to know.  Is there

1    something that says that once it's been used and there's

2    nothing left of it, it's been seeped into the ground or

3    wherever it went, there's the cleaning agent, there's the

4    ammonium, the AP, there is nothing left other than what's in

5    the inventory, and that's something else, that's not what

6    caused any contamination because it never made it, I want to

7    know specifically, in two sentences or less, what is it that

8    tells me that it's owned by the government?  Even, let's

9    assume you can make an argument that it was a direct cost for

10   the AP before that happened.

11        THE WITNESS:  To answer your question directly, if an

12   item is totally consumed, physically totally consumed, then it

13   ceases to exist and title becomes a nonsense term.

14        THE COURT:  That's all I'm asking.  So why do I spend

15   all this time on this?  Once you throw the stuff away,

16   wherever you do it, however you do it, it's burnt up, and

17   let's assume it was burnt up properly, it's gone, it's

18   nonsense --

19        THE WITNESS:  At that point it's gone.  And I think

20   the issue is who owns it while it's being burned up and

21   whether that is creating issues or problems.  But that's out

22   of my area.

23        THE COURT:  What do you mean it's out of your area?

24   You're here to tell me who owns what when.

25        THE WITNESS:  I can do that, but I can't tell you

1    anything about CERCLA.

2              THE COURT:  I'm not asking about CERCLA.  You haul up

3    either AP or TCE and you put it in a burn pit, and at whatever

4    point in time, whether you promptly burn it up or you wait,

5    and that is your disposal method --

6              THE WITNESS:  And if it totally disposes of it so that

7    it ceases to exist, at that point --

8              THE COURT:  There is nothing usable, that's for

9    sure --

10             THE WITNESS:  Well, but --

11             THE COURT:  -- and --

12             THE WITNESS:  Usable is a different term.

13             THE COURT:  So your question is when does it become

14   nonexistent?

15             THE WITNESS:  Exactly.

16             THE COURT:  No one knows.  Okay.  Thank you.  Really,

17   bear with me.  I have been trying to tell you there's not much

18   that I need to further understand about this concept, to tell

19   me it doesn't have a whole lot to do with equitable

20   allocation.  I mean, I can't get this point across.  It may

21   have to do with liability; they were perhaps an arranger for

22   purposes of liability.  But it doesn't move me as an equitable

23   matter, and it has to in order for it to be relevant.

24             MR. MURPHY:  Your Honor, you're saying the ownership

25   of the materials that were being used at the site, and if

1    Lockheed Propulsion was instructed to burn these materials on

2    behalf of the government, that's not relevant for a CERCLA

3    allocation?

4         THE COURT:  That is, but that's not what he is talking

5    about.  He's talking about the title to it when it's either

6    being burned or before it's being burned.

7         MR. MURPHY:  Yes, but title to it as it's being used,

8    Your Honor, becomes relevant to CERCLA, because some of these

9    releases occurred during its use.  Some releases occurred

10   during grinding operations.  The vapor degreaser was not a

11   disposal operation; it was using TCE in the process and was

12   released as a part of that process.

13        THE COURT:  We're never going to be able to show how

14   much went to a burn pit, how much went to an evaporation pit,

15   how much was going down the pump.  We're never going to be

16   able to know.

17        MR. MURPHY:  Agreed.  Agreed, Your Honor.  As they

18   say, we're not trying to make mathematical calculations here.

19   But under CERCLA, I think it has to be relevant that the

20   materials that are currently in the groundwater were owned by

21   the government during their use at the facility.  That has to

22   be relevant in equitable allocation.

23        THE COURT:  If you can say that with any assurance.

24        MR. MURPHY:  Well, I guess I'm not understanding why

25   ownership of the materials that were released somehow doesn't

```
1    matter as to CERCLA.

2            THE COURT:  It certainly matters for liability

3    purposes, but you know -- it would be interesting to know

4    whether there was a safe, nonpollutant cleaner, and nobody is

5    going to be able to tell me that.  They picked what everybody

6    was using to clean at the time.  So whether they owned it or

7    didn't own it or whether you owned it or used it -- and you

8    clearly used it, and I don't even -- I will assume for

9    purposes of argument the government told you to dispose of it

10   in the burn pit.  I just don't see that we have much of a

11   contested issue that requires -- that moves the ball one way

12   or another.  I mean, the harm was caused by it seeping into

13   the ground.

14           MR. MURPHY:  Yes.

15           THE COURT:  So that's when -- isn't that kind of

16   relevant?

17           MR. MURPHY:  Well, Your Honor, I guess that is

18   relevant as well.  I think everything in an equitable

19   allocation can be relevant.

20           THE COURT:  Right, but let's not overdo it.  Let's

21   pick our issues.

22           MR. MURPHY:  I believe the fact that --

23           THE COURT:  The other expert says that AP was owned by

24   the government.  I mean, we don't have money issues that are

25   importantly contested here.
```

1          MR. MURPHY:  It's around the edges, Your Honor.  They

2     say that -- we disagree about the amount of fixed-price

3     contracts and fixed-price contracts with progress payments.

4     And whether indirect is owned or not under a contract is

5     something we disagree about just as a legal matter between

6     Mr. Nagle and Mr. Johnson.  But I agree with Your Honor, I

7     think it is clear they owned the materials during their use.

8          THE COURT:  But you might have owned one of the

9     grinders, we now know.

10          MR. MURPHY:  We owned grinders, they owned grinders.

11          THE COURT:  That's my point.  That's exactly my point,

12     that you're not going to be able to make much of the whole

13     thing.

14          Okay.  Finish up, please, the government.  You've

15     heard my story here.  Just move on.

16          MR. JOHNSON:  Yes, Your Honor.

17          BY MR. JOHNSON:

18     Q.   In light of the Court's thinking on this, I'm going to try

19     and trim this down quite a bit.  Let's just jump straight to,

20     in your testimony you identified three exhibits that you

21     describe as showing the government occasionally acknowledged

22     some responsibility for the disposition of scrap propellant.

23     You recall that testimony?

24     A.   There were some documents we looked at which seemed to

25     suggest that conclusion.

—202—

1    Q.  Okay.  And just for clarification, in your affidavit --

2    and I don't know if you had a chance to discuss this with

3    counsel -- but in your testimonial affidavit, you identify

4    Plaintiff's Exhibit 435A and 435B.  I believe those should

5    have been identified --

6    A.  I accept what you say.  I don't have them in front of me.

7    Q.  Okay.  I didn't know if you'd be --

8         THE COURT:  You don't -- he doesn't have his

9    affidavit?

10        MR. JOHNSON:  He has it, Your Honor.

11        THE COURT:  Look at footnote 43.

12        MR. MURPHY:  Which tab is it behind?

13        MR. JOHNSON:  It's the last tab in the binder.

14        MR. MURPHY:  Do you have it?

15        THE WITNESS:  I have the affidavit.

16        THE COURT:  The reference he is talking about is 43, I

17   believe.

18        BY MR. JOHNSON:

19   Q.  Footnote 43, correct, on page 19.

20   A.  I have it.

21        THE COURT:  You want him to look at these documents?

22        MR. JOHNSON:  Yes, Your Honor.  I will bring up the

23   documents.

24        THE COURT:  Oh, you will?

25        BY MR. JOHNSON:

203

1    Q.  But I just wanted to clarify, just to make it clear for

2    the record, because in footnote 43 it identifies them as

3    Plaintiff's Exhibit 435A and 435B, when in fact they're

4    actually Plaintiff's Exhibit 435 and 435A.  There is no

5    Plaintiff's Exhibit 435B.  So that is what that endeavor was

6    about.

7    A.  My mistake, I guess.

8    Q.  No worries.  I just wanted to make it clear for the record

9    as I move on to the actual exhibits.

10        If we could turn to Plaintiff's Exhibit 435.  In your

11   binder it is labeled as PX 0435.  It should be the first tab.

12   A.  I have it.

13   Q.  Okay.  Great.  I just wanted to -- as I read that

14   document, I don't see the word "scrap."  Would you agree with

15   me that the term "scrap" is not used in Plaintiff's

16   Exhibit 435?

17   A.  You can read it the same as I can read it.  It doesn't use

18   the word "scrap" as I see.

19   Q.  Okay.  Thank you.  In fact, it uses the terms "accumulated

20   miscellaneous waste materials" and "miscellaneous sundry waste

21   materials"; correct?

22   A.  Right.

23   Q.  And you can't tell whether this waste was generated while

24   performing a cost type or fixed-price type contract; right?

25   A.  We can't tell from this document, no.

204

1   Q.  And this document never states that the government

2   acknowledges responsibility for the disposition of scrap

3   propellant; isn't that fair?

4   A.  Well, it depends what you mean by responsibility.  The

5   document states that the Sixth Army will accept these modes of

6   disposition.  So in my parlance, they're accepting some

7   responsibility to dispose of these items.

8   Q.  Okay.  But you admit there are other reasons the Army

9   might accept --

10   A.  Many, many.

11   Q.  One of them might be simply to reduce the contractor's

12   current costs?

13   A.  It could be that.  It may have nothing to do with title.

14   We can't tell.

15   Q.  It could be for safety reasons?

16          THE COURT:  How'd they dispose of it, I'd like to

17   know.  Camp Irwin.  How'd they dispose of all this stuff?  Did

18   they have any better practices than Lockheed?  My guess is not

19   since it's part of a Superfund site; right?

20          MR. JOHNSON:  Your Honor, I'm afraid I can't speak to

21   that.

22          THE COURT:  Go ahead.

23          BY MR. JOHNSON:

24   Q.  Thank you.  If we can go to Plaintiff's Exhibit 435B.

25   That's the inventory of waste that Lockheed was hoping to

1    dispose of; correct?

2    A.   I'm having some trouble --

3    Q.   I'm sorry.  435A.  I used the wrong nomenclature.

4    A.   435A is a one-page list called "Items for disposal."  Do

5    you have a question about that?

6    Q.   Yes.  There is nothing in that inventory that indicates

7    the government acknowledges responsibility for those wastes;

8    correct?

9    A.   It doesn't say anything at all about that.

10   Q.   And there is nothing in the inventory that identifies any

11   of that waste as being government owned; isn't that fair?

12   A.   It is not identified in this document as who owns it.

13             THE COURT:  Well, you say that these documents prove

14   or show that the government sometimes acknowledged

15   responsibility for the disposition.  So I take it you're

16   saying Camp Irwin is a government facility and they're going

17   to dispose of these motors.  But it doesn't tell me much about

18   title.

19             THE WITNESS:  It doesn't tell us anything about title.

20   It tells us that for one reason or another the government, or

21   the Army here, accepted some responsibility to dispose of

22   these materials, assuming these two pages go together, and I'm

23   not sure that that's the case.

24             THE COURT:  We're now on 435 and 435A.  I have 435A.

25   Where is 435?  In your binder is there a 435?

1      MR. JOHNSON:  Yes, Your Honor.

2      THE COURT:  Okay.  That's what we looked at.  They're

3 saying that they're going to do something -- do these two

4 documents go together?  They're part of the same --

5      MR. JOHNSON:  Your Honor, I will be quite honest, I

6 assumed they did because of the numbering.  The document is

7 offered by the plaintiffs.  I can't speak to that.

8      THE COURT:  Do you know whether these documents --

9      MR. MURPHY:  Your Honor --

10      THE COURT:  -- are attached --

11      MR. MURPHY:  -- that is how we found them in the

12 records, Your Honor.  They were together, and that's why

13 they're Bates numbered together.  I can't swear that they're

14 supposed to go together, but that's how we found them.

15      THE COURT:  So you think that the things that are

16 listed in 435A went over to Camp Irwin?

17      MR. MURPHY:  Again --

18      THE COURT:  Is that the gist of this?

19      MR. MURPHY:  The Bates numbering is sequential, Your

20 Honor, and that's how they were copied wherever they were

21 found.  So they were found together, but I can't guarantee --

22      THE COURT:  But that's the gist of what the facts are?

23      MR. MURPHY:  Yes.

24      THE COURT:  Okay.  So the government took some

25 responsibility for disposing it at Camp Irwin, which then

1    becomes a Superfund site, too.

2            Okay.  Move on.

3            BY MR. JOHNSON:

4    Q.  If we can move to Plaintiff's Exhibit 93.  This is the

5    other document you cited; correct?

6    A.  Not so fast.  I have to look at it.  I've learned my

7    lesson here.

8            THE COURT:  More Camp Irwin.

9            THE WITNESS:  Okay.  Got it.  Go ahead.  I didn't hear

10   your question.

11           BY MR. JOHNSON:

12   Q.  That's the other document you cited, correct, in your

13   footnote?

14   A.  I think so.

15   Q.  And if you look at the first paragraph, it begins, "Bert

16   Cousens, US AOD/LA, safety, advised me yesterday that the

17   Sixth Army cannot take any further action on disposal of Nike

18   Zeus rejected motors at Camp Irwin until after 1 June 1961

19   because of a backlog of work."

20           Do you see that?

21   A.  You read it correctly.

22   Q.  Based on that, is it safe to assume that Bert Cousens had

23   something to do with safety?

24   A.  His title is U.S. Army Ordnance/Los Angeles safety, so

25   yes.

—208—

1    Q.   Isn't that consistent with the government helping Lockheed

2    dispose of these rocket motors for reasons having to do with

3    safety?

4    A.   It could be or it could be that they have title to these

5    motors.  All you can say is that the Nike Zeus program was a

6    large program, and rejected motors would be motors that

7    Lockheed had manufactured that failed to pass inspection.  If

8    that contract was either a cost type, which is unlikely, or is

9    fixed-price with progress payments, which is very likely, then

10   the government had title to those rejected motors even though

11   it had rejected them because it had title in the progress

12   payment clause.

13   Q.   You know Lockheed performed fixed-price contracts without

14   progress payments; correct?

15   A.   Little ones, yes.

16   Q.   And those were for rocket motors; correct?

17   A.   Either that or parts of rocket motors, but I don't think

18   that many of these rocket motors were tiny little things.  I

19   think they were largely -- they were large and expensive

20   items.  They weren't sold to Woolworth's.

21   Q.   When the government is purchasing -- you also testified

22   that the government owned scrap AP and -- scrap AP that GCRC

23   and LPC removed from used rocket motors having acquired title

24   when it earlier accepted delivery of finished rocket motors

25   containing AP.  You recall that?

1    A.   Yes.

2    Q.   Here you're referring to rocket motors that the government

3    had previously accepted and taken possession of; correct?

4    A.   I was referring to rocket motors that had been accepted,

5    and then it was my understanding, after they were used, there

6    was some residual stuff that could be taken out of them.  This

7    document does not refer to that kind of rocket --

8    Q.   I'm sorry.  Moving on from that document.  Just your

9    testimony.  You have not seen a contract where the government

10   hired Lockheed to remove propellant or AP from a rocket motor

11   that had been previously delivered to and accepted by the

12   government; correct?

13   A.   I have not seen such a contract.

14   Q.   And you haven't seen any letters or other documentary

15   evidence discussing the government delivering previously

16   accepted rocket motors to LPC or GCR for removal of

17   propellant?

18   A.   I have not seen documents to that effect.

19   Q.   So really your testimony is, if this happened?

20   A.   If it happened, correct.

21   Q.   But you're not testifying it actually did?

22   A.   I cannot testify to what actually happened.

23   Q.   Okay.  One moment, Your Honor.

24        THE COURT:  How long do you think you'll be?

25        MR. MURPHY:  I would suggest maybe that we break for

1     the day, Your Honor, and I could probably be faster if I had

2     some time to organize my thoughts.

3              THE COURT:  I know.  Just give me an idea.

4              MR. MURPHY:  30 minutes, maybe 40.

5              THE COURT:  Are you finished?  I just have one

6     question for the witness.

7              MR. JOHNSON:  Your Honor, understanding the Court's

8     feelings on this, I'm tempted to be finished.  There was

9     material I was going to cover.  If we're going to break, I

10    would consult with my team and see if we can agree that we're

11    done.

12             THE COURT:  Okay.  Have you ever seen this clause

13    before?  I showed you this document.  This is PX 1073.  That

14    clause that we have no liability for any damage to property.

15             THE WITNESS:  This is the abandonment document.  Yes,

16    I've seen it before.

17             THE COURT:  Is it used in anything other than an

18    abandonment situation?

19             THE WITNESS:  I would say not this type of document,

20    no.  It's purely abandonment.

21             THE COURT:  All I'm looking at is the contract

22    language.

23             THE WITNESS:  The whole document just deals with

24    abandonment of some specific property.

25             THE COURT:  Okay.

1          THE WITNESS:  That's all it's talking about.

2          THE COURT:  You're a lawyer; right?  Obviously.  I'm

3     sorry.  And so when you see these indemnification clauses,

4     what is your opinion about -- where is your indemnification --

5     hold on.  Can I have that back?

6          MR. MURPHY:  Tab, it's marked indemnification, 85-804

7     indemnity.

8          MR. JOHNSON:  Your Honor, there are two

9     indemnification clauses.  It is also contained in the United

10    States binder under the Jim Nagle section --

11         THE COURT:  Can you show this witness?  I know he

12    didn't offer an opinion on it, but he's a lawyer.  He's a

13    government contracts lawyer.  What are the two indemnification

14    clauses that are of interest?  Obviously, this one he says is

15    limited to abandonment.

16         MR. MURPHY:  There is the SRAM indemnity clause and

17    then there's the ASPR indemnity clause for facilities

18    contracts.

19         THE COURT:  Can I show it to him?  Can you give it to

20    me?  What government exhibit is it part of?  Oh, it's Nagle.

21         So I'm looking for PX 506, PX 560 and U.S. -- I don't

22    know if that is an exhibit.

23         MR. MURPHY:  PX 560?

24         THE COURT:  Is that the ones you --

25         MR. MURPHY:  Yes.

-212-

1            THE COURT:  506, 560 is another one.

2            MR. MURPHY:  PX 560 is probably the best example, most

3       complete example.

4            THE COURT:  Give him both.

5            Then what is the facilities contract?

6            MR. JOHNSON:  Your Honor, it's set out in Jim Nagle's

7       affidavit on page 40.  It's identified as U.S. Exhibit 191.

8       And then he also sets out all the ASPR -- same ASPR clause

9       throughout the time period, so it is also identified as U.S.

10      Exhibit 231, 232.

11           THE COURT:  Where do I see this?

12           MR. JOHNSON:  If you go to page 40 of his declaration.

13           THE COURT:  Yeah.

14           MR. JOHNSON:  Starting on page -- starting at

15      paragraph 109.

16           THE COURT:  What are the exhibits?  Or if they're

17      repetitive -- I just want to show him one.

18           MR. JOHNSON:  Your Honor, U.S. Exhibit 191 is the one

19      cited.  Also, the actual -- an example of it is in the trial

20      brief, attachment 19, where it identifies the indemnification

21      of the government clause 27 of a facilities contract.  I don't

22      know if that's helpful.

23           THE COURT:  I don't have Exhibit 191 attached to -- I

24      go from 192 to 193.  Or, I'm sorry, 189.

25           MR. JOHNSON:  Your Honor, I believe they were on our

1    supplemental exhibit list.  When we were making a time crunch

2    to remove exhibits, that must have been one that got pulled

3    and moved to our second disk.  I can provide a copy to the

4    Court.

5         THE COURT:  This looks like a statute or a reg.

6         MR. JOHNSON:  Yes, Your Honor, it's the ASPR.  It

7    contains -- it's the Armed Services Procurement Regulation.

8    If you look at section 13-411, subparagraph B.

9         THE COURT:  Are you familiar with 13-411B --

10        THE WITNESS:  I can't say that reference, Your Honor,

11   but I'm totally familiar with this type of indemnification

12   clause because it was my job in the Air Force, among other

13   things, to approve this clause for contractors.

