UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,.       .
                                    .
          Plaintiff,                .
                                    .  CA No. 08-1160 (ESH)
     v.                             .
                                    .
UNITED STATES OF AMERICA,           .  Washington, D.C.
                                    .  Wednesday, February 12, 2014
          Defendant.                .  2:25 p.m.
                                    .
. . . . . . . . . . . . . . .       .  Pages 505 - 639

                DAY 3 - P.M. SESSION
            TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
            UNITED STATES DISTRICT JUDGE


 **APPEARANCES:**

For the Plaintiff:          MICHAEL K. MURPHY, ESQ.
                            JUSTIN A. TORRES, ESQ.
                            STACIE B. FLETCHER, ESQ.
                            DAVID FOTOUHI, ESQ.

                            Gibson, Dunn & Crutcher, LLP
                            1050 Connecticut Avenue, NW
                            Washington, DC 20036-5306

For the Defendant:          JOHN E. SULLIVAN, ESQ.
                            ERICA M. ZILOLI, ESQ.
                            JESSICA O'DONNELL, ESQ.
                            JUSTIN D. HEMINGER, ESQ.
                            JENNIFER E. POWELL, ESQ.
                            WILLIAM D. JOHNSON, ESQ.

                            U.S. Department of Justice
                            ENRD / Environmental Defense
                            Section
                            601 D Street, NW
                            Suite 8000
                            Washington, DC 20026-3986

```
Court Reporter:              PAT KANESHIRO-MILLER, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 4704B
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3243
```

## CONTENTS

WITNESS                                                      PAGE

    BERNARD TOD DELANEY
        Cross-Examination                                    508
        Redirect Examination                                 538


    WILEY R. WRIGHT III
        Direct Examination                                   561
        Cross Examination                                    562
        Redirect Examination                                 603
        Recross-Examination                                  616

**P R O C E E D I N G S**

**BERNARD TOD DELANEY,**

having been previously duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified further as follows:

THE COURT:  What binder am I looking for?

MR. SULLIVAN:  We don't have another binder this afternoon.

THE COURT:  I'm not looking for a new one.

MR. MURPHY:  May I approach with Mr. Sullivan and raise one quick issue with Your Honor?

(Bench conference as follows:)

MR. MURPHY:  In our last discussion right before lunch I mentioned a settlement --

THE COURT:  Under seal --

MR. SULLIVAN:  No objection.

MR. MURPHY:  The amount of the settlement is confidential.

THE COURT:  Off the record.

(Discussion off the record.)

(Bench conference ends.)

THE COURT:  Continue.

Go ahead, Mr. Sullivan.

MR. SULLIVAN:  Thank you, Your Honor.

///

1                    CROSS-EXAMINATION (Resumed)

2               BY MR. SULLIVAN:

3    Q.   Good afternoon, Dr. Delaney.

4    A.   Good afternoon.

5    Q.   I would like to focus now on page 13 of your declaration,

6    paragraph 28, which starts on 12.

7    A.   Yes.

8    Q.   And on page 13, you say that it is inconceivable that LPC

9    would have allowed a practice of washing the Pulsaire bags on

10   the ground outside building 77 and allowed the wash water to

11   flow into the south sump --

12   A.   Correct.

13   Q.   But as we discussed this morning, you've seen no procedure

14   that dealt with which sump to put the wash water from washing

15   grinder parts or bags; isn't that correct?

16   A.   I see no procedure, that's correct.

17   Q.   And I take it you've also seen no procedure providing

18   instructions for how to safely move a 165-pound lid; correct?

19   A.   Of?

20   Q.   Of the sump.

21   A.   I have seen no instructions how to do that, but I was able

22   to do that.  Yes.

23   Q.   Do you disagree that the sumps weigh approximately 165

24   pounds -- I'm sorry, the lids weigh approximately 165 pounds?

25   A.   I have been thinking about that since I was out there and

1    lifted it myself and moved it.  Of course I didn't lift it to

2    try to get it over my head, I just lifted it to move it onto

3    the southern sump.  It certainly wasn't that much of an effort

4    as I remember it.

5    Q.   Have you done any calculations based on what it was made

6    of in the diagrams and blueprints?

7    A.   No, I reviewed Mr. Cain's calculations and basis of

8    calculation.

9    Q.   Did his calculations, as you reviewed them, appear

10   accurate?

11   A.   They appeared to be what I would properly do.  I didn't go

12   back to check to look at some of the numbers he put in.  But

13   the way he proceeded would be the way I would do it.

14          THE COURT:  Did we ever finish with the witness -- you

15   put up the testimony from the Procter litigation.

16          MR. SULLIVAN:  That was George Nelson White.

17          THE WITNESS:  Correct.

18          MR. SULLIVAN:  That was from the 7 W case.

19          THE COURT:  Whatever case.  Did he have a chance to

20   comment?

21          THE WITNESS:  No.

22          MR. SULLIVAN:  I don't think so.

23          THE COURT:  Well, I think it's rather important.  The

24   premise here is that this isn't what would happen because this

25   isn't what should happen.

1        MR. SULLIVAN:  I think that is Exhibit 994, page 116

2   it begins.  It starts -- you can read at the top.  It starts

3   up there.

4        THE COURT:  What is his name again?  White?

5        MR. SULLIVAN:  George Nelson White, Your Honor.

6        BY MR. SULLIVAN:

7   Q.   Dr. Delaney, why don't you read his testimony and let us

8   know when you're done.

9   A.   Starting where, sir?

10  Q.   I would start right at the top of the page, and then it

11  proceeds over on the second page -- the next page.

12  A.   "And so the wash water that was used to wash down the

13  buildings, would that then simply drain out onto the ground?

14        "Right, except for building 52.  Then it went into a

15  pit automatically.

16        "All right.

17        "Answer:  77 had its own sump pump down behind it

18  which pumps it up --

19        "The Reporter:  What?

20        "The Witness:  Sump pump that pumps up to the top of

21  the hill.

22        "Question:  Which building was that?

23        "Answer:  77, grind station.  It had a pump down here.

24  And when it got so full, it -- like I say, it pumped the water

25  up to the top of the dike out into the rocks.  They're all

1    oxidizers there.

2              "Question:  All right.

3              "Mr. Brant:  Move to strike as nonresponsive to the

4    last response.

5              "Question:  Let me -- let me ask a follow-up question.

6    Are you aware of whether or not there was a sump pump at

7    building 77?

8              "Answer:  Yes, there were two of them there.

9              "Question:  Okay.  What -- what did they do?

10             "Answer:  They pumped -- any water that came down into

11   the pit would pump out of the pit up to the top of the dike.

12             "Question:  Okay.  What was building 114 used for?"

13             MR. SULLIVAN:  That's the end.

14             THE COURT:  Is this the critical testimony?

15             MR. SULLIVAN:  Yes, it is, Your Honor.

16             THE COURT:  I don't understand technologically how

17   this works.  It said, "It had a pump down here, and when it

18   got so full, like I say, it pumped the water up to the top of

19   the dike into the rocks."  How could anything -- how was the

20   water --

21             MR. SULLIVAN:  We're going to present testimony about

22   this.

23             BY MR. SULLIVAN:

24   Q.   But Dr. Delaney, there was a sump pump in the sump,

25   correct?

1    A.   There was a sump pump, there's an individual sump pump in

2    each of the two sumps, both the north and south.  In both of

3    them, they're the same sump, same brand, same model, and in

4    both of them they operate on a series of floats.  So, in other

5    words, until a certain level gets into the sump, the sump pump

6    does not go on.

7              THE COURT:  Okay.

8              THE WITNESS:  Once it gets to that level, then it will

9    go on until it pumps out the lower level and then it goes off.

10             THE COURT:  It pumps to the lower level?

11             THE WITNESS:  Yeah, it will remove the liquid from the

12   sump.  It is up here high (indicating).  And when it comes

13   down, it then moves another piece of equipment that shuts the

14   pump off.  So it only operates between a range.

15             THE COURT:  So how -- how does one understand, it had

16   a pump down here and when it got so full, it pumped the water

17   up to the top of the dike out onto the rocks?

18             THE WITNESS:  You have to know what the pump is in

19   order to interpret what Mr. White is saying.

20             THE COURT:  Do you know what the pump is?

21             THE WITNESS:  Yes.  We have a picture of it in one of

22   the documents.  I had gotten a copy of the manufacturer's --

23             THE COURT:  Pump the water up to the top of the dike

24   out into the rocks.

25             THE WITNESS:  That I agree with.  That's what we were

1    talking about earlier when we were looking at the diagram to

2    see whether there was something in that area.  The south pump

3    was designed to pump the water up about 35 feet, up to the top

4    of the hill from down at the bottom where it was, and then

5    that drained into the ditch that was up at the top of the

6    hill, and then it would go down when there was a lot of water.

7             THE COURT:  How high was the north sump pump designed

8    to go?

9             THE WITNESS:  The north sump pump probably had to pump

10   about the same amount.  It pumped it out in a pipe that went

11   up and through the building to the other side of the building,

12   so that it went over to 61, evaporation basin.  Sorry.

13            THE COURT:  I have some pumps in all my basements.

14   They never work.  Okay.

15            BY MR. SULLIVAN:

16   Q.  Isn't it also true, Dr. Delaney, that in the south sump,

17   which was the sump that had like the sewer hole in it so the

18   water could flow into it, there was also a hole in the bottom

19   that allowed water to drain into the ground; isn't that

20   correct?

21   A.  Yes.

22   Q.  And that's called a dry well; isn't that correct?

23   A.  Yes.

24   Q.  And beneath that opening in the bottom of the pump there

25   was about a cubic yard of gravel or sand or something down

-514-

1    there?

2    A.   That's what the drawing says.

3    Q.   I would like to go back -- I'm done with that, Your Honor.

4         I would like to go back to page 13 of your

5    declaration, paragraph 28, and we were talking about

6    procedures for washing bags.  And I take it you have never

7    seen any sort of manufacturing procedure that specified how to

8    wash bags or equipment in the north sump without damaging the

9    electric sump pump motor?

10   A.   Where are you reading that again?

11   Q.   I'm just asking that question of you.  You have never seen

12   a procedure in any of the manufacturing process standards for

13   Lockheed that provides a procedure for washing grinding parts

14   or bags in the north sump in a manner that wouldn't cause

15   damage to the electric motor?  You've never seen that

16   procedure?

17   A.   Nor have I seen one that said you couldn't.

18   Q.   But you have never seen a procedure one way or another?

19   A.   That's correct.

20   Q.   I take it you have also never seen a procedure for how to

21   wash grinding parts and bags in the north sump without

22   creating a safety risk due to the fact that the electrical

23   sump pump motor was actually plugged into an outlet in the

24   sump?

25   A.   I have not seen anything in terms of a written procedure,

1    but the outlet that was in there is the same kind of an outlet

2    that we currently have at the outside of your house, for

3    example, when you're running your rotisserie in your grill.

4    It's the same kind of a socket.  I know I grill quite a bit in

5    the rain, and so these systems are made so that if you get

6    incidental water on them, they're not going to cause a

7    problem.

8    Q.   But I take it you've seen no safety precaution ever

9    specified in a manufacturing procedure of Lockheed that talked

10   about how to deal with safety risks for washing with water

11   around an electric motor plugged into an electric outlet in

12   the sump?

13   A.   I have not seen anything, but . . .

14   Q.   I would like to move to page 14 of your declaration,

15   paragraph 32.  You basically are stating here that washing of

16   grinder parts and baghouse bags did not result in significant

17   discharges of AP to the ground; correct?

18   A.   That's correct.

19   Q.   And you basically are saying that Mr. Cain overestimates

20   the amount of AP that would be left on a baghouse filter bag

21   before it was washed; correct?

22   A.   Correct.

23   Q.   And actually, let's go to paragraph 32.  You're saying

24   that Mr. Cain, in doing his calculation, assumed that three

25   pounds of AP would be left on a bag; correct?

1    A.   That's what he said, yes.

2    Q.   Isn't it true that he actually said that only two and a

3    quarter pounds would be left on that bag?

4    A.   After he took some deduction, yes.

5    Q.   After he took what?

6    A.   Some deduction, yes.

7    Q.   What deduction did he take?

8    A.   He assigned a 75 percent availability.

9    Q.   Okay.  But didn't he multiply the 75 percent availability

10   times 2.25?

11   A.   It says Mr. Cain assigned a 75 percent availability ratio

12   to the three pounds per bag, and ultimately estimates 2.25

13   pounds of AP would have been washed off.

14   Q.   Let's look at Mr. Cain's declaration, page 46, paragraph

15   92.

16   A.   Where do I find it?

17            THE COURT:  Good luck.

18            MR. SULLIVAN:  We're going to put that up.

19            MR. MURPHY:  John, could you use Mr. Cain's report

20   instead of his declaration?  He didn't have his declaration

21   when he drafted his report.

22            MR. SULLIVAN:  Who didn't have it?

23            MR. MURPHY:  Tod did not have Mr. Cain's declaration

24   when he drafted his declaration because his was submitted two

25   weeks earlier.  Please use his report that Dr. Delaney had.

1          MR. SULLIVAN:  I will see if I can find it.

2          THE COURT:  Was there a change?

3          MR. MURPHY:  I have no idea, Your Honor.  I just want

4     to make sure it's fair for the record that they're using a

5     document that Dr. Delaney had.

6          THE COURT:  What number exhibit is it, please?  The

7     report?

8          MR. MURPHY:  Your Honor, I have no idea.  I don't

9     think it's been in the record, Your Honor, because it was an

10    expert report.  We did not have their declaration --

11          (Discussion off the record)

12          THE COURT:  Show him the declaration.

13          MR. MURPHY:  I don't know why it's important either,

14    Your Honor.  I just want to make sure that he's presented

15    with --

16          THE COURT:  Until you figure out how it is important,

17    show him the declaration.

18          MR. SULLIVAN:  Okay.

19          MR. MURPHY:  I apologize, Your Honor.

20          THE COURT:  Here we are with the declaration.  What

21    paragraph do you want him to look at?  Show it to the witness.

22    Lawyers seem to have an impossible time figuring out what's

23    important.  What paragraph?

24          MR. SULLIVAN:  We will just go ahead with this.

25          BY MR. SULLIVAN:

1    Q.   That's on page 46, paragraph 92, I believe.  Let's look at

2    the first number there.  It says the calculation is -- I take

3    it you recall that his -- the result of his calculation was

4    20,000 pounds of AP.  I think that's in your own declaration;

5    correct?

6    A.   Yes.

7    Q.   Let's do the math now.  45 pounds of AP coming from a bag

8    divided by 20 would be two and a quarter, wouldn't it?

9    A.   Look, I don't have a problem with what he is doing there.

10   My problem is that his basis of calculation was wrong in the

11   beginning.

12   Q.   This isn't what we're asking you.

13          THE COURT:  What are you saying?  You don't agree with

14   the 45 pounds?

15          THE WITNESS:  No, I am not even looking at that, Your

16   Honor.  The problem is he started out with three pounds per

17   bag.  Okay?  The three pounds per bag came from a reference

18   that didn't deal with a bag coming out of the air pollution

19   control device, the baghouse.  When the bags came out of the

20   air pollution control device, they had already been sitting

21   for five minutes with the pulsing system working to knock

22   everything off of the bags.

23          We then have the bags coming out, and they take a

24   vacuum cleaner to the bags as per CO 23, the manufacturing

25   process standard, and then the bags go to be washed.  So the

1    numbers he is using are wrong from the beginning and he didn't

2    take into consideration any of the processes that were done to

3    the bags after they were removed.  That's where my problem is.

4            BY MR. SULLIVAN:

5    Q.  But in your report you said he started out with 60 pounds

6    and discounted it by .75.  But he didn't do that.  He started

7    out with 45 pounds and multiplied everything by .75.

8    A.  No, he started out with three pounds per bag or 60 pounds.

9    Then he said there was a certain amount of availability, and

10   he reduced it down on a basis of one place of a 50-pound grind

11   going through the system.  So he used --

12   Q.  Are you saying his declaration here is a lie?

13   A.  I'm not saying it's a lie.  I'm saying he used the wrong

14   assumptions and the wrong number to begin with.  I don't have

15   a problem with him taking a 75 percent availability.  I would

16   have done something very similar.  But his very basic -- a

17   basic part of the calculation is wrong.

18   Q.  In his declaration he didn't start with 60 pounds?  Right

19   here in his declaration?

20   A.  He started with 2.25.

21   Q.  That's right.  That's only 45 pounds.  You said he started

22   with 60 in your declaration.  That's what I'm asking you

23   about.

24   A.  He started with 60 because he started with three pounds

25   per bag.  If you go back and look at his report.  I haven't

1    seen this part of the declaration.  I didn't go through this

2    in preparation for this.  I did have his report, and his

3    report said he took three pounds per bag.  He decreased it

4    down to the 2.25 with various mechanisms, and then he ran his

5    calculation, which gives the 45.

6         The problem is that he didn't take account of the AP

7    being knocked off of the bags in the cleaning system within

8    the air pollution control device, and then he did not continue

9    and take the vacuum cleaner -- take any account for the vacuum

10   cleaner when they vacuum cleaned the bags as we have seen that

11   they do.

12   Q.   Okay.

13        THE COURT:  Does the three pounds per bag translate

14   eventually into the 45 pounds per washing?

15        THE WITNESS:  Yes.

16        THE COURT:  So what would you put in instead of 45?

17   That's where you've questioned his --

18        THE WITNESS:  The person that I talked to that

19   manufactured these pieces of equipment and bags said there

20   would be ounces on the bags, each bag, as opposed to anything

21   in the way of pounds.  I did not get a written number from him

22   to do this kind of a calculation.  Just when I saw the

23   calculation he did, I knew it was wrong.

24        THE COURT:  So you think it would have gone through a

25   couple of processes to have less AP on the bags at the end of

—521—

1      the day?

2              THE WITNESS:  Yes.  Because one of the main processes

3      with this pneumatic system with this air pollution control

4      device --

5              THE COURT:  This is the one you installed when?

6              THE WITNESS:  This is the one that was installed in

7      '62.  When you shut the process down, the process for the bags

8      continues to operate so that it continues to knock product off

9      of the bag and into the bin.  So whatever was on the outside

10     of the bag, by the time it gets pulled from the air pollution

11     control device, there is very little on the bag.  And then

12     that bag is vacuumed as per the manufacturing process

13     standard.

14             BY MR. SULLIVAN:

15     Q.   You just said that the bag is vacuumed.  The washing

16     procedure for bags from the Mikro-Pulsaire unit began in late

17     1962, early 1963, didn't it?

18     A.   Yes.

19     Q.   The vacuum system wasn't installed until 1970, correct?

20     A.   That's correct.

21     Q.   So there would have been no vacuuming of bags during that

22     whole period of time from '63 all the way to 1970, correct?

23     A.   That is very true.

24     Q.   I take it you're not certain that they always vacuumed

25     bags after they installed the vacuum system?

1    A.   The manufacturing process standard says that's what they

2    were supposed to do.

3    Q.   Aren't there a lot of processing standards that don't even

4    talk about using the vacuum after the vacuum was installed?

5    A.   The only ones that I have seen that fall into that

6    category are the ones that are the on-site planning documents,

7    which are different, and remember, the manufacturing process

8    standard 023, it has to be followed before you do the on-site

9    planning.  So the answer to your question is no, I don't see

10   that.

11            THE COURT:  Was there vacuuming -- I can't remember --

12   in 023?

13            THE WITNESS:  That's the one that says to vacuum.

14            THE COURT:  But you couldn't have vacuumed before '70.

15            THE WITNESS:  That's correct.  So for that time

16   period, they wouldn't have been vacuumed, but they would have

17   been cleaned by the pulse air process itself to knock off the

18   product.

19            THE COURT:  So the vacuuming doesn't add anything?

20            THE WITNESS:  No, the vacuuming adds very little in

21   terms of the actual removal.

22            THE COURT:  So why did they get vacuums?

23            THE WITNESS:  I believe that they didn't want -- when

24   you pull these bags out of the machine, they're six foot long

25   and they look like a very heavy sock, and you then have some

1    material on it.  If you're going to move them around, you want

2    to have them vacuumed so they don't drop any more ammonium

3    perchlorate on the floor of the building.

4         THE COURT:  Were people worried about ammonium

5    perchlorate or AP because of the fire hazard or some other

6    safety problem, or some other environmental problem, I should

7    say?

8         THE WITNESS:  They were worried primarily because of

9    fire and if it got near anything it could potentially explode

10   if there was enough material and enough force used on it.  So

11   it was a safety issue.

12        THE COURT:  So why is it that you assume the policies

13   that were worried about safety would have much to do with what

14   pumps they went into?

15        THE WITNESS:  Do you want me to respond, Judge?

16        THE COURT:  Yes.  You're making an assumption that all

17   these standards are trying to protect the water and the soil

18   and to make sure that they go to the right evaporation pit,

19   but one half of what Lockheed tells me is this really wasn't a

20   recognized problem, AP as a contaminant -- I think you said it

21   too --

22        THE WITNESS:  That's correct.

23        THE COURT:  -- but it was not until after the mid-'70s

24   that people were worried about it.  So I don't know why

25   anybody would spend a whole lot of time worrying what pump it

524

1      went to.  You just don't want somebody to drop a match when

2      they're smoking or something.

3             THE WITNESS:  No, Judge, I think the reason we were

4      worried about it is we, Lockheed, were looking at a system, we

5      designed a system so any AP-contaminated wastewater would go

6      to evaporation.  That is primarily from safety and also going

7      back to the original comment that we weren't going to put any

8      water in the ground that had anything in it as per what we

9      said we weren't going to do when we started to work at the

10     facility.

11            The other is that whenever you look at like the Air

12     Force manual that we talked about, it's always health and

13     safety.  It's not dealing with it from a contamination

14     standpoint.

15            THE COURT:  I know.  That's why I'm wondering why

16     anybody would spend a good deal of time making sure it went

17     down one pipe versus another.  I understand you don't want

18     somebody to walk by and strike a match and drop a cigarette.

19            THE WITNESS:  Really, the short answer to that, too,

20     is if you do what Mr. Cain said he thought they did and would

21     do by washing this 22,000 pounds over 11 years, or whatever

22     time period, out onto a concrete apron -- remember, we're in

23     the middle of the desert.  In the middle of the desert, things

24     evaporate and the ammonium perchlorate can recrystallize on

25     that concrete.  That then would become a safety issue because

1    it would potentially explode if you drove over it with a

2    forklift or you rubbed a steel drum across it.  So it was

3    really a safety issue that you did not want this material out

4    where it shouldn't be.

5              THE COURT:  Okay.  Thanks.  Go ahead.

6              BY MR. SULLIVAN:

7    Q.   Now, Mr. Cain also did some other discounting of his

8    number, didn't he?  He assumed that the bags were washed only

9    once per week; correct?

10   A.   Yes.

11   Q.   And building 77 was the only grinding station at the

12   Redlands facility; correct?

13   A.   At this time, yes.

14   Q.   It's possible they may have been washing more than once a

15   week; isn't that correct?

16   A.   That's possible, yes.

17   Q.   And he also discounted his entire calculation by 25

18   percent by assuming that building 77 was only used 75 percent

19   of the time; correct?

20   A.   Correct.

21   Q.   And you've done no calculations yourself about how much AP

22   may have been released on the ground from the washing of bags;

23   correct?

24   A.   I've said that.  Going back to the very basis, as a

25   chemical engineer, and Mr. Cain is a chemical engineer, the

1    most important thing that you do is your basis of calculation,

2    which was the -- initially the three pounds per bag --

3           THE COURT:  He just asked you if you did any

4    calculations.

5           THE WITNESS:  No, but I would have done it, Judge, the

6    same way he did it except for the initial --

7           THE COURT:  Premise.

8           THE WITNESS:  -- premise.

9           BY MR. SULLIVAN:

10   Q.   Why didn't you do any calculations?

11   A.   There was no need for me to.

12   Q.   Why?  We have a lawsuit here about the amount of

13   perchlorate that is being released.  Why didn't you do any

14   calculations?

15   A.   No, because I was under the impression they did do what

16   they should have done, which was to wash the material out of

17   the bags, which they could have very easily done in a bucket,

18   and discharged that to the northern sump without any problems,

19   and it would have been pumped over to the evaporation basin,

20   which is the way the operation should have worked.

21   Q.   At your deposition, you talked about the -- that Lockheed

22   must have had some sort of tray on the side of the north sump

23   that they could have washed parts and bags in; correct?

24   A.   No, I think I said, or at least my intent was to say that

25   they could have, given the divots or the holes that you could

1    see in the side of the building where I believe something at

2    one point in time was attached, and it happened to be right at

3    the level that would have been right next to the opening for

4    the northern sump.

5    Q.   Isn't it true that you said at your deposition at length

6    that you dreamed up this theory while washing dishes at your

7    house?

8    A.   I don't think I dreamed it up.  I think I saw on our

9    counter after I had just washed some dishes for something to

10   hold small parts.  Remember, what we're doing here is washing

11   small parts from the grinder, and there's no way that you can

12   just put them down on the concrete and wash them with a hose.

13   You have to wash them somehow holding them, and then you have

14   to put them someplace to dry so that you don't lose them.  And

15   anybody that's lived in an apartment has a dish drying

16   apparatus that sits on their sink to dry these small parts.

17   Q.   Okay.  But I take it you have never seen any engineering

18   drawing at Lockheed Propulsion for a tray system on the side

19   of the north sump?

20   A.   If I had, we wouldn't be having this conversation.

21   Q.   I take it you haven't seen an engineering drawing with a

22   tray system on the side of the north sump?

23   A.   I have not.  And since there wasn't anything specified, I

24   was looking for a very practical and easy way so they would be

25   able to accomplish the task of washing these parts and not

1    losing them.

2    Q.   But Dr. Delaney, you weren't working for Lockheed

3    Propulsion at the time, were you?

4    A.   No, I wasn't.

5    Q.   Nobody ever asked you at the time to devise a tray system

6    for the side of the north sump, did they?

7    A.   No.

8    Q.   In fact there is no manufacturing procedure that talks

9    about the use of a tray system on the side of the north sump,

10   is there?

11   A.   No.

12            MR. SULLIVAN:  No further questions, Your Honor.

13            THE COURT:  I have one question before -- here,

14   counsel.  I just want to ask you about a letter -- I know you

15   have been offered to talk about building 77, but can I ask you

16   a question about a letter that was written by counsel for

17   Lockheed way back when?

18            Let's see, where is that letter?  I think it is

19   Exhibit US 151.  This is building 114.  Can you just look at

20   this a minute.

21            THE WITNESS:  Can you make it a little bigger?

22            THE COURT:  I'm going to give it to you.

23            THE WITNESS:  Thank you, Judge.

24            THE COURT:  So you're looking at this.  Is this the

25   kind of thing that should have been reported to the Water

1    Board?

2              THE WITNESS:  Yeah, I'm familiar with this letter.

3              THE COURT:  I'm sure.

4              THE WITNESS:  What is your question, Judge?

5              THE COURT:  Should this have been reported to the

6    Water Board if this was going on?  It's not intermittent.

7    Once a week during the dry weather.  That means it's not just

8    one time only.

9              THE WITNESS:  Again, you would look at it from the

10   standpoint, what potentially was in it and whether it would

11   ever reach -- I, as an engineer looking at it, not as an

12   attorney, would look at it from the standpoint as if it was

13   done once a week, it was an intermittent, most likely, given

14   the depth to groundwater, this was a dry wash, they knew that

15   it didn't get very far down, and when you look at the analysis

16   of the water, I think there were two or three analyses of the

17   water that came out of this, there were really very small

18   parts per million of material that were found.  So this would

19   be on a borderline as to whether you should or should not.  An

20   engineer would probably say no.  An attorney may say yes.

21             THE COURT:  This was written in '71.

22             THE WITNESS:  In '71.

23             THE COURT:  I'm sorry.  Is something clicking?

24             THE WITNESS:  Printer.

25             THE COURT:  Huh?

1              THE WITNESS:  A printer.

2              THE COURT:  Hold on a minute.

3         Do you know whether they got an answer from the corps?

4              THE WITNESS:  That I do not know.

5              THE COURT:  So part of your opinion is based on the

6    level of the groundwater?

7              THE WITNESS:  The ability to do harm to the resource,

8    which is in this particular -- what we're talking about here

9    is the groundwater, not a receiving stream.

10             THE COURT:  Which has to do with the level of the

11   groundwater, I assume.

12             THE WITNESS:  Yes.

13             THE COURT:  Because you're in a desertous area, the

14   groundwater is lower?

15             THE WITNESS:  Correct.  As opposed to for the Aerojet

16   case in Sacramento where it's very -- the groundwater is very

17   close to the surface there.

18             THE COURT:  Was there any water in the Redlands area?

19   Any ponds or lakes, anything?

20             THE WITNESS:  I have not seen any on the Redlands

21   property myself.

22             THE COURT:  What about the other site?  You don't

23   know?

24             THE WITNESS:  Which one?

25             THE COURT:  Beaumont.  There were two areas.

1          THE WITNESS:  I have not been to Beaumont.  I was

2    never there.

3          THE COURT:  Thank you.  Can I have that back?

4          MR. SULLIVAN:  I have a question about this.

5          THE COURT:  Go ahead.

6          BY MR. SULLIVAN:

7    Q.   Dr. Delaney, building 114 was Lockheed's propellant

8    research laboratory, wasn't it?

9    A.   Yes.

10   Q.   They would manufacture batches of propellant and do tests

11   on propellant at that laboratory; correct?

12   A.   Yes, they would, in usually not more than a few ounces

13   because of the limits in terms of the amount of the propellant

14   they were allowed to have at any one time.

15   Q.   They used AP in that building, didn't they?

16   A.   Yes, they did.

17   Q.   The water discharges referenced in this letter, I take it

18   you have never seen any analysis for quantities of AP in that

19   water, have you?

20   A.   Yes, I have.

21   Q.   In this water right here?

22   A.   Yes, that water right there.

23   Q.   An analysis for AP itself?

24   A.   There is an analysis in it and I believe the ammonium

25   perchlorate was something on the order of -- no, it was for

1    chlorine that came from the ammonium perchlorate, and I think

2    it was 58, 59 parts per million.

3    Q.  So you have concluded that the chlorine came from

4    ammonium --

5    A.  Perchlorate, yes.  It dissolves in water and the chlorine

6    is the thing that is most easily measured in that time period.

7    Q.  So what you're saying is that perchlorate was detected in

8    this water?

9    A.  Yes.

10   Q.  And yet Lockheed never filed a notice of waste discharge

11   with the Water Board; correct?

12   A.  I think this analysis came in another document that I saw

13   and was not associated with this.

14   Q.  I take it, as we discussed earlier, you're aware that the

15   Water Board had been regulating perchlorate discharges since

16   1951, and yet Lockheed never bothered to file a notice of

17   waste discharge with the Water Board for this; correct?

18   A.  Again, if this was a direct pipe going into a receiving

19   water, we would be talking about something else.  Remember,

20   during this period of time most people, including the Water

21   Board, figured that the material, if it was filtered through

22   sand and other things for a significant period of time, and

23   didn't reach the groundwater all at once, then it was still

24   okay to do with an intermittent source.

25   Q.  And so you don't think the Water Board would have cared, I

1    take it, even though they were operating a huge groundwater

2    recharge facility right on Lockheed's property?  You don't

3    think they would have cared?

4    A.    Well, if they would have cared and this went into -- what

5    was it that it went into?

6    Q.    It evaporated right into the ground.  Or it didn't

7    evaporate, it just sunk right into the ground according to the

8    attorney here.

9    A.    No, according to the attorney, if you read it, it sunk

10   into the ground all along a way, which means that it didn't

11   all stay where it was put.  So in other words, it wasn't going

12   to have an impact on the groundwater.

13   Q.    That's your conclusion, that this discharge would not have

14   had an impact on the water at the site?

15   A.    It would not.

16   Q.    Did you do any studies, take any samples to reach that

17   opinion?

18            MR. MURPHY:  Your Honor, this is outside the scope --

19            MR. SULLIVAN:  I'm just going with the doctor --

20            MR. MURPHY:  But he never gave an opinion on this

21   document, Your Honor.

22            THE COURT:  He didn't.  He didn't do any studies

23   related to building 114.  I know that.

24            MR. SULLIVAN:  Yet he is rendering opinions about it.

25            MR. MURPHY:  He was responding to the judge, but

—534—

1    that's different than answering your questions.

2              MR. SULLIVAN:  He is giving opinions.

3              THE COURT:  He responded to the lawyer.  I didn't ask

4    him those questions.  I only asked him whether that needed a

5    permit.  But what is yours?  Did he do -- we know he didn't do

6    any studies.

7              MR. SULLIVAN:  He just gave an opinion that he doesn't

8    think these discharges would have affected groundwater.

9              THE COURT:  But he didn't do any studies.

10             MR. SULLIVAN:  He didn't do any studies.  I just

11   wanted to know.

12             THE COURT:  So what do you want to know?

13             BY MR. SULLIVAN:

14   Q.   The bottom line is, Dr. Delaney, we will never know what

15   the Water Board would have thought about this because Lockheed

16   didn't bother to file a notice of waste discharge with the

17   Water Board, correct?

18             THE COURT:  In his opinion they didn't need to, so we

19   don't know what the board would have done.

20             Just recap before we hear from Lockheed's counsel.  Is

21   it correct -- am I correct that from your point of view the

22   evaporation pits worked the way they were supposed to and

23   everything is fine with the AP there?

24             THE WITNESS:  Yes.

25             THE COURT:  So to the extent that that is where it was

1     disposed of, it all came from that one area through the

2     grinding?

3                  THE WITNESS:  Which area?

4                  THE COURT:  From building 77?

5                  THE WITNESS:  Building 77 was only grinding and that

6     was the only material that went to that evaporation pit, yes,

7     from building 77.

8                  THE COURT:  And that's the only place AP was ground,

9     77?

10                 THE WITNESS:  That's correct.

11                 THE COURT:  Did AP come out of any other buildings

12    like 114?

13                 THE WITNESS:  There may have been -- there were trace

14    amounts in 114 in the wastewater because it was a research

15    facility.

16                 THE COURT:  But we don't know anything about

17    evaporation pits for that?

18                 THE WITNESS:  Well, they were not evaporation, they

19    were holding pits.

20                 THE COURT:  What kind of pits?

21                 THE WITNESS:  Holding.  Settling pits.  So any solids

22    would settle out.

