UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,.
                        .
      Plaintiff,      .
                        . CA No. 08-1160 (ESH)
                        .
   v.                 .
                        .
UNITED STATES OF AMERICA,  . Washington, D.C.
                        . Friday, February 14, 2014
      Defendant.    . 2:09 p.m.
                        .
. . . . . . . . . . . . . .  . Pages 715 - 773

DAY 4 - P.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:       MICHAEL K. MURPHY, ESQ.
                        JUSTIN A. TORRES, ESQ.
                        STACIE B. FLETCHER, ESQ.
                        DAVID FOTOUHI, ESQ.

                        Gibson, Dunn & Crutcher, LLP
                        1050 Connecticut Avenue, NW
                        Washington, DC 20036-5306
                        (202) 955-8238

For the Defendant:       JOHN E. SULLIVAN, ESQ.
                        ERICA M. ZILIOLI, ESQ.
                        JESSICA O'DONNELL, ESQ.
                        JUSTIN D. HEMINGER, ESQ.
                        JENNIFER E. POWELL, ESQ.
                        WILLIAM D. JOHNSON, ESQ.

                        U.S. Department of Justice
                        ENRD / Environmental Defense
                        Section
                        601 D Street, NW
                        Suite 8000
                        Washington, DC 20026-3986
                        (202) 305-0365

Court Reporter: PATRICIA KANESHIRO-MILLER, RMR
Certified Realtime Reporter
U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001
(202) 354-3243

**CONTENTS**

| WITNESS | PAGE |
|---|---|
| STANLEY FEENSTRA<br>Cross-Examination (Resumed) | 717 |

**AFTERNOON SESSION**

**STANLEY FEENSTRA,**

having previously been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified further as follows:

       THE COURT:  Okay.  Go ahead.

       MS. ZILIOLI:  Thank you, Your Honor.

           CROSS-EXAMINATION (Continued)

       BY MS. ZILIOLI:

Q.   Good afternoon, Dr. Feenstra.

A.   Good afternoon.

Q.   Dr. Feenstra, following up on a point we talked about before lunch, the TCE from the vapor degreaser in building 91 that you said was trucked to the Potrero site, that would not have contained ammonium perchlorate, or AP; correct?

A.   That's correct.

Q.   Are you aware of Walter Nunes's testimony that solvents and sludge from the vapor degreaser were in fact discharged directly into the burn pit at the Redlands site?

A.   At one point they were, it is my understanding.  I don't know what time frame Mr. Nunes was talking about.

Q.   I would like to ask you briefly about your calculations of the amount of TCE that would have been released from the vapor degreaser in building 91.  If we could go to page 66 of your affidavit, please.  And specifically, I'm looking at paragraph

92 on the bottom of that page.

I believe it indicates there that your calculations assume that the vapor degreaser operated approximately 300 days per year; is that right?

A.   Not exactly.  It's a rough estimate.  My one to two gallons a day of release is based on the volume that may have been released and gone unnoticed.  It's really an estimate per se, but it's a quantity that I believe may have escaped the solvent-water separator and would not have been noticed during normal operations.

Q.   So you're saying that more than one to two gallons per day were released from the vapor degreaser?

A.   It's possible, yes.

Q.   Is it -- excuse me.  Did you consider the testimony of George Nelson White and Lewis Rogers that the vapor degreaser would go days or weeks at a time without being used?

A.   I noted that testimony, yes.

Q.   Turning to page 45 of your affidavit.

A.   Excuse me.  45?

Q.   Yes.  Paragraph 63, if we could focus in on that, please.

The second sentence reads, "The southwestern portion of the Redlands site is the only area in which TCE has been detected on the groundwater on the Redlands site."

Do you see that?

A.   Yes.

Q.   So you're relying on that groundwater data in support of your opinion that the vapor degreaser in building 91 was a source of TCE contamination?

A.   In part, yes.  That the location -- the only place where we continue to see TCE in the groundwater on the Redlands facility is in that southwestern corner.

Q.   The groundwater under the Redlands site generally moves from east to west; correct?

A.   Correct.

Q.   So any TCE discharged further east than building 91 that made it to groundwater would migrate west to the point where you're describing that the data were taken; correct?

A.   Correct.

Q.   Groundwater samples were not taken throughout the entire site, were they?

A.   No, they were basically taken up and down the western boundary from north to south.

Q.   You also rely on some soil gas samples that show TCE in the vicinity of building 91; correct?

A.   Oh, to a much lesser extent.  I certainly did examine the soil gas data.

Q.   If I could draw your attention to U.S. Exhibit 820.

        Your Honor, U.S. Exhibit 820 was part of Dr. Sterrett's submission.  It's also in the witness binder here.

720

THE COURT:  Is it in the cross-examination binder?

MS. ZILIOLI:  Yes, it is, under tab 820, U.S.
Exhibit 820.  They're in numerical order.

THE COURT:  I go from 810, 822D.

MS. ZILIOLI:  I apologize.  Somehow that didn't make
it in.  If you could just look on the screen.  Hopefully that
will be big enough for you to read.

BY MS. ZILIOLI:

Q.   Dr. Feenstra, the figure shown in U.S. Exhibit 820 was
taken from your expert report.  Do you recognize it?

A.   Yes.

Q.   And it's a figure from, I believe it was your March 2013
expert report.

A.   I believe that's correct, yes.

Q.   Looking at the yellow box in the bottom right-hand corner,
it indicates that these were results from a sample taken in
1996?

A.   Yes.

Q.   You agree the pink spots indicate presence of TCE in the
soil gas?

A.   Correct.

Q.   And the green spots indicate the presence of TCA in the
soil gas?

A.   Also correct.

Q.   Do you agree that the vast majority of the TCE hits or

detections were east of building 91 and not west?

A.   That's correct, on the -- excuse me.  The eastern and northeastern corner of building 91.

Q.   I'm finished with that exhibit.

Dr. Feenstra, you're not aware of any evidence that the United States designed the degreaser pit in building 91, are you?

THE COURT:  Designed the what?

MS. ZILIOLI:  The degreaser pit in building 91.

THE COURT:  Degreaser?

MS. ZILIOLI:  The degreaser pit.  He had referenced an engineering drawing of a pit itself as having a drain.  I'm just asking if he -- do you have any evidence that the United States designed the structure of that pit?

THE WITNESS:  Not that I'm aware of.

BY MS. ZILIOLI:

Q.   You're also not aware of any evidence that the United States installed the vapor degreaser?

A.   That, I don't know.

Q.   You're not aware of any evidence that the United States performed maintenance on the vapor degreaser, are you?

A.   I don't think I have seen any documents to indicate that. No.

Q.   You haven't seen any documents indicating the United States was responsible, or had taken responsibility for

maintaining the vapor degreaser?

A.   Not that I'm aware of.

Q.   And you haven't seen any evidence that Lockheed filed a report of waste discharge with the California Water Board for discharges of solvents from the degreaser; correct?

A.   No.

Q.   I take it you would agree that if Lockheed were discharging TCE-containing water into the ground, it should have submitted a report of waste discharge?

A.   I don't believe so in practical terms with regard to my understanding of the Dickey Act.

Q.   Dr. Feenstra, there were multiple vapor degreasers at the Redlands site; correct?

A.   Yes.

Q.   Is it your contention that all of them released solvent into the ground?

A.   No.

Q.   Do you have any evidence to support the fact why one vapor degreaser would release solvents and not the others?

A.   Well, the TCE degreaser wasn't the largest vapor degreaser at the facility.  It was installed in a pit, and it is my opinion this pit did in fact have a drain, as indicated by the process documents, and releases to that drain were the source of contamination.  I don't believe that either the size or the configuration or the component -- or the compounds used by the

other vapor degreasers, I don't think there is any evidence to indicate there have been releases from those degreasers.

Q.   Have you seen the engineering drawings for the locations of the other vapor degreasers?

A.   No, I don't believe they were actually installed in a pit.

Q.   That wasn't my question.  Have you seen any -- have you seen any engineering drawings of the locations where the other vapor degreasers would be?

A.   In terms of locations, no.

Q.   Are you aware there was a vapor degreaser in building 30 immediately to the east of building 100, which is east of building 91?

A.   I don't recall the document where I have seen that.  I'm aware there was another degreaser somewhere, or two degreasers.  A Freon degreaser is the one I recall.

Q.   I take it you have not seen Lewis Rogers' testimony that the degreaser in building 30 used TCE; correct?

A.   I don't recall that came from Mr. Rogers, no.

Q.   Dr. Feenstra, I would like to ask you some questions about the dry cleaning studies you rely on in your affidavit.  Do you agree the dry cleaning process is somewhat different than the vapor degreaser process as the degreaser was used in building 91?

A.   In terms of the actual cleaning operation, yes, but not in terms of the operation of solvent-water separators.

Q.   Dry cleaners used PCE; correct?

A.   Correct.

Q.   And none of the dry cleaners you're aware of used TCE?

A.   In the early days, TCE was actually used for dry cleaning. It was largely replaced by PCE in the '60s.

Q.   In the studies you cite in your affidavit, did any of those discuss the use of TCE in dry cleaning equipment?

A.   No, I don't believe so.

Q.   You're not aware that any of those dry cleaners that were studied in the articles you described used TCA; is that correct?

A.   No, I don't believe TCA has been used to any extent in dry cleaning.

Q.   And dry cleaning equipment uses soap in addition to solvents?

A.   On occasion it does, yes.

Q.   And the PCE, water and soap are generally mixed together to clean fabric?

A.   PCE primarily, and in some cases a small quantity of water and soap, yes.

Q.   You're not aware of any evidence that the vapor degreaser at building 91 used soap; correct?

A.   No.

        THE COURT:  Can you excuse me one minute.

        (Discussion off the record.)

THE COURT:  Okay.  Go ahead.

BY MS. ZILIOLI:

Q.  Dr. Feenstra, in dry cleaning equipment that are cleaning clothes, lint is a potential source of clogs in that equipment; correct?

A.  In some parts of the equipment, yes.  And there are usually filters to remove that lint.

Q.  You're not aware that lint would be a potential source of a clog in the vapor degreasers; correct?

A.  Not lint specifically, but any other debris or material that gets into the vapor degreaser or the solvent collection troughs around the upper top of the degreaser tank, that's where foreign matter would come from.

THE COURT:  Where did the AP come from?

THE WITNESS:  Pardon me?

THE COURT:  Where did the AP come from?  There was AP found in various places, both at Redlands and -- what is the source of contamination?

THE WITNESS:  The easiest place to start is Potrero, because the main source of AP at Potrero is the burn pit.

THE COURT:  Are they putting in -- in the burn bit were they putting liquid solvents or sludge?  What form of AP was going in there?

THE WITNESS:  The AP would have been either -- the -- okay.  I will start at the back.  The AP would have been part

of the propellant that was being burned, or there could have been some AP powder in bags in powder form.

THE COURT:  It was not solvent water, AP solvent water going into burn pits?

THE WITNESS:  There would have been some propellant -- I believe some propellant-contaminated solvent that also went to the burn pits.

THE COURT:  Is that proper?

THE WITNESS:  Yes, according to military guidance and Department of Defense guidance, propellant-contaminated solvents were also to be burned.

THE COURT:  Without going to an evaporation pit first? It was okay to put them directly into the burn pit?

THE WITNESS:  Correct.

THE COURT:  In terms of the AP, it is your view that everybody did what was proper and it just produced contaminated water and soil?

THE WITNESS:  Yes, Your Honor, in terms of my review of the various guidance given from the U.S. military, the Department of Defense, and also consistent with other guidance given to either the handling of AP from equipment manufacturers or the handling of solvents in general from equipment manufacturers.

THE COURT:  Burning?

THE WITNESS:  Burning on the ground, yes.

THE COURT:  Without any lining or anything else?

THE WITNESS:  That's correct.  In the time frame through into the 1970s.

THE COURT:  If you don't accept the employees' testimony that they dumped TCE, is it fair to say that you would assume that they dumped TCA?

THE WITNESS:  I'm sorry.  Could you repeat that, please?

THE COURT:  If you're rejecting the employee testimony that they dumped TCE, do you accept the notion that they must have dumped TCA?

THE WITNESS:  It's difficult to discount the recollections that they dumped something sometime.  That's not a memory, I don't think, that could be confused.  I think the issue is whether they recall it to be TCE or TCA or, in the earliest days of operation at Redlands, other solvents like cyclohexanone.

THE COURT:  And whether they had dumped TCE on the ground or TCA, would it be your testimony that either would be improper, or neither?

THE WITNESS:  Well, it certainly was not according to the procedures and standards outlined by LPC at the time.  There was advice given not to put solvents on the ground, I believe in largest part because if the solvent was contaminated with AP, when the solvent evaporated it would

leave the AP residue on the ground and that would -- the
ground where it was disposed of, and that could result in a
potential fire or explosion hazard, because when the AP
recrystallizes, it is of the same properties that it had
before.

THE COURT:  It wasn't because there was anything wrong
with putting TCE; it's more you're worried about the AP going
into the ground.

THE WITNESS:  That's my belief, Your Honor, yes,
because there was advice given to users of solvents during the
'40s and '50s and '60s and into the '70s that waste solvent
could be placed on the ground to be evaporated.  It could be
placed on the ground to be burned or even buried.

THE COURT:  Are you distinguishing a solvent from AP
solvent?

THE WITNESS:  Yes, in that case I was distinguishing
solvent without AP versus solvent with AP.

THE COURT:  Okay.

BY MS. ZILIOLI:

Q.  Dr. Feenstra, I would like to ask you some more questions
about your opinions regarding sources of AP contamination.  If
we could turn to your affidavit on page 99, please, in
paragraph 148.  Dr. Feenstra, as I read paragraph 148, it
appears to be your opinion that there are several potential
sources of AP contamination besides the burn pit area at

Redlands; is that fair?

A.   Yes.  Based on the distribution of the perchlorate that we see in the groundwater along the western boundary of the site.

Q.   You have not attempted to quantify the amount of AP released from any of those sources; correct?

A.   No, I don't believe that's possible.

Q.   So you have not attempted to quantify the amount of AP that could have been released by the Redlands burn pit?

A.   No, I don't know how one would do that.

Q.   You have found no evidence that Lockheed submitted a report of waste discharge under the Dickey Act for either the Potrero or Redlands burn pit; correct?

A.   That's correct.  The only Dickey Act notification related to what is referred to as the waste discharge area at the LaBorde Canyon site.

THE COURT:  Why there and not the other places?

