```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION, .
                             .
         Plaintiff,          .
                             . CA No. 08-1160 (ESH)
     v.                      .
                             .
UNITED STATES OF AMERICA,    . Washington, D.C.
                             . Tuesday, February 18, 2014
         Defendant.          . 2:20 p.m.
                             .
. . . . . . . . . . . . . . . . Page 870 - 996

                    DAY 5 - P.M. SESSION
                 TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
                UNITED STATES DISTRICT JUDGE
```

**APPEARANCES:**

For the Plaintiff:          MICHAEL K. MURPHY, ESQ.
                            JUSTIN A. TORRES, ESQ.
                            STACIE B. FLETCHER, ESQ.
                            DAVID FOTOUHI, ESQ.

                            Gibson, Dunn & Crutcher, LLP
                            1050 Connecticut Avenue, NW
                            Washington, DC 20036-5306
                            (202) 955-8238

For the Defendant:          JOHN E. SULLIVAN, ESQ.
                            ERICA M. ZILIOLI, ESQ.
                            JESSICA O'DONNELL, ESQ.
                            JUSTIN D. HEMINGER, ESQ.
                            JENNIFER E. POWELL, ESQ.
                            WILLIAM D. JOHNSON, ESQ.

                            U.S. Department of Justice
                            ENRD / Environmental Defense
                            Section
                            601 D Street, NW
                            Suite 8000
                            Washington, DC 20026-3986
                            (202) 305-0365

```
Court Reporter:              PATRICIA KANESHIRO-MILLER, CRR, CM
                             Official Court Reporter
                             U.S. Courthouse, Room 4704
                             333 Constitution Avenue, NW
                             Washington, DC 20001
                             (202) 354-3243
```

## CONTENTS

| | PAGE |
|---|---|
| OPENING STATEMENT BY THE DEFENDANT | 873 |

WITNESS

   JAMES F. NAGLE
| | |
|---|---|
|      Direct Examination | 930 |
|      Cross-Examination | 932 |

# P R O C E E D I N G S

1        MR. MURPHY:  Your Honor, one last clarification.

2   Right before lunch we were talking about pending CERCLA cases

3   Lockheed Martin has against the United States.  I neglected to

4   mention there is a case in the Western District of Washington,

5   Your Honor.  It is Seattle Shipyards.  It was a ship-building

6   site that is also pending, Your Honor.

7        THE COURT:  Is it against the government?

8        MR. SULLIVAN:  It is.

9        THE COURT:  Do you have a case cite number?

10       MR. MURPHY:  I don't right now, Your Honor.  I can

11  provide it, however.

12       THE COURT:  Do you know who it's in front of?

13       MR. MURPHY:  I don't know, Your Honor.

14       THE COURT:  It would be Lockheed against the U.S.

15  government?

16       MR. MURPHY:  Yes.

17       THE COURT:  Thanks.  This is a PowerPoint, I take it.

18       MR. SULLIVAN:  Yes, Your Honor.

19       THE COURT:  Do you happen to have a copy I can write

20  on while you're going along?

21       MR. SULLIVAN:  Actually, we were going to give you one

22  afterwards, if that's okay.

23       THE COURT:  It's okay but it's not great.  It means I

24  can't take notes on it.  Okay.

873

1          MR. SULLIVAN:  I think it's note-takable.

2          THE COURT:  Fine.  That's all I want.  Thank you.  Go

3     ahead.

4                        OPENING STATEMENT

5          MR. SULLIVAN:  Good afternoon, Your Honor.  My name is

6     John Sullivan from the United States Department of Justice and

7     I'm making this opening statement today on behalf of the

8     United States of America.

9          Your Honor, you've asked us many times in this trial

10    what equitable factors you should consider in allocating the

11    costs among the parties, and so that's what I'm going to focus

12    on today.  And as I go through these allocation equitable

13    factors, you should know these are equitable factors we have

14    seen from other courts and other cases we have been involved

15    in, and other cases that we have seen.

16         What I'm going to first do is give you a list of the

17    equitable factors that we think you should consider, and then

18    I'm going to discuss them.

19         First of all, Lockheed's knowledge of the sensitive

20    groundwater conditions at the Redlands site and their

21    knowledge about how groundwater could be contaminated by the

22    dumping of waste on the ground at the Beaumont sites.

23         Second, Lockheed's management and control of all waste

24    disposal activities.

25         Third, Lockheed's management and control of all

1    building and equipment operations that led to releases at all

2    three sites.

3            Fourth, Your Honor, Lockheed's failure to train its

4    employees about proper waste disposal practices at the three

5    sites.

6            Fifth, Lockheed's failure to submit reports of waste

7    discharge under the California Dickey Act of 1949 for its

8    waste discharges at all three sites.

9            Sixth, Lockheed's routine dumping of TCE and

10   AP-contaminated wastewater on the ground at the sites.

11           Seventh, Lockheed's failure to control AP dust with

12   available equipment.

13           Eighth, Lockheed's burial of TCE and AP-contaminated

14   wastes at the Beaumont sites.

15           Ninth, the indemnification agreements in favor of the

16   United States in all facilities contracts the United States

17   had with Lockheed concerning Lockheed's use of

18   government-owned facilities.

19           Tenth, the United States' lack of management or

20   control over Lockheed's waste disposal practices.

21           Eleventh, the United States' lack of control over

22   facility operations and employee training.

23           And we will prove, Your Honor, that the United States'

24   focus in design contracts was on making sure the design met

25   the performance specifications for how a product was supposed

1    to perform.  And in production contracts, the focus was to

2    make sure that the equipment or the product was produced in

3    accordance with the design, and in general, we were focused on

4    safety.

5          Your Honor, based upon all these factors and the

6    evidence in this case, we submit that it would be reasonable

7    for an allocation share of between 10 to 15 percent to be

8    allocated to the United States.  But, Your Honor, that does

9    not include what we believe is the most important equitable

10   factor, and that's Lockheed's double recovery.

11         What I would like to first focus on, Your Honor, is

12   Lockheed's knowledge.  First of all, when Lockheed went about

13   setting up its business in Redlands, California, the city

14   warned Lockheed about the groundwater drinking water recharge

15   operation that was going on in the property that they were

16   thinking of leasing to Lockheed, which was known as Grand

17   Central Rocket at the time.  In fact, Grand Central Rocket

18   executive Herb Stickney negotiated the lease with the city of

19   Redlands, and he's testified that the city advised GCR about

20   the drinking water percolation basins on the site.

21         In fact, Mr. Stickney has testified, quote "That was

22   the number 1 thing on their minds, could we contaminate the

23   basin."

24         THE COURT:  Can I ask you a question.  The witness

25   that just finished had a lot of documents from the GAO, EPA.

1    I'm sure everybody agreed they didn't want to contaminate the

2    water.  Nobody goes out to contaminate the water.  The state

3    of knowledge about what creates contamination is highly

4    disputable.

5         I cannot help but find that, I suspect, that your own

6    sites got contaminated.  How do I resolve that?  I just think

7    you're spending a lot of time -- I don't know how you get over

8    the GAO study.  It's a government study.

9         MR. SULLIVAN:  Sure, it is.  But what we're focusing

10   on here, Your Honor, is the knowledge that was in place in

11   California.  We will present some testimony through Mr. Bauer

12   about what actually was going on in California at the time.

13   In the early 1940s there was the famous Montebello incident

14   where a pesticide manufacturer discharged chemicals into a

15   pond, it leaked into the groundwater, and within weeks they

16   had contaminated the city's groundwater supplies, and then

17   proceeded to move down the river.

18        That actually was a forerunner to the Dickey Act.  So

19   in California at the time, this wasn't just a matter of

20   knowledge of scientists; this was on the front page of the

21   paper.  This was big news.  So in the 1940s, the State of

22   California set about figuring out how do we prevent chemicals

23   and other contaminants from getting into the groundwater.

24   Your Honor, we will --

25        THE COURT:  Would that include TCE and AP?  You based

1      that on the Aerojet --

2              MR. SULLIVAN:  Your Honor, the focus was organic

3      solvents, chemicals, and inorganic materials that could

4      dissolve and get into the groundwater.  And chemists know that

5      a wide variety of these could get into the groundwater.  So

6      the way the Dickey Act was structured, Your Honor, was for the

7      Water Board to basically put on industry the requirement that

8      they notify the Water Board as to what chemicals were going to

9      be in their wastes that they were proposing to discharge on

10     the ground.

11             THE COURT:  That presupposes the Water Board will do

12     something to protect the environment.  What did they do over

13     there in LaBorde?  They were informed about something, they

14     permitted it, and it's polluted.  You're presupposing a lot of

15     scientific knowledge and the ability to do something about

16     this, but, okay, go ahead.

17             MR. SULLIVAN:  Well, the Water Board actually was

18     concerned about TCE and AP all the way back in 1951.  I will

19     show you some specific quotes about that here, Your Honor.

20             Your Honor, here is an overhead photo of Lockheed's

21     Redlands plant taken on April 16, 1966.  And you can see here,

22     and I point it out in this next slide, where the drinking

23     water recharge basins were.  And the way the water district

24     would do this -- and in fact Lockheed's employee, Grant Speer,

25     actually used to work for the water district before Lockheed

1    and is aware of this -- they would get the rain water from the

2    wet season and snow melt from the mountains and they would

3    channel it into these basins.  And the water would then

4    percolate into the ground and then go down into the ground

5    water.  And what the city was concerned about is that the

6    water flows from east to west.  And as you can see here, the

7    water flows beneath the ground, underneath the vast majority

8    of Lockheed's operations at the plant, and that's what the

9    city was concerned about, and that's what they warned Lockheed

10   about.

11          Lockheed's response to the city back in 1954 was --

12   and this is Herb Stickney again -- he said, "I pointed out we

13   were not in the business that would produce the kind of

14   contaminants that we could not control."  And he promised the

15   city this.  "I guaranteed them, and I gave my word, and that's

16   good enough because I was living there, that when our people

17   went into this area, that we would not spoil the house that

18   they lived in."

19          In fact, when asked about Lockheed's knowledge, he was

20   asked:  "So from the outset you understood the importance of

21   not contaminating the water beneath the site; is that

22   correct?"

23          And Mr. Stickney said, "Absolutely."

24          And in fact, a few years later, in 1963, Lockheed's

25   president, or LPC's president, President Hurt, opposed a

1      refuse dump on property next to the Beaumont 1 facility.   In

2      fact in his letter to the Riverside County, in a section

3      entitled "Surface water, subsurface water and air pollution,"

4      he said, "It is quite conceivable that any pollution created

5      by the dump will be discharged into the Potrero basin and

6      consequently may cause some pollution of the Colorado aqueduct

7      water supply, which out in that vicinity is several hundred

8      feet below the ground."  So that is what President Hurt was

9      saying in 1963.

10            What I'm now going to focus on is Lockheed's control

11     over waste disposal operations.

12            As Dr. Delaney talked about the other day, and as

13     Mr. Stickney testified, Lockheed installed the evaporation

14     pits at the Redlands facility to prevent waste from

15     contaminating the groundwater.  So you can see by this action

16     that Lockheed clearly knew they had to prevent their waste

17     from contaminating the groundwater.  As the testimony has

18     indicated, early on they were discharging AP-contaminated

19     wastewater and they were putting their solvents in these big

20     evaporation basins to evaporate rather than sink into the

21     ground.

22            But sloppy waste disposal practices began very

23     quickly, Your Honor.  If you look at the next slide, you'll

24     see a quote from a memo from November 1958 to Mr. Stickney,

25     the person who promised not to contaminate the water basins,

1    and that memo to Mr. Stickney said, "Mixer parts cleaned

2    manually in cyclohex.  Drained toward large evap pit.  Note:

3    This contaminates water basin, should be piped right into the

4    pit."

5              THE COURT:  Which building is this.

6              MR. SULLIVAN:  This is building 52, being pumped

7    toward evaporation pit 61.

8              THE COURT:  Isn't it undisputed that they didn't pump

9    both ways?  Isn't this where we got into the dispute about

10   smaller pipes --

11             MR. SULLIVAN:  Well, that's what the memo says.  Yeah,

12   this is what the memo says, is it was being drained toward but

13   not right into the pit.

14             THE COURT:  Is this the same one we had the discussion

15   about the inside pipe --

16             MR. SULLIVAN:  Yes, it is, Your Honor.

17             So this memo was issued in November 1958.  Let's see

18   what Mr. Stickney and GCR did a year later.  Here's an aerial

19   photograph from October 1959, and I have pointed out here you

20   can see building 52, the mix building, and you can see the

21   evaporation pit, and you can see there is a dark stain which

22   our expert will say looks like liquid flowing toward but not

23   into the evaporation pit.  So we would submit in all

24   probability, Your Honor, that that is the discharge from

25   building 52 going still toward but not into the evaporation

1      pit a full year later.  And the sad thing is, all they had to

2      do was extend the pipe into the evaporation pit, Your Honor.

3      This was not a tough fix.

4           Let's look at what was happening in circa 1960.  As we

5      can see here, the discharge still is not corrected.  What we

6      have here is a close-up view of the mixing building 52, and

7      you can see that there's still a large pool of water flowing

8      toward but not into the evaporation pit.  So what we have is

9      Mr. Stickney and Lockheed being warned in November 1958, and

10     this wastewater is still being discharged on the ground and

11     not in the evaporation pit, and that wastewater was coming

12     from the propellant mixing building, which indicates that it

13     probably contained significant quantities of AP.

14          What I would like to focus on next, Your Honor, is

15     building 114.  And again, it was Lockheed, not the United

16     States, who controlled unpermitted AP wastewater discharges

17     from building 114 each week.  In fact, in June 1971 --

18          THE COURT:  What would happen if I couldn't conclude

19     that people knew that TCE and AP were contaminants for

20     purposes of the ground and the water?  Would you argue this is

21     still relevant?

22          MR. SULLIVAN:  Yes, Your Honor.  Your Honor, that gets

23     to a central issue in this case.  Lockheed is pleading

24     ignorance, but, Your Honor, if they had complied with the

25     Dickey Act, the Water Board would have informed them what they

1     had informed --

2              THE COURT:  How do you know that?  You're going to

3     tell me Mr. Nagle, but wow is that speculative.  If they had

4     known -- they knew at LaBorde and didn't do anything

5     different.

6              MR. SULLIVAN:  Well, let's talk about LaBorde for a

7     second, Your Honor.  Lockheed presented a notice or report of

8     waste discharge to the Water Board at LaBorde Canyon.  Did

9     they tell the Water Board that water was going to contain

10    perchlorate?  No.  Did they tell the Water Board it was going

11    to contain a whole host of solvents?  No, they didn't tell the

12    Water Board that.

13             But when you look at the ground truth, what the

14    samples of the area show, a lot of perchlorate was dumped in

15    there, they didn't tell the Water Board that, and a lot of

16    solvents were dumped in there, many different kinds of

17    solvents, and they didn't tell the Water Board about any of

18    those.

19             THE COURT:  Is it okay to call it AP?

20             MR. SULLIVAN:  AP, Your Honor.

21             So the problem with that permit is they did get a

22    permit but they didn't comply with it, and that's the problem.

23             THE COURT:  They didn't comply with it or they got it

24    under false pretenses?

25             MR. SULLIVAN:  It could be either.  I don't know.

883

1          THE COURT:  What do you mean they didn't comply with

2     it?  The Water Board permitted it on the basis that they

3     didn't know what the chemicals were --

4          MR. SULLIVAN:  Well, the Water Board, the requirements

5     of the Dickey Act are for the waste discharger to tell the

6     Water Board what's in the waste.

7          THE COURT:  Well, yeah.

8          MR. SULLIVAN:  And they didn't tell the Water Board it

9     was going to contain AP.

10         THE COURT:  So that's why they didn't comply with

11    it -- with the act, not that they didn't comply with the

12    permit.

13         MR. SULLIVAN:  That's right.

14         They also didn't tell the Water Board it was going to

15    contain numerous other solvents which the samples indicate it

16    did.  And that's the problem with that permit, and that's

17    essentially what the problem was up at Aerojet.  When Aerojet

18    submitted their notice of waste discharge, they told the Water

19    Board back in 1951 that their waste discharge was going to

20    contain AP and TCE, and the Water Board and three other

21    government agencies were very concerned about that, so they

22    issued a permit, and they said you can't allow any of this to

23    get into the groundwater.

24         What did Aerojet do?  They ignored the permit.  They

25    poured AP and chemical-containing wastewaters into the

—884—

1    evaporation pits that just allowed that material to trickle

2    right down into the ground.  And Mr. Bauer is very familiar

3    with that site and he can tell you all about it.  But that was

4    the problem there.  They got a permit and didn't comply with

5    it.

6              THE COURT:  Who sued them?  You or the California

7    authorities?

8              MR. SULLIVAN:  We didn't sue them, Your Honor.  I

9    believe that's been a California -- U.S. EPA may have, but I

10   don't know.  But they may have actions under California law

11   that I'm not aware of.

12             In any event, Your Honor, getting back to building

13   114, as you saw here, Mr. Wehde, Lockheed's counsel in 1971,

14   said that from that building they were discharging

15   2,500 gallons per day as waste from LPC's chemical research

16   laboratory, building 114, which is returned to an evaporation

17   pit wherein solids included in this wastewater are settled

18   out.

19             Your Honor, here's a picture, an overhead view of this

20   building, and I have pointed out the two evaporation pits on

21   the right side of this picture, and it is my understanding --

22   and Mr. Cain can testify -- that each of those pits had a

23   volume capacity of about 10,000 gallons, and the way they

24   would work is they would fill up one, let solids settle, and

25   then drain it into the other pit, let solids settle, and then

1      discharge it each week.  Again, Your Honor --

2              THE COURT:  Discharge it by --

3              MR. SULLIVAN:  They would discharge it onto the ground

4      into a drain, a storm drain, that would go onto the ground.

5              As Mr. Wehde said, he described this discharge right

6      here, and he said, approximately once a week, during dry

7      weather, water is pumped from the evaporation pit to an

8      underground drain, which eventually runs onto the ground.

9              Mr. Weehde said, except during periods of rainfall,

10     when no pumping of the evaporation pit is carried on,

11     drainage, as evidenced by wet ground, has not been observed

12     beyond the culvert at Seventh Street on the LPC plant site.

13     This is due to the great percolation ability of the soil in

14     this area.

15             You can see significant volumes of wastewater were

16     quickly percolating into the ground.  If you think about what

17     Mr. Weehde is saying here, Your Honor, he's saying that

18     they're discharging 2,500 gallons a day from the building.

19     The two basins each hold about 10,000 gallons.  If they were

20     going to keep those basins from overflowing, they're going to

21     have to be discharging a lot of wastewater from those basins

22     onto the ground, Your Honor.

23             THE COURT:  Do you contest the statement earlier today

24     that the evaporation pits weren't used after a certain point

25     in time?  I can't remember the date.

1          MR. SULLIVAN:  Your Honor, these actually really

2     aren't evaporation pits.  These are more like settling basins.

3     The water is only in there for a matter of days.  But I think

4     that is right, Your Honor, I think that --

5          THE COURT:  Isn't this evaporation pit in 61 that

6     we're talking about?

7          MR. SULLIVAN:  No, this is not evaporation pit 61,

8     Your Honor.  This is building 114.  These are the twin -- they

9     call them sometimes evaporation pits, but they really function

10    more like settling basins because they were very deep.  If you

11    recall, the big evaporation pit over by building 52, it was

12    actually pretty shallow and it was pretty big.

13         THE COURT:  Do you know whether they ceased using

14    that?

15         MR. SULLIVAN:  My understanding is that they stopped

16    getting permits for the disposal of solvents in the mid 1960s

17    at some point.

18         THE COURT:  But you don't know why?

19         MR. SULLIVAN:  I don't know why, Your Honor.  It could

20    have been because of the air pollution issues that were

21    developing in the mid '60s that our experts will testify

22    about.  There was a rule 66 that came out in L.A., and they

23    were very concerned about smog, and some of these solvents

24    were contributors to smog, including TCE.

25         THE COURT:  Okay.

1             MR. SULLIVAN:  What I would like to focus on next,

2    Your Honor, is building 77 and the big issue about which sump

3    was used for the cleaning of grinder parts and bags, Your

4    Honor.  As the testimony has indicated, there are two sumps

5    here, the one on the right, the south sump, has what looks

6    like a sewer opening, and if anything was washed on the ground

7    or on a platform next to it over there on the right, the water

8    would just flow down into that like a sewer, go into the sump,

9    and either drain into the ground through a drain on the

10   bottom, or if the water was going in too fast, the sump pump

11   would pump it up into the rocks which surrounded the building,

12   the big dike that surrounded the building for safety purposes.

13           As the evidence indicates, Lockheed failed to provide

14   any sort of protocols or procedures for how to wash all these

15   parts and bags.  These lids, as the evidence indicates,

16   weighed about 165 pounds each.  The sump motors inside were

17   electric, and they were plugged in inside, and there were no

18   protocols to protect employees for safety purposes dealing

19   with water around electrical fixtures.

20           In fact, we also submitted this evidence the other

21   day, Your Honor.  This is an aerial photograph of building 77

22   and --

23           THE COURT:  What exhibit number?

24           MR. SULLIVAN:  This will be with Mary Sitton's

25   testimony.  It's in the binder.

888

1          THE COURT:  If you're using exhibits, for purposes of

2     the record, if they're not identified, then nobody knows what

3     you're talking about.

4          MR. SULLIVAN:  Yes, Your Honor.  I made a mistake on

5     this one, Your Honor.  I did not include the exhibit number on

6     it --

7          THE COURT:  Same with the sump.

8          MR. SULLIVAN:  That is in Tom Cain's declaration, an

9     exhibit in Tom Cain's declaration.

10         And this exhibit is one of Mary Sitton's exhibits and

11    figures right into her declaration, too.

12         THE COURT:  What do you say about the fact that the

13    pump goes the other way?

14         MR. SULLIVAN:  Lockheed has argued that there was a

15    design drawing that said that this water was supposed to drain

16    the other way; and actually, it is sort of a silly statement

17    because the general grade of the site is basically from east

18    to west, coming down from the San Bernardino mountains, so

19    that design drawing -- it apparently just wasn't followed

20    because it is very clear, once you look at the aerial

21    photographs, even back in 1959, that there was a drain that

22    was built here to drain the south sump.

23         THE COURT:  It goes from --

24         MR. SULLIVAN:  It goes --

25         THE COURT:  -- east to west.

1          MR. SULLIVAN:  This drain goes from east to west

2     toward the road, away from the building.

3          And what Mary Sitton will testify is that the end of

4     this drain on April 16th is pooled liquid or staining, which

5     she believes is water, and we checked the weather records, and

6     there had been no rain for the previous 14 days and --

7          THE COURT:  Are you saying the drawing that they

8     showed you is meaningless --

9          MR. SULLIVAN:  No, that was a design drawing, but

10    apparently, based on the aerial photographs, there is a clear

11    drainage path they built here, and we have seen no evidence of

12    a drainage path going the other way.  She has looked at all

13    the aerial photographs looking for a drainage going the other

14    way, and we haven't found any.

15         In any event, on this photograph, Your Honor, there

16    are two possibilities for water at the end of that ditch:  One

17    is that it is storm water; or two, that it is wash water,

18    because we know those are the two things that were going on

19    behind building 77.  Since it hadn't rained for 14 days, it is

20    our position that this is probably evidence that they were

21    washing grinder parts and bags behind building 77.

22         Your Honor, in addition, Lockheed's disposal of

23    AP-containing wastewater on bare ground was inconsistent with

24    the 1951 Army ordnance manual.

25         THE COURT:  What is your evidence that they were

1     disposing of AP on bare ground?

2              MR. SULLIVAN:  AP wastewater on bare ground?

3              THE COURT:  Yes.

4              MR. SULLIVAN:  The previous exhibit right here.  This

5     would have been from the cleaning of grinder parts and bags,

6     which contained AP, and the wastewater would have been going

7     on bare ground.

8              THE COURT:  What would be wrong if they were doing it

9     and getting it in the right pump before going north?  Would

10    you say that was in violation of the ordnance?

11             MR. SULLIVAN:  No, Your Honor.  If they were putting

12    the wastewater in the north sump, the wastewater would have

13    been conveyed by a sump pump up to evaporation pit 61, and

14    that would be proper.

15             THE COURT:  Except that you say there was a gap in the

16    pit, right?

17             MR. SULLIVAN:  Well, no.  In the north sump -- there

18    were basically -- when you say, "gap in the pit," did you mean

19    evaporation pit?

20             THE COURT:  Pipe.  Isn't that the one where they

21    said --

22             MR. SULLIVAN:  Well, that was the one where building

23    52 was not discharging all the way into the pit, but this

24    building actually had a different pipeline that went to the

25    evaporation pit, and to the best of my knowledge, the pipeline

1    from building 77 always made it to the evaporation pit.

2         THE COURT:  The other one was 56.

3         MR. SULLIVAN:  The other one was 52.  And at least for

4    a while wasn't discharging all the way into the pit.

5         THE COURT:  Okay.

6         MR. SULLIVAN:  Okay.

7         Getting back to the Army ordnance manual, Lockheed's

8    disposal of AP-containing wastewater on bare ground was

9    inconsistent with the 1951 Army ordnance manual that was in

10   place when they were operating.  In fact, Section 2701 of the

11   manual discusses the collection of contaminated industrial

12   wastes and discusses the handling of wastewater that contains

13   explosives, Your Honor.  In fact, Section 2701 said, "Sumps,

14   settling beds, or leaching pits shall be provided in all cases

15   where the quantities and types of explosives in the wastewater

16   are such that streams may become polluted or their banks

17   contaminated."

18        But it also says, "When sumps, settling beds, or

19   leaching pits are used, precautions must be taken to assure

20   that no contaminated wastewater will enter or pollute potable

21   sources of water by percolation through the soil as a result

22   of poor or inadequate treatment."

23        That is dated September 4, 1951, Your Honor, and it is

24   Exhibit 47.

25        THE COURT:  All of this depends on this aerial

1    photograph?

2         MR. SULLIVAN:  Well, that is one of the areas where

3    they were discharging AP-contaminated wastewater on the

4    ground.  We believe that they were also doing it at

5    building 77.

6         THE COURT:  You mean, that is what the picture is --

7         MR. SULLIVAN:  Well, building 77, but they were also

8    doing it at building 114 from the propellant research

9    laboratory.  That's why we're concerned about that

10   wastewater --

11        THE COURT:  What is the evidence of that, though?  I

12   understand for building 77 your evidence is this aerial photo.

13   What I'm trying to understand is what the basis for these

14   statements are.

15        MR. SULLIVAN:  The basis for that, that was all the

16   waste generated by the propellant research laboratory, and

17   they were using, in that building, AP to manufacture small

18   batches of propellant to make rockets and test rockets, little

19   rockets.  The wastewater, we believe, it is reasonable to

20   conclude would have contained AP.  In fact, even Dr. Delaney

21   said the other day that he thought that it might have

22   contained about 58 parts per million.

23        And there is also evidence, Your Honor.  George Nelson

24   White testified -- and there is documentary evidence that

25   supports this -- that when Lockheed was making samples, they

-893-

1    would make these samples called dog bones from each batch of

2    propellant, and they would cut the propellant sample into a

3    certain shape, and they would have a lot of chips and

4    grindings and pieces of propellant; and, Your Honor, they

5    would put that material into closed containers, and because it

6    was explosive, they would fill it with water so that it would

7    be safe.  George Nelson White testified that he took numerous

8    drums of that material out to the burn pit, and he dumped most

9    of them, water and all, into the burn pit, so they could have

10   just percolated into the ground.  Lockheed's own studies

11   indicate, Your Honor, that when you put propellant in water,

12   the AP will leach out.

13         What I would like to focus on next, Your Honor, is

14   that Lockheed controlled the operation of its burn pits.  It

15   was Lockheed, not the United States, that managed and

16   controlled the burn pits.

17         THE COURT:  Right.  I'm never going to be able to find

18   that burn pits in and of itself are not proper.  I'm sorry --

19         MR. SULLIVAN:  That's not what we're saying, Your

20   Honor.

21         THE COURT:  Okay.  But the fact they used burn pits

22   and everybody else was using burn pits, the fact that you had

23   an ordnance that covered that burn pits were okay, they did

24   it, so I don't see any traction from some of these arguments.

25   That's where I'm having trouble.

```
 1          MR. SULLIVAN:  Well, here's the problem with the burn

 2     pits, Your Honor.  It is not just that they were burning

 3     propellant or AP waste on the ground; it is that they were

 4     also dumping solvents, degreaser waste, chemicals, and AP

 5     wastewater into the burn pits.  These liquids cause a big

 6     problem because they percolate into the ground.  And in fact,

 7     it was Lockheed that chose to burn waste on the ground, and

 8     you can see a photo here of bags of propellant that are all

 9     broken open, laying over at the Potrero site.  And it was

10     Lockheed, not the United States, that decided to operate the

11     burn pit at Potrero like a waste dump.  What we mean by that,

12     Your Honor, is that they would put this waste into a trench

13     that was dug by a bulldozer, and they wouldn't burn it right

14     away, they would let it sit for weeks, even months --

15          THE COURT:  What is the evidence of that?

16          MR. SULLIVAN:  That is right in the Radian report.

17     That is their own report.  And there is --

18          THE COURT:  That is Exhibit 49, U.S.

19          MR. SULLIVAN:  That's Exhibit 49.  And our experts

20     will present other evidence, there are some letters and

21     whatnot where this is described.  And in fact, Mr. Borgelt

22     testified that he went out to the Potrero burn pit and

23     observed drums full of Chlorothene, TCE, leaking; and when

24     asked how long these leaking drums were sitting at the Potrero

25     burn pit, he said, probably up to a month.  And they asked
```

1    him, well, Mr. Borgelt, did you think there was anything wrong

2    with that?  And he said, no, that's where it was supposed to

3    be disposed of.  He didn't do anything about it.

4         In addition to that, Your Honor, it was Lockheed, not

5    the United States, that decided to bury AP waste at numerous

6    places at the Beaumont sites.  Here is a letter that talks

7    about it.  In September of 1963, this letter indicates, "Now

8    that it has been brought to our attention that there are

9    propellants in the watershed of our Potrero facility, it will

10   be necessary for us to remove these materials and relocate

11   them either to the Beaumont Proving Grounds or an area in

12   Potrero that is not in a watershed.  All of the areas where

13   the propellant is buried should be marked with some type of

14   pole or flag, so that when any construction is started in

15   Potrero, we can relocate these materials."

16        So here, in 1963, about the same time LPC's president

17   is protesting the burial of waste at a site next door, we see

18   that Lockheed is burying propellant on the ground, doing

19   exactly what their president said shouldn't happen next door.

20        In addition, Your Honor, Lockheed's burial of AP

21   wastes was inconsistent with the 1951 Army ordnance manual as

22   amended on December 23, 1955.  The manual said, Section

23   2704 -- it concerned the destruction of collected solid

24   wastes -- "Collected explosive wastes must not be disposed of

25   by being buried, or thrown in any streams or tide-water,

1    unless they are decomposed by water.  This latter disposition

2    will be allowed only if not prohibited by state laws or local

3    ordnances."

4         Your Honor, the only exception we know of to that rule

5    was for black powder, not AP propellant.  For some reason,

6    black powder does decompose in water.

7         In addition, Lockheed controlled the hog-out of rocket

8    motors at Potrero.  Lockheed, not the United States, decided

9    to wash propellant out of rocket motors, and the washing

10   procedure has frequently been referred to as hogging-out, and

11   that is washing propellant with high-pressure hoses out of the

12   rocket-motor casing itself.  It was Lockheed, not the United

13   States, who designed the hog-out process and how wastewater

14   would be handled, and basically it was allowed to run on bare

15   ground.

16        In fact, unlike the *AISLIC* case that Lockheed keeps

17   pointing to, the United States did not contract with Lockheed

18   for rocket motor washouts.  And, Your Honor, unlike the *AISLIC*

19   case, the United States did not participate in Lockheed's

20   decisions about washout procedures or waste management there.

21        I would like to next focus, Your Honor, on Lockheed's

22   failure to train employees about waste disposal.

23        You remember Mr. Oppliger, Your Honor --

24        THE COURT:  Barely.

25        MR. SULLIVAN:  In fact, I think at one point, you sort

1    of stood up and said:  Mr. Oppliger, what would happen if

2    someone threw TCE on the ground, or threw AP on the ground?

3         You remember that, Your Honor?

4         THE COURT:  I don't remember standing up.

5         Go ahead.

6         MR. SULLIVAN:  And he said that would be wrong, and he

7    actually raised his voice a bit, didn't he?

8         But nevertheless, clearly to Lockheed management, that

9    was wrong.  But Earl Wessman, Christian Mulder, and George

10   Nelson White, maintenance employees, all said that Lockheed

11   provided no training about solvent disposal.  In fact, Earl

12   Wessman testified, when he was asked whether he was ever told

13   not to dump solvent on the ground, he said, "No.  No.  That

14   was common practice.  That's what everybody did.  All the

15   mechanics did it."

16        Let's look at what Mr. Wessman did.  He dumped

17   1.5 quarts to 2 gallons of TCE per day on the ground at his

18   favorite dump station, at building 119.  And he even said that

19   when he worked across the street at building 85, he would

20   bring the waste back to his dump station.  He was asked, how

21   did you know it was TCE?  He said that trichloroethylene was

22   stenciled on the drum he obtained the TCE from.  In fact, he

23   said that when he was getting near the end of his days there,

24   there was still a drum that said trichloroethylene on it.  In

25   fact, he said he used to go looking around the site to find

—898—

1    drums that TCE used.

2        Let's look at Mr. Mulder.  He dumped 1 to 2 gallons of

3    TCE on the ground at building 8 at night.  I highlighted "at

4    night," Your Honor because evaporation rates go down at night.

5    The weather information that we will provide indicates that

6    temperatures get very cool at the Redlands and Beaumont

7    facilities, even in the summer time.  Mr. Mulder said he

8    dumped TCE on the ground five to six days a week from 1956 to

9    1965, and he even admitted that there was a settling basin

10   where he was supposed to dump this material, but he was afraid

11   to go there at night because he was afraid of rattlesnakes.

