UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOCKHEED MARTIN CORPORATION,   .
                               .
          Plaintiff,           .
                               .  CA No. 08-1160 (ESH)
     v.                        .
                               .
UNITED STATES OF AMERICA,      .  Washington, D.C.
                               .  Wednesday, February 19, 2014
          Defendant.           .  9:42 a.m.
                               .
. . . . . . . . . . . . . . . .  Page 997 - 1125

DAY 6 - A.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Plaintiff:            MICHAEL K. MURPHY, ESQ.
                              RAYMOND B. LUDWISZEWSKI, ESQ.
                              JUSTIN A. TORRES, ESQ.
                              STACIE B. FLETCHER, ESQ.
                              DAVID FOTOUHI, ESQ.

                              Gibson, Dunn & Crutcher, LLP
                              1050 Connecticut Avenue, NW
                              Washington, DC 20036-5306
                              (202) 955-8238

For the Defendant:            JOHN E. SULLIVAN, ESQ.
                              ERICA M. ZILIOLI, ESQ.
                              JESSICA O'DONNELL, ESQ.
                              JUSTIN D. HEMINGER, ESQ.
                              JENNIFER E. POWELL, ESQ.
                              WILLIAM D. JOHNSON, ESQ.

                              U.S. Department of Justice
                              ENRD / Environmental Defense
                              Section
                              601 D Street, NW
                              Suite 8000
                              Washington, DC 20026-3986
                              (202) 305-0365

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6714
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   (202) 354-3186

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

```
1                         P R O C E E D I N G S

2              THE DEPUTY CLERK:  Civil case No. 08-1160, Lockheed

3    Martin Corporation versus United States of America.

4              THE COURT:  Okay.  Go ahead.

5          (The witness resumes the stand.)

6              MR. MURPHY:  Good morning, Mr. Nagle.

7              THE WITNESS:  Good morning.

8              MR. MURPHY:  Before we started yesterday, Your Honor,

9    you asked about the Seattle case.  The case No. is 06-1032, and

10   the judge is Lasnik, L-A-S-N-I-K.

11             THE COURT:  Also, for the government, has any other

12   government contractor sued the government?  Is this all just

13   Lockheed that you are having this issue with?

14             MR. SULLIVAN:  Your Honor, I believe there's a case

15   that's in abeyance with Electric Boat that Mr. Murphy's firm is

16   representing, and I think we have the same issue there.

17             THE COURT:  Electric Boat?

18             MR. MURPHY:  It's General Dynamics, Your Honor.

19             THE COURT:  Why is that being held in abeyance?

20             MR. MURPHY:  We've entered into tolling agreements

21   with the government, trying to negotiate the settlement,

22   Your Honor.

23             THE COURT:  And that is the CERCLA case brought by

24   Lockheed against the government?

25             MR. MURPHY:  No, Your Honor.  General Dynamics.  There
```

1    have been cases brought, I think, by Raytheon.

2              MR. SULLIVAN:  There was a case by Raytheon that went

3    to trial.

4              MR. MURPHY:  Atlantic Research.  There was a

5    settlement in Atlantic Research.  I think there have been many

6    other federal contractors that have sued the government,

7    Your Honor.

8              THE COURT:  Under CERCLA.

9              MR. MURPHY:  Under CERCLA.

10             THE COURT:  But none of them have this issue -- or all

11   of them have the issue of the, what you call double recovery

12   and/or economic benefit?

13             MR. MURPHY:  It was raised by the government in the

14   Raytheon case, Your Honor, but the government was found to be

15   not liable.  But it was raised against Raytheon in that case.

16   It's been raised against General Dynamics, I know, and I know

17   it's been raised against other companies, Your Honor.

18             THE COURT:  Is it correct that the monies -- just so

19   I understand this, the DoD has been paying remediation costs.

20             MR. MURPHY:  Your Honor, it pays for the contract

21   performance.

22             THE COURT:  I know that; we're getting into semantics.

23   You haven't had anything disallowed on the grounds that you've

24   got a CERCLA.

25             MR. MURPHY:  No, Your Honor.  I think the audit manual

1    that DCAA publishes talks about the fact that these CERCLA cases

2    can last for years.  So whether we're going to get a credit or

3    not is something that will be happening way far in the future

4    after we incur the costs.  So the costs are allowable until we

5    can recover from other PRPs, and then we can credit it back.

6    And that's the system the government has installed.

7         THE COURT:  And not to put too fine a point on it,

8    have they also been paying all along, as part of indirect costs,

9    the legal fees for suing the government?  In other words, that

10   isn't under some kind of dispute?

11        MR. MURPHY:  No, Your Honor.  It's under the far cost

12   principles about allowable legal costs, and it's an allowable

13   cost because it's a normal cost of doing business that any other

14   company would have in the country.

15        THE COURT:  Well, it's a little bit like biting the

16   hand that feeds you.  It may be the normal cost of doing

17   business, but that's the effect of it.

18        MR. MURPHY:  You asked why it's taken so long for

19   Lockheed to bring these cases.  We really tried to settle these.

20   We don't want to sue the government here.  It's something we

21   thought we'd be able to settle, but we haven't been able to.

22        THE COURT:  Unfortunately, I can't get into that.

23   I just don't understand how that can't happen.  Anyways.

24      Okay.  All right, let's continue with the witness.  I'm

25   just trying to get a sense of...

1    **JAMES F. NAGLE, WITNESS FOR THE DEFENDANT, PREVIOUSLY SWORN**

2                    CONTINUED CROSS-EXAMINATION

3    BY MR. MURPHY:

4    Q.   Good morning, Mr. Nagle.

5    A.   Good morning.

6    Q.   Yesterday we talked a little bit about DCAS safety audits.

7    Do you recall that?

8    A.   Yes, sir.

9    Q.   I want to talk a little about other inspections that the

10   Air Force performs at LPC.

11   A.   Just the Air Force?

12   Q.   Well, we're going to start with the Air Force.

13   A.   Oh, okay.

14        MR. MURPHY:  Could we turn to Tab 10?  No, I'm sorry.

15   Tab 12.  Tab 12 in your witness binder.  This is Plaintiff's

16   Exhibit 576, and it is found in the SRAM Review Committee in our

17   trial binder, Your Honor, under that tab.

18   BY MR. MURPHY:

19   Q.   Mr. Nagle, did you review this document?

20   A.   It doesn't jump out at me.  I reviewed everything that was

21   sent me, but this one doesn't jump out at me.

22   Q.   Can we go to page 3, which is the second page in the

23   document?

24   A.   Yes, I see it.

25   Q.   So I'm looking at paragraph No. 1.  This defines what a

1  program management evaluation is.  Are you familiar with program

2  management evaluation?

3  A.   Yes.

4  Q.   So this was developed to provide Air Force management a

5  comprehensive review of technical and financial progress of a

6  weapons system at selected points in its evolution.  Do you see

7  that?

8  A.   Yes.

9  Q.   Is that your understanding of what a program management

10  evaluation is?

11  A.   Yes, make sure everything is on track, either technically

12  and also financially.

13  Q.   Okay.  And it says that the SRAM weapons system was

14  selected by the Chief of Staff, U.S. Air Force, as the first to

15  be evaluated under this concept.  Do you see that?

16  A.   Yes, sir.

17  Q.   So is this indicating this was the first program management

18  evaluation performed by the Air Force?

19  A.   I have no reason to doubt what this says.

20  Q.   And you said you're familiar with this, that these program

21  management evaluations happen today?

22  A.   Oh, yes, yes.  Different agencies may call it different

23  things, but periodically, if it's a major system, they'll send

24  in a team to make sure that it's not going off track.

25  Q.   Okay.

1    THE COURT:  What does that mean, not going off track?

2    THE WITNESS:  Well, financially, for example,

3  Your Honor, if it's a hundred million-dollar contract, you're

4  only three months into the contract and you've already burned

5  through $70 million, then the agency has to figure out what's

6  going wrong or what they're going to have to throw more money at

7  this job.

8    THE COURT:  Do they have to if it's a fixed-price?

9    THE WITNESS:  No, not if it's a fixed-price, Your

10  Honor, only if it's cost-plus.  In a fix-price contract, they

11  would typically be trying to see if there are any technical

12  difficulties that are going to delay deliveries.

13  BY MR. MURPHY:

14  Q.   And the SRAM was a fixed-price contract?

15  A.   Are you talking about the prime contract or the --

16  Q.   The production contracts.  So this was performed in --

17  A.   I don't remember.

18  Q.   Okay.

19    THE COURT:  Can somebody enlighten me?

20    MR. MURPHY:  They were fixed-price contracts,

21  Your Honor.

22    THE COURT:  All of them, including the prime and the

23  one subcontract?

24    MR. MURPHY:  I'm not sure about the Boeing contract.

25  I think it was a fixed-price contract, Your Honor.

1    THE COURT:  So between the government and Boeing, and

2 between Boeing and -- or are there ones directly between the

3 government and Lockheed?

4    MR. MURPHY:  I think the Boeing contract with the

5 government, and also the Boeing subcontract with Lockheed

6 Propulsion, they were both fixed-price, Your Honor.

7    THE COURT:  And were there also direct contracts under

8 SRAM?

9    MR. MURPHY:  There were direct contracts between

10 the Air Force and Lockheed Propulsion for development of SRAM,

11 research and development contracts that happened before, and

12 there were some other SRAM sort of add-ones that were direct

13 contracts.

14    THE COURT:  Were they fixed-price?

15    MR. MURPHY:  Off the top of my head, Your Honor, I

16 don't remember.

17    THE WITNESS:  R&D contracts are typically cost-plus,

18 but not always.

19    MR. MURPHY:  I believe they were cost, but again, I

20 don't want to represent that without checking.

21 BY MR. MURPHY:

22 Q.   Could you turn to page -- it's page -- the Bates number

23 ends in 10 at the bottom.  It's page 79 of the document.

24 A.   Yes, I've got it.

25 Q.   So you mentioned that the program management evaluation

1   often dealt with financial issues.  Did it do with safety issues

2   as well?

3   A.   It can.  It can, but normally it would sort of dovetail

4   with other safety surveys that had already been done, but it was

5   not off limits to a PME to go in and look at safety also.

6   Q.   Okay.  So here we have evidence that the PME was looking or

7   did a review of LPC's safety procedures.  Is that what this

8   indicates?

9   A.   Yes.  Let me just take a moment to take a look at it.

10        (Witness reviewing document.)

11        Yes.  They're certainly looking at the previous DCAS safety

12   surveys.

13   Q.   Okay.  And if we go to the top of the next page.  Well,

14   actually, I'm sorry.  Let's stick with page 79.  This is quoting

15   Lockheed's Safety Assurance Plan.  Do you see that at the bottom?

16   A.   Yes, I do.

17   Q.   And it's also incorporating safety manuals that LPC was

18   required to comply with in its performance of its contracts?

19   A.   Well, I don't know if they were required to.  It indicates

20   from this document that they will apply the constraints of the

21   following documents, but I don't know if they were required to.

22   Q.   Do you know whether Lockheed's Safety Assurance Program

23   Plan, Document No. 777-E-30 was a requirement of SRAM?

24   A.   I do not remember.

25   Q.   Okay.  Let's look at page 80.  Go to the first paragraph.

1    A.    Yes.

2    Q.    So we're going to start with the statement of the program

3    management evaluation that says, "The enforcement of Air Force

4    explosive safety inspection standards at Lockheed facilities was

5    not conducted."

6    A.    Yes.

7    Q.    So it says, "The records indicate that the last formal

8    safety survey by DCAS, which identified 15 discrepancies, was

9    completed on 27 September 1968."  Do you see that?

10   A.    Yes, sir.

11   Q.    Okay.  So they're criticizing the DCAS for not doing enough

12   safety inspections?

13   A.    Well, I don't know whether it's a criticism or a simple

14   statement of fact.

15   Q.    But it goes down.  In Subsection (c), it talks about

16   numerous visits and safety surveys that were conducted between

17   January '69 and March 1970.  Do you see that?

18   A.    Yes.

19   Q.    So they identified the last formal one being in September

20   of '68, but they also talk about several that took place between

21   January, which was about six months after -- well, September,

22   October, November, December, January, so four months after the

23   formal one.  And they talk about several that took place from

24   January '69 through March of '70.  Do you see that?

25   A.    I do, but it said, "numerous visits," comma, "and safety

1    surveys."  So I don't know if the "numerous" applies just to

2    safety surveys, or DCAS went in for a variety of other reasons.

3    Q.    Okay.  And they're saying that several discrepancies were

4    identified, and verbal agreement between DCAS and Lockheed

5    personnel normally served as approval for corrective actions.

6    A.    Yes.

7    Q.    The term "corrective actions," is that a formal term?

8    A.    I don't remember if "corrective action" was really defined

9    in the ASPR, but it's sort of a term of art that, okay, yes,

10   we've heard you, we're taking the following actions to correct

11   or respond to your deficiency.

12   Q.    And again, it's showing a cooperation or working together

13   between the government and Lockheed to make sure safety

14   procedures were followed.

15   A.    Yes.  And the last sentence in (b), "Corrective action was

16   recommended by DCAS.  However, Lockheed was not required to

17   document specific actions."  So it was more of a cooperation

18   action, as you say.

19   Q.    So it says on March 6, 1970, which takes place three days

20   after the last DCAS safety survey, it was a pre-award safety

21   survey was conducted by DCAS.  Is there a difference between a

22   pre-award safety survey and the normal DCAS safety surveys?

23   A.    Yes.  Pre-award is typically specific to a particular

24   contract.  There might have been a request for proposal issued,

25   and the government will send in a pre-award survey team to look

1    at the factory, the finances of the contractor, how much of a

2    backlog that they already have.  And typically, one of the

3    aspects of that will be safety, but it's looked at in terms of a

4    particular contract --

5    Q.    Okay.

6    A.    -- that's waiting to be awarded.

7    Q.    And it says, No explosive safety deficiencies were

8    identified," and then it said, "Seven days later, there was a

9    headquarters U.S. Air Force explosive safety inspector that

10   walked through, and he found some discrepancies when the first

11   one didn't."  Do you see that?

12   A.    Yes, sir.

13   Q.    Okay.  And so then we walk down kind of what that safety

14   guy was looking at in this program review, and we're talking

15   about air filters clogged with oxidizer in the grinding

16   building?

17   A.    Yes, I see that.

18   Q.    So that's No. 1.  Vanes in the hot water radiator located

19   in the oxidizer mixing room were clogged?

20        THE COURT:  Why is that an explosive safety problem?

21   Do you know?

22        THE WITNESS:  No, Your Honor, I do not know.

23   BY MR. MURPHY:

24   Q.    So it talks about different things.  Again, we've got the

25   nuts and bolts on the propellant casting machine mentioned.  We

1   saw that yesterday.  It seems to be something they check.

2         No. 7.  So it says," Concentrated solvent vapors were

3   present in the sling room.  A door was left open, which negated

4   the effect of the air exhaust system."  Do you see that?

5   A.   Yes, sir.

6   Q.   Okay.  And do you understand that that was part of an

7   inspection of Building 91, the one that was mentioned above, or

8   do you know where the vapor degreaser was?

9   A.   I don't know.  It doesn't identify No. 7 as a particular

10  building.  It just says a sling room.

11  Q.   Okay.  So again, this is indicating what the inspector in

12  March 1970 reviewed when he walked through the building.

13  A.   Yes, sir.

14  Q.   And he looked at the oxidizer grinding operations?

15  A.   Yeah.  He certainly looked at the oxidizing grinding

16  building.

17  Q.   And then he was looking at solvent vapors in the sling

18  room, wherever that may be.

19  A.   Yes, No. 7.

20  Q.   Okay.  Let's look at No. 14.  Tab 14 is Plaintiff's Exhibit

21  1024.  So that's Plaintiff's Exhibit 1024, and it's in our trial

22  binders under SRAM Review Committee.  So here we have dated May

23  8, 1970, a response by LPC to Boeing, responding to the PME

24  findings.  Do you see that?

25  A.   Yes, sir.

1   Q.   Let's turn to page -- the Bates number ends in 918.

2   A.   Yes, I have it.

3   Q.   Okay.  So this is LPC's response to the findings of the

4   Air Force review?

5   A.   Yes.  That seems to indicate what it is.

6   Q.   Okay.  So it talks about the stated finding, and it has

7   LPC's reply.  Can we go down to that, paragraph No. 4?

8   A.   Yes.

9   Q.   So LPC takes exception to the finding that we are at

10  variance with our own safety assurance plan or with the Air

11  Force direction.  It talks about a subsequent review on the 28th

12  and 29th of April by the DCAS district safety engineer that

13  confirms LPC's position.  Do you see that?

14  A.   Yes, sir.

15  Q.   So this says -- so after the review by the Air Force in

16  March, the next month we have another DCAS safety engineer

17  coming through our facility and reviewing our safety.  Do you

18  see that?

19  A.   Yes, sir.

20  Q.   So let's go back to the other one and count, then, all the

21  other -- well, we can't, because it just said "numerous."

22              THE COURT:  What page is highlighted?

23              MR. MURPHY:  The Bates number ends in 918.

24              THE COURT:  Yeah, I got it.

25

1    BY MR. MURPHY:

2    Q.   So these are the responses.  So it talks about the air

3    filters in oxidizer grinding building were clogged with

4    oxidizer.  Our response is, "The filters going into the heater

5    had a covering of AP.  LPC cleans these filters daily whenever

6    grinding operations are being performed.  A copy of the sign-off

7    sheets from October 1969 through March 1970 were presented to

8    the PME to confirm that the filters were changed as specified in

9    Air Force Manual 127-100.  Therefore, we were in compliance."

10        Do you see that?

11   A.   Yes, sir.

12   Q.   Did review Air Force Manual 127-100 as part of your

13   opinions?

14   A.   No, I did not.

15   Q.   Okay.  So you have no opinion about what it requires as to

16   oxidizer filter change-out.

17   A.   Correct.  I do not.

18            THE COURT:  Mr. Murphy, is there a document like this

19   prior to '70?

20            MR. MURPHY:  Yesterday, Your Honor, we talked about

21   the Army safety inspections from 1960 that went through --

22            THE COURT:  What document is that?

23            MR. MURPHY:  It is tab -- I'm looking, Your Honor.

24   I think it was No. 9, Your Honor, the tab, Plaintiff's Exhibit

25   471.  And then Tab 10 -- I'm sorry, Tab 9, Tab 10, and Tab 11

1   are all from the 1960 time period.

2          THE COURT:  Do you have some chart that tells me how

3   often they were doing these?

4          MR. MURPHY:  Your Honor, we don't have, obviously, a

5   perfect documentary record.  We have, obviously, documents that

6   were from later in the facility we have more of.  The documents

7   earlier are a little more spotty, but we do have evidence of

8   reviews going on through the entire time period, Your Honor.

9          THE COURT:  What's the date of Exhibit 12?

10          MR. MURPHY:  Exhibit 12, Your Honor, is 1970.

11          THE COURT:  Okay.  I think what I have in front of me,

12   it looks like 1970 and 1960.

13          MR. MURPHY:  Well, Your Honor, I'm trying to be

14   selective in presenting what we have.

15          THE COURT:  Okay.

16   BY MR. MURPHY:

17   Q.   Did anything change over a time period with government

18   safety inspections, Mr. Nagle?

19          THE COURT:  What are you asking?  How often do they do

20   it?

21          MR. MURPHY:  Yeah.

22   BY MR. MURPHY:

23   Q.   We talked yesterday a little bit about how, before 1964,

24   the Army and the Ordnance District did their own safety

25   inspections?

1  A.   Yes.

2  Q.   So in 1964, McNamara creates DCAS; is that correct?

3  A.   Correct.

4  Q.   And DCAS was formed in 1964 to monitor government

5  contractor performance with safety standards?

6  A.   That was one of their jobs, yes.  Contract administration

7  in general.

8  Q.   Okay.  And so we have DCAS then takes over the role that

9  the Army or the ordnance districts, or the individual military

10  agencies had before 1964.

11  A.   Yes, not to totally supplant them.  Obviously, the Air

12  force in this case still had some possibility to review on their

13  contracts.

14       THE COURT:  Can I just ask Lockheed's position, so I

15  understand?  If in fact one were to accept the position of your

16  prior witness that people really didn't understand the danger

17  from these chemicals, food and water and soil, you still take

18  the position that all these are relevant, all these inspections?

19  Yes, they had the ability to inspect, I'm sure that's true, and

20  they did on occasion.  But what difference does it make if no

21  one's looking for what we now know about?  Does it matter?

22       MR. MURPHY:  Well, Your Honor, it matters to the

23  extent that -- again, there's a responsibility for the wastes

24  that are in the ground today, and that's one of the issues we

25  look at.  And here we believe that both parties operated the

1   facility together in a cooperative manner to protect safety, and

2   one of the ways you safely disposed of explosives was into burn

3   pits.  One of the ways you safely disposed of these materials

4   were make sure you wash them every day, make sure the filters

5   were changed, and these were, at the time, safety concerns.  But

6   we now know, looking back, that some of these procedures led to

7   the waste that's in the ground today.

8              THE COURT:  Right.

9              MR. MURPHY:  So these procedures that the government

10  was imposing, through these manuals that we're talking about,

11  that they were inspecting to make sure we were complying with

12  and that we were complying with and working with them to do in

13  building these rockets with the government, that there's a

14  shared responsibility for what happened as a result of building

15  the rockets.  So here, what I'm showing with Mr. Nagle is that

16  cooperation, that back-and-forth of the parties over time on

17  these safety inspections -- and again, these safety inspections

18  dealt with the explosive material, the AP that we have today in

19  the ground.

20             THE COURT:  Right.  But from a different perspective.

21  That's clear.

22             MR. MURPHY:  Well, Your Honor, it would be inconsistent

23  for us to argue that they were concerned about groundwater.

24  They're not.  They're worried about safety.  But it's a result

25  of these safety things that they're worrying about that some of

1    those procedures, like burning, led to contamination all across

2    this nation at these types the sites.

3              THE COURT:  Okay.

4    BY MR. MURPHY:

5    Q.   So that's a little insight into why we're talking about

6    this.  So we talked a little bit about the PME, and Lockheed

7    has -- I'm sorry.

8    A.   Your question before the exchange was, did the inspection

9    change after DCAS.  The frequency, as I recall, there was no

10   regulatory change in how often you have to inspect, and I

11   wouldn't know if the substance of the inspections changed

12   because of DCAS.  They would also be looking at primarily the

13   explosive or the conflagration possibilities.

14   Q.   Sure.  So here again, though, in our response, we're back

15   to Tab 14, Exhibit 1024.  We're looking at the Lockheed response.

16   A.   Yes.

17             THE COURT:  Was there an increase in frequency?

18             THE WITNESS:  I don't know.

19             THE COURT:  So you don't know --

20             THE WITNESS:  Yes.

21   BY MR. MURPHY:

22   Q.   So we're looking at -- so this is talking about the fact

23   that DCAS had done -- again, we're at No. 1 with filters in the

24   oxidizer grinding room.  So here we see that DCAS had inspected,

25   and they had provided the sign-off sheets, correct?

1   A.   Yes.

2   Q.   For the filter grinding.  And again, on No. 2 we're talking

3   about AP on filters, correct?  Or vanes in the hot water room?

4   A.   On vanes.  I don't know if vanes are filters or not.

5   Q.   So the sentence, I'm focused in on that third-to-last

6   sentence in that paragraph on No. 2.

7        "To assure that a large amount of AP does not accumulate

8   on the vanes, they'll be cleaned daily and the cleanliness

9   certified in the same manner as the filters.  Again, we are in

10  compliance with the code.  The grind station checklist has been

11  changed."  Do you see that?

12  A.   Yes, sir.

13  Q.   And again, this is in response to the Air Force's audit

14  that dinged them on this compliance.

15  A.   Yes.

16  Q.   Okay.  I want to go to No. 7, Concentrated Solvent Vapors

17  in the Sling Room.  So here we're talking about the touring

18  group entered the sling room a few minutes after the SRAM motor

19  had been lined.  Do you see that?

20  A.   Yes.

21  Q.   Do you have any understanding whether vapor degreasing was

22  used in lining SRAM motors?

23  A.   I have no idea.

24  Q.   "At the same time, both front and back doors were open, and

25  personnel were starting to clean up operations.  From a hygiene

1   industrial point of view, it is better for employees to have

2   doors open, assuring a good cross-ventilation, than to depend on

3   the air exhaust system.  Here again, there's nothing in Air

4   Force Manual 127-100 which spells out the doors must be kept

5   closed.  In terms of the reference codes specify adequate

6   ventilation with maximum allowable concentrations for each

7   solvent, on this basis, we are in compliance."  Do you see that?

8   A.   Yes, sir.

9   Q.   And again, you didn't review Air Force Manual 127-100 to

10  deal with the vapor solvent --

11  A.   Correct.  I did not.

12  Q.   But again, this is again the Air Force looking at solvent

13  coming into the facility, looking at an operation that used

14  solvent and looking at whether we were in compliance with

15  certain codes or not, correct?

16  A.   Correct.  I'm not sure why they used the word "code."

17  It should have been "manual."

18  Q.   It should have been "manual," okay.  Could have been a

19  shorthand.  Okay.  Well, let's go back to -- I think this is a

20  document that you're familiar with; is that correct?

21  A.   It doesn't jump out at me.  I'm not a safety person.

22  Q.   Okay.

23  A.   If it was sent to me, I reviewed it.

24  Q.   Let's look at -- this page is a DCAS facility safety from

25  28 and 29 April.  Do you see that at the top?

1    A.    I'm sorry.  Say that again?

2    Q.    This is a DCAS safety audit, or survey -- excuse me --

3    facility safety survey?

4    A.    Yes.  There were certainly two DCAS people there.  There

5    was also a Boeing safety.  I'm not sure who was the prime mover

6    in this, whether it was Boeing, the prime contractor, or DCAS.

7    Q.    Okay, but we have two DCAS people there, correct?

8    A.    Yes.

9    Q.    And again, this was the safety survey that the LPC letter

10   we just looked at referenced as confirming their position on

11   compliance?

12   A.    I assume so, yes, that after the Air Force review, they had

13   some DCAS people come out and take a look.

14   Q.    Okay.  Okay.  So here we're looking at building -- so if

15   you look at the document, on the left-hand column it has a B/

16   number.  Do you see that?

17   A.    Yes, sir.

18   Q.    Do you understand that to be the building number they were

19   looking at?

20   A.    I assume so.  I know there was a Building 91 that came up.

21   The other numbers don't particularly mean anything to me.

22   Q.    Okay.  So we're talking about a comprehensive -- so we're

23   looking at Building 91 now, which is -- you see that?

24   A.    Yes, sir.

25   Q.    It says, "A comprehensive survey should be made to

1   determine if there is toxicity problem in the sling line room.

2   Odor very prevalent."  Do you see that?

3   A.   Yes.

4   Q.   So does this enlighten as to the solvent problems they were

5   talking about with the sling room in the last --

6   A.   It  appears to refer to that, yes.

7   Q.   And again, they're looking at whether -- and again, looking

8   back at what they said in the last document, they're talking

9   about solvent problems in the sling room after the SRAM had been

10  lined, correct?

11  A.   Probably, because they're talking about toxicity in the

12  sling line room.  I assume it's the same one.

13  Q.   Okay.  So assuming that they're talking about the vapor

14  degreaser at this point.

15  A.   I don't know.

16  Q.   You don't know?  Okay.

17  A.   I don't know where the vapor degreaser was.  I know there

18  was one, or more than one.  I don't know where it was.

19  Q.   Okay.  Let's look at -- again, let's look at Building 77,

20  then, on the top of the next page.

21          THE COURT:  Which tab?

22          MR. MURPHY:  I'm sorry.  This is Tab 13 again.  This

23  is Plaintiff's Exhibit 372.  It's in our trial binders under

24  Safety Manuals and Inspections.

25  BY MR. MURPHY:

1    Q.   So we just talked about Building 91, their inspection of

2    91.  We're now we're moving to page -- the last three page

3    numbers is 996, page 2 of the document.  We're looking at the

4    top at B/77, and we're assuming that's Building 77?

5    A.   Yes, sir.

6    Q.   Okay.  So it mentions, "The building under rehabilitation.

7    Looked good.  Reviewed filter change certification chart."

8    Do you see that?

9    A.   Yes, sir.

10   Q.   Okay.  So this indicates that DCAS was reviewing the filter

11   change procedures?

12   A.   Yes.  DCAS and Boeing, yes.

13   Q.   Yeah.  Okay.  And it says, "B. Grating over sump pump

14   broken.  Needs securing."  Do you see that?

15   A.   Yes, sir.

16   Q.   Do you know what sump pump they're talking about there?

17   A.   No, sir, I don't.

18   Q.   Okay.  "Grating and beam show sign of oxidation.  They

19   should be scrapped and repainted."  Do you see what that refers

20   to?  Do you have an understanding of what that refers to?

21   A.   No, I do not.

22   Q.   Okay.  Let's look at -- it's page 4 of this document.

23   A.   Okay.

24   Q.   Where it says Plantwide Comments.

25   A.   Yes, I see that.

1   Q.   So page 4 of this document, Plantwide Comments, it talks

2   about No. A.  "LPC should review the specifications requiring

3   the use of MEK to ascertain if a less toxic, less flammable

4   solvent should be used."  Do you see that?

5   A.   Yes, sir.

6   Q.   Do you have an understanding of what MEK is?

7   A.   No.

8   Q.   So this indicates that DCAS, and as you say, this Boeing

9   and DCAS review of LPC operations were questioning their use of

10   certain solvents?

11   A.   They were certainly suggesting that LPC look for possible

12   alternatives.  I don't know if that rises to the level of

13   questioning the use.  That's probably a reasonable interpretation.

14   Q.   Do you have an understanding of how many solvents they used

15   at LPC at this time period?

16   A.   No.

17   Q.   Okay.  Let's look at Tab 16.  Mr. Nagle, have you seen this

18   document before?

19   A.   Yes, I think I have.

20   Q.   And this is a document you cite in your expert affidavit,

21   correct?

22   A.   Yes.

23   Q.   What is this document?

24   A.   It's captioned, it's DCAS Safety Inspection Debriefing, by

25   a Mr. Marymee.  Debriefings are very common.  Basically, very

1    often before the formal report is written, they will say, okay,

2    before we exit -- "exit conference" might be a better way to

3    describe it.

4    Q.   So this is after a DCAS inspection took place, correct?

5    A.   Yes.

6    Q.   And it's a safety inspection?

7    A.   Yes, sir.

8    Q.   Okay.  And they're looking at our safety procedures again,

9    correct?

10   A.   Yes, sir.

11   Q.   And they're making certain observations that they believe

12   that we were not in compliance with standards?

13   A.   I'm not sure if they were all -- without reading the whole

14   thing again, I can't remember if they were all in noncompliance

15   or if there were any that were, maybe ought to look at a better

16   way of doing this.

17   Q.   Okay.  I think you cite No. 18 on page 3 in your affidavit.

18   Is that correct?

19   A.   Yes.  I do remember that.

20   Q.   Okay.  And in your affidavit, you say this demonstrates

21   your opinion that there's no control asserted by the government

22   in here because this shows that we push back on certain

23   occasions on their recommendations.  Is that correct?

24   A.   Yes.  Yes.  As I recall from this one, what happened, the

25   deficiency noted, or what DCAS was concerned about, that it

should be a metal closing container, and LPC pushed back,

saying, no, our -- what they call hamburger cartons, cardboard

cartons are actually better because the metal, you could have a

flash that could be a spark that could cause a problem, where

the cardboard on cardboard wouldn't do that.

Q.   Okay.

A.   I don't know if I'm droning on, or what.

Q.   No, no.  That's helpful.  So, again, this supports your

control opinion, because here it shows that they weren't

directing us all the time to do work; we were working together

instead to resolve these issues.  So there was no control by the

government, but again it showed a cooperative kind of effort

between the two parties to come to how to handle these explosive

materials.

A.   Yes.  The agency would point something out, and very often

it was a recommendation or a suggestion.  And basically while

certainly a lot of times LPC would comply, this is an example

where they said, no, you're wrong, ours is better.

Q.   Okay.  And do you know if the DCAS followed up with a

formal finding?

A.   I don't recall seeing any documents on that.

Q.   Okay.  So the date of this letter is, what, November 30,

1972?

A.   Yes.  30 November '72.

Q.   Could we go to Tab 17.  Tab 17 is Plaintiff's Exhibit 0398,

1    and it's in our trial binders under Safety Manuals and

2    Inspections.

3              THE COURT:  Is that the document -- who's handwriting

4    is that?

5              MR. MURPHY:  We have no idea, Your Honor.  We just

6    produced it the way we had it.

7              THE COURT:  Oh, really?

8              MR. MURPHY:  Yeah.

9    BY MR. MURPHY:

10   Q.  So this is -- have you seen this document, Mr. Nagle?

11   A.  It doesn't jump out at me.  So if it was provided to me,

12   I looked at it, but it doesn't jump out at me.

13   Q.  This is dated January 29, 1973, correct?

14   A.  Yes, sir.

15   Q.  So it came after the document you had cited.  It came after

16   the debrief we had just talked about.

17   A.  Yes, yes.

18   Q.  And this is a letter from Defense Supply Agency, which

19   again, DCAS was under the defense --

20   A.  Yes.  It was a parent organization.

21   Q.  This is to Lockheed, and it says, "The attached list of

22   specific discrepancies and recommendations resulting from the

23   survey conducted at LPC facilities," and it gives the date of

24   the safety survey we just talked about, "and corrective action

25   as required to" -- it's cut off there, but I'm going to assume

1   it's "comply," but it starts with a C, "with existing safety

2   regulations."

3   A.   Yes, sir.

4   Q.   Okay.  And it says, "Request your reply by 12 February

5   '73."  So let's look at the specific conditions and

6   recommendations.  So at No. 1, second page of the document,

7   Number 1 talks about where we can put our lunch room.

8   A.   Yes.

9   Q.   And you see that, and whether the lunch room was permitted

10  to be where it is because of interlying distances that were in

11  certain Air Force manuals?

12          MR. JOHNSON:  Objection, Your Honor.  It's not clear

13  that this document is actually tied with the January 29, 1973,

14  letter.

15          THE COURT:  He can't hear you unless you talk in a

16  mic.

17          MR. JOHNSON:  I apologize, Your Honor.

18      The 29 January 1973 memorandum discusses safety surveys on

19  28 and 29 November 1972, and now we're moving on to a document

20  that discusses deficiencies from 18, 21, and 22 August 1972.

21          MR. MURPHY:  In the cover letter, however, it talks

22  about a safety at 28 and 29 November.  Regardless, this is a --

23  regardless, this is a DCAS official response setting forth --

24          THE COURT:  We don't really know whether this was

25  attached to the letter originally.  It's the way it was

1    produced.

2              MR. MURPHY:  Yes.  Yes, Your Honor.  It says the

3    attached list, and the --

4              THE COURT:  The cover letter implies that it does, but

5    it may not be the attachment.  But either way, we have to talk

6    about lunch rooms.  We are down in the weeds.

7              MR. MURPHY:  Okay.  Moving on, Your Honor.

8         Let's go down to No. 3.

9              THE COURT:  Defense?

10             MR. MURPHY:  No.  Number 3 is on the next page,

11   Your Honor.  Oh, I'm sorry.  It says AB, and then it restarts

12   numbering.  This is on the next page, ending in 72 is the Bates

13   number.  Page 2 of the list, No. 3, it says Waste Containers.

14   BY MR. MURPHY:

15   Q.   So this is, again, the DCAS response, we believe, if this

16   was the list.  "Waste containers containing explosives, rags,

17   shop coats, and paper not stored in containers equipped with

18   lids or covers."  Do you see that?

19   A.   Response to what?

20   Q.   Well, this is a DCAS -- this is a list of specific

21   conditions and recommendations for Lockheed Propulsion Company.

22   Do you see that?

23   A.   Yes.

24             THE COURT:  They repeat deficiencies that they are

25   making recommendations about.

1    MR. MURPHY:  Yeah.

2  BY MR. MURPHY:

3  Q.    So No. 3 is the waste containers.  Do you see that?

4  A.    Yes.

5  Q.    And so a couple of months before, in a previous document,

6  you cited the fact that since we didn't follow the

7  recommendations on waste containers, it showed a cooperation

8  rather than control.  And here, they're talking about waste

9  containers a couple months later, and they're making

10  recommendation or citing DoD manuals about -- so here they're

11  citing DoD Manual 4145.26M, paragraph 1502i.  Do you see that?

12  A.    Yes.

13  Q.    So they're saying that your containers don't comply with

14  this DoD manual, and I want to go back to DoD manual.

15  A.    But before I do, the reason why I was saying response to

16  what, Tab 16 was a Lockheed Interdepartmental Communication.

17  Q.    Yes.

18  A.    I don't know if, by the time Tab 17 was written, Lockheed

19  had ever formally issued a rebuttal that they have in 16.

20  Q.    I understand.  I understand.  But this is an official --

21  this is the DCAS safety survey results.

22  A.    Yes.  This is basically the formalization of the debriefing

23  that they talked about in 16, but I don't recall if there's any

24  indication in 17 if the government has already been apprised of

25  Lockheed's response that was an interdepartmental communication

1    of 16.

