UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,    .
                                .
          Plaintiff,            .
                                .  CA No. 08-1160 (ESH)
     v.                         .
                                .
UNITED STATES OF AMERICA,       .  Washington, D.C.
                                .  Friday, February 21, 2014
          Defendant.            .  9:30 a.m.
                                .
. . . . . . . . . . . . . . . .  Page 1452 - 1569

DAY 8 - A.M. SESSION
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:            MICHAEL K. MURPHY, ESQ.
                              RAYMOND B. LUDWISZEWSKI, ESQ.
                              JUSTIN A. TORRES, ESQ.
                              STACIE B. FLETCHER, ESQ.
                              DAVID FOTOUHI, ESQ.

                              Gibson, Dunn & Crutcher, LLP
                              1050 Connecticut Avenue, NW
                              Washington, DC 20036-5306
                              (202) 955-8238

For the Defendant:            JOHN E. SULLIVAN, ESQ.
                              ERICA M. ZILIOLI, ESQ.
                              JESSICA O'DONNELL, ESQ.
                              JUSTIN D. HEMINGER, ESQ.
                              JENNIFER E. POWELL, ESQ.
                              WILLIAM D. JOHNSON, ESQ.

                              U.S. Department of Justice
                              ENRD / Environmental Defense
                              Section
                              601 D Street, NW
                              Suite 8000
                              Washington, DC 20026-3986
                              (202) 305-0365

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6714
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   (202) 354-3186

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil case No. 08-1160, Lockheed Martin Corporation v. United States of America.

MR. HEMINGER:  Your Honor, there's a housekeeping matter, and that is -- first of all, good morning.

THE COURT:  Good morning.

MR. HEMINGER:  Lockheed filed a brief about prejudgment interest.  And we've reviewed it.  I don't think the parties disagree about that that should be resolved during the second phase of this.

THE COURT:  I guess I have a question.  It may well be that you're right.  But I am curious, if they're right that it's mandatory, if that is correct, is it your position that if there was an allocation after phase 1, which is what we're in now, that -- would you be arguing something different about -- there's -- the rate for prejudgment interest is set by, I believe, statute.

So, it's not the rate you're talking about.  So I'm only interested in, one, whether you would be seeking at some point, assuming an allocation, something other than what they're asking for, which would be a percentage.  It's compounded interest is my recollection, set by statute.

MR. HEMINGER:  Yes, Your Honor, and the clarification that I would make is just the issue that we would probably want to explore further in phase 2 is the date from which prejudgment

1   interest should be calculated.  And I think we're going to just

2   agree that that's something that we could deal with at that

3   time?

4          MR. MURPHY:  Yes, Your Honor.  I think the statute

5   says it's the later of when the costs were incurred or when a

6   written demand was made.  So it's a question of when that

7   written demand was made.  So that might be an issue of fact to

8   deal with in terms of calculating it.

9          THE COURT:  But you agree it's a calculation.  And

10  what happens if you get prejudgment interest?  Does it go into

11  the fund?

12         MR. MURPHY:  Your Honor, I believe that that is a

13  question between us and our customer, to be negotiated.  I don't

14  know if that decision has been made yet or not between us and

15  our customer.

16         MR. HEMINGER:  And Your Honor, I guess I would just

17  note that Dr. Meyer's analysis took both possibilities into

18  account.

19         THE COURT:  Yeah.  I know that.  It occurred to me you

20  might be responding on the prejudgment interest issue, but I

21  didn't -- I wanted to understand.  So it says the later of when

22  the demand's made.

23         MR. MURPHY:  Yes, Your Honor.

24         THE COURT:  And remind me, did the Procter litigation

25  produce anything that went into the fund?

1          MR. MURPHY:  Yes, Your Honor.  There was a credit to

2    the fund made when the Procter settlement was reached.

3          THE COURT:  I want to know what that was, and I want

4    to know what the settlement provided.  You can submit it under

5    seal if you want.  I'm looking for two things about the Procter

6    litigation.

7          MR. HEMINGER:  And I'm not sure if we've seen that

8    document, so I guess if it's submitted *in camera*, we would also

9    like to see it.

10          THE COURT:  You maybe have some kind of protective

11    order.  But I'm not insisting it; I'm sure that it was

12    confidential, or so you said before.  I don't know whether the

13    fact of how much has gone into the settlement fund -- not the

14    settlement fund, the pool, is confidential.

15          MR. MURPHY:  That's been produced, Your Honor.  It's

16    on the spreadsheets the government has.

17          THE COURT:  Oh.  Share that with me, but the

18    settlement, I don't know if you have some kind of protective

19    order, but submit it to me under seal.  Okay?

20          MR. MURPHY:  Okay.

21          THE COURT:  Anything else before we begin?  And I do

22    want to go back to the question -- but I think we shouldn't hold

23    up the expert -- of what if anything more the Court should hear

24    about that settlement.  That still hasn't been resolved, I take

25    it.

1          MR. MURPHY:  Which, Your Honor?

2          THE COURT:  What if anything I'm going to be given as

3     a proffer regarding the settlement.

4          MR. MURPHY:  The discontinued operations?

5          THE COURT:  I noticed for instance one of the

6     pleadings you filed, that footnote that was the red flag.

7     Footnote 7, for instance, that document PX 1858, I don't have,

8     I've never seen it, and I don't know why I would want to see it,

9     frankly, because I'm not terribly interested in how the customer

10    thinks today.  The only question is how much do I get to find

11    out about what was thought back in the time the agreements, both

12    the consent and the settlement, were executed.

13        So I need to address that, but I think we ought to get

14    going with your witness first, see how far we go.

15        Do you have somebody available to follow up?  That's your

16    last witness, correct?

17         MR. HEMINGER:  Yes, Your Honor.

18         MR. MURPHY:  After that, Your Honor, we have Mark

19    Kiefer, who is here, and then Rod Mateer is working at the

20    Deloitte office downtown and can be here in 10 minutes.

21         THE COURT:  Okay.  He'd be a lot faster if we had to

22    slip one in.  But okay, go ahead.  Call your witness, please.

23         MR. HEMINGER:  Your Honor, the United States calls to

24    the stand Dr. Joan Meyer.

25        (Witness takes the stand.)

1     **JOAN MEYER, WITNESS FOR THE DEFENDANT, SWORN**

2                           DIRECT EXAMINATION

3     BY MR. HEMINGER:

4     Q.   Good morning, Dr. Meyer.

5     A.   Good morning.

6     Q.   Dr. Meyer, have you submitted a declaration in this case?

7     A.   Yes.

8     Q.   And do you adopt that declaration today as your testimony

9     here today?

10    A.   Yes.

11    Q.   And does that reflect your opinions to a reasonable degree

12    of certainty in your field?

13    A.   Yes.

14              MR. HEMINGER:  Your Honor, we pass the witness.

15              THE COURT:  Thank you.

16              MS. FLETCHER:  Today we'll be only using exhibits from

17    the U.S. trial binders, but I do have a copy for your

18    convenience if you would like to have a smaller binder just for

19    the cross.

20              THE COURT:  I'm sorry, where are those now?

21              MS. FLETCHER:  These are in the U.S. trial binder 2

22    under the Meyer declaration tab.

23              THE COURT:  If they're all there, I can follow that.

24

25

CROSS-EXAMINATION

BY MS. FLETCHER:

Q.   Good morning, Dr. Meyer.

A.   Good morning.

Q.   I wanted to start first today with your economic benefit
opinion, and if we could turn to paragraph 60 on page 45.
Dr. Meyer, have you had a chance to find that in your
declaration?

A.   Yes.

Q.   Thank you.  Dr. Meyer, in this first bullet point, you're
finding that there's an economic benefit to Lockheed Martin from
a judgment in this case because the United States would not
receive the benefit of the percentage -- the entire credit that
went to the disc ops pool; is that correct?

A.   Yes.

Q.   So Dr. Meyer, you're deriving economic benefit from the
percentage of the credit that's not flowing to federal
government contracts; is that correct?

A.   In part, yes.

Q.   Okay.  And in the second to last line, this is a
mathematical example of what you mean, Dr. Meyer.  That's why I
brought it up.  You say, "For example, a $73 million cash flow
to the disc ops pool, 30 million would be credited to the United
States over five years, with Lockheed Martin retaining the
benefit of 23 million in total for itself."  Do you see where

1    I'm reading, Dr. Meyer?

2    A.    Yes.

3    Q.    Dr. Meyer, do you agree that Lockheed Martin flows down the

4    entire -- the portion of the credit that's not going to federal

5    contracts to its other customers?

6    A.    It flows down to whom?

7    Q.    Well, in this case, say we have $100 in the disc ops,

8    that's going to be credited to the disc ops pool.

9    A.    Yes.

10   Q.    And if -- $87 go to federal contracts, correct?

11   A.    Roughly, yes.

12   Q.    Roughly.  Okay.  And you're saying the 13 million that

13   doesn't go to federal contracts is an economic benefit, correct?

14   A.    No.

15   Q.    Okay.  Can you explain why not?

16   A.    It might help if I take you to figure 3 in my declaration.

17   Figure 1 is one place to start and that's on page 6.  The reason

18   this might help visually is because -- I don't know if you want

19   to show that on the screen.

20            THE COURT:  Yes, figure 1.  They can do that.  It's

21   page 6, figure 1.

22            THE WITNESS:  What I wanted to convey here is when I

23   calculate economic benefit, the first thing I do is I calculate

24   what the cash flows would be under the baseline scenario.  So

25   that's the current status quo, no CERCLA allocation.  And as you

see, this figure presents these cash flows in net present value

terms as of the start of the trial.  The red bars represent the

actual site remediation cost incurred by Lockheed Martin through

2011, and then the estimated cost they will incur from 2012 all

the way through to 2031.

Now, the other cash flows that are very important to keep

track of are the dark blue bars, which would be the amount

estimated to be recovered through overhead, and then there are

the associated corporate income tax effects, in the light blue

bars, and then I've also separately shown the profit factor

that's earned on overhead recoveries.

So first of all, when I'm calculating or estimating an

economic benefit, I estimate what these cash flows are in the

baseline scenario.

If you turn to figure 3, which is on page 9, I subtract

those out from the cash flows that would be associated with a,

in this case a 60 percent CERCLA allocation for both past and

future remediation costs.  So what I wanted to convey is the way

I calculate economic benefit considers, you know, cash flows

out, those actual remediation costs incurred by Lockheed Martin,

the associated recoveries they receive essentially through

overhead.  They don't receive 100 percent of those costs, but

they do receive a majority of them through this overhead

recovery.

And then in the CERCLA allocation, Lockheed Martin is also

1   receiving that big spike, as you see, in 2014, for an allocation

2   for past costs.  And then they need to credit the overhead pool

3   for not all but part of that CERCLA allocation.

4       And then in this case, they're also continuing to receive a

5   portion of their estimated cleanup cost paid by the government

6   going forward in the future.

7           THE COURT:  Am I reading this correctly?  It's hard to

8   tell the colors, if you want to know the truth.  The CERCLA

9   payment and overhead credit?

10          THE WITNESS:  Yes.

11          THE COURT:  If I'm looking 2014 forward?

12          THE WITNESS:  Yes.

13          THE COURT:  What's happening to the payment and the

14  credit?

15          THE WITNESS:  The payment and the credit.  Would it be

16  easier to look at figure 3?  That's the baseline where the --

17          THE COURT:  I thought I was looking at figure 3.

18          THE WITNESS:  Oh, I'm sorry, figure 1, which doesn't

19  have the CERCLA allocation.  It's on page 6.  And the bars are a

20  little bit more prominent.  And here, let me give you an

21  example.  This is in net present value dollars.  If you look at

22  1994, Lockheed Martin spent just around $7.2 million in today's

23  terms in remediating that site.

24      Now, we know, then, in terms of overhead recovery, they

25  start to reflect that 1994 cost beginning in the next year, so

1  1995, and they amortize it over five years.  So they take that

2  essentially $7.2 million remediation cost, they divide it by

3  5 and -- I'm not very good at doing math when I'm on the stand,

4  but they -- that dark blue bar in 1995 is 20 percent of that

5  $7.2 million, multiplied by the net recovery factor, which is

6  driven in large part by the percentage of business Lockheed

7  Martin had in 1995 with the government, or that's how it's

8  estimated.

9      So you'll see that little bar in -- dark blue bar in 1995

10  is just about a million dollars.

11  BY MS. FLETCHER:

12  Q.   So Dr. Meyer, in your explanation --

13          THE COURT:  I'm sorry, but I've just got to be able to

14  read this.  I'm still on figure 3.  Take me to 2020 and just

15  translate what -- the red obviously is the remediation cost.

16  They're still running -- does that mean that they're running --

17          THE WITNESS:  Yes.  So in 2020 they're still

18  incurring, I don't know, say $400,000.  I'm not quite sure what

19  the figure is.  Now, that dark blue bar reflects not only -- it

20  actually reflects the remediation costs they've incurred over

21  the prior five years because it's cumulative.  So that overhead

22  recovery in any one year is calculated based on remediation cost

23  in each -- 20 percent of it multiplied by the net recovery

24  factor in the previous five years.

25          THE COURT:  Is that only through government contracts?

1          THE WITNESS:  Correct.

2          THE COURT:  So where is the 60 percent?  Is that

3     rolled into that?  I'm looking for --

4          THE WITNESS:  The 60 percent, that giant purple bar in

5     2014 would be a 60 percent allocation of all the past costs.  So

6     on a net present value basis, going through 2013 -- let me just

7     find you that number --

8          THE COURT:  Yeah, I assume it's about 175 million.

9          THE WITNESS:  Well, the total present value of past

10    costs in net present value figures was 490 million.

11         THE COURT:  That purple bar represents 490 million?

12         THE WITNESS:  That represents 60 percent.

13         THE COURT:  Got it.  But what happens to the purple

14    bar as you move to later dates?  I'm just trying to -- I don't

15    understand the colors here.

16         THE WITNESS:  If you look in 2015, there's a purple

17    bar below the zero axis, the horizontal axis, and that

18    represents the credit associated with the CERCLA payment that

19    Lockheed Martin tells us it will be making beginning the year

20    after receiving the CERCLA allocation.

21         THE COURT:  Right.  So you're taking the 60 percent of

22    490 and amortizing it over five years forward.

23         THE WITNESS:  Correct.

24         THE COURT:  But are you assuming there are no further

25    payments, only -- are there any other purple lines above?

That's what I don't understand.  You're going to have costs

until 20- something.

THE WITNESS:  This is what's interesting.  When

Lockheed Martin -- when the U.S. also pays for future costs,

what we're assuming is that the U.S. actually, every year, pays

60 percent of what the remediation cost is in that year.  So

these red bars going forward are reduced by the amount that the

U.S. is assumed to pay directly.

THE COURT:  Okay.  All right.  So that's why we don't

see more purple?

THE WITNESS:  Correct.  There is a little -- you can't

barely see it, but in 2032 beyond, there's a little bit of a

purple bar.  You can't really see it because of the dimensions

of the axis, and that reflects that -- it's just reflecting

those later payments.

THE COURT:  And again, bear with me.  This is not one

of my strong points.  Between the years of 20 -- I can't even

read it -- 2019 is the last time I see a little purple bar.  I

take it there's a gap of a good number of years, maybe 10, where

you will not be getting any credits, because?

THE WITNESS:  What's going on is the credit, the

amount of overhead recovery more than offsets that credit, and

what I could do is I could take you into the model to show you

those years and show you the actual lines.  It's just --

THE COURT:  Just explain that to me in English, in a

1    simple mathematical...

2              MS. FLETCHER:  John, can we pull up demonstrative 2,

3    please?

4              THE COURT:  The overhead recovery more than offsets,

5    meaning the payment that's coming through the contracts or some

6    other way?

7              MS. FLETCHER:  Can you blow it up, please?

8              THE WITNESS:  Well, yeah.  So it's just the problem is

9    the purple bar is not -- you can't see it very well, but it is

10   there.

11             THE COURT:  Why is it that the overhead recovery more

12   than offsets the credit after the five years amortized big bump

13   of 2014?

14             THE WITNESS:  I may have misspoken.  It's just when

15   you add them all together, that's what happens.  When we're

16   looking at overhead -- what's going on with overhead is you're

17   getting an amortized amount of the prior five years remediation

18   cost, and so that will be in your dark blue bar, and you're also

19   getting a credit for that portion that the U.S. is incurring.

20             THE COURT:  So what you're telling me is basically

21   starting in 2020, there's a much smaller credit and a much

22   smaller recovery cost.

23             THE WITNESS:  Yes, so that the major credit is really

24   driven by that big cash flow, yes, that will come with a CERCLA

25   allocation for past costs.

1          THE COURT:  There wouldn't be much disagreement

2     between you and the other side regarding future cost.

3          THE WITNESS:  Future remediation costs?  Actually, my

4     model takes Lockheed Martin's estimates.

5          THE COURT:  But the analysis doesn't come up with --

6     if in fact -- once upon a time I thought you said the ballpark

7     figures, that it's -- remediation costs in the past have been

8     somewhere around 500 million.

9          MR. MURPHY:  It's about 300 million.

10          THE COURT:  And then about 200 million for future?

11          MR. MURPHY:  Your Honor, I guess we estimate out 20

12     years.  Of course, these are estimates.

13          THE COURT:  Well, that's what they've done.

14          MR. MURPHY:  Yeah, those are based I think on our

15     current estimates.  And I think in the future, assuming the

16     Court gives an allocation here, that our costs will be reduced

17     by the amount of that allocation and it should -- I believe it

18     should work the same way.  Correct me if I'm wrong.

19          THE COURT:  I don't know what that means.

20          MR. MURPHY:  I'm sorry.  That in the future, if this

21     court establishes an allocation, our costs in the future will be

22     reduced by the amount of that allocation.

23          THE COURT:  Put aside the allocation for a minute and

24     just tell me what are the future costs predicted to be.

25          THE WITNESS:  Your Honor, if you go to figure 29 on

 1    page 41, it outlines the costs in every year.

 2              THE COURT:  Can you tell me what that says.

 3              THE WITNESS:  Yeah.  So the future costs in net

 4    present value terms are projected to be $67.4 million.  That's

 5    in today's dollars.  If you want to look on just nominal dollar

 6    terms, it's about, future costs are $124.5 million.

 7              THE COURT:  And in the past?

 8              THE WITNESS:  In the past --

 9              THE COURT:  As of 2014, I guess, is what you're

10    saying, prior to today.

11              THE WITNESS:  Prior to today, in today's dollars, the

12    past was approximately $490.2 million.  In nominal dollars,

13    that's $287.9 million.

14              THE COURT:  Which is your 300,000?

15              MR. MURPHY:  Yes, Your Honor.

16              THE COURT:  Yours are nominal dollars.

17              THE WITNESS:  Yes, Your Honor.

18              MR. MURPHY:  Yes, Your Honor.

19              THE COURT:  But my point is that, is it fair to say

20    that the analysis of economic benefit, to the extent I accept

21    your way of thinking about it, doesn't come out on the bottom

22    line terribly differently from the other side for costs not yet

23    incurred?  There isn't the same benefit after that big bump?

24              THE WITNESS:  To my knowledge, the other side did not

25    calculate economic benefit.

1    THE COURT:  I don't know if they did or they didn't,

2  but they have a fundamental disagreement with you over where you

3  start this analysis, I think.

4    MS. FLETCHER:  That's correct, Your Honor.

5    THE COURT:  And you tag it to today; they tag it

6  probably to the beginning of remediation costs.  You've read

7  their affidavits, I assume.

8    THE WITNESS:  Yes.

9    THE COURT:  Okay.  Correct me if I'm wrong so far.

10    THE WITNESS:  No.

11    THE COURT:  Okay.  But I'm trying to understand,

12  because their methodology doesn't differ, but depending on your

13  timeline, there can be a big difference of economic benefit.

14    THE WITNESS:  What puzzles me, and I'm not

15  understanding -- if I understand you correctly, you want me to

16  compare my methodology with theirs but --

17    THE COURT:  No.

18    THE WITNESS:  -- but they've just blown holes in mine,

19  as far as I can see.  They haven't shown me how they would go

20  about calculating economic benefit.

21    THE COURT:  Well, they don't acknowledge it.  They

22  think it's a wash.  But I'm just saying for future -- I think

23  that there is a difference -- their position is it washes so it

24  doesn't make any difference whether it's past or future; it all

25  comes out in the wash, for lack of a better word.  But if I

1    applied that theory to yours, I'm just wondering whether there's

2    any difference between the parties' experts as to the future

3    costs.  Not past costs.  I understand the government's argument

4    and yours is that the past costs, if they get an allocation

5    going forward, a bump like your purple chart, that produces the

6    economic benefit.

7        Is there an economic benefit beyond that time period for

8    future remediation cost which in nominal dollars are

9    approximated to be 124 million?

10                    THE WITNESS:  Yes.

11                    THE COURT:  There is?

12                    THE WITNESS:  Yes.

13                    THE COURT:  Okay.  So there would be a difference in

14   outcome when we were just talking about that 124 million,

15   between the two sides.

16                    THE WITNESS:  Yes.  If we were looking just at future

17   costs only --

18                    THE COURT:  All right.  I need, at some point i time,

19   through you, Mr. Heminger, I just need to understand the

20   difference.  Past and future make a big difference here.  Okay.

21   BY MS. FLETCHER:

22   Q.   To follow up on that point, Dr. Meyer, let's talk through

23   how future costs would work.  Is it your understanding that

24   following a judgment in this case, going forward for future

25   costs, that step one would be Lockheed incurs the cost and pays

1   the vendor, correct?

2   A.   Yes.

3   Q.   Okay.  And then do you understand that the cost will be put

4   into the discontinued operations pool, correct?

5   A.   Let me stop you a little bit, because I can tell you

6   effectively how I treat that in my calculations, but the actual

7   mechanics, I'm not a government contracts, cost counting expert.

8   But I know at other sites there's an arrangement by which the

9   government pays directly an agreed-upon portion of a bill.  Now,

10   how the mechanics work, I'm not familiar.

11         THE COURT:  Well, and we're going to call it the --

12   what did we call it?

13         THE WITNESS:  Disc ops.

14         THE COURT:  But for purposes of this, let's just say

15   they incur costs for cleanup, $100, then there's this recovery

16   factor -- for ease of reference, let's call it 80 percent --

17   that's $80 and it gets into the pool.

18         THE WITNESS:  Yes.

19         THE COURT:  How it gets there -- and then it's

20   amortized, so it's not 80, it's divided by cost.

21         THE WITNESS:  Yes.

22         THE COURT:  And it goes the year after they receive

23   it, right, under that agreement?

24         THE WITNESS:  Yes.

25         THE COURT:  The mechanics basically are set out by a

1    settlement agreement.  You're aware of that one?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  Beyond the accounting parts,

4    whether there's real money floating around is irrelevant.

5    That's how it's booked.  Do we all agree?

6              MS. FLETCHER:  Yes, Your Honor, that's --

7              MR. MURPHY:  I guess, Your Honor, I don't think we

8    agree that it doesn't matter the mechanics of how the payments

9    actually occur down by the business unit level.  These costs,

10   once they get into the pool, aren't paid directly, once they get

11   in the pool, they're flowed down to individual contract actions,

12   and those payments won't occur until contract performance is

13   achieved by Lockheed Martin, until they deliver something to the

14   government.  Then that payment is received over the term of that

15   contract, whatever that may be, and these are in thousands of

16   contracts.

17             THE COURT:  Right.  I oversimplified the timing aspect

18   of it, but I'm assuming from your SEC filings, you've got a lot

19   of government contracts floating around.

20             MR. MURPHY:  Yes, Your Honor.  But again, the payments

21   are made once we perform on our contracts, in consideration for

22   our performance.  I think that's an important thing to remember.

23             MR. HEMINGER:  Your Honor, I just wanted to note that

24   with respect to future costs, I would say that there is a

25   disagreement between the parties about how that might occur, and

I think that's what Ms. Fletcher is asking Dr. Meyer about.

THE COURT:  I don't know what she's asking her about, but I understand -- I finally figured that out.  Okay.  There's a disagreement.  Go ahead.

Right.  I think there are time issues, and there may be paper accounting issues, but in the simplest way, this agreement provided that you get paid a factor of the overhead, depending on government contracts, that goes into the disc op, and then thereafter there should be a credit after it's received.  When it's received, and exactly which contract it comes from, you don't put a credit into the -- you put the credit in when the allocation or the recovery from someplace comes.

That is not dependent on the contract performance.  The contract performance, obviously, is dependent on when the payment comes to Lockheed.  I understand that.  So who knows when exactly things are happening, but we all agree the mechanics are set forth in that agreement.

MR. MURPHY:  Yes, Your Honor.

THE COURT:  So 80 percent credit that year a certain portion of what's been recovered from either the U.S. government or anywhere else gets put into the disc op.  You agree?  80 percent of it.  Over five years.

THE WITNESS:  It's interesting.  The way I recall Lockheed Martin describing it is that the entire amount would be put into the disc ops pool, but what's actually apportioned to

1    the government is a function of that 80 percent.

2              THE COURT:  Right.  You called it a recovery rate.

3              THE WITNESS:  Net recovery factor.  That's a term they

4    use in their documents.

5              THE COURT:  But if we keep it simple, we'll --

6    BY MS. FLETCHER:

7    Q.   And Dr. Meyer, in the example you just gave, the cost was

8    handled the same way, correct?

9    A.   Yes.

10   Q.   Okay.  And so then to follow up on Judge Huvelle's point,

11   in the future, if the cost is incurred and we already know the

12   allocation, wouldn't the cost and credit kind of flow down in

13   the same years, net each other out?

14             THE COURT:  Well, your colleague just convinced me

15   that didn't happen, precisely.

16             THE WITNESS:  There is a time value of money dimension

17   to the actual cash flows.  There's also a profit on the overhead

18   recovered on cost, and there's also a profit that Lockheed

19   doesn't earn because the government's paying a portion going

20   forward.  But I guess the point I'm making is you have to be

21   very careful about first specifying each type of cash flow year

22   by year because there is -- in total there is not this offset

23   going on.

24   BY MS. FLETCHER:

25   Q.   But in the future, the costs and credits would be going

1       hand in hand in the same year, so where's the economic benefit?

2               THE COURT:  They're not the same.

3               MR. HEMINGER:  I'm going to object on foundation

4       grounds, Your Honor.

5               THE COURT:  Yeah, I agree.  Sustained.  I sustained it

6       on the basis that Mr. Murphy has convinced me otherwise.

7               MR. MURPHY:  Your Honor, just to explain.  There's a

8       two-step process.  The disc ops agreement covers how it reaches

9       the pool and goes into the pool.  And that pool is used on a

10      yearly basis to flow down costs to Lockheed Martin's business

11      units.  Those business units compare their allocation from that

12      pool to their G&A, they're turned into rates, and those rates

13      are then applied to individual contract actions across all

14      Lockheed Martin business units.

15              THE COURT:  By the way, when your expert testifies, I

16      would like to know how you think profit's determined.  You ought

17      to know better than anybody.  They use ███████ for profit for

18      lack of better, and I understand a lot of that is complicated by

19      this cost reimbursement versus fixed-price, but you have not

20      given me anything to show how you do determine profits.  They've

21      used the figure the accountant used, but anyways.

22              MS. FLETCHER:  Your Honor, our fact witness, Robert

23      Gatchel, will be addressing that.  He's the vice president of

24      government finance.

25              THE COURT:  Okay.  Your objection again, sir?

1        MR. HEMINGER:  It was just foundation.  Your Honor,

2    when Ms. Fletcher was asking about how future costs would be

3    treated, how --

4        THE COURT:  Yeah, I guess they can't accept that

5    everything's happening in the same year.  There's a time

6    disconnect.  There are overhead flowing down, costs flowing down

7    every year, and there will be, assuming an allocation, credits.

8    But beyond that, you can't tie them to each other.  That has to

9    be the case.

10       MR. HEMINGER:  There are timing differences, Your

11   Honor, yes.

12       THE COURT:  Nobody knows, when it goes down from

13   corporate, where it's coming from anyways, and once it gets into

14   the credit, gets into the pool, its identity is lost.

15       MR. MURPHY:  But, Your Honor, at the upper level, when

16   we're talking about into the pool and out of the pool, assuming

17   costs are incurred in the same year, and again assuming an

18   allocation, Your Honor, assuming the judgment fund makes those

19   payments in the same year, they will net out in that year and

20   that flow-down will not -- that's the point.

21       MR. HEMINGER:  Your Honor, and I guess the point --

22       THE COURT:  Let's have the expert tell us why not.

23   You understood what he just said, in the future.  Put aside

24   past.

25       THE WITNESS:  Yes, I do, and what I can do is take you

1   to a particular page in my model, which is U.S. Exhibit

2   1180.0024.

3          MS. FLETCHER:  I'm sorry, what page were you looking

4   at, Dr. Meyer?

5          THE WITNESS:  0024.

6          THE COURT:  And where do I find that?

7          THE WITNESS:  There is under tab 2 in my --

8          MS. FLETCHER:  Your Honor, that's in U.S. trial binder

9   number 2 under Meyer declaration.

10         THE COURT:  Right.  That's all the charts at the back.

11  I'm sorry I didn't spend all night reading these.  Okay.  Got

12  it.  And it's C-8.

13         THE WITNESS:  Yes.  And let me -- I'm just going to

14  pull a pen out --

15         THE COURT:  You can use your finger to highlight on

16  the board, if you want.

17         THE WITNESS:  My finger wasn't working well.  Let's

18  look at just the year of 2025, which is the last column.  And if

19  you look at these rows here, which would be rows 16 plus 17 plus

20  18, so I guess it should really be this 2.26 plus the 14.  So

21  the $2.26 is the estimated overhead recovery of the costs -- not

22  the costs from that year but for the prior five years.  There's

23  a profit we estimate is earned on the overhead cost of 14 cents.

24  Now, because this is essentially revenues coming in, you have to

25  adjust for taxes that get paid on those incremental revenues,

1     and that's what the negative .97 is.

2         Now, to look down at the future cost, government share paid

3     as incurred, we would look, I believe, at the cash flows here,

4     which would be the $1.74, less the overhead credit, less the

5     lost profits, or profits on overhead recovery with a tax effect.

6         So I guess the point is, that I'm trying to make, is that

7     what my model does is very, very carefully detail each source of

8     cash flow and then calculates --

9         THE COURT:  Okay.  So in that year, what's the

10    economic benefit under your analysis for future cost for the

11    year 2025?  What numbers am I...

12        THE WITNESS:  I don't calculate economic benefit on a

13    per-year basis, because if you think about it, the costs are

14    amortized over five years, any CERCLA allocation is credited

15    amortized over five years, so that's why I just don't think

16    looking at it on a per-year basis is the way to do it.

17        THE COURT:  What chunk should I look at?  How do I

18    translate this into present-day dollar economic benefit for the

19    future?  Put aside for a moment the bump from the past.  Is

20    there a bonanza of some sort strictly for future allocation

21    purposes?

22        THE WITNESS:  Yes.  I can calculate that.

23        MS. FLETCHER:  I'm sorry, Your Honor.  Do you mind if

24    I ask a follow-up question, Dr. Meyer?

25        THE COURT:  Uh-uh.  Let her do it.

1    MS. FLETCHER:  Okay.

2    THE WITNESS:  The way I would do it, if you go to

3    figure 28, which is on page 39, I would simply take my estimate

4    of --

5    THE COURT:  Figure which one again?

6    THE WITNESS:  Figure 28 on page 39.

7    THE COURT:  I'm at the stage -- sorry to inform you,

8    Counsel -- that if I have a question, I will forget the question

9    if you interrupt me.  So figure 28 on page 39.

10    THE WITNESS:  When I talk about economic benefit, it

11    is always in terms of the net present value as of the start of

12    the trial.  If I wanted to calculate the economic benefit for

13    future costs alone at the 60 percent allocation, I would

14    simply -- I'd take the difference between past and present

15    economic benefit from CERCLA payment of past and future costs,

16    and I'd subtract from that the estimated economic benefit from

17    past costs only.  So that's approximately $6 million.

18    THE COURT:  Give me the assumptions on the 6 million

19    again.  What does it represent and what's your assumption?

20    THE WITNESS:  First, my assumption is that there is a

21    U.S. CERCLA allocation of 60 percent, and what I do is I start

22    with my whole economic benefit estimate as of the start of the

23    trial of 31.3 million, and that's if a CERCLA payment is made

24    for past and future costs, and I subtract from that the economic

25    benefit Lockheed Martin would realize if there was a CERCLA

1    allocation at 60 percent for past costs only.

2           THE COURT:  And what figure does that give me?

3           THE WITNESS:  So 31.3 million minus 25.1 million I

4    think is approximately 6.2 million if I'm doing my math

5    correctly.

6           THE COURT:  And that is the economic benefit from past

7    or --

8           THE WITNESS:  From future.  Future.  So the past only,

9    if there's a CERCLA payment for just past cost at 60 percent,

10   economic benefit is 25,096,654.

11          THE COURT:  Where's the 6 million figure on this

12   chart?

13          THE WITNESS:  It's just the difference between 31.3,

14   which is past plus future CERCLA allocation.

15          THE COURT:  So it's not broken out here?

16          THE WITNESS:  I did not break out future only.  So I

17   have economic benefit if there's a CERCLA payment for past

18   costs, and economic benefit if there's a CERCLA payment for past

19   and future costs.  So if you take the difference, past and

20   future --

21          THE COURT:  So if there's a 10 percent allocation, do

22   the same thing for me again.

23          THE WITNESS:  Yes.  Okay.

24          THE COURT:  Past only is how many in nominal dollars?

25          THE WITNESS:  In net present value numbers, past only

1    is 4.18 million.  For past and future costs of a 10 percent

2    CERCLA allocation, it's 5.23 million.  The difference between

3    that is roughly $1.1 million, and that would be --

4              THE COURT:  Future.  Assuming costs out through 2036

5    or something, right?

6              THE WITNESS:  Correct.

7              THE COURT:  And the baseline -- I see.

8              THE WITNESS:  Yes.

9              THE COURT:  Under the baseline, what would be the past

10   costs and what are the future costs?

11             THE WITNESS:  The baseline by definition is what's

12   going on now.  There is no CERCLA allocation, so there's no

13   economic benefit from a CERCLA allocation.  But you do see the

14   next --

15             THE COURT:  I can see what the government, under your

16   theory, is paying, the effective rate that Lockheed pays --

17             THE WITNESS:  Yes.  And you can see here, on a net

18   present value basis, Lockheed Martin effectively bears 18.5

19   percent of the cost before there's any CERCLA allocation.

20        Then as you move down, you'll see that that percentage

21   effectively borne by Lockheed Martin drops.