14        THE COURT:  So you've looked at government -- Lockheed

15   exhibit -- which one do you have there?  Plaintiff exhibit

16   what again?

17        THE WITNESS:  I have 191, 189 through 204.

18        THE COURT:  All those?  I thought we got it down to

19   two numbers.

20        THE WITNESS:  I think it's all one clause.

21        MR. MURPHY:  It's all one clause, one Exhibit.

22        THE COURT:  Okay.  Then if you look at -- is there no

23   hard copy that he can look at?  Is it just B?  That's all we

24   have to worry about?

25        MR. JOHNSON:  Yes, Your Honor.

214

1           Your Honor, I have a hard copy of U.S. Exhibit 191.

2           THE COURT:  Give it to the witness.

3           MR. JOHNSON:  Certainly.

4           THE COURT:  So what do you make of these three

5    clauses?

6           Maybe it's more than three.

7           Did you give him a copy of yours?

8           MR. MURPHY:  I did.

9           THE COURT:  Yours is PX what?

10          MR. MURPHY:  I think it's 560.

11          THE COURT:  Where would I find that?  506 and 560.

12          MR. MURPHY:  Yes, 560.

13          THE COURT:  Tell me what you're looking at and tell me

14   what your opinion is about what its applicability is, if any.

15          THE WITNESS:  Your Honor, I'm looking at two clauses.

16   One indemnification runs --

17          THE COURT:  Which one are you looking at?

18          THE WITNESS:  191.0003, which is an excerpt of Title

19   32 of the CFR.  That's an indemnification provision that

20   actually requires the inclusion of an indemnification in

21   facilities contracts, and it runs in favor of the government.

22   And --

23          THE COURT:  You're looking at what's on the screen in

24   front of you?

25          It's also on the screen in front of you.  Can you --

215

 1    can I see the top of it again?

 2            THE WITNESS:  It's on the screen, right.  And it's a

 3    normal clause that was put in facilities contracts to protect

 4    the government.  I don't think I can comment on it more than

 5    that.  I haven't been asked to study exactly what it means or

 6    exactly what it applies to.

 7            THE COURT:  You can't tell me in your 35 years

 8    experience you've never seen this subpart b before.

 9            THE WITNESS:  50 years.

10            THE COURT:  I'm sorry.  It says "The contractor shall

11    hold the government harmless against claims for injury" or

12    property -- "to persons or damage to property of the

13    contractor or arising from the contractor's possession or use

14    of the industrial facilities."

15            THE WITNESS:  Right.  All I can say about this is it

16    is very dangerous to interpret one tiny provision out of an

17    entire facilities contract, and having studied those contracts

18    in the past, you have to look at the entire facilities

19    contract in order to determine who is liable for what.

20            THE COURT:  Let's go on to 506.

21            THE WITNESS:  All right.

22            THE COURT:  You don't have an opinion about the

23    meaning or the applicability to this case, to Redlands, of

24    this subpart b; correct?  That's fair?

25            THE WITNESS:  I don't know what you're looking at,

—216—

1    Your Honor.

2            THE COURT:  I'm sorry.  I'm looking at what's on the

3    screen there, 33 CFR.  I'm saying you don't have an opinion

4    about what b says regarding liability at Redlands under

5    this --

6            THE WITNESS:  I would not provide an opinion on what

7    that paragraph b means without having the entire facilities

8    contract in front of me.

9            THE COURT:  And we don't have the facilities contract.

10           THE WITNESS:  We do.  I have seen facilities

11   contracts.

12           MR. JOHNSON:  Your Honor, we do.  United States

13   Exhibit 84 and United States Exhibit 113 are facilities

14   contracts containing the indemnification clause.

15           THE COURT:  84 and what?

16           MR. JOHNSON:  113.

17           THE COURT:  Thank you.  So then we go over to 506.

18   He's welcome to look -- this evening, if you would like to

19   look at U.S. Exhibit 84 and 113, I'm sure counsel will provide

20   them to you.  You can come back and have the opportunity to

21   look at it and tell me what is b all about.  But don't ask

22   counsel.  I'm asking you.  Okay?

23           THE WITNESS:  Understood.

24           THE COURT:  I'm sure they have their opinions.  Okay.

25   Now, how do you feel about 506?  And the other one given to

217

1   you by Mr. Murphy is 516.  Are they pretty much similar?

2        MR. MURPHY:  Which?

3        THE COURT:  516 and 506?

4        MR. MURPHY:  560 and 516, Your Honor?  They're just

5   different examples of different years that it was incorporated

6   in a contract.  The language is the same.

7        THE COURT:  So just read one, please, whatever one you

8   want.  If you would pick it.

9        THE WITNESS:  The only one I have is 560.

10        MR. MURPHY:  That's enough.  It's the same.

11        THE WITNESS:  I do know what 560 is about, if that's

12   of any importance.

13        THE COURT:  I'm sorry.  I didn't hear.  560 is what?

14        THE WITNESS:  560 is an example of an indemnification

15   that has special contractual authority called public law

16   85-804.

17        THE COURT:  I'm sorry.  One is 506 and one is 516.  I

18   think you're getting the numbers confused.

19        MR. MURPHY:  He is referencing the public law that

20   authorizes the indemnity, Your Honor.

21        THE WITNESS:  It is a special statute.  It was last

22   enacted in 1958, and its purpose is to handle catastrophic

23   risks that insurance cannot possibly cover.  And what happened

24   was at the end of World War II, we started to get into such

25   things as nuclear submarines and missiles, and the problem was

1    that missiles went up and no one was quite certain where they

2    were going to come down, and there was a fear that one

3    would --

4              THE COURT:  Land on somebody's head.

5              THE WITNESS:  -- land in an urban area.  So Congress

6    authorized DOD and NASA to provide this extraordinary

7    protection.

8              THE COURT:  Okay.  But in your view, is it fair to say

9    it would not cover the disposal, properly or improperly, of AP

10   or TCE?

11             THE WITNESS:  I would hesitate to give an opinion on

12   that, but it's -- just sitting here, having not looked at this

13   in a long time, but I do know that the risks that it was

14   intended to cover are catastrophic risks.

15             THE COURT:  Okay.  That's all I have.  Anything else

16   for the government?  I still want to think about tomorrow

17   morning.

18             I have a matter at 9:00.  So we'll start -- I'm sorry.

19   We're going to start at 11:30.  I intend to finish this

20   witness before quarter to 1.

21             MR. MURPHY:  Yes, Your Honor.

22             THE COURT:  Both sides.  And I want him to have the

23   opportunity to look at the facilities contracts.  There's a

24   U.S. Exhibit 84 and 113, at your leisure, before 11:30

25   tomorrow.

1              You're not allowed to discuss your testimony with

2    anyone during the course of the break.  That includes counsel.

3              Okay?  Anything else?

4              MR. MURPHY:  No, Your Honor.  I think the schedule for

5    tomorrow will be we will finish up with Mr. Johnson, we will

6    have Mr. Blackman, Tom Blackman, who is a current employee of

7    Lockheed Martin who helped with the remediation at Redlands

8    and Beaumont -- at Redlands at least.  He was an environmental

9    safety and health manager at the remediation, cleaning up the

10   groundwater plumes.  So he will testify about that and his

11   experience in cleaning up the groundwater contamination.

12             THE COURT:  Did I misunderstand you?  He is a

13   government employee of Lockheed --

14             MR. MURPHY:  No, I'm sorry, he's a Lockheed Martin

15   employee, Your Honor.  I'm sorry.  He's a Lockheed Martin

16   employee who ran the cleanups at Redlands for many years.

17             THE COURT:  Okay.

18             MR. MURPHY:  Then we will also have Tod Delaney, who

19   will give opinions that he has given, he's an expert on

20   industrial processes.  Then we'll hopefully have Wednesday

21   Stan Feenstra, if we can finish up those two tomorrow.

22             THE COURT:  Okay.  That's fine.  I really think it has

23   to be -- well, we can tell, but on Friday sometime I need to

24   have your feedback on double recovery.  So you have to file

25   affidavits to rebut the ones that they filed.  They filed two.

220

1          MR. MURPHY:  Right.

2          THE COURT:  So if you want to put in direct testimony

3     in rebuttal on the question of double recovery, they need to

4     be filed by Friday.

5          MR. MURPHY:  We also had fact witnesses, Your Honor,

6     that we had suggested bringing up that had been reserved for

7     rebuttal.

8          THE COURT:  Well, we're not doing those by direct.  On

9     paper.

10          MR. MURPHY:  All right.

11          THE COURT:  I think, counsel, they really want me to

12     focus on an exhibit.  And either I have to have it here -- and

13     you know what I have; I have the binders -- or you have to

14     hand it up, using the exhibit number that you're using in your

15     index.  Otherwise -- I mean, the witness is having the same

16     problem I am having.  If you want a witness to talk about an

17     exhibit, I know you have given them binders.  But for

18     instance, the government -- maybe this is my fault -- but I've

19     got this big binder here; I don't know what to do with it all.

20     We looked at three documents.  I know what they're here for.

21          This is not -- you have to look at me like a jury.

22     You're not trying this case just to put in paper.  You've got

23     to be making points.  And the points have to be obvious from

24     the paper.  And if I can't figure it out, then you've lost the

25     jury.  I'm struggling to figure it out.  But I have read what

221

1    the binders have given me.

2         Also, if you want to give me five pages any time about

3    this arranger liability, not for liability purposes but for

4    equitable, I'm happy to see what you have to say.  I just

5    don't know -- this is a separate question.  I don't know where

6    we are factually anyways, put aside legally.  But if you want

7    to tell me legally, assuming that you have proven that at

8    least they own -- even Nagle agrees the government owned the

9    AP.  Exactly at what point in time, I think that is very

10   unclear, because this witness has told me at a certain point

11   it sort of evaporated and not existent, and he doesn't have an

12   opinion of who owns that.

13        But I'm trying to get a better sense of how this is

14   supposed to really -- I'm trying to get a sense of factually

15   and legally how this really does play in to what I'm thinking

16   of, not liability.

17        MR. MURPHY:  Not liability.

18        THE COURT:  Well, yeah, that's not what I'm doing

19   here.  And you'll have a chance to respond.  I'm just trying

20   to focus on the issue.  I know what Nagle has to say up to a

21   point.  I know I don't have a complete set of documents.  I

22   don't have a complete set of contracts.  I don't know what

23   contract is what.  You have certain speculations.  You have a

24   witness, an expert who agrees with him on many things, and

25   agrees that at least some of the AP, and I don't -- I think

1      it's fair to say you won't tell me how much AP was owned by

2      the government versus Lockheed; right?

3                  THE WITNESS:  I would tell you if I could.

4                  THE COURT:  So, big deal.  That's where we are.  Where

5      are we at the end of the day?  You'll both get to tell me five

6      on the issue of arranger why this is really something that

7      helps move the ball.  Okay?

8                  All right.  So we'll resume -- I have to do a

9      naturalization ceremony at the morning so we'll start at

10     11:30.  I promise you we will finish before 12:30, quarter to

11     1.  Then you're going to call Mr. Blackman.

12                 Are there specific documents you're going to talk to

13     him about that I have in this book, meaning your books?

14                 MR. MURPHY:  I believe, Your Honor, that Mr. Blackman

15     might actually have additional documents that we'll be

16     submitting into evidence.

17                 THE COURT:  Fine.  And then you --

18                 MR. MURPHY:  We will have them for everybody.

19                 THE COURT:  And we know Mr. Delaney has an affidavit.

20                 MR. MURPHY:  Yes, Your Honor.

21                 THE COURT:  Very good.  Thank you.

22                 MR. MURPHY:  Thank you.

23                 THE COURT:  Thank you, sir.  Have a good evening.

24                 (Proceedings adjourned at 5:10 p.m.)

25

223

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Patricia A. Kaneshiro-Miller, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7

8    ----------------------------------      -----------------------

9    PATRICIA A. KANESHIRO-MILLER                        DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'** [1] -

**'65** [1] - 169:22
**'66** [2] - 168:18, 168:24
**'68** [4] - 168:18, 168:24, 169:22
**'69** [3] - 167:22, 167:23, 168:24
**'70** [2] - 137:24
**'70s** [1] - 156:13
**'75** [4] - 167:21, 167:25, 185:11
**'Call** [1] - 127:20

**0**

**0040117** [1] - 131:4
**0435** [1] - 203:11

**1**

**1** [10] - 145:9, 145:10, 147:22, 147:24, 172:20, 181:24, 193:21, 207:18, 218:20, 222:11
**1-1/2** [1] - 181:25
**1067** [4] - 157:5, 157:7, 172:9, 175:8
**1073** [4] - 184:10, 184:12, 186:2, 210:13
**109** [1] - 212:15
**113** [4] - 216:13, 216:16, 216:19, 218:24
**1196** [2] - 193:11, 194:5
**11:30** [3] - 218:19, 218:24, 222:10
**12:30** [1] - 222:10
**13** [2] - 193:9, 194:9
**13-411** [1] - 213:8
**13-411B** [1] - 213:9
**14** [1] - 154:6
**18** [2] - 132:6, 136:1
**189** [2] - 212:24, 213:17
**19** [2] - 202:19, 212:20
**191** [5] - 212:7, 212:18, 212:23, 213:17, 214:1
**191.0003** [1] - 214:18
**192** [1] - 212:24
**193** [1] - 212:24
**19312** [1] - 140:24
**1958** [1] - 217:22

**1961** [1] - 207:18
**1965** [2] - 168:5, 173:25
**1966** [1] - 154:4
**1969** [3] - 135:25, 136:8, 136:20
**1970** [9] - 132:6, 135:8, 136:1, 136:20, 137:14, 138:2, 139:7, 140:3, 154:4
**1971** [1] - 158:12
**1972** [4] - 157:8, 168:9, 172:22, 175:9

**2**

**2** [5] - 127:1, 127:3, 137:18, 145:9, 175:1
**20** [6] - 126:8, 126:10, 135:25, 136:8, 148:23, 189:19
**204** [1] - 213:17
**22** [4] - 157:8, 193:9, 194:9, 194:15
**231** [1] - 212:10
**232** [1] - 212:10
**26** [1] - 175:2
**264** [1] - 132:3
**27** [2] - 175:3, 212:21
**28** [2] - 154:6, 175:3

**3**

**3** [7] - 130:22, 137:18, 140:1, 140:19, 140:20, 140:21, 141:1
**3.1** [3] - 140:24, 141:5, 141:6
**30** [4] - 154:6, 166:21, 166:22, 210:4
**32** [1] - 214:19
**33** [1] - 216:3
**35** [1] - 215:7
**3:27** [1] - 174:24
**3:58** [1] - 174:24

**4**

**4** [2] - 131:8, 157:13
**40** [4] - 189:19, 210:4, 212:7, 212:12
**40-some** [2] - 126:12, 130:18
**400** [1] - 139:8
**40117** [1] - 131:5
**40151** [5] - 127:1,

127:10, 127:19, 143:7, 143:9
**43** [4] - 202:11, 202:16, 202:19, 203:2
**435** [6] - 203:4, 203:10, 203:16, 205:24, 205:25
**435A** [8] - 202:4, 203:3, 203:4, 205:3, 205:4, 205:24, 206:16
**435B** [4] - 202:4, 203:3, 203:5, 204:24

**5**

**5,750** [1] - 185:15
**50** [6] - 130:12, 137:4, 156:22, 157:2, 166:5, 215:9
**50-50** [1] - 162:14
**500** [4] - 177:9, 178:9, 178:19, 179:24
**506** [8] - 211:21, 212:1, 214:11, 215:20, 216:17, 216:25, 217:3, 217:17
**516** [4] - 217:1, 217:3, 217:4, 217:17
**560** [12] - 211:21, 211:23, 212:1, 212:2, 214:10, 214:11, 214:12, 217:4, 217:9, 217:11, 217:13, 217:14
**577** [3] - 130:23, 130:25, 131:1
**5:10** [1] - 222:24

**6**

**60** [1] - 189:19

**7**

**7** [2] - 172:22, 175:9
**77** [7] - 125:22, 126:11, 126:15, 141:18, 153:12, 175:4, 175:5

**8**

**80,000** [4] - 158:12,

158:19, 158:20, 158:21
**84** [4] - 216:13, 216:15, 216:19, 218:24
**85-804** [2] - 211:6, 217:16

**9**

**91** [4] - 125:14, 125:15, 125:18, 126:11
**93** [1] - 207:4
**9:00** [1] - 218:18

**A**

**abandon** [3] - 183:22, 184:5, 184:15
**abandonment** [10] - 183:25, 185:1, 185:3, 185:13, 187:12, 210:15, 210:18, 210:20, 210:24, 211:15
**able** [8] - 146:12, 158:21, 162:20, 175:14, 199:13, 199:16, 200:5, 201:12
**above-entitled** [1] - 223:5
**absolute** [2] - 176:21, 193:2
**absolutely** [3] - 149:24, 160:21, 175:17
**accept** [6] - 171:12, 171:17, 180:23, 202:6, 204:5, 204:9
**accepted** [6] - 176:9, 185:13, 205:21, 208:24, 209:3, 209:4, 209:11, 209:16
**accepting** [1] - 204:6
**accordance** [1] - 174:6
**according** [1] - 188:4
**account** [3] - 170:21, 176:3, 180:10
**accountable** [1] - 153:2
**accounting** [9] - 157:21, 170:15, 170:22, 170:23, 188:5, 188:8, 188:9, 188:10, 189:17

**accumulate** [1] - 174:14
**accumulated** [1] - 203:19
**accurate** [1] - 177:6
**acknowledged** [2] - 201:21, 205:14
**acknowledges** [2] - 204:2, 205:7
**acquire** [1] - 185:13
**acquired** [2] - 182:3, 208:23
**acres** [2] - 125:25, 126:3
**acronym** [2] - 148:7, 149:7
**action** [1] - 207:17
**activity** [3] - 143:14, 143:23, 143:25
**actual** [4] - 126:6, 149:10, 203:9, 212:19
**add** [1] - 135:7
**added** [2] - 133:7, 133:14
**adding** [2] - 133:14, 138:3
**additional** [7] - 136:14, 136:15, 138:3, 146:23, 158:22, 189:10, 222:15
**address** [1] - 195:7
**addressing** [1] - 164:15
**adjourned** [1] - 222:24
**admit** [2] - 185:21, 204:8
**advance** [2] - 151:9, 151:11
**advertised** [1] - 151:12
**advised** [1] - 207:16
**aerial** [1] - 125:21
**affidavit** [20] - 145:18, 146:16, 146:19, 147:6, 147:8, 190:8, 190:23, 192:18, 193:9, 193:12, 193:16, 194:7, 202:1, 202:3, 202:9, 202:15, 212:7, 222:19
**affidavits** [2] - 193:22, 219:25
**afraid** [1] - 204:20
**AFRPL** [4] - 126:7, 127:7, 131:2, 132:7
**afternoon** [1] - 148:4
**agent** [4] - 153:23,