23                 THE COURT:  Well, how did they dispose of -- other

24    than the north pump going to -- what is that, number 61?

25                 THE WITNESS:  Correct.

-536-

1           THE COURT:  That takes care in your view of some AP.

2      What about the rest of the AP?  Where does it go?

3           THE WITNESS:  That should have taken care of the

4      majority of the AP except for the washing of the pieces of

5      equipment, which is where I have a problem with Mr. Cain's

6      testimony -- not testimony, but reports.

7           THE COURT:  You admitted it went to burn pits.

8           THE WITNESS:  Oh, and then afterwards -- every other

9      amount of ammonium perchlorate or propellant goes to the burn

10     pits.

11          THE COURT:  It goes from evaporation --

12          THE WITNESS:  Yes.

13          THE COURT:  -- to a burn pit?

14          THE WITNESS:  Yes.  Because once there is a sludge in

15     the evaporation pit after the water evaporated, they would

16     scrape that up and take it out to the burn pit to be burned.

17          THE COURT:  But in your view it never went there

18     directly?

19          THE WITNESS:  Correct.

20          THE COURT:  And your opinions are based on the notion

21     that all AP was processed through the evaporation pit.

22          THE WITNESS:  From 77.

23          MR. MURPHY:  Your Honor, I'm just -- Dr. Delaney was

24     offered to give rebuttal to Mr. Cain.  The scope of the

25     opinions of Mr. Cain are very narrow.  The types of questions

1   you're asking are what Dr. Feenstra is going to spend some

2   time to offer opinions on.

3          THE COURT:  I know, but he is telling me all about AP.

4   He has gone way beyond whatchamajigger, 77, but okay.  That is

5   where the majority of the AP activity occurred; correct?

6          THE WITNESS:  Where it was ground when it was new

7   before it went into the process, yes.

8          THE COURT:  And that's where the machinery was washed?

9          THE WITNESS:  That's correct.

10          THE COURT:  Is there any other AP activity outside of

11   building 77 that you're aware of?

12          THE WITNESS:  Only where they take the AP and make it

13   into the product, which is the propellant, which is the next

14   step from building 77's operations.

15          THE COURT:  Is that part of our case, too?

16          MR. SULLIVAN:  Yes, Your Honor.  That's building 52,

17   at least for a while, and then other mixing buildings.

18          THE COURT:  That's the mixing of it?  Okay.  You're

19   not here to talk about that.  This is the -- so 77 goes to an

20   evaporation pit and then goes to the burn pits.  As far as you

21   know, all of that worked according to procedure?

22          THE WITNESS:  Correct.

23          THE COURT:  Okay.

24          MR. SULLIVAN:  Pass the witness.

25          THE COURT:  Can I have the letter back, please?

1              THE WITNESS:  Yes, ma'am.

2              THE COURT:  So is this -- just for clarification, is

3      building 114 part of the mixing process or part of the

4      grinding process?

5              THE WITNESS:  It is part of the research of the

6      facility.

7              THE COURT:  So neither?

8              THE WITNESS:  It was a place where they would do

9      research on the propellants.

10             THE COURT:  Okay.  Go ahead.

11                        **REDIRECT EXAMINATION**

12     BY MR. TORRES:

13     Q.  Dr. Delaney, just to be clear, you were offered as a

14     rebuttal witness to Mr. Cain; is that correct?

15     A.  Correct.

16             THE COURT:  He purports to know a whole lot more.

17     Sorry.  You can't put somebody on here to talk about the

18     Dickey Act and how they're complying or not complying and then

19     say, oh, we're only going to limit ourselves to building 77.

20             BY MR. TORRES:

21     Q.  Well, your opinion concerns AP; correct?

22     A.  Correct.

23             THE COURT:  I didn't ask him about TCE.

24             BY MR. TORRES:

25     Q.  You didn't offer any opinions about solvents?

1    A.  It was not asked.

2          THE COURT:  Don't ask for it.

3          BY MR. TORRES:

4    Q.  Dr. Delaney, I want to turn to what appears in your

5    binder, in the cross-examination binder that you had in front

6    of you -- okay.  Well, we can bring it up.  It's Plaintiff's

7    Exhibit 9.

8          THE COURT:  This is attached to his affidavit?

9          MR. TORRES:  This is in the Feenstra affidavit.  It

10   was in the cross-examination binder that Dr. Delaney just had

11   in front of him.

12         THE WITNESS:  What number is it?

13         MR. TORRES:  Plaintiff's Exhibit Number 9.

14         THE WITNESS:  Can you give me the tab?  Here it is.

15         MR. TORRES:  PX 009.

16         BY MR. TORRES:

17   Q.  You're familiar with this document?

18   A.  Yes, I am.

19   Q.  What is this document?

20   A.  This is a document that was produced by the Air Force at

21   the direction of the Secretary of the Air Force to compile

22   information from contractors and Air Force operations with

23   regards to the storage, handling, and manufacturing of

24   solid-rocket propellants.

25   Q.  How, if at all, would this document be used by a

1    contractor?

2    A.   This document would be used as a contractor when you talk

3    about the scope of the document and look in the internals of

4    the document.  The Air Force was getting concerned that many

5    of the people in the rocket propulsion or manufacturing area

6    were getting older, and then, because of the national

7    interest, there were a lot of new people coming into it, and

8    they saw this as an instruction manual and a compendium of

9    information that had been developed since rocket -- solid

10   rocket work had started.

11   Q.   I'm going to have you turn to the Bates page that ends

12   463211, that's basically the sixth page -- seventh page.

13            THE COURT:  46 what?

14            MR. TORRES:  463211, it's Chapter 1, Introduction.

15            THE COURT:  Was there some specific pages the

16   government thought I should read -- it looks about 90 pages.

17   Did you highlight --

18            MR. SULLIVAN:  No, this is Dr. Delaney's citation.  We

19   didn't highlight it.

20            THE COURT:  This is what you gave me for

21   cross-examination.  I was wondering if there was something in

22   particular you thought I should focus on in this document.

23            MR. SULLIVAN:  Just the things we talked about in

24   cross-examination.

25            THE COURT:  Go ahead.

1          MR. TORRES:  Thank you, Your Honor.

2          BY MR. TORRES:

3     Q.   So you testified about people getting older and wanting to

4     gather experiences.  Let me have you look at the sections

5     there that are Background, Experience, Factors and Purpose.

6     What is being talked about there in those sections of this

7     document?  This is 1-1, 1-2, 1-3.

8     A.   I think the experience is they're talking about the

9     government and agency and industries have gotten a lot of

10    experience in terms of manufacturing of these materials over

11    the years, and what they're looking at is here's this great

12    amount of information and it's not -- it's going to waste

13    essentially.  And so the Secretary authorized that this

14    document be prepared to take all of this information that was

15    true at one point in time and be able to bring it in so the

16    new folks coming into the industry could use it.

17    Q.   So is it your opinion this document would contain what the

18    Air Force contractors, industry know about handling and use of

19    propellant as of '73?

20    A.   Yes.

21    Q.   And what were they -- based on 1-1, 1-2 and 1-3 here, what

22    were they concerned about?  What was the impetus of pulling

23    together this document?

24    A.   As you read through the document, and the title of it is

25    really dealing with the health and safety aspects of the

—542—

1      manufacturing, storage, handling, and disposal of these

2      materials.

3      Q.   Okay.   Take a look in paragraph 1-1 there, the last

4      sentence of that, could you take a look at that.   What does

5      that say?

6      A.   It says there have been periods in which the manufacturer

7      of missiles and rocket systems have gone for several years

8      without major accidents.

9      Q.   I'm sorry.   I'm taking a look at 1-1 there, background.

10     Take a look at that last sentence.

11     A.   "This search has evolved many propellants about whose

12     reaction it might truthfully be said that, 'they are nothing

13     more than controlled explosions.'"

14     Q.   What were the writers of this document concerned about

15     trying to prevent?

16     A.   Injury.

17     Q.   Let me have you take a look now, we're going to go way to

18     the back end of this document, and go to chapter 7 of this

19     document, and the Bates page is going to end in 463302.

20     A.   Or page 141, Judge.   There is a page number.

21     Q.   There's some handwritten notes on this document and it

22     lists it as 141.

23              THE COURT:   I've got it.   Go ahead.

24              BY MR. TORRES:

25     Q.   First of all, let me have you take a look at 7-1.1, waste

1    disposal personnel, that paragraph right there.  I'm going to

2    read the first sentence and ask you a question.  "Disposal of

3    waste should be regarded as an integral part of solid

4    propellant rocket operations."

5         What's going on in this paragraph?

6    A.   What they are basically saying, and they continue

7    throughout the rest of this chapter, is that the disposal of

8    waste products generated during the manufacture of missiles

9    with these kind of propellants, the waste disposal part is an

10   integral part of the manufacturing of these materials.  They

11   know that there is going to be waste generated.  The waste

12   they know can be explosive or can be very damaging to the

13   health and welfare of the individuals, and they're saying that

14   you should not just put any ol' person in charge of the waste

15   disposal operation.  It needs to be an organization that

16   really knows what they're doing.

17   Q.   What does it say about what kind of training crew members

18   should get in this paragraph?

19   A.   The crew members should have training, but the crew

20   foreman is the one that should be able to know all of the

21   things about all of the wastes that they're handling, what to

22   mix, what not to mix, where to place it, and how to dispose of

23   it.

24   Q.   Okay.  Let me have you go to section 7-2, that is below

25   that.  That's entitled -- 7-2 -- and that's entitled

544

1     "Guidelines" there.  I would like you to take a look at what's

2     noted as sub c in there.  What does this say is the safest

3     means of disposing of propellant?

4     A.   It says, "The safest means of disposing of propellant

5     waste is by burning."

6     Q.   I want you to move to the next page of the document, and

7     there is a table 7.1 on that document.

8          THE COURT:  Is there some reason why it can't go to

9     the burn pit directly?  Because you want to have it evaporate,

10    is that the notion, and then you haul it to the burn pit?

11         THE WITNESS:  Correct.

12         BY MR. TORRES:

13    Q.   Let me have you take a look on this page here, sort of

14    from left to right on this table.  What are these columns

15    describing?

16    A.   The first column is describing many of the materials that

17    you would normally find in waste streams, and they have put

18    them in there in their individual type of waste stream, and

19    then they've attached a note to it that says whether it can be

20    disposed of individually or with other materials, or whether

21    it has to have some special pretreatment associated with it

22    before you can dispose of it by burning.

23    Q.   And generally speaking, for all of these waste streams as

24    you've described them, what, generally speaking, is the method

25    of disposal?

545

1   A.   Burn.

2   Q.   Let me have you take a look at the -- let me have you take

3   a look at the second category in here.  This is identified as

4   waste oxidizer, contaminated, igniter and pyrotechnic

5   materials from igniter line (desensitized).  In the context of

6   what we're talking about at Redlands, what is waste oxidizer,

7   contaminated?

8   A.   Ammonium perchlorate.

9   Q.   The oxidizer is AP?

10  A.   The oxidizer is AP and it's contaminated because it is

11  picked up off the floor or it came out of the process and

12  wasn't ground properly or something like that.  It doesn't

13  matter where it came from, but it could not be used in the

14  propellant.

15  Q.   Let me have you take a look down, there's two categories

16  further down this table, and both of them are propellant,

17  machinings and cuttings.  What are machinings and cuttings?

18  A.   When you fill the rocket motor, which is really just a

19  steel casing, with the propellant, you don't always get -- you

20  always have a little bit more left afterwards on the outside

21  of the container at the end where you're filling.  That has to

22  be removed, and you also have to do some internal drilling

23  into the propellant in order to put other things into it to

24  actually ignite the propellant later on.  And that's what

25  they're calling the cuttings.

-546-

1    Q.   Okay.  Let me have you take a look at the method of

2    disposal.  First off, look at the first one, the propellant

3    machinings and cuttings (class 2).  There is a container

4    listed.  What is the container?

5    A.   The container for that is called a fiberboard container

6    with a polypropylene liner, and the material should be water

7    damp, and then they take that to the burn area and ignite it

8    with other wastes that are burning.

9    Q.   So at times propellant was burned when it was water damp;

10   is that correct?

11   A.   That's correct.

12   Q.   What about the second kind of propellant that's listed,

13   machinings and cuttings --

14   A.   Again, this was in fiber drums or cardboard cartons,

15   "remove from container, spread in thin layers on ground and

16   burn."

17   Q.   Let me have you -- there's been a lot of testimony here

18   today about vacuuming of various things in building 77,

19   baghouse bags, parts, the baghouse, things like that.  And

20   Mr. Cain offered an opinion that vacuuming of baghouse bags

21   would have been discontinued sometime after 1970.  Is that how

22   you understand his opinion?

23   A.   Yes, I believe that's correct.

24   Q.   You disagree with that opinion?

25   A.   Yes, I do.

1    Q.   Before we get into -- I think we got into some of this,

2    but I want to make clear, before we get into the basis of that

3    disagreement and look at some documents --

4         THE COURT:  What did Mr. Cain say?  I thought they

5    were vacuuming bags after '70?

6         MR. TORRES:  That is our contention.  Mr. Cain in his

7    affidavit says that he sees no evidence of vacuuming of bags

8    after 1970.

9         MR. SULLIVAN:  That's not true.

10        THE COURT:  What is your position on vacuuming the

11   bags -- I thought they got the proper equipment in 1970, or

12   they got a vacuum.

13        MR. SULLIVAN:  Our position, Your Honor, is that they

14   obtained the wet vacuum system in 1970, initially used it to

15   vacuum the bags, and then in about -- at the end of '72, early

16   '73, they stopped -- they just eliminated the vacuuming

17   procedure in the cleanup of the bags.  That's what the

18   procedures say.

19        THE COURT:  That's what the procedures say?

20        MR. SULLIVAN:  That's what the procedures say.

21        THE COURT:  Did they change the procedures?

22        MR. SULLIVAN:  It appears they actually almost put a

23   piece of paper over an old procedure with new language that

24   says water wash the bags.  And that's in Mr. Cain's

25   declaration.  We have copies of those standards right in his

1    declaration.

2          THE COURT:  All right.

3          MR. TORRES:  It will not surprise you, Your Honor,

4    that we disagree with that.

5          THE COURT:  No.

6          BY MR. TORRES:

7    Q.   Let me -- before we get into documents and the basis of

8    our disagreement, I want to nail down precisely, why does this

9    matter?  Why does this issue about the vacuuming of the bags

10   matter to the ultimate issues that we're talking about here?

11   A.   It matters because if in fact the bags were washed, as

12   Mr. Cain says, there would be more material going out with the

13   wash water either through the north sump or through some other

14   mechanism.

15   Q.   So if they're vacuuming the bags, there's going to be less

16   AP on the bags when they get washed?

17   A.   Correct.

18   Q.   Let's take a look in your binder at PX, this is

19   Plaintiff's Exhibit 1023, in the cross-examination binder you

20   have in front of you.  This is a manufacturing process

21   standard that we talked a lot about today.

22          THE COURT:  Can I go back?  From your point of view,

23   if it's going out the north sump, so what?

24          MR. TORRES:  Your Honor?

25          THE COURT:  No, the witness.

1          THE WITNESS:  That's correct.  It --

2          THE COURT:  From your point of view, whether they're

3     vacuuming or not vacuuming, as long as it goes through the

4     right pump, we're all right?

5          THE WITNESS:  From the standpoint of injury or

6     anything, yes.

7          THE COURT:  Contamination of water or soil.

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  So what do you care about this?

10          MR. TORRES:  We care about this, Your Honor, because

11     Mr. -- it goes I think to Mr. Cain's testimony and his

12     credibility and his reading of the documents.

13          THE COURT:  All right.  Chasing butterflies in this

14     case.  Go ahead.  Where are we?  Is this attached, 1023?

15          MR. TORRES:  Your Honor, if this -- is this something

16     we can deal with on cross-examination of Mr. Cain?

17          THE COURT:  If you think so.  That's up to you.

18          MR. TORRES:  All right.

19          THE COURT:  I certainly didn't see it as an issue, but

20     you have now brought it out as an issue.

21          MR. TORRES:  Your Honor, let's do this --

22          THE COURT:  All I knew from the government's case so

23     far is they had a vacuum starting in 1970.  I had no idea they

24     were suggesting they didn't, even though I did read Cain's --

25          MR. TORRES:  Okay, Your Honor.  Let me do this.  I

—550—

1     would like to point out one thing in the manufacturing process

2     standard and then we'll move on.

3             BY MR. TORRES:

4     Q.  The manufacturing process standard, Dr. Delaney, this

5     March 25, 1970 process standard, what is the number of this

6     standard?

7     A.  This is the one I have been referring to as CO 23, which

8     is a manufacturing process standard.

9     Q.  In this process standard there are references to vacuuming

10    of the bags; is that correct?

11    A.  That's correct.

12            THE COURT:  What page, please?

13            MR. TORRES:  Let's go to 13132, Bates ending 13132.

14    That is going to be sequence 6.7.2.

15            THE COURT:  The Bates stamp is --

16            MR. TORRES:  I'm sorry, 119966.  Excuse me.  119966.

17            THE COURT:  Okay.

18            BY MR. TORRES:

19    Q.  So 6.7.2, the vacuum here is used to vacuum the bags; is

20    that correct?

21    A.  That's correct.

22    Q.  And then move down do 6.7.3.  What else is the vacuum

23    being used to clean?

24    A.  It's used to clean out all of the oxidizer in the Pulsaire

25    housing that we mentioned before, the blowout panel, and to

1    clean around the seat in the vacuum system.

2    Q.   And take a look at 6.7.6.  What else is being cleaned with

3    the vacuum cleaner?

4    A.   They want you to clean the hopper below the bag collector

5    using the vacuum cleaner.

6    Q.   Then let's move down to, several pages down to 6.31.1,

7    Bates ending 119976.

8    A.   Uh-huh.

9    Q.   And there's -- this is entitled -- this is under the

10   heading "Station Cleaning."

11   A.   Yes.

12   Q.   What then is happening to the draining and the collection

13   in the vacuum?

14   A.   This is what we were talking about before where they would

15   take the material out of it and -- the drum and/or water would

16   be discarded as waste propellant.

17   Q.   Okay.  I just want to very quickly -- we've had some

18   testimony about other process documents that don't talk about

19   the vacuum, okay?  Just in general, what kind of documents are

20   those?

21   A.   The ones that were specifically brought up are on-station

22   planning documents.

23   Q.   What is the relationship between an on-station planning

24   document and a manufacturing process standard?

25   A.   The on-station planning document is a document that is

1    used for a grind that is not going to be used for a particular

2    case where you have to use the -- it has to be used for

3    something different than the normal propellant that you're

4    currently making, that you're making under the manufacturing

5    process standard.

6    Q.   Okay.  Would those on-station planning documents, would

7    they incorporate other documents?

8    A.   If on the first or second page of the on-station planning

9    document they say what other documents or procedures are

10   required or part of doing it.

11              THE COURT:  Give me an example.

12              THE WITNESS:  Beg your pardon?

13              BY MR. TORRES:

14   Q.   So as an example, let's take a look at Plaintiff's Exhibit

15   1043.

16              THE COURT:  43?

17              MR. TORRES:  1043, which is in the binder that we

18   have.

19              THE COURT:  What do you call a document like 1037?

20   What is the name of that document?  We have seen more than one

21   of these.  Do those have a name?  Do they have a generic

22   categorization?

23              BY MR. TORRES:

24   Q.   Dr. Delaney, why don't you take a look at 1037.

25              THE COURT:  It says "This S.O. establishing procedures

553

```
 1    for grinding."

 2            THE WITNESS:  This is the one that we were talking

 3    about, which is one of the ones that is an operations document

 4    that is used for oxidizer for a particular program.  This

 5    says, "The scope of this S.O. establishes a procedure for

 6    grinding oxidizer by the Raymond mill in building 77.

 7    Operations may be performed out of sequence to facilitate

 8    production."

 9            THE COURT:  What does S.O. stand for?

10            THE WITNESS:  It's a station operation planning

11    document.

12            THE COURT:  Okay.  Sorry.

13            THE WITNESS:  And then it says "Applicable documents

14    that are" --

15            THE COURT:  Never mind.

16            THE WITNESS:  Sorry.

17            THE COURT:  Now you're going on to the next kind.

18    This is 1043.

19            BY MR. TORRES:

20    Q.   In 1037 --

21            THE COURT:  I know it cross-referenced.

22    Q.   There is an additional item in 1037.  If you take a look

23    at sequence 6.5 in 1037, and that's going to appear on Bates

24    page ending 46869, sequence -- I will bring that up.

25            What does it instruct the operator to do?
```

554

1    A.   It instructs the operator to shut down the vacuum cleaner,

2    drain the water from the vacuum cleaner into the drum,

3    automatic turnoff, and then label and treat the drum as waste

4    propellant.

5            THE COURT:  What is the drum?

6            THE WITNESS:  After you shut down the vacuum cleaner,

7    you have to take the water out of the vacuum cleaner and pour

8    it into a drum.

9            THE COURT:  Then where do you go with it?

10           THE WITNESS:  Then that goes out as waste propellant

11   and is picked up by the waste crew that will take the waste

12   propellant to the burning area.

13           THE COURT:  So this kind of stuff doesn't go to the

14   evaporation pit?

15           THE WITNESS:  No.  No, it does not.

16           THE COURT:  Okay.  We should take a break for the

17   reporter, if not for the judge.  Okay.  Thank you.

18       (Recess taken from 3:29 p.m. to 3:52 p.m.)

19           BY MR. TORRES:

20   Q.   Dr. Delaney, during your cross-examination, you were asked

21   to look at some pictures; is that correct?

22   A.   Yes.

23   Q.   Those are not pictures you've looked at before?

24   A.   Beg your pardon?

25   Q.   They weren't pictures you'd looked at before?

555

1    A.   Oh, yes.

2         THE COURT:  Oh, yes?  Wait a minute.  What did you

3    say?

4         THE WITNESS:  Yes, I had looked at them before.  I saw

5    them today.

6         BY MR. TORRES:

7    Q.   You saw them today?

8    A.   Yes.

9    Q.   Let me have you -- let's take a look at these pictures.

10   This is a figure from Mary Sitton's report, the photographic

11   expert.

12   A.   Oh, no, I'm sorry.  I had not seen that --

13   Q.   That particular picture?

14   A.   I thought when you talked about photographs, it was the

15   photographs I had taken.

16   Q.   I'm sorry, I didn't clarify.  This picture, you have never

17   seen before today?

18   A.   Correct.

19   Q.   This is -- I believe there was testimony or a statement

20   about this picture coming from Mary Sitton's report, and as I

21   understand it, this is building 77; is that correct?

22   A.   Correct.

23   Q.   This is a 1966 picture.  Do you remember that testimony?

24   A.   No, but . . .

25   Q.   It is a 1966 picture from Mary Sitton's report.  And

1     you'll see, underneath, the testimony was that there was a

2     channel which is marked by this blue line right here.  Do you

3     remember that testimony?

4     A.   I do.

5     Q.   And the statement from Mr. Sullivan was that we had stain

6     or liquid right down here southwest of the building.  Do you

7     recall that?

8     A.   Yes.  Yes.

9     Q.   So we would understand from that arrow that is right here

10    that that channel goes east to west; is that what this

11    picture, with this annotation, seems to be suggesting?

12    A.   Correct.

13    Q.   Okay.  All right.  We can take that down.

14          Now, I would like to bring up Plaintiff's Exhibit 837.

15          Your Honor, this is not in the binder in front of you

16    because we didn't know Dr. Delaney was going to be taking a

17    look at pictures.  I have a paper copy of this, but to be

18    honest, this is going to be easier to look at on the screen.

19          THE COURT:  Is it in anybody's exhibits or is it

20    something new?

21          MR. TORRES:  This is in our plaintiff's exhibits,

22    Lockheed's Exhibit 837.

23          THE COURT:  And you say this is part of the binders or

24    is this something in addition?

25          MR. TORRES:  It is not in the binders you have before

1   you, but it is on our exhibit list, it is on the disk that

2   came.  I believe this is also listed as Defendant's Exhibit

3   33, I believe.

4           THE COURT:  Is it attached in any of the books?

5           MR. TORRES:  It is not attached, I don't believe, in

6   our books.

7           MR. SULLIVAN:  I believe, Your Honor, it might be a

8   figure in Tom Cain's declaration.

9           MR. TORRES:  I think it's 34.

10          MR. SULLIVAN:  Could be.

11          MR. TORRES:  Defendant's Exhibit 34.

12          BY MR. TORRES:

13  Q.  Dr. Delaney, do you know how to read an engineering

14  schematic?

15  A.  Most of the time, yes.

16  Q.  You're an engineer?

17  A.  It depends on what the engineer is, but yes.

18  Q.  Generally speaking, you can look at a plan?

19  A.  Yes.

20  Q.  In the bottom right-hand corner -- I just want to bring

21  that up so we can see exactly what we're looking

22  here -- you'll see it's listed, grind building 77, road and

23  excavation details.  You see that?

24  A.  Yes.

25  Q.  So you understand this to be a schematic of the building,

—558—

1    the road, and the construction area?

2    A.   Around building 77.

3    Q.   Around building 77.  Okay.  We can take that down.  I want

4    to highlight the area that is just sort of south of the

5    building there and bring that up for you so we can see that in

6    clearer detail.  Do you see a dotted line that is just south

7    of the building there?

8    A.   I do.

9    Q.   What does that dotted line say?

10   A.   "Existing drainage."

11   Q.   So that's the existing drainage.  And do you see a series

12   of arrows on that dotted line?

13   A.   I do.

14   Q.   What would you understand those arrows to mean?

15   A.   That's where the drainage -- from that part of the

16   building or that part of this area goes in a northeasterly

17   direction.

18   Q.   So the drainage on this schematic is going from west to

19   east; is that correct?

20   A.   Well, southwest to northeast.

21   Q.   Southwest to northeast.  It's going this way?

22   A.   Yes.  It's going the way the arrow is.

23   Q.   It's going the way the arrow is.  Where does the drainage

24   seem to go?  Can you see that on there?

25   A.   Say that again.

559

1    Q.  Where does the drainage seem to go?  Can you see that on

2    there?

3    A.  It then goes into a, I think it goes into a pipeline

4    culvert and then goes across and under the roadway for the

5    entrance to 77.

6    Q.  Okay.  So it is continuing on its way northeast?

7    A.  Northeast.

8    Q.  Okay.

9           THE COURT:  What is the handwriting on the corner up

10   there at the top?  I can't read it.

11          MR. TORRES:  I'm sorry.

12          THE WITNESS:  It's up in the block.

13          THE COURT:  When you get to the end of this pipe, it

14   goes somewhere.

15          MR. TORRES:  If we could bring up that part right

16   there.

17          THE COURT:  I just can't read it.

18          "Existing culvert"?

19          MR. TORRES:  "Existing culvert."

20          THE COURT:  Where is the evaporation pit?

21          MR. TORRES:  Your Honor, this is -- this is related --

22          THE COURT:  Different building.  Is that right?  This

23   is 114?

24          MR. TORRES:  No, Your Honor, this is grind building

25   77, as you can see down here at the bottom.  Okay.  Perhaps we

-560-

1    could go back --

2         THE WITNESS:  Get the big one back.

3         BY MR. TORRES:

4    Q.  Excuse me?

5    A.  Get the big one back.

6    Q.  Yeah.  This is grind building 77, the drainage on the

7    south side of the grind building.  Dr. Delaney's testimony has

8    been it moves west to east on this schematic.

9         Maybe we can go back to the annotated photo from Mary

10   Sitton and bring that up.

11        THE COURT:  Is the arrow at 77 going west to east?

12        MR. TORRES:  On the Mary Sitton exhibit?

13        THE COURT:  Yes.

14        MR. TORRES:  No.

15        THE COURT:  Okay.  I get it.

16        MR. TORRES:  No further questions.

17        THE COURT:  It's going east to west; right?  Is that

18   right?

19        MR. TORRES:  Yes.

20        THE COURT:  Okay.  Go it.  Anything else?

21        MR. SULLIVAN:  No questions, Your Honor.

22        THE COURT:  Thank you, sir.  You may step down.  I

23   appreciate your patience.

24        THE WITNESS:  Thank you very much, Judge.

25        THE COURT:  Your witness now?  Your witness.  Sorry.

561

1          MR. HEMINGER:  Yes, Your Honor.

2          Good afternoon, Your Honor.  Your Honor, the United

3    States calls its first witness, Wiley R. Wright III.

4                    WILEY R. WRIGHT III,

5    having been first duly sworn to tell the truth, the whole

6    truth and nothing but the truth, was examined and testified as

7    follows:

8                    **DIRECT EXAMINATION**

9          BY MR. HEMINGER:

10   Q.   Good afternoon, Mr. Wright.

11   A.   Good afternoon.

12   Q.   Mr. Wright, did you submit a written declaration in this

13   case?

14   A.   Yes, I did.

15   Q.   And does that declaration reflect your opinions to a

16   reasonable degree of accounting accuracy?

17   A.   Yes, it does.

18   Q.   And do you adopt that declaration here as your testimony

19   today?

20   A.   I do.

21   Q.   Thank you.  Your witness.

22          MS. FLETCHER:  Excuse me, Your Honor.  We have not

23   submitted our case-in-chief regarding double recovery.  So I

24   have Mr. Wright's exhibits here.

25          THE COURT:  That's what's attached to his declaration?

1        Ms. Fletcher:  These are the exhibits I will use today

2   for cross-examination.

3        THE COURT:  Okay.

4                        **CROSS-EXAMINATION**

5        BY MS. FLETCHER:

6   Q.   Good afternoon, Mr. Wright.  Thank you for joining us

7   early.

8   A.   Good afternoon.  You're welcome.

9   Q.   Mr. Wright, today I would like to focus first on opinion 1

10  in your affidavit.  I would specifically focus on paragraph 10

11  on page 3.  Are you with me --

12       THE COURT:  Are you talking about opinion paragraph

13  10?

14       MS. FLETCHER:  No, Your Honor, I'm looking at the

15  paragraph numbering scheme, but it is opinion 1.

16       BY MS. FLETCHER:

17  Q.   Mr. Wright, are you offering the opinion that Lockheed

18  Martin must reduce its CERCLA claim by the contract recovery

19  that you were discussing in opinion number 1?

20  A.    My opinion number 1 states that Lockheed does recover a

21  portion of its environmental remediation costs due to the

22  pricing of its contracts.  The offset or reduction of their

23  CERCLA claim is not addressed in opinion number 1.

24  Q.   Are you offering the opinion that Lockheed must reduce its

25  CERCLA claim by the contract recovery?

1          THE COURT:  How can he do that, by the way?  You're an

2     accountant, right?

3          THE WITNESS:  Yes.

4          THE COURT:  He's not -- that's my problem, not his.

5          MS. FLETCHER:  Thank you, Judge Huvelle.  We agree.  I

6     just wanted to make sure we were on the same page before we --

7          THE COURT:  I'm happy to have people's opinion on it,

8     but he's not the one.

9          BY MS. FLETCHER:

10    Q.  Mr. Wright, do you agree that Lockheed Martin must credit

11    any judgment in this case to the settled discontinued

12    operations pool?

13    A.  In order to comply with their disclosed and accepted cost

14    accounting practices, they should credit any judgment to the

15    Disc Ops pool, yes.

16         THE COURT:  Do they do that?  Do you know from your

17    review of the documents?  Do they give a credit to reflect

18    what they get from other sources?  Or we don't know because

19    they haven't gotten anything here to know that?

20         THE WITNESS:  Historically they do include credits in

21    their Disc Ops pool.

22         THE COURT:  What do you call it?

23         THE WITNESS:  Disc Ops.  I apologize.  Discontinued

24    operations pool.

25         THE COURT:  Is there some recognized abbreviation?

—564—

1           MS. FLETCHER:  Your Honor, Lockheed Martin calls it
2      the Disc Ops pool.
3           THE COURT:  Dis, D-I-S, ops, pool?
4           MS. FLETCHER:  Yes, D-I-S-C capital O-P-S, Disc Ops.
5           BY MS. FLETCHER:
6      Q.   Mr. Wright can we turn to page 21 of your affidavit,
7      paragraph 74?
8           Have you had a chance to review that, Mr. Wright?
9      A.   Yes.
10     Q.   So what you're saying here, Mr. Wright, is that if
11     Lockheed Martin's business is 87 percent government contracts
12     in a particular year, in your opinion Lockheed Martin is
13     recovering approximately 87 percent of its environmental
14     costs; is that correct?
15     A.   It's not just the fact that 87 percent of the business is
16     with the government.  It states that you also have to consider
17     each of the other factors used to calculate the recoverability
18     percentage.  And if those remain the same, then they would
19     recover the recoverability factor of the costs and credits.
20     Q.   Thank you, Mr. Wright.  I think we're on the same page.
21          Are the other factors used to calculate recoverability
22     that you're discussing in paragraph 74, would you characterize
23     those as an insignificant portion of what we're talking about
24     in terms of recovery probability factor?
25     A.   The other factors I'm referring to in this particular

1    paragraph deal with what is known as the decrement factors.

2    Those decrement factors are small percentages.  I don't know

3    whether or not I would characterize them as immaterial or

4    insignificant.  They do have a dollar impact.  Materiality and

5    significance is in the eye of the user of the information.

6    That may cause dollars to increase or decrease substantially.

7    What might be material for financial statement purposes or

8    what might not be material for financial statement purposes

9    could be material to a party asking to pay those dollars.  So

10   the concept of significance and materiality is all in the

11   context.

12          THE COURT:  Can we go back?  Are you suggesting in

13   this paragraph that if they don't do 100 percent of their

14   business with the government -- and I assume this 87 percent

15   has something to do with reality -- 87 percent of their

16   business in some year was with the government?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Does that mean the remediation

19   costs -- let's say the remediation costs are 1 billion.  If

20   you can't recover a hundred percent in one year because of 87,

21   can you recover it over time, the whole amount, or is it

22   always going to be 87 percent of the billion?

23          THE WITNESS:  The way they account for their

24   remediation costs and treat them for government contract

25   purposes is such that in the year the $1 billion was expended,

1    it becomes or it will be amortized over the succeeding five

2    years.  Those costs in each of those five years are recovered

3    to the degree of the recoverability factor.  So if that factor

4    is 85, 87 percent, in each of those years, they recover 87 or

5    85 percent of the amortized dollars.

6          THE COURT:  Let's take simple numbers.  It's $100 of

7    costs.  So what you're saying -- $87 over five years?