THE WITNESS:  Your Honor, I believe that's because LPC, in at least LPC's opinion, the opinion of the regulators at the time was that there were no wastewater discharges of significance other than the application that was made for the LaBorde Canyon site.

THE COURT:  What was being discharged there?

THE WITNESS:  At that site they had applied for or notified the board about the discharge of 5,000 gallons per year of the residues remaining after the burning of propellant

wastes.

Q.   Would that mean there would be AP or not?

A.   Well, in the application and in the resolution issued by the board, there was no mention of AP.  I don't believe it was anticipated or expected that there would have been much AP remaining in the residue after burning.  And even given that, I'm not sure that there was any expectation that even a small amount of residual AP in that material could be problematic in 1962.

THE COURT:  What was problematic?  What was it that caused them to seek a permit and not seek a permit anywhere else?

THE WITNESS:  I believe they considered that 5,000 gallons a year disposal, sort of intentional disposal of wastes at a specific location at the LaBorde Canyon facility constituted something that should be noticed to the board, and they did so.

THE COURT:  Is it the quantity or the substance?  It must have been something about the substance.  Sheer weight doesn't do it.  Burn pits had wastes; right?

THE WITNESS:  Yes, but the intent of the burn pits was to actually destroy the material.  The waste discharge area at the LaBorde Canyon site was an actual discharge to the ground, and the intent would be that most of that liquid would actually percolate into the ground and potentially affect the

groundwater.  And that was, I believe, the reason that that

activity was noticed to the board.

There were other constituents in the residues from the

burning of propellant wastes which were identified in the

application to the board, some chloride salt and some

potassium and other residues that were believed to be present

in that material at the time.

BY MS. ZILIOLI:

Q.  Is it your opinion that the chloride, potassium, salts and

those chemicals you just mentioned were the industrial wastes

that triggered the obligation to report under the Dickey Act?

A.  I mean, those were the compounds that were listed in the

application.  I think one can only presume that that was the

concern with regard to that discharge.

Q.  Dr. Feenstra, have you read the Dickey Act?

A.  Yes.

Q.  Do you agree there is no minimum amount of industrial

waste that triggers the reporting obligation?

A.  Oh, I mean, that's correct, but it can't be the practical

intent of the board to have the Dickey Act to regulate every

cup, every bucket of waste material.  It just wouldn't be

practical.  There would have to be consideration given to

frequency, duration, volume, weight, concentration, and

composition of the material.  And some understanding or some

knowledge that there might be a detrimental effect from that

release.

Q.   I would like to ask you some questions about the washing activities at building 77.

          Dr. Feenstra, you would agree that the AP grinding and dust collection equipment used at building 77 had to be cleaned; correct?

A.   The dust collection equipment?  Yes.

Q.   As well as the AP grinding equipment?

A.   Yes.

Q.   And those were washed with water pursuant to the process standards?

A.   I believe that's correct, yes.  I think in some circumstances some of the AP was initially swept, scraped, wiped from some of the equipment, but I believe the final cleaning usually involved water.

Q.   If that equipment was washed outside in the paved area in front of the sumps on the southwest corner of building 77, do you agree that wastewater would have gone into the south sump?

A.   If those materials were actually washed out on the pavement, the configuration, the design of the north and south sumps at building 77, the water, just like storm water off the paved area, would go into the south sump.  Some of that water could escape the bottom of the south sump because of the hole at the bottom, because it was intended, I believe, for wastewater.  Any collection of water that rose too high in the

southern sump would be pumped out of the sump to a drainage area to the south of the building.

Q.   From there it was discharged to the ground; correct?

A.   It went to a natural drainage course and in all likelihood would have entered the ground, yes.

Q.   Dr. Feenstra, on Wednesday, Dr. Delaney testified that some of the equipment may have been washed in a bucket and then the water poured into the north sump.  Is that your opinion, as well?

A.   I believe that that's the most probable disposal of wastewaters from building 77.  There was a northern chamber of the sump designed for the collection of water from inside the building, and a pump system designed to pump AP-contaminated water to the evaporation pit that was located west of building 52.

      When there is a system designed to deal with AP wastewater, in my mind, that's the most probable -- I can't think of the right term -- place where AP wastewaters would have been disposed of, to the north sump.

Q.   You just said the north sump was designed to receive wastewater from inside the building; correct?

A.   Yes.

Q.   But have you seen any process documents that required the employees to wash this equipment inside the building?

A.   Not on a routine basis.

Q.   They instructed them -- excuse me.  Go ahead.

A.   But any water used inside the building for other purposes, there was a drain coming from inside the building, so wastewater from inside the building would have gone to the northern sump.

Q.   The process documents specify that the washing was to occur outside at the sump; correct?

A.   At the faucet beside the sump, yes.

Q.   Have you seen any process document that specifies washing into a bucket and pouring the bucket into the north sump?

A.   I have seen no documents to indicate that.

Q.   Have you seen any process documents requiring employees to wash this equipment inside the north sump?  Taking the lid off and actually washing it inside?

A.   No.

Q.   Is it your opinion that the 6-foot-long Micro-Pulsaire bags were washed into a bucket?

A.   I don't know exactly how one would do that in a bucket.

Q.   But you agree, if they were trying to wash it in a bucket, some of the water would probably get on the ground?

A.   Well, I don't believe it would be done that way.

Q.   Do you agree the sump is only three feet by three feet, approximately?

A.   In area, yes.

Q.   The north sump, I should clarify.  The north sump is

approximately three feet by three feet?

A.   I believe both sumps are identical, so . . .

Q.   You're not aware of any testimony from any employees who washed parts in or over the north sump, are you?

A.   I'm not aware of any employee testimony that describes the washing operations at all, whether the material went to the north sump or onto the parking lot and then into the south sump, none whatsoever.

Q.   I would like to take a look at U.S. Exhibit 822B, please.

For the record, this is a photograph of the Redlands site produced by Lockheed's expert, Tod Delaney, and the Bates number is DELANEY 000006 in the bottom right-hand corner.

Dr. Feenstra, have you seen this photo before?

A.   I think so.  I've seen a lot of photos of the sumps.

Q.   Does this appear consistent with other photographs you've seen of the sumps?

A.   Yes, it is.

Q.   This is the grate and opening in the entrance to the south sump; correct?

A.   Correct.

Q.   Do you see how the concrete, there appears to be a hole dug out of the concrete beneath the grate or behind the grate?

A.   Yes.

Q.   Have you seen any engineering drawing that specifies the digging of that concrete hole?

A.   No.  The engineering drawing has the iron grating that you can see on the top part of the opening, and the grating that is along the ground surface in the front part, but it doesn't have that U-shaped hole.

Q.   You agree that U-shaped hole appears to be rather crudely taken out there?

A.   It appears to be, yes.

Q.   It didn't look like it was intended to be there?

A.   It wasn't part of the poured design of the concrete, no.

Q.   Could that additional dug-out U-shaped area have been made to allow water from the catch basin, which is just in front of the grate, to flow into the south sump?

A.   Oh, absolutely.  I mean, that was -- part of the design was for water that flowed into the catch basin to enter the sump.

Q.   I would like to switch topics a little bit.  You can put that photo back.  And I would like to ask you about building 114.  Building 114 was a propellant research laboratory; correct?

A.   That's my understanding, yes.

Q.   And the propellant they were working with contained AP?

A.   I believe that most of them would, yes.

Q.   I would like to take a look at U.S. Exhibit 781.  There's a tab in the witness binder, and this is also referenced in David Bauer and Bob Sterrett's declarations, Your Honor.

For the record, U.S. Exhibit 781 is a June 30, 1971 memo from an A.E. Wehde, that's W-E-H-D-E, division counsel, to district engineer, Department of Army Corps of Engineers.

You have seen this document before?

A.   Yes.

Q.   Is it your understanding that A.E. Wehde worked for Lockheed?

A.   That was my understanding, yes.

Q.   I would like to look at the middle paragraph on that page starting with "The Facts."  Specifically, the last sentence of that paragraph reads, "The remaining 2,500 gallons per day is waste from LPC's chemical research laboratory (building 114) which is returned to an evaporation pit wherein solids included in this wastewater are settled out."

You have seen this description before of how the sumps were used to collect approximately 2,500 gallons of wastewater from building 114?

A.   Yes.

Q.   And you agree this indicates that the wastewater contained solids?

A.   Yes.

Q.   Presumably those solids contained propellant?

A.   I don't know there is any way to know that for certain. It's certainly possible that it contained AP.  At that point, they wouldn't be solids that could settle out.  They would

be -- the AP would be dissolved in water.

Q.   That was my next question.  AP dissolves very easily in water; correct?

A.   Yes, in general.

Q.   So if propellant solids or pieces of propellant were included in the wastewater, the AP would most likely leach out into the water?

A.   Yes.

Q.   And dissolve in the water?

A.   Yes.

Q.   I would like to go to the next paragraph that starts with "Approximately."  It says, "Approximately once a week, during dry weather, water is pumped from the evaporation pit to an underground drain (storm sewer) catch basin close to the evaporation pit.  The underground drain traverses generally westward, emerging into an open swale just north of building 123.  From this point the water runs on open ground north towards 7th Street and then west towards San Bernardino Avenue (which is a paper street not presently constructed)."

        Dr. Feenstra, you agree that this indicates that the wastewater was pumped directly onto the ground; correct?

A.   Yes.

Q.   Could this weekly discharge be a source of AP in the Redlands plume?

A.   I do believe it probably was, based on the chemical

analysis that is on the second page of this letter.

Q.   Dr. Feenstra, did you find any evidence that Lockheed submitted a report of waste discharge for these releases?

A.   No.  I'm not sure this is a waste discharge.  The conclusion of this letter was that it was not.

Q.   If you could turn to the second page where you're describing the chemical analysis, in the paragraph that starts, "As matter of interest," and it has a list of four different things, and then the concentrations of the effluent for those things.  Do you see that?

A.   Yes.

Q.   Is AP listed there?

A.   No, it is not, but the total dissolved solids listed at 150 parts per million is not high.  In fact, it is probably consistent with some of the freshest groundwater from the Bunker Hill basin.

        THE COURT:  Where is this paper coming from?

        MR. MURPHY:  This isn't the second page.

        MR. FOTOUHI:  That's not the right page.

        MR. MURPHY:  There it is.

        BY MS. ZILIOLI:

Q.   Dr. Feenstra, were you following along with me when I was just describing that section where it has the four items listed and their concentrations?

A.   Yes.

Q.   So you were looking at your hard copy in the binder?

A.   That's correct.

Q.   So you were not looking at the screen.  I think we had the wrong thing on the screen.

A.   No, I wasn't looking at the screen.  With the glasses I have on, it's just a little too far.

Q.   And for the record, what I was just describing was U.S. Exhibit 781.0002, which was the second page of U.S. Exhibit 781?

        THE COURT:  781.

        MS. ZILIOLI:  Yes, Your Honor.

        THE COURT:  You're on U.S. Exhibit 781, the second page?

        MS. ZILIOLI:  Yes.

        THE COURT:  Okay.

        THE WITNESS:  Is there a question pending?

        BY MS. ZILIOLI:

Q.   I'm actually turning to another topic.  So we can put that one away.  I was going to ask you about evaporation pit 61, west of building 52.  We could look at U.S. Exhibit 43, which is in your witness binder and is also I believe cited by David Bauer and Robert Sterrett.

        For the record, U.S. Exhibit 43 is a November 6, 1958 memo from R. Holdridge to Herb Stickney, Re:  Air pollution control, Bates number LMC PRO 0048859 through 60.

Dr. Feenstra, have you seen this document before?

A.   Yes.

Q.   If I could turn to the second page of that document, please, U.S. Exhibit 43.0002.

In the middle of the page there is a sentence that starts with "Mixer parts cleaned."  Do you see that?

A.   Yes.

Q.   If we could focus on that paragraph, please.  It says, "Mixer parts cleaned manually in cyclohex.  Drained toward large evap pit.  Note:  this contaminates water basin, should be piped right into pit."  Do you see that?

A.   Yes.

Q.   Dr. Feenstra, building 52 was a propellant mixer building; correct?

A.   That's correct.

Q.   So presumably wastewater coming from cleaning of the building 52 mixer would have contained propellant waste?

A.   Wastewater would have, yes.

Q.   And that wastewater would have contained ammonium perchlorate or AP?

A.   I'm not actually sure that this document talks about wastewater.

Q.   Is it your understanding from reading documents about building 52 that what would have been going through the evaporation -- I'm sorry -- would have been going through the

pipe toward evaporation pit 61 would have been wastewater from inside building 52?

A.   That's not what this document says.  It talks about cyclohexanone that was used for mixing washer parts that was drained toward the evaporation pit.

Q.   Would you agree that the cyclohexanone that was used to wash the mixer parts would have contained traces of propellant?

A.   Yes, it would.

Q.   And that would contain AP?

A.   Yes.

Q.   Do you agree that this document indicates those discharges went directly to the ground and not into the evaporation pit?

A.   At this particular time, in November, I believe, of 1958, that's correct.

Q.   I take it from your affidavit you believe at some point a pipe -- that situation was remedied; is that right?

A.   It was corrected.  We don't know precisely when based on the documents we have.  It could have been a few weeks, it could have been a few months.  But by May of 1960, there was a separate pipeline that went from the building 52 area through the existing culvert that had been present originally, directly to the evaporation pit.

Q.   You have not seen any engineering drawings of that pipe that you just described; correct?

743

A.   Of which pipe?

Q.   The what do you call -- not the culvert but the actual pipe?

A.   The 6-inch pipe?  I don't believe there are engineering drawings of that.  There are several documents that give a written description of that pipe, and I believe one of the photographs or several of the photographs taken by Dr. Delaney represent the remnants of where that pipe was.

Q.   Is it your understanding that that 6-inch pipe went all the way from building 52 to the evaporation pit, 61?

A.   I believe it went from the sort of apron area around building 52 to the evaporation pit.

Q.   You're saying they built a pipe inside another pipe?

A.   Yes.

Q.   Approximately how long do you think that pipe was?

A.   Pardon me?

Q.   Approximately how long do you think that pipe was, the inner pipe?

A.   I wouldn't guess without scaling it off a map.

        THE COURT:  I'm sorry.  I'm confused.  I talked to Dr. Delaney the other day.  Is this the same pipe that didn't appear to be complete and make it all the way to the pit?  Or is this a different one?

        THE WITNESS:  When Dr. Delaney took the photograph, it didn't make it all the way to the pit anymore.  I believe it

was a plastic pipe and it was largely damaged, but there were remnants of that pipe present.

THE COURT:  Why do you think -- was it a construction default that it didn't connect properly and it was corrected?