12       THE COURT:  And tarantulas.

13       MR. SULLIVAN:  And tarantulas.

14       Mr. Mulder also said that he dumped 1 to 2 gallons of

15   TCE on the ground at building 12 from 1956 to 1965, again at

16   night.  And he said he saw his co-workers dumping solvent on

17   the ground at building 12 just about every night.

18       So, if you just look at what these two individuals did

19   and not include any of their co-workers, who supposedly were

20   doing the same thing, these two individuals could have dumped

21   approximately 53,000 to 141,000 pounds of TCE on the ground

22   just from these two people alone.  That's not just a couple

23   gallons, Your Honor; and even if a lot of it evaporated,

24   there's still plenty of it to fuel a plume.

25       THE COURT:  I take it you argue that whether or not

899

1    the government owns these chemicals is irrelevant to the

2    equitable allocation --

3              MR. SULLIVAN:  Your Honor, our position is that we

4    didn't own waste --

5              THE COURT:  -- liability, but it doesn't give you

6    any -- it's not useful in terms of allocation.

7              MR. SULLIVAN:  Yes, Your Honor.  We stipulated to

8    liability based upon our ownership of equipment.  If it was

9    TCE being used, I don't know whether we own the TCE that was

10   being dumped, but when it was being dumped, it was waste.  Our

11   position is that even under the contract clauses, we didn't

12   own waste.  It has absolutely no value in securing the

13   performance of a contract when something is waste.  That's our

14   position, Your Honor.

15             THE COURT:  So what is the basis of liability?  When

16   you say you owned --

17             MR. SULLIVAN:  Your Honor, the reason we stipulated to

18   liability is because we owned some of the equipment at the

19   site; for example, the vapor degreaser in building 91, a mixer

20   in building 52, and some other pieces of equipment.  But as

21   I'll show in a few minutes, Lockheed owned a lot more

22   equipment than we did.  And all of the equipment that we owned

23   would have been subject to the indemnification agreements

24   relating to claims for property damage on-site or off-site,

25   and that would be in our favor.

1            Next I want to turn to Lockheed's failure to comply

2    with the Dickey Act.  Your Honor, in 1952, as we talked about,

3    the Water Board began regulating Aerojet's AP and TCE waste

4    discharges, and the key thing to understand about the way the

5    regulation went is that the Water Board, based upon what had

6    happened in California in the 1940s, relied on dischargers to

7    tell them what the constituents were of their waste, and then

8    the Water Board would evaluate those constituents in light of

9    the groundwater conditions at their local facility.

10           As we indicated, the Water Board was so concerned,

11   they solicited comments from the Division of Water Resources,

12   the Division of Fish and Game, and the Department of Health

13   back in 1951 about the Aerojet discharges.  In fact, in 1951,

14   Harvey Banks of the Division of Water Resources said the

15   following about Aerojet's AP and TCE waste:

16           "The organic liquors, solvents, and process liquids

17   are stable in character and are all undesirable constituents

18   of water either for domestic supply or irrigation.  The

19   perchlorates of potassium and ammonia are reported to be toxic

20   to plant life in approximately the same concentrations as

21   boron.  It is conjectural to what extent they would be reduced

22   to harmless chlorides in their passage through gravel."

23           THE COURT:  They went over this this morning.

24   Lockheed's experts said plant life isn't the same thing.

25   You're talking about AP being toxic to plant life.

1          MR. SULLIVAN:  Yes, it was recognized to be toxic to

2     plant life; and if asked, Mr. Bauer would say, it was also

3     known there were thyroid issues with human beings known back I

4     believe in the 1930s, but Mr. Bauer knows that better than I

5     do.

6          THE COURT:  What about the water supply?

7          MR. SULLIVAN:  Well, I'm getting to that right now.

8     Mr. Banks of the Division of Water and the Water Board said

9     back in 1951, "To summarize, it is believed that the proposed

10    industrial waste discharges present a threat to the quality of

11    both surface and groundwater in the vicinity, and that their

12    disposal in the manner planned should be discouraged.

13    Alternate methods ought to be developed with the object of

14    excluding the process wastes from the groundwater to the

15    greatest extent."

16          Then, in 1952, the Water Board issued a permit to

17    Aerojet for AP and TCE contaminated waste that said, "Process

18    wastes which contain the following chemicals shall not be

19    discharged in a manner which will permit their entry into

20    either groundwater or the waters of the American River."

21          As we've indicated -- and I can skip through

22    this -- Lockheed clearly knew about the Dickey Act because

23    they did file a report of waste discharge for LaBorde Canyon

24    in 1962.

25          Lockheed had numerous industrial waste discharges that

1    were regulated by the Dickey Act at Redlands, and they did not

2    file a report of waste discharge with the Water Board for any

3    of the Redlands discharges.  And Lockheed did not file any

4    reports of waste discharge at Beaumont 1, the Potrero site,

5    despite the fact that there were numerous waste discharges

6    going on there.  And they filed only one at LaBorde Canyon,

7    which we talked about, despite the fact that there were

8    numerous other waste discharges going on there.  And they

9    indicated before that they failed to comply with the only

10   permit that they received.

11        THE COURT:  I'm sorry.  I thought we agreed before

12   they failed to comply with the Dickey Act.  Now you're saying

13   they didn't comply with the permit.  I thought it was because

14   they didn't disclose the discharge --

15        MR. SULLIVAN:  Well, they didn't disclose the

16   discharge.  The permit itself didn't talk about perchlorate or

17   solvent or any of these materials as being part of their

18   wastewater.  There was sort of a dual problem here.  They

19   didn't tell the Water Board what was going to be there, and

20   the Water Board didn't regulate it, and that's the problem,

21   and that's why it is important for the discharger to be

22   truthful.

23        Your Honor, if Lockheed had complied -- and this is a

24   big issue -- they would have learned of the Water Board's

25   concerns about TCE and AP discharges, and that's especially

1    true at Redlands since the Redlands site was being used for

2    the creation and the recharge of drinking water aquifers that

3    many citizens used in the area of Redlands and the surrounding

4    community --

5         THE COURT:  You're expecting more from the Water Board

6    than you expect from the U.S. Government.  I'm reading this

7    part on the burn pits.  You see the Water Board as being the

8    composite of all knowledge and information that the EPA didn't

9    have and neither did the U.S. government.

10        MR. SULLIVAN:  Well, I mean, Your Honor the EPA didn't

11   exist until the '70s, but the Water Board had the information.

12   The key issue here, Your Honor, is the Water Board did have

13   the information.  They were concerned.  And they would have

14   conveyed that information to Lockheed.  Whether Lockheed would

15   have followed it, that's another issue.  But they're pleading

16   ignorance when, if they had followed the law, they would have

17   been informed of these issues.  That's our point, Your Honor.

18        And in fact, if they had applied for a waste discharge

19   permit for the burn pits, the simplest and cheapest method to

20   comply with the Dickey Act would have been to install burn

21   pans, especially if you're going to be disposing of liquids in

22   the burn pit, because burn pans would not only contain the

23   solid materials but they would help to prevent liquids from

24   going into the ground.

25        THE COURT:  If you could show me that the U.S.

1    government thought this was the right thing to do when it

2    comes to burn pans, I would be a little more sympathetic.

3            MR. SULLIVAN:  Well, Your Honor --

4            THE COURT:  The Dickey Act argument, I'm just sure you

5    weren't using the burn pans.  You're sort of elevating what

6    the Water Board would do based on speculation and what --

7            MR. SULLIVAN:  No, Your Honor, the Water Board --

8            THE COURT:  -- you're insinuating best practices

9    without any real evidence of what the best practices were.

10   You can't say the best practices were things that you didn't

11   require.

12           MR. SULLIVAN:  Well, the United States offered

13   alternatives.  We didn't require them.  We didn't tell them

14   how you operate your burn pit, but --

15           THE COURT:  You were doing it yourself.  You said you

16   carted it away someplace and put it in burn pits.  I think

17   you've got to be a little less duplicitous here.

18           MR. SULLIVAN:  Well, I mean, Your Honor, this is what

19   we know:  The burn pans were discussed in the manual --

20           THE COURT:  Which manual?

21           MR. SULLIVAN:  In the Army 1951 manual they were

22   discussed.

23           THE COURT:  But for pyrotechnics.

24           MR. SULLIVAN:  Well, that is what perchlorate is.

25   Pyrotechnics is fireworks, small propellants --

1          THE COURT:  That's not what the evidence is at the

2    moment.

3          MR. SULLIVAN:  Well, it will be --

4          THE COURT:  I just have 50 more disputed issues.

5    Pyrotechnics was told to me to be something different --

6          MR. SULLIVAN:  It is my understanding that AP is a

7    pyrotechnic material.

8          THE COURT:  Okay.

9          MR. SULLIVAN:  And so, again, Lockheed pleads

10   ignorance of the risks of AP and TCE to the groundwater, but

11   by doing so, they're asking this Court to ignore its failure

12   to comply with the Dickey Act.

13         THE COURT:  Do you have any evidence that you

14   complied; you, the Department of Defense?

15         MR. SULLIVAN:  Complied with the Dickey Act?

16         THE COURT:  Yes.

17         MR. SULLIVAN:  Your Honor, I haven't investigated

18   these other sites, and I know it took me five years to figure

19   this one out, but what I do know is, if there was

20   contamination at the site, we cleaned it up.  That's all I

21   know, Your Honor.

22         THE COURT:  They have to do that, too.  We all admit

23   that that is what the law requires, without pointing fingers

24   and culpability.  I agree, if you messed it up, you clean up,

25   too.  But the question is whether or not one should require

1   certain procedures that you, the U.S. Government, didn't use

2   at your own sites.  That's what bothers me but --

3           MR. SULLIVAN:  Well, Your Honor, I know, in the 1960s,

4   one witness said they were using a burn pan at the Air Force

5   site down at Cape Canaveral, and that's 1960.

6           THE COURT:  Right.  I agree.  That's contested, too.

7   Besides that, that is just one witness.  The United States

8   government, look at all the sites we had, and all the

9   manufacturers, and it just seems like what is good for the

10  goose has got to be good for the gander here.  That's the

11  problem I'm having with some of your arguments.

12          Well, it is not just irrelevant.  You keep harping on

13  arguments.  Unless you can show me that you folks yourselves

14  lived up to a different standard, I'm not about to blame or

15  impose culpability.  You're arguing for a culpability-type

16  argument.

17          MR. SULLIVAN:  There is something that I think is

18  unique about this site.  I haven't seen a site -- this is the

19  first site I have ever seen -- where an industrial facility

20  was operating around drinking water recharge basins.  I have

21  never seen anything like that.

22          THE COURT:  Not Aerojet --

23          MR. SULLIVAN:  No, not Aerojet.

24          THE COURT:  I thought they were near the water.

25          MR. SULLIVAN:  They were about half a mile away from

1    the river, is my understanding, and the Water Board was

2    concerned about water traveling that far.  Here they were

3    operating right next to the drinking water recharge basin for

4    the entire community, and it is that drinking water that is

5    now being cleaned up, and I think that makes this site unique,

6    Your Honor.

7         What I would like to move on to next, Your Honor, is

8    to the indemnification agreements in the facilities contracts.

9    Your Honor, the United States, as I indicated, stipulated to

10   liability based on its ownership of some equipment that

11   Lockheed used at the sites, such as the vapor degreaser in

12   building 91, one grinder in building 11, and the propellant

13   mixer in building 52 but --

14        THE COURT:  According to you, the vapor degreaser

15   is --

16        MR. SULLIVAN:  Our position about the vapor degreaser

17   is, Your Honor, we haven't seen any evidence that it leaked.

18   We haven't seen any evidence that the solvent-water separator

19   malfunctioned.  We haven't seen any evidence as to how the

20   water that came out of the solvent-water separator was

21   actually disposed of.  It could have been put in a bucket and

22   put in the evaporation pit, but we haven't seen any evidence

23   of that, Your Honor.

24        In fact, Lockheed here owned the vast majority of the

25   equipment at the sites, including three grinders in

1    building 11, two grinders, including the Fluid Energy Mill, in

2    building 77, the dust collector in building 77, the propellant

3    mixers in buildings 12, 133, and 315, and a vapor degreaser in

4    building 30.  The facilities contracts that governed the

5    United States' use of equipment, United States equipment,

6    which in most circumstances -- maybe all circumstances, I

7    believe -- was free of charge, said, "The contractor shall

8    indemnify and hold the government harmless against claims for

9    damage to property of the contractor or others arising from

10   contractor's possession or use of the facilities."

11            THE COURT:  Why isn't this the end of the game, then?

12   Why should you pay anything --

13            MR. SULLIVAN:  Well, we think it should be a very

14   significant equitable factor, Your Honor.  And that's why we

15   think our share should be --

16            THE COURT:  Is there some exception?  Doesn't this go

17   on and except something --

18            MR. SULLIVAN:  In some contracts, there could be an

19   exception that relates to insurance claims.  As Mr. Johnson

20   said the other day, we're missing a lot of contractual

21   information to know exactly how these things would have

22   applied, which contracts they would have applied.  It is hard

23   to know.

24            THE COURT:  You don't know how frequent this provision

25   is?  We have 30 contracts.  How many does it appear in?

1          MR. SULLIVAN:  The law would require it to be in all

2   of them.

3          THE COURT:  What?

4          MR. SULLIVAN:  The law required it to be a mandatory

5   provision in all of them.

6          THE COURT:  If there's a thousand, then it would be

7   all of them?

8          MR. SULLIVAN:  Yes, Your Honor.

9          There may be other provisions that might have some

10  exceptions that I'm not aware of because I don't have the

11  contract, but this provision would have been in all of them.

12  That's my understanding, Your Honor, and our next witness will

13  be talking about that.

14         THE COURT:  Why isn't this your number one argument?

15  Why isn't it whether Lockheed understood that -- think about

16  this -- you're supposed to start with your strongest

17  argument --

18         MR. SULLIVAN:  Well, Your Honor, I think it is a

19  significant argument; and if I could go back and do it again

20  in light of what I have seen now, I would make it my first

21  argument.

22         THE COURT:  Think about it, I'm like a jury.  You

23  would wait until you've gotten into 15 minutes of argument to

24  tell me what your strongest argument is?  I don't think so.

25  Common sense says it can't be the strongest argument if you

—910—

1     put it down as number 8.  In your view, it is much more

2     important than some person said we're not going to pollute

3     your water.  You have to think of me like a jury.  Okay.  If

4     you don't think it is important enough to put it in the

5     beginning, I have my doubts.  Okay.

6          MR. SULLIVAN:  Well, Your Honor, we think it is very

7     important because we think the most important argument is

8     next.  We saved the double recovery.

9          THE COURT:  Why do you keep calling it "double

10    recovery"?  It isn't double-recovered.  It's not like they're

11    recovering it twice for the same thing.  They're reducing

12    their effective share, which means they pay less money.  And

13    can I -- this is the most difficult argument of all.  The U.S.

14    government -- I realize it is not the Department of Justice --

15    sets up a system pursuant to the *Burbank* consent decree and

16    the -- what are we calling it?  D?

17         MR. SULLIVAN:  DOSA.

18         THE COURT:  DOSA.  D-O-S-A is the abbreviation.  Which

19    says, go ahead and bill us for all of your legal fees, that's

20    the cost of doing business, and you do that as soon as you

21    incur them, go ahead and bill us up to the government sort of

22    contract recovery rate in our contracts, and you pay them 50

23    percent in Burbank.  What in the world is a judge supposed to

24    do with those facts?  To say that the government, what they do

25    once doesn't mean that we should ignore it now?  I understand

911

 1    that the allocation may not be 50-50 because I don't know what

 2    the facts are for Burbank, but why in the world would anybody

 3    set up that system and now tell me that I should penalize

 4    Lockheed for the government basically blessing an incredible

 5    way to reduce their contribution?

 6              MR. SULLIVAN:  Well, Your Honor, let me address that.

 7              THE COURT:  Please.

 8              MR. SULLIVAN:  First of all, the Burbank settlement

 9    occurred before the DOSA.

10              THE COURT:  That makes it worse in my view.

11              MR. SULLIVAN:  Well, it is before the United States

12    had agreed to settle and to allow --

13              THE COURT:  But they already knew that they had 50-50

14    going into it, so it is much worse.  They didn't know they

15    were going to do it.  When they agreed -- I mean, I may not

16    agree with the idea of giving the U.S. taxpayer all this

17    burden, but I'm stuck with what the government agreed to.

18              MR. SULLIVAN:  All right.  First of all --

19              THE COURT:  That's your Government, too.

20              MR. SULLIVAN:  -- Your Honor, the Burbank case is the

21    settlement.  The DOJ settled with Lockheed for the Burbank

22    case.  I don't know the facts of the Burbank case, but we

23    settled with them.

24              THE COURT:  You recognized an allocation which was

25    more than zero, and you gave your blessing to a system that

1     allows them to take it from their customer, the Department of

2     Defense, their legal fees, their profits.  They incorporate a

3     certain amount of profit on these indirect costs.  The

4     indirect costs incurred in cleaning up this site.  So we know

5     that they are getting -- and I understand there may be an

6     economic benefit from this credit, the credit may not come out

7     even, depending on when you have your start date -- but the

8     United States government said this is fine.  And implicit in

9     that -- put aside the 50-50 -- implicit is the notion of an

10    allocation still being proper.  So the effective rate of what

11    Lockheed paid at Burbank had to have changed dramatically, or

12    at least it changed given the structure that was approved by

13    the United States government.

14         MR. SULLIVAN:  Your Honor, I can see that you have

15    been reading Lockheed's arguments and you bought their side of

16    the story, but that is not exactly what is going on here, Your

17    Honor.

18         Your Honor, the government contract world is separate

19    from CERCLA; and in terms of what the federal acquisition

20    regulation says about legal fees, it doesn't say sue the

21    United States and bill taxpayers.  It just simply says, if you

22    sue the United States in a contract action, you can't recover

23    your legal fees.  Lockheed has made an interpretation very

24    aggressively that since the FAR doesn't say if we sue them

25    under CERCLA we can't recover our attorney fees, they just

1    include them.  The problem is --

2             THE COURT:  They include them with the DOD, not here.

3             MR. SULLIVAN:  That's right.

4             THE COURT:  What is your DOD doing?  Do they pay them,

5    or do they reject them?

6             MR. SULLIVAN:  They're allowable because they're not

7    prohibited by the FAR.  They have taken an interpretation of

8    the FAR that just hasn't been dealt with yet, and they are

9    paying them because the FAR doesn't say you can't recover your

10   attorney's fees for this case.

11            THE COURT:  It says that you can put them in this

12   residual pot.

13            MR. SULLIVAN:  The FAR doesn't say that.

14            THE COURT:  Well, somebody says this.  This has been

15   going on for years.

16            MR. SULLIVAN:  This is Lockheed's interpretation of

17   the laws and the discontinued operations settlement agreement.

18   But if I can go with discontinued operations settlement

19   agreement, Your Honor, basically what that is is, under the

20   FAR, Lockheed has agreed with the United States that the

21   United States will allow Lockheed to charge their

22   environmental costs for their discontinued operations under

23   their government contracts, period.  And Lockheed chooses how

24   much it tries to recover; and basically my understanding is

25   they try to recover them all, and they're recovering somewhere

914

1    between around 80 to 90 percent.  That's what they're doing

2    under --

3            THE COURT:  They're not trying to recover 100 percent

4    because they're trying to recover that portion of their

5    government work, so if they had 10 percent that wasn't

6    government work --

7            MR. SULLIVAN:  If they put 100 percent of the costs in

8    their overhead pool, they wind up recovering about 80 to 90

9    percent --

10           THE COURT:  That's because of your agreement with

11   them --

12           MR. SULLIVAN:  And that was an agreement --

13           THE COURT:  -- and that covers this case.

14           MR. SULLIVAN:  Yes, it covers this case, Your Honor.

15           THE COURT:  Okay.

16           MR. SULLIVAN:  It covers this case.  The United

17   States, it's determined in a settlement that that would be

18   okay under the FAR to do that.

19           THE COURT:  For this case.

20           MR. SULLIVAN:  No, not just for this case.  It is for

21   all their discontinued operations, Your Honor.

22           THE COURT:  That covers this case.  So I have to start

23   with that as a premise.  That's what hung up Judge Robertson.

24   I'm not surprised.

25           MR. SULLIVAN:  Your Honor, here is the thing about

1    Judge Robertson's opinion:  Judge Robertson's opinion deals

2    with CERCLA 114(b).  It doesn't deal with the equitable CERCLA

3    cases that talk about double recovery because the CERCLA

4    cases, Your Honor, they focus on preventing double recovery

5    during the CERCLA case.

6          THE COURT:  So do I have to find that this is double

7    recovery?  Is that what you're saying --

8          MR. SULLIVAN:  I will show you exactly how it works,

9    Your Honor.  All of these circuits agree that preventing

10   double recovery is an equitable factor in a CERCLA case.

11         THE COURT:  Right.

12         MR. SULLIVAN:  The way they do it is they ask whether

13   the PRP has been reimbursed for any of the costs it seeks to

14   recover from any source.  So the question here is:  Has

15   Lockheed been reimbursed for the cost it is seeking to

16   recover?  And the answer is yes.  The United States is paying

17   it through an agreement from 2000 for their costs.  It is not

18   a CERCLA relief, but we still have agreed to pay that.  So the

19   answer to that question is yes.

20         THE COURT:  Why didn't they prevent them from having

21   the ability to sue in CERCLA?  They knew --

22         MR. SULLIVAN:  The law doesn't say anything about

23   that.

24         THE COURT:  The agreement does --

25         MR. SULLIVAN:  The agreement doesn't say that Lockheed

1    should go out and sue the United States under CERCLA.

2           THE COURT:  No, it certainly doesn't preclude it.  It

3    says that this in no way impacts rights under CERCLA.

4           MR. SULLIVAN:  That's right.  But it doesn't say they

5    should go out and sue us again.

6           The DOD did not have authority, Your Honor, to release

7    a CERCLA claim, so they couldn't do that.  Only the DOJ has

8    that authority, Your Honor, and we weren't part of that

9    negotiation, so they couldn't release it.

10          THE COURT:  Well, somebody released a CERCLA claim

11   brought in Burbank, so it cannot be that it wasn't in the

12   government's consciousness that somebody is going to make an

13   allegation along with a system for DOD recovery by Lockheed

14   through DOD contracts.

15          MR. SULLIVAN:  Burbank is not a system of recovery.

16   This is a settlement of one case, Your Honor, in California.

17   It was separate.  It was negotiated by DOJ attorneys.  DOSA

18   was negotiated by DCMA, not us.

19          THE COURT:  You can't walk away from the DOSA --

20          MR. SULLIVAN:  It applies to this case.  We're not

21   trying to walk away.

22          THE COURT:  You can't tell me that DOJ or the DOD --

23   whoever they were, it doesn't make any difference -- was not

24   aware that Lockheed could sue, would sue for CERCLA.  You

25   weren't getting any protection from that.

1          MR. SULLIVAN:  We didn't get protection from that in

2     the DOSA agreement, no, we didn't.

3          THE COURT:  Somewhere along the line you got the idea

4     that they would get a credit, right?

5          Where is the agreement?  Do you have a copy, Jared?

6          MR. SULLIVAN:  It is Exhibit 1033.

7          THE COURT:  Okay.

8          MR. SULLIVAN:  It is in the double recovery section of

9     our binder, Your Honor.

10         THE COURT:  Is it your expert's testimony this is

11    double recovery as opposed to -- I thought you had moved away

12    from that to a more sophisticated analysis.

13         MR. SULLIVAN:  Legally, it will be double recovery,

14    and I will show you how in a few minutes.

15         THE COURT:  Go ahead.  Show me how it is double

16    recovery.

17         MR. SULLIVAN:  Here is how it is double recovery, Your

18    Honor --

19         THE COURT:  I spent all weekend reading the affidavit.

20    Go ahead.

21         MR. SULLIVAN:  Joan Meyer's analysis of economic

22    benefit is not about double recovery; it is about the farce of

23    Lockheed's effort to correct it after it has happened.  Here's

24    double recovery, Your Honor, under the CERCLA case.  What the

25    courts do is they look at has a party recovered from any other

1    source during or prior to the CERCLA case.  Those sources in

2    other cases were insurance, settlement agreements with other

3    PRPs, or informal settlement payments or contracts.

4            So how should the double recovery be accounted for?

5    What these cases show is that the predominant method is to

6    subtract the prior reimbursement from the costs that the

7    CERCLA plaintiff seeks to have allocated in the case.  In

8    fact, Your Honor, that is consistent with the way the U.S. EPA

9    does settlements.  If they settle with the parties, they have

10   to subtract that settlement, because it is an amount received,

11   from what the EPA can seek to recover from others.

12           Here's an example of how double recovery was handled

13   in another case.  In that case, there were $173,000 in total

14   past costs that the plaintiff was seeking to recover, but the

15   plaintiff had recovered 109,000 from insurance and 32,000 from

16   other sources.  So what the Court did there was simply

17   subtract those other recoveries and said, to avoid double

18   recovery, what the plaintiff is allowed to recover is $32,000

19   in allocable past costs.  That's how the CERCLA double

20   recovery cases do this, Your Honor.

21           THE COURT:  Except when I get to this Exhibit 1033, it

22   says -- what do you do with paragraph 47?

23           MR. SULLIVAN:  It says --

24           THE COURT:  No double recovery with regard to the

25   settled discontinued operations cost.  It's going to reimburse

1    U.S. for any double recovery under the contracts.  That's what

2    the credits are all about.

3            MR. SULLIVAN:  That's right.

4            THE COURT:  My only point is that you have agreed by

5    virtue of a contract -- this is a contract -- to alter some of

6    this sort of standard CERCLA law.

7            MR. SULLIVAN:  Your Honor, we didn't tell them to sue

8    the United States, to waste taxpayer dollars to do this.

9            THE COURT:  But you let them do this (indicating).

10           MR. SULLIVAN:  That's right.  We did that agreement,

11   but that agreement doesn't say, Lockheed, go ahead and sue the

12   United States as many times as you want to and waste millions

13   of dollars of taxpayers' dollars --

14           THE COURT:  I agree it is a waste, but nobody

15   precluded it.  That's the problem --

16           MR. SULLIVAN:  Well, the bottom line is, Your Honor,

17   that -

18           THE COURT:  -- they're motivated by the bottom law --

19           MR. SULLIVAN:  It is not precluded there, but it is

20   precluded in the CERCLA cases.  All the circuit courts say you

21   have to subtract at minimum what has been recovered by another

22   party.  The courts aren't looking to what happens afterwards;

23   only Lockheed is doing that.  Your Honor, the circuit courts

24   tell you, you must subtract what they have already recovered.

25   That's what we're saying, Your Honor.  This is a different

1   world you're in there.  All we're saying is that is another

2   source of payment to Lockheed, and all these circuit courts

3   say you must subtract it at minimum, and that's what they all

4   say.

5           THE COURT:  But they're not dealing with a settlement

6   agreement that covers Redlands.  I would be happy -- it would

7   be simple if you were right, but you're not.  You are ignoring

8   a settlement agreement, which was entered into by the U.S.

9   government, and it was on the heels of an allocation of 50-50.

10  I just can't -- I'm sorry.  Well, finish up.  I just don't see

11  it.

12          MR. SULLIVAN:  Thank you, Your Honor.

13          THE COURT:  Neither did Judge Robertson, is the

14  problem.  You lost the double recovery stage, and now you're

15  arguing -- you're not arguing what your expert argued.

16          MR. SULLIVAN:  Your Honor, our position is, in order

17  to be consistent with the other circuits, what this Court

18  should do is subtract what the United States has already paid

19  to Lockheed.  We estimate that Lockheed's total claimed costs

20  in this case are 286 million.  We have estimated that the

21  United States has already paid Lockheed, that they have

22  already recovered 208 million.  And so consistent with these

23  other double recovery cases, all that Lockheed should be able

24  to recover in this case is about $78 million.

25          THE COURT:  So no credits?  You basically want to take

1    that out --

2           MR. SULLIVAN:  Well, that's what we're dealing

3    with -- that's at minimum what you should do --

4           THE COURT:  Yes or no?  No credits?  Have you gotten

5    any credits so far, DOD?

6           MR. SULLIVAN:  I'm not sure -- not about this

7    case -- this case -- not for this case, I don't believe.  I'm

8    not sure.

9           THE COURT:  Can you answer that simply?  Have there

10   been any credits --

11          MR. MURPHY:  For Redlands, Your Honor?

12          THE COURT:  Yes --

13          MR. MURPHY:  Your Honor, there was a credit to DOD

14   from the 7 W settlement.

15          THE COURT:  The Easter grass.  I'm talking

16   about -- okay, there were credits that went into the pool.

17          MR. MURPHY:  Yes, Your Honor.

18          THE COURT:  And under the agreement do you disagree

19   that this agreement, the 1033, anticipates credits under 4.7?

20          MR. SULLIVAN:  That if there is a double recovery,

21   there would be credits.  There could be double recoveries from

22   a lot of places.

23          THE COURT:  But that assumes that that will take care

24   of the double recovery.  Am I misreading 4.7?

25          MR. SULLIVAN:  I don't believe the United States

1    intended to have Lockheed sue the United States again to

2    recover these costs.  The testimony, my understanding, is we

3    thought it was over.  Maybe we shouldn't have been so stupid,

4    but we thought it was over.

5        THE COURT:  Wait.  Over?  It says here that nothing in

6    here will affect CERCLA.  The settlement agreement does not

7    settle claims, if any, arising under CERCLA.  What were the

8    dates of the tolling agreement --

9        MR. MURPHY:  The Redlands one was 1997, Your Honor,

10   and the other sites was 1999.

11       THE COURT:  1999.  Wow.  So you're saying the

12   government signed off on this document in 2000 knowing that

13   they had sued you at Burbank, or at least counter-sued,

14   knowing that you were coming up with a 50-50, and they're

15   working out there in Redlands and you didn't get a release.

16       MR. SULLIVAN:  The DCMA did not have authority to get

17   a CERCLA release.

18       THE COURT:  The U.S. government cannot be segmented

19   like that.  You are the U.S. government.

20       MR. SULLIVAN:  I'm sorry, but the people who were

21   working on that settlement agreement were not the DOJ.  We did

22   not get a CERCLA release.

23       THE COURT:  You only got it in Burbank.

24       MR. SULLIVAN:  Burbank was a CERCLA case in Federal

25   Court.  This is not a federal court case, Your Honor --

1          THE COURT:  But you got at Burbank a release for any

2     further liability beyond the 50-50 --

3          MR. SULLIVAN:  I don't exactly know what is going on

4     in Burbank.  I know it continues on today and the United

5     States is making payments under that agreement.

6          THE COURT:  In fact, under this agreement in front of

7     me, some costs were not allowed.

8          MR. SULLIVAN:  That's right, Your Honor.

9          THE COURT:  So there was some thought as to what was

10    being put into the pool and what would be put in the pool in

11    the future.

12         MR. SULLIVAN:  What was happening there is, since the

13    Burbank case had already settled when they settled this

14    agreement, the United States had actually in Burbank already

15    made direct payments, and they were trying to do something to

16    take account for that.  The situation we're in now is the

17    opposite.  There Burbank settled first and the United States

18    had made payments before the United States had agreed that

19    they could recover their costs under contracts.

20         THE COURT:  Okay.  Do you have anything to say about

21    the economic --

22         MR. SULLIVAN:  Yes, Your Honor.  That gets to the

23    issue of what first impression is in the double recovery case,

24    and that is that the United States, not a third party, as in

25    the other cases, reimbursed Lockheed for its environmental

1    costs.  The question is should the United States receive full

2    credit for the amounts it has reimbursed the plaintiff.

3           Lockheed's position is -- and they have been saying

4    this all along -- you should ignore these double recovery

5    cases, the equitable double recovery cases, because Lockheed

6    claims it will fix double recovery after judgment by crediting

7    the judgment to its government customers.

8           THE COURT:  That shouldn't come as a surprise to the

9    government.  They agreed to it.

10          MR. SULLIVAN:  I don't think there is an agreement,

11   with all due respect, that we wanted them to go out and sue us

12   and waste taxpayers' dollars and do this, Your Honor.

13          THE COURT:  Yes, that's true, clearly.  Okay.

14          MR. SULLIVAN:  And Lockheed's rationale for what

15   they're doing here is that Lockheed's overhead costs are

16   burdened by the United States' share of CERCLA liability and

17   crediting will reduce Lockheed's overhead costs and make them

18   more competitive in the government contract marketplace.

19   That's their rationale for what they're doing here.  Your

20   Honor, that is inconsistent with the purpose of CERCLA.  As

21   you said in the Viacom case, the two main purposes of CERCLA

22   are prompt cleanup of hazardous waste sites and imposition of

23   all cleanup costs on the responsible parties.  The purpose of

24   CERCLA is not to enhance Lockheed's competitive position in

25   the government contracts marketplace.  It is not to lower

1      Lockheed's indirect costs on government contracts.  And

2      certainly, I have never seen in any CERCLA case the purpose of

3      CERCLA is to shift taxpayer funds from one source within the

4      executive branch to another.

5              In fact, Your Honor, Lockheed's post-judgment fix here

6      is a farce.  The crediting is only necessary if there is a

7      double recovery under CERCLA, which the circuit courts have

8      all said is wrong, and any credit would occur years after this

9      case is over, and you would not even have jurisdiction over

10     that.  In fact, it would be a government contract issue, and

11     if there was a problem, it would go up to the Armed Services

12     Board of Contract Appeals.  In fact, the United States will

13     not receive 100 percent of the credit.

14             THE COURT:  Yeah, explain that one.  That's your

15     expert's position, the credit doesn't work --

16             MR. SULLIVAN:  The credit doesn't work for two

17     reasons:  Because we will only receive part of the credit that

18     relates to their recovering of costs, which is their

19     recoverability factor, so we will be receiving somewhere

20     around 85, 86 percent of the credit over five years with no

21     interest.

22             THE COURT:  Do you pass on -- just to clarify -- does

23     Lockheed pass on when you -- as a profit -- when they bid

24     contracts for non-government, these costs, too?

25             MR. MURPHY:  It is my understanding, Your Honor, if we

1      get a credit in this case, it will be passed on to both

2      government and non-governmental entities, Your Honor.