2    Q.   Okay.  Go to the last page in this list.  It's signed by

3    Wesley Marymee, Safety Officer.

4    A.   Yes.

5    Q.   Are you familiar with Mr. Marymee was a DCAS?

6    A.   Yes.  If you go back to 16, he gave the DCAS safety

7    inspection debriefing by W. M. Marymee in the caption.

8    Q.   Okay.  This is DCAS recommendations on how we should

9    operate our waste collections.

10   A.   Yes.

11   Q.   Okay.  And so and he's citing DoD Manual paragraph 1502i.

12   Did you go back and look at -- are you familiar with --

13   A.   I'm sorry, where are you?

14   Q.   We're back at No. 3 where we were talking before.  The last

15   Bates number is 72.  It's page 2 of the list.  I'm sorry, I'm

16   going too fast.  Are you there?

17   A.   DoD Manual 4145.26?

18   Q.   Yeah, and paragraph 1502i.

19   A.   Yes.

20   Q.   I'd like to go back to the safety manual and see what

21   they're citing there.  This would be Tab 2 of our binder, Trial

22   Binder 2, Feenstra Tab 40.  This is the '68 manual.  I want to

23   go to 1502i.

24          MR. JOHNSON:  The objection is beyond the scope of the

25   witness.  He's having him testify as to the meaning of safety

1    standards, or compliance with safety standards, rather than

2    government control.

3              THE COURT:  Well, I'm not so sure you can cross them

4    out.  Overruled.  415.  What page are we looking at?

5              MR. MURPHY:  We're looking at, Your Honor, 1502i.

6              THE WITNESS:  The last four of the Bates are 799.

7              THE COURT:  Tab 2.

8    BY MR. MURPHY:

9    Q.   It's Tab 2.  Bates number at the end is 799, correct?

10   A.   Yes, sir.

11   Q.   So we're looking at little i, which is on the left-hand

12   side.  It says, Containers For Waste Explosives.

13   A.   Yes.

14   Q.   It says, "Explosives destined for the burning ground shall

15   be in original closed packages or in other suitable containers

16   which will not contribute to the existing hazard by readily

17   producing sparks when contacting rocks, steel, or other

18   containers.  Bags or containers made from easily ignitable

19   materials shall not be used."  Do you see that?

20   A.   Yes, sir.

21   Q.   Okay.  So they're citing how we should comply with this

22   waste.  And again, the waste is going to the burning grounds,

23   correct?

24   A.   Yes.  That's what it indicates, unless there's been a

25   deviation granted.

1   Q.   Okay.  And so, again, what we're seeing here is DCAS

2   oversight or DCAS review of how LPC is handling its waste

3   collection activities in connection with the burn pit.

4   A.   Unless a deviation's been granted.

5   Q.   Okay.  Let's look at -- do you know whether deviations were

6   granted at times for LPC?

7   A.   Deviations are -- requests for deviations or requests

8   for waivers were very common at this time because, remember,

9   I mentioned this manual was generic.  It covered any contractor,

10  wherever they were, handling explosives.

11       And these manuals also became very outdated very quickly.

12  So a contractor may -- technology may have marched on and they

13  have a better way of doing it.  So requests for waiver or

14  deviation were very commonly sought and were very commonly

15  granted.  I saw at least one in this case, but because of the

16  spotty documentary record, I don't know how many more there

17  would have been.  I would be speculating.

18  Q.   Tab 19.  So Tab 19, it's Exhibit No. 400. It's Trial Binder

19  1, Safety Manuals and Inspections.  Is this a deviation letter

20  from the Air Force to...

21  A.   It appears to be a waiver letter.  The distinction was,

22  deviations were prospective; waiver is retrospective: Oh, shoot,

23  we already did this, can we get a waiver for it?  Or, we're

24  going to do this in the future, can we get a deviation?

25  Q.   Okay.  And this was dealing with, again, requirements in

1   DoD Manual 4145.26M.

2   A.   Yes, sir.

3   Q.   Let's move on.  Let's look at Tab 20, which is PX385.

4   it's in our trial binders under the SRAM Review Committee.

5   Have you reviewed this document?

6   A.   Yes, I think I did take a look at this.

7   Q.   Okay.  So, again, we have -- this is a different review.

8   This is -- looking at the first page here, it says the purpose

9   is, "An independent government production progress review was

10  held at LPC from 17 to 20 August 1971."  It says, "The purpose

11  of the review was to verify that LPC has adequate technical

12  manufacturing skills and resources to manufacture the SRAM

13  rocket motor that meet contractual specifications."

14      Do you see that?

15  A.   Yes, sir.

16  Q.   Okay.  So this is a -- would this review have been not the

17  PME.  This is a different Air Force review?

18  A.   Yes.  This is lower level than a PME.  It's a PPR,

19  production progress review.

20  Q.   Okay.  And is that different than the DCAS reviews, the

21  safety reviews we've also talked about?

22  A.   Yes.  This is just typically customer.  This would be the

23  customer, Army, Navy, or Air Force.

24  Q.   Okay.

25  A.   DCAS may participate, but it's driven by the customer.

1   Q.   Okay.  And they're looking at basically how the contract

2   performance is progressing.

3   A.   Yes.

4   Q.   Okay.  And was safety something they looked at as part of

5   this?

6   A.   They certainly would have had the right to look at safety.

7   I don't recall that the PPRs were required to look at safety at

8   that point.

9   Q.   Okay.  Let's look at the attendance list, which is on the

10  first page of the attachment.  The Bates number is 665.  The

11  attendance list on this page, we have one, two, three, four,

12  five people from the SRAM SPO.  What is the SPO?

13  A.   It probably means Special Projects Office or something like

14  that.

15  Q.   Do you know who Colonel Skantze was?

16  A.   Yes.  Colonel Lon Skantze.  He was in this as a colonel; he

17  ended up being a four star.

18  Q.   Okay.  And was he in charge of the SRAM program at the

19  time?

20  A.   At various times, yes, I think he was.

21  Q.   Okay.  Okay, so we have one member from the AFPRO Boeing.

22  Is AFPRO an Air Force person, or would he be a Boeing person?

23  A.   No, he would be Air Force.  He'd be an Air Force

24  procurement resident officer at Boeing.

25  Q.   And then we have three DCAS people from Ontario?

1    A.    Yes, sir.

2    Q.    Okay.  And then they have a bunch of LPC people who also

3    participated, as well as three Boeing people.

4    A.    Yes, sir.

5    Q.    Okay.  Let's look at -- I want to first talk about -- it's

6    the first page of the findings.  It starts with the last five

7    words on the Bates number ending in 666 and moves on to the next

8    page.

9    A.    666?

10   Q.    Yeah, it's right after the attendance list.  Do you see it?

11   A.    Yes.

12   Q.    Okay.  And it says, "The second problem in this area deals

13   with purchased equipment.  LPC purchases all of their ammonium

14   perchlorate, AP, used in the rocket motor propellant from

15   Kerr-McGee.  The supplier has recently indicated he may

16   discontinue production because of low profitability.  This

17   matter affects other DoD programs and was the subject of a SAMSO

18   meeting on August 10, 1971, attended by LPC."

19         Do you know what an SAMSO -- is that an O or a D?

20   A.    I don't remember what that is.

21   Q.    Okay.  "Attended by LPC."  It says, "LPC will participate

22   on an industry team to review and determine future AP

23   requirements."  Do you see that?

24   A.    Yes, sir.

25   Q.    "So it is suggested LPC keep the Boeing Company apprised

the status on this matter.  The SRAM SPO will make direct

contract with the SAMSO to express our concern on this matter."

So I take it from this that the Air Force was concerned

about how they were going to get AP for the SRAM.

A.   Yes.  Very often, the DoD customer would be concerned about

the mobilization base, to make sure that they've got enough

contractors or suppliers able not only to be in a competitive

environment but also to mass-produce in the event of

hostilities.

Q.   So LPC was participating in an industry team, looking at

how they could get AP in the future?

A.   Yes.  It appears that way.

Q.   Okay.  And this was at the instruction or at least the

consent of the Air Force.

A.   Yes.

Q.   Okay.  Let's look at the last page of this document.  So

does this indicate whether the team looked at safety concerns

during their review as well?

A.   Yes, they certainly did.

Q.   Okay.  So safety was important enough for Colonel Skantze

to review as part of his review of the SRAM program.

A.   Oh, yeah.  The SRAM program was a vital program, and

obviously nothing would derail deliveries more than an explosion

or a fire.

Q.   So how LPC dealt with its waste would have been of

1   paramount concern to the Air Force in assuring that the SRAM was

2   delivered in time?

3   A.   In the concern of explosives or fires, yes.

4   Q.   Sure.  Let's look at Tab 24 now.  Tab 24 is Plaintiff's

5   Exhibit 339.  It's in our trial binder under General.  Did you

6   review this document?

7   A.   I remember seeing it.  Yes, I do.

8   Q.   This document is an internal government memorandum,

9   correct, where NASA is discussing whether we are -- in our

10  attempts to qualify a new lot of AP, whether we're running

11  enough mixer tests on the amount of AP, and they're criticizing

12  LPC for only doing two mixer tests instead of four mixer tests

13  on how to qualify that AP?

14  A.   Yes.  I don't know the details.  I can read the details,

15  but I have no problems relying on what you're telling me.

16  Q.   Okay.  Okay.  And at the end, the recommendation from

17  Mr. Haywood, it says, "In addition" -- this is the last paragraph.

18  "In addition to the recommended procedure for qualifying this

19  new lot of ammonium perchlorate, it's recommended that NAA" --

20  do you know what NAA is?

21  A.   It might be another contractor.

22  Q.   North American?

23  A.   I thought North American was Rockwell.  It might be.

24  Q.   Do you remember who the prime integrating contractor was in

25  the Apollo space program?

1   A.   It might have been North American.

2   Q.   I believe it was.

3   A.   Yes, okay.

4   Q.   North American.  So LPC was a subcontractor on the Apollo?

5   A.   Yes.

6   Q.   Do you recall what LPC did on the Apollo program?

7   A.   No, I do not.

8   Q.   And so then we go to the next page.  It's another exhibit

9   I think that should be attached in your binder.

10  A.   I'm sorry, did you finish with that?

11  Q.   I'm sorry, you're right.  I didn't.  "It is recommended

12  that NAA and LPC be directed to submit a detailed plan for

13  qualifying new lots of materials in the future."

14       Do you see that?

15  A.   Yes, sir.

16  Q.   Okay.  I want to then go to the next -- it's in the same

17  tab, but it's another exhibit.  It's Exhibit No. 490.  This is

18  also in our trial binders.  Did you review this document?

19  A.   I think I reviewed it in connection with the previous

20  document, yes.

21  Q.   Okay.  Is this a telegram from NASA to North American

22  Aviation and Lockheed Propulsion directing them to defer

23  utilization of a new lot of ammonium perchlorate until

24  sufficient small batch mixes have been prepared?

25  A.   Yes.  It was probably a TWIX, what they call it, TWIX back

1    then.

2    Q.   What is a TWIX?

3    A.   It was like a telegram, but it was a forerunner of a fax.

4    It was used frequently in the military.

5    Q.   Okay.  And so this was a TWIX giving technical direction to

6    Lockheed Propulsion about how to qualify ammonium perchlorate?

7    A.   Yes.  For issues of quality, yes.

8    Q.   Okay.  And that increased the amount of mixed batches they

9    had to run to make sure that the AP was qualified?

10   A.   Yes.  This would not be a safety inspection.  This would be

11   more of a quality assurance inspection to make sure that the

12   stuff you're putting in is going to work.

13   Q.   Well, this isn't an inspection at all, is it, Mr. Nagle?

14   This is a technical direction of how to qualify for ammonium

15   perchlorate.

16   A.   But I'm sure it came about from a quality assurance

17   inspection:  We the customer have doubts as to whether the stuff

18   you're buying would really make the product work as it's

19   supposed to.

20   Q.   Okay.  Let's go to Tab 22.  Tab 22 is Plaintiff's Exhibit

21   326.  It's also in our trial binders.  Did you review this

22   document, Mr. Nagle?

23   A.   It doesn't jump out at me, at least the first page doesn't.

24   Q.   Its date is March 30, 1962.  It's a trip report from LPC.

25   It's talking about a presentation on the LPC 156-inch large

1   solid motor design and development philosophy to EAFB.  Is that

2   Edwards Air Force Base?

3   A.   Yes.

4   Q.   On March 29, 1962?

5   A.   Yes, sir.

6   Q.   When it says personnel contacted, I want to go through that

7   list.  The last person there is Major W. Rice, Deputy Chief,

8   Solid Systems Branch, DGS.  Do you know what DGS stands for?

9   A.   It could be Deputy General Staff, but I'm not sure.

10  Q.   Would Major Rice be -- as a deputy chief in the Deputy

11  General Staff --

12  A.   Deputy General Staff.  The General Staff is -- the horse

13  holders was the expression used quite a lot.  These were the

14  administrative staff for the general, for the commanding

15  general.

16  Q.   Okay.

17  A.   If that's what the DGS means in this context.

18  Q.   Do you know the role Edwards Air Force played or the

19  Air Force Rocket Propulsion Lab played in the large solid rocket

20  motor?

21  A.   As I recall, they were the launch site and therefore also

22  the procurement command for a lot of the items.  They would

23  launch them from either Edwards or -- I could be wrong on this

24  -- Edwards or Vandenburg very often to Kwajalein Atoll in the

25  Pacific.

1    Q.   Let's look at No. 11 in the list of what they were talking

2    about with the Air Force.  It says, "Bill Rice," and that's the

3    person we were just talking about, "asked if we had considered

4    refurbishing each set of motor case hardware so that it could be

5    used for more than one test during the development program, thus

6    providing economy and aiding program scheduling."

7         Do you see that?

8    A.   Yes, sir.

9    Q.   Do you know what's involved in motor refurbishing after

10   firing?

11   A.   Not a clue.

12   Q.   Okay.  Do you know whether the motor refurbishing could

13   result in addition waste products?

14   A.   Not a clue.

15   Q.   Okay.  But this is an indication that Major Rice was

16   talking to LPC about how we should refurbish fired motors so we

17   could use them again to save money.

18   A.   From this, he'd asked if Lockheed had considered doing it.

19   Q.   Okay.  Do you know if Lockheed did refurbish rocket motors?

20   A.   No, I do not.

21   Q.   Let's look at Tab 25.  This is Plaintiff's Exhibit 286,

22   Trial Binder 1, Ownership Equipment.  Did you review this?

23   A.   Yes.  I do remember this.

24   Q.   So this again is dealing with North American Rockwell

25   Corporation, and it's a letter to North American Rockwell from

1    LPC dealing with an offer from Ampot for approximately 50,000

2    pounds of ammonium perchlorate residual from the subject

3    program.  Do you have an understanding of whether the subject

4    program was the Apollo?

5    A.   I do not.  I'll take your word for it if it is, just

6    looking at those numbers.

7    Q.   Okay.  So here LPC's telling its prime contractor, North

8    American Rockwell, that Ampot has offered to take this AP back,

9    and since there is no other known outlet for resale of this

10    material in the near future, we are recommending that LPC sell

11    this material back to Ampot and then credit the program costs

12    with the amount they receive.  Correct?

13    A.   Yes, sir.

14    Q.   If the North American Rockwell contract with LPC was a cost

15    contract, would that indicate that the AP was owned by the

16    government?

17    A.   Yes.  That would be probable.

18    Q.   Okay.  And if we couldn't sell it back, would we have

19    received disposition instructions from the government?

20    A.   Yes.  If it was government property and there was no

21    resale, then basically Lockheed would put this 50,000 pounds, or

22    whatever it was, on an inventory schedule saying, okay, here,

23    government, is your property at the end of this job, what do you

24    want to do with it?  Whether the government would say, okay,

25    we'll take it back or give it to this other contractor, which is

1   possible, or --

2   Q.   Or burn it in your burn pits and we'll abandon our

3   ownership?

4   A.   Basically.

5   Q.   But that option is given to the government, correct,

6   because its theirs?

7   A.   Well, assuming it's theirs.  I'm assuming it's under a

8   government contract and not an IRND.  So it's probably

9   government property.

10   Q.   But if it's government property, the government has an

11   option of making us sell it or accepting it for sale or

12   directing us, as they did on certain occasions, to burn it.

13   A.   Yes.  We saw at least one instance where they said, okay,

14   burning will be at a particular site, yes.

15   Q.   I'm going to now go to Tab 9 in the binder.  This is

16   Plaintiff's Exhibit 432.  This is in our trial binders under the

17   Waste Disposal tab.  Mr. Nagle, have you seen this document?

18   A.   Yes, I have.

19   Q.   Okay.  Here -- and I'm not suggesting that 50,000 relates

20   to the other 50,000 pounds.  It's just a coincidence that it's

21   the same amount.  We have on hand 50,000 pounds of propellant of

22   another flammable waste that cannot be disposed at another

23   Redlands plant.

24            THE COURT:  This is tab?

25            MR. MURPHY:  This is Tab 29, Your Honor.  It's

1    Plaintiff's Exhibit 432.

2    BY MR. MURPHY:

3    Q.   This is a memo to record from GCR in 1961.  Do you see that?

4    A.   I'm sorry.  Could you repeat that?

5    Q.   I'm sorry.  This is just a memo, a Grand Central Rocket

6    memo, from March of 1961.

7    A.   Yes, I see that.

8    Q.   And the subject is Disposition of Explosives and Flammable

9    Wastes.

10   A.   Yes.

11   Q.   And so this is a letter where Grand Central Rocket is

12   discussing how to dispose of this explosive waste.

13   A.   Yes.

14   Q.   And it talks about reaching out to the L.A. Ordnance

15   District to make arrangements at Camp Irwin for disposition of

16   propellant and other dangerous wastes?

17   A.   Yes.

18   Q.   Okay.  Do you know if Fort Irwin ever took explosive wastes

19   from LPC?

20   A.   I'm thinking in the back of my mind saying they did at some

21   point.  I don't remember specifically.  I know there are other

22   documents involving Camp, later Fort Irwin.  I don't know if

23   anything specifically was actually delivered there.

24   Q.   Okay.  And I take it your testimony in your affidavit is

25   that this back-and-forth on who should take the waste or where

1  it should be burned between the government and LPC does not

2  indicate ownership of this.

3  A.   That's correct.  It does not demonstrate ownership.  For

4  example, in this paragraph 4, they talk about Navy and Air Force

5  and our own research.  So clearly there would have been no

6  governmental ownership of their own research.  But a lot of

7  times, the government will take stuff, for lack of a better

8  expression, to reduce costs on a cost-reimbursement contract.

9      If Lockheed had a cost-reimbursement contract and it would

10  be an allowable cost for them to truck the stuff 500 miles and

11  pay fees to a landfill, or wherever you put this thing, and the

12  government says, no, we've got some space, you can put it here

13  because that'll only cost you $100, the government might very

14  well do that, having nothing to do with ownership, just to save

15  cost on a cost-reimbursement contract.

16  Q.   So these wastes were generated -- as you say, there's a

17  distinction between research-generated waste at LPC and waste

18  generated by the Navy, the Air Force, and the Army.  Correct?

19  A.   Yes, sir.

20  Q.   And so both parties have this waste.  The government's

21  either going to pay for us to dispose of at our facility, or

22  they're going to take it to save cost and dispose of it at their

23  facility, correct?

24  A.   Yes.  If it's a cost-plus contract, that's clearer, and if

25  it's a fixed-price contract and the contractor already

1    supposedly had included that in their bid.  And if the
2    government agreed to do that, the government would want probably
3    a reduction in the price.
4    Q.   Okay.  So if the government agreed to take this waste and
5    dispose of it at their facility, you're saying that maybe even
6    under a fixed-price contract they'd want some consideration for
7    doing that?
8    A.   Yes, sir.
9    Q.   So, again, this is an arrangement between both parties to
10   decide how to dispose of this waste, correct?
11   A.   Yes.  Basically, according to this, they're asking Sixth
12   Army which would have -- Sixth Army at that time would have had
13   control pretty much over the West Coast.
14   Q.   Okay.  Let's go to Tab 30.  Tab 30 is Plaintiff's Exhibit
15   439.  It's in our trial binders under Waste Disposal.  It's a
16   memo dated December 18, 1964.  It says Disposal of Reject Rocket
17   Motors and Propellant.  Did you review this document, Mr. Nagle?
18   A.   I think I did.  Yes, I think I did, but it doesn't jump out
19   at me, but I think I did.  Because I remember seeing Fort
20   MacArthur, and Fort MacArthur now is pretty much defunct.
21   Q.   Where was Fort MacArthur?
22   A.   Fort MacArthur was pretty close to L.A. back then.
23   Q.   Was it?
24   A.   It was very prime real estate.
25   Q.   Okay.  It says, per telecon with Paul Wester, LAPD.  Do you

1  know what LAPD is?

2  A.   It might be Los Angeles Procurement District.

3  Q.   Okay.  "He secured approval from Headquarters Sixth Army

4  for the 58th Ordnance Detachment Fort MacArthur to dispose of

5  the subject material as requested in our letter dated November

6  6, 1964.  Arrangements should be made with ST-5 Wertz at Fort

7  MacArthur to pick up the material."

8      And it gives a case number.  This is the last sentence.

9  You should cite Case No. Miscellaneous 1610-64-LPC on the

10  shipping document."  Do you see that?

11  A.   Yes, sir.

12  Q.   So is this evidence that, at least at this point in time,

13  in 1964, that the Army had agreed to take propellant and rocket

14  motors from LPC?

15  A.   Yes.

16  Q.   And the case number, in your experience, do you know what

17  that was?

18  A.   They would probably need something to credit or debit so

19  they might be able -- so that would not necessarily be just for

20  ordnance, but it may be for finance and accounting if there was

21  going to be consideration charged.

22  Q.   Okay.  But you see no evidence of contract payments back

23  and forth.

24  A.   Correct.  I do not.

25  Q.   And you just -- okay.  But again here, we have wastes that

1    were generated under contracts being disposed of by the Army at

2    their facility, correct?

3              THE COURT:  How much longer?

4              MR. MURPHY:  I'll try to do it in 10 minutes,

5    Your Honor.

6              THE WITNESS:  I don't know if it's waste, which is an

7    odd distinction.  Remember yesterday we talked about classified

8    material.

9              MR. MURPHY:  Yes.

10             THE WITNESS:  A lot of times the government would say,

11   no, the design of this rocket motor is classified.  You put it

12   on our site, and we've got troops around it so no one will be

13   able to get that.  So I'm not sure if it's waste that they're

14   talking about.

15             MR. MURPHY:  Okay.

16   BY MR. MURPHY:

17   Q.   Let's go to the next, Tab 31.  So here we have October 13,

18   1965.  I'm sorry.  This is Plaintiff's Exhibit 266.  This is in

19   our trial binders under Waste Disposal.  Have you reviewed this

20   letter?

21   A.   Yes, I have.

22   Q.   This letter is essentially talking about that LPC still

23   has a number of reject motors, experimental cylinders, and other

24   propellant explosives at our Redlands plant for which we desire

25   assistance from the Army for disposition.  And it says it's

```
 1    15,000 pounds of explosives, an estimated total of 470 cubic feet.
 2         It says, "This explosive material was generated in
 3    performance and support of orders and under Army as well as Navy
 4    and Air Force contracts.  The presence of this material presents
 5    a fire hazard and is creating a safety and storage problem at
 6    our plant."  So again, we're asking the Army to take this waste
 7    that were generated under Air Force and other contracts, correct?
 8    A.   Yes, sir.
 9    Q.   Okay.  And it's referencing --
10    A.   Again, I'm not sure if all of it is waste.
11    Q.   Okay.  But we talked before about whether if this was
12    generated in our cost contracts or if the government had
13    ownership interest, the government had control over how it
14    should be disposed of, correct?  So if it was government-owned,
15    they had the ability to provide disposition instructions?
16    A.   Certainly if it's classified material and it would save the
17    government money, the government would have that option, yes.
18    Q.   Okay.  Let's turn now to a couple of quick documents that
19    are sort of out of order here.  I just want to get to them.
20    Tab 34.  Tab 34 is Plaintiff's Exhibit 923, and it's entitled,
21    SRAM Process Aids (Program Chargeable) 1973.
22    A.   Yes.
23    Q.   Have you seen this document before?
24    A.   It doesn't jump out at me.  I've seen a bunch of documents
25    like this.
```

1    Q.    So this is again Plaintiff's Exhibit 923.  The title is

2    SRAM Process Aids (Program Chargeable.)  Does this present,

3    I guess, costs that LPC would anticipate having on the SRAM

4    program?

5    A.    It appears to be that.  They're going to charge it to the

6    project in one form or another.

7    Q.    Let's look at page 3 of 7.  So here we have a list of

8    chemicals that LPC was going to charge to the SRAM program, and

9    we have sodium dichromate, sulfuric acid, methyl ketone,

10   isopropyl alcohol, and the next one down is trichloroethane, or

11   TCA.  Do you see that?

12   A.    Yes, sir.

13   Q.    TCA, they're going to buy 15 gallons of it.  Do you have an

14   understanding of whether this would be per missile?

15   A.    No idea.

16   Q.    Okay.  But in any event, for the SRAM Program Chargeable,

17   they're going to buy 15 gallons of TCA, and they give a spec

18   number, that 0-T-620.  Do you have an understanding of whether

19   that's a military specification?

20   A.    No, I do not.

21   Q.    Okay.  And it lists a shop process for TCA: general purpose

22   cleaning of tools, motor components, bond surface, et cetera,

23   specification requirement.  Do you see that?

24   A.    Yes, sir.

25   Q.    Okay.  So TCA would have been used for general purpose

1   cleaning for the SRAM.

2   A.   It appears that to be the -- I'm not sure if it would also

3   be general purpose cleaning for other things that they had there,

4   but they certainly have it listed here under SRAM process aids.

5            THE COURT:  I'm sorry.  This is being purchased by

6   Lockheed, right?

7            THE WITNESS:  Yes, Your Honor.  It appears to be that

8   this is something that they would be purchasing, and they would

9   be charging it, in one form or another, either as direct or

10   indirect, to the SRAM project.

11           THE COURT:  So it's part of their inventory, not the

12   government's.

13           THE WITNESS:  Correct, Your Honor.

14   BY MR. MURPHY:

15   Q.   But under the Government Property Clause, we know the SRAM

16   was a fixed-price with progress payments contract, correct?

17   A.   I don't remember, but I'll take your word for it.

18   Q.   Okay.  Let's assume the SRAM was a fixed-price with

19   progress payments clause.  If it was charged directly to the

20   SRAM, it would be government-owned, correct?

21   A.   If it was charged directly to SRAM, yes, it would be.

22   At the end of a fixed-price contract with progress payments,

23   once the government had accepted what they were buying --

24   Q.   The motors.

25   A.   -- then the title for whatever was left over would revert

1    back to the contractor.

2    Q.   Okay.  But during contract performance, it would be owned

3    by -- the title would be held by the government.

4              THE COURT:  Well, how do I know how this was charged,

5    whether it was charged directly or not?

6              MR. MURPHY:  Your Honor, we believe it was direct

7    charge, because you have a per-motor charge at a certain amount

8    of gallons, and they're talking about a quantity promoter.

9         If you look at the top of the second column, it says

10   Quantity Promoter.  Do you see that, Mr. Nagle?  So it's the

11   second column, top of the second column where it talks about how

12   many gallons they're buying per motor?

13             THE WITNESS:  Oh, yes, I see it now.

14             THE COURT:  Do you have a document from earlier years

15   with a similar discussion of degreaser versus general purpose,

16   or is this your only one?

17             MR. MURPHY:  Of general and degreasing, Your Honor?

18   This is one of about, I think, two dozen.

19             THE COURT:  Does it say the same thing prior years --

20             MR. MURPHY:  No.  Not this type of document that talks

21   about -- I'm sorry, Your Honor.  I didn't understand your

22   question.  Could you say it again?

23             THE COURT:  This shows a purchase of 15 gallons of TCA

24   and TCE.  This is from 1973.  I'm wondering if you have

25   comparable similar documents prior to '73.

1    MR. MURPHY:  Not in this form, Your Honor, no.

2    THE COURT:  Okay.

3    BY MR. MURPHY:

4    Q.   So at least in 1973, we know they're charging 15 gallons of

5    TCA for general purpose cleaning per SRAM motor, correct?

6    A.   I'm having a problem with the per SRAM motor.  That I don't

7    know.

8    Q.   Well, it talks about, again, at the top of that second --

9    THE COURT:  He doesn't know.  Move on.

10   MR. MURPHY:  Okay.

11   BY MR. MURPHY:

12   Q.   TCE is the next one down.  So we have the TCE at 6 gallons.

13   Do you see that?

14   A.   Yes, sir.

15   Q.   And it gives a specification number, and it says, "The shop

16   process for TCE in 1973, being general purpose cleaning

17   degreaser usage."  Do you see that?

18   A.   Yes, sir.

19   Q.   Okay.  So it's making a distinction between TCA for general

20   purpose cleaning and TCE for degreaser usage.  Do you see that?

21   A.   They don't have the phrase "specification requirement."

22   Q.   But it just says "degreaser usage."

23   A.   Yes.

24   Q.   Okay, and that's in 1973.

25   A.   Yes, sir.

1   Q.   Okay.

2           THE COURT:  The contracts, let's assume they're all

3   over.  Does that mean, for instance, that the degreaser, which

4   the government clearly owned, if it still exists at the end of

5   the contract, reverts to Lockheed?

6           THE WITNESS:  No, Your Honor.  If the government

7   furnished equipment to the contractor, it remains government

8   property, and at the end of the contract, the contractor would

9   be required to list that on inventory and say, what do you want

10  us to do with this.

11          THE COURT:  And if the TCE, if they didn't abandon it,

12  they didn't return it, but it lands up in the ground, the

13  contracts are over, who owns that?

14          THE WITNESS:  If it was a fixed-price contract with

15  progress payments, if it was left over, it is the contractor's

16  property.

17          THE COURT:  I'm sorry?

18          THE WITNESS:  If it was paid with progress payments,

19  and if at the end of the contract the government has received

20  150 rocket motors, what it was buying, then all title the

21  government had to any residual material reverts back to the

22  contractor.

23          THE COURT:  Even if it's in the ground?

24          THE WITNESS:  If it's waste, the regulations don't

25  even contemplate ownership of essentially garbage.

```
 1              THE COURT:  Okay.  But residual material means
 2    something usable?
 3              THE WITNESS:  That's right.  Residual material can be
 4    good stuff that just wasn't used.  Can be salvage, can be scrap.
 5              THE COURT:  Okay.  Are you finished?
 6              MR. MURPHY:  Your Honor, I have --
 7              THE COURT:  Finish.
 8              MR. MURPHY:  I'm done, Your Honor.
 9              THE COURT:  That's what I thought.
10         I have a question for you, sir.  Within the meaning of
11    government contract work, is double recovery a term of art under
12    the Federal Acquisition Regulations?
13              THE WITNESS:  Double recovery is not mentioned in the
14    FAR.  There's been a long concept of cost mischarging.
15              THE COURT:  Cost mischarging?
16              THE WITNESS:  Mischarging.  But double recovery is not
17    in the FAR.
18              THE COURT:  Okay.  We'll take a 10-minute recess.
19         (Recess from 11:03 a.m. to 11:26 a.m.)
20                        REDIRECT EXAMINATION
21    BY MR. JOHNSON:
22    Q.   Mr. Nagle, I want to go through some of the exhibits in the
23    binder to follow up with you.
24    A.   Yes, sir.
25    Q.   If you would please turn to Tab 31, which is Plaintiff's
```

1    Exhibit 0226.

2    A.   Yes, sir.

3    Q.   During your testimony, there was some speculation as to

4    whether or not this was government-owned property; the questions

5    ran along those lines.  Can you tell from the document, the words

6    used in the document, whether it's referred to as government

7    property?

8              THE COURT:  What?

9              MR. JOHNSON:  I'm sorry, it's the --

10             THE COURT:  The motors?

11             MR. JOHNSON:  Yes, ma'am.  Disposal of rejected rocket

12   motors and propellant.

13             THE WITNESS:  No.  It does not indicate from this

14   document whether it was government property or not.

15   BY MR. JOHNSON:

16   Q.   What is the purpose of this memo?

17   A.   Obviously, LPC is asking, "We would appreciate it if you

18   would secure authorization for the 58th ordnance detachment to

19   dispose of this."  So they're not citing any contractual right

20   for that.  They're not demanding it.  They're coming as a

21   supplicant:  Geez, guys, can you give me this authorization?

22   Q.   And the fact that they're coming as a supplicant, asking

23   for help, does that shed any light on who had responsibility for

24   those rejected rocket motors and propellant?

25   A.   It would appear to me that it was not a contractual right.

1    Therefore, it was not necessarily the government's responsibility,

2    but they were just asking if the government could help them out.

3    Q.   If you turn to Tab 25.

4         THE COURT:  Does government property have to be listed

5    on an inventory schedule for a fixed-price contract with

6    progress payments?

7         THE WITNESS:  At the end of a fixed-price contract

8    with progress payments, Your Honor, it would not be, because

9    once the government has secured what it was buying under that

10   fixed-price contract, the government's protection, temporary

11   protection, on property reverts back to the contractor.

12       So the only thing that would be listed on an inventory

13   schedule at the conclusion of a fixed-price contract with

14   progress payments would be, for example, government-furnished

15   property, like equipment or something.

16        THE COURT:  All right.

17   BY MR. JOHNSON:

18   Q.   And just to clarify, you mentioned that would be with a

19   fixed-price with progress payments.  What about a fixed-price

20   contract without progress payments?

21   A.   The government would have no title in anything that the

22   contractor purchased, unless it was included within what is

23   being delivered to the government and then accepted by the

24   government, and anything else remains with the contractor.  It

25   was never the government's.

1    THE COURT:  Do we know how many of these contracts

2    were without progress payments?

3    THE WITNESS:  Your Honor, I looked at that.  The

4    documentary record is so spotty.  There were some with progress

5    payments, but I couldn't hazard a guess as to what percentage.

6    THE COURT:  You admit that the government owned some

7    of the AP, at least.

8    MR. MURPHY:  Oh, yes, Your Honor.

9    THE COURT:  And you admit that they owned some of the

10   TCE?

11   THE WITNESS:  Your Honor, I don't know that, because

12   TCE as a solvent would normally be charged indirect because it

13   could be used on an Army contract or independent research project.

14   THE COURT:  Right.  But if you buy Mr. Murphy's theory

15   about the per-missile, it might not be.

16   THE WITNESS:  Correct, Your Honor.  It's certainly

17   possible for a contractor to buy it and charge it direct to a

18   contractor, in which case, if it was a cost-plus contract or a

19   fixed-price contract with progress payments, the government

20   would have title to it.

21   THE COURT:  Up to the end.

22   THE WITNESS:  Yes, up to the end on a fixed-price

23   contract.  Under a cost-plus contract, title would remain with

24   the government.

25   THE COURT:  But when something becomes waste versus

1    residual, you have, what, no opinion?

2              THE WITNESS:  My opinion is the regulation was never

3    designed to even contemplate something like that because the

4    government's interest has been fully protected.  What I put in

5    my declaration was someone pays you to take away your scrap; you

6    pay someone else to take away your garbage.  There wouldn't be a

7    title interest there.

8              THE COURT:  Okay.

9    BY MR. JOHNSON:

10   Q.   One of the things that was not mentioned there, you

11   mentioned residual property and garbage.  What about consumed

12   property?  Would you consider the evaporated TCE that goes off

13   into the air to be consumed?

14   A.   Yes.

15   Q.   And what's the title implications as to consumed property?

16   A.   I would say there is no title to consumed.  One of the

17   problems I had in this case was both sides are asking almost

18   metaphysical questions.

19             THE COURT:  I agree with you, so let's move on.

20        (Laughter)

21             MR. JOHNSON:  Yes, ma'am.

22             THE COURT:  I agree entirely.  They have a talent for

23   that.  (Laughter)

24             THE COURT:  Now for the irrelevancies that we were

25   focusing on.  Okay.

1   BY MR. JOHNSON:

2   Q.   So turning to Tab 25, which is Plaintiff's Exhibit 0286, do

3   you recall this memo?

4   A.   Yes, I do.

5   Q.   It's between Lockheed Propulsion Company and North American

6   Rockwell Corporation, correct?

7   A.   Yes.

8   Q.   When a prime contract has a fixed-price contract, does that

9   necessarily mean their subcontracts will be fixed-price contracts?

10  A.   Not necessarily.  Even though the prime contract with the

11  government might be fixed-price, they could order a cost-

12  reimbursement subcontract or a time-and-material subcontract.

13          THE COURT:  Do you agree with Mr. Murphy's statement

14  that the SRAM contract is -- the subcontract between Lockheed

15  and Boeing is a fixed-price with progress payments?

16          MR. JOHNSON:  Your Honor, the United States agrees

17  that's true for the production contracts with the SRAM.  Once

18  they were delivering rocket motors, they were fixed-price with

19  progress payments authorized.