22             THE COURT:  Okay.  Go ahead, Ms. Fletcher.

23             MS. FLETCHER:  John, can we have demonstrative 2,

24   please?

25   BY MS. FLETCHER:

1    Q.   Dr. Meyer, you were just explaining to the Court the $25

2    million in economic benefit that you calculate for past part

3    payment.  If we could just walk through this together of how you

4    get the $25 million.

5    A.   Could you help me as to where this is?  What page?

6    Q.   Yes.  This is U.S. Exhibit 1180, and what I'm showing is

7    the cash flows in net present value at a 60 percent allocation,

8    which appears on page 23 and 24.

9              MR. HEMINGER:  Is this -- where does this appear in?

10             MS. FLETCHER:  Page 23 and 24.

11             THE WITNESS:  So my page 23 shows the years going

12   across as 2004 through 2014.

13   BY MS. FLETCHER:

14   Q.   Yes.  I'm looking at the last column on page 23 and then

15   starting with the first column on page 24.

16             THE COURT:  I'm sorry.  Where are you finding page

17   numbers?  I'm on these God-awful charts.

18             MS. FLETCHER:  Your Honor, I'm using the Bates numbers

19   down in the corner.  So 0023 and 0024.

20             THE COURT:  All right.

21   BY MS. FLETCHER:

22   Q.   What I'm looking at here is the first column which I've

23   excerpted is the last column on page 23, and then I've resumed

24   with the first column on page 24 because I wanted to talk about

25   these five years together.

1            MR. HEMINGER:  I just wanted to clarify.  You said you

2    excerpted those?

3            MS. FLETCHER:  There's no modification.  It's just an

4    excerpt so we can show the years together without a page break.

5            MR. HEMINGER:  Your Honor, Dr. Meyer prepared Excel

6    spreadsheets.  So we gave those to Lockheed.  U.S. Exhibit 1180

7    is a complete run of her model, so it prints out all of the cash

8    flows, and I'd just like to note for the record that this

9    excerpt doesn't reflect the full run from her model.  So I just

10   wanted to note that.

11           THE COURT:  If it's important to her, I'm sure she can

12   point that out.

13   BY MS. FLETCHER:

14   Q.   Dr. Meyer, can we start first with row 21, which is the 161

15   million 88 -- do you see where I'm looking, Dr. Meyer?

16   A.   I do.

17   Q.   This is the cash flow that you calculated for a judgment of

18   past cost judgment in this case; is that correct?

19   A.   For that year, yes.  In net present value numbers, yes.

20   Q.   And to calculate that, you took the nominal past cost and

21   then you multiplied it by 60 percent, and then I believe you

22   also brought it back from net present value within the year; is

23   that correct?

24   A.   Yes.  If you want to see the actual calculations, I can

25   tell you that it would be much easier if you just went to my

1    results page instead of diving right into here.

2    Q.   Can we just talk through so we understand how we get the 25

3    million?  In the next column --

4    A.   But what I was going to say is if you want to understand

5    how the numbers themselves are calculated, we have to start back

6    with the nominal spreadsheet and then apply the net present

7    value figure, because the actual calculations are done in the

8    prior spreadsheet.

9    Q.   I think what I'm trying to talk through with you,

10   Dr. Meyer, is how you get the 25 million in net present value.

11   We're not contending that you didn't do the calculation

12   correctly from nominal cost to net present value.

13   A.   I misunderstood you.  I thought you wanted to understand

14   how I derive that number.

15   Q.   No.  Okay, so in the next column, 22 -- the next column,

16   you're showing the amortization of the credit, correct?

17            THE COURT:  What's the next column?

18            MS. FLETCHER:  It's the overhead credit --

19        John, could you just...

20        (Adjustment made on monitor screen.)

21            THE COURT:  The overhead credit, column 22?

22            MS. FLETCHER:  Yes.

23            THE COURT:  Is this underneath the 161.88?  Not on my

24   chart.

25            MS. FLETCHER:  Your Honor, it's on the next page.  The

1    columns continue to the next page.  So 2014 is where you see the

2    26.01.  I'm sorry, 2015.

3              THE COURT:  What page?

4              MS. FLETCHER:  On page 24.

5              THE COURT:  What am I looking for?

6              MS. FLETCHER:  Looking at row 22, Your Honor.  That's

7    where the credit starts to be amortized.

8              THE COURT:  So $26?  That one?

9    BY MS. FLETCHER:

10   Q.   Dr. Meyer, is that the first year of the credit

11   amortization for a past cost payment?

12   A.   Yes, associated with that lump sum 161.88 million.

13   Q.   To determine that amount, did you amortize the 161 and then

14   multiply by the net recovery factor?

15   A.   Essentially.  That was done with nominal dollars, and then

16   this worksheet that you're showing me converts it all into net

17   present value.

18             THE COURT:  What did you use?  80 percent?

19             THE WITNESS:  Actually, I use -- if we're going to get

20   into the model, I can show you, just to give you an overview, if

21   you go to page 1, of how my model works, page 1 are the general

22   inputs, and these are the inputs that you would want to change

23   to do various runs.  For example, row 1 is the CERCLA

24   allocation, Lockheed Martin's share of the cost.  This one shows

25   40 percent to them, 60 percent to the U.S.  It also has certain

1    inputs that remain the same over huge swaths of years.

2         If you turn to page 2, these are year-specific inputs.

3    They're still used in all the calculations, but they differ by

4    year.

5              THE COURT:  All I'm asking is what did you use as

6    year --

7              THE WITNESS:  What I was getting to is on row 22 is

8    that projected recovery factor, that net recovery factor, and if

9    you want to flip to page 0004, looking at row 22 in 2015, it is

10   86.4 percent.

11             THE COURT:  Got it.  Okay.

12   BY MS. FLETCHER:

13   Q.   And in row 23, Dr. Meyer, you have calculated the lost

14   profits associated with a credit to the overhead pool, correct?

15   A.   Yes.

16   Q.   And that's negative in each of the years following the

17   judgment, correct?

18   A.   Let me just -- for that element, it is negative, because it

19   represents the fact that Lockheed Martin is not earning --

20   that's a share of the cost that it's not recovering through its

21   overhead.  Yes.

22   Q.   And then you calculate the increased taxes; is that

23   correct?

24   A.   Yes.

25   Q.   Okay.

1    A.   Because having the U.S. pay a share of the cost relative to

2    the baseline means that this is a source of revenue for them.

3              THE COURT:  Are your calculations as to tax rates

4    based on actual, what they really paid, or is it just based on

5    what they qualify to be paying and you're assuming they don't

6    put all their money offshore?

7              THE WITNESS:  The latter.  So what I'm doing --

8              THE COURT:  You're presuming they don't have any tax

9    dodge.

10             THE WITNESS:  Correct.  I'm saying at the highest

11   possible marginal corporate income tax rate.

12             THE COURT:  Who nobody pays.  Nobody does, okay.

13             THE WITNESS:  So I have made a conservative assumption

14   that at the very -- because I'm looking at the margin of just --

15             THE COURT:  If you change that assumption and decide

16   that they operate like Apple, for instance, what would that do

17   on the bottom line?  If they're paying very little tax, which

18   way does that cut?  That's all I'm asking.

19             THE WITNESS:  I believe it would make economic benefit

20   bigger, but again, I'd have to go run the numbers.

21             THE COURT:  Okay.  Go ahead.

22   BY MS. FLETCHER:

23   Q.   So, Dr. Meyer, am I correct that if you summed row 21, 22,

24   23, and 24, in the years that we have shown here, 2014 to 2019,

25   which is the judgment and five years following, that that would

1    equal the $25 million in economic benefit that you showed the

2    Court earlier?

3    A.   I'd have to add it all up, which I do later on on another

4    sheet.

5    Q.   So for purposes of your economic benefit opinion for past

6    cost, you're deriving that entire benefit from the five years

7    following the judgment, correct?

8    A.   No.  And if I can show you an exhibit, it might help

9    explain --

10   Q.   Well, I'm asking, Dr. Meyer, does it equal $25.1 million?

11   A.   Yes.

12   Q.   Okay.  And if we look at figure 9 in your report, and there

13   you also report that at the 60 percent CERCLA allocation, the

14   economic benefit is $25 million.  So that's the same number,

15   correct?

16   A.   The point I'm trying to make is my economic benefit

17   estimate considers all the cash flows starting from 1994, and

18   one way I could make this more clear perhaps is if I direct you

19   to Exhibit 26.

20   Q.   Well, Dr. Meyer, what I'm asking is, if you can calculate

21   it mathematically to be $25 million by just looking at those

22   years, how could you have considered the earlier years?

23   A.   Let me take you to figure 26, and that's on page 36.

24   Q.   Okay.  I'm with you.

25   A.   Here, this is looking at cleanup costs again on a net

present value basis, so as of the start of the trial, and you'll

see this first bar to the left is just the total site cost in

net present value figures.  That's $557.65 million.  This next

bar represents the baseline.  That's what's happening now,

status quo, there's no CERCLA allocation.  And you'll see this

dark blue part of it considers that -- what the U.S. has paid.

And you'll notice they haven't paid for the whole thing;

Lockheed Martin is paying for part of it.  But what that blue

bar does is it adjusts for the -- recover -- the amount of the

cost Lockheed Martin will recover should it receive an

allocation for past costs.  And then you'll see that the red

bar, Lockheed Martin's share, is about 18.5 percent.

        Now, under a CERCLA payment for past costs only, which is

this next bar, we see that again we're considering the U.S.

share -- and I'm calculating based on the amount that Lockheed

Martin has recovered in the past, will further recover from a

CERCLA allocation, and then you'll see Lockheed Martin's share.

The reason I'm pointing this out is if you wanted to, you could

calculate the difference just between the two red bars and say

that that's your 25 million.  But I don't do that in my

calculations.  My calculations rest on all the cash flows from

1994 through 2036, and that's an important distinction to make.

Q.   So, Dr. Meyer, am I correct that your starting point for

this analysis was to calculate a baseline and then compare it to

U.S. payment scenarios, correct?

1   A.   That's right.

2   Q.   And in the baseline, I think it's your testimony that you

3   considered the past cost impacts to Lockheed Martin, correct?

4   A.   Yes.  The costs, as well as the overhead recovered and the

5   associated tax consequences and profit earned on overhead.

6   Q.   And is that also true of the U.S. payment scenarios?

7   A.   Yes.

8   Q.   Then don't they effectively net out?

9   A.   Algebraically?

10  Q.   Yes.

11  A.   If you're just looking at that economic benefit, yes,

12  they'll net out.  However, it's important for me to point out

13  that that's not the way I constructed my economic benefit

14  estimate, and it's important because there are differences over

15  time in that net recovery factor.  There are also differences

16  over time in what the remediation costs are year by year, and

17  all that is accounted for in the way I build my estimates.

18           THE COURT:  It doesn't net out in fact because?

19           THE WITNESS:  This is -- I mean, here what you could

20  do, I think what is being suggested is I could just calculate

21  this red bar --

22           THE COURT:  Which the red bar meaning --

23           THE WITNESS:  Lockheed Martin.

24           THE COURT:  The baseline bar, the red bar for

25  Lockheed's share at 18.5 percent?

1             THE WITNESS:  Right.  At 103.35 million.  And I could

2    simply subtract out Lockheed Martin's share when there is a U.S.

3    allocation for past costs, that's 78.26 million.

4             THE COURT:  What allocation are you using in this bar?

5             THE WITNESS:  This would be 60 percent.

6             THE COURT:  And that comes out to the 25.

7             THE WITNESS:  Yes.

8             THE COURT:  But why is that not consistent with what

9    you're advocating?

10             THE WITNESS:  That's the way I built it, is to

11    calculate it as the difference between the total cost to

12    Lockheed Martin if there is an allocation for past costs only

13    minus what it would bear under the baseline.

14       So I just -- algebraically, you could compare the size of

15    the red blocks.  I compared the total bars here in my

16    calculation.  You can get to the same point; I just wanted to

17    show that I was very -- I think it's important to very carefully

18    estimate year by year.

19    BY MS. FLETCHER:

20    Q.   I understand, Dr. Meyer.  But regardless of how you

21    describe it, whether it's net out or algebraically it's only the

22    five years following the payment, how did you consider the

23    impacts to Lockheed Martin prejudgment if it nets out?

24             THE WITNESS:  I think I tried to explain that, and

25    again we can go back to figure 1 and figure 3.  So you can see

```
 1   figure 1 are the cash flows that I estimate under the baseline

 2   scenario.  I calculate the present value of all those cash

 3   flows, and I net them out from the cash flows I estimate under

 4   the U.S. payment scenario, which is figure 3.

 5               THE COURT:  Okay.  Anything else on this?  It's time

 6   to break.  Have we finished at least this part?  Do you have

 7   more questions?

 8               MS. FLETCHER:  No, Your Honor.  I can resume after the

 9   break.

10               THE COURT:  I know, but are we going to move on?  I

11   think we --

12               MS. FLETCHER:  I can move on, Your Honor.

13               THE COURT:  Okay.  Let's take 10 minutes.

14        (Recess from 10:52 a.m. to 11:15 a.m.)

15   BY MS. FLETCHER:

16   Q.   Dr. Meyer, I wanted to go back to a point I was asking this

17   morning that I don't think I quite got an answer to.  Can you

18   look at paragraph 60 on page 45 of your affidavit, please?

19   A.   Yes.

20   Q.   And we were talking, I think at the beginning of this

21   morning, about bulletpoint No. 1, and specifically I wanted to

22   ask you about the statement you make at the end:  "The remainder

23   of credit would lie within Lockheed Martin's control."

24        Dr. Meyer, in bulletpoint No. 1 are you deriving economic

25   benefit from the fact that when Lockheed Martin credits the
```

1    disc ops pool, only 87 percent goes to government contracts and

2    13 percent goes somewhere else?

3    A.    It's important to go back to how I define economic benefit.

4    So an element of economic benefit certainly is captured by the

5    fact that the United States receives less than 100 percent

6    benefit of this credit.

7    Q.    So that's a yes.

8    A.    Yes, that -- I don't mean to -- in terms of economic

9    benefit, one element of economic benefit derives from the fact

10   that the United States receives less than 100 percent of the

11   benefit, yes.

12   Q.    So I want to talk through a hypo.  If there's a $100

13   judgment in this case and $100 is put in the disc ops pool,

14   let's assume 80 percent goes to federal contracts.  Dr. Meyer,

15   are you deriving economic benefit from the $13 in my example

16   that did not go to federal contracts?

17   A.    Let's see.  Economic benefit is what the recovery would be

18   if there is an allocation, plus what the baseline is.  So the

19   fact that --

20            THE COURT:  Does it matter that some of it is going to

21   a private contract?

22            THE WITNESS:  It does in the sense that the U.S. is

23   not receiving the full benefit of that credit.

24            THE COURT:  Meaning they don't get the full credit.

25            THE WITNESS:  They don't get the full credit.  Whether

1    it's going to whoever is not what my estimate is focused on.

2    It's the fact that 100 percent of that credit is not to the

3    benefit of the United States.

4    BY MS. FLETCHER:

5    Q.   Okay, and Dr. Meyer, that $13 that we're talking about,

6    that goes to the other customers, correct?

7    A.   Correct, the commercial customers.

8    Q.   Then how does Lockheed Martin receive an economic benefit

9    on money it's not keeping?

10             THE COURT:  Does Lockheed Martin compete for contracts

11   with anybody?  This is hardly a compete tive system.

12             MR. MURPHY:  Yes, Your Honor.  It is a competitive

13   system, Your Honor.

14             THE COURT:  You'd never know.  Okay.

15             THE WITNESS:  I think one interesting aspect of what

16   happens to the portion that does not go to the government is we

17   don't know what happens to it.  In the commercial side of

18   Lockheed Martin's business, the prices presumably are set by

19   market forces.  So Lockheed Martin charges as much as it can to

20   commercial customers.  It sets the price based on market

21   conditions.  It's not like government contracts where government

22   contracts are priced according to government accounting

23   regulations which say that it's a cost build-up approach.

24        So what happens to that $13 at one end of the spectrum,

25   perhaps Lockheed Martin is able to set the price for commercial

customers such that it can keep that $13.  On the other extreme,

perhaps it reduces prices charged to commercial customers with

that $13.  We just don't know.

BY MS. FLETCHER:

Q.   So you don't know that Lockheed Martin keeps that $13,

correct?

A.   I just don't know.

Q.   But you attributed economic benefit to them keeping the

$13, correct?

A.   No.  Economic benefit is what Lockheed Martin would pay in

net present value terms of the site remediation cost with the

CERCLA allocation, minus what it will pay without a CERCLA

allocation.  Just that.

Q.   Dr. Meyer, do you know any of the customers that would get

the $13 in my hypo?

A.   Do I personally?  No, I don't think so.

Q.   So do you have any opinion about the competitiveness of

that market?

A.   No.  I'm not offering an opinion on that.

Q.   Dr. Meyer, on the cost side, do you agree that the

government does not pay 100 percent of the Redlands cost?

A.   Correct.  And, again, if you go back to Figure 26 --

Q.   Well, I just wanted to make a more conceptual point,

Dr. Meyer.  Because some of those cleanup costs are being paid

by these other customers, right?

1          THE COURT:  Maybe.

2          THE WITNESS:  I don't know.  You know, you have what's

3     going on, is Lockheed Martin incurs cost for cleaning up that

4     site.  They obtain, through overhead, a recovery of most but not

5     all of those costs on a delayed fashion, amortized over five

6     years.  If they also get a CERCLA allocation, they're going to

7     get a giant cash flow in for past costs, and then they're going

8     to also have to credit, not for all of that allocation, but for

9     part of it, amortized over the next five years.

10    BY MS. FLETCHER:

11    Q.   So you said earlier the government doesn't pay 100 percent

12    of the Redlands cost.

13    A.   Yes.  And that's shown on page 36.

14    Q.   When the costs are incurred, does the United States receive

15    an economic benefit from not paying 100 percent of the cost?

16    A.   Economic benefit is defined very carefully as what would

17    happen with the CERCLA allocation minus the amount Lockheed

18    Martin would pay without a CERCLA allocation.

19    Q.   So that's your way of saying you didn't calculate that?

20    A.   Correct.  I calculated the economic benefit to Lockheed

21    Martin.

22    Q.   And you didn't consider if there was an economic benefit to

23    the government, correct?

24          THE COURT:  Did you?

25          MS. FLETCHER:  No, Your Honor.  We have not put forth

1    that model.

2            THE COURT:  We know she didn't, and you didn't, so

3    let's move on.

4            THE WITNESS:  I did consider the cash flows, however,

5    and that goes back to Figure 1 and Figure 3, that I very much

6    considered the cash flows incurred.

7            THE COURT:  Right.  You show how the shares go up

8    and down, depending on what Lockheed's paying.  So I don't know

9    if it's an economic detriment when the government's share is

10   going up.  I don't know what your argument is.  Move on.

11   BY MS. FLETCHER:

12   Q.   Bulletpoint No. 2 on that same page, Dr. Meyer.

13   A.   I'm sorry.  The page is again, please?

14   Q.   We're still on page 46.  So here, Dr. Meyer, you're saying

15   you also derived an element of economic benefit from

16   amortization of the credit for over five years, correct?

17   A.   Yes.

18   Q.   And that mirrors how the costs were treated, correct?

19   The costs were also amortized over five years.

20   A.   The amortization period is the same for the credit, five

21   years, as it was for the cost as they were recovered through

22   overhead.

23   Q.   And did you calculate the economic impact from cost

24   amortization?

25   A.   It's certainly reflected in the cash flows, yes.  And

1    again, if you go back to Figure 3, you can see that CERCLA

2    payment.  I certainly am considering the fact that Lockheed

3    Martin incurs remediation cost -- and Figure 3 is on page 9.

4    It incurs those remediation costs, and then it receives overhead

5    recovery, beginning for the next five years following any

6    particular years for remediation costs.  So my results

7    definitely reflect that.

8    Q.   You say your results reflect that, so that you considered

9    cost amortization impact in both the baseline and the U.S.

10    CERCLA payment allocations, correct?

11    A.   Yes.

12    Q.   So they net out, correct?

13    A.   When you subtract one from the other, yes.  And again, if

14    you look at Figure 26, you can see that.

15    Q.   Okay.  Dr. Meyer, can we look at paragraph 19 on page 12,

16    please?  Dr. Meyer, I wanted to ask you about the first

17    statement you made in paragraph 19, which is that "Lockheed has

18    argued its accounting treatment for credits from a CERCLA

19    judgment is a mirror image of its accounting treatment for

20    environmental costs used in the pricing of its goods and

21    services."  Then you go on to say, "That assertion is

22    demonstrably false, for two reasons."

23    Let's talk about the two reasons that you say.

24    A.   You see that sentence continues: "and the company would not

25    receive an economic benefit from a CERCLA for this reason"?

1   That's the part that is demonstrably false.

2   Q.   Your first reason is, and it starts with the sentence

3   "in nominal cleanup dollars."  Do you see where I'm reading?

4   A.   Yes.

5   Q.   Now, the way I interpret that sentence is that you're

6   saying the cash flow from the CERCLA payment is going to be less

7   than the credit, correct?  Meaning the judgment's less than the

8   credit.

9   A.   Yes.

10  Q.   And the second point that you make here is the timing of

11  the CERCLA payment.  You're comparing the CERCLA payment being

12  in 2014 with the credit amortization, correct?

13  A.   Yes.

14  Q.   Okay.  Dr. Meyer, in both of those instances, you're

15  comparing the CERCLA judgment with the credits.  How are you --

16  how does that address the accounting treatment for environmental

17  cost in the pricing of goods and services?

18  A.   It addresses -- as I said, it's the second part of that

19  sentence that is demonstrably false, and that is, the company

20  would not receive an economic benefit from a CERCLA payment, and

21  here's why:  Remember how we define "economic benefit."  It's in

22  net present value terms, and you're taking what the company

23  would receive if they get a CERCLA allocation. You're subtracting

24  out what it's going to get as a baseline, no CERCLA allocation.

25       So, as you yourself pointed out, you've got some netting

1    out that goes on in that calculation, but the fact that the

2    credits assigned do not total up to the CERCLA allocation means

3    that there is an economic benefit.

4    Q.   I understand your point about economic benefit, Dr. Meyer,

5    but I was focusing on how do those two statements support the

6    assertion that the mirror image is demonstrably false.

7              THE COURT:  You're leaving out the "and" part of her

8    statement.

9              THE WITNESS:  As I understand Lockheed Martin's

10   statement about mirror image is that the net present value of

11   credits for CERCLA allocation is going to offset the net present

12   value of everything that's happened up until they get that

13   CERCLA allocation, and that is not true.  And you can look at

14   that just in cash flows.

15             THE COURT:  If in fact the law requires, I'm starting

16   to learn, prejudgment interest on any amount, what does that do

17   to Lockheed's argument about the past?

18             THE WITNESS:  It still doesn't change it.  Now,

19   prejudgment interest is calculated based on the Superfund

20   interest rate, which is extraordinarily low.  I mean, it's less

21   than 1 percent right now.

22             THE COURT:  That would be -- you'd get that compounded

23   from the time they first incurred -- oh, I guess there's a

24   debate about when it incurs.

25             THE WITNESS:  But still, even if you compound

1   1 percent for 10 years, it's going to be a whole lot less than

2   if you compound at Lockheed Martin's time value of money --

3   let's just say it's 8 percent -- if you compound 8 percent

4   forward compared to the 1 percent.  But more importantly, if you

5   look at the cash flows --

6   BY MS. FLETCHER:

7   Q.   Dr. Meyer, I wanted to ask you a question about how you

8   define the mirror image before we move on briefly.  Did you say

9   that you thought you were comparing the net present value of the

10  cost with the net present value of the credit?  Is that what you

11  said?

12  A.   Well, I should go back and say, the mirror image I

13  understand Lockheed Martin makes, is that because it amortizes

14  costs over five years and it proposes to amortize credits over

15  five years, they should offset one another.  And that is

16  demonstrably false.  Think of it on a net present value terms.

17  If I give you $2 a year for five years, from 1990 to 1994, is

18  that the same as me giving you $2 over five years, from 2010 to

19  2014?  No, because money that you receive in the past is worth

20  more than money today.

21  Q.   But, Dr. Meyer, I don't think that's necessarily what we're

22  talking about here, right, because the judgment a nominal value.

23  A.   Even in nominal value, that's true.  Here, what you can see

24  is Lockheed Martin, if you look on Figure 3 of page 9 and look

25  at all those dark blue bars -- or I'm sorry.  Let's look at

nominal, which is figure 4.  What I'm seeing on figure 4, if you

put that up here, I can show you.

    If you add up all these blue bars and you subtract out --

and you need to also add in the CERCLA payments, but you see

that's not offset by the purple bars.  And what I'm saying is

even on a nominal value, I can take you through my model and add

up all those costs that have been allocated to overhead in the

past, and it's not going to be offset by the five years worth of

credits.  That's an empirical question that you can calculate,

which I have.

            THE COURT:  Over the whole time span.

            THE WITNESS:  Yes.

            THE COURT:  So in your view, it's not a wash.

            THE WITNESS:  It's not a wash.

            THE COURT:  That's the debate.  Move on.

            MS. FLETCHER:  Can we bring up Demonstrative 2,

please.

BY MS. FLETCHER:

Q.   And Dr. Meyer, can we also turn to Figure 3 in your

declaration, please.

            MS. FLETCHER:  For the record, this is U.S. Exhibit

1180 at page 1.

            MR. HEMINGER:  And I would just again note for the

record that this is from the Excel model and not from the actual

printouts from Dr. Meyer's model.

1          THE COURT:  Go ahead and note it.  I'm not sure what

2      you're telling me.  Does it matter?

3          MR. HEMINGER:  It doesn't reflect all of the -- if you

4      compare U.S. Exhibit 1180 to this, there are more columns in the

5      printouts.

6          THE COURT:  Does it matter?

7          MR. HEMINGER:  I think it does for Dr. Meyer's

8      analysis, because she considered all of the cash flows.

9          THE COURT:  I assume you can deal with this,

10     Dr. Meyer.

11         MR. HEMINGER:  And I think she's explained that.

12         MS. FLETCHER:  Can you bring up Figure 3 here?

13     BY MS. FLETCHER:

14     Q.   So, Dr. Meyer, in Figure 30, you've outlined what your

15     assumed net recovery factors are, correct?

16     A.   So not Figure 3?

17     Q.   No, I'm sorry.  It's Figure 30.  It's on page 53.

18     Dr. Meyer, can you tell me where in your economic benefit

19     calculation you account for the difference between the net

20     recovery factor on the cost and the credits?

21     A.   It's certainly reflected in my estimate of the cost, or the

22     percentage share of cost, effectively borne by Lockheed Martin.

23     In here, for my page 22, as I mentioned, if you want to dive

24     into the model, you really need to go to the nominal calculation.

25     Q.   But in this chart that we're looking at where we have the

1    economic benefit from the past cost payment, only the credit

2    recovery factor is shown.  How did you use the cost recovery

3    factor in the $25 million, is what I'm specifically asking.

4    A.   Go to page 19 in Exhibit 1180.  Whoops, sorry.  I may have

5    led you astray.  So it would be pages 13 and 14, and it's -- oh,

6    gosh.  I'm sorry.  I apologize.  It's actually in the

7    year-specific inputs, and it would be on pages 3 and 4, line 22.

8    Q.   Three and 4, line 22.  Correct?

9    A.   Correct.  If you go to page 2, you'll see in line 22, if we

10   go to -- is that page 2 that you have?  So if you go up a page,

11   I'll show you how it relates.

12        Okay.  So let's go to row 22.  See the 73.7 figure here?

13   That is the net recovery factor in 1994 that's shown on Figure 3,

14   and you'll see, going forward each year, we are using the

15   estimated net recovery factor in each year in my model.  So the

16   fact that it was 73.7 percent in 1994 is reflected, and you can

17   go flip to the next page, page 3, line 22, in 2014 the estimated

18   net recovery factor is 86.4.  So every year is reflecting --

19   Q.   I understand that you calculated it, Dr. Meyer, but what I

20   was looking for is how it reflected in your results.  If what

21   you're deriving economic benefit from is the cash flow from the

22   judgment and the credit, and the judgment isn't tied to the cost

23   recovery factor, then how is it factored in?

24   A.   Well, it'll take me a while to explain.  I'm happy to,

25   though.  I love talking about my model.  So let's go to --

1  Q.   Can you tell us just by looking at that $25 million that we

2  looked at earlier, for ease of --

3  A.   It is reflected in there, and that would be the -- let's

4  see.  You can go to page 8.  Now, these are in nominal dollars,

5  but remember I told you my calculations are first done in

6  nominal before they're converted to net present value.

7       So if we look on page 8, you'll see for 2014, the last

8  column, we have the overhead recovery that Lockheed Martin is

9  realizing that year from past cost.  We also show this receipt

10 of a lump-sum payment of 172.73 million.

11      On the next page, in 2015, in order to figure out this --

12 is 2015 coming up?  That's on page 9.  In order to figure out

13 overhead credit here in row 22, that's where I apply the net

14 recovery factor multiplied by 20 percent of that, one fifth of

15 the amortized lump-sum payment.

16 Q.   Well, Dr. Meyer, I agree that you apply the net recovery

17 factor there, but that's the credit, and I'm just wondering how

18 does the cost in that recovery -- what I'm asking is, is there a

19 place where you figure out, okay, here's the cost recovery

20 factor, here's the credit recovery factor.

21 A.   Look up here just above 2015 again.  We have overhead

22 recovery, this 4.86 million?  That's overhead recovery

23 calculated on the cost over the previous five years.

24 Q.   But that's not used to calculate the overhead credit.  The

25 overhead credit is from the cash flow from the judgment, right?

1    A.   That's right, but I'm just illustrating the fact that my

2    estimates consider all the cash flows.

3              THE COURT:  Perhaps I can ask a question.  In terms of

4    the cost, are you treating it as a credit, i.e., if the recovery

5    factor of the cost that year is 80 percent, that's what's

6    reflected, 80 percent of the cost that they got from the DoD?

7              THE WITNESS:  Exactly.

8              THE COURT:  And then when they get a credit, it goes

9    into the pool.  You are, again, if the appropriate recovery rate

10   that year is 80 percent, that's what you apply.

11             THE WITNESS:  Exactly.

12             THE COURT:  Okay.  Move on.  That's what she says.

13   BY MS. FLETCHER:

14   Q.   Dr. Meyer, can we turn to page 27 in U.S. Exhibit 1180.

15   I believe row 25 is where you determine the cleanup share.

16   Is that correct?

17   A.   Yes.

18   Q.   So in the baseline, you've taken cleanup cost and then

19   taken -- accounted for overhead recovery, and that comes up with

20   a number that you say is Lockheed's effective share, correct?

21   A.   Correct.

22   Q.   So, basically, you're just looking at how much is recovered

23   in overhead.

24   A.   That's right.  So that would be -- I believe it's just row

25   24 divided by row 2.

1    Q.   And then continuing on to the U.S. payment past cost

2    scenario now, it looks to me, but I'd like you to confirm,

3    that everything between the baseline and the U.S. payment cost

4    scenario columns are the same up into row 32.  Correct?

5    A.   Row 32?  We have row 25 here.

6    Q.   I'm sorry.  I did misspeak.  I meant row 14.

7    A.   Yes.

8    Q.   Okay.  And that's also true --

9    A.   Well, no.  Actually -- oh, yes.  That's true, sorry.

10   Q.   And then the difference between, for instance, the baseline

11   and the past cost is derived here from this economic benefit

12   that you're attributing to the overhead credit, correct?

13   A.   One thing I want to make clear is that if you want to look

14   at the change in the percentage effectively paid for by Lockheed

15   Martin, you do have to consider all the cash flows.  If you want

16   to say economic benefit, which is just U.S. payment scenario

17   minus baseline, then, yes, algebraically you are going to net

18   out those prior cash flows.

19   Q.   Okay.  So what I'm trying to get is hopefully a shorthand

20   for how to talk about the changes in effective share.  But,

21   basically, you started with some calculation on what you think

22   is recovered overhead, and then for the various allocations, you

23   adjusted up and down by the economic benefit.  Do you agree with

24   that?

25   A.   No.  I don't adjust up and down by economic benefit.

1    It's simply the sum of all these cash flows -- not all of them.

2    I could tally it up for you, but it's the net cleanup cost to

3    Lockheed Martin divided by the total cost, and that line 24 is

4    derived from the lines above.

5    Q.   So everything is the same up until row 14.

6    A.   You just said that I derived the percentage proportion paid

7    by Lockheed Martin using economic benefit, and that's not true.

8    I do it by the cash flows.

9    Q.   Okay.  I think maybe I misspoke or we misunderstood each

10   other.  I didn't mean to suggest that.  What I was suggesting is

11   that you basically come up with a baseline effective share, and

12   to the extent it's higher in the U.S. payment allocations is

13   because you're adding the cash flows from the economic benefit,

14   correct?

15   A.   That's right.

16   Q.   Okay.

17   A.   So here, if we're looking at 18.5 percent, which is what

18   they pay in the baseline, relative to past cost only, the

19   effective share is 14 percent.

20          THE COURT:  Wait.  You're getting away from the mic.

21   We can't hear you.

22      How much longer?

23          MS. FLETCHER:  Your Honor, less than an hour.

24   Probably less than that.

25          THE COURT:  I'll give you a half hour.  Go ahead.

1    BY MS. FLETCHER:

2    Q.   Dr. Meyer, for the cash flows coming into Lockheed Martin

3    for contract payments, was there an economic benefit to the

4    government?

5              THE COURT:   I don't actually find this argument about

6    economic benefit to the government relevant.   Why is that?   Why

7    is it relevant to me?

8              MS. FLETCHER:   What I'm suggesting, Your Honor, is

9    that in exchange for the cash flows, the government received a

10   product, and that's not accounted for in this model.

11             THE COURT:   You mean the missiles.

12             MS. FLETCHER:   Yes.   They get missiles.

13             THE COURT:   Sure.   But why don't you just ask her that

14   question.   Why do we have to go through this extraordinary

15   gallop through the -- or dragging through the weeds?   Obviously

16   it doesn't show that the government got a product.   God only

17   knows how the 1500 missiles, what difference it made, but they

18   got it.   And they were happy.   15,000.

19             MR. MURPHY:   But we're not talking about the SRAM

20   missiles here, Your Honor.   We're talking about missiles and

21   airplanes and computer programs and everything that's being done

22   now.   I just want to make that clear.