155:11, 196:14, 197:3

**ago** [1] - 137:4
**agree** [13] - 151:21, 152:9, 152:21, 153:2, 160:1, 161:1, 163:6, 169:13, 179:4, 195:24, 201:6, 203:14, 210:10
**agreed** [2] - 199:17
**agrees** [4] - 151:15, 221:8, 221:24, 221:25
**ahead** [8] - 125:6, 138:6, 147:25, 152:8, 166:16, 181:22, 204:22, 207:9
**Air** [4] - 132:7, 140:12, 175:19, 213:12
**AISLIC** [3] - 161:11, 161:12, 164:17
**allocable** [7] - 151:17, 151:18, 155:15, 176:22, 177:3, 177:14, 195:13
**allocate** [1] - 178:24
**allocated** [13] - 154:10, 168:13, 169:1, 170:4, 176:25, 178:11, 179:2, 180:3, 183:12, 188:7, 189:2, 189:11, 189:23
**allocation** [9] - 163:8, 163:23, 165:18, 178:3, 178:18, 198:20, 199:3, 199:22, 200:19
**allow** [1] - 186:20
**allowable** [2] - 151:17, 151:18
**allowed** [1] - 219:1
**alone** [1] - 161:19
**aluminum** [1] - 184:25
**ammonium** [17] - 148:6, 171:14, 173:15, 173:16, 176:16, 177:9, 177:12, 178:8, 178:11, 178:19, 178:21, 179:10, 180:21, 182:9, 182:10, 184:25, 197:4
**amount** [12] - 155:20, 159:2, 159:14, 163:18, 170:20,

179:2, 182:15, 182:18, 182:19, 182:20, 201:2
**analogous** [2] - 163:22, 163:25
**analogy** [1] - 164:1
**analysis** [1] - 167:21
**Angeles** [1] - 207:24
**answer** [7] - 138:6, 142:8, 160:5, 174:25, 180:24, 183:13, 197:11
**answers** [1] - 176:17
**anticipate** [1] - 146:2
**anyway** [1] - 180:16
**anyways** [1] - 221:6
**AOD/LA** [1] - 207:16
**AP** [56] - 148:7, 148:8, 154:18, 154:19, 154:20, 156:9, 156:12, 157:14, 157:16, 158:5, 169:9, 169:18, 169:20, 170:1, 170:3, 170:12, 171:12, 171:13, 171:17, 171:19, 173:21, 176:13, 176:19, 177:10, 177:18, 177:23, 178:15, 178:24, 179:5, 179:7, 179:11, 179:17, 179:24, 180:3, 181:14, 182:10, 182:18, 184:11, 185:10, 186:13, 195:4, 195:8, 195:10, 197:4, 197:10, 198:3, 200:23, 208:22, 208:25, 209:10, 218:9, 221:9, 221:25, 222:1
**apologies** [1] - 142:3
**apologize** [2] - 142:20, 153:13
**apology** [1] - 142:21
**Appeals** [1] - 193:20
**applicability** [2] - 214:14, 215:23
**applies** [1] - 215:6
**approach** [2] - 172:14, 172:15
**appropriate** [1] - 194:4
**approval** [1] - 140:10
**approve** [1] - 213:13
**approved** [1] - 174:7
**area** [3] - 197:22,

197:23, 218:5
**argument** [7] - 165:21, 190:19, 190:21, 193:4, 196:3, 197:9, 200:9
**arising** [1] - 215:13
**Armed** [1] - 213:7
**Army** [6] - 175:19, 204:5, 204:8, 205:21, 207:17, 207:24
**Army-Navy-Air** [1] - 175:19
**arranger** [17] - 161:2, 161:3, 161:4, 161:5, 161:16, 162:3, 164:1, 164:13, 164:17, 164:18, 165:2, 165:14, 166:8, 198:21, 221:3, 222:6
**aside** [1] - 221:6
**aspect** [1] - 188:4
**ASPR** [4] - 211:17, 212:8, 213:6
**associated** [1] - 189:11
**assume** [8] - 137:25, 167:14, 168:21, 188:14, 197:9, 197:17, 200:8, 207:22
**assumed** [1] - 206:6
**assumes** [1] - 132:14
**assuming** [5] - 144:13, 177:7, 189:13, 205:22, 221:7
**assurance** [13] - 129:21, 132:24, 134:3, 134:4, 134:6, 134:8, 134:10, 134:13, 134:15, 134:17, 139:15, 176:21, 199:23
**assure** [1] - 149:23
**attached** [3] - 146:15, 206:10, 212:23
**attachment** [8] - 135:13, 135:24, 136:5, 136:6, 136:7, 136:15, 175:2, 212:20
**attempting** [1] - 140:8
**attention** [3] - 172:8, 172:19, 193:8
**attorneys** [1] - 142:21
**August** [5] - 137:14, 137:24, 137:25, 138:2, 138:16

**author** [1] - 127:2
**authority** [1] - 217:15
**authorized** [1] - 218:6
**authorizes** [1] - 217:20
**aware** [1] - 126:17

# B

**backlog** [1] - 207:19
**ball** [2] - 200:11, 222:7
**base** [1] - 166:18
**based** [3] - 137:14, 154:2, 207:22
**basis** [2] - 160:7, 196:13
**Bates** [3] - 131:3, 140:24, 143:6, 206:13, 206:19
**bear** [3] - 161:7, 169:18, 198:17
**Beaumont** [1] - 219:8
**become** [1] - 198:13
**becomes** [3] - 197:13, 199:8, 207:1
**beginning** [1] - 160:6
**begins** [2] - 168:15, 207:15
**behalf** [1] - 199:2
**behind** [3] - 137:18, 202:12
**bell** [1] - 126:18
**belongs** [1] - 157:24
**below** [1] - 133:21
**Bert** [2] - 207:15, 207:22
**best** [3] - 133:7, 165:12, 212:2
**better** [8] - 133:6, 175:13, 193:3, 196:3, 204:18, 221:13
**between** [8] - 125:2, 136:5, 150:8, 150:9, 154:4, 154:6, 170:12, 201:5
**beyond** [2] - 155:1, 181:5
**big** [5] - 125:24, 126:1, 157:12, 220:19, 222:4
**binder** [18] - 130:22, 143:1, 145:9, 145:11, 146:20, 146:23, 147:22, 147:24, 157:7, 175:1, 193:16, 193:21, 194:3, 202:13, 203:11,

205:25, 211:10, 220:19
**binders** [5] - 146:21, 147:17, 220:13, 220:17, 221:1
**bit** [6] - 152:8, 152:20, 175:25, 186:1, 194:22, 201:19
**bite** [1] - 171:8
**bite-sized** [1] - 171:8
**Blackman** [4] - 219:6, 222:11, 222:14
**blaming** [1] - 162:25
**blocks** [2] - 140:8, 140:16
**Boeing** [8] - 127:21, 128:11, 129:14, 131:20, 150:12, 150:15, 150:18, 184:6
**book** [2] - 132:3, 222:13
**books** [1] - 222:13
**borne** [1] - 180:16
**bottom** [5] - 143:6, 143:8, 185:5, 194:10, 194:11
**bought** [2] - 153:23, 179:23
**break** [6] - 171:7, 174:19, 174:21, 209:25, 210:9, 219:2
**Brief** [1] - 135:16
**brief** [1] - 212:20
**briefly** [1] - 175:7
**bring** [1] - 202:22
**bringing** [1] - 220:6
**broadest** [2] - 150:22, 150:24
**broom** [21] - 188:21, 188:23, 189:2, 189:3, 189:5, 189:9, 189:10, 189:11, 189:14, 189:20, 190:2, 190:4, 190:5, 190:13, 190:16, 195:18, 195:19, 195:23, 196:1
**brooms** [2] - 187:22, 196:8
**brought** [1] - 172:8
**bucket** [1] - 169:15
**building** [14] - 125:14, 125:15, 125:18, 125:22, 126:11, 126:15, 140:8, 140:16, 141:18, 141:19, 153:11, 175:4, 175:5
**buildings** [3] - 126:6,

126:9, 141:18
**bunch** [1] - 179:24
**Burlington** [3] -
161:21, 164:13,
164:16
**burn** [13] - 162:2,
165:20, 165:23,
165:24, 165:25,
166:4, 166:6, 198:3,
198:4, 199:1,
199:14, 200:10
**burned** [3] - 197:20,
199:6
**burnt** [2] - 197:16,
197:17
**business** [1] - 167:16
**butterflies** [1] - 166:17
**buying** [1] - 168:20,
192:7
**BY** [34] - 130:11,
131:6, 132:19,
134:1, 135:1,
135:21, 136:9,
137:12, 137:19,
138:1, 138:24,
139:3, 141:14,
142:18, 142:24,
143:20, 144:23,
145:17, 148:3,
172:18, 175:6,
175:24, 180:13,
185:25, 186:12,
186:24, 192:15,
194:2, 201:17,
202:18, 202:25,
204:23, 207:3,
207:11

**C**

**calculations** [1] -
199:18
**Camp** [6] - 204:17,
205:16, 206:16,
206:25, 207:8,
207:18
**Canaveral** [1] - 165:24
**cannot** [10] - 149:23,
151:1, 157:4,
182:15, 183:15,
183:20, 183:25,
207:17, 209:22,
217:23
**Cape** [1] - 165:24
**caps** [1] - 134:8
**car** [3] - 160:11,
160:12
**care** [1] - 184:5
**cares** [2] - 166:5,

168:1
**case** [21] - 134:5,
145:18, 146:22,
146:24, 149:21,
150:11, 161:22,
162:17, 163:8,
164:13, 165:4,
174:12, 178:1,
179:9, 184:2, 184:3,
196:1, 196:10,
205:23, 215:23,
220:22
**case-in-chief** [1] -
146:22
**cases** [3] - 149:16,
151:12, 164:17
**catastrophic** [2] -
217:22, 218:14
**categories** [1] -
143:12
**caused** [2] - 197:6,
200:12
**ceases** [2] - 197:13,
198:7
**Central** [1] - 148:12
**CERCLA** [16] - 156:6,
161:3, 161:8,
161:16, 163:14,
163:16, 163:24,
164:24, 165:1,
166:9, 198:1, 198:2,
199:2, 199:8,
199:19, 200:1
**ceremony** [1] - 222:9
**certain** [14] - 141:16,
149:3, 151:9,
153:14, 153:18,
154:2, 174:12,
176:19, 181:5,
184:15, 188:19,
218:1, 221:10,
221:23
**certainly** [16] - 136:20,
137:9, 152:8,
159:16, 163:2,
169:6, 173:7, 181:3,
186:8, 188:2,
188:17, 190:3,
193:3, 193:8, 200:2,
214:3
**certainty** [3] - 145:21,
157:2, 191:7
**CERTIFICATE** [1] -
223:1
**certify** [1] - 223:3
**CFR** [2] - 214:19,
216:3
**chance** [3] - 186:18,
202:2, 221:19
**change** [2] - 160:8,

190:25
**characterize** [1] -
127:12
**charge** [4] - 154:21,
177:11, 178:10,
178:16
**charged** [34] - 155:13,
155:15, 169:9,
169:10, 169:12,
169:20, 170:16,
170:23, 173:1,
173:8, 173:9,
173:13, 173:17,
175:20, 176:13,
176:20, 182:22,
183:6, 183:8,
183:17, 187:7,
187:20, 188:5,
188:10, 188:16,
188:18, 188:21,
190:22, 191:3,
195:3, 195:19,
196:5, 196:6
**charges** [1] - 170:20
**chasing** [1] - 166:16
**chemical** [1] - 153:23
**chemicals** [2] - 167:6,
184:25
**chief** [1] - 146:22
**choose** [1] - 178:8
**chose** [2] - 190:2,
190:4
**chunks** [1] - 171:8
**cited** [6] - 146:18,
147:7, 166:13,
207:5, 207:12,
212:19
**claim** [1] - 165:13
**claims** [1] - 215:11
**clarification** [1] -
202:1
**clarify** [2] - 192:16,
203:1
**classification** [1] -
161:3
**clause** [33] - 152:13,
152:16, 154:8,
155:2, 155:4, 163:9,
167:3, 167:19,
171:4, 173:24,
173:25, 174:10,
177:16, 177:19,
180:18, 191:22,
191:23, 195:9,
196:19, 196:21,
208:12, 210:12,
210:14, 211:16,
211:17, 212:8,
212:21, 213:12,
213:13, 213:20,

213:21, 215:3,
216:14
**clauses** [15] - 154:1,
155:14, 160:8,
161:12, 162:8,
163:9, 168:7, 169:5,
190:11, 196:17,
211:3, 211:9,
211:14, 214:5,
214:15
**clean** [2] - 196:14,
200:6
**cleaner** [1] - 200:4
**cleaning** [9] - 141:7,
141:11, 153:23,
155:11, 196:14,
197:3, 219:9, 219:11
**cleanups** [1] - 219:16
**clear** [8] - 148:9,
164:18, 175:16,
186:9, 192:16,
201:7, 203:1, 203:8
**clearly** [1] - 200:8
**clerk** [1] - 147:4
**close** [1] - 164:18
**closed** [4] - 168:9,
168:10, 189:2,
189:24
**coin** [1] - 151:14
**collection** [1] - 148:25
**coming** [2] - 127:15,
129:6
**comment** [1] - 215:4
**commerce** [2] -
161:23, 164:15
**commingled** [1] -
173:6
**Company** [2] - 148:12,
172:21
**company** [1] - 167:16
**competitive** [1] -
151:12
**complete** [1] -
149:11, 149:13,
149:20, 149:22,
149:24, 154:23,
178:23, 185:21,
212:3, 221:21,
221:22
**complex** [1] - 169:5
**complicated** [1] -
169:3
**component** [1] - 183:3
**compound** [1] - 157:3
**concept** [3] - 170:15,
183:25, 198:18
**concerned** [2] -
154:19, 155:14
**concluded** [6] -
190:15, 190:17,

192:24, 194:19,
195:2, 195:22
**conclusion** [3] -
131:7, 152:6, 201:25
**conclusions** [2] -
162:19, 191:9
**condense** [1] - 146:12
**condition** [2] - 134:23,
188:25
**conducted** [2] -
144:19, 182:4
**conferred** [1] - 147:4
**confused** [1] - 217:18
**confusing** [1] - 192:14
**congress** [1] - 161:4
**Congress** [3] - 161:8,
166:9, 218:5
**connect** [1] - 147:10
**consent** [5] - 184:1,
185:4, 185:6, 185:7,
185:8
**conservative** [1] -
154:2
**consider** [1] - 150:21
**consistent** [3] - 152:2,
183:5, 208:1
**consists** [1] - 195:22
**constant** [3] - 168:3,
168:10, 170:6
**consult** [1] - 210:10
**consumed** [12] -
188:6, 188:15,
190:9, 192:20,
192:23, 195:1,
195:6, 195:21,
196:7, 196:8, 197:12
**Consumption** [1] -
194:15
**contained** [3] -
135:13, 155:2, 211:9
**containers** [1] -
156:12
**containing** [2] -
208:25, 216:14
**contains** [2] - 132:8,
213:7
**contaminated** [1] -
171:13
**contamination** [2] -
197:6, 219:11
**contested** [2] -
200:11, 200:25
**context** [2] - 158:15,
186:1
**continue** [2] - 188:20,
189:5
**contract** [116] - 149:1,
149:3, 149:8, 149:9,
149:13, 149:17,
149:20, 149:22,

149:23, 150:5,
150:6, 150:8,
150:16, 150:17,
150:21, 151:8,
151:12, 151:14,
151:16, 151:18,
152:10, 152:11,
152:12, 152:22,
153:3, 154:10,
154:18, 154:21,
154:22, 154:25,
161:15, 162:2,
162:16, 165:5,
167:3, 167:11,
167:16, 167:24,
168:11, 168:12,
168:13, 168:17,
168:22, 168:23,
168:25, 169:2,
169:11, 169:20,
169:21, 169:22,
169:24, 170:1,
170:10, 170:14,
170:16, 170:18,
173:7, 173:10,
173:11, 173:13,
173:17, 176:1,
176:23, 176:24,
176:25, 177:7,
177:9, 177:11,
177:13, 177:14,
178:9, 178:11,
178:25, 179:3,
179:6, 179:11,
179:16, 179:17,
179:25, 180:1,
180:4, 180:18,
181:18, 183:9,
186:17, 187:1,
187:5, 187:8,
187:13, 188:7,
188:9, 188:22,
189:10, 192:1,
192:3, 192:5,
192:11, 192:19,
195:20, 201:4,
203:24, 208:8,
209:9, 209:13,
210:21, 212:5,
212:21, 215:17,
215:19, 216:8,
216:9, 217:6, 221:23
**contracted** [5] - 150:6,
150:12, 150:15,
150:18, 165:2
**contracting** [2] -
188:5, 190:9
**contractor** [19] -
150:10, 150:15,
156:23, 161:15,
167:9, 168:24,

170:16, 173:1,
173:7, 174:13,
174:15, 176:6,
176:9, 176:11,
177:22, 186:15,
192:11, 215:10,
215:13
**contractor's** [5] -
156:20, 164:3,
164:4, 204:11,
215:13
**contractors** [4] -
155:3, 180:7,
180:11, 213:13
**contracts** [70] -
140:14, 148:15,
148:22, 149:2,
149:10, 149:14,
149:18, 149:25,
150:1, 150:24,
150:25, 151:3,
151:6, 151:7,
151:22, 151:24,
151:25, 152:4,
152:5, 153:16,
154:1, 154:5, 154:7,
154:9, 154:24,
155:13, 156:18,
162:4, 162:5, 162:6,
162:7, 162:11,
163:10, 166:18,
166:25, 167:13,
168:6, 168:7,
168:13, 169:4,
170:6, 175:19,
176:14, 176:20,
177:4, 177:17,
178:17, 180:14,
181:5, 183:13,
183:18, 189:1,
189:6, 189:8,
189:23, 191:10,
195:9, 201:3,
208:13, 211:13,
211:18, 214:21,
215:3, 215:17,
216:11, 216:14,
218:23, 221:22
**contractual** [1] -
217:15
**contrary** [3] - 182:3,
190:19, 190:21
**control** [7] - 153:21,
156:14, 158:5,
178:18, 178:20,
178:23, 189:7
**Control** [1] - 147:21
**convention** [2] -
188:8, 188:14
**copied** [1] - 206:20

**copy** [10] - 157:13,
172:9, 172:10,
172:13, 172:15,
186:5, 213:3,
213:23, 214:1, 214:7
**corner** [1] - 143:7
**Corporation** [1] -
175:5
**correct** [57] - 130:13,
131:12, 131:15,
131:21, 131:22,
131:25, 149:8,
150:1, 150:13,
150:14, 150:16,
150:20, 151:4,
151:10, 151:16,
152:14, 153:6,
154:14, 173:1,
173:8, 173:13,
173:14, 173:20,
174:11, 175:10,
176:7, 176:14,
177:14, 177:19,
177:24, 178:12,
178:21, 180:16,
180:22, 182:5,
185:12, 186:17,
187:2, 187:9, 188:7,
188:13, 189:12,
190:10, 194:13,
202:19, 203:21,
205:1, 205:8, 207:5,
207:12, 208:14,
208:16, 209:3,
209:12, 209:20,
215:24, 223:4
**correctly** [2] - 172:23,
207:21
**cost** [57] - 151:14,
151:17, 154:5,
154:8, 154:22,
169:17, 169:24,
170:14, 173:7,
173:17, 176:1,
176:20, 176:22,
176:25, 177:2,
177:3, 177:4,
177:10, 177:11,
177:12, 177:13,
177:14, 177:16,
177:22, 178:9,
178:10, 178:25,
179:25, 182:22,
182:25, 183:6,
183:8, 183:9,
183:12, 183:18,
184:7, 186:16,
187:8, 187:13,
188:9, 188:15,
189:2, 189:11,