8    Amortized over five years?

9          THE WITNESS:  The total of the recovery over the

10   five-year period would be 87 percent, or $87.  Yes, Your

11   Honor.

12         THE COURT:  So they incur the costs say in 2000 and

13   they get paid back a portion for each of five years.

14         THE WITNESS:  Yes.  Roughly 20 percent in each of the

15   succeeding five years.

16         THE COURT:  No interest?

17         THE WITNESS:  That's correct, Your Honor.

18         THE COURT:  Okay.  Got it.  Maybe.

19         Is 87 a real figure, in paragraph 74?  Is that about

20   what the percentage of Lockheed's business is for government

21   contracts?

22         THE WITNESS:  That's roughly the average

23   recoverability percentage over the relevant time period, that

24   being 1994 through 2012.

25         BY MS. FLETCHER:

1    Q.   Just to clarify, isn't that the average in the more recent

2    years?

3    A.   Yes.  You're correct.

4          MS. FLETCHER:  So, Your Honor, that would be just the

5    recoverability in the more recent years we're discussing.

6          THE COURT:  Was it lower before?  Is that what you're

7    saying?  Was it lower in earlier years than 87?

8          THE WITNESS:  Yes.  Over time it has trended upwards.

9          THE COURT:  Because they get more government work or

10   because of some other reason?

11         THE WITNESS:  It would be a combination of the amount

12   of government work they have, plus the mix of government

13   contracts, the mix of type of contract, fixed-price versus

14   cost reimbursement, as well as unallowable cost factors and

15   the other decrements.  And the other decrements include items

16   such as priced-out fixed-price work as well as loss-position

17   contracts.

18         THE COURT:  What?  What is a loss-position contract?

19         BY MS. FLETCHER:

20   Q.   Mr. Wright, perhaps it would help the Court's analysis, is

21   the 87 percent that you're talking about in terms of

22   recoverability factor, is that roughly or approximately equal

23   to the percentage of government contracts business?

24   A.   Roughly, yes.

25         THE COURT:  What is a loss-position contract?  The one

1     they bid on and didn't get?

2          THE WITNESS:  No, it's a fixed-price contract,

3     typically a fixed-price contract that has overrun the

4     anticipated costs such that they're losing money on that

5     particular contract.

6          BY MS. FLETCHER:

7     Q.  Mr. Wright, this process you were explaining to Judge

8     Huvelle, does it work the same way for credits?

9     A.  Yes, it does.  It works the same for both costs as well as

10    credits, including the amortization of both of them.

11    Q.  Thank you.

12         So the accounting treatment for the credits and costs

13    are essentially mirror images; is that correct?

14    A.  They are mirror images in the sense of the method and the

15    mechanics of the calculation.  They're not mirror images with

16    respect to the timing of the recognition of the costs and the

17    credits.  The credits are typically recognized and realized

18    later than the incurrence and recognition of the costs.

19    Q.  I think my point was hopefully simpler, that both costs

20    and credits are amortized over a five-year period; is that

21    correct?

22    A.  That's correct.  Different five-year periods, but, yes,

23    the method is the same.

24         THE COURT:  But the credits may not come at the same

25    time?  They may be incurred in a year, the costs were

1   incurred -- I don't know -- what year did you start getting

2   costs?

3           MS. FLETCHER:  1994, Your Honor.

4           THE COURT:  1994.  And you're still incurring costs?

5           MS. FLETCHER:  That's correct, Your Honor.

6           THE COURT:  Do you happen to know what kind of credits

7   have been allocated to the government with respect to the

8   Redlands and Beaumont?

9           THE WITNESS:  The individual recoveries that have been

10  included in the discontinued operations pool, I believe there

11  were amounts from the Procter litigation that were included in

12  the discontinued operations pool, as well as the other

13  settlement that was discussed earlier, the ███████████

14          BY MS. FLETCHER:

15  Q.   You're referring to the 7 W litigation?

16  A.   Yes.

17          MS. FLETCHER:  Your Honor, I believe we discussed this

18  earlier, if we could have that amount confidential, the

19  number.  Just the number.

20          THE COURT:  The actual amount is confidential, for the

21  purposes of the record.  That's the one with the Easter grass.

22          So that would work in the year they recovered X

23  amount, goes into the pool as a credit and amortized over five

24  years from the time received.

25          THE WITNESS:  Yes, Your Honor.

1          THE COURT:  And the cost -- so is it confidential? --

2     and if it is, why is it? -- how much has been spent on the

3     remediation here?

4          MS. FLETCHER:  Your Honor, we actually do keep that as

5     internal business information.  The total number that is

6     reported to -- for example, in the SEC filings is cumulative

7     with the other Disc Ops.  So outside of LMC, we do keep those

8     numbers, in terms of the ELC projected, the projected cost as

9     well as the actual, I do believe is confidential.

10          THE COURT:  What is ELC?

11          MS. FLETCHER:  Sorry.  That's the estimate to

12     complete, which is essentially how much the company is

13     projecting it would cost to clean up the site in the future.

14          THE COURT:  In the future.  You can't tell me on the

15     record how much has been expended to date?  Then I want to

16     know how much has been passed on to the government.

17          MS. FLETCHER:  Your Honor, I can give you some numbers

18     if you're ready.

19          THE COURT:  Are these under seal?

20          MR. MURPHY:  They should be, Your Honor, yes.

21          THE COURT:  I don't know how you can say that when

22     that is what you're suing for.  Does the government agree to

23     that?

24          MR. HEMINGER:  Your Honor, we've tried to address this

25     issue a number of times.  Some of the documents in this case

1      involve Lockheed's confidential business information, I

2      understand, but there are certain numbers that we think are

3      probably public information, or could be.

4              THE COURT:  In the public record, Mr. Murphy said 300

5      million cost to date.

6              MR. MURPHY:  Yes, I --

7              THE COURT:  Give or take a million here or there.  But

8      I will work with that.  But how much of that -- he's telling

9      me that's the cost of remediation to date, not future cost,

10     not estimated ELCs or whatever.  Do you know how much of that

11     has been recovered through the overhead pool?

12             THE WITNESS:  In order to calculate the recovery, Your

13     Honor, you would take the recoverability factor which is

14     disclosed by Lockheed in their documents, and extend that

15     factor by the Redlands costs on a fiscal year -- excuse

16     me -- on a year by year basis, and I have not done that

17     calculation.  That would be part of Phase 2.

18             THE COURT:  What do you call this?  Phase 1 or 2?

19             THE WITNESS:  I'm sorry.  This would be Phase 1, as I

20     understand it.

21             MR. HEMINGER:  Your Honor, I would also note Dr. Meyer

22     has done calculations reflecting what has been recovered.

23             THE COURT:  Okay.

24             MS. FLETCHER:  Your Honor, while we're on this topic,

25     you had previously asked for cost breakdowns by site.  Would

1    you want that information now or do you want it submitted some

2    other way?

3            THE COURT:  Yeah, why don't you submit that in writing

4    so they're able to see it ahead of time.  And I would like to

5    know by chemical, if you know.  I don't know how you do that,

6    if you do.  And I want to know how much you made on all of

7    these contracts.  There's only a thousand or so.  But I assume

8    you must have been filing things having something to do with

9    the profit, gross revenues and profit from all this.

10           MS. FLETCHER:  By that you mean Lockheed Propulsion

11   Company, Your Honor?

12           THE COURT:  I mean everybody that you are the

13   successor to.  You didn't have it originally.  GRC and the

14   other one.

15           MS. FLETCHER:  I think we understand, yes, Your Honor.

16   Grand Central Rocket.

17           THE COURT:  I want to know whether there is any

18   benefit to Lockheed.  I want to know how the benefits flowed

19   here.  Okay.

20           Do they report in SEC filings how much contracts are

21   worth to them?  I can't remember.  I don't read them

22   regularly.

23           THE WITNESS:  They report net sales, and then they

24   report in their footnote disclosures a breakdown of their net

25   sales.

1          THE COURT:  So net sales means -- what does that mean?

2          THE WITNESS:  Gross revenue.  I'm sorry.

3          THE COURT:  Is it the same thing as gross profit?

4          THE WITNESS:  Net sales are gross revenues minus cost

5     of sales.  So they report both gross cost of sales and net

6     sales in their statement of operations in their SEC filings.

7          THE COURT:  But none of that is profit?

8          THE WITNESS:  Well, they also report profit.  The

9     statement of operations lists all the activities for what is

10    commonly known as the income statement.  That's total sales,

11    cost of sales, extraordinary items and other items of income

12    and expense.  You subtract all of those items to arrive at the

13    net profit line.

14         THE COURT:  Okay.  But is that broken down by

15    contracts or is it lumped as one --

16         THE WITNESS:  It is in the aggregate, combined

17    effective all contracts.

18         THE COURT:  Oh, it's in the aggregate.  When did

19    Lockheed buy these things?

20         MS. FLETCHER:  Buy the company you mean?

21         THE COURT:  Yes.  There are two companies.

22         MS. FLETCHER:  I believe Lockheed Martin

23    purchased -- I'm sorry, Lockheed Aircraft Company purchased --

24    or formed Lockheed Propulsion Company from Grand Central

25    Rocket in 1962.

1            THE COURT:  Then what about the other one?  GR --

2            MS. FLETCHER:  GRC was formed not by Lockheed Martin

3     but by the predecessors at that site in 1954.

4            THE COURT:  Then when did Lockheed Martin get it?  It

5     was just Lockheed back then.

6            MS. FLETCHER:  It was Lockheed back then, Your Honor.

7     Lockheed Propulsion Company was owned by Lockheed Aircraft

8     Corporation.

9            THE COURT:  And GRC was taken over by --

10           MS. FLETCHER:  Yes, the successor-in-interest is

11    Lockheed Propulsion Company.

12           THE COURT:  So when did that happen?  Before '62?

13           MS. FLETCHER:  No, that was 1962.  I'm sorry if I was

14    not clear.

15           MR. MURPHY:  Your Honor, Lockheed Propulsion purchased

16    a share of interest in Grand Central Rocket I think in 1960,

17    and eventually acquired the entire company in 1962, Your

18    Honor.

19           THE COURT:  When did Lockheed Propulsion become -- it

20    then evolved into Lockheed Martin?

21           MR. MURPHY:  Lockheed Propulsion went out of business

22    and it was kind of folded back up into Lockheed Aircraft in

23    '75, I believe.

24           THE COURT:  Okay.  Sorry.

25           MS. FLETCHER:  Thank you.

—575—

1          BY MS. FLETCHER:

2    Q.   Mr. Wright, we were just looking at paragraph 74 in your

3    affidavit, and you were explaining to the Court how credit,

4    costs and amortization would work.  Let's assume that Lockheed

5    Martin receives a judgment in this case, Mr. Wright, and it

6    puts a hundred percent of the judgment in the settled

7    discontinued operations pool.  Are we on the same page so far?

8    A.   I'm following you, yes.

9    Q.   In the years that the costs were amortized, the percentage

10   of government business was 80 percent.  Are you on the same

11   page?

12   A.   I understand you, yes.

13   Q.   And in the years that the credit for the judgment is

14   amortized, the percentage of government business is 90

15   percent.  In that situation, am I correct that the government

16   will receive a higher allocable share of the credit than it

17   received relative to the cost?

18   A.   Are you also assuming that in those years when the

19   government percentage of business being 80 and 90 percent

20   equates to the recoverability factor as well?

21   Q.   Yes.  Let's talk about it in terms of recoverability

22   factors, since you've already explained it to the Court.  The

23   recoverability factor for the cost is 80 percent and the

24   recoverability factor for the credit is 90 percent.  Am I

25   correct that the government receives a higher allocable share

—576—

1    of the credit than it receives for the cost?

2    A.    That is correct.  And the inverse would be true as well.

3    Q.    In that situation, in your opinion, has double recovery

4    occurred?

5    A.    In that situation, the United States would not be paying

6    twice for the same costs -- well, they would be paying twice

7    in the first instance because the minute you make a payment,

8    that creates a double payment because they have already been

9    paid once through the contracts.  So if there is a judgment,

10   that's the second payment.  Now, we flow that second payment

11   into the Disc Ops pool, the discontinued operations pool, as a

12   credit, and that credit gets allocated, it gets amortized and

13   allocated, and if it is amortized and allocated at a 90

14   percent basis, then the allocable share of the credit is

15   higher than the allocable share of the costs.  So that would

16   offset or correct the double payment in the first instance.

17            THE COURT:  How fast does this all happen, so to

18   speak?  You incur costs and you get paid for that cost.  You

19   have to wait to get another contract?  Or is it pretty much

20   there are so many contracts that as you're entering into a

21   contract you're starting the five-year process pretty quickly?

22            Is that a stupid question?

23            THE WITNESS:  No.  It would depend on the nature of

24   the contract.  If it is a cost reimbursable contract, then the

25   realization of the costs and the credits can be quicker than

1    they would in a fixed-price contract.  For fixed-price

2    contracts, once the price is established for that contract,

3    then as costs come in or are allocated to, for example, that

4    contract, there won't be a price adjustment on that contract

5    because the price is fixed, but there would be a cost impact

6    on cost reimbursable contracts because those are based on

7    reimbursement of allowable costs.

8              MS. FLETCHER:  Your Honor, if I may ask the witness a

9    question in follow-up which I think will hopefully clarify the

10   issue?

11             THE COURT:  Go ahead and try.

12             BY MS. FLETCHER:

13   Q.   Hopefully.  Mr. Wright, the costs that we're talking about

14   in this case are all collected at the corporate level;

15   correct?

16   A.   They are collected and accounted for at the corporate home

17   office level.

18   Q.   Okay.  And in that situation, isn't it true that an

19   incurred cost is amortized in the year following its

20   incursion?

21   A.   It's amortized -- it's collected, for example, in 2012.

22   It is amortized over the next or succeeding five years, so

23   '13, '14, '15, '16, and '17.

24   Q.   The same is true for credits; correct?

25   A.   That is true.  However, I believe -- Your Honor was asking

1    about the timing of that, and the timing is such that the

2    costs are incurred well in advance of the credits, just by the

3    nature of what gives rise to the credits.  That's a dispute

4    and litigation over those costs, so that's naturally going to

5    follow the costs.  That creates time value of money issues,

6    and those particular issues are part of the analysis that

7    Dr. Meyer has performed.

8    Q.   Your Honor --

9         THE COURT:  The credits don't -- they're not hand in

10   hand with the costs at all?  To date -- I don't know -- the

11   credits have been small, the costs have been large, but

12   they're also -- you're losing the value -- well, it depends on

13   how fast you're getting the money, the 300 million from the

14   government through contracts, whether it's at the corporate

15   level or somewhere else.

16        THE WITNESS:  Yes.

17        THE COURT:  The question is when you're talking about

18   time value of money, whether or not they're expending 300

19   million before -- how much of a lag before they're actually

20   recovering these costs, and you're saying it depends on the

21   contract.

22        THE WITNESS:  It would depend in part on the type of

23   contract.  Those costs will be amortized over a five-year

24   period -- for cost reimbursable contracts, they're going to

25   recover them over that five-year period.

1          THE COURT:  But we don't know sitting here, I assume

2     we don't -- how much of a lag time do all their contracts --

3     cost reimbursement, I have been told government prefers fixed

4     price, so you don't know if they're actually -- they have

5     little in the way of credits.

6          THE WITNESS:  That's correct, Your Honor.

7          THE COURT:  But you don't know whether they

8     have -- there's been a loss of the current value of money

9     because they're not getting the payback from the Army?

10          THE WITNESS:  We have not analyzed the average time

11     between the inclusion of the cost in the discontinued

12     operations pool and the receipt or reimbursement of those

13     funds --

14          THE COURT:  You don't know if they incurred 100

15     million in 1979, how long it is before they recover?  I know

16     that if they had a contract right away, they might get it.

17     But you also have told me that at some period of time they

18     weren't running 80 percent.

19          THE WITNESS:  The recoverability --

20          THE COURT:  87 percent.

21          THE WITNESS:  Yes, Your Honor.  The recoverability

22     factor changes over time.  But using your example, if they

23     incur $100 million in 1979, they recognize it over the next

24     five years, and you take that recognition and multiply it by

25     their disclosed recoverability factor, and that tells you how

—580—

1    much they recover in any particular year.

2            THE COURT:  So they don't have to -- are you saying

3    they don't have to wait to get contracts, so to speak?

4    There's a stream of contracts that allows them to get these

5    back.  There are so many contracts going on there is no lag

6    time built into that?

7            THE WITNESS:  There is a lag time.  The examples I was

8    giving with respect to cost reimbursement versus fixed price,

9    those are at the micro level, at the detail level.

10           Lockheed has performed and does perform an analysis at

11   the macro level, and they have concluded, considering the

12   nature of the contracts, decrements, et cetera, that they

13   recover in any particular year X percentage of their costs.

14   So if you utilize their data, you can calculate, and we have

15   calculated, how much they recover each year.

16           THE COURT:  So that could vary, 85, 86, 84?  What am I

17   looking at?

18           THE WITNESS:  It does vary over time, yes, Your Honor.

19           MS. FLETCHER:  Your Honor, we're going to bring up on

20   the screen the variations over time that was in the

21   government's expert report?

22           THE COURT:  Okay.

23           MS. FLETCHER:  Your Honor, this is figure 30 in the

24   declaration of Joan Meyer.  It should be in the United States

25   trial binder.

1          THE COURT:  Okay.

2          BY MS. FLETCHER:

3   Q.   Mr. Wright, I believe you're familiar with the net

4   recovery factor concept that Dr. Meyer is discussing in this

5   table; is that correct?

6   A.   Yes.

7   Q.   Is that what you mean by recoverability factor on page 74

8   of your affidavit?

9   A.   The recoverability factor that I have addressed in my

10  report is based on Lockheed's calculations.  I believe there

11  are some other factors that go into Dr. Meyer's calculation of

12  net recovery factor.  There may or may not be some other

13  factors.  I think it would be appropriate to ask Dr. Meyer how

14  these numbers were derived.

15  Q.   Looking at this table, do you agree that Lockheed Martin's

16  recoverability factor is increasing over time?

17  A.   I would agree that from 1994 through 2012 it has

18  increased.  There are times during this span of years where

19  it's gone up and there are years where it's decreased.

20  Q.   But I think you testified earlier that it was a generally

21  increasing trend; is that correct?

22  A.   Generally it's an increasing trend; however, as I just

23  indicated, there are downward fluctuations in the percentages,

24  and that is in part why I stated in my declaration and

25  report that it is important to do an analysis of the recovery

582

1      of both the costs and the credits for purposes of this

2      litigation.

3      Q.   But you have not presented that calculation; correct?

4      A.   That's one of the data sets that was included in

5      Dr. Meyer's analysis.

6      Q.   But you don't have your own expert opinion regarding

7      whether the cost recovery factor -- I'm sorry.  Let me ask

8      that a little better.

9           You're not offering an opinion in this case that the

10     credits will in fact be less than the cost recovery factor; is

11     that correct?

12     A.   Whether the credits will be less than the cost recovery

13     factor?  I don't follow you.

14     Q.   Okay.  Let's tie it to something in your affidavit to make

15     sure.

16          THE COURT:  She is asking you whether you think the

17     credits will be less than these percentages.  How would you

18     know?  How could one say?  But anyways.

19          THE WITNESS:  Would the realization of the credit be

20     at percentages different than --

21          THE COURT:  Assuming they get a bonanza in another two

22     years and that's what they have recovered in the past.  Since

23     the credits have to do with whatever the factor is; right?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  She's asking whether you think that

1    the -- they're going to be mirrored.

2            THE WITNESS:  I don't have the data to project what

3    the recoverability factor would be post 2012.  Lockheed does.

4            BY MS. FLETCHER:

5    Q.  Mr. Wright, to confirm, if the recoverability factor from

6    the credit is larger than the recoverability for the related

7    cost --

8            THE COURT:  We get that.  Go ahead.

9            MS. FLETCHER:  Thank you.

10           BY MS. FLETCHER:

11   Q.  Mr. Wright, the calculation that you're talking about -- I

12   believe you offer it in opinion 4, but it is also the

13   calculation you just mentioned -- is that required by federal

14   acquisition regulations?

15   A.  No.

16   Q.  Is that required by cost accounting standards?

17   A.  No.

18           THE COURT:  What?  What is not required?  Sorry.  I

19   didn't understand the question.

20           MS. FLETCHER:  My question was, he's offering an

21   opinion that we should --

22           THE COURT:  What are you saying?  What is not

23   required?  I'm sorry.

24           THE WITNESS:  The requirement to do the analysis of

25   how much of the costs that have already been paid by the

584

1    government versus how much of the credit will be flowed back

2    or returned to the government.

3              THE COURT:  Well, doesn't the regulations require them

4    to give a credit for whatever they get?

5              THE WITNESS:  The regulations require that they flow

6    proceeds back into the pool pursuant to the credit cost

7    principle, which is a FAR principle, but the regulations do

8    not require a calculation of the effect of that.

9              BY MS. FLETCHER:

10   Q.   Mr. Wright, I take it you're probably familiar with the

11   Defense Contract Management Agency; is that correct?

12   A.   Yes.

13   Q.   Would you agree with me that the Defense Contract

14   Management Agency is the agency charged with administering

15   government contracts for the Defense Department?

16   A.   Yes.

17             MS. FLETCHER:  Your Honor, I would like to

18   introduce -- this is going to be Plaintiff's Exhibit 1859.  It

19   is in the binder.  Because again, we haven't done our double

20   recovery binder, this is not something you've seen before in a

21   binder.

22             BY MS. FLETCHER:

23   Q.   Mr. Wright, have you seen this document?

24             THE COURT:  Is it uncontested what they're doing is

25   consistent with whatever, the DOD and all the rest?  I

─585─

```
1    understand you have a different position about equitable
2    issues, but is there any suggestion that's inconsistent with
3    anything the government asked for --
4              MR. HEMINGER:  Your Honor, I think it would be best to
5    ask Mr. Wright, but our position is not that they're not
6    properly accounting for these costs under government contract
7    accounting standards.
8              MS. FLETCHER:  Your Honor, I was offering this
9    document for a different proposition.
10             THE COURT:  Okay.
11             MS. FLETCHER:  Which is that to the extent they argue
12   that there is an economic benefit from credit amortization, I
13   wanted to show the position of the Defense Department on that.
14             THE COURT:  I figure the Defense Department is on your
15   side.  You don't have to convince me of that.
16             MS. FLETCHER:  Okay.
17             THE COURT:  This is insanity.  I mean, what were you
18   going to show him?
19             MS. FLETCHER:  I was going to focus on paragraphs five
20   and six, Your Honor.
21             THE COURT:  Who put the Post-its?
22             MS. FLETCHER:  I did, Your Honor.  I'm sorry if that
23   was improper.  I was trying to make it easier for you.
24             THE COURT:  It's improper.
25             MS. FLETCHER:  Okay.  I'm sorry.
```

1          THE COURT:  You can highlight it when you put it up

2     there.  I'm the one that is putting tabs on all the documents

3     I think are important.  All I need to do is get yours rolled

4     in the hopper.  Okay.

5          BY MS. FLETCHER:

6     Q.  Mr. Wright, I wanted to direct your attention to paragraph

7     5 and 6.  Could you just read the first two sentences of

8     paragraph 5 for the Court.

9     A.  Yes.  "Amortization of the Disc Ops II pool costs would

10    also result in amortization of any credits that are booked

11    into the pool.  Such accounting treatment is in the best

12    interest of the government."

13    Q.  Thank you.  And could you please read paragraph 6 for the

14    Court.

15    A.  "Historically at LMC, the majority of costs included in

16    the discontinued operations pools are environmental

17    remediation costs.  These costs are generally an allowable

18    expense if it is shown that the contractor committed no wrong.

19    Given the uncertainty of expenses related to environmental

20    remediation costs, they can vary dramatically from year to

21    year based on current laws and regulations and contamination

22    levels.  Amortization spreads the costs and credits into out

23    years and makes contract estimates more consistent, which is

24    preferred by the various services that LMC contracts with."

25    Q.  Thank you, Mr. Wright.  In offering your opinion regarding

587

1      potential double recovery on credit amortization, did you

2      consider this position by the Defense Contract Management

3      Agency?

4      A.   I have reviewed this document as well as documents similar

5      to it, and have taken into account all of that information.

6      My opinion is that an analysis should be performed with

7      respect to the recovery in the first instance of the costs

8      under the government contracts.  There should also be an

9      analysis of the recovery or flowback of the credits to those

10     contracts to see if the relative benefits or comparative value

11     of the two calculations are equal.

12          That's just one part of a much broader analysis that

13     should be done in determining economic benefit.  I was only

14     pointing to just those two particular analyses.

15     Q.   Okay.  And I believe you just testified that that analysis

16     is not required under the federal acquisition regulations;

17     correct?

18     A.   Those two analyses that I just described are not required

19     by the FAR.

20          THE COURT:  Can we break down your opinion again.

21     Your analysis should be -- let's see.

22          What would your analysis mean in terms of both the

23     front end and the credit end?  I can't get the words exactly

24     back up.

25          You just answered that -- whether it is required by

—588—

1    the Defense Contract -- you said it is your opinion that an

2    analysis should be done at these two points.

3             THE WITNESS:  An analysis should be done of the costs

4    that have been recovered in the government contracts, and

5    another analysis should be done of the credits that are

6    applied to the contracts.

7             THE COURT:  Right.  But so far, the complication is

8    that the credits -- there aren't any credits to speak

9    of -- there have been some minor ones.  It depends on some

10   judgment here.  So those credits can't be analyzed today.

11            THE WITNESS:  Those credits could be projected or

12   estimated based on Lockheed's forward-looking or long-range

13   planning data, which they utilize for booking assets and

14   liabilities with respect to environmental costs.

15            THE COURT:  Have they done this analysis?

16            THE WITNESS:  They have not.

17            THE COURT:  You're just saying could be.  They have

18   the capability of doing it.

19            THE WITNESS:  I hope I'm not being confusing here.

20            THE COURT:  Everything is confusing.

21            THE WITNESS:  I'm sorry, Your Honor.  They have not

22   done the specific analysis of the recovery of the Redlands

23   costs through the contracts, or what the projected application

24   of the credit would be for those costs.  What they have done

25   is long-range planning and determination of recoverability

589

1    factors for financial statement purposes.  That takes into

2    account their entire business base as well as all

3    environmental costs.

4            THE COURT:  So you can't break it down to the Redlands

5    and Beaumont sites?

6            THE WITNESS:  Well, could they calculate

7    recoverability percentages as it relates to the Redlands

8    costs?  Yes, they could.

9            THE COURT:  Is that the actual costs incurred you're

10   talking about, or projected, or both?

11           THE WITNESS:  It would be actuals for historical

12   costs, and then it would be projections for future costs or

13   future credits.

14           THE COURT:  Is this what the next witness is on for

15   the government?

16           MS. FLETCHER:  No, Your Honor, she has calculated cash

17   flows and economic benefit.  It's slightly different.

18           May I follow up on that question you had for

19   Mr. Wright?

20           THE COURT:  Hold up for a minute.

21           (Discussion off the record.)

22           BY MS. FLETCHER:

23   Q.  Mr. Wright, if you did that calculation given that

24   Lockheed Martin's percentage of government business is

25   increasing, do you have any reason to think that there

1   actually would be some detriment to the government in the

2   crediting process?

3   A.   There is a trend in the most recent years of the

4   recoverability factor increasing.  We don't know without the

5   benefit of Lockheed's projections whether or not that factor

6   will continue to rise.  It's got a cap someplace.

7   Q.   So your testimony is you have never seen those

8   projections; is that correct?

9   A.   We have never seen the projections of the recoverability

10   factors into the out years, that is correct.

11   Q.   Are you familiar with the deferred environmental asset

12   memorandum?

13   A.   Yes.

14   Q.   You have reviewed that memorandum; correct?

15   A.   I have reviewed several of those memoranda, yes.

16   Q.   And you've reviewed the data that was used to prepare

17   those memoranda; correct?

18   A.   Yes.

19          (Discussion off the record.)

20          MS. FLETCHER:  Your Honor, we were looking at U.S.

21   402.  I believe this is probably in the double recovery

22   binder.

23          BY MS. FLETCHER:

24   Q.   Mr. Wright, I wanted to direct your attention to page 2.

25          THE COURT:  It is not in your cross binder?

591

1          MS. FLETCHER:  No, Your Honor.  I didn't anticipate we

2    would talk about this issue.  I can pass a copy up to you.

3          THE COURT:  You haven't given it to us yet?

4          MR. MURPHY:  This was part of our rebuttal case, Your

5    Honor.

6          THE COURT:  If it's U.S. 402 --

7          MR. HEMINGER:  You can find it in the United States

8    trial binder in Dr. Meyer's tab, under Dr. Meyer's tab.

9          THE COURT:  Go ahead.  402.

10          This has been admitted already.  It's 402.

11          BY MS. FLETCHER:

12    Q.  Mr. Wright, do you see the section where it says "Per 2013

13    LRP 2012 analysis," and it has commercial sales projections?

14    A.  Yes.

15    Q.  You see it has the out years for 2012, 2013, 2014, and

16    2015?

17    A.  Yes, it has the next three years.  What it doesn't have

18    are the balance of the years that are used for the projection

19    of the liability, and I believe it is projected out over 20

20    years.  So this has '13, '14, '15, it doesn't have the next 17

21    years.  So for example, if a credit is received in 2018, there

22    is no projection of what the recoverability factor would be to

23    be applied to that credit.

24    Q.  Do you agree that the years that are represented here, the

25    four years, indicate that Lockheed Martin's government

1    contract base is continuing to increase for the years they

2    have projected?

3              THE COURT:  I'm sorry.  The recoverability factor is

4    not 9.5 percent.  I'm not following.

5              MS. FLETCHER:  I'm sorry, Your Honor.  It is actually

6    shown in the inverse.  So it would be 90.5 percent because

7    you're showing the percentage of commercial sales.

8              THE COURT:  So the recovery factor goes up and down?

9              MS. FLETCHER:  Yes.  I'm trying to illustrate, Your

10   Honor, that it will continue to increase.

11             THE COURT:  What will continue to increase?

12             MS. FLETCHER:  Lockheed Martin's government contract

13   base for purposes of analyzing the credits.

14             THE COURT:  Shouldn't I be using the figure 90, 87,

15   88?  No?

16             MS. FLETCHER:  Yes, Your Honor, actually that could be

17   an easier place to look.

18             THE COURT:  It doesn't show it is increasing.  It

19   shows it is high for next year.  But anyway.  If the

20   government bellies up because they waste so much money on

21   this, we won't have to worry about it.

22             Do you have any response to that?

23             THE WITNESS:  I believe the trends show for this time

24   period, projected period show that the government percentage

25   is decreasing, not increasing.  ████████████████████████

593

1 ██████████████████████████████████████

2          MS. FLETCHER:  Could we go back to demonstrative 1,

3 please.

4          THE COURT:  Why doesn't it flow as a credit dollar for

5 dollar?  Is it because they have other contracts?  If they got

6 a government judgment for $100, it all relates to this one

7 thing, why does it not go 100 percent?  Because of some FAR

8 regulation?

9          THE WITNESS:  They would put the recovery in the

10 discontinued operations pool, but by function of the

11 recoverability percentage, the government would only realize

12 87 percent of that payment in the form of a credit.

13          THE COURT:  Right.  That's function of defining it

14 as this pool, as a portion of the pool?

15          THE WITNESS:  That's correct, Your Honor.

16          THE COURT:  The government, if they get a judgment

17 here, it is only because of Redlands and Beaumont, it has

18 nothing to do with anything else?  Correct?

19          THE WITNESS:  Correct, Your Honor.

20          THE COURT:  So as a result of this -- it's a FAR

21 regulation or something else that means that the recovery is

22 not dollar for dollar?

23          THE WITNESS:  The FAR regulation --

24          THE COURT:  The credit is not dollar for dollar.

25          THE WITNESS:  The credit/cost principle, which is a

1   FAR regulation, would dictate that the entire amount of the

2   credit be included in the pool.  Now, that is the accounting.

3   But the government contract treatment of the credit, now, next

4   we have to look at the effect of that treatment, and the

5   effect of that treatment, even though it is compliant, the

6   effect of the treatment is the government doesn't receive the

7   full benefit of the credit.

8          THE COURT:  Why is that if you assume, as she says,

9   the percentage, recovery factor percentage, is going to be

10  higher than what you see in these figures here, assuming that

11  is your net recovery factor?  And I'm talking about

12  demonstrative number 1.

13         THE WITNESS:  I believe the point that was being made

14  was that if the percentage is higher in the future years, then

15  the allocable share of the credit would be higher than the

16  share of the cost to which the credit relates.

17         They're still not going to get 100 percent of the

18  credit, but they will get a higher percentage of the credit

19  versus the costs to which it related.

20         THE COURT:  Right.  So where is the money -- where is

21  the double recovery if she is correct that this net recovery

22  from contracts, any other recovery goes -- it goes to the

23  percentage existing at the time, the credits.

24         THE WITNESS:  For this single part of the analysis, if

25  the recoverability percentage increases in a time period that

1    affects the credit, then the credit will correct the double

2    recovery.  Conversely, if the percentage declines, which is

3    indicated that it may, and that it's projected to decline on

4    Exhibit 402, page 2, then the allocation of the credit will

5    not correct the double recovery.

6         THE COURT:  Okay.  Another imponderable.  Is that the

7    only thing that affects the double recovery?  Whether the

8    recoverability rate goes up or done?

9         THE WITNESS:  For my purposes, I have analyzed or

10   looked at the double recovery issue just as it relates to the

11   application of -- or the recovery of the costs through the

12   contracts versus the credits.  There's a much broader analysis

13   that considers all of the economic benefits as it relates to

14   the government payments, and that's the analysis that

15   Dr. Meyer has performed.

16        THE COURT:  Are you finished?  Do you --

17        MS. FLETCHER:  Your Honor, we do have continued --

18        THE COURT:  I want to finish with this witness.  Go

19   ahead.

20        BY MS. FLETCHER:

21   Q.  Mr. Wright, are you familiar with the term "corporate

22   administrative contracting officer," or CACO?

23   A.  Yes.

24   Q.  Mr. Wright, would you agree that the CACO has

25   responsibility for contract administration, including the

1    credits to the indirect cost pools?

2    A.   The CACO does have those responsibilities as well as the

3    contractor.  The contractor has the obligation to credit the

4    cost pool.