THE WITNESS:  No.  I actually believe it was probably an oversight.  When building 52 was constructed, a large 18-inch diameter culvert was connected from the area around building 52 to take storm water from the parking area and the roadway area, underneath the roadway to the west, and allow that storm water runoff to percolate into the ground.  It is my understanding that building 52 mixer operations began sometime in the fall of 1958, and the exhibit we're looking at right now from November of '58 noticed that at least some of the cleaning solvent was also being discharged into this drain and it wasn't actually going into the evaporation pit.

It is my understanding that that was corrected by putting a smaller diameter drain extending from the building 52 area through the larger pipe but then going all the way to the evaporation pit, to take the cleaning solvents from operations at building 52 all the way to the pit itself.

BY MS. ZILIOLI:

Q.  I would like to look at, Dr. Feenstra, on your affidavit, page 35, your demonstrative 10.  There's a picture. Dr. Feenstra, you don't know exactly when --

A.  Excuse me.  What page number?

Q.   I'm sorry.  It's on page 35.  Your demonstrative 10.

A.   Yes.

Q.   You say "circa 1960," but I take it you don't know exactly when this picture was taken?

A.   No, we don't know the exact date for these photographs. It was after building 52 had been constructed, but from other photographs in that same area, there are other buildings that are still underway, and those were underway in about 1960. So . . .

Q.   Dr. Feenstra, if you look at evaporation pit 61, which I take it is that sort of square in the upper right-hand corner of the picture; is that right?

A.   Yes.

Q.   There is a dark area to the kind of bottom left corner of that evaporation pit.  Do you see that?

A.   Yes.

Q.   I believe in your affidavit you opined that that was storm water; is that right?

A.   Correct.

Q.   But looking at this picture, you can't actually tell what the substance is; correct?

A.   No.  But you've got to understand where the pipe work is. There is an 18-inch culvert that goes from behind --

          THE COURT:  Can you point it out with your finger. It'll light up.

        BY MS. ZILIOLI:

Q.   Yeah, if you press on the screen, it should make a mark.

A.   You can see right in here, right in there, there is a small, like concrete catchment -- how do I make this go away now?

Q.   I think if you touch the screen again it might disappear.

A.   Just behind the building.  That is where the 18-inch culvert comes out from around building 52.  It extends underneath the berm, underneath the roadway, and comes out just the other side of the dark gray roadway where it says "pipe from building 52."  You see the left-to-right roadway. The pipe that extends to -- and that's then -- the water, storm water runoff or rainfall that goes through that 18-inch pipe is discharged right at that roadway, and it goes out onto the ground, and that's what I believe collects in that dark area.

        The pipe that goes from the building 52 area directly to the evaporation pit is a smaller diameter pipe, 6 inches, inside an 18-inch culvert, that goes underneath the berm, underneath the road, and then is underground for some distance until it gets to the evaporation pit.

Q.   I believe the pictures that you were describing that Dr. Delaney took show that large 18-inch pipe stopping a few feet short of evaporation pit 61, doesn't it?

A.   No.  No, that's not the 18-inch culvert.  That's the

6-inch pipe.

Q.   You're saying that black pipe, that circular thing that was shown ending just shy of evaporation pit 61 is 6 inches?

A.   Page 43 of my affidavit -- yes, this is the 6-inch pipe. The 18-inch pipe was an 18-inch corrugated steel culvert.  I don't know the exact composition of this pipe, but this is the smaller diameter pipe that went directly to the evaporation pit.

        THE COURT:  The one on the bottom?

        THE WITNESS:  Well, there's two views.  The upper view shows the view -- the pipe you can see off in the distance, as in -- I think these photos were taken in the year 2000.  The plastic pipe didn't extend all the way to the evaporation pit any longer, but you can see the notch where the pipe likely sat.  And then the second photograph is just a close-up of the end of the pipe itself, the end of the pipe as it existed in 2000.

        BY MS. ZILIOLI:

Q.   Dr. Feenstra, are you saying that the storm water was discharged approximately where the word "pipe from building 52" was -- if we go back to page 35.

        You're saying that the storm water discharged approximately where that road is?

A.   No, probably more where -- you see the almost vertical dashed line that comes from the evaporation pit back toward

748

building 52?  The lower end of that line is where the 18-inch

culvert comes out from underneath the road and storm water

runoff would come out.

Q.  Could you please make a mark on the screen where you think

the storm water came out?  Do you see any water between where

that mark is and where the big pool of liquid is?

A.  No, because water hasn't pooled there.  It drains to the

west.

Q.  Dr. Feenstra, are you offering an opinion as an expert in

aerial photographic interpretation?

A.  Not specifically, no.

Q.  Okay.

A.  But this is my integration of the information that I have

from the process documents, from building drawings, and what I

can see on the photograph.

Q.  I believe you testified earlier that you have not seen any

engineering drawings showing where the 6-inch pipe was

supposed to be constructed; correct?

A.  It goes through the 18-inch pipe.  It can't be anywhere

else.  The descriptions given in the documents say it goes

through the 18-inch pipe.

Q.  Dr. Feenstra, you're not aware of any evidence that the

discharge, before this second pipe was constructed and

discharge was going into the ground, you're not aware of any

evidence that Lockheed filed a report of waste discharge for

that; correct?

A.   I don't believe so.  I don't think it was ever intended to be a point of waste discharge.

        THE COURT:  But did it happen in fact?  Did they put the 6-inch pipe in later?

        THE WITNESS:  That's correct, Your Honor.  The November 1958 document that we were looking at indicated that cyclohexanone from the mixing of washer parts went through that 18-inch culvert and didn't go all the way to the evaporation pit, and it recommended that that be corrected. And subsequent documents indicate that in fact it was, by the installation of the smaller diameter pipe.

        THE COURT:  When did that happen?

        THE WITNESS:  We don't know precisely when, but it was certainly in place by May of 1960.

        BY MS. ZILIOLI:

Q.   So Lockheed could have waited approximately a year and a half before building that second pipe?

A.   Or they could have done it the following week.  We don't know.

Q.   Dr. Feenstra, I would like to ask you just a couple of questions about the burn pits, just to revisit that topic quickly.

        You would agree that Lockheed did not use burn pans at either of those burn pits; correct?

A.   I have seen no reference to burn pans.  I don't believe they did.

Q.   But you would agree that burn pans were available in the 1960s?

A.   I mean at some level burn pans are always available.  They certainly weren't recommended or advised for the burning of these types of waste materials in any of the military guidance I have seen.

Q.   I'm sorry.  That wasn't my question.  I was simply asking were the burn pans available?  Lockheed could have used them?

A.   They would need a lot of them given the scale and the size of the burn areas, but it's certainly possible.

Q.   Dr. Feenstra, would the use of burn pans have reduced the ability of contaminants to get into the ground if Lockheed had used them?

A.   In hindsight, it probably would have reduced it.  I don't know if it could have eliminated it entirely.  Exactly -- I mean the anticipation or the expectation of these burn pits is that all of the combustible material would actually be destroyed.  It wasn't appreciated at the time that any significant quantities would go unburned and then potentially enter the subsurface environment.

     I'm not aware of any forensic studies that have tried to really understand what that process is.  I think conceptually burn pans might have captured some of that

contamination and caused those materials to combust more completely.  Exactly how much better, I don't think it's possible to know.

Q.  I would like to ask you, just continuing on the conversation we had before about your opinions that Lockheed and the California regulators did not anticipate the contamination that ultimately was found in the Redlands plume. I would like to turn to your affidavit on page 131, please.

Your Honor, I know you said you had to leave sometime around 3, so if you could just tell me --

THE COURT:  Finish up.  Finish up.

Q.  If you look at paragraph 196, you testified, "During operations at the Redlands site between 1954 and the early 1970s, there is no documentary evidence to indicate that GCR/LPC or that the county or state environmental regulatory agencies anticipated or recognized that groundwater contamination by TCE or perchlorate could be the result of GCR/LPC's operations at the site."

Do you see that?

A.  Yes.

Q.  In your summary of research that you presented in various tables attached to your affidavit, you reference a 1953 article by Banks and Lawrence called "Water Quality Problems in California"; correct?

A.  Yes.

Q.   You did not interpret the article to indicate awareness of

TCE or AP contamination of groundwater at that time?

A.   I don't believe Banks and Lawrence mentioned TCE or

perchlorate.

Q.   If we could take a quick look at that article.  It's U.S.

Exhibit 810.

        Your Honor, this has not previously been provided in

any of the submissions thus far.  This is strictly rebuttal

evidence.

        THE COURT:  Okay.  810 is admitted.  It is all going

to be part of this ultimate disk, I guess.

        BY MS. ZILIOLI:

Q.   Dr. Feenstra, if you look at 810, is this the Banks and

Lawrence article we were just discussing?

A.   So it's not in the binder?

Q.   It is in the binder.  It's under the tab for U.S.

Exhibit 810.

        If we could turn to, at the bottom it says U.S.

Exhibit 810.0006.  If you look at the bottom of that page, the

paragraph starting with "Pollution of groundwater."

        It says, "Pollution of groundwater.  Serious

conditions of pollution of the groundwater resources occur

when industrial wastes containing organic solvents and other

chemical compounds are either indiscriminately discharged into

open unlined sumps, or directly onto a highly absorptive

surface dump site area, or are disposed of directly in the ground through wells."

The last sentence of that paragraph reads, "Solvents and soluble chemicals contained in industrial wastes, however, remain in solution in the liquid phase in most instances, and percolate downward to the underlying groundwater."

You see that?

A.   Yes.

Q.   You're saying because this article does not mention AP or TCE, that the authors did not intend that to refer to those chemicals?

A.   Well, if they're not mentioned, I don't know how you can know for certain that it was intended.  In terms of the published information, I tried to look at contemporaneous published documents related to groundwater contamination, and there is really nothing else in the literature, aside from one example in the U.K., which discusses TCE.

In terms of Banks and Lawrence in particular, in the published literature in California, where I went to look was a compilation of water quality criteria compiled by Dr. McKee at Cal Tech that was done on behalf of Mr. Banks's organization, the Division of Water of the State of California.

TCE is not discussed in 1952 as a potential contaminant of water, and neither is perchlorate.  Other organic solvents are.  Things like acetone, ethanol, much more

water soluble solvents, are listed in 1952 by Dr. McKee.  But

TCE was not.

Q.   Do you agree TCE is an organic solvent?

A.   Certainly it is.

Q.   And AP is a highly soluble material?

A.   Yes, along with many other solvents and soluble materials.

Q.   Going back to the first page of Exhibit 810, just to look

at the top at the lines -- to be clear, this is a February

1953 article; correct?

A.   That's correct.

Q.   Harvey O. Banks is the first author listed?

A.   Yes.

Q.   Do you know who Mr. Banks was?

A.   He was with the state, I believe Division of Water.  I

don't recall exactly what his title was.

Q.   If we could pull up U.S. Exhibit 131, please.

        For the record, U.S. Exhibit 131 is an October 10,

1951 memo from the Division of Water Resources to the Water

Board.  And Your Honor, this is also cited by Dave Bauer in

his affidavit.

        Have you seen this document?

        THE COURT:  It's in the cross-examination?  You have

about five more minutes.  Okay?

        BY MS. ZILIOLI:

Q.   Have you seen this document before?

A.   Yes.  Not in terms of published information, but I believe
I have seen it as documents escaped from other litigation.

Q.   This concerns the Aerojet site --

A.   Yes.

Q.   -- in California?  And you agree that the discharge that
Aerojet submitted a report of waste discharge for was to put
chemicals including TCE and AP into unlined ponds for
percolating into the ground?

A.   Correct.

Q.   If you could look to the back page, the second page of
U.S. Exhibit 131.  Do you see Mr. Banks' signature block
there?

A.   Yes.

Q.   So looking at this document, are you still of the opinion
that Mr. Banks was not aware that TCE and AP could contaminate
the groundwater?

A.   With regard to -- certainly Mr. Banks had a concern with
regard to the activities at Aerojet in 1951.  With regard to
what Mr. Banks wrote in 1953 and what else was available in
the published literature in 1952, 1953, that information
wasn't evident in what he was writing in 1953.

Q.   Going back to the second page of Exhibit 131, the first
paragraph, it says, "To summarize."

A.   Excuse me.  Which paragraph?

Q.   The top paragraph on page 2, "To summarize."  Do you see

that?

A.   Yes.

Q.   "To summarize," he wrote, "it is believed that the
proposed industrial waste discharges present a threat to the
quality of both surface and groundwater in the vicinity, and
that their disposal in the manner planned should be
discouraged."

        Do you see that?

A.   Yes.

        THE COURT:  It includes ammonium perchlorate, right,
second-to-the-last paragraph on the first page?

        THE WITNESS:  Yes.  The waste at Aerojet included
ammonium perchlorate, and a variety of other compounds too.

        THE COURT:  Did it include ACT -- I mean ACE?

        THE WITNESS:  It included TCE, styrene, and a variety
of other -- butyl acetate, other solvents, also.

        BY MS. ZILIOLI:

Q.   Dr. Feenstra, you were an expert for Lockheed in the
Redlands tort case; correct?

A.   Yes.

Q.   Is it fair to say that you offered an opinion in that case
on the historic development of knowledge about solvents as
groundwater contamination?

A.   Yes.

Q.   Is it also fair to say you developed your opinions in that

case without seeing site-specific information about Redlands?

A.   That's correct.   I described the development of knowledge and standard practice related to disposal operations based on information from the published literature.

Q.   I take it in this case you have seen numerous site-specific documents from the operations at the Redlands site?

A.   I'm sorry.   I didn't catch the first part of the question.

Q.   I take it in this litigation you have since your prior opinion seen many documents that describe Lockheed's operations at its site at Redlands?

A.   I apologize.   I still can't follow that.

Q.   You testified that when you developed your opinion in the prior case you had not seen site-specific documents; it was just a literature search.   Correct?

A.   Correct.

Q.   And I'm saying, in this litigation that we're here today for, you have seen documents about site operations; correct?

A.   Oh, absolutely.

Q.   Having seen all those documents, your opinions have not changed?

A.   With regard to the historical development of knowledge?   I don't understand.   I'm not sure how site-specific documents could change my opinions on history.

          THE COURT:   Let's be specific.   Does this document

here -- Exhibit 131 U.S., does that now change your mind about the state of knowledge about the danger posed by these types of AP and TCE?

THE WITNESS:  No, Your Honor, it doesn't.  I was trying to characterize in the Redlands tort litigation, and in this litigation also, in terms of historical knowledge, it's a general state of knowledge.  That general state of knowledge derived from published literature, engineering, scientific, regulatory literature, published information from chemical manufacturers, military organizations, governments, and what the general state of knowledge was with regard to different types of contamination.