3              THE COURT:  Thank you.

4              And the costs, as well?

5              MR. MURPHY:  The costs, as well, Your Honor.  It is

6      the same pool that gets allocated to the different contracts.

7              MR. SULLIVAN:  And so what we have done in order to

8      calculate this, Joan Meyer has done an economic analysis, and

9      if this Court were to assign a 10 percent allocation to the

10     United States in this case, Lockheed would receive a

11     $5.2 million economic benefit despite the credit.  If this

12     Court were to assign what Lockheed has asked, 60 percent,

13     Lockheed would receive a $31.3 million economic benefit.

14             THE COURT:  How does that translate into the Court

15     decision?  Put aside your double recovery, perhaps.  How do

16     you -- how do you factor that in?  If you say, let's just

17     say you start out coming out with an allocation, you say

18     10 percent.  What do you do after that in order to address the

19     economic benefit?

20             MR. SULLIVAN:  Well, Your Honor, we just don't think

21     it is proper because it is not going to provide a credit; it

22     is going to provide a profit to Lockheed.  They're using

23     CERCLA to make a profit.  You have the power to stop it, but

24     that's what they want.  They want to make a profit off of

25     CERCLA, Your Honor.  This isn't the end of it.

1          As you heard the other day from Mr. Wright, the

2     economic benefit calculation does not even include the impact

3     of the credit on Lockheed's existing fixed-price contracts,

4     which make up about 40 to 50 percent of Lockheed's business.

5     Here is how it works, Your Honor:  The credit, when it goes to

6     those contracts, will lower the overhead costs, but since

7     those contracts are fixed-price contracts, the price won't

8     come down.  So that means Lockheed's profits will go up on all

9     those contracts.  So when you look at what percentage of the

10    credit will the United States really get without interest over

11    five years, is it 50 percent, 60?  I don't know exactly, but I

12    would say if we got 60 percent of that credit we would be

13    lucky.

14          Your Honor, that is why this is a total farce, and

15    it's an abuse of CERCLA, Your Honor, and we just discovered

16    this within the last two weeks, and this is sad.

17          THE COURT:  You discovered it within the last two

18    weeks?

19          MR. SULLIVAN:  In the last two weeks, we finally

20    figured out what was going on here with Lockheed using a

21    credit to increase the profit on their existing fixed-price

22    contracts, and we think, Your Honor, that is wrong.

23          THE COURT:  But how, other than accepting your double

24    recovery, is the Court to address this in percentages?  That

25    is what I don't understand.

1            MR. SULLIVAN:  This kind of thing shouldn't happen,

2     Your Honor.

3            THE COURT:  All right.  Thank you.  We need a break.

4     Fifteen minutes, please.

5            (Recess taken from 3:41 p.m. to 3:56 p.m.)

6            THE COURT:  Do you want to call your witness?

7            MR. SULLIVAN:  I actually had a couple more things to

8     say.

9            THE COURT:  We can get it at the next round.

10           MR. SULLIVAN:  You want us to call our witness now?

11           THE COURT:  Yes.

12           MR. JOHNSON:  Your Honor, before the United States

13    calls James Nagle to the stand, the Court had brought up with

14    Mr. Johnson this exhibit, Plaintiff's Exhibit 1067.

15           THE COURT:  Uh-huh.

16           The United States had become aware and was trying to

17    gather information on environmental sensitivities of the

18    disposal of waste, but you'll recall Mr. Johnson testified

19    that he wasn't aware of Mr. Borgelt providing testimony that

20    speaks to this document as to why it was created.  So the

21    United States would like to read Mr. Borgelt's designated

22    testimony into the record.  Mr. Borgelt's testimony is United

23    States Exhibit 852.  This is in the United States binder in

24    the Bauer section.

25           THE COURT:  It is in evidence?

—929—

1          MR. JOHNSON:  It is in evidence.

2          THE COURT:  How much are you going to read?

3          MR. JOHNSON:  One paragraph, Your Honor.  It is a

4     broken paragraph, one paragraph on page 168.

5          THE COURT:  This is relative to what exhibit number?

6          MR. JOHNSON:  To Plaintiff's Exhibit 1067.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Mr. Borgelt testified -- and I will tie

9     this to the exhibit with a question to Mr. Nagle, if that's

10    okay.  But Mr. Borgelt testified, "In fact, the previous

11    document that was in reply to the Navy, that one was in

12    response to a Navy survey that they had made of Navy

13    suppliers, wanting to know.  And the Navy itself was looking

14    at the possibility of establishing a disposal facility at

15    China Lake that could be used by contractors as well as the

16    Navy.  And so they had -- they contacted us and asked us for

17    what our level of waste management was.  So that was, in turn,

18    our response."

19         THE COURT:  Can you put the exhibit back on?

20         MR. JOHNSON:  If you go to the second page, it is

21    signed by Mr. Borgelt.  I have a copy of the exhibit if it

22    would make it easier for the Court.

23         THE COURT:  Back to the first page.  I can't read

24    that.

25         THE COURT:  Okay.

930

1          MR. JOHNSON:  Thank you.

2          The United States calls James F. Nagle.

3                    **JAMES F. NAGLE,**

4     having been first duly sworn to tell the truth, the whole

5     truth and nothing but the truth, was examined and testified as

6     follows:

7                   **DIRECT EXAMINATION**

8          BY MR. JOHNSON:

9     Q.   Mr. Nagle, I have handed you Plaintiff's Exhibit 1067, and

10    you were present while I read Mr. Borgelt's testimony into the

11    record.

12    A.   Yes, sir.

13    Q.   Have you reviewed Mr. Borgelt's testimony?

14    A.   Yes, sir.

15    Q.   Where Mr. Borgelt states, "In fact, the previous document

16    that was in reply to the Navy, that was in response to a Navy

17    survey," when Mr. Borgelt made that statement, was he

18    referring to Plaintiff's Exhibit 1067?

19    A.   Yes.  I was tracking down the documents as I was going

20    through his deposition.

21    Q.   Thank you.

22          And Mr. Nagle, have you made a declaration,

23    testimonial declaration for this case?

24    A.   Yes, sir, I have.

25    Q.   Do you adopt that as your testimony in this case?

1      A.   Yes, sir.

2            MR. JOHNSON:  Thank you.

3            THE COURT:  When you look at this document, are they

4      viewing waste propellants as the same thing as pyrotechnics?

5      I was told that in the government's opening a few moments ago.

6      Were you here for that?

7            THE WITNESS:  I was.  I wasn't paying a whole lot of

8      attention to it, but I was.

9            THE COURT:  They said pyrotechnics include AP.

10           MR. JOHNSON:  Your Honor, that would be beyond the

11     scope of this expert's expertise.  He is a government

12     contracting expert.

13           THE COURT:  Oh, I thought he was going to come with

14     that.  Sorry.  My mistake.

15           MR. MURPHY:  Could you put the testimony back up on

16     the screen, please.

17           Could you blow up the last paragraph there.

18           I just wanted to point out -- the Court has asked

19     several times about Fort Irwin.  So at the bottom, the

20     testimony was, "And so the Navy would not take it at China

21     Lake, but I made several trips to Fort Irwin, which was an

22     Army facility, and we hauled waste propellant to Fort Irwin

23     and actually burned it on a dry lake bed in Fort Irwin."

24           I just that thought that that was interesting, Your

25     Honor.

1         THE COURT:  I'm sure you did.

2                   **CROSS-EXAMINATION**

3         BY MR. MURPHY:

4    Q.   Mr. Nagle, how are you today?

5    A.   I'm fine, Mr. Murphy.  How are you?

6    Q.   I'm very good.

7         Mr. Nagle, I want to talk a little bit about opinions

8    you have offered in your affidavit.  You gave a control

9    opinion; is that's correct?

10   A.   Yes, sir.

11   Q.   And that control opinion is that the government did not

12   control waste operations at the LPC facilities?

13   A.   Yes, sir.

14   Q.   What is the basis -- well, I will state it this way:  The

15   basis of your control opinion looks to constructive law,

16   constructive change case law; is that correct?

17   A.   That's correct.  There is nothing in the ASPR or the FAR

18   that deals with control.  Basically, the government is not to

19   control an independent contractor.  It is when government

20   officials overstep their authority that you get into

21   litigation and constructive change issues, so yes, you're

22   right.

23   Q.   Okay.  Your opinion is based on your experience as a

24   government contracts JAG attorney?

25   A.   Partly.  Partly, yes.  Certainly that's where it began,

933

1    where the contracting officer or contractor would say, there

2    is this government inspector who is overstepping his

3    authority, and I would have to review and sometimes conduct

4    training to make sure that they didn't overstep their

5    authority.

6    Q.   And so it's true that you would only find control,

7    correct, if the contracting officer or other government

8    officials overstepped their bounds at the LPC facility?

9    A.   Yes.  Yes.  That would be my opinion.  What was required

10    in the contract, what the contractor had to do.  And then the

11    inspection, to make sure they were doing what the contract

12    said they must do.  The government cannot do by contract

13    administration what it should have done when it wrote the

14    contract.

15    Q.   Okay.  But so it's your testimony, again, that if -- I

16    don't want to use "control" because that's the word you're

17    using -- but that any sort of government oversight or

18    direction of waste disposal activities took place under the

19    terms of the contract, isn't it true that you would find no

20    control in that situation?

21    A.   Well, again, we're splitting -- we're making a

22    distinction.  Oversight, the government certainly would do

23    oversight, and a contract such as this one, it would not be

24    what they would call a turnkey contract, here's the contract,

25    we'll come back in five years, and we want our missiles.

934

1    There would be oversight but not that -- there would be no

2    usurping of the control on that contract.

3              Am I answering your question?

4    Q.   Yes.

5              In your deposition, you made an analogy to the

6    government basically -- you clarified this opinion through an

7    example of an individual buying a car.  He cares that the car

8    meets the government standards but doesn't care how the

9    manufacturer gets rid of the waste, the extra remnants of

10   fabric from the seats.

11             Do you remember saying that?

12   A.   I do, sir.

13   Q.   So you see the contract here more like the government

14   bought a car from LPC and didn't care about how it disposed of

15   the waste it was generating in buying that car?

16   A.   Well, I was doing it by analogy to me.  If I buy a car, I

17   will inspect to make sure that the fabrics are blue or

18   something like that, but it would not enter into my mind as a

19   typical buyer what the seller does with the remnant fabrics or

20   something like that.

21   Q.   Okay.  You found no evidence that the government

22   controlled or cared what happened to the waste in this case?

23   A.   Only as to safety.  Some quality assurance but primarily

24   safety.

25   Q.   Safety.

1    A.   Yes.

2    Q.   Mr. Nagle, I just want to start -- let's start with tab 2.

3    I'm going to hand you a binder of materials.  Your affidavit

4    is there, as well.

5    A.   Thank you.

6         MR. MURPHY:  Your Honor, we're going to give you a

7    binder that you can give back to us as soon as you're done,

8    just for ease of review.

9         THE COURT:  There is actually no ease of review.

10        MR. MURPHY:  I'm trying to make it as easy as

11   possible.

12        THE COURT:  I tried to do that.  It didn't work.

13        BY MR. MURPHY:

14   Q.   Mr. Nagle, did you review this as part of your opinions in

15   this case?

16        THE COURT:  What tab is this?

17        MR. MURPHY:  This is tab 2 in the binder, Your Honor.

18        THE WITNESS:  I looked at it.  I'm not a technical

19   person.  So much of this literally would have gone in one ear

20   and out the other.  I knew of its existence.  I knew it was

21   incorporated in some of the contracts that I was able to see.

22        BY MR. MURPHY:

23   Q.   Okay.  So you found evidence that this was incorporated

24   into contracts that LPC performed?

25   A.   Yes.  I don't remember how many, but it was certainly in

1    at least one and probably more.

2    Q.   Okay.  Do you remember if it was incorporated into the

3    SRAM or short-range attack missile contract?

4    A.   I don't remember.  I would be surprised if it were not.

5    Q.   So let's look at part 1501.  I'm sorry.  It's 1502, which

6    is the first page of the binder after the title page.

7    A.   Page 1502.

8    Q.   I'm sorry.  It is 15-1.

9    A.   15-1.

10   Q.   Excuse me.

11         So, again, before we start reading here, I just want

12   to confirm, in your experience as a government contracts

13   attorney, did you ever work at a site that handled explosive

14   wastes?

15   A.   I did a lot of work at Rock Island Arsenal Tank and

16   Automotive Command.  So, yes, that wasn't the focus of my

17   visits there, but they would have been handling explosive

18   wastes there, yes.

19   Q.   Was that run by a contractor?

20   A.   No.  Rock Island Arsenal was -- and still is, as far as I

21   know -- a government-owned, government-operated facility.  I

22   had to go as part of my work to various ordnance

23   manufacturers, Norris, Chamberlain, but I don't -- again, I

24   don't think the focus of my going there was to look at waste.

25   Q.   So did you ever work with this manual or other similar

1    explosives manuals in your work?

2    A.   I have worked with similar ones.  It's a generic manual.

3    It applies whether the Army is buying low-caliber rifle

4    ammunition or the Navy is buying 15-inch shells for

5    battleships.

6    Q.   So it's fair to say this was an industry standard?

7    A.   I don't know if it was an industry standard.  It was a DOD

8    standard.

9    Q.   Okay.  That applied to its contractors?

10   A.   To its contractors doing this type of work.

11   Q.   Okay.  Mr. Nagle, in terms of industry, does the

12   government have a specialized control over its contractors?

13          THE COURT:  What does "specialized control" mean?

14          BY MR. MURPHY:

15   Q.   Well, let me put it this way:  Is it true, in certain

16   circumstances, the government is the sole buyer of a certain

17   type of ammunition or munition?

18   A.   Oh, yes, very often, the government is a monopsony, there

19   is only one buyer of a nuclear submarine or something like

20   that.

21          THE COURT:  Can you spell that for the reporter?

22          THE WITNESS:  M-O-N-O-P -- I didn't realize spelling

23   would be a requirement -- M-O-N-O-P-S-O-N-Y.

24          BY MR. MURPHY:

25   Q.   Are there other purchasers for advanced solid-rocket

—938—

1    motors except for the federal government?

2    A.   Advanced solid-rocket motors?  I would doubt it.

3    Q.   Do you know how many contractors operated in this field

4    during the '50s, '60s, and '70s?

5    A.   No, I do not.  I was present when the previous witness

6    said anywhere from half a dozen to a dozen.  I would have no

7    reason to disagree with that.

8    Q.   Okay.  We're going to go back to tab 1 now.

9         Do you recognize --

10   A.   I do.  I'm thrilled that somebody has read my book.

11   Q.   I have excerpted a page from your book, Mr. Nagle, 474 and

12   475.  I'm going to read from the first full paragraph there at

13   the bottom.

14   A.   Bottom of which page?

15   Q.   474.  I'm sorry.

16        It says, "The shipbuilders could always sell ships to

17   transport companies.  But Sears or J.C. Penney do not now buy

18   Abrams tanks or ICBMs."

19   A.   I'm sorry.  Where are you?

20   Q.   The first paragraph on page 474, last sentence, last

21   couple of sentences.

22   A.   Yes, I'm sorry.  Yes.

23   Q.   It says, "The shipbuilders could always sell ships to

24   transport companies.  But Sears or J.C. Penney do not now buy

25   Abrams tanks or ICBMs.

939

1                "The system had become the opposite of a monopoly --

2        that is, a monopsony, with only one buyer rather than one

3        seller."

4                Go to the top of page 475.  It says, "Investment in

5        people and equipment tends to shackle a company to the

6        government market."

7                You see that?

8        A.   Yes.

9        Q.   The next operative sentence in the next paragraph says,

10       "Once these companies made the initial tremendous investment,

11       they were wedded to the system and the system was wedded to

12       them."

13               THE COURT:  I'm sorry, Mr. Murphy, is this designed to

14       make me feel sympathetic to Lockheed?  I'm not sure what

15       you're getting at --

16               MR. MURPHY:  Your Honor, the last sentence, it talks

17       about, "Only two companies could build nuclear submarines,

18       only five could build a strategic bomber, and only five would

19       even try to build a fighter.  Many are, in reality, agents of

20       the government."

21               BY MR. MURPHY:

22       Q.   So, Mr. Nagle, as an agent of the government, did the

23       government have control over its contractors in these types of

24       areas?

25       A.   Controls, not in the sense of the contract.  Certainly,

1    they had, as any huge buyer, if they said something, a seller

2    would be interested in complying with their wishes.

3            Am I answering your question?

4    Q.   Yes.

5            So, in other words, as a buyer in this industry, the

6    only buyer in the advanced solid-rocket motor industry, it had

7    the power to impose industry standards on its customers?

8    A.   With one major exception:  No one puts a gun to your head

9    to take a government contract.  You can always decide, nah,

10   this is too risky, I won't bid this job.

11   Q.   Okay.  Going back to tab 2, you said you reviewed this

12   contract --

13   A.   I would have reviewed it -- just -- not very well at all.

14   It would have been too technical for me.

15   Q.   Okay.  Looking at -- let's go to page 15-2(d), where it

16   says, "Solid wastes."

17   A.   Yes, sir.

18   Q.   "Contaminated solid waste material should be collected,

19   placed in closed containers and taken, as soon as practicable,

20   to buildings set apart for its treatment or to the burning

21   ground to be destroyed in an appropriate manner."

22           Do you see that?

23   A.   Yes.

24   Q.   So if this were incorporated into a contract, would LPC be

25   required to comply with it?

1    A.   Not exactly.

2    Q.   Okay.

3    A.   The word is "should."

4         Whenever you review government manuals or regulations,

5    you got to look at four words:  "shall," "should," "may,"

6    "shall not."  So this is hortatory.  But because this is a

7    generic manual that applies across the board, requests for

8    waiver or deviation were very commonly asked for and granted.

9    Q.   Okay.  But a contract would have to ask for a variation?

10   A.   Yes, typically.

11   Q.   Okay.  Let's then look for -- look at 15-4, where it says

12   "Destruction sites."

13   A.   Yes, I've got it.

14   Q.   It says, "The site selected for destruction of ammunition

15   and explosives shall be located at the maximum practicable

16   distance available from all magazines, inhabited buildings,

17   public highways, railways, and operating buildings."

18        Do you see that?

19   A.   Yes.

20        THE COURT:  You're talking too fast for the reporter.

21        MR. MURPHY:  I'm sorry.

22        BY MR. MURPHY:

23   Q.   Then, at paragraph 3 down below, it says, "Dry grass,

24   leaves, and other extraneous combustible materials shall be

25   removed within a radius of 200 feet from the point of

1     destruction."

2           Do you see that?

3     A.   Yes.

4     Q.   The use of "shall" in this paragraph means that the

5     contractor was required to comply with this?

6     A.   Yes, sir.

7           THE COURT:   I'm sorry.  What number was that?

8           MR. MURPHY:   It was 15-4(a)(3).

9           BY MR. MURPHY:

10    Q.   Mr. Nagle, isn't it true that the government can impose

11    safety standards on its contractor?

12    A.   It depends on the contractor.  Certainly, a contractor

13    doing stuff like this, yes.  A contractor doing water

14    pitchers --

15    Q.   Right.  But on LPC, the government imposed safety

16    standards?

17    A.   Yes.  As I recall, in several of the contracts I looked

18    at, they imposed specifically this manual.

19    Q.   Okay.  Did the government inspect to make sure its

20    contractor was complying with those manuals?

21    A.   Periodically, yes.  They didn't have to, but they would

22    have a right to.

23    Q.   Okay.  And it's true that these safety manuals controlled

24    waste disposal; correct?

25    A.   No, I don't agree that it controlled waste disposal.  It

943

1    would certainly have some impact on safety.  They would look

2    at it, but they wouldn't go into the details of how, who,

3    when, why.

4    Q.  So looking back at the DOD safety manual, Title 15, where

5    it says, "Collection and destruction standards for ammunition

6    and explosive material."

7    A.  Where are you?

8    Q.  Page 15-1, the first page of tab 2, part 15.

9    A.  Uh-huh.

10   Q.  So your testimony is that this doesn't control waste

11   disposal?

12   A.  It certainly looks at it from the purpose of safety, but

13   it doesn't dictate all the requirements that may have to be

14   done to dispose of waste.  If you're talking about fabric,

15   they're not going to care about that.

16   Q.  We're not talking about fabric; we're talking about

17   explosive materials.

18   A.  I know that, but there may be a lot of other fabric that

19   are related to it, or non-explosive things that are involved

20   in a contract that does have some explosive material in there.

21   Q.  Okay.  So I guess I'm not defining my term correctly

22   enough.  Do these safety manuals control the disposal of

23   explosive waste materials?

24   A.  In regards to safety, they would have an impact,

25   certainly.

944

1    Q.   Safety, okay.  Because safety was the number one problem

2    dealing with explosive materials; correct?

3    A.   Yes.  They were worried about an explosion, which would

4    not only kill people, but it would delay production.

5    Q.   Okay.  Let's look at 15 -- again, first page, paragraph

6    1502(b), waste liquids.

7         It talks about, "When sumps or beds are properly

8    designed, the wash water, which passes beyond filters and

9    beds, should be free from significant amounts of explosives

10   materials, i.e., the amount dissolved in neutral water near

11   atmospheric temperature is small and can be expected to

12   produce no toxic or explosive hazard when connected with

13   natural drainage of the area."

14        Is this talking about waste disposal from a safety

15   point of view only?

16   A.   I think so.

17   Q.   Okay.  And so when it talks about, "Consideration should

18   be given to the possibility of collecting explosive materials

19   on the banks of streams or marshes during periods of drought,"

20   it's talking about the potential for explosive risks?

21   A.   I think so.

22   Q.   So we've seen now that there are manuals that are imposed

23   on LPC governing explosives disposal; correct?

24   A.   Correct.

25   Q.   We've talked a little bit about the fact that there were

1 inspections at LPC to monitor whether they were complying with

2 these explosives standards; correct?

3 A. Correct.

4    THE COURT:  They were?  Do you know?

5    MR. MURPHY:  We'll go over them, Your Honor.

6    BY MR. MURPHY:

7 Q. Is it also your testimony, then, that the government

8 inspected to ensure that we were disposing of these waste

9 materials correctly?

10 A. Only in regards to safety.

11 Q. Only in regards to safety, okay.

12    Let's look at tab 5.  Your Honor, tab 5 appears in our

13 trial binders at the waste disposal section.

14    THE COURT:  PX 0461.

15    MR. MURPHY:  Yes.  I'm sorry.  Yes.

16    BY MR. MURPHY:

17 Q. Did you review this document, Mr. Nagle?

18 A. I'm sorry?

19 Q. Did you review this document?

20 A. Yes.  I remember seeing it or something very similar to

21 it, at least the first page.  I'm positive I have seen the

22 second page.

23 Q. Okay.  So the first page talks about -- looking at the

24 second paragraph from the -- the paragraph right above the

25 last paragraph, where it says, "Demilitarization or

946

1    destruction of this material must" -- must -- "be witnessed by

2    an authorized government representative and a signed

3    certification as referenced below be forwarded this office."

4            You see that?

5    A.   Yes, I do.

6    Q.   Below it talks about the fact that the certificate gets

7    signed by a government employee.

8            Do you see that?

9    A.   Yes.

10   Q.   This demonstrates the government, at times, directed LPC

11   to dispose of explosive waste and then were required to watch

12   that disposal occur; correct?

13   A.   Yes.  Let me point out, though, that in the first

14   paragraph the materials that are classified or dangerous.

15   Typically, when you have something mutilated and witnessed, it

16   is because it might be a top secret type item and they want it

17   mutilated in that regard.  That's why it is being mutilated.

18   Q.   It says, "Classified or dangerous to public health,

19   safety, and welfare."

20   A.   Yes.

21   Q.   That would be the same, you would say this would be

22   classified because of the "or"?

23   A.   I do.  In my experience, when they wanted it specifically

24   witnessed, they want to make sure that there could be no

25   release of top secret, for example, information.

1    Q.   Do you know if what LPC was working on was classified at

2    the time?

3    A.   I do not.

4    Q.   Whether the missiles, like the SRAM missile, were

5    classified?

6    A.   I assume SRAM would have been classified, probably a

7    fairly high degree of classification.

8    Q.   And those classifications would give, then, as you say,

9    the government extra -- again, I want to avoid "control"

10   because I don't want -- ability to oversee or work with a

11   contractor on certain issues?

12   A.   Yes.  Yes.  It is very, very common, if there is

13   classified information, that at the end of the contract that

14   that information must be either returned to the government for

15   its destruction.  Shredding the paper or mutilating any

16   equipment that was made from classified drawings is witnessed

17   by a government official.

18   Q.   Okay.

19            THE COURT:  What does this material reference?

20            THE WITNESS:  Your Honor, I don't know what it is.

21            THE COURT:  Can I tell from the invoice, the shipping

22   document?  Do we know?

23            MR. MURPHY:  Who owned this material?

24            THE COURT:  What is the material itself?

25            MR. MURPHY:  Your Honor, it is -- I think in the back

1    it talks about two line items on schedule 2.

2           Your Honor, I would have to look again, but I believe

3    it is motors, rocket motors.

4           THE COURT:  It's what?

5           MR. MURPHY:  Rocket motors, Your Honor.

6           THE COURT:  The motors themselves?

7           MR. MURPHY:  I think so.

8           THE WITNESS:  Are you sure that both of these pages

9    refer to the same item?

10          Apparently, they do, the same number.

11          MR. MURPHY:  The contract is the same.

12          MR. JOHNSON:  Your Honor, objection to counsel

13   testifying as to the meaning of the document.  It doesn't

14   appear clear from the document.

15          MR. MURPHY:  Well --

16          THE COURT:  I don't know, either.  It says, "ABAND

17   TWO (2) Line Items."

18          MR. MURPHY:  That would be two line items.  We have to

19   look on the schedule attached.

20          THE COURT:  But we don't have that.

21          MR. MURPHY:  Not before us, Your Honor, but I can look

22   for it.

23          THE COURT:  I guess I would like to know because

24   otherwise I don't know -- it is $200.

25          MR. MURPHY:  Yes, Your Honor.

1          But again, it was being destroyed with government

2     oversight.

3               THE COURT:  Whatever it is.

4               MR. MURPHY:  Whatever it is.

5               THE COURT:  It could be pyrotechnics.  I don't know.

6               THE WITNESS:  Yes, to answer your last question.

7          BY MR. MURPHY:

8     Q.   Okay.  Let's go to the next tab, tab number 6, please.

9     This is tab 6 -- tab 6 is Plaintiff's Exhibit 302, and it is

10    in our waste disposal section of our trial binders.

11              THE COURT:  PX 0302.

12              MR. MURPHY:  0302, yes, Your Honor.

13              By MR. MURPHY:

14    Q.   Have you seen this document before?

15    A.   If I had, it didn't really jump out at me.

16    Q.   Okay.  It's true, isn't it, that this is a level-of-effort

17    planning/technical services document?

18    A.   That's what the title suggests.

19    Q.   Can you see where it says "manhours" on the right-hand

20    portion?

21    A.   Yes, sir.

22    Q.   Is that an estimate or a calculation of how many man-hours

23    that have been required to complete a task?

24    A.   I would assume that because it covers the activity

25    1 September through 19 September '75 and this is dated

1    20 October '75, that it is actuals at that point, not

2    estimates.

3    Q.   Okay.  And it is signed by two representatives?

4    A.   Yes.  The right-hand signing, surveillance program manager

5    and the contracting officer.

6    Q.   If you look at the period ending 9/19 -- you see that?

7    A.   Yes.

8    Q.   The activity is "Disposed of residual propellant from SRAM

9    aging program"?

10   A.   Yes.

11   Q.   Here it is a situation where the contractor is disposing

12   of SRAM propellants under government contract; correct?

13   A.   Yes, it appears to be.

14   Q.   Okay.  Let's look at tab number 7.  In tab number 7 is

15   Plaintiff's Exhibit 0483 --

16              THE COURT:  One second.  Just go back to tab 5.  Is

17   that a usual designation, "The contractor shall assume full

18   liability, and hereby releases the government from damages or

19   injuries to personnel, and/or property as a result of this

20   abandonment"?

21              MR. MURPHY:  You're on page 2 of that tab?

22              THE WITNESS:  Are you asking me?

23              THE COURT:  Do you have the exhibit?

24              THE WITNESS:  Yes, I do.

25              THE COURT:  Tab 5.  I just want to know whether you're

1    familiar with that paragraph.

2         THE WITNESS:  Yes.  That is very common language when

3    the government abandons property.

4         THE COURT:  If they didn't abandon the property, then

5    you would not expect to see that.  But have you seen these

6    facilities indemnification clauses?

7         THE WITNESS:  Oh, yes, they were common during that

8    time.

9         THE COURT:  And does it cover waste disposal?

10        THE WITNESS:  Your Honor, in all candor, I don't

11   remember any case discussing that, but it was just a full

12   indemnification, so I don't know of any reason for it to

13   exclude that other than anything that might be in the

14   contract.

15        THE COURT:  But you're unaware of any exceptions to

16   that broad language?

17        THE WITNESS:  Correct.  I'm not aware of anything that

18   would have excluded waste management.  There are exclusions

19   that are possible for insurance or things like that.

20        BY MR. MURPHY:

21   Q.  Could we bring up U.S. Exhibit 84.  So this is a

22   facilities contract.  Have you reviewed this?

23   A.  I do -- I do remember seeing this, yes.

24   Q.  Okay.  Is this required in all production contracts?  I'm

25   sorry.  Let's go -- let me start again.

952

1           So this is a facilities contract; correct?

2    A.   Yes.

3    Q.   Facilities contracts are contracts governing the use of

4    government-owned facilities?

5    A.   Yes.  Facilities either being a building or equipment,

6    things like that.

7    Q.   Pieces of equipment?

8    A.   Yes.

9    Q.   Okay.  Let's turn to page 28 in that indemnity -- I'm

10   sorry -- in this facilities contract, to look at the indemnity

11   clause that we were just talking about.

12           So here we have a clause 27 that says,

13   "Indemnification of the government."

14           You see that?

15   A.   Yes, sir.

16   Q.   Was this required to be in facilities contracts at the

17   time?

18   A.   The indemnification clause is required to be in all

19   facilities contracts at the time.  The reason why I hesitate,

20   there were essentially two versions of this clause.  Some did

21   not have that introductory clause except as provided in the

22   insurance-liability to third persons clause.  Some contracts

23   which would not have that insurance clause wouldn't have that

24   language in there.

25   Q.   Let's look at the last sentence of that indemnification.

1     "However, the provision of the contractor's related

2     procurement contracts shall govern the government's assumption

3     of liability for such claims arising out of or related to the

4     performance of each such related government contract and

5     involving the possession or use of the facilities."

6             So that means, correct, that to know whether this

7     indemnity applies, you would have to go to the actual

8     production contract to see whether there were other

9     assumptions of risks in that clause?  Correct?

10    A.   If there had been production contracts awarded, yes.  The

11    facilities contract was essentially a two-step process.  You

12    got the facilities contract, which might be at bare bones

13    cost.  The contractor was making its money on the production

14    contracts that were awarded to it to be performed in that

15    facility.  So if there were production contracts, what this

16    clause basically does is it defers to the production contract

17    to see if there is anything that impacts indemnification.

18    Q.   We would have to look at the actual contracts the

19    facilities were used under -- we would have to look at the

20    actual production contracts these facilities were used under

21    to determine whether there was a different assumption of risk

22    clause in those contracts?

23    A.   Yes, if there were production contracts.

24    Q.   Okay.  The clause that talks about --

25            THE COURT:  You say if there were production

954

 1      contracts.  Have you seen any?

 2              THE WITNESS:  In this contract?  Yes, Your Honor.

 3              THE COURT:  And have you looked to see whether there

 4      is something that changes assumption of the risk?

 5              THE WITNESS:  Your Honor, I did not recall anything

 6      that changed the assumption of risk.

 7              THE COURT:  Indemnification, I guess I should say.

 8              THE WITNESS:  There is at least one clause -- one

 9      contract that had that insurance liability to third persons

10      clause, but I think that was in a facilities contract.  That

11      might -- I think it might have been a facilities contract.

12      I'm sorry.  I'm sputtering.

13              BY MR. MURPHY:

14      Q.   Did you review the SRAM production contracts in this case?

15      A.   The one between the U.S. and Boeing or Boeing and --

16      Q.   Both, the U.S. and Boeing and Boeing and its subcontract

17      with LPC.

18      A.   I'm sure I reviewed the subcontract.

19      Q.   Was there an indemnification clause in that contract?

20      A.   Off the top of my head, I can't remember.

21      Q.   Isn't there a clause in there that was inserted under 5804

22      governing indemnity from a hold harmless clause from the

23      government to LPC?

24      A.   I don't remember.  That wouldn't surprise me, but I don't

25      remember.  All of the contracts are kind of jumbled together

1    at this point.

2    Q.  And it is true that that indemnity, if it was in the

3    production contract --

4            THE REPORTER:  Please slow down.  Repeat that one more

5    time.

6            MR. JOHNSON:  Objection.

7            THE COURT:  Overruled as to the objection.

8            BY MR. MURPHY:

9    Q.  It is true, is it not, that if there is an indemnity in

10   the SRAM contract, the production contract, that that would

11   take precedence over the indemnity in the facilities contract?

12   A.  I don't know without looking at those contracts, and I

13   don't -- I would be hesitant to offer a really legal opinion

14   as to which one would trump the other.

15   Q.  This says -- reading this one, it says, "The provisions of

16   the contractor's related procurement contracts shall govern."

17           Doesn't this mean this recedes in favor of the ones

18   that are in the production contracts?

19   A.  Yes.  The clear language is this defers to something else,

20   but I don't know how all encompassing or how specific the

21   other clause might be.

22   Q.  Looking at the first sentence, where it says, "Except as

23   provided in the insurance-liability to third persons clause."

24           Are you familiar with the insurance liability to third

25   persons clause?

1    A.   Yes.

2    Q.   Can we put up clause 26, please.

3            I'm sorry.  It is the one right before.

4    A.   That's not the beginning of the clause.

5    Q.   I guess it is (c) of that clause is the most relevant one.

6            Mr. Nagle, it is true, is it not, that this clause

7    stipulates certain situations or puts forward certain

8    situations where the government would reimburse the contractor

9    for certain liabilities?