20          THE COURT:  Okay.  R&D, maybe not?

21          MR. JOHNSON:  Correct.

22          THE COURT:  Okay.

23  BY MR. JOHNSON:

24  Q.   In discussing this memo between Lockheed Propulsion Company

25  and North American Rockwell, it was mentioned that perhaps this

1    was government-owned property.  So I wanted to ask, why is

2    Lockheed requesting disposition instructions from North American?

3    A.    Because North American is the one -- again, I'm speculating

4    for this one page -- is the one with whom Lockheed would be in

5    privity.  So they would basically say, okay, we have this stuff.

6    From this memo, it clearly means to me that Lockheed doesn't own

7    it.  I would presume that the government owns it, but it's

8    possible that North American could if it was a North American

9    independent research and development project.

10   Q.    Thank you.  If you turn to Tab 16 in your binder, and

11   actually, you can answer this question without looking at Tab 16.

12   It's just the one that made me want to ask.  Why is the

13   government, as a customer, concerned about safety at the

14   contractor's plant, facility?

15   A.    Really, two reasons.  First, they don't want anyone killed

16   or hurt, but to be more hard-nosed about it, they don't want the

17   production, the delivery schedule on an important contract,

18   disrupted.  You typically would not do a safety inspection on a

19   contract for water pitchers or something like that, but on a

20   major project that's important to the nation, you'd send in any

21   team to make sure that nothing's going to derail the schedule.

22   Q.    Thank you.  If you turn to Tab 12 in your binder, which is

23   Plaintiff's Exhibit 576.

24   A.    Yes.

25   Q.    This is the program management evaluation?

1    A.    Yes, sir.

2    Q.    Who conducted that program management evaluation, if you

3    can tell?

4    A.    As I recall, it was done by the Air Force, the customer

5    under this project.  I'm looking to see if there's any table of

6    attendees.  I don't see it, but it was an Air Force PME.

7    Q.    And if you'd turn to the page marked 79, Bates number

8    ending in 10.

9    A.    Yes, sir.

10   Q.    Directing your attention to the bottom of the page, there

11   was some discussion as to that last sentence that begins, "The

12   Lockheed Safety Assurance Program Plan, identified by document

13   number, stated that the Lockheed Propulsion Company will apply

14   the constraints of the following documents to accomplish

15   compliance with adequate assurance of safety."

16   A.    Yes, sir.

17   Q.    I guess if you could explain a little bit how this

18   requirement comes about.  At what time would the contractor be

19   notified that safety was going to be an aspect of the contract?

20   A.    Okay.  It's typically -- the regulation at this time was

21   the ASPR, the Armed Services Procurement Regulation.  There were

22   a variety of clauses and provisions.

23         Typically, this would be included in the solicitation.

24   As soon as the government hits the street with the request for

25   proposals, it basically says, okay, proposers, whichever of you

1   wins this contract, you will have to comply with X, Y, Z.

2   That's, for example, where they first reference Tab 2, the DoD's

3   contractor's manual.  You have to look at the DoD, they give the

4   number, current as of the date of this solicitation.

5        So it's fixed in time, and it's done so that contractors/

6   proposers, can look at it, decide whether to bid, and if to bid,

7   how much of a price they include in there, either an estimated

8   cost if it's a cost-reimbursement contract, or a fixed price, if

9   it's a fixed-price contract.

10       Did I answer your question?  I'm not sure if I did.

11  Q.   I think you did, because the idea was that it was in

12  advance of the contract.

13  A.   Yes.

14  Q.   My question is -- I guess what I'm getting at here is

15  Lockheed incorporated, it appears, according to this program

16  management evaluation on page 79, incorporated these manuals:

17  two Air Force manuals, a Lockheed Propulsion Company safety

18  manual, and an Air Force regulation.  I guess the -- it kind of

19  answers itself, but who created the Lockheed Safety Assurance

20  Program Plan?

21            THE COURT:  Oh, I can's guess.  Please.

22            MR. FOTOUHI:  I'm sorry?

23            THE COURT:  I think I know.  You can lead this

24  witness.  Let's move it along.

25            MR. JOHNSON:  Thank you, Your Honor.

1  BY MR. JOHNSON:

2  Q.   When the Air Force was conducting this inspection to

3  determine safety compliance, it's fair to say they were

4  measuring Lockheed's performance to Lockheed's promise as to

5  what they would do for safety.  Is that fair to say?

6  A.   Lockheed's promise and the contractual requirements.  And

7  the reason I make the distinction, the contractual requirements

8  are the benchmark.  It's not at all unusual for a proposer to

9  say we will go beyond the benchmark and give you better value

10  for your money.

11  Q.   Thank you.

12  A.   Did I answer your question?

13  Q.   I think you did.  If you turn to Tab 14, this is Lockheed

14  Propulsion Company's response to that program management

15  evaluation.

16  A.   Yes, sir.

17  Q.   Now, that was an inspection conducted by the Air Force.

18  Do you have any insight as to why Lockheed was responding to

19  Boeing?

20  A.   Privity.  They are the ones that Lockheed would be in

21  privity with, so basically everything would go though the prime,

22  the general contractor, to the government.  Normally, Boeing, if

23  they had disagreements with this, would hash it out with their

24  subcontractor before Boeing replies directly to the government.

25  Q.   So is Boeing the one that makes the determination whether

1    Lockheed Propulsion Company was in compliance with their quality

2    assurance plan?

3              THE COURT:  With whose quality assurance plan?

4              MR. JOHNSON:  I'm sorry, with Boeing's.

5              THE WITNESS:  Boeing would be the first one to make

6    that determination.  Obviously, if Boeing thinks they are in

7    full compliance but the government says, no, you're not,

8    ultimately it would be the government.

9    BY MR. JOHNSON:

10   Q.   And who would they inform that they disagreed?

11   A.   They would go through Boeing.

12   Q.   Now, turning to Tab 2, which is the DoD's contractor's

13   safety manual, Plaintiff's Exhibit 0007, this document was not

14   created for Lockheed Martin, correct?

15   A.   No, no.  This is a generic manual.  This would apply to

16   every contractor, every DoD contractor dealing with ammunition,

17   explosives and related, regardless of where or what type of

18   stuff they were working on.

19   Q.   Was the government required to inspect to ensure compliance

20   with this manual?

21   A.   No.  No.  The government is never required to inspect.

22   We have a right to inspect, not a duty to inspect.  The duty to

23   produce compliant goods and services and to comply with the

24   contract always rests with the contractor.

25   Q.   And if the contractor, in reviewing the requirements of the

1   DoD contractor safety manual, found that something could be

2   performed in a more effective way or in a safer way, is there

3   anything the contractor could do about that?

4   A.   Well, yes.

5            THE COURT:  He could get a waiver.

6            MR. JOHNSON:  Excuse me?

7            THE COURT:  He could get a waiver.

8   BY MR. JOHNSON:

9   Q.   And how would he do that?

10  A.   Request it, either an RFW, a request for waiver; or an RFD,

11  request for deviation.

12  Q.   And who would he request?  If it was Lockheed Martini in

13  the subcontract with Boeing, who would Lockheed Martin submit

14  that request to?

15  A.   They would send the request through Boeing, and Boeing

16  would forward it on to the appropriate office.

17           MR. JOHNSON:  Thank you.  I have nothing further,

18  Your Honor.

19           THE COURT:  Okay.  Anything else?

20           MR. MURPHY:  No, Your Honor.

21           THE COURT:  Thank you, sir.  You may step down.

22           THE WITNESS:  Thank you, Your Honor.

23       (The witness steps down.)

24           MR. SULLIVAN:  Your Honor, the United States calls

25  David Bauer.

1    THE COURT:  Okay.

2    **DAVID BAUER, WITNESS FOR THE DEFENDANT, SWORN**

3                    DIRECT EXAMINATION

4    BY MR. SULLIVAN:

5    Q.   Good morning, Mr. Bauer.

6    A.   Good morning.

7    Q.   Mr. Bauer, have you made a declaration of your direct

8    testimony in this case?

9    A.   Yes, I have.

10   Q.   And were your opinions in that declaration made to a

11   reasonable degree of scientific and professional certainty?

12   A.   Yes.

13   Q.   And do you adopt that declaration as your direct testimony

14   in this case?

15   A.   I do.

16           MR. SULLIVAN:  Thank you.

17                    CROSS-EXAMINATION

18   BY MR. FOTOUHI:

19   Q.   Mr. Bauer, good morning.

20   A.   Good morning.

21   Q.   Mr. Bauer, have you served as an expert for the

22   United States in cases other than this one?

23   A.   Yes.

24   Q.   In how many?

25   A.   The only one that I recall is AISLIC.

1   Q.   That's the American International Specialty Lines Insurance

2   Company case?

3   A.   Yes.

4   Q.   You hold a degree in chemistry from John F. Kennedy

5   University; is that correct?

6   A.   Yes.

7   Q.   Where is that located?

8   A.   It's in Walnut Creek, California.

9   Q.   Do you have any advanced degrees, Mr. Bauer?

10  A.   No.

11  Q.   Do you consider yourself a hydrogeologist, Mr. Bauer?

12  A.   No.

13  Q.   If we could turn to your affidavit -- it's opinion 3 of

14  your affidavit regarding the Redlands site.  Opinions 3 and 4

15  I'd like to look at.  Mr. Bauer, you state in opinion 3,

16  "LPC failed to properly train and/or supervise its employees to

17  make sure that solvents, including TCE" -- and I'm skipping

18  ahead -- "should be disposed of in the evaporation pits, not on

19  the ground at the Redlands facility."

20       Do you see where I'm reading?

21  A.   Yes.

22  Q.   Is that still your opinion today?

23  A.   Yes.

24  Q.   Opinion 4 says that, "As a result of LPC's failure to

25  properly train and/or supervise its employees, certain

```
1    maintenance mechanics, laboratory technicians, and other
2    personnel dumped quantities of TCE on the ground at numerous
3    locations at the Redlands facility, and discharged significant
4    quantities of AP-contaminated wastewater onto the ground at the
5    Redlands facility."  Do you see where I'm reading?
6    A.   Yes.
7    Q.   Is that still your opinion today, Mr. Bauer?
8              THE COURT:  He just adopted that affidavit.  You don't
9    have to ask all the opinions.  You didn't change anything at all.
10             THE WITNESS:  No, Your Honor.
11             THE COURT:  Move on.
12             MR. FOTOUHI:  Thank you, Your Honor.
13   BY MR. FOTOUHI:
14   Q.   When reaching those opinions, Mr. Bauer, did you take into
15   account the knowledge that those employees would have had at the
16   time of LPC's operations regarding TCE?
17   A.   The knowledge of the employees themselves that dumped it?
18   Q.   Yes.
19   A.   To a minor degree.
20   Q.   Whose knowledge -- did you take anyone's knowledge into
21   account other than the employees?
22   A.   Well, certainly the technical people at the site,
23   supervisory, management people, this type of thing.
24   Q.   And it's your view that those people would have known that
25   the appropriate way to dispose of TCE was in some means other
```

1   than on the ground?

2   A.   Yes.

3   Q.   And that goes from the mid-1950s to the mid-1970s.  Is that

4   your view?

5   A.   Yes.

6            THE COURT:  What do you mean "appropriate way"?

7   Appropriate for what purpose?

8            MR. FOTOUHI:  My question was about disposal, disposal

9   of TCE on the ground.

10           THE COURT:  I thought everybody agreed that that

11  wasn't the way to dispose it, put aside burn pits.  There's not

12  any issue about that.  Your own person said that would be wrong,

13  wrong, wrong, remember?  Oppliger?

14           MR. FOTOUHI:  I believe the concern that Mr. Oppliger

15  spoke about was TCE that included AP.

16           THE COURT:  He said you weren't supposed to take this

17  and put it on the ground.  I don't think anybody's advocating

18  that.  Whether they understood the consequences of it,

19  environmentally speaking, is another thing.  But you satisfied

20  me in your case that everybody agreed that wouldn't be

21  consistent with anything.  So I don't know what you're asking

22  him for.

23           MR. FOTOUHI:  Well, maybe it would be helpful if we

24  could look at a document, Your Honor.

25           THE COURT:  Go right ahead.  Your documents.

1    MR. FOTOUHI:  Yes, Your Honor.

2    THE COURT:  It was your witness that said that.  Okay.

3    You're not going to argue that it was okay to do what you

4    say they didn't do, right?

5    MR. MURPHY:  Your Honor?

6    THE COURT:  You are not going to take the position

7    here that it was okay if one assumes as a fact that people took

8    buckets and went *dump* outside, with either compound, or mixing,

9    that that was okay.  You said it didn't happen and that I should

10   look to the degreaser and I should look to other...

11   MR. MURPHY:  Your Honor, the question is that I don't

12   think we believe -- the question of whether certain employees

13   dumped amounts of solvents on the ground I don't think is

14   something we dispute.

15   THE COURT:  Right.

16   MR. MURPHY:  Right.  The question, though, is what did

17   they dump.  The question is whether anybody is culpable for

18   those activities at the time under the law.

19   THE COURT:  Culpable under CERCLA?

20   MR. MURPHY:  Yes, Your Honor.

21   THE COURT:  Sorry?

22   MR. MURPHY:  Yes, Your Honor.

23   THE COURT:  Because you're saying the issue is whether

24   the workers knew the environmental consequences?

25   MR. MURPHY:  Yes, Your Honor.  I think Dr. Feenstra

1   yesterday looked at safety data sheets from the time period,

2   from the '70s, talking about proper disposal methods for TCE and

3   other solvents, and that was to pour them on the ground at

4   certain points in time, bury them, burn them.  So at the time,

5   we're looking at the state of knowledge at the time period,

6   Your Honor.

7          THE COURT:  I'll go back and look.  I don't think he

8   suggested that anybody should be dumping things on the ground.

9          MR. MURPHY:  He presented testimony yesterday,

10  Your Honor, that Dow Chemicals, for example, who produced TCA at

11  the time was instructing users that a proper disposal method was

12  putting it on the ground or burning it, Your Honor, flushing it

13  to the ground.  So the question is whether there is a general

14  knowledge at the time that putting solvents in the ground was

15  bad, Your Honor.

16         THE COURT:  When you say "bad," that's the problem.

17  Are you defining bad from an environmental sense, or are you

18  just saying "bad"?

19         MR. MURPHY:  Well, bad from an environmental --

20         THE COURT:  Yeah, I understand.

21         MR. MURPHY:  At this site, Your Honor, I think there

22  was a recognition that solvents contaminated with propellants

23  could be a safety hazard.  So they were supposed to put solvents

24  that was contaminated in that manner into vat pits.  Whether or

25  not these employees followed proper procedures at the site or

1    not, I think that is obviously debatable, Your Honor, and

2    obviously I think there were procedures that prohibited that

3    type of activity.  The question, though, is whether their

4    activities were bad acts or culpable or there was some sort of

5    negligence involved.

6         THE COURT:  That is a vital inquiry.  Otherwise,

7    we'd have nothing to do here if it was based on negligence or

8    culpability.  That's why I keep saying to the government, why

9    are you bothering me with burn pans?  Lockheed's got to take it

10   one way or another.  I thought you said they didn't do these,

11   quote, bad things.

12        Now you're saying they're not bad from an environmental

13   point of view, and your witness testified about how it could not

14   be said that they were dumping TCE, it should be TCA, and that

15   they had proper procedures in terms of evaporation pits.  I've

16   been listening to all this testimony for days about the proper

17   procedures and why these employees have faulty memories.

18        Now you're going to tell me that the position is it's okay

19   what they -- assuming they did these sloppy procedures, and

20   that's okay too?

21        MR. MURPHY:  There's two questions, Your Honor.  One

22   is whether the sloppy procedures led to the groundwater plume we

23   have today.  We don't believe the sloppy procedures the

24   government is mentioning led to the groundwater plume we have

25   today.  We believe that, to the extent that these employees were

1    using other solvents, you would see those solvents in the

2    groundwater plume.  We don't.  We don't see them in the plume.

3            THE COURT:  That's a TCE argument.

4            MR. MURPHY:  Yes, Your Honor.  We believe that the

5    maintenance workers that we're talking about today were using

6    other solvents.  We'll talk with Dr. Sterrett about his opinions

7    on the dumping of TCE.

8        We also believe, Your Honor, that dumping at the time,

9    you have to put it in the context of the '50s, '60s, and '70s.

10   So you have to put it in the time period of understanding of the

11   state of knowledge at the time about proper handling techniques

12   of these solvents.  Yes, at this site, they were not supposed to

13   be dumping on the ground.  But at the same time, that was a

14   safety issue, not a groundwater issue, and we want to put it in

15   the proper context.

16           THE COURT:  Listen.  You have spent hours talking to

17   the last witness up here about how it was the safety issues that

18   they were looking at were not -- or they're saying the safety

19   issues we're looking at -- or you're saying safety for

20   explosion.  All of a sudden now, you're saying that these were

21   safety issues for explosion purposes.  It doesn't matter what

22   these workers intended to do or knew at the time.  I just --

23           MR. MURPHY:  Your Honor, yesterday, during

24   Mr. Sullivan's opening, he basically said we had a knowledge at

25   the time that what we were doing was going to contaminate the

1   groundwater, and we don't believe that to be true.  And that was

2   a big part of his presentation, Your Honor, about what we knew

3   and what we should have known at the time.  And that is part of

4   their argument about why should we be held more liable here.  So

5   we want to put the understanding of the time --

6   THE COURT:  So are we in a situation -- Dr. Feenstra

7   doesn't rely on the on-the-ground testimony of these people.

8   They're confused about what it was; therefore, there's no

9   causation, so I shouldn't credit their testimony.

10  And now you're saying, but if in the event that I do credit

11  it, we should put it in the context of they're not really evil

12  people.  I don't think they're evil people, and I don't think

13  that's what CERCLA's all about.  If they dump the stuff there

14  and one decides that it contributed, even if they dump the TCA,

15  I suspect, under the law, that's a problem.

16  MR. MURPHY:  Your Honor, correct.  Again, though,

17  we're talking about the government's argument's here that these

18  employees' activities were the sole cause of this plume.

19  THE COURT:  I don't think I have make a finding one

20  way or another about that.  We're not in a negligence case.

21  We're in a strict liability context.

22  MR. MURPHY:  We agree, Your Honor.  We're responding

23  to arguments that have been raised by the government on these

24  issues.  This is their experts who has come in and said that

25  somehow we should have known about groundwater.  So that is what

1    we're dealing with on this issue.

2             THE COURT:  Well, make it short.

3             MR. MURPHY:  Okay.  Thank you, Your Honor.

4             THE COURT:  I'm not so much concerned that you should

5    have known that what you were doing was going to pollute the

6    groundwater.  I do care whether what you *did* do polluted the

7    groundwater.  I'm with the person who just testified, Mr. Nagle.

8    There's a lot of metaphysical wasted time.  Okay.  Go ahead.

9    BY MR. FOTOUHI:

10   Q.  Mr. Bauer, may I direct your attention to Tab 1 in your

11   binder.

12            MR. FOTOUHI:  Your Honor, this is a document that's a

13   brief filed by the United States in another matter in federal

14   district court on a similar issue.  It's not numbered.  We'd

15   like to request your permission to insert it as an exhibit in

16   this case as Plaintiff's Exhibit 2059.

17            THE COURT:  Tab 1?

18            MR. FOTOUHI:  Yes, Your Honor.

19            THE COURT:  Any objection?  Plaintiff's Exhibit --

20            MR. SULLIVAN:  Your Honor, this is the first time

21   we've ever seen this.  I have no idea what it is.

22            MR. FOTOUHI:  Your Honor, it's drafted by the

23   United States.  We pulled it from the docket of this case.

24            MR. SULLIVAN:  It's 2001.  I know nothing about it.

25            THE COURT:  Right, but it is by the government.

 1          Go ahead.

 2                  MR. SULLIVAN:  And it's irrelevant.

 3                  THE COURT:  That may be.  Go ahead.  Ask him.

 4                  MR. FOTOUHI:  Thank you, Your Honor.

 5     BY MR. FOTOUHI:

 6     Q.   Mr. Bauer, are you familiar with the Camp Lejeune Marine

 7     Corps base in North Carolina?

 8     A.   No.

 9     Q.   Mr. Bauer, let me direct your attention to page 3 of this

10     document.

11     A.   Go ahead.

12     Q.   On page 3, at the bottom, the document reads -- and again,

13     this is the brief of the United States in this matter filed in

14     federal court.  "It is undisputed that the plaintiff's

15     allegations of negligence, in particular, pouring the solvents

16     onto the ground or into barrels, even if true, could not have

17     violated any standard of care in existence prior to or during

18     the time the Snyders lived at Camp Lejeune in the early 1970s."

19          Mr. Bauer, do you agree with that statement?

20     A.   I can't even find it in the document in front of me.

21     The screen here is hard for me to read, but page 3 here is very

22     different on the document I have than what you're showing.

23                  MR. FOTOUHI:  I'm sorry.

24                  THE COURT:  I'm sorry, I don't think it's coming out

25     with page 3.

1          MR. SULLIVAN:  Your Honor, I have a question.

2     Was this ever on their exhibit list?

3          MR. FOTOUHI:  It's rebuttal.

4          THE COURT:  It's cross-examination.

5          MR. FOTOUHI:  I think I've directed Your Honor to the

6     wrong Tab.  My intent was to direct you to Tab 2.  I apologize.

7          Your Honor, Tab 2 is a brief filed by the United States in

8     a different matter in 2006 in federal district court, Southern

9     District of Mississippi.  We would request permission to use

10    this document and mark it as Plaintiff's Exhibit 2060.

11         THE COURT:  Okay.  Admitted.  2060, over objection.

12         MR. SULLIVAN:  Your Honor, I also object because this

13    took place in North Carolina, not California.  Different laws.

14         THE COURT:  Right.  Overruled.  I'm admitting

15    Plaintiff's Exhibit 2060.

16                              (Plaintiff Exhibit No. 2060

17                               received into evidence.)

18         THE COURT:  At what page do you want the witness to

19    look at?

20         MR. FOTOUHI:  Page 3, Mr. Bauer.

21         THE WITNESS:  I'm there.

22    BY MR. FOTOUHI:

23    Q.  At the bottom of page 3, the section I just read, "It is

24    undisputed that plaintiff's allegations of negligence, in

25    particular, pouring the solvents onto the ground or into

1    barrels, even if true, could not have violated any standard of

2    care in existence prior to or during the time the Snyders lived

3    near Camp Lejeune in the early 1970s."   That continues onto

4    page 4 of the document.

5         Mr. Bauer, do you agree with that statement?

6    A.   I'm trying to figure out what it's all about.  I don't know

7    what VAV is, and that seems to be critical to it.

8    Q.   Let's continue to read.  Mr. Bauer, let me direct your

9    attention to page 18 of this document.

10             THE COURT:  This is a federal tort claim case?

11             MR. FOTOUHI:  It is, Your Honor.

12             THE WITNESS:  Okay.  I'm on page 18.

13   BY MR. FOTOUHI:

14   Q.   Mr. Bauer, in the middle of the page, do you see that

15   there's a block quote from a case, Bolinder v. United States?

16   A.   Okay.

17   Q.   The second paragraph of that block quote reads, "Because

18   there was generally no recognition that TCE posed a danger to

19   the environment until the mid-1970s, it was standard practice in

20   the military and in private industry to dispose of TCE and other

21   solvents through the use of ponds, lagoons, conveyance ditches,

22   and other methods."

23             MR. SULLIVAN:  Your Honor, I'm not sure I have this in

24   my binder.  I can't find page 18.

25             MR. FOTOUHI:  It's ECF page 24 of 27.

```
 1              THE COURT:  He's referring to the bottom page number.
 2              MR. SULLIVAN:  Is this Tab 1?
 3              MR. FOTOUHI:  It's Tab 2.
 4    BY MR. FOTOUHI:
 5    Q.   Mr. Bauer, do you agree with the position that the
 6    government took in this case -- I'm sorry.  Let me rephrase.
 7    Mr. Bauer, do you agree with the position of the court in
 8    Bolinder that there was no general recognition that TCE posed a
 9    danger to the environment until the mid-1970s?
10              THE COURT:  Wait.  When you say Bolinder --
11              MR. FOTOUHI:  Yes, Your Honor.  In the middle of the
12    page, on page 18, the government's brief in this case quotes
13    from a case captioned Bolinder v. United States.
14              THE WITNESS:  It generally means the overall public,
15    this type of thing.  Then I would have to agree with that.  But
16    I don't think it's correct from a scientific standpoint at all.
17    BY MR. FOTOUHI:
18    Q.   That quote appears to say, "It was standard practice in the
19    military and in private industry to dispose of TCE and other
20    solvents through the use of ponds."  Do you see that?
21    A.   Yes.
22    Q.   Is that your understanding?
23    A.   No.
24    Q.   Was it common practice to dispose of TCE in lagoons?
25    A.   Ponds and lagoons are similar enough that I would say no.
```

1    Q.   And in conveyance ditches?

2    A.   I don't know what a conveyance ditch is for sure, but if

3    that just means on the ground and it means liquid TCE, I would

4    say no.

5    Q.   Mr. Bauer, may I direct your attention to page 19 of this

6    document.

7    A.   Okay.

8    Q.   Mr. Bauer, the first full paragraph on page 19 reads,

9    "The only expert who has offered an opinion on this issue is

10   Davis Ford, Ph.D., PE.  Are you aware of a Mr. Davis Ford,

11   Mr. Bauer?

12   A.   I know who he is.

13   Q.   "An environmental engineer with over 40 years of experience

14   as a practicing engineer and educator."

15       Skipping down, specifically he noted that, "The disposal of

16   PCE or TCE by applying on the ground and letting evaporate was

17   common practice throughout the period from 1940 until 1973,

18   followed manufacturers' recommendations, and was not at variance

19   with state or federal regulations."

20       Mr. Bauer, do you agree with Dr. Ford's conclusion in this

21   brief?

22   A.   If he had been talking about residues and still bottoms,

23   this type of thing, I would accept that, but not as liquids.

24   Residues, it was common to allow residues complete evaporation

25   on the ground.  It was not common for liquids.

1    Q.   There's a quote from presumably Dr. Ford's expert report on

2    behalf of the United States in this case.

3            THE COURT:  It's your position that in the '60s, that

4    people in the scientific community or in the military community

5    knew that liquid TCE and/or AP could cause groundwater

6    contamination?

7            THE WITNESS:  I can't speak to the military,

8    Your Honor.  I have limited experience there.  But I would say

9    in industry in general, an understanding of the physical

10   chemical properties material which governs --

11           THE COURT:  You have to speak in the mic so he can

12   hear you.

13           THE WITNESS:  I'm sorry.  A knowledge of the physical

14   and chemical properties of virtually any material that was being

15   used, where it's known, and those properties determine the

16   impact that material has in an environmental setting, and with

17   that knowledge, you can predict it.

18       The case we're talking about here, with highly pervious

19   soil materials over an aquifer, you knew that these type of

20   materials would percolate.  There's no question about it.

21   All you had to do is look at the material, look up the

22   characteristics, and go.  The fact that you didn't have

23   documentation of groundwater pollution miles, sometimes tens of

24   miles, from point of disposal is irrelevant.  You knew it would

25   happen.

```
1              THE COURT:  Who is the "you" know that it would
2     happen?  That fact that it would seep in there, I mean, that
3     seems to be common sense.
4              THE WITNESS:  Yes.
5              THE COURT:  It's a recognized environmental hazard.
6              THE WITNESS:  Yes.
7              THE COURT:  You say that that was commonly understood
8     among environmental scientists or somebody back in the '60s?
9              THE WITNESS:  Well, you didn't have people that called
10    themselves environmental scientists in '40s, '50s, and even into
11    the '60s; not until the '70s.  You have professionals who deal
12    with chemical engineering, chemists, some civil engineers, and
13    all you really need to understand is that gravity works.
14             THE COURT:  Well, I understand that gravity works, but
15    there are a lot of things.  You know, they used one of these
16    things -- I can't remember whether it was TCE -- to take out
17    caffeine from coffee.  Now, you tell me the regulators or,
18    I don't know, chemical engineers or whoever it is understood
19    that this could be a cause for concern?  I mean, you're eating
20    it at that point.  You don't have to worry about getting it in
21    the water and drinking it.
22             THE WITNESS:  My question is, is there cause for
23    concern, because the decaffeination of coffee with corn
24    insolvent leaves a very tiny residue in the coffee, and if you
25    heat the coffee to brew it, Henry's law will tell you
```

1   specifically that that material evaporates.  It's not in the

2   coffee when you drink it.  If you were chewing the coffee,

3   I suppose, you might get a minor, minor dose, but not if you're

4   brewing coffee and it's hot and you're drinking it.

5              THE COURT:  So what is your main source of this

6   opinion?  What do you rely on?

7              THE WITNESS:  The main source, personal experience and

8   knowledge and chemical research.

9              THE COURT:  Is there literature that you can point to

10  from back then to say don't let TCE or AP or even TCA percolate

11  into the ground near a water basin?  Is there something that

12  says that?

13             THE WITNESS:  I don't think there's anything that's

14  that specific.  The problem we have is, if we basically wait

15  until something happens and we say we don't understand it until

16  the government tells us that something is bad, chemical by

17  chemical, there are over a hundred thousand chemicals in

18  commerce in the United States.  Very, very few of them have

19  specific quantity restrictions on them.  Many of them have

20  tremendous potential for groundwater potential pollution

21  particularly.  If we wait until that pollution happens, we're

22  missing the whole thing.

23             THE COURT:  Well, of course.

24             THE WITNESS:  I would suggest that the --

25             THE COURT:  Yeah, but the question, that's always the

1    case.  You're trying to attribute fault out of the level of

2    culpability on the grounds that somebody should have known that

3    these things you should have -- for instance, I assume it's your

4    opinion they should have used pans and not burn pits back then.

5              THE WITNESS:  For liquids.

6              THE COURT:  And that's with 20/20 hindsight we now

7    know that pits were not effective in preventing leeching, or

8    what is it that --

9              THE WITNESS:  Well, I don't think there's even any

10   suggestion that pits were effective.

11             THE COURT:  But was it known then?

12             THE WITNESS:  Of course it was.  I would suggest --

13             THE COURT:  Is there a piece of literature that says

14   that?  Is there something besides --

15             THE WITNESS:  Something that you have seen that I

16   heard testified the other day, the R.J. case, when the two

17   compounds were called out to the regional board, Colonel

18   Galinisky asked three other professionals what he thought about

19   it.  Those professionals looked at the physical chemical

20   properties of the material, without any groundwater data or

21   anything else, and said, hey, this is going to create a problem

22   based on the physical chemical properties of those materials

23   alone.  That's all you need to do.

24        Chlorinated solvents, there's hundreds of them.  Almost all

25   of them are more dense than water.  Some of them have very low

vapor pressures, and when they get in the soil, they just go

down.  Again, gravity works.  So if there's groundwater down

there, it's not an issue as to will it get to groundwater; it's

how long will it take.

THE COURT:  Well, we know that nitrates come from the

earth, farming sites, into the water.  I don't know when we

discovered this, but in hindsight we blew it.  Right?

THE WITNESS:  And we continue to.

THE COURT:  Well, that may be, but your point is that

throughout, we missed the boat.  But is that because everybody

knew what you knew?  He's just shown you some documents that the

government argued exactly the opposite, at least back in the

relevant time period.

A court can't impose culpability, so to speak, nor does

it need to worry about it, frankly, under CERCLA.  There's a

standard of care for culpability.  It's not just some educated

people, more professional than others, understand what other

people haven't come to understand, including the federal

government; and the EPA I know didn't exist, et cetera.

I don't know what standard of care you're asking me to

apply, Mr. Sullivan.  I mean, it matters.  In a case, in a

lawsuit, if you're suing Lockheed for negligence, you'd have to

come up with a standard of care.  He's not talking about that

standard of care.

MR. SULLIVAN:  I'm talking about -- the standard of

care I'm talking about are what the civil engineers, the Water
Board, and the public in California knew in the 1950s, and '40s,
based upon things like the Montebello incident and things like
that, that caused Mr. Dickey to do a study of groundwater
contamination problems.

That's what we're talking about, plus the fact that
Lockheed was warned flat-out by the City of Redlands that you
are operating your plant at a place where we are right next to
your buildings injecting water into the ground for drinking
water.

THE COURT:  Okay.  Your field is civil engineering?

THE WITNESS:  No.  I was trained and worked for eight
years as a research chemist in 1947.  I started doing
environmental work for Dow Chemical, and I've done that ever
since for 47 years.

THE COURT:  And Dow Chemical produced most of these
things.

THE WITNESS:  They're one of the producers, yes.

THE COURT:  And you would be able to say that in 1960,
from a reasonable degree of scientific certainty -- that's what
a breach of a standard of care is -- that Lockheed breached the
standard of care with respect to their disposal of waste.

THE WITNESS:  On a pervious soil over a used aquifer.

THE COURT:  From where do you derive the standard of
care?  Don't forget, it has to be the standard of care at the

1    time, not now.

2              THE WITNESS:  No, I understand.

3              THE COURT:  And what is your basis for the national

4    standard of care?  That's what it is.

5              THE WITNESS:  Standard of care is based on classes of

6    compounds, the physical chemical properties of those compounds,

7    and what you know their impact will be on the environment.

8    There are some places that you can do some things, there are

9    other places you can't.  It's very site-specific.

10             THE COURT:  Does that exist in any of the scientific

11   literature that one would rely on, is what I'm saying.  At the

12   time, obviously.

13             THE WITNESS:  Well, I think you can actually go back a

14   long ways.  One of the things I relied on my entire professional

15   career is Jack McKee's water quality criteria, and most

16   particularly in his water quality criteria where he talks about

17   impacts to groundwater and the problem with groundwater is that

18   if you impact it, you may not discover it for a long time,

19   decades before somebody off your site knows you did it, and that

20   it's going to take longer to clean it up, if it's possible to

21   clean it up, than it did to pollute it.  Jack McKee goes through

22   that and the problems with groundwater with respect to the

23   discovery of groundwater contamination, cleanup of contamination.

24   As a result, they're basically saying, don't do it.

25             THE COURT:  Is it your position that they should have

1    found a different site?

2              THE WITNESS:  No.  I think you could have operated on

3    this site, but you had to be really, really careful.

4              THE COURT:  So if I look at -- I know there's been

5    reference to McKee before.  That is the basis for your testimony

6    to a reasonable degree of certainty, that that would be the

7    required standard of care for someone that's operating on this

8    site.

9              THE WITNESS:  That's one, Your Honor.  There are many

10   others.

11   BY MR. FOTOUHI:

12   Q.   Mr. Bauer, you referenced McKee's reports.  Are those from

13   1952 and 1963?  Are those the reports you're referencing?

14   A.   I believe so.  He wrote several volumes.  That was a best

15   seller, I might add.  Everybody I knew in the '60s had a copy of

16   them.

17   Q.   In his 1952 report, it makes no mention of TCE, does it?

18   A.   It doesn't.  I don't think it does, no.

19   Q.   In the 1952 report, McKee makes no mention of perchlorate,

20   does it?

21   A.   I don't believe it does.

22   Q.   Did that change in the 1963 version?

23   A.   I'm not sure he ever does.  He calls out several hundred

24   compounds based on their known aquatic toxicity.  That was a key

25   criteria.  He was looking for aquatic toxicity data to see how

1    much it killed fish or some types of snails, this type of thing.

2    I'm not sure that data existed.  I'm not sure it even exists now.

3    Q.   Let's turn to page 19 of the document.  We were reading

4    from the quote in the brief of the government's expert,

5    Dr. Davis Ford, and it's the block quote in the middle of the

6    page:  "There was no reason for industry or the military to

7    focus in on TCE, PCE, or other chlorinated solvents prior to or

8    during the alleged period of exposure in this case, 1970 to

9    1972."  Mr. Bauer, do you agree with that statement?

10   A.   I don't know what he's referencing to, but as to why you

11   would focus in, it depends entirely upon how they're using it,

12   and I don't know that.

13   Q.   The next sentence says, "There were no prior reports of TCE

14   or PCE groundwater contamination."  Mr. Bauer, isn't it the case

15   that from the period of 1970 to 1972, there were no reports of

16   TCE groundwater contamination in the United States?

17   A.   No, that's not true.

18   Q.   Okay.

19             THE COURT:  Why not?

20             THE WITNESS:  Because their reports of TCE groundwater

21   contamination, in several reports that were done by a committee

22   called EC4.  One of those areas of chlorinated solvent, it was

23   probably PCE contamination, was in Lemon Grove, California, and

24   I believe that's --

25             THE COURT:  EC4?

1       THE WITNESS:  EC4 was a committee -- I can't even

2   think of the parent group -- that dealt with pollution and

3   surface groundwater.

4       THE COURT:  Is PCE contamination the same thing as TCE?

5       THE WITNESS:  It would be very similar.  They're both

6   chlorinated solvent.  PCE has greater density and less solubility.

7       THE COURT:  Can I ask perhaps a very simplistic

8   analogy?  I remember Rachel Carson talking about DDT.  Are you

9   saying that prior to that sort of scientific breakthrough that

10  it would have been, by big agriculture, a breach of the standard

11  of care to be using DDT?  I'm just trying to understand your

12  position.