23             THE COURT:   I know.

24             MR. MURPHY:   Okay.

25             THE COURT:   But we have this fundamental problem here:

1   whether we treat the government as one, or the government as

2   CERCLA, and the government as DoD.  DoD got products, and

3   Lockheed stayed in business and their stock prices go up.

4   I don't know what their profit on -- you showing me that SRAM

5   was not a great idea.  If I don't understand the point, I can't

6   stick with you.  I understand the point now.  She would admit

7   that it does not show whether Lockheed produced anything worth-

8   while to the government.  Yes?

9           THE WITNESS:  Yes.

10          THE COURT:  Move on.

11          MS. FLETCHER:  Thank you.  That was my point.

12          THE COURT:  There are easier ways to accomplish the

13   same thing.

14          MS. FLETCHER:  Can I get Meyer Demonstrative 4, please.

15   BY MS. FLETCHER:

16   Q.   I want to make a very simple point here, hopefully.  Can we

17   compare the nominal dollars and cleanup dollars, Dr. Meyer?  And

18   to confirm, the only difference between those columns are you

19   took out the profit and tax effects, correct?

20   A.   That's right.  And you can see that right here on row 28,

21   there's a tax effect under nominal, but it's not reflected in

22   nominal cleanup dollars.  And the same thing with row 31.

23   Q.   Dr. Meyer, and the lost profits and the tax effects had

24   the effect of reducing the economic benefit, correct?

25   A.   I don't -- economic benefit I discuss in terms of net

present value dollars, not nominal.  So when I presented my
results, I tried to make that clear.  It may be relevant in
terms of the Lockheed Martin share of the cleanup costs and
definitely -- whoops, I'm sorry.  The share of total cleanup
cost paid by Lockheed Martin is lower when you account for --
when you leave in the tax and the profit on overhead.

Q.   Okay.  So taking out those two items increased the share.

A.   In nominal cleanup dollars, yes.

Q.   Dr. Meyer, I had just one last question for you.  I believe
I asked you this at your depo, but I wanted to see if it was
still true today.  When you think about -- for your work
personally at Industrial Economics, what percentage of the time
do you work on projects for the United States?

A.   At the moment, I believe all of my work is for different
agencies of the United States.  In the past, I have done work
for commercial clients.  At the moment, I am not.

Q.   Thank you.

         MS. FLETCHER:  And thank you, Your Honor.

         THE COURT:  Go ahead.

         MR. HEMINGER:  Your Honor, could I have just a minute
to collect myself?

         THE COURT:  Sure.

    I'd like to give you a softball before he starts.  Do you
understand what that means?

         THE WITNESS:  I think so.

1           THE COURT:  Okay.  And I'll give the same softball

2      to Mr. Kiefer.  There, I read, even though I'm not in the weeds

3      along with everyone else, their criticism of you that you have

4      not given sufficient consideration to the past, that the

5      remediation costs were paid out starting sometime in '94,

6      perhaps, and that if we had looked at that and assumed that

7      there should have been an equitable allocation way back when,

8      there would be no economic benefit.  I hope I'm stating this

9      right, on behalf of Dr. Kiefer.  He's basically looking at a

10     different baseline and measuring time at a different time, and

11     that produces different results.

12          What is your response?  Why should I start as of today, so

13     to speak?  Does that make sense?  Or this is your opportunity to

14     tell me why Dr. Kiefer should not be embraced.

15          THE WITNESS:  If I understand right, the question

16     is --

17          THE COURT:  What's wrong with Kiefer?

18          THE WITNESS:  Baseline should always be what's the

19     status quo, and you should compare a hypothetical to that

20     baseline.  In my analysis, the baseline is the world right now,

21     and what I compare is how the world would be different should a

22     CERCLA allocation be awarded.  Plain and simple.

23          The other point I did want to make is that in terms of

24     calculating the percentage share of costs that Lockheed Martin

25     will bear, one must take into account the past remediation cost

1    that they spent, the fact that they received recovery through

2    overhead, not for all of it and on a delayed fashion, and this

3    net recovery factor varied a lot year by year.  All that's

4    accounted for.

5         If you want to calculate economic benefit itself, then it's

6    true those cash flows will ultimately net out.  However, I'm

7    really presenting two important results.  One is the percentage

8    share of the cost that Lockheed Martin is shouldering, and then

9    also just the economic benefit they'll realize should a CERCLA

10   allocation be awarded.

11        THE COURT:  Is that measured in terms of the reduction

12   in the share of their cost?

13        THE WITNESS:  That's part of it, yes, the fact that

14   the U.S. doesn't get the full benefit of the credit.

15        THE COURT:  They'd argue that had they been paid for

16   CERCLA way back when, your analysis wouldn't survive.  Why is

17   that right?

18        THE WITNESS:  You'd be comparing two hypotheticals.

19   If that indeed is true, you could -- it's an empirical question.

20   You could calculate it. If that's true, I haven't seen any

21   results that would suggest that's the case.

22        THE COURT:  I'm sorry.  What does that mean?  You

23   haven't seen any results what?

24        THE WITNESS:  If somebody is going to say -- let's

25   pick another hypothetical where the U.S., from the get-go, was

1    paying 60 percent of the site cost.  One should be able to go

2    and estimate what the associated cash flows are, and you should

3    be able to empirically demonstrate it.  That has not been done.

4           THE COURT:  I agree.  But they're saying that's the

5    right analysis, and therefore one should not accept yours.

6    I think.  Whether they've chosen to do it or not is something

7    else.

8           THE WITNESS:  I don't think that would be true.  But I

9    also think it would be --

10          THE COURT:  What wouldn't be true?

11          THE WITNESS:  I think it would be really hard to

12   compare two hypotheticals, because the U.S., in fact, did not

13   pay 60 percent of the cost starting in 1994.  So you'd have to

14   make lots of different assumptions.  You'd be building up a

15   house of cards.  You'd be having to make assumptions about, you

16   know, the government payment of that, what would the allocation

17   be in the first place.

18          THE COURT:  Well, it's the same kind of assumptions

19   that everybody's making.  You were told to make 10, 60.  I mean,

20   you do the same thing.

21          THE WITNESS:  Right.

22          THE COURT:  The assumption about percentage doesn't

23   matter.  I mean, we can pick one out of the air.  That's what

24   they're doing.  Okay.  But you're saying that the fallacy in

25   their approach is they're comparing hypotheticals that should

1    not be compared.

2              THE WITNESS:  Correct.

3              THE COURT: Go ahead.  Have you collected your thoughts?

4              MR. HEMINGER:  One minute, Your Honor.

5              THE COURT:  Is that an economic opinion?  I mean, that

6    you're saying that comparing these two dissimilar hypotheticals

7    is not economically proper?

8              THE WITNESS:  Correct.

9              THE COURT:  As an economist?

10             THE WITNESS:  Correct.  And it's not proper in an

11   economic benefit analysis.  In another similar analysis, say a

12   cost benefit analysis that you may be more familiar with, one is

13   always estimating the cost and benefits of the current status

14   quo and then comparing that to alternatives, alternative

15   scenarios, but one starts with the baseline.

16             THE COURT:  Right.  And your job isn't to figure out

17   what this contract's worth to the U.S. government.  You're

18   trying to figure out what got incorporated in this settlement

19   agreement and what CERCLA provides for.  People have given you

20   numbers, so to speak, or percentages.  Your goal is narrow, if I

21   may say so.

22             THE WITNESS:  My goal is just to provide the

23   information.

24             THE COURT:  And the economic benefit only from one

25   side, based on economic theory about economic benefit.  However,

1    that is a term of art.

2                THE WITNESS:  Yes.

3                THE COURT:  Okay.

4                        REDIRECT EXAMINATION

5    BY MR. HEMINGER:

6    Q.  Dr. Meyer, focusing on the question of when Lockheed Martin

7    originally incurred the cost, what is your understanding about

8    how CERCLA addresses a party's incurrence of those remediation

9    costs back whenever they're incurred?

10               THE COURT:  As a legal matter?

11               MR. HEMINGER:  Yes.

12               THE COURT:  How would she understand?  I'm having

13   trouble finding out.

14

15   BY MR. HEMINGER:

16   Q.  Dr. Meyer, just to try to get to the point more quickly, if

17   the Court awarded prejudgment interest to compensate Lockheed

18   Martin for the time value money lost when they first incurred

19   the costs, how would that affect the economic benefit that

20   Lockheed Martin would receive from the CERCLA payment if it

21   included prejudgment interest?

22   A.   If prejudgment interest is included in the economic benefit

23   estimate, economic benefit would increase.

24   Q.   Okay.  And Dr. Meyer, just directing your attention to page

25   92 of your declaration, I'd like to look at figure 36.

1    THE COURT:  I think I asked you before.  Let's make

2    sure I understand.  You're saying that because of the amount

3    that would be awarded, like 1 percent, it wouldn't offset the

4    fact that, for a period of time, Lockheed Martin, prior to any

5    award, was losing the time value of money.  You admit that their

6    cost, they lost some time value of money in the past.

7    THE WITNESS:  Yes.  And as I understand, under CERCLA,

8    courts usually allocate nominal dollars, and then they add on to

9    that prejudgment interest to reflect the fact that there's this

10   time dimension, time value of money.

11   THE COURT:  I think you answered an earlier question

12   for me that this 1 percent, assuming that's what the Superfund

13   rate is -- I don't have any idea -- would not be quite the time

14   value of money that you're using in your analysis.

15   THE WITNESS:  Correct.

16   THE COURT:  You would admit that Lockheed Martin's

17   system in the past has not been as beneficial as the system

18   would be in the future, starting with a judgment.

19   THE WITNESS:  Yes.  Well, let me -- I'm confused

20   myself.  I may have misspoke, because if you look at Figure 36,

21   what I estimate is that their economic benefit from getting

22   prejudgment interest on top of a CERCLA allocation is that their

23   actual percentage share of costs will be lower.

24   So here we see that -- let's just look at the 60 percent

25   allocation, that at the baseline, Lockheed Martin effectively

1    is going to pay 18.5 percent of the total cleanup cost at this

2    site.  If they are also awarded prejudgment interest, that

3    percentage will be lower.

4         So if they're awarded an allocation for past costs only and

5    they also receive prejudgment interest, then their effective

6    share, instead of being 18.5 percent, is going to be 13 percent.

7    BY MR. HEMINGER:

8    Q.   And Dr. Meyer, your assumption there about crediting, what

9    is your assumption if it's 13 percent?

10   A.   Oh, yes.  It really very much depends on whether it's

11   credited, if they get that prejudgment interest, whether they

12   credit it to the settled discontinued operations pool or not.

13   So here the 13 percent had been, assuming that it was credited,

14   and if not, then it's 10 percent.  So if they keep all that

15   prejudgment interest --

16             THE COURT:  How are you calculating prejudgment

17   interest?  How many years?  Are you going back to '94?

18             THE WITNESS:  I am going back to '94, yes.

19             THE COURT:  All right.  We learned something new about

20   that today.  You can only go back somewhere, the later or the

21   demand --

22             THE WITNESS:  Yes.  I calculated back to '94.

23   I should state that, yes.

24             MR. HEMINGER:  Those are my questions.  No further

25   questions, Your Honor.

1    THE COURT:  All right.  Okay.  What was that number on

2    the screen that just came down?

3    MR. HEMINGER:  Your Honor, that was Figure 36 on page

4    92.

5    THE COURT:  To make sure I understand, put the subject

6    of prejudgment interest out of the box.  Now it's clear that

7    whether they credit it or not credit it, the figures would not

8    be 13 percent or 10 percent, correct?  Because prejudgment

9    interest under the law is limited to 1 percent for, I don't

10   know, the later of the demand, or what?

11   MR. MURPHY:  It's later for cost incurred or written

12   demand.  Our written demand was sometime in the 2000s.

13   THE COURT:  And it could be as late as the suit being

14   filed in '08.

15   MR. MURPHY:  Yes, Your Honor.

16   THE COURT:  Okay.  But the question remains whether or

17   not, under your analysis, the economic benefit of getting a

18   CERCLA award now, does it sufficiently take into consideration

19   that Lockheed Martin did lose some time value of money given

20   that they incurred costs prior to -- well, back as far as '94.

21   THE WITNESS:  Yes.  Now, this net present value does

22   take into account the time value of money using Lockheed

23   Martin's estimated time value of money.

24   THE COURT:  Which is what do you call that, W-A-

25   something?

1           THE WITNESS:  WACC.

2           THE COURT:  What kind of percentage are you using for

3    that?  Is it the discount rate?

4           THE WITNESS:  That's the rate I use for discounting,

5    and it averages 7.55 percent.  But it is bounced around from '94

6    to 2012.

7           THE COURT:  But that rate, if we were sitting here

8    awarding somebody future economic damages, you reduce it to the

9    present value, it would be nowhere near that rate anymore of 7.5

10   percent.  You agree in the sort of economic analysis of normal

11   damages.  Time value of money has changed dramatically in the

12   last 20 years.

13          THE WITNESS:  You know what, time value of money

14   really depends on the entity for whom you're speaking.  So if

15   you are a company -- I don't agree.

16          THE COURT:  Right.  I'm not talking about that.

17   That's right.  I'm saying it differs from a company to an

18   individual.

19          THE WITNESS:  Oh, yes.  It is very different.

20          THE COURT:  What would an economist be telling me now,

21   for me, if I were to recover a million dollars?  In the future,

22   I would reduce it to present value by what percent?

23          THE WITNESS:  Oh, as an individual?

24          THE COURT:  Yeah.

25          THE WITNESS:  Oh, I don't think it would probably be

1   more than 5 percent, and that would be assuming -- again, you've

2   got to make a lot of assumptions about what tax rate you pay.

3           THE COURT:  Yeah, yeah, yeah.  No, I know all that.

4           THE WITNESS:  And also, where are you going to invest

5   the money?  Is it all going to be in stock market, bonds?

6           THE COURT:  No, you're supposed to put it in

7   something.  I mean, there are a lot of rules for this kind of

8   thing.  Five percent's high.  Okay.  Go ahead.  Nothing?

9           MS. FLETCHER:  Nothing further, Your Honor.

10          THE COURT:  Oh, very good.  Thank you.

11      You're excused.  I appreciate it.

12          THE WITNESS:  Thank you.

13      (The witness steps down.)

14          THE COURT:  Okay.  I'd like to do a couple of things.

15  I think we should call the next witness, yours, after lunch.

16          MR. MURPHY:  Okay.

17          THE COURT:  But I do need to get some clarification.

18  Excuse me first, before I get clarified, Jared, I have a couple

19  of questions for you.  (The Court conferring with law clerk.)

20       All right.  To recap a bit, I would like Lockheed Martin

21  to give me by Monday, I want the complaint in the Procter

22  litigation, and I want the settlement.  If you want the

23  settlement to be filed under seal, that's fine.  You can work

24  out what you need subject to the protective order.  I would like

25  to see the tolling agreements.  Those cannot be possibly

1  confidential.

2          MR. MURPHY:  No, Your Honor.

3          THE COURT:  The government's going to be filing on

4  Monday morning, if you could deliver your briefs on the -- I

5  think that you're going to respond to three of their issues, and

6  not prejudgment interest, and then you're going to file

7  something affirmative on operator liability.

8      Once again, I'd like you to limit the legal discussion.

9  I mean, I can read a case as well as you can read the case.

10 So I don't need people discussing cases.  So the operator

11 liability, and then Lockheed will respond by nine o'clock on

12 Tuesday to the operator liability.

13     This afternoon, we have one or two?

14         MR. MURPHY:  Mark Kiefer is here.  I'm not sure how

15 long that will take.  And then we'll have Rod Mateer here as

16 well if we get through Mr. Kiefer.

17         THE COURT:  And then the other gentleman is going to

18 be starting around 9:30 on Monday.

19         MR. MURPHY:  Yes, Your Honor.

20         THE COURT:  Okay the last question is, are you still

21 interested in supplementing the record?

22         MR. MURPHY:  Well, Your Honor, I guess at this stage,

23 probably not.

24         THE COURT:  On the issue of that agreement.

25         MR. MURPHY:  Well, again, the question is whether

1    Your Honor wants parol evidence on what those agreements mean.

2            THE COURT:  Well, you've argued it various different

3    ways, so maybe I should ask the government.

4        What is your response -- let's stay with you.  Mr. Murphy,

5    what would you say the relevance of these agreements, meaning

6    the consent decree of Burbank, plus the -- what are we calling

7    it?

8            MR. MURPHY:  We call it the disc ops agreement.  The

9    government calls is DOSA.

10           THE COURT:  Let's make sure.  Those pools are called

11   disc ops.

12           MR. MURPHY:  Okay.

13           THE COURT:  DOSA.  What is your argument in terms of

14   the Court's consideration of that as an equitable matter?  And I

15   think we agree that I do not consider Judge Robertson's opinion,

16   although brilliant and enough to give me heartache, it doesn't

17   resolve my issue.

18           MR. MURPHY:  Yes, Your Honor.

19           THE COURT:  So it's not preclusive.  They have a lot

20   of cases that say, you know, double recovery -- say, if you

21   recovered from an insurance company, even though that's not

22   covered by CERCLA per se, I ought to consider it as an equitable

23   matter.

24           MR. MURPHY:  Yes, Your Honor.  Those cases deal with,

25   in our view, direct recoveries, either from other PRPs, from

insurance companies, or other direct payments where people who are paying directly for the cost at issue.

Here, the question is whether our government contract payments for the work we're performing for the federal government should count against us under CERCLA. As an equitable matter, we don't believe that should be considered by the Court at all. We have an agreement with our customer whereby we agree that these costs are put into our discontinued operations pool and then flow down to our contracts.

We believe that there's no double recovery here or there's no risk of an equitable result here, because if we get a recovery here under CERCLA, the CERCLA recoveries would be flowed down back to our customers as a credit in accordance with the system that they set up, Your Honor.

THE COURT:  Under the agreement.

MR. MURPHY:  Under the agreement.

THE COURT:  Right.  Would you have the same argument if there had been no agreement?

MR. MURPHY:  We believe so, Your Honor.

THE COURT:  What does the agreement do to increase the efficacy of your argument?

MR. MURPHY:  Well, Your Honor, it recognizes a system whereby how these costs are allocated into the discontinued operations pool and down.  It memorializes -- and I say down to our operating units and down to the contracts.  It memorializes

1   the system that says that if we get credits in the future, we

2   credit the pool.  And we also have a -- the system in the

3   agreement says, and this doesn't settle CERCLA liability.

4        At the same time, close in time, the Burbank agreement also

5   references this agreement and says there's no double recovery if

6   you credit the pools the way it's laid out in the DOSA.

7             THE COURT:  What paragraph are you now referring to in

8   the agreement?

9             MR. MURPHY:  In the discontinued operations agreement?

10            THE COURT:  No, I think it would be in the other one.

11            MR. MURPHY:  In the Burbank consent decree?  I think

12   the Burbank consent decree recognizes that there's no double

13   recovery if there's a credit flowed down.  I don't have it in

14   front of me, Your Honor.

15            THE COURT:  Okay.  So here we are.  This is the

16   consent decree.  It must be an exhibit number.

17            MR. MURPHY:  I think it was one of the exhibits that

18   was excluded, Your Honor.  It was part of the government motion

19   to -- there was a motion to strike certain evidence.  I think

20   Your Honor ruled in your order that it came in.

21            THE COURT:  Yeah, it came in.  The decree came in.

22            MR. HEMINGER:  It's PX1844.

23            THE COURT:  I know what the agreement -- okay.

24   3.25 paragraph of PX1844.  Is that what you're referring to?

25            MR. MURPHY:  The one that says Double Recovery of Past

1   Contract Cost Claim.

2           THE COURT:  Avoidance of double recovery.  And that

3   sort of concept gets carried over to the actual agreement

4   itself.  What number is the agreement in the exhibits?  The

5   settlement agreement comes in about September, I think, 2000.

6   The decree is early 2000.

7       Certainly, the people said it here in 3.25, Lockheed Martin

8   shall credit its discontinued operation pools with amounts

9   received from the U.S. pursuant to this decree in accordance

10  with an agreement of Lockheed Martin and the United States, or

11  -- and what in fact happened was there was an agreement.  So the

12  rule never kicked in.

13          MR. MURPHY:  That's correct, Your Honor.

14          THE COURT:  And the agreement covers double recovery,

15  whatever that word means.

16          MR. MURPHY:  Yes, Your Honor.

17          THE COURT:  4.7, and the agreement number is PX what?

18          MR. MURPHY:  It's 1033.  I'm sorry, it's U.S. Exhibit

19  1033.  Excuse me.

20          THE COURT:  Okay, go ahead.  I interrupted you.

21  That's 4.7.

22          MR. MURPHY:  Yes, I think 4.7.  "Lockheed Martin shall

23  not realize a double recovery with regard to any settled

24  discontinued operations cost."

25          THE COURT:  Got it.  Okay.  So your position is that

by agreement with the United States government, you're allowed

to do this, and?

        MR. MURPHY:  And that we're supposed to do this,

Your Honor, that this is a way for us --

        THE COURT:  You're supposed to sue.

        MR. MURPHY:  We are supposed to recover these costs

whenever possible, Your Honor.

        THE COURT:  Okay.  Let's assume that's right.  But

what does it tell me about equitable double recovery?

        MR. MURPHY:  Well, Your Honor, equitable double

recovery, the government is arguing essentially that the

United States government, as PRP, should receive a credit, or it

should be absolved from its liability under CERCLA because of

these contract payments, and these contract payments were

incorporated, were flowed down to the operating unit levels as

a way to determine what price Lockheed Martin should be paid to

do services or produce goods.  So it was a way Lockheed Martin

would get paid to produce these goods and services.

    Now, what is allowable should only be Lockheed Martin's

cost of cleanup.  So other PRP costs, other judgment fund,

responsibility of other PRPs like the United States here should

reduce our costs of cleanup, and to the extent our cost can be

reduced, we have an obligation to do that.

    And so the government, in its guidance to its auditors and

its guidance to its contracts officials say explicitly that

 1      these contract costs are paid contingent upon recovery.

 2              THE COURT:  Say that again?

 3              MR. MURPHY:  In guidance given to defense contract

 4      auditors, looking at whether these costs are reasonable or not,

 5      that guidance says that these costs, environmental costs, should

 6      be paid contingent upon the contractor recovering these costs

 7      from other people.  So they're only reasonable if we recover

 8      these costs from other people.

 9              THE COURT:  Well, if I preclude that, they're not

10      going to say it's unreasonable by virtue of a court decision.

11      Is that your view?  If you try, and lose, that's going to be

12      held against you?  I'm curious.

13              MR. MURPHY:  Well, Your Honor, if Lockheed Martin did

14      not try to recover these costs from other PRPs -- and we've

15      talked about its efforts to recover these costs in other ways.

16      If it doesn't do this, the DCAA and DCMA can come in and say

17      these costs are unreasonable.

18              THE COURT:  Can they do that under the agreement?

19              MR. MURPHY:  The agreement allows them to review these

20      costs for reasonableness, Your Honor, over a certain ceiling

21      amount.

22              THE COURT:  Yeah, but that's a pretty high ceiling

23      amount.  What is it, per year?

24              MR. MURPHY:  It's total, Your Honor, and I think

25      there's been testimony that ceiling has been met, Your Honor.

```
 1              THE COURT:  All right.  So, is it your position that

 2      DCAA, if you got nothing as an allocation, that DCAA could start

 3      to reduce your recovery cost?

 4              MR. MURPHY:  It's called disallowal.

 5              THE COURT:  Disallowed.  That is your position.  It's

 6      been disallowed all this time, since 1994?

 7              MR. MURPHY:  Your Honor, again, we don't know whether

 8      they would ever disallow it or not, but it's a possibility.

 9      And again, law says that we should only be paying our costs.

10      We should not be -- the contract allowability should only be our

11      cost.  It shouldn't be other PRP costs.

12          And here the equitable factor -- couple different points

13      on equity, Your Honor.  Here the United States government, we

14      believe, is a PRP.  They've accepted liability as a PRP.

15      Congress has said that when the United States is liable as a

16      PRP, they should share in that liability from payments from the

17      judgment fund.

18              MR. SULLIVAN:  That's not true.  Find me a citation.

19              THE COURT:  Oh, no, no, no.  Please don't do that to

20      him.  I mean, I have a hard enough time.  I was going to ask

21      that question.  Judge Robertson says something about there seems

22      to be a preference for the judgment fund.  Where did he get

23      that?

24              MR. MURPHY:  It's a Comptroller General decision,

25      Your Honor.
```

1        THE COURT:  Can I have the cite?

2        MR. MURPHY:  It's in Judge Robertson's opinion.

3        THE COURT:  I'm not so sure about that.

4     Is it, Jared?

5        LAW CLERK:  I didn't see it.

6        THE COURT:  Okay.  He says it twice, and I didn't see

7     a citation.  I'm not doubting his carefulness; I just didn't see

8     a citation.  He says more than once there's a preference for the

9     judgment fund.  I just don't know where it comes from.

10       MR. MURPHY:  There is a Comptroller General decision,

11    Your Honor, that says -- and we're looking for the pincite.

12       THE COURT:  Okay.  I want that.

13       MR. MURPHY:  Here, Your Honor, the United States as

14    PRP would basically be saying, you, Lockheed Martin; you, DoD

15    customers for the end of time, you should be paying the

16    United States PRP liability through increased prices to Lockheed

17    Martin, through increased prices to its government customers.

18    So essentially you're saying the government's CERCLA liability

19    here should be borne by Lockheed Martin through increased prices

20    and Lockheed Martin's customers by increased prices.  That's not

21    fair, Your Honor.

22       THE COURT:  To whom?

23       MR. MURPHY:  To whom?  To Lockheed Martin and its

24    customers.

25       THE COURT:  Why is it, if we're worried about equity,

1   since I'm not so sure you don't pass on your cost, why isn't it

2   fair to Lockheed Martin?  I know why you could argue it isn't

3   fair to customers, because they're paying a higher contract price.

4         MR. MURPHY:  Yes.

5         THE COURT:  So a lot of this depends on maintaining

6   this sort of -- "fictional" is not an accurate word, but

7   government is PRP, government is DoD.  That helps your analysis

8   because you have the government as customer, and I'm not here to

9   say you can't sue the government.  I mean, we're way past that.

10   You get sued, you can't stop them, and you retain the right

11   under the agreement.

12      It would have been a much more interesting question if it

13   hadn't been an explicit retention of a right to sue, to seek

14   recovery under CERCLA.  That's there in the agreement that we've

15   been talking about.  But exactly where is this great, let's feel

16   sorry.  I feel your pain for Lockheed Martin.

17         MR. MURPHY:  Well, Your Honor the is a system --

18         THE COURT:  Not to be sarcastic.

19         MR. MURPHY:  No, no.  I understand, Your Honor.

20         THE COURT:  That's what you're arguing.

21         MR. MURPHY:  This is a system that was set up back in

22   2000 after negotiations that led to the Burbank consent decree

23   and also negotiations that led to the DOSA.

24      So that sets up a system that Lockheed Martin has relied

25   upon since that point in time in how it prices its goods and

1   services, and an expectation that eventually we will receive

2   recoveries from the federal government as their PRP obligation,

3   Your Honor.  And again, looking at past cost is only half of

4   this story.  There are future costs here, Your Honor.

5           THE COURT:  I know.  I get it.

6           MR. MURPHY:  And so in the future, 30, 40 years from

7   now, if these cleanups are still going on, does the world still

8   look the same way it looks today?  We don't know that.  So if

9   Lockheed Martin doesn't get an allocation today, it's going to

10  be saddled with these costs for all time.

11      And we can't assure that rules won't change, we can't

12  assure that Lockheed Martin looks the same way today as it

13  looks in 20, 30 years, so that has to be factored in here.

14  By establishing liability under CERCLA, it establishes an

15  allocation between two liable parties.  That's what CERCLA was

16  intended to do, to bring all parties together to clean up.

17  And here, the United States is liable as a PRP because of the

18  activities it engaged in during the Cold War.

19          THE COURT:  I know your argument.  All I'm trying to

20  do is figure out the double recovery.  You don't have to go back

21  to the --

22          MR. MURPHY:  I'm sorry, I'm sorry.  But the point

23  is --

24          THE COURT:  I know they're liable as a PRP, and if

25  there was no -- and just put aside if you had no agreement and

1    there was no government contract recovery whatsoever through

2    this other system, that didn't exist, we'd have a different --

3         MR. MURPHY:  The government could have created

4    different rules, Your Honor.  The government could have said,

5    look, PRPs like Lockheed Martin, you go sue everybody in the

6    world to recover if you can, and we'll only pay you after you

7    establish what your price is.  They could have said we're not

8    going to pay you until you resolve all this liability, and then

9    you get to put this into your contracts.  It didn't say that.

10        THE COURT:  Oh, I see.

11        MR. MURPHY:  It said you could put all your stuff into

12   contracts as long as you establish CERCLA allocations later and

13   then credit us back.  That's the system that was created here.

14        THE COURT:  By the agreement.

15        MR. MURPHY:  And by guidance given to the DCAA

16   auditors and by just the idea of cost reasonableness,

17   Your Honor.

18        THE COURT:  The guidance, do I have that?

19        MR. MURPHY:  We cite it in our brief, Your Honor, the

20   mini-brief we just provided to you.  I think we attached it.

21   It's an exhibit, Your Honor.

22        THE COURT:  What would it appear in, a CFR?

23        MR. MURPHY:  It's called Defense Contract Audit Manual.

24        THE COURT:  Okay.  I got it.  So now I just want to

25   hear briefly from Mr. Sullivan and his response.  You understand

now where they're coming from -- wait a minute, let me see.
Where is that brief -- in terms of this agreement.  It's not
their only argument, but it bolsters their argument that this is
an acceptable system, built into the system, that was signed off
on, is the notion we're going to sue under CERCLA, and our
rights are preserved under CERCLA so that you can't zing us.

MR. SULLIVAN:  Well, Your Honor, our position about
the DOSA and CERCLA is that the DOSA does not settle CERCLA
claims between the United States and Lockheed.

THE COURT:  I don't know they disagree.

MR. SULLIVAN:  Yeah.  And I don't think that we do.

THE COURT:  You don't disagree that it doesn't settle
it.

MR. MURPHY:  It doesn't settle it.

THE COURT:  It only settled it for Burbank.

MR. SULLIVAN:  Well, Burbank had been settled about
nine months earlier pursuant to a consent decree.

THE COURT:  I know, but a consent decree requires that
everybody agree, including you.  And you read that paragraph we
just read into the record, they foresaw specifically a creation
of an agreement.

MR. SULLIVAN:  They were certainly negotiating trying
to reach an agreement at the time, and if they reached it, it
would have to be accounted for.  And I think in the DOSA, when
they finally reached an agreement nine months later, they

1    accounted for it.  See, Your Honor --

2              THE COURT:  That agreement covered a lot more than

3    Burbank.

4              MR. SULLIVAN:  Yes, it did.

5              THE COURT:  Okay.  So your response to the notion

6    that -- I called it yesterday "the elephant in the room."

7    He calls it, or putting words in Mr. Murphy's mouth, "some of

8    his best evidence on double recovery."  What is your response?

9              MR. SULLIVAN:  Okay.  Our position, first of all, on

10   the DOSA is that the DOSA does not contain a waiver by the

11   United States of any defenses or arguments that it can make

12   about double recovery in a CERCLA if they choose to sue us.

13             THE COURT:  Equitable.  Do you agree or disagree?

14   Yes or no?

15             MR. MURPHY:  Your Honor, I don't think it says

16   anything about CERCLA.  It just says that we're not settling

17   CERCLA, and that's clear in the agreement.

18             THE COURT:  So it doesn't constitute a waiver.

19             MR. MURPHY:  Yes, Your Honor.

20             THE COURT:  They agree.

21             MR. SULLIVAN:  Yeah.  And number two, it doesn't

22   prevent the courts from considering our arguments about double

23   recovery under CERCLA equitable arguments like we're making

24   today.

25             THE COURT:  At that level of generality, do you agree

1    or disagree?

2            MR. MURPHY:  At that level of generality, I guess I

3    would be arguing that you're not allowed to consider equity at

4    this point.

5            THE COURT:  Now the question is how does it work.

6            MR. MURPHY:  But I think it's relevant.  I think the

7    agreements are very relevant to the equities of the situation.

8            THE COURT:  Well, that's right.

9        And you have to argue the opposite in some fashion,

10   and I'm having a hard time articulating what that argument is.

11   So here's your chance.

12           MR. SULLIVAN:  Okay.

13           THE COURT:  At level one and two, we're in agreement.

14   We don't need to discuss it ever again.  I have equitable power,

15   and they say I should consider it.

16           MR. SULLIVAN:  Okay.  I can just go piece by piece.

17   Mr. Murphy talked about unfairness to Lockheed, about the

18   United States' liability share being included in their pricing.

19   Under the DOSA, the United States does not dictate how much of

20   overhead they charge for their environmental cost.  That's up to

21   Lockheed.  If they want to try to get 100 percent and load it

22   all in their discontinued operations cost, they can do that.

23       If they would rather, for example, in this case, not load

24   any Redlands cost in the discontinued operations pool and sue us

25   under CERCLA to recover, that's fine.  Our position is, do it

1    one way or the other.  It's up to you.

2              THE COURT:  But he's going to respond to you that

3    you allowed them to do it both ways.  You signed off on that.

4              MR. SULLIVAN:  The agreement doesn't say you can do

5    both.  It says you can recover under contracts if you want to.

6              THE COURT:  And you have the right to sue us.

7              MR. SULLIVAN:  Well, it just says we didn't settle any

8    CERCLA cases.

9              THE COURT:  Yes, but -- okay.  I don't care whether he

10   agrees with you.  I have to assume that the U.S. government,

11   without any parol evidence -- and I'm not sure I need it --

12   these two agreements, when read together, say you can recover,

13   Burbank, both from the U.S. government at a percentage whichever

14   the court desires or whoever you settled that percentage, and

15   you can keep passing these on and we don't expect you to, out of

16   the goodness of your heart, not to pass them on to us.

17             MR. SULLIVAN:  Here's what we think about those two

18   agreements.  First of all, the Burbank settlement is just that.

19   It's a settlement of another case that's unrelated to this case.

20   That's the first part.

21        Number two, the timing of this is very important.  The

22   Burbank consent decree was finalized in January of 2000, about

23   nine months before DCMA and Lockheed reached an agreement as to

24   whether Lockheed would be allowed to recover their environmental

25   costs under government contracts.

1      So when we reached the Burbank settlement, there was no

2  agreement at that time, and it was uncertain whether Lockheed

3  was going to be able to keep the costs that they were trying to

4  recover under their government contracts.  So, when we settled

5  the Burbank case, we had to make direct payments because we had

6  not reached an agreement as to whether they'd be able to recover

7  those under contracts.  Here we have the opposite situation.