189:14, 189:20,
191:10, 191:12,
191:16, 191:19,
195:9, 197:9,
203:24, 208:8
**costs** [7] - 151:15,
176:14, 176:23,
189:8, 189:10,
195:14, 204:12
**counsel** [9] - 137:2,
141:15, 157:9,
162:13, 202:3,
216:19, 216:22,
219:2, 220:11
**couple** [2] - 127:18,
148:6
**course** [4] - 156:22,
176:11, 190:3, 219:2
**COURT** [292] - 125:3,
125:6, 125:9,
125:14, 125:16,
125:19, 126:2,
126:5, 126:10,
126:14, 126:17,
126:20, 126:22,
127:1, 127:8,
127:10, 127:12,
127:18, 127:23,
128:1, 128:4, 128:7,
128:9, 128:11,
128:13, 128:16,
128:22, 129:4,
129:10, 129:14,
129:18, 129:25,
130:4, 130:7,
130:25, 132:15,
132:17, 133:25,
134:4, 134:8,
134:11, 134:14,
134:17, 134:20,
134:25, 135:15,
135:17, 135:20,
136:6, 136:24,
137:5, 137:9,
137:15, 137:23,
138:6, 138:11,
138:15, 139:2,
139:25, 140:5,
140:19, 140:21,
140:24, 141:1,
141:5, 141:7,
141:10, 141:13,
142:8, 142:14,
142:23, 143:18,
144:11, 144:18,
145:2, 145:6, 145:9,
145:25, 146:6,
146:25, 147:5,
147:12, 147:14,
147:19, 147:23,

147:25, 153:4,
153:8, 153:11,
153:14, 153:17,
153:22, 154:12,
154:17, 154:22,
155:7, 155:10,
155:16, 155:21,
155:24, 156:8,
156:21, 157:1,
157:5, 157:13,
157:17, 157:22,
158:1, 158:4,
158:11, 158:19,
158:23, 159:3,
159:6, 159:12,
159:16, 159:22,
160:1, 160:3,
160:11, 160:15,
160:19, 161:17,
161:21, 162:4,
162:9, 162:11,
162:24, 163:3,
163:11, 163:19,
164:9, 165:3,
165:10, 165:19,
166:10, 166:12,
166:15, 166:21,
166:23, 167:5,
167:10, 167:14,
167:20, 168:4,
168:17, 168:20,
169:6, 169:18,
170:8, 170:11,
171:10, 171:16,
171:23, 171:25,
172:6, 172:11,
172:13, 172:16,
174:18, 174:21,
175:15, 179:23,
180:5, 180:23,
181:4, 181:10,
181:15, 181:17,
183:22, 184:9,
184:17, 184:20,
184:22, 185:2,
185:6, 185:9,
185:14, 185:21,
185:24, 186:6,
186:11, 186:22,
191:1, 191:4,
191:12, 191:15,
191:20, 191:24,
192:4, 192:9,
192:13, 193:12,
193:15, 193:19,
194:8, 195:6,
196:13, 196:19,
196:25, 197:14,
197:23, 198:2,
198:8, 198:11,
198:13, 198:16,

199:4, 199:13, 199:23, 200:2, 200:15, 200:20, 200:23, 201:8, 201:11, 202:8, 202:11, 202:16, 202:21, 202:24, 204:16, 204:22, 205:13, 205:24, 206:2, 206:8, 206:10, 206:15, 206:18, 206:22, 206:24, 207:8, 209:24, 210:3, 210:5, 210:12, 210:17, 210:21, 210:25, 211:2, 211:11, 211:19, 211:24, 212:1, 212:4, 212:11, 212:13, 212:16, 212:23, 213:5, 213:9, 213:14, 213:18, 213:22, 214:2, 214:4, 214:9, 214:11, 214:13, 214:17, 214:23, 215:7, 215:10, 215:20, 215:22, 216:2, 216:9, 216:15, 216:17, 216:24, 217:3, 217:7, 217:13, 217:17, 218:4, 218:8, 218:15, 218:22, 219:12, 219:17, 219:22, 220:2, 220:8, 220:11, 221:18, 222:4, 222:17, 222:19, 222:21, 222:23, 223:1
**Court** [8] - 136:18, 162:18, 163:7, 181:9, 182:8, 187:18, 193:20, 213:4
**court** [1] - 147:4
**Court's** [6] - 163:7, 164:14, 174:25, 176:12, 201:18, 210:7
**courtroom** [1] - 133:13
**Cousens** [2] - 207:16, 207:22
**cover** [6] - 130:1, 130:3, 210:9, 217:23, 218:9, 218:14

**create** [1] - 164:1
**creating** [1] - 197:21
**credit** [4] - 157:24, 159:15, 160:25
**credited** [1] - 174:16
**crediting** [1] - 174:7
**creditor** [1] - 163:24
**critical** [2] - 133:15, 133:18
**cross** [6] - 125:2, 136:25, 146:22, 162:16, 174:18, 194:22
**CROSS** [1] - 148:2
**cross-examination** [1] - 194:22
**CROSS-EXAMINATION** [1] - 148:2
**cross-walk** [1] - 125:2
**crunch** [1] - 213:1
**Current** [1] - 133:1
**current** [3] - 133:4, 204:12, 219:6
**cut** [1] - 153:4

# D

**damage** [2] - 210:14, 215:12
**dangerous** [2] - 144:3, 215:16
**Darrell** [1] - 155:4
**data** [1] - 154:16
**database** [1] - 149:21
**date** [4] - 132:5, 136:6, 136:7, 179:14
**DATE** [1] - 223:9
**dated** [4] - 135:24, 136:1, 157:7, 175:9
**DCAS** [16] - 128:11, 129:1, 131:20, 132:22, 133:2, 133:5, 133:14, 133:17, 133:21, 135:3, 135:4, 135:8, 136:13, 136:20, 138:2, 184:13
**deal** [3] - 175:22, 187:11, 222:4
**dealer** [1] - 160:17
**dealing** [6] - 154:13, 154:24, 169:8, 171:18, 185:15, 195:8
**deals** [1] - 210:23
**debate** [1] - 153:5
**December** [3] - 135:25, 136:8,

136:20
**deciding** [3] - 135:6, 135:9, 158:11
**decision** [4] - 161:11, 161:12, 164:14, 164:17
**deck** [1] - 185:22
**declaration** [1] - 212:12
**deemed** [1] - 188:6
**define** [1] - 134:20
**defined** [1] - 196:21
**definition** [1] - 174:13
**degreaser** [5] - 126:22, 153:6, 153:8, 153:18, 199:10
**degree** [2] - 145:21, 157:2
**Delaney** [2] - 219:18, 222:19
**delivered** [2] - 177:23, 209:11
**delivering** [1] - 209:15
**delivery** [2] - 178:2, 208:24
**demands** [1] - 133:8
**demolished** [1] - 160:12
**department** [2] - 129:21, 140:22
**departments** [2] - 142:5
**describe** [2] - 149:2, 201:21
**describing** [1] - 131:10
**desirable** [1] - 155:4
**desiring** [1] - 184:14
**determination** [1] - 164:5
**determine** [2] - 133:6, 215:19
**development** [2] - 177:5, 180:22
**device** [1] - 170:23
**Dick** [1] - 145:8
**difference** [3] - 156:3, 170:12, 171:11
**different** [9] - 138:12, 168:25, 169:4, 194:24, 196:4, 196:7, 198:12, 217:5
**difficulty** [1] - 146:24
**direct** [24] - 131:17, 131:23, 133:10, 135:22, 136:11, 136:24, 137:6, 154:10, 154:21, 169:10, 170:16,

176:14, 176:20, 176:22, 177:12, 178:15, 187:8, 192:17, 193:8, 193:22, 194:7, 197:9, 220:2, 220:8
**DIRECT** [1] - 145:16
**directing** [1] - 172:19
**directly** [8] - 150:6, 169:20, 173:1, 173:8, 173:9, 173:13, 173:17, 197:11
**disadvantaged** [1] - 162:18
**disagree** [2] - 201:2, 201:5
**discard** [1] - 190:1
**discuss** [4] - 174:22, 187:16, 202:2, 219:1
**discussed** [1] - 192:3
**discusses** [2] - 172:2, 172:3
**discussing** [2] - 186:15, 209:15
**discussion** [1] - 135:16
**discussions** [1] - 171:20
**disk** [2] - 147:9, 213:3
**disposal** [17] - 130:1, 140:13, 140:18, 143:14, 143:23, 143:25, 144:19, 161:19, 162:8, 164:5, 174:7, 191:1, 198:5, 199:11, 205:4, 207:17, 218:9
**dispose** [16] - 161:6, 161:7, 161:10, 162:2, 164:20, 165:2, 174:6, 174:14, 200:9, 204:7, 204:16, 204:17, 205:1, 205:17, 205:21, 208:2
**disposed** [6] - 161:15, 164:25, 166:1, 179:20, 191:2, 191:5
**disposes** [1] - 198:6
**disposing** [1] - 206:25
**disposition** [6] - 156:14, 174:5, 201:22, 204:2, 204:6, 205:15
**distinction** [1] - 170:12
**document** [36] - 127:1, 127:3, 127:5,

127:7, 131:8, 132:6, 132:8, 132:18, 135:25, 140:25, 143:7, 157:7, 158:7, 172:2, 172:3, 172:8, 175:14, 175:21, 184:9, 186:3, 186:14, 186:19, 203:14, 203:25, 204:1, 204:5, 205:12, 206:6, 207:5, 207:12, 209:7, 209:8, 210:13, 210:15, 210:19, 210:23
**documentary** [1] - 209:14
**documentation** [1] - 139:15
**documents** [31] - 136:12, 136:19, 137:14, 137:15, 137:17, 137:18, 137:23, 139:5, 140:16, 146:8, 146:9, 146:14, 146:17, 146:23, 147:10, 147:15, 147:21, 149:1, 151:23, 201:24, 202:21, 202:23, 205:13, 206:4, 206:8, 209:18, 220:20, 221:21, 222:12, 222:15
**DOD** [2] - 140:12, 218:6
**dollars** [2] - 155:1, 167:4
**done** [3] - 140:15, 184:1, 210:11
**double** [2] - 219:24, 220:3
**down** [9] - 132:20, 145:6, 171:7, 183:20, 194:10, 199:15, 201:19, 213:18, 218:2
**draw** [1] - 140:17
**drawing** [2] - 158:3, 170:12
**drawings** [1] - 125:20
**drawn** [1] - 140:9
**due** [1] - 163:9
**duly** [2] - 125:11, 145:13
**dump** [2] - 159:7, 165:6
**during** [7] - 141:19, 162:1, 199:9,

199:10, 199:21, 201:7, 219:2
**dust** [1] - 153:20

## E

**earliest** [1] - 178:1
**early** [1] - 136:19
**ease** [1] - 146:4
**edges** [1] - 201:1
**effect** [2] - 152:1, 209:18
**effectiveness** [1] - 141:11
**either** [14] - 151:11, 157:3, 157:11, 162:14, 164:3, 174:4, 177:21, 181:6, 187:6, 198:3, 199:5, 208:8, 208:17, 220:12
**eludes** [1] - 160:21
**eluding** [1] - 163:4
**embodying** [1] - 132:9
**employee** [4] - 219:6, 219:13, 219:15, 219:16
**employees** [1] - 144:25
**enacted** [1] - 217:22
**end** [24] - 147:15, 153:3, 165:5, 167:6, 167:11, 167:18, 168:7, 168:14, 168:22, 169:22, 170:1, 171:6, 173:5, 173:11, 179:17, 179:18, 180:1, 185:17, 187:13, 188:15, 188:22, 192:10, 217:24, 222:5
**endeavor** [1] - 203:5
**engineering** [1] - 139:13
**engines** [1] - 183:3
**ensure** [1] - 144:24
**enter** [1] - 165:18
**entire** [6] - 162:20, 175:14, 189:14, 215:17, 215:18, 216:7
**entirely** [1] - 180:10
**entitled** [3] - 159:14, 194:15, 223:5
**entity** [2] - 159:10, 161:19
**environmental** [1] - 219:8

**equipment** [4] - 141:8, 153:15, 153:21, 164:10
**equitable** [6] - 165:18, 198:19, 198:22, 199:22, 200:18, 221:4
**equity** [1] - 181:21
**equivalent** [1] - 183:11
**erroneous** [1] - 182:2
**escape** [1] - 161:9
**escapes** [2] - 149:7, 181:22
**established** [1] - 137:3
**evaporated** [1] - 221:11
**evaporation** [1] - 199:14
**evening** [2] - 216:18, 222:23
**event** [1] - 156:18
**events** [1] - 137:3
**evidence** [12] - 132:14, 149:3, 152:1, 154:3, 166:25, 181:13, 182:19, 193:12, 193:15, 194:8, 209:15, 222:16
**evidentiary** [1] - 194:16
**exact** [4] - 151:1, 182:15, 183:20, 187:12
**exactly** [13] - 125:18, 138:20, 148:20, 169:7, 171:1, 181:7, 190:23, 196:12, 198:15, 201:11, 215:5, 215:6, 221:9
**examination** [1] - 194:22
**EXAMINATION** [4] - 130:10, 142:17, 145:16, 148:2
**examined** [2] - 125:12, 145:14
**example** [12] - 154:3, 162:9, 167:1, 169:2, 184:3, 184:13, 195:18, 195:23, 212:2, 212:3, 212:19, 217:14
**examples** [1] - 217:5
**except** [2] - 147:15, 157:19
**excerpt** [1] - 214:18
**Excuse** [1] - 143:5

**excuse** [4] - 143:15, 149:5, 152:6, 192:20
**exemption** [1] - 163:24
**exercised** [1] - 189:7
**exercising** [1] - 158:4
**Exhibit** [28] - 130:23, 131:1, 132:3, 140:1, 140:19, 157:5, 172:9, 175:7, 186:2, 193:11, 202:4, 203:3, 203:4, 203:5, 203:10, 203:16, 204:24, 207:4, 212:7, 212:10, 212:18, 212:23, 213:21, 214:1, 216:13, 216:19, 218:24
**exhibit** [12] - 147:1, 187:18, 193:19, 193:24, 211:20, 211:22, 213:1, 213:15, 220:12, 220:14, 220:17
**exhibits** [7] - 146:2, 146:3, 147:5, 201:20, 203:9, 212:16, 213:2
**Exhibits** [1] - 175:2
**exist** [5] - 130:17, 188:20, 196:20, 197:13, 198:7
**existence** [1] - 149:4
**existent** [1] - 221:11
**exists** [2] - 153:1, 188:18
**expect** [2] - 129:1, 152:2
**expected** [1] - 129:2
**expensive** [1] - 208:19
**experience** [2] - 215:8, 219:11
**expert** [4] - 181:6, 200:23, 219:19, 221:24
**explain** [4] - 139:25, 146:1, 148:24, 184:10
**explained** [1] - 195:25
**explanation** [1] - 154:24
**explicit** [2] - 173:25, 174:9
**extraordinary** [1] - 218:6
**extreme** [2] - 184:3, 195:25
**extremely** [1] - 166:25

## F

**fabrication** [1] - 133:6
**facilities** [17] - 153:14, 153:16, 153:18, 164:7, 211:17, 212:5, 212:21, 214:21, 215:3, 215:14, 215:17, 215:18, 216:7, 216:9, 216:10, 216:13, 218:23
**facility** [4] - 164:9, 181:13, 199:21, 205:16
**fact** [13] - 138:8, 138:11, 157:19, 162:19, 167:22, 180:24, 182:6, 185:4, 192:19, 200:22, 203:3, 203:19, 220:5
**factors** [1] - 163:5
**facts** [3] - 132:14, 181:1, 206:22
**factually** [2] - 221:6, 221:14
**failed** [1] - 208:7
**fair** [16] - 127:12, 127:23, 130:15, 136:18, 148:16, 152:6, 158:4, 186:25, 191:4, 191:6, 204:3, 205:11, 215:24, 218:8, 222:1
**fairness** [1] - 163:23
**familiar** [2] - 213:9, 213:11
**far** [4] - 132:1, 152:8, 163:8, 182:17
**fashion** [1] - 166:2
**fast** [1] - 207:6
**faster** [1] - 210:1
**fault** [2] - 175:15, 220:18
**favor** [1] - 214:21
**Fe** [1] - 161:21
**fear** [1] - 218:2
**February** [7] - 132:6, 135:8, 136:1, 136:20, 157:8, 172:22, 175:9
**feedback** [1] - 219:24
**feelings** [1] - 210:8
**Feenstra** [1] - 219:21
**few** [3] - 129:19, 130:8, 139:23
**figure** [3] - 162:13,

220:24, 220:25
**file** [1] - 219:24
**filed** [3] - 219:25, 220:4
**filled** [1] - 156:12
**finally** [1] - 175:13
**finance** [1] - 164:3
**findings** [1] - 162:19
**fine** [2] - 219:22, 222:17
**finish** [6] - 133:25, 201:14, 218:19, 219:5, 219:21, 222:10
**finished** [4] - 196:15, 208:24, 210:5, 210:8
**finishing** [1] - 168:11
**fire** [1] - 142:22
**first** [24] - 127:18, 130:12, 132:2, 132:4, 132:21, 133:10, 135:22, 135:25, 137:20, 137:21, 142:19, 145:10, 145:13, 146:3, 146:17, 147:20, 152:21, 160:10, 172:19, 173:15, 179:14, 195:8, 203:11, 207:15
**five** [7] - 125:23, 146:14, 166:10, 166:18, 166:20, 221:2, 222:5
**five-page** [1] - 166:10
**fixed** [35] - 151:3, 151:5, 151:7, 151:8, 151:22, 151:25, 152:5, 152:9, 152:12, 152:22, 153:3, 154:13, 154:24, 154:25, 167:2, 168:6, 169:25, 179:5, 179:11, 179:16, 180:14, 180:17, 183:18, 187:1, 187:5, 191:10, 191:18, 192:5, 192:11, 201:2, 201:3, 203:24, 208:9, 208:13
**fixed-price** [29] - 151:3, 151:5, 151:7, 151:8, 151:22, 151:25, 152:5, 152:9, 152:12, 152:22, 153:3, 154:24, 154:25,

168:6, 179:5, 179:16, 180:14, 180:17, 183:18, 187:1, 187:5, 191:10, 192:5, 192:11, 201:2, 201:3, 203:24, 208:9, 208:13
**flow** [3] - 168:3, 168:4, 191:16
**flows** [1] - 191:19
**fluid** [1] - 168:20
**fly** [1] - 143:18
**focus** [3] - 140:5, 220:12, 221:20
**focused** [1] - 140:18
**focusing** [1] - 188:4
**follow** [2] - 160:6, 170:24
**followed** [1] - 188:8
**following** [2] - 129:22, 129:25
**follows** [2] - 125:13, 145:15
**footnote** [5] - 147:8, 202:11, 202:19, 203:2, 207:13
**force** [1] - 175:19
**Force** [4] - 132:7, 140:12, 175:19, 213:12
**foregoing** [1] - 223:4
**formal** [3] - 132:23, 133:22, 134:2
**forward** [2] - 153:21, 181:3
**foundation** [2] - 132:14, 137:4
**four** [1] - 134:21
**four-inch** [1] - 134:21
**fourth** [1] - 132:21
**free** [2] - 190:1, 190:5
**frequently** [2] - 188:19, 188:20
**Friday** [2] - 219:23, 220:4
**front** [8] - 127:4, 127:9, 146:5, 202:6, 214:24, 214:25, 216:8
**funds** [3] - 180:9, 187:24, 189:24