5         MS. FLETCHER:  Your Honor, the next document I have is

6    actually already in the record in the sense that it was filed

7    with our 56(f) motion.  I can give you the docket citation or

8    we can have it entered as an exhibit.  What is your

9    preference?

10        THE COURT:  I think you better introduce it.  I'm not

11   going back to the ECF.  You folks have to get the point that

12   what you want me to see is available.  I thought that was the

13   point of exhibits.

14        MS. FLETCHER:  Your Honor, this is the second document

15   in your binder.

16        THE COURT:  It is?

17        MS. FLETCHER:  In the cross-examination binder.  It is

18   before you.  I just wanted to --

19        THE COURT:  No, no, I have the binder.

20        So this is document PX 1852.  Do you have any

21   objection to this one?  I have seen this before.  Okay.

22        MR. HEMINGER:  No objection, Your Honor.

23        THE COURT:  Okay.

24        BY MS. FLETCHER:

25   Q.   Mr. Wright, I was going to ask you regarding Exhibit 5,

597

1      which is actually, if you use the ECF page numbers, 45.

2              THE COURT:  No, no, no.  No ECF.  The Court of Appeals

3      doesn't go with ECF.  This is PX 1852, correct?

4              MS. FLETCHER:  Yes, Your Honor.  I'm sorry.  What I

5      was referencing is the fact this document doesn't have page

6      numbers in its natural format.  So it's Exhibit F, which is

7      about halfway through.  I was only trying to indicate --

8              THE COURT:  Okay.

9              BY MS. FLETCHER:

10     Q.   Mr. Wright, have you seen this document before?

11              I'm sorry.  Are you still turning to the correct page?

12     A.   I don't recall seeing this document, no.

13     Q.   Do you see that Mr. Tinti is a corporate administrative

14     contracting officer or a CACO for the Defense Contract

15     Management Agency?

16     A.   Yes, I do.

17     Q.   I want to turn your attention to paragraph number 5 on the

18     next page and paragraph number 6 on the next page.  Could you

19     read those for the Court, please?

20     A.   Paragraph 5 and 6?

21     Q.   Yes, sir.

22     A.   "At the time I negotiated the advance agreement, UTC and I

23     agreed that the amount of environmental remediation costs that

24     had already been incorporated into the price of prior

25     government contracts was impossible to determine with any

1   degree of precision and that it would not be precisely

2   determinable what amounts would be credited to future

3   contracts.  Nothing in the interim has altered the fact that

4   these amounts are not determinable with any degree of

5   precision."

6          Paragraph 6, "UTC and I agreed that, without a precise

7   way of matching costs and credits, the mechanism provided in

8   the advance agreement for the return of environmental credits

9   recovered from other sources made the most overall sense.

10  This mechanism allows individual operating units to apply

11  credits either to a general overhead pool or, if possible, to

12  divide the credits among the specific overhead pools to which

13  costs of environmental remediation have been charged.

14  Therefore, any analysis of how credits are being applied

15  necessarily requires looking at how the credits are flowing

16  out to each operating unit."

17          THE COURT:  As an accounting matter, you don't agree

18  with that methodology?  Or is that an unfair question?

19          THE WITNESS:  The statements don't make a distinction

20  between different types of contracts, and the degree to which

21  you could precisely estimate or determine these amounts varies

22  by contract.  So there's not enough information here for me to

23  agree or disagree.  I do believe with respect to cost

24  reimbursable contracts, that exercise can be done with a

25  reasonable degree of certainty.

1          BY MS. FLETCHER:

2     Q.   Mr. Wright, would you agree with me that Lockheed Martin

3     has fixed-price contracts as well?

4     A.   Yes, I believe Exhibit 402 we just looked at indicated

5     that cost reimbursable type contracts were roughly 60 percent

6     of the business and a smaller percentage were fixed-price

7     contracts, yes.

8     Q.   Mr. Wright, could we please turn to opinion number 5 in

9     your expert affidavit.  Let's look at paragraph 87, which I

10    believe is the conclusion.

11    A.   Which paragraph number?

12    Q.   87.  So Mr. Wright, again, you have not presented this

13    court with any calculation regarding fee or profit recovered

14    relating to Redlands costs; is that correct?

15    A.   No, we have -- the United States has requested that

16    information, and Lockheed Martin has indicated that that

17    calculation is not necessary and wouldn't provide it.

18    Q.   Fee and profit?

19    A.   The underlying cost to which the fee and profit relate.

20         THE COURT:  Can you explain that sentence to me.

21    A.   The sentence has two components.  It indicates that in

22    this case Lockheed has not presented any analysis to calculate

23    the amount of Redlands costs that they have recovered.  The

24    second piece is nor have they calculated or presented the

25    amount of profit recovered as it relates to those costs.

1          THE COURT:  Okay.  So how does profit work on the

2     costs?  You're talking about the costs incurred for cleanup?

3     There is administrative overhead or also on top of that

4     profit?

5          THE WITNESS:  There are several components of a

6     typical cost of a contract.  That would include what is known

7     as the direct cost, and that may include direct labor,

8     materials, subcontract costs.  In addition to the direct

9     costs, there are also overhead costs and G&A costs.  Those are

10    administrative costs that are not directly identifiable with

11    any particular single contract.  In government contract terms,

12    that is known as a final cost objective.

13         In addition to the direct costs, the overhead and the

14    G&A, a contractor earns a fee or profit on top of those costs.

15    So those are all of the amounts that they earn and recover on

16    their contracts.

17         THE COURT:  Does that profit have to do with specific

18    contracts or does it have all contracts for a million and the

19    profit is X percentage?

20         THE WITNESS:  It is determined on a

21    contract-by-contract basis.

22         THE COURT:  So it is within the power of the

23    Department of Defense to decide we're going to give you less

24    profit on the direct cost recovery for remediation costs?

25         Maybe you can't answer.  Do you understand the

1    question?  You say profit -- profit has to be a percentage of

2    something.

3             THE WITNESS:  Yes, and how it works, Your Honor, is in

4    the precontract phase and the negotiation phase, a contractor

5    will present its anticipated costs.  The government will take

6    those anticipated costs and perform profit analysis, typically

7    in the form of what is known as a DOD weighted guidelines

8    method.

9             THE COURT:  And they come up with --

10            THE WITNESS:  They come up with a profit objective.

11   The parties then negotiate the costs and the profit objective

12   to arrive at a contract price.

13            THE COURT:  Okay.  Is it a percentage or is it a flat

14   fee?  Is it a flat amount?  In what form does it come out?

15            THE WITNESS:  It's typically a fixed -- in a cost plus

16   fixed fee contract, it's a fixed fee amount.  In a fixed-price

17   contract, it's a fixed number.

18            THE COURT:  And there is nothing -- does that get

19   mirrored in the credit?

20            THE WITNESS:  The flowdown of the credit would not

21   impact a fixed-price contract that's already been -- that's

22   already in place, already executed.  So there is no

23   application of the credit to those contracts.  For cost

24   reimbursable contracts, the credit impacts the final indirect

25   cost rates, and the contracts are adjusted to reflect those

1    final indirect cost rates so the credit does flow to those

2    contracts.

3            MS. FLETCHER:  Your Honor, if I may ask a question to

4    clarify that response.

5            BY MS. FLETCHER:

6    Q.  Mr. Wright, to the extent there are new fixed-price

7    contracts that are being priced after receipt of the judgment,

8    wouldn't those receive the benefit of the credit, even if they

9    hadn't received the cost in the past?

10   A.  To the extent the credit goes into the forward pricing

11   rates, which are projected rates to be used in contract

12   actions, then those rates would incorporate the benefit of the

13   credit, and that reduced number would be the negotiating point

14   or objective in entering into future contracts.

15           THE COURT:  You've got three minutes -- quarter past

16   five.  Make it short.

17           MS. FLETCHER:  Your Honor, we're done.  Thank you.

18           THE COURT:  Okay.  You've got 10 minutes.

19           MS. FLETCHER:  Thank you, Mr. Wright.

20           THE WITNESS:  Thank you.

21           THE COURT:  What I intend to do is give you back all

22   your binders, and you're going to start again and do it right.

23   Whatever has been introduced in cross-examination, anything

24   that is in the universe is going to get distilled and we'll go

25   over what is really important.  This is not the way to educate

1    the unknowing, to keep on throwing more documents.  I get one

2    of these from both sides almost for every witness.  I was

3    supposed to have all the key documents.  Some of these are not

4    in here.  And you knew what these people had to say.  You had

5    counter exhibits and all the rest.

6         So at the end of the day, you may think it is going to

7    the Court of Appeals, but if it doesn't go through my head,

8    it's not going up.  You can throw all these documents at them.

9    I warned you that this is not the way to make a jury

10   understand, and I am no different than the jury, I hope.  I

11   understand the law.  But your job is to make this simple, not

12   more complicated.

13        Okay.  Go ahead.  Try to make it simple.

14        MR. HEMINGER:  Thank you, Your Honor.  I'll try.

15        THE COURT:  Do your best.

16                      **REDIRECT EXAMINATION**

17        BY MR. HEMINGER:

18   Q.   Good afternoon, Mr. Wright.

19   A.   Good afternoon.

20   Q.   I wanted to go back to what Ms. Fletcher asked you at the

21   end about the flowdown of profits or -- excuse me, the

22   flowdown of credits to fixed-price contracts.  I believe

23   Ms. Fletcher had asked you for contracts that were not

24   forward-priced at the time that the credit was received by

25   Lockheed, whether those fixed-price contracts would receive

604

1    some of the -- would price in the credit.  Do you remember

2    that?

3    A.   I believe the question was for contracts that had not been

4    executed and priced, would the credit flow in.

5    Q.   Right.  That was a better way of saying it.  So for

6    contracts that have been priced at the time that the credit is

7    received, what is your understanding of the way that the

8    credit would work?

9    A.   For contracts in place or contracts that have been priced,

10   the credit will have no impact on those contract prices.

11   Q.   And so for --

12   A.   Pardon me.  To the extent the credit is allocated across

13   the full contract base, including these contracts, the net

14   effect of applying a credit to a contract reduces that

15   contract's cost, so it increases its profitability.

16   Q.   And what do you mean when you say increases its

17   profitability?

18   A.   If you reduce the cost of a particular contract and the

19   revenue remains the same because it is a fixed-price contract,

20   then you are in an improved profit position.  You have fewer

21   costs, so your net profit is higher.

22   Q.   I guess what I'm asking is, who is you?  Is that Lockheed?

23             THE COURT:  They're the only one that is making a

24   profit.  The government doesn't seem to understand the

25   concept.

605

1    THE WITNESS:  Yes.  I apologize.  Yes, I was referring

2    to Lockheed.

3    BY MR. HEMINGER:

4    Q.  Okay.  To go back to Ms. Fletcher's questions to you about

5    fixed-price contracts and whether Lockheed recovers its costs

6    under fixed-price contracts, I just had a few questions for

7    you about that.

8    Your Honor, I wanted to try to stay in the United

9    States trial binder, so if you look at the United States trial

10   binder, the double recovery section --

11   THE COURT:  Uh-huh.  Okay.  Is that volume 1 or 2?

12   MR. HEMINGER:  I believe it is volume 2, Your Honor.

13   THE COURT:  Is that where Ms. Meyer's deposition is --

14   or affidavit?

15   MR. HEMINGER:  Dr. Meyer's affidavit is after the

16   double recovery section.

17   BY MR. HEMINGER:

18   Q.  So Mr. Wright, Ms. Fletcher asked you questions about

19   whether Lockheed recovers its environmental remediation costs

20   under fixed-price contracts.  Do you recall those questions?

21   A.  Yes.

22   Q.  And what does Lockheed Martin say about its recovery of

23   environmental remediation costs under fixed-price contracts?

24   A.  They indicate in their deferred asset memorandums that

25   they do in fact recover their environmental remediation costs

1    in both cost reimbursable as well as fixed-price contracts.

2    They further state that to the extent the mix of those

3    contracts would change, it would not have an impact on the

4    recoverability of those costs.  They would continue to recover

5    them.

6    Q.   Okay.  Let's look at U.S. Exhibit 407.

7         That's behind the double recovery submission, Your

8    Honor.

9         THE COURT:  I got it.

10        BY MR. HEMINGER:

11   Q.   Mr. Wright, do you recognize this document?

12   A.   Yes, this document, Exhibit 407 is the December 2012

13   Lockheed Martin memorandum to the files, copying the outside

14   auditors, Ernst & Young, and it concerns the deferred asset

15   and deferred liability calculations.

16   Q.   For the Court's benefit, could you briefly describe your

17   understanding of what purpose this document serves in Lockheed

18   Martin's accounting process?

19   A.   It is my understanding this document summarizes the

20   information that is related to the calculation of the deferred

21   asset account as well as the deferred liability.

22        And if I could just explain what those two are.  The

23   deferred liability account is a liability on the balance sheet

24   of Lockheed that projects out the total amount of costs that

25   they will spend on environmental remediations.

1          The deferred asset account is the amount of

2     environmental remediation costs that they project they will

3     recover -- "they" being Lockheed -- will recover through the

4     pricing of their government contracts, both fixed-price and

5     cost reimbursable contracts.

6          So, in other words, they identify specific amounts

7     that they anticipate spending, and they record them on their

8     balance sheet, and then they analyze how much of those

9     specific expenditures for environmental remediation that they

10    will recoup or be reimbursed for through their government

11    contracts.  And that's the asset.

12          THE COURT:  Does this thing get incorporated into

13    their SEC filings too?

14          THE WITNESS:  Yes, it does.

15          MR. HEMINGER:  Your Honor, that was going to be my

16    next question, actually.

17          THE COURT:  Can we get back to the bottom line?  What

18    did they decide about Redlands?  What do they say is the

19    deferred asset for Redlands and the deferred liability?

20          THE WITNESS:  The memorandum addresses the total

21    deferred liability amount and total deferred asset amount, and

22    that would include Redlands.

23          THE COURT:  I thought I saw Redlands broken down here

24    at one point.  It has discontinued operations and listed a

25    figure of 800 million, I think.  I could have been wrong.

1          BY MR. HEMINGER:

2    Q.   I think Your Honor is looking at the bottom of the page,

3    the deferred asset memo, 407.

4    A.   On page 2 of that document, there is information

5    concerning significant discontinued operations sites, and it

6    indicates 107 million for the Redlands site.

7          THE COURT:  Is that -- what does that represent, 107

8    million?

9          THE WITNESS:  That is the Redlands component of the

10   full 820 million.

11         THE COURT:  820 is what?  Deferred liability?  Or

12   neither?  Sorry.

13         THE WITNESS:  I believe this is a breakdown of the

14   major components of a much larger total.  So, in other words,

15   this is -- the major components add up to 820 million.  That's

16   a component of a larger number as reflected in paragraph 2 on

17   page 1.

18         BY MR. HEMINGER:

19   Q.   Mr. Wright, on page 2 there, the 820 million, is that the

20   asset or the liability?  What is your understanding of that?

21   A.   That's the liability.

22   Q.   Okay.

23         THE COURT:  But you say the figure is actually bigger?

24         THE WITNESS:  The total amount is $959.  That is the

25   total amount of the environmental liability.  And of that, 107

1    million relates to Redlands.

2            THE COURT:  Okay.  How about comparable for the

3    deferred asset?

4            THE WITNESS:  No, Your Honor.

5            THE COURT:  They don't?  How could they not?  If you

6    just told me this memo is asset and deferred liability.

7            THE WITNESS:  It gives the total amount for the

8    deferred asset.  It doesn't give a comparable breakdown into a

9    site by site component.

10           THE COURT:  What is the total for deferred asset?

11           THE WITNESS:  For November 30, 2012, the total

12   deferred asset is 829 million, as compared to a liability of

13   959 million.  That's reflected on page 1 in the lower

14   paragraph.

15           THE COURT:  So I don't know what the percentage is,

16   but is this what you're referring to they have come up with

17   some kind of recovery?

18           THE WITNESS:  Yes, Your Honor.

19           THE COURT:  This is 80-some percent?

20           THE WITNESS:  Approximately, yes.

21           THE COURT:  About 80 percent of what's been spent they

22   will recover?

23           THE WITNESS:  Currently they project or calculate that

24   they will recover 87 percent of every environmental

25   remediation dollar they spend.

1          THE COURT:  Do you have their latest SEC filing by

2     chance?  Did I just see it?

3          MR. HEMINGER:  Yes, Your Honor.

4          THE COURT:  Go ahead.  Hurry up and ask him.  This is

5     it here.  Do they allocate how much they're going to recover

6     in this case?  In the SEC filing?

7          MS. FLETCHER:  Your Honor, it is disclosed in the SEC

8     filing.  It's on page 53, I believe.  I'm sorry.  It's not how

9     much they get; it's just a disclosure that this case is

10    ongoing.

11         THE COURT:  I just wanted to know what the accountants

12    thought.  Okay.

13         MR. HEMINGER:  Other questions, Your Honor?

14         THE COURT:  Page 53, is that what you're saying?

15         MS. FLETCHER:  I'm sorry, Your Honor, it's page 51,

16    the last paragraph in the environmental matters section.  It

17    is right before goodwill, the paragraph immediately preceding

18    that.

19         THE COURT:  Okay.

20         THE WITNESS:  Your Honor, if I could clarify?

21         The information that is contained in the financial

22    statements that indicates that they can't quantify it, that's

23    the quantification of what they might recover in litigation.

24    The 87 percent is a calculation of what they recover in their

25    government contracts.

1        THE COURT:  I understand.  Okay.  Anything else?

2        BY MR. HEMINGER:

3    Q.   Mr. Wright, I just had a follow-up question.  I think

4    there was a discussion about, going back to 407, the deferred

5    environmental asset memo.  Ms. Fletcher had asked you about

6    fixed-price contracts.  I wanted to direct your attention to

7    the fourth page of the deferred environmental asset memo, the

8    bottom of that page, the carryover paragraph, the paragraph

9    that begins "We are aware."  Do you see that?

10   A.   Yes, I do.  That is what I was referring to earlier when I

11   indicated that although there is a movement, if you will, to

12   shift from cost type to fixed-price contracts, that won't

13   affect the recoverability of the environmental remediation

14   costs.  In other words, if the percentage of fixed-price

15   contracts increases versus cost reimbursable, it won't impact

16   or affect the recoverability of environmental remediation

17   costs.  And that's Lockheed's position as reflected in this

18   paragraph and in other documents.

19   Q.   Just to back up, this paragraph is talking about a

20   directive from DOD; is that your understanding?

21   A.   Yes.

22   Q.   And the directive is to move towards more fixed-price

23   contracts or fixed-price incentive contracts?

24   A.   That's correct.

25   Q.   And then would you read for the record the last sentence

1    in that paragraph on the bottom of page 4 that begins "This

2    directive"?

3    A.   Yes.  "This directive does not affect the probability that

4    our environmental remediation costs will be recovered since

5    the underlying tenet in pricing all of our contracts with the

6    U.S. Government is our ability to recover our costs plus

7    profit, regardless of the type of contract."

8    Q.   And how does that support your opinion that Lockheed

9    Martin recovers its environmental remediation costs under

10   government contracts?

11   A.   That is consistent with my opinion, and it is consistent

12   with many, many documents where Lockheed has stated just that,

13   that they do, in fact, recover their environmental remediation

14   costs, and they calculate percentages of recovery and record

15   assets for those calculations.  So they acknowledge and state

16   on their balance sheet in their SEC filing that we do, in

17   fact, recover and will recover our remediation costs through

18   our contracts.

19        MR. HEMINGER:  Thank you, Your Honor.  No further

20   questions unless the Court has --

21        THE COURT:  Just quickly.  Does that same principle

22   apply regardless fixed-price, cost plus or what have you, to

23   the credits?

24        THE WITNESS:  The treatment of the credits would be

25   the same as the costs.

1          THE COURT:  But I thought you said before something to

2     do with fixed-price you don't quite -- for future costs --

3          THE WITNESS:  The detailed calculations at an

4     individual contract level are such that the treatment for

5     fixed-price is different than cost reimbursable.  But when

6     Lockheed performs its assessment of its recoverability factor,

7     they take all of that information into consideration, as well

8     as the other decrements, and they conclude that on a net

9     basis, in other words, considering all of the factors, they

10    will recover 87 percent of their dollars and give 87 percent

11    of the credits to the Disc Ops pool.

12         THE COURT:  But if the 87 --

13         THE WITNESS:  To the contracts.  Pardon me.

14         THE COURT:  If the 87 percent that is recovered, that

15    includes the overhead, the profit?

16         THE WITNESS:  The 87 percent that they're referring to

17    is the percentage of the cost that they will recover, and the

18    cost being the environmental remediation costs.

19         THE COURT:  Does that incorporate what I have just

20    said?  Is that only cost outlay, or does it include elements

21    that you talked about before, overhead, G&A and profit?

22         THE WITNESS:  Those are just the costs, the

23    environmental remediation costs.

24         THE COURT:  When they put something in a contract --

25    let's get it down to its simplest -- if they are recovering

1    remediation costs, you said that there was in that figure,

2    overhead, G&A and profit, I thought.  Or is that in the total

3    contract you mean?

4         THE WITNESS:  A total contract will include costs for

5    direct labor, other direct costs, overhead, G&A and profit or

6    fee.  One of those elements is G&A.  Included within the G&A,

7    or general and administrative costs, are the environmental

8    remediation costs.  Now, when Lockheed does its assessment of

9    the recoverability factor, they are only looking at the

10   element of the general and the administrative as it relates to

11   remediation costs, and that's where they calculating their

12   recovery.  They're not calculating a recovery of direct labor,

13   overhead, other G&A costs, or profit.

14        THE COURT:  They bid a contract and they've incurred

15   remediation costs of a hundred dollars, that goes in the

16   contract that they're now negotiating with the government.  It

17   is part of the pool, so that some portion of it is going into

18   this contract?

19        THE WITNESS:  Yes.  Some portion will be allocated to

20   the contract and included in its pricing.

21        THE COURT:  Then does the profit include that?  In

22   other words, are they paying profit on the G&A?

23        THE WITNESS:  The G&A goes into the cost objective,

24   which drives the -- or is part of the profit objective

25   consideration, so, yes, it would influence and cause profit.

1          THE COURT:  And cause what?

2          THE WITNESS:  And cause profit.

3          THE COURT:  Okay.

4          THE WITNESS:  But the recoverability factor does not

5    address profit, only costs.

6          THE COURT:  That's the percentage you recover of the

7    costs?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  The hundred dollars, you get 87 percent of

10   it, but there is some other figure that covers profit that is

11   affected by those costs?

12         THE WITNESS:  There is profit associated with those

13   costs, but that is not included in the recoverability

14   calculation.  But there is profit, yes.

15         THE COURT:  So the credit doesn't have the same -- it

16   can't mirror it exactly because there is no profit factor?

17         THE WITNESS:  Correct.

18         THE COURT:  Okay.  Anything else?

19         MS. FLETCHER:  I'm sorry.  Could we -- I'm sorry.  I

20   will let you finish.

21         MR. HEMINGER:  Recross.

22         BY MR. HEMINGER:

23   Q.  So Mr. Wright, for fixed-price contracts that are executed

24   before the credit would be received, what's your understanding

25   of how that would affect the fixed-price contract?

1    A.   Fixed-price contracts that are in place prior to

2    amortization of the credit won't realize a price adjustment,

3    so there is no -- while the credit would be accounted for and

4    applied to the cost of that contract, there is no adjustment

5    to the price.  So the credit doesn't flow back to the

6    government through a price adjustment.

7    Q.   What is your understanding of where that credit would go

8    for that fixed-price contract?

9    A.   Well, that credit, because there is no price adjustment,

10   reduces costs and causes profits to go up.

11           MR. HEMINGER:  No further questions, Your Honor.

12           THE COURT:  Anything else?

13           MS. FLETCHER:  Your Honor, I just wanted to address

14   two points if I may, if it please the Court.

15           THE COURT:  Quickly.

16                     **RECROSS-EXAMINATION**

17           BY MS. FLETCHER:

18   Q.   Mr. Wright, can we revisit the point you just testified

19   about regarding fixed-price contracts.  Again, isn't it true

20   that to the extent that there is a credit in this case, that

21   that credit would be flowed down to new fixed-price contracts

22   that have not been priced yet?

23   A.   Yes, the credit would go into the Disc Ops pool.  It would

24   get into the forward pricing rates which would affect future

25   contracts.

617

1    Q.   So isn't it true then that that credit that you were just

2    talking about, it won't increase profits, it will just

3    decrease costs on new fixed-price contracts; correct?

4    A.   It will decrease costs that go into the calculation of

5    what those future fixed-price contracts might be, so it may

6    decrease revenues.

7    Q.   Right.  So that's different than what you just said.  In

8    other words, new fixed-price contracts, the price is reduced,

9    it is not that Lockheed keeps it as profit; correct?

10   A.   Well, that is correct.  What I was talking about a moment

11   ago was contracts in place.  The prices for those contracts

12   are not adjusted, so as costs decrease, profit increases on

13   those contracts.  We're talking about two types of contracts,

14   contracts in place versus future contracts.

15   Q.   Okay.

16            THE COURT:  Anything else?

17            MS. FLETCHER:  No.  Thank you, Your Honor.

18            THE COURT:  Yeah, you made that point before.

19            Thank you very much.

20            We'll work on the assumption we're going to resume at

21   9:30 on Friday.  Obviously, if there is no snow, you know

22   we're going to resume tomorrow.  Is he well enough?

23            Thank you very much, sir.

24            MR. MURPHY:  He could be well enough.

25            THE COURT:  You don't know?

618

1          MR. MURPHY:  We've talked to him this afternoon.  He's

2     shaky.  If we go tomorrow, I think he could go tomorrow, but

3     we're rolling the dice on the snow.

4          THE COURT:  I think the weather people have to be

5     terribly wrong if we go tomorrow.

6          Friday morning I have a plea at 9.  So anyways, if the

7     weather is okay and we start on time, it will be 9:30.  Okay?

8          MR. MURPHY:  Okay.  Your Honor, a couple days ago, the

9     first day, you asked for a five-page memorandum on arranger

10    liability.  Do you want it in hard copy, Your Honor, or shall

11    we file it on ECF?

12         THE COURT:  File it on ECF.

13         MR. MURPHY:  Okay.

14         THE COURT:  I can't wait to give you all this stuff

15    back.  All right.  Thank you.

16         (Proceedings adjourned at 5:31 p.m.)

619

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Patricia A. Kaneshiro-Miller, certify that the

4     foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6

7

8     -----------------------------------     -----------------------

9     PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [3] - 566:6, 579:23, 593:6
**$87** [2] - 566:7, 566:10
**$959** [1] - 608:24

## '

**'13** [2] - 577:23, 591:20
**'14** [2] - 577:23, 591:20
**'15** [2] - 577:23, 591:20
**'16** [1] - 577:23
**'17** [1] - 577:23
**'62** [2] - 521:7, 574:12
**'63** [1] - 521:22
**'70** [2] - 522:14, 547:5
**'71** [2] - 529:21, 529:22
**'72** [1] - 547:15
**'73** [2] - 541:19, 547:16
**'75** [1] - 574:23
**'they** [1] - 542:12

## 0

**009** [1] - 539:15
**023** [2] - 522:8, 522:12

## 1

**1** [15] - 540:14, 562:9, 562:15, 562:19, 562:20, 562:23, 565:19, 565:25, 571:18, 571:19, 593:2, 594:12, 605:11, 608:17, 609:13
**1-1** [4] - 541:7, 541:21, 542:3, 542:9
**1-2** [2] - 541:7, 541:21
**1-3** [2] - 541:7, 541:21
**10** [3] - 562:10, 562:13, 602:18
**100** [4] - 565:13, 579:14, 593:7, 594:17
**1023** [2] - 548:19, 549:14
**1037** [5] - 552:19, 552:24, 553:20, 553:22, 553:23

**1043** [3] - 552:15, 552:17, 553:18
**107** [3] - 608:6, 608:7, 608:25
**11** [1] - 524:21
**114** [8] - 511:12, 528:19, 531:7, 533:23, 535:12, 535:14, 538:3, 559:23
**116** [1] - 510:1
**119966** [2] - 550:16
**119976** [1] - 551:7
**12** [1] - 508:6
**13** [3] - 508:5, 508:8, 514:4
**13132** [2] - 550:13
**14** [1] - 515:14
**141** [2] - 542:20, 542:22
**151** [1] - 528:19
**165** [2] - 508:23, 508:24
**165-pound** [1] - 508:18
**17** [1] - 591:20
**1852** [2] - 596:20, 597:3
**1859** [1] - 584:18
**1951** [1] - 532:16
**1954** [1] - 574:3
**1960** [1] - 574:16
**1962** [4] - 521:17, 573:25, 574:13, 574:17
**1963** [1] - 521:17
**1966** [2] - 555:23, 555:25
**1970** [8] - 521:19, 521:22, 546:21, 547:8, 547:11, 547:14, 549:23, 550:5
**1979** [2] - 579:15, 579:23
**1994** [4] - 566:24, 569:3, 569:4, 581:17

## 2

**2** [9] - 571:17, 571:18, 590:24, 595:4, 605:11, 605:12, 608:4, 608:16, 608:19
**2)** [1] - 546:3
**2.25** [4] - 516:10, 516:12, 519:20, 520:4

**20** [3] - 518:8, 566:14, 591:19
**20,000** [1] - 518:4
**2000** [1] - 566:12
**2012** [9] - 566:24, 577:21, 581:17, 583:3, 591:13, 591:15, 592:25, 606:12, 609:11
**2013** [2] - 591:12, 591:15
**2014** [1] - 591:15
**2015** [2] - 591:16, 593:1
**2018** [1] - 591:21
**21** [1] - 564:6
**22,000** [1] - 524:21
**23** [2] - 518:24, 550:7
**25** [2] - 525:17, 550:5
**28** [2] - 508:6, 514:5

## 3

**3** [1] - 562:11
**30** [2] - 580:23, 609:11
**300** [3] - 571:4, 578:13, 578:18
**32** [2] - 515:15, 515:23
**33** [1] - 557:3
**34** [2] - 557:9, 557:11
**35** [1] - 513:3
**3:29** [1] - 554:18
**3:52** [1] - 554:18

## 4

**4** [2] - 583:12, 612:1
**402** [6] - 590:21, 591:6, 591:9, 591:10, 595:4, 599:4
**407** [4] - 606:6, 606:12, 608:3, 611:4
**43** [1] - 552:16
**45** [8] - 518:7, 518:14, 519:7, 519:21, 520:5, 520:14, 520:16, 597:1
**46** [3] - 516:14, 518:1, 540:13
**463211** [2] - 540:12, 540:14
**463302** [1] - 542:19
**46869** [1] - 553:24

## 5

**5** [6] - 586:7, 586:8, 596:25, 597:17,

597:20, 599:8
**50-pound** [1] - 519:10
**51** [1] - 610:15
**52** [2] - 510:14, 537:16
**53** [2] - 610:8, 610:14
**56(f** [1] - 596:7
**58** [1] - 532:2
**59** [1] - 532:2
**5:31** [1] - 618:16

## 6

**6** [5] - 586:7, 586:13, 597:18, 597:20, 598:6
**6.5** [1] - 553:23
**6.31.1** [1] - 551:6
**6.7.2** [2] - 550:14, 550:19
**6.7.3** [1] - 550:22
**6.7.6** [1] - 551:2
**60** [6] - 519:5, 519:8, 519:18, 519:22, 519:24, 599:5
**61** [2] - 513:12, 535:24

## 7

**7** [3] - 509:18, 542:18, 569:15
**7-1.1** [1] - 542:25
**7-2** [2] - 543:24, 543:25
**7.1** [1] - 544:7
**74** [5] - 564:7, 564:22, 566:19, 575:2, 581:7
**75** [7] - 516:8, 516:9, 516:11, 519:6, 519:7, 519:15, 525:18
**77** [26] - 508:10, 510:17, 510:23, 511:7, 525:11, 525:18, 528:15, 535:4, 535:5, 535:7, 535:9, 536:22, 537:4, 537:11, 537:19, 538:19, 546:18, 553:6, 555:21, 557:22, 558:2, 558:3, 559:5, 559:25, 560:6, 560:11
**77's** [1] - 537:14

## 8

**80** [5] - 575:10,

575:19, 575:23, 579:18, 609:21
**80-some** [1] - 609:19
**800** [1] - 607:25
**820** [4] - 608:10, 608:11, 608:15, 608:19
**829** [1] - 609:12
**837** [2] - 556:14, 556:22
**84** [1] - 580:16
**85** [3] - 566:4, 566:5, 580:16
**86** [1] - 580:16
**87** [26] - 564:11, 564:13, 564:15, 565:14, 565:15, 565:20, 565:22, 566:4, 566:10, 566:19, 567:7, 567:21, 579:20, 592:14, 593:12, 599:9, 599:12, 609:24, 610:24, 613:10, 613:12, 613:14, 613:16, 615:9
**88** [1] - 592:15
**88.8** [1] - 593:1

## 9

**9** [3] - 539:7, 539:13, 618:6
**9.5** [1] - 592:4
**90** [6] - 540:16, 575:14, 575:19, 575:24, 576:13, 592:14
**90.5** [2] - 592:6, 593:1
**92** [2] - 516:15, 518:1
**959** [1] - 609:13
**994** [1] - 510:1
**9:30** [2] - 617:21, 618:7

## A

**abbreviation** [1] - 563:25
**ability** [2] - 530:7, 612:6
**able** [3] - 508:21, 527:25, 541:15, 543:20, 572:4
**above-entitled** [1] - 619:5
**accepted** [1] - 563:13
**accidents** [1] - 542:8

**accomplish** [1] -
527:25
**according** [3] - 533:7,
533:9, 537:21
**account** [8] - 520:6,
520:9, 565:23,
587:5, 589:2,
606:21, 606:23,
607:1
**accountant** [1] - 563:2
**accountants** [1] -
610:11
**accounted** [2] -
577:16, 616:3
**accounting** [10] -
561:16, 563:14,
568:12, 583:16,
585:6, 585:7,
586:11, 594:2,
598:17, 606:18
**accuracy** [1] - 561:16
**accurate** [1] - 509:10
**acknowledge** [1] -
612:15
**acquired** [1] - 574:17
**acquisition** [2] -
583:14, 587:16
**Act** [1] - 538:18
**actions** [1] - 602:12
**activities** [1] - 573:9
**activity** [2] - 537:5,
537:10
**actual** [4] - 522:21,
569:20, 570:9, 589:9
**actuals** [1] - 589:11
**add** [2] - 522:19,
608:15
**addition** [3] - 556:24,
600:8, 600:13
**additional** [1] - 553:22
**address** [3] - 570:24,
615:5, 616:13
**addressed** [2] -
562:23, 581:9
**addresses** [1] -
607:20
**adds** [1] - 522:20
**adjourned** [1] - 618:16
**adjusted** [2] - 601:25,
617:12
**adjustment** [5] -
577:4, 616:2, 616:4,
616:6, 616:9
**administering** [1] -
584:14
**administration** [1] -
595:25
**administrative** [6] -
595:22, 597:13,
600:3, 600:10,