THE COURT:  Your conclusion was things like TCE, there wasn't much of a concern about AP and TCE.  So I see an inherent contradiction in your testimony because you believe that they followed proper procedures and that they were concerned with proper procedures, and the employees you discredit to some extent and believe that things were being done correctly.  Why would anybody bother doing things correctly if there was no reason to worry about what was going on?  Does that make sense?

THE WITNESS:  No.  I'm afraid I don't follow that.

THE COURT:  The notion that it was not known that this kind of problem could occur, and they weren't worried about it because they didn't have enough knowledge, undercuts the

notion that they followed proper procedures, they had proper procedures, and what they did were designed to make sure that there weren't mishaps.

THE WITNESS:  Your Honor, there's two aspects to that. One is the issue of groundwater contamination that we have been discussing mostly today, but the other issue is with regard to fire and explosion hazard for this particular industry itself.

THE COURT:  Your notion is that the, quote, proper procedures were you were worried about fire.

THE WITNESS:  That's correct.

THE COURT:  But let's say the lazy worker doesn't want to drag some container somewhere.  Why not just dig a hole and cover the hole?  That won't present a fire risk.

THE WITNESS:  You're not supposed to bury explosive materials either.

THE COURT:  Because?

THE WITNESS:  Because the potential that somebody might dig through it in the future in terms of constructing other utilities or roadways or something like that.

THE COURT:  Because of flammability or because of just --

THE WITNESS:  Well, flammability, fire hazard and explosion hazard.  Those types of concerns are outlined in the military guidance also.  You're not supposed to bury explosive

760

materials.

MS. ZILIOLI:  Your Honor, I just have a few more questions on his credentials and then I'll finish.

THE COURT:  Go ahead.

Q.  Dr. Feenstra, you're not registered as a hydrogeologist or any other type of scientist in the State of California; correct?

A.  Correct.

Q.  You have never held any licenses in California?

A.  No.

Q.  You are not basing your opinions in this case on personal experience practicing before the Water Board in California; correct?

A.  That's correct.

Q.  You have never advised a company on compliance with the California Dickey Act or Porter-Cologne Act; correct?

A.  Not knowingly.  I don't know if it was Porter-Cologne. Certainly I have dealt with some of my clients and their issues with regard to regulators.

THE COURT:  How long have you been involved with Lockheed as a client?

THE WITNESS:  I originally did some work for Lockheed on the Burbank litigation in 1999.

THE COURT:  Was that your first engagement?

THE WITNESS:  Yes, ma'am.

THE COURT:  About how much of your time since then has been spent in Lockheed-related matters?

THE WITNESS:  I did work on the Redlands tort litigation in around 2001, 2002.  I was reborn again in 2010 I guess.  And then when this litigation -- my involvement began sometime in the fall of 2011.

THE COURT:  So your involvement has always just been Redlands?  Burbank?

THE WITNESS:  Burbank and Redlands, yes, ma'am.

THE COURT:  Where is your affidavit attached?  Do you have a curriculum vitae attached to your affidavit?  I'm sorry.

THE WITNESS:  There should have been.

THE COURT:  I don't know.

Is there one in any of that?

MR. MURPHY:  I have one.

THE COURT:  Go ahead.  Finish up.  Anything else?

MS. ZILIOLI:  One last question, Your Honor.

THE COURT:  Okay.

BY MS. ZILIOLI:

Q.  Dr. Feenstra, just to clarify, you have never prepared or submitted to the Water Board a report of waste discharge under the Dickey Act or the Porter-Cologne Act; correct?

A.  No, I have not.

MS. ZILIOLI:  Thank you for your time.  I have no

762

further questions.

THE COURT:  I'm afraid, Doctor, you will be back at 9:30 on Tuesday morning.  They just canceled my plane.  So I have to figure out something else.

Thank you.  Have a very nice weekend.  I appreciate it.  And the government will respond on the arranger memo early next week, I think.

MR. SULLIVAN:  Yes, Your Honor.  When would you like us to have it in by?

THE COURT:  Tuesday morning.

Thank you.  Have a good day.

(Proceedings adjourned at 3:20 p.m.)

763

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, Patricia A. Kaneshiro-Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


---------------------------------    -----------------------
PATRICIA A. KANESHIRO-MILLER                         DATE

**'40s** [1] - 728:11
**'50s** [1] - 728:11
**'58** [1] - 744:13
**'60s** [2] - 724:5, 728:11
**'70s** [1] - 728:11

**0**

**000006** [1] - 735:12
**0048859** [1] - 740:25

**1**

**10** [3] - 744:23, 745:1, 754:17
**100** [1] - 723:11
**114** [4] - 736:18, 737:12, 737:17
**123** [1] - 738:17
**131** [6] - 751:8, 754:16, 754:17, 755:11, 755:22, 758:1
**148** [2] - 728:23
**150** [1] - 739:14
**18-inch** [13] - 744:7, 745:23, 746:7, 746:13, 746:19, 746:23, 746:25, 747:5, 748:1, 748:19, 748:21, 749:9
**1951** [2] - 754:18, 755:18
**1952** [3] - 753:23, 754:1, 755:20
**1953** [5] - 751:22, 754:9, 755:19, 755:20, 755:21
**1954** [1] - 751:13
**1958** [4] - 740:23, 742:14, 744:12, 749:7
**196** [1] - 751:12
**1960** [4] - 742:20, 745:3, 745:8, 749:15
**1960s** [1] - 750:4
**1962** [1] - 730:9
**1970s** [2] - 727:3, 751:14
**1971** [1] - 737:1
**1996** [1] - 720:17
**1999** [1] - 760:23

**2**

**2** [1] - 755:25
**2,500** [2] - 737:11, 737:16
**2000** [2] - 747:12, 747:17
**2001** [1] - 761:4
**2002** [1] - 761:4
**2010** [1] - 761:4
**2011** [1] - 761:6
**2013** [1] - 720:12

**3**

**3** [1] - 751:10
**30** [3] - 723:10, 723:17, 737:1
**300** [1] - 718:3
**35** [3] - 744:23, 745:1, 747:21
**3:20** [1] - 762:12

**4**

**43** [3] - 740:20, 740:23, 747:4
**43.0002** [1] - 741:4
**45** [2] - 718:18, 718:19

**5**

**5,000** [2] - 729:24, 730:13
**52** [20] - 733:15, 740:20, 741:13, 741:17, 741:24, 742:2, 742:21, 743:10, 743:12, 744:6, 744:8, 744:11, 744:18, 744:20, 745:6, 746:8, 746:11, 746:17, 747:21, 748:1

**6**

**6** [3] - 740:23, 746:18, 747:3
**6-foot-long** [1] - 734:16
**6-inch** [6] - 743:4, 743:9, 747:1, 747:4, 748:17, 749:5
**60** [1] - 740:25

**61** [6] - 740:19, 742:1, 743:10, 745:10, 746:24, 747:3
**63** [1] - 718:20

**7**

**77** [5] - 732:3, 732:5, 732:17, 732:21, 733:11
**781** [5] - 736:23, 737:1, 740:9, 740:10, 740:12
**781.0002** [1] - 740:8
**7th** [1] - 738:18

**8**

**810** [6] - 720:4, 752:6, 752:10, 752:13, 752:17, 754:7
**810.0006** [1] - 752:19
**820** [5] - 719:22, 719:23, 720:2, 720:3, 720:9
**822B** [1] - 735:9
**822D** [1] - 720:4

**9**

**91** [10] - 719:2, 719:10, 719:19, 721:1, 721:3, 721:6, 721:9, 723:12, 723:23, 724:22
**92** [1] - 718:1
**99** [1] - 728:22
**9:30** [1] - 762:3

**A**

**A.E** [2] - 737:2, 737:6
**ability** [1] - 750:14
**above-entitled** [1] - 763:5
**absolutely** [2] - 736:13, 757:19
**absorptive** [1] - 752:25
**accept** [2] - 727:4, 727:10
**according** [2] - 726:9, 727:21
**ACE** [1] - 756:14
**acetate** [1] - 756:16
**acetone** [1] - 753:25
**Act** [10] - 722:11,

729:11, 729:13, 731:11, 731:15, 731:20, 760:16, 761:23
**ACT** [1] - 756:14
**activities** [2] - 732:3, 755:18
**activity** [1] - 731:2
**actual** [3] - 723:24, 730:23, 743:2
**addition** [1] - 724:14
**additional** [1] - 736:10
**adjourned** [1] - 762:12
**admitted** [1] - 752:10
**advice** [2] - 727:23, 728:10
**advised** [2] - 750:6, 760:15
**aerial** [1] - 748:10
**Aerojet** [4] - 755:3, 755:6, 755:18, 756:12
**affect** [1] - 730:25
**affidavit** [13] - 718:18, 723:20, 724:6, 728:22, 742:16, 744:22, 745:17, 747:4, 751:8, 751:22, 754:20, 761:10, 761:11
**afraid** [2] - 758:22, 762:2
**agencies** [1] - 751:16
**agree** [18] - 720:19, 720:25, 722:7, 723:21, 731:17, 732:4, 732:18, 734:19, 734:22, 736:5, 737:19, 738:20, 742:6, 742:12, 749:24, 750:3, 754:3, 755:5
**ahead** [4] - 725:1, 734:1, 760:4, 761:17
**air** [1] - 740:24
**allow** [2] - 736:11, 744:9
**almost** [1] - 747:24
**ammonium** [3] - 741:19, 756:10, 756:13
**amount** [4] - 729:4, 729:7, 730:8, 731:17
**analysis** [2] - 739:1, 739:7
**anticipate** [1] - 751:6
**anticipated** [2] - 730:5, 751:16
**anticipation** [1] - 750:18

**AP** [48] - 725:14, 725:16, 725:20, 725:22, 725:24, 725:25, 726:2, 726:3, 726:15, 726:21, 727:25, 728:1, 728:3, 728:7, 728:14, 728:17, 728:21, 728:25, 729:4, 729:7, 730:2, 730:4, 730:5, 730:8, 732:4, 732:8, 732:13, 733:13, 733:16, 733:18, 736:21, 737:24, 738:1, 738:2, 738:6, 738:23, 739:12, 741:20, 742:10, 752:2, 753:9, 754:5, 755:7, 755:15, 758:3, 758:14
**AP-contaminated** [1] - 733:13
**apologize** [2] - 720:5, 757:12
**appear** [2] - 735:15, 743:22
**application** [4] - 729:20, 730:3, 731:5, 731:13
**applied** [1] - 729:23
**appreciate** [1] - 762:5
**appreciated** [1] - 750:20
**apron** [1] - 743:11
**area** [20] - 718:22, 728:25, 729:14, 730:22, 732:16, 732:22, 733:2, 734:24, 736:10, 742:21, 743:11, 744:7, 744:8, 744:9, 744:18, 745:7, 745:14, 746:16, 746:17, 753:1
**areas** [1] - 750:12
**Army** [1] - 737:3
**arranger** [1] - 762:6
**article** [6] - 751:23, 752:1, 752:5, 752:14, 753:9, 754:9
**articles** [1] - 724:10
**aside** [1] - 753:16
**aspects** [1] - 759:4
**assume** [3] - 718:3, 727:6
**attached** [3] - 751:22, 761:10, 761:11
**attempted** [2] - 729:4, 729:7

**attention** [1] - 719:22
**author** [1] - 754:11
**authors** [1] - 753:10
**available** [4] - 750:3,
750:5, 750:10,
755:19
**Avenue** [1] - 738:18
**aware** [17] - 721:5,
721:15, 721:17,
721:20, 722:2,
723:10, 723:14,
724:3, 724:9,
724:21, 725:8,
735:3, 735:5,
748:22, 748:24,
750:23, 755:15
**awareness** [1] - 752:1

# B

**bags** [2] - 726:2,
734:17
**Banks** [5] - 751:23,
752:3, 752:13,
753:18, 754:11
**banks** [4] - 754:13,
755:15, 755:17,
755:19
**banks'** [1] - 755:11
**banks's** [1] - 753:21
**based** [5] - 718:6,
729:2, 738:25,
742:18, 757:3
**basin** [5] - 736:11,
736:14, 738:14,
739:16, 741:10
**basing** [1] - 760:11
**basis** [1] - 733:25
**Bates** [2] - 735:11,
740:25
**Bauer** [3] - 736:25,
740:22, 754:19
**began** [2] - 744:11,
761:5
**behalf** [1] - 753:21
**behind** [3] - 735:22,
745:23, 746:7
**belief** [1] - 728:9
**beneath** [1] - 735:22
**berm** [2] - 746:9,
746:19
**Bernardino** [1] -
738:18
**beside** [1] - 734:8
**better** [1] - 751:2
**between** [2] - 748:5,
751:13
**big** [2] - 720:7, 748:6
**binder** [7] - 719:24,

720:1, 736:24,
740:1, 740:21,
752:15, 752:16
**bit** [2] - 725:21, 736:16
**black** [1] - 747:2
**block** [1] - 755:11
**board** [6] - 729:24,
730:4, 730:16,
731:2, 731:5, 731:20
**Board** [4] - 722:4,
754:19, 760:12,
761:22
**Bob** [1] - 736:25
**bother** [1] - 758:19
**bottom** [9] - 718:1,
720:15, 732:23,
732:24, 735:12,
745:14, 747:9,
752:18, 752:19
**boundary** [2] - 719:17,
729:3
**box** [1] - 720:15
**bucket** [7] - 731:21,
733:7, 734:10,
734:17, 734:18,
734:19
**building** [54] - 719:2,
719:10, 719:19,
721:1, 721:3, 721:6,
721:9, 723:10,
723:11, 723:12,
723:17, 723:23,
724:22, 732:3,
732:5, 732:17,
732:21, 733:2,
733:11, 733:13,
733:14, 733:21,
733:24, 734:2,
734:3, 734:4,
736:17, 736:18,
737:12, 737:17,
738:16, 740:20,
741:13, 741:17,
741:24, 742:2,
742:21, 743:10,
743:12, 744:6,
744:8, 744:11,
744:17, 744:20,
745:6, 746:7, 746:8,
746:11, 746:17,
747:20, 748:1,
748:14, 749:18
**buildings** [1] - 745:7
**built** [1] - 743:13
**Bunker** [1] - 739:16
**Burbank** [3] - 760:23,
761:8, 761:9
**buried** [1] - 728:13
**burn** [21] - 725:20,
725:21, 726:4,