10   A.   Yes.

11   Q.   Okay.  Have you done an analysis of whether the

12   liabilities in the CERCLA claim would be covered, or the

13   CERCLA liability would be covered, by this (c) clause?

14   A.   No, I have not.

15   Q.   So you have not looked at any of the CERCLA case law

16   looking at indemnity clauses and whether pre-CERCLA

17   indemnities are valid post-CERCLA or anything like that?

18   A.   No, I have not.

19   Q.   Tab 7 is Plaintiff's Exhibit 0483.  It can be found in our

20   trial binders between the safety manuals and inspections tab.

21           THE COURT:  PX 0483.

22           BY MR. MURPHY:

23   Q.   Mr. Nagle, did you review this?

24   A.   Yes, Mr. Murphy.

25   Q.   This is a safety survey; correct?

1    A.   Yes, that's how it is identified.

2    Q.   It is a safety survey conducted by the Defense Contract

3    Administration Services District?

4    A.   Yes.  DCAS is what it is called.

5    Q.   This is DCAS.  When was DCAS founded?

6    A.   DCAS was founded I think about 1964.  It was one of

7    Secretary McNamara's initiatives.

8    Q.   Okay.  Its job was to oversee contractor performance?

9    A.   Basically, yes.  Secretary McNamara wanted to make sure

10   that administration services were more uniform throughout the

11   Defense Department, so they created -- rather than have the

12   Army do it, the Air Force, they would have a more uniform DOD

13   organization do it.

14   Q.   Okay.  Did you review this DCAS safety survey, the

15   findings?

16   A.   Yes.  Again, I wouldn't have gone through it terribly

17   detailed.  We may have gone over this in my deposition in more

18   detail than when I first looked at it.

19   Q.   It's possible.  Looking at page 2, number 6.

20        So it's correct that we have a DCAS review looking at

21   disposal procedures and finding that "Detail procedures are

22   available and in use by disposal personnel.  However, they

23   will be incorporated in the safety manual as recommended."

24        Do you see that?

25   A.   Yes, I do.

1    Q.   So is it your opinion that this -- so it is your opinion,

2    correct, that this finding by DCAS exhibits no control of the

3    government over disposal at LPC?

4    A.   No, no, because it was clearly a recommendation that LPC

5    could agree with -- and here they did, obviously, agree

6    with -- but suggestions, recommendations on a safety issue I

7    don't view as control.

8    Q.   Okay.  At least it shows a cooperation or working together

9    with DCAS to dispose of this waste?

10   A.   I don't know exactly what the details were because all we

11   have here is LPC's response, but obviously, yes, you would try

12   to cooperate with DCAS.  I do remember documents where LPC

13   said, no, we're not going to do that, we think our procedures

14   are good enough, but generally, absolutely, you would try to

15   cooperate with DCAS.

16   Q.   Okay.  Again, this is showing DCAS reviewed the disposal

17   procedures that were in use by LPC at the time?

18   A.   Yes, as part of their safety survey.

19   Q.   Okay.  Let's look at tab 8.  Tab 8 is also found in our

20   trial binders under waste disposal.  It is Plaintiff's Exhibit

21   1073.

22            Have you seen this document before, Mr. Nagle?

23   A.   Yes, sir, I have.

24   Q.   And this document, it's a DCAS -- it's a letter from

25   Defense Supply Agency.  Is that DCAS, as well?

959

1    A.   Defense Supply Agency, now called the Defense Logistics

2    Agency, was the higher headquarters of DCAS at that time.

3    Q.   Okay.  Here we have a letter from the Defense Supply

4    Agency to Lockheed Propulsion where the government is

5    abandoning ammonium perchlorate; correct?

6    A.   Yes, sir.

7    Q.   So that implies the government owned the ammonium

8    perchlorate before it was abandoned; correct?

9    A.   Yes, I would agree with that.  It's on the inventory

10    schedule, which is page 3, and the contractor would not put

11    it, the AP, on there unless it was considered government

12    property.

13    Q.   Okay.  And the direction is to "Dispose by pit burning at

14    your Potrero plant."

15         Do you see that?

16    A.   Yes, sir.

17    Q.   Would the costs of disposing of the AP waste by pit

18    burning, would that have been an allowable cost if it was a

19    cost contract it was performing?

20    A.   If it was a cost reimbursable contract and certainly if it

21    was a direction by the plant clearance officer, I assume it

22    would be.  The only caveat I would have is if they had already

23    exceeded the maximum cost.

24    Q.   Okay.  If a contractor was bidding a fixed-price contract,

25    it would include the cost of waste disposal as part of its bid

960

1    in a fixed-price contract; correct?

2    A.   Yes, it should, yes.

3    Q.   So part of its contract performance would be to dispose of

4    these types of explosive wastes; correct?

5    A.   Correct.

6    Q.   Let's look at tab 10.  Tab 10 is Plaintiff's Exhibit 0472,

7    which is also in Lockheed Martin's trial binders under the

8    safety manuals and inspections tab.

9            Did you review this document, Mr. Nagle?

10   A.   I think I did.  I think I have seen it before.

11   Q.   This was a technical explosive safety survey of the

12   Mentone facility conducted on May 25, 1960.

13           Do you see that?

14   A.   Yes, sir.

15   Q.   Okay.  So this is a letter from the Los Angeles Ordnance

16   District, U.S. Army --

17   A.   Yes.

18   Q.   -- to LPC?

19   A.   Yes.  To Grand Central.

20   Q.   To Grant Central Rocket, I'm sorry.  Excuse me.

21           What was the Los Angeles Ordnance District?

22   A.   Before there was a major reorganization, a lot of times

23   areas where there was a lot of ordnance activity would be

24   under the auspices of the Ordnance Corps, and they would break

25   it up into ordnance districts.  A lot of that stuff would be

1    later transferred to DCAS responsibility.

2    Q.   This was sort of a DCAS inspection agency?

3    A.   Yes.  This is what McNamara wanted to get away from,

4    basically something that was service specific, Army Ordnance

5    Corps as opposed to DOD.

6    Q.   Okay.  So here we have recommendations.  Talking about

7    number (a) --

8    A.   Uh-huh.

9    Q.   -- where it says, "All nuts and bolts, should be

10   effectively secured, on propellant mixer covers and screeners,

11   where a possibility exists of those parts becoming loosened

12   and falling into the mixer."

13           You see that?

14   A.   Yes, sir.

15   Q.   So, this was a fairly detailed inspection, correct, if

16   they were checking loose bolts and nuts?

17   A.   It certainly seems that way, yes.

18   Q.   (b), "The operation of cutting back propellant to finish

19   the Zeus sustainer motors should be accomplished by remote

20   control, and propellant chips from this operation should be

21   removed by a vacuum collecting system."

22           Do you see that?

23   A.   Yes, sir.

24   Q.   So is it your understanding that this process was

25   discussing about how to manage waste that was coming off of

1    motors that were being trimmed?

2    A.   Yes, from a safety standpoint.

3    Q.   From a safety standpoint.  The safe way to collect

4    propellant trimmings?

5    A.   Yes.  I'm going to assume -- take it for what it is

6    worth -- that they didn't want a large amount of this

7    collected in one pile, in which case the possibility of

8    explosion goes up exponentially.

9    Q.   Okay.  (c), "Action should be taken to assure complete

10   removal of waste propellant from solvents, contaminated during

11   the process of cleaning the mixer, at building number 52,

12   before this solvent is allowed to pass into the drain line

13   leading to the evaporation pads."

14        You see that?

15   A.   Yes, sir.

16   Q.   It requests a response from Grand Central Rocket Company

17   to the ordnance district?

18   A.   I'm sorry.  Say that again.

19   Q.   The letter concludes by asking for a response from Grand

20   Central Rocket?

21   A.   Yes.

22   Q.   So I think you described these safety surveys as more of a

23   recommendation, but we have the contractor having to respond

24   in writing to the survey; correct?

25   A.   Correct.  It is still recommendations, I believe, and

1    recommendations are submitted for corrections, but they would

2    want a response, yes.

3    Q.   So the contractor was expected to comply with the findings

4    that had been made or the recommendations?

5    A.   They were expected to respond, and whether or not they

6    comply is up to their judgment; and obviously, you don't

7    ignore your customer, so if you don't agree with the

8    recommendation, you would state, no, we think our procedures

9    are safe because, and then just lay them out.

10   Q.   Again, there might even be a response back from the Army

11   saying, okay, we see this, maybe we can work around it this

12   way; correct?

13   A.   Correct.

14   Q.   Again, it is demonstrating a cooperation in how to deal

15   with these wastes and explosive issues; correct?

16   A.   Yes.  You don't want to say, no, I'm going to ignore a

17   major customer.

18   Q.   Okay.  So let's go to tab 11.  Tab 11 is Plaintiff's

19   Exhibit 0321; and it is, again, in our trial binders behind

20   the safety manuals and inspections tab.

21        Mr. Nagle, did you review this document?

22   A.   Actually, I don't remember seeing this one.

23   Q.   Okay.  The subject is "Regular technical explosives safety

24   survey of Grand Central Rocket Company, Mentone, California."

25        Do you see that?

964

1  A.  Yes.  I just wanted to see if this is the response to the

2  earlier tab 10.

3  Q.  I believe it is, but I will leave you to your own

4  conclusions on that.

5  A.  Sure.

6  Q.  So it is to the Commanding Officer, Ordnance Field Safety

7  Office, U.S. Army, in Jeffersonville, Indiana.

8       So reference is the prior letter, one of the prior

9  letters we just talked about.  Number 1 is talking about the

10  nuts and bolts on propellant mixer covers.

11      Do you see that?

12  A.  Yes.

13  Q.  I want to look at number 2.  It says, "The following

14  paragraph, pertaining to item 3, tab A, of reference (a) is

15  quoted from a letter dated 11 July 1960, submitted to this

16  district by the contractor."

17      "By the contractor," do you believe that to be Grand

18  Central Rocket Company?

19  A.  Yes, I assume that.

20  Q.  It says, "The open floor drain at discharge level of mixer

21  station, building 52, loads into a small box which discharges

22  into a 6-inch pipe inside an 18-inch tube extending through

23  the earthen barricade west of the mix station."

24      Do you see that?

25  A.  Yes.  I wasn't sure if that was "loads" or "leads."

1    Q.   You're right.  I can't tell.  "Leads," I guess.  "Leads

2    into," you're correct.

3         So it discusses, in the second paragraph, "mixer

4    cleanup operations."

5         It talks about "two 50-gallon drums are placed under

6    the two mixer discharge tubes, and all solvent-propellant

7    waste from the cleaning operation is collected in these drums.

8    Collected waste is transported to the evaporation pits.  The

9    only waste permitted to pass through the drain from building

10   52 is the water to hose down the area after mixer is cleaned."

11        Do you see that?

12   A.   Yes, sir.

13   Q.   Is this a response from Grand Central Rocket to the Army's

14   concerns from June of 1960 concerning waste from building 52

15   to the evaporation pits?

16   A.   I believe so, recommendation (c) on tab 10.

17   Q.   You were here for Mr. Sullivan's opening; correct?

18   A.   Yes, I was.

19   Q.   Do you remember the picture of building 52, where he put

20   up a picture saying "circa 1960," and showing the water that

21   this is talking about flowing towards the evap --

22   A.   I really wasn't paying that much attention.

23   Q.   Okay.

24        THE COURT:  I can show it to him.

25        MR. MURPHY:  Well, it's just -- Your Honor, it deals

1    with the question of what was possibly in that water that was

2    going towards the pits.  I was wondering if Mr. Nagle had paid

3    attention or not.  It's fine.  We can do it later.

4        BY MR. MURPHY:

5    Q.  Building 52 is the mixer building.  Do you understand

6    that?

7    A.  I'll take your word for it.

8    Q.  Okay.  Okay.  Do you have any understanding of whether

9    wastes from building 52 went to an evap pit?

10   A.  No, I have no clue.

11       MR. JOHNSON:  Objection.  Beyond the scope of this

12   witness.

13       THE COURT:  He has answered that.

14       Next question.

15       MR. MURPHY:  Okay.

16       THE COURT:  When are you going to finish?

17       MR. MURPHY:  Your Honor, I probably have at least

18   another hour.

19       THE COURT:  Okay.  I think we should take a break with

20   the witness.

21       Thank you.  We'll resume tomorrow morning, 9:30 I

22   believe is fine.

23       MR. MURPHY:  I just have one question to raise after

24   Mr. Sullivan's opening about evidence, Your Honor.

25       THE COURT:  Okay.  We can excuse the witness.

1          MR. MURPHY:  You can excuse the witness.

2          THE COURT:  You're excused.  Tomorrow morning we'll

3     resume.

4          Please do not discuss your testimony with anyone.

5          (Off the record discussion)

6          THE COURT:  You wanted to make some point about the

7     opening?

8          MR. MURPHY:  Your Honor, Mr. Sullivan's opening made

9     some allegations about DOJ being surprised by some of these

10    CERCLA cases and them not knowing about these CERCLA cases,

11    and some of the evidence that we had stricken before this --

12         THE COURT:  Parol evidence?

13         MR. MURPHY:  Yeah.

14         THE COURT:  It may not be parol evidence.

15         MR. MURPHY:  At the time, Your Honor didn't believe it

16    was an issue.

17         Again, on the basis of some of the arguments that DOJ

18    has just raised concerning the equities about how the system

19    works, what DOJ knew in -- I'm sorry -- 1999, 2000, what DCMA

20    or the DOD knew, their understandings -- again, we don't

21    believe it is particularly relevant, but at the same time, he

22    has made some allegations that I don't believe are true, and I

23    would like a chance to prove that.

24         THE COURT:  I think the only allegations that he has

25    made is, as of the time of this settlement/consent decree, the

1    U.S. government didn't expect to be sued --

2           MR. MURPHY:  And I don't believe that to be true, Your

3    Honor.

4           THE COURT:  Are you actually standing on that?  It

5    seems like he may well want to respond to that?

6           You see, we've had a discussion in which I find

7    myself, despite your arguments, feeling that I have my hands

8    tied, that I am being asked to respond to a system that was

9    blessed by the U.S. government and how I respond to it as an

10   equitable matter.  I think you are egging them to come back

11   and say -- I'm sort of assuming the U.S. government had to

12   know that Lockheed was going to sue them because they already

13   had, or they counter-sued, and I mean how -- what else would

14   they do?  They're not nice guys.  I'm not saying that in the

15   way -- this is business, this is hard-nosed business.  This

16   isn't -- they're going to get back everything they can get

17   back, and they negotiated an agreement with you.  I don't find

18   the agreement so ambiguous.  Yeah, it doesn't say we're going

19   to open ourselves up to more suits, but it also doesn't say

20   we're not going to open ourselves up to suits.

21          MR. SULLIVAN:  That's right.

22          THE COURT:  That issue was not addressed.

23          MR. SULLIVAN:  The issue of CERCLA releases is not

24   something the DCMA could release in that agreement.  That's

25   right, Your Honor.  At the time -- I don't know what DCMA knew

1     about --

2              THE COURT:  The question --

3              MR. SULLIVAN:  -- the lawsuits, the lawsuits that

4     there were tolling agreements on, you know, and they were just

5     tolling agreements.  Were they going to bring them or not, who

6     knows.  They were tolling agreements.  Maybe they would, maybe

7     they wouldn't.

8              THE COURT:  Please.  You don't ask when you have a

9     criminal prosecution for a tolling agreement -- I mean, you're

10    considering the whole issue, but you don't need one if you're

11    going to sue.  You had already been hit by them, Burbank --

12             MR. SULLIVAN:  In the past before the DOSA, yes.

13             THE COURT:  Right.

14             MR. SULLIVAN:  So the question to us is, you know,

15    after we signed an agreement to pay them under contracts in

16    the DOSA, would they then, down the road, sue us and try to

17    recover for a second time under CERCLA?  I don't know if

18    anyone was considering that.  I just don't know.

19             MR. MURPHY:  And, Your Honor, we believe those

20    documents that were excluded speak to that and show the DCMA

21    knew that we were going to be bringing suits, Your Honor, as

22    far as the negotiations --

23             THE COURT:  I think you're going to have to make a

24    proffer.  You are opening it up.  You're saying that this was

25    not permissible and that I should understand that, and he's

1      saying it was perfectly permissible --

2            MR. SULLIVAN:  I'm not saying it was not permissible

3      for them to bring a CERCLA suit, but we also didn't waive our

4      defenses and all our equitable arguments in CERCLA, and we

5      want to be able to bring our equitable arguments here that if

6      they have already been paid once for these costs, they

7      shouldn't be able to be paid for them again.  We're not saying

8      that they can't sue us under the DOSA.

9            THE COURT:  You're saying go ahead and sue us --

10           MR. SULLIVAN:  No --

11           THE COURT:  -- and whether --

12           MR. SULLIVAN:  -- we're not releasing CERCLA claims

13     under the DOSA.  We're simply agreeing to pay their remedial

14     costs under contracts.

15           THE COURT:  Okay.  This is what I would like Lockheed

16     to file by Thursday -- and the government can respond by

17     Monday -- one, we talked about prejudgment interest.  I'm

18     looking for no more than three pages per issue, and I'm about

19     to give you three issues.  One is prejudgment interest,

20     whether it is mandatory or a matter of discretion, and whether

21     it should be addressed now or later, issue one.

22           Number two, there is a lot of discussion about

23     indemnification clauses.  I really don't know what the

24     parties' positions are here, whether any of what I am dealing

25     with is covered by -- in other words, the contamination of the

1    water and the soil by these two solvents and chemicals.  Do

2    any of the indemnification clauses lead me anywhere under

3    CERCLA?  I'm going around in circles with indemnification

4    clauses.  You raised some that have to do with hazardous

5    materials.  The government says those don't apply.  They

6    raised some on facilities, and it appears now from this

7    cross-examination that you think the facilities don't matter.

8    And then there's these abandonment ones.  They're all

9    assigning liability.  Do any one of them cover the allocation

10   issues that are before me?

11           The last is, I understand the government -- I have

12   read the whole Powerpoint -- to be making an argument about

13   the whole recovery and economic benefit.  The economic benefit

14   is covered ad nauseam by the experts, the economists, the two

15   people.  That's a different issue.  They are now raising an

16   issue -- maybe they have forever and ever -- that as an

17   equitable matter, I should not allow double recovery.  You

18   have a response to this, and I want to know what it is.  This

19   is a new issue as far as I understood.  As a legal matter, it

20   has been addressed by another judge, and that's been taken

21   care of.  They now want me to subtract $208 million from the

22   pool -- I'm using the word "pool" not the way it is used in

23   that agreement -- and then do an allocation.

24           Is that correct, Mr. Sullivan?

25           MR. SULLIVAN:  At minimum, yes, Your Honor.

1          THE COURT:  What do you mean "at minimum"?

2          MR. SULLIVAN:  Well, because I think that as an

3     equitable matter under CERCLA this Court also needs to

4     consider whether we should get credit for the payments we've

5     made to Lockheed since we are the party who made the payments.

6          THE COURT:  Isn't that the same thing?

7          MR. SULLIVAN:  No.  The first, Your Honor, is

8     following the double recovery cases, the courts have

9     subtracted from recoveries that are allowed prior

10    reimbursements.

11         THE COURT:  DOD reimbursements?

12         MR. SULLIVAN:  Yes.  So what we would say is the

13    contract payments are reimbursements of Lockheed's cost and

14    should be subtracted --

15         THE COURT:  Right.

16         MR. SULLIVAN:  -- at a minimum, but there is a new

17    issue here that has never been addressed in those other cases,

18    and that is that the defendant is the party making the

19    payments.  So should we get credit for the payments we're

20    making as part of the allocation, and our argument is that we

21    should.

22         THE COURT:  Is the credit that you want to get the

23    same thing as we would be subtracting?

24         MR. SULLIVAN:  No.  That would be an alternative.  You

25    would either subtract, as the other courts have done, or since

973

1    this case raises a new issue, should you give us credit for

2    our payments.  And our argument would be, unless our CERCLA

3    percentage is greater than our contract payments, we shouldn't

4    have to pay any more.

5            THE COURT:  Right.  So if hypothetically, the CERCLA

6    allocation was 50-50, you have already paid way more than

7    50 --

8            MR. SULLIVAN:  That's correct.

9            THE COURT:  -- it is not like they're going to owe you

10   money at the end of the day.

11           MR. SULLIVAN:  That's right, we want to get credit for

12   what we've paid.  Otherwise, it is a double payment, too.

13           THE COURT:  It is the same argument, I think.

14           MR. MURPHY:  It is the same argument that was

15   presented to Judge Robertson.

16           MR. SULLIVAN:  But that was under 114(b), Michael.

17           THE COURT:  114(b).

18           MR. SULLIVAN:  Different argument.

19           THE COURT:  Where is this under?

20           MR. SULLIVAN:  This is under 113.  All the cases we

21   have cited to you, when they discussed the equitable double

22   recovery, are under 113.

23           MR. MURPHY:  Weren't those the same cases you

24   presented --

25           THE COURT:  That may be.  That's what I want to find

1     out.  But he left open the equitable consideration.

2              MR. SULLIVAN:  Yes, Your Honor.

3              MR. MURPHY:  He did, Your Honor.

4              THE COURT:  I want to know why, under equity, I

5     shouldn't do what they're doing, which is shrink the ball of

6     wax either by a credit or use the double recovery, that's what

7     they're saying.

8              MR. MURPHY:  Yes, Your Honor, it's what they have been

9     saying throughout the entire case, Your Honor.

10             THE COURT:  Well, when I read their experts, I thought

11    we were on a different issue, which had to do with your

12    effective share --

13             MR. SULLIVAN:  That is a different issue.  That is --

14             THE COURT:  I understand the response to that.

15             Okay.  After we see -- I want responses from you, but

16    I will be better able to articulate these three issues for the

17    government after I --

18             MR. MURPHY:  So we should present -- even though the

19    facilities indemnification is their argument, we should submit

20    those --

21             THE COURT:  Well, you have a position.

22             MR. MURPHY:  Okay.

23             THE COURT:  I'm trying to educate myself on what the

24    parties' positions are as opposed to reading paragraph by

25    paragraph, having witnesses read paragraph by paragraph.

975

1    What's the bottom line, for lack of a better word.  Okay?

2    Those three issues, I don't have to issue an order?

3              MR. MURPHY:  No, Your Honor.

4              THE COURT:  Thursday by noon.  Then, at least, I can

5    focus a little better.

6              Did you raise something new here in this having to do

7    with -- or has that been addressed, the last issue that has to

8    do with profit --

9              MR. SULLIVAN:  Yes.  I was talking about that earlier.

10             THE COURT:  Right.

11             MR. SULLIVAN:  If you allow them to go through their

12   crediting process, recover again under CERCLA, crediting, they

13   will make a profit --

14             THE COURT:  I think that is part of the experts --

15             MR. SULLIVAN:  It is also part of the fixed-price

16   contract.

17             MR. MURPHY:  Well --

18             THE COURT:  You can address that through the

19   witnesses.  I don't see that any witness will handle these

20   issues that I have --

21             MR. SULLIVAN:  These are CERCLA arguments.

22             THE COURT:  Yeah, right.  So I need some

23   back-and-forth from you.

24             Okay.  We will resume tomorrow at 9:30.

25             (Proceedings adjourned at 5:05 p.m.)   `.

976

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Patricia A. Kaneshiro-Miller, certify that the

4     foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6

7

8     -----------------------------------      -----------------------

9     PATRICIA A. KANESHIRO-MILLER                      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$173,000** [1] - 918:13
**$200** [1] - 948:24
**$208** [1] - 971:21
**$32,000** [1] - 918:18
**$78** [1] - 920:24

## '

**'50s** [1] - 938:4
**'60s** [2] - 886:21,
938:4
**'70s** [2] - 903:11,
938:4
**'75** [2] - 949:25, 950:1

## 0

**0302** [2] - 949:11,
949:12
**0321** [1] - 963:19
**0461** [1] - 945:14
**0472** [1] - 960:6
**0483** [3] - 950:15,
956:19, 956:21

## 1

**1** [8] - 875:22, 879:1,
898:2, 898:14,
902:4, 938:8,
949:25, 964:9
**1.5** [1] - 897:17
**10** [8] - 875:7, 914:5,
926:9, 926:18,
960:6, 964:2, 965:16
**10,000** [2] - 884:23,
885:19
**100** [3] - 914:3, 914:7,
925:13
**1033** [3] - 917:6,
918:21, 921:19
**1067** [4] - 928:14,
929:6, 930:9, 930:18
**1073** [1] - 958:21
**109,000** [1] - 918:15
**11** [5] - 907:12, 908:1,
963:18, 964:15
**113** [2] - 973:20,
973:22
**114** [6] - 881:15,
881:17, 884:13,
884:16, 886:8, 892:8
**114(b** [1] - 973:16
**114(b)** [2] - 915:2,
973:17

**119** [1] - 897:18
**12** [3] - 898:15,
898:17, 908:3
**133** [1] - 908:3
**14** [2] - 889:6, 889:19
**141,000** [1] - 898:21
**15** [5] - 875:7, 909:23,
943:4, 943:8, 944:5
**15-1** [3] - 936:8, 936:9,
943:8
**15-2(d** [1] - 940:15
**15-4** [1] - 941:11
**15-4(a)(3)** [1] - 942:8
**15-inch** [1] - 937:4
**1501** [1] - 936:5
**1502** [2] - 936:5, 936:7
**1502(b** [1] - 944:6
**16** [1] - 877:21
**165** [1] - 887:16
**168** [1] - 929:4
**16th** [1] - 889:4
**18-inch** [1] - 964:22
**19** [1] - 949:25
**1930s** [1] - 901:4
**1940s** [3] - 876:13,
876:21, 900:6
**1949** [1] - 874:7
**1951** [10] - 877:18,
883:19, 889:24,
891:9, 891:23,
895:21, 900:13,
901:9, 904:21
**1952** [2] - 900:2,
901:16
**1954** [1] - 878:11
**1955** [1] - 895:22
**1956** [2] - 898:8,
898:15
**1958** [3] - 879:24,
880:17, 881:9
**1959** [2] - 880:19,
888:21
**1960** [6] - 881:4,
906:5, 960:12,
964:15, 965:14,
965:20
**1960s** [2] - 886:16,
906:3
**1962** [1] - 901:24
**1963** [4] - 878:24,
879:9, 895:7, 895:16
**1964** [1] - 957:6
**1965** [2] - 898:9,
898:15
**1966** [1] - 877:21
**1971** [2] - 881:17,
884:13
**1997** [1] - 922:9
**1999** [3] - 922:10,
922:11, 967:19

## 2

**2** [12] - 897:17, 898:2,
898:14, 935:2,
935:17, 940:11,
943:8, 948:1,
948:17, 950:21,
957:19, 964:13
**2,500** [2] - 884:15,
885:18
**20** [1] - 950:1
**200** [1] - 941:25
**2000** [3] - 915:17,
922:12, 967:19
**208** [1] - 920:22
**23** [1] - 895:22
**25** [1] - 960:12
**26** [1] - 956:2
**27** [1] - 952:12
**2701** [2] - 891:10,
891:13
**2704** [1] - 895:23
**28** [1] - 952:9
**286** [1] - 920:20

## 3

**3** [3] - 941:23, 959:10,
964:14
**30** [2] - 908:4, 908:25
**302** [1] - 949:9
**31.3** [1] - 926:13
**315** [1] - 908:3
**32,000** [1] - 918:15
**3:41** [1] - 928:5
**3:56** [1] - 928:5

## 4

**4** [1] - 891:23
**4.7** [2] - 921:19,
921:24
**40** [1] - 927:4
**47** [2] - 891:24, 918:22
**474** [3] - 938:11,
938:15, 938:20
**475** [2] - 938:12, 939:4
**49** [2] - 894:18, 894:19

## 5

**5** [4] - 945:12, 950:16,
950:25
**5.2** [1] - 926:11
**50** [5] - 905:4, 910:22,
927:4, 927:11, 973:7
**50-50** [7] - 911:1,

911:13, 912:9,
920:9, 922:14,
923:2, 973:6
**50-gallon** [1] - 965:5
**52** [16] - 880:6,
880:20, 880:25,
881:6, 886:11,
890:23, 891:3,
899:20, 907:13,
962:11, 964:21,
965:10, 965:14,
965:19, 966:5, 966:9
**53,000** [1] - 898:21
**56** [1] - 891:2
**58** [1] - 892:22
**5804** [1] - 954:21
**5:05** [1] - 975:25

## 6

**6** [4] - 949:8, 949:9,
957:19
**6-inch** [1] - 964:22
**60** [3] - 926:12,
927:11, 927:12
**61** [4] - 880:7, 886:5,
886:7, 890:13
**66** [1] - 886:22

## 7

**7** [4] - 921:14, 950:14,
956:19
**77** [10] - 887:2,
887:21, 889:19,
889:21, 891:1,
892:5, 892:7,
892:12, 908:2

## 8

**8** [4] - 898:3, 910:1,
958:19
**80** [2] - 914:1, 914:8
**84** [1] - 951:21
**85** [2] - 897:19, 925:20
**852** [1] - 928:23
**86** [1] - 925:20

## 9

**9/19** [1] - 950:6
**90** [2] - 914:1, 914:8
**91** [2] - 899:19, 907:12
**9:30** [2] - 966:21,
975:24

## A

**ABAND** [1] - 948:16
**abandon** [1] - 951:4
**abandoned** [1] - 959:8
**abandoning** [1] -
959:5
**abandonment** [2] -
950:20, 971:8
**abandons** [1] - 951:3
**abbreviation** [1] -
910:18
**ability** [4] - 877:15,
885:13, 915:21,
947:10
**able** [6] - 893:17,
920:23, 935:21,
970:5, 970:7, 974:16
**above-entitled** [1] -
976:5
**Abrams** [2] - 938:18,
938:25
**absolutely** [2] -
899:12, 958:14
**Absolutely** [1] -
878:23
**abuse** [1] - 927:15
**accepting** [1] - 927:23
**accomplished** [1] -
961:19
**accordance** [1] -
875:3
**according** [1] - 907:14
**account** [1] - 923:16
**accounted** [1] - 918:4
**acquisition** [1] -
912:19
**act** [1] - 883:11
**Act** [13] - 874:7,
876:18, 877:6,
881:25, 883:5,
900:2, 901:22,
902:1, 902:12,
903:20, 904:4,
905:12, 905:15
**action** [3] - 879:15,
912:22, 962:9
**actions** [1] - 884:10
**activities** [2] - 873:24,
933:18
**activity** [3] - 949:24,
950:8, 960:23
**actual** [3] - 953:7,
953:18, 953:20
**actuals** [1] - 950:1
**ad** [1] - 971:14
**addition** [4] - 889:22,
895:4, 895:20, 896:7
**address** [4] - 911:6,

926:18, 927:24, 975:18

**addressed** [5] - 968:22, 970:21, 971:20, 972:17, 975:7

**adjourned** [1] - 975:25

**administration** [2] - 933:13, 957:10

**Administration** [1] - 957:3

**admit** [1] - 905:22

**admitted** [1] - 898:9

**adopt** [1] - 930:25

**advanced** [3] - 937:25, 938:2, 940:6

**advised** [1] - 875:19

**aerial** [7] - 880:18, 887:21, 888:20, 889:10, 889:13, 891:25, 892:12

**Aerojet** [8] - 877:1, 883:17, 883:24, 900:13, 901:17, 906:22, 906:23

**Aerojet's** [2] - 900:3, 900:15

**affect** [1] - 922:6

**affidavit** [3] - 917:19, 932:8, 935:3

**afraid** [2] - 898:10, 898:11

**afternoon** [1] - 873:5

**afterwards** [1] - 919:22

**agencies** [1] - 883:21

**Agency** [4] - 958:25, 959:1, 959:2, 959:4

**agency** [1] - 961:2

**agent** [1] - 939:22

**agents** [1] - 939:19

**aggressively** [1] - 912:24

**aging** [1] - 950:9

**ago** [1] - 931:5

**agree** [10] - 905:24, 906:6, 911:16, 915:9, 919:14, 942:25, 958:5, 959:9, 963:7

**agreed** [10] - 876:1, 902:11, 911:12, 911:15, 911:17, 913:20, 915:18, 919:4, 923:18, 924:9

**agreeing** [1] - 970:13

**agreement** [28] - 913:17, 913:19, 914:10, 914:12, 915:17, 915:24,

915:25, 917:2, 917:5, 919:10, 919:11, 920:6, 920:8, 921:18, 921:19, 922:6, 922:8, 922:21, 923:5, 923:6, 923:14, 924:10, 968:17, 968:18, 968:24, 969:9, 969:15, 971:23

**agreements** [7] - 874:15, 899:23, 907:8, 918:2, 969:4, 969:5, 969:6

**ahead** [9] - 873:3, 877:16, 897:5, 910:19, 910:21, 917:15, 917:20, 919:11, 970:9

**air** [2] - 879:3, 886:20

**Air** [2] - 906:4, 957:12

**AISLIC** [2] - 896:16, 896:18

**allegation** [1] - 916:13

**allegations** [3] - 967:9, 967:22, 967:24

**allocable** [1] - 918:19

**allocated** [3] - 875:8, 918:7, 926:6

**allocating** [1] - 873:10

**allocation** [14] - 873:12, 875:7, 899:2, 899:6, 911:1, 911:24, 912:10, 920:9, 926:9, 926:17, 971:9, 971:23, 972:20, 973:6

**allow** [5] - 883:22, 911:12, 913:21, 971:17, 975:11

**allowable** [2] - 913:6, 959:18

**allowed** [7] - 884:1, 896:2, 896:14, 918:18, 923:7, 962:12, 972:9

**allows** [1] - 912:1

**alone** [1] - 898:22

**alter** [1] - 919:5

**alternate** [1] - 901:13

**alternative** [1] - 972:24

**alternatives** [1] - 904:13

**ambiguous** [1] - 968:18

**amended** [1] - 895:22

**America** [1] - 873:8

**American** [1] - 901:20

**ammonia** [1] - 900:19

**ammonium** [2] - 959:5, 959:7

**ammunition** [4] - 937:4, 937:17, 941:14, 943:5

**amount** [4] - 912:3, 918:10, 944:10, 962:6

**amounts** [2] - 924:2, 944:9

**analogy** [2] - 934:5, 934:16

**analysis** [4] - 917:12, 917:21, 926:8, 956:11

**Angeles** [2] - 960:15, 960:21

**answer** [4] - 915:16, 915:19, 921:9, 949:6

**answered** [1] - 966:13

**answering** [2] - 934:3, 940:3

**anticipates** [1] - 921:19

**AP** [39] - 874:10, 874:11, 874:13, 876:25, 877:18, 879:18, 881:13, 881:16, 881:19, 882:19, 882:20, 883:9, 883:20, 883:25, 889:23, 890:1, 890:2, 890:6, 891:8, 892:3, 892:17, 892:20, 893:12, 894:3, 894:4, 895:5, 895:20, 896:5, 897:2, 900:3, 900:15, 900:25, 901:17, 902:25, 905:6, 905:10, 931:9, 959:11, 959:17