13      THE WITNESS:  What Rachel Carson laid out was the

14  misuse and the overuse of DDT and the impact it had on the

15  environment.  Even after that, we didn't ban it in this country

16  for --

17      THE COURT:  We did not what?

18      THE WITNESS:  We did not ban the use of DDT for

19  another 11 or 12 years.

20      THE COURT:  But I'm just trying to figure out,

21  prior to her bringing it to public consciousness, exactly what

22  standard of care am I holding people to.

23      THE WITNESS:  I think her book particularly raised

24  tremendous public awareness, as you know.  She has one chapter,

25  I think it's chapter 3, that talks about underground or

```
 1   groundwater pollution from sources far remote from the point of

 2   origin.  One of the materials that she talked about was not

 3   perchlorate; it was sodium chlorate at the Rocky Mountain

 4   Arsenal near Denver, Colorado.  It was percolating miles, and it

 5   was contaminating water to the point you could no longer raise

 6   green crops.

 7              THE COURT:  What year was this?

 8              THE WITNESS:  She published it in 1962.

 9              THE COURT:  All right.  Go ahead.

10   BY MR. FOTOUHI:

11   Q.   Mr. Bauer, you make no mention of the EC4 that you just

12   spoke about with Your Honor in your affidavit; is that correct?

13   A.   Probably not.

14   Q.   And you make no mention of Rachel Carson's book or --

15              THE COURT:  I asked him that.  Of course not.  Why

16   would he?  You can't blame him for not mentioning that.

17              MR. FOTOUHI:  Understood, Your Honor.

18   BY MR. FOTOUHI:

19   Q.   In terms of sodium chlorate that you just mentioned, that's

20   not discussed in your affidavit, is it?

21   A.   It's not.

22              THE COURT:  Everything he knows can't be in the

23   affidavit.  Otherwise, I'd never get here.

24              MR. FOTOUHI:  Yes, Your Honor.

25              THE COURT:  It has no probative value.
```

1    MR. FOTOUHI:  Your Honor, the 1963 version of McKee

2    that we were speaking of earlier is Plaintiff's Exhibit 1313.

3    BY MR. FOTOUHI:

4    Q.   Mr. Bauer, turning back to page 19 of the government's

5    brief behind Tab 2 in your binder, Dr. Ford continues to say --

6    or a quote from Dr. Ford's report continues to say, "TCE and PCE

7    were not regulated constituents.  TCE was not considered a

8    health risk except from large atmospheric exposures, and there

9    was not even a drinking water standard for TCE or PCE until

10   1989."  Mr. Bauer, is Dr. Ford correct in that conclusion?

11   A.   Well, it had an industrial hygiene standard for exposure in

12   the workplace that was fairly low, but, yeah, you could kill

13   people if you got it high.

14   Q.   And that's exposure to vapor?

15   A.   That's exposure to vapor.  I don't know anybody who would

16   be willing to drink it.  That's a test I would not like to see

17   applied, but that would do you in.

18       With respect to drinking water standards, that's right, but

19   recognize we have very few drinking water standards.  As an

20   example, we still don't have a drinking water standard for

21   strychnine, and I think that's fairly toxic.

22   Q.   Continuing on, Dr. Ford writes -- my apologies.  The

23   brief states that Dr. Ford wrote, "TCE and PCE were not target

24   compounds in the scientific literature, university curricula,

25   textbooks, or the regulatory agencies throughout the 1940s,

1    1950s, 1960s, and early 1970s."

2         Mr. Bauer, do you have any reason to doubt that Dr. Ford is

3    not correct about this?

4    A.   Not really.

5    Q.   Then the brief continues, no longer in the block there but

6    just right under it on page 19, "Therefore, land application of

7    TCE, PCE, and other solvents was widely practiced and accepted

8    by knowledgeable people, regulatory agencies, and the industrial

9    and military sectors, based on the belief that it would be

10   harmlessly evaporated to the atmosphere."

11        Mr. Bauer, is it your contention that Dr. Ford is incorrect

12   when he states that it was the belief at the pertinent time that

13   he discussed that TCE discharged to the land would harmlessly

14   evaporate to the atmosphere?

15   A.   If they're discharging liquid, I think he's wrong.

16   Q.   You think he's wrong if you're discharging TCE in liquid

17   form?

18   A.   Yes.

19   Q.   What's your basis for that statement?

20   A.   Because that's not what happens.  In the area where we're

21   talking about here where it's highly pervious, it goes down very

22   quickly.  We have all kinds of depositional testimony that

23   confirms that.  If you're discharging it on an impervious slab

24   and allowing it to evaporate, yes, it will.  I don't know how

25   harmless that is, but yes, it will evaporate, but not when

1   you're putting it on soil.

2   Q.   Dr. Ford doesn't refer to this as discharging on an

3   impervious slab; isn't that right?

4   A.   Correct.

5   Q.   He refers to it as land application, correct?

6   A.   That's why I disagree with him.

7   Q.   Let's look at paragraph 38 of your affidavit, Mr. Bauer.

8   I believe that the very first tab in your binder is a copy of

9   your affidavit.

10   A.   Paragraph 38?

11   Q.   Yes.

12   A.   Go ahead.

13   Q.   You state that "Section 1502(b) of the 1968 DoD Safety

14   Manual, which addresses collection and destruction standards for

15   ammunition and explosive materials, states that when sumps,

16   settling beds, or leeching pits are used, precautions shall be

17   taken to ensure that no contaminated wastewater will enter or

18   pollute potable sources of water by percolation through the soil

19   as the result of poor or inadequate treatment.  The 1951

20   Department of the Army Ordnance Safety Manual contains the same

21   language."  Do you see where I just read?

22   A.   I do.

23   Q.   Now may I direct your attention, Mr. Bauer, to the document

24   that's behind Tab 3 in your binder.

25          MR. FOTOUHI:  Your Honor, this is another brief filed

1   by the United States in the same case, <u>Snyder v. United States</u>.

2   We request permission to include it as an exhibit, Plaintiff's

3   Exhibit 2061, I believe.

4           MR. SULLIVAN:  Your Honor, objection.

5           THE COURT:  Same reason as before.  Overruled.

6                         (Plaintiff Exhibit No. 2061

7                          received into evidence.)

8           THE COURT:  Don't read it all to him.  Just tell him

9   what page and paragraph.

10          MR. FOTOUHI:  I apologize, Your Honor.  Could we turn

11  to page 9 of this document.  It's the first full paragraph of

12  page 9.  Again, this is another brief filed by the government in

13  the same case.

14  BY MR. FOTOUHI:

15  Q.   Mr. Bauer, as this brief states, is your reliance on a

16  military manual speaking about sort of aspirational terms about

17  pollution and preventing pollution, is it "immaterial unless a

18  party can raise an issue of material fact regarding knowledge

19  that this pollution could occur through TCE or PCE disposal

20  practices"?

21  A.   I'm not sure I even understand what your question is.

22          THE COURT:  He's not a lawyer, overruled.

23          Sustained.  I mean I sustain my own objection.

24          (Laughter)

25          MR. FOTOUHI:  I'll move on, Your Honor.  I apologize.

1          THE COURT:  When you look at the DoD safety manual,

2     the witness who testified before you sort of used them as

3     generic and more concerned about hurting people through fire and

4     explosions.  Do you view this as an environmental precaution

5     that's mandatory?

6          THE WITNESS:  I always have. If you're saying you can't

7     pollute groundwater, I think that's pretty much a mandatory

8     statement.  I don't think there's a lot of give in that.

9          THE COURT:  That's a loaded statement.  You cannot

10    pollute groundwater, I agree, but what pollutes it and how much

11    and all the rest is where the issues are here.  I'm not sure

12    anybody intended in the sense of -- well, that's contested, too.

13    But is this any more than -- he used the word authoritory --

14    statement of don't pollute the groundwater?

15          THE WITNESS:  It's --

16          THE COURT:  I mean, is this at a level of generality:

17    don't kill people, don't pollute the groundwater, don't let a

18    rocket go down in the middle of Burbank?

19          THE WITNESS:  All very good ideas.

20          THE COURT:  Right.  We all accept those.

21          THE WITNESS:  I agree.  The concept that I'm saying

22    here is understand what you're doing.  Now you're dealing with

23    concentration and mass of material and the specific environmental

24    setting.  If you bring those things into play, as discussed

25    before, then you can say, well, I'm not polluting groundwater.

1    This material leaks from this concrete pit on the order of

2    two or three gallons a day of water with some material in it,

3    that might be okay.  But if I've got straight chlorinated

4    hydrocarbon and it's leaking at two or three gallons a day, now

5    I've got a problem.  So it requires you to basically verify that

6    you were not polluting groundwater.

7         THE COURT:  But if there was no test for testing the

8    groundwater, how do you know back then?  That's what I'm

9    troubled by.

10        THE WITNESS:  Oh, you can test groundwater.  You could

11   test groundwater then if you chose to, right next to the

12   facility, to understand what you're doing.

13        THE COURT:  You could have found the TCE or TCA or the

14   AP in the groundwater in 1965?

15        THE WITNESS:  Close to the facility, categorically.

16   No problem at all.

17        THE COURT:  Well, the plume seems to have traveled

18   somewhere else.

19        THE WITNESS:  Yes, it does.  But at the point of

20   contact where it's leeching into the groundwater, the

21   concentration would be many, many times higher.  There would be

22   no problem finding it.

23        THE COURT:  And there was a test available that would

24   have been at the level of...

25        THE WITNESS:  There has been, Your Honor.  Since these

materials were first created in the 1800s, we've been able to
analyze them.  That, frankly, at the time was considered very
low levels.  Now we're looking at parts per trillion, for
heaven's sakes, but parts per million, not a problem in the
world.  You'd find it.

THE COURT:  And let's assume they did the test.  They
found parts per million that would have said to a reasonably
well-educated scientist -- I'm not sure exactly what specialty
we're talking about in 1960 -- that you're following practices
that are contaminating the groundwater.

THE WITNESS:  Well, it's even more than that.  If I
have a groundwater sample and I basically smell it and it almost
knocks me down, I know I'm not going to drink it.  I know that's
contaminated.  That's likely what you're going to have at that
point in time next to the facility when it hits the groundwater
there.

The point is, now we're finding it five, six miles away.
There's a lot of degradation that's taken place over 30 years.
The concentration is reduced somewhat by dilution, this type of
thing.  Close to the source, there's never been a time when you
couldn't find it.

THE COURT:  Was the water purified before it becomes
drinking water?

THE WITNESS:  In this case, I think all they did was
chlorinate it.

1    BY MR. FOTOUHI:

2    Q.    Dr. Bauer, TCE groundwater contamination was not located at

3    the Aerojet site until 1979; isn't that correct?

4    A.    I'm not -- yeah, I think that's right; I'm not real sure.

5    Okay, Aerojet in '79 -- at the Aerojet site or offsite.  I think

6    offsite it was located in '79.  At the site, it's a matter of

7    when they took a sample.  Anytime they took a sample, they would

8    have found it.  Offsite is a different issue altogether.  It

9    takes a while.  Concentration goes down.  But I think '79 is the

10   date they usually use.

11   Q.    But your view is that onsite it was found before 1979.

12   A.    No, I'm not sure it was.  I'm not sure they sampled it

13   onsite before that time.  That's really what I'm saying.  I'm

14   saying, had they sampled it onsite before that time, it would

15   have been much easier to find in much, much higher

16   concentrations than they found out in the communities later.

17   Q.    And perchlorate was not found at the Aerojet site until

18   1985; isn't that right?

19   A.    Again, I think it was found offsite, not onsite.  It was in

20   the drinking water area where the water was actually being

21   extracted for use, not onsite.

22   Q.    Well, and isn't it true that before 1997, there was no test

23   for perchlorate at a concentration below 400 parts per billion;

24   isn't that right?

25   A.    But if you were sampling onsite, 400 parts per billion was

1    no problem at all.

2    Q.   Well, that's not my question, Mr. Bauer.

3    A.   It would have been much higher.  Yes, that was the standard

4    at that point in time.  I think about a part per million would

5    have been readily detectible, oh, probably in early '50s, maybe

6    even before that.  But I think, generally, they didn't see 400

7    parts per billion until later.

8    Q.   In the Redlands AP plume, there's no concentration above

9    400 parts per billion; isn't that right?

10   A.   In that detached plume five miles away, yes, that's correct.

11   Q.   Well, there's no concentration of AP above 400 parts per

12   million at the Redlands site, is there?

13   A.   I can't recall any groundwater data at all on the site.

14   If it's there, I don't recall it.

15   Q.   Your recollection is that there's no groundwater data taken

16   at the Redlands site?

17   A.   I'm not coming up with something in my head right now.

18   Q.   Let's turn to the document that's behind Tab 5 in your

19   binder.  It's Plaintiff's Exhibit 966.

20           MR. FOTOUHI:  This is also in Lockheed Martin's trial

21   binders behind the Stan Feenstra affidavit, Your Honor.

22           THE COURT:  It's in this one I'm looking at?

23           MR. FOTOUHI:  It is, Your Honor.  It's Tab 5 in the

24   witness binder.  Yes, Your Honor.

25           THE WITNESS:  This is -- okay.  I've got it.

1    BY MR. FOTOUHI:

2    Q.   Mr. Bauer, have you seen this document before?

3    A.   Probably.

4    Q.   Do you remember seeing it when I showed it to you at your

5    deposition?

6    A.   No.  I'm trying to forget my deposition.

7            THE COURT:  How do you think *I* feel?

8        (Laughter)

9            THE WITNESS:  I'm sure I've seen it before.  This is

10   a material safety data sheet.  I'm looking for a date on it.

11   '71, okay.  I've got it now.

12   BY MR. FOTOUHI:

13   Q.   And you worked for Dow; is that right?

14   A.   Yes.

15   Q.   At the Pittsburg, California, facility?

16   A.   Yes.

17   Q.   What time period did that span?

18   A.   I worked for Dow from 1962 till early 1978.

19   Q.   Okay.  Let's take a look --

20           THE COURT:  Did Dow put any warnings on any of its

21   products that said, you know, make sure it doesn't go into the

22   groundwater?

23           THE WITNESS:  The product sheets they put out,

24   the basic product data sheets included a host of material --

25   physical chemical data, how to handle it, this type of thing --

1     and all of those had a section towards the end that gave general

2     advice on waste disposal as well.

3          THE COURT:  It did?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.  We have to take a break.  I have a

6     luncheon appointment at quarter of and then a meeting at 1:30.

7     So we'll come back quarter of 2:00 please.  And tomorrow we have

8     to start late due to a dentistry problem.  We'll start at 10:00.

9          THE WITNESS:  I'm sorry.

10         THE COURT:  I know.  I think it's caused by the TCE.

11     (Laughter)

12         THE COURT:  Okay, thank you.  Have a good lunch.

13     (Lunch recess taken at 12:35 p.m.)

**INDEX**

**WITNESS:**                                                              **PAGE:**


James F. Nagle:          Continued Cross-Examination.......... 1002
                         Redirect Examination................. 1054

David Bauer:             Direct Examination................... 1066
                         Cross-Examination.................... 1066

\* \* \* \* \*



**EXHIBITS RECEIVED**

Plaintiff Exhibit No. 2060 ............................... 1077
Plaintiff Exhibit No. 2061 ............................... 1095

\* \* \* \* \*



CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that

the foregoing pages are a correct transcript from the record of

proceedings in the above-entitled matter.


                         *Bryan Wayne*
                         _____
                         BRYAN A. WAYNE

## $

**$100** [1] - 1044:13
**$70** [1] - 1004:5

## '

**'40s** [2] - 1082:10, 1086:2
**'50s** [3] - 1073:9, 1082:10, 1100:5
**'60s** [5] - 1073:9, 1081:3, 1082:8, 1082:11, 1088:15
**'68** [2] - 1007:20, 1029:22
**'69** [2] - 1007:17, 1007:24
**'70** [2] - 1007:24, 1012:19
**'70s** [3] - 1071:2, 1073:9, 1082:11
**'71** [1] - 1101:11
**'72** [1] - 1024:24
**'73** [2] - 1026:5, 1051:25
**'79** [3] - 1099:5, 1099:6, 1099:9

## 0

**0-T-620** [1] - 1049:18
**0007** [1] - 1064:13
**0226** [1] - 1055:1
**0286** [1] - 1059:2
**0398** [1] - 1024:25
**06-1032** [1] - 999:9
**08-1160** [2] - 997:5, 999:2

## 1

**1** [10] - 1002:25, 1009:18, 1016:23, 1026:6, 1026:7, 1031:19, 1040:22, 1075:10, 1075:17, 1079:2
**10** [7] - 1002:14, 1005:23, 1012:25, 1034:18, 1047:4, 1061:8
**10-minute** [1] - 1054:18
**1002** [1] - 1104:3
**1024** [3] - 1010:21, 1016:15

**1050** [1] - 997:17
**1054** [1] - 1104:4
**1066** [2] - 1104:5, 1104:5
**1077** [1] - 1104:11
**1095** [1] - 1104:11
**10:00** [1] - 1102:8
**11** [3] - 1012:25, 1040:1, 1090:19
**11:03** [1] - 1054:19
**11:26** [1] - 1054:19
**12** [7] - 1002:15, 1013:9, 1013:10, 1026:4, 1060:22, 1090:19
**127-100** [4] - 1012:9, 1012:12, 1018:4, 1018:9
**12:35** [1] - 1102:13
**13** [2] - 1020:22, 1047:17
**1313** [1] - 1092:2
**14** [4] - 1010:20, 1016:15, 1063:13
**15** [5] - 1007:8, 1049:13, 1049:17, 1051:23, 1052:4
**15,000** [1] - 1078:3
**150** [1] - 1053:20
**1502(b** [1] - 1094:13
**1502i** [5] - 1028:11, 1029:11, 1029:18, 1029:23, 1030:5
**156-inch** [1] - 1038:25
**16** [8] - 1022:17, 1028:16, 1028:19, 1028:23, 1029:1, 1029:6, 1060:10, 1060:11
**1610-64-LPC** [1] - 1046:9
**17** [5] - 1024:25, 1028:18, 1028:24, 1032:10
**18** [7] - 1023:17, 1026:20, 1045:16, 1078:9, 1078:12, 1078:24, 1079:12
**1800s** [1] - 1098:1
**19** [8] - 997:7, 1031:18, 1080:5, 1080:8, 1089:3, 1092:4, 1093:6
**1940** [1] - 1080:17
**1940s** [1] - 1092:25
**1947** [1] - 1086:13
**1950s** [2] - 1086:2, 1093:1
**1951** [1] - 1094:19
**1952** [3] - 1088:13,

**1088:17, 1088:19
**1960** [5] - 1012:21, 1013:1, 1013:12, 1086:19, 1098:9
**1960s** [1] - 1093:1
**1961** [2] - 1043:3, 1043:6
**1962** [4] - 1038:24, 1039:4, 1091:8, 1101:18
**1963** [3] - 1088:13, 1088:22, 1092:1
**1964** [7] - 1013:23, 1014:2, 1014:4, 1014:10, 1045:16, 1046:6, 1046:13
**1965** [2] - 1047:18, 1097:14
**1968** [2] - 1007:9, 1094:13
**1969** [1] - 1012:7
**1970** [9] - 1007:17, 1008:19, 1010:12, 1010:23, 1012:7, 1013:10, 1013:12, 1089:8, 1089:15
**1970s** [3] - 1076:18, 1078:3, 1093:1
**1971** [2] - 1032:10, 1034:18
**1972** [5] - 1024:23, 1026:19, 1026:20, 1089:9, 1089:15
**1973** [9] - 1025:13, 1026:13, 1026:18, 1048:21, 1051:24, 1052:4, 1052:16, 1052:24, 1080:17
**1978** [1] - 1101:18
**1979** [2] - 1099:3, 1099:11
**1985** [1] - 1099:18
**1989** [1] - 1092:10
**1997** [1] - 1099:22
**1:30** [1] - 1102:6

## 2

**2** [15] - 1017:2, 1017:6, 1021:3, 1027:13, 1029:15, 1029:21, 1029:22, 1030:7, 1030:9, 1062:2, 1064:12, 1077:6, 1077:7, 1079:3, 1092:5
**20** [2] - 1032:3, 1032:10
**20/20** [1] - 1084:6

**20001** [1] - 998:3
**2001** [1] - 1075:24
**20026-3986** [1] - 997:25
**20036-5306** [1] - 997:17
**2006** [1] - 1077:8
**2014** [1] - 997:7
**202** [3] - 997:18, 997:25, 998:3
**2059** [1] - 1075:16
**2060** [5] - 1077:10, 1077:11, 1077:15, 1077:16, 1104:11
**2061** [3] - 1095:3, 1095:6, 1104:11
**21** [1] - 1026:20
**22** [3] - 1026:20, 1038:20
**24** [3] - 1036:4, 1078:25
**25** [3] - 1040:21, 1056:3, 1059:2
**266** [1] - 1047:18
**27** [2] - 1007:9, 1078:25
**28** [3] - 1018:25, 1026:19, 1026:22
**286** [1] - 1040:21
**28th** [1] - 1011:11
**29** [8] - 1018:25, 1025:13, 1026:13, 1026:18, 1026:19, 1026:22, 1039:4, 1042:25
**29th** [1] - 1011:12
**2:00** [1] - 1102:7

## 3

**3** [19] - 1002:22, 1023:17, 1027:8, 1027:10, 1027:13, 1028:3, 1029:14, 1049:7, 1067:13, 1067:14, 1067:15, 1076:9, 1076:12, 1076:21, 1076:25, 1077:20, 1077:23, 1090:25, 1094:24
**30** [6] - 1024:22, 1024:24, 1038:24, 1045:14, 1098:18
**305-0365** [1] - 997:25
**31** [2] - 1047:17, 1054:25
**326** [1] - 1038:21
**333** [1] - 998:1
**339** [1] - 1036:5

**34** [2] - 1048:20
**354-3186** [1] - 998:3
**372** [1] - 1020:23
**38** [2] - 1094:7, 1094:10

## 4

**4** [7] - 1011:7, 1021:22, 1022:1, 1044:4, 1067:14, 1067:24, 1078:4
**40** [2] - 1029:22, 1080:13
**400** [6] - 1031:18, 1099:23, 1099:25, 1100:6, 1100:9, 1100:11
**4145.26** [1] - 1029:17
**4145.26M** [2] - 1028:11, 1032:1
**415** [1] - 1030:4
**432** [2] - 1042:16, 1043:1
**439** [1] - 1045:15
**47** [1] - 1086:15
**470** [1] - 1048:1
**471** [1] - 1012:25
**490** [1] - 1037:17

## 5

**5** [2] - 1100:18, 1100:23
**50,000** [5] - 1041:1, 1041:21, 1042:19, 1042:20, 1042:21
**500** [1] - 1044:10
**576** [2] - 1002:16, 1060:23
**58th** [2] - 1046:4, 1055:18

## 6

**6** [4] - 997:9, 1008:19, 1046:6, 1052:12
**601** [1] - 997:24
**665** [1] - 1033:10
**666** [2] - 1034:7, 1034:9
**6714** [1] - 998:2

## 7

**7** [5] - 1010:2, 1010:9, 1010:19, 1017:16,

1049:7
**72** [2] - 1027:12,
1029:15
**77** [2] - 1020:19,
1021:4
**777-E-30** [1] - 1006:23
**79** [4] - 1005:23,
1006:14, 1061:7,
1062:16
**799** [2] - 1030:6,
1030:9

**8**

**8** [1] - 1010:23
**80** [1] - 1006:25
**8000** [1] - 997:24

**9**

**9** [5] - 1012:24,
1012:25, 1042:15,
1095:11, 1095:12
**91** [5] - 1010:7,
1019:20, 1019:23,
1021:1, 1021:2
**918** [2] - 1011:1,
1011:23
**923** [2] - 1048:20,
1049:1
**955-8238** [1] - 997:18
**966** [1] - 1100:19
**996** [1] - 1021:3
**997** [1] - 997:8
**9:42** [1] - 997:7

**A**

**a.m** [3] - 997:7,
1054:19
**A.M** [1] - 997:9
**AB** [1] - 1027:11
**abandon** [2] - 1042:2,
1053:11
**abeyance** [2] - 999:15,
999:19
**ability** [2] - 1014:19,
1048:15
**able** [7] - 1001:21,
1035:7, 1046:19,
1047:13, 1086:19,
1098:1
**above-entitled** [1] -
1104:19
**accept** [3] - 1014:15,
1080:23, 1096:20
**accepted** [3] -
1050:23, 1056:23,

1093:7
**accepting** [1] -
1042:11
**accomplish** [1] -
1061:14
**according** [2] -
1045:11, 1062:15
**account** [2] - 1068:15,
1068:21
**accounting** [1] -
1046:20
**accumulate** [1] -
1017:7
**acid** [1] - 1049:9
**Acquisition** [1] -
1054:12
**action** [4] - 1008:8,
1008:15, 1008:18,
1025:24
**actions** [4] - 1008:5,
1008:7, 1008:10,
1008:17
**activities** [4] - 1031:3,
1070:18, 1072:4,
1074:18
**activity** [1] - 1072:3
**acts** [1] - 1072:4
**add** [2] - 1005:12,
1088:15
**add-ones** [1] -
1005:12
**addition** [3] - 1036:17,
1036:18, 1040:13
**addresses** [1] -
1094:14
**adequate** [3] - 1018:5,
1032:11, 1061:15
**administration** [1] -
1014:6
**administrative** [1] -
1039:14
**admit** [2] - 1057:6,
1057:9
**admitted** [1] - 1077:11
**admitting** [1] -
1077:14
**adopt** [1] - 1066:13
**adopted** [1] - 1068:8
**advance** [1] - 1062:12
**advanced** [1] - 1067:9
**advice** [1] - 1102:2
**advocating** [1] -
1069:17
**Aerojet** [4] - 1099:3,
1099:5, 1099:17
**affects** [1] - 1034:17
**affidavit** [13] -
1022:20, 1023:17,
1023:20, 1043:24,
1067:13, 1067:14,

1068:8, 1091:12,
1091:20, 1091:23,
1094:7, 1094:9,
1100:21
**AFPRO** [2] - 1033:21,
1033:22
**agencies** [4] -
1003:22, 1014:10,
1092:25, 1093:8
**agency** [2] - 1004:5,
1024:15
**Agency** [1] - 1025:18
**agree** [13] - 1058:19,
1058:22, 1059:13,
1074:22, 1076:19,
1078:5, 1079:5,
1079:7, 1079:15,
1080:20, 1089:9,
1096:10, 1096:21
**agreed** [5] - 1045:2,
1045:4, 1046:13,
1069:10, 1069:20
**agreement** [1] -
1008:4
**agreements** [1] -
999:20
**agrees** [1] - 1059:16
**agriculture** [1] -
1090:10
**ahead** [9] - 999:4,
1067:18, 1069:25,
1075:8, 1076:1,
1076:3, 1076:11,
1091:9, 1094:12
**aided** [1] - 998:25
**aiding** [1] - 1040:6
**Aids** [2] - 1048:21,
1049:2
**aids** [1] - 1050:4
**air** [5] - 1009:15,
1010:4, 1012:2,
1018:3, 1058:13
**Air** [44] - 1002:10,
1002:11, 1002:12,
1003:4, 1003:14,
1003:18, 1005:10,
1007:3, 1009:9,
1011:4, 1011:10,
1011:15, 1012:9,
1012:12, 1014:11,
1017:13, 1018:3,
1018:9, 1018:12,
1019:12, 1026:11,
1031:20, 1032:17,
1032:23, 1033:22,
1033:23, 1035:3,
1035:14, 1036:1,
1039:2, 1039:18,
1039:19, 1040:2,
1044:4, 1044:18,

1048:4, 1048:7,
1061:4, 1061:6,
1062:17, 1062:18,
1063:2, 1063:17
**AISLIC** [1] - 1066:25
**alcohol** [1] - 1049:10
**allegations** [2] -
1076:15, 1077:24
**alleged** [1] - 1089:8
**allow** [1] - 1080:24
**allowable** [5] - 1001:4,
1001:12, 1018:6,
1044:10
**allowing** [1] - 1093:24
**almost** [3] - 1058:17,
1084:24, 1098:12
**alone** [1] - 1084:23
**alternatives** [1] -
1022:12
**altogether** [1] - 1099:8
**AMERICA** [1] - 997:6
**America** [1] - 999:3
**American** [16] -
1036:22, 1036:23,
1037:1, 1037:4,
1037:21, 1040:24,
1040:25, 1041:8,
1041:14, 1059:5,
1059:25, 1060:2,
1060:3, 1060:8,
1067:1
**ammonium** [6] -
1034:13, 1036:19,
1037:23, 1038:6,
1038:14, 1041:2
**ammunition** [2] -
1064:16, 1094:15
**amount** [6] - 1017:7,
1036:11, 1038:8,
1041:12, 1042:21,
1051:7
**amounts** [1] - 1070:13
**Ampot** [3] - 1041:1,
1041:8, 1041:11
**analogy** [1] - 1090:8
**analyze** [1] - 1098:2
**Angeles** [1] - 1046:2
**answer** [3] - 1060:11,
1062:10, 1063:12
**answers** [1] - 1062:19
**anticipate** [1] - 1049:3
**anytime** [1] - 1099:7
**anyways** [1] - 1001:23
**AP** [22] - 1012:5,
1015:18, 1017:3,
1017:7, 1034:14,
1034:22, 1035:4,
1035:11, 1036:10,
1036:11, 1036:13,
1038:9, 1041:8,

1041:15, 1057:7,
1068:4, 1069:15,
1081:5, 1083:10,
1097:14, 1100:8,
1100:11
**AP-contaminated** [1] -
1068:4
**Apollo** [4] - 1036:25,
1037:4, 1037:6,
1041:4
**apologies** [1] -
1092:22
**apologize** [4] -
1026:17, 1077:6,
1095:10, 1095:25
**appear** [1] - 1055:25
**APPEARANCES** [1] -
997:12
**application** [2] -
1093:6, 1094:5
**applied** [1] - 1092:17
**applies** [1] - 1008:1
**apply** [4] - 1006:20,
1061:13, 1064:15,
1085:21
**applying** [1] - 1080:16
**appointment** [1] -
1102:6
**appreciate** [1] -
1055:17
**apprised** [2] -
1028:24, 1034:25
**appropriate** [4] -
1065:16, 1068:25,
1069:6, 1069:7
**approval** [2] - 1008:5,
1046:3
**April** [2] - 1011:12,
1018:25
**aquatic** [1] - 1088:24,
1088:25
**aquifer** [2] - 1081:19,
1086:23
**area** [3] - 1034:12,
1093:20, 1099:20
**areas** [1] - 1089:22
**argue** [2] - 1015:23,
1070:3
**argued** [1] - 1085:12
**argument** [2] - 1073:3,
1074:4
**argument's** [1] -
1074:17
**arguments** [1] -
1074:23
**Armed** [1] - 1061:21
**Army** [15] - 1012:21,
1013:24, 1014:9,
1032:23, 1044:18,
1045:12, 1046:3,

1046:13, 1047:1, 1047:25, 1048:3, 1048:6, 1057:13, 1094:20
**arrangement** [1] - 1045:9
**arrangements** [2] - 1043:15, 1046:6
**Arsenal** [1] - 1091:4
**art** [2] - 1008:9, 1054:11
**ascertain** [1] - 1022:3
**aside** [1] - 1069:11
**aspect** [1] - 1061:19
**aspects** [1] - 1009:3
**aspirational** [1] - 1095:16
**ASPR** [2] - 1008:9, 1061:21
**asserted** [1] - 1023:21
**assistance** [1] - 1047:25
**assume** [8] - 1019:12, 1019:20, 1020:12, 1025:25, 1050:18, 1053:2, 1084:3, 1098:6
**assumes** [1] - 1070:7
**assuming** [5] - 1020:13, 1021:4, 1042:7, 1072:19
**assurance** [6] - 1011:10, 1038:11, 1038:16, 1061:15, 1064:2, 1064:3
**Assurance** [4] - 1006:15, 1006:22, 1061:12, 1062:19
**assure** [1] - 1017:7
**assuring** [2] - 1018:2, 1036:1
**Atlantic** [2] - 1000:4, 1000:5
**atmosphere** [2] - 1093:10, 1093:14
**atmospheric** [1] - 1092:8
**Atoll** [1] - 1039:24
**attached** [4] - 1025:21, 1026:25, 1027:3, 1037:9
**attachment** [2] - 1027:5, 1033:10
**attempts** [1] - 1036:10
**attendance** [3] - 1033:9, 1033:11, 1034:10
**attended** [2] - 1034:18, 1034:21
**attendees** [1] - 1061:6

**attention** [6] - 1061:10, 1075:10, 1076:9, 1078:9, 1080:5, 1094:23
**attribute** [1] - 1084:1
**audit** [3] - 1000:25, 1017:13, 1019:2
**audits** [1] - 1002:6
**August** [3] - 1026:20, 1032:10, 1034:18
**authority** [1] - 1096:13
**authorization** [2] - 1055:18, 1055:21
**authorized** [1] - 1059:19
**available** [1] - 1097:23
**Avenue** [2] - 997:17, 998:2
**Aviation** [1] - 1037:22
**award** [4] - 1008:20, 1008:22, 1008:23, 1008:25
**awarded** [1] - 1009:6
**aware** [1] - 1080:10
**awareness** [1] - 1090:24

# B

**B/77** [1] - 1021:4
**back-and-forth** [2] - 1015:16, 1043:25
**backlog** [1] - 1009:2
**bad** [9] - 1071:15, 1071:16, 1071:17, 1071:18, 1071:19, 1072:4, 1072:11, 1072:12, 1083:16
**bags** [1] - 1030:18
**ban** [2] - 1090:15, 1090:18
**barrels** [2] - 1076:16, 1078:1
**Base** [1] - 1039:2
**base** [2] - 1035:6, 1076:7
**based** [6] - 1072:7, 1084:22, 1086:3, 1087:5, 1088:24, 1093:9
**basic** [2] - 1101:24
**basin** [1] - 1083:11
**basis** [4] - 1018:7, 1087:3, 1088:5, 1093:19
**batch** [1] - 1037:24
**batches** [1] - 1038:8
**Bates** [10] - 1005:22,

1011:1, 1011:23, 1027:12, 1029:15, 1030:6, 1030:9, 1033:10, 1034:7, 1061:7
**Bauer** [39] - 1065:25, 1066:5, 1066:7, 1066:19, 1066:21, 1067:9, 1067:11, 1067:15, 1068:7, 1068:14, 1075:10, 1076:6, 1076:9, 1076:19, 1077:20, 1078:5, 1078:8, 1078:14, 1079:5, 1079:7, 1080:5, 1080:8, 1080:11, 1080:20, 1088:12, 1089:9, 1089:14, 1091:11, 1092:4, 1092:10, 1093:2, 1093:11, 1094:7, 1094:23, 1095:15, 1099:2, 1100:2, 1101:2, 1104:5
**BAUER** [1] - 1066:2
**beam** [1] - 1021:18
**became** [1] - 1031:11
**becomes** [2] - 1057:25, 1098:22
**beds** [1] - 1094:16
**BEFORE** [1] - 997:10
**begins** [1] - 1061:11
**behalf** [1] - 1081:2
**behind** [4] - 1092:5, 1094:24, 1100:18, 1100:21
**belief** [2] - 1093:9, 1093:12
**below** [1] - 1099:23
**BENCH** [1] - 997:10
**benchmark** [2] - 1063:8, 1063:9
**benefit** [1] - 1000:12
**best** [1] - 1088:14
**better** [8] - 1018:1, 1023:2, 1023:15, 1024:3, 1024:18, 1031:13, 1044:7, 1063:9
**between** [17] - 1005:1, 1005:2, 1005:9, 1007:16, 1007:20, 1008:4, 1008:13, 1008:21, 1024:13, 1044:1, 1044:17, 1045:9, 1052:19, 1059:5, 1059:14, 1059:24
**beyond** [2] - 1029:24,

1063:9
**bid** [3] - 1045:1, 1062:6
**big** [2] - 1074:2, 1090:10
**bill** [1] - 1040:2
**billion** [4] - 1099:23, 1099:25, 1100:7, 1100:9
**binder** [16] - 1002:15, 1002:17, 1029:21, 1036:5, 1037:9, 1042:15, 1054:23, 1060:10, 1060:22, 1075:11, 1078:24, 1092:5, 1094:8, 1094:24, 1100:19, 1100:24
**Binder** [3] - 1029:22, 1031:18, 1040:22
**binders** [10] - 1010:22, 1020:23, 1025:1, 1032:4, 1037:18, 1038:21, 1042:16, 1045:15, 1047:19, 1100:24
**bit** [5] - 1001:15, 1002:6, 1013:23, 1016:6, 1061:17
**biting** [1] - 1001:15
**blame** [1] - 1091:16
**blew** [1] - 1085:7
**block** [4] - 1078:15, 1078:17, 1089:5, 1093:5
**board** [1] - 1084:17
**Board** [1] - 1086:2
**Boat** [2] - 999:15, 999:17
**boat** [1] - 1085:10
**Boeing** [26] - 1004:24, 1005:1, 1005:2, 1005:4, 1005:5, 1010:23, 1019:5, 1019:6, 1021:12, 1022:8, 1033:21, 1033:22, 1033:24, 1034:3, 1034:25, 1059:15, 1063:19, 1063:22, 1063:24, 1063:25, 1064:5, 1064:6, 1064:11, 1065:13, 1065:15
**Boeing's** [1] - 1064:4
**Bolinder** [4] - 1078:15, 1079:8, 1079:10, 1079:13
**bolts** [1] - 1009:25
**bond** [1] - 1049:22
**book** [1] - 1090:23,