8      THE COURT:  Direct payments, when was the first direct

9  payment?

10     MR. SULLIVAN:  It started after the consent decree was

11  entered in January 2000.

12     THE COURT:  I know, but that's not when.

13  When did you get the first direct payment?

14     MR. MURPHY:  Under the Burbank consent decree,

15  Your Honor?  Honestly, I have no idea.

16     THE COURT:  Well, was it immediately?

17     MR. MURPHY: Your Honor, I'd have to look. I don't know.

18     THE COURT:  All right.  But in any case.

19     MR. SULLIVAN:  I think there was a provision for like

20  a demand for payment in there.  I can't remember.  I have no

21  idea exactly when it came.  But I think the DOSA actually

22  accounts for the fact that we had made direct payments as of the

23  date it was signed, and they were trying to make sure that there

24  wasn't a double recovery there as best they could.

25     THE COURT:  How did they do that?

1        MR. SULLIVAN:  Through the provisions in the DOSA,

2   through a crediting provision, I believe.

3        THE COURT:  What do you mean?

4        MR. SULLIVAN:  It's specified in the DOSA.  We can

5   look to that.  There was a specific section in the DOSA, the

6   Treatment of the Burbank Consent Decree, on page 7 starting at

7   paragraph 3.1.

8        THE COURT:  Okay.  So there probably was a payment.

9        MR. SULLIVAN:  Yes.  There had already been a payment

10  as of that time, and they were crediting them for it, because I

11  don't know any other way to deal with it.

12       THE COURT:  Is it relevant to me that at the time that

13  Burbank was settled that this agreement has been negotiated

14  somewhere along the lines it is?

15       MR. SULLIVAN:  I think it is, Your Honor, and here's

16  why.

17       THE COURT:  It is relevant?  I should determine that?

18       MR. SULLIVAN:  Well, I think it is, and I'll tell you

19  why I think it's relevant.  The timing is relevant, because what

20  we have in this case is the opposite situation.  In the Burbank

21  situation, Lockheed and the DoD had not yet reached an agreement

22  about recoverability of those costs, so we had to enter a

23  consent decree and make direct payments.

24       Here, Lockheed is recovering all their environmental costs

25  of this site by agreement of the United States, and then they

1    sued us, trying to recover again under CERCLA.  So it's like the

2    reverse of Burbank.

3         THE COURT:  You aren't *really* arguing that.  You're

4    taken by surprise.  Are you?

5         MR. SULLIVAN:  Taken by surprise by being sued?

6         THE COURT:  Yeah.

7         MR. SULLIVAN:  We knew it was possible that we could

8    be sued, sure, but we also knew we had all of our defenses.

9         THE COURT:  What day is the tolling agreement signed?

10        MR. MURPHY:  I think it's someday in 1997, Your Honor.

11   I don't have the exact date.

12        THE COURT:  Before these are even --

13        MR. MURPHY:  Before those.

14        THE COURT:  And how many suits again?

15        MR. MURPHY:  There are three suits that have been

16   filed, Your Honor.

17        THE COURT:  They were filed when?  Is this the first?

18        MR. MURPHY:  This was actually the last.

19        THE COURT:  Well, you countersued in Burbank.

20        MR. MURPHY:  Okay.  Well, Burbank is one.  We tried to

21   negotiate settlements that didn't work, and then we had 2006 in

22   the Harbor Island and Great Neck.

23        THE COURT:  Harbor Island?

24        MR. MURPHY:  Which is the Seattle case, the Western

25   District.  And then this one was filed two years later,

1   Your Honor, 2008.

2           THE COURT:  Great Neck was 2006.  And then what about

3   the one with Judge Leon?

4           MR. MURPHY:  That's 2006.

5           THE COURT:  That's Great Neck.

6           MR. MURPHY:  That's Great Neck.

7           THE COURT:  So 2008 was here.

8           MR. MURPHY:  Yes, Your Honor.

9           THE COURT:  And the tolling agreement was 1997.

10          MR. MURPHY:  For the Redlands site.  The other tolling

11  agreements for Great Neck and Harbor Island, the Washington

12  site, were 1999.

13          THE COURT:  Do you have a date in '99?

14          MR. MURPHY:  We're going to be providing them to you,

15  Your Honor.

16          THE COURT:  Okay.  So we set out that chronology,

17  and we read that with the gloss of the agreement that says,

18  paragraph 4.18, "This settlement does not settle claims, if any,

19  arising under CERCLA."  So all claims that were there, or that

20  were going to be, or could be, or would be, or anticipated to be

21  brought by Lockheed Martin, they're still there.

22          MR. SULLIVAN:  Still there.

23          THE COURT:  They're still there.

24          MR. SULLIVAN:  Still there.

25          THE COURT:  So you rely on the notion that, in some

```
 1    fashion, any conceivable equitable -- first you argued it to

 2    Judge Robertson legal, but now equitable defense is still there.

 3              MR. SULLIVAN:  Yes, Your Honor.

 4              THE COURT:  Okay.

 5              MR. SULLIVAN:  That's why I said the other day, our

 6    point is, they could sue us, but what's the point with the

 7    double recovery case law there is?

 8              THE COURT:  Okay.  I think you do open up doors.

 9    I hate to say it.

10              MR. SULLIVAN:  Me, Your Honor?

11              THE COURT:  Sorry?

12              MR. SULLIVAN:  Me, Your Honor?

13              THE COURT:  I mean, I know you blame me, but --

14              MR. SULLIVAN:  I don't blame you anymore, Your Honor.

15              THE COURT:  -- I didn't sign this agreement.  At the

16    most basic level, the government is asking me to look at these

17    things and preserve their equitable defenses, one you lost

18    before Judge Robertson.  I don't think it's preclusive, but you

19    are looking at the equitable.  And to the extent there is in

20    these agreements anything relevant beyond what's on the face of

21    them -- at the time.  Not now, not later.  I don't care what the

22    DoD says now that the DOJ has probably woken up to what's gone

23    on here.

24         I'm troubled that you are relying on -- and I know from the

25    get-go you would have preferred these agreements to be irrelevant
```

1    to my consideration, but I've notified you that they are relevant.

2              MR. SULLIVAN:  Actually, just the opposite.  I think

3    they are relevant to your consideration.

4              THE COURT:  Oh.  And because?

5              MR. SULLIVAN:  Because, if we compare the DOSA to the

6    double recovery case law, the DOSA is a settlement agreement.

7    The DOSA is a contract between the United States where the

8    United States is paying Lockheed for remedial cost, providing

9    them a prior recovery.  So when you compare that situation to

10   the other equitable double recovery cases, it's very similar.

11   Lockheed is receiving, pursuant to a contract or settlement

12   agreement, recovery or payment from a party for its remedial

13   costs.

14             THE COURT:  Okay.  That really opens up what does that

15   sentence mean in that contract.  It all comes down to that one

16   paragraph.

17             MR. SULLIVAN:  And the DOSA does not say that we're

18   waiving any of our CERCLA defenses or arguments, Your Honor.

19             THE COURT:  No.

20             MR. SULLIVAN:  And neither does the Burbank case.

21   The Burbank settlement says it only applies to that case, and

22   we're not waiving any defenses concerning this case.

23             THE COURT:  Right.  But the question is whether these

24   agreements, in some fashion, are favorable and relevant to

25   Lockheed on the equitable issue.  You say no.

1    MR. SULLIVAN:  I mean, I think the only relevance they

2    have is that they don't settle this case and that it's a

3    contract that we're making payments to Lockheed under.  Other

4    than that, I don't think it's terribly relevant.

5    MR. MURPHY:  I just want to clarify.  It's not a

6    contract that Lockheed receives any payments under.  All it

7    does is tell us how we can allocate costs to our procurement

8    contracts.  It's not a contract that provides for direct

9    recoveries.  It just settles how Lockheed Martin allocates its

10   already allowable costs to its business -- how to allocate.

11   THE COURT:  And you didn't get that resolved.  I mean,

12   the U.S. government, DoD, could have fought you and said that

13   none of this is recoverable.

14   MR. MURPHY:  I don't believe that to be true.  There

15   were questions about allowability on certain areas of cost and

16   that the allowability on certain areas of cost, and that the

17   allocability was to determine of whether we should use CAS 403

18   to spread it down to our business units according to cost

19   accounting standards or whether each one of these sites should

20   have been allocated to a old business unit directly.

21   THE COURT:  Who sued who in the contract?  Did you

22   raise the dispute and the government responded?

23   MR. MURPHY:  The government started disallowing our

24   costs for several reasons, Your Honor: based on the allocability

25   applicability of it, whether they should be directly allocated,

1  or whether they should be allocated under CAS 403.  How home

2  office overhead goes down to its business units.  So there were

3  disputes about certain areas of cost and also --

4      THE COURT:  But it was never on the basis of this

5  remediation cost relating to a site that you add some PRP

6  responsibility for.

7      MR. MURPHY:  It's a question of, these are costs that

8  are normal costs of doing business that are environmental costs

9  that are allowable.  And so the question is, to what extent

10  they're allowable as reasonable cost, and how they allocate as a

11  portion of corporate overhead down, Your Honor.  So I just want

12  to clarify this is not a contract that provides for direct

13  payments.

14      THE COURT:  But however you classify it or define it,

15  you are receiving some remediation costs that you've expended.

16  You are getting them back indirectly.

17      MR. MURPHY:  As an exchange, it's factored into the

18  prices that we charge to perform goods and -- to perform

19  contracts, Your Honor.  It factors into how you set the price,

20  and then if Lockheed Martin performs the contract, it gets money

21  for performing the contract.

22      THE COURT:  Does it get factored also into private

23  contracts, non-U.S. government contracts?

24      MR. MURPHY:  Your Honor, I think Bob Gatchel will

25  testify about that.  I believe that it does.

1   THE COURT:  Okay.  But that's a small --

2   MR. MURPHY:  It's the 13 percent if you were using 87

3   percent.

4   THE COURT:  All right.  And on a metaphysical basis,

5   are you looking at government as PRP and government as customer?

6   MR. SULLIVAN:  Your Honor, we respectfully disagree

7   with Judge Robertson's characterization of that.  We think it's

8   inconsistent with all the unified executive branch case law, and

9   there's a lot of case law that contradicts that.

10   And also, while I'm there, on the Comptroller General

11   opinion, it's my recollection that in the early CERCLA days,

12   DOJ was uncertain whether we would be allowed to recover -- do a

13   settlement through the judgment fund.  So we asked the

14   Comptroller General whether we could, and the opinion is

15   basically an answer saying that, yes, we could.  Because we were

16   uncertain.  But I don't believe it says -- I've never seen a

17   citation that Congress actually intended that.

18   MR. MURPHY:  Well, Your Honor, it's at 73 Comptroller

19   General, paragraph 48, and the Westlaw cite is 1993 Westlaw

20   505822.

21   THE COURT:  All right.  So let me go back to Lockheed.

22   Is there anything you want beyond these two more witnesses?

23   MR. MURPHY:  In terms of additional evidence,

24   Your Honor, on this point, are you saying that it's --

25   THE COURT:  I'm only ruling when I have to rule.

1     MR. MURPHY:  Right.

2     THE COURT:  I'm not dumb.

3     MR. MURPHY:  Well, Your Honor excluded a lot of that

4  testimony on the grounds of parol evidence and 802 that was not

5  necessary, and you were going to let us know later in the case

6  whether it was necessary or not.  And I guess --

7     THE COURT:  That's my question now.  You can think

8  about it and tell me after lunch.

9     MR. MURPHY:  Okay.

10     THE COURT:  That's exactly my question.  And the

11  government, the same thing.  It would be evidence relating to

12  the meaning of the interaction between the two agreements back

13  then, not now.  I don't care.  Whether there are documents that

14  elucidate this, I wouldn't know.

15     You have indicated you were to make a proffer.  I said

16  don't make a proffer until we resolve this issue.  I don't want

17  you coming to me when -- you know, once the cat's out of the

18  bag, it's out of the bag when the decision-maker is one in the

19  same.  So I'm still deciding whether you can make a proffer or

20  offer other evidence on it.  I don't know what the government's

21  position is.

22     MR. SULLIVAN:  If Lockheed wants to make a proffer

23  and you allow it, we would want to make a counter-proffer.

24     MR. MURPHY:  And this issue would be on the meaning of

25  the -- or how the discontinued operations agreement in Burbank

1    were settled.

2            THE COURT:  Yeah.  In particular, the double recovery

3    provisions and the interrelationship, because I cannot believe

4    that they are separated in mind and time.

5            MR. MURPHY: Well, they refer to each other, Your Honor.

6            THE COURT:  I *know*.

7            MR. MURPHY:  Okay.

8            THE COURT:  That's why I don't --

9            MR. MURPHY:  I'm sorry.  I couldn't help myself.

10            THE COURT:  -- among other things.

11       Okay.  Thank you.  We'll be back at 2:00, and we will start

12    with your next witness.

13            MR. MURPHY:  Thank you, Your Honor.

         (Lunch recess taken at 12:49 p.m.)

**<u>INDEX</u>**

<u>WITNESS:</u>                                                      <u>PAGE</u>:


<u>Joan Meyer</u>:    Direct Examination........................ 1458
                Cross-Examination......................... 1459
                Redirect Examination...................... 1516



*****



CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that

the foregoing pages are a correct transcript from the record of

proceedings in the above-entitled matter.



                        _____
                        BRYAN A. WAYNE

## $

**$1.74** [1] - 1478:4
**$100** [4] - 1460:7, 1471:15, 1493:12, 1493:13
**$13** [8] - 1493:15, 1494:5, 1494:24, 1495:1, 1495:3, 1495:5, 1495:9, 1495:15
**$2.26** [1] - 1477:21
**$25** [7] - 1482:1, 1482:4, 1488:1, 1488:14, 1488:21, 1504:3, 1505:1
**$26** [1] - 1485:8
**$400,000** [1] - 1463:16
**$557.65** [1] - 1489:3
**$73** [1] - 1459:22
**$80** [1] - 1471:17
**$87** [1] - 1460:10

## '

**'08** [1] - 1519:14
**'94** [6] - 1512:5, 1518:17, 1518:18, 1518:22, 1519:20, 1520:5
**'99** [1] - 1541:13

## 0

**0004** [1] - 1486:9
**0023** [1] - 1482:19
**0024** [2] - 1477:5, 1482:19
**08-1160** [2] - 1452:5, 1454:2

## 1

**1** [20] - 1454:14, 1460:17, 1460:20, 1460:21, 1462:18, 1485:21, 1485:23, 1491:25, 1492:1, 1492:21, 1492:24, 1497:5, 1500:21, 1501:1, 1501:4, 1502:22, 1517:3, 1517:12, 1519:9
**1.1** [1] - 1481:3
**10** [9] - 1457:20, 1465:19, 1480:21, 1481:1, 1492:13,

1501:1, 1514:19, 1518:14, 1519:8
**100** [8] - 1461:22, 1493:5, 1493:10, 1494:2, 1495:21, 1496:11, 1496:15, 1536:21
**103.35** [1] - 1491:1
**1033** [2] - 1526:18, 1526:19
**1050** [1] - 1452:17
**10:52** [1] - 1492:14
**1180** [6] - 1482:6, 1483:6, 1502:22, 1503:4, 1504:4, 1506:14
**1180.0024** [1] - 1477:2
**11:15** [1] - 1492:14
**12** [1] - 1498:15
**124** [2] - 1470:9, 1470:14
**124.5** [1] - 1468:6
**12:49** [1] - 1548:14
**13** [8] - 1460:12, 1493:2, 1504:5, 1518:6, 1518:9, 1518:13, 1519:8, 1546:2
**14** [6] - 1477:20, 1477:23, 1504:5, 1507:6, 1508:5, 1508:19
**1452** [1] - 1452:8
**1458** [1] - 1549:3
**1459** [1] - 1549:4
**15,000** [1] - 1509:18
**1500** [1] - 1509:17
**1516** [1] - 1549:4
**16** [1] - 1477:19
**161** [2] - 1483:14, 1485:13
**161.88** [2] - 1484:23, 1485:12
**17** [1] - 1477:19
**172.73** [1] - 1505:10
**175** [1] - 1464:8
**18** [1] - 1477:20
**18.5** [6] - 1481:18, 1489:12, 1490:25, 1508:17, 1518:1, 1518:6
**1858** [1] - 1457:7
**19** [3] - 1498:15, 1498:17, 1504:4
**1990** [1] - 1501:17
**1993** [1] - 1546:19
**1994** [9] - 1462:22, 1462:25, 1488:17, 1489:22, 1501:17, 1504:13, 1504:16,

1514:13, 1529:6
**1995** [4] - 1463:1, 1463:4, 1463:7, 1463:9
**1997** [2] - 1540:10, 1541:9
**1999** [1] - 1541:12

## 2

**2** [14] - 1454:25, 1458:21, 1466:2, 1477:7, 1477:9, 1481:23, 1486:2, 1497:12, 1501:17, 1501:18, 1502:16, 1504:9, 1504:10, 1506:25
**2.26** [1] - 1477:20
**20** [8] - 1463:4, 1463:23, 1465:2, 1465:17, 1467:11, 1505:14, 1520:12, 1532:13
**200** [1] - 1467:10
**2000** [5] - 1526:5, 1526:6, 1531:22, 1537:22, 1538:11
**20001** [1] - 1453:3
**2000s** [1] - 1519:12
**20026-3986** [1] - 1452:25
**20036-5306** [1] - 1452:17
**2004** [1] - 1482:12
**2006** [3] - 1540:21, 1541:2, 1541:4
**2008** [2] - 1541:1, 1541:7
**2010** [1] - 1501:18
**2011** [1] - 1461:4
**2012** [2] - 1461:4, 1520:6
**2013** [1] - 1464:6
**2014** [13] - 1452:7, 1462:1, 1462:11, 1464:5, 1466:13, 1468:9, 1482:12, 1485:1, 1487:24, 1499:12, 1501:19, 1504:17, 1505:7
**2015** [6] - 1464:16, 1485:2, 1486:9, 1505:11, 1505:12, 1505:21
**2019** [2] - 1465:18, 1487:24
**202** [3] - 1452:18, 1452:25, 1453:3

**2020** [3] - 1463:14, 1463:17, 1466:21
**2025** [2] - 1477:18, 1478:11
**2031** [1] - 1461:5
**2032** [1] - 1465:12
**2036** [2] - 1481:4, 1489:22
**21** [3] - 1452:7, 1483:14, 1487:23
**22** [13] - 1484:15, 1484:21, 1485:6, 1486:7, 1486:9, 1487:23, 1503:23, 1504:7, 1504:8, 1504:9, 1504:12, 1504:17, 1505:13
**23** [8] - 1459:25, 1482:8, 1482:10, 1482:11, 1482:14, 1482:23, 1486:13, 1487:24
**24** [8] - 1482:8, 1482:10, 1482:15, 1482:24, 1485:4, 1487:24, 1506:25, 1508:3
**25** [6] - 1484:2, 1484:10, 1489:20, 1491:6, 1506:15, 1507:5
**25,096,654** [1] - 1480:10
**25.1** [2] - 1480:3, 1488:10
**26** [14] - 1488:19, 1488:23, 1495:22, 1498:14
**26.01** [1] - 1485:2
**27** [1] - 1506:14
**28** [4] - 1479:3, 1479:6, 1479:9, 1510:20
**287.9** [1] - 1468:13
**29** [1] - 1467:25
**2:00** [1] - 1548:11

## 3

**3** [17] - 1460:16, 1461:15, 1462:16, 1462:17, 1463:14, 1491:25, 1492:4, 1497:5, 1498:1, 1498:3, 1501:24, 1502:19, 1503:12, 1503:16, 1504:7, 1504:13, 1504:17
**3.1** [1] - 1539:7

**3.25** [2] - 1525:24, 1526:7
**30** [5] - 1459:23, 1503:14, 1503:17, 1532:6, 1532:13
**300** [1] - 1467:9
**300,000** [1] - 1468:14
**305-0365** [1] - 1452:25
**31** [1] - 1510:22
**31.3** [3] - 1479:23, 1480:3, 1480:13
**32** [2] - 1507:4, 1507:5
**333** [1] - 1453:2
**354-3186** [1] - 1453:3
**36** [5] - 1488:23, 1496:13, 1516:25, 1517:20, 1519:3
**39** [3] - 1479:3, 1479:6, 1479:9

## 4

**4** [5] - 1502:1, 1504:7, 1504:8, 1510:14
**4.18** [2] - 1481:1, 1541:18
**4.7** [3] - 1526:17, 1526:21, 1526:22
**4.86** [1] - 1505:22
**40** [2] - 1485:25, 1532:6
**403** [2] - 1544:17, 1545:1
**41** [1] - 1468:1
**45** [2] - 1459:6, 1492:18
**46** [1] - 1497:14
**48** [1] - 1546:19
**490** [3] - 1464:10, 1464:11, 1464:22
**490.2** [1] - 1468:12

## 5

**5** [2] - 1463:3, 1521:1
**5.23** [1] - 1481:2
**500** [1] - 1467:8
**505822** [1] - 1546:20
**53** [1] - 1503:17

## 6

**6** [7] - 1460:17, 1460:21, 1462:19, 1475:17, 1479:17, 1479:18, 1480:11
**6.2** [1] - 1480:4
**60** [22] - 1459:6,

1461:17, 1464:2, 1464:4, 1464:5, 1464:12, 1464:21, 1465:6, 1479:13, 1479:21, 1480:1, 1480:9, 1482:7, 1483:21, 1485:25, 1488:13, 1491:5, 1492:18, 1514:1, 1514:13, 1514:19, 1517:24
**601** [1] - 1452:24
**67.4** [1] - 1468:4
**6714** [1] - 1453:2

## 7

**7** [2] - 1457:7, 1539:6
**7.2** [3] - 1462:22, 1463:2, 1463:5
**7.5** [1] - 1520:9
**7.55** [1] - 1520:5
**73** [1] - 1546:18
**73.7** [2] - 1504:12, 1504:16
**78.26** [1] - 1491:3

## 8

**8** [5] - 1452:9, 1501:3, 1505:4, 1505:7
**80** [10] - 1471:16, 1471:20, 1473:19, 1473:21, 1474:1, 1485:18, 1493:14, 1506:5, 1506:6, 1506:10
**8000** [1] - 1452:24
**802** [1] - 1547:4
**86.4** [2] - 1486:10, 1504:18
**87** [1] - 1493:1, 1546:2
**88** [1] - 1483:15

## 9

**9** [5] - 1461:15, 1488:12, 1498:3, 1501:24, 1505:12
**92** [2] - 1516:25, 1519:4
**955-8238** [1] - 1452:18
**97** [1] - 1478:1
**9:30** [2] - 1452:7, 1522:18

## A

**a.m** [3] - 1452:7, 1492:14
**A.M** [1] - 1452:9
**able** [6] - 1463:19, 1494:25, 1514:1, 1514:3, 1538:3, 1538:6
**above-entitled** [1] - 1549:12
**absolved** [1] - 1527:13
**accept** [3] - 1468:20, 1476:4, 1514:5
**acceptable** [1] - 1534:4
**accepted** [1] - 1529:14
**accomplish** [1] - 1510:12
**accordance** [2] - 1524:13, 1526:9
**according** [2] - 1494:22, 1544:18
**account** [5] - 1455:18, 1503:19, 1511:5, 1512:25, 1519:22
**accountant** [1] - 1475:21
**accounted** [6] - 1490:17, 1506:19, 1509:10, 1513:4, 1534:24, 1535:1
**accounting** [7] - 1472:3, 1473:6, 1494:22, 1498:18, 1498:19, 1499:16, 1544:19
**accounts** [1] - 1538:22
**accurate** [1] - 1531:6
**achieved** [1] - 1472:13
**acknowledge** [1] - 1469:21
**actions** [2] - 1472:11, 1475:13
**activities** [1] - 1532:18
**actual** [1] - 1461:3, 1461:20, 1465:24, 1471:6, 1474:17, 1483:24, 1484:7, 1487:4, 1502:24, 1517:23, 1526:3
**add** [7] - 1466:15, 1488:3, 1502:3, 1502:4, 1502:6, 1517:8, 1545:5
**adding** [1] - 1508:13

**additional** [1] - 1546:23
**address** [2] - 1457:13, 1499:16
**addresses** [2] - 1499:18, 1516:8
**addressing** [1] - 1475:23
**adjust** [2] - 1477:25, 1507:25
**adjusted** [1] - 1507:23
**adjustment** [1] - 1484:20
**adjusts** [1] - 1489:9
**admit** [3] - 1510:6, 1517:5, 1517:16
**adopt** [1] - 1458:8
**advocating** [1] - 1491:9
**affect** [1] - 1516:19
**affidavit** [1] - 1492:18
**affidavits** [1] - 1469:7
**afternoon** [1] - 1522:13
**agencies** [1] - 1511:15
**agree** [20] - 1455:2, 1455:9, 1460:3, 1472:5, 1472:8, 1473:16, 1473:21, 1475:5, 1495:20, 1505:16, 1507:23, 1514:4, 1520:10, 1520:15, 1523:15, 1524:8, 1534:19, 1535:13, 1535:20, 1535:25
**agreed** [1] - 1471:9
**agreed-upon** [1] - 1471:9
**agreement** [54] - 1471:23, 1472:1, 1473:6, 1473:17, 1475:8, 1515:19, 1522:24, 1523:8, 1524:7, 1524:15, 1524:16, 1524:18, 1524:20, 1525:3, 1525:4, 1525:5, 1525:8, 1525:9, 1525:23, 1526:3, 1526:4, 1526:5, 1526:10, 1526:11, 1526:14, 1526:17, 1527:1, 1528:18, 1528:19, 1531:11, 1531:14, 1532:25, 1533:14, 1534:2, 1534:21, 1534:23, 1534:25, 1535:2, 1535:17, 1536:13,

1537:4, 1537:23, 1538:2, 1538:6, 1539:13, 1539:21, 1539:25, 1540:9, 1541:9, 1541:17, 1542:15, 1543:6, 1543:12, 1547:25
**agreements** [12] - 1457:11, 1521:25, 1523:1, 1523:5, 1536:7, 1537:12, 1537:18, 1541:11, 1542:20, 1542:25, 1543:24, 1547:12
**agrees** [1] - 1537:10
**ahead** [10] - 1457:22, 1473:4, 1481:22, 1487:21, 1503:1, 1508:25, 1511:19, 1515:3, 1521:8, 1526:20
**aided** [1] - 1453:25
**air** [1] - 1514:23
**airplanes** [1] - 1509:21
**algebraically** [4] - 1490:9, 1491:14, 1491:21, 1507:17
**allocability** [2] - 1544:17, 1544:24
**allocate** [4] - 1517:8, 1544:7, 1544:10, 1545:10
**allocated** [5] - 1502:7, 1524:23, 1544:20, 1544:25, 1545:1
**allocates** [1] - 1544:9
**allocation** [64] - 1454:14, 1454:20, 1460:25, 1461:17, 1461:25, 1462:1, 1462:3, 1462:19, 1464:5, 1464:20, 1466:25, 1467:16, 1467:17, 1467:21, 1467:22, 1467:23, 1470:4, 1473:12, 1474:12, 1475:11, 1476:7, 1476:18, 1478:14, 1478:20, 1479:13, 1479:21, 1480:1, 1480:14, 1480:21, 1481:2, 1481:12, 1481:13, 1481:19, 1482:7, 1485:24, 1488:13, 1489:5, 1489:11, 1489:17, 1491:3, 1491:4, 1491:12, 1493:18, 1495:12,

1495:13, 1496:6, 1496:8, 1496:17, 1496:18, 1499:23, 1499:24, 1500:2, 1500:11, 1500:13, 1512:7, 1512:22, 1513:10, 1514:16, 1517:22, 1517:25, 1518:4, 1529:2, 1532:9, 1532:15
**allocations** [4] - 1498:10, 1507:22, 1508:12, 1533:12
**allow** [1] - 1547:23
**allowability** [3] - 1529:10, 1544:15, 1544:16
**allowable** [4] - 1527:19, 1544:10, 1545:9, 1545:10
**allowed** [5] - 1527:1, 1536:3, 1537:3, 1537:24, 1546:12
**allows** [1] - 1528:19
**alone** [1] - 1479:13
**alternative** [1] - 1515:14
**alternatives** [1] - 1515:14
**America** [1] - 1454:3
**AMERICA** [1] - 1452:6
**amortization** [7] - 1484:16, 1485:11, 1497:16, 1497:20, 1497:24, 1498:9, 1499:12
**amortize** [3] - 1463:1, 1485:13, 1501:14
**amortized** [10] - 1466:12, 1466:17, 1471:20, 1478:14, 1478:15, 1485:7, 1496:5, 1496:9, 1497:19, 1505:15
**amortizes** [1] - 1501:13
**amortizing** [1] - 1464:22
**amount** [15] - 1461:7, 1465:7, 1465:22, 1466:17, 1467:17, 1467:22, 1473:24, 1485:13, 1489:9, 1489:15, 1496:17, 1500:16, 1517:2, 1528:21, 1528:23
**amounts** [1] - 1526:8
**analysis** [17] - 1455:17, 1467:5, 1468:20, 1469:3,

1478:10, 1489:24,
1503:8, 1512:20,
1513:16, 1514:5,
1515:11, 1515:12,
1517:14, 1519:17,
1520:10, 1531:7
**answer** [2] - 1492:17,
1546:15
**answered** [1] -
1517:11
**anticipated** [1] -
1541:20
**anyways** [2] -
1475:21, 1476:13
**apologize** [1] - 1504:6
**appear** [2] - 1482:9,
1533:22
**APPEARANCES** [1] -
1452:12
**Apple** [1] - 1487:16
**applicability** [1] -
1544:25
**applied** [2] - 1470:1,
1475:13
**applies** [1] - 1543:21
**apply** [4] - 1484:6,
1505:13, 1505:16,
1506:10
**apportioned** [1] -
1473:25
**appreciate** [1] -
1521:11
**approach** [2] -
1494:23, 1514:25
**appropriate** [1] -
1506:9
**approximated** [1] -
1470:9
**areas** [3] - 1544:15,
1544:16, 1545:3
**argue** [2] - 1513:15,
1531:2, 1536:9
**argued** [3] - 1498:18,
1523:2, 1542:1
**arguing** [5] - 1454:15,
1527:11, 1531:20,
1536:3, 1540:3
**argument** [11] -
1470:3, 1497:10,
1500:17, 1509:5,
1523:13, 1524:17,
1524:21, 1532:19,
1534:3, 1536:10
**arguments** [4] -
1535:11, 1535:22,
1535:23, 1543:18
**arising** [1] - 1541:19
**arrangement** [1] -
1471:8
**art** [1] - 1516:1

**articulating** [1] -
1536:10
**aside** [4] - 1467:23,
1476:23, 1478:19,
1532:25
**aspect** [2] - 1472:17,
1494:15
**assertion** [2] -
1498:21, 1500:6
**assigned** [1] - 1500:2
**associated** [8] -
1461:9, 1461:16,
1461:21, 1464:18,
1485:12, 1486:14,
1490:5, 1514:2
**assume** [6] - 1464:8,
1469:7, 1493:14,
1503:9, 1527:8,
1537:10
**assumed** [3] - 1465:8,
1503:15, 1512:6
**assuming** [14] -
1454:20, 1464:24,
1465:5, 1467:15,
1472:18, 1476:7,
1476:16, 1476:17,
1476:18, 1481:4,
1487:5, 1517:12,
1518:13, 1521:1
**assumption** [7] -
1479:19, 1479:20,
1487:13, 1487:15,
1514:22, 1518:8,
1518:9
**assumptions** [5] -
1479:18, 1514:14,
1514:15, 1514:18,
1521:2
**assure** [2] - 1532:11,
1532:12
**astray** [1] - 1504:5
**attached** [1] - 1533:20
**attention** [1] - 1516:24
**attributed** [1] - 1495:8
**attributing** [1] -
1507:12
**Audit** [1] - 1533:23
**auditors** [3] - 1527:24,
1528:4, 1533:16
**available** [1] - 1457:15
**Avenue** [2] - 1452:17,
1453:2
**averages** [1] - 1520:5
**avoidance** [1] -
1526:2
**award** [2] - 1517:5,
1519:18
**awarded** [6] -
1512:22, 1513:10,
1516:17, 1517:3,

1518:2, 1518:4
**awarding** [1] - 1520:8
**aware** [1] - 1472:1
**awful** [1] - 1482:17
**axis** [3] - 1464:17,
1465:14

## B

**bag** [2] - 1547:18
**ballpark** [1] - 1467:6
**bar** [22] - 1463:4,
1463:9, 1463:19,
1464:4, 1464:11,
1464:14, 1464:17,
1465:13, 1465:18,
1466:9, 1466:18,
1489:2, 1489:4,
1489:9, 1489:12,
1489:14, 1490:21,
1490:22, 1490:24,
1491:4
**barely** [1] - 1465:12
**bars** [10] - 1461:2,
1461:7, 1461:10,
1462:19, 1465:7,
1489:19, 1491:15,
1501:25, 1502:3,
1502:5
**based** [9] - 1463:22,
1467:14, 1487:4,
1489:15, 1494:20,
1500:19, 1515:25,
1544:24
**baseline** [28] -
1460:24, 1461:14,
1462:16, 1481:7,
1481:9, 1481:11,
1487:2, 1489:4,
1489:24, 1490:2,
1490:24, 1491:13,
1492:1, 1493:18,
1498:9, 1499:24,
1506:18, 1507:3,
1507:10, 1507:17,
1508:11, 1508:18,
1512:10, 1512:18,
1512:20, 1515:15,
1517:25
**basic** [1] - 1542:16
**basis** [9] - 1464:6,
1475:6, 1475:10,
1478:13, 1478:16,
1481:18, 1489:1,
1545:4, 1546:4
**Bates** [1] - 1482:18
**bear** [3] - 1465:16,
1491:13, 1512:25
**bears** [1] - 1481:18