## G

**GCR** [1] - 209:16
**GCRC** [1] - 208:22
**general** [2] - 127:19, 182:25

**generally** [1] - 171:4
**generated** [1] - 203:23
**GERALD** [1] - 125:10
**gist** [2] - 206:18, 206:22
**given** [5] - 185:5, 216:25, 219:19, 220:17, 221:1
**goal** [1] - 146:8
**gosh** [1] - 128:8
**governed** [1] - 143:23
**government** [156] - 127:5, 127:8, 127:13, 127:21, 138:22, 140:10, 150:1, 150:5, 150:7, 150:9, 150:10, 150:16, 150:21, 150:24, 151:5, 151:7, 151:15, 151:22, 151:24, 152:10, 152:17, 152:24, 153:3, 153:5, 153:8, 153:9, 154:8, 154:9, 155:18, 155:24, 156:3, 156:5, 156:17, 156:19, 156:23, 157:3, 158:8, 159:13, 160:22, 160:24, 160:25, 161:13, 161:14, 161:25, 162:10, 163:10, 164:2, 164:23, 164:24, 165:11, 165:22, 166:2, 166:4, 166:6, 167:7, 167:23, 170:5, 170:14, 171:3, 172:5, 173:12, 173:17, 173:19, 174:6, 174:8, 174:16, 175:9, 176:9, 176:13, 176:20, 177:7, 177:16, 177:17, 177:21, 177:22, 178:6, 178:25, 179:6, 179:12, 179:14, 179:25, 180:2, 182:11, 182:17, 183:7, 183:9, 183:10, 183:12, 183:16, 183:18, 183:22, 184:2, 184:3, 185:10, 187:17, 187:19, 188:7, 188:9, 188:22,

189:1, 189:13, 189:18, 190:16, 190:18, 190:21, 191:10, 191:16, 191:22, 192:24, 193:19, 194:19, 195:2, 195:8, 195:10, 195:12, 195:15, 195:20, 195:22, 196:1, 196:11, 196:14, 197:8, 199:2, 199:21, 200:9, 200:24, 201:14, 201:21, 204:1, 205:7, 205:11, 205:14, 205:16, 205:20, 206:24, 208:1, 208:10, 208:21, 208:22, 209:2, 209:9, 209:12, 209:15, 211:13, 211:20, 212:21, 213:14, 214:21, 215:4, 215:11, 218:16, 219:13, 220:18, 221:8, 222:2
**government's** [4] - 146:25, 169:16, 189:15, 189:22
**government-owned** [2] - 160:24, 164:23
**governs** [1] - 169:21
**Grand** [1] - 148:11
**great** [3] - 159:8, 175:22, 203:13
**grind** [2] - 141:21, 171:14
**grinder** [5] - 153:9, 153:10, 153:18, 164:8, 175:4
**grinders** [4] - 175:4, 201:9, 201:10
**grinding** [1] - 199:10
**ground** [8] - 159:23, 160:4, 165:11, 171:13, 171:17, 197:2, 200:13
**groundwater** [3] - 199:20, 219:10, 219:11
**group** [1] - 128:17
**groups** [2] - 127:19, 127:21
**guarantee** [1] - 206:21
**guess** [7] - 130:2, 146:24, 192:12, 199:24, 200:17, 203:7, 204:18

**guiding** [1] - 140:13

## H

**hand** [4] - 143:7, 172:10, 186:5, 220:14
**handle** [1] - 217:22
**handled** [1] - 141:16
**handles** [1] - 144:4
**handling** [1] - 175:22
**handy** [1] - 125:20
**happy** [1] - 221:4
**hard** [5] - 125:3, 144:9, 169:7, 213:23, 214:1
**hard-pressed** [1] - 169:7
**hardly** [1] - 159:8
**harm** [1] - 200:12
**harmless** [1] - 215:11
**haul** [1] - 198:2
**head** [1] - 218:4
**health** [1] - 219:9
**hear** [5] - 128:14, 142:20, 207:9, 217:13
**heard** [1] - 201:15
**held** [2] - 129:9, 129:17
**help** [2] - 162:13, 164:3
**helped** [1] - 219:7
**helpful** [4] - 162:21, 163:7, 164:5, 212:22
**helping** [1] - 208:1
**helps** [1] - 222:7
**here..** [1] - 147:16
**hesitant** [2] - 186:20, 190:12
**hesitate** [1] - 218:11
**highlight** [1] - 132:4
**highly** [1] - 155:3
**hired** [1] - 209:10
**hold** [6] - 128:21, 129:5, 129:14, 142:15, 211:5, 215:11
**holding** [4] - 129:7, 129:11, 129:12, 163:17
**honest** [1] - 206:5
**Honor** [113] - 125:5, 125:7, 130:8, 131:1, 132:13, 135:14, 135:18, 136:7, 136:23, 137:2, 137:8, 137:22, 138:5, 140:7, 142:2,

142:7, 142:12, 145:5, 145:8, 145:10, 145:24, 146:2, 146:17, 146:21, 147:7, 147:18, 147:21, 148:1, 153:7, 153:13, 153:16, 153:20, 153:25, 157:10, 157:11, 161:2, 161:11, 161:20, 161:22, 162:6, 162:8, 162:15, 162:16, 162:17, 162:23, 163:13, 163:21, 164:6, 164:12, 164:16, 164:22, 165:15, 166:9, 166:11, 166:14, 166:20, 168:3, 171:7, 171:18, 172:7, 172:12, 174:20, 174:25, 180:2, 181:2, 181:12, 181:23, 183:24, 184:12, 186:4, 186:8, 192:6, 193:13, 193:18, 194:1, 196:17, 198:24, 199:8, 199:17, 200:17, 201:1, 201:6, 201:16, 202:10, 202:22, 204:20, 206:1, 206:5, 206:9, 206:12, 206:20, 209:23, 210:1, 210:7, 211:8, 212:6, 212:18, 212:25, 213:6, 213:10, 213:25, 214:1, 214:15, 216:1, 216:12, 217:4, 217:20, 218:21, 219:4, 219:15, 220:5, 222:14, 222:20
**hopefully** [1] - 219:20
**hoping** [2] - 146:7, 204:25
**hoses** [1] - 142:22
**hour** [2] - 146:13, 174:20
**house** [1] - 139:13
**how'd** [1] - 204:16, 204:17
**huge** [1] - 167:3
**hundred** [1] - 167:4
**hundreds** [3] - 148:15,

148:17, 148:22
**Huvelle** [3] - 142:25, 143:11, 143:13
**hyperlinks** [1] - 147:10
**hypothetically** [4] - 165:3, 165:14, 165:15, 168:17
**hypotheticals** [3] - 180:25, 181:3

**I**

**idea** [4] - 140:15, 175:13, 180:5, 210:3
**identifiable** [2] - 149:2, 177:1
**identification** [1] - 193:10
**identified** [5] - 201:20, 202:5, 205:12, 212:7, 212:9
**identifies** [3] - 203:2, 205:10, 212:20
**identify** [3] - 143:24, 175:2, 202:3
**II** [1] - 217:24
**imagine** [1] - 184:2
**imbued** [1] - 163:8
**implement** [1] - 133:7
**implemented** [1] - 131:24
**importance** [2] - 163:4, 217:12
**important** [1] - 164:23
**importantly** [1] - 200:25
**impossible** [4] - 149:12, 170:25, 191:7
**improperly** [1] - 218:9
**inch** [1] - 134:21
**include** [4] - 134:17, 174:4, 187:21
**included** [2] - 147:9, 154:1
**includes** [4] - 136:16, 174:13, 187:23, 219:2
**inclusion** [1] - 214:20
**incorporate** [1] - 162:7
**incorporated** [3] - 179:18, 183:2, 217:5
**increased** [1] - 138:15
**incur** [1] - 189:9
**incurred** [5] - 151:15, 176:23, 177:3, 177:13, 189:9

**indemnification** [12] - 211:3, 211:4, 211:6, 211:9, 211:13, 212:20, 213:11, 214:16, 214:19, 214:20, 216:14, 217:14
**indemnity** [4] - 211:7, 211:16, 211:17, 217:20
**independent** [2] - 177:5, 180:21
**index** [1] - 220:15
**indicates** [1] - 205:6
**indicating** [1] - 175:3
**indirect** [23] - 154:10, 155:13, 155:15, 169:12, 169:17, 170:23, 177:2, 178:10, 182:22, 183:6, 183:8, 183:12, 187:20, 188:5, 189:13, 191:3, 191:15, 191:21, 195:3, 195:14, 195:19, 201:4
**indirectly** [6] - 183:17, 188:17, 188:22, 190:22, 196:5, 196:6
**indivisible** [2] - 183:11, 183:15
**industrial** [2] - 215:14, 219:20
**infer** [2] - 159:4, 159:19
**inference** [1] - 158:3
**information** [1] - 157:19
**injury** [1] - 215:11
**inquiry** [3] - 172:21, 173:19, 175:9
**inspect** [6] - 127:14, 127:20, 131:10, 132:11, 133:19, 138:13
**inspected** [1] - 143:13
**inspecting** [5] - 127:15, 129:19, 132:12, 143:25, 144:15
**Inspection** [1] - 127:10
**inspection** [26] - 127:19, 128:17, 128:19, 129:21, 129:22, 130:3, 130:6, 131:14, 132:9, 132:10, 133:7, 133:11,

133:13, 134:12, 135:7, 135:9, 135:12, 136:14, 136:16, 136:21, 138:3, 138:15, 139:15, 208:7
**inspections** [5] - 129:15, 143:2, 143:4, 144:18, 144:24
**inspectors** [15] - 127:24, 128:1, 128:4, 128:6, 128:25, 129:1, 131:11, 131:19, 132:11, 134:14, 143:12, 143:13, 143:15, 143:17, 143:25
**inspects** [1] - 128:13
**instance** [29] - 129:11, 150:11, 150:12, 185:9, 188:21, 220:18
**instances** [1] - 191:19
**instructed** [1] - 199:1
**instructions** [2] - 173:25, 174:5
**insufficient** [2] - 154:16, 161:19
**insurance** [1] - 217:23
**intend** [1] - 218:19
**intended** [2] - 157:10, 218:14
**interactions** [1] - 139:12
**interest** [6] - 160:20, 163:17, 163:20, 164:2, 172:5, 211:14
**interesting** [4] - 163:12, 185:4, 190:6, 200:3
**internal** [1] - 140:6
**interpret** [1] - 215:16
**interpretation** [1] - 136:19
**introduce** [1] - 193:16
**inundated** [1] - 146:7
**inventories** [2] - 180:8, 191:25
**inventory** [28] - 173:12, 173:18, 174:1, 174:5, 176:2, 176:5, 176:6, 178:3, 178:22, 179:24, 180:4, 180:11, 180:15, 186:10, 186:13, 186:14, 186:18, 186:22, 186:25, 191:24,

192:2, 192:7, 192:8, 192:12, 197:5, 204:25, 205:6, 205:10
**investment** [2] - 164:4, 180:9
**involved** [1] - 132:12
**IR&D** [3] - 181:23, 182:3, 182:4
**Irwin** [6] - 204:17, 205:16, 206:16, 206:25, 207:8, 207:18
**issue** [7] - 152:9, 159:24, 162:22, 197:20, 200:11, 221:20, 222:6
**issues** [3] - 197:21, 200:21, 200:24
**item** [4] - 177:1, 187:23, 188:10, 197:12
**Items** [1] - 205:4
**items** [6] - 141:8, 185:1, 186:13, 192:12, 204:7, 208:20
**itself** [3] - 149:8, 149:9, 163:14

**J**

**Jim** [2] - 211:10, 212:6
**job** [2] - 128:21, 213:12
**Johnson** [8] - 145:8, 145:18, 148:4, 148:15, 172:19, 175:7, 201:6, 219:5
**JOHNSON** [64] - 145:12, 145:24, 146:1, 146:17, 147:7, 147:13, 148:1, 148:3, 153:7, 153:10, 153:13, 153:16, 157:10, 162:22, 163:2, 163:6, 163:13, 163:21, 171:7, 172:7, 172:12, 172:14, 172:18, 174:20, 174:25, 175:6, 175:24, 180:13, 181:2, 181:7, 185:25, 186:8, 186:12, 186:24, 192:15, 193:13, 193:18, 194:1, 194:2, 201:16, 201:17,

202:10, 202:13, 202:18, 202:22, 202:25, 204:20, 204:23, 206:1, 206:5, 207:3, 207:11, 210:7, 211:8, 212:6, 212:12, 212:14, 212:18, 212:25, 213:6, 213:25, 214:3, 216:12, 216:16
**Johnson's** [1] - 146:19
**joint** [1] - 175:19
**Judge** [3] - 142:25, 143:11, 143:12
**judge** [3] - 130:21, 131:9, 141:17
**judgment** [1] - 156:25
**judgments** [1] - 154:2
**jump** [1] - 201:19
**jumping** [1] - 152:8
**June** [1] - 207:18
**jury** [2] - 220:21, 220:25

**K**

**KANESHIRO** [1] - 223:9
**Kaneshiro** [1] - 223:3
**KANESHIRO-MILLER** [1] - 223:9
**Kaneshiro-Miller** [1] - 223:3
**keep** [2] - 178:18, 180:11
**key** [2] - 146:8, 146:9
**kind** [14] - 139:11, 151:1, 151:2, 153:15, 180:8, 182:24, 183:13, 191:11, 192:1, 192:2, 192:13, 194:22, 200:15, 209:7
**kinds** [2] - 154:23, 187:22
**knowing** [1] - 151:21
**knowledge** [4] - 131:24, 142:1, 143:14, 161:19
**known** [4] - 127:20, 132:23, 133:22, 134:2
**knows** [5] - 144:3, 144:5, 173:9, 181:4, 198:16

# L

**Lab** [1] - 132:7
**labeled** [2] - 172:20, 203:11
**lacks** [2] - 132:13, 137:4
**land** [2] - 218:4, 218:5
**lands** [1] - 165:10
**language** [4] - 174:2, 174:9, 210:22, 217:6
**large** [6] - 129:20, 142:4, 167:1, 180:8, 208:6, 208:19
**largely** [1] - 208:19
**last** [4] - 194:16, 194:17, 202:13, 217:21
**lasted** [1] - 146:13
**lasting** [1] - 155:17
**lasts** [1] - 178:7
**latest** [1] - 164:14
**law** [7] - 147:4, 161:17, 162:19, 164:13, 166:12, 217:15, 217:19
**lawyer** [3] - 211:2, 211:12, 211:13
**lay** [1] - 140:15
**leading** [5] - 132:15, 132:16, 135:14, 137:9, 138:5
**learn** [1] - 186:7
**learned** [2] - 186:7, 207:6
**learning** [1] - 169:19
**least** [6] - 127:12, 165:6, 185:14, 219:8, 221:8, 221:25
**left** [8] - 156:17, 168:7, 170:1, 171:5, 195:19, 196:15, 197:2, 197:4
**leftover** [2] - 184:4, 192:12
**legal** [3] - 159:9, 163:13, 201:5
**legally** [3] - 221:6, 221:7, 221:15
**leisure** [1] - 218:24
**less** [2] - 148:23, 197:7
**lesson** [1] - 207:7
**letter** [5] - 136:13, 172:20, 173:16, 175:8, 184:13
**letters** [1] - 209:14
**level** [1] - 138:15
**liability** [19] - 161:2,

161:4, 161:5, 161:7, 161:9, 162:3, 163:15, 164:1, 164:24, 181:21, 198:21, 198:22, 200:2, 210:14, 216:4, 221:3, 221:16, 221:17
**liable** [5] - 161:4, 163:15, 165:1, 166:4, 215:19
**light** [8] - 182:9, 182:13, 182:16, 183:21, 186:1, 201:18
**lightbulbs** [1] - 187:22
**likelihood** [3] - 154:20, 170:7, 170:19
**likely** [4] - 148:17, 182:21, 189:18, 208:9
**likewise** [1] - 195:6
**limited** [3] - 149:21, 154:3, 211:15
**line** [2] - 162:14, 166:5
**lines** [1] - 127:18
**list** [4] - 153:21, 192:11, 205:4, 213:1
**listed** [2] - 143:12, 206:16
**lists** [1] - 186:13
**LMCPRO** [1] - 131:3
**Lockheed** [80] - 127:21, 128:24, 128:25, 129:19, 129:22, 140:3, 140:22, 141:7, 141:11, 146:4, 148:11, 148:12, 148:15, 149:19, 150:6, 150:8, 150:9, 150:11, 150:18, 150:24, 151:24, 152:4, 152:11, 156:1, 157:19, 157:21, 158:5, 158:6, 158:9, 167:14, 167:24, 168:1, 168:6, 170:2, 170:20, 172:3, 172:20, 173:18, 175:5, 175:22, 176:2, 176:5, 177:7, 177:9, 177:11, 178:7, 178:18, 179:5, 179:7, 179:10, 179:19, 180:20, 182:4, 182:11, 184:4,

184:6, 184:15, 185:4, 185:12, 188:23, 188:24, 189:3, 189:5, 189:9, 190:1, 190:4, 199:1, 204:18, 204:25, 208:1, 208:7, 208:13, 209:10, 213:14, 219:7, 219:13, 219:14, 219:15, 222:2
**Lockheed's** [3] - 140:6, 159:20, 193:21
**logical** [1] - 165:7
**look** [37] - 125:1, 127:10, 130:24, 132:2, 132:5, 133:3, 133:20, 140:19, 143:6, 143:9, 157:5, 157:13, 161:17, 163:24, 164:13, 164:16, 184:9, 184:17, 184:20, 184:22, 187:11, 189:17, 189:20, 191:9, 202:11, 202:21, 207:6, 207:15, 213:8, 213:22, 213:23, 215:18, 216:18, 216:19, 216:21, 218:23, 220:21
**looked** [6] - 161:12, 201:24, 206:2, 213:14, 218:12, 220:20
**looking** [17] - 127:1, 135:4, 135:5, 140:23, 141:3, 157:1, 162:15, 175:20, 193:7, 210:21, 211:21, 214:13, 214:15, 214:17, 214:23, 215:25, 216:2
**looks** [3] - 184:24, 194:17, 213:5
**loophole** [1] - 164:19
**loosely** [1] - 167:25
**lose** [1] - 171:1
**loses** [1] - 188:11
**losing** [2] - 146:8, 147:2
**lost** [3] - 130:17, 167:16, 220:24
**LPC** [4] - 131:20, 134:9, 208:23, 209:16
**lunch** [1] - 135:23

# M

**ma'am** [3] - 141:12, 159:25, 174:23
**majority** [4] - 151:21, 151:23, 152:4, 154:12
**managed** [1] - 181:13
**manager** [1] - 219:9
**managers** [2] - 139:19, 144:8
**manual** [1] - 162:10
**manufacture** [1] - 177:8
**manufactured** [2] - 162:1, 208:7
**manufacturing** [5] - 128:19, 139:19, 140:2, 141:2, 149:5
**March** [3] - 137:24, 137:25, 140:3
**marked** [2] - 193:10, 211:6
**Martin** [5] - 175:5, 176:5, 219:7, 219:14, 219:15
**Martin's** [1] - 176:2
**material** [19] - 140:17, 144:4, 152:18, 154:10, 158:17, 158:22, 160:6, 161:8, 161:9, 161:13, 168:2, 170:18, 171:13, 175:21, 180:8, 180:9, 182:2, 192:7, 210:9
**materials** [17] - 147:24, 152:11, 161:25, 164:23, 168:5, 170:15, 187:20, 187:21, 188:6, 198:25, 199:1, 199:20, 199:25, 201:7, 203:20, 203:21, 205:22
**mathematical** [1] - 199:18
**matter** [6] - 167:12, 198:23, 200:1, 201:5, 218:18, 223:5
**matters** [2] - 156:7, 200:2
**mean** [29] - 126:21, 126:23, 129:5, 130:17, 134:11, 134:21, 135:3, 144:11, 154:25,