614:7, 614:10
**admitted** [2] - 536:7,
591:10
**adopt** [1] - 561:18
**advance** [3] - 578:2,
597:22, 598:8
**Aerojet** [1] - 530:15
**affect** [5] - 611:13,
611:16, 612:3,
615:25, 616:24
**affected** [2] - 534:8,
615:11
**affects** [1] - 595:1,
595:7
**affidavit** [11] - 539:8,
539:9, 547:7,
562:10, 564:6,
575:3, 581:8,
582:14, 599:9,
605:14, 605:15
**afternoon** [10] - 508:3,
508:4, 561:2,
561:10, 561:11,
562:6, 562:8,
603:18, 603:19,
618:1
**afterwards** [2] - 536:8,
545:20
**agency** [2] - 541:9,
584:14
**Agency** [4] - 584:11,
584:14, 587:3,
597:15
**aggregate** [2] -
573:16, 573:18
**ago** [2] - 617:11, 618:8
**agree** [13] - 512:25,
518:13, 563:5,
563:10, 570:22,
581:15, 581:17,
584:13, 591:24,
595:24, 598:17,
598:23, 599:2
**agreed** [2] - 597:23,
598:6
**agreement** [2] -
597:22, 598:8
**ahead** [14] - 517:24,
525:5, 531:5,
538:10, 540:25,
542:23, 549:14,
572:4, 577:11,
583:8, 591:9,
595:19, 603:13,
610:4
**air** [6] - 518:18,
518:20, 520:8,
521:3, 521:10,
522:17
**Air** [6] - 524:11,

539:20, 539:21,
539:22, 540:4,
541:18
**Aircraft** [3] - 573:23,
574:7, 574:22
**allocable** [5] - 575:16,
575:25, 576:14,
576:15, 594:15
**allocate** [1] - 610:5
**allocated** [7] - 569:7,
576:12, 576:13,
577:3, 604:12,
614:19
**allocation** [1] - 595:4
**allowable** [2] - 577:7,
586:17
**allowed** [4] - 508:9,
508:10, 513:19,
531:14
**allows** [2] - 580:4,
598:10
**almost** [2] - 547:22,
603:2
**altered** [1] - 598:3
**ammonium** [8] -
523:2, 523:4,
524:24, 531:24,
532:1, 532:4, 536:9,
545:8
**amortization** [8] -
568:10, 575:4,
585:12, 586:9,
586:10, 586:22,
587:1, 616:2
**amortized** [13] - 566:1,
566:5, 566:8,
568:20, 569:23,
575:9, 575:14,
576:12, 576:13,
577:19, 577:21,
577:22, 578:23
**amount** [25] - 513:10,
515:20, 519:9,
526:12, 531:13,
536:9, 541:12,
565:21, 567:11,
569:18, 569:20,
569:23, 594:1,
597:23, 599:23,
599:25, 601:14,
601:16, 606:24,
607:1, 607:21,
608:24, 608:25,
609:7
**amounts** [7] - 535:14,
569:11, 598:2,
598:4, 598:21,
600:15, 607:6
**analyses** [3] - 529:16,
587:14, 587:18

**analysis** [29] - 529:15,
531:18, 531:23,
531:24, 532:12,
567:20, 578:6,
580:10, 581:25,
582:5, 583:24,
587:6, 587:9,
587:12, 587:15,
587:21, 587:22,
588:2, 588:3, 588:5,
588:15, 588:22,
591:13, 594:24,
595:12, 595:14,
598:14, 599:22,
601:6
**analyze** [1] - 607:8
**analyzed** [3] - 579:10,
588:10, 595:9
**analyzing** [1] - 592:13
**annotated** [1] - 560:9
**annotation** [1] -
556:11
**answer** [8] - 510:17,
510:23, 511:8,
511:10, 522:9,
524:19, 530:3,
600:25
**answered** [1] - 587:25
**answering** [1] - 534:1
**anticipate** [2] - 591:1,
607:7
**anticipated** [3] -
568:4, 601:5, 601:6
**anyway** [1] - 592:19
**anyways** [2] - 582:18,
618:6
**AP** [30] - 515:17,
515:20, 515:25,
516:13, 518:4,
518:7, 520:6,
520:25, 523:5,
523:20, 524:5,
525:21, 531:15,
531:18, 531:23,
534:23, 535:8,
535:11, 536:1,
536:2, 536:4,
536:21, 537:3,
537:5, 537:10,
537:12, 538:21,
545:9, 545:10,
548:16
**AP-contaminated** [1] -
524:5
**apartment** [1] - 527:15
**apologize** [3] -
517:19, 563:23,
605:1
**apparatus** [1] - 527:16
**Appeals** [2] - 597:2,

603:7
**appear** [2] - 509:9,
553:23
**appeared** [1] - 509:11
**Applicable** [1] -
553:13
**application** [3] -
588:23, 595:11,
601:23
**applied** [4] - 588:6,
591:23, 598:14,
616:4
**apply** [2] - 598:10,
612:22
**applying** [1] - 604:14
**appreciate** [1] -
560:23
**appropriate** [1] -
581:13
**apron** [1] - 524:22
**area** [11] - 513:2,
530:13, 530:18,
535:1, 535:3, 540:5,
546:7, 554:12,
558:1, 558:4, 558:16
**areas** [1] - 530:25
**argue** [1] - 585:11
**Army** [1] - 579:9
**arranger** [1] - 618:9
**arrive** [2] - 573:12,
601:12
**arrow** [4] - 556:9,
558:22, 558:23,
560:11
**arrows** [2] - 558:12,
558:14
**aspects** [1] - 541:25
**assessment** [2] -
613:6, 614:8
**asset** [17] - 590:11,
605:24, 606:14,
606:21, 607:1,
607:11, 607:19,
607:21, 608:3,
608:20, 609:3,
609:6, 609:8,
609:10, 609:12,
611:5, 611:7
**assets** [1] - 588:13,
612:15
**assigned** [2] - 516:8,
516:11
**associated** [3] -
532:13, 544:21,
615:12
**assume** [7] - 523:12,
530:11, 565:14,
572:7, 575:4, 579:1,
594:8
**assumed** [2] - 515:24,

525:8
**assuming** [4] - 525:18, 575:18, 582:21, 594:10
**assumption** [2] - 523:16, 617:20
**assumptions** [1] - 519:14
**attached** [7] - 527:2, 539:8, 544:19, 549:14, 557:4, 557:5, 561:25
**attention** [4] - 586:6, 590:24, 597:17, 611:6
**attorney** [4] - 529:12, 529:20, 533:8, 533:9
**auditors** [1] - 606:14
**authorized** [1] - 541:13
**automatic** [2] - 554:3
**automatically** [1] - 510:15
**availability** [5] - 516:8, 516:9, 516:11, 519:9, 519:15
**available** [1] - 596:12
**average** [2] - 566:22, 567:1, 579:10
**aware** [4] - 511:6, 532:14, 537:11, 611:9

**B**

**Background** [1] - 541:5
**background** [1] - 542:9
**bag** [20] - 515:20, 515:25, 516:3, 516:12, 518:7, 518:17, 518:18, 519:8, 519:25, 520:3, 520:13, 520:20, 521:9, 521:10, 521:11, 521:12, 521:15, 526:2, 551:4
**baghouse** [6] - 515:16, 515:20, 518:19, 546:19, 546:20
**bags** [41] - 508:9, 508:15, 514:6, 514:8, 514:14, 514:21, 515:16, 518:19, 518:22, 518:23, 518:24,

518:25, 519:3, 520:7, 520:10, 520:19, 520:20, 520:25, 521:7, 521:16, 521:21, 521:25, 522:24, 525:8, 525:22, 526:17, 526:23, 546:19, 546:20, 547:5, 547:7, 547:11, 547:15, 547:17, 547:24, 548:9, 548:11, 548:15, 548:16, 550:10, 550:19
**balance** [4] - 591:18, 606:23, 607:8, 612:16
**base** [4] - 589:2, 592:1, 592:13, 604:13
**based** [8] - 509:5, 530:5, 536:20, 541:21, 577:6, 581:10, 586:21, 588:12
**basements** [1] - 513:13
**basic** [2] - 519:16, 519:17
**basin** [2] - 513:12, 526:19
**basis** [11] - 509:7, 518:10, 519:10, 525:24, 526:1, 547:2, 548:7, 571:16, 576:14, 600:21, 613:9
**batches** [1] - 531:10
**Bates** [6] - 540:11, 542:19, 550:13, 550:15, 551:7, 553:23
**Beaumont** [5] - 530:25, 531:1, 569:8, 589:5, 593:17
**become** [2] - 524:25, 574:19
**becomes** [1] - 566:1
**beg** [2] - 552:12, 554:24
**began** [2] - 521:16
**begin** [1] - 519:14
**beginning** [2] - 518:11, 519:1
**begins** [3] - 510:2, 611:9, 612:1
**behind** [2] - 510:17, 606:7
**bellies** [1] - 592:20

**below** [2] - 543:24, 551:4
**beneath** [1] - 513:24
**benefit** [9] - 572:18, 585:12, 587:13, 589:17, 590:5, 594:7, 602:8, 602:12, 606:16
**benefits** [3] - 572:18, 587:10, 595:13
**best** [3] - 585:4, 586:11, 603:15
**better** [3] - 582:8, 596:10, 604:5
**between** [4] - 512:14, 551:23, 579:11, 598:20
**beyond** [1] - 537:4
**bid** [2] - 568:1, 614:14
**big** [2] - 560:2, 560:5
**bigger** [2] - 528:21, 608:23
**billion** [3] - 565:19, 565:22, 565:25
**bin** [1] - 521:9
**binder** [19] - 539:5, 539:10, 548:18, 548:19, 552:17, 556:15, 580:25, 584:19, 584:20, 584:21, 590:22, 590:25, 591:8, 596:15, 596:17, 596:19, 605:9, 605:10
**binders** [3] - 556:23, 556:25, 602:22
**bit** [2] - 515:4, 545:20
**block** [1] - 559:12
**blowout** [1] - 550:25
**blue** [1] - 556:2
**blueprints** [1] - 509:6
**Board** [9] - 529:1, 529:6, 532:11, 532:15, 532:17, 532:21, 532:25, 534:15, 534:17
**board** [1] - 534:19
**bonanza** [1] - 582:21
**booked** [1] - 586:10
**booking** [1] - 588:13
**books** [2] - 557:4, 557:6
**borderline** [1] - 529:19
**bother** [1] - 534:16
**bothered** [1] - 532:16
**bottom** [10] - 511:24, 513:18, 513:24, 534:14, 557:20,

559:25, 607:17, 608:2, 611:8, 612:1
**brand** [1] - 512:3
**Brant** [1] - 511:3
**break** [3] - 554:16, 587:20, 589:4
**breakdown** [3] - 572:24, 608:13, 609:8
**breakdowns** [1] - 571:25
**briefly** [1] - 606:16
**bring** [9] - 539:6, 541:15, 553:24, 556:14, 557:20, 558:5, 559:15, 560:10, 580:19
**broader** [2] - 587:12, 595:12
**broken** [2] - 573:14, 607:23
**brought** [2] - 549:20, 551:21
**bucket** [1] - 526:17
**building** [39] - 508:10, 510:14, 510:22, 511:7, 511:12, 513:11, 523:3, 525:11, 525:18, 527:1, 528:15, 528:19, 531:7, 531:15, 533:23, 535:4, 535:5, 535:7, 537:11, 537:14, 537:16, 538:3, 538:19, 546:18, 553:6, 555:21, 556:6, 557:22, 557:25, 558:2, 558:3, 558:5, 558:7, 558:16, 559:22, 559:24, 560:6, 560:7
**buildings** [3] - 510:13, 535:11, 537:17
**built** [1] - 580:6
**burn** [10] - 536:7, 536:9, 536:13, 536:16, 537:20, 544:9, 544:10, 545:1, 546:7, 546:16
**burned** [2] - 536:16, 546:9
**burning** [4] - 544:5, 544:22, 546:8, 554:12
**business** [15] - 564:11, 564:15, 565:14, 565:16, 566:20, 567:23, 570:5, 571:1,

574:21, 575:10, 575:14, 575:19, 589:2, 589:24, 599:6
**butterflies** [1] - 549:13
**buy** [2] - 573:19, 573:20
**BY** [63] - 508:2, 510:6, 511:23, 513:15, 517:25, 519:4, 521:14, 525:6, 526:9, 531:6, 534:13, 538:12, 538:20, 538:24, 539:3, 539:16, 541:2, 542:24, 544:12, 548:6, 550:3, 550:18, 552:13, 552:23, 553:19, 554:19, 555:6, 557:12, 560:3, 561:9, 562:5, 562:16, 563:9, 564:5, 566:25, 567:19, 568:6, 569:14, 575:1, 577:12, 581:2, 583:4, 583:10, 584:9, 584:22, 586:5, 589:22, 590:23, 591:11, 595:20, 596:24, 597:9, 599:1, 602:5, 603:17, 605:3, 605:17, 606:10, 608:1, 608:18, 611:2, 615:22, 616:17

**C**

**CACO** [4] - 595:22, 595:24, 596:2, 597:14
**Cain** [14] - 515:19, 515:24, 516:11, 524:20, 525:7, 525:25, 536:24, 536:25, 538:14, 546:20, 547:4, 547:6, 548:12, 549:16
**Cain's** [5] - 509:7, 516:14, 516:19, 516:23, 536:5, 547:24, 549:11, 549:24, 557:8
**calculate** [8] - 564:17, 564:21, 571:12, 580:14, 589:6, 599:22, 609:23,

612:14
**calculated** [3] - 580:15, 589:16, 599:24
**calculating** [2] - 614:11, 614:12
**calculation** [25] - 509:8, 515:24, 518:2, 518:3, 518:10, 519:17, 520:5, 520:22, 520:23, 525:17, 526:1, 568:15, 571:17, 581:11, 582:3, 583:11, 583:13, 584:8, 589:23, 599:13, 599:17, 606:20, 610:24, 615:14, 617:4
**calculations** [13] - 509:5, 509:7, 509:9, 525:21, 526:4, 526:10, 526:14, 571:22, 581:10, 587:11, 606:15, 612:15, 613:3
**cap** [1] - 590:6
**capability** [1] - 588:18
**capital** [1] - 564:4
**cardboard** [1] - 546:14
**care** [4] - 536:1, 536:3, 549:9, 549:10
**cared** [3] - 532:25, 533:3, 533:4
**carryover** [1] - 611:8
**cartons** [1] - 546:14
**case** [19] - 509:18, 509:19, 530:16, 537:15, 549:14, 549:22, 552:2, 561:13, 561:23, 563:11, 570:25, 575:5, 577:14, 582:9, 591:4, 599:22, 610:6, 610:9, 616:20
**case-in-chief** [1] - 561:23
**cash** [1] - 589:16
**casing** [1] - 545:19
**categories** [1] - 545:15
**categorization** [1] - 552:22
**category** [2] - 522:6, 545:3
**causes** [1] - 616:10
**Central** [3] - 572:16, 573:24, 574:16

**CERCLA** [3] - 562:18, 562:23, 562:25
**certain** [4] - 512:5, 519:9, 521:24, 571:2
**certainly** [2] - 509:3, 549:19
**certainty** [1] - 598:25
**CERTIFICATE** [1] - 619:1
**certify** [1] - 619:3
**cetera** [1] - 580:12
**chance** [3] - 509:19, 564:8, 610:2
**change** [3] - 517:2, 547:21, 606:3
**changes** [1] - 579:22
**channel** [2] - 556:2, 556:10
**chapter** [2] - 542:18, 543:7
**Chapter** [1] - 540:14
**characterize** [2] - 564:22, 565:3
**charge** [1] - 543:14
**charged** [2] - 584:14, 598:13
**chasing** [1] - 549:13
**check** [1] - 509:12
**chemical** [3] - 525:25, 572:5
**chief** [1] - 561:23
**chlorine** [3] - 532:1, 532:3, 532:5
**cigarette** [1] - 524:18
**citation** [2] - 540:18, 596:7
**claim** [3] - 562:18, 562:23, 562:25
**clarification** [1] - 538:2
**clarify** [5] - 555:16, 567:1, 577:9, 602:4, 610:20
**class** [1] - 546:3
**clean** [5] - 550:23, 550:24, 551:1, 551:4, 570:13
**cleaned** [3] - 520:10, 522:17, 551:2
**cleaner** [9] - 518:24, 520:9, 520:10, 551:3, 551:5, 554:1, 554:2, 554:6, 554:7
**Cleaning** [1] - 551:10
**cleaning** [1] - 520:7
**cleanup** [2] - 547:17, 600:2
**clear** [3] - 538:13, 547:2, 574:14
**clearer** [1] - 558:6

**clicking** [1] - 529:23
**close** [1] - 530:17
**CO** [2] - 518:24, 550:7
**collected** [3] - 577:14, 577:16, 577:21
**collection** [1] - 551:12
**collector** [1] - 551:4
**column** [1] - 544:16
**columns** [1] - 544:14
**combination** [1] - 567:11
**combined** [1] - 573:16
**coming** [6] - 518:7, 518:18, 518:23, 540:7, 541:16, 555:20
**comment** [1] - 509:20, 524:7
**commercial** [2] - 591:13, 592:7
**committed** [1] - 586:18
**commonly** [1] - 573:10
**companies** [1] - 573:21
**company** [3] - 570:12, 573:20, 574:17
**Company** [5] - 572:11, 573:23, 573:24, 574:7, 574:11
**comparable** [2] - 609:2, 609:8
**comparative** [1] - 587:10
**compared** [1] - 609:12
**compendium** [1] - 540:8
**compile** [1] - 539:21
**complete** [1] - 570:12
**compliant** [1] - 594:5
**complicated** [1] - 603:12
**complication** [1] - 588:7
**comply** [1] - 563:13
**complying** [2] - 538:18
**component** [3] - 608:9, 608:16, 609:9
**components** [4] - 599:21, 600:5, 608:14, 608:15
**concept** [3] - 565:10, 581:4, 604:25
**concerned** [3] - 540:4, 541:22, 542:14
**concerning** [1] - 608:5
**concerns** [2] - 538:21, 606:14

**conclude** [1] - 613:8
**concluded** [2] - 532:3, 580:11
**conclusion** [2] - 533:13, 599:10
**concrete** [3] - 524:22, 524:25, 527:12
**confidential** [5] - 569:18, 569:20, 570:1, 570:9, 571:1
**confirm** [1] - 583:5
**confusing** [2] - 588:19, 588:20
**consider** [2] - 564:16, 587:2
**consideration** [3] - 519:2, 613:7, 614:25
**considering** [2] - 580:11, 613:9
**considers** [1] - 595:13
**consistent** [4] - 584:25, 586:23, 612:11
**construction** [1] - 558:1
**contain** [1] - 541:17
**contained** [1] - 610:21
**container** [6] - 545:21, 546:3, 546:4, 546:5, 546:15
**contaminant** [1] - 523:20
**contaminated** [4] - 524:5, 545:4, 545:7, 545:10
**contamination** [3] - 524:13, 549:7, 586:21
**contention** [1] - 547:6
**context** [2] - 545:5, 565:11
**continue** [6] - 520:8, 543:6, 590:6, 592:10, 592:11, 606:4
**continued** [1] - 595:17
**continues** [2] - 521:8
**continuing** [2] - 559:6, 592:1
**contract** [54] - 562:18, 562:25, 565:24, 567:13, 567:18, 567:25, 568:2, 568:3, 568:5, 576:19, 576:21, 576:24, 577:1, 577:2, 577:4, 578:21, 578:23, 579:16, 585:6, 586:23, 592:1,

592:12, 594:3, 595:25, 598:22, 600:6, 600:11, 600:21, 601:12, 601:16, 601:17, 601:21, 602:11, 604:10, 604:13, 604:14, 604:18, 604:19, 612:7, 613:4, 613:24, 614:3, 614:4, 614:14, 614:16, 614:18, 614:20, 615:25, 616:4, 616:8
**Contract** [5] - 584:11, 584:13, 587:2, 588:1, 597:14
**contract's** [1] - 604:15
**contract-by-contract** [1] - 600:21
**contracting** [2] - 595:22, 597:14
**contractor** [7] - 540:1, 540:2, 586:18, 596:3, 600:14, 601:4
**contractors** [2] - 539:22, 541:18
**contracts** [88] - 562:22, 564:11, 566:21, 567:13, 567:17, 567:23, 572:7, 572:20, 573:15, 573:17, 576:9, 576:20, 577:2, 577:6, 578:14, 578:24, 579:2, 580:3, 580:4, 580:5, 580:12, 584:15, 586:24, 587:8, 587:10, 588:4, 588:6, 588:23, 593:5, 594:22, 595:12, 597:25, 598:3, 598:20, 598:24, 599:3, 599:5, 599:7, 600:16, 600:18, 601:23, 601:24, 601:25, 602:2, 602:7, 602:14, 603:22, 603:23, 603:25, 604:3, 604:6, 604:9, 604:13, 605:5, 605:6, 605:20, 605:23, 606:1, 606:3, 607:4, 607:5, 607:11, 610:25, 611:6, 611:12, 611:15, 611:23,

612:5, 612:10,
612:18, 613:13,
615:23, 616:1,
616:19, 616:21,
616:25, 617:3,
617:5, 617:8,
617:11, 617:13,
617:14
**control** [5] - 518:19,
518:20, 520:8,
521:3, 521:11
**controlled** [1] - 542:13
**conversation** [1] -
527:20
**conversely** [1] - 595:2
**convince** [1] - 585:15
**copies** [1] - 547:25
**copy** [4] - 512:22,
556:17, 591:2,
618:10
**copying** [1] - 606:13
**corner** [2] - 557:20,
559:9
**corporate** [5] - 577:14,
577:16, 578:14,
595:21, 597:13
**Corporation** [1] -
574:8
**corps** [1] - 530:3
**correct** [100] - 508:12,
508:15, 508:16,
508:18, 509:17,
511:25, 513:20,
513:22, 514:19,
515:17, 515:18,
515:21, 515:22,
515:25, 518:5,
521:19, 521:20,
521:22, 522:15,
523:22, 525:9,
525:12, 525:15,
525:19, 525:20,
525:23, 526:23,
530:15, 531:11,
532:11, 532:17,
534:17, 534:21,
535:10, 535:25,
536:19, 537:5,
537:9, 537:22,
538:14, 538:15,
538:21, 538:22,
544:11, 546:10,
546:11, 546:23,
548:17, 549:1,
549:8, 550:10,
550:11, 550:20,
550:21, 554:21,
555:18, 555:21,
555:22, 556:12,
558:19, 564:14,

566:17, 567:3,
568:13, 568:21,
568:22, 569:5,
575:15, 575:25,
576:2, 576:16,
577:15, 577:24,
579:6, 581:5,
581:21, 582:3,
582:11, 584:11,
587:17, 590:8,
590:10, 590:14,
590:17, 593:15,
593:18, 593:19,
594:21, 595:1,
595:5, 597:3,
597:11, 599:14,
611:24, 615:17,
617:3, 617:9,
617:10, 619:4
**cost** [59] - 563:13,
567:14, 570:1,
570:8, 570:13,
571:5, 571:9,
571:25, 573:4,
573:5, 573:11,
575:17, 575:23,
576:1, 576:18,
576:24, 577:5,
577:6, 577:19,
578:24, 579:3,
579:11, 580:8,
582:7, 582:10,
582:12, 583:7,
583:16, 584:6,
594:16, 596:1,
596:4, 598:23,
599:5, 599:19,
600:6, 600:7,
600:12, 600:24,
601:15, 601:23,
601:25, 602:1,
602:9, 604:15,
604:18, 606:1,
607:5, 611:12,
611:15, 612:22,
613:5, 613:17,
613:18, 613:20,
614:23, 616:4
**costs** [112] - 562:21,
564:14, 564:19,
565:19, 565:24,
566:2, 566:7,
566:12, 568:4,
568:9, 568:12,
568:16, 568:18,
568:19, 568:25,
569:2, 569:4,
571:15, 575:4,
575:9, 576:6,
576:15, 576:18,
576:25, 577:3,

577:7, 577:13,
578:2, 578:4, 578:5,
578:10, 578:11,
578:20, 578:23,
580:13, 582:1,
583:25, 585:6,
586:9, 586:15,
586:17, 586:20,
586:22, 587:7,
588:3, 588:14,
588:23, 588:24,
589:3, 589:8, 589:9,
589:12, 594:19,
595:11, 597:23,
598:7, 598:13,
599:14, 599:23,
599:25, 600:2,
600:8, 600:9,
600:10, 600:13,
600:14, 600:24,
601:5, 601:6,
601:11, 604:21,
605:5, 605:19,
605:23, 605:25,
606:4, 606:24,
607:2, 611:14,
611:17, 612:4,
612:6, 612:9,
612:14, 612:17,
612:25, 613:2,
613:18, 613:22,
613:23, 614:1,
614:4, 614:5, 614:7,
614:8, 614:11,
614:13, 614:15,
615:5, 615:7,
615:11, 615:13,
616:10, 617:3,
617:4, 617:12
**counsel** [3] - 528:14,
528:16, 534:20
**counter** [2] - 527:9,
603:5
**couple** [2] - 520:25,
618:8
**course** [1] - 509:1
**COURT** [303] - 509:14,
509:19, 509:23,
510:4, 511:14,
511:16, 512:7,
512:10, 512:15,
512:20, 512:23,
513:7, 513:13,
516:17, 517:2,
517:6, 517:12,
517:16, 517:20,
518:13, 520:13,
520:16, 520:24,
521:5, 522:11,
522:14, 522:19,

522:22, 523:4,
523:12, 523:16,
523:23, 524:15,
525:5, 526:3, 526:7,
528:13, 528:22,
528:24, 529:3,
529:5, 529:21,
529:23, 529:25,
530:2, 530:5,
530:10, 530:13,
530:18, 530:22,
530:25, 531:3,
531:5, 533:22,
534:3, 534:9,
534:12, 534:18,
534:25, 535:4,
535:8, 535:11,
535:16, 535:20,
535:23, 536:1,
536:7, 536:11,
536:13, 536:17,
536:20, 537:3,
537:8, 537:10,
537:15, 537:18,
537:23, 537:25,
538:2, 538:7,
538:10, 538:16,
538:23, 539:2,
539:8, 540:13,
540:15, 540:20,
540:25, 542:23,
544:8, 547:4,
547:10, 547:19,
547:21, 548:2,
548:5, 548:22,
548:25, 549:2,
549:7, 549:9,
549:13, 549:17,
549:19, 549:22,
550:12, 550:15,
550:17, 552:11,
552:16, 552:19,
552:25, 553:9,
553:12, 553:15,
553:17, 553:21,
554:5, 554:9,
554:13, 554:16,
555:2, 556:19,
556:23, 557:4,
559:9, 559:13,
559:17, 559:20,
559:22, 560:11,
560:13, 560:15,
560:17, 560:20,
560:22, 560:25,
561:25, 562:3,
562:12, 563:1,
563:4, 563:7,
563:16, 563:22,
563:25, 564:3,
565:12, 565:18,

566:6, 566:12,
566:16, 566:18,
567:6, 567:9,
567:18, 567:25,
568:24, 569:4,
569:6, 569:20,
570:1, 570:10,
570:14, 570:19,
570:21, 571:4,
571:7, 571:18,
571:23, 572:3,
572:12, 572:17,
573:1, 573:3, 573:7,
573:14, 573:18,
573:21, 574:1,
574:4, 574:9,
574:12, 574:19,
574:24, 576:17,
577:11, 578:9,
578:17, 579:1,
579:7, 579:14,
579:20, 580:2,
580:16, 580:22,
581:1, 582:16,
582:21, 582:25,
583:8, 583:18,
583:22, 584:3,
584:24, 585:10,
585:14, 585:17,
585:21, 585:24,
586:1, 587:20,
588:7, 588:15,
588:17, 588:20,
589:4, 589:9,
589:14, 589:20,
590:25, 591:3,
591:6, 591:9, 592:3,
592:8, 592:11,
592:14, 592:18,
593:4, 593:13,
593:16, 593:20,
593:24, 594:8,
594:20, 595:6,
595:16, 595:18,
596:10, 596:16,
596:19, 596:23,
597:2, 597:8,
598:17, 599:20,
600:1, 600:17,
600:22, 601:9,
601:13, 601:18,
602:15, 602:18,
602:21, 603:15,
604:23, 605:11,
605:13, 606:9,
607:12, 607:17,
607:23, 608:7,
608:11, 608:23,
609:2, 609:5,
609:10, 609:15,
609:19, 609:21,

610:1, 610:4, 610:11, 610:14, 610:19, 611:1, 612:21, 613:1, 613:12, 613:14, 613:19, 613:24, 614:14, 614:21, 615:1, 615:3, 615:6, 615:9, 615:15, 615:18, 616:12, 616:15, 617:16, 617:18, 617:25, 618:4, 618:12, 618:14, 619:1
**Court** [9] - 575:3, 575:22, 586:8, 586:14, 597:2, 597:19, 603:7, 612:20, 616:14
**court** [1] - 599:13
**Court's** [2] - 567:20, 606:16
**covers** [1] - 615:10
**creates** [2] - 576:8, 578:5
**creating** [1] - 514:22
**credibility** [1] - 549:12
**credit** [64] - 563:10, 563:14, 563:17, 569:23, 575:3, 575:13, 575:16, 575:24, 576:1, 576:12, 576:14, 582:19, 583:6, 584:1, 584:4, 584:6, 585:12, 587:1, 587:23, 588:24, 591:21, 591:23, 593:4, 593:12, 593:24, 594:2, 594:3, 594:7, 594:15, 594:16, 594:18, 595:1, 595:4, 596:3, 601:19, 601:20, 601:23, 601:24, 602:1, 602:8, 602:10, 602:13, 603:24, 604:1, 604:4, 604:6, 604:8, 604:10, 604:12, 604:14, 615:15, 615:24, 616:2, 616:3, 616:5, 616:7, 616:9, 616:20, 616:21, 616:23, 617:1
**credit/cost** [1] - 593:25
**credited** [1] - 598:2

**crediting** [1] - 590:2
**credits** [45] - 563:20, 564:19, 568:8, 568:10, 568:12, 568:17, 568:20, 568:24, 569:6, 576:25, 577:24, 578:2, 578:3, 578:9, 578:11, 579:5, 582:1, 582:10, 582:12, 582:17, 582:23, 586:10, 586:22, 587:9, 588:5, 588:8, 588:10, 588:11, 589:13, 592:13, 594:23, 595:12, 596:1, 598:7, 598:8, 598:11, 598:12, 598:14, 598:15, 603:22, 612:23, 612:24, 613:11
**crew** [4] - 543:17, 543:19, 554:11
**critical** [1] - 511:14
**CROSS** [2] - 508:1, 562:4
**cross** [12] - 539:5, 539:10, 540:21, 540:24, 548:19, 549:16, 553:21, 554:20, 562:2, 590:25, 596:17, 602:23
**CROSS-EXAMINATION** [2] - 508:1, 562:4
**cross-examination** [10] - 539:5, 539:10, 540:21, 540:24, 548:19, 549:16, 554:20, 562:2, 596:17, 602:23
**cross-referenced** [1] - 553:21
**cubic** [1] - 513:25
**culvert** [3] - 559:4, 559:18, 559:19
**cumulative** [1] - 570:6
**current** [2] - 579:8, 586:21
**cuttings** [5] - 545:17, 545:25, 546:3, 546:13

# D

**damage** [1] - 514:15
**damaging** [2] - 514:8,

543:12
**damp** [2] - 546:7, 546:9
**data** [5] - 580:14, 582:4, 583:2, 588:13, 590:16
**date** [4] - 570:15, 571:5, 571:9, 578:10
**DATE** [1] - 619:9
**days** [1] - 618:8
**deal** [5] - 515:10, 518:18, 524:16, 549:16, 565:1
**dealing** [2] - 524:13, 541:25
**dealt** [1] - 508:14
**December** [1] - 606:12
**decide** [2] - 600:23, 607:18
**declaration** [27] - 508:5, 514:5, 515:14, 516:14, 516:20, 516:23, 516:24, 517:10, 517:12, 517:17, 517:20, 518:4, 519:12, 519:18, 519:19, 519:22, 520:1, 547:25, 548:1, 557:8, 561:12, 561:15, 561:18, 561:25, 580:24, 581:24
**decline** [1] - 595:3
**declines** [1] - 595:2
**decrease** [5] - 565:6, 617:3, 617:4, 617:6, 617:12
**decreased** [2] - 520:3, 581:19
**decreasing** [1] - 592:25
**decrement** [2] - 565:1, 565:2
**decrements** [4] - 567:15, 580:12, 613:8
**deduction** [3] - 516:4, 516:6, 516:7
**Defendant's** [2] - 557:2, 557:11
**Defense** [9] - 584:11, 584:13, 584:15, 585:13, 585:14, 587:2, 588:1, 597:14, 600:23
**deferred** [21] - 590:11, 605:24, 606:14, 606:15, 606:20, 606:21, 606:23,