726:7, 726:13,
728:25, 729:8,
729:12, 730:20,
730:21, 749:22,
749:24, 749:25,
750:1, 750:3, 750:5,
750:10, 750:12,
750:13, 750:18,
750:25
**burned** [3] - 726:1,
726:11, 728:13
**burning** [6] - 726:24,
726:25, 729:25,
730:6, 731:4, 750:6
**bury** [2] - 759:15,
759:25
**butyl** [1] - 756:16
**BY** [15] - 720:8,
721:16, 725:2,
728:19, 731:8,
739:21, 740:17,
744:21, 746:1,
747:18, 749:16,
752:12, 754:24,
756:17, 761:20

# C

**Cal** [1] - 753:21
**calculations** [1] -
718:2
**California** [10] - 722:4,
751:6, 751:24,
753:19, 753:22,
755:5, 760:6, 760:9,
760:12, 760:16
**canceled** [1] - 762:3
**Canyon** [4] - 729:15,
729:21, 730:15,
730:23
**captured** [1] - 750:25
**case** [7] - 728:16,
756:19, 756:21,
757:1, 757:5,
757:14, 760:11
**cases** [1] - 724:19
**catch** [4] - 736:11,
736:14, 738:14,
757:8
**catchment** [1] - 746:4
**caused** [2] - 730:11,
751:1
**certain** [2] - 737:23,
753:13
**certainly** [9] - 719:20,
727:21, 737:24,
749:15, 750:6,
750:12, 754:4,
755:17, 760:18

**CERTIFICATE** [1] -
763:1
**certify** [1] - 763:3
**chamber** [1] - 733:11
**change** [2] - 757:24,
758:1
**changed** [1] - 757:21
**characterize** [1] -
758:5
**chemical** [5] - 737:12,
738:25, 739:7,
752:24, 758:9
**chemicals** [4] -
731:10, 753:4,
753:11, 755:7
**chloride** [2] - 731:5,
731:9
**circa** [1] - 745:3
**circular** [1] - 747:2
**circumstances** [1] -
732:13
**cite** [1] - 724:6
**cited** [2] - 740:21,
754:19
**clarify** [2] - 734:25,
761:21
**clean** [1] - 724:18
**cleaned** [3] - 732:6,
741:6, 741:9
**cleaners** [3] - 724:1,
724:3, 724:9
**cleaning** [13] - 723:20,
723:21, 723:24,
724:4, 724:7,
724:13, 724:14,
725:3, 732:15,
741:16, 744:14,
744:19
**clear** [1] - 754:8
**client** [1] - 760:21
**clients** [1] - 760:18
**clog** [1] - 725:9
**clogs** [1] - 725:4
**close** [2] - 738:14,
747:15
**close-up** [1] - 747:15
**clothes** [1] - 725:4
**collect** [1] - 737:16
**collection** [5] -
725:11, 732:5,
732:7, 732:25,
733:12
**collects** [1] - 746:15
**Cologne** [3] - 760:16,
760:17, 761:23
**combust** [1] - 751:1
**combustible** [1] -
750:19
**coming** [3] - 734:3,
739:17, 741:16

**company** [1] - 760:15
**compilation** [1] -
753:20
**compiled** [1] - 753:20
**complete** [1] - 743:22
**completely** [1] - 751:2
**compliance** [1] -
760:15
**component** [1] -
722:25
**composition** [2] -
731:24, 747:6
**compounds** [4] -
722:25, 731:12,
752:24, 756:13
**concentration** [1] -
731:23
**concentrations** [2] -
739:9, 739:24
**conceptually** [1] -
750:25
**concern** [3] - 731:14,
755:17, 758:14
**concerned** [1] -
758:17
**concerns** [2] - 755:3,
759:24
**conclusion** [2] -
739:5, 758:13
**concrete** [5] - 735:21,
735:22, 735:25,
736:9, 746:4
**conditions** [1] -
752:22
**configuration** [2] -
722:25, 732:20
**confused** [2] - 727:14,
743:20
**connect** [1] - 744:4
**connected** [1] - 744:7
**consider** [1] - 718:14
**consideration** [1] -
731:22
**considered** [1] -
730:13
**consistent** [3] -
726:20, 735:15,
739:15
**constituents** [1] -
731:3
**constituted** [1] -
730:16
**constructed** [4] -
744:6, 745:6,
748:18, 748:23
**constructed)** [1] -
738:19
**constructing** [1] -
759:19
**construction** [1] -

744:3
**contain** [1] - 742:10
**contained** [8] -
736:21, 737:19,
737:22, 737:24,
741:17, 741:19,
742:7, 753:4
**container** [1] - 759:13
**containing** [2] - 722:8,
752:23
**contaminant** [1] -
753:24
**contaminants** [1] -
750:14
**contaminate** [1] -
755:15
**contaminated** [5] -
726:6, 726:10,
726:17, 727:25,
733:13
**contaminates** [1] -
741:10
**contamination** [13] -
719:3, 722:24,
725:18, 728:21,
728:25, 751:1,
751:7, 751:17,
752:2, 753:15,
756:23, 758:12,
759:5
**contemporaneous** [1]
- 753:14
**contention** [1] -
722:15
**continue** [1] - 719:5
**continuing** [1] - 751:4
**contradiction** [1] -
758:15
**control** [1] - 740:25
**conversation** [1] -
751:5
**copy** [1] - 740:1
**corner** [7] - 719:6,
720:15, 721:3,
732:17, 735:12,
745:11, 745:14
**Corps** [1] - 737:3
**correct** [62] - 719:8,
719:9, 719:12,
719:13, 719:19,
720:14, 720:21,
720:24, 721:2,
722:5, 722:13,
723:17, 724:1,
724:2, 724:11,
724:22, 725:5,
725:9, 726:14,
727:2, 729:5,
729:12, 729:13,
731:19, 732:6,

732:12, 733:3,
733:21, 734:7,
735:19, 735:20,
736:19, 738:3,
738:21, 740:2,
741:14, 741:15,
742:15, 742:25,
745:19, 745:21,
748:18, 749:1,
749:6, 749:25,
751:24, 754:9,
754:10, 755:9,
756:19, 757:2,
757:15, 757:16,
757:18, 759:11,
760:7, 760:8,
760:13, 760:14,
760:16, 761:23,
763:4
**corrected** [4] - 742:18,
744:4, 744:16,
749:10
**correctly** [2] - 758:19,
758:20
**corrugated** [1] - 747:5
**counsel** [1] - 737:2
**county** [1] - 751:15
**couple** [1] - 749:21
**course** [1] - 733:4
**COURT** [59] - 720:1,
720:4, 721:8,
721:10, 724:24,
725:1, 725:14,
725:16, 725:21,
726:3, 726:8,
726:12, 726:15,
726:24, 727:1,
727:4, 727:9,
727:18, 728:6,
728:14, 728:18,
729:16, 729:22,
730:10, 730:18,
739:17, 740:10,
740:12, 740:15,
743:20, 744:3,
745:24, 747:9,
749:4, 749:13,
751:11, 752:10,
754:22, 756:10,
756:14, 757:25,
758:13, 758:23,
759:9, 759:12,
759:17, 759:21,
760:4, 760:20,
760:24, 761:1,
761:7, 761:10,
761:14, 761:17,
761:19, 762:2,
762:10, 763:1
**cover** [1] - 759:14

**credentials** [1] - 760:3
**criteria** [1] - 753:20
**cross** [2] - 720:1,
754:22
**cross-examination** [2]
- 720:1, 754:22
**crudely** [1] - 736:5
**culvert** [10] - 742:22,
743:2, 744:7,
745:23, 746:8,
746:19, 746:25,
747:5, 748:2, 749:9
**cup** [1] - 731:21
**curriculum** [1] -
761:11
**cyclohex** [1] - 741:9
**cyclohexanone** [4] -
727:17, 742:4,
742:6, 749:8

# D

**damaged** [1] - 744:1
**danger** [1] - 758:2
**dark** [3] - 745:14,
746:10, 746:15
**dashed** [1] - 747:25
**data** [3] - 719:1,
719:12, 719:21
**DATE** [1] - 763:9
**date** [1] - 745:5
**Dave** [1] - 754:19
**David** [2] - 736:25,
740:21
**days** [4] - 718:4,
718:16, 724:4,
727:16
**deal** [1] - 733:16
**dealt** [1] - 760:18
**debris** [1] - 725:10
**declarations** [1] -
736:25
**default** [1] - 744:4
**Defense** [2] - 726:10,
726:20
**degreaser** [24] -
718:3, 718:12,
718:15, 719:2,
721:6, 721:9,
721:10, 721:11,
721:18, 721:21,
722:1, 722:5,
722:19, 722:20,
723:10, 723:14,
723:15, 723:17,
723:22, 724:21,
725:11, 725:12
**degreasers** [7] -
722:12, 723:1,

723:2, 723:4, 723:8,
723:15, 725:9
**DELANEY** [1] - 735:12
**Delaney** [6] - 733:6,
735:11, 743:7,
743:21, 743:24,
746:23
**demonstrative** [2] -
744:23, 745:1
**Department** [3] -
726:10, 726:20,
737:3
**derived** [1] - 758:8
**describe** [1] - 757:10
**described** [3] -
724:10, 742:25,
757:2
**describes** [1] - 735:5
**describing** [5] -
719:12, 739:7,
739:23, 740:7,
746:22
**description** [2] -
737:15, 743:6
**descriptions** [1] -
748:20
**design** [3] - 732:20,
736:9, 736:13
**designed** [8] - 721:6,
721:8, 721:14,
733:12, 733:13,
733:16, 733:20,
759:2
**destroy** [1] - 730:22
**destroyed** [1] - 750:20
**detected** [1] - 718:23
**detections** [1] - 721:1
**detrimental** [1] -
731:25
**developed** [2] -
756:25, 757:13
**development** [3] -
756:22, 757:2,
757:22
**diameter** [5] - 744:7,
744:17, 746:18,
747:7, 749:12
**Dickey** [8] - 722:11,
729:11, 729:13,
731:11, 731:15,
731:20, 760:16,
761:23
**different** [4] - 723:21,
739:9, 743:23,
758:11
**difficult** [1] - 727:12
**dig** [2] - 759:13,
759:19
**digging** [1] - 735:25
**directly** [8] - 726:13,

738:21, 742:13,
742:23, 746:17,
747:7, 752:25, 753:1
**disappear** [1] - 746:6
**discharge** [18] - 722:4,
722:9, 729:11,
729:14, 729:24,
730:22, 730:23,
731:14, 738:23,
739:3, 739:4,
748:23, 748:24,
748:25, 749:3,
755:5, 755:6, 761:22
**discharged** [8] -
719:10, 729:22,
733:3, 744:14,
746:14, 747:20,
747:22, 752:24
**discharges** [4] -
722:5, 729:19,
742:12, 756:4
**discharging** [1] -
722:8
**discount** [1] - 727:12
**discouraged** [1] -
756:7
**discredit** [1] - 758:18
**discuss** [1] - 724:7
**discussed** [1] -
753:23
**discusses** [1] - 753:17
**discussing** [2] -
752:14, 759:6
**Discussion** [1] -
724:25
**disk** [1] - 752:11
**disposal** [5] - 730:14,
733:10, 756:6, 757:3
**disposed** [2] - 728:2,
733:19, 753:1
**dissolve** [1] - 738:9
**dissolved** [2] - 738:1,
739:13
**dissolves** [1] - 738:2
**distance** [2] - 746:20,
747:11
**distinguishing** [2] -
728:14, 728:16
**distribution** [1] -
729:2
**district** [1] - 737:3
**Division** [3] - 753:22,
754:14, 754:18
**division** [1] - 737:2
**Doctor** [1] - 762:2
**document** [13] -
723:13, 734:9,
737:4, 741:1, 741:3,
741:21, 742:3,
742:12, 749:7,

754:21, 754:25, 755:14, 757:25

**documentary** [1] - 751:14

**documents** [21] - 721:22, 721:24, 722:23, 733:23, 734:6, 734:11, 734:12, 741:23, 742:19, 743:5, 748:14, 748:20, 749:11, 753:15, 755:2, 757:6, 757:10, 757:14, 757:18, 757:20, 757:23

**done** [4] - 734:21, 749:19, 753:21, 758:19

**down** [1] - 719:16

**downward** [1] - 753:6

**Dr** [36] - 719:24, 720:9, 721:5, 722:12, 723:19, 725:3, 728:20, 728:23, 731:15, 732:4, 733:6, 735:13, 738:20, 739:2, 739:22, 741:1, 741:13, 743:7, 743:21, 743:24, 744:22, 744:24, 745:10, 746:23, 747:19, 748:9, 748:22, 749:21, 750:13, 752:13, 753:20, 754:1, 756:18, 760:5, 761:21

**drag** [1] - 759:13

**drain** [8] - 721:12, 722:22, 722:23, 734:3, 738:14, 738:15, 744:14, 744:17

**drainage** [2] - 733:1, 733:4

**drained** [2] - 741:9, 742:5

**drains** [1] - 748:7

**draw** [1] - 719:22

**drawing** [3] - 721:12, 735:24, 736:1

**drawings** [6] - 723:3, 723:7, 742:24, 743:5, 748:14, 748:17

**dry** [11] - 723:20, 723:21, 724:1, 724:3, 724:4, 724:7,

724:9, 724:12, 724:14, 725:3, 738:13

**dug** [2] - 735:22, 736:10

**dug-out** [1] - 736:10

**dump** [1] - 753:1

**dumped** [6] - 727:5, 727:6, 727:10, 727:11, 727:13, 727:18

**duration** [1] - 731:23

**during** [3] - 718:10, 728:10, 738:12

**During** [1] - 751:12

**dust** [2] - 732:5, 732:7

**E**

**earliest** [1] - 727:16

**early** [3] - 724:4, 751:13, 762:7

**easiest** [1] - 725:19

**easily** [1] - 738:2

**east** [5] - 719:8, 719:10, 721:1, 723:11

**eastern** [1] - 721:2

**effect** [1] - 731:25

**effluent** [1] - 739:9

**either** [8] - 722:24, 725:24, 726:21, 727:19, 729:11, 749:25, 752:24, 759:16

**eliminated** [1] - 750:17

**emerging** [1] - 738:16

**employee** [2] - 727:9, 735:5

**employees** [4] - 733:24, 734:12, 735:3, 758:17

**employees'** [1] - 727:4

**end** [3] - 747:16, 748:1

**ending** [1] - 747:3

**engagement** [1] - 760:24

**engineer** [1] - 737:3

**engineering** [9] - 721:12, 723:3, 723:7, 735:24, 736:1, 742:24, 743:4, 748:17, 758:8

**Engineers** [1] - 737:3

**enter** [2] - 736:14, 750:22

**entered** [1] - 733:5

**entire** [1] - 719:14

**entirely** [1] - 750:17

**entitled** [1] - 763:5

**entrance** [1] - 735:18

**environment** [1] - 750:22

**environmental** [1] - 751:15

**equipment** [15] - 724:7, 724:14, 725:3, 725:5, 725:6, 726:21, 726:23, 732:5, 732:7, 732:8, 732:14, 732:16, 733:7, 733:24, 734:13