**AP-containing** [2] - 889:23, 891:8

**AP-contaminated** [4] - 874:10, 874:13, 879:18, 892:3

**apart** [1] - 940:20

**Appeals** [1] - 925:12

**appear** [2] - 908:25, 948:14

**applied** [4] - 903:18, 908:22, 937:9

**applies** [4] - 916:20, 937:3, 941:7, 953:7

**apply** [1] - 971:5

**appropriate** [1] - 940:21

**approved** [1] - 912:12

**April** [2] - 877:21, 889:4

**aqueduct** [1] - 879:6

**aquifers** [1] - 903:2

**area** [7] - 878:17, 882:14, 885:14, 895:11, 903:3, 944:13, 965:10

**areas** [4] - 892:2, 895:12, 939:24, 960:23

**argue** [2] - 881:20, 898:25

**argued** [2] - 888:14, 920:15

**arguing** [3] - 906:15, 920:15

**argument** [18] - 904:4, 906:16, 909:14, 909:17, 909:19, 909:21, 909:23, 909:24, 909:25, 910:7, 910:13, 971:12, 972:20, 973:2, 973:13, 973:14, 973:18, 974:19

**arguments** [9] - 893:24, 906:11, 906:13, 912:15, 967:17, 968:7, 970:4, 970:5, 975:21

**arising** [3] - 908:9, 922:7, 953:3

**Armed** [1] - 925:11

**Army** [12] - 889:24, 891:7, 891:9, 895:21, 904:21, 931:22, 937:3, 957:12, 960:16, 961:4, 963:10, 964:7

**Army's** [1] - 965:13

**Arsenal** [2] - 936:15, 936:20

**articulate** [1] - 974:16

**aside** [2] - 912:9, 926:15

**ASPR** [1] - 932:17

**assign** [2] - 926:9, 926:12

**assigning** [1] - 971:9

**assume** [6] - 947:6, 949:24, 950:17, 959:21, 962:5, 964:19

**assumes** [1] - 921:23

**assuming** [1] - 968:11

**assumption** [4] - 953:2, 953:21, 954:4, 954:6

**assumptions** [1] - 953:9

**assurance** [1] - 934:23

**assure** [2] - 891:19, 962:9

**atmospheric** [1] - 944:11

**attached** [1] - 948:19

**attack** [1] - 936:3

**attention** [4] - 895:8, 931:8, 965:22, 966:3

**attorney** [3] - 912:25, 932:24, 936:13

**attorney's** [1] - 913:10

**attorneys** [1] - 916:17

**auspices** [1] - 960:24

**authorities** [1] - 884:7

**authority** [6] - 916:6, 916:8, 922:16, 932:20, 933:3, 933:5

**authorized** [1] - 946:2

**Automotive** [1] - 936:16

**available** [3] - 874:12, 941:16, 957:22

**avoid** [2] - 918:17, 947:9

**awarded** [2] - 953:10, 953:14

**aware** [7] - 878:1, 884:11, 909:10, 916:24, 928:16, 928:19, 951:17

**B**

**back-and-forth** [1] - 975:23

**bags** [5] - 887:3, 887:15, 889:21, 890:5, 894:8

**ball** [1] - 974:5

**Banks** [2] - 900:14, 901:8

**banks** [2] - 891:16, 944:19

**bare** [7] - 889:23, 890:1, 890:2, 890:7, 891:8, 896:14, 953:12

**barely** [1] - 896:24

**barricade** [1] - 964:23

**based** [8] - 875:5, 876:25, 889:10,

899:8, 900:5, 904:6, 907:10, 932:23

**basin** [5] - 875:23, 879:5, 880:3, 898:9, 907:3

**basins** [11] - 875:20, 877:23, 878:3, 879:20, 879:25, 885:19, 885:20, 885:21, 886:2, 886:10, 906:20

**basis** [7] - 883:2, 892:13, 892:15, 899:15, 932:14, 932:15, 967:17

**batch** [1] - 893:1

**batches** [1] - 892:18

**battleships** [1] - 937:5

**Bauer** [5] - 876:11, 884:2, 901:2, 901:4, 928:24

**Beaumont** [7] - 873:22, 874:14, 879:1, 895:6, 895:11, 898:6, 902:4

**become** [3] - 891:16, 928:16, 939:1

**becoming** [1] - 961:11

**bed** [1] - 931:23

**beds** [4] - 891:14, 891:18, 944:7, 944:9

**began** [3] - 879:22, 900:3, 932:25

**beginning** [2] - 910:5, 956:4

**behalf** [1] - 873:7

**behind** [3] - 889:19, 889:21, 963:19

**beings** [1] - 901:3

**believes** [1] - 889:5

**below** [4] - 879:8, 941:23, 946:3, 946:6

**beneath** [2] - 878:7, 878:21

**benefit** [8] - 912:6, 917:22, 926:11, 926:13, 926:19, 927:2, 971:13

**Bernardino** [1] - 888:18

**best** [4] - 890:25, 904:8, 904:9, 904:10

**better** [4] - 901:4, 974:16, 975:1, 975:5

**between** [4] - 875:7, 914:1, 954:15, 956:20

**beyond** [5] - 885:12, 923:2, 931:10, 944:8, 966:11

**bid** [3] - 925:23, 940:10, 959:25

**bidding** [1] - 959:24

**big** [8] - 876:21, 879:19, 886:11, 886:12, 887:2, 887:12, 894:5, 902:24

**bill** [3] - 910:19, 910:21, 912:21

**binder** [7] - 887:25, 917:9, 928:23, 935:3, 935:7, 935:17, 936:6

**binders** [6] - 945:13, 949:10, 956:20, 958:20, 960:7, 963:19

**bit** [3] - 897:7, 932:7, 944:25

**black** [2] - 896:5, 896:6

**blame** [1] - 906:14

**blessed** [1] - 968:9

**blessing** [2] - 911:4, 911:25

**blow** [1] - 931:17

**blue** [1] - 934:17

**board** [1] - 941:7

**Board** [35] - 877:7, 877:8, 877:11, 877:17, 881:25, 882:8, 882:9, 882:10, 882:12, 882:15, 882:17, 883:2, 883:4, 883:6, 883:8, 883:14, 883:19, 883:20, 900:3, 900:5, 900:8, 900:10, 901:8, 901:16, 902:2, 902:19, 902:20, 903:5, 903:7, 903:11, 903:12, 904:6, 904:7, 907:1, 925:12

**Board's** [1] - 902:24

**Boeing** [4] - 954:15, 954:16

**bolts** [3] - 961:9, 961:16, 964:10

**bomber** [1] - 939:18

**bones** [2] - 893:1, 953:12

**book** [2] - 938:10, 938:11

**Borgelt** [8] - 894:21, 895:1, 928:19, 929:8, 929:10, 929:21, 930:15,

930:17

**Borgelt's** [4] - 928:21, 928:22, 930:10, 930:13

**boron** [1] - 900:21

**bothers** [1] - 906:2

**bottom** [7] - 887:10, 919:16, 919:18, 931:19, 938:13, 938:14, 975:1

**bought** [2] - 912:15, 934:14

**bounds** [1] - 933:8

**box** [1] - 964:21

**branch** [1] - 925:4

**break** [3] - 928:3, 960:24, 966:19

**bring** [5] - 897:20, 951:21, 969:5, 970:3, 970:5

**bringing** [1] - 969:21

**broad** [1] - 951:16

**broken** [2] - 894:9, 929:4

**brought** [3] - 895:8, 916:11, 928:13

**bucket** [1] - 907:21

**build** [3] - 939:17, 939:18, 939:19

**building** [55] - 874:1, 880:5, 880:6, 880:20, 880:25, 881:6, 881:12, 881:15, 881:17, 884:12, 884:14, 884:16, 884:20, 885:18, 886:8, 886:11, 887:2, 887:11, 887:12, 887:21, 889:2, 889:19, 889:21, 890:22, 890:24, 891:1, 892:5, 892:7, 892:8, 892:12, 892:17, 897:18, 897:19, 898:3, 898:15, 898:17, 899:19, 899:20, 907:12, 907:13, 908:1, 908:2, 908:4, 952:5, 962:11, 964:21, 965:9, 965:14, 965:19, 966:5, 966:9

**buildings** [4] - 908:3, 940:20, 941:16, 941:17

**built** [2] - 888:22, 889:11

**bulldozer** [1] - 894:13

**Burbank** [19] - 910:15, 910:23, 911:2, 911:8, 911:20, 911:21, 911:22, 912:11, 916:11, 916:15, 922:13, 922:23, 922:24, 923:1, 923:4, 923:13, 923:14, 923:17, 969:11

**burden** [1] - 911:17

**burdened** [1] - 924:16

**burial** [3] - 874:13, 895:17, 895:20

**buried** [2] - 895:13, 895:25

**burn** [26] - 893:8, 893:9, 893:14, 893:16, 893:18, 893:21, 893:22, 893:23, 894:1, 894:5, 894:7, 894:11, 894:13, 894:22, 894:25, 903:7, 903:19, 903:20, 903:22, 904:2, 904:5, 904:14, 904:16, 904:19, 906:4

**burned** [1] - 931:23

**burning** [4] - 894:2, 940:20, 959:13, 959:18

**bury** [1] - 895:5

**burying** [1] - 895:18

**business** [6] - 875:13, 878:13, 910:20, 927:4, 968:15

**buy** [3] - 934:16, 938:17, 938:24

**buyer** [7] - 934:19, 937:16, 937:19, 939:2, 940:1, 940:5, 940:6

**buying** [4] - 934:7, 934:15, 937:3, 937:4

**BY** [17] - 930:8, 932:3, 935:13, 935:22, 937:14, 937:24, 939:21, 941:22, 942:9, 945:6, 945:16, 949:7, 951:20, 954:13, 955:8, 956:22, 966:4

888:9

**calculate** [1] - 926:8

**calculation** [2] - 927:2, 949:22

**caliber** [1] - 937:3

**California** [12] - 874:7, 875:13, 876:11, 876:12, 876:19, 876:22, 884:6, 884:9, 884:10, 900:6, 916:16, 963:24

**Canaveral** [1] - 906:5

**candor** [1] - 951:10

**cannot** [4] - 876:5, 916:11, 922:18, 933:12

**Canyon** [3] - 882:8, 901:23, 902:6

**capacity** [1] - 884:23

**Cape** [1] - 906:5

**car** [5] - 934:7, 934:14, 934:15, 934:16

**care** [5] - 921:23, 934:8, 934:14, 943:15, 971:21

**cared** [1] - 934:22

**cares** [1] - 934:7

**carried** [1] - 885:10

**carted** [1] - 904:16

**case** [48] - 875:6, 881:23, 896:16, 896:19, 911:20, 911:22, 913:10, 914:13, 914:14, 914:16, 914:19, 914:20, 914:22, 915:5, 915:10, 916:16, 916:20, 917:24, 918:1, 918:7, 918:13, 920:20, 920:24, 921:7, 922:24, 922:25, 923:13, 923:23, 924:21, 925:2, 925:9, 926:1, 926:10, 930:23, 930:25, 932:16, 934:22, 935:15, 951:11, 954:14, 956:15, 962:7, 973:1, 974:9

**cases** [18] - 873:14, 873:15, 891:14, 915:3, 915:4, 918:2, 918:5, 918:20, 919:20, 920:23, 923:25, 924:5, 967:10, 972:8, 972:17, 973:20,

**C**

**Cain** [1] - 884:22

**Cain's** [2] - 888:8,

973:23
**casing** [1] - 896:12
**caveat** [1] - 959:22
**ceased** [1] - 886:13
**Central** [9] - 875:17,
960:19, 960:20,
962:16, 962:20,
963:24, 964:18,
965:13
**central** [1] - 881:23
**CERCLA** [53] - 912:19,
912:25, 915:2,
915:3, 915:5,
915:10, 915:18,
915:21, 916:1,
916:3, 916:7,
916:10, 916:24,
917:24, 918:1,
918:7, 918:19,
919:6, 919:20,
922:6, 922:7,
922:17, 922:22,
922:24, 924:16,
924:20, 924:21,
924:24, 925:2,
925:3, 925:7,
926:23, 926:25,
927:15, 956:12,
956:13, 956:15,
956:16, 956:17,
967:10, 968:23,
969:17, 970:3,
970:4, 970:12,
971:3, 972:3, 973:2,
973:5, 975:12,
975:21
**certain** [10] - 885:24,
893:3, 906:1, 912:3,
937:15, 937:16,
947:11, 956:7, 956:9
**certainly** [12] - 916:2,
925:2, 932:25,
933:22, 935:25,
939:25, 942:12,
943:1, 943:12,
943:25, 959:20,
961:17
**certificate** [1] - 946:6
**CERTIFICATE** [1] -
976:1
**certification** [1] -
946:3
**certify** [1] - 976:3
**Chamberlain** [1] -
936:23
**chance** [1] - 967:23
**change** [2] - 932:16,
932:21
**changed** [3] - 912:11,
912:12, 954:6

**changes** [1] - 954:4
**channel** [1] - 878:3
**character** [1] - 900:17
**charge** [2] - 908:7,
913:21
**cheapest** [1] - 903:19
**checked** [1] - 889:5
**checking** [1] - 961:16
**chemical** [2] - 883:25,
884:15
**chemical-containing**
[1] - 883:25
**chemicals** [9] -
876:14, 876:22,
877:3, 877:8, 883:3,
894:4, 899:1,
901:18, 971:1
**chemists** [1] - 877:4
**China** [2] - 929:15,
931:20
**chips** [2] - 893:3,
961:20
**chlorides** [1] - 900:22
**Chlorothene** [1] -
894:23
**chooses** [1] - 913:23
**chose** [1] - 894:7
**Christian** [1] - 897:9
**circa** [2] - 881:4,
965:20
**circles** [1] - 971:3
**circuit** [4] - 919:20,
919:23, 920:2, 925:7
**circuits** [2] - 915:9,
920:17
**circumstances** [3] -
908:6, 937:16
**cited** [1] - 973:21
**citizens** [1] - 903:3
**city** [7] - 875:13,
875:18, 875:19,
878:5, 878:9,
878:11, 878:15
**city's** [1] - 876:16
**claim** [3] - 916:7,
916:10, 956:12
**claimed** [1] - 920:19
**claims** [7] - 899:24,
908:8, 908:19,
922:7, 924:6, 953:3,
970:12
**clarified** [1] - 934:6
**clarify** [1] - 925:22
**classification** [1] -
947:7
**classifications** [1] -
947:8
**classified** [8] - 946:14,
946:18, 946:22,
947:1, 947:5, 947:6,

947:13, 947:16
**clause** [24] - 952:11,
952:12, 952:18,
952:20, 952:21,
952:22, 952:23,
953:9, 953:16,
953:22, 953:24,
954:8, 954:10,
954:19, 954:21,
954:22, 955:21,
955:23, 955:25,
956:2, 956:4, 956:5,
956:6, 956:13
**clauses** [6] - 899:11,
951:6, 956:16,
970:23, 971:2, 971:4
**clean** [1] - 905:24
**cleaned** [4] - 880:1,
905:20, 907:5,
965:10
**cleaning** [5] - 887:3,
890:5, 912:4,
962:11, 965:7
**cleanup** [3] - 924:22,
924:23, 965:4
**clear** [4] - 888:20,
889:10, 948:14,
955:19
**clearance** [1] - 959:21
**clearly** [5] - 879:16,
897:8, 901:22,
924:13, 958:4
**close** [1] - 881:6
**close-up** [1] - 881:6
**closed** [2] - 893:5,
920:20
**clue** [1] - 966:10
**co** [2] - 898:16, 898:19
**co-workers** [2] -
898:16, 898:19
**collect** [1] - 962:3
**collected** [4] - 895:23,
940:18, 962:7, 965:7
**Collected** [1] - 895:24,
965:8
**collecting** [2] -
944:18, 961:21
**collection** [2] -
891:11, 943:5
**collector** [1] - 908:2
**Colorado** [1] - 879:6
**combustible** [1] -
941:24
**coming** [5] - 881:11,
888:18, 922:14,
926:17, 961:25
**Command** [1] -
936:16
**Commanding** [1] -
964:6

**comments** [1] -
900:11
**common** [5] - 897:14,
909:25, 947:12,
951:2, 951:7
**commonly** [1] - 941:8
**community** [2] -
903:4, 907:4
**companies** [4] -
938:17, 938:24,
939:10, 939:17
**Company** [3] - 962:16,
963:24, 964:18
**company** [1] - 939:5
**competitive** [2] -
924:18, 924:24
**complete** [2] - 949:23,
962:9
**complied** [4] - 881:24,
902:23, 905:14,
905:15
**comply** [16] - 882:22,
882:23, 883:1,
883:10, 883:11,
884:4, 900:1, 902:9,
902:12, 902:13,
903:20, 905:12,
940:25, 942:5,
963:3, 963:6
**complying** [3] - 940:2,
942:20, 945:1
**composite** [1] - 903:8
**conceivable** [1] -
879:4
**concentrations** [1] -
900:20
**concerned** [10] -
877:18, 878:5,
878:9, 883:21,
886:23, 892:9,
895:23, 900:10,
903:13, 907:2
**concerning** [3] -
874:17, 965:14,
967:18
**concerns** [2] - 902:25,
965:14
**conclude** [2] - 881:18,
892:20
**concludes** [1] -
962:19
**conclusions** [1] -
964:4
**conditions** [2] -
873:20, 900:9
**conduct** [1] - 933:3
**conducted** [2] - 957:2,
960:12
**confirm** [1] - 936:12
**conjectural** [1] -

900:21
**connected** [1] -
944:12
**consciousness** [1] -
916:12
**consent** [1] - 910:15
**consequently** [1] -
879:6
**consider** [3] - 873:10,
873:17, 972:4
**consideration** [2] -
944:17, 974:1
**considered** [1] -
959:11
**considering** [2] -
969:10, 969:18
**consistent** [3] - 918:8,
920:17, 920:22
**constituents** [3] -
900:7, 900:8, 900:17
**construction** [1] -
895:14
**constructive** [3] -
932:15, 932:16,
932:21
**contacted** [1] - 929:16
**contain** [7] - 882:9,
882:11, 883:9,
883:15, 883:20,
901:18, 903:22
**contained** [4] -
881:13, 890:6,
892:20, 892:22
**containers** [2] - 893:5,
940:19
**containing** [3] -
883:25, 889:23,
891:8
**contains** [1] - 891:12
**contaminants** [3] -
876:23, 878:14,
881:19
**contaminate** [4] -
875:22, 876:1,
876:2, 879:25
**contaminated** [13] -
873:21, 874:10,
874:13, 876:6,
876:16, 879:18,
891:11, 891:17,
891:20, 892:3,
901:17, 940:18,
962:10
**contaminates** [1] -
880:3
**contaminating** [3] -
878:21, 879:15,
879:17
**contamination** [3] -
876:3, 905:20,

970:25
**contest** [1] - 885:23
**contested** [1] - 906:6
**continues** [1] - 923:4
**contract** [57] - 896:17,
899:11, 899:13,
909:11, 910:22,
912:18, 912:22,
919:5, 924:18,
925:10, 933:10,
933:11, 933:12,
933:14, 933:19,
933:23, 933:24,
934:2, 934:13,
936:3, 939:25,
940:9, 940:12,
940:24, 941:9,
943:20, 947:13,
948:11, 950:12,
951:14, 951:22,
952:1, 952:10,
953:4, 953:8,
953:11, 953:12,
953:16, 954:2,
954:9, 954:10,
954:11, 954:19,
955:3, 955:10,
955:11, 959:19,
959:20, 959:24,
960:1, 960:3,
972:13, 973:3,
975:16
**Contract** [2] - 925:12,
957:2
**contracting** [4] -
931:12, 933:1,
933:7, 950:5
**contractor** [24] -
908:7, 908:9,
932:19, 933:1,
933:10, 936:19,
942:5, 942:11,
942:12, 942:13,
942:20, 947:11,
950:11, 950:17,
953:13, 956:8,
957:8, 959:10,
959:24, 962:23,
963:3, 964:16,
964:17
**contractor's** [3] -
908:10, 953:1,
955:16
**contractors** [6] -
929:15, 937:9,
937:10, 937:12,
938:3, 939:23
**contracts** [51] -
874:16, 874:24,
875:1, 907:8, 908:4,

908:18, 908:22,
908:25, 910:22,
913:23, 916:14,
918:3, 919:1,
923:19, 924:25,
925:1, 925:24,
926:6, 927:3, 927:6,
927:7, 927:9,
927:22, 932:24,
935:21, 935:24,
936:12, 942:17,
951:24, 952:3,
952:16, 952:19,
952:22, 953:2,
953:10, 953:14,
953:15, 953:18,
953:20, 953:22,
953:23, 954:1,
954:14, 954:25,
955:12, 955:16,
955:18, 969:15,
970:14
**contractual** [1] -
908:20
**contribution** [1] -
911:5
**contributors** [1] -
886:24
**control** [26] - 873:23,
873:25, 874:11,
874:20, 874:21,
878:14, 879:10,
932:8, 932:11,
932:12, 932:15,
932:18, 932:19,
933:6, 933:16,
933:20, 934:2,
937:12, 937:13,
939:23, 943:10,
943:22, 947:9,
958:2, 958:7, 961:20
**controlled** [7] -
881:16, 893:14,
893:16, 896:7,
934:22, 942:23,
942:25
**controls** [1] - 939:25
**conveyed** [2] - 890:13,
903:14
**cool** [1] - 898:6
**cooperate** [2] -
958:12, 958:15
**cooperation** [2] -
958:8, 963:14
**copy** [2] - 917:5,
929:21
**Corps** [2] - 960:24,
961:5
**correct** [37] - 878:22,
917:23, 932:9,

932:16, 932:17,
933:7, 942:24,
944:2, 944:23,
944:24, 945:2,
945:3, 946:12,
950:12, 951:17,
952:1, 953:6, 953:9,
956:25, 957:20,
958:2, 959:5, 959:8,
960:1, 960:4, 960:5,
961:15, 962:24,
962:25, 963:12,
963:13, 963:15,
965:2, 965:17,
971:24, 973:8, 976:4
**corrected** [1] - 881:5
**corrections** [1] -
963:1
**correctly** [2] - 943:21,
945:9
**cost** [10] - 910:20,
915:15, 918:25,
953:13, 959:18,
959:19, 959:20,
959:23, 959:25,
972:13
**costs** [27] - 873:11,
912:3, 912:4,
913:22, 914:7,
915:13, 915:17,
918:6, 918:14,
918:19, 920:19,
922:2, 923:7,
923:19, 924:1,
924:15, 924:17,
924:23, 925:1,
925:18, 925:24,
926:4, 926:5, 927:6,
959:17, 970:6,
970:14
**counsel** [2] - 884:13,
948:12
**counter** [2] - 922:13,
968:13
**counter-sued** [2] -
922:13, 968:13
**County** [1] - 879:2
**couple** [3] - 898:22,
928:7, 938:21
**Court** [12] - 905:11,
918:16, 920:17,
922:25, 926:9,
926:12, 926:14,
927:24, 928:13,
929:22, 931:18,
972:3
**court** [1] - 922:25
**COURT** [225] - 873:2,
875:24, 876:25,
877:11, 880:5,

880:8, 880:14,
881:18, 882:2,
882:19, 882:23,
883:1, 883:7,
883:10, 884:6,
885:2, 885:23,
886:5, 886:13,
886:18, 886:25,
887:23, 888:1,
888:7, 888:12,
888:23, 888:25,
889:7, 889:25,
890:3, 890:8,
890:15, 890:20,
891:2, 891:5,
891:25, 892:6,
892:11, 893:17,
893:21, 894:15,
894:18, 896:24,
897:4, 898:12,
898:25, 899:5,
899:15, 900:23,
901:6, 902:11,
903:5, 903:25,
904:4, 904:8,
904:15, 904:20,
904:23, 905:1,
905:4, 905:8,
905:13, 905:16,
905:22, 906:6,
906:22, 906:24,
907:14, 908:11,
908:16, 908:24,
909:3, 909:6,
909:14, 909:22,
910:9, 910:18,
911:7, 911:10,
911:13, 911:19,
911:24, 913:2,
913:4, 913:11,
913:14, 914:3,
914:10, 914:13,
914:15, 914:19,
914:22, 915:6,
915:11, 915:20,
915:24, 916:2,
916:10, 916:19,
916:22, 917:3,
917:7, 917:10,
917:15, 917:19,
918:21, 918:24,
919:4, 919:9,
919:14, 919:18,
920:5, 920:13,
920:25, 921:4,
921:9, 921:12,
921:15, 921:18,
921:23, 922:5,
922:11, 922:18,
922:23, 923:1,
923:6, 923:9,

923:20, 924:8,
924:13, 925:14,
925:22, 926:3,
926:14, 927:17,
927:23, 928:3,
928:6, 928:9,
928:11, 928:15,
928:25, 929:2,
929:5, 929:7,
929:19, 929:23,
929:25, 931:3,
931:9, 931:13,
932:1, 935:9,
935:12, 935:16,
937:13, 937:21,
939:13, 941:20,
942:7, 945:4,
945:14, 947:19,
947:21, 947:24,
948:4, 948:6,
948:16, 948:20,
948:23, 949:3,
949:5, 949:11,
950:16, 950:23,
950:25, 951:4,
951:9, 951:15,
953:25, 954:3,
954:7, 955:7,
956:21, 965:24,
966:13, 966:16,
966:19, 966:25,
967:2, 967:6,
967:12, 967:14,
967:24, 968:4,
968:22, 969:2,
969:8, 969:13,
969:23, 970:9,
970:11, 970:15,
972:1, 972:6,
972:11, 972:15,
972:22, 973:5,
973:9, 973:13,
973:17, 973:19,
973:25, 974:4,
974:10, 974:14,
974:21, 974:23,
974:5, 975:10,
975:14, 975:18,
975:22, 976:1
**courts** [9] - 873:14,
917:25, 919:20,
919:22, 919:23,
920:2, 925:7, 972:8,
972:25
**cover** [2] - 951:9,
971:9
**covered** [5] - 893:23,
956:12, 956:13,
970:25, 971:14
**covers** [8] - 914:13,
914:14, 914:16,

914:22, 920:6, 949:24, 961:10, 964:10
**created** [3] - 879:4, 928:20, 957:11
**creates** [1] - 876:3
**creation** [1] - 903:2
**credit** [25] - 912:6, 917:4, 921:13, 924:2, 925:8, 925:13, 925:15, 925:16, 925:17, 925:20, 926:1, 926:11, 926:21, 927:3, 927:5, 927:10, 927:12, 927:21, 972:4, 972:19, 972:22, 973:1, 973:11, 974:6
**crediting** [5] - 924:6, 924:17, 925:6, 975:12
**credits** [8] - 919:2, 920:25, 921:4, 921:5, 921:10, 921:16, 921:19, 921:21
**criminal** [1] - 969:9
**cross** [1] - 971:7
**CROSS** [1] - 932:2
**cross-examination** [1] - 971:7
**CROSS-EXAMINATION** [1] - 932:2
**culpability** [3] - 905:24, 906:15
**culpability-type** [1] - 906:15
**culvert** [1] - 885:12
**customer** [3] - 912:1, 963:7, 963:17
**customers** [2] - 924:7, 940:7
**cut** [1] - 893:2
**cutting** [1] - 961:18
**cyclohex** [1] - 880:2

# D

**damage** [2] - 899:24, 908:9
**damages** [1] - 950:18
**dangerous** [2] - 946:14, 946:18
**dark** [1] - 880:21
**DATE** [1] - 976:9
**date** [2] - 885:25, 912:7

**dated** [3] - 891:23, 949:25, 964:15
**dates** [1] - 922:8
**days** [5] - 886:3, 889:6, 889:19, 897:23, 898:8
**DCAS** [16] - 957:4, 957:5, 957:6, 957:14, 957:20, 958:2, 958:9, 958:12, 958:15, 958:16, 958:24, 958:25, 959:2, 961:1, 961:2
**DCMA** [6] - 916:18, 922:16, 967:19, 968:24, 968:25, 969:20
**deal** [2] - 915:2, 963:14
**dealing** [5] - 887:18, 920:5, 921:2, 944:2, 970:24
**deals** [3] - 915:1, 932:18, 965:25
**dealt** [1] - 913:8
**December** [1] - 895:22
**decide** [1] - 940:9
**decided** [3] - 894:10, 895:5, 896:8
**decision** [1] - 926:15
**decisions** [1] - 896:20
**declaration** [5] - 888:8, 888:9, 888:11, 930:22, 930:23
**decompose** [1] - 896:6
**decomposed** [1] - 896:1
**decree** [2] - 910:15, 967:25
**deep** [1] - 886:10
**defendant** [1] - 972:18
**Defense** [8] - 905:14, 912:2, 957:2, 957:11, 958:25, 959:1, 959:3
**defenses** [1] - 970:4
**defers** [2] - 953:16, 955:19
**defining** [1] - 943:21
**degreaser** [6] - 894:4, 899:19, 907:11, 907:14, 907:16, 908:3
**degree** [1] - 947:7
**Delaney** [2] - 879:12, 892:20
**delay** [1] - 944:4

**demilitarization** [1] - 945:25
**demonstrates** [1] - 946:10
**demonstrating** [1] - 963:14
**Department** [6] - 873:6, 900:12, 905:14, 910:14, 912:1, 957:11
**deposition** [3] - 930:20, 934:5, 957:17
**described** [3] - 885:5, 894:21, 962:22
**design** [6] - 874:24, 875:3, 888:15, 888:19, 889:9
**designated** [1] - 928:21
**designation** [1] - 950:17
**designed** [3] - 896:13, 939:13, 944:8
**despite** [4] - 902:5, 902:7, 926:11, 968:7
**destroyed** [2] - 940:21, 949:1
**destruction** [7] - 895:23, 941:12, 941:14, 942:1, 943:5, 946:1, 947:15
**detail** [2] - 957:18, 957:21
**detailed** [2] - 957:17, 961:15
**details** [2] - 943:2, 958:10
**determine** [1] - 953:21
**determined** [1] - 914:17
**developed** [1] - 901:13
**developing** [1] - 886:21
**deviation** [1] - 941:8
**Dickey** [13] - 874:7, 876:18, 877:6, 881:25, 883:5, 900:2, 901:22, 902:1, 902:12, 903:20, 904:4, 905:12, 905:15
**dictate** [1] - 943:13
**difference** [1] - 916:23
**different** [7] - 882:5, 882:16, 890:24, 905:5, 906:14, 919:25, 926:6, 953:21, 971:15,

973:18, 974:11, 974:13
**difficult** [1] - 910:13
**dike** [1] - 887:12
**direct** [1] - 923:15
**DIRECT** [1] - 930:7
**directed** [1] - 946:10
**direction** [3] - 933:18, 959:13, 959:21
**disagree** [2] - 921:18, 938:7
**discharge** [19] - 874:7, 877:9, 880:24, 881:5, 882:8, 883:18, 883:19, 885:1, 885:2, 885:3, 885:5, 901:23, 902:2, 902:4, 902:14, 902:16, 903:18, 964:20, 965:6
**discharged** [4] - 876:14, 879:5, 881:10, 901:19
**discharger** [2] - 883:5, 902:21
**dischargers** [1] - 900:6
**discharges** [11] - 874:8, 881:16, 900:4, 900:13, 901:10, 901:25, 902:3, 902:5, 902:8, 902:25, 964:21
**discharging** [7] - 879:18, 884:14, 885:18, 885:21, 890:23, 891:4, 892:3
**disclose** [2] - 902:14, 902:15
**discontinued** [5] - 913:17, 913:18, 913:22, 914:21, 918:25
**discouraged** [1] - 901:12
**discovered** [2] - 927:15, 927:17
**discretion** [1] - 970:20
**discuss** [2] - 873:18, 967:4
**discussed** [3] - 904:19, 904:22, 973:21
**discusses** [3] - 891:11, 891:12, 965:3
**discussing** [2] - 951:11, 961:25
**discussion** [4] -

880:14, 967:5, 968:6, 970:22
**disposal** [30] - 873:24, 874:4, 874:20, 879:11, 879:22, 886:16, 889:22, 891:8, 896:22, 897:11, 901:12, 928:18, 929:14, 933:18, 942:24, 942:25, 943:11, 943:22, 944:14, 944:23, 945:13, 946:12, 949:10, 951:9, 957:21, 957:22, 958:3, 958:16, 958:20, 959:25
**dispose** [5] - 943:14, 946:11, 958:9, 959:13, 960:3
**disposed** [5] - 895:3, 895:24, 907:21, 934:14, 950:8
**disposing** [5] - 890:1, 903:21, 945:8, 950:11, 959:17
**disposition** [1] - 896:1
**disputable** [1] - 876:4
**dispute** [1] - 880:9
**disputed** [1] - 905:4
**dissolve** [1] - 877:4
**dissolved** [1] - 944:10
**distance** [1] - 941:16
**distinction** [1] - 933:22
**District** [3] - 957:3, 960:16, 960:21
**district** [4] - 877:23, 877:25, 962:17, 964:16
**districts** [1] - 960:25
**ditch** [1] - 889:16
**Division** [4] - 900:11, 900:12, 900:14, 901:8
**document** [16] - 922:12, 928:20, 929:11, 930:15, 931:3, 945:17, 945:19, 947:22, 948:13, 948:14, 949:14, 949:17, 958:22, 958:24, 960:9, 963:21
**documentary** [1] - 892:24
**documents** [4] - 875:25, 930:19, 958:12, 969:20