1091:14
**bothering** [1] - 1072:9
**bottom** [6] - 1005:23, 1006:15, 1061:10, 1076:12, 1077:23, 1079:1
**bottoms** [1] - 1080:22
**Branch** [1] - 1039:8
**breach** [2] - 1086:21, 1090:10
**breached** [1] - 1086:21
**break** [1] - 1102:5
**breakthrough** [1] - 1090:9
**brew** [1] - 1082:25
**brewing** [1] - 1083:4
**brief** [12] - 1075:13, 1076:13, 1077:7, 1079:12, 1080:21, 1089:4, 1092:5, 1092:23, 1093:5, 1094:25, 1095:12, 1095:15
**bring** [2] - 1001:19, 1096:24
**bringing** [1] - 1090:21
**broken** [1] - 1021:14
**brought** [2] - 999:23, 1000:1
**BRYAN** [3] - 998:1, 1104:17, 1104:21
**buckets** [1] - 1070:8
**Building** [6] - 1010:7, 1019:20, 1019:23, 1020:19, 1021:1, 1021:4
**building** [10] - 1009:16, 1010:10, 1010:12, 1010:16, 1012:3, 1015:13, 1015:14, 1019:14, 1019:18, 1021:6
**buildings** [1] - 1086:9
**bunch** [2] - 1034:2, 1048:24
**Burbank** [1] - 1096:18
**burn** [9] - 1015:2, 1031:3, 1042:2, 1042:12, 1069:11, 1071:4, 1072:9, 1084:4
**burned** [2] - 1004:4, 1044:1
**burning** [5] - 1016:1, 1030:14, 1030:22, 1042:14, 1071:12
**bury** [1] - 1071:4
**business** [2] - 1001:13, 1001:17

**buy** [4] - 1049:13, 1049:17, 1057:14, 1057:17
**buying** [5] - 1038:18, 1050:23, 1051:12, 1053:20, 1056:9
**BY** [46] - 1002:3, 1002:18, 1004:13, 1005:21, 1009:23, 1012:1, 1013:16, 1013:22, 1016:4, 1016:21, 1020:25, 1025:9, 1027:14, 1028:2, 1030:8, 1043:2, 1047:16, 1050:14, 1052:3, 1052:11, 1054:21, 1055:15, 1056:17, 1058:9, 1059:1, 1059:23, 1063:1, 1064:9, 1065:8, 1066:4, 1066:18, 1068:13, 1075:9, 1076:5, 1077:22, 1078:13, 1079:4, 1079:17, 1088:11, 1091:10, 1091:18, 1092:3, 1095:14, 1099:1, 1101:1, 1101:12

**C**

**cA** [1] - 997:5
**caffeine** [1] - 1082:17
**California** [5] - 1067:8, 1077:13, 1086:2, 1089:23, 1101:15
**Camp** [5] - 1043:15, 1043:22, 1076:6, 1076:18, 1078:3
**can's** [1] - 1062:21
**cannot** [2] - 1042:22, 1096:9
**caption** [1] - 1029:7
**captioned** [2] - 1022:24, 1079:13
**cardboard** [3] - 1024:2, 1024:5
**care** [17] - 1075:6, 1076:17, 1078:2, 1085:16, 1085:20, 1085:23, 1085:24, 1086:1, 1086:21, 1086:22, 1086:25, 1087:4, 1087:5, 1088:7, 1090:11, 1090:22
**career** [1] - 1087:15

**careful** [1] - 1088:3
**Carolina** [2] - 1076:7, 1077:13
**Carson** [2] - 1090:8, 1090:13
**Carson's** [1] - 1091:14
**cartons** [2] - 1024:2, 1024:3
**case** [37] - 999:2, 999:9, 999:14, 999:23, 1000:2, 1000:14, 1000:15, 1014:12, 1031:15, 1040:4, 1046:8, 1046:16, 1057:18, 1058:17, 1066:8, 1066:14, 1067:2, 1069:20, 1074:20, 1075:16, 1075:23, 1078:10, 1078:15, 1079:6, 1079:12, 1079:13, 1081:2, 1081:18, 1084:1, 1084:16, 1085:21, 1089:8, 1089:14, 1095:1, 1095:13, 1098:24
**Case** [1] - 1046:9
**cases** [4] - 1000:1, 1001:1, 1001:19, 1066:22
**casting** [1] - 1009:25
**categorically** [1] - 1097:15
**causation** [1] - 1074:9
**caused** [2] - 1086:4, 1102:10
**Central** [2] - 1043:5, 1043:11
**CERCLA** [7] - 999:23, 1000:8, 1000:9, 1000:24, 1001:1, 1070:19, 1085:15
**CERCLA's** [1] - 1074:13
**certain** [10] - 1018:15, 1022:10, 1023:11, 1023:22, 1026:11, 1042:12, 1051:7, 1067:25, 1070:12, 1071:4
**certainly** [11] - 1006:11, 1010:15, 1019:4, 1022:11, 1024:17, 1033:6, 1035:19, 1048:16, 1050:4, 1057:16, 1068:22
**certainty** [3] - 1066:11, 1086:20,

1088:6
**CERTIFICATE** [1] - 1104:16
**certification** [1] - 1021:7
**certified** [1] - 1017:9
**certify** [1] - 1104:17
**cetera** [2] - 1049:22, 1085:19
**change** [8] - 1012:16, 1013:17, 1016:9, 1016:10, 1021:7, 1021:11, 1068:9, 1088:22
**change-out** [1] - 1012:16
**changed** [4] - 1012:8, 1015:5, 1016:11, 1017:11
**chapter** [2] - 1090:24, 1090:25
**characteristics** [1] - 1081:22
**charge** [6] - 1033:18, 1049:5, 1049:8, 1051:7, 1057:17
**Chargeable** [3] - 1048:21, 1049:2, 1049:16
**charged** [6] - 1046:21, 1050:19, 1050:21, 1051:4, 1051:5, 1057:12
**charging** [2] - 1050:9, 1052:4
**chart** [2] - 1013:2, 1021:7
**check** [1] - 1010:1
**checking** [1] - 1005:20
**checklist** [1] - 1017:10
**chemical** [11] - 1081:10, 1081:14, 1082:12, 1082:18, 1083:8, 1083:16, 1083:17, 1084:19, 1084:22, 1087:6, 1101:25
**Chemical** [2] - 1086:14, 1086:16
**chemicals** [3] - 1014:17, 1049:8, 1083:17
**Chemicals** [1] - 1071:10
**chemist** [1] - 1086:13
**chemistry** [1] - 1067:4
**chemists** [1] - 1082:12
**chewing** [1] - 1083:2
**chief** [1] - 1039:10

**Chief** [2] - 1003:14, 1039:7
**chlorate** [2] - 1091:3, 1091:19
**chlorinate** [1] - 1098:25
**chlorinated** [5] - 1084:24, 1089:7, 1089:22, 1090:6, 1097:3
**chose** [1] - 1097:11
**cite** [3] - 1022:20, 1023:17, 1046:9
**cited** [2] - 1025:15, 1028:6
**citing** [6] - 1028:10, 1028:11, 1029:11, 1029:21, 1030:21, 1055:19
**City** [1] - 1086:7
**civil** [4] - 999:2, 1082:12, 1086:1, 1086:11
**claim** [1] - 1078:10
**clarify** [1] - 1056:18
**classes** [1] - 1087:5
**classified** [3] - 1047:7, 1047:11, 1048:16
**Clause** [1] - 1050:15
**clause** [1] - 1050:19
**clauses** [1] - 1061:22
**clean** [3] - 1017:25, 1087:20, 1087:21
**cleaned** [1] - 1017:8
**cleaning** [6] - 1049:22, 1050:1, 1050:3, 1052:5, 1052:16, 1052:20
**cleanliness** [1] - 1017:8
**cleans** [1] - 1012:5
**cleanup** [1] - 1087:23
**clear** [2] - 1015:21, 1026:12
**clearer** [1] - 1044:24
**clearly** [3] - 1044:5, 1053:4, 1060:6
**CLERK** [1] - 999:2
**clogged** [3] - 1009:15, 1009:19, 1012:3
**close** [3] - 1045:22, 1097:15, 1098:20
**closed** [2] - 1018:5, 1030:15
**closing** [1] - 1024:1
**clue** [2] - 1040:11, 1040:14
**Coast** [1] - 1045:13
**coats** [1] - 1027:17
**code** [2] - 1017:10,

1018:16
**codes** [2] - 1018:5, 1018:15
**coffee** [5] - 1082:17, 1082:23, 1082:24, 1082:25, 1083:2, 1083:4
**coincidence** [1] - 1042:20
**collection** [2] - 1031:3, 1094:14
**collections** [1] - 1029:9
**Colonel** [3] - 1033:15, 1035:20, 1084:17
**colonel** [2] - 1033:16
**Colorado** [1] - 1091:4
**COLUMBIA** [1] - 997:1
**column** [4] - 1019:15, 1051:9, 1051:11
**coming** [6] - 1011:17, 1018:13, 1055:20, 1055:22, 1076:24, 1100:17
**comma** [1] - 1007:25
**command** [1] - 1039:22
**commanding** [1] - 1039:14
**Comments** [2] - 1021:24, 1022:1
**commerce** [1] - 1083:18
**committee** [1] - 1089:21, 1090:1
**Committee** [3] - 1002:16, 1010:22, 1032:4
**common** [7] - 1022:25, 1031:8, 1079:24, 1080:17, 1080:24, 1080:25, 1082:3
**commonly** [3] - 1031:14, 1082:7
**Communication** [1] - 1028:16
**communication** [1] - 1028:25
**communities** [1] - 1099:16
**community** [2] - 1081:4
**companies** [1] - 1000:17
**company** [1] - 1001:14
**Company** [8] - 1027:21, 1034:25, 1059:5, 1059:24,

1061:13, 1062:17,
1064:1, 1067:2
**Company's** [1] -
1063:14
**comparable** [1] -
1051:25
**competitive** [1] -
1035:7
**complete** [1] -
1080:24
**completed** [1] -
1007:9
**compliance** [13] -
1012:9, 1017:10,
1017:14, 1018:7,
1018:14, 1019:11,
1023:12, 1030:1,
1061:15, 1063:3,
1064:1, 1064:7,
1064:19
**compliant** [1] -
1064:23
**comply** [7] - 1006:18,
1024:17, 1026:1,
1028:13, 1030:21,
1062:1, 1064:23
**complying** [2] -
1015:11, 1015:12
**components** [1] -
1049:22
**compound** [1] -
1070:8
**compounds** [5] -
1084:17, 1087:6,
1088:24, 1092:24
**comprehensive** [3] -
1003:5, 1019:22,
1019:25
**computer** [1] - 998:25
**computer-aided** [1] -
998:25
**Concentrated** [2] -
1010:2, 1017:16
**concentration** [7] -
1096:23, 1097:21,
1098:19, 1099:9,
1099:23, 1100:8,
1100:11
**concentrations** [2] -
1018:6, 1099:16
**concept** [3] - 1003:15,
1054:14, 1096:21
**concern** [6] - 1035:2,
1036:1, 1036:3,
1069:14, 1082:19,
1082:23
**concerned** [7] -
1015:23, 1023:25,
1035:3, 1035:5,
1060:13, 1075:4,

1096:3
**concerns** [2] - 1015:5,
1035:17
**conclusion** [3] -
1056:13, 1080:20,
1092:10
**concrete** [1] - 1097:1
**conditions** [2] -
1026:5, 1027:21
**conducted** [6] -
1007:5, 1007:16,
1008:21, 1025:23,
1061:2, 1063:17
**conducting** [1] -
1063:2
**conference** [1] -
1023:2
**confirm** [1] - 1012:8
**confirming** [1] -
1019:10
**confirms** [2] -
1011:13, 1093:23
**conflagration** [1] -
1016:13
**confused** [1] - 1074:8
**Connecticut** [1] -
997:17
**connection** [2] -
1031:3, 1037:19
**consciousness** [1] -
1090:21
**consent** [1] - 1035:14
**consequences** [2] -
1069:18, 1070:24
**consider** [2] -
1058:12, 1067:11
**consideration** [2] -
1045:6, 1046:21
**considered** [4] -
1040:3, 1040:18,
1092:7, 1098:2
**consistent** [1] -
1069:21
**constituents** [1] -
1092:7
**Constitution** [1] -
998:2
**constraints** [2] -
1006:20, 1061:14
**consumed** [4] -
1058:11, 1058:13,
1058:15, 1058:16
**contact** [1] - 1097:20
**contacted** [1] - 1039:6
**contacting** [1] -
1030:17
**container** [1] - 1024:1
**Containers** [2] -
1027:13, 1030:12
**containers** [9] -

1027:16, 1027:17,
1028:3, 1028:7,
1028:9, 1028:13,
1030:15, 1030:18
**containing** [1] -
1027:16
**contains** [1] - 1094:20
**contaminate** [1] -
1073:25
**contaminated** [5] -
1068:4, 1071:22,
1071:24, 1094:17,
1098:14
**contaminating** [2] -
1091:5, 1098:10
**contamination** [11] -
1016:1, 1081:6,
1086:5, 1087:23,
1089:14, 1089:16,
1089:21, 1089:23,
1090:4, 1099:2
**contemplate** [2] -
1053:25, 1058:3
**contention** [1] -
1093:11
**contested** [1] -
1096:12
**context** [5] - 1039:17,
1073:9, 1073:15,
1074:11, 1074:21
**continue** [3] -
1001:24, 1078:8,
1085:8
**Continued** [1] -
1104:3
**CONTINUED** [1] -
1002:2
**continues** [4] -
1078:3, 1092:5,
1092:6, 1093:5
**continuing** [1] -
1092:22
**contract** [54] -
1000:20, 1004:3,
1004:4, 1004:10,
1004:14, 1004:15,
1004:24, 1004:25,
1005:4, 1008:24,
1009:4, 1014:6,
1033:1, 1035:2,
1041:14, 1041:15,
1042:8, 1044:8,
1044:9, 1044:15,
1044:24, 1044:25,
1045:6, 1046:22,
1050:16, 1050:22,
1051:2, 1053:5,
1053:8, 1053:14,
1053:19, 1054:11,
1056:5, 1056:7,

1056:10, 1056:13,
1056:20, 1057:13,
1057:18, 1057:19,
1057:23, 1059:8,
1059:10, 1059:14,
1060:17, 1060:19,
1061:19, 1062:1,
1062:8, 1062:9,
1062:12, 1064:24
**contractor** [28] -
999:12, 1009:1,
1014:5, 1019:6,
1031:9, 1031:12,
1036:21, 1036:24,
1041:7, 1041:25,
1044:25, 1051:1,
1053:7, 1053:8,
1053:22, 1056:11,
1056:22, 1056:24,
1057:17, 1057:18,
1061:18, 1063:22,
1064:16, 1064:24,
1064:25, 1065:1,
1065:3
**contractor's** [4] -
1053:15, 1060:14,
1062:3, 1064:12
**contractors** [3] -
1000:6, 1035:7,
1062:5
**contracts** [18] -
1004:16, 1004:20,
1005:7, 1005:9,
1005:11, 1005:13,
1005:17, 1006:18,
1014:13, 1047:1,
1048:4, 1048:7,
1048:12, 1053:2,
1053:13, 1057:1,
1059:9, 1059:17
**contractual** [5] -
1032:13, 1055:19,
1055:25, 1063:6,
1063:7
**contribute** [1] -
1030:16
**contributed** [1] -
1074:14
**control** [7] - 1023:21,
1024:9, 1024:11,
1028:8, 1030:2,
1045:13, 1048:13
**conveyance** [3] -
1078:21, 1080:1,
1080:2
**cooperation** [4] -
1008:12, 1008:17,
1015:16, 1028:7
**cooperative** [2] -
1015:1, 1024:12

**copy** [3] - 1012:6,
1088:15, 1094:8
**corn** [1] - 1082:23
**CORPORATION** [1] -
997:3
**Corporation** [3] -
999:3, 1040:25,
1059:6
**Corps** [1] - 1076:7
**correct** [51] - 1000:18,
1008:10, 1012:17,
1014:2, 1014:3,
1016:25, 1017:3,
1018:11, 1018:15,
1018:16, 1018:20,
1019:7, 1020:10,
1022:21, 1023:4,
1023:9, 1023:18,
1023:23, 1025:13,
1030:9, 1030:23,
1036:9, 1041:12,
1042:5, 1044:3,
1044:18, 1044:23,
1045:10, 1046:24,
1047:2, 1048:7,
1048:14, 1050:13,
1050:16, 1050:20,
1052:5, 1057:16,
1059:6, 1059:21,
1064:14, 1067:5,
1074:16, 1079:16,
1091:12, 1092:10,
1093:3, 1094:4,
1094:5, 1099:3,
1100:10, 1104:18
**corrective** [4] -
1008:5, 1008:7,
1008:8, 1025:24
**Corrective** [1] -
1008:15
**cost** [24] - 1001:11,
1001:13, 1001:16,
1004:10, 1005:17,
1005:19, 1041:14,
1044:8, 1044:9,
1044:10, 1044:13,
1044:15, 1044:22,
1044:24, 1048:12,
1054:14, 1054:15,
1057:18, 1057:23,
1059:11, 1062:8
**cost-plus** [5] -
1004:10, 1005:17,
1044:24, 1057:18,
1057:23
**cost-reimbursement**
[4] - 1044:8, 1044:9,
1044:15, 1062:8
**costs** [8] - 1000:19,
1001:4, 1001:8,

1001:12, 1041:11, 1044:8, 1049:3
**count** [1] - 1011:20
**country** [2] - 1001:14, 1090:15
**couple** [3] - 1028:5, 1028:9, 1048:18
**course** [3] - 1083:23, 1084:12, 1091:15
**COURT** [179] - 997:1, 999:4, 999:11, 999:17, 999:19, 999:23, 1000:8, 1000:10, 1000:18, 1000:22, 1001:7, 1001:15, 1001:22, 1004:1, 1004:8, 1004:19, 1004:22, 1005:1, 1005:7, 1005:14, 1009:20, 1011:22, 1011:24, 1012:18, 1012:22, 1013:2, 1013:9, 1013:11, 1013:15, 1013:19, 1014:14, 1015:8, 1015:20, 1016:3, 1016:17, 1016:19, 1020:21, 1025:3, 1025:7, 1026:15, 1026:24, 1027:4, 1027:9, 1027:24, 1030:3, 1030:7, 1042:24, 1047:3, 1050:5, 1050:11, 1051:4, 1051:14, 1051:19, 1051:23, 1052:2, 1052:9, 1053:2, 1053:11, 1053:17, 1053:23, 1054:1, 1054:5, 1054:7, 1054:9, 1054:15, 1054:18, 1055:8, 1055:10, 1056:4, 1056:16, 1057:1, 1057:6, 1057:9, 1057:14, 1057:21, 1057:25, 1058:8, 1058:19, 1058:22, 1058:24, 1059:13, 1059:20, 1059:22, 1062:21, 1062:23, 1064:3, 1065:5, 1065:7, 1065:19, 1065:21, 1066:1, 1068:8, 1068:11, 1069:6, 1069:10, 1069:16, 1069:25, 1070:2, 1070:6, 1070:15, 1070:19,

1070:21, 1070:23, 1071:7, 1071:16, 1071:20, 1072:6, 1073:3, 1073:16, 1074:6, 1074:19, 1075:2, 1075:4, 1075:17, 1075:19, 1075:25, 1076:3, 1076:24, 1077:4, 1077:11, 1077:14, 1077:18, 1078:10, 1079:1, 1079:10, 1081:3, 1081:11, 1082:1, 1082:5, 1082:7, 1082:14, 1083:5, 1083:9, 1083:23, 1083:25, 1084:6, 1084:11, 1084:13, 1085:5, 1085:9, 1086:11, 1086:16, 1086:19, 1086:24, 1087:3, 1087:10, 1087:25, 1088:4, 1089:19, 1089:25, 1090:4, 1090:7, 1090:17, 1090:20, 1091:7, 1091:9, 1091:15, 1091:22, 1091:25, 1095:5, 1095:8, 1095:22, 1096:1, 1096:9, 1096:16, 1096:20, 1097:7, 1097:13, 1097:17, 1097:23, 1098:6, 1098:22, 1100:22, 1101:7, 1101:20, 1102:3, 1102:5, 1102:10, 1102:12
**Court** [3] - 998:1, 998:1, 1104:17
**court** [5] - 1075:14, 1076:14, 1077:8, 1079:7, 1085:14
**Courthouse** [1] - 998:2
**cover** [2] - 1026:21, 1027:4
**covered** [1] - 1031:9
**covering** [1] - 1012:5
**covers** [1] - 1027:18
**create** [1] - 1084:21
**created** [3] - 1062:19, 1064:14, 1098:1
**creates** [1] - 1014:2
**creating** [1] - 1048:5
**credit** [6] - 1001:2, 1001:5, 1041:11, 1046:18, 1074:9, 1074:10

**Creek** [1] - 1067:8
**criteria** [3] - 1087:15, 1087:16, 1088:25
**critical** [1] - 1078:7
**criticism** [1] - 1007:13
**criticizing** [2] - 1007:11, 1036:11
**crops** [1] - 1091:6
**CROSS** [2] - 1002:2, 1066:17
**Cross** [2] - 1104:3, 1104:5
**cross** [3] - 1018:2, 1030:3, 1077:4
**cross-examination** [1] - 1077:4
**CROSS-EXAMINATION** [2] - 1002:2, 1066:17
**Cross-Examination.. .......** [1] - 1104:3
**Cross-Examination.. .................** [1] - 1104:5
**cross-ventilation** [1] - 1018:2
**CRR** [1] - 998:1
**Crutcher** [1] - 997:16
**cubic** [1] - 1048:1
**culpability** [4] - 1072:8, 1084:2, 1085:14, 1085:16
**culpable** [3] - 1070:17, 1070:19, 1072:4
**current** [1] - 1062:4
**curricula** [1] - 1092:24
**customer** [3] - 1032:22, 1032:23, 1032:25, 1035:5, 1038:17, 1060:13, 1061:4
**cut** [1] - 1025:25
**cylinders** [1] - 1047:23

# D

**D.C** [1] - 997:6
**daily** [2] - 1012:5, 1017:8
**danger** [3] - 1014:16, 1078:18, 1079:9
**dangerous** [1] - 1043:16
**data** [9] - 1071:1, 1084:20, 1088:25, 1089:2, 1100:13, 1100:15, 1101:10,

1101:24, 1101:25
**date** [7] - 1013:9, 1024:22, 1025:23, 1038:24, 1062:4, 1099:10, 1101:10
**dated** [4] - 1010:22, 1025:13, 1045:16, 1046:5
**DAVID** [2] - 997:15, 1066:2
**David** [2] - 1065:25, 1104:5
**Davis** [3] - 1080:10, 1089:5
**DAY** [1] - 997:9
**days** [3] - 1008:19, 1009:8, 1072:16
**DC** [3] - 997:17, 997:25, 998:3
**DCAA** [1] - 1001:1
**DCAS** [46] - 1002:6, 1006:11, 1007:8, 1007:11, 1008:2, 1008:4, 1008:16, 1008:20, 1008:21, 1008:22, 1011:12, 1011:16, 1014:2, 1014:4, 1014:8, 1016:9, 1016:12, 1016:23, 1016:24, 1018:24, 1019:2, 1019:4, 1019:6, 1019:7, 1019:13, 1021:10, 1021:12, 1022:8, 1022:9, 1022:24, 1023:4, 1023:25, 1024:19, 1025:19, 1026:23, 1027:15, 1027:20, 1028:21, 1029:5, 1029:6, 1029:8, 1031:1, 1031:2, 1032:20, 1032:25, 1033:25
**DDT** [4] - 1090:8, 1090:11, 1090:14, 1090:18
**deal** [2] - 1018:10, 1082:11
**dealing** [6] - 1031:25, 1040:24, 1041:1, 1064:16, 1075:1, 1096:22
**deals** [1] - 1034:12
**dealt** [4] - 1006:1, 1015:18, 1035:25, 1090:2
**debatable** [1] - 1072:1
**debit** [1] - 1046:18
**debrief** [1] - 1025:16

**debriefing** [2] - 1028:22, 1029:7
**Debriefing** [1] - 1022:24
**debriefings** [1] - 1022:25
**decades** [1] - 1087:19
**decaffeination** [1] - 1082:23
**December** [2] - 1007:22, 1045:16
**decide** [2] - 1045:10, 1062:6
**decides** [1] - 1074:14
**declaration** [4] - 1058:5, 1066:7, 1066:10, 1066:13
**DEFENDANT** [2] - 1002:1, 1066:2
**Defendant** [2] - 997:7, 997:19
**Defense** [2] - 997:23, 1025:18
**defense** [2] - 1025:19, 1027:9
**defer** [1] - 1037:22
**deficiencies** [3] - 1009:7, 1026:20, 1027:24
**deficiency** [2] - 1008:11, 1023:25
**defined** [1] - 1008:8
**defines** [1] - 1002:25
**defining** [1] - 1071:17
**defunct** [1] - 1045:20
**degradation** [1] - 1098:18
**degreaser** [9] - 1010:8, 1020:14, 1020:17, 1051:15, 1052:17, 1052:20, 1052:22, 1053:3, 1070:10
**degreasing** [2] - 1017:21, 1051:17
**degree** [5] - 1066:11, 1067:4, 1068:19, 1086:20, 1088:6
**degrees** [1] - 1067:9
**delay** [1] - 1004:12
**delivered** [3] - 1036:2, 1043:23, 1056:23
**deliveries** [2] - 1004:12, 1035:23
**delivering** [1] - 1059:18
**delivery** [1] - 1060:17
**demanding** [1] - 1055:20
**demonstrate** [1] -

1044:3
demonstrates [1] - 1023:20
dense [1] - 1084:25
density [1] - 1090:6
dentistry [1] - 1102:8
Denver [1] - 1091:4
Department [2] - 997:22, 1094:20
deposition [2] - 1101:5, 1101:6
depositional [1] - 1093:22
DEPUTY [1] - 999:2
Deputy [4] - 1039:7, 1039:9, 1039:10, 1039:12
deputy [1] - 1039:10
derail [2] - 1035:23, 1060:21
derive [1] - 1086:24
describe [1] - 1023:3
design [2] - 1039:1, 1047:11
designed [1] - 1058:3
desire [1] - 1047:24
destined [1] - 1030:14
destruction [1] - 1094:14
detached [1] - 1100:10
detachment [1] - 1055:18
Detachment [1] - 1046:4
detailed [1] - 1037:12
details [2] - 1036:14
detectible [1] - 1100:5
determination [2] - 1063:25, 1064:6
determine [4] - 1020:1, 1034:22, 1063:3, 1081:15
developed [1] - 1003:4
development [5] - 1005:10, 1005:11, 1039:1, 1040:5, 1060:9
deviation [5] - 1030:25, 1031:14, 1031:19, 1031:24, 1065:11
deviation's [1] - 1031:4
deviations [4] - 1031:5, 1031:7, 1031:22
DGS [3] - 1039:8, 1039:17

dichromate [1] - 1049:9
Dickey [1] - 1086:4
difference [2] - 1008:21, 1014:20
different [12] - 1003:22, 1009:24, 1015:20, 1032:7, 1032:17, 1032:20, 1076:22, 1077:8, 1077:13, 1088:1, 1099:8
difficulties [1] - 1004:12
dilution [1] - 1098:19
dinged [1] - 1017:14
DIRECT [1] - 1066:3
direct [15] - 1005:7, 1005:9, 1005:12, 1035:1, 1050:9, 1051:6, 1057:17, 1066:7, 1066:13, 1075:10, 1076:9, 1077:6, 1078:8, 1080:5, 1094:23
Direct [1] - 1104:5
directed [2] - 1037:12, 1077:5
directing [4] - 1024:10, 1037:22, 1042:12, 1061:10
direction [3] - 1011:11, 1038:5, 1038:14
directly [5] - 1005:2, 1050:19, 1050:21, 1051:5, 1063:24
disagree [1] - 1094:6
disagreed [1] - 1064:10
disagreements [1] - 1063:23
disallowed [1] - 1000:23
discharged [2] - 1068:3, 1093:13
discharging [4] - 1093:15, 1093:16, 1093:23, 1094:2
discontinue [1] - 1034:16
discover [1] - 1087:18
discovered [1] - 1085:7
discovery [1] - 1087:23
discrepancies [4] - 1007:8, 1008:3, 1009:10, 1025:22
discussed [3] -

1091:20, 1093:13, 1096:24
discusses [2] - 1026:18, 1026:20
discussing [3] - 1036:9, 1043:12, 1059:24
discussion [2] - 1051:15, 1061:11
Disposal [4] - 1042:17, 1045:15, 1045:16, 1047:19
disposal [10] - 1055:11, 1069:8, 1071:2, 1071:11, 1080:15, 1081:24, 1086:22, 1095:19, 1102:2
dispose [12] - 1043:12, 1044:21, 1044:22, 1045:5, 1045:10, 1046:4, 1055:19, 1068:25, 1069:11, 1078:20, 1079:19, 1079:24
disposed [6] - 1015:2, 1015:3, 1042:22, 1047:1, 1048:14, 1067:18
disposition [5] - 1041:19, 1043:15, 1047:25, 1048:15, 1060:2
Disposition [1] - 1043:8
dispute [2] - 1001:10, 1070:14
disrupted [1] - 1060:18
distances [1] - 1026:10
distinction [5] - 1031:21, 1044:17, 1047:7, 1052:19, 1063:7
DISTRICT [3] - 997:1, 997:1, 997:11
district [3] - 1011:12, 1075:14, 1077:8
District [4] - 1013:24, 1043:15, 1046:2, 1077:9
districts [1] - 1014:9
ditch [1] - 1080:2
ditches [2] - 1078:21, 1080:1
docket [1] - 1075:23
document [57] - 1002:19, 1002:23, 1005:23, 1006:10,

1006:20, 1008:17, 1012:18, 1012:22, 1018:20, 1019:15, 1020:8, 1021:3, 1021:22, 1022:1, 1022:18, 1022:20, 1022:23, 1025:3, 1025:10, 1025:15, 1026:6, 1026:13, 1026:19, 1028:5, 1032:5, 1035:16, 1036:6, 1036:8, 1037:18, 1037:20, 1038:22, 1042:17, 1045:17, 1046:10, 1048:23, 1051:14, 1051:20, 1055:5, 1055:6, 1055:14, 1061:12, 1064:13, 1069:24, 1075:12, 1076:10, 1076:12, 1076:20, 1076:22, 1077:10, 1078:4, 1078:9, 1080:6, 1089:3, 1094:23, 1095:11, 1100:18, 1101:2
Document [1] - 1006:23
documentary [3] - 1013:5, 1031:16, 1057:4
documentation [1] - 1081:23
documents [11] - 1006:21, 1013:5, 1013:6, 1024:21, 1043:22, 1048:18, 1048:24, 1051:25, 1061:14, 1069:25, 1085:11
DoD [15] - 1000:19, 1028:10, 1028:11, 1028:14, 1029:11, 1029:17, 1032:1, 1034:17, 1035:5, 1062:3, 1064:16, 1065:1, 1094:13, 1096:1
DoD's [2] - 1062:2, 1064:12
dollar [1] - 1004:3
done [7] - 1006:4, 1016:23, 1054:8, 1061:4, 1062:5, 1086:14, 1089:21
door [1] - 1010:3
doors [3] - 1017:24, 1018:2, 1018:4
dose [1] - 1083:3

double [4] - 1000:11, 1054:11, 1054:13, 1054:16
doubt [2] - 1003:19, 1093:2
doubts [1] - 1038:17
dovetail [1] - 1006:3
Dow [6] - 1071:10, 1086:14, 1086:16, 1101:13, 1101:18, 1101:20
down [16] - 1007:15, 1009:13, 1011:7, 1027:6, 1027:8, 1049:10, 1052:12, 1065:21, 1065:23, 1080:15, 1085:2, 1093:21, 1096:18, 1098:13, 1099:9
dozen [1] - 1051:18
Dr [15] - 1070:25, 1073:6, 1074:6, 1080:20, 1081:1, 1089:5, 1092:5, 1092:6, 1092:10, 1092:22, 1092:23, 1093:2, 1093:11, 1094:2, 1099:2
drafted [1] - 1075:22
drink [3] - 1083:2, 1092:16, 1098:13
drinking [9] - 1082:21, 1083:4, 1086:9, 1092:9, 1092:18, 1092:19, 1092:20, 1098:23, 1099:20
driven [1] - 1032:25
droning [1] - 1024:7
due [1] - 1102:8
dump [4] - 1070:8, 1070:17, 1074:13, 1074:14
dumped [3] - 1068:2, 1068:17, 1070:13
dumping [5] - 1071:8, 1072:14, 1073:7, 1073:8, 1073:13
Dunn [1] - 997:16
during [8] - 1035:18, 1040:5, 1051:2, 1055:3, 1073:23, 1076:17, 1078:2, 1089:8
duty [2] - 1064:22
Dynamics [3] - 999:18, 999:25, 1000:16

# E

**EAFB** [1] - 1039:1
**early** [5] - 1076:18, 1078:3, 1093:1, 1100:5, 1101:18
**earth** [1] - 1085:6
**easier** [1] - 1099:15
**easily** [1] - 1030:18
**eating** [1] - 1082:19
**EC4** [4] - 1089:22, 1089:25, 1090:1, 1091:11
**ECF** [1] - 1078:25
**economic** [1] - 1000:12
**economy** [1] - 1040:6
**educated** [2] - 1085:16, 1098:8
**educator** [1] - 1080:14
**Edwards** [4] - 1039:2, 1039:18, 1039:23, 1039:24
**effect** [2] - 1001:17, 1010:4
**effective** [3] - 1065:2, 1084:7, 1084:10
**effort** [1] - 1024:12
**eight** [1] - 1086:12
**either** [8] - 1003:11, 1027:5, 1039:23, 1044:21, 1050:9, 1062:7, 1065:10, 1070:8
**Electric** [2] - 999:15, 999:17
**ELLEN** [1] - 997:10
**employees** [10] - 1018:1, 1067:16, 1067:25, 1068:15, 1068:17, 1068:21, 1070:12, 1071:25, 1072:17, 1072:25
**employees'** [1] - 1074:18
**end** [11] - 1030:9, 1036:16, 1041:23, 1050:22, 1053:4, 1053:8, 1053:19, 1056:7, 1057:21, 1057:22, 1102:1
**ended** [1] - 1033:17
**ending** [3] - 1027:12, 1034:7, 1061:8
**ends** [3] - 1005:23, 1011:1, 1011:23
**enforcement** [1] - 1007:3
**engineer** [4] -

1011:12, 1011:16, 1080:13, 1080:14
**engineering** [2] - 1082:12, 1086:11
**engineers** [3] - 1082:12, 1082:18, 1086:1
**enlighten** [2] - 1004:19, 1020:4
**ENRD** [1] - 997:23
**ensure** [2] - 1064:19, 1094:17
**enter** [1] - 1094:17
**entered** [2] - 999:20, 1017:18
**entire** [2] - 1013:8, 1087:14
**entirely** [2] - 1058:22, 1089:11
**entitled** [2] - 1048:20, 1104:19
**environment** [5] - 1035:8, 1078:19, 1079:9, 1087:7, 1090:15
**Environmental** [1] - 997:23
**environmental** [12] - 1070:24, 1071:17, 1071:19, 1072:12, 1080:13, 1081:16, 1082:5, 1082:8, 1082:10, 1086:14, 1096:4, 1096:23
**environmentally** [1] - 1069:19
**EPA** [1] - 1085:19
**equipment** [4] - 1034:13, 1040:22, 1053:7, 1056:15
**equipped** [1] - 1027:17
**ERICA** [1] - 997:19
**ESH** [1] - 997:5
**ESQ** [11] - 997:13, 997:14, 997:14, 997:15, 997:15, 997:19, 997:19, 997:20, 997:20, 997:21, 997:21
**essentially** [2] - 1047:22, 1053:25
**estate** [1] - 1045:24
**estimated** [2] - 1048:1, 1062:7
**et** [2] - 1049:22, 1085:19
**evaluated** [1] - 1003:15
**evaluation** [10] -