**BEFORE** [1] - 1452:10
**begin** [1] - 1456:21
**beginning** [5] -
1462:25, 1464:19,
1469:6, 1492:20,
1498:5
**behalf** [1] - 1512:9
**below** [1] - 1464:17
**BENCH** [1] - 1452:10
**beneficial** [1] -
1517:17
**benefit** [90] - 1459:5,
1459:11, 1459:13,
1459:16, 1459:25,
1460:13, 1460:23,
1461:13, 1461:19,
1468:20, 1468:23,
1468:25, 1469:13,
1469:20, 1470:6,
1470:7, 1475:1,
1478:10, 1478:12,
1478:18, 1479:10,
1479:12, 1479:15,
1479:16, 1479:22,
1479:25, 1480:6,
1480:10, 1480:17,
1480:18, 1481:13,
1482:2, 1487:19,
1488:1, 1488:5,
1488:6, 1488:14,
1488:16, 1490:11,
1490:13, 1492:25,
1493:3, 1493:4,
1493:6, 1493:9,
1493:11, 1493:15,
1493:17, 1493:23,
1494:3, 1494:8,
1495:8, 1495:10,
1496:15, 1496:16,
1496:20, 1496:22,
1497:15, 1498:25,
1499:20, 1499:21,
1500:3, 1500:4,
1503:18, 1504:1,
1504:21, 1507:11,
1507:16, 1507:23,
1507:25, 1508:7,
1508:13, 1509:3,
1509:6, 1510:24,
1510:25, 1512:8,
1513:5, 1513:9,
1513:14, 1515:11,
1515:12, 1515:24,
1515:25, 1516:19,
1516:22, 1516:23,
1517:21, 1519:17
**benefits** [1] - 1515:13
**best** [2] - 1535:8,
1538:24
**better** [3] - 1469:25,

1475:17, 1475:18
**between** [20] -
1455:13, 1455:14,
1465:17, 1467:2,
1470:2, 1470:15,
1472:25, 1479:14,
1480:13, 1481:2,
1489:19, 1491:11,
1503:19, 1507:3,
1507:10, 1510:18,
1532:15, 1534:9,
1543:7, 1547:12
**beyond** [6] - 1465:12,
1470:7, 1472:3,
1476:8, 1542:20,
1546:22
**big** [6] - 1462:1,
1466:12, 1466:24,
1468:23, 1469:13,
1470:20
**bigger** [1] - 1487:20
**bill** [1] - 1471:9
**binder** [3] - 1458:18,
1458:21, 1477:8
**binders** [1] - 1458:17
**bit** [4] - 1462:20,
1465:12, 1471:5,
1521:20
**blame** [2] - 1542:13,
1542:14
**blocks** [1] - 1491:15
**blow** [1] - 1466:7
**blown** [1] - 1469:18
**blue** [10] - 1461:7,
1461:9, 1463:4,
1463:9, 1463:19,
1466:18, 1489:6,
1489:8, 1501:25,
1502:3
**board** [1] - 1477:16
**Bob** [1] - 1545:24
**bolsters** [1] - 1534:3
**bonanza** [1] - 1478:20
**bonds** [1] - 1521:5
**booked** [1] - 1472:5
**borne** [3] - 1481:21,
1503:22, 1530:19
**bottom** [2] - 1468:21,
1487:17
**bounced** [1] - 1520:5
**box** [1] - 1519:6
**branch** [1] - 1546:8
**break** [4] - 1480:16,
1483:4, 1492:6,
1492:9
**brief** [4] - 1454:7,
1533:19, 1533:20,
1534:2
**briefly** [2] - 1501:8,
1533:25

briefs [1] - 1522:4
brilliant [1] - 1523:16
bring [3] - 1502:16, 1503:12, 1532:16
broken [1] - 1480:15
brought [3] - 1459:22, 1483:22, 1541:21
BRYAN [3] - 1453:1, 1549:10, 1549:14
build [2] - 1490:17, 1494:23
build-up [1] - 1494:23
building [1] - 1514:14
built [2] - 1491:10, 1534:4
bullet [1] - 1459:10
bulletpoint [3] - 1492:21, 1492:24, 1497:12
bump [4] - 1466:12, 1468:23, 1470:5, 1478:19
Burbank [23] - 1523:6, 1525:4, 1525:11, 1525:12, 1531:22, 1534:15, 1534:16, 1535:3, 1537:13, 1537:18, 1537:22, 1538:1, 1538:5, 1538:14, 1539:6, 1539:13, 1539:20, 1540:2, 1540:19, 1540:20, 1543:20, 1543:21, 1547:25
business [12] - 1463:6, 1472:9, 1475:10, 1475:11, 1475:14, 1494:18, 1510:3, 1544:10, 1544:18, 1544:20, 1545:2, 1545:8
BY [28] - 1458:3, 1459:2, 1463:11, 1470:21, 1474:6, 1474:24, 1481:25, 1482:13, 1482:21, 1483:13, 1485:9, 1486:12, 1487:22, 1491:19, 1492:15, 1494:4, 1495:4, 1496:10, 1497:11, 1501:6, 1502:18, 1503:13, 1506:13, 1509:1, 1510:15, 1516:5, 1516:15, 1518:7

**C**

C-8 [1] - 1477:12
cA [1] - 1452:5
calculate [22] - 1460:23, 1461:19, 1468:25, 1478:12, 1478:22, 1479:12, 1482:2, 1483:20, 1486:22, 1488:20, 1489:19, 1489:24, 1490:20, 1491:11, 1492:2, 1496:19, 1497:23, 1502:9, 1505:24, 1513:5, 1513:20
calculated [10] - 1455:1, 1463:22, 1483:17, 1484:5, 1486:13, 1496:20, 1500:19, 1504:19, 1505:23, 1518:22
calculates [1] - 1478:8
calculating [6] - 1455:8, 1461:12, 1469:20, 1489:15, 1512:24, 1518:16
calculation [7] - 1455:9, 1484:11, 1491:16, 1500:1, 1503:19, 1503:24, 1507:21
calculations [8] - 1471:6, 1483:24, 1484:7, 1486:3, 1487:3, 1489:21, 1505:5
camera [1] - 1456:8
cannot [2] - 1521:25, 1548:3
captured [1] - 1493:4
cards [1] - 1514:15
care [3] - 1537:9, 1542:21, 1547:13
careful [1] - 1474:21
carefully [3] - 1478:7, 1491:17, 1496:16
carefulness [1] - 1530:7
carried [1] - 1526:3
case [29] - 1454:2, 1458:6, 1459:12, 1460:7, 1461:17, 1462:4, 1470:24, 1476:9, 1483:18, 1493:13, 1513:21, 1522:9, 1536:23, 1537:19, 1538:5, 1538:18, 1539:20,

1540:24, 1542:7, 1543:6, 1543:20, 1543:21, 1543:22, 1544:2, 1546:8, 1546:9, 1547:5
cases [5] - 1522:10, 1523:20, 1523:24, 1537:8, 1543:10
cash [40] - 1459:22, 1460:24, 1461:1, 1461:6, 1461:13, 1461:16, 1461:19, 1466:24, 1474:17, 1474:21, 1478:3, 1478:8, 1482:7, 1483:7, 1483:17, 1488:17, 1489:21, 1492:1, 1492:2, 1492:3, 1496:7, 1497:4, 1497:6, 1497:25, 1499:6, 1500:14, 1501:5, 1503:8, 1504:21, 1505:25, 1506:2, 1507:15, 1507:18, 1508:1, 1508:8, 1508:13, 1509:2, 1509:9, 1513:6, 1514:2
cat's [1] - 1547:17
ceiling [3] - 1528:20, 1528:22, 1528:25
cents [1] - 1477:23
CERCLA [82] - 1460:25, 1461:17, 1461:25, 1462:3, 1462:8, 1462:19, 1464:18, 1464:20, 1466:24, 1478:14, 1479:15, 1479:21, 1479:23, 1479:25, 1480:9, 1480:14, 1480:17, 1480:18, 1481:2, 1481:12, 1481:13, 1481:19, 1485:23, 1488:13, 1489:5, 1489:13, 1489:17, 1495:12, 1496:6, 1496:17, 1496:18, 1498:1, 1498:10, 1498:18, 1498:25, 1499:6, 1499:11, 1499:15, 1499:20, 1499:23, 1499:24, 1500:2, 1500:11, 1500:13, 1502:4, 1510:2, 1512:22, 1513:9, 1513:16, 1515:19, 1516:8, 1516:20,

1517:7, 1517:22, 1519:18, 1523:22, 1524:5, 1524:12, 1525:3, 1527:13, 1530:18, 1531:14, 1532:14, 1532:15, 1533:12, 1534:5, 1534:6, 1534:8, 1535:12, 1535:16, 1535:17, 1535:23, 1536:25, 1537:8, 1540:1, 1541:19, 1543:18, 1546:11
certain [7] - 1473:19, 1485:25, 1525:19, 1528:20, 1544:15, 1544:16, 1545:3
certainly [6] - 1493:4, 1497:25, 1498:2, 1503:21, 1526:7, 1534:22
certainty [1] - 1458:12
CERTIFICATE [1] - 1549:9
certify [1] - 1549:10
CFR [1] - 1533:22
chance [2] - 1459:7, 1536:11
change [5] - 1485:22, 1487:15, 1500:18, 1507:14, 1532:11
changed [1] - 1520:11
changes [1] - 1507:20
characterization [1] - 1546:7
charge [2] - 1536:20, 1545:18
charged [1] - 1495:2
charges [1] - 1494:19
chart [4] - 1470:5, 1480:12, 1484:24, 1503:25
charts [2] - 1477:10, 1482:17
choose [1] - 1535:12
chosen [1] - 1514:6
chronology [1] - 1541:16
chunk [1] - 1478:17
citation [4] - 1529:18, 1530:7, 1530:8, 1546:17
cite [3] - 1530:1, 1533:19, 1546:19
civil [1] - 1454:2
Claim [1] - 1526:1
claims [3] - 1534:9, 1541:18, 1541:19
clarification [2] - 1454:23, 1521:17

clarified [1] - 1521:18
clarify [3] - 1483:1, 1544:5, 1545:12
classify [1] - 1545:14
clean [1] - 1532:16
cleaning [1] - 1496:3
cleanup [16] - 1462:5, 1471:15, 1488:25, 1495:24, 1499:3, 1506:15, 1506:18, 1508:2, 1510:17, 1510:22, 1511:3, 1511:4, 1518:1, 1527:20, 1527:22
cleanups [1] - 1532:7
clear [6] - 1488:18, 1507:13, 1509:22, 1511:2, 1519:6, 1535:17
CLERK [2] - 1454:2, 1530:5
clerk [1] - 1521:19
clients [1] - 1511:16
close [1] - 1525:4
Cold [1] - 1532:18
colleague [1] - 1474:14
collect [1] - 1511:21
collected [1] - 1515:3
colors [2] - 1462:8, 1464:15
COLUMBIA [1] - 1452:1
column [12] - 1477:18, 1482:14, 1482:15, 1482:22, 1482:23, 1482:24, 1484:3, 1484:15, 1484:17, 1484:21, 1505:8
columns [4] - 1485:1, 1503:4, 1507:4, 1510:18
coming [7] - 1466:5, 1476:13, 1477:24, 1505:12, 1509:2, 1534:1, 1547:17
commercial [6] - 1494:7, 1494:17, 1494:20, 1494:25, 1495:2, 1511:16
companies [1] - 1524:1
company [6] - 1498:24, 1499:19, 1499:22, 1520:15, 1520:17, 1523:21
compare [11] - 1469:16, 1475:11, 1489:24, 1491:14,

1503:4, 1510:17,
1512:19, 1512:21,
1514:12, 1543:5,
1543:9
**compared** [3] -
1491:15, 1501:4,
1515:1
**comparing** [7] -
1499:11, 1499:15,
1501:9, 1513:18,
1514:25, 1515:6,
1515:14
**compensate** [1] -
1516:17
**compete** [2] -
1494:10, 1494:11
**competitive** [1] -
1494:12
**competitiveness** [1] -
1495:17
**complaint** [1] -
1521:21
**complete** [1] - 1483:7
**complicated** [1] -
1475:18
**compound** [3] -
1500:25, 1501:2,
1501:3
**compounded** [2] -
1454:21, 1500:22
**Comptroller** [5] -
1529:24, 1530:10,
1546:10, 1546:14,
1546:18
**computer** [2] -
1453:25, 1509:21
**computer-aided** [1] -
1453:25
**conceivable** [1] -
1542:1
**concept** [1] - 1526:3
**conceptual** [1] -
1495:23
**concerning** [1] -
1543:22
**conditions** [1] -
1494:21
**conferring** [1] -
1521:19
**confidential** [3] -
1456:12, 1456:14,
1522:1
**confirm** [2] - 1507:2,
1510:18
**confused** [1] -
1517:19
**Congress** [2] -
1529:15, 1546:17
**Connecticut** [1] -
1452:17

**Consent** [1] - 1539:6
**consent** [12] -
1457:12, 1523:6,
1525:11, 1525:12,
1525:16, 1531:22,
1534:17, 1534:18,
1537:22, 1538:10,
1538:14, 1539:23
**consequences** [1] -
1490:5
**conservative** [1] -
1487:13
**consider** [9] -
1491:22, 1496:22,
1497:4, 1506:2,
1507:15, 1523:15,
1523:22, 1536:3,
1536:15
**consideration** [6] -
1472:21, 1512:4,
1519:18, 1523:14,
1543:1, 1543:3
**considered** [6] -
1488:22, 1490:3,
1497:6, 1498:8,
1503:8, 1524:6
**considering** [3] -
1489:14, 1498:2,
1535:22
**considers** [3] -
1461:19, 1488:17,
1489:6
**consistent** [1] -
1491:8
**constitute** [1] -
1535:18
**Constitution** [1] -
1453:2
**constructed** [1] -
1490:13
**contain** [1] - 1535:10
**contending** [1] -
1484:11
**contingent** [2] -
1528:1, 1528:6
**continue** [1] - 1485:1
**continues** [1] -
1498:24
**continuing** [2] -
1462:4, 1507:1
**Contract** [2] - 1526:1,
1533:23
**contract** [27] -
1472:11, 1472:12,
1472:15, 1473:10,
1473:13, 1473:14,
1475:13, 1493:21,
1509:3, 1524:3,
1527:14, 1528:1,
1528:3, 1529:10,

1531:3, 1533:1,
1543:7, 1543:11,
1543:15, 1544:3,
1544:6, 1544:8,
1544:21, 1545:12,
1545:20, 1545:21
**contract's** [1] -
1515:17
**contractor** [1] -
1528:6
**contracts** [30] -
1459:18, 1460:5,
1460:10, 1460:13,
1463:25, 1466:5,
1471:7, 1472:16,
1472:19, 1472:21,
1473:8, 1493:1,
1493:14, 1493:16,
1494:10, 1494:21,
1494:22, 1524:9,
1524:25, 1527:25,
1533:9, 1533:12,
1537:5, 1537:25,
1538:4, 1538:7,
1544:8, 1545:19,
1545:23
**contradicts** [1] -
1546:9
**control** [1] - 1492:23
**convenience** [1] -
1458:18
**converted** [1] - 1505:6
**converts** [1] - 1485:16
**convey** [2] - 1460:22,
1461:18
**convinced** [2] -
1474:14, 1475:6
**copy** [1] - 1458:17
**corner** [1] - 1482:19
**corporate** [4] -
1461:9, 1476:13,
1487:11, 1545:11
**CORPORATION** [1] -
1452:3
**Corporation** [1] -
1454:3
**correct** [59] - 1454:13,
1457:16, 1459:14,
1459:18, 1460:10,
1460:13, 1464:1,
1464:23, 1465:11,
1467:18, 1469:4,
1469:9, 1471:1,
1471:4, 1474:8,
1481:6, 1483:18,
1483:23, 1484:16,
1486:14, 1486:17,
1486:23, 1487:10,
1487:23, 1488:7,
1488:15, 1489:23,

1489:25, 1490:3,
1494:6, 1495:6,
1495:9, 1495:22,
1496:20, 1496:23,
1497:16, 1497:18,
1498:10, 1498:12,
1499:7, 1499:12,
1503:15, 1504:8,
1504:9, 1506:16,
1506:20, 1506:21,
1507:4, 1507:12,
1508:14, 1510:19,
1510:24, 1515:2,
1515:8, 1515:10,
1517:15, 1519:8,
1526:13, 1549:11
**Correct** [1] - 1494:7
**correctly** [4] - 1462:7,
1469:15, 1480:5,
1484:12
**Cost** [1] - 1526:1
**cost** [102] - 1461:3,
1461:4, 1462:5,
1462:25, 1463:2,
1463:15, 1463:22,
1465:6, 1466:18,
1466:22, 1467:2,
1470:8, 1470:25,
1471:3, 1471:7,
1471:20, 1474:7,
1474:11, 1474:12,
1474:18, 1475:19,
1477:23, 1478:2,
1478:10, 1480:9,
1481:19, 1483:18,
1483:20, 1484:12,
1485:11, 1485:24,
1486:20, 1487:1,
1488:6, 1489:2,
1489:10, 1490:3,
1491:11, 1494:23,
1495:11, 1495:20,
1495:21, 1496:3,
1496:12, 1496:15,
1497:21, 1497:23,
1498:3, 1498:9,
1499:17, 1501:10,
1503:20, 1503:21,
1503:22, 1504:1,
1504:2, 1504:22,
1505:9, 1505:18,
1505:19, 1505:23,
1506:4, 1506:5,
1506:6, 1506:18,
1507:1, 1507:3,
1507:11, 1508:2,
1508:3, 1508:18,
1511:5, 1512:25,
1513:8, 1513:12,
1514:1, 1514:13,
1515:12, 1515:13,

1516:7, 1517:6,
1518:1, 1519:11,
1524:2, 1526:24,
1527:20, 1527:22,
1529:3, 1529:11,
1531:1, 1532:3,
1533:16, 1536:20,
1536:22, 1536:24,
1543:8, 1544:15,
1544:16, 1544:18,
1545:3, 1545:5,
1545:10
**costs** [106] - 1455:5,
1461:18, 1461:20,
1461:22, 1462:2,
1463:20, 1464:5,
1464:10, 1465:1,
1465:4, 1466:25,
1467:3, 1467:7,
1467:16, 1467:21,
1467:24, 1468:1,
1468:3, 1468:6,
1468:22, 1469:6,
1470:3, 1470:4,
1470:17, 1470:23,
1470:25, 1471:15,
1472:9, 1472:24,
1474:25, 1475:10,
1476:2, 1476:6,
1476:17, 1477:21,
1477:22, 1478:13,
1479:13, 1479:15,
1479:17, 1479:24,
1480:1, 1480:18,
1480:19, 1481:1,
1481:4, 1481:10,
1488:25, 1489:11,
1489:13, 1490:4,
1490:16, 1491:3,
1491:12, 1495:24,
1496:5, 1496:7,
1496:14, 1497:18,
1497:19, 1498:4,
1498:6, 1498:20,
1501:14, 1502:7,
1511:3, 1512:5,
1512:24, 1516:9,
1516:19, 1517:23,
1518:4, 1519:20,
1524:8, 1524:23,
1527:6, 1527:20,
1527:22, 1528:1,
1528:4, 1528:5,
1528:6, 1528:8,
1528:14, 1528:15,
1528:17, 1528:20,
1529:9, 1529:11,
1532:4, 1532:10,
1537:25, 1538:3,
1539:22, 1539:24,
1543:13, 1544:7,

1544:10, 1544:24,
1545:7, 1545:8,
1545:15
**Counsel** [1] - 1479:8
**count** [1] - 1524:5
**counter** [1] - 1547:23
**counter-proffer** [1] -
1547:23
**countersued** [1] -
1540:19
**counting** [1] - 1471:7
**couple** [3] - 1521:14,
1521:18, 1529:12
**course** [1] - 1467:12
**COURT** [302] - 1452:1,
1454:6, 1454:11,
1455:9, 1455:19,
1455:24, 1456:3,
1456:10, 1456:17,
1456:21, 1457:2,
1457:5, 1457:21,
1458:15, 1458:20,
1458:23, 1460:20,
1462:7, 1462:11,
1462:13, 1462:17,
1463:13, 1463:25,
1464:2, 1464:8,
1464:11, 1464:13,
1464:21, 1464:24,
1465:9, 1465:16,
1465:25, 1466:4,
1466:11, 1466:20,
1467:1, 1467:5,
1467:10, 1467:13,
1467:19, 1467:23,
1468:2, 1468:7,
1468:9, 1468:14,
1468:16, 1468:19,
1469:1, 1469:5,
1469:9, 1469:11,
1469:17, 1469:21,
1470:11, 1470:13,
1470:18, 1471:11,
1471:14, 1471:19,
1471:22, 1471:25,
1472:3, 1472:17,
1473:2, 1473:19,
1474:2, 1474:5,
1474:14, 1475:2,
1475:5, 1475:15,
1475:25, 1476:4,
1476:12, 1476:22,
1477:6, 1477:10,
1477:15, 1478:9,
1478:17, 1478:25,
1479:5, 1479:7,
1479:18, 1480:2,
1480:6, 1480:11,
1480:15, 1480:21,
1480:24, 1481:4,

1481:7, 1481:9,
1481:15, 1481:22,
1482:16, 1482:20,
1483:11, 1484:17,
1484:21, 1484:23,
1485:3, 1485:5,
1485:8, 1485:18,
1486:5, 1486:11,
1487:3, 1487:8,
1487:12, 1487:15,
1487:21, 1490:18,
1490:22, 1490:24,
1491:4, 1491:6,
1491:8, 1492:5,
1492:10, 1492:13,
1493:20, 1493:24,
1494:10, 1494:14,
1496:1, 1496:24,
1497:2, 1497:7,
1500:7, 1500:15,
1500:22, 1502:11,
1502:13, 1502:15,
1503:1, 1503:6,
1503:9, 1506:3,
1506:8, 1506:12,
1508:20, 1508:25,
1509:5, 1509:11,
1509:13, 1509:23,
1509:25, 1510:10,
1510:12, 1511:19,
1511:22, 1512:1,
1512:17, 1513:11,
1513:15, 1513:22,
1514:4, 1514:10,
1514:18, 1514:22,
1515:3, 1515:5,
1515:9, 1515:16,
1515:24, 1516:3,
1516:10, 1516:12,
1517:1, 1517:11,
1517:16, 1518:16,
1518:19, 1519:1,
1519:5, 1519:13,
1519:16, 1519:24,
1520:2, 1520:7,
1520:16, 1520:20,
1520:24, 1521:3,
1521:6, 1521:10,
1521:14, 1521:17,
1522:3, 1522:17,
1522:20, 1522:24,
1523:2, 1523:10,
1523:13, 1523:19,
1524:15, 1524:17,
1524:20, 1525:7,
1525:10, 1525:15,
1525:21, 1525:23,
1526:2, 1526:14,
1526:17, 1526:20,
1526:25, 1527:5,
1527:8, 1528:2,

1528:9, 1528:18,
1528:22, 1529:1,
1529:5, 1529:19,
1530:1, 1530:3,
1530:6, 1530:12,
1530:22, 1530:25,
1531:5, 1531:18,
1531:20, 1532:5,
1532:19, 1532:24,
1533:10, 1533:14,
1533:18, 1533:22,
1533:24, 1534:10,
1534:12, 1534:15,
1534:18, 1535:2,
1535:5, 1535:13,
1535:18, 1535:20,
1535:25, 1536:5,
1536:8, 1536:13,
1537:2, 1537:6,
1537:9, 1538:8,
1538:12, 1538:16,
1538:18, 1538:25,
1539:3, 1539:8,
1539:12, 1539:17,
1540:3, 1540:6,
1540:9, 1540:12,
1540:14, 1540:17,
1540:19, 1540:23,
1541:2, 1541:5,
1541:7, 1541:9,
1541:13, 1541:16,
1541:23, 1541:25,
1542:4, 1542:8,
1542:11, 1542:13,
1542:15, 1543:4,
1543:14, 1543:19,
1543:23, 1544:11,
1544:21, 1545:4,
1545:14, 1545:22,
1546:1, 1546:4,
1546:21, 1546:25,
1547:2, 1547:7,
1547:10, 1548:2,
1548:6, 1548:8,
1548:10
**Court** [10] - 1453:1,
1453:1, 1456:23,
1467:16, 1482:1,
1488:2, 1516:17,
1521:19, 1524:7,
1549:10
**court** [3] - 1467:21,
1528:10, 1537:14
**Court's** [1] - 1523:14
**Courthouse** [1] -
1453:2
**courts** [2] - 1517:8,
1535:22
**covered** [2] - 1523:22,
1535:2

**covers** [2] - 1475:8,
1526:14
**created** [2] - 1533:3,
1533:13
**creation** [1] - 1534:20
**credit** [62] - 1456:1,
1459:13, 1459:17,
1460:4, 1462:2,
1462:9, 1462:14,
1462:15, 1464:18,
1465:21, 1465:22,
1466:12, 1466:19,
1466:21, 1466:23,
1473:9, 1473:11,
1473:19, 1474:12,
1476:14, 1478:4,
1484:16, 1484:18,
1484:21, 1485:7,
1485:10, 1486:14,
1492:23, 1493:6,
1493:23, 1493:24,
1493:25, 1494:2,
1496:8, 1497:16,
1497:20, 1499:7,
1499:8, 1499:12,
1501:10, 1504:1,
1504:22, 1505:13,
1505:17, 1505:20,
1505:24, 1505:25,
1506:4, 1506:8,
1507:12, 1513:14,
1518:12, 1519:7,
1524:13, 1525:2,
1525:6, 1525:13,
1526:8, 1527:12,
1533:13
**credited** [5] - 1459:23,
1460:8, 1478:14,
1518:11, 1518:13
**crediting** [2] - 1518:8,
1539:2, 1539:10
**credits** [12] - 1465:20,
1474:25, 1476:7,
1492:25, 1498:18,
1499:15, 1500:2,
1500:11, 1501:14,
1502:9, 1503:20,
1525:1
**criticism** [1] - 1512:3
**cross** [1] - 1458:19
**Cross** [1] - 1549:4
**CROSS** [1] - 1459:1
**CROSS-
EXAMINATION** [1] -
1459:1
**Cross-Examination..
..................** [1] -
1549:4
**CRR** [1] - 1453:1
**Crutcher** [1] - 1452:16

**cumulative** [1] -
1463:21
**curious** [2] - 1454:12,
1528:12
**current** [3] - 1460:25,
1467:15, 1515:13
**customer** [6] -
1455:13, 1455:15,
1457:9, 1524:7,
1531:8, 1546:5
**customers** [14] -
1460:5, 1494:6,
1494:7, 1494:20,
1495:1, 1495:2,
1495:14, 1495:25,
1524:13, 1530:15,
1530:17, 1530:20,
1530:24, 1531:3
**cut** [1] - 1487:18

# D

**D.C** [1] - 1452:6
**damages** [2] - 1520:8,
1520:11
**dark** [7] - 1461:7,
1463:4, 1463:9,
1463:19, 1466:18,
1489:6, 1501:25
**date** [4] - 1454:25,
1538:23, 1540:11,
1541:13
**dates** [1] - 1464:14
**DAVID** [1] - 1452:15
**DAY** [1] - 1452:9
**days** [1] - 1546:11
**DC** [3] - 1452:17,
1452:25, 1453:3
**DCAA** [4] - 1528:16,
1529:2, 1533:15
**DCMA** [2] - 1528:16,
1537:23
**deal** [5] - 1455:2,
1455:8, 1503:9,
1523:24, 1539:11
**debate** [2] - 1500:24,
1502:15
**decide** [1] - 1487:15
**deciding** [1] - 1547:19
**decision** [5] -
1455:14, 1528:10,
1529:24, 1530:10,
1547:18
**decision-maker** [1] -
1547:18
**declaration** [8] -
1458:6, 1458:8,
1458:22, 1459:8,
1460:16, 1477:9,

1502:20, 1516:25
**Decree** [1] - 1539:6
**decree** [14] - 1523:6,
1525:11, 1525:12,
1525:16, 1525:21,
1526:6, 1526:9,
1531:22, 1534:17,
1534:18, 1537:22,
1538:10, 1538:14,
1539:23
**DEFENDANT** [1] -
1458:1
**Defendant** [2] -
1452:7, 1452:19
**Defense** [2] - 1452:23,
1533:23
**defense** [2] - 1528:3,
1542:2
**defenses** [5] -
1535:11, 1540:8,
1542:17, 1543:18,
1543:22
**define** [4] - 1493:3,
1499:21, 1501:8,
1545:14
**defined** [1] - 1496:16
**definitely** [2] - 1498:7,
1511:4
**definition** [1] -
1481:11
**degree** [1] - 1458:11
**delayed** [2] - 1496:5,
1513:2
**deliver** [2] - 1472:13,
1522:4
**Deloitte** [1] - 1457:20
**demand** [7] - 1455:6,
1455:7, 1518:21,
1519:10, 1519:12,
1538:20
**demand's** [1] -
1455:22
**demonstrably** [5] -
1498:22, 1499:1,
1499:19, 1500:6,
1501:16
**demonstrate** [1] -
1514:3
**Demonstrative** [2] -
1502:16, 1510:14
**demonstrative** [2] -
1466:2, 1481:23
**Department** [1] -
1452:22
**dependent** [2] -
1473:13, 1473:14
**depo** [1] - 1511:10
**DEPUTY** [1] - 1454:2
**derive** [1] - 1484:14
**derived** [4] - 1497:15,

1507:11, 1508:4,
1508:6
**derives** [1] - 1493:9
**deriving** [5] - 1459:16,
1488:6, 1492:24,
1493:15, 1504:21
**describe** [1] - 1491:21
**describing** [1] -
1473:24
**desires** [1] - 1537:14
**detail** [1] - 1478:7
**determine** [6] -
1475:20, 1485:13,
1506:15, 1527:16,
1539:17, 1544:17
**determined** [1] -
1475:16
**detriment** [1] - 1497:9
**dictate** [1] - 1536:19
**differ** [2] - 1469:12,
1486:3
**difference** [17] -
1469:13, 1469:23,
1469:24, 1470:2,
1470:13, 1470:20,
1479:14, 1480:13,
1480:19, 1481:2,
1489:19, 1491:11,
1503:19, 1507:10,
1509:17, 1510:18
**differences** [3] -
1476:10, 1490:14,
1507:15
**different** [12] -
1454:15, 1511:14,
1512:10, 1512:11,
1512:21, 1514:14,
1520:19, 1523:2,
1529:12, 1533:2,
1533:4
**differently** [1] -
1468:22
**differs** [1] - 1520:17
**dimension** [2] -
1474:16, 1517:10
**dimensions** [1] -
1465:13
**DIRECT** [1] - 1458:2
**Direct** [1] - 1549:3
**direct** [11] - 1488:18,
1523:25, 1524:1,
1538:5, 1538:8,
1538:13, 1538:22,
1539:23, 1544:8,
1545:12
**directing** [1] - 1516:24
**directly** [6] - 1465:8,
1471:9, 1472:10,
1524:2, 1544:20,
1544:25

**disagree** [6] - 1454:9,
1534:10, 1534:12,
1535:13, 1536:1,
1546:6
**disagreement** [4] -
1467:1, 1469:2,
1472:25, 1473:4
**disallow** [1] - 1529:8
**disallowal** [1] - 1529:4
**disallowed** [2] -
1529:5, 1529:6
**disallowing** [1] -
1544:23
**disc** [13] - 1459:14,
1459:23, 1460:7,
1460:8, 1471:13,
1473:8, 1473:21,
1473:25, 1475:8,
1493:1, 1493:13,
1523:8, 1523:11
**disconnect** [1] -
1476:6
**discontinued** [11] -
1457:4, 1471:4,
1518:12, 1524:8,
1524:23, 1525:9,
1526:8, 1526:24,
1536:22, 1536:24,
1547:25
**discount** [1] - 1520:3
**discounting** [1] -
1520:4
**discuss** [2] - 1510:25,
1536:14
**discussing** [1] -
1522:10
**discussion** [1] -
1522:8
**dispute** [1] - 1544:22
**disputes** [1] - 1545:3
**dissimilar** [1] - 1515:6
**distinction** [1] -
1489:22
**DISTRICT** [3] -
1452:1, 1452:1,
1452:11
**District** [1] - 1540:25
**dive** [1] - 1503:23
**divide** [1] - 1463:2
**divided** [3] - 1471:20,
1506:25, 1508:3
**diving** [1] - 1484:1
**document** [2] -
1456:8, 1457:7
**documents** [2] -
1474:4, 1547:13
**DoD** [8] - 1506:6,
1510:2, 1530:14,
1531:7, 1539:21,
1542:22, 1544:12

**dodge** [1] - 1487:9
**DOJ** [2] - 1542:22,
1546:12
**dollar** [2] - 1468:5,
1478:18
**dollars** [18] - 1462:21,
1463:10, 1468:5,
1468:11, 1468:12,
1468:16, 1470:8,
1480:24, 1485:15,
1499:3, 1505:4,
1510:17, 1510:22,
1511:1, 1511:8,
1517:8, 1520:21
**done** [7] - 1467:13,
1484:7, 1485:15,
1505:5, 1509:21,
1511:15, 1514:3
**doors** [1] - 1542:8
**DOSA** [17] - 1523:9,
1525:6, 1531:23,
1534:8, 1534:24,
1535:10, 1536:19,
1538:21, 1539:1,
1539:4, 1539:5,
1543:5, 1543:6,
1543:7, 1543:17
**dOSA** [1] - 1523:13
**Double** [1] - 1525:25
**double** [18] - 1523:20,
1524:10, 1525:5,
1525:12, 1526:2,
1526:14, 1526:23,
1527:9, 1527:10,
1532:20, 1535:8,
1535:12, 1535:22,
1538:24, 1542:7,
1543:6, 1543:10,
1548:2
**doubting** [1] - 1530:7
**down** [29] - 1460:3,
1460:6, 1472:9,
1472:11, 1474:12,
1475:10, 1476:6,
1476:12, 1476:20,
1478:2, 1481:20,
1482:19, 1497:8,
1507:23, 1507:25,
1519:2, 1521:13,
1524:9, 1524:13,
1524:24, 1524:25,
1525:13, 1527:15,
1543:15, 1544:18,
1545:2, 1545:11
**downtown** [1] -
1457:20
**Dr** [63] - 1455:17,
1457:24, 1458:4,
1458:6, 1459:3,
1459:7, 1459:10,

1459:16, 1459:21,
1460:1, 1460:3,
1463:12, 1470:22,
1473:1, 1474:7,
1477:4, 1478:24,
1482:1, 1483:5,
1483:14, 1483:15,
1484:10, 1485:10,
1486:13, 1487:23,
1488:10, 1488:20,
1489:23, 1491:20,
1492:16, 1492:24,
1493:14, 1494:5,
1495:14, 1495:20,
1495:24, 1497:12,
1497:14, 1498:15,
1498:16, 1499:14,
1500:4, 1501:7,
1501:21, 1502:19,
1502:25, 1503:7,
1503:10, 1503:14,
1503:18, 1504:19,
1505:16, 1506:14,
1509:2, 1510:17,
1510:23, 1511:9,
1512:9, 1512:14,
1516:6, 1516:16,
1516:24, 1518:8
**dragging** [1] - 1509:15
**dramatically** [1] -
1520:11
**driven** [2] - 1463:6,
1466:24
**drops** [1] - 1481:21
**dumb** [1] - 1547:2
**Dunn** [1] - 1452:16
**during** [2] - 1454:9,
1532:18