155:24, 158:13, 159:8, 160:21, 164:25, 165:23, 166:3, 167:20, 169:3, 180:25, 181:17, 196:14, 196:19, 196:22, 197:23, 198:20, 200:12, 200:24, 204:4, 220:15
**meaning** [3] - 141:11, 215:23, 222:13
**means** [8] - 134:23, 146:10, 158:23, 158:25, 165:1, 188:9, 215:5, 216:7
**meant** [1] - 158:14
**meet** [1] - 138:22
**memo** [3] - 136:1, 136:5, 166:10
**memory** [1] - 130:17
**mentioned** [1] - 184:14
**merciful** [1] - 181:22
**mere** [1] - 161:18
**messed** [1] - 186:19
**method** [1] - 198:5
**mid-'75** [1] - 167:17
**middle** [1] - 138:18
**might** [6] - 165:7, 181:24, 201:8, 204:9, 204:11, 222:15
**mike** [1] - 125:16
**military** [1] - 161:15
**Miller** [1] - 223:3
**MILLER** [1] - 223:9
**million** [2] - 155:1, 167:4
**mind** [1] - 172:14
**minor** [1] - 159:2
**minute** [2] - 143:5, 184:7
**minutes** [3] - 162:24, 174:21, 210:4
**miscellaneous** [2] - 185:1, 203:20
**missiles** [2] - 217:25, 218:1
**mistake** [1] - 203:7
**misunderstand** [1] - 219:12
**mixers** [1] - 153:20
**mixture** [1] - 156:16
**modes** [1] - 204:5
**modifications** [2] - 149:14, 149:16
**moment** [1] - 129:23
**money** [7] - 159:8, 159:10, 160:17,

165:8, 174:15, 184:7, 200:24
**monitor** [1] - 141:10
**months** [1] - 155:1
**morning** [2] - 218:17, 222:9
**most** [4] - 149:25, 189:18, 195:4, 212:2
**motion** [1] - 163:22
**motor** [3] - 133:16, 136:17, 209:10
**motors** [20] - 135:6, 138:19, 138:20, 138:23, 177:8, 205:17, 207:18, 208:2, 208:5, 208:6, 208:10, 208:16, 208:17, 208:18, 208:23, 208:24, 209:2, 209:4, 209:16
**move** [7] - 181:3, 198:22, 201:15, 203:9, 207:2, 207:4, 222:7
**moved** [1] - 213:3
**moves** [2] - 162:14, 200:11
**moving** [2] - 182:21, 209:8
**MPO** [3] - 149:5, 149:6, 149:8
**MPOs** [1] - 149:1
**MR** [157] - 125:1, 125:5, 130:8, 130:11, 131:1, 131:6, 132:19, 134:1, 135:1, 135:21, 136:7, 136:9, 137:1, 137:8, 137:11, 137:12, 137:17, 137:19, 138:1, 138:24, 139:3, 140:4, 140:7, 140:20, 141:2, 141:14, 142:11, 145:7, 145:10, 145:17, 145:23, 145:24, 146:1, 146:17, 146:21, 147:7, 147:13, 147:17, 147:20, 147:24, 148:1, 148:3, 153:7, 153:10, 153:13, 153:16, 153:20, 157:10, 161:2, 161:20, 161:22, 162:6, 162:10, 162:15, 162:22, 163:2, 163:6,

163:13, 163:21, 164:6, 164:12, 165:9, 165:15, 166:8, 166:11, 166:14, 171:7, 172:7, 172:12, 172:14, 172:18, 174:20, 174:25, 175:6, 175:24, 180:13, 181:2, 181:7, 181:12, 181:16, 185:25, 186:8, 186:12, 186:24, 192:15, 193:13, 193:18, 194:1, 194:2, 198:24, 199:7, 199:17, 199:24, 200:14, 200:17, 200:22, 201:1, 201:10, 201:16, 201:17, 202:10, 202:12, 202:13, 202:14, 202:18, 202:22, 202:25, 204:20, 204:23, 206:1, 206:5, 206:9, 206:11, 206:17, 206:19, 206:23, 207:3, 207:11, 209:25, 210:4, 210:7, 211:6, 211:8, 211:16, 211:23, 211:25, 212:2, 212:6, 212:12, 212:14, 212:18, 212:25, 213:6, 213:21, 213:25, 214:3, 214:8, 214:10, 214:12, 216:12, 216:16, 217:2, 217:4, 217:10, 217:19, 218:21, 219:4, 219:14, 219:18, 220:1, 220:5, 220:10, 221:17, 222:14, 222:18, 222:20, 222:22
**MS** [18] - 125:7, 132:13, 132:16, 135:14, 135:18, 136:23, 137:22, 138:5, 142:7, 142:12, 142:15, 142:18, 142:24, 143:20, 144:17, 144:23, 145:4
**multiple** [4] - 177:4, 178:17, 182:25

**Murphy** [2] - 147:14, 217:1
**MURPHY** [69] - 125:1, 125:5, 145:7, 145:10, 145:17, 145:23, 146:21, 147:17, 147:20, 147:24, 153:20, 161:2, 161:20, 161:22, 162:6, 162:10, 162:15, 164:6, 164:12, 165:9, 165:15, 166:8, 166:11, 166:14, 181:12, 181:16, 198:24, 199:7, 199:17, 199:24, 200:14, 200:17, 200:22, 201:1, 201:10, 202:12, 202:14, 206:9, 206:11, 206:17, 206:19, 206:23, 209:25, 210:4, 211:6, 211:16, 211:23, 211:25, 212:2, 213:21, 214:8, 214:10, 214:12, 217:2, 217:4, 217:10, 217:19, 218:21, 219:4, 219:14, 219:18, 220:1, 220:5, 220:10, 221:17, 222:14, 222:18, 222:20, 222:22
**must** [8] - 190:15, 190:17, 192:24, 194:19, 195:1, 195:22, 196:1, 213:2

**N**

**Nagle** [7] - 162:16, 176:18, 201:6, 211:10, 211:20, 221:8, 221:20
**Nagle's** [3] - 169:10, 176:15, 212:6
**named** [1] - 177:25
**NASA** [1] - 218:6
**naturalization** [1] - 222:9
**nature** [3] - 149:3, 173:22, 196:4
**Navy** [7] - 157:20, 157:25, 158:10, 159:21, 175:19
**necessarily** [2] -

155:19, 160:16
**necessary** [1] - 128:25
**need** [7] - 125:16, 186:7, 191:12, 191:16, 198:18, 219:23, 220:3
**negligent** [1] - 165:12
**negotiated** [2] - 151:9, 151:11
**negotiation** [1] - 151:13
**never** [7] - 141:22, 152:10, 197:6, 199:13, 199:15, 204:1, 215:8
**new** [10] - 129:5, 132:9, 135:20, 136:21, 146:2, 168:12, 168:13, 169:2, 170:4
**next** [3] - 145:7, 168:15, 170:9
**Nike** [2] - 207:17, 208:5
**nobody** [2] - 180:24, 200:4
**nomenclature** [1] - 205:3
**nonexistent** [1] - 198:14
**nonpollutant** [1] - 200:4
**nonsense** [2] - 197:13, 197:18
**normal** [3] - 182:6, 190:3, 215:3
**normally** [1] - 181:24
**north** [2] - 126:17, 126:20
**North** [1] - 161:21
**Northern** [2] - 164:14, 164:16
**nothing** [14] - 125:12, 145:14, 170:21, 175:17, 175:18, 196:15, 196:22, 197:2, 197:4, 198:8, 204:13, 205:6, 205:10
**notifies** [1] - 136:13
**noxious** [1] - 195:15
**nuclear** [2] - 184:4, 217:25
**number** [9] - 141:3, 143:6, 143:7, 145:10, 175:1, 177:25, 193:14, 193:24, 220:14
**numbered** [1] - 131:3,

206:13
**numbering** [2] - 206:6, 206:19
**numbers** [2] - 213:19, 217:18

**O**

**O'DONNELL** [18] - 125:7, 132:13, 132:16, 135:14, 135:18, 136:23, 137:2, 137:22, 138:5, 142:7, 142:12, 142:15, 142:18, 142:24, 143:20, 144:17, 144:23, 145:4
**objected** [1] - 135:18
**objection** [5] - 132:13, 135:14, 137:22, 138:5, 142:7
**objectives** [2] - 177:4, 182:25
**obligation** [1] - 172:25
**obvious** [1] - 220:23
**obviously** [3] - 140:7, 211:2, 211:14
**occasionally** [1] - 201:21
**occurred** [3] - 164:8, 199:9
**OF** [1] - 223:1
**offer** [3] - 176:6, 176:9, 211:12
**offered** [2] - 140:12, 206:7
**OFFICIAL** [1] - 223:1
**oftentimes** [1] - 188:17
**old** [1] - 149:13
**once** [5] - 155:4, 173:4, 188:10, 197:1, 197:15
**one** [68] - 125:20, 126:23, 126:24, 128:13, 128:16, 128:17, 129:10, 129:25, 132:21, 132:22, 133:1, 133:22, 137:24, 141:21, 142:12, 145:25, 147:3, 149:19, 149:22, 153:11, 162:9, 163:5, 166:12, 167:13, 168:14, 168:15, 170:13, 170:21, 171:25,

172:15, 173:4, 174:1, 176:22, 178:3, 181:4, 184:24, 185:19, 198:16, 200:11, 201:8, 204:11, 205:4, 205:20, 209:23, 210:5, 211:14, 212:1, 212:17, 212:18, 213:2, 213:15, 213:20, 213:21, 214:16, 214:17, 215:16, 216:25, 217:7, 217:9, 217:17, 218:1, 218:2
**one-page** [1] - 205:4
**ones** [6] - 146:9, 146:18, 147:15, 208:15, 211:24, 219:25
**opening** [1] - 146:13
**operating** [2] - 141:23, 161:24
**operation** [3] - 129:2, 129:3, 199:11
**operations** [5] - 129:20, 133:15, 140:14, 164:3, 199:10
**operators** [1] - 139:23
**opinion** [40] - 145:20, 152:3, 153:24, 154:7, 155:12, 155:16, 166:18, 169:1, 169:9, 169:10, 176:13, 176:15, 176:17, 178:13, 178:15, 182:23, 183:7, 183:10, 183:25, 187:17, 187:19, 189:22, 189:25, 190:7, 190:17, 191:23, 192:22, 192:25, 194:25, 211:4, 211:12, 214:14, 215:22, 216:3, 216:6, 218:11, 221:12
**opinions** [2] - 216:24, 219:19
**Oppliger** [10] - 130:12, 135:22, 136:10, 138:25, 141:15, 142:11, 142:15, 142:25, 143:9, 143:21
**OPPLIGER** [1] - 125:10

199:25
**Ownership** [1] - 147:24
**owning** [1] - 161:25
**owns** [17] - 153:6, 153:8, 153:9, 153:22, 160:3, 161:5, 164:11, 167:7, 175:17, 185:17, 189:21, 196:11, 196:14, 197:20, 197:24, 205:12, 221:12
**oxidizer/grinding** [2] - 126:16, 141:18

---

# P

**p.m** [2] - 174:24, 222:24
**page** [24] - 127:10, 127:18, 130:22, 131:3, 132:4, 132:21, 140:21, 141:1, 143:1, 143:2, 143:4, 143:9, 162:12, 166:10, 184:24, 193:9, 194:9, 194:10, 194:13, 202:19, 205:4, 212:7, 212:12, 212:14
**pages** [4] - 135:25, 184:22, 205:22, 221:2
**paid** [5] - 167:9, 168:11, 170:2, 189:14, 189:19
**pans** [2] - 165:23, 165:24
**paper** [9] - 132:22, 133:5, 133:21, 135:13, 146:7, 146:10, 220:9, 220:22, 220:24
**papers** [2] - 135:3, 135:4
**paperwork** [7] - 128:19, 133:16, 133:17, 135:8, 138:22, 139:21, 139:22
**paragraph** [18] - 129:19, 132:21, 133:20, 157:13, 172:20, 173:24, 174:10, 177:19, 193:9, 194:9, 194:11, 194:15, 194:16, 194:17,

195:4, 207:15, 212:15, 216:7
**paragraphs** [1] - 133:1
**paraphrasing** [1] - 174:9
**pardon** [1] - 138:10
**parlance** [2] - 177:3, 204:6
**part** [15] - 130:3, 134:24, 140:14, 147:6, 157:7, 171:3, 172:25, 177:8, 191:16, 193:15, 195:5, 199:12, 204:19, 206:4, 211:20
**particles** [2] - 194:20, 195:11
**particular** [12] - 140:6, 151:18, 169:15, 173:10, 176:23, 176:24, 176:25, 179:3, 182:1, 182:18, 182:19, 182:20
**parts** [1] - 208:17
**party** [5] - 160:9, 162:14, 162:20, 163:16, 164:19
**pass** [2] - 155:14, 208:7
**passage** [2] - 155:13, 156:18
**passed** [1] - 164:18
**past** [1] - 215:18
**PATRICIA** [1] - 223:9
**Patricia** [1] - 223:3
**pattern** [1] - 168:10
**pay** [2] - 151:15, 151:17
**paying** [5] - 155:25, 156:1, 156:2, 156:3
**payment** [14] - 152:13, 152:16, 155:2, 155:5, 167:3, 167:19, 168:7, 171:4, 176:10, 178:4, 179:12, 179:14, 191:23, 208:12
**payments** [26] - 152:10, 152:14, 152:17, 155:3, 167:7, 167:8, 168:11, 168:22, 170:1, 170:2, 179:6, 179:12, 179:17, 180:15, 180:18, 180:19, 183:19,

187:1, 187:6, 191:11, 191:13, 191:17, 191:18, 201:3, 208:9, 208:14
**pays** [2] - 155:24, 159:2
**people** [21] - 128:18, 128:22, 129:1, 129:19, 138:25, 139:4, 139:9, 139:10, 139:11, 139:12, 139:15, 139:17, 139:19, 139:21, 140:2, 141:25, 142:4, 142:5, 155:25, 156:1, 161:24
**per** [1] - 138:22
**percent** [11] - 126:8, 126:10, 154:6, 156:22, 157:2, 160:22, 181:24, 181:25, 189:19
**percentage** [13] - 150:23, 151:1, 151:3, 154:4, 156:24, 181:24, 182:9, 183:11, 183:20, 189:21, 191:9, 195:16, 195:17
**perchlorate** [14] - 148:7, 173:15, 173:16, 177:10, 177:12, 178:8, 178:11, 178:19, 178:21, 179:10, 180:21, 182:9, 182:10, 184:25
**perfect** [1] - 184:12
**perfectly** [1] - 165:7
**perform** [4] - 152:11, 179:5, 179:11, 180:21
**performed** [6] - 148:15, 149:19, 150:25, 151:24, 152:4, 208:13
**performing** [6] - 151:16, 177:8, 178:17, 180:14, 189:6, 203:24
**perhaps** [5] - 148:22, 148:24, 163:13, 188:24, 198:21
**period** [2] - 149:15, 212:9
**permission** [2] - 159:16, 172:17
**persist** [4] - 189:15,

**opportunity** [4] - 137:6, 176:18, 216:20, 218:23
**opposed** [1] - 126:6
**order** [3] - 191:15, 198:23, 215:19
**Ordnance/Los** [1] - 207:24
**organization** [2] - 134:12, 134:13
**organize** [1] - 210:2
**organized** [1] - 129:22
**original** [1] - 149:16
**otherwise** [4] - 125:3, 158:9, 166:5, 220:15
**outdated** [1] - 199:25
**outfit** [1] - 184:13
**overdo** [1] - 200:20
**overhead** [4] - 170:21, 174:16, 187:24, 188:10
**overlap** [2] - 168:13, 168:15
**overlapping** [1] - 167:12
**overstated** [1] - 194:22
**own** [15] - 128:1, 128:5, 160:11, 161:8, 164:19, 175:3, 176:17, 178:10, 178:20, 180:21, 196:16, 196:22, 200:7, 221:8
**owned** [35] - 153:10, 153:17, 153:20, 155:17, 156:23, 157:3, 157:18, 157:20, 158:8, 160:24, 161:13, 161:14, 164:23, 164:25, 166:2, 166:6, 169:7, 171:3, 175:4, 182:17, 197:8, 199:20, 200:6, 200:7, 200:23, 201:4, 201:7, 201:8, 201:10, 205:11, 205:22, 221:8, 222:1
**owner** [2] - 163:17, 164:9
**ownership** [15] - 152:24, 161:18, 163:8, 163:18, 163:19, 164:7, 164:23, 167:5, 175:2, 178:23, 180:1, 180:3, 196:20, 198:24,

189:16, 190:22, 196:1

**persisted** [1] - 194:19

**persists** [6] - 189:23, 190:16, 190:18, 192:24, 195:2, 195:23

**person** [1] - 156:6

**personally** [2] - 139:23, 141:16

**persons** [1] - 215:12

**persuade** [1] - 181:10

**phase** [1] - 163:23

**philosophy** [7] - 127:2, 127:13, 127:19, 127:23, 131:11, 131:15, 132:10

**photography** [1] - 125:21

**physical** [1] - 187:23

**physically** [1] - 197:12

**pick** [2] - 200:21, 217:8

**picked** [2] - 133:18, 200:5

**pictures** [1] - 125:21

**piece** [2] - 161:5, 193:7

**pit** [4] - 198:3, 199:14, 200:10

**pits** [6] - 162:2, 165:20, 165:24, 165:25, 166:4, 166:7

**place** [4] - 137:3, 149:14, 160:10, 178:20

**placed** [1] - 133:8

**plaintiff** [1] - 213:15

**Plaintiff's** [13] - 130:23, 172:8, 175:7, 184:10, 186:2, 202:4, 203:3, 203:4, 203:5, 203:10, 203:15, 204:24, 207:4

**plaintiff's** [2] - 131:1, 146:3

**plaintiffs** [1] - 206:7

**planned** [1] - 161:19

**planning** [3] - 133:5, 133:16, 172:4

**plant** [10] - 154:5, 168:9, 168:10, 169:14, 170:6, 171:2, 171:5, 181:25, 183:4, 188:12

**play** [1] - 221:15

**plumes** [1] - 219:10

**point** [24] - 127:13, 133:24, 156:21, 161:13, 162:12, 165:16, 169:6, 170:4, 170:21, 171:1, 178:6, 181:2, 181:7, 181:20, 182:8, 197:19, 198:4, 198:7, 198:20, 201:11, 221:9, 221:10, 221:21

**points** [16] - 128:19, 132:9, 133:7, 133:11, 133:12, 133:13, 135:7, 135:10, 135:12, 136:14, 136:16, 136:21, 138:3, 138:12, 220:23

**pollution** [1] - 175:20

**portion** [4] - 178:24, 183:15, 189:2, 189:24

**position** [4] - 153:17, 155:7, 155:10, 169:21

**possession** [3] - 158:6, 209:3, 215:13

**possible** [6] - 143:16, 143:19, 143:24, 144:2, 189:4

**possibly** [2] - 165:22, 180:11, 217:23

**potentially** [4] - 149:18, 163:16, 165:16, 171:13

**pounds** [10] - 158:12, 158:19, 158:20, 158:22, 170:17, 177:9, 178:9, 178:19, 179:24, 185:16

**practical** [1] - 167:12

**practiced** [1] - 131:11

**practices** [3] - 130:1, 165:12, 204:18

**precisely** [1] - 174:10

**predicate** [1] - 131:18

**preferred** [1] - 151:5

**prefers** [2] - 151:7, 151:22

**preliminaries** [1] - 148:6

**prepare** [3] - 145:18, 174:1, 192:11

**prepared** [2] - 127:5, 127:8

**present** [2] - 162:20, 181:12

**presentation** [1] - 193:21

**pressed** [1] - 169:7

**presumably** [3] - 188:23, 188:24, 195:11

**pretty** [1] - 217:1

**previously** [4] - 125:11, 209:3, 209:11, 209:15

**price** [40] - 151:3, 151:5, 151:7, 151:8, 151:11, 151:22, 151:25, 152:5, 152:9, 152:12, 152:22, 153:3, 154:13, 154:18, 154:24, 154:25, 167:2, 168:6, 169:25, 179:5, 179:11, 179:16, 180:14, 180:17, 183:18, 187:1, 187:5, 191:10, 191:12, 191:16, 191:18, 192:5, 192:11, 201:2, 201:3, 203:24, 208:9, 208:13