607:1, 607:19, 607:21, 608:3, 608:11, 609:3, 609:6, 609:8, 609:10, 609:12, 611:4, 611:7
**defining** [1] - 593:13
**degree** [6] - 561:16, 566:3, 598:1, 598:4, 598:20, 598:25
**Delaney** [18] - 508:3, 510:7, 511:24, 513:16, 516:25, 517:5, 528:2, 531:7, 534:14, 536:23, 538:13, 539:4, 539:10, 550:4, 552:24, 554:20, 556:16, 557:13
**Delaney's** [2] - 540:18, 560:7
**demonstrative** [2] - 593:2, 594:12
**Department** [4] - 584:15, 585:13, 585:14, 600:23
**deposition** [3] - 526:21, 527:5, 605:13
**depth** [1] - 529:14
**derived** [1] - 581:14
**describe** [1] - 606:16
**described** [2] - 544:24, 587:18
**describing** [2] - 544:15, 544:16
**desensitized)** [1] - 545:5
**desert** [2] - 524:23
**desertous** [1] - 530:13
**designed** [3] - 513:3, 513:7, 524:5
**detail** [2] - 558:6, 580:9
**detailed** [1] - 613:3
**details** [1] - 557:23
**detected** [1] - 532:7
**determinable** [2] - 598:2, 598:4
**determination** [1] - 588:25
**determine** [2] - 597:25, 598:21
**determined** [1] - 600:20
**determining** [1] - 587:13
**detriment** [1] - 590:1
**developed** [1] - 540:9
**device** [5] - 518:19,

518:20, 520:8, 521:4, 521:11
**devise** [1] - 528:5
**diagram** [1] - 513:1
**diagrams** [1] - 509:6
**dice** [1] - 618:3
**Dickey** [1] - 538:18
**dictate** [1] - 594:1
**different** [13] - 522:7, 534:1, 552:3, 559:22, 568:22, 582:20, 585:1, 585:9, 589:17, 598:20, 603:10, 613:5, 617:7
**dike** [5] - 510:25, 511:11, 511:19, 512:17, 512:23
**DIRECT** [1] - 561:8
**direct** [12] - 532:18, 586:6, 590:24, 600:7, 600:8, 600:13, 600:24, 611:6, 614:5, 614:12
**direction** [2] - 539:21, 558:17
**directive** [4] - 611:20, 611:22, 612:2, 612:3
**directly** [3] - 536:18, 544:9, 600:10
**dis** [1] - 564:3
**DIS** [1] - 564:3
**disagree** [4] - 508:23, 546:24, 548:4, 598:23
**disagreement** [2] - 547:3, 548:8
**Disc** [10] - 563:15, 563:21, 563:23, 564:2, 564:4, 570:7, 576:11, 586:9, 613:11, 616:23
**DISC** [1] - 564:4
**discarded** [1] - 551:16
**discharge** [4] - 532:10, 532:17, 533:13, 534:16
**discharged** [1] - 526:18
**discharges** [4] - 515:17, 531:17, 532:15, 534:8
**disclosed** [4] - 563:13, 571:14, 579:25, 610:7
**disclosure** [1] - 610:9
**disclosures** [1] - 572:24
**discontinued** [12] - 546:21, 563:11,

563:23, 569:10, 569:12, 575:7, 576:11, 579:11, 586:16, 593:10, 607:24, 608:5
**discounted** [2] - 519:6, 525:17
**discounting** [1] - 525:7
**discussed** [4] - 508:13, 532:14, 569:13, 569:17
**discussing** [4] - 562:19, 564:22, 567:5, 581:4
**Discussion** [3] - 517:11, 589:21, 590:19
**discussion** [1] - 611:4
**dish** [1] - 527:15
**dishes** [2] - 527:6, 527:9
**disk** [1] - 557:1
**disposal** [8] - 542:1, 543:1, 543:2, 543:7, 543:9, 543:15, 544:25, 546:2
**dispose** [3] - 535:23, 543:22, 544:22
**disposed** [2] - 535:1, 544:20
**disposing** [2] - 544:3, 544:4
**dispute** [1] - 578:3
**dissolves** [1] - 532:5
**distilled** [1] - 602:24
**distinction** [1] - 598:19
**ditch** [1] - 513:5
**divide** [1] - 598:12
**divided** [1] - 518:8
**divots** [1] - 526:25
**docket** [1] - 596:7
**doctor** [1] - 533:19
**document** [44] - 517:5, 532:12, 533:21, 539:17, 539:19, 539:20, 539:25, 540:2, 540:3, 540:4, 540:22, 541:7, 541:14, 541:17, 541:23, 541:24, 542:14, 542:18, 542:19, 542:21, 544:6, 544:7, 551:24, 551:25, 552:9, 552:19, 552:20, 553:3, 553:11, 584:23,

585:9, 587:4, 596:5, 596:14, 596:20, 597:5, 597:10, 597:12, 606:11, 606:12, 606:17, 606:19, 608:4
**documents** [22] - 512:22, 522:6, 547:3, 548:7, 549:12, 551:18, 551:19, 551:22, 552:6, 552:7, 552:9, 553:13, 563:17, 570:25, 571:14, 586:2, 587:4, 603:1, 603:3, 603:8, 611:18, 612:12
**DOD** [3] - 584:25, 601:7, 611:20
**dollar** [8] - 565:4, 593:4, 593:5, 593:22, 593:24, 609:25
**dollars** [6] - 565:6, 565:9, 566:5, 613:10, 614:15, 615:9
**done** [24] - 509:5, 510:8, 514:3, 519:2, 519:16, 525:21, 526:5, 526:16, 526:17, 529:13, 534:19, 571:16, 571:22, 584:19, 587:13, 588:2, 588:3, 588:5, 588:15, 588:22, 588:24, 595:8, 598:24, 602:17
**dotted** [3] - 558:6, 558:9, 558:12
**double** [15] - 561:23, 576:3, 576:8, 576:16, 584:19, 587:1, 590:21, 594:21, 595:1, 595:5, 595:7, 595:10, 605:10, 605:16, 606:7
**down** [36] - 510:12, 510:17, 510:23, 511:10, 511:17, 512:13, 512:16, 513:4, 513:6, 513:25, 519:10, 520:4, 521:7, 524:17, 527:12, 529:15, 545:15, 545:16, 548:8, 550:22, 551:6,

554:1, 554:6, 556:6, 556:13, 558:3, 559:25, 560:22, 573:14, 587:20, 589:4, 592:8, 607:23, 613:25, 616:21
**downward** [1] - 581:23
**Dr** [31] - 508:3, 510:7, 511:24, 513:16, 516:25, 517:5, 528:2, 531:7, 534:14, 536:23, 537:1, 538:13, 539:4, 539:10, 540:18, 550:4, 552:24, 554:20, 556:16, 557:13, 560:7, 571:21, 578:7, 581:4, 581:11, 581:13, 582:5, 591:8, 595:15, 605:15
**drafted** [2] - 516:21, 516:24
**drain** [3] - 510:13, 513:19, 564:2
**drainage** [7] - 558:10, 558:11, 558:15, 558:18, 558:23, 559:1, 560:6
**drained** [1] - 513:5
**draining** [1] - 551:12
**dramatically** [1] - 586:20
**drawing** [3] - 514:2, 527:18, 527:21
**dreamed** [2] - 527:6, 527:8
**drilling** [1] - 545:22
**drives** [1] - 614:24
**drop** [3] - 523:2, 524:1, 524:18
**drove** [1] - 525:1
**drum** [6] - 525:2, 551:15, 554:2, 554:3, 554:5, 554:8
**drums** [1] - 546:14
**dry** [5] - 513:22, 527:14, 527:16, 529:7, 529:14
**drying** [1] - 527:15
**due** [2] - 514:22, 562:21
**duly** [1] - 561:5
**during** [6] - 521:21, 529:7, 532:20, 543:8, 554:20, 581:18

**E**

**early** [3] - 521:17, 547:15, 562:7
**earn** [1] - 600:15
**earns** [1] - 600:14
**easier** [3] - 556:18, 585:23, 592:17
**easily** [2] - 526:17, 532:6
**east** [5] - 556:10, 558:19, 560:8, 560:11, 560:17
**Easter** [1] - 569:21
**easy** [1] - 527:24
**ECF** [6] - 596:11, 597:1, 597:2, 597:3, 618:11, 618:12
**economic** [4] - 585:12, 587:13, 589:17, 595:13
**educate** [1] - 602:25
**effect** [5] - 584:8, 594:4, 594:5, 594:6, 604:14
**effective** [1] - 573:17
**effort** [1] - 509:3
**either** [3] - 517:13, 548:13, 598:11
**ELC** [2] - 570:8, 570:10
**ELCs** [1] - 571:10
**electric** [4] - 514:9, 514:15, 515:11
**electrical** [1] - 514:22
**element** [1] - 614:10
**elements** [2] - 613:20, 614:6
**eliminated** [1] - 547:16
**end** [11] - 511:13, 520:25, 542:18, 542:19, 545:21, 547:15, 559:13, 587:23, 603:6, 603:21
**ending** [3] - 550:13, 551:7, 553:24
**ends** [1] - 540:11
**engineer** [6] - 525:25, 529:11, 529:20, 557:16, 557:17
**engineering** [3] - 527:17, 527:21, 557:13
**entered** [1] - 596:8
**entering** [2] - 576:20, 602:14
**entire** [4] - 525:17,

574:17, 589:2, 594:1
**entitled** [4] - 543:25, 551:9, 619:5
**entrance** [1] - 559:5
**environmental** [30] - 523:6, 562:21, 564:13, 586:16, 586:19, 588:14, 589:3, 590:11, 597:23, 598:8, 598:13, 605:19, 605:23, 605:25, 606:25, 607:2, 607:9, 608:25, 609:24, 610:16, 611:5, 611:7, 611:13, 611:16, 612:4, 612:9, 612:13, 613:18, 613:23, 614:7
**equal** [2] - 567:22, 587:11
**equates** [1] - 575:20
**equipment** [5] - 512:13, 514:8, 520:19, 536:5, 547:11
**equitable** [1] - 585:1
**Ernst** [1] - 606:14
**essentially** [3] - 541:13, 568:13, 570:12
**established** [1] - 577:2
**establishes** [1] - 553:5
**establishing** [1] - 552:25
**estimate** [2] - 570:11, 598:21
**estimated** [2] - 571:10, 588:12
**estimates** [2] - 516:12, 586:23
**et** [1] - 580:12
**evaporate** [3] - 524:24, 533:7, 544:9
**evaporated** [2] - 533:6, 536:15
**evaporation** [14] - 513:12, 523:18, 524:6, 526:19, 534:22, 535:6, 535:17, 535:18, 536:11, 536:15, 536:21, 537:20, 554:14, 559:20
**eventually** [2] - 520:14, 574:17
**evidence** [1] - 547:7

**evolved** [2] - 542:11, 574:20
**exactly** [3] - 557:21, 587:23, 615:16
**EXAMINATION** [6] - 508:1, 538:11, 561:8, 562:4, 603:16, 616:16
**examination** [10] - 539:5, 539:10, 540:21, 540:24, 548:19, 549:16, 554:20, 562:2, 596:17, 602:23
**examined** [1] - 561:6
**example** [9] - 515:3, 552:11, 552:14, 570:6, 577:3, 577:21, 579:22, 591:21, 592:25
**examples** [1] - 580:7
**excavation** [1] - 557:23
**except** [3] - 510:14, 526:6, 536:4
**excuse** [5] - 550:16, 560:4, 561:22, 571:15, 603:21
**executed** [3] - 601:22, 604:4, 615:23
**exercise** [1] - 598:24
**exhibit** [4] - 517:6, 557:1, 560:12, 596:8
**Exhibit** [17] - 510:1, 528:19, 539:7, 539:13, 548:19, 552:14, 556:14, 556:22, 557:2, 557:11, 584:18, 595:4, 596:25, 597:6, 599:4, 606:6, 606:12
**exhibits** [6] - 556:19, 556:21, 561:24, 562:1, 596:13, 603:5
**existing** [5] - 558:10, 558:11, 559:18, 559:19, 594:23
**expended** [2] - 565:25, 570:15
**expending** [1] - 578:18
**expenditures** [1] - 607:9
**expense** [2] - 573:12, 586:18
**expenses** [1] - 586:19
**Experience** [1] - 541:5
**experience** [2] - 541:8, 541:10

**experiences** [1] - 541:4
**expert** [5] - 517:10, 555:11, 580:21, 582:6, 599:9
**explain** [2] - 599:20, 606:22
**explained** [1] - 575:22
**explaining** [2] - 568:7, 575:3
**explode** [2] - 523:9, 525:1
**explosions** [1] - 542:13
**explosive** [1] - 543:12
**extend** [1] - 571:14
**extent** [7] - 534:25, 585:11, 602:6, 602:10, 604:12, 606:2, 616:20
**extraordinary** [1] - 573:11
**eye** [1] - 565:5

## F

**facilitate** [1] - 553:7
**facility** [5] - 524:10, 525:12, 533:2, 535:15, 538:6
**fact** [10] - 514:22, 528:8, 548:11, 564:15, 582:10, 597:5, 598:3, 605:25, 612:13, 612:17
**factor** [34] - 564:19, 564:24, 566:3, 567:22, 571:13, 571:15, 575:20, 575:23, 575:24, 579:22, 579:25, 581:4, 581:7, 581:9, 581:12, 581:16, 582:7, 582:10, 582:13, 582:23, 583:3, 583:5, 590:4, 590:5, 591:22, 592:3, 592:8, 594:9, 594:11, 613:6, 614:9, 615:4, 615:16
**Factors** [1] - 541:5
**factors** [12] - 564:17, 564:21, 564:25, 565:1, 565:2, 567:14, 575:22, 581:11, 581:13, 589:1, 590:10, 613:9
**fair** [1] - 517:4

**fall** [1] - 522:5
**familiar** [6] - 529:2, 539:17, 581:3, 584:10, 590:11, 595:21
**FAR** [6] - 584:7, 587:19, 593:7, 593:20, 593:23, 594:1
**far** [5] - 529:15, 537:20, 549:23, 575:7, 588:7
**fast** [2] - 576:17, 578:13
**federal** [2] - 583:13, 587:16
**fee** [8] - 599:13, 599:18, 599:19, 600:14, 601:14, 601:16, 614:6
**Feenstra** [2] - 537:1, 539:9
**feet** [1] - 513:3
**few** [2] - 531:12, 605:6
**fewer** [1] - 604:20
**fiber** [1] - 546:14
**fiberboard** [1] - 546:5
**figure** [11] - 517:16, 555:10, 557:8, 566:19, 580:23, 585:14, 592:14, 607:25, 608:23, 614:1, 615:10
**figured** [1] - 532:21
**figures** [1] - 594:10
**figuring** [1] - 517:22
**file** [4] - 532:16, 534:16, 618:11, 618:12
**filed** [2] - 532:10, 596:6
**files** [1] - 606:13
**filing** [5] - 572:8, 610:1, 610:6, 610:8, 612:16
**filings** [4] - 570:6, 572:20, 573:6, 607:13
**fill** [1] - 545:18
**filling** [1] - 545:21
**filter** [1] - 515:20
**filtered** [1] - 532:21
**final** [3] - 600:12, 601:24, 602:1
**financial** [4] - 565:7, 565:8, 589:1, 610:21
**fine** [1] - 534:23
**finish** [3] - 509:14, 595:18, 615:20
**finished** [1] - 595:16

**fire** [2] - 523:5, 523:9
**first** [15] - 518:2, 542:25, 543:2, 544:16, 546:2, 552:8, 561:3, 561:5, 562:9, 576:7, 576:16, 586:7, 587:7, 618:9
**fiscal** [1] - 571:15
**five** [19] - 518:21, 566:1, 566:2, 566:7, 566:8, 566:10, 566:13, 566:15, 568:20, 568:22, 569:23, 576:21, 577:22, 578:23, 578:25, 579:24, 585:19, 602:16, 618:9
**five-page** [1] - 618:9
**five-year** [6] - 566:10, 568:20, 568:22, 576:21, 578:23, 578:25
**fixed** [44] - 567:13, 567:16, 568:2, 568:3, 577:1, 577:5, 579:3, 580:8, 599:3, 599:6, 601:15, 601:16, 601:17, 601:21, 602:6, 603:22, 603:25, 604:19, 605:5, 605:6, 605:20, 605:23, 606:1, 607:4, 611:6, 611:12, 611:14, 611:22, 611:23, 612:22, 613:2, 613:5, 615:23, 615:25, 616:1, 616:8, 616:19, 616:21, 617:3, 617:5, 617:8
**fixed-price** [37] - 567:13, 567:16, 568:2, 568:3, 577:1, 599:3, 599:6, 601:16, 601:21, 602:6, 603:22, 603:25, 604:19, 605:5, 605:6, 605:20, 605:23, 606:1, 607:4, 611:6, 611:12, 611:14, 611:22, 611:23, 612:22, 613:2, 613:5, 615:23, 615:25, 616:1, 616:8, 616:19,

616:21, 617:3, 617:5, 617:8
**flat** [2] - 601:13, 601:14
**FLETCHER** [80] - 561:22, 562:5, 562:14, 562:16, 563:5, 563:9, 564:1, 564:4, 564:5, 566:25, 567:4, 567:19, 568:6, 569:3, 569:5, 569:14, 569:17, 570:4, 570:11, 570:17, 571:24, 572:10, 572:15, 573:20, 573:22, 574:2, 574:6, 574:10, 574:13, 574:25, 575:1, 577:8, 577:12, 580:19, 580:23, 581:2, 583:4, 583:9, 583:10, 583:20, 584:9, 584:17, 584:22, 585:8, 585:11, 585:16, 585:19, 585:22, 585:25, 586:5, 589:16, 589:22, 590:20, 590:23, 591:1, 591:11, 592:5, 592:9, 592:12, 592:16, 593:2, 595:17, 595:20, 596:5, 596:14, 596:17, 596:24, 597:4, 597:9, 599:1, 602:3, 602:5, 602:17, 602:19, 610:7, 610:15, 615:19, 616:13, 616:17, 617:17
**Fletcher** [4] - 603:20, 603:23, 605:18, 611:5
**fletcher** [1] - 562:1
**Fletcher's** [1] - 605:4
**floats** [1] - 512:4
**floor** [2] - 523:3, 545:11
**flow** [8] - 508:11, 513:18, 576:10, 584:5, 593:4, 602:1, 604:4, 616:5
**flowback** [1] - 587:9
**flowdown** [3] - 601:20, 603:21, 603:22

**flowed** [3] - 572:18, 584:1, 616:21
**flowing** [1] - 598:15
**flows** [1] - 589:17
**fluctuations** [1] - 581:23
**focus** [5] - 508:5, 540:22, 562:9, 562:10, 585:19
**folded** [1] - 574:22
**folks** [2] - 541:16, 596:11
**follow** [6] - 511:5, 577:9, 578:5, 582:13, 589:18, 611:3
**follow-up** [3] - 511:5, 577:9, 611:3
**followed** [1] - 522:8
**following** [3] - 575:8, 577:19, 592:4
**follows** [1] - 561:7
**foot** [1] - 522:24
**footnote** [1] - 572:24
**force** [1] - 523:10
**Force** [6] - 524:12, 539:20, 539:21, 539:22, 540:4, 541:18
**foregoing** [1] - 619:4
**foreman** [1] - 543:20
**forklift** [1] - 525:2
**form** [3] - 593:12, 601:7, 601:14
**format** [1] - 597:6
**formed** [2] - 573:24, 574:2
**forward** [4] - 548:12, 602:10, 603:24, 616:24
**forward-looking** [1] - 588:12
**forward-priced** [1] - 603:24
**four** [1] - 591:25
**fourth** [1] - 611:7
**Friday** [2] - 617:21, 618:6
**front** [5] - 539:5, 539:11, 548:20, 556:15, 587:23
**full** [6] - 510:24, 511:18, 512:16, 594:7, 604:13, 608:10
**function** [2] - 593:10, 593:13
**funds** [1] - 579:13
**future** [12] - 570:13, 570:14, 571:9,

589:12, 589:13, 594:14, 598:2, 602:14, 613:2, 616:24, 617:5, 617:14

## G

**G&A** [10] - 600:9, 600:14, 613:21, 614:2, 614:5, 614:6, 614:13, 614:22, 614:23
**gather** [1] - 541:4
**general** [4] - 551:19, 598:11, 614:7, 614:10
**generally** [6] - 544:23, 544:24, 557:18, 581:20, 581:22, 586:17
**generated** [2] - 543:8, 543:11
**generic** [1] - 552:21
**George** [2] - 509:16, 510:5
**given** [5] - 526:25, 529:13, 586:19, 589:23, 591:3
**goodwill** [1] - 610:17
**Government** [1] - 612:6
**government** [53] - 540:16, 541:9, 564:11, 564:16, 565:14, 565:16, 565:24, 566:20, 567:9, 567:12, 567:23, 569:7, 570:16, 570:22, 575:10, 575:14, 575:15, 575:19, 575:25, 578:14, 579:3, 584:1, 584:2, 584:15, 585:3, 585:6, 586:12, 587:8, 588:4, 589:15, 589:24, 590:1, 591:25, 592:12, 592:20, 592:24, 593:6, 593:11, 593:16, 594:3, 594:6, 595:14, 597:25, 600:11, 601:5, 604:24, 607:4, 607:10, 610:25, 612:10, 614:16, 616:6
**government's** [2] -

549:22, 580:21
**GR** [1] - 574:1
**Grand** [3] - 572:16, 573:24, 574:16
**grass** [1] - 569:21
**gravel** [1] - 513:25
**GRC** [3] - 572:13, 574:2, 574:9
**great** [1] - 541:11
**grill** [2] - 515:3, 515:4
**grind** [7] - 510:23, 519:10, 552:1, 557:22, 559:24, 560:6, 560:7
**grinder** [3] - 508:15, 515:16, 527:11
**grinding** [8] - 514:13, 514:21, 525:11, 535:2, 535:5, 538:4, 553:1, 553:6
**gross** [5] - 572:9, 573:2, 573:3, 573:4, 573:5
**ground** [13] - 508:10, 510:13, 513:19, 515:17, 524:8, 525:22, 533:6, 533:7, 533:10, 535:8, 537:6, 545:12, 546:15
**groundwater** [10] - 529:14, 530:6, 530:9, 530:11, 530:14, 530:16, 532:23, 533:1, 533:12, 534:8
**guess** [1] - 604:22
**Guidelines** [1] - 544:1
**guidelines** [1] - 601:7

## H

**half** [1] - 523:19
**halfway** [1] - 597:7
**hand** [3] - 557:20, 578:9, 578:10
**handling** [4] - 539:23, 541:18, 542:1, 543:21
**handwriting** [1] - 559:9
**handwritten** [1] - 542:21
**happy** [1] - 563:7
**hard** [1] - 618:10
**harm** [1] - 530:7
**haul** [1] - 544:10
**hazard** [1] - 523:5
**head** [2] - 509:2, 603:7

**heading** [1] - 551:10
**health** [3] - 524:12, 541:25, 543:13
**hear** [1] - 534:20
**heavy** [1] - 522:25
**help** [1] - 567:20
**HEMINGER** [24] - 561:1, 561:9, 570:24, 571:21, 585:4, 591:7, 596:22, 603:14, 603:17, 605:3, 605:12, 605:15, 605:17, 606:10, 607:15, 608:1, 608:18, 610:3, 610:13, 611:2, 612:19, 615:21, 615:22, 616:11
**high** [3] - 512:12, 513:7, 592:19
**higher** [8] - 575:16, 575:25, 576:15, 594:10, 594:14, 594:15, 594:18, 604:21
**highlight** [4] - 540:17, 540:19, 558:4, 586:1
**hill** [3] - 510:21, 513:4, 513:6
**historical** [1] - 589:11
**historically** [2] - 563:20, 586:15
**hold** [3] - 527:10, 530:2, 589:20
**holding** [3] - 527:13, 535:19, 535:21
**hole** [2] - 513:17, 513:18
**holes** [1] - 526:25
**home** [1] - 577:16
**honest** [1] - 556:18
**Honor** [105] - 510:5, 511:15, 514:3, 517:3, 517:8, 517:9, 517:14, 517:19, 518:16, 528:12, 533:18, 533:21, 536:23, 537:16, 541:1, 547:13, 548:3, 548:24, 549:10, 549:15, 549:21, 549:25, 556:15, 557:7, 559:21, 559:24, 560:21, 561:1, 561:2, 561:22, 562:14, 564:1, 565:17, 566:11, 566:17, 567:4,

569:3, 569:5, 569:17, 569:25, 570:4, 570:17, 570:20, 570:24, 571:13, 571:21, 571:24, 572:11, 572:15, 574:6, 574:15, 574:18, 577:8, 577:25, 578:8, 579:6, 579:21, 580:18, 580:19, 580:23, 582:24, 584:17, 585:4, 585:8, 585:20, 585:22, 588:21, 589:16, 590:20, 591:1, 591:5, 592:5, 592:10, 592:16, 593:15, 593:19, 595:17, 596:5, 596:14, 596:22, 597:4, 601:3, 602:3, 602:17, 603:14, 605:8, 605:12, 606:8, 607:15, 608:2, 609:4, 609:18, 610:3, 610:7, 610:13, 610:15, 610:20, 612:19, 615:8, 616:11, 616:13, 617:17, 618:8, 618:10
**hope** [2] - 588:19, 603:10
**hopefully** [1] - 568:19, 577:9, 577:13
**hopper** [2] - 551:4, 586:4
**hose** [1] - 527:12
**house** [2] - 515:2, 527:7
**housing** [1] - 550:25
**huge** [1] - 533:1
**hundred** [4] - 565:20, 575:6, 614:15, 615:9
**hurry** [1] - 610:4
**Huvelle** [2] - 563:5, 568:8

## I

**idea** [3] - 517:3, 517:8, 549:23
**identifiable** [1] - 600:10
**identified** [1] - 545:3
**identify** [1] - 607:6
**ignite** [2] - 545:24,

546:7
**igniter** [2] - 545:4, 545:5
**II** [1] - 586:9
**III** [2] - 561:3, 561:4
**illustrate** [1] - 592:9
**images** [3] - 568:13, 568:14, 568:15
**immaterial** [1] - 565:3
**immediately** [1] - 610:17
**impact** [8] - 533:12, 533:14, 565:4, 577:5, 601:21, 604:10, 606:3, 611:15
**impacts** [1] - 601:24
**impetus** [1] - 541:22
**imponderable** [1] - 595:6
**important** [8] - 509:23, 517:13, 517:16, 517:23, 526:1, 581:25, 586:3, 602:25
**impossible** [2] - 517:22, 597:25
**impression** [1] - 526:15
**improper** [2] - 585:23, 585:24
**improved** [1] - 604:20
**incentive** [1] - 611:23
**incidental** [1] - 515:6
**include** [8] - 563:20, 567:15, 600:6, 600:7, 607:22, 613:20, 614:4, 614:21
**included** [8] - 569:10, 569:11, 582:4, 586:15, 594:2, 614:6, 614:20, 615:13
**includes** [1] - 613:15
**including** [4] - 532:20, 568:10, 595:25, 604:13
**inclusion** [1] - 579:11
**income** [2] - 573:10, 573:11
**inconceivable** [1] - 508:8
**inconsistent** [1] - 585:2
**incorporate** [3] - 552:7, 602:12, 613:19
**incorporated** [2] - 597:24, 607:12

**increase** [5] - 565:6, 592:1, 592:10, 592:11, 617:2
**increased** [2] - 581:18
**increases** [5] - 594:25, 604:15, 604:16, 611:15, 617:12
**increasing** [7] - 581:16, 581:21, 581:22, 589:25, 590:4, 592:18, 592:25
**incur** [3] - 566:12, 576:18, 579:23
**incurred** [8] - 568:25, 569:1, 577:19, 578:2, 579:14, 589:9, 600:2, 614:14
**incurrence** [1] - 568:18
**incurring** [1] - 569:4
**incursion** [1] - 577:20
**indicate** [3] - 591:25, 597:7, 605:24
**indicated** [5] - 581:23, 595:3, 599:4, 599:16, 611:11
**indicates** [3] - 599:21, 608:6, 610:22
**indicating)** [1] - 512:12
**indirect** [3] - 596:1, 601:24, 602:1
**individual** [5] - 512:1, 544:18, 569:9, 598:10, 613:4
**individually** [1] - 544:20
**individuals** [1] - 543:13
**industries** [1] - 541:9
**industry** [2] - 541:16, 541:18
**influence** [1] - 614:25
**information** [16] - 539:22, 540:9, 541:12, 541:14, 565:5, 570:5, 571:1, 571:3, 572:1, 587:5, 598:22, 599:16, 606:20, 608:4, 610:21, 613:7
**initial** [1] - 526:6
**injury** [2] - 542:16, 549:5
**insanity** [1] - 585:17
**insignificant** [2] - 564:23, 565:4
**installed** [5] - 521:5, 521:6, 521:19,

521:25, 522:4
**instance** [3] - 576:7, 576:16, 587:7
**instead** [2] - 516:20, 520:16
**instruct** [1] - 553:25
**instruction** [1] - 540:8
**instructions** [2] - 508:18, 508:21
**instructs** [1] - 554:1
**integral** [2] - 543:3, 543:10
**intend** [1] - 602:21
**intent** [1] - 526:24
**interest** [5] - 540:7, 566:16, 574:10, 574:16, 586:12
**interim** [1] - 598:3
**intermittent** [3] - 529:6, 529:13, 532:24
**internal** [2] - 545:22, 570:5
**internals** [1] - 540:3
**interpret** [1] - 512:19
**introduce** [2] - 584:18, 596:10
**introduced** [1] - 602:23
**Introduction** [1] - 540:14
**inverse** [2] - 576:2, 592:6
**involve** [1] - 571:1
**issue** [10] - 523:11, 524:25, 525:3, 548:9, 549:19, 549:20, 570:25, 577:10, 591:2, 595:10
**issues** [4] - 548:10, 578:5, 578:6, 585:2
**item** [1] - 553:22
**items** [4] - 567:15, 573:11, 573:12
**itself** [2] - 522:17, 531:23

**J**

**Joan** [1] - 580:24
**job** [1] - 603:11
**John** [1] - 516:19
**joining** [1] - 562:6
**judge** [2] - 533:25, 554:17
**Judge** [9] - 523:15, 524:3, 526:5, 528:23, 529:4,

542:20, 560:24, 563:5, 568:7
**judgment** [10] - 563:11, 563:14, 575:5, 575:6, 575:13, 576:9, 588:10, 593:6, 593:16, 602:7
**jury** [2] - 603:9, 603:10

**K**

**Kaneshiro** [1] - 619:3
**KANESHIRO** [1] - 619:9
**Kaneshiro-Miller** [1] - 619:3
**KANESHIRO-MILLER** [1] - 619:9
**keep** [3] - 570:4, 570:7, 603:1
**keeps** [1] - 617:9
**key** [1] - 603:3
**kind** [14] - 515:1, 515:4, 520:22, 528:25, 535:20, 543:9, 543:17, 546:12, 551:19, 553:17, 554:13, 569:6, 574:22, 609:17
**knock** [3] - 518:21, 521:8, 522:17
**knocked** [1] - 520:7
**known** [5] - 565:1, 573:10, 600:6, 600:12, 601:7
**knows** [1] - 543:16

**L**

**label** [1] - 554:3
**labor** [3] - 600:7, 614:5, 614:12
**laboratory** [2] - 531:8, 531:11
**lag** [4] - 578:19, 579:2, 580:5, 580:7
**lakes** [1] - 530:19
**language** [1] - 547:23
**large** [1] - 578:11
**larger** [3] - 583:6, 608:14, 608:16
**last** [5] - 511:4, 542:3, 542:10, 610:16, 611:25
**late** [1] - 521:16
**latest** [1] - 610:1
**law** [1] - 603:11

**laws** [1] - 586:21
**lawsuit** [1] - 526:12
**lawyer** [1] - 534:3
**lawyers** [1] - 517:22
**layers** [1] - 546:15
**least** [2] - 526:24, 537:17
**left** [5] - 515:20, 515:25, 516:3, 544:14, 545:20
**length** [1] - 527:5
**less** [6] - 520:25, 548:15, 582:10, 582:12, 582:17, 600:23
**letter** [6] - 528:14, 528:16, 528:18, 529:2, 531:17, 537:25
**level** [14] - 512:5, 512:8, 512:9, 512:10, 527:3, 530:6, 530:10, 577:14, 577:17, 578:15, 580:9, 580:11, 613:4
**levels** [1] - 586:22
**liabilities** [1] - 588:14
**liability** [14] - 591:19, 606:15, 606:21, 606:23, 607:19, 607:21, 608:11, 608:20, 608:21, 608:25, 609:6, 609:12, 618:10
**lid** [1] - 508:18
**lids** [1] - 508:24
**lie** [2] - 519:12, 519:13
**lift** [1] - 509:1
**lifted** [2] - 509:1, 509:2
**likely** [1] - 529:13
**limit** [1] - 538:19
**limits** [1] - 531:13
**line** [8] - 534:14, 545:5, 556:2, 558:6, 558:9, 558:12, 573:13, 607:17
**liner** [1] - 546:6
**liquid** [2] - 512:11, 556:6
**list** [1] - 557:1
**listed** [5] - 546:4, 546:12, 557:2, 557:22, 607:24
**lists** [2] - 542:22, 573:9
**litigation** [5] - 509:15, 569:11, 569:15, 578:4, 582:2, 610:23

630

**lived** [1] - 527:15
**LMC** [3] - 570:7, 586:15, 586:24
**Lockheed** [62] - 514:13, 515:9, 523:19, 524:4, 526:21, 527:18, 528:2, 528:17, 532:10, 532:16, 534:15, 562:17, 562:20, 562:24, 563:10, 564:1, 564:11, 564:12, 571:14, 572:10, 572:18, 573:19, 573:22, 573:23, 573:24, 574:2, 574:4, 574:5, 574:6, 574:7, 574:11, 574:15, 574:19, 574:20, 574:21, 574:22, 575:4, 580:10, 581:15, 583:3, 589:24, 591:25, 592:12, 599:2, 599:16, 599:22, 603:25, 604:22, 605:2, 605:5, 605:19, 605:22, 606:13, 606:17, 606:24, 607:3, 612:8, 612:12, 613:6, 614:8, 617:9
**Lockheed's** [10] - 531:7, 533:2, 534:20, 556:22, 566:20, 571:1, 581:10, 588:12, 590:5, 611:17
**long-range** [2] - 588:12, 588:25
**look** [43] - 509:12, 516:14, 517:21, 518:1, 518:9, 519:25, 522:25, 524:11, 528:19, 529:9, 529:12, 529:15, 540:3, 541:4, 542:3, 542:4, 542:9, 542:10, 542:17, 542:25, 544:1, 544:13, 545:2, 545:3, 545:15, 546:1, 546:2, 547:3, 548:18, 551:2, 552:14, 552:24, 553:22, 554:21, 555:9, 556:17,