**escape** [1] - 732:23

**escaped** [2] - 718:8, 755:2

**estimate** [2] - 718:5, 718:7

**ethanol** [1] - 753:25

**evap** [1] - 741:10

**evaporated** [2] - 727:25, 728:12

**evaporation** [25] - 726:12, 733:14, 737:13, 738:13, 738:15, 740:19, 741:25, 742:1, 742:5, 742:13, 742:23, 743:10, 743:12, 744:15, 744:19, 745:10, 745:15, 746:18, 746:21, 746:24, 747:3, 747:7, 747:13, 747:25, 749:10

**evidence** [14] - 721:5, 721:13, 721:17, 721:20, 722:3, 722:18, 723:1, 724:21, 729:10, 739:2, 748:22, 748:25, 751:14, 752:9

**evident** [1] - 755:21

**exact** [2] - 745:5, 747:6

**exactly** [7] - 718:5, 734:18, 744:24, 745:3, 750:17, 751:2, 754:15

**examination** [2] - 720:1, 754:22

**examine** [1] - 719:20

**example** [1] - 753:17

**excuse** [7] - 718:14, 718:19, 721:2, 724:24, 734:1,

744:25, 755:24

**exhibit** [2] - 721:4, 744:12

**Exhibit** [22] - 719:22, 719:23, 720:3, 720:9, 735:9, 736:23, 737:1, 740:8, 740:12, 740:20, 740:23, 741:4, 752:6, 752:17, 752:19, 754:7, 754:16, 754:17, 755:11, 755:22, 758:1

**existed** [1] - 747:16

**existing** [1] - 742:22

**expectation** [2] - 730:7, 750:18

**expected** [1] - 730:5

**experience** [1] - 760:12

**expert** [5] - 720:10, 720:13, 735:11, 748:9, 756:18

**explosion** [3] - 728:3, 759:7, 759:24

**explosive** [2] - 759:15, 759:25

**extend** [1] - 747:13

**extending** [1] - 744:17

**extends** [2] - 746:8, 746:12

**extent** [3] - 719:20, 724:12, 758:18

**F**

**fabric** [1] - 724:18

**facility** [3] - 719:6, 722:21, 730:15

**fact** [5] - 722:18, 722:22, 739:14, 749:4, 749:11

**Facts** [1] - 737:10

**fair** [4] - 727:5, 729:1, 756:21, 756:25

**fall** [2] - 744:12, 761:6

**far** [2] - 740:6, 752:8

**faucet** [1] - 734:8

**February** [1] - 754:8

**Feenstra** [28] - 720:9, 721:5, 722:12, 723:19, 725:3, 728:20, 728:23, 731:15, 732:4, 733:6, 735:13, 738:20, 739:2, 739:22, 741:1, 741:13, 744:22,

744:24, 745:10, 747:19, 748:9, 748:22, 749:21, 750:13, 752:13, 756:18, 760:5, 761:21

**feet** [5] - 734:22, 735:1, 746:24

**few** [4] - 742:19, 742:20, 746:23, 760:2

**figure** [3] - 720:9, 720:12, 762:4

**filed** [2] - 722:3, 748:25

**filters** [1] - 725:7

**final** [1] - 732:14

**finger** [1] - 745:24

**finish** [4] - 751:11, 760:3, 761:17

**finished** [1] - 721:4

**fire** [5] - 728:3, 759:7, 759:10, 759:14, 759:23

**first** [7] - 726:12, 754:7, 754:11, 755:22, 756:11, 757:8, 760:24

**five** [1] - 754:23

**flammability** [2] - 759:21, 759:23

**flow** [1] - 736:12

**flowed** [1] - 736:14

**focus** [2] - 718:20, 741:8

**follow** [2] - 757:12, 758:22

**followed** [2] - 758:16, 759:1

**following** [2] - 739:22, 749:19

**foregoing** [1] - 763:4

**foreign** [1] - 725:13

**forensic** [1] - 750:23

**form** [2] - 725:22, 726:2

**FOTOUHI** [1] - 739:19

**four** [2] - 739:8, 739:23

**frame** [1] - 727:2

**Freon** [1] - 723:15

**frequency** [1] - 731:23

**freshest** [1] - 739:15

**front** [3] - 732:17, 736:3, 736:11

**future** [1] - 759:19

**G**

**gallons** [6] - 718:6, 718:11, 729:24, 730:14, 737:11, 737:16
**gas** [4] - 719:18, 719:21, 720:20, 720:23
**GCR/LPC** [1] - 751:15
**GCR/LPC's** [1] - 751:18
**general** [5] - 726:22, 738:4, 758:7, 758:11
**generally** [3] - 719:7, 724:17, 738:15
**George** [1] - 718:15
**given** [8] - 726:19, 726:21, 727:23, 728:10, 730:6, 731:22, 748:20, 750:11
**glasses** [1] - 740:5
**government** [1] - 762:6
**governments** [1] - 758:10
**grate** [4] - 735:18, 735:22, 736:12
**grating** [2] - 736:1, 736:2
**gray** [1] - 746:10
**green** [1] - 720:22
**grinding** [2] - 732:4, 732:8
**ground** [25] - 722:8, 722:16, 726:25, 727:19, 727:23, 728:1, 728:2, 728:8, 728:12, 728:13, 730:23, 730:25, 733:3, 733:5, 734:20, 736:3, 738:17, 738:21, 742:13, 744:10, 746:15, 748:24, 750:14, 753:2, 755:8
**groundwater** [20] - 718:23, 719:1, 719:5, 719:7, 719:11, 719:14, 729:3, 731:1, 739:15, 751:16, 752:2, 752:20, 752:21, 752:22, 753:6, 753:15, 755:16, 756:5, 756:23, 759:5
**guess** [3] - 743:19,

752:11, 761:5
**guidance** [6] - 726:9, 726:10, 726:19, 726:20, 750:7, 759:25

**H**

**half** [1] - 749:18
**hand** [3] - 720:15, 735:12, 745:11
**handling** [2] - 726:21, 726:22
**hard** [1] - 740:1
**Harvey** [1] - 754:11
**hazard** [4] - 728:3, 759:7, 759:23, 759:24
**held** [1] - 760:9
**Herb** [1] - 740:24
**high** [2] - 732:25, 739:14
**highly** [2] - 752:25, 754:5
**Hill** [1] - 739:16
**hindsight** [1] - 750:16
**historic** [1] - 756:22
**historical** [2] - 757:22, 758:6
**history** [1] - 757:24
**hits** [1] - 720:25
**Holdridge** [1] - 740:24
**hole** [7] - 732:23, 735:21, 735:25, 736:4, 736:5, 759:13, 759:14
**Honor** [15] - 719:23, 726:18, 728:9, 729:17, 736:25, 740:11, 749:6, 751:9, 752:7, 754:19, 758:4, 759:4, 760:2, 761:18, 762:8
**hopefully** [1] - 720:6
**hydrogeologist** [1] - 760:5

**I**

**identical** [1] - 735:2
**identified** [1] - 731:4
**immediately** [1] - 723:11
**improper** [1] - 727:20
**inches** [2] - 746:18, 747:3
**include** [1] - 756:14

**included** [4] - 737:14, 738:6, 756:12, 756:15
**includes** [1] - 756:10
**including** [1] - 755:7
**indicate** [8] - 720:19, 720:22, 721:22, 723:2, 734:11, 749:11, 751:14, 752:1
**indicated** [2] - 722:22, 749:7
**indicates** [4] - 718:2, 720:16, 737:19, 738:20, 742:12
**indicating** [1] - 721:24
**indiscriminately** [1] - 752:24
**industrial** [5] - 731:10, 731:17, 752:23, 753:4, 756:4
**industry** [1] - 759:8
**information** [7] - 748:13, 753:14, 755:1, 755:20, 757:1, 757:4, 758:9
**inherent** [1] - 758:15
**inner** [1] - 743:18
**inside** [11] - 733:12, 733:21, 733:24, 734:2, 734:3, 734:4, 734:13, 734:14, 742:2, 743:13, 746:19
**installation** [1] - 749:12
**installed** [3] - 721:18, 722:21, 723:5
**instances** [1] - 753:5
**instructed** [1] - 734:1
**integration** [1] - 748:13
**intend** [1] - 753:10
**intended** [4] - 732:24, 736:8, 749:2, 753:13
**intent** [3] - 730:21, 730:24, 731:20
**intentional** [1] - 730:14
**interest** [1] - 739:8
**interpret** [1] - 752:1
**interpretation** [1] - 748:10
**involved** [2] - 732:15, 760:20
**involvement** [2] - 761:5, 761:7
**iron** [1] - 736:1
**issue** [3] - 727:15, 759:5, 759:6

**issued** [1] - 730:3
**issues** [1] - 760:19
**it'll** [1] - 745:25
**items** [1] - 739:23
**itself** [4] - 721:12, 744:20, 747:16, 759:8

**J**

**June** [1] - 737:1

**K**

**Kaneshiro** [1] - 763:3
**KANESHIRO** [1] - 763:9
**Kaneshiro-Miller** [1] - 763:3
**KANESHIRO-MILLER** [1] - 763:9
**kind** [2] - 745:14, 758:24
**knowingly** [1] - 760:17
**knowledge** [10] - 731:25, 756:22, 757:2, 757:22, 758:2, 758:6, 758:7, 758:11, 758:25
**known** [1] - 758:23

**L**

**laboratory** [2] - 736:18, 737:12
**LaBorde** [4] - 729:15, 729:21, 730:15, 730:23
**large** [3] - 741:10, 744:6, 746:23
**largely** [2] - 724:5, 744:1
**larger** [1] - 744:18
**largest** [2] - 722:20, 727:24
**last** [4] - 737:10, 753:3, 756:11, 761:18
**Lawrence** [4] - 751:23, 752:3, 752:14, 753:18
**lazy** [1] - 759:12
**leach** [1] - 738:6
**least** [2] - 729:18, 744:13
**leave** [2] - 728:1, 751:9

**left** [2] - 745:14, 746:11
**left-to-right** [1] - 746:11
**lesser** [1] - 719:20
**letter** [2] - 739:1, 739:5
**level** [1] - 750:5
**Lewis** [2] - 718:15, 723:16
**licenses** [1] - 760:9
**lid** [1] - 734:13
**light** [1] - 745:25
**likelihood** [1] - 733:4
**likely** [2] - 738:6, 747:14
**line** [2] - 747:25, 748:1
**lines** [1] - 754:8
**lining** [1] - 727:1
**lint** [4] - 725:4, 725:7, 725:8, 725:10
**liquid** [4] - 725:22, 730:24, 748:6, 753:5
**list** [1] - 739:8
**listed** [6] - 731:12, 739:12, 739:13, 739:24, 754:1, 754:11
**literature** [7] - 753:16, 753:19, 755:20, 757:4, 757:15, 758:8, 758:9
**litigation** [8] - 752:2, 757:9, 757:17, 758:5, 758:6, 760:23, 761:4, 761:5
**LMC** [1] - 740:25
**located** [1] - 733:14
**location** [2] - 719:4, 730:15
**locations** [3] - 723:3, 723:7, 723:9
**Lockheed** [15] - 722:3, 722:7, 729:10, 737:7, 739:2, 748:25, 749:17, 749:24, 750:10, 750:14, 751:5, 756:18, 760:21, 760:22, 761:2
**Lockheed's** [2] - 735:11, 757:10
**Lockheed-related** [1] - 761:2
**look** [16] - 720:6, 735:9, 736:8, 736:23, 737:9, 740:20, 744:22, 745:10, 751:12, 752:5, 752:13,

752:19, 753:14,
753:19, 754:7,
755:10
**looking** [8] - 720:15,
740:1, 740:3, 740:5,
744:12, 745:20,
749:7, 755:14
**lower** [1] - 748:1
**LPC** [2] - 727:22,
729:18
**LPC's** [2] - 729:18,
737:12

# M

**ma'am** [2] - 760:25,
761:9
**main** [1] - 725:20
**maintaining** [1] -
722:1
**maintenance** [1] -
721:21
**majority** [1] - 720:25
**manner** [1] - 756:6
**manually** [1] - 741:9
**manufacturers** [3] -
726:22, 726:23,
758:10
**map** [1] - 743:19
**March** [1] - 720:12
**mark** [3] - 746:2,
748:4, 748:6
**material** [9] - 725:10,
730:8, 730:22,
731:7, 731:21,
731:24, 735:6,
750:19, 754:5
**materials** [6] - 732:19,
750:7, 751:1, 754:6,
759:16, 760:1
**matter** [3] - 725:13,
739:8, 763:5
**matters** [1] - 761:2
**McKee** [2] - 753:20,
754:1
**mean** [7] - 730:2,
731:12, 731:19,
736:13, 750:5,
750:18, 756:14
**memo** [4] - 737:2,
740:24, 754:18,
762:6
**memory** [1] - 727:14
**mention** [2] - 730:4,
753:9
**mentioned** [3] -
731:10, 752:3,
753:12
**Micro** [1] - 734:16

**Micro-Pulsaire** [1] -
734:16
**middle** [2] - 737:9,
741:5
**might** [4] - 731:25,
746:6, 750:25,
759:19
**migrate** [1] - 719:11
**military** [5] - 726:9,
726:19, 750:7,
758:10, 759:25
**Miller** [1] - 763:3
**MILLER** [1] - 763:9
**million** [1] - 739:14
**mind** [2] - 733:17,
758:1
**minimum** [1] - 731:17
**minute** [1] - 724:24
**minutes** [1] - 754:23
**mishaps** [1] - 759:3
**mixed** [1] - 724:17
**Mixer** [2] - 741:6,
741:9
**mixer** [4] - 741:13,
741:17, 742:7,
744:11
**mixing** [2] - 742:4,
749:8
**months** [1] - 742:20
**morning** [2] - 762:3,
762:10
**most** [6] - 730:24,
733:10, 733:17,
736:22, 738:6, 753:5
**mostly** [1] - 759:6
**moves** [1] - 719:7
**MR** [5] - 739:18,
739:19, 739:20,
761:16, 762:8
**MS** [24] - 720:2, 720:5,
720:8, 721:9,
721:11, 721:16,
725:2, 728:19,
731:8, 739:21,
740:11, 740:14,
740:17, 744:21,
746:1, 747:18,
749:16, 752:12,
754:24, 756:17,
760:2, 761:18,
761:20, 761:25
**multiple** [1] - 722:12
**MURPHY** [3] - 739:18,
739:20, 761:16
**must** [2] - 727:10,
730:19