**DOD** [14] - 913:2, 913:4, 916:6, 916:13, 916:14, 916:22, 921:5, 921:13, 937:7, 943:4, 957:12, 961:5, 967:20, 972:11

**dog** [1] - 893:1

**DOJ** [8] - 911:21, 916:7, 916:17, 916:22, 922:21, 967:9, 967:17, 967:19

**dollars** [4] - 919:8, 919:13, 924:12

**domestic** [1] - 900:18

**done** [7] - 926:7, 926:8, 933:13, 935:7, 943:14, 956:11, 972:25

**door** [2] - 895:17, 895:19

**DOSA** [11] - 910:17, 910:18, 911:9, 916:17, 916:19, 917:2, 969:12, 969:16, 970:8, 970:13

**double** [38] - 875:10, 910:8, 910:9, 910:10, 915:3, 915:4, 915:6, 915:10, 917:8, 917:11, 917:13, 917:15, 917:17, 917:22, 917:24, 918:4, 918:12, 918:17, 918:19, 918:24, 919:1, 920:14, 920:23, 921:20, 921:21, 921:24, 923:23, 924:4, 924:5, 924:6, 925:7, 926:15, 927:23, 971:17, 972:8, 973:12, 973:21, 974:6

**double-recovered** [1] - 910:10

**doubt** [1] - 938:2

**doubts** [1] - 910:5

**down** [14] - 876:17, 878:4, 884:2, 887:8, 888:18, 898:4, 906:5, 910:1, 927:8, 930:19, 941:23, 955:4, 965:10, 969:16

**dozen** [2] - 938:6

**Dr** [2] - 879:12, 892:20

**drain** [14] - 884:25, 885:4, 885:8, 887:9, 888:15, 888:21, 888:22, 889:1, 889:4, 962:12, 964:20, 965:9

**drainage** [5] - 885:11, 889:11, 889:12, 889:13, 944:13

**drained** [2] - 880:2, 880:12

**dramatically** [1] - 912:11

**drawing** [4] - 888:15, 888:19, 889:7, 889:9

**drawings** [1] - 947:16

**drinking** [7] - 875:14, 875:20, 877:22, 903:2, 906:20, 907:3, 907:4

**drought** [1] - 944:19

**drum** [2] - 897:22, 897:24

**drums** [6] - 893:8, 894:23, 894:24, 898:1, 965:5, 965:7

**dry** [3] - 885:6, 931:23, 941:23

**dual** [1] - 902:18

**due** [2] - 885:13, 924:11

**dug** [1] - 894:13

**duly** [1] - 930:4

**dump** [7] - 879:1, 879:5, 894:11, 897:13, 897:18, 897:20, 898:10

**dumped** [10] - 882:14, 882:16, 893:8, 897:16, 898:2, 898:8, 898:14, 898:20, 899:10

**dumping** [4] - 873:22, 874:9, 894:4, 898:16

**duplicitous** [1] - 904:17

**during** [8] - 885:6, 885:9, 915:5, 918:1, 938:4, 944:19, 951:7, 962:10

**dust** [2] - 874:11, 908:2

# E

**ear** [1] - 935:19

**Earl** [2] - 897:9, 897:11

**early** [2] - 876:13, 879:18

**earthen** [1] - 964:23

**ease** [2] - 935:8, 935:9

**easier** [1] - 929:22

**east** [4] - 878:6, 888:17, 888:25, 889:1

**Easter** [1] - 921:15

**easy** [1] - 935:10

**economic** [10] - 912:6, 917:21, 923:21, 926:8, 926:11, 926:13, 926:19, 927:2, 971:13

**economists** [1] - 971:14

**educate** [1] - 974:23

**effective** [3] - 910:12, 912:10, 974:12

**effectively** [1] - 961:10

**effort** [2] - 917:23, 949:16

**egging** [1] - 968:10

**eighth** [1] - 874:13

**either** [10] - 882:25, 887:9, 895:11, 900:18, 901:20, 947:14, 948:16, 952:5, 972:25, 974:6

**electric** [1] - 887:17

**electrical** [1] - 887:19

**elevating** [1] - 904:5

**eleventh** [1] - 874:21

**employee** [3] - 874:22, 877:24, 946:7

**employees** [4] - 874:4, 887:18, 896:22, 897:10

**encompassing** [1] - 955:20

**end** [7] - 889:3, 889:16, 897:23, 908:11, 926:25, 947:13, 973:10

**ending** [1] - 950:6

**Energy** [1] - 908:1

**enhance** [1] - 924:24

**ensure** [1] - 945:8

**enter** [2] - 891:20, 934:18

**entered** [1] - 920:8

**entire** [2] - 907:4, 974:9

**entities** [1] - 926:2

**entitled** [2] - 879:3, 976:5

**entry** [1] - 901:19

**environment** [1] -

877:12

**environmental** [3] - 913:22, 923:25, 928:17

**EPA** [6] - 875:25, 884:9, 903:8, 903:10, 918:8, 918:11

**equipment** [16] - 874:1, 874:12, 875:2, 899:8, 899:18, 899:20, 899:22, 907:10, 907:25, 908:5, 939:5, 947:16, 952:5, 952:7

**equitable** [17] - 873:10, 873:12, 873:13, 873:17, 875:9, 899:2, 908:14, 915:2, 915:10, 924:5, 968:10, 970:4, 970:5, 971:17, 972:3, 973:21, 974:1

**equities** [1] - 967:18

**equity** [1] - 974:4

**especially** [2] - 902:25, 903:21

**essentially** [3] - 883:17, 952:20, 953:11

**establishing** [1] - 929:14

**estimate** [2] - 920:19, 949:22

**estimated** [1] - 920:20

**estimates** [1] - 950:2

**evaluate** [1] - 900:8

**evap** [3] - 880:2, 965:21, 966:9

**evaporate** [1] - 879:20

**evaporated** [1] - 898:23

**evaporation** [29] - 879:13, 879:20, 880:7, 880:21, 880:23, 880:25, 881:2, 881:8, 881:11, 884:1, 884:16, 884:20, 885:7, 885:10, 885:24, 886:2, 886:5, 886:7, 886:9, 886:11, 890:13, 890:19, 890:25, 891:1, 898:4, 907:22, 962:13, 965:8, 965:15

**event** [2] - 884:12,

889:15

**eventually** [1] - 885:8

**evidence** [28] - 875:6, 887:13, 887:15, 887:20, 889:11, 889:20, 889:25, 892:11, 892:12, 892:23, 892:24, 894:15, 894:20, 904:9, 905:1, 905:13, 907:17, 907:18, 907:19, 907:22, 928:25, 929:1, 934:21, 935:23, 966:24, 967:11, 967:12, 967:14

**evidenced** [1] - 885:11

**exactly** [8] - 895:19, 908:21, 912:16, 915:8, 923:3, 927:11, 941:1, 958:10

**EXAMINATION** [2] - 930:7, 932:2

**examination** [1] - 971:7

**examined** [1] - 930:5

**example** [4] - 899:19, 918:12, 934:7, 946:25

**exceeded** [1] - 959:23

**except** [7] - 885:9, 890:15, 908:17, 918:21, 938:1, 952:21, 955:22

**exception** [4] - 896:4, 908:16, 908:19, 940:8

**exceptions** [2] - 909:10, 951:15

**excerpted** [1] - 938:11

**exclude** [1] - 951:13

**excluded** [2] - 951:18, 969:20

**excluding** [1] - 901:14

**exclusions** [1] - 951:18

**excuse** [4] - 936:10, 960:20, 966:25, 967:1

**excused** [1] - 967:2

**executive** [2] - 875:18, 925:4

**exhibit** [11] - 887:23, 888:5, 888:9, 888:10, 890:4, 928:14, 929:5, 929:9, 929:19,

929:21, 950:23
**Exhibit** [17] - 891:24, 894:18, 894:19, 917:6, 918:21, 928:14, 928:23, 929:6, 930:9, 930:18, 949:9, 950:15, 951:21, 956:19, 958:20, 960:6, 963:19
**exhibits** [3] - 888:1, 888:10, 958:2
**exist** [1] - 903:11
**existence** [1] - 935:20
**existing** [2] - 927:3, 927:21
**exists** [1] - 961:11
**expect** [3] - 903:6, 951:5, 968:1
**expected** [3] - 944:11, 963:3, 963:5
**expecting** [1] - 903:5
**experience** [3] - 932:23, 936:12, 946:23
**expert** [3] - 880:22, 920:15, 931:12
**expert's** [3] - 917:10, 925:15, 931:11
**expertise** [1] - 931:11
**experts** [4] - 886:21, 894:19, 900:24, 971:14, 974:10, 975:14
**explain** [1] - 925:14
**explosion** [2] - 944:3, 962:8
**explosive** [17] - 893:6, 895:24, 936:13, 936:17, 943:6, 943:17, 943:19, 943:20, 943:23, 944:2, 944:12, 944:18, 944:20, 946:11, 960:4, 960:11, 963:15
**explosives** [8] - 891:13, 891:15, 937:1, 941:15, 944:9, 944:23, 945:2, 963:23
**exponentially** [1] - 962:8
**extend** [1] - 881:2
**extending** [1] - 964:22
**extent** [2] - 900:21, 901:15
**extra** [2] - 934:9, 947:9
**extraneous** [1] -

941:24

# F

**fabric** [4] - 934:10, 943:14, 943:16, 943:18
**fabrics** [2] - 934:17, 934:19
**facilities** [27] - 874:16, 874:18, 898:7, 907:8, 908:4, 908:10, 932:12, 951:6, 951:22, 952:1, 952:3, 952:4, 952:5, 952:10, 952:16, 952:19, 953:5, 953:11, 953:12, 953:19, 953:20, 954:10, 954:11, 955:11, 971:6, 971:7, 974:19
**facility** [12] - 874:22, 879:1, 879:14, 895:9, 900:9, 906:19, 929:14, 931:22, 933:8, 936:21, 953:15, 960:12
**fact** [35] - 875:17, 875:21, 877:24, 878:19, 878:24, 879:2, 881:17, 887:20, 888:12, 891:10, 891:13, 892:20, 893:21, 893:22, 894:6, 894:21, 896:16, 896:25, 897:11, 897:22, 897:25, 900:13, 902:5, 902:7, 903:18, 907:24, 918:8, 923:6, 925:5, 925:10, 925:12, 929:10, 930:15, 944:25, 946:6
**factor** [5] - 875:10, 908:14, 915:10, 925:19, 926:16
**factors** [5] - 873:10, 873:13, 873:17, 875:5
**facts** [3] - 910:24, 911:2, 911:22
**failed** [3] - 887:13, 902:9, 902:12
**failure** [6] - 874:3, 874:6, 874:11, 896:22, 900:1,

905:11
**fair** [1] - 937:6
**fairly** [2] - 947:7, 961:15
**falling** [1] - 961:12
**false** [1] - 882:24
**familiar** [3] - 884:2, 951:1, 955:24
**famous** [1] - 876:13
**far** [5] - 907:2, 921:5, 936:20, 969:22, 971:19
**FAR** [8] - 912:24, 913:7, 913:8, 913:9, 913:13, 913:20, 914:18, 932:17
**farce** [3] - 917:22, 925:6, 927:14
**fast** [2] - 887:10, 941:20
**favor** [3] - 874:15, 899:25, 955:17
**favorite** [1] - 897:18
**Federal** [1] - 922:24
**federal** [3] - 912:19, 922:25, 938:1
**fees** [6] - 910:19, 912:2, 912:20, 912:23, 912:25, 913:10
**feet** [2] - 879:8, 941:25
**few** [4] - 878:24, 899:21, 917:14, 931:5
**field** [1] - 938:3
**Field** [1] - 964:6
**fifteen** [1] - 928:4
**fifth** [1] - 874:6
**fighter** [1] - 939:19
**figure** [1] - 905:18
**figured** [1] - 927:20
**figures** [1] - 888:11
**figuring** [1] - 876:22
**file** [4] - 901:23, 902:2, 902:3, 970:16
**filed** [1] - 902:6
**fill** [2] - 884:24, 893:6
**filters** [1] - 944:8
**finally** [1] - 927:19
**findings** [2] - 957:15, 963:3
**fine** [5] - 873:2, 912:8, 932:5, 966:3, 966:22
**fingers** [1] - 905:23
**finish** [3] - 920:10, 961:18, 966:16
**finished** [1] - 875:25
**fireworks** [1] - 904:25
**first** [23] - 873:16, 873:19, 875:11,

875:12, 906:19, 909:20, 911:8, 911:18, 923:17, 923:23, 929:23, 930:4, 936:6, 938:12, 938:20, 943:8, 944:5, 945:21, 945:23, 946:13, 955:22, 957:18, 972:7
**Fish** [1] - 900:12
**five** [7] - 898:8, 905:18, 925:20, 927:11, 933:25, 939:18
**fix** [3] - 881:3, 924:6, 925:5
**fixed** [6] - 927:3, 927:7, 927:21, 959:24, 960:1, 975:15
**fixed-price** [6] - 927:3, 927:7, 927:21, 959:24, 960:1, 975:15
**fixtures** [1] - 887:19
**flag** [1] - 895:14
**floor** [1] - 964:20
**flow** [1] - 887:8
**flowing** [3] - 880:22, 881:7, 965:21
**flows** [2] - 878:6, 878:7
**Fluid** [1] - 908:1
**focus** [14] - 873:11, 874:24, 875:1, 875:11, 877:2, 879:10, 881:14, 887:1, 893:13, 896:21, 915:4, 936:16, 936:24, 975:5
**focused** [1] - 875:3
**focusing** [1] - 876:9
**folks** [1] - 906:13
**followed** [2] - 888:19, 903:15, 903:16
**following** [4] - 900:15, 901:18, 964:13, 972:8
**follows** [1] - 930:6
**Force** [2] - 906:4, 957:12
**foregoing** [1] - 976:4
**forerunner** [1] - 876:18
**forever** [1] - 971:16
**Fort** [4] - 931:19, 931:21, 931:22, 931:23

**forth** [1] - 975:23
**forward** [1] - 956:7
**forwarded** [1] - 946:3
**founded** [2] - 957:5, 957:6
**four** [1] - 941:5
**fourth** [1] - 874:3
**free** [2] - 908:7, 944:9
**frequent** [1] - 908:24
**frequently** [1] - 896:10
**front** [2] - 876:20, 923:6
**fuel** [1] - 898:24
**full** [6] - 881:1, 894:23, 924:1, 938:12, 950:17, 951:11
**function** [1] - 886:9
**funds** [1] - 925:3
**future** [1] - 923:11

# G

**gallons** [8] - 884:15, 884:23, 885:18, 885:19, 897:17, 898:2, 898:14, 898:23
**game** [1] - 908:11
**Game** [1] - 900:12
**gander** [1] - 906:10
**GAO** [2] - 875:25, 876:8
**gap** [2] - 890:15, 890:18
**gather** [1] - 928:17
**GCR** [2] - 875:19, 880:18
**general** [2] - 875:3, 888:17
**generally** [1] - 958:14
**generated** [1] - 892:16
**generating** [1] - 934:15
**generic** [2] - 937:2, 941:7
**George** [3] - 892:23, 893:7, 897:9
**given** [2] - 912:12, 944:18
**goose** [1] - 906:10
**govern** [1] - 953:2, 955:16
**governed** [1] - 908:4
**governing** [3] - 944:23, 952:3, 954:22
**Government** [3] - 903:6, 906:1, 911:19
**government** [88] -

874:18, 876:8, 883:21, 899:1, 903:9, 904:1, 906:8, 908:8, 910:14, 910:21, 910:24, 911:4, 911:17, 912:8, 912:13, 912:18, 913:23, 914:5, 914:6, 920:9, 922:12, 922:18, 922:19, 924:7, 924:9, 924:18, 924:25, 925:1, 925:10, 925:24, 926:2, 931:11, 932:11, 932:18, 932:19, 932:24, 933:2, 933:7, 933:12, 933:17, 933:22, 934:6, 934:8, 934:13, 934:21, 936:12, 936:21, 937:12, 937:16, 937:18, 938:1, 939:6, 939:20, 939:22, 939:23, 940:9, 941:4, 942:10, 942:15, 942:19, 945:7, 946:2, 946:7, 946:10, 947:9, 947:14, 947:17, 949:1, 950:12, 950:18, 951:3, 952:4, 952:13, 953:4, 954:23, 956:8, 958:3, 959:4, 959:7, 959:11, 968:1, 968:9, 968:11, 970:16, 971:5, 971:11, 974:17

**government's** [3] - 916:12, 931:5, 953:2

**government-operated** [1] - 936:21

**government-owned** [3] - 874:18, 936:21, 952:4

**governmental** [1] - 926:2

**grade** [1] - 888:17

**Grand** [8] - 875:16, 875:17, 960:19, 962:16, 962:19, 963:24, 964:17, 965:13

**Grant** [2] - 877:24, 960:20

**granted** [1] - 941:8

**grass** [2] - 921:15, 941:23

**gravel** [1] - 900:22

**great** [1] - 885:13

**greater** [1] - 973:3

**greatest** [1] - 901:15

**grinder** [4] - 887:3, 889:21, 890:5, 907:12

**grinders** [2] - 907:25, 908:1

**grindings** [1] - 893:4

**ground** [43] - 873:22, 874:10, 877:10, 878:4, 878:7, 879:8, 879:21, 881:10, 881:20, 882:13, 884:2, 885:3, 885:4, 885:8, 885:11, 885:16, 885:22, 887:6, 887:9, 889:23, 890:1, 890:2, 890:7, 891:8, 892:4, 893:10, 894:3, 894:6, 894:7, 895:18, 896:15, 897:2, 897:13, 897:17, 898:3, 898:8, 898:15, 898:17, 898:21, 903:24, 940:21

**Grounds** [1] - 895:11

**groundwater** [16] - 873:20, 873:21, 875:14, 876:15, 876:16, 876:23, 877:4, 877:5, 879:15, 879:17, 883:23, 900:9, 901:11, 901:14, 901:20, 905:10

**guaranteed** [1] - 878:15

**guess** [5] - 943:21, 948:23, 954:7, 956:5, 965:1

**gun** [1] - 940:8

**guys** [1] - 968:14

## H

**half** [2] - 906:25, 938:6

**hand** [3] - 935:3, 949:19, 950:4

**handed** [1] - 930:9

**handle** [1] - 975:19

**handled** [3] - 896:14, 918:12, 936:13

**handling** [2] - 891:12,
936:17

**hands** [1] - 968:7

**happy** [1] - 920:6

**hard** [2] - 908:22, 968:15

**hard-nosed** [1] - 968:15

**harmless** [3] - 900:22, 908:8, 954:22

**harping** [1] - 906:12

**Harvey** [1] - 900:14

**hauled** [1] - 931:22

**hazard** [1] - 944:12

**hazardous** [2] - 924:22, 971:4

**head** [2] - 940:8, 954:20

**headquarters** [1] - 959:2

**Health** [1] - 900:12

**health** [1] - 946:18

**heard** [1] - 927:1

**heels** [1] - 920:9

**help** [2] - 876:5, 903:23

**Herb** [2] - 875:18, 878:12

**hereby** [1] - 950:18

**hesitant** [1] - 955:13

**hesitate** [1] - 952:19

**high** [2] - 896:11, 947:7

**high-pressure** [1] - 896:11

**higher** [1] - 959:2

**highlighted** [1] - 898:3

**highly** [1] - 876:3

**highways** [1] - 941:17

**hit** [1] - 969:11

**hog** [2] - 896:7, 896:13

**hog-out** [2] - 896:7, 896:13

**hogging** [1] - 896:10

**hogging-out** [1] - 896:10

**hold** [3] - 885:19, 908:8, 954:22

**Honor** [165] - 873:5, 873:9, 874:3, 874:23, 875:5, 875:8, 875:11, 876:10, 876:24, 877:2, 877:6, 877:19, 877:20, 879:23, 880:16, 880:24, 881:2, 881:14, 881:22, 881:24, 882:7, 882:20, 884:8,
884:12, 884:19, 885:1, 885:17, 885:22, 886:1, 886:4, 886:8, 886:19, 887:2, 887:4, 887:21, 888:4, 888:5, 889:15, 889:22, 890:11, 891:13, 891:23, 892:23, 893:4, 893:11, 893:13, 893:20, 894:2, 894:12, 895:4, 895:20, 896:4, 896:18, 896:21, 896:23, 897:3, 898:4, 898:23, 899:3, 899:7, 899:14, 899:17, 900:2, 902:23, 903:10, 903:12, 903:17, 904:3, 904:7, 904:18, 905:17, 905:21, 906:3, 907:6, 907:7, 907:9, 907:17, 907:23, 908:14, 909:8, 909:12, 909:18, 910:6, 911:6, 911:20, 912:14, 912:17, 912:18, 913:19, 914:14, 914:21, 914:25, 915:4, 915:9, 916:6, 916:8, 916:16, 917:9, 917:18, 917:24, 918:8, 918:20, 919:7, 919:16, 919:23, 919:25, 920:12, 920:16, 921:11, 921:13, 921:17, 922:9, 922:25, 923:8, 923:22, 924:12, 924:20, 925:5, 925:25, 926:2, 926:5, 926:20, 926:25, 927:5, 927:14, 927:15, 927:22, 928:2, 928:12, 929:3, 931:10, 931:25, 935:6, 935:17, 939:16, 945:5, 945:12, 947:20, 947:25, 948:2, 948:5, 948:12, 948:21, 948:25, 949:12, 951:10, 954:2,
954:5, 965:25, 966:17, 966:24, 967:8, 967:15, 968:3, 968:25, 969:19, 969:21, 971:25, 972:7, 974:2, 974:3, 974:8, 974:9, 975:3

**hortatory** [1] - 941:6

**hose** [1] - 965:10

**hoses** [1] - 896:11

**host** [1] - 882:11

**hour** [1] - 966:18

**hours** [1] - 949:22

**house** [1] - 878:17

**huge** [1] - 940:1

**human** [1] - 901:3

**hundred** [1] - 879:7

**hung** [1] - 914:23

**Hurt** [2] - 878:25, 879:8

**hypothetically** [1] - 973:5

## I

**i.e** [1] - 944:10

**ICBMs** [2] - 938:18, 938:25

**idea** [2] - 911:16, 917:3

**identified** [2] - 888:2, 957:1

**ignorance** [3] - 881:24, 903:16, 905:10

**ignore** [5] - 905:11, 910:25, 924:4, 963:7, 963:16

**ignored** [1] - 883:24

**ignoring** [1] - 920:7

**impact** [3] - 927:2, 943:1, 943:24

**impacts** [2] - 916:3, 953:17

**implicit** [2] - 912:8, 912:9

**implies** [1] - 959:7

**importance** [1] - 878:20

**important** [6] - 875:9, 902:21, 910:2, 910:4, 910:7

**impose** [3] - 906:15, 940:7, 942:10

**imposed** [3] - 942:15, 942:18, 944:22

**imposition** [1] - 924:22

901:10, 901:25, 906:19
**impression** [1] - 923:23
**inadequate** [1] - 891:22
**incident** [1] - 876:13
**include** [9] - 875:9, 876:25, 888:5, 898:19, 913:1, 913:2, 927:2, 931:9, 959:25
**included** [1] - 884:17
**including** [3] - 886:24, 907:25, 908:1
**inconsistent** [4] - 889:23, 891:9, 895:21, 924:20
**incorporate** [1] - 912:2
**incorporated** [5] - 935:21, 935:23, 936:2, 940:24, 957:23
**increase** [1] - 927:21
**incredible** [1] - 911:4
**incur** [1] - 910:21
**incurred** [1] - 912:4
**indemnification** [15] - 874:15, 899:23, 907:8, 951:6, 951:12, 952:13, 952:18, 952:25, 953:17, 954:7, 954:19, 970:23, 971:2, 971:3, 974:19
**indemnify** [1] - 908:8
**indemnities** [1] - 956:17
**indemnity** [8] - 952:9, 952:10, 953:7, 954:22, 955:2, 955:9, 955:11, 956:16
**independent** [1] - 932:19
**Indiana** [1] - 964:7
**indicate** [2] - 883:15, 893:11
**indicated** [6] - 879:18, 887:4, 900:10, 901:21, 902:9, 907:9
**indicates** [5] - 881:12, 887:13, 887:15, 895:7, 898:5
**indicating)** [1] - 919:9
**indirect** [3] - 912:3, 912:4, 925:1
**individual** [1] - 934:7
**individuals** [2] - 898:18, 898:20
**industrial** [4] - 891:11,

901:10, 901:25, 906:19
**industry** [7] - 877:7, 937:6, 937:7, 937:11, 940:5, 940:6, 940:7
**informal** [1] - 918:3
**information** [10] - 898:5, 903:8, 903:11, 903:13, 903:14, 908:21, 928:17, 946:25, 947:13, 947:14
**informed** [4] - 877:13, 881:25, 882:1, 903:17
**inhabited** [1] - 941:16
**initial** [1] - 939:10
**initiatives** [1] - 957:7
**injuries** [1] - 950:19
**inorganic** [1] - 877:3
**inserted** [1] - 954:21
**inside** [4] - 880:15, 887:16, 887:17, 964:22
**insinuating** [1] - 904:8
**inspect** [2] - 934:17, 942:19
**inspected** [1] - 945:8
**inspection** [3] - 933:11, 961:2, 961:15
**inspections** [4] - 945:1, 956:20, 960:8, 963:20
**inspector** [1] - 933:2
**install** [1] - 903:20
**installed** [1] - 879:13
**insurance** [9] - 908:19, 918:2, 918:15, 951:19, 952:22, 952:23, 954:9, 955:23, 955:24
**insurance-liability** [2] - 952:22, 955:23
**intended** [1] - 922:1
**interest** [4] - 925:21, 927:10, 970:17, 970:19
**interested** [1] - 940:2
**interesting** [1] - 931:24
**interpretation** [3] - 912:23, 913:7, 913:16
**introductory** [1] - 952:21
**inventory** [1] - 959:9
**investigated** [1] -

905:17
**investment** [2] - 939:4, 939:10
**invoice** [1] - 947:21
**involved** [2] - 873:14, 943:19
**involving** [1] - 953:5
**irrelevant** [2] - 899:1, 906:12
**irrigation** [1] - 900:18
**Irwin** [4] - 931:19, 931:21, 931:22, 931:23
**Island** [2] - 936:15, 936:20
**issue** [23] - 881:23, 887:2, 902:24, 903:12, 903:15, 923:23, 925:10, 958:6, 967:16, 968:22, 968:23, 969:10, 970:18, 970:21, 971:15, 971:16, 971:19, 972:17, 973:1, 974:11, 974:13, 975:2, 975:7
**issued** [3] - 880:17, 883:22, 901:16
**issues** [12] - 886:20, 901:3, 903:17, 905:4, 932:21, 947:11, 963:15, 970:19, 971:10, 974:16, 975:2, 975:20
**item** [2] - 946:16, 948:9, 964:14
**items** [2] - 948:1, 948:18
**Items** [1] - 948:17
**itself** [5] - 893:18, 896:12, 902:16, 929:13, 947:24

J

**J.C** [2] - 938:17, 938:24
**JAG** [1] - 932:24
**James** [2] - 928:13, 930:2
**JAMES** [1] - 930:3
**Jared** [1] - 917:5
**Jeffersonville** [1] - 964:7
**Joan** [2] - 917:21, 926:8
**job** [2] - 940:10, 957:8

**John** [1] - 873:6
**Johnson** [3] - 908:19, 928:14, 928:18
**JOHNSON** [13] - 928:12, 929:1, 929:3, 929:6, 929:8, 929:20, 930:1, 930:8, 931:2, 931:10, 948:12, 955:6, 966:11
**judge** [2] - 910:23, 971:20
**Judge** [5] - 914:23, 915:1, 920:13, 973:15
**judgment** [4] - 924:6, 924:7, 925:5, 963:6
**July** [1] - 964:15
**jumbled** [1] - 954:25
**jump** [1] - 949:15
**June** [2] - 881:17, 965:14
**jurisdiction** [1] - 925:9
**jury** [2] - 909:22, 910:3
**Justice** [2] - 873:6, 910:14

K

**Kaneshiro** [1] - 976:3
**KANESHIRO** [1] - 976:9
**Kaneshiro-Miller** [1] - 976:3
**KANESHIRO-MILLER** [1] - 976:9
**keep** [3] - 885:20, 906:12, 910:9
**keeps** [1] - 896:16
**key** [2] - 900:4, 903:12
**kill** [1] - 944:4
**kind** [3] - 878:13, 928:1, 954:25
**kinds** [1] - 882:16
**knowing** [3] - 922:12, 922:14, 967:10
**knowledge** [10] - 873:19, 873:21, 875:12, 876:3, 876:10, 876:20, 877:15, 878:19, 890:25, 903:8
**known** [4] - 875:16, 882:4, 901:3
**knows** [3] - 888:2, 901:4, 969:6

L

**L.A** [1] - 886:22
**laboratory** [3] - 884:16, 892:9, 892:16
**LaBorde** [6] - 877:13, 882:4, 882:6, 882:8, 901:23, 902:6
**lack** [3] - 874:19, 874:21, 975:1
**Lake** [2] - 929:15, 931:21
**lake** [1] - 931:23
**language** [4] - 951:2, 951:16, 952:24, 955:19
**large** [3] - 880:2, 881:7, 962:6
**last** [12] - 927:16, 927:17, 927:19, 931:17, 938:20, 939:16, 945:25, 949:6, 952:25, 971:11, 975:7
**latter** [1] - 896:1
**law** [11] - 884:10, 903:16, 905:23, 909:1, 909:4, 915:22, 919:6, 919:18, 932:15, 932:16, 956:15
**laws** [2] - 896:2, 913:17
**lawsuits** [2] - 969:3
**lay** [1] - 963:9
**laying** [1] - 894:9
**leach** [1] - 893:12
**leaching** [2] - 891:14, 891:19
**lead** [1] - 971:2
**leading** [1] - 962:13
**leads** [3] - 964:25, 965:1
**leaked** [2] - 876:15, 907:17
**leaking** [2] - 894:23, 894:24
**learned** [1] - 902:24
**lease** [1] - 875:18
**leasing** [1] - 875:16
**least** [9] - 891:3, 912:12, 922:13, 936:1, 945:21, 954:8, 958:8, 966:17, 975:4
**leave** [1] - 964:3
**leaves** [1] - 941:24
**led** [1] - 874:1

**left** [1] - 974:1
**legal** [6] - 910:19, 912:2, 912:20, 912:23, 955:13, 971:19
**legally** [1] - 917:13
**less** [2] - 904:17, 910:12
**letter** [9] - 879:2, 895:6, 895:7, 958:24, 959:3, 960:15, 962:19, 964:8, 964:15
**letters** [2] - 894:20, 964:9
**level** [3] - 929:17, 949:16, 964:20
**level-of-effort** [1] - 949:16
**liabilities** [2] - 956:9, 956:12
**liability** [15] - 899:5, 899:8, 899:15, 899:18, 907:10, 923:2, 924:16, 950:18, 952:22, 953:3, 954:9, 955:23, 955:24, 956:13, 971:9
**lids** [1] - 887:15
**life** [4] - 900:20, 900:24, 900:25, 901:2
**light** [2] - 900:8, 909:20
**line** [6] - 917:3, 919:16, 948:1, 948:18, 962:12, 975:1
**Line** [1] - 948:17
**liquid** [2] - 880:22, 889:4
**liquids** [5] - 894:5, 900:16, 903:21, 903:23, 944:6
**liquors** [1] - 900:16
**list** [1] - 873:16
**literally** [1] - 935:19
**litigation** [1] - 932:21
**lived** [2] - 878:18, 906:14
**living** [1] - 878:16
**loads** [2] - 964:21, 964:25
**local** [2] - 896:2, 900:9
**located** [1] - 941:15
**Lockheed** [71] - 874:17, 875:12, 875:14, 875:16, 877:25, 878:9,

879:13, 879:16, 881:9, 881:15, 881:23, 882:7, 887:13, 888:14, 892:25, 893:14, 893:15, 894:7, 894:10, 895:4, 895:18, 896:7, 896:8, 896:12, 896:16, 896:17, 897:8, 897:10, 899:21, 901:22, 901:25, 902:3, 902:23, 903:14, 905:9, 907:11, 907:24, 909:15, 911:4, 911:21, 912:11, 912:23, 913:20, 913:21, 913:23, 915:15, 915:25, 916:13, 916:24, 919:11, 919:23, 920:2, 920:19, 920:21, 920:23, 922:1, 923:25, 924:5, 925:23, 926:10, 926:12, 926:13, 926:22, 927:20, 939:14, 959:4, 960:7, 968:12, 970:15, 972:5
**Lockheed's** [43] - 873:19, 873:23, 873:25, 874:3, 874:6, 874:9, 874:11, 874:13, 874:17, 874:20, 875:10, 875:12, 877:20, 877:24, 878:8, 878:11, 878:19, 878:24, 879:10, 884:13, 889:22, 891:7, 893:10, 895:20, 896:19, 896:21, 900:1, 900:24, 912:15, 913:16, 917:23, 920:19, 924:3, 924:14, 924:15, 924:17, 924:24, 925:1, 925:5, 927:3, 927:4, 927:8, 972:13
**Logistics** [1] - 959:1
**look** [31] - 879:23, 881:4, 882:13, 888:20, 897:16, 898:2, 898:18, 906:8, 917:25, 927:9, 931:3, 936:5,

936:24, 941:5, 941:11, 943:1, 944:5, 945:12, 948:2, 948:19, 948:21, 950:6, 950:14, 952:10, 952:25, 953:18, 953:19, 958:19, 960:6, 964:13
**looked** [6] - 889:12, 935:18, 942:17, 954:3, 956:15, 957:18
**looking** [13] - 889:13, 897:25, 919:22, 929:13, 940:15, 943:4, 945:23, 955:12, 955:22, 956:16, 957:19, 957:20, 970:18
**looks** [4] - 880:22, 887:5, 932:15, 943:12
**loose** [1] - 961:16
**loosened** [1] - 961:11
**Los** [2] - 960:15, 960:21
**lost** [1] - 920:14
**low** [1] - 937:3
**low-caliber** [1] - 937:3
**lower** [2] - 924:25, 927:6
**LPC** [18] - 885:12, 932:12, 933:8, 934:14, 935:24, 940:24, 942:15, 944:23, 945:1, 946:10, 947:1, 954:17, 954:23, 958:3, 958:4, 958:12, 958:17, 960:18
**LPC's** [4] - 878:25, 884:15, 895:16, 958:11
**lucky** [1] - 927:13