1003:1, 1003:2, 1003:10, 1003:18, 1005:25, 1007:3, 1060:25, 1061:2, 1062:16, 1063:15
**evaluations** [1] - 1003:21
**evaporate** [4] - 1080:16, 1093:14, 1093:24, 1093:25
**evaporated** [2] - 1058:12, 1093:10
**evaporates** [1] - 1083:1
**evaporation** [3] - 1067:18, 1072:15, 1080:24
**event** [3] - 1035:8, 1049:16, 1074:10
**evidence** [6] - 1006:6, 1013:7, 1046:12, 1046:22, 1077:17, 1095:7
**evil** [2] - 1074:11, 1074:12
**evolution** [1] - 1003:6
**exactly** [3] - 1085:12, 1090:21, 1098:8
**examination** [1] - 1077:4
**EXAMINATION** [4] - 1002:2, 1054:20, 1066:3, 1066:17
**Examination.........** [1] - 1104:3
**Examination.............** ... [1] - 1104:4
**Examination.............** ...... [1] - 1104:5
**Examination.............** ...... [1] - 1104:5
**example** [7] - 1004:2, 1024:17, 1044:4, 1056:14, 1062:2, 1071:10, 1092:20
**except** [1] - 1092:8
**exception** [1] - 1011:9
**exchange** [1] - 1016:8
**excuse** [1] - 1019:2
**Excuse** [1] - 1065:6
**exhaust** [2] - 1010:4, 1018:3
**Exhibit** [35] - 1002:16, 1010:20, 1010:21, 1012:24, 1013:9, 1013:10, 1016:15, 1020:23, 1024:25, 1031:18, 1036:5, 1037:17, 1038:20, 1040:21, 1042:16,

1043:1, 1045:14, 1047:18, 1048:20, 1049:1, 1055:1, 1059:2, 1060:23, 1064:13, 1075:16, 1075:19, 1077:10, 1077:15, 1077:16, 1092:2, 1095:3, 1095:6, 1100:19, 1104:11, 1104:11
**exhibit** [5] - 1037:8, 1037:17, 1075:15, 1077:2, 1095:2
**exhibits** [1] - 1054:22
**EXHIBITS** [1] - 1104:9
**exist** [2] - 1085:19, 1087:10
**existed** [1] - 1089:2
**existence** [2] - 1076:17, 1078:2
**existing** [2] - 1026:1, 1030:16
**exists** [2] - 1053:4, 1089:2
**exit** [1] - 1023:2
**experience** [4] - 1046:16, 1080:13, 1081:8, 1083:7
**experimental** [1] - 1047:23
**expert** [5] - 1022:20, 1066:21, 1080:9, 1081:1, 1089:4
**experts** [1] - 1074:24
**explain** [1] - 1061:17
**explosion** [3] - 1035:23, 1073:20, 1073:21
**explosions** [1] - 1096:4
**explosive** [11] - 1007:4, 1009:7, 1009:9, 1009:20, 1015:18, 1016:13, 1024:13, 1043:12, 1043:18, 1048:2, 1094:15
**Explosives** [3] - 1030:12, 1030:14, 1043:8
**explosives** [7] - 1015:2, 1027:16, 1031:10, 1036:3, 1047:24, 1048:1, 1064:17
**exposure** [4] - 1089:8, 1092:11, 1092:14, 1092:15
**exposures** [1] - 1092:8

**express** [1] - 1035:2
**expression** [2] - 1039:13, 1044:8
**extent** [2] - 1014:23, 1072:25
**extracted** [1] - 1099:21

# F

**facilities** [2] - 1007:4, 1025:23
**facility** [18] - 1011:17, 1013:6, 1015:1, 1018:13, 1018:24, 1019:3, 1044:21, 1044:23, 1045:5, 1047:2, 1060:14, 1067:19, 1068:3, 1068:5, 1097:12, 1097:15, 1098:15, 1101:15
**fact** [11] - 1001:1, 1007:14, 1014:15, 1016:22, 1028:6, 1055:22, 1070:7, 1081:22, 1082:2, 1086:6, 1095:18
**factory** [1] - 1009:1
**failed** [1] - 1067:16
**failure** [1] - 1067:24
**fair** [2] - 1063:3, 1063:5
**fairly** [2] - 1092:12, 1092:21
**familiar** [6] - 1003:1, 1003:20, 1018:20, 1029:5, 1029:12, 1076:6
**far** [3] - 1001:3, 1001:11, 1091:1
**FAR** [2] - 1054:14, 1054:17
**farming** [1] - 1085:6
**fast** [1] - 1029:16
**fault** [1] - 1084:1
**faulty** [1] - 1072:17
**fax** [1] - 1038:3
**February** [2] - 997:7, 1026:4
**Federal** [1] - 1054:12
**federal** [7] - 1000:6, 1075:13, 1076:14, 1077:8, 1078:10, 1080:19, 1085:18
**feeds** [1] - 1001:16
**Feenstra** [4] - 1029:22, 1070:25, 1074:6, 1100:21

**fees** [2] - 1001:9, 1044:11
**feet** [1] - 1048:1
**few** [3] - 1017:18, 1083:18, 1092:19
**field** [1] - 1086:11
**figure** [3] - 1004:5, 1078:6, 1090:20
**filed** [5] - 1075:13, 1076:13, 1077:7, 1094:25, 1095:12
**filter** [4] - 1012:16, 1017:2, 1021:7, 1021:10
**filters** [10] - 1009:15, 1012:3, 1012:4, 1012:5, 1012:8, 1015:4, 1016:23, 1017:3, 1017:4, 1017:9
**finance** [1] - 1046:20
**finances** [1] - 1009:1
**financial** [2] - 1003:5, 1006:1
**financially** [2] - 1003:12, 1004:2
**findings** [3] - 1010:24, 1011:3, 1034:6
**fine** [1] - 1001:7
**finish** [2] - 1037:10, 1054:7
**finished** [1] - 1054:5
**fire** [3] - 1035:24, 1048:5, 1096:3
**fired** [1] - 1040:16
**fires** [1] - 1036:3
**firing** [1] - 1040:10
**firm** [1] - 999:15
**first** [17] - 1003:14, 1003:17, 1006:25, 1009:10, 1032:8, 1033:10, 1034:5, 1034:6, 1038:23, 1060:15, 1062:2, 1064:5, 1075:20, 1080:8, 1094:8, 1095:11, 1098:1
**fish** [1] - 1089:1
**five** [4] - 1033:12, 1034:6, 1098:17, 1100:10
**fix** [1] - 1004:10
**fix-price** [1] - 1004:10
**fixed** [29] - 1004:8, 1004:9, 1004:14, 1004:20, 1004:25, 1005:6, 1005:14, 1045:6, 1050:16, 1050:18, 1050:22, 1053:14,

1056:5, 1056:7, 1056:10, 1056:13, 1056:19, 1057:19, 1057:22, 1059:8, 1059:9, 1059:11, 1059:15, 1059:18, 1062:5, 1062:8, 1062:9
**fixed-price** [27] - 1004:8, 1004:9, 1004:14, 1004:20, 1004:25, 1005:6, 1005:14, 1044:25, 1045:6, 1050:16, 1050:18, 1050:22, 1053:14, 1056:5, 1056:7, 1056:10, 1056:13, 1056:19, 1057:19, 1057:22, 1059:8, 1059:9, 1059:11, 1059:15, 1059:18, 1062:9
**Flammable** [1] - 1043:8
**flammable** [2] - 1022:3, 1042:22
**flash** [1] - 1024:4
**flat** [1] - 1017:18
**flat-out** [1] - 1086:7
**FLETCHER** [1] - 997:15
**flushing** [1] - 1071:12
**focus** [1] - 1089:7, 1089:11
**focused** [1] - 1017:5
**focusing** [1] - 1058:25
**follow** [2] - 1028:6, 1054:23
**followed** [4] - 1008:14, 1024:19, 1071:25, 1080:18
**following** [4] - 1006:21, 1008:10, 1061:14, 1098:9
**food** [1] - 1014:17
**FOR** [3] - 997:1, 1002:1, 1066:2
**force** [1] - 1014:12
**Force** [42] - 1002:10, 1002:11, 1002:12, 1003:4, 1003:14, 1003:18, 1005:10, 1007:3, 1009:9, 1011:4, 1011:11, 1011:15, 1012:9, 1012:12, 1018:4, 1018:9, 1018:12, 1019:12, 1026:11, 1031:20, 1032:17, 1032:23, 1033:22,

1033:23, 1035:3, 1035:14, 1036:1, 1039:2, 1039:18, 1039:19, 1040:2, 1044:4, 1044:18, 1048:4, 1048:7, 1061:4, 1061:6, 1062:17, 1062:18, 1063:2, 1063:17
**Force's** [1] - 1017:13
**Ford** [10] - 1080:10, 1089:5, 1092:5, 1092:10, 1092:22, 1092:23, 1093:2, 1093:11, 1094:2
**Ford's** [3] - 1080:20, 1081:1, 1092:6
**foregoing** [1] - 1104:18
**forerunner** [1] - 1038:3
**forget** [2] - 1086:25, 1101:6
**form** [4] - 1049:6, 1050:9, 1052:1, 1093:17
**formal** [6] - 1007:7, 1007:19, 1007:23, 1008:7, 1023:1, 1024:20
**formalization** [1] - 1028:22
**formally** [1] - 1028:19
**formed** [1] - 1014:4
**Fort** [8] - 1043:18, 1043:22, 1045:19, 1045:20, 1045:21, 1045:22, 1046:4, 1046:6
**forth** [4] - 1015:16, 1026:23, 1043:25, 1046:23
**forward** [1] - 1065:16
**FOTOUHI** [43] - 997:15, 1062:22, 1066:18, 1068:12, 1068:13, 1069:8, 1069:14, 1069:23, 1070:1, 1075:9, 1075:12, 1075:18, 1075:22, 1076:4, 1076:5, 1076:23, 1077:3, 1077:5, 1077:20, 1077:22, 1078:11, 1078:13, 1078:25, 1079:3, 1079:4, 1079:11, 1079:17, 1088:11, 1091:10, 1091:17, 1091:18, 1091:24,

1092:1, 1092:3, 1094:25, 1095:10, 1095:14, 1095:25, 1099:1, 1100:20, 1100:23, 1101:1, 1101:12
**four** [5] - 1007:22, 1030:6, 1033:11, 1033:17, 1036:12
**frankly** [2] - 1085:15, 1098:2
**frequency** [2] - 1016:9, 1016:17
**frequently** [1] - 1038:4
**front** [3] - 1013:11, 1017:24, 1076:20
**full** [2] - 1064:7, 1080:8, 1095:11
**fully** [1] - 1058:4
**furnished** [2] - 1053:7, 1056:14
**future** [4] - 1001:3, 1031:24, 1034:22, 1035:11, 1037:13, 1041:10

## G

**Galinisky** [1] - 1084:18
**gallons** [9] - 1049:13, 1049:17, 1051:8, 1051:12, 1051:23, 1052:4, 1052:12, 1097:2, 1097:4
**garbage** [3] - 1053:25, 1058:6, 1058:11
**GCR** [1] - 1043:3
**geez** [1] - 1055:21
**General** [7] - 999:18, 999:25, 1000:16, 1039:9, 1039:11, 1039:12
**general** [17] - 1014:7, 1036:5, 1039:14, 1039:15, 1049:21, 1049:25, 1050:3, 1051:15, 1051:17, 1052:5, 1052:16, 1052:19, 1063:22, 1071:13, 1079:8, 1081:9, 1102:1
**generality** [1] - 1096:16
**generally** [3] - 1078:18, 1079:14, 1100:6
**generated** [7] - 1044:16, 1044:17,

1044:18, 1047:1, 1048:2, 1048:7, 1048:12
**generic** [3] - 1031:9, 1064:15, 1096:3
**Gibson** [1] - 997:16
**given** [1] - 1042:5
**goods** [1] - 1064:23
**government** [91] - 999:11, 999:12, 999:21, 999:24, 1000:6, 1000:13, 1000:14, 1001:6, 1001:9, 1001:20, 1005:1, 1005:3, 1005:5, 1008:13, 1008:25, 1013:17, 1014:4, 1015:9, 1015:13, 1023:21, 1024:12, 1028:24, 1030:2, 1032:9, 1036:8, 1041:16, 1041:19, 1041:20, 1041:23, 1041:24, 1042:5, 1042:9, 1042:10, 1044:1, 1044:7, 1044:12, 1044:13, 1045:2, 1045:4, 1047:10, 1048:12, 1048:13, 1048:14, 1048:17, 1050:20, 1050:23, 1051:3, 1053:4, 1053:6, 1053:7, 1053:19, 1053:21, 1054:11, 1055:4, 1055:6, 1055:14, 1056:2, 1056:4, 1056:9, 1056:21, 1056:23, 1056:24, 1057:6, 1057:19, 1057:24, 1059:11, 1060:1, 1060:7, 1060:13, 1061:24, 1063:22, 1063:24, 1064:7, 1064:8, 1064:19, 1064:21, 1072:8, 1072:24, 1074:23, 1075:25, 1079:6, 1083:16, 1085:12, 1085:19, 1095:12
**Government** [1] - 1050:15
**government's** [10] - 1044:20, 1050:12, 1056:1, 1056:10, 1056:25, 1058:4, 1074:17, 1079:12,

1089:4, 1092:4
**government-furnished** [1] - 1056:14
**government-owned** [4] - 1048:14, 1050:20, 1055:4, 1060:1
**governmental** [1] - 1044:6
**governs** [1] - 1081:10
**Grand** [2] - 1043:5, 1043:11
**granted** [4] - 1030:25, 1031:4, 1031:6, 1031:15
**grating** [2] - 1021:13, 1021:18
**gravity** [3] - 1082:13, 1082:14, 1085:2
**greater** [1] - 1090:6
**green** [1] - 1091:6
**grind** [1] - 1017:10
**grinding** [7] - 1009:15, 1010:14, 1010:15, 1012:3, 1012:6, 1016:24, 1017:2
**ground** [27] - 1014:24, 1015:7, 1015:19, 1030:14, 1053:12, 1053:23, 1067:19, 1068:2, 1068:4, 1069:1, 1069:9, 1069:17, 1070:13, 1071:3, 1071:8, 1071:12, 1071:13, 1071:14, 1073:13, 1074:7, 1076:16, 1077:25, 1080:3, 1080:16, 1080:25, 1083:11, 1086:9
**grounds** [3] - 1000:23, 1030:22, 1084:2
**groundwater** [43] - 1015:23, 1072:22, 1072:24, 1073:2, 1073:14, 1074:1, 1074:25, 1075:6, 1075:7, 1081:5, 1081:23, 1083:20, 1084:20, 1085:2, 1085:3, 1086:4, 1087:17, 1087:22, 1087:23, 1089:14, 1089:16, 1089:20, 1090:3, 1091:1, 1096:7, 1096:10, 1096:14, 1096:17, 1096:25, 1097:6, 1097:8, 1097:10,

1097:11, 1097:14, 1097:20, 1098:10, 1098:12, 1098:15, 1099:2, 1100:13, 1100:15, 1101:22
**group** [2] - 1017:18, 1090:2
**Grove** [1] - 1089:23
**guess** [6] - 1049:3, 1057:5, 1061:17, 1062:14, 1062:18, 1062:21
**guy** [1] - 1009:14
**guys** [1] - 1055:21

# H

**hamburger** [1] - 1024:2
**hand** [4] - 1001:16, 1019:15, 1030:11, 1042:21
**handle** [2] - 1024:13, 1101:25
**handling** [3] - 1031:2, 1031:10, 1073:11
**handwriting** [1] - 1025:3
**hard** [2] - 1060:16, 1076:21
**hard-nosed** [1] - 1060:16
**hardware** [1] - 1040:4
**harmless** [1] - 1093:25
**harmlessly** [2] - 1093:10, 1093:13
**hash** [1] - 1063:23
**haywood** [1] - 1036:17
**hazard** [5] - 1030:16, 1048:5, 1057:5, 1071:23, 1082:5
**head** [2] - 1005:15, 1100:17
**Headquarters** [1] - 1046:3
**headquarters** [1] - 1009:9
**health** [1] - 1092:8
**hear** [2] - 1026:15, 1081:12
**heard** [2] - 1008:10, 1084:16
**heat** [1] - 1082:25
**heater** [1] - 1012:4
**heaven's** [1] - 1098:4
**held** [4] - 999:19, 1032:10, 1051:3,

1074:4
**help** [2] - 1055:23, 1056:2
**helpful** [2] - 1024:8, 1069:23
**HEMINGER** [1] - 997:20
**Henry's** [1] - 1082:25
**high** [1] - 1092:13
**higher** [3] - 1097:21, 1099:15, 1100:3
**highlighted** [1] - 1011:22
**highly** [2] - 1081:18, 1093:21
**hindsight** [2] - 1084:6, 1085:7
**hits** [2] - 1061:24, 1098:15
**hold** [1] - 1067:4
**holders** [1] - 1039:13
**holding** [1] - 1090:22
**Honor** [106] - 999:8, 999:14, 999:18, 999:22, 999:25, 1000:7, 1000:14, 1000:17, 1000:20, 1000:25, 1001:11, 1002:17, 1004:3, 1004:10, 1004:21, 1004:25, 1005:6, 1005:15, 1009:22, 1012:20, 1012:23, 1012:24, 1013:4, 1013:8, 1013:10, 1013:13, 1014:22, 1015:22, 1025:5, 1026:12, 1026:17, 1027:2, 1027:7, 1027:11, 1030:5, 1042:25, 1047:5, 1050:7, 1050:13, 1051:6, 1051:17, 1051:21, 1052:1, 1053:6, 1054:6, 1054:8, 1056:8, 1057:3, 1057:8, 1057:11, 1057:16, 1059:16, 1062:25, 1065:18, 1065:20, 1065:22, 1065:24, 1068:10, 1068:12, 1069:24, 1070:1, 1070:5, 1070:11, 1070:20, 1070:22, 1070:25, 1071:6, 1071:10, 1071:12, 1071:15, 1071:21, 1072:1, 1072:21, 1073:4, 1073:8,

1073:23, 1074:2, 1074:16, 1074:22, 1075:3, 1075:12, 1075:18, 1075:20, 1075:22, 1076:4, 1077:1, 1077:5, 1077:7, 1077:12, 1078:11, 1078:23, 1079:11, 1081:8, 1088:9, 1091:12, 1091:17, 1091:24, 1092:1, 1094:25, 1095:4, 1095:10, 1095:25, 1097:25, 1100:21, 1100:23, 1100:24
**HONORABLE** [1] - 997:10
**horse** [1] - 1039:12
**host** [1] - 1101:24
**hostilities** [1] - 1035:9
**hot** [3] - 1009:18, 1017:3, 1083:4
**hours** [1] - 1073:16
**hundred** [3] - 1004:3, 1083:17, 1088:23
**hundreds** [1] - 1084:24
**hurt** [1] - 1060:16
**hurting** [1] - 1096:3
**HUVELLE** [1] - 997:10
**hydrocarbon** [1] - 1097:4
**hydrogeologist** [1] - 1067:11
**hygiene** [2] - 1017:25, 1092:11

# I

**idea** [5] - 1017:23, 1025:5, 1049:15, 1062:11, 1075:21
**ideas** [1] - 1096:19
**identified** [5] - 1007:8, 1007:19, 1008:4, 1009:8, 1061:12
**identify** [1] - 1010:9
**ignitable** [1] - 1030:18
**immaterial** [1] - 1095:17
**impact** [4] - 1081:16, 1087:7, 1087:18, 1090:14
**impacts** [1] - 1087:17
**impervious** [2] - 1093:23, 1094:3
**implications** [1] - 1058:15

**implies** [1] - 1027:4
**important** [3] - 1035:20, 1060:17, 1060:20
**impose** [1] - 1085:14
**imposing** [1] - 1015:10
**inadequate** [1] - 1094:19
**incident** [1] - 1086:3
**include** [2] - 1062:7, 1095:2
**included** [5] - 1045:1, 1056:22, 1061:23, 1069:15, 1101:24
**including** [5] - 1004:22, 1067:17, 1085:18
**inconsistent** [1] - 1015:22
**incorporated** [2] - 1062:15, 1062:16
**incorporating** [1] - 1006:17
**incorrect** [1] - 1093:11
**increase** [1] - 1016:17
**increased** [1] - 1038:8
**incur** [1] - 1001:4
**independent** [3] - 1032:9, 1057:13, 1060:9
**INDEX** [1] - 1104:1
**indicate** [6] - 1007:7, 1011:5, 1035:17, 1041:15, 1044:2, 1055:13
**indicated** [1] - 1034:15
**indicates** [5] - 1006:8, 1006:19, 1021:10, 1022:8, 1030:24
**indicating** [2] - 1003:17, 1010:11
**indication** [2] - 1028:24, 1040:15
**indirect** [3] - 1001:8, 1050:10, 1057:12
**individual** [1] - 1014:9
**industrial** [3] - 1018:1, 1092:11, 1093:8
**industry** [6] - 1034:22, 1035:10, 1078:20, 1079:19, 1081:9, 1089:6
**inform** [1] - 1064:10
**injecting** [1] - 1086:9
**inquiry** [1] - 1072:6
**insert** [1] - 1075:15
**insight** [2] - 1016:5, 1063:18

**insolvent** [1] - 1082:24
**inspect** [6] - 1014:19, 1016:10, 1064:19, 1064:21, 1064:22
**inspected** [1] - 1016:24
**inspecting** [1] - 1015:11
**Inspection** [1] - 1022:24
**inspection** [14] - 1007:4, 1010:7, 1016:8, 1021:1, 1023:4, 1023:6, 1029:7, 1038:10, 1038:11, 1038:13, 1038:17, 1060:18, 1063:2, 1063:17
**inspections** [9] - 1002:9, 1007:12, 1012:21, 1013:18, 1013:25, 1014:18, 1015:17, 1016:11
**Inspections** [3] - 1020:24, 1025:2, 1031:19
**inspector** [2] - 1009:9, 1010:11
**installed** [1] - 1001:6
**instance** [3] - 1042:13, 1053:3, 1084:3
**instead** [2] - 1024:11, 1036:12
**instructing** [1] - 1071:11
**instruction** [1] - 1035:13
**instructions** [3] - 1041:19, 1048:15, 1060:2
**Insurance** [1] - 1067:1
**integrating** [1] - 1036:24
**intended** [2] - 1073:22, 1096:12
**intent** [1] - 1077:6
**interdepartmental** [1] - 1028:25
**Interdepartmental** [1] - 1028:16
**interest** [3] - 1048:13, 1058:4, 1058:7
**interlying** [1] - 1026:10
**internal** [1] - 1036:8
**International** [1] - 1067:1
**interpretation** [1] -

1022:13
**inventory** [5] - 1041:22, 1050:11, 1053:9, 1056:5, 1056:12
**involved** [2] - 1040:9, 1072:5
**involving** [1] - 1043:22
**IRND** [1] - 1042:8
**irrelevancies** [1] - 1058:24
**irrelevant** [2] - 1076:2, 1081:24
**Irwin** [3] - 1043:15, 1043:18, 1043:22
**isopropyl** [1] - 1049:10
**issue** [14] - 999:13, 999:16, 1000:10, 1000:11, 1069:12, 1070:23, 1073:14, 1075:1, 1075:14, 1080:9, 1085:3, 1095:18, 1099:8
**issued** [2] - 1008:24, 1028:19
**issues** [10] - 1006:1, 1014:24, 1024:11, 1038:7, 1073:17, 1073:19, 1073:21, 1074:24, 1096:11
**items** [1] - 1039:22
**itself** [1] - 1062:19

## J

**Jack** [2] - 1087:15, 1087:21
**James** [1] - 1104:3
**JAMES** [1] - 1002:1
**January** [7] - 1007:17, 1007:21, 1007:22, 1007:24, 1025:13, 1026:13, 1026:18
**JENNIFER** [1] - 997:21
**JESSICA** [1] - 997:20
**job** [2] - 1004:7, 1041:23
**jobs** [1] - 1014:6
**John** [1] - 1067:4
**JOHN** [1] - 997:19
**JOHNSON** [22] - 997:21, 1026:12, 1026:17, 1029:24, 1054:21, 1055:9, 1055:11, 1055:15, 1056:17, 1058:9,

1058:21, 1059:1, 1059:16, 1059:21, 1059:23, 1062:25, 1063:1, 1064:4, 1064:9, 1065:6, 1065:8, 1065:17
**JUDGE** [1] - 997:11
**judge** [1] - 999:10
**jump** [8] - 1002:20, 1002:21, 1018:21, 1025:11, 1025:12, 1038:23, 1045:18, 1048:24
**Justice** [1] - 997:22
**JUSTIN** [2] - 997:14, 997:20

## K

**keep** [2] - 1034:25, 1072:8
**Kennedy** [1] - 1067:4
**kept** [1] - 1018:4
**Kerr** [1] - 1034:15
**Kerr-McGee** [1] - 1034:15
**ketone** [1] - 1049:9
**key** [1] - 1088:24
**kill** [2] - 1092:12, 1096:17
**killed** [2] - 1060:15, 1089:1
**kind** [4] - 1001:10, 1009:13, 1024:12, 1062:18
**kinds** [1] - 1093:22
**knocks** [1] - 1098:13
**knowledge** [12] - 1068:15, 1068:17, 1068:20, 1071:5, 1071:14, 1073:11, 1073:24, 1081:13, 1081:17, 1083:8, 1095:18
**knowledgeable** [1] - 1093:8
**known** [9] - 1041:9, 1068:24, 1074:3, 1074:25, 1075:5, 1081:15, 1084:2, 1084:11, 1088:24
**knows** [2] - 1087:19, 1091:22
**Kwajalein** [1] - 1039:24

## L

**L-A-S-N-I-K** [1] -

999:10
**L.A** [2] - 1043:14, 1045:22
**Lab** [1] - 1039:19
**laboratory** [1] - 1068:1
**lack** [1] - 1044:7
**lagoons** [3] - 1078:21, 1079:24, 1079:25
**laid** [1] - 1090:13
**land** [3] - 1093:6, 1093:13, 1094:5
**landfill** [1] - 1044:11
**lands** [1] - 1053:12
**language** [1] - 1094:21
**LAPD** [2] - 1045:25, 1046:1
**large** [4] - 1017:7, 1038:25, 1039:19, 1092:8
**Lasnik** [1] - 999:10
**last** [19] - 1001:2, 1007:7, 1007:19, 1008:15, 1008:20, 1017:5, 1020:5, 1020:8, 1021:2, 1029:2, 1029:14, 1030:6, 1034:6, 1035:16, 1036:17, 1039:7, 1046:8, 1061:11, 1073:17
**late** [1] - 1102:8
**Laughter** [5] - 1058:20, 1058:23, 1095:24, 1101:8, 1102:11
**launch** [2] - 1039:21, 1039:23
**law** [3] - 1070:18, 1074:15, 1082:25
**laws** [1] - 1077:13
**lawsuit** [1] - 1085:22
**lawyer** [1] - 1095:22
**lead** [1] - 1062:23
**leaking** [1] - 1097:4
**leaks** [1] - 1097:1
**least** [8] - 1031:15, 1035:13, 1038:23, 1042:13, 1046:12, 1052:4, 1057:7, 1085:12
**leaves** [1] - 1082:24
**led** [4] - 1015:6, 1016:1, 1072:22, 1072:24
**leeching** [3] - 1084:7, 1094:16, 1097:20
**left** [5] - 1010:3, 1019:15, 1030:11, 1050:25, 1053:15

**left-hand** [2] - 1019:15, 1030:11
**legal** [2] - 1001:9, 1001:12
**Lejeune** [3] - 1076:6, 1076:18, 1078:3
**Lemon** [1] - 1089:23
**less** [3] - 1022:3, 1090:6
**letter** [14] - 1019:9, 1024:22, 1025:18, 1026:14, 1026:21, 1026:25, 1027:4, 1031:19, 1031:21, 1040:25, 1043:11, 1046:5, 1047:20, 1047:22
**letting** [1] - 1080:16
**level** [5] - 1022:12, 1032:18, 1084:1, 1096:16, 1097:24
**levels** [1] - 1098:3
**liability** [1] - 1074:21
**liable** [2] - 1000:15, 1074:4
**lids** [1] - 1027:18
**light** [1] - 1055:23
**likely** [1] - 1098:14
**limited** [1] - 1081:8
**limits** [1] - 1006:5
**line** [2] - 1020:1, 1020:12
**lined** [1] - 1017:19, 1020:10
**Lines** [1] - 1067:1
**lines** [1] - 1055:5
**lining** [1] - 1017:22
**liquid** [4] - 1080:3, 1081:5, 1093:15, 1093:16
**liquids** [3] - 1080:23, 1080:25, 1084:5
**list** [5] - 1025:21, 1027:3, 1027:13, 1027:16, 1027:20, 1029:2, 1029:15, 1033:9, 1033:11, 1034:10, 1039:7, 1040:1, 1049:7, 1053:9, 1077:2
**listed** [3] - 1050:4, 1056:4, 1056:12
**listen** [1] - 1073:16
**listening** [1] - 1072:16
**lists** [1] - 1049:21
**literature** [4] - 1083:9, 1084:13, 1087:11, 1092:24
**lived** [2] - 1076:18, 1078:2

**LLP** [1] - 997:16
**loaded** [1] - 1096:9
**located** [4] - 1009:18, 1067:7, 1099:2, 1099:6
**locations** [1] - 1068:3
**LOCKHEED** [1] - 997:3
**Lockheed** [47] - 999:2, 999:13, 999:24, 1001:19, 1005:3, 1005:5, 1005:10, 1007:4, 1008:4, 1008:13, 1008:16, 1016:6, 1016:15, 1025:21, 1027:21, 1028:16, 1028:18, 1037:22, 1038:6, 1040:18, 1040:19, 1041:21, 1044:9, 1050:6, 1053:5, 1059:5, 1059:14, 1059:24, 1060:2, 1060:4, 1060:6, 1061:12, 1061:13, 1062:15, 1062:17, 1062:19, 1063:13, 1063:18, 1063:20, 1064:1, 1064:14, 1065:12, 1065:13, 1085:22, 1086:7, 1086:21, 1100:20
**Lockheed's** [8] - 1006:15, 1006:22, 1014:14, 1028:25, 1063:4, 1063:6, 1072:9
**Lon** [1] - 1033:16
**look** [44] - 1006:5, 1006:9, 1006:25, 1008:25, 1010:20, 1014:25, 1018:24, 1019:13, 1019:15, 1020:19, 1021:22, 1022:11, 1022:17, 1023:15, 1026:5, 1029:12, 1031:5, 1032:3, 1032:6, 1033:6, 1033:7, 1033:9, 1034:5, 1035:16, 1036:4, 1040:1, 1040:21, 1049:7, 1051:9, 1062:3, 1062:6, 1067:15, 1069:24, 1070:10, 1071:7, 1077:19, 1081:21, 1088:4, 1094:7, 1096:1, 1101:19
**looked** [11] - 1009:3,

1010:14, 1010:15, 1019:10, 1021:7, 1025:12, 1033:4, 1035:17, 1057:3, 1071:1, 1084:19
**looking** [37] - 1002:25, 1006:6, 1006:11, 1009:14, 1010:17, 1012:23, 1014:21, 1015:6, 1016:12, 1016:15, 1016:22, 1018:12, 1018:13, 1018:14, 1019:14, 1019:19, 1019:23, 1020:7, 1021:3, 1023:8, 1030:4, 1030:5, 1030:11, 1032:8, 1033:1, 1035:10, 1041:6, 1060:11, 1061:5, 1071:5, 1073:18, 1073:19, 1088:25, 1098:3, 1100:22, 1101:10
**looks** [1] - 1013:12
**Los** [1] - 1046:2
**low** [4] - 1034:16, 1084:25, 1092:12, 1098:3
**lower** [1] - 1032:18
**LPC** [44] - 1002:10, 1006:17, 1010:23, 1011:9, 1012:5, 1019:9, 1022:2, 1022:9, 1022:11, 1022:15, 1024:1, 1024:17, 1025:23, 1031:2, 1031:6, 1032:10, 1032:11, 1034:2, 1034:13, 1034:18, 1034:21, 1034:25, 1035:10, 1035:25, 1036:12, 1037:4, 1037:6, 1037:12, 1038:24, 1038:25, 1040:16, 1041:1, 1041:10, 1041:14, 1043:19, 1044:1, 1044:17, 1046:14, 1047:22, 1049:3, 1049:8, 1055:17, 1067:16
**LPC's** [7] - 1006:7, 1011:3, 1011:7, 1011:13, 1041:7, 1067:24, 1068:16
**LUDWISZEWSKI** [1] - 997:14
**Lunch** [1] - 1102:13
**lunch** [4] - 1026:7,

1026:9, 1027:6, 1102:12
**luncheon** [1] - 1102:6

## M

**ma'am** [2] - 1055:11, 1058:21
**MacArthur** [6] - 1045:20, 1045:21, 1045:22, 1046:4, 1046:7
**machine** [2] - 998:25, 1009:25
**main** [2] - 1083:5, 1083:7
**maintenance** [2] - 1068:1, 1073:5
**major** [3] - 1003:23, 1040:15, 1060:20
**Major** [2] - 1039:7, 1039:10
**management** [13] - 1003:1, 1003:2, 1003:4, 1003:9, 1003:17, 1003:21, 1005:25, 1007:3, 1060:25, 1061:2, 1062:16, 1063:14, 1068:23
**mandatory** [2] - 1096:5, 1096:7
**manner** [3] - 1015:1, 1017:9, 1071:24
**manual** [16] - 1000:25, 1018:17, 1018:18, 1028:14, 1029:20, 1029:22, 1031:9, 1062:3, 1062:18, 1064:13, 1064:15, 1064:20, 1065:1, 1095:16, 1096:1
**Manual** [10] - 1012:9, 1012:12, 1018:4, 1018:9, 1028:11, 1029:11, 1029:17, 1032:1, 1094:14, 1094:20
**manuals** [7] - 1006:17, 1015:10, 1026:11, 1028:10, 1031:11, 1062:16, 1062:17
**Manuals** [3] - 1020:24, 1025:1, 1031:19
**manufacture** [1] - 1032:12
**manufacturers'** [1] - 1080:18

**manufacturing** [1] - 1032:12
**March** [9] - 1007:17, 1007:24, 1008:19, 1010:12, 1011:16, 1012:7, 1038:24, 1039:4, 1043:6
**marched** [1] - 1031:12
**Marine** [1] - 1076:6
**mark** [1] - 1077:10
**marked** [1] - 1061:7
**Martin** [3] - 999:3, 1064:14, 1065:13
**MARTIN** [1] - 997:3
**Martin's** [1] - 1100:20
**Martini** [1] - 1065:12
**Marymee** [4] - 1022:25, 1029:3, 1029:5, 1029:7
**mass** [2] - 1035:8, 1096:23
**mass-produce** [1] - 1035:8
**material** [25] - 1015:18, 1041:10, 1041:11, 1046:5, 1046:7, 1047:8, 1048:2, 1048:4, 1048:16, 1053:21, 1054:1, 1054:3, 1059:12, 1081:10, 1081:14, 1081:16, 1081:21, 1083:1, 1084:20, 1095:18, 1096:23, 1097:1, 1097:2, 1101:10, 1101:24
**materials** [10] - 1015:3, 1024:14, 1030:19, 1037:13, 1081:19, 1081:20, 1084:22, 1091:2, 1094:15, 1098:1
**matter** [10] - 1014:21, 1034:17, 1035:1, 1035:2, 1073:21, 1075:13, 1076:13, 1077:8, 1099:6, 1104:19
**matters** [2] - 1014:22, 1085:21
**maximum** [1] - 1018:6
**McGee** [1] - 1034:15
**McKee** [4] - 1087:21, 1088:5, 1088:19, 1092:1
**McKee's** [2] - 1087:15, 1088:12
**McNamara** [1] - 1014:2

**mean** [10] - 1004:1, 1019:21, 1053:3, 1059:9, 1069:6, 1082:2, 1082:19, 1085:21, 1095:23, 1096:16
**meaning** [2] - 1029:25, 1054:10
**means** [8] - 1033:13, 1039:17, 1054:1, 1060:6, 1068:25, 1079:14, 1080:3
**measuring** [1] - 1063:4
**mechanics** [1] - 1068:1
**meet** [1] - 1032:13
**meeting** [2] - 1034:18, 1102:6
**MEK** [2] - 1022:3, 1022:6
**member** [1] - 1033:21
**memo** [8] - 1043:3, 1043:5, 1043:6, 1045:16, 1055:16, 1059:3, 1059:24, 1060:6
**memorandum** [2] - 1026:18, 1036:8
**memories** [1] - 1072:17
**mention** [4] - 1088:17, 1088:19, 1091:11, 1091:14
**mentioned** [10] - 1005:25, 1009:25, 1010:7, 1031:9, 1054:13, 1056:18, 1058:10, 1058:11, 1059:25, 1091:19
**mentioning** [2] - 1072:24, 1091:16
**mentions** [1] - 1021:6
**metal** [2] - 1024:1, 1024:3
**metaphysical** [2] - 1058:18, 1075:8
**method** [1] - 1071:11
**methods** [2] - 1071:2, 1078:22
**methyl** [1] - 1049:9
**mic** [2] - 1026:16, 1081:11
**MICHAEL** [1] - 997:13
**mid-1950s** [1] - 1069:3
**mid-1970s** [3] - 1069:3, 1078:19, 1079:9
**middle** [4] - 1078:14, 1079:11, 1089:5,