**E**

**early** [2] - 1526:6,
1546:11
**earn** [1] - 1474:19
**earned** [3] - 1461:11,
1477:23, 1490:5
**earning** [1] - 1486:19
**ease** [2] - 1471:16,
1505:2
**easier** [3] - 1462:16,
1483:25, 1510:12
**economic** [86] -
1459:5, 1459:11,
1459:16, 1460:13,
1460:23, 1461:13,
1461:19, 1468:20,
1468:25, 1469:13,
1469:20, 1470:6,
1470:7, 1475:1,
1478:10, 1478:12,

1478:18, 1479:10,
1479:12, 1479:15,
1479:16, 1479:22,
1479:24, 1480:6,
1480:10, 1480:17,
1480:18, 1481:13,
1482:2, 1487:19,
1488:1, 1488:5,
1488:14, 1488:16,
1490:11, 1490:13,
1492:24, 1493:3,
1493:4, 1493:8,
1493:9, 1493:15,
1493:17, 1494:8,
1495:8, 1495:10,
1496:15, 1496:16,
1496:20, 1496:22,
1497:9, 1497:15,
1497:23, 1498:25,
1499:20, 1499:21,
1500:3, 1500:4,
1503:18, 1504:1,
1504:21, 1507:11,
1507:16, 1507:23,
1507:25, 1508:7,
1508:13, 1509:3,
1509:6, 1510:24,
1510:25, 1512:8,
1513:5, 1513:9,
1515:5, 1515:11,
1515:24, 1515:25,
1516:19, 1516:22,
1516:23, 1517:21,
1519:17, 1520:8,
1520:10
**economically** [1] -
1515:7
**Economics** [1] -
1511:12
**economist** [2] -
1515:9, 1520:20
**effect** [3] - 1478:5,
1510:21, 1510:24
**effective** [6] -
1481:16, 1506:20,
1507:20, 1508:11,
1508:19, 1518:5
**effectively** [7] -
1471:6, 1481:18,
1481:21, 1490:8,
1503:22, 1507:14,
1517:25
**effects** [3] - 1461:9,
1510:19, 1510:23
**efficacy** [1] - 1524:21
**efforts** [1] - 1528:15
**either** [2] - 1473:20,
1523:25
**element** [4] - 1486:18,
1493:4, 1493:9,

1497:15
**elephant** [1] - 1535:6
**ELLEN** [1] - 1452:10
**elucidate** [1] -
1547:14
**embraced** [1] -
1512:14
**empirical** [2] - 1502:9,
1513:19
**empirically** [1] -
1514:3
**end** [3] - 1492:22,
1494:24, 1530:15
**engaged** [1] - 1532:18
**English** [1] - 1465:25
**ENRD** [1] - 1452:23
**enter** [1] - 1539:22
**entered** [1] - 1538:11
**entire** [4] - 1459:13,
1460:4, 1473:24,
1488:6
**entitled** [1] - 1549:12
**entity** [1] - 1520:14
**environmental** [7] -
1498:20, 1499:16,
1528:5, 1536:20,
1537:24, 1539:24,
1545:8
**Environmental** [1] -
1452:23
**equal** [2] - 1488:1,
1488:10
**equitable** [17] -
1512:7, 1523:14,
1523:22, 1524:6,
1524:11, 1527:9,
1527:10, 1529:12,
1535:13, 1535:23,
1536:14, 1542:1,
1542:2, 1542:17,
1542:19, 1543:10,
1543:25
**equities** [1] - 1536:7
**equity** [3] - 1529:13,
1530:25, 1536:3
**ERICA** [1] - 1452:19
**ESH** [1] - 1452:5
**ESQ** [11] - 1452:13,
1452:14, 1452:14,
1452:15, 1452:15,
1452:19, 1452:19,
1452:20, 1452:20,
1452:21, 1452:21
**essentially** [6] -
1461:21, 1463:2,
1477:24, 1485:15,
1527:11, 1530:18
**establish** [2] - 1533:7,
1533:12
**establishes** [2] -

1467:21, 1532:14
**establishing** [1] -
1532:14
**estimate** [15] -
1461:13, 1467:11,
1477:23, 1479:3,
1479:22, 1488:17,
1490:14, 1491:18,
1492:1, 1492:3,
1494:1, 1503:21,
1514:2, 1516:23,
1517:21
**estimated** [9] -
1461:4, 1461:8,
1462:5, 1463:8,
1477:21, 1479:16,
1504:15, 1504:17,
1519:23
**estimates** [5] -
1467:4, 1467:12,
1467:15, 1490:17,
1506:2
**estimating** [2] -
1461:12, 1515:13
**eventually** [1] - 1532:1
**evidence** [8] - 1523:1,
1525:19, 1535:8,
1537:11, 1546:23,
1547:4, 1547:11,
1547:20
**exact** [1] - 1540:11
**exactly** [7] - 1473:10,
1473:16, 1506:7,
1506:11, 1531:15,
1538:21, 1547:10
**EXAMINATION** [3] -
1458:2, 1459:1,
1516:4
**Examination..............
........** [1] - 1549:4
**Examination..............
..........** [1] - 1549:3
**Examination..............
...........** [1] - 1549:4
**example** [7] - 1459:21,
1459:22, 1462:21,
1474:7, 1485:23,
1493:15, 1536:23
**Excel** [2] - 1483:5,
1502:24
**excerpt** [2] - 1483:4,
1483:9
**excerpted** [2] -
1482:23, 1483:2
**exchange** [2] -
1509:9, 1545:17
**excluded** [2] -
1525:18, 1547:3
**excuse** [1] - 1521:18
**Excuse** [1] - 1526:19

**excused** [1] - 1521:11
**executed** [1] -
1457:12
**executive** [1] - 1546:8
**exhibit** [3] - 1488:8,
1525:16, 1533:21
**Exhibit** [9] - 1477:1,
1482:6, 1483:6,
1488:19, 1502:21,
1503:4, 1504:4,
1506:14, 1526:18
**exhibits** [3] - 1458:16,
1525:17, 1526:4
**exist** [1] - 1533:2
**expect** [1] - 1537:15
**expectation** [1] -
1532:1
**expended** [1] -
1545:15
**expert** [4] - 1456:23,
1471:7, 1475:15,
1476:22
**experts** [1] - 1470:2
**explain** [6] - 1460:15,
1465:25, 1475:7,
1488:9, 1491:24,
1504:24
**explained** [1] -
1503:11
**explaining** [1] -
1482:1
**explanation** [1] -
1463:12
**explicit** [1] - 1531:13
**explicitly** [1] - 1527:25
**explore** [1] - 1454:25
**extent** [5] - 1468:20,
1508:12, 1527:22,
1542:19, 1545:9
**extraordinarily** [1] -
1500:20
**extraordinary** [1] -
1509:14
**extreme** [1] - 1495:1

---

**F**

---

**face** [1] - 1542:20
**fact** [23] - 1455:7,
1456:13, 1467:6,
1475:22, 1486:19,
1490:18, 1492:25,
1493:5, 1493:9,
1493:19, 1494:2,
1498:2, 1500:1,
1500:15, 1504:16,
1506:1, 1513:1,
1513:13, 1514:12,
1517:4, 1517:9,

1526:11, 1538:22
**factor** [24] - 1461:10,
1463:5, 1463:24,
1471:16, 1473:7,
1474:3, 1485:14,
1486:8, 1490:15,
1503:20, 1504:2,
1504:3, 1504:13,
1504:15, 1504:18,
1504:23, 1505:14,
1507:1, 1505:20,
1506:5, 1513:3,
1529:12
**factored** [4] - 1504:23,
1532:13, 1545:17,
1545:22
**factors** [2] - 1503:15,
1545:19
**fair** [4] - 1468:19,
1530:21, 1531:2,
1531:3
**fallacy** [1] - 1514:24
**false** [5] - 1498:22,
1499:1, 1499:19,
1500:6, 1501:16
**familiar** [2] - 1471:10,
1515:12
**far** [4] - 1457:14,
1469:9, 1469:19,
1519:20
**fashion** [5] - 1496:5,
1513:2, 1536:9,
1542:1, 1543:24
**faster** [1] - 1457:21
**favorable** [1] -
1543:24
**February** [1] - 1452:7
**federal** [8] - 1459:17,
1460:4, 1460:10,
1460:13, 1493:14,
1493:16, 1524:4,
1532:2
**fictional** [1] - 1531:6
**field** [1] - 1458:12
**fifth** [1] - 1505:14
**figure** [36] - 1460:16,
1460:17, 1460:20,
1460:21, 1461:1,
1461:15, 1462:16,
1462:17, 1462:18,
1463:14, 1463:19,
1467:25, 1475:21,
1479:3, 1479:5,
1479:6, 1479:9,
1480:2, 1480:11,
1484:7, 1488:12,
1488:23, 1491:25,
1492:1, 1492:4,
1502:1, 1504:12,
1505:11, 1505:12,

1505:19, 1515:16,
1515:18, 1516:25,
1532:20
**Figure** [15] - 1495:22,
1497:5, 1498:1,
1498:3, 1498:14,
1501:24, 1502:19,
1503:12, 1503:14,
1503:16, 1503:17,
1504:13, 1517:20,
1519:3
**figured** [1] - 1473:3
**figures** [4] - 1464:10,
1467:7, 1489:3,
1519:7
**file** [1] - 1522:6
**filed** [7] - 1454:7,
1457:6, 1519:14,
1521:23, 1540:16,
1540:17, 1540:25
**filing** [1] - 1522:3
**filings** [1] - 1472:18
**finalized** [1] - 1537:22
**finally** [2] - 1473:3,
1534:25
**finance** [1] - 1475:24
**fine** [2] - 1521:23,
1536:25
**finger** [2] - 1477:15,
1477:17
**finished** [1] - 1492:6
**first** [28] - 1454:5,
1457:14, 1459:5,
1459:10, 1460:23,
1461:12, 1474:21,
1479:20, 1482:15,
1482:22, 1482:24,
1483:14, 1485:10,
1489:2, 1498:16,
1499:2, 1500:23,
1505:5, 1514:17,
1516:18, 1521:18,
1535:9, 1537:18,
1537:20, 1538:8,
1538:13, 1540:17,
1542:1
**Five** [1] - 1521:8
**five** [27] - 1459:24,
1463:1, 1463:21,
1463:24, 1464:22,
1466:12, 1466:17,
1473:22, 1477:22,
1478:14, 1478:15,
1482:25, 1487:25,
1488:6, 1491:22,
1496:5, 1496:9,
1497:16, 1497:19,
1497:20, 1498:5,
1501:14, 1501:15,
1501:17, 1501:18,

1502:8, 1505:23
**fixed** [1] - 1475:19
**fixed-price** [1] -
1475:19
**flag** [1] - 1457:6
**Fletcher** [3] - 1473:1,
1476:2, 1481:22
**FLETCHER** [58] -
1452:15, 1458:16,
1458:21, 1459:2,
1463:11, 1466:2,
1466:7, 1469:4,
1470:21, 1472:6,
1474:6, 1474:24,
1475:22, 1477:3,
1477:8, 1478:23,
1479:1, 1481:23,
1481:25, 1482:10,
1482:13, 1482:18,
1482:21, 1483:3,
1483:13, 1484:18,
1484:22, 1484:25,
1485:4, 1485:6,
1485:9, 1486:12,
1487:22, 1491:19,
1492:8, 1492:12,
1492:15, 1494:4,
1494:5, 1496:10,
1496:25, 1497:11,
1501:6, 1502:16,
1502:18, 1502:21,
1503:12, 1503:13,
1506:13, 1508:23,
1509:1, 1509:8,
1509:12, 1510:11,
1510:14, 1510:15,
1511:18, 1521:9
**flip** [2] - 1486:9,
1504:17
**floating** [2] - 1472:4,
1472:19
**flow** [13] - 1459:22,
1466:24, 1474:12,
1474:21, 1475:10,
1476:20, 1478:8,
1483:17, 1496:7,
1499:6, 1504:21,
1505:25, 1524:9
**flow-down** [1] -
1476:20
**flowed** [4] - 1472:11,
1524:13, 1525:13,
1527:15
**flowing** [3] - 1459:17,
1476:6
**flows** [33] - 1460:3,
1460:6, 1460:24,
1461:1, 1461:6,
1461:13, 1461:16,
1461:19, 1474:17,

1478:3, 1482:7,
1483:8, 1488:17,
1489:21, 1492:1,
1492:3, 1497:4,
1497:6, 1497:25,
1500:14, 1501:5,
1503:8, 1506:2,
1507:15, 1507:18,
1508:1, 1508:8,
1508:13, 1509:2,
1509:9, 1513:6,
1514:2
**focused** [1] - 1494:1
**focusing** [2] - 1500:5,
1516:6
**follow** [5] - 1457:15,
1458:23, 1470:22,
1474:10, 1478:24
**follow-up** [1] -
1478:24
**following** [6] -
1470:24, 1486:16,
1487:25, 1488:7,
1491:22, 1498:5
**footnote** [2] - 1457:6,
1457:7
**FOR** [2] - 1452:1,
1458:1
**forces** [1] - 1494:19
**foregoing** [1] -
1549:11
**foresaw** [1] - 1534:20
**forget** [1] - 1479:8
**forth** [2] - 1473:17,
1496:25
**forward** [9] - 1462:6,
1462:11, 1464:22,
1465:7, 1470:5,
1470:24, 1474:20,
1501:4, 1504:14
**FOTOUHI** [1] -
1452:15
**fought** [1] - 1544:12
**foundation** [2] -
1475:3, 1476:1
**frankly** [1] - 1457:9
**Friday** [1] - 1452:7
**front** [1] - 1525:14
**full** [5] - 1483:9,
1493:23, 1493:24,
1493:25, 1513:14
**function** [1] - 1474:1
**fund** [11] - 1455:11,
1455:25, 1456:2,
1456:13, 1456:14,
1476:18, 1527:20,
1529:17, 1529:22,
1530:9, 1546:13
**fundamental** [2] -
1469:2, 1509:25

**future** [47] - 1461:18,
1462:6, 1465:4,
1467:2, 1467:3,
1467:10, 1467:15,
1467:20, 1467:21,
1467:24, 1468:3,
1468:6, 1469:22,
1469:24, 1470:2,
1470:8, 1470:16,
1470:20, 1470:23,
1470:24, 1472:24,
1474:11, 1474:25,
1476:2, 1476:23,
1478:2, 1478:10,
1478:19, 1478:20,
1479:13, 1479:15,
1479:24, 1480:8,
1480:14, 1480:16,
1480:19, 1480:20,
1481:1, 1481:4,
1481:10, 1517:18,
1520:8, 1520:21,
1525:1, 1532:4,
1532:6

## G

**G&A** [1] - 1475:12
**gallop** [1] - 1509:15
**gap** [1] - 1465:19
**Gatchel** [2] - 1475:23,
1545:24
**general** [1] - 1485:21
**General** [5] - 1529:24,
1530:10, 1546:10,
1546:14, 1546:19
**generality** [1] -
1535:25, 1536:2
**gentleman** [1] -
1522:17
**get-go** [2] - 1513:25,
1542:25
**giant** [2] - 1464:4,
1496:7
**Gibson** [1] - 1452:16
**given** [7] - 1457:2,
1475:20, 1512:4,
1515:19, 1519:19,
1528:3, 1533:15
**gloss** [1] - 1541:17
**goal** [2] - 1515:20,
1515:22
**God** [2] - 1482:17,
1509:16
**God-awful** [1] -
1482:17
**goodness** [1] -
1537:16
**goods** [6] - 1498:20,

1499:17, 1527:17,
1527:18, 1531:25,
1545:18
**gosh** [1] - 1504:6
**government** [64] -
1456:16, 1459:18,
1462:5, 1463:7,
1463:25, 1471:7,
1471:9, 1472:14,
1472:19, 1473:8,
1473:20, 1474:1,
1475:24, 1478:2,
1481:15, 1493:1,
1494:16, 1494:21,
1494:22, 1495:21,
1496:11, 1496:23,
1509:4, 1509:6,
1509:9, 1509:16,
1510:1, 1510:2,
1510:8, 1514:16,
1515:17, 1523:3,
1523:9, 1524:3,
1524:5, 1525:18,
1527:1, 1527:11,
1527:12, 1527:24,
1529:13, 1530:17,
1531:7, 1531:8,
1531:9, 1532:2,
1533:1, 1533:3,
1533:4, 1537:10,
1537:13, 1537:25,
1538:4, 1542:16,
1544:12, 1544:22,
1544:23, 1545:23,
1546:5, 1547:11
**government's** [6] -
1470:3, 1474:19,
1497:9, 1522:3,
1530:18, 1547:20
**great** [2] - 1510:5,
1531:15
**Great** [5] - 1540:22,
1541:2, 1541:5,
1541:6, 1541:11
**grounds** [2] - 1475:4,
1547:4
**guess** [15] - 1454:11,
1455:16, 1456:8,
1467:11, 1468:9,
1472:7, 1474:20,
1476:4, 1476:21,
1477:20, 1478:6,
1500:23, 1522:22,
1536:2, 1547:6
**guidance** [6] -
1527:24, 1527:25,
1528:3, 1528:5,
1533:15, 1533:18

# H

**half** [2] - 1508:25, 1532:3
**hand** [2] - 1475:1
**handled** [1] - 1474:8
**happy** [2] - 1504:24, 1509:18
**Harbor** [3] - 1540:22, 1540:23, 1541:11
**hard** [4] - 1462:7, 1514:11, 1529:20, 1536:10
**hardly** [1] - 1494:11
**hate** [1] - 1542:9
**hear** [3] - 1456:23, 1508:21, 1533:25
**heart** [1] - 1537:16
**heartache** [1] - 1523:16
**held** [1] - 1528:12
**help** [5] - 1460:16, 1460:18, 1482:5, 1488:8, 1548:9
**helps** [1] - 1531:7
**HEMINGER** [31] - 1452:20, 1454:4, 1454:7, 1454:23, 1455:16, 1456:7, 1457:17, 1457:23, 1458:3, 1458:14, 1472:23, 1475:3, 1476:1, 1476:10, 1476:21, 1482:9, 1483:1, 1483:5, 1502:23, 1503:3, 1503:7, 1503:11, 1511:20, 1515:4, 1516:5, 1516:11, 1516:15, 1518:7, 1518:24, 1519:3, 1525:22
**Heminger** [1] - 1470:19
**high** [2] - 1521:8, 1528:22
**higher** [2] - 1508:12, 1531:3
**highest** [1] - 1487:10
**highlight** [1] - 1477:15
**hold** [1] - 1456:22
**holes** [1] - 1469:18
**home** [1] - 1545:1
**honestly** [1] - 1538:15
**Honor** [115] - 1454:4, 1454:23, 1455:4, 1455:12, 1455:16, 1455:23, 1456:1, 1456:15, 1457:1,
1457:17, 1457:18, 1457:23, 1458:14, 1467:11, 1467:25, 1468:15, 1468:17, 1468:18, 1469:4, 1472:6, 1472:7, 1472:20, 1472:23, 1473:18, 1475:4, 1475:7, 1475:22, 1476:1, 1476:11, 1476:15, 1476:18, 1476:21, 1477:8, 1478:23, 1482:18, 1483:5, 1484:25, 1485:6, 1492:8, 1492:12, 1494:12, 1494:13, 1496:25, 1508:23, 1509:8, 1509:20, 1511:18, 1511:20, 1515:4, 1518:25, 1519:3, 1519:15, 1521:9, 1522:2, 1522:19, 1522:22, 1523:1, 1523:18, 1523:24, 1524:14, 1524:19, 1524:22, 1525:14, 1525:18, 1525:20, 1526:13, 1526:16, 1527:4, 1527:7, 1527:10, 1528:13, 1528:20, 1528:24, 1528:25, 1529:7, 1529:13, 1529:25, 1530:11, 1530:13, 1530:21, 1531:17, 1531:19, 1532:3, 1532:4, 1533:4, 1533:17, 1533:19, 1533:21, 1534:7, 1535:1, 1535:15, 1535:19, 1538:15, 1538:17, 1539:15, 1540:10, 1540:16, 1541:1, 1541:8, 1541:15, 1542:3, 1542:10, 1542:12, 1542:14, 1543:18, 1544:24, 1545:11, 1545:19, 1545:24, 1546:6, 1546:18, 1546:24, 1547:3, 1548:5, 1548:13
**HONORABLE** [1] - 1452:10
**hope** [1] - 1512:9
**hopefully** [2] - 1507:19, 1510:16
**horizontal** [1] - 1464:17

**hour** [2] - 1508:23, 1508:25
**house** [1] - 1514:15
**housekeeping** [1] - 1454:4
**huge** [1] - 1486:1
**HUVELLE** [1] - 1452:10
**Huvelle's** [1] - 1474:10
**hypo** [2] - 1493:12, 1495:15
**hypothetical** [2] - 1512:19, 1513:25
**hypotheticals** [4] - 1513:18, 1514:12, 1514:25, 1515:6

# I

**I..** [1] - 1478:11
**i.e** [1] - 1506:4
**idea** [5] - 1510:5, 1517:13, 1533:16, 1538:15, 1538:21
**identity** [1] - 1476:14
**illustrating** [1] - 1506:1
**image** [5] - 1498:19, 1500:6, 1500:10, 1501:8, 1501:12
**immediately** [1] - 1538:16
**impact** [2] - 1497:23, 1498:9
**impacts** [2] - 1490:3, 1491:23
**important** [10] - 1461:6, 1472:22, 1483:11, 1489:22, 1490:12, 1490:14, 1491:17, 1493:3, 1513:7, 1537:21
**importantly** [1] - 1501:4
**included** [3] - 1516:21, 1516:22, 1536:18
**including** [1] - 1534:19
**income** [2] - 1461:9, 1487:11
**inconsistent** [1] - 1546:8
**incorporated** [2] - 1515:18, 1527:15
**increase** [2] - 1516:23, 1524:20
**increased** [6] -

1486:22, 1511:7, 1530:16, 1530:17, 1530:19, 1530:20
**incremental** [1] - 1477:25
**incur** [2] - 1461:4, 1471:15
**incurred** [16] - 1455:5, 1461:3, 1461:20, 1463:20, 1468:23, 1474:11, 1476:17, 1478:3, 1496:14, 1497:6, 1500:23, 1516:7, 1516:9, 1516:18, 1519:11, 1519:20
**incurrence** [1] - 1516:8
**incurring** [2] - 1463:18, 1466:19
**incurs** [7] - 1470:25, 1496:3, 1498:3, 1498:4, 1500:24
**indeed** [1] - 1513:19
**INDEX** [1] - 1549:1
**indicated** [1] - 1547:15
**indirectly** [1] - 1545:16
**individual** [4] - 1472:11, 1475:13, 1520:18, 1520:23
**Industrial** [1] - 1511:12
**inform** [1] - 1479:7
**information** [1] - 1515:23
**inputs** [5] - 1485:22, 1486:1, 1486:2, 1504:7
**insisting** [1] - 1456:11
**instance** [4] - 1457:5, 1457:7, 1487:16, 1507:10
**instances** [1] - 1499:14
**instead** [2] - 1484:1, 1518:6
**insurance** [2] - 1523:21, 1524:1
**intended** [2] - 1532:16, 1546:17
**interaction** [1] - 1547:12
**interest** [22] - 1454:8, 1454:16, 1454:21, 1455:1, 1455:10, 1455:20, 1500:16, 1500:19, 1500:20, 1516:17, 1516:21,

1516:22, 1517:9, 1517:22, 1518:2, 1518:5, 1518:11, 1518:15, 1518:17, 1519:6, 1519:9, 1522:6
**interested** [3] - 1454:19, 1457:9, 1522:21
**interesting** [4] - 1465:3, 1473:23, 1494:15, 1531:12
**interpret** [1] - 1499:5
**interrelationship** [1] - 1548:3
**interrupt** [1] - 1479:9
**interrupted** [1] - 1526:20
**invest** [1] - 1521:4
**irrelevant** [2] - 1472:4, 1542:25
**Island** [3] - 1540:22, 1540:23, 1541:11
**issue** [9] - 1454:24, 1455:7, 1455:20, 1522:24, 1523:17, 1524:2, 1543:25, 1547:16, 1547:24
**issues** [3] - 1473:5, 1473:6, 1522:5
**it'll** [1] - 1504:24
**items** [1] - 1511:7
**itself** [3] - 1459:25, 1513:5, 1526:4

# J

**January** [2] - 1537:22, 1538:11
**Jared** [2] - 1521:18, 1530:4
**JENNIFER** [1] - 1452:21
**JESSICA** [1] - 1452:20
**Joan** [2] - 1457:24, 1549:3
**JOAN** [1] - 1458:1
**job** [1] - 1515:16
**John** [2] - 1481:23, 1484:19
**john** [1] - 1466:2
**JOHN** [1] - 1452:19
**JOHNSON** [1] - 1452:21
**JUDGE** [1] - 1452:11
**Judge** [8] - 1474:10, 1523:15, 1529:21, 1530:2, 1541:3, 1542:2, 1542:18,

1546:7
**judgment** [21] -
1459:12, 1470:24,
1476:18, 1483:17,
1483:18, 1486:17,
1487:25, 1488:7,
1493:13, 1498:19,
1499:15, 1501:22,
1504:22, 1505:25,
1517:18, 1527:20,
1529:17, 1529:22,
1530:9, 1546:13
**judgment's** [1] -
1499:7
**just..** [1] - 1484:19
**Justice** [1] - 1452:22
**JUSTIN** [2] - 1452:14,
1452:20

## K

**KAS** [2] - 1544:17,
1545:1
**keep** [6] - 1461:6,
1474:5, 1495:1,
1518:14, 1537:15,
1538:3
**keeping** [2] - 1494:9,
1495:8
**keeps** [1] - 1495:5
**kicked** [1] - 1526:12
**Kiefer** [7] - 1457:19,
1512:2, 1512:9,
1512:14, 1512:17,
1522:14, 1522:16
**kind** [6] - 1456:10,
1456:18, 1474:12,
1514:18, 1520:2,
1521:7
**knowledge** [1] -
1468:24
**knows** [3] - 1473:15,
1476:12, 1509:17

## L

**lack** [2] - 1469:25,
1475:18
**laid** [1] - 1525:6
**large** [1] - 1463:6
**last** [11] - 1457:16,
1459:20, 1465:18,
1477:18, 1482:14,
1482:23, 1505:7,
1511:9, 1520:12,
1522:20, 1540:18
**late** [1] - 1519:13
**latter** [1] - 1487:7
**law** [8] - 1500:15,

1519:9, 1521:19,
1529:9, 1542:7,
1543:6, 1546:8,
1546:9
**LAW** [1] - 1530:5
**learn** [1] - 1500:16
**learned** [1] - 1518:19
**least** [1] - 1492:6
**leave** [1] - 1511:6
**leaving** [1] - 1500:7
**led** [3] - 1504:5,
1531:22, 1531:23
**left** [1] - 1489:2
**legal** [3] - 1516:10,
1522:8, 1542:2
**Leon** [1] - 1541:3
**less** [10] - 1478:4,
1493:5, 1493:10,
1499:6, 1499:7,
1500:20, 1501:1,
1508:23, 1508:24
**level** [6] - 1472:9,
1476:15, 1535:25,
1536:2, 1536:13,
1542:16
**levels** [1] - 1527:15
**liability** [12] - 1522:7,
1522:11, 1522:12,
1525:3, 1527:13,
1529:14, 1529:16,
1530:16, 1530:18,
1532:14, 1533:8,
1536:18
**liable** [4] - 1529:15,
1532:15, 1532:17,
1532:24
**lie** [1] - 1492:23
**light** [1] - 1461:9
**limit** [1] - 1522:8
**limited** [1] - 1519:9
**line** [8] - 1459:20,
1468:22, 1487:17,
1504:7, 1504:8,
1504:9, 1504:17,
1508:3
**lines** [4] - 1464:25,
1465:24, 1508:4,
1539:14
**litigation** [3] -
1455:24, 1456:6,
1521:22
**LLP** [1] - 1452:16
**load** [2] - 1536:21,
1536:23
**Lockheed** [113] -
1454:2, 1454:7,
1459:11, 1459:24,
1460:3, 1461:3,
1461:20, 1461:25,
1462:22, 1463:6,

1464:19, 1465:4,
1467:4, 1470:25,
1472:13, 1473:15,
1473:24, 1474:18,
1475:10, 1475:14,
1479:25, 1481:16,
1481:18, 1481:21,
1483:6, 1485:24,
1486:19, 1489:8,
1489:10, 1489:12,
1489:15, 1489:17,
1490:3, 1490:23,
1491:2, 1491:12,
1491:23, 1492:23,
1492:25, 1494:8,
1494:10, 1494:18,
1494:19, 1494:25,
1495:5, 1495:10,
1496:3, 1496:17,
1496:20, 1498:2,
1498:17, 1500:9,
1501:2, 1501:13,
1501:24, 1503:22,
1505:8, 1507:14,
1508:3, 1508:7,
1509:2, 1510:3,
1510:7, 1511:3,
1511:5, 1512:24,
1513:8, 1516:6,
1516:17, 1516:20,
1517:4, 1517:16,
1517:25, 1519:19,
1519:22, 1521:20,
1522:11, 1526:7,
1526:10, 1526:22,
1527:16, 1527:17,
1527:19, 1528:13,
1530:14, 1530:16,
1530:19, 1530:20,
1530:23, 1531:2,
1531:16, 1531:24,
1532:9, 1532:12,
1533:5, 1534:9,
1536:17, 1536:21,
1537:23, 1537:24,
1538:2, 1539:21,
1539:24, 1541:21,
1543:8, 1543:11,
1543:25, 1544:3,
1544:6, 1544:9,
1545:20, 1546:21,
1547:22
**LOCKHEED** [1] -
1452:3
**Lockheed's** [4] -
1490:25, 1497:8,
1500:17, 1506:20
**look** [29] - 1462:16,
1462:21, 1464:16,
1468:5, 1477:18,
1477:19, 1478:2,

1478:3, 1478:17,
1488:12, 1492:18,
1498:14, 1498:15,
1500:13, 1501:5,
1501:24, 1501:25,
1505:7, 1505:21,
1507:13, 1516:25,
1517:20, 1517:24,
1532:8, 1533:5,
1538:17, 1539:5,
1542:16
**looked** [2] - 1505:2,
1512:6
**looking** [29] - 1456:5,
1462:11, 1462:17,
1464:3, 1466:16,
1470:16, 1477:3,
1478:16, 1482:14,
1482:22, 1483:15,
1485:5, 1485:6,
1486:9, 1487:14,
1488:21, 1488:25,
1490:11, 1503:25,
1504:20, 1505:1,
1506:22, 1508:17,
1512:9, 1528:4,
1530:11, 1532:3,
1542:19, 1546:5
**looks** [4] - 1507:2,
1532:8, 1532:12,
1532:13
**lose** [2] - 1519:19,
1528:11
**losing** [1] - 1517:5
**lost** [7] - 1476:14,
1478:5, 1486:13,
1510:23, 1516:18,
1517:6, 1542:17
**love** [1] - 1504:25
**low** [1] - 1500:20
**lower** [3] - 1511:5,
1517:23, 1518:3
**LUDWISZEWSKI** [1] -
1452:14
**lump** [3] - 1485:12,
1505:10, 1505:15
**lump-sum** [2] -
1505:10, 1505:15
**lunch** [2] - 1521:15,
1547:8
**Lunch** [1] - 1548:14

## M

**machine** [1] - 1453:24
**maintaining** [1] -
1531:5
**major** [1] - 1466:23
**majority** [1] - 1461:23

**maker** [1] - 1547:18
**mandatory** [1] -
1454:13
**Manual** [1] - 1533:23
**margin** [1] - 1487:14
**marginal** [1] - 1487:11
**Mark** [2] - 1457:18,
1522:14
**market** [4] - 1494:19,
1494:20, 1495:18,
1521:5
**MARTIN** [1] - 1452:3
**Martin** [74] - 1454:3,
1459:11, 1459:24,
1460:3, 1461:3,
1461:20, 1461:25,
1462:22, 1463:7,
1464:19, 1465:4,
1472:13, 1473:24,
1475:14, 1479:25,
1481:18, 1481:21,
1486:19, 1489:8,
1489:10, 1489:16,
1490:3, 1490:23,
1491:12, 1491:23,
1492:25, 1494:8,
1494:10, 1494:19,
1494:25, 1495:5,
1495:10, 1496:3,
1496:18, 1496:21,
1498:3, 1501:13,
1501:24, 1503:22,
1505:8, 1507:15,
1508:3, 1508:7,
1509:2, 1511:3,
1511:5, 1512:24,
1513:8, 1516:6,
1516:18, 1516:20,
1517:4, 1517:25,
1519:19, 1521:20,
1526:7, 1526:10,
1526:22, 1527:16,
1527:17, 1528:13,
1530:14, 1530:17,
1530:19, 1530:23,
1531:2, 1531:16,
1531:24, 1532:9,
1532:12, 1533:5,
1541:21, 1544:9,
1545:20
**Martin's** [14] - 1467:4,
1475:10, 1485:24,
1489:12, 1489:17,
1491:2, 1492:23,
1494:18, 1500:9,
1501:2, 1517:16,
1519:23, 1527:19,
1530:20
**Mateer** [2] - 1457:19,
1522:15

**math** [2] - 1463:3, 1480:4
**mathematical** [1] - 1459:21
**mathematical..** [1] - 1466:1
**mathematically** [1] - 1488:21
**matter** [11] - 1454:5, 1472:8, 1493:20, 1503:2, 1503:6, 1514:23, 1516:10, 1523:14, 1523:23, 1524:6, 1549:12
**mean** [21] - 1459:21, 1463:16, 1490:19, 1493:8, 1500:20, 1508:10, 1509:11, 1513:22, 1514:19, 1514:23, 1515:5, 1521:7, 1522:9, 1523:1, 1529:20, 1531:9, 1539:3, 1542:13, 1543:15, 1544:1, 1544:11
**meaning** [7] - 1466:5, 1490:22, 1493:24, 1499:7, 1523:5, 1547:12, 1547:24
**means** [5] - 1467:19, 1487:2, 1500:2, 1511:24, 1526:15
**meant** [1] - 1507:6
**measured** [1] - 1513:11
**measuring** [1] - 1512:10
**mechanics** [5] - 1471:7, 1471:10, 1471:25, 1472:8, 1473:17
**memorializes** [2] - 1524:24, 1524:25
**mentioned** [1] - 1503:23
**met** [1] - 1528:25
**metaphysical** [1] - 1546:4
**methodology** [2] - 1469:12, 1469:16
**Meyer** [62] - 1457:24, 1458:4, 1458:6, 1458:22, 1459:3, 1459:7, 1459:10, 1459:16, 1459:21, 1460:1, 1460:3, 1463:12, 1470:22, 1473:1, 1474:7, 1477:4, 1477:9, 1478:24, 1482:1,