**prime** [6] - 150:6, 150:8, 150:10, 150:15, 150:25, 170:5

**principles** [1] - 180:23

**pristine** [1] - 188:25

**probable** [1] - 144:3

**problem** [3] - 169:17, 217:25, 220:16

**problems** [1] - 197:21

**procedure** [1] - 127:15

**procedures** [2] - 133:4, 174:7

**proceedings** [2] - 222:24, 223:5

**proceeds** [1] - 159:15

**process** [16] - 130:6, 130:16, 132:12, 136:22, 138:3, 140:2, 141:2, 141:11, 160:7, 161:14, 162:1, 167:15, 196:10, 199:11, 199:12

**processes** [2] - 133:18, 219:20

**processing** [1] - 143:22

**Procurement** [1] - 213:7

**produce** [1] - 135:5

**produces** [1] - 173:5

**product** [11] - 129:21, 132:24, 134:3, 134:4, 134:5, 134:8, 134:9, 134:13, 134:17, 154:14, 179:18

**production** [8] - 133:15, 136:17, 138:20, 138:23, 139:19, 173:5, 179:8, 196:11

**productive** [1] - 180:10

**products** [2] - 151:9, 164:15

**professional** [1] - 145:21

**program** [4] - 138:19, 150:12, 208:5, 208:6

**programs** [1] - 140:14

**progress** [38] - 152:10, 152:13, 152:14, 152:16, 152:17, 155:2, 155:3, 155:5, 167:3, 167:6, 167:8, 167:19, 168:6, 168:11, 168:22, 169:25, 170:2, 171:4, 179:6, 179:11, 179:12, 179:14, 179:16, 180:15, 180:18, 183:19, 187:1, 187:6, 191:11, 191:12, 191:17, 191:18, 191:23, 201:3, 208:9, 208:11, 208:14

**promise** [1] - 222:10

**promptly** [1] - 198:4

**propellant** [5] - 141:16, 201:22, 204:3, 209:10, 209:17

**propellants** [1] - 144:5

**properly** [3] - 178:15, 197:17, 218:9

**property** [55] - 125:24, 152:21, 152:22, 152:23, 153:2, 154:8, 154:21, 155:15, 156:19, 156:20, 159:20, 161:6, 161:12, 163:9, 163:17, 163:20, 164:2, 164:4, 169:11,

170:15, 170:24, 173:1, 173:4, 173:8, 173:12, 173:21, 174:1, 176:1, 176:3, 176:7, 176:10, 177:16, 184:15, 184:16, 186:16, 188:4, 188:18, 190:10, 190:22, 191:3, 191:21, 191:22, 192:20, 192:23, 195:1, 195:3, 195:9, 195:19, 195:21, 210:14, 210:24, 215:12

**proportion** [1] - 182:10

**proposed** [1] - 132:9

**proposing** [1] - 136:21

**Propulsion** [6] - 128:24, 128:25, 132:7, 148:12, 172:21, 199:1

**protect** [1] - 215:3

**protection** [1] - 218:7

**prove** [1] - 205:13

**proven** [1] - 221:7

**provide** [8] - 173:11, 173:18, 176:2, 186:16, 213:3, 216:6, 216:19, 218:6

**provided** [3] - 133:5, 146:3, 147:11

**providing** [1] - 176:6

**provision** [3] - 194:18, 214:19, 215:16

**PRP** [1] - 163:15

**public** [2] - 217:15, 217:19

**pulled** [2] - 178:2, 213:2

**pump** [1] - 199:15

**purchase** [2] - 176:7, 178:19

**purchased** [6] - 176:11, 177:9, 178:8, 179:5, 179:10, 187:23

**purchases** [2] - 170:20, 180:20

**purchasing** [2] - 168:21, 208:21

**purely** [1] - 210:20

**purpose** [3] - 138:21, 182:25, 217:22

**purposes** [7] - 183:4, 183:5, 193:10, 198:22, 200:3,

200:9, 221:3
**pursuant** [1] - 177:16
**put** [14] - 140:8,
146:23, 153:21,
157:6, 166:1, 173:9,
178:9, 179:24,
180:4, 198:3, 215:3,
220:2, 220:22, 221:6
**putting** [5] - 135:9,
161:23, 164:15,
163:3, 166:6
**PX** [9] - 147:15, 157:6,
203:11, 210:13,
211:21, 211:23,
212:2, 214:9

## Q

**qualification** [3] -
133:1, 133:4, 138:19
**quality** [7] - 128:5,
134:15, 134:19,
134:20, 134:23,
134:24, 139:15
**quantify** [5] - 154:13,
154:17, 182:14,
182:15, 183:16
**quantities** [2] - 185:15
**quantity** [2] - 154:14,
185:10
**quarter** [2] - 218:20,
222:10
**questions** [8] - 125:8,
130:9, 137:10,
141:15, 141:17,
142:13, 145:4,
146:13
**quite** [5] - 139:23,
190:12, 201:19,
206:5, 218:1

## R

**Railroad** [1] - 161:21
**ran** [1] - 219:16
**ranged** [1] - 154:5
**reach** [1] - 154:2
**reached** [1] - 129:5
**reacquires** [1] - 170:2
**read** [17] - 125:3,
127:18, 129:18,
132:18, 146:11,
157:11, 159:5,
172:23, 175:14,
186:21, 203:13,
203:17, 207:21,
217:7, 220:25
**reading** [2] - 158:15,
161:20

**ready** [2] - 128:20,
129:3
**real** [1] - 160:20
**reality** [2] - 188:17,
188:19
**really** [16] - 130:2,
134:13, 142:20,
161:1, 180:24,
181:5, 181:19,
190:6, 196:22,
198:16, 209:19,
219:22, 220:11,
221:14, 221:15,
222:6
**reason** [6] - 138:17,
159:20, 163:14,
164:2, 187:7, 205:20
**reasonable** [3] -
145:21, 157:2, 191:8
**reasonably** [1] - 149:2
**reasons** [4] - 181:8,
204:8, 204:15, 208:2
**rebut** [1] - 219:25
**rebuttal** [2] - 220:3,
220:7
**recently** [1] - 148:25
**Recess** [1] - 174:24
**recognize** [3] -
190:18, 190:20,
194:6
**recollection** [3] -
125:20, 133:13,
143:22
**recommendation** [5] -
131:8, 131:14,
131:18, 131:19,
131:21
**recommendations** [1]
- 131:24
**record** [7] - 135:16,
162:7, 169:11,
170:17, 203:2,
203:8, 223:4
**records** [1] - 206:12
**recovery** [2] - 219:24,
220:3
**recross** [2] - 142:15,
145:2
**RECROSS** [1] -
142:17
**RECROSS-
EXAMINATION** [1] -
142:17
**recycle** [2] - 158:21,
159:1
**recycled** [3] - 158:12,
158:13, 158:23
**redirect** [3] - 137:5,
181:12, 181:15
**REDIRECT** [1] -

130:10
**Redlands** [17] -
130:13, 139:1,
139:4, 143:25,
148:16, 150:1,
151:24, 152:5,
155:8, 155:9, 182:5,
182:11, 215:23,
216:4, 219:7, 219:8,
219:16
**reduce** [1] - 204:11
**reevaluate** [2] -
131:14, 132:10
**refer** [2] - 148:6, 209:7
**reference** [5] - 131:9,
146:4, 193:24,
202:16, 213:10
**referenced** [1] - 147:5
**referencing** [1] -
217:19
**referring** [8] - 128:23,
134:9, 144:12,
144:14, 162:11,
192:6, 209:2, 209:4
**refers** [1] - 134:6
**reflects** [1] - 127:2
**refresh** [2] - 125:19,
133:12
**reg** [1] - 213:5
**regarding** [2] - 130:1,
216:4
**regular** [1] - 127:14
**regularly** [1] - 129:6
**Regulation** [1] - 213:7
**regulations** [6] -
190:9, 190:11,
192:19, 192:23,
194:25, 195:21
**reimbursed** [1] -
177:22
**reimbursement** [6] -
177:11, 177:17,
178:4, 179:25,
183:18, 187:8
**reiterate** [1] - 182:8
**rejected** [4] - 207:18,
208:6, 208:10,
208:11
**related** [1] - 130:20
**relating** [1] - 140:13
**relationship** [2] -
135:24, 136:4
**release** [1] - 164:8
**released** [4] - 139:16,
194:20, 199:12,
199:25
**releases** [1] - 199:9
**relevant** [14] - 156:7,
161:24, 163:11,
163:14, 167:22,

196:21, 198:23,
199:2, 199:8,
199:19, 199:22,
200:16, 200:18,
200:19
**reliable** [1] - 149:3
**remaining** [1] - 170:3
**remains** [1] - 160:9
**remediation** [2] -
219:7, 219:9
**remember** [4] -
125:17, 130:15,
144:19, 144:22
**removal** [1] - 209:16
**remove** [2] - 209:10,
213:2
**removed** [1] - 208:23
**repeat** [3] - 136:10,
137:6, 191:25
**repetitive** [1] - 212:17
**rephrase** [1] - 192:21
**REPORTER** [1] -
223:1
**reporter** [1] - 174:19
**representing** [1] -
156:1
**represents** [3] -
136:15, 177:1, 180:9
**request** [5] - 132:23,
133:5, 133:23,
134:2, 174:5
**requesting** [1] -
136:14
**required** [8] - 135:5,
173:8, 173:11,
173:18, 186:15,
187:1, 187:5, 192:5
**requirement** [1] -
192:10
**requirements** [1] -
138:22
**requires** [4] - 184:1,
185:4, 200:11,
214:20
**research** [2] - 177:5,
180:21
**reserved** [1] - 220:6
**residual** [15] - 152:20,
152:22, 152:23,
153:2, 156:18,
157:16, 173:12,
173:21, 174:1,
176:1, 176:7,
179:17, 179:20,
186:16, 209:6
**resolve** [1] - 193:6
**respect** [1] - 196:7
**respond** [1] - 221:19
**response** [3] - 172:21,
173:16, 176:12

**responsibility** [11] -
128:20, 164:20,
176:2, 201:22,
204:2, 204:4, 204:7,
205:7, 205:15,
205:21, 206:25
**responsible** [4] -
141:7, 160:22,
163:16, 165:14
**restrict** [1] - 176:17
**result** [2] - 183:17,
193:3
**results** [2] - 187:17,
187:19
**resume** [1] - 222:8
**retained** [1] - 179:7
**retaining** [1] - 178:20
**return** [2] - 157:22,
174:15
**returning** [1] - 175:7
**reused** [1] - 158:14
**reversion** [2] - 190:9,
192:20
**reversionary** [1] -
194:18
**revert** [3] - 168:8,
168:24, 179:18
**reverted** [4] - 167:18,
167:23, 167:24
**reverts** [2] - 167:9,
168:12
**review** [7] - 127:6,
131:2, 132:7,
139:18, 140:11,
186:18
**reviewed** [4] - 133:17,
139:16, 148:25,
151:23
**reviewing** [1] - 139:22
**rhyme** [1] - 136:13
**RICHARD** [1] - 145:12
**rid** [1] - 165:5
**ridiculous** [1] - 188:1
**right-hand** [1] - 143:7
**ring** [1] - 126:18
**risks** [3] - 217:23,
218:13, 218:14
**rocket** [16] - 133:16,
135:6, 136:17,
177:8, 183:3, 208:2,
208:16, 208:17,
208:18, 208:23,
208:24, 209:2,
209:4, 209:7,
209:10, 209:16
**Rocket** [2] - 132:7,
148:12
**roof** [1] - 168:16
**rules** [1] - 188:5
**runs** [2] - 214:16,

214:21

# S

**safe** [2] - 200:4, 207:22
**safety** [13] - 128:4, 128:5, 128:25, 134:15, 139:17, 140:22, 144:24, 204:15, 207:16, 207:23, 207:24, 208:3, 219:9
**Santa** [1] - 161:21
**sarcastic** [1] - 196:23
**saw** [4] - 149:13, 149:15, 149:16, 149:23
**schedule** [10] - 173:19, 174:5, 184:17, 186:10, 186:13, 186:14, 186:22, 186:25, 187:12, 219:4
**schedules** [2] - 186:18, 187:11
**scientific** [1] - 145:21
**scrap** [19] - 160:14, 160:17, 171:19, 171:24, 173:5, 173:22, 174:3, 174:4, 174:12, 179:20, 191:2, 201:22, 203:14, 203:15, 203:18, 204:2, 208:22
**screen** [10] - 131:2, 157:6, 157:12, 193:23, 194:4, 214:23, 214:25, 215:2, 216:3
**second** [9] - 140:21, 141:1, 143:1, 145:25, 147:3, 168:15, 194:16, 213:3
**section** [3] - 147:22, 211:10, 213:8
**secure** [1] - 164:4
**secured** [3] - 163:17, 163:20, 163:24
**see** [24] - 125:1, 131:12, 132:5, 148:4, 148:5, 158:9, 160:7, 162:4, 165:23, 181:17, 191:24, 191:25, 193:4, 196:9, 200:10, 203:14, 203:18, 207:20,

210:10, 211:3, 212:11, 215:1, 221:4
**seem** [1] - 164:10
**seemingly** [1] - 129:20
**seeped** [2] - 159:23, 197:2
**seeping** [1] - 200:12
**seeps** [1] - 159:22
**sell** [2] - 190:4, 190:5
**seller** [1] - 157:23
**selling** [1] - 174:7
**sense** [7] - 125:4, 150:22, 150:24, 181:19, 192:8, 221:13, 221:14
**sentence** [4] - 133:24, 133:25, 194:16, 194:18
**sentences** [2] - 133:3, 197:7
**separate** [1] - 221:5
**sequential** [1] - 206:19
**Services** [1] - 213:7
**services** [1] - 151:9
**set** [3] - 212:6, 221:21, 221:22
**sets** [3] - 131:11, 131:19, 212:8
**seven** [3] - 128:9, 128:11, 167:2
**several** [5] - 128:8, 141:15, 141:17, 143:12, 167:4
**shall** [1] - 215:10
**share** [3] - 155:15, 195:13, 196:11
**shed** [5] - 182:9, 182:13, 182:16, 186:1
**shedding** [2] - 183:21
**sheet** [1] - 143:12
**shift** [3] - 130:3, 130:4, 130:6
**shifts** [1] - 130:5
**shingles** [1] - 168:16
**shipment** [1] - 171:2
**shop** [6] - 132:22, 133:4, 133:16, 133:21, 135:3, 135:4
**short** [1] - 153:4
**show** [6] - 161:18, 199:13, 205:14, 211:11, 211:19, 212:17
**showed** [2] - 172:11, 210:13
**showing** [1] - 201:21
**shy** [1] - 180:7

**side** [3] - 139:13, 151:14, 177:2
**sides** [1] - 218:22
**sight** [2] - 171:1, 188:11
**signed** [1] - 140:2
**significance** [1] - 159:9
**significant** [1] - 162:12
**silent** [7] - 190:9, 190:11, 190:14, 192:19, 192:23, 195:1, 195:21
**similar** [1] - 217:1
**simple** [1] - 169:2
**simply** [5] - 151:12, 170:15, 178:9, 188:11, 204:11
**site** [29] - 128:20, 130:13, 139:1, 139:4, 139:6, 139:7, 139:9, 139:11, 139:12, 140:14, 140:15, 141:25, 142:1, 142:6, 144:1, 148:16, 149:19, 150:1, 151:24, 152:5, 156:9, 156:13, 161:24, 182:5, 182:11, 182:18, 198:25, 204:19, 207:1
**sites** [2] - 155:8, 167:15
**sitting** [4] - 126:10, 156:12, 162:25, 218:12
**situation** [2] - 163:25, 210:18
**six** [6] - 128:9, 128:11, 129:25, 146:14, 155:1, 167:2
**Sixth** [2] - 204:5, 207:17
**sizable** [1] - 154:25
**size** [1] - 180:15
**sized** [1] - 171:8
**slightly** [1] - 196:4
**sloshing** [1] - 160:4
**slower** [1] - 142:19
**small** [1] - 180:11
**sold** [1] - 208:20
**solely** [1] - 163:17
**solvent** [3] - 141:17, 182:24, 183:3
**solvents** [1] - 144:5
**someone** [4] - 144:6, 144:7, 161:6, 161:7
**sometime** [1] - 219:23

**sometimes** [2] - 142:21, 205:14
**somewhere** [3] - 158:14, 160:22, 169:23
**soon** [2] - 177:13, 180:3
**sooner** [1] - 177:23
**sorry** [29] - 126:19, 134:7, 139:25, 142:2, 142:14, 142:15, 143:2, 145:1, 147:13, 150:3, 175:15, 179:23, 191:14, 192:5, 192:6, 192:14, 194:10, 194:17, 205:3, 209:8, 211:3, 212:24, 215:10, 216:2, 217:13, 217:17, 218:18, 219:14, 219:15
**sort** [4] - 130:16, 162:20, 163:3, 221:11
**sorts** [1] - 128:2
**south** [2] - 126:18, 126:20
**special** [2] - 217:15, 217:21
**specific** [7] - 129:16, 130:16, 143:22, 182:18, 210:24, 222:12
**specifically** [3] - 129:13, 140:18, 197:7
**speculating** [1] - 163:3
**speculations** [1] - 221:23
**spend** [2] - 126:7, 197:14
**spending** [1] - 164:10
**spent** [2] - 126:5, 126:8
**spite** [1] - 129:20
**SRAM** [6] - 150:12, 162:6, 162:11, 162:15, 167:1, 211:16
**stamp** [1] - 140:24
**Stan** [1] - 219:21
**standard** [3] - 130:16, 162:7, 164:17
**standards** [6] - 140:2, 140:6, 140:11, 140:13, 143:22
**standpoint** [1] -

189:17
**stands** [1] - 149:6
**start** [5] - 135:9, 142:2, 218:18, 218:19, 222:9
**started** [2] - 130:13, 217:24
**starting** [4] - 136:19, 194:18, 212:14
**starts** [1] - 133:1
**state** [1] - 190:8
**statement** [2] - 127:23, 185:17
**statements** [1] - 182:3
**states** [3] - 163:16, 204:1, 204:5
**States** [11] - 132:3, 147:17, 153:10, 163:6, 163:9, 175:1, 175:2, 175:3, 211:10, 216:12, 216:13
**station** [3] - 126:16, 129:20, 141:21
**statute** [2] - 213:5, 217:21
**step** [2] - 129:5, 145:6
**steps** [2] - 135:5, 135:6
**still** [8] - 127:4, 160:13, 167:7, 188:18, 188:23, 188:24, 189:3, 218:16
**stop** [1] - 153:4
**stopped** [1] - 144:10
**stores** [2] - 178:10, 178:20
**story** [2] - 162:21, 201:15
**stove** [1] - 196:15
**straight** [1] - 201:19
**stream** [2] - 161:23, 164:15
**strike** [1] - 142:2
**strongly** [1] - 158:8
**struck** [1] - 146:12
**struggling** [1] - 220:25
**studied** [1] - 215:17
**study** [1] - 215:5
**stuff** [15] - 153:22, 155:17, 156:22, 159:6, 159:22, 160:3, 160:23, 165:5, 166:1, 166:3, 166:6, 175:23, 197:15, 204:17, 209:6
**subcontract** [3] -