556:18, 557:18, 592:17, 594:4, 599:9, 605:9, 606:6
**looked** [5] - 554:23, 554:25, 555:4, 595:10, 599:4
**looking** [17] - 513:1, 518:15, 524:4, 527:24, 528:24, 529:11, 541:11, 557:21, 562:14, 575:2, 580:17, 581:15, 588:12, 590:20, 598:15, 608:2, 614:9
**looks** [1] - 540:16
**lose** [1] - 527:14
**losing** [3] - 528:1, 568:4, 578:12
**loss** [4] - 567:16, 567:18, 567:25, 579:8
**loss-position** [3] - 567:16, 567:18, 567:25
**lower** [6] - 512:9, 512:10, 530:14, 567:6, 567:7, 609:13
**LPC** [1] - 508:8
**LRP** [1] - 591:13
**luck** [1] - 516:17
**lumped** [1] - 573:15

## M

**ma'am** [1] - 538:1
**machine** [1] - 522:24
**machinery** [1] - 537:8
**machinings** [4] - 545:17, 546:3, 546:13
**macro** [1] - 580:11
**main** [1] - 521:2
**major** [3] - 542:8, 608:14, 608:15
**majority** [3] - 536:4, 537:5, 586:15
**Management** [4] - 584:11, 584:14, 587:2, 597:15
**manner** [1] - 514:14
**manual** [2] - 524:12, 540:8
**manufacture** [2] - 531:10, 543:8
**manufactured** [1] - 520:19
**manufacturer** [1] - 542:6

**manufacturer's** [1] - 512:22
**manufacturing** [19] - 514:7, 514:12, 515:9, 518:24, 521:12, 522:1, 522:7, 528:8, 539:23, 540:5, 541:10, 542:1, 543:10, 548:20, 550:1, 550:4, 550:8, 551:24, 552:4
**March** [1] - 550:5
**marked** [1] - 556:2
**Martin** [14] - 562:18, 563:10, 564:1, 564:12, 573:22, 574:2, 574:4, 574:20, 575:5, 599:2, 599:16, 605:22, 606:13, 612:9
**Martin's** [6] - 564:11, 581:15, 589:24, 591:25, 592:12, 606:18
**Mary** [5] - 555:10, 555:20, 555:25, 560:9, 560:12
**match** [2] - 524:1, 524:18
**matching** [1] - 598:7
**material** [13] - 523:1, 523:10, 525:3, 526:16, 529:18, 532:21, 535:6, 546:6, 548:12, 551:15, 565:7, 565:8, 565:9
**materiality** [2] - 565:4, 565:10
**materials** [7] - 541:10, 542:2, 543:10, 544:16, 544:20, 545:5, 600:8
**math** [1] - 518:7
**matter** [5] - 545:13, 548:9, 548:10, 598:17, 619:5
**matters** [2] - 548:11, 610:16
**mean** [11] - 558:14, 565:18, 572:10, 572:12, 573:1, 573:20, 581:7, 585:17, 587:22, 604:16, 614:3
**means** [2] - 529:7, 533:10, 544:3, 544:4, 573:1, 593:21

**measured** [1] - 532:6
**mechanics** [1] - 568:15
**mechanism** [3] - 548:14, 598:7, 598:10
**mechanisms** [1] - 520:4
**members** [2] - 543:17, 543:19
**memo** [4] - 608:3, 609:6, 611:5, 611:7
**memoranda** [2] - 590:15, 590:17
**memorandum** [5] - 590:12, 590:14, 606:13, 607:20, 618:9
**memorandums** [1] - 605:24
**mentioned** [2] - 550:25, 583:13
**method** [6] - 544:24, 546:1, 568:14, 568:23, 601:8
**methodology** [1] - 598:18
**Meyer** [6] - 571:21, 578:7, 580:24, 581:4, 581:13, 595:15
**Meyer's** [6] - 581:11, 582:5, 591:8, 605:13, 605:15
**micro** [1] - 580:9
**mid-'70s** [1] - 523:23
**middle** [2] - 524:23
**might** [7] - 542:12, 557:7, 565:7, 565:8, 579:16, 610:23, 617:5
**Mikro** [1] - 521:16
**Mikro-Pulsaire** [1] - 521:16
**mill** [1] - 553:6
**MILLER** [1] - 619:9
**Miller** [1] - 619:3
**million** [18] - 529:18, 532:2, 571:5, 571:7, 578:13, 578:19, 579:15, 579:23, 600:18, 607:25, 608:6, 608:8, 608:10, 608:15, 608:19, 609:1, 609:12, 609:13
**mind** [1] - 553:15
**minor** [1] - 588:9
**minus** [1] - 573:4
**minute** [5] - 528:20,

530:2, 555:2, 576:7, 589:20
**minutes** [3] - 518:21, 602:15, 602:18
**mirror** [4] - 568:13, 568:14, 568:15, 615:16
**mirrored** [2] - 583:1, 601:19
**missiles** [2] - 542:7, 543:8
**mix** [5] - 543:22, 567:12, 567:13, 606:2
**mixing** [3] - 537:17, 537:18, 538:3
**model** [1] - 512:3
**moment** [1] - 617:10
**money** [7] - 568:4, 578:5, 578:13, 578:18, 579:8, 592:20, 594:20
**morning** [2] - 508:13, 618:6
**most** [7] - 526:1, 529:13, 532:6, 532:20, 557:15, 590:3, 598:9
**motion** [1] - 596:7
**motor** [5] - 514:9, 514:15, 514:23, 515:11, 545:18
**move** [10] - 508:18, 509:2, 511:3, 515:14, 523:1, 544:6, 550:2, 550:22, 551:6, 611:22
**moved** [1] - 509:1
**movement** [1] - 611:11
**moves** [2] - 512:13, 560:8
**MR** [133] - 508:2, 509:16, 509:18, 509:22, 510:1, 510:5, 510:6, 511:13, 511:15, 511:21, 511:23, 513:15, 516:18, 516:19, 516:22, 516:23, 517:1, 517:3, 517:8, 517:13, 517:18, 517:19, 517:24, 517:25, 519:4, 521:14, 525:6, 526:9, 528:12, 531:4, 531:6, 533:18, 533:19,

533:20, 533:24,
533:25, 534:2,
534:7, 534:10,
534:13, 536:23,
537:16, 537:24,
538:12, 538:20,
538:24, 539:3,
539:9, 539:13,
539:15, 539:16,
540:14, 540:18,
540:23, 541:1,
541:2, 542:24,
544:12, 547:6,
547:9, 547:13,
547:20, 547:22,
548:3, 548:6,
548:24, 549:10,
549:15, 549:18,
549:21, 549:25,
550:3, 550:13,
550:16, 550:18,
552:13, 552:17,
552:23, 553:19,
554:19, 555:6,
556:21, 556:25,
557:5, 557:7, 557:9,
557:10, 557:11,
557:12, 559:11,
559:15, 559:19,
559:21, 559:24,
560:3, 560:12,
560:14, 560:16,
560:19, 560:21,
561:1, 561:9,
570:20, 570:24,
571:6, 571:21,
574:15, 574:21,
585:4, 591:4, 591:7,
596:22, 603:14,
603:17, 605:3,
605:12, 605:15,
605:17, 606:10,
607:15, 608:1,
608:18, 610:3,
610:13, 611:2,
612:19, 615:21,
615:22, 616:11,
617:24, 618:1,
618:8, 618:13
**MS** [80] - 561:22,
562:5, 562:14,
562:16, 563:5,
563:9, 564:1, 564:4,
564:5, 566:25,
567:4, 567:19,
568:6, 569:3, 569:5,
569:14, 569:17,
570:4, 570:11,
570:17, 571:24,
572:10, 572:15,
573:20, 573:22,

574:2, 574:6,
574:10, 574:13,
574:25, 575:1,
577:8, 577:12,
580:19, 580:23,
581:2, 583:4, 583:9,
583:10, 583:20,
584:9, 584:17,
584:22, 585:8,
585:11, 585:16,
585:19, 585:22,
585:25, 586:5,
589:16, 589:22,
590:20, 590:23,
591:1, 591:11,
592:5, 592:9,
592:12, 592:16,
593:2, 595:17,
595:20, 596:5,
596:14, 596:17,
596:24, 597:4,
597:9, 599:1, 602:3,
602:5, 602:17,
602:19, 610:7,
610:15, 615:19,
616:13, 616:17,
617:17
**multiplied** [1] - 519:7
**multiply** [2] - 516:9,
579:24
**Murphy** [1] - 571:4
**MURPHY** [19] -
516:19, 516:23,
517:3, 517:8,
517:13, 517:19,
533:18, 533:20,
533:25, 536:23,
570:20, 571:6,
574:15, 574:21,
591:4, 617:24,
618:1, 618:8, 618:13
**must** [5] - 526:22,
562:18, 562:24,
563:10, 572:8

## N

**nail** [1] - 548:8
**name** [3] - 510:4,
552:20, 552:21
**narrow** [1] - 536:25
**national** [1] - 540:6
**natural** [1] - 597:6
**naturally** [1] - 578:4
**nature** [3] - 576:23,
578:3, 580:12
**near** [1] - 523:9
**necessarily** [1] -
598:15
**necessary** [1] - 599:17

**need** [3] - 526:11,
534:18, 586:3
**needed** [1] - 534:4
**needs** [1] - 543:15
**negotiate** [1] - 601:11
**negotiated** [1] -
597:22
**negotiating** [2] -
602:13, 614:16
**negotiation** [1] - 601:4
**Nelson** [1] - 509:16,
510:5
**net** [13] - 572:23,
572:24, 573:1,
573:4, 573:5,
573:13, 581:3,
581:12, 594:11,
594:21, 604:13,
604:21, 613:8
**never** [18] - 513:14,
514:6, 514:11,
514:15, 514:18,
514:20, 527:17,
531:2, 531:18,
532:10, 532:16,
533:20, 534:14,
536:17, 553:15,
555:16, 590:7, 590:9
**new** [9] - 537:6, 540:7,
541:16, 547:23,
556:20, 602:6,
616:21, 617:3, 617:8
**next** [16] - 510:11,
527:3, 537:13,
544:6, 553:17,
577:22, 579:23,
589:14, 591:17,
591:20, 592:19,
594:3, 596:5,
597:18, 607:16
**nobody** [1] - 528:5
**none** [1] - 573:7
**nonresponsive** [1] -
511:3
**normal** [1] - 552:3
**normally** [1] - 544:17
**north** [14] - 512:2,
513:7, 513:9, 514:8,
514:14, 514:21,
526:22, 527:19,
527:22, 528:6,
528:9, 535:24,
548:13, 548:23
**northeast** [4] - 558:20,
558:21, 559:6, 559:7
**northeasterly** [1] -
558:16
**northern** [2] - 526:18,
527:4
**note** [2] - 544:19,

571:21
**noted** [1] - 544:2
**notes** [1] - 542:21
**nothing** [5] - 542:12,
561:6, 593:18,
598:3, 601:18
**notice** [3] - 532:10,
532:16, 534:19
**notion** [2] - 536:20,
544:10
**November** [1] - 609:11
**number** [24] - 517:6,
518:2, 519:14,
520:21, 525:8,
535:24, 539:12,
542:20, 550:5,
562:19, 562:20,
562:23, 569:19,
570:5, 570:25,
594:12, 597:17,
597:18, 599:8,
599:11, 601:17,
602:13, 608:16
**Number** [1] - 539:13
**numbering** [1] -
562:15
**numbers** [9] - 509:12,
519:1, 566:6, 570:8,
570:17, 571:2,
581:14, 597:1, 597:6

## O

**objection** [2] - 596:21,
596:22
**objective** [6] - 600:12,
601:10, 601:11,
602:14, 614:23,
614:24
**obligation** [1] - 596:3
**obtained** [1] - 547:14
**obviously** [1] - 617:21
**occurred** [2] - 537:5,
576:4
**OF** [1] - 619:1
**offer** [3] - 537:2,
538:25, 583:12
**offered** [4] - 528:15,
536:24, 538:13,
546:20
**offering** [6] - 562:17,
562:24, 582:9,
583:20, 585:8,
586:25
**office** [1] - 577:17
**officer** [2] - 595:22,
597:14
**OFFICIAL** [1] - 619:1
**offset** [2] - 562:22,

576:16
**ol'** [1] - 543:14
**old** [1] - 547:23
**older** [2] - 540:6,
541:3
**on-site** [2] - 522:6,
522:8
**on-station** [5] -
551:21, 551:23,
551:25, 552:6, 552:8
**once** [9] - 512:8,
525:9, 525:14,
529:7, 529:13,
532:23, 536:14,
576:9, 577:2
**one** [44] - 512:15,
512:21, 514:17,
514:18, 519:10,
521:2, 521:5, 521:6,
522:13, 523:19,
524:17, 527:2,
528:13, 529:8,
530:24, 531:14,
535:1, 541:15,
543:20, 546:2,
550:1, 550:7,
552:20, 553:2,
553:3, 560:2, 560:5,
563:8, 565:20,
567:25, 569:21,
572:14, 573:15,
574:1, 582:4,
582:18, 586:2,
587:12, 593:6,
596:21, 603:1,
604:23, 607:24,
614:6
**ones** [5] - 522:5,
522:6, 551:21,
553:3, 588:9
**ongoing** [1] - 610:10
**opening** [2] - 513:24,
527:3
**operate** [2] - 512:4,
521:8
**operates** [1] - 512:14
**operating** [3] - 533:1,
598:10, 598:16
**operation** [3] - 526:20,
543:15, 553:10
**operations** [18] -
537:14, 539:22,
543:4, 553:3, 553:7,
563:12, 563:24,
569:10, 569:12,
573:6, 573:9, 575:7,
576:11, 579:12,
586:16, 593:10,
607:24, 608:5
**operator** [2] - 553:25,

554:1
**opinion** [32] - 530:5, 533:17, 533:20, 534:7, 534:18, 538:21, 541:17, 546:20, 546:22, 546:24, 562:9, 562:12, 562:15, 562:17, 562:19, 562:20, 562:23, 562:24, 563:7, 564:12, 576:3, 582:6, 582:9, 583:12, 583:21, 586:25, 587:6, 587:20, 588:1, 599:8, 612:8, 612:11
**opinions** [7] - 533:24, 534:2, 536:20, 536:25, 537:2, 538:25, 561:15
**opposed** [2] - 520:20, 530:15
**ops** [1] - 564:3
**Ops** [10] - 563:15, 563:21, 563:23, 564:2, 564:4, 570:7, 576:11, 586:9, 613:11, 616:23
**OPS** [1] - 564:4
**order** [5] - 512:19, 531:25, 545:23, 563:13, 571:12
**organization** [1] - 543:15
**original** [1] - 524:7
**originally** [1] - 572:13
**ounces** [2] - 520:20, 531:12
**ourselves** [1] - 538:19
**outlay** [1] - 613:20
**outlet** [4] - 514:23, 515:1, 515:11
**outside** [8] - 508:10, 515:2, 512:9, 533:18, 537:10, 545:20, 570:7, 606:13
**overall** [1] - 598:9
**overestimates** [1] - 515:19
**overhead** [11] - 571:11, 598:11, 598:12, 600:3, 600:9, 600:13, 613:15, 613:21, 614:2, 614:5, 614:13
**overrun** [1] - 568:3
**own** [3] - 510:17, 518:4, 582:6

owned [1] - 574:7
**oxidizer** [7] - 545:4, 545:6, 545:9, 545:10, 550:24, 553:4, 553:6
**oxidizers** [1] - 511:1

---

**P**

**p.m** [3] - 554:18, 618:16
**page** [47] - 508:5, 508:8, 510:1, 510:10, 510:11, 514:4, 515:14, 516:14, 518:1, 540:11, 540:12, 542:19, 542:20, 544:6, 544:13, 550:12, 552:8, 553:24, 562:11, 563:6, 564:6, 564:20, 575:7, 575:11, 581:7, 590:24, 595:4, 597:1, 597:5, 597:11, 597:18, 608:2, 608:4, 608:17, 608:19, 609:13, 610:8, 610:14, 610:15, 611:7, 611:8, 612:1, 618:9
**pages** [3] - 540:15, 540:16, 551:6
**paid** [4] - 566:13, 576:9, 576:18, 583:25
**panel** [1] - 550:25
**paper** [2] - 547:23, 556:17
**paragraph** [39] - 508:6, 514:5, 515:15, 515:23, 516:14, 517:21, 517:23, 518:1, 542:3, 543:1, 543:5, 543:18, 562:10, 562:12, 562:15, 564:7, 564:22, 565:1, 565:13, 566:19, 575:2, 586:6, 586:8, 586:13, 597:17, 597:18, 597:20, 598:6, 599:9, 599:11, 608:16, 609:14, 610:16, 610:17, 611:8, 611:18, 611:19,

612:1
**paragraphs** [1] - 585:19
**pardon** [4] - 552:12, 554:24, 604:12, 613:13
**part** [24] - 519:17, 520:1, 530:5, 537:15, 538:3, 538:5, 543:3, 543:9, 543:10, 552:10, 556:23, 558:15, 558:16, 559:15, 571:17, 578:6, 578:22, 581:24, 587:12, 591:4, 594:24, 614:17, 614:24
**particular** [14] - 530:8, 540:22, 552:1, 553:4, 555:13, 564:12, 564:25, 568:5, 578:6, 580:1, 580:13, 587:14, 600:11, 604:18
**parties** [1] - 601:11
**parts** [12] - 508:15, 514:13, 514:21, 515:16, 526:23, 527:10, 527:11, 527:16, 527:25, 529:18, 532:2, 535:9
**party** [1] - 565:9
**pass** [2] - 537:24, 591:2
**passed** [1] - 570:16
**past** [3] - 582:22, 602:9, 602:15
**patience** [1] - 560:23
**Patricia** [1] - 619:3
**PATRICIA** [1] - 619:9
**pay** [1] - 565:9
**payback** [1] - 579:9
**paying** [3] - 576:5, 576:6, 614:22
**payment** [6] - 576:7, 576:8, 576:10, 576:16, 593:12
**payments** [1] - 595:14
**people** [8] - 523:4, 523:24, 532:20, 540:5, 540:7, 541:3, 603:4, 618:4
**people's** [1] - 563:7
**per** [15] - 516:12, 518:16, 518:17, 518:24, 519:8, 519:25, 520:3, 520:13, 520:14,

521:12, 524:8, 525:9, 526:2, 529:18, 532:2
**Per** [1] - 591:12
**percent** [45] - 516:8, 516:9, 516:11, 519:15, 525:18, 564:11, 564:13, 564:15, 565:13, 565:14, 565:15, 565:20, 565:22, 566:4, 566:5, 566:10, 566:14, 567:21, 575:6, 575:10, 575:15, 575:19, 575:23, 575:24, 576:14, 579:18, 579:20, 592:4, 592:6, 593:1, 593:7, 593:12, 594:17, 599:5, 609:19, 609:21, 609:24, 610:24, 613:10, 613:14, 613:16, 615:9
**percentage** [27] - 564:18, 566:20, 566:23, 567:23, 575:9, 575:14, 575:19, 580:13, 589:24, 592:7, 592:24, 593:11, 594:9, 594:14, 594:18, 594:23, 594:25, 595:2, 599:6, 600:19, 601:1, 601:13, 609:15, 611:14, 613:17, 615:6
**percentages** [6] - 565:2, 581:23, 582:17, 582:20, 589:7, 612:14
**perchlorate** [11] - 523:3, 523:5, 524:24, 526:13, 531:25, 532:1, 532:5, 532:7, 532:15, 536:9, 545:8
**perform** [2] - 580:10, 601:6
**performed** [5] - 553:7, 578:7, 580:10, 587:6, 595:15
**performs** [1] - 613:6
**perhaps** [2] - 559:25, 567:20
**period** [15] - 521:22, 522:16, 524:22, 532:6, 532:20,

532:22, 566:10, 566:23, 568:20, 578:24, 578:25, 579:17, 592:24, 594:25
**periods** [2] - 542:6, 568:22
**permit** [1] - 534:5
**person** [2] - 520:18, 543:14
**personnel** [1] - 543:1
**phase** [2] - 601:4
**Phase** [3] - 571:17, 571:18, 571:19
**photo** [1] - 560:9
**photographic** [1] - 555:10
**photographs** [2] - 555:14, 555:15
**picked** [2] - 545:11, 554:11
**picture** [7] - 512:21, 555:13, 555:16, 555:20, 555:23, 555:25, 556:11
**pictures** [5] - 554:21, 554:23, 554:25, 555:9, 556:17
**piece** [3] - 512:13, 547:23, 599:24
**pieces** [2] - 520:19, 536:4
**pipe** [4] - 513:10, 524:17, 532:18, 559:13
**pipeline** [1] - 559:3
**pit** [14] - 510:15, 511:11, 523:18, 535:6, 536:13, 536:15, 536:16, 536:21, 537:20, 544:9, 544:10, 554:14, 559:20
**pits** [8] - 534:22, 535:17, 535:19, 535:20, 535:21, 536:7, 536:10, 537:20
**place** [10] - 519:10, 535:8, 538:8, 543:22, 592:17, 601:22, 604:9, 616:1, 617:11, 617:14
**Plaintiff's** [5] - 539:6, 548:19, 552:14, 556:14, 584:18
**plaintiff's** [2] - 539:13, 556:21
**plan** [1] - 557:18

**planning** [10] - 522:6, 522:9, 551:22, 551:23, 551:25, 552:6, 552:8, 553:10, 588:13, 588:25
**plea** [1] - 618:6
**plugged** [2] - 514:23, 515:11
**plus** [4] - 567:12, 601:15, 612:6, 612:22
**pneumatic** [1] - 521:3
**point** [14] - 527:2, 534:21, 541:15, 548:22, 549:2, 550:1, 568:19, 594:13, 596:11, 596:13, 602:13, 607:24, 616:18, 617:18
**pointing** [1] - 587:14
**points** [2] - 588:2, 616:14
**policies** [1] - 523:12
**pollution** [5] - 518:18, 518:20, 520:8, 521:3, 521:10
**polypropylene** [1] - 546:6
**ponds** [1] - 530:19
**pool** [26] - 563:12, 563:15, 563:21, 563:24, 564:2, 564:3, 569:10, 569:12, 569:23, 571:11, 575:7, 576:11, 579:12, 584:6, 586:9, 586:11, 593:10, 593:14, 594:2, 596:4, 598:11, 613:11, 614:17, 616:23
**pools** [3] - 586:16, 596:1, 598:12
**portion** [6] - 562:21, 564:23, 566:13, 593:14, 614:17, 614:19
**position** [11] - 547:10, 547:13, 567:16, 567:18, 567:25, 585:1, 585:5, 585:13, 587:2, 604:20, 611:17
**possible** [3] - 525:14, 525:16, 598:11
**Post** [1] - 585:21
**post** [1] - 583:3

**Post-its** [1] - 585:21
**potential** [1] - 587:1
**potentially** [3] - 523:9, 525:1, 529:10
**pounds** [24] - 508:24, 515:25, 516:3, 516:12, 516:13, 518:4, 518:7, 518:14, 518:16, 518:17, 519:5, 519:7, 519:8, 519:18, 519:21, 519:24, 520:3, 520:13, 520:14, 520:21, 524:21, 526:2
**pour** [1] - 554:7
**power** [1] - 600:22
**practical** [1] - 527:24
**practice** [1] - 508:9
**practices** [1] - 563:14
**precaution** [1] - 515:8
**preceding** [1] - 610:17
**precise** [1] - 598:6
**precisely** [3] - 548:8, 598:1, 598:21
**precision** [2] - 598:1, 598:5
**precontract** [1] - 601:4
**predecessors** [1] - 574:3
**preference** [1] - 596:9
**preferred** [1] - 586:24
**prefers** [1] - 579:3
**premise** [3] - 509:24, 526:7, 526:8
**preparation** [1] - 520:2
**prepare** [1] - 590:16
**prepared** [1] - 541:14
**present** [2] - 511:21, 601:5
**presented** [5] - 517:14, 582:3, 599:12, 599:22, 599:24
**pretreatment** [1] - 544:21
**pretty** [2] - 576:19, 576:21
**prevent** [1] - 542:15
**previously** [1] - 571:25
**price** [50] - 567:13, 567:16, 568:2, 568:3, 577:1, 577:2, 577:4, 577:5, 579:4, 580:8, 597:24, 599:3, 599:6,

601:12, 601:16, 601:21, 602:6, 603:22, 603:25, 604:1, 604:19, 605:5, 605:6, 605:20, 605:23, 606:1, 607:4, 611:6, 611:12, 611:14, 611:22, 611:23, 612:22, 613:2, 613:5, 615:23, 615:25, 616:1, 616:2, 616:5, 616:6, 616:8, 616:9, 616:19, 616:21, 617:3, 617:5, 617:8
**priced** [7] - 567:16, 602:7, 603:24, 604:4, 604:6, 604:9, 616:22
**priced-out** [1] - 567:16
**prices** [2] - 604:10, 617:11
**pricing** [6] - 562:22, 602:10, 607:4, 612:5, 614:20, 616:24
**primarily** [2] - 523:8, 524:6
**principle** [4] - 584:7, 593:25, 612:21
**printer** [2] - 529:24, 530:1
**probability** [2] - 564:24, 612:3
**problem** [12] - 515:7, 518:9, 518:10, 518:16, 519:3, 519:15, 520:6, 523:6, 523:20, 536:5, 563:4
**problems** [1] - 526:18
**procedure** [17] - 508:13, 508:16, 508:17, 514:7, 514:12, 514:13, 514:16, 514:18, 514:20, 514:25, 515:9, 521:16, 528:8, 537:21, 547:17, 547:23, 553:5
**procedures** [7] - 514:6, 547:18, 547:19, 547:20, 547:21, 552:9, 552:25
**proceeded** [1] - 509:13

**proceedings** [2] - 618:16, 619:5
**proceeds** [2] - 510:11, 584:6
**process** [25] - 514:12, 518:25, 521:7, 521:12, 522:1, 522:7, 522:17, 537:7, 538:3, 538:4, 545:11, 548:20, 550:1, 550:4, 550:5, 550:8, 550:9, 551:18, 551:24, 552:5, 568:7, 576:21, 590:2, 606:18
**processed** [1] - 536:21
**processes** [3] - 519:2, 520:25, 521:2
**processing** [1] - 522:3
**Procter** [2] - 509:15, 569:11
**produced** [1] - 539:20
**product** [3] - 521:8, 522:18, 537:13
**production** [1] - 553:8
**products** [1] - 543:8
**profit** [42] - 572:9, 573:3, 573:7, 573:8, 573:13, 599:13, 599:18, 599:19, 599:25, 600:1, 600:4, 600:14, 600:17, 600:19, 600:24, 601:1, 601:6, 601:10, 601:11, 604:20, 604:21, 604:24, 612:7, 613:15, 613:21, 614:2, 614:5, 614:13, 614:21, 614:22, 614:24, 614:25, 615:2, 615:5, 615:10, 615:12, 615:14, 615:16, 617:9, 617:12
**profitability** [2] - 604:15, 604:17
**profits** [3] - 603:21, 616:10, 617:2
**program** [1] - 553:4
**project** [3] - 583:2, 607:2, 609:23
**projected** [10] - 570:8, 588:11, 588:23, 589:10, 591:19, 592:2, 592:24, 595:3, 602:11

**projecting** [1] - 570:13
**projection** [2] - 591:18, 591:22
**projections** [5] - 589:12, 590:5, 590:8, 590:9, 591:13
**projects** [1] - 606:24
**propellant** [23] - 531:7, 531:10, 531:11, 531:13, 536:9, 537:13, 541:19, 543:4, 544:3, 544:4, 545:14, 545:16, 545:19, 545:23, 545:24, 546:2, 546:9, 546:12, 551:16, 552:3, 554:4, 554:10, 554:12
**propellants** [4] - 538:9, 539:24, 542:11, 543:9
**proper** [1] - 547:11
**properly** [3] - 509:11, 545:12, 585:6
**property** [2] - 530:21, 533:2
**proposition** [1] - 585:9
**Propulsion** [9] - 527:18, 528:3, 572:10, 573:24, 574:7, 574:11, 574:15, 574:19, 574:21
**propulsion** [1] - 540:5
**protect** [1] - 523:17
**provide** [1] - 599:17
**provided** [1] - 598:7
**provides** [1] - 514:13
**providing** [1] - 508:17
**public** [2] - 571:3, 571:4
**pull** [1] - 522:24
**pulled** [1] - 521:10
**pulling** [1] - 541:22
**Pulsaire** [3] - 508:9, 521:16, 550:24
**pulse** [1] - 522:17
**pulsing** [1] - 518:21
**pump** [26] - 510:17, 510:20, 510:23, 511:6, 511:11, 511:17, 511:24, 512:1, 512:5, 512:14, 512:16, 512:18, 512:20, 512:23, 513:2, 513:3, 513:7, 513:9,

513:24, 514:9,
514:23, 523:25,
535:24, 549:4
**pumped** [6] - 510:24,
511:10, 511:18,
512:16, 513:10,
526:19
**pumps** [8] - 510:18,
510:20, 512:9,
512:10, 513:13,
523:14
**purchased** [3] -
573:23, 574:15
**purports** [1] - 538:16
**purpose** [1] - 606:17
**Purpose** [1] - 541:5
**purposes** [8] - 565:7,
565:8, 565:25,
569:21, 582:1,
589:1, 592:13, 595:9
**pursuant** [1] - 584:6
**put** [18] - 508:14,
509:12, 509:15,
516:18, 520:16,
524:7, 527:12,
527:14, 533:11,
538:17, 543:14,
544:17, 545:23,
547:22, 585:21,
586:1, 593:9, 613:24
**puts** [1] - 575:6
**putting** [1] - 586:2
**PX** [4] - 539:15,
548:18, 596:20,
597:3
**pyrotechnic** [1] -
545:4

## Q

**quantification** [1] -
610:23
**quantify** [1] - 610:22
**quantities** [1] - 531:18
**quarter** [3] - 516:3,
518:8, 602:15
**questioned** [1] -
520:17
**questions** [13] -
528:12, 534:1,
534:4, 536:25,
560:16, 560:21,
605:4, 605:6,
605:18, 605:20,
610:13, 612:20,
616:11
**quicker** [1] - 576:25
**quickly** [4] - 551:17,
576:21, 612:21,

616:15
**quite** [2] - 515:4,
613:2

## R

**rain** [1] - 515:5
**ran** [1] - 520:4
**range** [3] - 512:14,
588:12, 588:25
**rate** [1] - 595:8
**rates** [6] - 601:25,
602:1, 602:11,
602:12, 616:24
**rather** [1] - 509:23
**ratio** [1] - 516:11
**Raymond** [1] - 553:6
**reach** [3] - 529:11,
532:23, 533:16
**reaction** [1] - 542:12
**read** [15] - 510:2,
510:7, 533:9,
540:16, 541:24,
543:2, 549:24,
557:13, 559:10,
559:17, 572:21,
586:7, 586:13,
597:19, 611:25
**reading** [2] - 514:10,
549:12
**ready** [1] - 570:18
**real** [1] - 566:19
**reality** [1] - 565:15
**realization** [2] -
576:25, 582:19
**realize** [2] - 593:11,
616:2
**realized** [1] - 568:17
**really** [8] - 523:19,
524:19, 525:3,
529:17, 541:25,
543:16, 545:18,
602:25
**reason** [4] - 524:3,
544:8, 567:10,
589:25
**reasonable** [2] -
561:16, 598:25
**rebuttal** [3] - 536:24,
538:14, 591:4
**recap** [1] - 534:20
**receipt** [2] - 579:12,
602:7
**receive** [4] - 575:16,
594:6, 602:8, 603:25
**received** [7] - 569:24,
575:17, 591:21,
602:9, 603:24,
604:7, 615:24

**receives** [3] - 575:5,
575:25, 576:1
**receiving** [2] - 530:9,
532:18
**recent** [3] - 567:1,
567:5, 590:3
**Recess** [1] - 554:18
**recharge** [1] - 533:2
**recognition** [3] -
568:16, 568:18,
579:24
**recognize** [2] -
579:23, 606:11
**recognized** [3] -
523:20, 563:25,
568:17
**record** [13] - 517:4,
517:9, 517:11,
569:21, 570:15,
571:4, 589:21,
590:19, 596:6,
607:7, 611:25,
612:14, 619:4
**recoup** [1] - 607:10
**recover** [27] - 562:20,
564:19, 565:20,
565:21, 566:4,
578:25, 579:15,
580:1, 580:13,
580:15, 600:15,
605:25, 606:4,
607:3, 609:22,
609:24, 610:5,
610:23, 610:24,
612:6, 612:13,
612:17, 613:10,
613:17, 615:6
**recoverability** [37] -
564:17, 564:19,
564:21, 566:3,
566:23, 567:5,
567:22, 571:13,
575:20, 575:21,
575:23, 575:24,
579:19, 579:21,
579:25, 581:7,
581:9, 581:16,
583:3, 583:5, 583:6,
588:25, 589:7,
590:4, 590:9,
591:22, 592:3,
593:11, 594:25,
595:8, 606:4,
611:13, 611:16,
613:6, 614:9, 615:4,
615:13
**recovered** [12] -
566:2, 569:22,
571:11, 571:22,
582:22, 588:4,

598:9, 599:13,
599:23, 599:25,
612:4, 613:14
**recoveries** [1] - 569:9
**recovering** [3] -
564:13, 578:20,
613:25
**recovers** [2] - 605:5,
605:19, 612:9
**recovery** [41] - 561:23,
562:18, 562:25,
564:24, 566:9,
571:12, 576:3,
581:4, 581:12,
581:25, 582:7,
582:10, 582:12,
584:20, 587:1,
587:7, 587:9,
588:22, 590:21,
592:8, 593:9,
593:21, 594:9,
594:11, 594:21,
594:22, 595:2,
595:5, 595:7,
595:10, 595:11,
600:24, 605:10,
605:16, 605:22,
606:7, 609:17,
612:14, 614:12
**recross** [1] - 615:21
**RECROSS** [1] -
616:16
**RECROSS-
EXAMINATION** [1] -
616:16
**recrystallize** [1] -
524:24
**REDIRECT** [2] -
538:11, 603:16
**Redlands** [19] -
525:12, 530:18,
530:20, 545:6,
569:8, 571:15,
588:22, 589:4,
589:7, 593:17,
599:14, 599:23,
607:18, 607:19,
607:22, 607:23,
608:6, 608:9, 609:1
**reduce** [3] - 562:18,
562:24, 604:18
**reduced** [3] - 519:10,
602:13, 617:8
**reduces** [2] - 604:14,
616:10
**reduction** [1] - 562:22
**reference** [1] - 518:17
**referenced** [2] -
531:17, 553:21
**references** [1] - 550:9

**referencing** [1] - 597:5
**referring** [7] - 550:7,
564:25, 569:15,
605:1, 609:16,
611:10, 613:16
**reflect** [3] - 561:15,
563:17, 601:25
**reflected** [3] - 608:16,
609:13, 611:17
**reflecting** [1] - 571:22
**regarded** [1] - 543:3
**regarding** [6] -
561:23, 582:6,
586:25, 596:25,
599:13, 616:19
**regardless** [2] - 612:7,
612:22
**regards** [1] - 539:23
**regularly** [1] - 572:22
**regulating** [1] - 532:15
**regulation** [4] - 593:8,
593:21, 593:23,
594:1
**regulations** [6] -
583:14, 584:3,
584:5, 584:7,
586:21, 587:16
**reimbursable** [10] -
576:24, 577:6,
578:24, 598:24,
599:5, 601:24,
606:1, 607:5,
611:15, 613:5
**reimbursed** [1] -
607:10
**reimbursement** [5] -
567:14, 577:7,
579:3, 579:12, 580:8
**relate** [1] - 599:19
**related** [6] - 533:23,
559:21, 583:6,
586:19, 594:19,
606:20
**relates** [8] - 589:7,
593:6, 594:16,
595:10, 595:13,
599:25, 609:1,
614:10
**relating** [1] - 599:14
**relationship** [1] -
551:23
**relative** [2] - 575:17,
587:10
**released** [2] - 525:22,
526:13
**relevant** [1] - 566:23
**remain** [1] - 564:18
**remains** [1] - 604:19
**remediation** [29] -
562:21, 565:18,

565:19, 565:24,
570:3, 571:9,
586:17, 586:20,
597:23, 598:13,
600:24, 605:19,
605:23, 605:25,
607:2, 607:9,
609:25, 611:13,
611:16, 612:4,
612:9, 612:13,
612:17, 613:18,
613:23, 614:1,
614:8, 614:11,
614:15
**remediations** [1] -
606:25
**remember** [10] -
509:4, 522:7,
522:11, 524:22,
527:10, 532:19,
555:23, 556:3,
572:21, 604:1
**removal** [1] - 522:21
**remove** [2] - 512:11,
546:15
**removed** [2] - 519:3,
545:22
**rendering** [1] - 533:24
**report** [20] - 516:19,
516:21, 516:25,
517:7, 517:10,
519:5, 519:25,
520:2, 520:3,
555:10, 555:20,
555:25, 572:20,
572:23, 572:24,
573:5, 573:8,
580:21, 581:10,
581:25
**reported** [3] - 528:25,
529:5, 570:6
**Reporter** [1] - 510:19
**reporter** [1] - 554:17
**REPORTER** [1] -
619:1
**reports** [1] - 536:6
**represent** [1] - 608:7
**represented** [1] -
591:24
**requested** [1] - 599:15
**require** [3] - 584:3,
584:5, 584:8
**required** [8] - 552:10,
583:13, 583:16,
583:18, 583:23,
587:16, 587:18,
587:25
**requirement** [1] -
583:24
**requires** [1] - 598:15

**research** [4] - 531:8,
535:14, 538:5, 538:9
**resource** [1] - 530:7
**respect** [6] - 568:16,
569:7, 580:8, 587:7,
588:14, 598:23
**respond** [1] - 523:15
**responded** [1] - 534:3
**responding** [1] -
533:25
**response** [3] - 511:4,
592:22, 602:4
**responsibilities** [1] -
596:2
**responsibility** [1] -
595:25
**rest** [4] - 536:2, 543:7,
584:25, 603:5
**result** [4] - 515:16,
518:3, 586:10,
593:20
**resume** [2] - 617:20,
617:22
**Resumed** [1] - 508:1
**return** [1] - 598:8
**returned** [1] - 584:2
**revenue** [2] - 573:2,
604:19
**revenues** [3] - 572:9,
573:4, 617:6
**review** [2] - 563:17,
564:8
**reviewed** [6] - 509:7,
509:9, 587:4,
590:14, 590:15,
590:16
**revisit** [1] - 616:18
**right-hand** [1] -
557:20
**rise** [2] - 578:3, 590:6
**risk** [1] - 514:22
**risks** [1] - 515:10
**road** [2] - 557:22,
558:1
**roadway** [1] - 559:4
**Rocket** [3] - 572:16,
573:25, 574:16
**rocket** [7] - 539:24,
540:5, 540:9,
540:10, 542:7,
543:4, 545:18
**rocks** [4] - 510:25,
511:19, 512:17,
512:24
**rolled** [1] - 586:3
**rolling** [1] - 618:3
**rotisserie** [1] - 515:3
**roughly** [6] - 566:14,
566:22, 567:22,
567:24, 599:5

**rubbed** [1] - 525:2
**running** [2] - 515:3,
579:18

## S

**S.O** [3] - 552:25,
553:5, 553:9
**Sacramento** [1] -
530:16
**safely** [1] - 508:18
**safest** [2] - 544:2,
544:4
**safety** [11] - 514:22,
515:8, 515:10,
523:6, 523:11,
523:13, 524:6,
524:13, 524:25,
525:3, 541:25
**sales** [11] - 572:23,
572:25, 573:1,
573:4, 573:5, 573:6,
573:10, 573:11,
591:13, 592:7
**samples** [1] - 533:16
**sand** [2] - 513:25,
532:22
**saw** [7] - 520:22,
527:8, 532:12,
540:8, 555:4, 555:7,
607:23
**schematic** [4] -
557:14, 557:25,
558:18, 560:8
**scheme** [1] - 562:15
**scope** [4] - 533:18,
536:24, 544:3, 553:5
**scrape** [1] - 536:16
**screen** [2] - 556:18,
580:20
**seal** [1] - 570:19
**search** [1] - 542:11
**seat** [1] - 551:1
**SEC** [8] - 570:6,
572:20, 573:6,
607:13, 610:1,
610:6, 610:7, 612:16
**second** [2] - 510:11,
545:3, 546:12,
552:8, 576:10,
596:14, 599:24
**Secretary** [2] - 539:21,
541:13
**section** [5] - 543:24,
591:12, 605:10,
605:16, 610:16
**sections** [2] - 541:4,
541:6
**see** [27] - 508:16,

513:2, 517:1, 522:9,
527:1, 528:18,
549:19, 556:1,
557:21, 557:22,
557:23, 558:5,
558:6, 558:11,
558:24, 559:1,
559:25, 572:4,
587:10, 587:21,
591:12, 591:15,
594:10, 596:12,
597:13, 610:2, 611:9
**seeing** [1] - 597:12
**seem** [4] - 517:22,
558:24, 559:1,
604:24
**sees** [1] - 547:7
**sense** [3] - 568:14,
596:6, 598:9
**sentence** [6] - 542:4,
542:10, 543:2,
599:20, 599:21,
611:25
**sentences** [1] - 586:7
**sequence** [4] -
550:14, 553:7,
553:23, 553:24
**series** [2] - 512:4,
558:11
**serves** [1] - 606:17
**services** [1] - 586:24
**sets** [1] - 582:4
**settle** [1] - 535:22
**settled** [2] - 563:11,
575:6
**settlement** [1] -
569:13
**settling** [1] - 535:21
**seventh** [1] - 540:12
**several** [4] - 542:7,
551:6, 590:15, 600:5
**sewer** [1] - 513:17
**shaky** [1] - 618:2
**shall** [1] - 618:10
**share** [7] - 574:16,
575:16, 575:25,
576:14, 576:15,
594:15, 594:16
**sheet** [3] - 606:23,
607:8, 612:16
**shift** [1] - 611:12
**short** [2] - 524:19,
602:16
**show** [8] - 517:12,
517:17, 517:21,
585:13, 585:18,
592:18, 592:23,
592:24
**showing** [1] - 592:7
**shown** [2] - 586:18,

592:6
**shows** [1] - 592:19
**shut** [3] - 521:7,
554:1, 554:6
**shuts** [1] - 512:13
**side** [9] - 513:11,
526:22, 527:1,
527:18, 527:22,
528:6, 528:9, 560:7,
585:15
**sides** [1] - 603:2
**significance** [2] -
565:5, 565:10
**significant** [3] -
515:16, 532:22,
608:5
**similar** [2] - 519:16,
587:4
**simple** [3] - 566:6,
603:11, 603:13
**simpler** [1] - 568:19
**simplest** [1] - 613:25
**simply** [1] - 510:13
**single** [2] - 594:24,
600:11
**sink** [1] - 527:16
**site** [10] - 522:6,
522:8, 530:22,
533:14, 570:13,
571:25, 574:3,
608:6, 609:9
**sites** [2] - 589:5, 608:5
**sits** [1] - 527:16
**sitting** [2] - 518:20,
579:1
**Sitton** [2] - 560:10,
560:12
**Sitton's** [3] - 555:10,
555:20, 555:25
**situation** [4] - 575:15,
576:3, 576:5, 577:18
**six** [2] - 522:24,
585:20
**sixth** [1] - 540:12
**slightly** [1] - 589:17
**sludge** [1] - 536:14
**small** [6] - 527:10,
527:11, 527:16,
529:17, 565:2,
578:11
**smaller** [1] - 599:6
**smoking** [1] - 524:2
**snow** [2] - 617:21,
618:3
**sock** [1] - 522:25
**socket** [1] - 515:4
**soil** [2] - 523:17, 549:7
**solid** [3] - 539:24,
540:9, 543:3
**solid-rocket** [1] -

539:24
**solids** [1] - 535:21
**solvents** [1] - 538:25
**someplace** [2] - 527:14, 590:6
**sometime** [1] - 546:21
**somewhere** [2] - 559:14, 578:15
**sorry** [33] - 508:24, 513:12, 529:23, 538:17, 542:9, 550:16, 553:12, 553:16, 555:12, 555:16, 559:11, 560:25, 570:11, 571:19, 573:2, 573:23, 574:13, 574:24, 582:7, 583:18, 583:23, 585:22, 585:25, 588:21, 592:3, 592:5, 597:4, 597:11, 608:12, 610:8, 610:15, 615:19
**sort** [4] - 514:7, 526:22, 544:13, 558:4
**source** [1] - 532:24
**sources** [2] - 563:18, 598:9
**south** [7] - 508:11, 512:2, 513:2, 513:16, 558:4, 558:6, 560:7
**southern** [1] - 509:3
**southwest** [2] - 556:6, 558:20
**Southwest** [1] - 558:21
**span** [1] - 581:18
**speaking** [3] - 544:23, 544:24, 557:18
**special** [1] - 544:21
**specific** [6] - 540:15, 588:22, 598:12, 600:17, 607:6, 607:9
**specifically** [2] - 551:21, 562:10
**specified** [3] - 514:7, 515:9, 527:23
**spend** [5] - 523:25, 524:16, 537:1, 606:25, 609:25
**spending** [1] - 607:7
**spent** [2] - 570:2, 609:21
**spread** [1] - 546:15
**spreads** [1] - 586:22
**stain** [1] - 556:5

**stamp** [1] - 550:15
**stand** [1] - 553:9
**standard** [13] - 518:25, 521:13, 522:1, 522:8, 548:21, 550:2, 550:4, 550:5, 550:6, 550:8, 550:9, 551:24, 552:5
**standards** [6] - 514:12, 522:3, 523:17, 547:25, 583:16, 585:7
**standpoint** [4] - 524:14, 529:10, 529:12, 549:5
**start** [5] - 510:10, 519:18, 569:1, 602:22, 618:7
**started** [10] - 518:16, 519:5, 519:6, 519:8, 519:20, 519:21, 519:24, 524:9, 540:10
**starting** [3] - 510:9, 549:23, 576:21
**starts** [3] - 508:6, 510:2
**state** [2] - 606:2, 612:15
**statement** [8] - 555:19, 556:5, 565:7, 565:8, 573:6, 573:9, 573:10, 589:1
**statements** [2] - 598:19, 610:22
**states** [2] - 562:20, 564:16
**States** [7] - 561:3, 576:5, 580:24, 591:7, 599:15, 605:9
**stating** [1] - 515:15
**Station** [1] - 551:10
**station** [8] - 510:23, 525:11, 551:21, 551:23, 551:25, 552:6, 552:8, 553:10
**stay** [2] - 533:11, 605:8
**steel** [2] - 525:2, 545:19
**step** [2] - 537:14, 560:22
**still** [4] - 532:23, 569:4, 594:17, 597:11
**stopped** [1] - 547:16
**storage** [2] - 539:23, 542:1
**stream** [3] - 530:9,

544:18, 580:4
**streams** [2] - 544:17, 544:23
**strike** [2] - 511:3, 524:18
**studies** [5] - 533:16, 533:22, 534:6, 534:9, 534:10
**stuff** [2] - 554:13, 618:14
**stupid** [1] - 576:22
**sub** [1] - 544:2
**subcontract** [1] - 600:8
**submission** [1] - 606:7
**submit** [2] - 561:12, 572:3
**submitted** [3] - 516:24, 561:23, 572:1
**substantially** [1] - 565:6
**subtract** [1] - 573:12
**succeeding** [3] - 566:1, 566:15, 577:22
**successor** [2] - 572:13, 574:10
**successor-in-interest** [1] - 574:10
**suggesting** [3] - 549:24, 556:11, 565:12
**suggestion** [1] - 585:2
**suing** [1] - 570:22
**SULLIVAN** [42] - 508:2, 509:16, 509:18, 509:22, 510:1, 510:5, 510:6, 511:13, 511:15, 511:21, 511:23, 513:15, 516:18, 516:22, 517:1, 517:18, 517:24, 517:25, 519:4, 521:14, 525:6, 526:9, 528:12, 531:4, 531:6, 533:19, 533:24, 534:2, 534:7, 534:10, 534:13, 537:16, 537:24, 540:18, 540:23, 547:9, 547:13, 547:20, 547:22, 557:7, 557:10, 560:21
**Sullivan** [1] - 556:5
**summarizes** [1] -

606:19
**sump** [35] - 508:11, 508:14, 508:20, 509:3, 510:17, 510:20, 511:6, 511:24, 512:1, 512:3, 512:5, 512:12, 513:7, 513:9, 513:16, 513:17, 514:8, 514:9, 514:14, 514:21, 514:23, 514:24, 515:12, 526:18, 526:22, 527:4, 527:19, 527:22, 528:6, 528:9, 548:13, 548:23
**sumps** [2] - 508:23, 512:2
**sunk** [2] - 533:7, 533:9
**support** [1] - 612:8
**supposed** [3] - 522:2, 534:22, 603:3
**surface** [1] - 530:17
**surprise** [1] - 548:3
**sworn** [1] - 561:5
**system** [14] - 518:21, 519:11, 520:7, 521:3, 521:19, 521:25, 524:4, 524:5, 527:18, 527:22, 528:5, 528:9, 547:14, 551:1
**systems** [2] - 515:5, 542:7

## T

**tab** [3] - 539:14, 591:8
**table** [5] - 544:7, 544:14, 545:16, 581:5, 581:15
**tabs** [1] - 586:2
**talks** [1] - 528:8
**task** [1] - 527:25
**TCE** [1] - 538:23
**technologically** [1] - 511:16
**tenet** [1] - 612:5
**term** [1] - 595:21
**terms** [10] - 514:25, 522:21, 531:13, 541:10, 564:24, 567:21, 570:8, 575:21, 587:22, 600:11
**terribly** [1] - 618:5
**testified** [5] - 541:3,

561:6, 581:20, 587:15, 616:18
**testimony** [16] - 509:15, 510:7, 511:14, 511:21, 536:6, 546:17, 549:11, 551:18, 555:19, 555:23, 556:1, 556:3, 560:7, 561:18, 590:7
**tests** [1] - 531:10
**THE** [465] - 509:14, 509:17, 509:19, 509:21, 509:23, 510:4, 511:14, 511:16, 512:7, 512:8, 512:10, 512:11, 512:15, 512:18, 512:20, 512:21, 512:23, 512:25, 513:7, 513:9, 513:13, 516:17, 517:2, 517:6, 517:12, 517:16, 517:20, 518:13, 518:15, 520:13, 520:15, 520:16, 520:18, 520:24, 521:2, 521:5, 521:6, 522:11, 522:13, 522:14, 522:15, 522:19, 522:20, 522:22, 522:23, 523:4, 523:8, 523:12, 523:15, 523:16, 523:22, 523:23, 524:3, 524:15, 524:19, 525:5, 526:3, 526:5, 526:7, 526:8, 528:13, 528:21, 528:22, 528:23, 528:24, 529:2, 529:3, 529:4, 529:5, 529:9, 529:21, 529:22, 529:23, 529:24, 529:25, 530:1, 530:2, 530:4, 530:5, 530:7, 530:10, 530:12, 530:13, 530:15, 530:18, 530:20, 530:22, 530:24, 530:25, 531:1, 531:3, 531:5, 533:22, 534:3, 534:9, 534:12, 534:18, 534:24, 534:25, 535:3, 535:4, 535:5, 535:8,

535:10, 535:11,
535:13, 535:16,
535:18, 535:20,
535:21, 535:23,
535:25, 536:1,
536:3, 536:7, 536:8,
536:11, 536:12,
536:13, 536:14,
536:17, 536:19,
536:20, 536:22,
537:3, 537:6, 537:8,
537:9, 537:10,
537:12, 537:15,
537:18, 537:22,
537:23, 537:25,
538:1, 538:2, 538:5,
538:7, 538:8,
538:10, 538:16,
538:23, 539:2,
539:8, 539:12,
539:14, 540:13,
540:15, 540:20,
540:25, 542:23,
544:8, 544:11,
547:4, 547:10,
547:19, 547:21,
548:2, 548:5,
548:22, 548:25,
549:1, 549:2, 549:5,
549:7, 549:8, 549:9,
549:13, 549:17,
549:19, 549:22,
550:12, 550:15,
550:17, 552:11,
552:12, 552:16,
552:19, 552:25,
553:2, 553:9,
553:10, 553:12,
553:13, 553:15,
553:16, 553:17,
553:21, 554:5,
554:6, 554:9,
554:10, 554:13,
554:15, 554:16,
555:2, 555:4,
556:19, 556:23,
557:4, 559:9,
559:12, 559:13,
559:17, 559:20,
559:22, 560:2,
560:11, 560:13,
560:15, 560:17,
560:20, 560:22,
560:24, 560:25,
561:25, 562:3,
562:12, 563:1,
563:3, 563:4, 563:7,
563:16, 563:20,
563:22, 563:23,
563:25, 564:3,
565:12, 565:17,

565:18, 565:23,
566:6, 566:9,
566:12, 566:14,
566:16, 566:17,
566:18, 566:22,
567:6, 567:8, 567:9,
567:11, 567:18,
567:25, 568:2,
568:24, 569:4,
569:6, 569:9,
569:20, 569:25,
570:1, 570:10,
570:14, 570:19,
570:21, 571:4,
571:7, 571:12,
571:18, 571:19,
571:23, 572:3,
572:12, 572:17,
572:23, 573:1,
573:2, 573:3, 573:4,
573:7, 573:8,
573:14, 573:16,
573:18, 573:21,
574:1, 574:4, 574:9,
574:12, 574:19,
574:24, 576:17,
576:23, 577:11,
577:9, 578:16,
578:17, 578:22,
579:1, 579:6, 579:7,
579:10, 579:14,
579:19, 579:20,
579:21, 580:2,
580:7, 580:16,
580:18, 580:22,
581:1, 582:16,
582:19, 582:21,
582:24, 582:25,
583:2, 583:8,
583:18, 583:22,
583:24, 584:3,
584:5, 584:24,
585:10, 585:14,
585:17, 585:21,
585:24, 586:1,
587:20, 588:3,
588:7, 588:11,
588:15, 588:16,
588:17, 588:19,
588:20, 588:21,
589:4, 589:6, 589:9,
589:11, 589:14,
589:20, 590:25,
591:3, 591:6, 591:9,
592:3, 592:8,
592:11, 592:14,
592:18, 592:23,
593:4, 593:9,
593:13, 593:15,
593:16, 593:19,
593:20, 593:23,

593:24, 593:25,
594:8, 594:13,
594:20, 594:24,
595:6, 595:9,
595:16, 595:18,
596:10, 596:16,
596:19, 596:23,
597:2, 597:8,
598:17, 598:19,
599:20, 600:1,
600:5, 600:17,
600:20, 600:22,
601:3, 601:9,
601:10, 601:13,
601:15, 601:18,
601:20, 602:15,
602:18, 602:20,
602:21, 603:15,
604:23, 605:1,
605:11, 605:13,
606:9, 607:12,
607:14, 607:17,
607:20, 607:23,
608:7, 608:9,
608:11, 608:13,
608:23, 608:24,
609:2, 609:4, 609:5,
609:7, 609:10,
609:11, 609:15,
609:18, 609:19,
609:20, 609:21,
609:23, 610:1,
610:4, 610:11,
610:14, 610:19,
610:20, 611:1,
612:21, 612:24,
613:1, 613:3,
613:12, 613:13,
613:14, 613:16,
613:19, 613:22,
613:24, 614:4,
614:14, 614:19,
614:21, 614:23,
615:1, 615:2, 615:3,
615:4, 615:6, 615:8,
615:9, 615:12,
615:15, 615:17,
615:18, 616:12,
616:15, 617:16,
617:18, 617:25,
618:4, 618:12,
618:14
**theory** [1] - 527:6
**therefore** [1] - 598:14
**they've** [2] - 544:19,
  614:14
**thin** [1] - 546:15
**thinking** [1] - 508:25
**thousand** [1] - 572:7
**three** [12] - 515:24,

516:12, 518:16,
518:17, 519:8,
519:24, 520:3,
520:13, 526:2,
529:16, 591:17,
602:15
**throughout** [1] - 543:7
**throw** [1] - 603:8
**throwing** [1] - 603:1
**tie** [1] - 582:14
**timing** [2] - 568:16,
  578:1
**Tinti** [1] - 597:13
**title** [1] - 541:24
**tod** [1] - 516:23
**today** [9] - 546:18,
  548:21, 555:5,
  555:7, 555:17,
  561:19, 562:1,
  562:9, 588:10
**together** [1] - 541:23
**Tom** [1] - 557:8
**tomorrow** [4] -
  617:22, 618:2, 618:5
**took** [3] - 516:4,
  516:5, 520:3
**top** [13] - 510:2,
  510:10, 510:20,
  510:25, 511:11,
  511:18, 512:17,
  512:23, 513:3,
  513:5, 559:10,
  600:3, 600:14
**topic** [1] - 571:24
**TORRES** [48] - 538:12,
  538:20, 538:24,
  539:3, 539:9,
  539:13, 539:15,
  539:16, 540:14,
  541:1, 541:2,
  542:24, 544:12,
  547:6, 548:3, 548:6,
  548:24, 549:10,
  549:15, 549:18,
  549:21, 549:25,
  550:3, 550:13,
  550:16, 550:18,
  552:13, 552:17,
  552:23, 553:19,
  554:19, 555:6,
  556:21, 556:25,
  557:5, 557:9,
  557:11, 557:12,
  559:11, 559:15,
  559:19, 559:21,
  559:24, 560:3,
  560:12, 560:14,
  560:16, 560:19
**total** [14] - 566:9,
  570:5, 573:10,

606:24, 607:20,
607:21, 608:14,
608:24, 608:25,
609:7, 609:10,
609:11, 614:2, 614:4
**towards** [1] - 611:22
**trace** [1] - 535:13
**training** [2] - 543:17,
  543:19
**transcript** [1] - 619:4
**translate** [1] - 520:13
**tray** [5] - 526:22,
  527:18, 527:22,
  528:5, 528:9
**treat** [2] - 554:3,
  565:24
**treatment** [8] - 568:12,
  586:11, 594:3,
  594:4, 594:5, 594:6,
  612:24, 613:4
**trend** [3] - 581:21,
  581:22, 590:3
**trended** [1] - 567:8
**trends** [1] - 592:23
**trial** [4] - 580:25,
  591:8, 605:9
**tried** [1] - 570:24
**true** [12] - 513:16,
  516:2, 521:23,
  527:5, 541:15,
  547:9, 576:2,
  577:18, 577:24,
  577:25, 616:19,
  617:1
**truth** [3] - 561:5, 561:6
**truthfully** [1] - 542:12
**try** [5] - 509:2, 577:11,
  603:13, 603:14,
  605:8
**trying** [5] - 523:17,
  542:15, 585:23,
  592:9, 597:7
**turn** [5] - 539:4,
  540:11, 564:6,
  597:17, 599:8
**turning** [1] - 597:11
**turnoff** [1] - 554:3
**twice** [2] - 576:6
**two** [19] - 511:8,
  512:2, 516:2,
  516:24, 518:8,
  529:16, 530:25,
  545:15, 573:21,
  582:21, 586:7,
  587:11, 587:14,
  587:18, 588:2,
  599:21, 606:22,
  616:14, 617:13
**type** [6] - 544:18,
  567:13, 578:22,

599:5, 611:12, 612:7
**types** [3] - 536:25,
598:20, 617:13
**typical** [1] - 600:6
**typically** [4] - 568:3,
568:17, 601:6,
601:15

## U

**U.S** [4] - 590:20,
591:6, 606:6, 612:6
**ultimate** [1] - 548:10
**ultimately** [1] - 516:12
**unallowable** [1] -
567:14
**uncertainty** [1] -
586:19
**uncontested** [1] -
584:24
**under** [13] - 526:15,
551:9, 552:4, 559:4,
570:19, 585:6,
587:8, 587:16,
591:8, 605:6,
605:20, 605:23,
612:9
**underlying** [2] -
599:19, 612:5
**underneath** [1] -
556:1
**unfair** [1] - 598:18
**unit** [2] - 521:16,
598:16
**United** [7] - 561:2,
576:5, 580:24,
591:7, 599:15,
605:8, 605:9
**units** [1] - 598:10
**universe** [1] - 602:24
**unknowing** [1] - 603:1
**unless** [1] - 612:20
**up** [54] - 509:15,
510:3, 510:18,
510:20, 510:25,
511:5, 511:11,
511:18, 512:12,
512:17, 512:23,
513:3, 513:5,
513:11, 516:18,
527:6, 527:8,
536:16, 539:6,
545:11, 549:17,
551:21, 553:24,
554:11, 556:14,
557:21, 558:5,
559:9, 559:12,
559:15, 560:10,
570:13, 574:22,

577:9, 580:19,
581:19, 586:1,
587:24, 589:18,
589:20, 591:2,
592:8, 592:20,
595:8, 601:9,
601:10, 603:8,
608:15, 609:16,
610:4, 611:3,
611:19, 616:10
**upwards** [1] - 567:8
**US** [1] - 528:19
**user** [1] - 565:5
**UTC** [2] - 597:22,
598:6
**utilize** [2] - 580:14,
588:13

## V

**vacuum** [25] - 518:24,
520:9, 520:10,
521:19, 521:25,
522:4, 522:13,
547:12, 547:14,
547:15, 549:23,
550:19, 550:22,
551:1, 551:3, 551:5,
551:13, 551:19,
554:1, 554:2, 554:6,
554:7
**vacuumed** [6] -
521:12, 521:15,
521:24, 522:14,
522:16, 523:2
**vacuuming** [15] -
521:21, 522:11,
522:19, 522:20,
546:18, 546:20,
547:5, 547:7,
547:10, 547:16,
548:9, 548:15,
549:3, 550:9
**vacuums** [1] - 522:22
**value** [5] - 578:5,
578:12, 578:18,
579:8, 587:10
**variations** [1] - 580:20
**varies** [1] - 598:21
**various** [3] - 520:4,
546:18, 586:24
**vary** [3] - 580:16,
580:18, 586:20
**versus** [8] - 524:17,
567:13, 580:8,
584:1, 594:19,
595:12, 611:15,
617:14
**view** [5] - 534:21,
536:1, 536:17,

548:22, 549:2
**volume** [2] - 605:11,
605:12

## W

**wait** [4] - 555:2,
576:19, 580:3,
618:14
**walk** [1] - 524:18
**warned** [1] - 603:9
**wash** [12] - 508:10,
508:14, 510:12,
514:8, 514:21,
526:16, 527:12,
527:13, 529:14,
547:24, 548:13
**washed** [9] - 515:21,
516:13, 518:25,
525:8, 526:23,
527:9, 537:8,
548:11, 548:16
**washing** [15] - 508:9,
508:14, 514:6,
514:13, 515:10,
515:15, 520:14,
521:15, 524:21,
525:14, 525:22,
527:6, 527:10,
527:25, 536:4
**waste** [23] - 532:10,
532:17, 534:16,
541:12, 542:25,
543:3, 543:8, 543:9,
543:11, 543:14,
544:5, 544:17,
544:18, 544:23,
545:4, 545:6,
551:16, 554:3,
554:10, 554:11,
592:20
**wastes** [2] - 543:21,
546:8
**wastewater** [2] -
524:5, 535:14
**Water** [9] - 528:25,
529:6, 532:11,
532:15, 532:17,
532:20, 532:25,
534:15, 534:17
**water** [37] - 508:10,
508:14, 510:12,
510:24, 511:10,
511:18, 511:20,
512:16, 512:23,
513:3, 513:6,
513:18, 513:19,
515:6, 515:10,
523:17, 524:8,
529:16, 529:17,

530:18, 531:17,
531:19, 531:21,
531:22, 532:5,
532:8, 532:19,
533:14, 536:15,
546:6, 546:9,
547:24, 548:13,
549:7, 551:15,
554:2, 554:7
**weather** [3] - 529:7,
618:4, 618:7
**week** [4] - 525:9,
525:15, 529:7,
529:13
**weeks** [1] - 516:25
**weigh** [2] - 508:23,
508:24
**weighted** [1] - 601:7
**welcome** [1] - 562:8
**welfare** [1] - 543:13
**west** [5] - 556:10,
558:18, 560:8,
560:11, 560:17
**wet** [1] - 547:14
**whatchamajigger** [1] -
537:4
**White** [4] - 509:16,
510:4, 510:5, 512:19
**whole** [5] - 521:22,
523:25, 538:16,
561:5, 565:21
**WILEY** [1] - 561:4
**Wiley** [1] - 561:3
**Witness** [1] - 510:20
**witness** [13] - 509:14,
517:21, 537:24,
538:14, 548:25,
560:25, 561:3,
561:21, 577:8,
589:14, 595:18,
603:2
**WITNESS** [163] -
509:17, 509:21,
512:8, 512:11,
512:18, 512:21,
512:25, 513:9,
518:15, 520:15,
520:18, 521:2,
521:6, 522:13,
522:15, 522:20,
522:23, 523:8,
523:15, 523:22,
524:3, 524:19,
526:5, 526:8,
528:21, 528:23,
529:2, 529:4, 529:9,
529:22, 529:24,
530:1, 530:4, 530:7,
530:12, 530:15,
530:20, 530:24,

531:1, 534:24,
535:3, 535:5,
535:10, 535:13,
535:18, 535:21,
535:25, 536:3,
536:8, 536:12,
536:14, 536:19,
536:22, 537:6,
537:9, 537:12,
537:22, 538:1,
538:5, 538:8,
539:12, 539:14,
544:11, 549:1,
549:5, 549:8,
552:12, 553:2,
553:10, 553:13,
553:16, 554:6,
554:10, 554:15,
555:4, 559:12,
560:2, 560:24,
563:3, 563:20,
563:23, 565:17,
565:23, 566:9,
566:14, 566:17,
566:22, 567:8,
567:11, 568:2,
569:9, 569:25,
571:12, 571:19,
572:23, 573:2,
573:4, 573:8,
573:16, 576:23,
578:16, 578:22,
579:6, 579:10,
579:19, 579:21,
580:7, 580:18,
582:19, 582:24,
583:2, 583:24,
584:5, 588:3,
588:11, 588:16,
588:19, 588:21,
589:6, 589:11,
592:23, 593:9,
593:15, 593:19,
593:23, 593:25,
594:13, 594:24,
595:9, 598:19,
600:5, 600:20,
601:3, 601:10,
601:15, 601:20,
602:20, 605:1,
607:14, 607:20,
608:9, 608:13,
608:24, 609:4,
609:7, 609:11,
609:20, 609:20,
609:23, 610:20,
612:24, 613:3,
613:13, 613:16,
613:22, 614:4,
614:19, 614:23,
615:2, 615:4, 615:8,

615:12, 615:17
**wondering** [2] -
524:15, 540:21
**words** [9] - 512:5,
533:11, 587:23,
607:6, 608:14,
611:14, 613:9,
614:22, 617:8
**works** [3] - 511:17,
568:9, 601:3
**worried** [5] - 523:4,
523:8, 523:13,
523:24, 524:4
**worry** [1] - 592:21
**worrying** [1] - 523:25
**worth** [1] - 572:21
**Wright** [44] - 561:3,
561:10, 561:12,
562:6, 562:9,
562:17, 563:10,
564:6, 564:8,
564:10, 564:20,
567:20, 568:7,
575:2, 575:5,
577:13, 581:3,
583:5, 583:11,
584:10, 584:23,
585:5, 586:6,
586:25, 589:19,
589:23, 590:24,
591:12, 595:21,
595:24, 596:25,
597:10, 599:2,
599:8, 599:12,
602:6, 602:19,
603:18, 605:18,
606:11, 608:19,
611:3, 615:23,
616:18
**WRIGHT** [1] - 561:4
**Wright's** [1] - 561:24
**writers** [1] - 542:14
**writing** [1] - 572:3
**written** [5] - 514:25,
520:21, 528:16,
529:21, 561:12

## Y

**yard** [1] - 513:25
**year** [23] - 564:12,
565:16, 565:20,
565:25, 566:10,
568:20, 568:22,
568:25, 569:1,
569:22, 571:15,
571:16, 576:21,
577:19, 578:23,
578:25, 580:1,
580:13, 580:15,

586:20, 586:21,
592:19
**years** [34] - 524:21,
541:11, 542:7,
566:2, 566:4, 566:7,
566:8, 566:13,
566:15, 567:2,
567:5, 567:7,
569:24, 575:9,
575:13, 575:18,
577:22, 579:24,
581:18, 581:19,
582:22, 586:23,
590:3, 590:10,
591:15, 591:17,
591:18, 591:20,
591:21, 591:24,
591:25, 592:1,
594:14
**Young** [1] - 606:14
**yourself** [1] - 525:21