# N

**natural** [1] - 733:4
**need** [1] - 750:11
**Nelson** [1] - 718:15
**never** [3] - 760:9,
760:15, 761:21
**next** [3] - 738:2,
738:11, 762:7
**nice** [1] - 762:5
**none** [2] - 724:3,
735:8
**normal** [1] - 718:10
**north** [13] - 719:17,
732:20, 733:8,
733:19, 733:20,
734:10, 734:13,
734:25, 735:4,
735:7, 738:16,
738:17
**northeastern** [1] -
721:3
**northern** [2] - 733:11,
734:5
**notch** [1] - 747:14
**Note** [1] - 741:10
**noted** [1] - 718:17
**nothing** [1] - 753:16
**noticed** [4] - 718:9,
730:16, 731:2,
744:13
**notification** [1] -
729:13
**notified** [1] - 729:24
**notion** [4] - 727:10,
758:23, 759:1, 759:9
**November** [4] -
740:23, 742:14,
744:13, 749:7
**number** [3] - 735:12,
740:25, 744:25
**numerical** [1] - 720:3
**numerous** [1] - 757:5

# O

**obligation** [2] -
731:11, 731:18
**occasion** [1] - 724:16
**occur** [3] - 734:7,
752:22, 758:24
**October** [1] - 754:17
**OF** [1] - 763:1
**offered** [1] - 756:21
**offering** [1] - 748:9
**OFFICIAL** [1] - 763:1
**once** [1] - 738:12
**one** [17] - 718:5,

718:11, 722:18,
723:15, 724:24,
729:9, 731:13,
734:18, 740:19,
743:6, 743:23,
747:9, 753:16,
759:5, 761:15,
761:16, 761:18
**open** [3] - 738:16,
738:17, 752:25
**opening** [2] - 735:18,
736:2
**operated** [1] - 718:3
**operation** [3] - 723:24,
723:25, 727:16
**operations** [10] -
718:10, 735:6,
744:11, 744:20,
751:13, 751:18,
757:3, 757:6,
757:11, 757:18
**opined** [1] - 745:17
**opinion** [3] - 719:2,
722:22, 728:24,
729:18, 731:9,
733:9, 734:16,
748:9, 755:14,
756:21, 757:10,
757:13
**opinions** [6] - 728:21,
751:5, 756:25,
757:20, 757:24,
760:11
**order** [1] - 720:3
**organic** [3] - 752:23,
753:25, 754:3
**organization** [1] -
753:21
**organizations** [1] -
758:10
**originally** [2] - 742:22,
760:22
**outlined** [2] - 727:22,
759:24
**outside** [2] - 732:16,
734:7
**oversight** [1] - 744:6

# P

**p.m** [1] - 762:12
**page** [25] - 718:1,
718:18, 728:22,
737:9, 739:1, 739:6,
739:18, 739:19,
740:8, 740:13,
741:3, 741:5,
744:23, 744:25,
745:1, 747:4,

747:21, 751:8,
752:19, 754:7,
755:10, 755:22,
755:25, 756:11
**pans** [7] - 749:24,
750:1, 750:3, 750:5,
750:10, 750:13,
750:25
**paper** [2] - 738:19,
739:17
**paragraph** [15] -
718:20, 728:23,
737:9, 737:11,
738:11, 739:7,
741:8, 751:12,
752:20, 753:3,
755:23, 755:24,
755:25, 756:11
**pardon** [2] - 725:15,
743:16
**parking** [2] - 735:7,
744:8
**part** [10] - 719:4,
719:23, 725:25,
727:24, 736:2,
736:3, 736:9,
736:13, 752:11,
757:8
**particular** [3] - 742:14,
753:18, 759:7
**parts** [8] - 725:6,
735:4, 739:14,
741:6, 741:9, 742:4,
742:7, 749:8
**Patricia** [1] - 763:3
**PATRICIA** [1] - 763:9
**paved** [2] - 732:16,
732:22
**pavement** [1] - 732:20
**PCE** [4] - 724:1, 724:5,
724:17, 724:19
**pending** [1] - 740:16
**per** [6] - 718:4, 718:8,
718:11, 729:24,
737:11, 739:14
**perchlorate** [7] -
729:2, 741:20,
751:17, 752:4,
753:24, 756:10,
756:13
**percolate** [3] - 730:25,
744:10, 753:6
**percolating** [1] - 755:8
**performed** [1] -
721:21
**permit** [1] - 730:11
**personal** [1] - 760:11
**phase** [1] - 753:5
**photo** [2] - 735:13,
736:17

photograph [4] - 735:10, 743:24, 747:15, 748:15
photographic [1] - 748:10
photographs [5] - 735:15, 743:7, 745:5, 745:7
photos [2] - 735:14, 747:12
picture [4] - 744:23, 745:4, 745:12, 745:20
pictures [1] - 746:22
pieces [1] - 738:5
pink [1] - 720:19
pipe [44] - 742:1, 742:17, 742:24, 743:1, 743:3, 743:4, 743:6, 743:8, 743:9, 743:13, 743:15, 743:17, 743:18, 743:21, 744:1, 744:2, 744:18, 745:22, 746:11, 746:12, 746:14, 746:17, 746:18, 746:23, 747:1, 747:2, 747:4, 747:5, 747:6, 747:7, 747:11, 747:13, 747:14, 747:16, 747:20, 748:17, 748:19, 748:21, 748:23, 749:5, 749:12, 749:18
piped [1] - 741:11
pipeline [1] - 742:21
pit [42] - 721:6, 721:9, 721:11, 721:12, 721:14, 722:21, 722:22, 723:5, 725:20, 726:12, 726:13, 728:25, 729:8, 729:12, 733:14, 737:13, 738:13, 738:15, 740:19, 741:10, 741:11, 742:1, 742:5, 742:13, 742:23, 743:10, 743:12, 743:22, 743:25, 744:15, 744:19, 744:20, 745:10, 745:15, 746:18, 746:21, 746:24, 747:3, 747:8, 747:13, 747:25, 749:10
pits [7] - 726:4, 726:7,

730:20, 730:21, 749:22, 749:25, 750:18
place [4] - 719:4, 725:19, 733:18, 749:15
placed [2] - 728:12, 728:13
places [2] - 725:17, 729:16
plane [1] - 762:3
planned [1] - 756:6
plastic [2] - 744:1, 747:13
plume [2] - 738:24, 751:7
point [6] - 719:11, 737:24, 738:17, 742:16, 745:24, 749:3
Pollution [2] - 752:20, 752:21
pollution [2] - 740:24, 752:22
ponds [1] - 755:7
pool [1] - 748:6
pooled [1] - 748:7
Porter [3] - 760:16, 760:17, 761:23
Porter-Cologne [3] - 760:16, 760:17, 761:23
portion [1] - 718:21
posed [1] - 758:2
possible [5] - 718:13, 729:6, 737:24, 750:12, 751:3
potassium [2] - 731:6, 731:9
potential [6] - 725:4, 725:8, 728:3, 728:24, 753:23, 759:18
potentially [2] - 730:25, 750:21
Potrero [3] - 725:19, 725:20, 729:12
poured [2] - 733:8, 736:9
pouring [1] - 734:10
powder [1] - 726:2
practical [3] - 722:10, 731:19, 731:22
practice [1] - 757:3
practicing [1] - 760:12
precisely [2] - 742:18, 749:14
prepared [1] - 761:21
presence [2] - 720:19, 720:22

present [5] - 731:6, 742:22, 744:2, 756:4, 759:14
presented [1] - 751:21
presently [1] - 738:19
press [1] - 746:2
presumably [2] - 737:22, 741:16
presume [1] - 731:13
previously [1] - 752:7
primarily [2] - 724:19
PRO [1] - 740:25
probable [2] - 733:10, 733:17
problem [1] - 758:24
problematic [2] - 730:8, 730:10
Problems [1] - 751:23
procedures [6] - 727:22, 758:16, 758:17, 759:1, 759:2, 759:10
proceedings [2] - 762:12, 763:5
process [10] - 722:23, 723:21, 723:22, 732:10, 733:23, 734:6, 734:9, 734:12, 748:14, 750:24
produced [2] - 726:16, 735:11
propellant [14] - 726:1, 726:5, 726:6, 726:10, 729:25, 731:4, 736:18, 736:21, 737:22, 738:5, 741:13, 741:17, 742:8
propellant-contaminated [2] - 726:6, 726:10
proper [7] - 726:8, 726:16, 758:16, 758:17, 759:1, 759:9
properly [1] - 744:4
properties [1] - 728:4
proposed [1] - 756:4
provided [1] - 752:7
published [8] - 753:14, 753:15, 753:19, 755:1, 755:20, 757:4, 758:8, 758:9
pull [1] - 754:16
Pulsaire [1] - 734:16
pump [2] - 733:13
pumped [3] - 733:1, 738:13, 738:21
purposes [1] - 734:2

pursuant [1] - 732:10
put [6] - 726:13, 727:23, 736:16, 740:18, 749:4, 755:6
putting [4] - 725:21, 725:22, 728:7, 744:17

Q

Quality [1] - 751:23
quality [2] - 753:20, 756:5
quantify [2] - 729:4, 729:7
quantities [1] - 750:21
quantity [3] - 718:8, 724:19, 730:18
questions [6] - 723:19, 728:20, 732:2, 749:22, 760:3, 762:1
quick [1] - 752:5
quickly [1] - 749:23
quote [1] - 759:9

R

rainfall [1] - 746:13
rather [1] - 736:5
Re [1] - 740:24
read [3] - 720:7, 728:23, 731:15
reading [1] - 741:23
reads [3] - 718:21, 737:11, 753:3
really [3] - 718:7, 750:24, 753:16
reason [2] - 731:1, 758:20
reborn [1] - 761:4
rebuttal [1] - 752:8
receive [1] - 733:20
recognize [1] - 720:10
recognized [1] - 751:16
recollections [1] - 727:13
recommended [2] - 749:10, 750:6
record [7] - 724:25, 735:10, 737:1, 740:7, 740:23, 754:17, 763:4
recrystallizes [1] - 728:4
Redlands [22] - 718:22, 718:23,

719:5, 719:7, 722:13, 725:17, 727:16, 729:1, 729:8, 729:12, 735:10, 738:24, 751:7, 751:13, 756:19, 757:1, 757:6, 757:11, 758:5, 761:3, 761:8, 761:9
reduced [2] - 750:13, 750:16
refer [1] - 753:10
reference [2] - 750:1, 751:22
referenced [2] - 721:11, 736:24
referred [1] - 729:14
regard [9] - 722:10, 731:14, 755:17, 755:18, 757:22, 758:11, 759:7, 760:19
regarding [1] - 728:21
registered [1] - 760:5
regulate [1] - 731:20
regulators [3] - 729:18, 751:6, 760:19
regulatory [2] - 751:15, 758:9
rejecting [1] - 727:9
related [4] - 729:13, 753:15, 757:3, 761:2
release [3] - 718:6, 722:19, 732:1
released [5] - 718:7, 718:12, 722:15, 729:5, 729:8
releases [3] - 722:23, 723:2, 739:3
rely [2] - 719:18, 723:20
relying [1] - 719:1
remain [1] - 753:5
remaining [3] - 729:25, 730:6, 737:11
remedied [1] - 742:17
remnants [2] - 743:8, 744:2
remove [1] - 725:7
repeat [1] - 727:7
replaced [1] - 724:5
report [10] - 720:10, 720:13, 722:4, 722:9, 729:11, 731:11, 739:3, 748:25, 755:6, 761:22

**REPORTER** [1] - 763:1

**reporting** [1] - 731:18

**represent** [1] - 743:8

**required** [1] - 733:23

**requiring** [1] - 734:12

**research** [3] - 736:18, 737:12, 751:21

**residual** [1] - 730:8

**residue** [2] - 728:1, 730:6

**residues** [3] - 729:25, 731:3, 731:6

**resolution** [1] - 730:3

**Resources** [1] - 754:18

**resources** [1] - 752:22

**respond** [1] - 762:6

**responsibility** [1] - 721:25

**responsible** [1] - 721:25

**result** [2] - 728:2, 751:17

**results** [1] - 720:16

**returned** [1] - 737:13

**review** [1] - 726:18

**revisit** [1] - 749:22

**right-hand** [3] - 720:15, 735:12, 745:11

**risk** [1] - 759:14

**road** [3] - 746:20, 747:23, 748:2

**roadway** [6] - 744:9, 746:9, 746:10, 746:11, 746:14

**roadways** [1] - 759:20

**Robert** [1] - 740:22

**Rogers** [2] - 718:15, 723:18

**Rogers'** [1] - 723:16

**rose** [1] - 732:25

**rough** [1] - 718:5

**routine** [1] - 733:25

**runoff** [3] - 744:10, 746:13, 748:3

**runs** [1] - 738:17

---

**S**

**salt** [1] - 731:5

**salts** [1] - 731:9

**sample** [1] - 720:16

**samples** [2] - 719:14, 719:18

**San** [1] - 738:18

**sat** [1] - 747:15

**scale** [1] - 750:11

**scaling** [1] - 743:19

**scientific** [1] - 758:8

**scientist** [1] - 760:6

**scraped** [1] - 732:13

**screen** [7] - 720:6, 740:3, 740:4, 740:5, 746:2, 746:6, 748:4

**se** [1] - 718:8

**search** [1] - 757:15

**second** [13] - 718:21, 739:1, 739:6, 739:18, 740:8, 740:12, 741:3, 747:15, 748:23, 749:18, 755:10, 755:22, 756:11

**second-to-the-last** [1] - 756:11

**section** [1] - 739:23

**see** [22] - 718:24, 719:5, 729:3, 735:21, 736:2, 739:10, 741:6, 741:11, 745:15, 746:3, 746:11, 747:11, 747:14, 747:24, 748:5, 748:15, 751:19, 753:7, 755:11, 755:25, 756:8, 758:14

**seeing** [1] - 757:1

**seek** [2] - 730:11

**sense** [1] - 758:21

**sentence** [4] - 718:21, 737:10, 741:5, 753:3

**separate** [1] - 742:21

**separator** [1] - 718:9

**separators** [1] - 723:25

**Serious** [1] - 752:21

**settle** [1] - 737:25

**settled** [1] - 737:14

**several** [3] - 728:24, 743:5, 743:7

**sewer** [1] - 738:14

**shaped** [3] - 736:4, 736:5, 736:10

**sheer** [1] - 730:19

**short** [1] - 746:24

**show** [2] - 719:18, 746:23

**showing** [1] - 748:17

**shown** [2] - 720:9, 747:3

**shows** [1] - 747:11

**shy** [1] - 747:3

**side** [1] - 746:10

**signature** [1] - 755:11

**significance** [1] -

729:20

**significant** [1] - 750:21

**simply** [1] - 750:9

**site** [22] - 718:22, 718:23, 719:7, 719:15, 722:13, 729:3, 729:15, 729:21, 729:23, 730:23, 735:11, 751:13, 751:18, 753:1, 755:3, 757:1, 757:6, 757:7, 757:11, 757:14, 757:18, 757:23

**site-specific** [4] - 757:1, 757:6, 757:14, 757:23

**situation** [1] - 742:17

**size** [2] - 722:24, 750:11

**sludge** [1] - 725:22

**small** [3] - 724:19, 730:7, 746:4

**smaller** [4] - 744:17, 746:18, 747:7, 749:12

**soap** [4] - 724:14, 724:17, 724:20, 724:22

**soil** [5] - 719:18, 719:21, 720:20, 720:23, 726:17

**solids** [6] - 737:13, 737:20, 737:22, 737:25, 738:5, 739:13

**soluble** [4] - 753:4, 754:1, 754:5, 754:6

**solution** [1] - 753:5

**solvent** [16] - 718:9, 722:15, 723:25, 725:11, 726:3, 726:6, 727:24, 727:25, 728:11, 728:14, 728:15, 728:17, 744:14, 754:3

**solvent-water** [2] - 718:9, 723:25

**solvents** [16] - 722:5, 722:19, 724:15, 725:22, 726:11, 726:22, 727:16, 727:23, 728:10, 744:19, 752:23, 753:25, 754:1, 754:6, 756:16, 756:22

**Solvents** [1] - 753:3

**sometime** [4] - 727:13, 744:12, 751:9, 761:6

**somewhat** [1] - 723:21

**somewhere** [2] - 723:14, 759:13

**sorry** [7] - 727:7, 741:25, 743:20, 745:1, 750:9, 757:8, 761:12

**sort** [3] - 730:14, 743:11, 745:11

**source** [7] - 719:3, 722:23, 725:4, 725:8, 725:18, 725:20, 738:23

**sources** [3] - 728:21, 728:25, 729:5

**south** [9] - 719:17, 732:18, 732:20, 732:22, 732:23, 733:2, 735:7, 735:18, 736:12

**southern** [1] - 733:1

**southwest** [1] - 732:17

**southwestern** [2] - 718:21, 719:6

**specific** [6] - 730:15, 757:1, 757:6, 757:14, 757:23, 757:25

**specifically** [3] - 725:10, 737:10, 748:11

**specifies** [2] - 734:9, 735:24

**specify** [1] - 734:6

**spent** [1] - 761:2

**spots** [2] - 720:19, 720:22

**square** [1] - 745:11

**standard** [1] - 757:3

**standards** [2] - 727:22, 732:11

**start** [2] - 725:19, 725:25

**starting** [2] - 737:10, 752:20

**starts** [3] - 738:11, 739:8, 741:6

**State** [2] - 753:22, 760:6

**state** [6] - 751:15, 754:14, 758:2, 758:7, 758:11

**States** [5] - 721:6, 721:14, 721:18, 721:20, 721:25

**steel** [1] - 747:5

**Sterrett** [1] - 740:22

**Sterrett's** [2] - 719:24, 736:25

**Stickney** [1] - 740:24

**still** [3] - 745:8, 755:14, 757:12

**stopping** [1] - 746:23

**storm** [10] - 732:21, 738:14, 744:8, 744:10, 745:17, 746:13, 747:19, 747:22, 748:2, 748:5

**Street** [1] - 738:18

**street** [1] - 738:19

**strictly** [1] - 752:8

**structure** [1] - 721:14

**studied** [1] - 724:10

**studies** [3] - 723:20, 724:6, 750:23

**styrene** [1] - 756:15

**submission** [1] - 719:24

**submissions** [1] - 752:8

**submitted** [5] - 722:9, 729:10, 739:3, 755:6, 761:22

**subsequent** [1] - 749:11

**substance** [3] - 730:18, 730:19, 745:21

**subsurface** [1] - 750:22

**SULLIVAN** [1] - 762:8

**summarize** [3] - 755:23, 755:25, 756:3

**summary** [1] - 751:21

**sump** [23] - 732:18, 732:22, 732:23, 733:1, 733:8, 733:12, 733:19, 733:20, 734:5, 734:7, 734:8, 734:10, 734:13, 734:22, 734:25, 735:4, 735:7, 735:8, 735:19, 736:12, 736:15

**sumps** [7] - 732:17, 732:21, 735:2, 735:14, 735:16, 737:15, 752:25

**support** [2] - 719:1, 722:18

**supposed** [3] - 748:18, 759:15, 759:25

**surface** [3] - 736:3, 753:1, 756:5
**swale** [1] - 738:16
**swept** [1] - 732:13
**switch** [1] - 736:16
**system** [2] - 733:13, 733:16

**T**

**tab** [3] - 720:2, 736:24, 752:16
**tables** [1] - 751:22
**talks** [2] - 741:21, 742:3
**tank** [1] - 725:12
**TCA** [7] - 720:22, 724:10, 724:12, 727:6, 727:11, 727:15, 727:19
**TCE** [32] - 718:22, 719:3, 719:5, 719:10, 719:18, 720:19, 720:25, 722:8, 722:20, 723:17, 724:3, 724:4, 724:7, 727:5, 727:10, 727:15, 727:18, 728:7, 751:17, 752:2, 752:3, 753:10, 753:17, 753:23, 754:2, 754:3, 755:7, 755:15, 756:15, 758:3, 758:13, 758:14
**TCE-containing** [1] - 722:8
**Tech** [1] - 753:21
**term** [1] - 733:18
**terms** [11] - 722:10, 723:9, 723:24, 723:25, 726:15, 726:18, 753:13, 753:18, 755:1, 758:6, 759:19
**testified** [4] - 733:6, 748:16, 751:12, 757:13
**testimony** [9] - 718:14, 718:17, 723:16, 727:5, 727:9, 727:19, 735:3, 735:5, 758:15
**THE** [97] - 720:1, 720:4, 721:8, 721:10, 721:15, 724:24, 725:1, 725:14, 725:15,

725:16, 725:19, 725:21, 725:24, 726:3, 726:5, 726:8, 726:9, 726:12, 726:14, 726:15, 726:18, 726:24, 726:25, 727:1, 727:2, 727:4, 727:7, 727:9, 727:12, 727:18, 727:21, 728:6, 728:9, 728:14, 728:16, 728:18, 729:16, 729:17, 729:22, 729:23, 730:10, 730:13, 730:18, 730:21, 739:17, 740:10, 740:12, 740:15, 740:16, 743:20, 743:24, 744:3, 744:5, 745:24, 747:9, 747:10, 749:4, 749:6, 749:13, 749:14, 751:11, 752:10, 754:22, 756:10, 756:12, 756:14, 756:15, 757:25, 758:4, 758:13, 758:22, 758:23, 759:4, 759:9, 759:11, 759:12, 759:15, 759:17, 759:18, 759:21, 759:23, 760:4, 760:20, 760:22, 760:24, 760:25, 761:1, 761:3, 761:7, 761:9, 761:10, 761:13, 761:14, 761:17, 761:19, 762:2, 762:10
**threat** [1] - 756:4
**three** [4] - 734:22, 735:1
**throughout** [1] - 719:14
**title** [1] - 754:15
**Tod** [1] - 735:11
**today** [2] - 757:17, 759:6
**together** [1] - 724:17
**took** [2] - 743:24, 746:23
**top** [4] - 725:12, 736:2, 754:8, 755:25
**topic** [2] - 740:18, 749:22
**topics** [1] - 736:16

**tort** [1] - 756:19, 758:5, 761:3
**total** [1] - 739:13
**touch** [1] - 746:6
**toward** [4] - 741:9, 742:1, 742:5, 747:25
**towards** [2] - 738:18
**traces** [1] - 742:7
**transcript** [1] - 763:4
**traverses** [1] - 738:15
**tried** [2] - 750:23, 753:14
**triggered** [1] - 731:11
**triggers** [1] - 731:18
**troughs** [1] - 725:12
**trying** [2] - 734:19, 758:5
**Tuesday** [2] - 762:3, 762:10
**turn** [5] - 728:22, 739:6, 741:3, 751:8, 752:18
**turning** [2] - 718:18, 740:18
**two** [5] - 718:5, 718:11, 723:14, 747:10, 759:4
**type** [1] - 760:6
**types** [4] - 750:7, 758:2, 758:12, 759:24

**U**

**U-shaped** [3] - 736:4, 736:5, 736:10
**U.K** [1] - 753:17
**U.S** [21] - 719:22, 719:23, 720:2, 720:9, 726:19, 735:9, 736:23, 737:1, 740:7, 740:8, 740:12, 740:20, 740:23, 741:4, 752:5, 752:16, 752:18, 754:16, 754:17, 755:11, 758:1
**ultimate** [1] - 752:11
**ultimately** [1] - 751:7
**unburned** [1] - 750:21
**under** [6] - 719:7, 720:2, 729:11, 731:11, 752:16, 761:22
**undercuts** [1] - 758:25
**underground** [3] - 738:14, 738:15, 746:20

**underlying** [1] - 753:6
**underneath** [6] - 744:9, 746:9, 746:19, 746:20, 748:2
**underway** [2] - 745:8
**United** [5] - 721:6, 721:13, 721:17, 721:20, 721:24
**unlined** [2] - 752:25, 755:7
**unnoticed** [1] - 718:7
**up** [7] - 719:16, 745:25, 747:15, 751:11, 754:16, 761:17
**upper** [2] - 725:12, 745:11, 747:10
**users** [1] - 728:10
**uses** [1] - 724:14
**utilities** [1] - 759:20

**V**

**vapor** [18] - 718:3, 718:12, 718:15, 719:2, 721:18, 721:21, 722:1, 722:12, 722:18, 722:20, 723:1, 723:4, 723:8, 723:10, 723:22, 724:21, 725:9, 725:11
**variety** [2] - 756:13, 756:15
**various** [3] - 725:17, 726:19, 751:21
**vast** [1] - 720:25
**versus** [1] - 728:17
**vertical** [1] - 747:24
**vicinity** [2] - 719:19, 756:5
**view** [3] - 726:15, 747:10, 747:11
**views** [1] - 747:10
**vitae** [1] - 761:11
**volume** [2] - 718:6, 731:23

**W**

**waited** [1] - 749:17
**wash** [4] - 733:24, 734:13, 734:19, 742:7
**washed** [6] - 732:10, 732:16, 732:19, 733:7, 734:17, 735:4

**washer** [2] - 742:4, 749:8
**washing** [5] - 732:2, 734:6, 734:9, 734:14, 735:6
**waste** [19] - 722:4, 722:9, 728:11, 729:11, 729:14, 730:22, 731:18, 731:21, 737:12, 739:3, 739:4, 741:17, 748:25, 749:3, 750:7, 755:6, 756:4, 756:12, 761:22
**wastes** [7] - 730:1, 730:15, 730:20, 731:4, 731:10, 752:23, 753:4
**wastewater** [16] - 729:19, 732:18, 732:25, 733:17, 733:21, 734:4, 737:14, 737:16, 737:19, 738:6, 738:21, 741:16, 741:18, 741:19, 741:22, 742:1
**wastewaters** [2] - 733:11, 733:18
**water** [42] - 718:9, 722:8, 723:25, 724:17, 724:19, 726:3, 726:17, 732:10, 732:15, 732:21, 732:22, 732:25, 733:8, 733:12, 733:14, 734:2, 734:20, 736:11, 736:14, 738:1, 738:3, 738:7, 738:9, 738:13, 738:17, 741:10, 744:8, 744:10, 745:18, 746:12, 746:13, 747:19, 747:22, 748:2, 748:5, 748:7, 753:20, 753:24, 754:1
**Water** [8] - 722:4, 751:23, 753:22, 754:14, 754:18, 760:12, 761:22
**weather** [1] - 738:13
**Wednesday** [1] - 733:6
**week** [3] - 738:12, 749:19, 762:7
**weekend** [1] - 762:5

**weekly** [1] - 738:23
**weeks** [2] - 718:16, 742:19
**Wehde** [2] - 737:2, 737:6
**WEHDE** [1] - 737:2
**weight** [2] - 730:19, 731:23
**wells** [1] - 753:2
**west** [8] - 719:8, 719:11, 721:1, 733:14, 738:18, 740:20, 744:9, 748:8
**western** [2] - 719:16, 729:3
**westward** [1] - 738:16
**whatsoever** [1] - 735:8
**wherein** [1] - 737:13
**White** [1] - 718:15
**wiped** [1] - 732:14
**witness** [3] - 719:24, 736:24, 740:21
**WITNESS** [39] - 721:15, 725:15, 725:19, 725:24, 726:5, 726:9, 726:14, 726:18, 726:25, 727:2, 727:7, 727:12, 727:21, 728:9, 728:16, 729:17, 729:23, 730:13, 730:21, 740:16, 743:24, 744:5, 747:10, 749:6, 749:14, 756:12, 756:15, 758:4, 758:22, 759:4, 759:11, 759:15, 759:18, 759:23, 760:22, 760:25, 761:3, 761:9, 761:13
**word** [1] - 747:20
**worker** [1] - 759:12
**worried** [3] - 728:7, 758:24, 759:10
**worry** [1] - 758:20
**writing** [1] - 755:21
**written** [1] - 743:6
**wrote** [2] - 755:19, 756:3

## Y

**year** [5] - 718:4, 729:25, 730:14, 747:12, 749:17
**yellow** [1] - 720:15

## Z

**ZILIOLI** [24] - 720:2, 720:5, 720:8, 721:9, 721:11, 721:16, 725:2, 728:19, 731:8, 739:21, 740:11, 740:14, 740:17, 744:21, 746:1, 747:18, 749:16, 752:12, 754:24, 756:17, 760:2, 761:18, 761:20, 761:25