# M

M-O-N-O-P-S-O-N-Y [1] - 937:23
**magazines** [1] - 941:16
**main** [1] - 924:21
**maintenance** [1] - 897:10
**major** [3] - 940:8, 960:22, 963:17
**majority** [2] - 878:7,

907:24
**malfunctioned** [1] - 907:19
**man** [1] - 949:22
**man-hours** [1] - 949:22
**manage** [1] - 961:25
**managed** [1] - 893:15
**management** [7] - 873:23, 873:25, 874:19, 896:20, 897:8, 929:17, 951:18
**manager** [1] - 950:4
**mandatory** [2] - 909:4, 970:20
**manhours** [1] - 949:19
**manner** [3] - 901:12, 901:19, 940:21
**manual** [15] - 889:24, 891:7, 891:9, 891:11, 895:21, 895:22, 904:19, 904:20, 904:21, 936:25, 937:2, 941:7, 942:18, 943:4, 957:23
**manually** [1] - 880:2
**manuals** [9] - 937:1, 941:4, 942:20, 942:23, 943:22, 944:22, 956:20, 960:8, 963:20
**manufacture** [1] - 892:17
**manufacturer** [2] - 876:14, 934:9
**manufacturers** [2] - 906:9, 936:23
**marked** [1] - 895:13
**market** [1] - 939:6
**marketplace** [2] - 924:18, 924:25
**marshes** [1] - 944:19
**Martin's** [1] - 960:7
**Mary** [3] - 887:24, 888:10, 889:3
**material** [12] - 884:1, 893:5, 893:8, 898:10, 905:7, 940:18, 943:6, 943:20, 946:1, 947:19, 947:23, 947:24
**materials** [15] - 877:3, 895:10, 895:15, 902:17, 903:23, 935:3, 941:24, 943:17, 943:23, 944:2, 944:10,

944:18, 945:9, 946:14, 971:5
**matter** [9] - 876:19, 886:3, 968:10, 970:20, 971:7, 971:17, 971:19, 972:3, 976:5
**maximum** [2] - 941:15, 959:23
**McNamara** [2] - 957:9, 961:3
**McNamara's** [1] - 957:7
**mean** [13] - 883:1, 890:18, 892:6, 894:11, 903:10, 904:18, 910:25, 911:15, 937:13, 955:17, 968:13, 969:9, 972:1
**meaning** [1] - 948:13
**meaningless** [1] - 889:8
**means** [4] - 910:12, 927:8, 942:4, 953:6
**mechanics** [1] - 897:15
**meets** [1] - 934:8
**melt** [1] - 878:2
**memo** [5] - 879:24, 880:1, 880:11, 880:12, 880:17
**Mentone** [2] - 960:12, 963:24
**messed** [1] - 905:24
**met** [1] - 874:24
**method** [2] - 903:19, 918:5
**methods** [1] - 901:13
**Meyer** [1] - 926:8
**Meyer's** [1] - 917:21
**Michael** [2] - 973:16
**mid** [2] - 886:16, 886:21
**might** [9] - 892:21, 909:9, 946:16, 951:13, 953:12, 954:11, 955:21, 963:10
**mile** [1] - 906:25
**Mill** [1] - 908:1
**MILLER** [1] - 976:9
**Miller** [1] - 976:3
**million** [7] - 892:22, 920:20, 920:22, 920:24, 926:11, 926:13, 971:21
**millions** [1] - 919:12
**mind** [1] - 934:18
**minds** [1] - 875:22

**minimum** [6] - 919:21, 920:3, 921:3, 971:25, 972:1, 972:16
**minutes** [4] - 899:21, 909:23, 917:14, 928:4
**misreading** [1] - 921:24
**missile** [2] - 936:3, 947:4
**missiles** [2] - 933:25, 947:4
**missing** [1] - 908:20
**mistake** [2] - 888:4, 931:14
**mix** [2] - 880:20, 964:23
**mixer** [11] - 899:19, 907:13, 961:10, 961:12, 962:11, 964:10, 964:20, 965:3, 965:6, 965:10, 966:5
**Mixer** [1] - 880:1
**mixers** [1] - 908:3
**mixing** [2] - 881:6, 881:12
**moment** [1] - 905:2
**moments** [1] - 931:5
**Monday** [1] - 970:17
**money** [3] - 910:12, 953:13, 973:10
**monitor** [1] - 945:1
**MONOP** [1] - 937:22
**monopoly** [1] - 939:1
**monopsony** [2] - 937:18, 939:2
**Montebello** [1] - 876:13
**month** [1] - 894:25
**months** [1] - 894:14
**morning** [3] - 900:23, 966:21, 967:2
**most** [6] - 875:9, 893:8, 908:6, 910:7, 910:13, 956:5
**motivated** [1] - 919:18
**motor** [3] - 896:12, 896:18, 940:6
**motors** [11] - 887:16, 896:8, 896:9, 938:1, 938:2, 948:3, 948:5, 948:6, 961:19, 962:1
**mountains** [2] - 878:2, 888:18
**move** [2] - 876:17, 907:7
**moved** [1] - 917:11
**MR** [234] - 873:1,

873:5, 876:9, 877:2, 877:17, 880:6, 880:11, 880:16, 881:22, 882:6, 882:20, 882:25, 883:4, 883:8, 883:13, 884:8, 885:3, 886:1, 886:7, 886:15, 886:19, 887:1, 887:24, 888:4, 888:8, 888:14, 888:24, 889:1, 889:9, 890:2, 890:4, 890:11, 890:17, 890:22, 891:3, 891:6, 892:2, 892:7, 892:15, 893:19, 894:1, 894:16, 894:19, 896:25, 897:6, 898:13, 899:3, 899:7, 899:17, 901:1, 901:7, 902:15, 903:10, 904:3, 904:7, 904:12, 904:18, 904:21, 904:24, 905:3, 905:6, 905:9, 905:15, 905:17, 906:3, 906:17, 906:23, 906:25, 907:16, 908:13, 908:18, 909:1, 909:4, 909:8, 909:18, 910:6, 910:17, 911:6, 911:8, 911:11, 911:18, 911:20, 912:14, 913:3, 913:6, 913:13, 913:16, 914:7, 914:12, 914:14, 914:16, 914:20, 914:25, 915:8, 915:12, 915:22, 915:25, 916:4, 916:15, 916:20, 917:1, 917:6, 917:8, 917:13, 917:17, 917:21, 918:23, 919:3, 919:7, 919:10, 919:16, 919:19, 920:12, 920:16, 921:2, 921:6, 921:11, 921:13, 921:17, 921:20, 921:25, 922:9, 922:16, 922:20, 922:24, 923:3, 923:8, 923:12, 923:22,

924:10, 924:14, 925:16, 925:25, 926:5, 926:7, 926:20, 927:19, 928:1, 928:7, 928:10, 928:12, 929:1, 929:3, 929:6, 929:8, 929:20, 930:1, 930:8, 931:2, 931:10, 931:15, 932:3, 935:6, 935:10, 935:13, 935:17, 937:14, 937:24, 939:16, 939:21, 941:21, 942:8, 942:9, 945:5, 945:6, 945:15, 945:16, 947:23, 947:25, 948:7, 948:11, 948:12, 948:15, 948:18, 948:21, 948:25, 949:4, 949:7, 949:12, 949:13, 950:21, 951:20, 954:13, 955:6, 955:8, 956:22, 965:25, 966:4, 966:15, 966:17, 966:23, 967:1, 967:8, 967:13, 967:15, 968:2, 969:19, 973:14, 973:23, 974:3, 974:8, 974:18, 974:22, 975:3, 975:9, 975:11, 975:15, 975:17, 975:21
**Mulder** [1] - 897:9, 898:2, 898:7, 898:14
**munition** [1] - 937:17
**Murphy** [3] - 932:5, 939:13, 956:24
**MURPHY** [62] - 921:11, 921:13, 921:17, 922:9, 925:25, 926:5, 931:15, 932:3,

935:6, 935:10, 935:13, 935:17, 935:22, 937:14, 937:24, 939:16, 939:21, 941:21, 941:22, 942:8, 942:9, 945:5, 945:6, 945:15, 945:16, 947:23, 947:25, 948:5, 948:7, 948:11, 948:14, 948:18, 948:21, 948:25, 949:4, 949:7, 949:12, 949:13, 950:21, 951:20, 955:13, 955:8, 956:22, 965:25, 966:4, 966:11, 966:15, 966:17, 966:23, 967:1, 967:8, 967:13, 967:15, 968:2, 969:19, 973:14, 973:23, 974:3, 974:8, 974:22, 975:3, 975:17
**must** [8] - 891:19, 895:24, 919:24, 920:3, 933:12, 946:1, 947:14
**mutilated** [3] - 946:15, 946:17
**mutilating** [1] - 947:15

## N

**Nagle** [21] - 882:3, 928:13, 929:9, 930:2, 930:9, 930:22, 932:4, 932:7, 935:2, 935:14, 937:11, 938:11, 939:22, 942:10, 945:17, 956:6, 956:23, 958:22, 960:9, 963:21, 966:2
**NAGLE** [1] - 930:3
**nah** [1] - 940:9
**name** [1] - 873:5
**natural** [1] - 944:13
**nauseam** [1] - 971:14
**Navy** [9] - 929:11, 929:12, 929:13, 929:16, 930:16, 931:20, 937:4
**near** [3] - 897:23, 906:24, 944:10
**necessary** [2] -

895:10, 925:6
**need** [3] - 928:3, 969:10, 975:22
**needs** [1] - 972:3
**negotiated** [4] - 875:18, 916:17, 916:18, 968:17
**negotiation** [1] - 916:9
**negotiations** [1] - 969:22
**Nelson** [3] - 892:23, 893:7, 897:10
**neutral** [1] - 944:10
**never** [4] - 893:17, 906:21, 925:2, 972:17
**nevertheless** [1] - 897:8
**new** [4] - 971:19, 972:16, 973:1, 975:6
**news** [1] - 876:21
**next** [20] - 877:22, 879:1, 879:23, 881:14, 887:1, 887:7, 893:13, 895:17, 895:19, 896:21, 900:1, 907:3, 907:7, 909:12, 910:8, 928:9, 939:9, 949:8, 966:14
**nice** [1] - 968:14
**night** [6] - 898:3, 898:4, 898:11, 898:16, 898:17
**ninth** [1] - 874:15
**nobody** [3] - 876:2, 888:2, 919:14
**non** [3] - 925:24, 926:2, 943:19
**non-explosive** [1] - 943:19
**non-government** [1] - 925:24
**non-governmental** [1] - 926:2
**noon** [1] - 975:4
**Norris** [1] - 936:23
**north** [3] - 890:9, 890:12, 890:17
**nosed** [1] - 968:15
**note** [2] - 873:1, 880:2
**note-takable** [1] - 873:1
**nothing** [3] - 922:5, 930:5, 932:17
**notice** [2] - 882:7, 883:18
**notify** [1] - 877:8
**notion** [1] - 912:9

November [3] - 879:24, 880:17, 881:9
nuclear [2] - 937:19, 939:17
number [18] - 875:22, 887:23, 888:5, 909:14, 910:1, 929:5, 942:7, 944:1, 948:10, 949:8, 950:14, 957:19, 961:7, 962:11, 964:9, 964:13, 970:22
numerous [6] - 883:15, 893:7, 895:5, 901:25, 902:5, 902:8
nuts [3] - 961:9, 961:16, 964:10

**O**

object [1] - 901:13
Objection [1] - 955:6
objection [3] - 948:12, 955:7, 966:11
observed [2] - 885:11, 894:23
obtained [1] - 897:22
obviously [3] - 958:5, 958:11, 963:6
occur [2] - 925:8, 946:12
occurred [1] - 911:9
October [2] - 880:19, 950:1
OF [1] - 976:1
off-site [1] - 899:24
offer [1] - 955:13
offered [2] - 904:12, 932:8
Office [1] - 964:7
office [1] - 946:3
Officer [1] - 964:6
officer [4] - 933:1, 933:7, 950:5, 959:21
OFFICIAL [1] - 976:1
official [1] - 947:17
officials [2] - 932:20, 933:8
often [1] - 937:18
on-site [1] - 899:24
once [5] - 885:6, 888:20, 910:25, 939:10, 970:6
one [54] - 880:14, 884:24, 887:5, 888:5, 888:10,

889:16, 890:20, 890:22, 891:2, 891:3, 892:22, 896:25, 902:6, 905:19, 905:25, 906:4, 906:7, 907:12, 909:14, 916:16, 922:9, 925:3, 925:14, 929:3, 929:4, 929:11, 933:23, 935:19, 936:1, 937:19, 939:2, 940:8, 944:1, 950:16, 954:8, 954:15, 955:4, 955:14, 955:15, 956:3, 956:5, 957:6, 962:7, 963:22, 964:8, 966:23, 969:10, 970:17, 970:19, 970:21, 971:9
ones [2] - 937:2, 955:17, 971:8
open [5] - 894:9, 964:20, 968:19, 968:20, 974:1
OPENING [1] - 873:4
opening [8] - 873:7, 887:6, 931:5, 965:17, 966:24, 967:7, 967:8, 969:24
operate [2] - 894:10, 904:14
operated [2] - 936:21, 938:3
operating [4] - 891:10, 906:20, 907:3, 941:17
operation [5] - 875:15, 893:14, 961:18, 961:20, 965:7
operations [11] - 874:1, 874:22, 878:8, 879:11, 913:17, 913:18, 913:22, 914:21, 918:25, 932:12, 965:4
operative [1] - 939:9
opinion [11] - 915:1, 932:9, 932:11, 932:15, 932:23, 933:9, 934:6, 955:13, 958:1
opinions [2] - 932:7, 935:14
Oppliger [2] - 896:23, 897:1

opposed [4] - 878:25, 917:11, 961:5, 974:24
opposite [2] - 923:17, 939:1
order [4] - 920:16, 926:7, 926:18, 975:2
ordnance [10] - 889:24, 890:10, 891:7, 891:9, 893:23, 895:21, 936:22, 960:23, 960:25, 962:17
Ordnance [5] - 960:15, 960:21, 960:24, 961:4, 964:6
ordnances [1] - 896:3
organic [2] - 877:2, 900:16
organization [1] - 957:13
otherwise [2] - 948:24, 973:12
ought [1] - 901:13
ourselves [2] - 968:19, 968:20
outset [1] - 878:20
overflowing [1] - 885:20
overhead [6] - 877:20, 884:19, 914:8, 924:15, 924:17, 927:6
overruled [1] - 955:7
oversee [2] - 947:10, 957:8
oversight [5] - 933:17, 933:22, 933:23, 934:1, 949:2
overstep [2] - 932:20, 933:4
overstepped [1] - 933:8
overstepping [1] - 933:2
owe [1] - 973:9
own [8] - 876:5, 893:10, 894:17, 899:4, 899:9, 899:12, 906:2, 964:3
owned [10] - 874:18, 899:16, 899:18, 899:21, 899:22, 907:24, 936:21, 947:23, 952:4, 959:7
ownership [2] - 899:8, 907:10
owns [1] - 899:1

**P**

p.m [3] - 928:5, 975:25
pads [1] - 962:13
page [22] - 876:20, 929:4, 929:20, 929:23, 936:6, 936:7, 938:11, 938:14, 938:20, 939:4, 940:15, 943:8, 944:5, 945:21, 945:22, 945:23, 950:21, 952:9, 957:19, 959:10
pages [2] - 948:8, 970:18
paid [8] - 912:11, 920:18, 920:21, 966:2, 970:6, 970:7, 973:6, 973:12
pan [1] - 906:4
pans [5] - 903:21, 903:22, 904:2, 904:5, 904:19
paper [2] - 876:21, 947:15
paragraph [22] - 918:22, 929:3, 929:4, 931:17, 938:12, 938:20, 939:9, 941:23, 942:4, 944:5, 945:24, 945:25, 946:14, 951:1, 964:14, 965:3, 974:24, 974:25
parol [2] - 967:12, 967:14
part [14] - 902:17, 903:7, 916:8, 925:17, 935:14, 936:5, 936:22, 943:8, 958:18, 959:25, 960:3, 972:20, 975:14, 975:15
participate [1] - 896:19
particularly [1] - 967:21
parties [3] - 873:11, 918:9, 924:23
parties' [2] - 970:24, 974:24
partly [2] - 932:25
parts [7] - 880:1, 887:3, 887:15, 889:21, 890:5,

892:22, 961:11
party [5] - 917:25, 919:22, 923:24, 972:5, 972:18
pass [4] - 925:22, 925:23, 962:12, 965:9
passage [1] - 900:22
passed [1] - 926:1
passes [1] - 944:8
past [3] - 918:14, 918:19, 969:12
path [2] - 889:11, 889:12
Patricia [1] - 976:3
PATRICIA [1] - 976:9
pay [8] - 908:12, 910:12, 910:22, 913:4, 915:18, 969:15, 970:13, 973:4
paying [4] - 913:9, 915:16, 931:7, 965:22
payment [2] - 920:2, 973:12
payments [11] - 918:3, 923:5, 923:15, 923:18, 972:4, 972:5, 972:13, 972:19, 973:2, 973:3
penalize [1] - 911:3
Penney [2] - 938:17, 938:24
people [7] - 878:16, 881:19, 898:22, 922:20, 939:5, 944:4, 971:15
per [4] - 884:15, 892:22, 897:17, 970:18
percent [15] - 875:7, 910:23, 914:1, 914:3, 914:5, 914:7, 914:9, 925:13, 925:20, 926:9, 926:12, 926:18, 927:4, 927:11, 927:12
percentage [2] - 927:9, 973:3
percentages [1] - 927:24
perchlorate [6] - 882:10, 882:14, 902:16, 904:24, 959:5, 959:8
perchlorates [1] - 900:19
percolate [2] - 878:4,

894:6
**percolated** [1] - 893:10
**percolating** [1] - 885:16
**percolation** [3] - 875:20, 885:13, 891:21
**perfectly** [1] - 970:1
**perform** [1] - 875:1
**performance** [5] - 874:25, 899:13, 953:4, 957:8, 960:3
**performed** [2] - 935:24, 953:14
**performing** [1] - 959:19
**perhaps** [1] - 926:15
**period** [2] - 913:23, 950:6
**periodically** [1] - 942:21
**periods** [2] - 885:9, 944:19
**permissible** [3] - 969:25, 970:1, 970:2
**permit** [13] - 882:21, 882:22, 883:12, 883:16, 883:22, 883:24, 884:4, 901:16, 901:19, 902:10, 902:13, 902:16, 903:19
**permits** [1] - 886:16
**permitted** [3] - 877:14, 883:2, 965:9
**person** [3] - 879:25, 910:2, 935:19
**personnel** [2] - 950:19, 957:22
**persons** [4] - 952:22, 954:9, 955:23, 955:25
**pertaining** [1] - 964:14
**pesticide** [1] - 876:14
**photo** [3] - 877:20, 892:12, 894:8
**photograph** [4] - 880:19, 887:21, 889:15, 892:1
**photographs** [3] - 888:21, 889:10, 889:13
**picture** [5] - 884:19, 884:21, 892:6, 965:19, 965:20
**pieces** [3] - 893:4, 899:20, 952:7
**pile** [1] - 962:7
**pipe** [4] - 880:15,

881:2, 890:20, 964:22
**piped** [1] - 880:3
**pipeline** [2] - 890:24, 890:25
**pipes** [1] - 880:10
**pit** [36] - 880:2, 880:4, 880:7, 880:13, 880:21, 880:23, 881:1, 881:2, 881:8, 881:11, 884:17, 884:25, 885:7, 885:10, 886:5, 886:7, 886:11, 890:13, 890:16, 890:18, 890:19, 890:23, 890:25, 891:1, 891:4, 893:8, 893:9, 894:11, 894:22, 894:25, 903:22, 904:14, 907:22, 959:13, 959:17, 966:9
**pitchers** [1] - 942:14
**pits** [23] - 879:14, 884:1, 884:20, 884:22, 885:24, 886:2, 886:9, 891:14, 891:19, 893:14, 893:16, 893:18, 893:21, 893:22, 893:23, 894:2, 894:5, 903:7, 903:19, 904:16, 965:8, 965:15, 966:2
**place** [3] - 876:10, 891:10, 933:18
**placed** [2] - 940:19, 965:5
**places** [2] - 895:6, 921:22
**plaintiff** [5] - 918:7, 918:14, 918:15, 918:18, 924:2
**Plaintiff's** [10] - 928:14, 929:6, 930:9, 930:18, 949:9, 950:15, 956:19, 958:20, 960:6, 963:18
**planned** [1] - 901:12
**planning/technical** [1] - 949:17
**plant** [9] - 877:21, 878:8, 885:12, 900:20, 900:24, 900:25, 901:2, 959:14, 959:21
**platform** [1] - 887:7
**pleading** [2] - 881:23,

903:15
**pleads** [1] - 905:9
**plenty** [1] - 898:24
**plugged** [1] - 887:17
**plume** [1] - 898:24
**point** [13] - 877:22, 885:24, 886:17, 896:25, 903:17, 919:4, 931:18, 941:25, 944:15, 946:13, 950:1, 955:1, 967:6
**pointed** [3] - 878:12, 880:19, 884:20
**pointing** [2] - 896:17, 905:23
**pole** [1] - 895:14
**pollute** [2] - 891:20, 910:2
**polluted** [2] - 877:14, 891:16
**pollution** [4] - 879:3, 879:4, 879:6, 880:20
**pond** [1] - 876:15
**pool** [8] - 881:7, 914:8, 921:16, 923:10, 926:6, 971:22
**pooled** [1] - 889:4
**poor** [1] - 891:22
**portion** [2] - 914:4, 949:20
**position** [10] - 889:20, 899:3, 899:11, 899:14, 907:16, 920:16, 924:3, 924:24, 925:15, 974:21
**positions** [2] - 970:24, 974:24
**positive** [1] - 945:21
**possession** [2] - 908:10, 953:5
**possibilities** [1] - 889:16
**possibility** [4] - 929:14, 944:18, 961:11, 962:7
**possible** [3] - 935:11, 951:19, 957:19
**possibly** [1] - 966:1
**post** [2] - 925:5, 956:17
**post-CERCLA** [1] - 956:17
**post-judgment** [1] - 925:5
**pot** [1] - 913:12
**potable** [1] - 891:20
**potassium** [1] -

900:19
**potential** [1] - 944:20
**Potrero** [11] - 879:5, 894:9, 894:11, 894:22, 894:24, 895:9, 895:12, 895:15, 896:8, 902:4, 959:14
**pounds** [2] - 887:16, 898:21
**poured** [1] - 883:25
**powder** [2] - 896:5, 896:6
**power** [2] - 926:23, 940:7
**Powerpoint** [1] - 971:12
**practicable** [2] - 940:19, 941:15
**practice** [1] - 897:14
**practices** [6] - 874:4, 874:20, 879:22, 904:8, 904:9, 904:10
**pre** [1] - 956:16
**pre-CERCLA** [1] - 956:16
**precautions** [1] - 891:19
**precedence** [1] - 955:11
**preclude** [1] - 916:2
**precluded** [3] - 919:15, 919:19, 919:20
**predominant** [1] - 918:5
**prejudgment** [2] - 970:17, 970:19
**premise** [1] - 914:23
**present** [6] - 876:11, 894:20, 901:10, 930:10, 938:5, 974:18
**presented** [3] - 882:7, 973:15, 973:24
**president** [4] - 878:25, 895:16, 895:19
**President** [2] - 878:25, 879:8
**pressure** [1] - 896:11
**presupposes** [1] - 877:11
**presupposing** [1] - 877:14
**pretenses** [1] - 882:24
**pretty** [2] - 886:12
**prevent** [5] - 876:22, 879:14, 879:16, 903:23, 915:20
**preventing** [2] - 915:4,

915:9
**previous** [5] - 889:6, 890:4, 929:10, 930:15, 938:5
**price** [7] - 927:3, 927:7, 927:21, 959:24, 960:1, 975:15
**primarily** [1] - 934:23
**probability** [1] - 880:24
**problem** [15] - 882:21, 882:22, 883:16, 883:17, 884:4, 894:1, 894:6, 902:18, 902:20, 906:11, 913:1, 919:15, 920:14, 925:11, 944:1
**procedure** [1] - 896:10
**procedures** [8] - 887:14, 896:20, 906:11, 957:21, 958:13, 958:17, 963:8
**proceeded** [1] - 876:17
**proceedings** [2] - 975:25, 976:5
**Process** [1] - 901:17
**process** [7] - 896:13, 900:16, 901:14, 953:11, 961:24, 962:11, 975:12
**procurement** [2] - 953:2, 955:16
**produce** [2] - 878:13, 944:12
**produced** [1] - 875:2
**product** [2] - 874:25, 875:2
**production** [15] - 875:1, 944:4, 951:24, 953:8, 953:10, 953:13, 953:15, 953:16, 953:20, 953:23, 953:25, 954:14, 955:3, 955:10, 955:18
**proffer** [1] - 969:24
**profit** [8] - 912:3, 925:23, 926:22, 926:23, 926:24, 927:21, 975:8, 975:13
**profits** [2] - 912:2, 927:8
**program** [2] - 950:4,

950:9
prohibited [2] - 896:2, 913:7
promised [2] - 878:14, 879:25
prompt [1] - 924:22
propellant [26] - 881:12, 892:8, 892:16, 892:18, 893:2, 893:4, 893:11, 894:3, 894:8, 895:13, 895:18, 896:5, 896:9, 896:11, 907:12, 908:2, 931:22, 950:8, 961:10, 961:18, 961:20, 962:4, 962:10, 964:10, 965:6
propellants [4] - 895:9, 904:25, 931:4, 950:12
proper [5] - 874:4, 890:14, 893:18, 912:10, 926:21
properly [1] - 944:7
property [8] - 875:15, 879:1, 899:24, 908:9, 950:19, 951:3, 951:4, 959:12
proposed [1] - 901:9
proposing [1] - 877:9
Propulsion [1] - 959:4
prosecution [1] - 969:9
protect [2] - 877:12, 887:18
protection [2] - 916:25, 917:1
protesting [1] - 895:17
protocols [2] - 887:14, 887:18
prove [2] - 874:23, 967:23
provide [4] - 887:13, 898:5, 926:21, 926:22
provided [4] - 891:14, 897:11, 952:21, 955:23
providing [1] - 928:19
Proving [1] - 895:11
provision [4] - 908:24, 909:5, 909:11, 953:1
provisions [2] - 909:9, 955:15
PRP [1] - 915:13
PRPs [1] - 918:3

public [2] - 941:17, 946:18
pump [6] - 880:8, 887:10, 887:11, 888:13, 890:9, 890:13
pumped [2] - 880:6, 885:7
pumping [1] - 885:10
purchasers [1] - 937:25
purpose [4] - 924:20, 924:23, 925:2, 943:12
purposes [5] - 881:20, 887:12, 887:18, 888:1, 924:21
pursuant [1] - 910:15
put [21] - 877:7, 893:5, 893:11, 894:12, 904:16, 907:21, 907:22, 910:1, 910:4, 912:9, 913:11, 914:7, 923:10, 926:15, 929:19, 931:15, 937:15, 956:2, 959:10, 965:19
puts [2] - 940:8, 956:7
putting [2] - 879:19, 890:11
PX [3] - 945:14, 949:11, 956:21
pyrotechnic [1] - 905:7
pyrotechnics [6] - 904:23, 904:25, 905:5, 931:4, 931:9, 949:5

## Q

quality [2] - 901:10, 934:23
quantities [2] - 881:13, 891:15
quarts [1] - 897:17
quickly [2] - 879:23, 885:16
quite [1] - 879:4
quote [2] - 875:21, 879:24
quoted [1] - 964:15
quotes [2] - 877:19

## R

Radian [1] - 894:16
radius [1] - 941:25

railways [1] - 941:17
rain [2] - 878:1, 889:6
rained [1] - 889:19
rainfall [1] - 885:9
raise [2] - 966:23, 975:6
raised [4] - 897:7, 967:18, 971:4, 971:6
raises [1] - 973:1
raising [1] - 971:15
range [1] - 936:3
rate [2] - 910:22, 912:10
rates [1] - 898:4
rather [3] - 879:20, 939:2, 957:11
rationale [2] - 924:14, 924:19
rattlesnakes [1] - 898:11
read [9] - 928:21, 929:2, 929:23, 930:10, 938:10, 938:12, 971:12, 974:10, 974:25
reading [6] - 903:6, 912:15, 917:19, 936:11, 955:15, 974:24
real [1] - 904:9
reality [1] - 939:19
realize [2] - 910:14, 937:22
really [7] - 886:1, 886:9, 927:10, 949:15, 955:13, 965:22, 970:23
reason [5] - 896:5, 899:17, 938:7, 951:12, 952:19
reasonable [2] - 875:6, 892:19
reasons [1] - 925:17
recedes [1] - 955:17
receive [5] - 924:1, 925:13, 925:17, 926:10, 926:13
received [2] - 902:10, 918:10
receiving [1] - 925:19
Recess [1] - 928:5
recharge [5] - 875:14, 877:23, 903:2, 906:20, 907:3
recognize [1] - 938:9
recognized [2] - 901:1, 911:24
recommendation [4] - 958:4, 962:23, 963:8, 965:16

recommendations [5] - 958:6, 961:6, 962:25, 963:1, 963:4
recommended [1] - 957:23
record [5] - 888:2, 928:22, 930:11, 967:5, 976:4
records [1] - 889:5
recover [17] - 912:22, 912:25, 913:9, 913:24, 913:25, 914:3, 914:4, 915:14, 915:16, 918:11, 918:14, 918:18, 920:24, 922:2, 923:19, 969:17, 975:12
recoverability [1] - 925:19
recovered [6] - 910:10, 917:25, 918:15, 919:21, 919:24, 920:22
recoveries [3] - 918:17, 921:21, 972:9
recovering [4] - 910:11, 913:25, 914:8, 925:18
recovery [39] - 875:10, 910:8, 910:10, 910:22, 915:3, 915:4, 915:7, 915:10, 916:13, 916:15, 917:8, 917:11, 917:13, 917:16, 917:17, 917:22, 917:24, 918:4, 918:12, 918:18, 918:20, 918:24, 919:1, 920:14, 920:23, 921:20, 921:24, 923:23, 924:4, 924:5, 924:6, 925:7, 926:15, 927:24, 971:13, 971:17, 972:8, 973:22, 974:6
Redlands [15] - 873:20, 875:13, 875:19, 877:21, 879:14, 898:6, 902:1, 902:3, 903:1, 903:3, 920:6, 921:11, 922:9, 922:15
reduce [2] - 911:5, 924:17
reduced [1] - 900:21

reducing [1] - 910:11
refer [1] - 948:9
reference [3] - 947:19, 964:8, 964:14
referenced [1] - 946:3
referred [1] - 896:10
referring [1] - 930:18
refuse [1] - 879:1
regard [2] - 918:24, 946:17
regards [3] - 943:24, 945:10, 945:11
regular [1] - 963:23
regulate [1] - 902:20
regulated [1] - 902:1
regulating [1] - 900:3
regulation [2] - 900:5, 912:20
regulations [1] - 941:4
reimbursable [1] - 959:20
reimburse [2] - 918:25, 956:8
reimbursed [4] - 915:13, 915:15, 923:25, 924:2
reimbursement [1] - 918:6
reimbursements [3] - 972:10, 972:11, 972:13
reject [1] - 913:5
related [5] - 943:19, 953:1, 953:3, 953:4, 955:16
relates [2] - 908:19, 925:18
relating [1] - 899:24
relative [1] - 929:5
release [8] - 916:6, 916:9, 922:15, 922:17, 922:22, 923:1, 946:25, 968:24
released [1] - 916:10
releases [3] - 874:1, 950:18, 968:23
releasing [1] - 970:12
relevant [3] - 881:21, 956:5, 967:21
relied [1] - 900:6
relief [1] - 915:18
relocate [2] - 895:10, 895:15
remedial [1] - 970:13
remember [17] - 885:25, 896:23, 897:3, 897:4, 934:11, 935:25, 936:2, 936:4,

945:20, 951:11, 951:23, 954:20, 954:24, 954:25, 958:12, 963:22, 965:19

**remnant** [1] - 934:19
**remnants** [1] - 934:9
**remote** [1] - 961:19
**removal** [1] - 962:10
**remove** [1] - 895:10
**removed** [2] - 941:25, 961:21
**reorganization** [1] - 960:22
**repeat** [1] - 955:4
**reply** [2] - 929:11, 930:16
**report** [5] - 882:7, 894:16, 894:17, 901:23, 902:2
**reported** [1] - 900:19
**reporter** [2] - 937:21, 941:20
REPORTER [2] - 955:4, 976:1
**reports** [2] - 874:6, 902:4
**representative** [1] - 946:2
**representatives** [1] - 950:3
**requests** [2] - 941:7, 962:16
**require** [4] - 904:11, 904:13, 905:25, 909:1
**required** [9] - 909:4, 933:9, 940:25, 942:5, 946:11, 949:23, 951:24, 952:16, 952:18
**requirement** [2] - 877:7, 937:23
**requirements** [2] - 883:4, 943:13
**requires** [1] - 905:23
**research** [3] - 884:15, 892:8, 892:16
**residual** [2] - 913:12, 950:8
**resolve** [1] - 876:6
Resources [2] - 900:11, 900:14
**respect** [1] - 924:11
**respond** [6] - 962:23, 963:5, 968:5, 968:8, 968:9, 970:16
**response** [13] - 878:11, 929:12, 929:18, 930:16,

958:11, 962:16, 962:19, 963:2, 963:10, 964:1, 965:13, 971:18, 974:14
**responses** [1] - 974:15
**responsibility** [1] - 961:1
**responsible** [1] - 924:23
**result** [2] - 891:21, 950:19
**resume** [3] - 966:21, 967:3, 975:24
**returned** [2] - 884:16, 947:14
**review** [11] - 933:3, 935:8, 935:9, 935:14, 941:4, 945:17, 945:19, 954:14, 956:23, 957:14, 957:20, 960:9, 963:21
**reviewed** [6] - 930:13, 940:11, 940:13, 951:22, 954:18, 958:16
**rid** [1] - 934:9
**rifle** [1] - 937:3
**right-hand** [2] - 949:19, 950:4
**rights** [1] - 916:3
**risk** [3] - 953:21, 954:4, 954:6
**risks** [3] - 905:10, 944:20, 953:9
**risky** [1] - 940:10
**river** [2] - 876:17, 907:1
**River** [1] - 901:20
**Riverside** [1] - 879:2
**road** [2] - 889:2, 969:16
**Robertson** [3] - 914:23, 920:13, 973:15
**Robertson's** [2] - 915:1
Rock [2] - 936:15, 936:20
**Rocket** [8] - 875:17, 960:20, 962:16, 962:20, 963:24, 964:18, 965:13
**rocket** [9] - 896:7, 896:9, 896:12, 896:18, 937:25, 938:2, 940:6, 948:3, 948:5

rocket-motor [1] - 896:12
**rockets** [3] - 892:18, 892:19
**rocks** [1] - 887:11
**round** [1] - 928:9
**routine** [1] - 874:9
**rule** [2] - 886:22, 896:4
**run** [2] - 896:14, 936:19
**runs** [1] - 885:8

**S**

**sad** [2] - 881:1, 927:16
**safe** [3] - 893:7, 962:3, 963:9
**safety** [34] - 875:4, 887:12, 887:18, 934:23, 934:24, 934:25, 942:11, 942:15, 942:23, 943:1, 943:4, 943:12, 943:22, 943:24, 944:1, 944:14, 945:10, 945:11, 946:19, 956:20, 956:25, 957:2, 957:14, 957:23, 958:6, 958:18, 960:8, 960:11, 962:2, 962:3, 962:22, 963:20, 963:23
**Safety** [1] - 964:6
**sample** [1] - 893:2
**samples** [4] - 882:14, 883:15, 892:25, 893:1
**San** [1] - 888:18
**saved** [1] - 910:8
**saw** [2] - 884:13, 898:16
**schedule** [2] - 948:1, 948:19, 959:10
**scientific** [1] - 877:15
**scientists** [1] - 876:20
**scope** [2] - 931:11, 966:11
**screen** [1] - 931:16
**screeners** [1] - 961:10
**Sears** [2] - 938:17, 938:24
**season** [1] - 878:2
**seats** [1] - 934:10
**second** [8] - 873:23, 882:7, 929:20, 945:22, 945:24,

950:16, 965:3, 969:17
**secret** [2] - 946:16, 946:25
**Secretary** [2] - 957:7, 957:9
**Section** [3] - 891:10, 891:13, 895:22
**section** [5] - 879:2, 917:8, 928:24, 945:13, 949:10
**secured** [1] - 961:10
**securing** [1] - 899:12
**see** [47] - 877:21, 878:6, 879:15, 879:24, 880:17, 880:20, 880:21, 881:5, 881:7, 885:15, 893:24, 894:8, 895:17, 903:7, 912:14, 920:10, 934:13, 935:21, 939:7, 940:22, 941:18, 942:2, 946:4, 946:8, 949:19, 950:6, 951:5, 952:14, 953:8, 953:17, 954:3, 957:24, 959:15, 960:13, 961:13, 961:22, 962:14, 963:11, 963:25, 964:1, 964:11, 964:24, 965:11, 968:6, 974:15, 975:19
**seeing** [3] - 945:20, 951:23, 963:22
**seek** [1] - 918:11
**seeking** [2] - 915:15, 918:14
**seeks** [2] - 915:13, 918:7
**segmented** [1] - 922:18
**selected** [1] - 941:14
**sell** [2] - 938:16, 938:23
**seller** [1] - 934:19, 939:3, 940:1
**sense** [2] - 909:25, 939:25
**sensitive** [1] - 873:19
**sensitivities** [1] - 928:17
**sentence** [5] - 938:20, 939:9, 939:16, 952:25, 955:22
**sentences** [1] - 938:21

**separate** [2] - 912:18, 916:17
**separator** [2] - 907:18, 907:20
**September** [4] - 891:23, 895:7, 949:25
**service** [1] - 961:4
**services** [2] - 949:17, 957:10
**Services** [2] - 925:11, 957:3
**set** [3] - 876:22, 911:3, 940:20
**sets** [1] - 910:15
**setting** [1] - 875:13
**settle** [5] - 884:24, 884:25, 911:12, 918:9, 922:7
**settled** [7] - 884:17, 911:21, 911:23, 918:25, 923:13, 923:17
**settlement** [14] - 911:8, 911:21, 913:17, 913:18, 914:17, 916:16, 918:2, 918:3, 918:10, 920:5, 920:8, 921:14, 922:6, 922:21
**settlement/consent** [1] - 967:25
**settlements** [1] - 918:9
**settling** [5] - 886:2, 886:10, 891:14, 891:18, 898:9
**seventh** [1] - 874:11
**Seventh** [1] - 885:12
**several** [4] - 879:7, 931:19, 931:21, 942:17
**sewer** [2] - 887:6, 887:8
**shackle** [1] - 939:5
**shall** [11] - 891:14, 901:18, 908:7, 941:5, 941:6, 941:15, 941:24, 942:4, 950:17, 953:2, 955:16
**shallow** [1] - 886:12
**shape** [1] - 893:3
**share** [5] - 875:7, 908:15, 910:12, 924:16, 974:12
**shells** [1] - 937:4
**shift** [1] - 925:3
**shipbuilders** [2] -

938:16, 938:23
**shipping** [1] - 947:21
**ships** [2] - 938:16, 938:23
**short** [1] - 936:3
**short-range** [1] - 936:3
**show** [11] - 877:19, 882:14, 899:21, 903:25, 906:13, 915:8, 917:14, 917:15, 918:5, 965:24, 969:20
**showed** [1] - 889:8
**showing** [2] - 958:16, 965:20
**shows** [1] - 958:8
**shredding** [1] - 947:15
**shrink** [1] - 974:5
**side** [2] - 884:21, 912:15
**signed** [6] - 922:12, 929:21, 946:2, 946:7, 950:3, 969:15
**significant** [5] - 881:13, 885:15, 908:14, 909:19, 944:9
**signing** [1] - 950:4
**silly** [1] - 888:16
**similar** [3] - 936:25, 937:2, 945:20
**simple** [1] - 920:7
**simplest** [1] - 903:19
**simply** [4] - 912:21, 918:16, 921:9, 970:13
**sink** [1] - 879:20
**sit** [1] - 894:14
**site** [23] - 873:20, 875:20, 878:21, 884:3, 885:12, 888:17, 894:9, 895:17, 897:25, 899:19, 899:24, 902:4, 903:1, 905:20, 906:5, 906:18, 906:19, 907:5, 912:4, 936:13, 941:14
**sites** [16] - 873:22, 874:2, 874:5, 874:8, 874:10, 874:14, 876:6, 895:6, 905:18, 906:2, 906:8, 907:11, 907:25, 922:10, 924:22, 941:12
**sitting** [1] - 894:24
**Sitton** [1] - 889:3

**Sitton's** [1] - 887:24, 888:10
**situation** [3] - 923:16, 933:20, 950:11
**situations** [2] - 956:7, 956:8
**six** [1] - 898:8
**sixth** [1] - 874:9
**skip** [1] - 901:21
**slide** [2] - 877:22, 879:23
**sloppy** [1] - 879:22
**slow** [1] - 955:4
**small** [4] - 892:17, 904:25, 944:11, 964:21
**smaller** [1] - 880:10
**smog** [2] - 886:23, 886:24
**snow** [1] - 878:2
**soil** [3] - 885:13, 891:21, 971:1
**sole** [1] - 937:16
**solicited** [1] - 900:11
**solid** [7] - 895:23, 903:23, 937:25, 938:2, 940:6, 940:16, 940:18
**solid-rocket** [3] - 937:25, 938:2, 940:6
**solids** [3] - 884:17, 884:24, 884:25
**solvent** [8] - 897:11, 897:13, 898:16, 902:17, 907:18, 907:20, 962:12, 965:6
**solvent-propellant** [1] - 965:6
**solvent-water** [1] - 907:18, 907:20
**solvents** [12] - 877:3, 879:19, 882:11, 882:16, 882:17, 883:15, 886:16, 886:23, 894:4, 900:16, 962:10, 971:1
**someone** [1] - 897:2
**someplace** [1] - 904:16
**sometimes** [2] - 886:9, 933:3
**somewhere** [3] - 913:25, 917:3, 925:19
**soon** [3] - 910:20, 935:7, 940:19
**sophisticated** [1] - 917:12

**sorry** [22] - 893:18, 902:11, 920:10, 922:20, 931:14, 936:5, 936:8, 938:15, 938:19, 938:22, 939:13, 941:21, 942:7, 945:15, 945:18, 951:25, 952:10, 954:12, 956:3, 960:20, 962:18, 967:19
**sort** [10] - 887:14, 888:16, 896:25, 902:18, 904:5, 910:21, 919:6, 933:17, 961:2, 968:11
**source** [4] - 915:14, 918:1, 920:2, 925:3
**sources** [3] - 891:21, 918:1, 918:16
**south** [2] - 887:5, 888:22
**speaks** [1] - 928:20
**specialized** [2] - 937:12, 937:13
**specific** [3] - 877:19, 955:20, 961:4
**specifically** [2] - 942:18, 946:23
**specifications** [1] - 874:25
**speculation** [1] - 904:6
**speculative** [1] - 882:3
**Speer** [1] - 877:24
**spell** [1] - 937:21
**spelling** [1] - 937:22
**spending** [1] - 876:7
**spent** [1] - 917:19
**splitting** [1] - 933:21
**spoil** [1] - 878:17
**sputtering** [1] - 954:12
**SRAM** [7] - 936:3, 947:4, 947:6, 950:8, 950:12, 954:14, 955:10
**stable** [1] - 900:17
**stage** [1] - 920:14
**stain** [1] - 880:21
**staining** [1] - 889:4
**stand** [1] - 928:13
**standard** [5] - 906:14, 919:6, 937:6, 937:7, 937:8
**standards** [6] - 934:8, 940:7, 942:11,

942:16, 943:5, 945:2
**standing** [2] - 897:4, 968:4
**standpoint** [2] - 962:2, 962:3
**start** [8] - 909:16, 912:7, 914:22, 926:17, 935:2, 936:11, 951:25
**started** [1] - 895:14
**State** [1] - 876:21
**state** [4] - 876:2, 896:2, 932:14, 963:8
**STATEMENT** [1] - 873:4
**statement** [4] - 873:7, 885:23, 888:16, 930:17
**statements** [1] - 892:14
**states** [1] - 930:15
**States** [48] - 873:6, 873:8, 874:16, 875:8, 881:16, 893:15, 894:10, 895:5, 896:8, 896:13, 896:17, 896:19, 904:12, 906:7, 907:9, 908:5, 911:11, 912:8, 912:13, 912:21, 912:22, 913:20, 913:21, 914:17, 915:16, 916:1, 919:8, 919:12, 920:18, 920:21, 921:25, 922:1, 923:5, 923:14, 923:17, 923:18, 923:24, 924:1, 925:12, 926:10, 927:10, 928:12, 928:16, 928:21, 928:23, 930:2
**States'** [5] - 874:19, 874:21, 874:23, 908:5, 924:16
**station** [4] - 897:18, 897:20, 964:21, 964:23
**stenciled** [1] - 897:22
**step** [1] - 953:11
**Stickney** [9] - 875:18, 875:21, 878:12, 878:23, 879:13, 879:24, 880:1, 880:18, 881:9
**still** [11] - 880:25, 881:5, 881:7, 881:10, 881:21,

897:24, 898:24, 912:10, 915:18, 936:20, 962:25
**stipulated** [3] - 899:7, 899:17, 907:9
**stipulates** [1] - 956:7
**stood** [1] - 897:1
**stop** [1] - 926:23
**stopped** [1] - 886:15
**storm** [2] - 885:4, 889:17
**story** [1] - 912:16
**strategic** [1] - 939:18
**streams** [3] - 891:16, 895:25, 944:19
**Street** [1] - 885:12
**street** [1] - 897:19
**stricken** [1] - 967:11
**strongest** [3] - 909:16, 909:24, 909:25
**structure** [1] - 912:12
**structured** [1] - 877:6
**stuck** [1] - 911:17
**studies** [1] - 893:10
**study** [2] - 876:8
**stuff** [2] - 942:13, 960:25
**stupid** [1] - 922:3
**subcontract** [2] - 954:16, 954:18
**subject** [2] - 899:23, 963:23
**submarine** [1] - 937:19
**submarines** [1] - 939:17
**submit** [4] - 874:6, 875:6, 880:23, 974:19
**submitted** [4] - 883:18, 887:20, 963:1, 964:15
**subsurface** [1] - 879:3
**subtract** [9] - 918:6, 918:10, 918:17, 919:21, 919:24, 920:3, 920:18, 971:21, 972:25
**subtracted** [2] - 972:9, 972:14
**subtracting** [1] - 972:23
**sue** [10] - 884:8, 912:20, 912:22, 912:24, 915:21, 916:1, 916:5, 916:24, 919:7, 919:11, 922:1, 924:11, 968:12, 969:11, 969:16,

970:8, 970:9
**sued** [5] - 884:6, 922:13, 968:1, 968:13
**suggestions** [1] - 958:6
**suggests** [1] - 949:18
**suit** [1] - 970:3
**suits** [3] - 968:19, 968:20, 969:21
**SULLIVAN** [159] - 873:1, 873:5, 876:9, 877:2, 877:17, 880:6, 880:11, 880:16, 881:22, 882:6, 882:20, 882:25, 883:4, 883:8, 883:13, 884:8, 885:3, 886:1, 886:7, 886:15, 886:19, 887:1, 887:24, 888:4, 888:8, 888:14, 888:24, 889:1, 889:9, 890:2, 890:4, 890:11, 890:17, 890:22, 891:3, 891:6, 892:2, 892:7, 892:15, 893:19, 894:1, 894:16, 894:19, 896:25, 897:6, 898:13, 899:3, 899:7, 899:17, 901:1, 901:7, 902:15, 903:10, 904:3, 904:7, 904:12, 904:18, 904:21, 904:24, 905:3, 905:6, 905:9, 905:15, 905:17, 906:3, 906:17, 906:23, 906:25, 907:16, 908:13, 908:18, 909:1, 909:4, 909:8, 909:18, 910:6, 910:17, 911:6, 911:8, 911:11, 911:18, 911:20, 912:14, 913:3, 913:6, 913:13, 913:16, 914:7, 914:12, 914:14, 914:16, 914:20, 914:25, 915:8, 915:12, 915:22, 915:25, 916:4, 916:15, 916:20, 917:1, 917:6, 917:8,

917:13, 917:17, 917:21, 918:23, 919:3, 919:7, 919:10, 919:16, 919:19, 920:12, 920:16, 921:2, 921:6, 921:20, 921:25, 922:16, 922:20, 922:24, 923:3, 923:8, 923:12, 923:22, 924:10, 924:14, 925:16, 926:7, 926:20, 927:19, 928:1, 928:7, 928:10, 968:21, 968:23, 969:3, 969:12, 969:14, 970:2, 970:10, 970:12, 971:25, 972:2, 972:7, 972:12, 972:16, 972:24, 973:8, 973:11, 973:16, 973:18, 973:20, 974:2, 974:13, 975:9, 975:11, 975:15, 975:21
**Sullivan** [2] - 873:6, 971:24
**Sullivan's** [3] - 965:17, 966:24, 967:8
**summarize** [1] - 901:9
**summer** [1] - 898:7
**sump** [10] - 887:2, 887:5, 887:8, 887:10, 887:16, 888:7, 888:22, 890:12, 890:13, 890:17
**Sumps** [1] - 891:13
**sumps** [3] - 887:4, 891:18, 944:7
**suppliers** [1] - 929:13
**supplies** [1] - 876:16
**supply** [3] - 879:7, 900:18, 901:6
**Supply** [3] - 958:25, 959:1, 959:3
**supports** [1] - 892:25
**supposed** [6] - 874:25, 888:15, 895:2, 898:10, 909:16, 910:23
**supposedly** [1] - 898:19
**surface** [1] - 901:11
**Surface** [1] - 879:3
**surprise** [2] - 924:8,

954:24
**surprised** [3] - 914:24, 936:4, 967:9
**surrounded** [2] - 887:11, 887:12
**surrounding** [1] - 903:3
**surveillance** [1] - 950:4
**survey** [9] - 929:12, 930:17, 956:25, 957:2, 957:14, 958:18, 960:11, 962:24, 963:24
**surveys** [1] - 962:22
**suspect** [1] - 876:5
**sustainer** [1] - 961:19
**sworn** [1] - 930:4
**sympathetic** [2] - 904:2, 939:14
**system** [11] - 910:15, 911:3, 911:25, 916:13, 916:15, 939:1, 939:11, 961:21, 967:18, 968:8

## T

**tab** [30] - 935:2, 935:16, 935:17, 938:8, 940:11, 943:8, 945:12, 949:8, 949:9, 950:14, 950:16, 950:21, 950:25, 956:19, 956:20, 958:19, 960:6, 960:8, 963:18, 963:20, 964:2, 964:14, 965:16
**takable** [1] - 873:1
**talks** [9] - 895:6, 939:16, 944:7, 944:17, 945:23, 946:6, 948:1, 953:24, 965:5
**Tank** [1] - 936:15
**tanks** [2] - 938:18, 938:25
**tarantulas** [2] - 898:12, 898:13
**task** [1] - 949:23
**taxpayer** [3] - 911:16, 919:8, 925:3
**taxpayers** [1] - 912:21
**taxpayers'** [2] - 919:13, 924:12
**TCE** [24] - 874:9,

874:13, 876:25, 877:18, 881:19, 883:20, 886:24, 894:23, 897:2, 897:17, 897:21, 897:22, 898:1, 898:3, 898:8, 898:15, 898:21, 899:9, 900:3, 900:15, 901:17, 902:25, 905:10
**technical** [4] - 935:18, 940:14, 960:11, 963:23
**temperature** [1] - 944:11
**temperatures** [1] - 898:6
**tends** [1] - 939:5
**tenth** [1] - 874:19
**term** [1] - 943:21
**terms** [4] - 899:6, 912:19, 933:19, 937:11
**terribly** [1] - 957:16
**test** [1] - 892:18
**testified** [11] - 875:19, 875:21, 879:13, 892:24, 893:7, 894:22, 897:12, 928:18, 929:8, 929:10, 930:5
**testify** [3] - 884:22, 886:21, 889:3
**testifying** [1] - 948:13
**testimonial** [1] - 930:23
**testimony** [18] - 876:11, 879:17, 887:4, 887:25, 917:10, 922:2, 928:19, 928:22, 930:10, 930:13, 930:25, 931:15, 931:20, 933:15, 943:10, 945:7, 967:4
**THE** [240] - 873:2, 875:24, 876:25, 877:11, 880:5, 880:8, 880:14, 881:18, 882:2, 882:19, 882:23, 883:1, 883:7, 883:10, 884:6, 885:2, 885:23, 886:5, 886:13, 886:18, 886:25, 887:23, 888:1, 888:7, 888:12, 888:23, 888:25,

889:7, 889:25, 890:3, 890:8, 890:15, 890:20, 891:2, 891:5, 891:25, 892:6, 892:11, 893:17, 893:21, 894:15, 894:18, 896:24, 897:4, 898:12, 898:25, 899:5, 899:15, 900:23, 901:6, 902:11, 903:5, 903:25, 904:4, 904:8, 904:15, 904:20, 904:23, 905:1, 905:4, 905:8, 905:13, 905:16, 905:22, 906:6, 906:22, 906:24, 907:14, 908:11, 908:16, 908:24, 909:3, 909:6, 909:14, 909:22, 910:9, 910:18, 911:7, 911:10, 911:13, 911:19, 911:24, 913:2, 913:4, 913:11, 913:14, 914:3, 914:10, 914:13, 914:15, 914:19, 914:22, 915:6, 915:11, 915:20, 915:24, 916:2, 916:10, 916:19, 916:22, 917:3, 917:7, 917:10, 917:15, 917:19, 918:21, 918:24, 919:4, 919:9, 919:14, 919:18, 920:5, 920:13, 920:25, 921:4, 921:9, 921:12, 921:15, 921:18, 921:23, 922:5, 922:11, 922:18, 922:23, 923:1, 923:6, 923:9, 923:20, 924:8, 924:13, 925:14, 925:22, 926:3, 926:14, 927:17, 927:23, 928:3, 928:6, 928:9, 928:11, 928:15, 928:25, 929:2, 929:5, 929:7, 929:19, 929:23, 929:25, 931:3,

931:7, 931:9, 931:13, 932:1, 935:9, 935:12, 935:16, 935:18, 937:13, 937:21, 937:22, 939:13, 941:20, 942:7, 945:4, 945:14, 947:19, 947:20, 947:21, 947:24, 948:4, 948:6, 948:8, 948:16, 948:20, 948:23, 949:3, 949:5, 949:6, 949:11, 950:16, 950:22, 950:23, 950:24, 950:25, 951:2, 951:4, 951:7, 951:9, 951:10, 951:15, 951:17, 953:25, 954:2, 954:3, 954:5, 954:7, 954:8, 955:4, 955:7, 956:21, 965:24, 966:13, 966:16, 966:19, 966:25, 967:2, 967:6, 967:12, 967:14, 967:24, 968:4, 968:22, 969:2, 969:8, 969:13, 969:23, 970:9, 970:11, 970:15, 972:1, 972:6, 972:11, 972:15, 972:22, 973:5, 973:9, 973:13, 973:17, 973:19, 973:25, 974:4, 974:10, 974:14, 974:21, 974:23, 975:4, 975:10, 975:14, 975:18, 975:22

**themselves** [1] - 948:6

**thinking** [1] - 875:16

**third** [6] - 873:25, 923:24, 952:22, 954:9, 955:23, 955:24

**thousand** [1] - 909:6

**threat** [1] - 901:10

**three** [9] - 874:2, 874:4, 874:8, 883:20, 907:25, 970:18, 970:19, 974:16, 975:2

**threw** [2] - 897:2

**thrilled** [1] - 938:10

**throughout** [2] - 957:10, 974:9

**thrown** [1] - 895:25

**Thursday** [2] - 970:16, 975:4

**thyroid** [1] - 901:3

**tide** [1] - 895:25

**tide-water** [1] - 895:25

**tie** [1] - 929:8

**tied** [1] - 968:8

**Title** [1] - 943:4

**title** [2] - 936:6, 949:18

**today** [5] - 873:7, 873:12, 885:23, 923:4, 932:4

**together** [2] - 954:25, 958:8

**tolling** [5] - 922:8, 969:4, 969:5, 969:6, 969:9

**Tom** [2] - 888:8, 888:9

**tomorrow** [3] - 966:21, 967:2, 975:24

**took** [3] - 893:7, 905:18, 933:18

**top** [4] - 939:4, 946:16, 946:25, 954:20

**total** [3] - 918:13, 920:19, 927:14

**tough** [1] - 881:3

**toward** [7] - 880:2, 880:7, 880:12, 880:22, 880:25, 881:8, 889:2

**towards** [2] - 965:21, 966:2

**toxic** [4] - 900:19, 900:25, 901:1, 944:12

**tracking** [1] - 930:19

**traction** [1] - 893:24

**train** [2] - 874:3, 896:22

**training** [3] - 874:22, 897:11, 933:4

**transcript** [1] - 976:4

**transferred** [1] - 961:1

**translate** [1] - 926:14

**transport** [2] - 938:17, 938:24

**transported** [1] - 965:8

**traveling** [1] - 907:2

**treatment** [2] - 891:22, 940:20

**tremendous** [1] - 939:10

**trench** [1] - 894:12

**trial** [7] - 873:9, 945:13, 949:10, 956:20, 958:20, 960:7, 963:19

**trichloroethylene** [2] - 897:21, 897:24

**trickle** [1] - 884:1

**tried** [1] - 935:12

**tries** [1] - 913:24

**trimmed** [1] - 962:1

**trimmings** [1] - 962:4

**trips** [1] - 931:21

**trouble** [1] - 893:25

**true** [13] - 903:1, 924:13, 933:6, 933:19, 937:15, 942:10, 942:23, 949:16, 955:2, 955:9, 956:6, 967:22, 968:2

**trump** [1] - 955:14

**truth** [4] - 882:13, 930:4, 930:5

**truthful** [1] - 902:22

**try** [5] - 913:25, 939:19, 958:11, 958:14, 969:16

**trying** [8] - 892:13, 914:3, 914:4, 916:21, 923:15, 928:16, 935:10, 974:23

**tube** [1] - 964:22

**tubes** [1] - 965:6

**turn** [3] - 900:1, 929:17, 952:9

**turnkey** [1] - 933:24

**twice** [1] - 910:11

**twin** [1] - 886:8

**two** [26] - 884:20, 885:19, 887:4, 889:16, 889:17, 889:18, 898:18, 898:20, 898:22, 908:1, 924:21, 925:16, 927:16, 927:17, 927:19, 939:17, 948:1, 948:18, 950:3, 952:20, 953:11, 965:5, 965:6, 970:22, 971:1, 971:14

**TWO** [1] - 948:17

**two-step** [1] - 953:11

**type** [3] - 895:13, 906:15, 937:10, 937:17, 946:16

**types** [3] - 891:15, 939:23, 960:4

**typical** [1] - 934:19

**typically** [2] - 941:10, 946:15

## U

**U.S** [21] - 884:9, 894:18, 903:6, 903:9, 903:25, 906:1, 910:13, 911:16, 918:8, 919:1, 920:8, 922:18, 922:19, 951:21, 954:15, 954:16, 960:16, 964:7, 968:1, 968:9, 968:11

**unaware** [1] - 951:15

**under** [42] - 874:7, 882:24, 884:10, 899:11, 912:25, 913:19, 913:22, 914:2, 914:18, 916:1, 916:3, 917:24, 919:1, 921:18, 921:19, 922:7, 923:5, 923:6, 923:19, 925:7, 933:18, 950:12, 953:19, 953:20, 954:21, 958:20, 960:7, 960:24, 965:5, 969:15, 969:17, 970:8, 970:13, 970:14, 971:2, 972:3, 973:16, 973:19, 973:20, 973:22, 974:4, 975:12

**underground** [1] - 885:8

**underneath** [1] - 878:7

**understandings** [1] - 967:20

**understood** [3] - 878:20, 909:15, 971:19

**undesirable** [1] - 900:17

**undisputed** [1] - 880:8

**uniform** [2] - 957:10, 957:12

**unique** [2] - 906:18, 907:5

**United** [53] - 873:6, 873:8, 874:16, 874:19, 874:21, 874:23, 875:8, 881:15, 893:15,

894:10, 895:5, 896:8, 896:12, 896:17, 896:19, 904:12, 906:7, 907:9, 908:5, 911:11, 912:8, 912:13, 912:21, 912:22, 913:20, 913:21, 914:16, 915:16, 916:1, 919:8, 919:12, 920:18, 920:21, 921:25, 922:1, 923:4, 923:14, 923:17, 923:18, 923:24, 924:1, 924:16, 925:12, 926:10, 927:10, 928:12, 928:16, 928:21, 928:22, 928:23, 930:2

**unless** [4] - 896:1, 906:13, 959:11, 973:2

**unlike** [2] - 896:16, 896:18

**unpermitted** [1] - 881:16

**up** [37] - 875:13, 881:6, 883:17, 884:24, 887:11, 890:13, 894:25, 897:1, 897:4, 905:20, 905:24, 906:14, 907:5, 910:15, 910:21, 911:3, 912:4, 914:8, 914:23, 920:10, 922:14, 925:11, 927:4, 927:8, 928:13, 931:15, 931:17, 951:21, 956:2, 960:25, 962:8, 963:6, 965:20, 968:19, 968:20, 969:24

**useful** [1] - 899:6

**usual** [1] - 950:17

**usurping** [1] - 934:2

## V

**vacuum** [1] - 961:21

**valid** [1] - 956:17

**value** [1] - 899:12

**vapor** [5] - 899:19, 907:11, 907:14, 907:16, 908:3

**variation** [1] - 941:9

**variety** [1] - 877:5

**various** [1] - 936:22
**vast** [2] - 878:7,
907:24
**versions** [1] - 952:20
**Viacom** [1] - 924:21
**vicinity** [2] - 879:7,
901:11
**view** [6] - 881:6,
884:19, 910:1,
911:10, 944:15,
958:7
**viewing** [1] - 931:4
**violation** [1] - 890:10
**virtue** [1] - 919:5
**visits** [1] - 936:17
**voice** [1] - 897:7
**volume** [1] - 884:23
**volumes** [1] - 885:15

## W

**wait** [2] - 909:23,
922:5
**waive** [1] - 970:3
**waiver** [1] - 941:8
**walk** [2] - 916:19,
916:21
**warned** [3] - 875:14,
878:9, 881:9
**wash** [4] - 887:14,
889:17, 896:9, 944:8
**washed** [1] - 887:6
**washing** [3] - 889:21,
896:9, 896:11
**washout** [1] - 896:20
**washouts** [1] - 896:18
**waste** [82] - 873:22,
873:23, 874:4,
874:6, 874:8,
874:20, 879:11,
879:14, 879:16,
879:22, 882:8,
883:5, 883:6,
883:18, 883:19,
884:15, 892:16,
894:3, 894:4, 894:7,
894:11, 894:12,
895:5, 895:17,
896:20, 896:22,
897:20, 899:4,
899:10, 899:12,
899:13, 900:3,
900:7, 900:15,
901:10, 901:17,
901:23, 901:25,
902:2, 902:4, 902:5,
902:8, 903:18,
919:8, 919:12,
919:14, 924:12,

924:22, 928:18,
929:17, 931:4,
931:22, 932:12,
933:18, 934:9,
934:15, 934:22,
936:24, 940:18,
942:24, 942:25,
943:10, 943:14,
943:23, 944:6,
944:14, 945:8,
945:13, 946:11,
949:10, 951:9,
951:18, 958:9,
958:20, 959:17,
959:25, 961:25,
962:10, 965:7,
965:8, 965:9, 965:14
**wastes** [14] - 874:14,
877:9, 891:12,
895:21, 895:24,
901:14, 901:18,
936:14, 936:18,
940:16, 960:4,
963:15, 966:9
**wastewater** [23] -
874:10, 879:19,
881:10, 881:11,
881:16, 884:17,
885:15, 885:21,
889:23, 890:2,
890:6, 890:12,
891:8, 891:12,
891:15, 891:20,
892:3, 892:10,
892:19, 894:5,
896:13, 902:18
**wastewaters** [1] -
883:25
**watch** [1] - 946:11
**water** [57] - 875:14,
875:20, 876:2,
877:23, 877:25,
878:1, 878:3, 878:5,
878:6, 878:7,
878:21, 879:3,
879:7, 879:25,
880:3, 881:7,
881:20, 882:9,
885:7, 886:3, 887:7,
887:10, 887:19,
888:15, 889:5,
889:16, 889:17,
891:21, 893:6,
893:9, 893:11,
895:25, 896:1,
896:6, 900:18,
901:6, 903:2,
906:20, 906:24,
907:2, 907:3, 907:4,
907:18, 907:20,

910:3, 942:13,
944:8, 944:10,
965:10, 965:20,
966:1, 971:1
**Water** [38] - 877:7,
877:8, 877:11,
877:17, 881:25,
882:8, 882:9,
882:10, 882:12,
882:15, 882:17,
883:2, 883:4, 883:6,
883:8, 883:14,
883:18, 883:20,
900:3, 900:5, 900:8,
900:10, 900:11,
900:14, 901:8,
901:16, 902:2,
902:19, 902:20,
902:24, 903:5,
903:7, 903:11,
903:12, 904:6,
904:7, 907:1
**waters** [1] - 901:20
**watershed** [2] - 895:9,
895:12
**wax** [1] - 974:6
**ways** [1] - 880:9
**weather** [3] - 885:7,
889:5, 898:5
**wedded** [2] - 939:11
**Weehde** [2] - 885:9,
885:17
**week** [4] - 881:17,
885:1, 885:6, 898:8
**weekend** [1] - 917:19
**weeks** [5] - 876:15,
894:14, 927:16,
927:18, 927:19
**Wehde** [2] - 884:13,
885:5
**weighed** [1] - 887:16
**welfare** [1] - 946:19
**Wessman** [3] - 897:9,
897:12, 897:16
**west** [5] - 878:6,
888:18, 888:25,
889:1, 964:23
**wet** [2] - 878:2, 885:11
**whatnot** [1] - 894:21
**wherein** [1] - 884:17
**White** [3] - 892:24,
893:7, 897:10
**whole** [6] - 882:11,
930:4, 931:7,
969:10, 971:12,
971:13
**wide** [1] - 877:5
**wind** [1] - 914:8
**wishes** [1] - 940:2
**WITNESS** [15] - 931:7,

935:18, 937:22,
947:20, 948:8,
949:6, 950:22,
950:24, 951:2,
951:7, 951:10,
951:17, 954:2,
954:5, 954:8
**witness** [12] - 875:24,
906:4, 906:7,
909:12, 928:6,
928:10, 938:5,
966:12, 966:20,
966:25, 967:1,
975:19
**witnessed** [4] - 946:1,
946:15, 946:24,
947:16
**witnesses** [2] -
974:25, 975:19
**wondering** [1] - 966:2
**word** [6] - 878:15,
933:16, 941:3,
966:7, 971:22, 975:1
**words** [3] - 940:5,
941:5, 970:25
**workers** [2] - 898:16,
898:19
**works** [3] - 915:8,
927:5, 967:19
**world** [4] - 910:23,
911:2, 912:18, 920:1
**worried** [1] - 944:3
**worse** [2] - 911:10,
911:14
**worth** [1] - 962:6
**wow** [2] - 882:3,
922:11
**Wright** [1] - 927:1
**writing** [1] - 962:24
**wrote** [1] - 933:13

## Y

**year** [2] - 880:18,
881:1
**years** [7] - 878:24,
905:18, 913:15,
925:8, 925:20,
927:11, 933:25
**yourself** [1] - 904:15
**yourselves** [1] -
906:13

## Z

**zero** [1] - 911:25
**Zeus** [1] - 961:19