1096:18
**might** [13] - 1008:24, 1023:2, 1036:21, 1036:23, 1037:1, 1044:13, 1046:2, 1046:19, 1057:15, 1059:11, 1083:3, 1088:15, 1097:3
**miles** [6] - 1044:10, 1081:23, 1081:24, 1091:4, 1098:17, 1100:10
**military** [10] - 1014:9, 1038:4, 1049:19, 1078:20, 1079:19, 1081:4, 1081:7, 1089:6, 1093:9, 1095:16
**million** [6] - 1004:3, 1004:5, 1098:4, 1098:7, 1100:4, 1100:12
**million-dollar** [1] - 1004:3
**mind** [1] - 1043:20
**minor** [3] - 1068:19, 1083:3
**minutes** [2] - 1017:18, 1047:4
**Miscellaneous** [1] - 1046:9
**mischarging** [3] - 1054:14, 1054:15, 1054:16
**missed** [1] - 1085:10
**missile** [2] - 1049:14, 1057:15
**missing** [1] - 1083:22
**Mississippi** [1] - 1077:9
**misuse** [1] - 1090:14
**mixed** [1] - 1038:8
**mixer** [3] - 1036:11, 1036:12
**mixes** [1] - 1037:24
**mixing** [2] - 1009:19, 1070:8
**mobilization** [1] - 1035:6
**moment** [1] - 1006:9
**money** [4] - 1004:6, 1040:17, 1048:17, 1063:10
**monies** [1] - 1000:18
**monitor** [1] - 1014:4
**Montebello** [1] - 1086:3
**month** [1] - 1011:16
**months** [5] - 1004:4, 1007:21, 1007:22,

1028:5, 1028:9
**morning** [8] - 999:6, 999:7, 1002:4, 1002:5, 1066:5, 1066:6, 1066:19, 1066:20
**most** [2] - 1086:16, 1087:15
**motor** [14] - 1017:18, 1032:13, 1034:14, 1039:1, 1039:20, 1040:4, 1040:9, 1040:12, 1047:11, 1049:22, 1051:7, 1051:12, 1052:5, 1052:6
**Motors** [1] - 1045:17
**motors** [11] - 1017:22, 1040:16, 1040:19, 1046:14, 1047:23, 1050:24, 1053:20, 1055:10, 1055:12, 1055:24, 1059:18
**Mountain** [1] - 1091:3
**Move** [1] - 1052:9
**move** [5] - 1032:3, 1058:19, 1062:24, 1068:11, 1095:25
**mover** [1] - 1019:5
**moves** [1] - 1034:7
**moving** [3] - 1021:2, 1026:19, 1027:7
**MR** [162] - 999:6, 999:8, 999:14, 999:18, 999:20, 999:25, 1000:2, 1000:4, 1000:9, 1000:13, 1000:20, 1000:25, 1001:11, 1001:18, 1002:3, 1002:14, 1002:18, 1004:13, 1004:20, 1004:24, 1005:4, 1005:9, 1005:15, 1005:19, 1005:21, 1009:23, 1011:23, 1012:1, 1012:20, 1012:23, 1013:4, 1013:10, 1013:13, 1013:16, 1013:21, 1013:22, 1014:22, 1015:9, 1015:22, 1016:4, 1016:21, 1020:22, 1020:25, 1025:5, 1025:8, 1025:9, 1026:12, 1026:17, 1026:21, 1027:2, 1027:7, 1027:10, 1027:14, 1028:1, 1028:2,

1029:24, 1030:5, 1030:8, 1042:25, 1043:2, 1047:4, 1047:9, 1047:15, 1047:16, 1050:14, 1051:6, 1051:17, 1051:20, 1052:1, 1052:3, 1052:10, 1052:11, 1054:6, 1054:8, 1054:21, 1055:9, 1055:11, 1055:15, 1056:17, 1057:8, 1058:9, 1058:21, 1059:1, 1059:16, 1059:21, 1059:23, 1062:22, 1062:25, 1063:1, 1064:4, 1064:9, 1065:8, 1065:17, 1065:20, 1065:24, 1066:4, 1066:16, 1066:18, 1068:12, 1068:13, 1069:8, 1069:14, 1069:23, 1070:1, 1070:5, 1070:11, 1070:16, 1070:20, 1070:22, 1070:25, 1071:9, 1071:19, 1071:21, 1072:21, 1073:4, 1073:23, 1074:16, 1074:22, 1075:3, 1075:9, 1075:12, 1075:18, 1075:20, 1075:22, 1075:24, 1076:2, 1076:4, 1076:5, 1076:23, 1077:1, 1077:3, 1077:5, 1077:12, 1077:20, 1077:22, 1078:11, 1078:13, 1078:23, 1078:25, 1079:2, 1079:3, 1079:4, 1079:11, 1079:17, 1085:25, 1088:11, 1091:10, 1091:17, 1091:18, 1091:24, 1092:1, 1092:3, 1094:25, 1095:4, 1095:10, 1095:14, 1095:25, 1099:1, 1100:20, 1100:23, 1101:1, 1101:12
**Murphy** [1] - 1012:18
**MURPHY** [87] - 997:13, 999:6, 999:8, 999:18, 999:20, 999:25, 1000:4, 1000:9, 1000:13, 1000:20,

1000:25, 1001:11, 1001:18, 1002:3, 1002:14, 1002:18, 1004:13, 1004:20, 1004:24, 1005:4, 1005:9, 1005:15, 1005:19, 1005:21, 1009:23, 1011:23, 1012:1, 1012:20, 1012:23, 1013:4, 1013:10, 1013:13, 1013:16, 1013:21, 1013:22, 1014:22, 1015:9, 1015:22, 1016:4, 1016:21, 1020:22, 1020:25, 1025:5, 1025:8, 1025:9, 1026:12, 1026:17, 1026:21, 1027:2, 1027:7, 1027:10, 1027:14, 1028:1, 1028:2, 1030:5, 1030:8, 1042:25, 1043:2, 1047:4, 1047:9, 1047:15, 1047:16, 1050:14, 1051:6, 1051:17, 1051:20, 1052:1, 1052:3, 1052:10, 1052:11, 1054:6, 1054:8, 1057:8, 1065:20, 1070:5, 1070:11, 1070:16, 1070:20, 1070:22, 1070:25, 1071:9, 1071:19, 1071:21, 1072:21, 1073:4, 1073:23, 1074:16, 1074:22, 1075:3
**Murphy's** [3] - 999:15, 1057:14, 1059:13
**must** [1] - 1018:4

# N

**NAA** [3] - 1036:19, 1036:20, 1037:12
**NAGLE** [1] - 1002:1
**Nagle** [15] - 999:6, 1002:4, 1002:19, 1013:18, 1015:15, 1022:17, 1025:10, 1038:13, 1038:22, 1042:17, 1045:17, 1051:10, 1054:22, 1075:7, 1104:3
**NASA** [2] - 1036:9, 1037:21
**nation** [2] - 1016:2, 1060:20

national [1] - 1087:3
**Navy** [4] - 1032:23, 1044:4, 1044:18, 1048:3
**near** [4] - 1041:10, 1078:3, 1083:11, 1091:4
**necessarily** [4] - 1046:19, 1056:1, 1059:9, 1059:10
**need** [4] - 1046:18, 1082:13, 1084:23, 1085:15
**needs** [1] - 1021:14
**negated** [1] - 1010:3
**negligence** [6] - 1072:5, 1072:7, 1074:20, 1076:15, 1077:24, 1085:22
**negotiate** [1] - 999:21
**never** [5] - 1056:25, 1058:2, 1064:21, 1091:23, 1098:20
**new** [4] - 1036:10, 1036:19, 1037:13, 1037:23
**next** [15] - 1006:13, 1011:16, 1020:20, 1027:10, 1027:12, 1034:7, 1037:8, 1037:16, 1047:17, 1049:10, 1052:12, 1086:8, 1089:13, 1097:11, 1098:15
**nitrates** [1] - 1085:5
**noncompliance** [1] - 1023:14
**none** [1] - 1000:10
**normal** [3] - 1001:13, 1001:16, 1008:22
**normally** [4] - 1006:3, 1008:5, 1057:12, 1063:22
**North** [17] - 1036:22, 1036:23, 1037:1, 1037:4, 1037:21, 1040:24, 1040:25, 1041:7, 1041:14, 1059:5, 1059:25, 1060:2, 1060:3, 1060:8, 1076:7, 1077:13
**nosed** [1] - 1060:16
**noted** [2] - 1023:25, 1080:15
**nothing** [6] - 1018:3, 1035:23, 1044:14, 1065:17, 1072:7, 1075:24
**nothing's** [1] -

1060:21
**notified** [1] - 1061:19
**November** [6] -
1007:22, 1024:22,
1024:24, 1026:19,
1026:22, 1046:5
**Number** [2] - 1026:7,
1027:10
**number** [19] -
1005:22, 1011:1,
1011:23, 1019:16,
1019:18, 1027:13,
1029:15, 1030:9,
1033:10, 1034:7,
1046:8, 1046:16,
1047:23, 1049:18,
1052:15, 1061:7,
1061:13, 1062:4,
1079:1
**numbered** [1] -
1075:14
**numbering** [1] -
1027:12
**numbers** [3] -
1019:21, 1021:3,
1041:6
**numerous** [5] -
1007:16, 1007:25,
1008:1, 1011:21,
1068:2
**nuts** [1] - 1009:25
**NW** [3] - 997:17,
997:24, 998:2

## O

**O'DONNELL** [1] -
997:20
**object** [1] - 1077:12
**objection** [6] -
1026:12, 1029:24,
1075:19, 1077:11,
1095:4, 1095:23
**observations** [1] -
1023:11
**obviously** [9] -
1013:4, 1013:5,
1014:11, 1035:23,
1055:17, 1064:6,
1072:1, 1072:2,
1087:12
**occasion** [1] -
1014:20
**occasions** [2] -
1023:23, 1042:12
**occur** [1] - 1095:19
**October** [3] - 1007:22,
1012:7, 1047:17
**odd** [1] - 1047:7

**odor** [1] - 1020:2
**OF** [3] - 997:1, 997:6,
997:10
**of..** [2] - 1001:25,
1097:24
**offer** [1] - 1041:1
**offered** [2] - 1041:8,
1080:9
**office** [1] - 1065:16
**Office** [1] - 1033:13
**Officer** [1] - 1029:3
**officer** [1] - 1033:24
**official** [2] - 1026:23,
1028:20
**Official** [2] - 998:1,
1104:17
**offsite** [4] - 1099:5,
1099:6, 1099:8,
1099:19
**often** [8] - 1006:1,
1013:3, 1013:19,
1016:10, 1023:1,
1024:15, 1035:5,
1039:24
**on-the-ground** [1] -
1074:7
**once** [3] - 1050:23,
1056:9, 1059:17
**one** [53] - 1002:21,
1004:23, 1007:19,
1007:23, 1009:2,
1009:11, 1010:7,
1011:20, 1014:6,
1014:15, 1014:24,
1015:2, 1015:3,
1020:12, 1020:18,
1023:24, 1031:15,
1033:11, 1033:21,
1040:5, 1042:13,
1047:12, 1049:6,
1049:10, 1050:9,
1051:16, 1051:18,
1052:12, 1058:10,
1058:16, 1060:3,
1060:4, 1060:12,
1063:25, 1064:5,
1066:22, 1066:25,
1070:7, 1072:10,
1072:21, 1074:14,
1074:19, 1082:15,
1086:18, 1087:11,
1087:14, 1088:9,
1089:22, 1090:24,
1091:2, 1100:22
**one's** [1] - 1014:21
**ones** [3] - 1005:2,
1005:12, 1063:20
**onsite** [6] - 1099:11,
1099:13, 1099:14,
1099:19, 1099:21,
1099:25
**Ontario** [1] - 1033:25
**open** [3] - 1010:3,
1017:24, 1018:2
**opening** [1] - 1073:24
**operate** [1] - 1029:9
**operated** [2] -
1014:25, 1088:2
**operating** [2] - 1086:8,
1088:7
**operation** [1] -
1018:13
**operations** [5] -
1010:14, 1012:6,
1017:25, 1022:9,
1068:16
**opinion** [13] -
1012:15, 1023:21,
1024:9, 1058:1,
1058:2, 1067:13,
1067:15, 1067:22,
1067:24, 1068:7,
1080:9, 1083:6,
1084:4
**opinions** [6] -
1012:13, 1066:10,
1067:14, 1068:9,
1068:14, 1073:6
**Oppliger** [2] -
1069:13, 1069:14
**opposite** [1] - 1085:12
**option** [3] - 1042:5,
1042:11, 1048:17
**order** [3] - 1048:19,
1059:11, 1097:1
**orders** [1] - 1048:3
**Ordnance** [4] -
1013:24, 1043:14,
1046:4, 1094:20
**ordnance** [3] - 1014:9,
1046:20, 1055:18
**organization** [1] -
1025:20
**origin** [1] - 1091:2
**original** [1] - 1030:15
**originally** [1] -
1026:25
**other..** [1] - 1070:10
**otherwise** [2] -
1072:6, 1091:23
**ought** [1] - 1023:15
**outdated** [1] - 1031:11
**outlet** [1] - 1041:9
**outside** [1] - 1070:8
**overall** [1] - 1079:14
**overruled** [4] - 1030:4,
1077:14, 1095:5,
1095:22
**oversight** [1] - 1031:2
**overuse** [1] - 1090:14

**own** [7] - 1011:10,
1013:24, 1044:5,
1044:6, 1060:6,
1069:12, 1095:23
**owned** [9] - 1041:15,
1048:14, 1050:20,
1051:2, 1053:4,
1054:4, 1057:6,
1057:9, 1060:1
**ownership** [8] -
1040:22, 1042:3,
1044:2, 1044:3,
1044:6, 1044:14,
1048:13, 1053:25
**owns** [2] - 1053:13,
1060:7
**oxidation** [1] -
1021:18
**oxidizer** [7] - 1009:15,
1009:19, 1010:14,
1012:3, 1012:4,
1012:16, 1016:24
**oxidizing** [1] -
1010:15

## P

**p.m** [1] - 1102:13
**Pacific** [1] - 1039:25
**packages** [1] -
1030:15
**PAGE** [1] - 1104:2
**Page** [1] - 997:8
**page** [63] - 1002:22,
1005:22, 1005:23,
1006:13, 1006:14,
1006:25, 1011:1,
1011:22, 1018:24,
1020:20, 1021:2,
1021:3, 1021:22,
1022:1, 1023:17,
1026:6, 1027:10,
1027:12, 1027:13,
1029:2, 1029:15,
1030:4, 1032:8,
1033:10, 1033:11,
1034:6, 1034:8,
1035:16, 1037:8,
1038:23, 1049:7,
1060:4, 1061:7,
1061:10, 1062:16,
1076:9, 1076:12,
1076:21, 1076:25,
1077:18, 1077:20,
1077:23, 1078:4,
1078:9, 1078:12,
1078:14, 1078:24,
1078:25, 1079:1,
1079:12, 1080:5,
1080:8, 1089:3,

1089:6, 1092:4,
1093:6, 1095:9,
1095:11, 1095:12
**pages** [1] - 1104:18
**paid** [1] - 1053:18
**pans** [2] - 1072:9,
1084:4
**paper** [1] - 1027:17
**paragraph** [15] -
1002:25, 1006:25,
1011:7, 1017:6,
1028:11, 1029:11,
1029:18, 1036:17,
1044:4, 1078:17,
1080:8, 1094:7,
1094:10, 1095:9,
1095:11
**paramount** [1] -
1036:1
**parent** [2] - 1025:20,
1090:2
**part** [9] - 1001:8,
1010:6, 1012:12,
1033:4, 1035:21,
1050:11, 1074:2,
1074:3, 1100:4
**participate** [2] -
1032:25, 1034:21
**participated** [1] -
1034:3
**participating** [1] -
1035:10
**particular** [6] -
1008:23, 1009:4,
1010:9, 1042:14,
1076:15, 1077:25
**particularly** [4] -
1019:21, 1083:21,
1087:16, 1090:23
**parties** [5] - 1014:25,
1015:16, 1024:13,
1044:20, 1045:9
**parts** [8] - 1098:3,
1098:4, 1098:7,
1099:23, 1099:25,
1100:7, 1100:9,
1100:11
**party** [1] - 1095:18
**Paul** [1] - 1045:25
**pay** [3] - 1044:11,
1044:21, 1058:6
**paying** [2] - 1000:19,
1001:8
**payments** [16] -
1046:22, 1050:16,
1050:19, 1050:22,
1053:15, 1053:18,
1056:6, 1056:8,
1056:14, 1056:19,
1056:20, 1057:2,

1057:5, 1057:19, 1059:15, 1059:19
**pays** [2] - 1000:20, 1058:5
**PCE** [11] - 1080:16, 1089:7, 1089:14, 1089:23, 1090:4, 1090:6, 1092:6, 1092:9, 1092:23, 1093:7, 1095:19
**PE** [1] - 1080:10
**people** [24] - 1014:16, 1019:4, 1019:7, 1019:13, 1033:12, 1033:25, 1034:2, 1034:3, 1068:22, 1068:23, 1068:24, 1070:7, 1074:7, 1074:12, 1081:4, 1082:9, 1085:17, 1085:18, 1090:22, 1092:13, 1093:8, 1096:3, 1096:17
**per** [16] - 1045:25, 1049:14, 1051:7, 1051:12, 1052:5, 1052:6, 1057:15, 1098:3, 1098:4, 1098:7, 1099:23, 1099:25, 1100:4, 1100:7, 1100:9, 1100:11
**per-missile** [1] - 1057:15
**per-motor** [1] - 1051:7
**percentage** [1] - 1057:5
**perchlorate** [10] - 1034:14, 1036:19, 1037:23, 1038:6, 1038:15, 1041:2, 1088:19, 1091:3, 1099:17, 1099:23
**percolate** [2] - 1081:20, 1083:10
**percolating** [1] - 1091:4
**percolation** [1] - 1094:18
**perfect** [1] - 1013:5
**performance** [7] - 1000:21, 1006:18, 1014:5, 1033:2, 1048:3, 1051:2, 1063:4
**performed** [4] - 1003:18, 1004:16, 1012:6, 1065:2
**performs** [1] - 1002:10
**perhaps** [1] - 1059:25,

1090:7
**period** [12] - 1013:1, 1013:8, 1013:17, 1022:15, 1071:1, 1071:5, 1073:10, 1080:17, 1085:13, 1089:8, 1089:15, 1101:17
**periodically** [1] - 1003:23
**permission** [3] - 1075:15, 1077:9, 1095:2
**permitted** [1] - 1026:9
**person** [7] - 1018:21, 1033:22, 1039:7, 1040:3, 1069:12, 1075:7
**personal** [1] - 1083:7
**personnel** [4] - 1008:5, 1017:25, 1039:6, 1068:2
**perspective** [1] - 1015:20
**pertinent** [1] - 1093:12
**pervious** [3] - 1081:18, 1086:23, 1093:21
**Ph.D** [1] - 1080:10
**philosophy** [1] - 1039:1
**phrase** [1] - 1052:21
**physical** [6] - 1081:9, 1081:13, 1084:19, 1084:22, 1087:6, 1101:25
**pick** [1] - 1046:7
**piece** [1] - 1084:13
**pit** [2] - 1031:3, 1097:1
**pitchers** [1] - 1060:19
**pits** [10] - 1015:3, 1042:2, 1067:18, 1069:11, 1071:24, 1072:15, 1084:4, 1084:7, 1084:10, 1094:16
**Pittsburg** [1] - 1101:15
**place** [7] - 1007:20, 1007:23, 1008:19, 1023:4, 1077:13, 1086:8, 1098:18
**places** [2] - 1087:8, 1087:9
**Plaintiff** [6] - 997:4, 997:13, 1077:16, 1095:6, 1104:11, 1104:11
**plaintiff's** [2] - 1076:14, 1077:24

**Plaintiff's** [26] - 1002:15, 1010:20, 1010:21, 1012:24, 1020:23, 1024:25, 1036:4, 1038:20, 1040:21, 1042:16, 1043:1, 1045:14, 1047:18, 1048:20, 1049:1, 1054:25, 1059:2, 1060:23, 1064:13, 1075:16, 1075:19, 1077:10, 1077:15, 1092:2, 1095:2, 1100:19
**Plan** [4] - 1006:15, 1006:23, 1061:12, 1062:20
**plan** [4] - 1011:10, 1037:12, 1064:2, 1064:3
**plant** [5] - 1042:23, 1047:24, 1048:6, 1060:14, 1086:8
**Plantwide** [2] - 1021:24, 1022:1
**play** [1] - 1096:24
**played** [2] - 1039:18, 1039:19
**plume** [8] - 1072:22, 1072:24, 1073:2, 1074:18, 1097:17, 1100:8, 1100:10
**plus** [6] - 1004:10, 1005:17, 1044:24, 1057:18, 1057:23, 1086:6
**PME** [8] - 1006:5, 1006:6, 1010:23, 1012:8, 1016:6, 1032:17, 1032:18, 1061:6
**point** [18] - 1001:7, 1018:1, 1020:14, 1024:15, 1033:8, 1043:21, 1046:12, 1072:13, 1081:24, 1082:20, 1083:9, 1085:9, 1091:1, 1091:5, 1097:19, 1098:15, 1098:17, 1100:4
**points** [2] - 1003:6, 1071:4
**pollute** [7] - 1075:5, 1087:21, 1094:18, 1096:7, 1096:10, 1096:14, 1096:17
**polluted** [1] - 1075:6
**pollutes** [1] - 1096:10
**polluting** [2] -

1096:25, 1097:6
**pollution** [8] - 1081:23, 1083:20, 1083:21, 1090:2, 1091:1, 1095:17, 1095:19
**ponds** [3] - 1078:21, 1079:20, 1079:25
**poor** [1] - 1094:19
**posed** [2] - 1078:18, 1079:8
**position** [12] - 1011:13, 1014:14, 1014:15, 1014:18, 1019:10, 1070:6, 1072:18, 1079:5, 1079:7, 1081:3, 1087:25, 1090:12
**possibilities** [1] - 1016:13
**possibility** [1] - 1014:12
**possible** [5] - 1022:11, 1042:1, 1057:17, 1060:8, 1087:20
**potable** [1] - 1094:18
**potential** [2] - 1083:20
**pounds** [5] - 1041:2, 1041:21, 1042:20, 1042:21, 1048:1
**pour** [1] - 1071:3
**pouring** [2] - 1076:15, 1077:25
**POWELL** [1] - 997:21
**PPR** [1] - 1032:18
**PPRs** [1] - 1033:7
**practice** [4] - 1078:19, 1079:18, 1079:24, 1080:17
**practiced** [1] - 1093:7
**practices** [2] - 1095:20, 1098:9
**practicing** [1] - 1080:14
**pre** [4] - 1008:20, 1008:22, 1008:23, 1008:25
**pre-award** [4] - 1008:20, 1008:22, 1008:23, 1008:25
**precaution** [1] - 1096:4
**precautions** [1] - 1094:16
**predict** [1] - 1081:17
**prepared** [1] - 1037:24
**presence** [1] - 1048:4
**present** [2] - 1010:3, 1049:2

**presentation** [2] - 1038:25, 1074:2
**presented** [2] - 1012:7, 1071:9
**presenting** [1] - 1013:14
**presents** [1] - 1048:4
**pressures** [1] - 1085:1
**presumably** [1] - 1081:1
**presume** [1] - 1060:7
**pretty** [4] - 1045:13, 1045:20, 1045:22, 1096:7
**prevalent** [1] - 1020:2
**preventing** [2] - 1084:7, 1095:17
**previous** [3] - 1006:11, 1028:5, 1037:19
**PREVIOUSLY** [1] - 1002:1
**price** [31] - 1004:8, 1004:9, 1004:10, 1004:14, 1004:20, 1004:25, 1005:6, 1005:14, 1044:25, 1045:3, 1045:6, 1050:16, 1050:18, 1050:22, 1053:14, 1056:5, 1056:7, 1056:10, 1056:13, 1056:19, 1057:19, 1057:22, 1059:8, 1059:9, 1059:11, 1059:15, 1059:18, 1062:7, 1062:8, 1062:9
**primarily** [1] - 1016:12
**prime** [10] - 1004:15, 1004:22, 1019:5, 1019:6, 1036:24, 1041:7, 1045:24, 1059:8, 1059:10, 1063:21
**principles** [1] - 1001:12
**private** [2] - 1078:20, 1079:19
**privity** [2] - 1060:5, 1063:20, 1063:21
**probable** [1] - 1041:17
**probative** [1] - 1091:25
**problem** [17] - 1009:20, 1020:1, 1024:4, 1034:12, 1048:5, 1052:6, 1071:16, 1074:15, 1083:14, 1084:21,

1087:17, 1097:5, 1097:16, 1097:22, 1098:4, 1100:1, 1102:8
**problems** [6] - 1020:4, 1020:9, 1036:15, 1058:17, 1086:5, 1087:22
**procedure** [1] - 1036:18
**procedures** [14] - 1006:7, 1008:14, 1015:6, 1015:9, 1016:1, 1021:11, 1023:8, 1071:25, 1072:2, 1072:15, 1072:17, 1072:19, 1072:22, 1072:23
**proceedings** [1] - 1104:19
**Proceedings** [1] - 998:25
**Process** [2] - 1048:21, 1049:2
**process** [3] - 1049:21, 1050:4, 1052:16
**Procurement** [2] - 1046:2, 1061:21
**procurement** [2] - 1033:24, 1039:22
**produce** [2] - 1035:8, 1064:23
**produced** [5] - 998:25, 1025:6, 1027:1, 1071:10, 1086:16
**producers** [1] - 1086:18
**producing** [1] - 1030:17
**product** [3] - 1038:18, 1101:23, 1101:24
**production** [6] - 1004:16, 1032:9, 1032:19, 1034:16, 1059:17, 1060:17
**products** [2] - 1040:13, 1101:21
**professional** [3] - 1066:11, 1085:17, 1087:14
**professionals** [3] - 1082:11, 1084:18, 1084:19
**profitability** [1] - 1034:16
**Program** [6] - 1006:22, 1048:21, 1049:2, 1049:16, 1061:12, 1062:20
**program** [25] - 1003:1,

1003:9, 1003:17, 1003:20, 1005:25, 1007:2, 1009:14, 1033:18, 1035:21, 1035:22, 1036:25, 1037:6, 1040:5, 1040:6, 1041:3, 1041:4, 1041:11, 1049:4, 1049:8, 1060:25, 1061:2, 1062:15, 1063:14
**programs** [1] - 1034:17
**progress** [18] - 1003:5, 1032:9, 1032:19, 1050:16, 1050:19, 1050:22, 1053:15, 1053:18, 1056:6, 1056:8, 1056:14, 1056:19, 1056:20, 1057:2, 1057:4, 1057:19, 1059:15, 1059:19
**progressing** [1] - 1033:2
**prohibited** [1] - 1072:2
**project** [6] - 1049:6, 1050:10, 1057:13, 1060:9, 1060:20, 1061:5
**Projects** [1] - 1033:13
**promise** [2] - 1063:4, 1063:6
**promoter** [1] - 1051:8
**Promoter** [1] - 1051:10
**propellant** [8] - 1009:25, 1034:14, 1042:21, 1043:16, 1046:13, 1047:24, 1055:12, 1055:24
**Propellant** [1] - 1045:17
**propellants** [1] - 1071:22
**proper** [7] - 1071:2, 1071:11, 1071:25, 1072:15, 1072:16, 1073:11, 1073:15
**properly** [2] - 1067:16, 1067:25
**properties** [6] - 1081:10, 1081:14, 1081:15, 1084:20, 1084:22, 1087:6
**property** [16] - 1041:20, 1041:23, 1042:9, 1042:10, 1053:8, 1053:16,

1055:4, 1055:7, 1055:14, 1056:4, 1056:11, 1056:15, 1058:11, 1058:12, 1058:15, 1060:1
**Property** [1] - 1050:15
**proposal** [1] - 1008:24
**proposals** [1] - 1061:25
**proposer** [1] - 1063:8
**proposers** [2] - 1061:25, 1062:6
**Propulsion** [12] - 1005:6, 1005:10, 1027:21, 1037:22, 1038:6, 1039:19, 1059:5, 1059:24, 1061:13, 1062:17, 1063:14, 1064:1
**prospective** [1] - 1031:22
**protect** [1] - 1015:1
**protected** [1] - 1058:4
**protection** [2] - 1056:10, 1056:11
**provide** [2] - 1003:4, 1048:15
**provided** [2] - 1016:25, 1025:11
**providing** [1] - 1040:6
**provisions** [1] - 1061:22
**PRPs** [1] - 1001:5
**public** [4] - 1079:14, 1086:2, 1090:21, 1090:24
**published** [1] - 1091:8
**publishes** [1] - 1001:1
**pulled** [1] - 1075:23
**pump** [2] - 1021:13, 1021:16
**purchase** [1] - 1051:23
**purchased** [3] - 1034:13, 1050:5, 1056:22
**purchases** [1] - 1034:13
**purchasing** [1] - 1050:8
**purified** [1] - 1098:22
**purpose** [11] - 1032:8, 1032:10, 1049:21, 1049:25, 1050:3, 1051:15, 1052:5, 1052:16, 1052:20, 1055:16, 1069:7
**purposes** [1] - 1073:21
**push** [1] - 1023:22

**pushed** [1] - 1024:1
**put** [17] - 1001:7, 1026:7, 1041:21, 1044:11, 1044:12, 1047:11, 1058:4, 1069:11, 1069:17, 1071:23, 1073:9, 1073:10, 1073:14, 1074:5, 1074:11, 1101:20, 1101:23
**putting** [4] - 1038:12, 1071:12, 1071:14, 1094:1
**PX385** [1] - 1032:3

**Q**

**qualified** [1] - 1038:9
**qualify** [4] - 1036:10, 1036:13, 1038:6, 1038:14
**qualifying** [2] - 1036:18, 1037:13
**quality** [7] - 1038:7, 1038:11, 1038:16, 1064:1, 1064:3, 1087:15, 1087:16
**quantities** [2] - 1068:2, 1068:4
**quantity** [2] - 1051:8, 1083:19
**Quantity** [1] - 1051:10
**quarter** [2] - 1102:6, 1102:7
**questioning** [2] - 1022:9, 1022:13
**questions** [3] - 1055:4, 1058:18, 1072:21
**quick** [1] - 1048:18
**quickly** [2] - 1031:11, 1093:22
**quite** [1] - 1039:13
**quote** [8] - 1072:11, 1078:15, 1078:17, 1079:18, 1081:1, 1089:4, 1089:5, 1092:6
**quotes** [1] - 1079:12
**quoting** [1] - 1006:14

**R**

**R&D** [2] - 1005:17, 1059:20
**R.J** [1] - 1084:16
**Rachel** [3] - 1090:8, 1090:13, 1091:14
**radiator** [1] - 1009:18

**rags** [1] - 1027:16
**raise** [2] - 1091:5, 1095:18
**raised** [6] - 1000:13, 1000:15, 1000:16, 1000:17, 1074:23, 1090:23
**ran** [1] - 1055:5
**rather** [2] - 1028:8, 1030:1
**RAYMOND** [1] - 997:14
**Raytheon** [4] - 1000:1, 1000:2, 1000:14, 1000:15
**reaching** [2] - 1043:14, 1068:14
**read** [6] - 1036:14, 1076:21, 1077:23, 1078:8, 1094:21, 1095:8
**readily** [2] - 1030:16, 1100:5
**reading** [4] - 1023:13, 1067:20, 1068:5, 1089:3
**reads** [3] - 1076:12, 1078:17, 1080:8
**real** [2] - 1045:24, 1099:4
**really** [13] - 1001:19, 1008:8, 1014:16, 1025:7, 1026:24, 1038:18, 1060:15, 1074:11, 1082:13, 1088:3, 1093:4, 1099:13
**reason** [6] - 1003:19, 1028:15, 1063:7, 1089:6, 1093:2, 1095:5
**reasonable** [4] - 1022:13, 1066:11, 1086:20, 1088:6
**reasonably** [1] - 1098:7
**reasons** [2] - 1008:2, 1060:15
**rebuttal** [2] - 1028:19, 1077:3
**receive** [1] - 1041:12
**RECEIVED** [1] - 1104:9
**received** [4] - 1041:19, 1053:19, 1077:17, 1095:7
**recently** [1] - 1034:15
**recess** [2] - 1054:18, 1102:13
**Recess** [1] - 1054:19

recognition [3] - 1071:22, 1078:18, 1079:8
recognize [1] - 1092:19
recognized [1] - 1082:5
recollection [1] - 1100:15
recommendation [3] - 1024:16, 1028:10, 1036:16
recommendations [8] - 1023:23, 1025:22, 1026:6, 1027:21, 1027:25, 1028:7, 1029:8, 1080:18
recommended [4] - 1008:16, 1036:18, 1036:19, 1037:11
recommending [1] - 1041:10
record [5] - 1013:5, 1031:16, 1043:3, 1057:4, 1104:18
records [1] - 1007:7
recover [1] - 1001:5
recovery [4] - 1000:11, 1054:11, 1054:13, 1054:16
Redirect [1] - 1104:4
REDIRECT [1] - 1054:20
Redlands [10] - 1042:23, 1047:24, 1067:14, 1067:19, 1068:3, 1068:5, 1086:7, 1100:8, 1100:12, 1100:16
reduce [1] - 1044:8
reduced [1] - 1098:19
reduction [1] - 1045:3
refer [2] - 1020:6, 1094:2
reference [3] - 1018:5, 1062:2, 1088:5
referenced [2] - 1019:10, 1088:12
referencing [3] - 1048:9, 1088:13, 1089:10
referred [1] - 1055:6
referring [1] - 1079:1
refers [3] - 1021:19, 1021:20, 1094:5
refurbish [2] - 1040:16, 1040:19
refurbishing [3] - 1040:4, 1040:9, 1040:12

regarding [3] - 1067:14, 1068:16, 1095:18
regardless [3] - 1026:22, 1026:23, 1064:17
regional [1] - 1084:17
regulated [1] - 1092:7
regulation [3] - 1058:2, 1061:20, 1062:18
Regulation [1] - 1061:21
regulations [3] - 1026:2, 1053:24, 1080:19
Regulations [1] - 1054:12
regulators [1] - 1082:17
regulatory [3] - 1016:10, 1092:25, 1093:8
rehabilitation [1] - 1021:6
reimbursement [5] - 1044:8, 1044:9, 1044:15, 1059:12, 1062:8
reject [1] - 1047:23
Reject [1] - 1045:16
rejected [2] - 1055:11, 1055:24
related [1] - 1064:17
relates [1] - 1042:19
relevant [2] - 1014:18, 1085:13
reliance [1] - 1095:15
relied [1] - 1087:14
rely [3] - 1074:7, 1083:6, 1087:11
relying [1] - 1036:15
remain [1] - 1057:23
remains [2] - 1053:7, 1056:24
remediation [1] - 1000:19
remember [19] - 1004:17, 1005:16, 1006:24, 1008:8, 1023:14, 1023:19, 1031:8, 1034:20, 1036:7, 1036:24, 1040:23, 1043:21, 1045:19, 1047:7, 1050:17, 1069:13, 1082:16, 1090:8, 1101:4
remote [1] - 1091:1
repainted [1] -

1021:19
repeat [2] - 1027:24, 1043:4
rephrase [1] - 1079:6
replies [1] - 1063:24
reply [2] - 1011:7, 1026:4
report [6] - 1023:1, 1038:24, 1081:1, 1088:17, 1088:19, 1092:6
reported [1] - 998:25
Reporter [3] - 998:1, 998:1, 1104:17
reports [6] - 1088:12, 1088:13, 1089:13, 1089:15, 1089:20, 1089:21
represent [1] - 1005:20
representing [1] - 999:16
request [11] - 1008:24, 1061:24, 1065:10, 1065:11, 1065:12, 1065:14, 1065:15, 1075:15, 1077:9, 1095:2
Request [1] - 1026:4
requested [1] - 1046:5
requesting [1] - 1060:2
requests [3] - 1031:7, 1031:13
required [10] - 1006:18, 1006:19, 1006:21, 1008:16, 1025:25, 1033:7, 1053:9, 1064:19, 1064:21, 1088:7
requirement [4] - 1006:23, 1049:23, 1052:21, 1061:18
requirements [5] - 1031:25, 1034:23, 1063:6, 1063:7, 1064:25
requires [2] - 1012:15, 1097:5
requiring [1] - 1022:2
resale [2] - 1041:9, 1041:21
Research [2] - 1000:4, 1000:5
research [8] - 1005:11, 1044:5, 1044:6, 1044:17, 1057:13, 1060:9, 1083:8, 1086:13
research-generated

[1] - 1044:17
resident [1] - 1033:24
residual [6] - 1041:2, 1053:21, 1054:1, 1054:3, 1058:1, 1058:11
residue [1] - 1082:24
residues [3] - 1080:22, 1080:24
resolve [1] - 1024:11
resources [1] - 1032:12
respect [3] - 1086:22, 1087:22, 1092:18
respond [1] - 1008:11
responding [3] - 1010:23, 1063:18, 1074:22
response [12] - 1010:23, 1011:3, 1012:4, 1016:14, 1016:15, 1017:13, 1026:23, 1027:15, 1027:19, 1028:15, 1028:25, 1063:14
responses [1] - 1012:2
responsibility [4] - 1014:23, 1015:14, 1055:23, 1056:1
rest [1] - 1096:11
restarts [1] - 1027:11
restrictions [1] - 1083:19
rests [1] - 1064:24
result [6] - 1015:14, 1015:24, 1040:13, 1067:24, 1087:24, 1094:19
resulting [1] - 1025:22
results [1] - 1028:21
resumes [1] - 999:5
retrospective [1] - 1031:22
return [1] - 1053:12
revert [1] - 1050:25
reverts [3] - 1053:5, 1053:21, 1056:11
Review [3] - 1002:16, 1010:22, 1032:4
review [29] - 1002:19, 1003:5, 1006:7, 1009:14, 1011:4, 1011:11, 1011:15, 1012:12, 1014:12, 1018:9, 1019:12, 1022:2, 1022:9, 1031:2, 1032:7, 1032:9, 1032:11, 1032:16, 1032:17,

1032:19, 1034:22, 1035:18, 1035:21, 1036:6, 1037:18, 1038:21, 1040:22, 1045:17
reviewed [7] - 1002:20, 1010:12, 1018:23, 1021:7, 1032:5, 1037:19, 1047:19
reviewing [4] - 1006:10, 1011:17, 1021:10, 1064:25
reviews [3] - 1013:8, 1032:20, 1032:21
RFD [1] - 1065:10
RFW [1] - 1065:10
rice [2] - 1039:7, 1040:15
Rice [2] - 1039:10, 1040:2
rises [1] - 1022:12
risk [1] - 1092:8
Rocket [4] - 1039:19, 1043:5, 1043:11, 1045:16
rocket [1] - 1032:13, 1034:14, 1039:19, 1040:19, 1046:13, 1047:11, 1053:20, 1055:11, 1055:24, 1059:18, 1096:18
rockets [2] - 1015:13, 1015:15
rocks [1] - 1030:17
Rockwell [7] - 1036:23, 1040:24, 1040:25, 1041:8, 1041:14, 1059:6, 1059:25
Rocky [1] - 1091:3
role [2] - 1014:8, 1039:18
Room [2] - 998:2, 1017:17
room [10] - 1009:19, 1010:3, 1010:10, 1010:18, 1016:24, 1017:3, 1017:18, 1020:1, 1020:5, 1020:9, 1020:12, 1026:7, 1026:9
rooms [1] - 1027:6
RPR [1] - 998:1
run [1] - 1038:9
running [1] - 1036:10

# S

**safely** [2] - 1015:2, 1015:3
**safer** [1] - 1065:2
**safety** [80] - 1002:6, 1006:1, 1006:4, 1006:5, 1006:7, 1006:11, 1006:17, 1007:4, 1007:8, 1007:12, 1007:16, 1007:25, 1008:2, 1008:13, 1008:20, 1008:22, 1009:3, 1009:7, 1009:9, 1009:13, 1009:20, 1011:10, 1011:12, 1011:16, 1011:17, 1012:21, 1013:18, 1013:24, 1014:5, 1015:1, 1015:5, 1015:17, 1015:24, 1015:25, 1018:21, 1018:24, 1019:2, 1019:3, 1019:5, 1019:9, 1023:6, 1023:8, 1025:24, 1026:1, 1026:18, 1026:22, 1028:21, 1029:6, 1029:20, 1029:25, 1030:1, 1032:21, 1033:4, 1033:6, 1033:7, 1035:17, 1035:20, 1038:10, 1048:5, 1060:13, 1060:18, 1061:15, 1061:19, 1062:17, 1063:3, 1063:5, 1064:13, 1065:1, 1071:1, 1071:23, 1073:14, 1073:17, 1073:18, 1073:19, 1073:21, 1096:1, 1101:10
**Safety** [11] - 1006:15, 1006:22, 1020:24, 1022:24, 1025:1, 1029:3, 1031:19, 1061:12, 1062:19, 1094:13, 1094:20
**sakes** [1] - 1098:4
**sale** [1] - 1042:11
**salvage** [1] - 1054:4
**sample** [3] - 1098:12, 1099:7
**sampled** [2] - 1099:12, 1099:14
**sampling** [1] - 1099:25

**SAMSO** [3] - 1034:17, 1034:19, 1035:2
**satisfied** [1] - 1069:19
**save** [4] - 1040:17, 1044:14, 1044:22, 1048:16
**saw** [3] - 1010:1, 1031:15, 1042:13
**schedule** [5] - 1041:22, 1056:5, 1056:13, 1060:17, 1060:21
**scheduling** [1] - 1040:6
**scientific** [7] - 1066:11, 1079:16, 1081:4, 1086:20, 1087:10, 1090:9, 1092:24
**scientist** [1] - 1098:8
**scientists** [2] - 1082:8, 1082:10
**scope** [1] - 1029:24
**scrap** [2] - 1054:4, 1058:5
**scrapped** [1] - 1021:19
**screen** [1] - 1076:21
**Seattle** [1] - 999:9
**second** [8] - 1002:22, 1026:6, 1034:12, 1051:9, 1051:11, 1052:8, 1078:17
**Section** [2] - 997:23, 1094:13
**section** [2] - 1077:23, 1102:1
**sectors** [1] - 1093:9
**secure** [1] - 1055:18
**secured** [2] - 1046:3, 1056:9
**securing** [1] - 1021:14
**see** [63] - 1002:24, 1003:6, 1003:15, 1004:11, 1006:15, 1007:9, 1007:17, 1007:24, 1009:11, 1009:17, 1010:4, 1010:24, 1011:13, 1011:18, 1012:10, 1016:24, 1017:11, 1017:19, 1018:7, 1018:25, 1019:16, 1019:23, 1020:2, 1021:8, 1021:14, 1021:19, 1021:25, 1022:4, 1026:9, 1027:18, 1027:22, 1028:3, 1028:11, 1029:20, 1030:19,

1032:14, 1034:10, 1034:23, 1037:14, 1040:7, 1043:3, 1043:7, 1046:10, 1046:22, 1049:11, 1049:23, 1051:10, 1051:13, 1052:13, 1052:17, 1052:20, 1061:5, 1061:6, 1067:20, 1068:5, 1073:1, 1073:2, 1078:14, 1079:20, 1088:25, 1092:16, 1094:21, 1100:6
**seeing** [5] - 1024:21, 1031:1, 1036:7, 1045:19, 1101:4
**seep** [1] - 1082:2
**SEGAL** [1] - 997:10
**selected** [2] - 1003:6, 1003:14
**selective** [1] - 1013:14
**sell** [3] - 1041:10, 1041:18, 1042:11
**seller** [1] - 1088:15
**semantics** [1] - 1000:22
**send** [4] - 1003:23, 1008:25, 1060:20, 1065:15
**sense** [4] - 1001:25, 1071:17, 1082:3, 1096:12
**sent** [2] - 1002:21, 1018:23
**sentence** [6] - 1008:15, 1017:5, 1017:6, 1046:8, 1061:11, 1089:13
**September** [3] - 1007:9, 1007:19, 1007:21
**served** [2] - 1008:5, 1066:21
**services** [1] - 1064:23
**Services** [1] - 1061:21
**SESSION** [1] - 997:9
**set** [1] - 1040:4
**setting** [3] - 1026:23, 1081:16, 1096:24
**settle** [2] - 1001:19, 1001:21
**settlement** [2] - 999:21, 1000:5
**settling** [1] - 1094:16
**Seven** [1] - 1009:8
**several** [6] - 1007:20, 1007:23, 1008:3, 1088:14, 1088:23, 1089:21

**shall** [3] - 1030:14, 1030:19, 1094:16
**shared** [1] - 1015:14
**shed** [1] - 1055:23
**sheet** [1] - 1101:10
**sheets** [5] - 1012:7, 1016:25, 1071:1, 1101:23, 1101:24
**shipping** [1] - 1046:10
**shoot** [1] - 1031:22
**shop** [3] - 1027:17, 1049:21, 1052:15
**short** [1] - 1075:2
**shorthand** [2] - 998:25, 1018:19
**show** [1] - 1021:18
**showed** [3] - 1024:12, 1028:7, 1101:4
**showing** [3] - 1008:12, 1015:15, 1076:22
**shown** [1] - 1085:11
**shows** [3] - 1023:22, 1024:9, 1051:23
**side** [1] - 1030:12
**sides** [1] - 1058:17
**sign** [3] - 1012:6, 1016:25, 1021:18
**sign-off** [2] - 1012:6, 1016:25
**signed** [1] - 1029:2
**significant** [1] - 1068:3
**similar** [5] - 1051:15, 1051:25, 1075:14, 1079:25, 1090:5
**simple** [1] - 1007:13
**simplistic** [1] - 1090:7
**site** [20] - 1039:21, 1042:14, 1047:12, 1067:14, 1068:22, 1071:21, 1071:25, 1073:12, 1087:9, 1087:19, 1088:1, 1088:3, 1088:8, 1089:3, 1099:5, 1099:6, 1099:17, 1100:12, 1100:13, 1100:16
**site-specific** [1] - 1087:9
**sites** [2] - 1016:2, 1085:6
**situation** [1] - 1074:6
**six** [2] - 1007:21, 1039:24
**Sixth** [3] - 1045:11, 1045:12, 1046:3
**Skantze** [3] - 1033:15, 1033:16, 1035:20

**skills** [1] - 1032:12
**skipping** [2] - 1067:17, 1080:15
**slab** [2] - 1093:23, 1094:3
**Sling** [1] - 1017:17
**sling** [8] - 1010:3, 1010:10, 1010:17, 1017:18, 1020:1, 1020:5, 1020:9, 1020:12
**sloppy** [3] - 1072:19, 1072:22, 1072:23
**small** [1] - 1037:24
**smell** [1] - 1098:12
**snails** [1] - 1089:1
**Snyder** [1] - 1095:1
**Snyders** [2] - 1076:18, 1078:2
**sodium** [3] - 1049:9, 1091:3, 1091:19
**soil** [6] - 1014:17, 1081:19, 1085:1, 1086:23, 1094:1, 1094:18
**sole** [1] - 1074:18
**solicitation** [2] - 1061:23, 1062:4
**solid** [2] - 1039:1, 1039:19
**Solid** [1] - 1039:8
**solubility** [1] - 1090:6
**Solvent** [1] - 1017:16
**solvent** [12] - 1010:2, 1010:17, 1018:7, 1018:10, 1018:12, 1018:14, 1020:4, 1020:9, 1022:4, 1057:12, 1089:22, 1090:6
**solvents** [19] - 1022:10, 1022:14, 1067:17, 1070:13, 1071:3, 1071:14, 1071:22, 1071:23, 1073:1, 1073:6, 1073:12, 1076:15, 1077:25, 1078:21, 1079:20, 1084:24, 1089:7, 1093:7
**someone** [3] - 1058:5, 1058:6, 1088:7
**sometimes** [1] - 1081:23
**somewhat** [1] - 1098:19
**somewhere** [1] - 1097:18
**soon** [1] - 1061:24
**sorry** [26] - 1002:14,

1006:14, 1012:25, 1016:7, 1019:1, 1020:22, 1027:11, 1029:13, 1029:15, 1037:10, 1037:11, 1043:4, 1043:5, 1047:18, 1050:5, 1051:21, 1053:17, 1055:9, 1062:22, 1064:4, 1070:21, 1076:23, 1076:24, 1079:6, 1081:13, 1102:9

**sort** [8] - 1005:12, 1006:3, 1008:9, 1048:19, 1072:4, 1090:9, 1095:16, 1096:2

**sought** [1] - 1031:14

**source** [3] - 1083:5, 1083:7, 1098:20

**sources** [2] - 1091:1, 1094:18

**Southern** [1] - 1077:8

**space** [2] - 1036:25, 1044:12

**span** [1] - 1101:17

**spark** [1] - 1024:4

**sparks** [1] - 1030:17

**speaking** [3] - 1069:19, 1092:2, 1095:16

**spec** [1] - 1049:17

**Special** [1] - 1033:13

**specialty** [1] - 1098:8

**Specialty** [1] - 1067:1

**specific** [9] - 1008:17, 1008:23, 1025:22, 1026:5, 1027:20, 1083:14, 1083:19, 1087:9, 1096:23

**specifically** [4] - 1043:21, 1043:23, 1080:15, 1083:1

**specification** [4] - 1049:19, 1049:23, 1052:15, 1052:21

**specifications** [2] - 1022:2, 1032:13

**specified** [1] - 1012:8

**specify** [1] - 1018:5

**speculating** [2] - 1031:17, 1060:3

**speculation** [1] - 1055:3

**spells** [1] - 1018:4

**spent** [1] - 1073:16

**SPO** [3] - 1033:12, 1035:1

**spotty** [1] - 1013:7,

1031:16, 1057:4

**SRAM** [36] - 1002:16, 1003:13, 1004:14, 1005:8, 1005:10, 1005:12, 1006:23, 1010:22, 1017:18, 1017:22, 1020:9, 1032:4, 1032:12, 1033:12, 1033:18, 1035:1, 1035:4, 1035:21, 1035:22, 1036:1, 1048:21, 1049:2, 1049:3, 1049:8, 1049:16, 1050:1, 1050:4, 1050:10, 1050:15, 1050:18, 1050:20, 1050:21, 1052:5, 1052:6, 1059:14, 1059:17

**ST-5** [1] - 1046:6

**STACIE** [1] - 997:15

**Staff** [5] - 1003:14, 1039:9, 1039:11, 1039:12

**staff** [1] - 1039:14

**Stan** [1] - 1100:21

**stand** [1] - 999:5

**standard** [22] - 1076:17, 1078:1, 1078:19, 1079:18, 1085:16, 1085:20, 1085:23, 1085:24, 1085:25, 1086:21, 1086:22, 1086:24, 1086:25, 1087:4, 1087:5, 1088:7, 1090:10, 1090:22, 1092:9, 1092:11, 1092:20, 1100:3

**standards** [8] - 1007:4, 1014:5, 1023:12, 1030:1, 1092:18, 1092:19, 1094:14

**standpoint** [1] - 1079:16

**stands** [1] - 1039:8

**star** [1] - 1033:17

**start** [4] - 1002:12, 1007:2, 1102:8

**started** [2] - 999:8, 1086:13

**starting** [1] - 1017:25

**starts** [2] - 1026:1, 1034:6

**state** [5] - 1067:15, 1071:5, 1073:11, 1080:19, 1094:13

**statement** [10] -

1007:2, 1007:14, 1059:13, 1076:19, 1078:5, 1089:9, 1093:19, 1096:8, 1096:9, 1096:14

**STATES** [3] - 997:1, 997:6, 997:11

**States** [15] - 999:3, 1059:16, 1065:24, 1066:22, 1075:13, 1075:23, 1076:13, 1077:7, 1078:15, 1079:13, 1081:2, 1083:18, 1089:16, 1095:1

**states** [4] - 1092:23, 1093:12, 1094:15, 1095:15

**station** [1] - 1017:10

**status** [1] - 1035:1

**steel** [1] - 1030:17

**step** [1] - 1065:21

**steps** [1] - 1065:23

**Sterrett** [1] - 1073:6

**stick** [1] - 1006:14

**still** [8] - 1014:12, 1014:17, 1047:22, 1053:4, 1067:22, 1068:7, 1080:22, 1092:20

**storage** [1] - 1048:5

**stored** [1] - 1027:17

**straight** [1] - 1097:3

**Street** [1] - 997:24

**street** [1] - 1061:24

**strict** [1] - 1074:21

**strychnine** [1] - 1092:21

**study** [1] - 1086:4

**stuff** [8] - 1038:12, 1038:17, 1044:7, 1044:10, 1054:4, 1060:5, 1064:18, 1074:13

**subcontract** [6] - 1004:23, 1005:5, 1059:12, 1059:14, 1065:13

**subcontractor** [2] - 1037:4, 1063:24

**subcontracts** [1] - 1059:9

**subject** [5] - 1034:17, 1041:2, 1041:3, 1043:8, 1046:5

**submit** [2] - 1037:12, 1065:13

**Subsection** [1] - 1007:15

**subsequent** [1] -

1011:11

**substance** [1] - 1016:11

**sudden** [1] - 1073:20

**sue** [1] - 1001:20

**sued** [2] - 999:12, 1000:6

**sufficient** [1] - 1037:24

**suggest** [2] - 1083:24, 1084:12

**suggested** [2] - 1034:25, 1071:8

**suggesting** [2] - 1022:11, 1042:19

**suggestion** [2] - 1024:16, 1084:10

**suing** [2] - 1001:9, 1085:22

**suitable** [1] - 1030:15

**Suite** [1] - 997:24

**sulfuric** [1] - 1049:9

**Sullivan** [1] - 1085:21

**SULLIVAN** [15] - 997:19, 999:14, 1000:2, 1065:24, 1066:4, 1066:16, 1075:20, 1075:24, 1076:2, 1077:1, 1077:12, 1078:23, 1079:2, 1085:25, 1095:4

**Sullivan's** [1] - 1073:24

**sump** [2] - 1021:13, 1021:16

**sumps** [1] - 1094:15

**supervise** [2] - 1067:16, 1067:25

**supervisory** [1] - 1068:23

**supplant** [1] - 1014:11

**supplicant** [2] - 1055:21, 1055:22

**supplier** [1] - 1034:15

**suppliers** [1] - 1035:7

**Supply** [1] - 1025:18

**support** [1] - 1048:3

**supports** [1] - 1024:8

**suppose** [1] - 1083:3

**supposed** [4] - 1038:19, 1069:16, 1071:23, 1073:12

**supposedly** [1] - 1045:1

**surface** [2] - 1049:22, 1090:3

**survey** [12] - 1007:8, 1008:20, 1008:21, 1008:22, 1008:25,

1019:2, 1019:3, 1019:9, 1019:25, 1025:23, 1025:24, 1028:21

**surveys** [7] - 1006:4, 1006:12, 1007:16, 1008:1, 1008:2, 1008:22, 1026:18

**suspect** [1] - 1074:15

**sustain** [1] - 1095:23

**sustained** [1] - 1095:23

**SWORN** [2] - 1002:1, 1066:2

**system** [6] - 1001:6, 1003:6, 1003:13, 1003:23, 1010:4, 1018:3

**Systems** [1] - 1039:8

---

## T

**Tab** [50] - 1002:14, 1002:15, 1010:20, 1012:25, 1016:15, 1020:22, 1022:17, 1024:25, 1028:16, 1028:18, 1029:21, 1029:22, 1030:7, 1030:9, 1031:18, 1032:3, 1036:4, 1038:20, 1040:21, 1042:15, 1042:25, 1045:14, 1047:17, 1054:25, 1056:3, 1059:2, 1060:10, 1060:11, 1060:22, 1062:2, 1063:13, 1064:12, 1075:10, 1075:17, 1077:6, 1077:7, 1079:2, 1079:3, 1092:5, 1094:24, 1100:18, 1100:23

**tab** [12] - 1002:17, 1012:23, 1012:24, 1020:21, 1024:25, 1031:18, 1037:17, 1042:17, 1042:24, 1048:20, 1094:8

**table** [1] - 1061:5

**talent** [1] - 1058:22

**talks** [15] - 1001:1, 1007:15, 1009:24, 1011:6, 1011:11, 1012:2, 1022:1, 1026:7, 1026:21, 1043:14, 1051:11, 1051:20, 1052:8, 1087:16, 1090:25

**target** [1] - 1092:23
**TCA** [13] - 1049:11,
1049:13, 1049:17,
1049:21, 1049:25,
1051:23, 1052:5,
1052:19, 1071:10,
1072:14, 1074:14,
1083:10, 1097:13
**TCE** [46] - 1051:24,
1052:12, 1052:16,
1052:20, 1053:11,
1057:10, 1057:12,
1058:12, 1067:17,
1068:2, 1068:16,
1068:25, 1069:9,
1069:15, 1071:2,
1072:14, 1073:3,
1073:7, 1078:18,
1078:20, 1079:8,
1079:19, 1079:24,
1080:3, 1080:16,
1081:5, 1082:16,
1083:10, 1088:17,
1089:7, 1089:13,
1089:16, 1089:20,
1090:4, 1092:6,
1092:7, 1092:9,
1092:23, 1093:7,
1093:13, 1093:16,
1095:19, 1097:13,
1099:2, 1102:10
**team** [6] - 1003:24,
1008:25, 1034:22,
1035:10, 1035:17,
1060:21
**technical** [6] - 1003:5,
1004:11, 1032:11,
1038:5, 1038:14,
1068:22
**technically** [1] -
1003:11
**technicians** [1] -
1068:1
**techniques** [1] -
1073:11
**technology** [1] -
1031:12
**telecon** [1] - 1045:25
**telegram** [2] -
1037:21, 1038:3
**temporary** [1] -
1056:10
**tens** [1] - 1081:23
**term** [4] - 1008:7,
1008:9, 1054:11
**terms** [5] - 1009:3,
1018:5, 1072:15,
1091:19, 1095:16
**test** [8] - 1040:5,
1092:16, 1097:7,

1097:10, 1097:11,
1097:23, 1098:6,
1099:22
**testified** [4] - 1072:13,
1075:7, 1084:16,
1096:2
**testify** [1] - 1029:25
**testimony** [10] -
1043:24, 1055:3,
1066:8, 1066:13,
1071:9, 1072:16,
1074:7, 1074:9,
1088:5, 1093:22
**testing** [1] - 1097:7
**tests** [3] - 1036:11,
1036:12
**textbooks** [1] -
1092:25
**that'll** [1] - 1044:13
**THE** [260] - 997:1,
997:10, 999:2,
999:4, 999:7,
999:11, 999:17,
999:19, 999:23,
1000:8, 1000:10,
1000:18, 1000:22,
1001:7, 1001:15,
1001:22, 1002:1,
1004:1, 1004:2,
1004:8, 1004:9,
1004:19, 1004:22,
1005:1, 1005:7,
1005:14, 1005:17,
1009:20, 1009:22,
1011:22, 1011:24,
1012:18, 1012:22,
1013:2, 1013:9,
1013:11, 1013:15,
1013:19, 1014:14,
1015:8, 1015:20,
1016:3, 1016:17,
1016:18, 1016:19,
1016:20, 1020:21,
1025:3, 1025:7,
1026:15, 1026:24,
1027:4, 1027:9,
1027:24, 1030:3,
1030:6, 1030:7,
1042:24, 1047:3,
1047:6, 1047:10,
1050:5, 1050:7,
1050:11, 1050:13,
1051:4, 1051:13,
1051:14, 1051:19,
1051:23, 1052:2,
1052:9, 1053:2,
1053:6, 1053:11,
1053:14, 1053:17,
1053:18, 1053:23,
1053:24, 1054:1,

1054:3, 1054:5,
1054:7, 1054:9,
1054:13, 1054:15,
1054:16, 1054:18,
1055:8, 1055:10,
1055:13, 1056:4,
1056:7, 1056:16,
1057:1, 1057:3,
1057:6, 1057:9,
1057:11, 1057:14,
1057:16, 1057:21,
1057:22, 1057:25,
1058:2, 1058:8,
1058:19, 1058:22,
1058:24, 1059:13,
1059:20, 1059:22,
1062:21, 1062:23,
1064:3, 1064:5,
1065:5, 1065:7,
1065:19, 1065:21,
1065:22, 1066:1,
1066:2, 1068:8,
1068:10, 1068:11,
1069:6, 1069:10,
1069:16, 1069:25,
1070:2, 1070:6,
1070:15, 1070:19,
1070:21, 1070:23,
1071:7, 1071:16,
1071:20, 1072:6,
1073:3, 1073:16,
1074:6, 1074:19,
1075:2, 1075:4,
1075:17, 1075:19,
1075:25, 1076:3,
1076:24, 1077:4,
1077:11, 1077:14,
1077:18, 1077:21,
1078:10, 1078:12,
1079:1, 1079:10,
1079:14, 1081:3,
1081:7, 1081:11,
1081:13, 1082:1,
1082:4, 1082:5,
1082:6, 1082:7,
1082:9, 1082:14,
1082:22, 1083:5,
1083:7, 1083:9,
1083:13, 1083:23,
1083:24, 1083:25,
1084:5, 1084:6,
1084:9, 1084:11,
1084:12, 1084:13,
1084:15, 1085:5,
1085:8, 1085:9,
1086:11, 1086:12,
1086:16, 1086:18,
1086:19, 1086:23,
1086:24, 1087:2,
1087:3, 1087:5,
1087:10, 1087:13,

1087:25, 1088:2,
1088:4, 1088:9,
1089:19, 1089:20,
1089:25, 1090:1,
1090:4, 1090:5,
1090:7, 1090:13,
1090:17, 1090:18,
1090:20, 1090:23,
1091:7, 1091:8,
1091:9, 1091:15,
1091:22, 1091:25,
1095:5, 1095:8,
1095:22, 1096:1,
1096:6, 1096:9,
1096:15, 1096:16,
1096:19, 1096:20,
1096:21, 1097:7,
1097:10, 1097:13,
1097:15, 1097:17,
1097:19, 1097:23,
1097:25, 1098:6,
1098:11, 1098:22,
1098:24, 1100:22,
1100:25, 1101:7,
1101:9, 1101:20,
1101:23, 1102:3,
1102:4, 1102:5,
1102:9, 1102:10,
1102:12
**theirs** [2] - 1042:6,
1042:7
**themselves** [2] -
1068:17, 1082:10
**theory** [1] - 1057:14
**Therefore** [1] - 1093:6
**therefore** [4] - 1012:9,
1039:21, 1056:1,
1074:8
**they've** [1] - 1035:6
**thinking** [1] - 1043:20
**thinks** [1] - 1064:6
**third** [1] - 1017:5
**third-to-last** [1] -
1017:5
**thousand** [1] -
1083:17
**three** [9] - 1004:4,
1008:19, 1021:2,
1033:11, 1033:25,
1034:3, 1084:18,
1097:2, 1097:4
**throughout** [3] -
1080:17, 1085:10,
1092:25
**throw** [1] - 1004:6
**tied** [1] - 1026:13
**time-and-material** [1]
- 1059:12
**tiny** [1] - 1082:24
**title** [10] - 1049:1,

1050:25, 1051:3,
1053:20, 1056:21,
1057:20, 1057:23,
1058:7, 1058:15,
1058:16
**to..** [1] - 1031:20
**today** [9] - 1003:21,
1014:24, 1015:7,
1015:18, 1067:22,
1068:7, 1072:23,
1072:25, 1073:5
**together** [3] - 1008:12,
1015:1, 1024:12
**tolling** [1] - 999:20
**tomorrow** [1] - 1102:7
**took** [9] - 1007:20,
1007:23, 1023:4,
1043:18, 1070:7,
1077:13, 1079:6,
1099:7
**tools** [1] - 1049:22
**top** [8] - 1005:15,
1006:13, 1018:25,
1020:20, 1021:4,
1051:9, 1051:11,
1052:8
**TORRES** [1] - 997:14
**tort** [1] - 1078:10
**total** [1] - 1048:1
**totally** [1] - 1014:11
**touring** [1] - 1017:17
**towards** [1] - 1102:1
**toxic** [2] - 1022:3,
1092:21
**toxicity** [4] - 1020:1,
1020:11, 1088:24,
1088:25
**track** [3] - 1003:11,
1003:24, 1004:1
**train** [2] - 1067:16,
1067:25
**trained** [1] - 1086:12
**TRANSCRIPT** [1] -
997:10
**transcript** [2] - 998:25,
1104:18
**transcription** [1] -
998:25
**traveled** [1] - 1097:17
**treatment** [1] -
1094:19
**tremendous** [2] -
1083:20, 1090:24
**Trial** [3] - 1029:21,
1031:18, 1040:22
**trial** [13] - 1000:3,
1002:17, 1010:21,
1020:23, 1025:1,
1032:4, 1036:5,
1037:18, 1038:21,

1042:16, 1045:15,
1047:19, 1100:20
**TRIAL** [1] - 997:10
**trichloroethane** [1] -
1049:10
**tried** [1] - 1001:19
**trillion** [1] - 1098:3
**trip** [1] - 1038:24
**troops** [1] - 1047:12
**troubled** [1] - 1097:9
**truck** [1] - 1044:10
**true** [7] - 1014:19,
1059:17, 1074:1,
1076:16, 1078:1,
1089:17, 1099:22
**try** [1] - 1047:4
**trying** [9] - 999:21,
1001:25, 1004:14,
1013:13, 1078:6,
1084:1, 1090:11,
1090:20, 1101:6
**turn** [14] - 1002:14,
1005:22, 1011:1,
1048:18, 1054:25,
1056:3, 1060:10,
1060:22, 1061:7,
1063:13, 1067:13,
1089:3, 1095:10,
1100:18
**turning** [3] - 1059:2,
1064:12, 1092:4
**TWIX** [4] - 1037:25,
1038:2, 1038:5
**two** [12] - 1019:4,
1019:7, 1024:13,
1033:11, 1036:12,
1051:18, 1060:15,
1062:17, 1072:21,
1084:16, 1097:2,
1097:4
**type** [10] - 1051:20,
1064:17, 1068:23,
1072:3, 1079:15,
1080:23, 1081:19,
1089:1, 1098:19,
1101:25
**types** [2] - 1016:2,
1089:1
**typically** [8] - 1004:11,
1005:17, 1008:23,
1009:2, 1032:22,
1060:18, 1061:20,
1061:23

## U

**U.S** [4] - 997:22,
998:2, 1003:14,
1009:9

**ultimately** [1] - 1064:8
**under** [33] - 1000:8,
1000:9, 1001:10,
1001:11, 1002:17,
1003:15, 1005:7,
1007:22, 1020:23,
1021:6, 1025:1,
1025:19, 1032:4,
1036:5, 1042:7,
1042:16, 1045:6,
1045:15, 1047:1,
1047:19, 1048:3,
1048:7, 1050:4,
1050:15, 1054:11,
1056:9, 1057:23,
1061:5, 1070:18,
1070:19, 1074:15,
1085:15, 1093:6
**underground** [1] -
1090:25
**understood** [4] -
1069:18, 1082:7,
1082:18, 1091:17
**undisputed** [2] -
1076:14, 1077:24
**unfortunately** [1] -
1001:22
**United** [15] - 999:3,
1059:16, 1065:24,
1066:22, 1075:13,
1075:23, 1076:13,
1077:7, 1078:15,
1079:13, 1081:2,
1083:18, 1089:16,
1095:1
**UNITED** [3] - 997:1,
997:6, 997:11
**University** [1] - 1067:5
**university** [1] -
1092:24
**unless** [5] - 1026:15,
1030:24, 1031:4,
1056:22, 1095:17
**unusual** [1] - 1063:8
**up** [15] - 1017:25,
1019:20, 1024:19,
1033:17, 1046:7,
1053:12, 1054:23,
1057:21, 1057:22,
1073:17, 1081:21,
1085:23, 1087:20,
1087:21, 1100:17
**usable** [1] - 1054:2
**usage** [3] - 1052:17,
1052:20, 1052:22
**users** [1] - 1071:11
**utilization** [1] -
1037:23

## V

**value** [2] - 1063:9,
1091:25
**Vandenburg** [1] -
1039:24
**Vanes** [1] - 1009:18
**vanes** [4] - 1017:3,
1017:4, 1017:8
**vapor** [8] - 1010:8,
1017:21, 1018:10,
1020:13, 1020:17,
1085:1, 1092:14,
1092:15
**Vapors** [1] - 1017:16
**vapors** [2] - 1010:2,
1010:17
**variance** [2] - 1011:10,
1080:18
**variety** [2] - 1008:2,
1061:22
**various** [1] - 1033:20
**vat** [1] - 1071:24
**VAV** [1] - 1078:7
**ventilation** [2] -
1018:2, 1018:6
**verbal** [1] - 1008:4
**verify** [2] - 1032:11,
1097:5
**version** [2] - 1088:22,
1092:1
**versus** [3] - 999:3,
1051:15, 1057:25
**view** [6] - 1018:1,
1068:24, 1069:4,
1072:13, 1096:4,
1099:11
**violated** [2] - 1076:17,
1078:1
**virtually** [1] - 1081:14
**visits** [2] - 1007:16,
1007:25
**vital** [2] - 1035:22,
1072:6
**volumes** [1] - 1088:14

## W

**wait** [3] - 1079:10,
1083:14, 1083:21
**waiting** [1] - 1009:6
**waiver** [7] - 1031:13,
1031:21, 1031:22,
1031:23, 1065:5,
1065:7, 1065:10
**waivers** [1] - 1031:8
**walk** [1] - 1009:13
**walked** [2] - 1009:10,

1010:12
**Walnut** [1] - 1067:8
**warned** [1] - 1086:7
**warnings** [1] -
1101:20
**wash** [1] - 1015:4
**Washington** [4] -
997:6, 997:17,
997:25, 998:3
**Waste** [5] - 1027:13,
1030:12, 1042:17,
1045:15, 1047:19
**waste** [27] - 1015:7,
1027:16, 1028:3,
1028:7, 1028:8,
1029:9, 1030:22,
1031:2, 1035:25,
1040:13, 1042:22,
1043:12, 1043:25,
1044:17, 1044:20,
1045:4, 1045:10,
1047:6, 1047:13,
1048:6, 1048:10,
1053:24, 1057:25,
1086:22, 1102:2
**wasted** [1] - 1075:8
**Wastes** [1] - 1043:9
**wastes** [5] - 1014:23,
1043:16, 1043:18,
1044:16, 1046:25
**wastewater** [2] -
1068:4, 1094:17
**water** [23] - 1009:18,
1014:17, 1017:3,
1060:19, 1082:21,
1083:11, 1084:25,
1085:6, 1086:9,
1086:10, 1087:15,
1087:16, 1091:5,
1092:9, 1092:18,
1092:19, 1092:20,
1094:18, 1097:2,
1098:22, 1098:23,
1099:20
**Water** [1] - 1086:1
**WAYNE** [3] - 998:1,
1104:17, 1104:21
**ways** [3] - 1015:2,
1015:3, 1087:14
**weapons** [2] - 1003:6,
1003:13
**Wednesday** [1] -
997:7
**weeds** [1] - 1027:6
**well-educated** [1] -
1098:8
**Wertz** [1] - 1046:6
**Wesley** [1] - 1029:3
**West** [1] - 1045:13
**wester** [1] - 1045:25

**whichever** [1] -
1061:25
**whole** [2] - 1023:13,
1083:22
**widely** [1] - 1093:7
**WILLIAM** [1] - 997:21
**willing** [1] - 1092:16
**wins** [1] - 1062:1
**witness** [13] - 999:5,
1001:24, 1002:15,
1014:16, 1029:25,
1062:24, 1065:23,
1070:2, 1072:13,
1073:17, 1077:18,
1096:2, 1100:24
**WITNESS** [80] - 999:7,
1002:1, 1004:2,
1004:9, 1005:17,
1009:22, 1016:18,
1016:20, 1030:6,
1047:6, 1047:10,
1050:7, 1050:13,
1051:13, 1053:6,
1053:14, 1053:16,
1053:24, 1054:3,
1054:13, 1054:16,
1055:13, 1056:7,
1057:3, 1057:11,
1057:16, 1057:22,
1058:2, 1064:5,
1065:22, 1066:2,
1068:10, 1077:21,
1078:12, 1079:14,
1081:7, 1081:13,
1082:4, 1082:6,
1082:9, 1082:22,
1083:7, 1083:13,
1083:24, 1084:5,
1084:9, 1084:12,
1084:15, 1085:8,
1086:12, 1086:18,
1086:23, 1087:2,
1087:5, 1087:13,
1088:2, 1088:9,
1089:20, 1090:1,
1090:5, 1090:13,
1090:18, 1090:23,
1091:8, 1096:6,
1096:15, 1096:19,
1096:21, 1097:10,
1097:15, 1097:19,
1097:25, 1098:11,
1098:24, 1100:25,
1101:9, 1101:23,
1102:4, 1102:9,
1104:2
**Witness** [1] - 1006:10
**wondering** [1] -
1051:24
**word** [4] - 1018:16,

1041:5, 1050:17, 1096:13

**words** [3] - 1001:9, 1034:7, 1055:5

**workers** [3] - 1070:24, 1073:5, 1073:22

**workplace** [1] - 1092:12

**works** [3] - 1082:13, 1082:14, 1085:2

**world** [1] - 1098:5

**worried** [1] - 1015:24

**worry** [2] - 1082:20, 1085:15

**worrying** [1] - 1015:25

**writes** [1] - 1092:22

**written** [2] - 1023:1, 1028:18

**wrote** [2] - 1088:14, 1092:23

## Y

**year** [1] - 1091:7

**years** [8] - 1001:2, 1051:14, 1051:19, 1080:13, 1086:13, 1086:15, 1090:19, 1098:18

**yesterday** [9] - 999:8, 1002:6, 1010:1, 1012:20, 1013:23, 1047:7, 1071:1, 1071:9, 1073:23

**yourself** [1] - 1067:11

## Z

**ZILIOLI** [1] - 997:19