1483:5, 1483:14, 1483:15, 1484:10, 1485:10, 1486:13, 1487:23, 1488:10, 1488:20, 1489:23, 1491:20, 1492:16, 1492:24, 1493:14, 1494:5, 1495:14, 1495:20, 1495:24, 1497:12, 1497:14, 1498:14, 1498:16, 1499:14, 1500:4, 1501:7, 1501:21, 1502:19, 1503:10, 1503:14, 1503:18, 1504:19, 1505:16, 1506:14, 1509:2, 1510:14, 1510:17, 1510:23, 1511:9, 1516:6, 1516:16, 1516:24, 1518:8, 1549:3
**MEYER** [1] - 1458:1
**Meyer's** [3] - 1455:17, 1502:25, 1503:7
**mic** [1] - 1508:20
**MICHAEL** [1] - 1452:13
**might** [6] - 1455:7, 1455:20, 1460:16, 1460:18, 1472:25, 1488:8
**million** [49] - 1459:22, 1459:23, 1459:25, 1460:12, 1462:22, 1463:2, 1463:5, 1463:10, 1464:8, 1464:10, 1464:11, 1467:8, 1467:9, 1467:10, 1468:4, 1468:6, 1468:12, 1468:13, 1470:9, 1470:14, 1479:17, 1479:18, 1479:23, 1480:3, 1480:4, 1480:11, 1481:1, 1481:2, 1481:3, 1482:2, 1482:4, 1483:15, 1484:3, 1484:10, 1485:12, 1488:1, 1488:10, 1488:14, 1488:21, 1489:3, 1489:20, 1491:1, 1491:3, 1504:3, 1505:1, 1505:10, 1505:22, 1520:21
**mind** [2] - 1478:23, 1548:4
**mine** [1] - 1469:18

**mini** [1] - 1533:20
**mini-brief** [1] - 1533:20
**minus** [5] - 1480:3, 1491:13, 1495:12, 1496:17, 1507:17
**minute** [4] - 1467:23, 1511:20, 1515:4, 1534:1
**minutes** [2] - 1457:20, 1492:13
**mirror** [5] - 1498:19, 1500:6, 1500:10, 1501:8, 1501:12
**mirrors** [1] - 1497:18
**missiles** [5] - 1509:11, 1509:12, 1509:17, 1509:20
**misspeak** [1] - 1507:6
**misspoke** [2] - 1508:9, 1510:24
**misspoken** [1] - 1466:14
**misunderstood** [2] - 1484:13, 1508:9
**model** [16] - 1465:23, 1467:4, 1477:1, 1478:7, 1483:7, 1483:9, 1485:20, 1485:21, 1497:1, 1502:6, 1502:24, 1502:25, 1503:24, 1504:15, 1504:25, 1509:10
**modification** [1] - 1483:3
**moment** [3] - 1478:19, 1511:14, 1511:16
**Monday** [3] - 1521:21, 1522:4, 1522:18
**money** [19] - 1472:4, 1474:16, 1487:6, 1494:9, 1501:2, 1501:19, 1501:20, 1516:18, 1517:5, 1517:6, 1517:10, 1517:14, 1519:19, 1519:22, 1519:23, 1520:11, 1520:13, 1521:5, 1545:20
**monitor** [1] - 1484:20
**months** [3] - 1534:17, 1534:25, 1537:23
**morning** [9] - 1454:5, 1454:6, 1458:4, 1458:5, 1459:3, 1459:4, 1492:17, 1492:21, 1522:4
**most** [2] - 1496:4, 1542:16

**motion** [2] - 1525:18, 1525:19
**mouth** [1] - 1535:7
**move** [10] - 1464:14, 1481:20, 1492:10, 1492:12, 1497:3, 1497:10, 1501:8, 1502:15, 1506:12, 1510:10
**MR** [172] - 1454:4, 1454:7, 1454:23, 1455:4, 1455:12, 1455:16, 1455:23, 1456:1, 1456:7, 1456:15, 1456:20, 1457:1, 1457:4, 1457:17, 1457:18, 1457:23, 1458:3, 1458:14, 1467:9, 1467:11, 1467:14, 1467:20, 1468:15, 1468:18, 1472:7, 1472:20, 1472:23, 1473:18, 1475:3, 1475:7, 1476:1, 1476:10, 1476:15, 1476:21, 1482:9, 1483:1, 1483:5, 1494:12, 1502:23, 1503:3, 1503:7, 1503:11, 1509:19, 1509:24, 1511:20, 1515:4, 1516:5, 1516:11, 1516:15, 1518:7, 1518:24, 1519:3, 1519:11, 1519:15, 1521:16, 1522:2, 1522:14, 1522:19, 1522:22, 1522:25, 1523:8, 1523:12, 1523:18, 1523:24, 1524:16, 1524:19, 1524:22, 1525:9, 1525:11, 1525:17, 1525:22, 1525:25, 1526:13, 1526:16, 1526:18, 1526:22, 1527:3, 1527:6, 1527:10, 1528:13, 1528:19, 1528:24, 1529:4, 1529:7, 1529:18, 1529:24, 1530:2, 1530:10, 1530:13, 1530:23, 1531:4, 1531:17, 1531:19, 1531:21, 1532:6, 1532:22, 1533:3, 1533:11, 1533:15, 1533:19, 1533:23, 1534:7,

1534:11, 1534:14, 1534:16, 1534:22, 1535:4, 1535:9, 1535:15, 1535:19, 1535:21, 1536:2, 1536:6, 1536:12, 1536:16, 1537:4, 1537:7, 1537:17, 1538:10, 1538:14, 1538:17, 1538:19, 1539:1, 1539:4, 1539:9, 1539:15, 1539:18, 1540:5, 1540:7, 1540:10, 1540:13, 1540:15, 1540:18, 1540:20, 1540:24, 1541:4, 1541:6, 1541:8, 1541:10, 1541:14, 1541:22, 1541:24, 1542:3, 1542:5, 1542:10, 1542:12, 1542:14, 1543:2, 1543:5, 1543:17, 1543:20, 1544:1, 1544:5, 1544:14, 1544:23, 1545:7, 1545:17, 1545:24, 1546:2, 1546:6, 1546:18, 1546:23, 1547:1, 1547:3, 1547:9, 1547:22, 1547:24, 1548:5, 1548:7, 1548:9, 1548:13
**MS** [57] - 1458:16, 1458:21, 1459:2, 1463:11, 1466:2, 1466:7, 1469:4, 1470:21, 1472:6, 1474:6, 1474:24, 1475:22, 1477:3, 1477:8, 1478:23, 1479:1, 1481:23, 1481:25, 1482:10, 1482:13, 1482:18, 1482:21, 1483:3, 1483:13, 1484:18, 1484:22, 1484:25, 1485:4, 1485:6, 1485:9, 1486:12, 1487:22, 1491:19, 1492:8, 1492:12, 1492:15, 1494:4, 1495:4, 1496:10, 1496:25, 1497:11, 1501:6, 1502:16, 1502:18, 1502:21, 1503:12, 1503:13, 1506:13, 1508:23, 1509:1, 1509:8,

1509:12, 1510:11,
1510:14, 1510:15,
1511:18, 1521:9
**multiplied** [4] -
1463:5, 1463:23,
1483:21, 1505:14
**multiply** [1] - 1485:14
**Murphy** [3] - 1475:6,
1523:4, 1536:17
**MURPHY** [107] -
1452:13, 1455:4,
1455:12, 1455:23,
1456:1, 1456:15,
1456:20, 1457:1,
1457:4, 1457:18,
1467:9, 1467:11,
1467:14, 1467:20,
1468:15, 1468:18,
1472:7, 1472:20,
1473:18, 1475:7,
1476:15, 1494:12,
1509:19, 1509:24,
1519:11, 1519:15,
1521:16, 1522:2,
1522:14, 1522:19,
1522:22, 1522:25,
1523:8, 1523:12,
1523:18, 1523:24,
1524:16, 1524:19,
1524:22, 1525:9,
1525:11, 1525:17,
1525:25, 1526:13,
1526:16, 1526:18,
1526:22, 1527:3,
1527:6, 1527:10,
1528:3, 1528:13,
1528:19, 1528:24,
1529:4, 1529:7,
1529:24, 1530:2,
1530:10, 1530:13,
1530:23, 1531:4,
1531:17, 1531:19,
1531:21, 1532:6,
1532:22, 1533:3,
1533:11, 1533:15,
1533:19, 1533:23,
1534:14, 1535:15,
1535:19, 1536:2,
1536:6, 1538:14,
1538:17, 1540:10,
1540:13, 1540:15,
1540:18, 1540:20,
1540:24, 1541:4,
1541:6, 1541:8,
1541:10, 1541:14,
1544:5, 1544:14,
1544:23, 1545:7,
1545:17, 1545:24,
1546:2, 1546:18,
1546:23, 1547:1,
1547:3, 1547:9,

1547:24, 1548:5,
1548:7, 1548:9,
1548:13
**Murphy's** [1] - 1535:7
**must** [2] - 1512:25,
1525:16

## N

**narrow** [1] - 1515:20
**near** [1] - 1520:9
**necessarily** [1] -
1501:21
**necessary** [2] -
1547:5, 1547:6
**Neck** [5] - 1540:22,
1541:2, 1541:5,
1541:6, 1541:11
**need** [11] - 1457:13,
1462:2, 1470:18,
1470:19, 1502:4,
1503:24, 1521:17,
1521:24, 1522:10,
1536:14, 1537:11
**negative** [3] - 1478:1,
1486:16, 1486:18
**negotiate** [1] -
1540:21
**negotiated** [2] -
1455:13, 1539:13
**negotiating** [1] -
1534:22
**negotiations** [2] -
1531:22, 1531:23
**net** [52] - 1461:1,
1462:21, 1463:5,
1463:23, 1464:6,
1464:10, 1468:3,
1474:3, 1474:13,
1476:19, 1479:11,
1480:25, 1481:17,
1482:7, 1483:19,
1483:22, 1484:6,
1484:10, 1484:12,
1485:14, 1485:16,
1486:8, 1488:25,
1489:3, 1490:8,
1490:12, 1490:15,
1490:18, 1491:21,
1492:3, 1495:11,
1498:12, 1499:22,
1500:10, 1500:11,
1501:9, 1501:10,
1501:16, 1503:15,
1503:19, 1504:13,
1504:15, 1504:18,
1505:6, 1505:13,
1505:16, 1507:17,
1508:2, 1510:25,
1513:3, 1513:6,

1519:21
**nets** [1] - 1491:23
**netting** [1] - 1499:25
**never** [5] - 1457:8,
1494:14, 1526:12,
1545:4, 1546:16
**new** [1] - 1518:19
**next** [16] - 1462:25,
1481:14, 1484:3,
1484:15, 1484:17,
1484:25, 1485:1,
1489:3, 1489:14,
1496:9, 1498:5,
1504:17, 1505:11,
1521:15, 1548:12
**night** [1] - 1477:11
**nine** [4] - 1522:11,
1534:17, 1534:25,
1537:23
**nobody** [3] - 1476:12,
1487:12
**nominal** [23] - 1468:5,
1468:12, 1468:16,
1470:8, 1480:24,
1483:20, 1484:6,
1484:12, 1485:15,
1499:3, 1501:22,
1501:23, 1502:1,
1502:6, 1503:24,
1505:4, 1505:6,
1510:17, 1510:21,
1510:22, 1511:1,
1511:8, 1517:8
**non** [1] - 1545:23
**non-U.S** [1] - 1545:23
**none** [1] - 1544:13
**normal** [2] - 1520:10,
1545:8
**note** [6] - 1455:17,
1472:23, 1483:8,
1483:10, 1502:23,
1503:1
**nothing** [3] - 1521:8,
1521:9, 1529:2
**notice** [1] - 1489:7
**noticed** [1] - 1457:5
**notified** [1] - 1543:1
**notion** [3] - 1534:5,
1535:5, 1541:25
**nowhere** [1] - 1520:9
**number** [12] - 1464:7,
1465:19, 1477:9,
1484:14, 1488:14,
1506:20, 1519:1,
1525:16, 1526:4,
1526:17, 1535:21,
1537:21
**numbers** [8] -
1478:11, 1480:25,
1482:17, 1482:18,

1483:19, 1484:5,
1487:20, 1515:20
**NW** [3] - 1452:17,
1452:24, 1453:2

## O

**o'clock** [1] - 1522:11
**O'DONNELL** [1] -
1452:20
**object** [1] - 1475:3
**objection** [1] -
1475:25
**obligation** [2] -
1527:23, 1532:2
**obtain** [1] - 1496:4
**obviously** [3] -
1463:15, 1473:14,
1509:15
**occur** [3] - 1472:9,
1472:12, 1472:25
**occurred** [1] - 1455:19
**OF** [3] - 1452:1,
1452:6, 1452:10
**offer** [1] - 1547:20
**offering** [1] - 1495:19
**office** [2] - 1457:20,
1545:2
**Official** [2] - 1453:1,
1549:10
**officials** [1] - 1527:25
**offset** [9] - 1474:22,
1500:11, 1501:15,
1502:5, 1502:8,
1517:3
**offsets** [3] - 1465:22,
1466:4, 1466:12
**offshore** [1] - 1487:6
**old** [1] - 1544:20
**once** [8] - 1467:6,
1472:10, 1472:21,
1476:13, 1522:8,
1530:8, 1547:17
**one** [43] - 1454:19,
1457:5, 1457:22,
1460:17, 1463:22,
1465:16, 1470:25,
1472:1, 1479:5,
1485:8, 1485:24,
1488:18, 1493:9,
1494:15, 1494:24,
1498:13, 1501:15,
1505:14, 1507:13,
1510:1, 1511:9,
1512:25, 1513:7,
1514:1, 1514:5,
1514:23, 1515:4,
1515:12, 1515:15,
1515:24, 1522:13,

1525:10, 1525:17,
1525:25, 1536:13,
1537:1, 1540:20,
1540:25, 1541:3,
1542:17, 1543:15,
1544:19, 1547:18
**op** [2] - 1473:8,
1473:21
**open** [1] - 1542:8
**opens** [1] - 1543:14
**operate** [1] - 1487:16
**operating** [2] -
1524:25, 1527:15
**operation** [1] - 1526:8
**operations** [10] -
1457:4, 1471:4,
1518:12, 1524:9,
1524:24, 1525:9,
1526:24, 1536:22,
1536:24, 1547:25
**operator** [3] - 1522:7,
1522:10, 1522:12
**opinion** [9] - 1459:6,
1488:5, 1495:17,
1495:19, 1515:5,
1523:15, 1530:2,
1546:11, 1546:14
**opinions** [1] - 1458:11
**opportunity** [1] -
1512:13
**opposite** [4] - 1536:9,
1538:7, 1539:20,
1543:2
**ops** [11] - 1459:14,
1459:23, 1460:7,
1460:8, 1471:13,
1473:25, 1475:8,
1493:1, 1493:13,
1523:8, 1523:11
**order** [6] - 1456:11,
1456:19, 1505:11,
1505:12, 1521:24,
1525:20
**originally** [1] - 1516:7
**otherwise** [1] - 1475:6
**ought** [3] - 1457:13,
1475:16, 1523:22
**outcome** [1] - 1470:14
**outlined** [1] - 1503:14
**outlines** [1] - 1468:1
**overhead** [45] -
1461:8, 1461:11,
1461:22, 1461:23,
1462:2, 1462:9,
1462:24, 1463:21,
1465:22, 1466:4,
1466:11, 1466:16,
1473:7, 1474:17,
1476:6, 1477:21,
1477:23, 1478:4,

1478:5, 1484:18, 1484:21, 1486:14, 1486:21, 1490:4, 1490:5, 1496:4, 1497:22, 1498:4, 1502:7, 1505:8, 1505:13, 1505:21, 1505:22, 1505:24, 1505:25, 1506:19, 1506:23, 1507:12, 1507:22, 1511:6, 1513:2, 1536:20, 1545:2, 1545:11
**oversimplified** [1] - 1472:17
**overview** [1] - 1485:20

**P**

**p.m** [1] - 1548:14
**page** [56] - 1459:6, 1460:17, 1460:21, 1461:15, 1462:19, 1468:1, 1477:1, 1477:3, 1479:3, 1479:6, 1479:9, 1482:5, 1482:8, 1482:10, 1482:11, 1482:14, 1482:15, 1482:16, 1482:23, 1482:24, 1483:4, 1484:1, 1484:25, 1485:1, 1485:3, 1485:4, 1485:21, 1486:2, 1486:9, 1488:23, 1492:18, 1496:13, 1497:12, 1497:13, 1497:14, 1498:3, 1498:15, 1501:24, 1502:22, 1503:17, 1503:23, 1504:4, 1504:9, 1504:10, 1504:17, 1505:4, 1505:7, 1505:11, 1505:12, 1506:14, 1516:24, 1519:3, 1539:6
**Page** [1] - 1452:8
**PAGE** [1] - 1549:2
**pages** [3] - 1504:5, 1504:7, 1549:11
**paid** [18] - 1462:5, 1472:10, 1473:7, 1477:25, 1478:2, 1487:4, 1489:6, 1489:7, 1495:24, 1507:14, 1508:6, 1511:5, 1512:5, 1513:15, 1527:16, 1527:18, 1528:1,

1528:6
**pain** [1] - 1531:16
**paper** [1] - 1473:6
**paragraph** [11] - 1459:6, 1492:18, 1498:15, 1498:17, 1525:7, 1525:24, 1534:19, 1539:7, 1541:18, 1543:16, 1546:19
**parol** [3] - 1523:1, 1537:11, 1547:4
**part** [14] - 1459:19, 1462:3, 1463:6, 1482:2, 1489:6, 1489:8, 1492:6, 1496:9, 1499:1, 1499:18, 1500:7, 1513:13, 1525:18, 1537:20
**particular** [3] - 1477:1, 1498:6, 1548:2
**parties** [4] - 1454:9, 1472:25, 1532:15, 1532:16
**parties'** [1] - 1470:2
**parts** [1] - 1472:3
**party** [1] - 1543:12
**party's** [1] - 1516:8
**pass** [3] - 1458:14, 1531:1, 1537:16
**passing** [1] - 1537:15
**Past** [1] - 1525:25
**past** [59] - 1461:17, 1462:2, 1464:5, 1464:9, 1466:25, 1467:7, 1468:7, 1468:8, 1468:12, 1469:24, 1470:3, 1470:4, 1470:20, 1476:24, 1478:19, 1479:14, 1479:15, 1479:17, 1479:24, 1480:1, 1480:6, 1480:8, 1480:9, 1480:14, 1480:17, 1480:18, 1480:19, 1480:24, 1480:25, 1481:1, 1481:9, 1482:2, 1483:18, 1483:20, 1485:11, 1488:5, 1489:11, 1489:13, 1489:16, 1490:3, 1491:3, 1491:12, 1496:7, 1500:17, 1501:19, 1502:8, 1504:1, 1507:1, 1507:11, 1508:18, 1511:15, 1512:4,

1512:25, 1517:6, 1517:17, 1518:4, 1531:9, 1532:3
**pay** [13] - 1465:8, 1487:1, 1495:10, 1495:12, 1495:21, 1496:11, 1496:18, 1508:18, 1514:13, 1518:1, 1521:2, 1533:6, 1533:8
**paying** [13] - 1474:19, 1481:16, 1487:5, 1487:17, 1489:8, 1496:15, 1497:8, 1514:1, 1524:2, 1529:9, 1530:15, 1531:3, 1543:8
**payment** [40] - 1462:9, 1462:13, 1462:15, 1464:18, 1466:5, 1472:14, 1473:15, 1479:15, 1479:23, 1480:9, 1480:17, 1480:18, 1482:3, 1485:11, 1489:13, 1489:25, 1490:6, 1491:22, 1492:4, 1498:2, 1498:10, 1499:6, 1499:11, 1499:20, 1504:1, 1505:10, 1505:15, 1507:1, 1507:3, 1507:16, 1508:12, 1514:16, 1516:20, 1538:9, 1538:13, 1538:20, 1539:8, 1539:9, 1543:12
**payments** [20] - 1464:25, 1465:15, 1472:8, 1472:12, 1472:20, 1476:19, 1502:4, 1509:3, 1524:1, 1524:4, 1527:14, 1529:16, 1538:5, 1538:8, 1538:22, 1539:23, 1544:3, 1544:6, 1545:13
**pays** [6] - 1465:4, 1465:5, 1470:25, 1471:9, 1481:16, 1487:12
**pen** [1] - 1477:14
**people** [6] - 1515:19, 1522:10, 1524:1, 1526:7, 1528:7, 1528:8
**per** [4] - 1478:13, 1478:16, 1523:22, 1528:23

**per-year** [2] - 1478:13, 1478:16
**percent** [74] - 1461:17, 1461:22, 1463:4, 1463:23, 1464:2, 1464:4, 1464:5, 1464:12, 1464:21, 1465:6, 1471:16, 1473:19, 1473:22, 1474:1, 1475:17, 1479:13, 1479:21, 1480:1, 1480:9, 1480:21, 1481:1, 1481:19, 1482:7, 1483:21, 1485:18, 1485:25, 1486:10, 1488:13, 1489:12, 1490:25, 1491:5, 1493:1, 1493:2, 1493:5, 1493:10, 1493:14, 1494:2, 1495:21, 1496:11, 1496:15, 1500:21, 1501:1, 1501:3, 1501:4, 1504:16, 1505:14, 1506:5, 1506:6, 1506:10, 1508:17, 1508:19, 1514:1, 1514:13, 1517:3, 1517:12, 1517:24, 1518:1, 1518:6, 1518:9, 1518:13, 1518:14, 1519:8, 1519:9, 1520:5, 1520:10, 1520:22, 1521:1, 1536:21, 1546:2, 1546:3
**percent's** [1] - 1521:8
**percentage** [17] - 1454:21, 1459:13, 1459:17, 1463:6, 1481:20, 1503:22, 1507:14, 1508:6, 1511:12, 1512:24, 1513:7, 1514:22, 1517:23, 1518:3, 1520:2, 1537:13, 1537:14
**percentages** [1] - 1515:20
**perform** [3] - 1472:21, 1545:18
**performance** [4] - 1472:12, 1472:22, 1473:13, 1473:14
**performing** [2] - 1524:4, 1545:21
**performs** [1] - 1545:20

**perhaps** [5] - 1488:18, 1494:25, 1495:2, 1506:3, 1512:6
**period** [3] - 1470:7, 1497:20, 1517:4
**personally** [2] - 1495:16, 1511:12
**phase** [3] - 1454:10, 1454:14, 1454:25
**pick** [2] - 1513:25, 1514:23
**piece** [2] - 1536:16
**pincite** [1] - 1530:11
**place** [3] - 1460:17, 1505:19, 1514:17
**plain** [1] - 1512:22
**Plaintiff** [2] - 1452:4, 1452:13
**pleadings** [1] - 1457:6
**plus** [6] - 1477:19, 1477:20, 1480:14, 1493:18, 1523:6
**point** [31] - 1454:19, 1459:10, 1468:19, 1470:18, 1470:22, 1474:10, 1474:20, 1476:20, 1476:21, 1478:6, 1483:12, 1488:16, 1489:23, 1490:12, 1491:16, 1492:16, 1495:23, 1499:10, 1500:4, 1510:5, 1510:6, 1510:11, 1510:16, 1512:23, 1516:16, 1531:25, 1532:22, 1536:4, 1542:6, 1546:24
**pointed** [1] - 1499:25
**pointing** [1] - 1489:18
**points** [2] - 1465:17, 1529:12
**pool** [26] - 1456:14, 1459:14, 1459:23, 1460:8, 1462:2, 1471:4, 1471:17, 1472:10, 1472:11, 1473:25, 1475:9, 1475:12, 1476:14, 1476:16, 1486:14, 1493:1, 1493:13, 1506:9, 1518:12, 1524:9, 1524:24, 1525:2, 1536:24
**pools** [3] - 1523:10, 1525:6, 1526:8
**portion** [8] - 1460:4, 1462:5, 1466:19, 1471:9, 1473:20, 1474:19, 1494:16,

1545:11
**position** [9] - 1454:13, 1469:23, 1526:25, 1529:1, 1529:5, 1534:7, 1535:9, 1536:25, 1547:21
**possibilities** [1] - 1455:17
**possibility** [1] - 1529:8
**possible** [3] - 1487:11, 1527:7, 1540:7
**possibly** [1] - 1521:25
**POWELL** [1] - 1452:21
**power** [1] - 1536:14
**precisely** [1] - 1474:15
**preclude** [1] - 1528:9
**preclusive** [2] - 1523:19, 1532:18
**predicted** [1] - 1467:24
**preference** [2] - 1529:22, 1530:8
**preferred** [1] - 1542:25
**prejudgment** [21] - 1454:8, 1454:16, 1454:25, 1455:10, 1455:20, 1491:23, 1500:16, 1500:19, 1516:17, 1516:21, 1516:22, 1517:9, 1517:22, 1518:2, 1518:5, 1518:11, 1518:15, 1518:16, 1519:6, 1519:8, 1522:6
**prepared** [1] - 1483:5
**present** [33] - 1461:1, 1462:21, 1464:6, 1464:9, 1464:10, 1468:4, 1478:18, 1479:11, 1479:14, 1480:25, 1481:18, 1482:7, 1483:19, 1483:22, 1484:6, 1484:10, 1484:12, 1485:17, 1489:1, 1489:3, 1492:2, 1495:11, 1499:22, 1500:10, 1500:11, 1501:9, 1501:10, 1501:16, 1505:6, 1511:1, 1519:21, 1520:9, 1520:22
**present-day** [1] - 1478:18
**presented** [1] - 1511:1

**presenting** [1] - 1513:7
**presents** [1] - 1461:1
**preserve** [1] - 1542:17
**preserved** [1] - 1534:6
**president** [1] - 1475:23
**presumably** [1] - 1494:18
**presuming** [1] - 1487:8
**pretty** [1] - 1528:22
**prevent** [1] - 1535:22
**previous** [2] - 1463:24, 1505:23
**price** [7] - 1475:19, 1494:20, 1494:25, 1527:16, 1531:3, 1533:7, 1545:19
**priced** [1] - 1494:22
**prices** [9] - 1494:18, 1495:2, 1510:3, 1530:16, 1530:17, 1530:19, 1530:20, 1531:25, 1545:18
**pricing** [2] - 1498:20, 1499:17, 1536:18
**printouts** [2] - 1502:25, 1503:5
**prints** [1] - 1483:7
**private** [2] - 1493:21, 1545:22
**problem** [2] - 1466:8, 1509:25
**Proceedings** [1] - 1453:25
**proceedings** [1] - 1549:12
**process** [1] - 1475:8
**Procter** [4] - 1455:24, 1456:2, 1456:5, 1521:21
**procurement** [1] - 1544:7
**produce** [3] - 1455:25, 1527:17, 1527:18
**produced** [3] - 1453:25, 1456:15, 1510:7
**produces** [2] - 1470:5, 1512:11
**product** [2] - 1509:10, 1509:16
**products** [1] - 1510:2
**proffer** [6] - 1457:3, 1547:15, 1547:16, 1547:19, 1547:22, 1547:23
**profit** [9] - 1461:20, 1474:17, 1474:18,

1475:17, 1477:23, 1490:5, 1510:4, 1510:19, 1511:6
**profit's** [1] - 1475:16
**profits** [5] - 1475:20, 1478:5, 1486:14, 1510:23
**programs** [1] - 1509:21
**projected** [2] - 1468:4, 1486:8
**projects** [1] - 1511:13
**prominent** [1] - 1462:20
**proper** [2] - 1515:7, 1515:10
**proportion** [1] - 1508:6
**proposes** [1] - 1501:14
**protective** [3] - 1456:10, 1456:18, 1521:24
**provide** [1] - 1515:22
**provided** [3] - 1456:4, 1473:7, 1533:20
**provides** [3] - 1515:19, 1544:8, 1545:12
**providing** [2] - 1541:14, 1543:8
**provision** [2] - 1538:19, 1539:2
**provisions** [2] - 1539:1, 1548:3
**PRP** [14] - 1527:12, 1527:20, 1529:11, 1529:14, 1529:16, 1530:14, 1530:16, 1531:7, 1532:2, 1532:17, 1532:24, 1545:5, 1546:5
**PRPs** [4] - 1523:25, 1527:21, 1528:14, 1533:5
**pull** [2] - 1466:2, 1477:14
**purple** [11] - 1464:4, 1464:11, 1464:13, 1464:16, 1464:25, 1465:10, 1465:13, 1465:18, 1466:9, 1470:5, 1502:5
**purposes** [3] - 1471:14, 1478:21, 1488:5
**pursuant** [3] - 1526:9, 1534:17, 1543:11
**put** [18] - 1467:23, 1471:3, 1473:11,

1473:21, 1473:25, 1476:23, 1478:19, 1487:6, 1493:13, 1496:25, 1502:2, 1519:5, 1521:6, 1524:8, 1532:25, 1533:9, 1533:11
**putting** [1] - 1535:7
**puzzles** [1] - 1469:14
**PX** [2] - 1457:7, 1526:17
**PX1844** [2] - 1525:22, 1525:24

## Q

**qualify** [1] - 1487:5
**questions** [5] - 1492:7, 1518:24, 1518:25, 1521:19, 1544:15
**quickly** [1] - 1516:16
**quite** [3] - 1463:18, 1492:17, 1517:13
**quo** [4] - 1460:25, 1489:5, 1512:19, 1515:14

## R

**raise** [1] - 1544:22
**rate** [13] - 1454:16, 1454:18, 1474:2, 1481:16, 1487:11, 1500:20, 1506:9, 1517:13, 1520:3, 1520:4, 1520:7, 1520:9, 1521:2
**rates** [3] - 1475:12, 1487:3
**rather** [1] - 1536:23
**RAYMOND** [1] - 1452:14
**reach** [1] - 1534:23
**reached** [7] - 1456:2, 1534:23, 1534:25, 1537:23, 1538:1, 1538:6, 1539:21
**reaches** [1] - 1475:8
**read** [10] - 1463:14, 1465:18, 1469:6, 1512:2, 1522:9, 1534:19, 1534:20, 1537:12, 1541:17
**reading** [4] - 1460:1, 1462:7, 1477:11, 1499:3
**real** [1] - 1472:4
**realize** [3] - 1479:25,

1513:9, 1526:23
**realizing** [1] - 1505:9
**really** [11] - 1465:13, 1466:23, 1477:20, 1487:4, 1503:24, 1513:7, 1514:11, 1518:10, 1520:14, 1540:3, 1543:14
**reason** [4] - 1460:17, 1489:18, 1498:25, 1499:2
**reasonable** [4] - 1458:11, 1528:4, 1528:7, 1545:10
**reasonableness** [2] - 1528:20, 1533:16
**reasons** [3] - 1498:22, 1498:23, 1544:24
**recap** [1] - 1521:20
**receipt** [1] - 1505:9
**receive** [17] - 1459:13, 1461:21, 1461:22, 1461:23, 1462:4, 1471:22, 1489:10, 1494:8, 1496:14, 1498:25, 1499:20, 1499:23, 1501:19, 1516:20, 1518:5, 1527:12, 1532:1
**received** [6] - 1472:14, 1473:9, 1473:10, 1509:9, 1513:1, 1526:9
**receives** [4] - 1493:5, 1493:10, 1498:4, 1544:6
**receiving** [5] - 1462:1, 1464:20, 1493:23, 1543:11, 1545:15
**recess** [1] - 1548:14
**Recess** [1] - 1492:14
**recognizes** [2] - 1524:22, 1525:12
**recollection** [2] - 1454:22, 1546:11
**record** [6] - 1483:8, 1502:21, 1502:24, 1522:21, 1534:20, 1549:11
**recover** [17] - 1489:9, 1489:10, 1489:16, 1520:21, 1527:6, 1528:7, 1528:14, 1528:15, 1533:6, 1536:25, 1537:5, 1537:12, 1537:24, 1538:4, 1538:6, 1540:1, 1546:12
**recoverability** [1] - 1539:22

**recoverable** [1] - 1544:13
**recovered** [9] - 1461:8, 1473:20, 1474:18, 1489:16, 1490:4, 1497:21, 1506:22, 1507:22, 1523:21
**recoveries** [6] - 1461:11, 1461:21, 1523:25, 1524:12, 1532:2, 1544:9
**recovering** [3] - 1486:20, 1528:6, 1539:24
**recovery** [68] - 1461:24, 1462:24, 1463:5, 1463:22, 1463:23, 1465:22, 1466:4, 1466:11, 1466:22, 1471:15, 1473:12, 1474:2, 1474:3, 1477:21, 1478:5, 1485:14, 1486:8, 1490:15, 1493:17, 1496:4, 1498:5, 1503:15, 1503:20, 1504:2, 1504:13, 1504:15, 1504:18, 1504:23, 1505:8, 1505:14, 1505:16, 1505:18, 1505:19, 1505:20, 1505:22, 1506:4, 1506:9, 1506:19, 1513:1, 1513:3, 1523:20, 1524:10, 1524:12, 1525:5, 1525:13, 1526:2, 1526:14, 1526:23, 1527:9, 1527:11, 1528:1, 1529:3, 1531:14, 1532:20, 1533:1, 1535:8, 1535:12, 1535:23, 1538:24, 1542:7, 1543:6, 1543:9, 1543:10, 1543:12, 1548:2
**Recovery** [1] - 1525:25
**red** [10] - 1457:6, 1461:2, 1463:15, 1465:7, 1489:11, 1489:19, 1490:21, 1490:22, 1490:24, 1491:15
**Redirect** [1] - 1549:4
**REDIRECT** [1] - 1516:4

**Redlands** [4] - 1495:21, 1496:12, 1536:24, 1541:10
**reduce** [4] - 1520:8, 1520:22, 1527:22, 1529:3
**reduced** [4] - 1465:7, 1467:16, 1467:22, 1527:23
**reduces** [1] - 1495:2
**reducing** [1] - 1510:24
**reduction** [1] - 1513:11
**refer** [1] - 1548:5
**reference** [1] - 1471:16
**references** [1] - 1525:5
**referring** [2] - 1525:7, 1525:24
**reflect** [7] - 1458:11, 1462:25, 1483:9, 1498:7, 1498:8, 1503:3, 1517:9
**reflected** [7] - 1497:25, 1503:21, 1504:16, 1504:20, 1505:3, 1506:6, 1510:21
**reflecting** [2] - 1465:14, 1504:18
**reflects** [3] - 1463:19, 1463:20, 1465:14
**regard** [1] - 1526:23
**regarding** [2] - 1457:3, 1467:2
**regardless** [1] - 1491:20
**regulations** [1] - 1494:23
**reimbursement** [1] - 1475:19
**relates** [1] - 1504:11
**relating** [2] - 1545:5, 1547:11
**relative** [2] - 1487:1, 1508:18
**relevance** [2] - 1523:5, 1544:1
**relevant** [14] - 1509:6, 1509:7, 1511:2, 1536:6, 1536:7, 1539:12, 1539:17, 1539:19, 1542:20, 1543:1, 1543:3, 1543:24, 1544:4
**relied** [1] - 1531:24
**rely** [1] - 1541:25
**relying** [1] - 1542:24
**remain** [1] - 1486:1

**remainder** [1] - 1492:22
**remains** [1] - 1519:16
**remedial** [2] - 1543:8, 1543:12
**remediating** [1] - 1462:23
**remediation** [23] - 1461:3, 1461:18, 1461:20, 1463:2, 1463:15, 1463:20, 1463:22, 1465:6, 1466:17, 1467:3, 1467:7, 1469:6, 1470:8, 1490:16, 1495:11, 1498:3, 1498:4, 1498:6, 1512:5, 1512:25, 1516:8, 1545:5, 1545:15
**remember** [4] - 1472:22, 1499:21, 1505:5, 1538:20
**remind** [1] - 1455:24
**report** [2] - 1488:12, 1488:13
**reported** [1] - 1453:25
**Reporter** [3] - 1453:1, 1453:1, 1549:10
**represent** [2] - 1461:2, 1479:19
**represents** [5] - 1464:11, 1464:12, 1464:18, 1486:19, 1489:4
**requires** [2] - 1500:15, 1534:18
**resolve** [3] - 1523:17, 1533:8, 1547:16
**resolved** [3] - 1454:9, 1456:24, 1544:11
**respect** [1] - 1472:24
**respectfully** [1] - 1546:6
**respond** [3] - 1522:5, 1522:11, 1537:2
**responded** [1] - 1544:22
**responding** [1] - 1455:20
**response** [5] - 1512:12, 1523:4, 1533:25, 1535:5, 1535:8
**responsibility** [2] - 1527:21, 1545:6
**rest** [1] - 1489:21
**result** [1] - 1524:11
**results** [9] - 1484:1, 1498:6, 1498:8,

1504:20, 1511:2, 1512:11, 1513:7, 1513:21, 1513:23
**resume** [1] - 1492:8
**resumed** [1] - 1482:23
**retain** [1] - 1531:10
**retaining** [1] - 1459:24
**retention** [1] - 1531:13
**revenue** [1] - 1487:2
**revenues** [2] - 1477:24, 1477:25
**reverse** [1] - 1540:2
**review** [1] - 1528:19
**reviewed** [1] - 1454:8
**rights** [1] - 1534:6
**risk** [1] - 1524:11
**Robert** [1] - 1475:22
**Robertson** [3] - 1529:21, 1542:2, 1542:18
**Robertson's** [3] - 1523:15, 1530:2, 1546:7
**Rod** [1] - 1457:19, 1522:15
**rolled** [1] - 1464:3
**Room** [1] - 1453:2
**room** [1] - 1535:6
**roughly** [3] - 1460:11, 1460:12, 1481:3
**row** [19] - 1483:14, 1485:6, 1485:23, 1486:7, 1486:9, 1486:13, 1487:23, 1504:12, 1505:13, 1506:15, 1506:24, 1506:25, 1507:4, 1507:5, 1507:6, 1508:5, 1510:20, 1510:22
**rows** [2] - 1477:19
**RPR** [1] - 1453:1
**rule** [2] - 1526:12, 1546:25
**ruled** [1] - 1525:20
**rules** [3] - 1521:7, 1532:11, 1533:4
**ruling** [1] - 1546:25
**run** [3] - 1483:7, 1483:9, 1487:20
**running** [2] - 1463:16
**runs** [1] - 1485:23

# S

**saddled** [1] - 1532:10
**sarcastic** [1] - 1531:18
**scenario** [7] -

1460:24, 1461:14, 1492:2, 1492:4, 1507:2, 1507:4, 1507:16
**scenarios** [3] - 1489:25, 1490:6, 1515:15
**screen** [3] - 1460:19, 1484:20, 1519:2
**se** [1] - 1523:22
**seal** [3] - 1456:5, 1456:19, 1521:23
**Seattle** [1] - 1540:24
**SEC** [1] - 1472:18
**second** [4] - 1454:10, 1459:20, 1499:10, 1499:18
**section** [1] - 1539:5
**Section** [1] - 1452:23
**see** [49] - 1456:9, 1457:8, 1457:14, 1459:25, 1461:1, 1462:1, 1463:9, 1465:10, 1465:12, 1465:13, 1465:18, 1466:9, 1469:19, 1481:7, 1481:13, 1481:15, 1481:17, 1481:20, 1483:15, 1483:24, 1485:1, 1489:2, 1489:5, 1489:11, 1489:14, 1489:17, 1491:25, 1493:17, 1498:1, 1498:14, 1498:24, 1499:3, 1501:23, 1502:4, 1504:9, 1504:12, 1504:14, 1505:4, 1505:7, 1510:20, 1511:10, 1517:24, 1521:25, 1530:5, 1530:6, 1530:7, 1533:10, 1534:1, 1535:1
**seeing** [1] - 1502:1
**seek** [1] - 1531:13
**seeking** [1] - 1454:19
**SEGAL** [1] - 1452:10
**sense** [2] - 1493:22, 1512:13
**sentence** [5] - 1498:24, 1499:2, 1499:5, 1499:19, 1543:15
**separated** [1] - 1548:4
**separately** [1] - 1461:10
**September** [1] - 1526:5
**services** [5] - 1498:21,

1499:17, 1527:17, 1527:18, 1532:1
**SESSION** [1] - 1452:9
**set** [10] - 1454:16, 1454:22, 1471:25, 1473:17, 1494:18, 1494:25, 1524:14, 1531:21, 1541:16, 1545:19
**sets** [2] - 1494:20, 1531:24
**settle** [7] - 1525:3, 1534:8, 1534:12, 1534:14, 1537:7, 1541:18, 1544:2
**settled** [8] - 1518:12, 1526:23, 1534:15, 1534:16, 1537:14, 1538:4, 1539:13, 1548:1
**settlement** [21] - 1456:2, 1456:4, 1456:13, 1456:14, 1456:18, 1456:24, 1457:3, 1457:12, 1472:1, 1515:18, 1521:22, 1521:23, 1526:5, 1537:18, 1537:19, 1538:1, 1541:18, 1543:6, 1543:11, 1543:21, 1546:13
**settlements** [1] - 1540:21
**settles** [1] - 1544:9
**settling** [1] - 1535:16
**several** [1] - 1544:24
**shall** [2] - 1526:8, 1526:22
**share** [27] - 1456:17, 1478:2, 1485:24, 1486:20, 1487:1, 1489:12, 1489:15, 1489:17, 1490:25, 1491:2, 1497:9, 1503:22, 1506:15, 1506:20, 1507:20, 1508:11, 1508:19, 1511:3, 1511:4, 1511:7, 1512:24, 1513:8, 1513:12, 1517:23, 1518:6, 1529:16, 1536:18
**shares** [1] - 1497:7
**sheet** [1] - 1488:4
**shorthand** [2] - 1453:25, 1507:19
**shouldering** [1] - 1513:8
**show** [14] - 1460:19,

1465:23, 1465:24, 1475:20, 1483:4, 1485:20, 1488:8, 1491:17, 1497:7, 1502:2, 1504:11, 1505:9, 1509:16, 1510:7
**showed** [1] - 1488:1
**showing** [4] - 1482:6, 1484:16, 1485:16, 1510:4
**shown** [6] - 1461:10, 1469:19, 1487:24, 1496:13, 1504:2, 1504:13
**shows** [2] - 1482:11, 1485:24
**side** [6] - 1467:2, 1468:22, 1468:24, 1494:17, 1495:20, 1515:25
**sides** [1] - 1470:15
**sign** [1] - 1542:15
**signed** [4] - 1534:4, 1537:3, 1538:23, 1540:9
**similar** [2] - 1515:11, 1543:10
**simple** [4] - 1466:1, 1474:5, 1510:16, 1512:22
**simplest** [1] - 1473:6
**simply** [4] - 1479:3, 1479:14, 1491:2, 1508:1
**site** [11] - 1461:3, 1462:23, 1489:2, 1495:11, 1496:4, 1514:1, 1518:2, 1539:25, 1541:10, 1541:12, 1545:5
**sites** [2] - 1471:8, 1544:19
**sitting** [1] - 1520:7
**situation** [5] - 1536:7, 1538:7, 1539:20, 1539:21, 1543:9
**size** [1] - 1491:14
**slip** [1] - 1457:22
**small** [1] - 1546:1
**smaller** [3] - 1458:18, 1466:21, 1466:22
**softball** [2] - 1511:23, 1512:1
**someday** [1] - 1540:10
**someplace** [1] - 1473:12
**sometime** [2] - 1512:5, 1519:12

**somewhere** [4] - 1467:8, 1493:2, 1518:20, 1539:14
**sorry** [25] - 1458:20, 1462:18, 1463:13, 1467:20, 1477:3, 1477:11, 1478:23, 1479:7, 1482:16, 1485:2, 1497:13, 1501:25, 1503:17, 1504:4, 1504:6, 1507:6, 1507:9, 1511:4, 1513:22, 1526:18, 1531:16, 1532:22, 1542:11, 1548:9
**sort** [4] - 1478:20, 1520:10, 1526:3, 1531:6
**source** [2] - 1478:7, 1487:2
**span** [1] - 1502:11
**speaking** [1] - 1520:14
**specific** [3] - 1486:2, 1504:7, 1539:5
**specifically** [3] - 1492:21, 1504:3, 1534:20
**specified** [1] - 1539:4
**specifying** [1] - 1474:21
**spectrum** [1] - 1494:24
**spend** [1] - 1477:11
**spent** [2] - 1462:22, 1513:1
**spike** [1] - 1462:1
**spread** [1] - 1544:18
**spreadsheet** [2] - 1484:6, 1484:8
**spreadsheets** [2] - 1456:16, 1483:6
**SRAM** [2] - 1509:19, 1510:4
**STACIE** [1] - 1452:15
**stage** [2] - 1479:7, 1522:22
**stand** [3] - 1457:24, 1457:25, 1463:3
**standards** [1] - 1544:19
**start** [14] - 1459:5, 1460:17, 1461:2, 1462:25, 1469:3, 1479:11, 1479:21, 1479:22, 1483:14, 1484:5, 1489:1, 1512:12, 1529:2, 1548:11

**started** [3] - 1507:21, 1538:10, 1544:23
**starting** [10] - 1466:21, 1482:15, 1488:17, 1489:23, 1500:15, 1512:5, 1514:13, 1517:18, 1522:18, 1539:6
**starts** [4] - 1485:7, 1499:2, 1511:23, 1515:15
**state** [1] - 1518:23
**statement** [4] - 1492:22, 1498:17, 1500:8, 1500:10
**statements** [1] - 1500:5
**States** [25] - 1454:3, 1457:23, 1459:12, 1459:24, 1493:5, 1493:10, 1494:3, 1496:14, 1511:13, 1511:15, 1526:10, 1527:1, 1527:12, 1527:21, 1529:13, 1529:15, 1530:13, 1530:16, 1532:17, 1534:9, 1535:11, 1536:19, 1539:25, 1543:7, 1543:8
**STATES** [3] - 1452:1, 1452:6, 1452:11
**States'** [1] - 1536:18
**stating** [1] - 1512:8
**status** [4] - 1460:25, 1489:5, 1512:19, 1515:13
**statute** [3] - 1454:17, 1454:22, 1455:4
**stay** [1] - 1523:4
**stayed** [1] - 1510:3
**step** [2] - 1470:25, 1475:8
**steps** [1] - 1521:13
**stick** [1] - 1510:6
**still** [18] - 1456:24, 1463:14, 1463:16, 1463:17, 1486:3, 1497:14, 1500:18, 1500:25, 1511:11, 1522:20, 1532:7, 1541:21, 1541:22, 1541:23, 1541:24, 1542:2, 1547:19
**stock** [2] - 1510:3, 1521:5
**stop** [2] - 1471:5, 1531:10
**story** [1] - 1532:4
**Street** [1] - 1452:24

**strictly** [1] - 1478:20
**strike** [1] - 1525:19
**strong** [1] - 1465:17
**stuff** [1] - 1533:11
**subject** [2] - 1519:5, 1521:24
**submit** [2] - 1456:4, 1456:19
**submitted** [2] - 1456:8, 1458:6
**subtract** [6] - 1461:15, 1479:16, 1479:24, 1491:2, 1498:13, 1502:3
**subtracting** [1] - 1499:23
**sue** [9] - 1527:5, 1531:9, 1531:13, 1533:5, 1534:5, 1535:12, 1536:24, 1537:6, 1542:6
**sued** [5] - 1531:10, 1540:1, 1540:5, 1540:8, 1544:21
**sufficient** [1] - 1512:4
**sufficiently** [1] - 1519:18
**suggest** [2] - 1508:10, 1513:21
**suggested** [1] - 1490:20
**suggesting** [2] - 1508:10, 1509:8
**suit** [1] - 1519:13
**Suite** [1] - 1452:24
**suits** [2] - 1540:14, 1540:15
**Sullivan** [1] - 1533:25
**SULLIVAN** [37] - 1452:19, 1529:18, 1534:7, 1534:11, 1534:16, 1534:22, 1535:4, 1535:9, 1535:21, 1536:12, 1536:16, 1537:4, 1537:7, 1537:17, 1538:10, 1538:19, 1539:1, 1539:4, 1539:9, 1539:15, 1539:18, 1540:5, 1540:7, 1541:22, 1541:24, 1542:3, 1542:5, 1542:10, 1542:12, 1542:14, 1543:2, 1543:5, 1543:17, 1543:20, 1544:1, 1546:6, 1547:22
**sum** [4] - 1485:12, 1505:10, 1505:15,

1508:1
**summed** [1] - 1487:23
**Superfund** [2] -
1500:19, 1517:12
**supplementing** [1] -
1522:21
**support** [1] - 1500:5
**supposed** [4] -
1521:6, 1527:3,
1527:5, 1527:6
**surprise** [2] - 1540:4,
1540:5
**survive** [1] - 1513:16
**sustained** [2] - 1475:5
**swaths** [1] - 1486:1
**SWORN** [1] - 1458:1
**system** [15] - 1494:11,
1494:13, 1517:17,
1524:14, 1524:22,
1525:1, 1525:2,
1531:17, 1531:21,
1531:24, 1533:2,
1533:13, 1534:4

## T

**tab** [2] - 1458:22,
1477:7
**tag** [2] - 1469:5
**tally** [1] - 1508:2
**tax** [12] - 1461:9,
1478:5, 1487:3,
1487:8, 1487:11,
1487:17, 1490:5,
1510:19, 1510:21,
1510:23, 1511:6,
1512:2
**taxes** [2] - 1477:25,
1486:22
**term** [3] - 1472:14,
1474:3, 1516:1
**terms** [19] - 1455:8,
1461:2, 1462:23,
1462:24, 1468:4,
1468:6, 1479:11,
1493:8, 1495:11,
1499:22, 1501:16,
1506:3, 1510:25,
1511:3, 1512:23,
1513:11, 1523:13,
1534:2, 1546:23
**terribly** [3] - 1457:9,
1468:22, 1544:4
**testifies** [1] - 1475:15
**testify** [1] - 1545:25
**testimony** [4] -
1458:8, 1490:2,
1528:25, 1547:4
**THE** [421] - 1452:1,

1452:10, 1454:2,
1454:6, 1454:11,
1455:9, 1455:19,
1455:24, 1456:3,
1456:10, 1456:17,
1456:21, 1457:2,
1457:5, 1457:21,
1458:1, 1458:15,
1458:20, 1458:23,
1460:20, 1460:22,
1462:7, 1462:10,
1462:11, 1462:12,
1462:13, 1462:15,
1462:17, 1462:18,
1463:13, 1463:17,
1463:25, 1464:1,
1464:2, 1464:4,
1464:8, 1464:9,
1464:11, 1464:12,
1464:13, 1464:16,
1464:21, 1464:23,
1464:24, 1465:3,
1465:9, 1465:11,
1465:16, 1465:21,
1465:25, 1466:4,
1466:8, 1466:11,
1466:14, 1466:20,
1466:23, 1467:1,
1467:3, 1467:5,
1467:10, 1467:13,
1467:19, 1467:23,
1467:25, 1468:2,
1468:3, 1468:7,
1468:8, 1468:9,
1468:11, 1468:14,
1468:16, 1468:17,
1468:19, 1468:24,
1469:1, 1469:5,
1469:8, 1469:9,
1469:10, 1469:11,
1469:14, 1469:17,
1469:18, 1469:21,
1470:10, 1470:11,
1470:12, 1470:13,
1470:16, 1470:18,
1471:11, 1471:13,
1471:14, 1471:18,
1471:19, 1471:21,
1471:22, 1471:24,
1471:25, 1472:2,
1472:3, 1472:17,
1473:2, 1473:19,
1473:23, 1474:2,
1474:3, 1474:5,
1474:14, 1474:16,
1475:2, 1475:5,
1475:15, 1475:25,
1476:4, 1476:12,
1476:22, 1476:25,
1477:5, 1477:6,
1477:7, 1477:10,

1477:13, 1477:15,
1477:17, 1478:9,
1478:12, 1478:17,
1478:22, 1478:25,
1479:2, 1479:5,
1479:6, 1479:7,
1479:10, 1479:18,
1479:20, 1480:2,
1480:3, 1480:6,
1480:8, 1480:11,
1480:13, 1480:15,
1480:16, 1480:21,
1480:23, 1480:24,
1480:25, 1481:4,
1481:6, 1481:7,
1481:8, 1481:9,
1481:11, 1481:15,
1481:17, 1481:22,
1482:11, 1482:16,
1482:20, 1483:11,
1484:17, 1484:21,
1484:23, 1485:3,
1485:5, 1485:8,
1485:18, 1485:19,
1486:5, 1486:7,
1486:11, 1487:3,
1487:7, 1487:8,
1487:10, 1487:12,
1487:13, 1487:15,
1487:19, 1487:21,
1490:18, 1490:19,
1490:22, 1490:23,
1490:24, 1491:1,
1491:4, 1491:5,
1491:6, 1491:7,
1491:8, 1491:10,
1491:24, 1492:5,
1492:10, 1492:13,
1493:20, 1493:22,
1493:24, 1493:25,
1494:10, 1494:14,
1494:15, 1496:1,
1496:2, 1496:24,
1497:2, 1497:4,
1497:7, 1500:7,
1500:9, 1500:15,
1500:18, 1500:22,
1500:25, 1502:11,
1502:12, 1502:13,
1502:14, 1502:15,
1503:1, 1503:6,
1503:9, 1506:3,
1506:7, 1506:8,
1506:11, 1506:12,
1508:20, 1508:25,
1509:5, 1509:11,
1509:13, 1509:23,
1509:25, 1510:9,
1510:10, 1510:12,
1511:19, 1511:22,
1511:25, 1512:1,

1512:15, 1512:17,
1512:18, 1513:11,
1513:13, 1513:15,
1513:18, 1513:22,
1513:24, 1514:4,
1514:8, 1514:10,
1514:11, 1514:18,
1514:21, 1514:22,
1515:2, 1515:3,
1515:5, 1515:8,
1515:9, 1515:10,
1515:16, 1515:22,
1515:24, 1516:2,
1516:3, 1516:10,
1516:12, 1517:1,
1517:7, 1517:11,
1517:15, 1517:16,
1517:19, 1518:16,
1518:18, 1518:19,
1518:22, 1519:1,
1519:5, 1519:13,
1519:16, 1519:21,
1519:24, 1520:1,
1520:2, 1520:4,
1520:7, 1520:13,
1520:16, 1520:19,
1520:20, 1520:23,
1520:24, 1520:25,
1521:3, 1521:4,
1521:6, 1521:10,
1521:12, 1521:14,
1521:17, 1522:3,
1522:17, 1522:20,
1522:24, 1523:2,
1523:10, 1523:13,
1523:19, 1524:15,
1524:17, 1524:20,
1525:7, 1525:10,
1525:15, 1525:21,
1525:23, 1526:2,
1526:14, 1526:17,
1526:20, 1526:25,
1527:5, 1527:8,
1528:2, 1528:9,
1528:18, 1528:22,
1529:1, 1529:5,
1529:19, 1530:1,
1530:3, 1530:6,
1530:12, 1530:22,
1530:25, 1531:5,
1531:18, 1531:20,
1532:5, 1532:19,
1532:24, 1533:10,
1533:14, 1533:18,
1533:22, 1533:24,
1534:10, 1534:12,
1534:15, 1534:18,
1535:2, 1535:5,
1535:13, 1535:18,
1535:20, 1535:25,
1536:5, 1536:8,

1536:13, 1537:2,
1537:6, 1537:9,
1538:8, 1538:12,
1538:16, 1538:18,
1538:25, 1539:3,
1539:8, 1539:12,
1539:17, 1540:3,
1540:6, 1540:9,
1540:12, 1540:14,
1540:17, 1540:19,
1540:23, 1541:2,
1541:5, 1541:7,
1541:9, 1541:13,
1541:16, 1541:23,
1541:25, 1542:4,
1542:8, 1542:11,
1542:13, 1542:15,
1543:4, 1543:14,
1543:19, 1543:23,
1544:11, 1544:21,
1545:4, 1545:14,
1545:22, 1546:1,
1546:4, 1546:21,
1546:25, 1547:2,
1547:7, 1547:10,
1548:2, 1548:6,
1548:8, 1548:10
**theirs** [1] - 1469:16
**themselves** [1] -
1484:5
**theory** [3] - 1470:1,
1481:16, 1515:25
**thereafter** [1] - 1473:9
**therefore** [1] - 1514:5
**they've** [6] - 1463:20,
1467:13, 1469:18,
1475:20, 1514:6,
1529:14
**thinking** [1] - 1468:21
**thinks** [1] - 1457:10
**thoughts** [1] - 1515:3
**thousands** [1] -
1472:15
**three** [3] - 1504:8,
1522:5, 1540:15
**tie** [1] - 1476:8
**tied** [1] - 1504:22
**timeline** [1] - 1469:13
**timing** [5] - 1472:17,
1476:10, 1499:10,
1537:21, 1539:19
**tive** [1] - 1494:11
**today** [16] - 1457:10,
1458:8, 1458:9,
1458:16, 1459:5,
1468:10, 1468:11,
1469:5, 1501:20,
1511:11, 1512:12,
1518:20, 1532:8,
1532:9, 1532:12,

1535:24
**today's** [3] - 1462:22, 1468:5, 1468:11
**together** [6] - 1466:15, 1482:3, 1482:25, 1483:4, 1532:16, 1537:12
**tolling** [4] - 1521:25, 1540:9, 1541:9, 1541:10
**took** [3] - 1455:17, 1483:20, 1510:19
**top** [1] - 1517:22
**TORRES** [1] - 1452:14
**total** [11] - 1459:25, 1464:9, 1474:22, 1489:2, 1491:11, 1491:15, 1500:2, 1508:3, 1511:4, 1518:1, 1528:24
**track** [1] - 1461:7
**transcript** [2] - 1453:25, 1549:11
**TRANSCRIPT** [1] - 1452:10
**transcription** [1] - 1453:25
**translate** [2] - 1463:15, 1478:18
**treat** [2] - 1471:6, 1510:1
**treated** [2] - 1476:3, 1497:18
**treating** [1] - 1506:4
**treatment** [3] - 1498:18, 1498:19, 1499:16
**Treatment** [1] - 1539:6
**TRIAL** [1] - 1452:10
**trial** [7] - 1458:17, 1458:21, 1461:2, 1477:8, 1479:12, 1479:23, 1489:1
**tried** [3] - 1491:24, 1511:2, 1540:20
**trouble** [1] - 1516:13
**troubled** [1] - 1542:24
**true** [14] - 1490:6, 1500:13, 1501:23, 1507:8, 1507:9, 1508:7, 1511:11, 1513:6, 1513:19, 1513:20, 1514:8, 1514:10, 1529:18, 1544:14
**truth** [1] - 1462:8
**try** [4] - 1516:16, 1528:11, 1528:14, 1536:21
**trying** [12] - 1464:14,

1469:11, 1478:6, 1484:9, 1488:16, 1507:19, 1515:18, 1532:19, 1534:22, 1538:3, 1538:23, 1540:1
**Tuesday** [1] - 1522:12
**turn** [5] - 1459:6, 1461:15, 1486:2, 1502:19, 1506:14
**turned** [1] - 1475:12
**twice** [1] - 1530:6
**two** [22] - 1456:5, 1470:15, 1475:8, 1489:19, 1498:22, 1498:23, 1500:5, 1511:7, 1513:7, 1513:18, 1514:12, 1515:6, 1522:13, 1532:15, 1535:21, 1536:13, 1537:12, 1537:17, 1537:21, 1540:25, 1546:22, 1547:12
**two-step** [1] - 1475:8
**type** [1] - 1474:21

## U

**U.S** [41] - 1452:22, 1453:2, 1458:17, 1458:21, 1465:4, 1465:5, 1465:8, 1466:19, 1473:20, 1477:1, 1477:8, 1479:21, 1482:6, 1483:6, 1485:25, 1487:1, 1489:6, 1489:14, 1489:25, 1490:6, 1491:2, 1492:4, 1493:22, 1498:9, 1502:21, 1503:4, 1506:14, 1507:1, 1507:3, 1507:16, 1508:12, 1513:14, 1513:25, 1514:12, 1515:17, 1526:9, 1526:18, 1537:10, 1537:13, 1544:12, 1545:23
**ultimately** [1] - 1513:6
**uncertain** [3] - 1538:2, 1546:12, 1546:16
**under** [43] - 1456:4, 1456:19, 1458:22, 1460:24, 1471:23, 1477:7, 1477:9, 1478:10, 1481:9, 1481:15, 1489:13, 1491:13, 1492:1,

1492:3, 1510:21, 1517:7, 1519:9, 1519:17, 1521:23, 1524:5, 1524:12, 1524:15, 1524:16, 1527:13, 1528:18, 1531:11, 1531:14, 1532:14, 1534:5, 1534:6, 1535:23, 1536:19, 1536:25, 1537:5, 1537:25, 1538:4, 1538:7, 1538:14, 1540:1, 1541:19, 1544:3, 1544:6, 1545:1
**underneath** [1] - 1484:23
**understood** [1] - 1476:23
**unfairness** [1] - 1536:17
**unified** [1] - 1546:8
**unit** [3] - 1472:9, 1527:15, 1544:20
**UNITED** [3] - 1452:1, 1452:6, 1452:11
**United** [26] - 1454:3, 1457:23, 1459:12, 1459:23, 1493:5, 1493:10, 1494:3, 1496:14, 1511:13, 1511:15, 1526:10, 1527:1, 1527:12, 1527:21, 1529:13, 1529:15, 1530:13, 1530:16, 1532:17, 1534:9, 1535:11, 1536:18, 1536:19, 1539:25, 1543:7, 1543:8
**units** [6] - 1475:11, 1475:14, 1524:25, 1544:18, 1545:2
**unreasonable** [2] - 1528:10, 1528:17
**unrelated** [1] - 1537:19
**up** [42] - 1456:23, 1457:15, 1459:22, 1466:2, 1466:7, 1467:5, 1470:22, 1474:10, 1478:24, 1488:3, 1494:23, 1496:3, 1497:7, 1497:10, 1500:2, 1500:12, 1502:2, 1502:3, 1502:7, 1502:16, 1503:12, 1504:10, 1505:12, 1505:21, 1506:19,

1507:4, 1507:23, 1507:25, 1508:2, 1508:5, 1508:11, 1510:3, 1514:14, 1524:14, 1531:21, 1531:24, 1532:16, 1536:20, 1537:1, 1542:8, 1542:22, 1543:14
**upper** [1] - 1476:15

## V

**value** [46] - 1461:1, 1462:21, 1464:6, 1464:9, 1464:10, 1468:4, 1474:16, 1479:11, 1480:25, 1481:18, 1482:7, 1483:19, 1483:22, 1484:7, 1484:10, 1484:12, 1485:17, 1489:1, 1489:3, 1492:2, 1499:11, 1499:22, 1500:10, 1500:12, 1501:2, 1501:9, 1501:10, 1501:16, 1501:22, 1501:23, 1502:6, 1505:6, 1511:1, 1516:18, 1517:5, 1517:6, 1517:10, 1517:14, 1519:19, 1519:21, 1519:22, 1519:23, 1520:9, 1520:11, 1520:13, 1520:22
**varied** [1] - 1513:3
**various** [3] - 1485:23, 1507:22, 1523:2
**vendor** [1] - 1471:1
**versus** [1] - 1475:19
**vice** [1] - 1475:23
**view** [3] - 1502:13, 1523:25, 1528:11
**virtue** [1] - 1528:10
**visually** [1] - 1460:18

## W

**WA** [1] - 1519:24
**WACC** [1] - 1520:1
**wait** [2] - 1508:20, 1534:1
**waiver** [1] - 1535:10, 1535:18
**waiving** [2] - 1543:18, 1543:22
**walk** [1] - 1482:3

**wants** [2] - 1523:1, 1547:22
**War** [1] - 1532:18
**wash** [4] - 1469:22, 1469:25, 1502:13, 1502:14
**washes** [1] - 1469:23
**Washington** [5] - 1452:6, 1452:17, 1452:25, 1453:3, 1541:11
**WAYNE** [3] - 1453:1, 1549:10, 1549:14
**ways** [4] - 1510:12, 1523:3, 1528:15, 1537:3
**weeds** [2] - 1509:15, 1512:2
**Western** [1] - 1540:24
**Westlaw** [2] - 1546:19
**whatsoever** [1] - 1533:1
**whereby** [2] - 1524:8, 1524:23
**whichever** [1] - 1537:13
**whole** [4] - 1479:22, 1489:7, 1501:1, 1502:11
**whoops** [2] - 1504:4, 1511:4
**WILLIAM** [1] - 1452:21
**witness** [8] - 1457:14, 1457:16, 1457:22, 1458:14, 1475:22, 1521:13, 1521:15, 1548:12
**Witness** [1] - 1457:25
**WITNESS** [118] - 1458:1, 1460:22, 1462:10, 1462:12, 1462:15, 1462:18, 1463:17, 1464:1, 1464:4, 1464:9, 1464:12, 1464:16, 1464:23, 1465:3, 1465:11, 1465:21, 1466:8, 1466:14, 1466:23, 1467:3, 1467:25, 1468:3, 1468:8, 1468:11, 1468:17, 1468:24, 1469:8, 1469:10, 1469:14, 1469:18, 1470:10, 1470:12, 1470:16, 1471:13, 1471:18, 1471:21, 1471:24, 1472:2, 1473:23, 1474:3, 1474:16, 1476:25,

1477:5, 1477:7,
1477:13, 1477:17,
1478:12, 1478:22,
1479:2, 1479:6,
1479:10, 1479:20,
1480:3, 1480:8,
1480:13, 1480:16,
1480:23, 1480:25,
1481:6, 1481:8,
1481:11, 1481:17,
1482:11, 1485:19,
1486:7, 1487:7,
1487:10, 1487:13,
1487:19, 1490:19,
1490:23, 1491:1,
1491:5, 1491:7,
1491:10, 1491:24,
1493:22, 1493:25,
1494:15, 1496:2,
1497:4, 1500:9,
1500:18, 1500:25,
1502:12, 1502:14,
1506:7, 1506:11,
1510:9, 1511:25,
1512:15, 1512:18,
1513:13, 1513:18,
1513:24, 1514:8,
1514:11, 1514:21,
1515:2, 1515:8,
1515:10, 1515:22,
1516:2, 1517:7,
1517:15, 1517:19,
1518:18, 1518:22,
1519:21, 1520:1,
1520:4, 1520:13,
1520:19, 1520:23,
1520:25, 1521:4,
1521:12, 1549:2
**witnesses** [1] -
1546:22
**woken** - 1542:22
**wondering** [2] -
1470:1, 1505:17
**word** [3] - 1469:25,
1526:15, 1531:6
**words** [1] - 1535:7
**works** [1] - 1485:21
**worksheet** [1] -
1485:16
**world** [4] - 1512:20,
1512:21, 1532:7,
1533:6
**worried** [1] - 1530:25
**worth** [4] - 1501:19,
1502:8, 1510:7,
1515:17
**written** [4] - 1455:6,
1455:7, 1519:11,
1519:12

## Y

**year** [43] - 1462:25,
1463:22, 1464:19,
1465:5, 1465:6,
1468:1, 1471:22,
1473:19, 1474:21,
1474:22, 1475:1,
1476:5, 1476:7,
1476:17, 1476:19,
1477:18, 1477:22,
1478:9, 1478:11,
1478:13, 1478:16,
1483:19, 1483:22,
1485:10, 1486:2,
1486:4, 1486:6,
1490:16, 1491:18,
1501:17, 1504:7,
1504:14, 1504:15,
1504:18, 1505:9,
1506:5, 1506:10,
1513:3, 1528:23
**year-specific** [2] -
1486:2, 1504:7
**yearly** [1] - 1475:10
**years** [46] - 1459:24,
1463:1, 1463:21,
1463:24, 1464:22,
1465:17, 1465:19,
1465:24, 1466:12,
1466:17, 1467:12,
1473:22, 1474:13,
1477:22, 1478:14,
1478:15, 1482:11,
1482:25, 1483:4,
1486:1, 1486:16,
1487:24, 1487:25,
1488:6, 1488:22,
1491:22, 1496:6,
1496:9, 1497:16,
1497:19, 1497:21,
1498:5, 1498:6,
1501:1, 1501:14,
1501:15, 1501:17,
1501:18, 1502:8,
1505:23, 1518:17,
1520:12, 1532:6,
1532:13, 1540:25
**yesterday** [1] - 1535:6
**yourself** [1] - 1499:25

## Z

**zero** [1] - 1464:17
**ZILIOLI** [1] - 1452:19
**zing** [1] - 1534:6