**swear** [1] - 206:13
**swing** [2] - 130:3, 130:4
**sworn** [2] - 125:11, 145:13
**system** [2] - 170:22, 188:10

# T

**tab** [16] - 127:1, 127:3, 130:22, 132:2, 137:18, 140:20, 140:21, 141:1, 143:1, 194:3, 194:4, 202:12, 202:13, 203:11, 211:6
**tail** [1] - 173:4
**task** [2] - 170:25, 175:19
**TCE** [38] - 154:19, 154:21, 155:7, 155:11, 155:12, 155:17, 156:9, 156:12, 168:20, 168:24, 169:9, 169:12, 169:16, 170:13, 170:19, 170:22, 171:2, 182:21, 182:24, 183:2, 183:8, 183:11, 183:12, 183:16, 191:4, 191:8, 195:6, 195:13, 195:14, 196:4, 196:10, 196:11, 198:3, 199:11, 218:10
**team** [1] - 210:10
**tempted** [1] - 210:8
**ten** [1] - 174:21
**term** [3] - 197:13, 198:12, 203:15
**terms** [4] - 154:14, 154:18, 167:20, 203:19
**test** [8] - 130:6, 132:22, 133:4, 133:21, 135:3, 135:4, 138:19, 138:21
**testified** [9] - 125:13, 131:17, 131:23, 133:10, 135:22, 137:7, 144:24, 145:14, 208:21
**testify** [6] - 136:11, 142:1, 176:18, 183:15, 209:22, 219:10

**testifying** [1] - 209:21
**testimonial** [4] - 190:8, 192:18, 194:7, 202:3
**testimony** [18] - 135:23, 136:2, 140:10, 140:12, 174:22, 190:15, 190:20, 192:17, 192:18, 193:23, 194:21, 201:20, 201:23, 209:9, 209:19, 219:1, 220:2
**text** [1] - 147:8
**THE** [448] - 125:3, 125:6, 125:9, 125:14, 125:15, 125:16, 125:17, 125:19, 126:1, 126:2, 126:3, 126:5, 126:8, 126:10, 126:12, 126:14, 126:15, 126:17, 126:19, 126:20, 126:21, 126:22, 126:25, 127:1, 127:7, 127:8, 127:9, 127:10, 127:11, 127:12, 127:17, 127:18, 127:22, 127:23, 127:25, 128:1, 128:3, 128:4, 128:5, 128:7, 128:8, 128:9, 128:10, 128:11, 128:12, 128:13, 128:14, 128:16, 128:18, 128:22, 128:24, 129:4, 129:8, 129:10, 129:13, 129:14, 129:16, 129:18, 129:24, 129:25, 130:2, 130:4, 130:5, 130:7, 130:25, 131:5, 132:15, 132:17, 133:25, 134:4, 134:7, 134:8, 134:9, 134:11, 134:12, 134:14, 134:16, 134:17, 134:19, 134:20, 134:23, 134:25, 135:15, 135:17, 135:20, 136:6, 136:24, 137:5, 137:9, 137:15, 137:23, 138:6, 138:10, 138:11, 138:14, 138:15, 138:17,

139:2, 139:25, 140:5, 140:19, 140:21, 140:23, 140:24, 140:25, 141:1, 141:3, 141:5, 141:6, 141:7, 141:9, 141:10, 141:12, 141:13, 142:8, 142:14, 142:23, 143:18, 144:11, 144:15, 144:18, 144:21, 145:2, 145:6, 145:9, 145:25, 146:6, 146:25, 147:5, 147:12, 147:14, 147:19, 147:23, 147:25, 153:4, 153:8, 153:11, 153:14, 153:17, 153:22, 153:25, 154:12, 154:15, 154:17, 154:20, 154:22, 154:23, 155:7, 155:9, 155:10, 155:12, 155:16, 155:19, 155:21, 155:23, 155:24, 156:5, 156:8, 156:16, 156:21, 156:24, 157:1, 157:4, 157:5, 157:11, 157:13, 157:15, 157:17, 157:18, 157:22, 157:24, 158:1, 158:2, 158:4, 158:6, 158:11, 158:15, 158:19, 158:20, 158:23, 158:25, 159:3, 159:4, 159:6, 159:10, 159:12, 159:13, 159:16, 159:19, 159:22, 159:25, 160:1, 160:2, 160:3, 160:5, 160:11, 160:13, 160:15, 160:16, 160:19, 161:17, 161:21, 162:4, 162:9, 162:11, 162:24, 163:3, 163:11, 163:19, 164:9, 165:3, 165:10, 165:19, 166:10, 166:12, 166:15, 166:20, 166:21, 166:22, 166:23, 166:24, 167:5, 167:8, 167:10, 167:11,

167:14, 167:18, 167:20, 168:2, 168:4, 168:5, 168:17, 168:19, 168:20, 169:1, 169:6, 169:8, 169:18, 169:24, 170:8, 170:9, 170:11, 170:14, 171:10, 171:15, 171:16, 171:18, 171:23, 171:24, 171:25, 172:1, 172:6, 172:11, 172:13, 172:16, 174:18, 174:21, 174:23, 175:15, 175:16, 179:23, 180:2, 180:5, 180:7, 180:23, 181:4, 181:10, 181:15, 181:17, 181:23, 183:22, 183:24, 184:9, 184:12, 184:17, 184:19, 184:20, 184:21, 184:22, 184:24, 185:2, 185:3, 185:6, 185:7, 185:9, 185:12, 185:14, 185:19, 185:21, 185:23, 185:24, 186:6, 186:11, 186:22, 191:1, 191:3, 191:4, 191:7, 191:12, 191:14, 191:15, 191:18, 191:20, 191:21, 191:24, 192:2, 192:4, 192:6, 192:9, 192:10, 192:13, 192:14, 193:12, 193:15, 193:19, 194:8, 195:6, 195:7, 196:13, 196:17, 196:19, 196:24, 196:25, 197:11, 197:14, 197:19, 197:23, 197:25, 198:2, 198:6, 198:8, 198:10, 198:11, 198:12, 198:13, 198:15, 198:16, 199:4, 199:13, 199:23, 200:2, 200:15, 200:20, 200:23, 201:8, 201:11, 202:8, 202:11, 202:15, 202:16, 202:21, 202:24, 204:16,

**subcontractor** [1] - 150:19
**subcontracts** [5] - 150:2, 150:4, 152:7, 154:5, 154:7
**submarines** [1] - 217:25
**submitted** [1] - 187:13
**submitting** [1] - 222:16
**subparagraph** [1] - 213:8
**subpart** [2] - 215:8, 215:24
**subsequent** [3] - 189:6, 189:8, 189:10
**substance** [1] - 174:11
**substances** [2] - 141:16, 167:21
**substantial** [3] - 136:21, 155:20, 156:25
**succession** [1] - 170:6
**suggest** [2] - 201:25, 209:25
**suggested** [1] - 220:6
**suggesting** [1] - 165:4
**suggests** [3] - 157:20, 158:8, 172:4
**sump** [4] - 126:18, 126:20
**sundry** [1] - 203:20
**Superfund** [2] - 204:19, 207:1
**supervisors** [2] - 139:20, 144:8
**supplemental** [1] - 213:1
**supplier** [13] - 158:25, 159:1, 159:2, 159:8, 160:25, 165:7, 171:12, 171:17, 171:20, 171:21, 177:10, 177:23
**suppose** [1] - 144:2
**supposed** [7] - 129:8, 138:19, 140:5, 141:10, 156:10, 206:14, 221:14
**Supreme** [1] - 164:14
**survey** [1] - 175:21
**surviving** [1] - 195:20
**suspect** [1] - 181:6
**sustained** [5] - 132:17, 135:15, 135:19, 136:24, 142:9

150:9, 167:1, 170:5

204:22, 205:13, 205:19, 205:24, 206:2, 206:8, 206:10, 206:15, 206:18, 206:22, 206:24, 207:8, 207:9, 209:24, 210:3, 210:5, 210:12, 210:15, 210:17, 210:19, 210:21, 210:23, 210:25, 211:1, 211:2, 211:11, 211:19, 211:24, 212:1, 212:4, 212:11, 212:13, 212:16, 212:23, 213:5, 213:9, 213:10, 213:14, 213:17, 213:18, 213:20, 213:22, 214:2, 214:4, 214:9, 214:11, 214:13, 214:15, 214:17, 214:18, 214:23, 215:2, 215:7, 215:9, 215:10, 215:15, 215:20, 215:21, 215:22, 215:25, 216:2, 216:6, 216:9, 216:10, 216:15, 216:17, 216:23, 216:24, 217:3, 217:7, 217:9, 217:11, 217:13, 217:14, 217:17, 217:21, 218:4, 218:5, 218:8, 218:11, 218:15, 218:22, 219:12, 219:17, 219:22, 220:2, 220:8, 220:11, 221:18, 222:3, 222:4, 222:17, 222:19, 222:21, 222:23

**themselves** [4] - 137:23, 149:1, 180:16, 193:20
**theory** [2] - 165:11, 167:24
**thereabouts** [1] - 139:7
**thinking** [3] - 174:20, 201:18, 221:15
**third** [1] - 194:17
**thoughts** [1] - 210:2
**thousand** [3] - 126:3, 166:19, 166:23
**thousands** [6] -

125:24, 148:17, 148:18, 148:22, 149:18
**three** [13] - 127:21, 131:11, 131:19, 132:21, 137:15, 146:3, 146:17, 147:21, 148:24, 201:20, 214:4, 214:6, 220:20
**throughout** [2] - 179:7, 212:9
**throw** [1] - 197:15
**timing** [2] - 177:20, 178:6
**tiny** [5] - 181:24, 193:6, 193:7, 208:18, 215:16
**title** [90] - 152:9, 152:11, 152:12, 152:17, 154:9, 155:6, 155:10, 155:13, 155:14, 156:4, 156:5, 156:7, 156:18, 158:7, 159:6, 159:8, 159:11, 159:14, 160:6, 160:8, 160:9, 160:11, 160:12, 160:13, 160:19, 163:9, 167:9, 167:18, 167:22, 167:23, 168:12, 170:3, 175:18, 176:10, 177:17, 177:21, 178:7, 178:20, 179:1, 179:2, 179:7, 179:9, 179:12, 179:15, 180:17, 180:20, 182:2, 182:12, 183:7, 183:10, 183:17, 183:22, 185:10, 185:13, 187:17, 187:20, 189:15, 189:22, 190:16, 190:18, 190:21, 191:1, 191:6, 191:8, 191:21, 192:20, 192:23, 192:24, 194:19, 195:1, 195:2, 195:10, 195:11, 195:13, 195:16, 195:21, 195:22, 196:1, 197:13, 199:5, 199:7, 204:13, 205:18, 205:19, 207:24, 208:4,

208:10, 208:11, 208:23
**Title** [1] - 214:18
**Tod** [1] - 219:18
**today** [2] - 126:11, 190:20
**together** [10] - 136:12, 140:9, 140:17, 161:25, 205:22, 206:4, 206:12, 206:13, 206:14, 206:21
**Tom** [1] - 219:6
**tomorrow** [4] - 218:16, 218:25, 219:5, 219:21
**took** [8] - 137:3, 152:10, 176:9, 179:12, 182:12, 183:7, 183:10, 206:24
**tools** [1] - 141:8
**top** [2] - 167:13, 215:1
**TORRES** [25] - 130:8, 130:11, 131:1, 131:6, 132:19, 134:1, 135:1, 135:21, 136:7, 136:9, 137:1, 137:8, 137:11, 137:12, 137:17, 137:19, 138:1, 138:24, 139:3, 140:4, 140:7, 140:20, 141:2, 141:14, 142:11
**total** [2] - 139:6, 139:7
**totally** [4] - 197:12, 198:6, 213:11
**towards** [1] - 194:10
**track** [3] - 169:13, 173:1, 173:8
**tracked** [4] - 169:11, 169:21, 170:13
**tracking** [2] - 171:25, 172:1
**tracks** [3] - 169:12, 170:21, 170:22
**trained** [1] - 144:5
**transcript** [1] - 223:4
**transfer** [5] - 155:5, 179:9, 180:17, 180:20, 182:2
**transfers** [3] - 152:12, 154:9, 191:21
**trial** [2] - 193:21, 212:19
**tried** [1] - 165:6
**trigger** [2] - 178:3
**triggers** [2] - 177:25, 178:2

**trim** [1] - 201:19
**trouble** [2] - 170:11, 205:2
**true** [8] - 128:16, 128:18, 130:18, 152:15, 152:19, 175:11, 180:17, 187:3
**truth** [6] - 125:11, 125:12, 145:13, 145:14
**try** [7] - 142:19, 170:24, 171:7, 174:14, 180:11, 181:23, 201:18
**trying** [17] - 146:12, 147:12, 159:7, 160:24, 162:13, 163:25, 171:10, 171:16, 178:6, 181:7, 195:17, 198:17, 199:18, 220:22, 221:13, 221:14, 221:19
**tube** [1] - 134:21
**turn** [1] - 203:10
**two** [19] - 132:21, 132:25, 135:25, 136:12, 137:17, 142:12, 161:24, 162:24, 175:4, 177:25, 197:7, 205:22, 206:3, 211:8, 211:13, 213:19, 214:15, 219:21, 219:25
**type** [28] - 151:3, 151:6, 151:7, 151:8, 151:14, 151:25, 154:5, 154:8, 154:22, 173:7, 173:17, 175:20, 176:1, 177:12, 178:9, 178:25, 181:19, 183:9, 186:16, 187:13, 191:10, 191:19, 195:9, 203:24, 208:8, 210:19, 213:11
**types** [2] - 174:12, 188:19

## U

**U.S** [10] - 193:10, 193:24, 207:24, 211:21, 212:7, 212:9, 212:18, 214:1, 216:19,

218:24
**unclear** [2] - 191:5, 221:10
**uncommon** [1] - 165:25
**under** [22] - 156:17, 160:8, 161:3, 161:14, 161:16, 164:24, 165:1, 165:11, 166:8, 167:19, 167:23, 168:21, 179:16, 191:22, 191:25, 192:2, 195:13, 199:19, 201:4, 211:10, 216:4
**undercuts** [1] - 185:17
**understandable** [1] - 171:9
**understood** [5] - 148:13, 150:18, 152:20, 190:14, 216:23
**undertakes** [1] - 151:17
**unfortunately** [2] - 162:18, 172:9
**unhelpful** [1] - 181:8
**unilaterally** [2] - 184:1, 184:8
**United** [11] - 132:3, 147:17, 153:10, 163:6, 163:8, 175:1, 175:2, 175:3, 211:9, 216:12, 216:13
**unknowable** [2] - 181:8, 181:11
**unless** [2] - 152:12, 186:20
**unlikely** [2] - 189:15, 208:8
**unused** [8] - 156:9, 156:10, 156:11, 156:13, 157:17, 157:18, 158:5, 159:7
**up** [30] - 127:13, 128:21, 129:5, 129:7, 129:9, 129:11, 129:12, 129:15, 129:17, 131:2, 142:16, 166:23, 171:14, 184:4, 186:19, 197:16, 197:17, 197:20, 198:2, 198:4, 201:14, 202:22, 218:1, 219:5, 219:9, 219:11, 219:21, 220:6, 220:14,

221:20
**urban** [1] - 218:5
**US** [1] - 207:16
**usable** [2] - 198:8, 198:12
**useful** [1] - 161:1
**useless** [1] - 160:15
**uses** [1] - 203:19

## V

**value** [2] - 171:19, 183:11
**vapor** [1] - 199:10
**vapors** [2] - 194:20, 195:15
**various** [3] - 140:10, 140:11, 183:4
**vein** [1] - 151:2
**vendor** [1] - 178:2
**versed** [1] - 156:6
**versus** [1] - 222:2
**vesting** [1] - 163:9
**view** [4] - 156:21, 182:1, 196:3, 218:8
**virtually** [1] - 149:12
**visited** [2] - 125:14, 125:15
**visiting** [2] - 126:6, 126:9
**volume** [1] - 193:21

## W

**wait** [6] - 129:1, 133:25, 168:8, 181:17, 184:6, 198:4
**walk** [1] - 125:2
**walked** [1] - 195:18
**War** [1] - 217:24
**waste** [19] - 130:1, 140:13, 140:17, 143:14, 143:23, 143:25, 144:15, 144:19, 147:22, 156:10, 156:15, 164:5, 164:19, 174:13, 203:20, 203:23, 204:25, 205:11
**wastes** [1] - 205:7
**water** [2] - 159:24, 160:4
**weapon** [1] - 184:4
**Wednesday** [1] - 219:20
**week** [2] - 132:23, 133:22

**welcome** [1] - 216:18
**whichever** [2] - 177:23, 178:1
**whole** [11] - 125:11, 136:16, 145:13, 148:25, 153:4, 153:21, 164:9, 184:23, 198:19, 201:12, 210:23
**witness** [21] - 130:22, 137:3, 140:1, 145:7, 145:23, 146:5, 146:9, 147:1, 157:6, 162:25, 163:1, 172:9, 172:15, 210:6, 211:11, 214:2, 218:20, 220:15, 220:16, 221:10, 221:24
**WITNESS** [157] - 125:15, 125:17, 126:1, 126:3, 126:8, 126:12, 126:15, 126:19, 126:21, 126:25, 127:7, 127:9, 127:11, 127:17, 127:22, 127:25, 128:3, 128:5, 128:8, 128:10, 128:12, 128:14, 128:18, 128:24, 129:8, 129:13, 129:16, 129:24, 130:2, 130:5, 131:5, 134:7, 134:9, 134:12, 134:16, 134:19, 134:23, 138:10, 138:14, 138:17, 140:23, 140:25, 141:3, 141:6, 141:9, 141:12, 144:15, 144:21, 153:25, 154:15, 154:20, 154:23, 155:9, 155:12, 155:19, 155:23, 156:5, 156:16, 156:24, 157:4, 157:11, 157:15, 157:18, 157:24, 158:2, 158:6, 158:15, 158:20, 158:25, 159:4, 159:10, 159:13, 159:19, 159:25, 160:2, 160:5, 160:13, 160:16, 166:20, 166:22, 166:24, 167:8, 167:11,

167:18, 168:2, 168:5, 168:19, 169:1, 169:8, 169:24, 170:9, 170:14, 171:15, 171:18, 171:24, 172:1, 174:23, 175:16, 180:2, 180:7, 181:23, 183:24, 184:12, 184:19, 184:21, 184:24, 185:3, 185:7, 185:12, 185:19, 185:23, 191:3, 191:7, 191:14, 191:18, 191:21, 192:2, 192:6, 192:10, 192:14, 195:7, 196:17, 196:24, 197:11, 197:19, 197:25, 198:6, 198:10, 198:12, 198:15, 202:15, 205:19, 207:9, 210:15, 210:19, 210:23, 211:1, 213:10, 213:17, 213:20, 214:15, 214:18, 215:2, 215:9, 215:15, 215:21, 215:25, 216:6, 216:10, 216:23, 217:9, 217:11, 217:14, 217:21, 218:5, 218:11, 222:3
**witness's** [1] - 172:8
**witnesses** [2] - 140:9, 220:5
**Woolworth's** [1] - 208:20
**word** [3] - 148:11, 203:14, 203:18
**wording** [1] - 193:2
**works** [1] - 129:6
**World** [1] - 217:24
**worries** [1] - 203:8
**worry** [1] - 213:24
**worth** [1] - 164:11
**worthwhile** [1] - 164:11
**write** [1] - 166:10
**writing** [1] - 139:20
**written** [1] - 172:20

## Y

**yard** [1] - 166:5
**year** [5] - 132:6, 168:9,

188:6, 188:15, 188:22
**years** [11] - 125:24, 126:12, 130:12, 130:18, 137:4, 149:15, 167:2, 215:7, 215:9, 217:5, 219:16
**yesterday** [1] - 207:16
**yourself** [1] - 146:5

## Z

**Zeus** [2] - 207:18, 208: