UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOCKHEED MARTIN CORPORATION,   .
                               .
          Plaintiff,           .
                               .  CA No. 08-1160 (ESH)
     v.                        .
                               .
  UNITED STATES OF AMERICA,    .  Washington, D.C.
                               .  Wednesday, February 24, 2014
          Defendant.           .  9:57 a.m.
                               .
. . . . . . . . . . . . . .    .  Pages 1643 - 1714

                        DAY 9
             TRANSCRIPT OF BENCH TRIAL
       BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

   For the Plaintiff:         MICHAEL K. MURPHY, ESQ.
                              JUSTIN A. TORRES, ESQ.
                              STACIE B. FLETCHER, ESQ.
                              DAVID FOTOUHI, ESQ.

                              Gibson, Dunn & Crutcher, LLP
                              1050 Connecticut Avenue, NW
                              Washington, DC 20036-5306
                              (202) 955-8238

   For the Defendant:         JOHN E. SULLIVAN, ESQ.
                              ERICA M. ZILIOLI, ESQ.
                              JESSICA O'DONNELL, ESQ.
                              JUSTIN D. HEMINGER, ESQ.
                              JENNIFER E. POWELL, ESQ.
                              WILLIAM D. JOHNSON, ESQ.

                              U.S. Department of Justice
                              ENRD / Environmental Defense
                              Section
                              601 D Street, NW
                              Suite 8000
                              Washington, DC 20026-3986
                              (202) 305-0365

```
Court Reporter:              PATRICIA KANESHIRO-MILLER, RMR
                             Certified Realtime Reporter
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Washington, DC 20001
                             (202) 354-3243
```

## CONTENTS

WITNESS                                                      PAGE

    ROBERT GATCHEL
         Direct Examination.............................. 1645
         Cross-Examination............................... 1677
         Recross-Examination............................. 1692

1    PROCEEDINGS

2         THE COURT:  Good morning.  Go ahead.

3         MS. FLETCHER:  Good morning, Your Honor.  Lockheed

4    Martin calls Robert Gatchel.

5                       **ROBERT GATCHEL**

6         having been first duly sworn to tell the truth, the

7    whole truth and nothing but the truth, was examined and

8    testified as follows:

9         THE COURT:  Good morning.  Go ahead.

10                    **DIRECT EXAMINATION**

11        BY MS. FLETCHER:

12   Q.   Good morning, sir.

13        Could you, please, state your name for the record.

14   A.   Robert Gatchel.

15   Q.   What is your current position?

16   A.   I am the vice president of government finance for Lockheed

17   Martin Corporation.

18   Q.   Mr. Gatchel, how long have you held that position?

19   A.   Approximately seven and a half years.

20   Q.   And prior to becoming the vice president of government

21   finance, what positions did you hold at Lockheed Martin?

22   A.   I held similar positions in the same discipline at one of

23   Lockheed Martin's business units, which was missiles and fire

24   control in Orlando, Florida.

25        THE COURT:  Could you keep your voice up.

1    BY MS. FLETCHER:

2  Q.   Have you ever worked for the government, Mr. Gatchel?

3  A.   Yes, I have.  After college, I entered the civil service,

4  and I worked as an auditor for three different government

5  agencies:  the Department of Treasury; the Department of Energy;

6  and also, under the Department of Defense, I worked as an

7  auditor for the Defense Contract Audit Agency.

8  Q.   Mr. Gatchel, as a vice president of government finance,

9  what are your job duties?

10  A.   I report in through the controller organization, and I am

11  responsible for the preparation, submittal, and support of the

12  indirect expenses at the corporate overhead level, which ends up

13  in forward pricing submittals and forward pricing rate

14  agreements at the business unit level.

15       I'm also responsible for preparing, submitting, and

16  supporting the incurred cost claims, which are required under

17  regulation for us to submit to the government at the end of our

18  fiscal year in order to settle our indirect rates, communicate

19  those out to the business units so that they may use them for

20  closing contracts under U.S. government contracts.

21       I'm also for preparing and supporting the company's cost

22  accounting standards for disclosure statement, which is our

23  written statement of our cost accounting practices.

24       I also interpret and apply and provide guidance for the FAR

25  cost principles as applies to Lockheed's business in pricing and

1  billing under contracts.

2  Q.   Thank you, Mr. Gatchel.

3       The forward pricing and incurred cost claims that you just

4  mentioned, do those include the environmental costs at issue in

5  this case?

6  A.   Yes, they do, at the corporate level.  The environmental

7  costs that we incur are an indirect expense to the corporation's

8  contracts, and we accumulate those indirect expenses with other

9  indirect expenses at the corporate level, such as the

10  maintenance of the building, the utility bills that we may pay,

11  the cost of the corporate staff to manage the infrastructure

12  overall; and those costs are pooled in one large pool and sent

13  down to the business units as a burden or an indirect rate, if

14  you will, which they then incorporate into their pricing actions

15  under our contracts.

16  Q.   Mr. Gatchel, if Lockheed Martin receives a judgment in the

17  case, how will that judgment be reflected in your cost

18  accounting for government contracts?

19  A.   Yes, we would handle this judgment, if it were to be

20  finalized, we would handle this in accordance with our disclosed

21  and established cost accounting practices in the same manner

22  that we've handled these types of settlements before.

23  Specifically, the cost accounting standards require us to handle

24  costs in a consistent manner, not only in accordance with the

25  standards, but from time period to time period, year to year,

1   contract by contract in a cross customer type so that every

2   customer or cost objective is handled in the same manner.  So

3   when these credits are received, we will record the credit into

4   our books of record.  It will be established as a deferred

5   account, and then beginning in the year after we receive the

6   credit, those costs will be -- those credits will be allocated

7   against our remediation costs over a five-year period.  So when

8   we determine the total amount of remediation costs that we're

9   going to include in this indirect flow-down that goes to the

10  business units, these credits will be taken as a bottom line

11  reduction to that number.

12  Q.   Do you credit other indirect cost pools on a normal basis?

13  A.   Yes, we do.  Again, we have to follow the cost accounting

14  standards, and we have to be consistent.  The FAR credits clause

15  requires us to apply in a consistent manner any credits,

16  refunds, rebates, et cetera that we have received and are

17  related to a similar cost under our government contracts.  So if

18  we receive a refund of a property tax assessment at the local

19  level, that would be credited back against the appropriate cost

20  pool.  If we receive credits back under workman's compensation,

21  that's handled the same way.  If we were to receive a credit

22  back on state tax assessment, those credits are applied, again,

23  against the similar cost as it was incurred in our books.

24  Q.   Do you have other credits in the discontinued operations

25  pool now?

1   A.   Yes, I'm aware that we have had at least three credits in
2   disc ops pool.  One relates to the Burbank CERCLA agreement; we
3   have had another recovery against a small company, I think it
4   was referred to as 7 W; and we have also had some insurance
5   recoveries which we have credited back against the disc ops
6   pool.
7             THE COURT:  Can you tell me how much those were?
8             THE WITNESS:  No, Your Honor, I don't know the
9   specific amounts.
10            BY MS. FLETCHER:
11   Q.   Mr. Gatchel, can you deviate from this accounting practice
12   for credits without the approval of the United States?
13   A.   We cannot.  As a government contractor, we are governed by
14   a set of cost accounting standards.  There's 19 of them.  One in
15   particular is CAS 4, one which requires us to have consistency
16   in estimating, accumulating, and reporting costs under
17   government contracts.  So once we have established a cost
18   accounting practice and we have disclosed that to the government
19   and the government has approved that cost accounting practice as
20   being compliant with CAS, we're required to follow that same
21   practice for all similar costs on a consistent basis year to
22   year, contract by contract, against all customer types in our
23   contract base regardless of whether they're U.S. Government or
24   non-U.S. Government, DOD or non-DOD.
25            THE COURT:  So if you deal with a foreign company or a

1    non-U.S. government, private entity, you follow the same

2    procedures?

3              THE WITNESS:  Yes, Your Honor.

4              THE COURT:  So if you contract with Boeing, are they

5    getting the benefit of this reduction?  If you get a judgment,

6    does Boeing get the benefit of the credit?

7              THE WITNESS:  Yes, Your Honor, if we are subcontractor

8    to Boeing, then we would allocate to that subcontract the cost

9    of the remediation, and we would also credit to the cost pool

10   any credits that come back as a result of any type of recovery.

11             THE COURT:  So nobody tries to negotiate with you to

12   get rid of indirect costs, non-U.S. entity, whether it be

13   foreign or a private?  The competitive market does not affect

14   the indirect costs that are put into your contracts?

15             THE WITNESS:  That's correct.

16             THE COURT:  So the Saudis don't come on and say, I'm

17   not paying this kind of thing, reduce your bid?

18             THE WITNESS:  If it were a competitive contract and

19   the Saudis elected to come in with a price, we would be

20   negotiating the price.  Regardless of what price was

21   established, the cost associated with all of our

22   indirect -- excuse me -- all of our indirect expenses, including

23   the allocable share of remediation, would be placed on that

24   contract and would be a cost of doing the contract.

25             THE COURT:  So when you figure out your profit on the

1    contract, are you figuring it on the gross or on some other --

2              THE WITNESS:  It's gross costs.  It's going to be

3    gross costs against whatever the price of the contract provided.

4              THE COURT:  So, really, in terms of your dealings with

5    the world, whether it be government, non-government, private or

6    government, the mechanism doesn't vary?

7              THE WITNESS:  It doesn't.

8              THE COURT:  Somebody gets a credit, somebody

9    gets -- and you get to recoup costs?

10             THE WITNESS:  Every contract, every activity in

11   Lockheed Martin's total business gets costs and credits the same

12   way regardless of the customer and regardless of the contract

13   type and regardless whether it was competitive or whether it was

14   negotiated.

15             THE COURT:  Okay.  And were you working for Lockheed

16   in 2000?

17             THE WITNESS:  Yes.  Not in my current position but

18   yes.

19             THE COURT:  What were you doing then?

20             THE WITNESS:  I was at Lockheed Martin's business unit

21   in Orlando, Florida, missiles and fire control.

22             THE COURT:  So you weren't involved in the -- what's

23   it called?

24        MS. FLETCHER:  The discontinued operations settlement

25   agreement, the DOSA.

1    THE COURT:  DOSA, we have been calling it DOSA.

2    THE WITNESS:  I was not.

3    THE COURT:  But you're familiar with the way that it

4    provides for the payment of costs, then credit, then you put it

5    into the contract, and then you credit any judgments.  Was that

6    a big change, that agreement represent a big change from what

7    had been going on before, or was this just sort of this was the

8    way to resolve the dispute between you and the government over

9    what costs might or might not be disallowed?

10   THE WITNESS:  I was part of the negotiations on that.

11   My understanding was that the handling of the costs, the method

12   by which the costs were being recorded into the books and then

13   amortized and placed on the contracts via the indirect cost

14   pool, was a practice which had been in place.  In fact, the

15   agreement solidified that practice as well as establishing some

16   amount of allowable costs, which would then live on as those

17   costs were incurred.

18   THE COURT:  But you don't know what the credits are

19   attributable to Redlands?

20   THE WITNESS:  I know that as we incur the costs and we

21   then send -- we send the bill forward to the U.S. government, we

22   are credited with 50 percent of those costs.  I don't know the

23   dollar amount.  We then take that 50 percent, we record it into

24   our books; and then beginning the year after receipt, that

25   credit will be applied to the indirect cost pools and reduce the

1    remediation costs that we otherwise pay.

2              THE COURT:  But that 50 percent applies to more than

3    Burbank, 7 or whatever it is called, and insurance, or not?

4              THE WITNESS:  I don't know the answer to that.

5              THE COURT:  Presumably, you're getting credits from

6    other sources other than those three?  You identified Burbank

7    and that small company 7, whatever, and insurance.

8              THE WITNESS:  And some insurance, right.  Those are

9    the types of credits and the parties that I am aware of.

10   They're all handled in the same manner, but I just can't

11   delineate for you how many insurance recoveries there might be.

12   I'm not sure.

13             BY MS. FLETCHER:

14   Q.   Mr. Gatchel, when you're talking about the 50 percent

15   payment system, you're talking about Burbank; correct?

16   A.   That's my understanding, that's the Burbank settlement.

17   Q.   Mr. Gatchel, can you tell the Court who some of the other

18   non-federal government customers will be that will get the

19   benefit of the credit?

20   A.   Yes.  From the non-federal government side, we provide

21   goods and services to a number of universities; goods and

22   services to many municipalities, including city and county.  We

23   provide goods and services to many state governments.  On the

24   commercial, purely commercial side, we don't have a lot of

25   business other than -- I'm aware of we have a contract with UPS,

1    where we provide them with package sorting machines, much as we

2    deliver to the U.S. Postal Service.

3    Q.   Mr. Gatchel, who are some of the non-DOD federal customers

4    that will get the benefit of the credit?

5    A.   Beyond the DOD, NASA is one of our major customers.  We

6    also deal with the Department of Energy, the Department of

7    Homeland Security, the Federal Aviation Agency, the Social

8    Security Administration, the Department of Treasury.  I think I

9    said Health & Human Services; if I didn't, that's in there.  And

10   also, the Department of Justice is one of our customers for the

11   goods and services, primarily in the IT world.

12   Q.   Mr. Gatchel, when you have gotten other credits to indirect

13   cost pools in the past, has Lockheed Martin, for lack of a

14   better term, just pocketed the money going to non-federal

15   customers?

16   A.   No, any credit that we receive related to any of our cost

17   pools or types of costs is always taken as a cost reduction to

18   that particular item of cost; and as you then gather that

19   reduction, along with the costs that are incurred for

20   remediation, it is booked together -- excuse me -- it's pooled

21   together with other items of indirect costs and then sent out to

22   the business units.  To the extent that costs come in, they are

23   allocated to the business units, who then use them in pricing

24   their contracts.  To the extent that credits come in, they are

25   also allocated to those same indirect cost pools and sent down

1    to the business units for purposes of establishing their rates

2    and negotiating contracts with the government.

3            THE COURT:  But when they talk about an 87 percent

4    recovery factor, are they -- are you talking strictly about DOD

5    contracts or government contracts?

6            THE WITNESS:  No, this would be -- the 87 percent is

7    computed at a point in time based on our forecast of how much

8    U.S. government business we might have in the future, so it is

9    all U.S. government.

10           THE COURT:  The 13 percent doesn't include DOJ, it

11   doesn't include Homeland Security if I use 87 percent

12   hypothetically?

13           THE WITNESS:  No, the 87 percent is all U.S.

14   government contracts under which we are required to perform in

15   accordance with the federal acquisition regulations and the CAS

16   regulations.  So, for instance, the Department of Justice, if

17   they were to work a contract with us, that contract would be

18   governed by FAR and CAS, and we would allocate the costs

19   accordingly.

20           THE COURT:  So what does the 13 percent consist of,

21   basically?

22           THE WITNESS:  The 13 percent is our international

23   sales and our purely commercial sales.

24           THE COURT:  Okay.

25           THE WITNESS:  So international sales have two colors

1   to them:  There are international sales called FMS sales, which

2   are foreign military sales, that are sales to our allies that

3   are facilitated through the U.S. government.  There are foreign

4   direct sales in which the government has given us license or

5   permission to contract directly with our allies, and we make the

6   sale directly to them without going through the U.S. government.

7   So of the 17 percent, I would say that there's about 10 percent

8   that are foreign military sales, facilitated through the U.S.

9   government.  There's about ████████ that is directly sold to

10  our allies.  And then the other 1 percent would be in two

11  pieces:  items such as UPS, where it is purely a commercial

12  sale, and there are other small IT -- cyber IT jobs that we

13  compete and sell in the commercial market.

14          THE COURT:  So these entities, that 17 percent, do

15  benefit from the credits?

16          THE WITNESS:  Yes, correct.

17          THE COURT:  Okay.

18          THE WITNESS:  A hundred percent of our business base

19  shares in the cost and benefits in the credits.  They make no

20  distinction by contract type, customer type.  We can't, we're

21  required to be consistent.

22          THE COURT:  Anything else?

23          BY MS. FLETCHER:

24  Q.   Mr. Gatchel, how does the credit get allocated to

25  fixed-price contracts?

A.   It gets allocated in the same manner as all other contracts in our contract base.  When the credit comes in, it will work to offset other costs within that pool.  You can kind of think of that pool as, for lack of a better word, a peanut butter spread that goes over our entire contract base.  So as the credits come in, we accumulate those against the costs.  The net impact of those environmental costs plus other indirect costs at the corporate level -- again, building maintenance, depreciation, electricity, cost of the corporate staff -- are sent to the business units.  They put that into their G&A pools, which is the top level of burden at the business unit, and then they apply that to the contract.  So as we're working on fixed-price contracts and we burden those contracts with costs, there will be direct material, direct labor, subcontract cost, et cetera, and then we apply a level of burdens on that.  So the credit will work to reduce the burden that is applied to the direct cost on the fixed-price contracts, just as an increase in the environmental costs will work to apply more costs on those contracts.

     Fixed price is a fixed price, and the price does not vary.  So when we enter into a fixed-price contract with the government, both parties are in agreement that not all things are known.  The outcomes can be reasonably estimated, but we don't know all the impacts of either performance or cost or other environmental events that may affect that contract.  The

government agrees to accept risk in establishing that fixed

price, and Lockheed Martin agrees to accept risk in establishing

that fixed price.  So both parties go into it wide open,

wide-eyed, knowing that as you predict the cost, when you

establish the negotiated price, things can change, but the

government, nonetheless, says, I'm sticking with that price, and

the contractor, of course, is required to stick with that price,

as well.

Q.   And when you're pricing new fixed-price work in the future,

will it receive the benefit of the credit?

A.   Yes, it will.  We're required under public law 87-653,

which is the truth in negotiations act, we are required to

follow that law in providing cost and pricing data for

consideration by the contracting officer in establishing the

price of the contract.

    So when we provide a cost buildup we will have the -- let's

take a Hellfire Missile, for instance.  Hellfire, we launch

those off the Apache helicopter, has been a big player in the

theaters across the world.  When the customer comes to us and

asks for a quote, we will have direct materials, so it is the

cost of the rocket motor and the seeker and the explosives.

    We will have cost of the direct labor, engineering to

design the product to put the product together.  And then when

we estimate all that up, we then will apply several layers of

burden, which are the indirect costs there at the business unit,

1  as well as the indirect costs that come down from the corporate

2  level.  That's all put together in a cost profile, and we have

3  to disclose all of that to the contracting officer for their

4  review in establishing what they believe will be a fair and

5  reasonable price for the product.

6  So when credits come in, we are required to incorporate

7  those credits into our cost pool in accordance with the cost

8  accounting standards in our established accounting practices,

9  and thus to disclose to the contracting officer the amount of

10  indirect costs that is being built into that bid.

11  Q.   Mr. Gatchel --

12  A.   May I continue on?

13  Q.   I'm sorry.  I didn't mean to cut you off.  Of course.

14  A.   So what will happen to the credit on all future new

15  business is that whether it is -- regardless of contract type or

16  customer type, those lowered costs will be considered in

17  establishing the cost profile and, therefore, the price profile

18  that is negotiated for those firm fixed-price contracts.

19  Q.   Thank you.

20  Mr. Gatchel, does Lockheed Martin realize a profit on the

21  Redlands remediation costs?

22  A.   When a contracting officer establishes the profit on a

23  contract, he or she has to follow certain guidelines for profit

24  consideration, and there are four major considerations:  It is

25  the technical difficulty of the contract itself or the product

1    itself.  It's the type of contract that is being awarded.  Our

2    firm fixed-price contracts have more risks, so, therefore, they

3    are subject to a higher profit percentage, profit consideration,

4    whereas cost reimbursable is less.  The third item that the

5    contracting officer considers is the record of management, the

6    contractor's record of management, control, and cost control.

7        And the fourth element that is considered in establishing

8    the profit objective for the contracting officer and, therefore,

9    the contract is the amount of capital that the contractor has

10   dedicated to the contract.  This would be the amount of

11   investment we have in property, plant, and equipment and other

12   types of assets.

13       Those four elements then are applied to the cost profile

14   that's being offered, and that cost profile includes indirect

15   expenses.  So while the contracting officer is not required to

16   evaluate indirect expenses for profit consideration, it is

17   indeed in the base cost to which profit is applied.  So that's a

18   long answer to say indirectly we probably do, but it's not

19   discrete either as an element of cost or as an element of profit

20   consideration by the contracting officer.

21           THE COURT:  There's been a lot of talk about

22   fixed-price contracts, which is, I take is, my understanding is,

23   the majority of your government contracts.  Is that true?

24           THE WITNESS:  No, Your Honor.  Our fixed-price

25   contracts are probably more in the 40 to 50 percent range of our

1    total contract activity.  The remainder of it would be either

2    the cost reimbursable contracts or there's a third category of

3    time and material.

4              THE COURT:  And this would apply to DOD-type

5    contracts, that breakdown?

6              THE WITNESS:  Yes, that's correct.

7              THE COURT:  There's also been an estimate of a profit

8    margin of about ███████, I think, on fixed price.

9              THE WITNESS:  That's not a correct assumption.

10             THE COURT:  Okay.

11             THE WITNESS:  Every contract stands on its own.

12             THE COURT:  Right.

13             THE WITNESS:  Every contracting officer will come up

14   with different determinations, so a highly complex, a highly

15   technical complex fixed-price contract would probably have a

16   higher profit assigned to it than a routine follow-on cost

17   reimbursable, give me another hundred rounds of the same thing.

18   So ████████ is -- I mean that doesn't mean anything to me

19   because our contracts have a wide varying range of profit.

20             THE COURT:  When you look at your government contracts

21   I presume as a accounting matter, you figure out -- putting

22   aside fixed price -- what is your profit margin, what is the

23   average or median profit margin on government contracts?

24             THE WITNESS:  I don't have visibility into that

25   separately.  I can tell you that in our published annual

financial statements for the year ending 2013, I think -- I
don't know the exact number -- but I think our operating margin
was around 11 percent.

THE COURT:  What is that defined as?

THE WITNESS:  That's before tax profit, so it would be
the revenues minus the expenses assigned for that year.

THE COURT:  That's a hundred percent across the board?

THE WITNESS:  That's correct.  So that would include
all the commercial business, all the non-DOD.  I don't know what
a percentage would be particularly for the DOD.  Again --

THE COURT:  Well, how about just the ones that you
follow this indirect costs being included in the price and
credits being included in the pool?  What do you think that
operating margin would be?

THE WITNESS:  There would be no separate visibility on
that because the inclusion of the costs and the inclusion of the
credits is across all the contracts and all the customers and
all the types.

THE COURT:  Okay.

THE WITNESS:  So it would receive no different
consideration.

THE COURT:  But it sort of -- the 11 percent -- what
happens when you take out taxes, do you know?

THE WITNESS:  Well, the tax rate is 39 percent.  I
guess that drops it down to seven or eight.

```
1              THE COURT:  Okay.  So six is not such a wild estimate.

2              THE WITNESS:  In the composite.

3              THE COURT:  Yeah, right.  You don't break it down any

4    other way, so I can't think of it in any other way.  Okay.

5              THE WITNESS:  Again, I wasn't prepared to quote the

6    2013 numbers, so I will just say that's my best recollection.

7              THE COURT:  Well, if that's not right, let me know.

8    Operating margin of 11 percent for 2013, and that's before tax.

9    Are you including state and federal tax when you bring it down

10   to 39 percent?

11             THE WITNESS:  Yes.

12             BY MS. FLETCHER:

13   Q.   Mr. Gatchel, when you put the credit in the discontinued

14   operations pool, will that operate to reduce the cost buildup

15   for profit negotiations at the contract level?

16   A.   Yes, it will.

17   Q.   Would it effectively be a mirror image of how the costs

18   build up originally?

19   A.   Yes, exactly.  Again, we follow a very robust and strict

20   set of cost accounting standards where the U.S. government,

21   about 45 years ago, implemented these standards to ensure that

22   contractors treat costs and credits consistently under U.S.

23   government contracts, not only within the contractor entity

24   itself, but also across contractors and across the industry.

25   This was done so that the government could get some sense of
```

1    uniformity as it was entering into the marketplace to obtain

2    goods and services and be able to provide pricing capability and

3    cost comparison between contractors.

4    Q.    Mr. Gatchel, how does Lockheed Martin get paid on federal

5    government contracts?

6    A.    It depends on the type of contract.  There are a number of

7    ways that we get paid on contracts, and they are all very

8    specific to the contract terms and conditions, which are

9    negotiated and set forth between Lockheed Martin and the

10   contracting officer at the time the price agreement is reached.

11   In general, if it is a cost reimbursement contract, the costs

12   that are accumulated through our accounting system on that

13   contract will be accumulated and put into a request for payment,

14   a voucher, usually on a two-week cycle, not more than a 30-day

15   cycle.  If it is a -- let me continue on with that.  When we

16   submit the costs for recognition and payment by the government,

17   it is at a decremented billing rate because the government never

18   reimburses us for 100 percent of the costs until the contract is

19   settled.  Settled means that the work has been performed, all

20   costs have been accumulated, all costs have been audited by the

21   Defense Contract Audit Agency, an audit report has been provided

22   to the Defense Contract Management Agency, CACO, we have

23   negotiated those costs, we have settled the costs, and we can

24   apply those final indirect rates to the contracts for close-out.

25        At this point in time, Lockheed Martin has not closed out

1  any contracts post-2006, as DCAA is somewhat slow in doing their

2  audits.

3       So on a cost reimbursement contract, we will bill on a

4  two-week or 30-day cycle at decremented billing rates until

5  those contracts are settled.  If we are working on a fixed-price

6  contract, it depends on the type of fixed-price contract.  If it

7  is a fixed-price contract with progress payments, we can bill at

8  the costs incurred at a point in time but not to exceed 80

9  percent until the contract is closed.

10      If it's a fixed-price contract with milestone

11  payments -- and I will use the example of the Hellfire -- we may

12  negotiate a fixed-price contract that says, upon completion of

13  your first lot operational testing, we will pay you X, so those

14  milestones are valued, and when we accomplish the

15  milestone -- that's why they're called performance

16  payments -- then we're paid a certain amount, and then we move

17  on to the next milestone.  Some contracts only pay on delivery,

18  so we don't get any interim financing until we pay -- until we

19  deliver on the contracts.

20      So the answer is it's contract by contract unique, and we

21  have to follow the terms and conditions of the contract; and to

22  the extent that we have performance payments, those are strictly

23  an item of negotiation based on the product and whatever terms

24  and conditions we've reached with the contracting officer.

25  Q.  So for Redlands remediation costs incurred this year, if

1   you amortize them over five years --

2   A.   Correct.

3   Q.   -- is it realistic to assume you have some sort of contract

4   cash flow that covers that cost in the year amortized?

5   A.   Yes, for -- and we would have to look at the types of

6   contracts.  But if we were to, in this month, have some

7   amortized costs, those costs would be allocated to all the

8   contracts in Lockheed's business base.  The contracts that were

9   cost reimbursable, we'd then take that cost and -- as an

10  indirect cost -- along with all the other indirect costs and

11  direct costs on the contract and bill that to the U.S.

12  government.

13      Now, we don't get paid -- there's a 30-day cycle typically.

14  But for the fixed-price contracts and for the -- depending on

15  the payment terms that they have -- typically we don't get paid

16  concurrently in the same month or, in some cases, even in the

17  same year that the costs are incurred.  Keep in mind that these

18  costs are indirect, and we don't settle indirect rates and get

19  final payment until many, many years after incurrence of the

20  cost and, in fact, many years after the performance of the

21  contract.

22  Q.   Mr. Gatchel, this Court may find that contract payments bar

23  CERCLA recovery.  Can you share your premier perspective why

24  that would be unfair to Lockheed Martin to continue to place the

25  government share of liability in contract overhead?

1    A.   Our duty as a contractor and the requirement that we have

2    is to do full costing.  There is a requirement in the cost

3    accounting standards, an underlying principle, called full

4    costing.  The government says all costs that are properly

5    allocable to a contract are to be allocated to the contract; and

6    thus, the government can determine uniformity, consistency, and

7    comparability from contract to contract, from customer to

8    customer, and across contract types.

9         We are in the situation where we have some sites that need

10   to be cleaned up.  The guidance and requirements under FAR

11   require us as we conduct our business to conform to the actions

12   of a prudent person in the conduct of a competitive business and

13   to, therefore, take reasonable and appropriate actions in

14   proposing, accumulating and billing costs under U.S. government

15   contracts.

16        We have to send these costs through.  The unfairness is

17   twofold in that, number one, we're required to do this; number

18   two, the ultimate bill payer on this is our customers, and so we

19   are burdening our contractors --

20             THE COURT:  Let me step back.  I understand what

21   you're saying.

22             THE WITNESS:  Yes.

23             THE COURT:  But the ultimate customer, so to speak,

24   the person who is paying, is the taxpayer, to be frank.

25             THE WITNESS:  Only to the extent of the U.S.

1   government participation.

2           THE COURT:  Well, right.  But many, many, many, many

3   of your contracts are government contracts; and in fact, more

4   than 87 percent are, when you get right down to it.  They may

5   not all follow the cost accounting principles.

6       Do you consider -- let me ask this -- the foreign ones that

7   are aided by the government, are you contracting directly with a

8   foreign country or are you going through the U.S. government?

9           THE WITNESS:  We have two types.  If it is a foreign

10  military sale, the ultimate customer is the foreign customer,

11  but we go through the U.S. government.

12          THE COURT:  No money goes to the U.S. government?  No

13  money comes from the U.S. government, I should say?

14          THE WITNESS:  Correct.  Actually, on the FMS sales,

15  the U.S. government gets some money from the foreign government

16  in order to administer the contract.

17          THE COURT:  Okay.  But at least 87 percent.  To step

18  back, whether you are required or not required by law to seek

19  reimbursement when you don't succeed, as was the case in the

20  Procter litigation, you've complied with your obligation,

21  obviously.  You don't have to win.

22          THE WITNESS:  Correct.

23          THE COURT:  You're not guaranteeing anybody the win;

24  you're just exercising your rights or fulfilling your

25  obligations, as you see it, under the contract to seek

1    reimbursement?

2              THE WITNESS:  Correct.  We are -- there's even

3    guidance in the DCAA contract audit manual where it instructs

4    the auditors that when you're evaluating environmental

5    government costs for reasonableness, ensure that or ask that or

6    determine whether the contractor is in fact seeking recovery

7    from all other sources, PRPs, or other sources, and that is part

8    of their determination as to whether the environmental costs

9    that we're including in our indirect pools and incorporating

10   into our contract price is reasonable.

11             THE COURT:  You haven't had any difficulty to date

12   with the government contractors or the auditors with respect to

13   your remediation costs related to Redlands?

14             THE WITNESS:  We have not.  There was an audit issue I

15   think in the 2003 or '04, where they questioned whether

16   we -- the assignment of the credit going to one disc ops pool

17   versus another, they agreed it had no impact to the government,

18   but it was kind of an accounting classification, but as far as

19   the amount of cost or reasonableness of cost, we have not been

20   questioned on that thus far.

21             THE COURT:  In terms of legal fees, you have not had

22   any problem with the government yet, either?

23             THE WITNESS:  We have not.

24             THE COURT:  Have they caught up to that yet?  Do you

25   know?  You said that the auditing --

1   THE WITNESS:  When we submit our incurred cost claim,

2   which is after the costs have come in and they have been booked

3   and we have to put it together in a certain form and format for

4   auditing, they look at all elements of cost, and they do look at

5   the legal cost.  We have not to date been questioned on that not

6   withstanding the fact that it is an area that they always look

7   at.

8   THE COURT:  And all legal costs, as far as you know,

9   related to this lawsuit, the one instituted by Lockheed Martin

10  against the United States government, which the last I knew in

11  2012 or 2013 amounted to close to $8 million, has been part of

12  the -- and that is not amortized; correct?  That cost goes in on

13  the year incurred; correct?

14  THE WITNESS:  That's correct.

15  THE COURT:  There's not been a problem with that.

16  THE WITNESS:  To date, no.

17  THE COURT:  On any of these other ones, I mean there

18  are a bunch of suits that involve these two.  Do you know how

19  legal fees for Lockheed was treated for Burbank?

20  THE WITNESS:  If there were any settlements with third

21  parties per the agreement, those settlements were handled as

22  part of the disc ops pool and amortized accordingly.  The cost

23  of the legal fees associated with that, to my best recollection,

24  were handled as they are today in that we have a consistent

25  practice of recognizing those as current period expense, and

1    they would be included with other indirect costs from the

2    corporate office and flow down to the business units in the

3    peanut butter manner that I discussed.  Again, that would have

4    been allocated -- continues to be allocated to all our customers

5    regardless of DOD, non-DOD, USG, non-USG, commercial, et cetera.

6              THE COURT:  You don't know what the legal fees are to

7    date?

8              THE WITNESS:  I do not.

9              BY MS. FLETCHER:

10   Q.   Mr. Gatchel, to follow up on a question that this Court had

11   for you, are you aware that there was a prior litigation between

12   Lockheed Martin and the Air Force called the 85-804 litigation?

13   A.   Yes, I was.

14   Q.   Were those legal costs allowable?

15   A.   The 85-804, they were not allowable.

16   Q.   Thank you.

17        Mr. Gatchel, to follow up again on another question that

18   this Court had, is there any ceiling or trigger in the

19   discontinued operations agreement that kind of allows the DCMA

20   to take a relook at some of these costs?

21   A.   Yes.  At the time that the agreement was struck, which I

22   believe was the end of '99 or beginning of 2000, the parties

23   agreed that when the estimate to complete -- excuse me -- when

24   the costs incurred were expected to exceed 389 million that the

25   contractor would notify the government of that expectation, and

1  the government would then have the right to come in and assess

2  that estimate and the costs underlying that to determine

3  reasonableness.

4  Q.   Mr. Gatchel, have you surpassed the 389 million mark for

5  the discontinued operations pool?

6  A.   Yes.  In 2009, we anticipated that we would push through

7  that trigger point.  We provided notice to the CACO.  We

8  provided a walk-down of where the variations occurred.  We

9  offered them our cooperation in conducting any type of review of

10  reasonableness that they wanted to perform; and again, that was

11  documented in June of '09.

12       This was an example of where your best estimates often go

13  awry.  The parties to the agreement in 2000 had an estimate

14  that, hey, we would like to look at this again, the 389.  Of

15  course, a lot of the -- it is my understanding that a lot of the

16  standards that we're now trying to achieve on clean water, those

17  standards have changed, so of course the cost increase is

18  related to that, but we did follow the provisions of the

19  agreement.  We did notify them.  We did make the books and

20  records available if they wanted to review for reasonableness.

21  Q.   Mr. Gatchel, who are some of your competitors?

22  A.   For our major weapons systems, we compete with probably

23  what we would call the big five, which would be Raytheon,

24  Boeing, Northrop Grumman, Honeywell, and -- I'm sorry, I'm

25  forgetting the last one here on the stand.  But we compete with

1  them repeatedly for the major weapons systems.

2      In the IT world, we compete with hundreds of firms.  We are

3  the leading IT provider to the United States government, but

4  that is a very low margin of very competitive business that

5  we're constantly chasing, so I can't particularly name off

6  those, but those would be the competitive environment.

7      BAE -- excuse me -- BAE is one of our big competitors.

8  Q.   We won't tell them you forgot.

9      Have you actually lost contracts due to increased costs?

10 A.   If we are in a competitive situation where the key criteria

11 or determination of award is on cost, the answer is yes.  We

12 have lost competitions because our costs are too high.

13     There are other competitions where cost is interesting but

14 technical expertise is more important, and we may be chosen for

15 that particular contract despite cost.  Yes, overall cost, we

16 have lost contracts for that.

17     THE COURT:  You're talking IT area or non-IT?

18        THE WITNESS:  IT.

19        THE COURT:  What about non-IT?

20        THE WITNESS:  All areas.  Affordability, it's a huge

21 thing for the industry and for Lockheed Martin right now.  Our

22 customers in the DOD continually direct us and encourage us to

23 pursue avenues to reduce our indirect costs.  As a matter of

24 fact, just Wednesday of last week, I met with senior acquisition

25 officials from four of our major buy commands, and the direct

```
1    question was:  What are you doing to reduce your indirect rates?
2          It's a big emphasis across the industry.
3             THE COURT:  If anything, your profitability has gone
4    up, up, up in recent years; correct?
5             THE WITNESS:  Yes.  And you will see that as a result
6    of performance.  We are continuing to do -- we do two things:
7    We try to continually reduce our indirect structure and also
8    improve performance at the same time.  So I will use the
9    Hellfire Missile once again.  If our best estimate says it takes
10   a hundred hours to build it and we can implement a manufacturing
11   process or better tools and build it in 80, then, of course, the
12   cost goes down accordingly.
13       On our indirect structure, you probably have even seen in
14   the news where we are laying off people.  I mean we were a
15   136,000 employee corporation.  Now, unfortunately -- or
16   fortunately, depending on which way you're looking at it --
17   we're about 114,000.  Just in December, we announced we were
18   laying off 4,000 people and closing 2 million square feet of
19   footprint.  So these are the areas that we have to take.
20       So, again, back to the question of fair or unfair, it's
21   appropriate and required of us to go pursue opportunities on
22   behalf of our customers to reduce costs.  And this number -- I
23   mean, you know, you can buy a lot of Hellfire Missiles for the
24   kind of money we're talking about here.
25             BY MS. FLETCHER:
```

1    Q.   So for the cost of the Redlands remediation, approximately

2    $300 million, how many Hellfire Missiles could the taxpayers

3    have bought?

4    A.   You're going to make me do the math?

5    Q.   Or whatever you're comfortable with.

6    A.   An Apache helicopter carries two racks of four, so you

7    could field a lot of Apaches for that amount of money.

8    Q.   Mr. Gatchel, earlier in this case, we have talked about the

9    recoverability factor that's in your deferred environmental

10   asset memo, or the net recovery factor.  Do you know what I'm

11   talking about?

12   A.   Yes, I do.

13   Q.   How many years in advance do you predict that?

14   A.   The recoverability factor has three components to it, one

15   of which is the content of the U.S. government business that we

16   expect to have.  We compute that factor, and it is an estimate,

17   and it is based on the current amount of U.S. Government

18   participation in our business base, as well as our estimate of

19   what we think that would be over the next three years.

20        The reason it's three years is that's what our long range

21   plan is.  So it is the current plus three years.  We're somewhat

22   using a crystal ball to kind of project what we think might

23   happen.  Of course, there's a lot of variables in that.

24        BY MS. FLETCHER:

25   Q.   Mr. Gatchel, if you were going to lose profits from a

1    recovery in this case, then why are you pursuing this

2    litigation?

3    A.   We're pursuing the litigation to, again, in our execution

4    of business as a reasonable contractor, taking prudent actions

5    in conformance with that conduct of a commercial business, we

6    are required to pursue credits.  We are required under the

7    guidance of the DCAA guidelines, it says, in order for costs to

8    be reasonable, you have to take appropriate actions.  The credit

9    clause is there.  Our past history says that where we can get a

10   credit, we go after it and we apply it to all the customers in

11   our business base.

12       In the current environment, our goal is to reduce costs.

13   And this is an opportunity to reduce costs and to, therefore,

14   provide more affordability to the war fighter, and many of our

15   affordability initiatives are, in fact, producing products that

16   we can deliver at a better price, at better affordability in

17   concert with what the DOD and our other government customers

18   want.

19       But with the shrinking budgets and the turmoil that we have

20   in the world, our products are used in every theater that there

21   is where we're at conflict with nations, and we are doing

22   everything we can to reduce our indirect expense because

23   indirect expense is not valued by the customer, and we would

24   rather have the customer buying Hellfires instead of paying for

25   remediation.

1        MS. FLETCHER:  Thank you, Mr. Gatchel.

2    Your witness.

3                      **CROSS-EXAMINATION**

4        BY MR. SULLIVAN:

5    Q.   Good morning, Mr. Gatchel.

6    A.   Good morning.

7    Q.   You were talking earlier about the 13 percent of Lockheed's

8    annual sales that relate to non-U.S. government customers;

9    correct?

10   A.   I believe I reconciled the 17 percent.

11   Q.   17 percent, okay.

12   A.   Yes.  We're talking two different percentages here.

13   Lockheed's latest financial statements show that 17 percent go

14   to our international customers.

15   Q.   Okay.  So let's use 17 percent.  So the credit from a

16   CERCLA judgment in this case would benefit those 17 percent of

17   non-government, non-United States government customers; correct?

18   A.   In the same manner it benefits the U.S. government.  The

19   credits are applied through indirect cost allocations to all of

20   our customers without regard to domestic or international

21   contract type or whether it's commercial, just as the costs are.

22   So the credits are the mirror -- are always the mirror image of

23   the cost.

24   Q.   Okay.  So the answer to my question was yes; correct?

25   A.   Yes.

1   Q.   And that would be at the expense of the United States

2   taxpayers; correct?

3        Yes?

4   A.   It would come from the judgment fund, which I understand is

5   funded by the government.

6   Q.   And so the answer to my question is yes; correct?

7   A.   If the source of those funds is the taxpayer, yes.  I don't

8   know the source of the funds.

9   Q.   And you indicated that if the United States paid a judgment

10  under CERCLA in this case, that Lockheed would then credit that

11  beginning the year after the judgment is paid and then over the

12  next five years; correct?

13  A.   That's our established cost accounting practice, that's

14  correct.

15  Q.   And that would be made without interest; correct?

16  A.   That's correct.  Mirror image of how the costs were

17  handled.  We accumulate the costs, they are deferred, we hold

18  them on our balance sheet.  We do not get any interest on them.

19  Q.   So the answer to my question is yes?

20  A.   That's correct.

21  Q.   Okay.  And a credit from a CERCLA judgment in this case

22  reduces the cost on your fixed-price contracts; correct?

23  A.   It reduces costs on all of our contracts, including

24  fixed-price.

25  Q.   Okay.  And on the fixed-price contracts, the price would

1    stay the same; correct?

2    A.    On the firm fixed-price contracts that are in the backlog.

3    For newly priced fixed-price contracts, the credits will be

4    included in the cost profile upon which the prices are

5    established.

6    Q.    So in existing backlog, firm fixed-price contracts, the

7    price would stay the same?

8    A.    Correct.

9    Q.    The profit on those contracts would essentially increase;

10   correct?

11   A.    Well, it would depend upon the status of the individual

12   contract.  If the credit comes in, it would also work to offset

13   any increased costs that were not included at the time of

14   pricing related to remediation or any other indirect cost pool.

15   As I stated before, there is an assumption of risk by both the

16   contractor and the U.S. government when you enter into a

17   fixed-price contract.

18   Q.    So, essentially, the answer to my question is yes; correct?

19   A.    It would lower the cost.  I can't -- it would be contract

20   by contract to determine whether or not that contract is on a

21   profit basis, but overall, I would say the answer is yes.

22   Q.    Okay.  Thank you.

23         And you indicated that the percentage of Lockheed's

24   fixed-price contracts currently is in the 40 to 50 percent

25   range?

1    A.   Not the backlog, but overall, as we win business and

2    execute business, year after year, approximately 40 to

3    50 percent of our business is derived from fixed-price

4    contracts.

5    Q.   And what is the percentage of the current backlog of

6    fixed-price contracts in terms of your overall business?

7    A.   Over the period of time of this cost credit, it would be

8    about ███████.

9    Q.   And what is the percentage of firm fixed-price contracts

10   that will continue from this year to next year?

11   A.   The ████████ number is the period of performance over the

12   five years.  I don't know the percentage for just one year.

13   Q.   Do you know the percentage for two years?

14   A.   No.  I know the percentage for five years.

15   Q.   And isn't it true that Lockheed controls the amount of

16   Redlands costs it bills to its contracts?

17   A.   Could you define "controls"?

18   Q.   Well, Lockheed could make the decision itself not to bill

19   Redlands costs for whatever reason to its government contracts;

20   couldn't it?

21   A.   No.

22   Q.   It doesn't have that right?

23   A.   No.  As I explained earlier, we have a concept under the

24   cost accounting standards called full costing --

25   Q.   Uh-huh.

1    A.    -- and we are required to include all the costs of the

2    performance of the contracts so that the U.S. government can

3    understand and compare from contract to contract or contractor

4    to contractor the actual costs of performing the contract.  So

5    the remediation costs are allocable cost and must be included in

6    the contract pricing?

7    Q.    So just, hypothetically, if Lockheed decided not to include

8    Redlands costs in its contracts for the next five years, would

9    the United States turn around and say, hey, please charge us for

10   these costs?

11   A.    We're required to include it in the proposal side of the

12   business, so we have to provide visibility to that.  The

13   government is interested in understanding the full cost of

14   providing goods and services to the war fighter.

15        The reason that the cost accounting standards came along is

16   to precisely address the issue that you're talking about, which

17   Admiral Rickover was running to in the 1960s, where the

18   contractor would bid one way and then bill a different way, and

19   the U.S. government had no ability to do comparisons between

20   otherwise qualified ship builders when they were trying to

21   compete and award contracts for the next fleet of aircraft

22   carriers or destroyers.

23        We cannot pick and choose costs.  It is precisely why the

24   cost accounting standards are there.  It precisely why we have a

25   disclosure statement and why we have a DCAA that audits that and

1    a DCMA that watches over that.

2    Q.    Okay.  But isn't it true that on the DOSA, the government

3    had a dispute with Lockheed about whether Lockheed could even

4    bill these costs; correct?

5    A.    The dispute in the DOSA, as I understand it -- I was not

6    part of the negotiations -- but as I read the document and as I

7    understand the references to which the document makes, the issue

8    was over the allowability of the costs, not over the cost

9    accounting practice.

10   Q.    Actually, wasn't the big issue allocability since there was

11   no operation at Redlands and no cost relating to that business

12   that were still in existence?

13   A.    The issue, as I understand it, was the allowability of the

14   total amount that was being claimed.  I'm not aware one way or

15   the other as to whether the issue of allocability came up.

16   Q.    Have you read the DOSA in recent years?

17   A.    Yes, I have.

18   Q.    You didn't see the discussion about the dispute about

19   allocability?

20   A.    I recall the words within the document that discuss how the

21   costs are to be allocated.  I don't recall a discussion of any

22   differences of agreement in there.

23   Q.    Okay.  And you mentioned the DCAA audit manual as a reason

24   why Lockheed is bringing this suit; correct?

25   A.    I mentioned the requirement for Lockheed to incur costs and

1   perform in a reasonable manner.  We look to the DCAA audit

2   manual because it often calls out what they consider to be

3   reasonable actions.  There is no specific cost principle related

4   to environmental costs.  The FAR counsel considered it, and they

5   rejected writing a very separate principle for the remediation

6   costs because they determined that these are ordinary and

7   necessary for the conduct of business and it was not required to

8   have a separate cost principle applicable to that.

9   Q.   Okay.  But the DCAA audit manual does not say that Lockheed

10  must sue the United States in order to recover its costs under

11  government contracts; does it?

12  A.   It says that the auditor should perform inquiry to see if

13  credits are being sought from other parties.  That's the extent

14  that I recall that it said.

15          THE COURT:  Can I see the document?  I recall it being

16  more specific than that, frankly.  It was given to me by

17  Lockheed Martin.

18      Do you have your attachment to the recovery memo?

19          MR. MURPHY:  Can you bring up 1862, please.

20          THE COURT:  Can the witness take a look at Plaintiff's

21  Exhibit 1858.  I have it attached as an Exhibit 3 to a pleading.

22  I think this is what I had in mind.

23          I'm reading a manual --

24          MS. FLETCHER:  1862.

25          THE COURT:  I'm reading a manual, disc ops II advanced

1    agreement.  It looks like it comes from 2006.  And we're talking

2    about -- I don't see the date -- oh, November 19, 2005.  It is

3    Exhibit 3 to a document that was filed -- 126, paragraph 4.

4    This must be referring to paragraph 4 -- page 4, paragraph 3.1

5    mentions that "the disc ops II pool will be reduced for

6    recoveries such as CERCLA claims and insurance settlements.  LMC

7    should also identify other agencies such as the Department of

8    Justice, and the agreement should also require LMC to pursue

9    recoveries from potential responsible parties, PRPs."

10        Did you ever see that before?

11            BY MR. SULLIVAN:

12   Q.   The disc ops II pool is not the discontinued operations

13   pool that we're talking about for Redlands costs; correct?

14   A.   That's correct.

15            THE COURT:  What is that pool?

16            THE WITNESS:  They are exactly -- may I?

17            THE COURT:  What is --

18            THE WITNESS:  Your Honor, what is referred to as the

19   DOSA settled costs up through a period of time and going

20   forward.  There are other sites that came on later on that, for

21   purposes of maintaining visibility and separation between those

22   costs that were contemplated under the DOSA and those same types

23   of costs that are not contemplated under the DOSA.  We put that

24   into what we call the disc ops II pool.  They are exactly the

25   same kind of cost and handled in exactly the same manner.

1           THE COURT:  I see.

2           THE WITNESS:  The document that you're looking at --

3           THE COURT:  PX 1858, yes.

4           THE WITNESS:  Yes.  We pursued consideration as to

5      whether we now needed another advance agreement for these

6      post-DOSA costs; and the government, the CACO, specifically came

7      back and told us that you're handling your costs in a consistent

8      manner, I understand what it is, we don't need a separate --

9           THE COURT:  So you didn't have one.  This is a

10     government document, what I'm looking at here, PX 1858.  This is

11     generated by DOD?

12          THE WITNESS:  This was generated by -- yes, that's

13     correct.  This was generated out of either the -- I'm trying to

14     look at the date.  This would have been generated by either the

15     Defense Contract Audit Agency or the Defense Contract Management

16     Agency, both of which are our oversight agencies.

17          THE COURT:  What you're saying is that, although this

18     looks like a negotiation over redoing paragraph this and that,

19     it was never actually executed?

20          THE WITNESS:  It was not.  In the opinion of the

21     defense contract executive -- excuse me -- the defense corporate

22     executive, who was Mr. Justin Palmisano at the time, he said, as

23     long as you are treating the costs consistently, we don't see

24     the need for a separate advance agreement.

25          BY MR. SULLIVAN:

1   Q.   Okay.  But nevertheless, this isn't the DCAA audit manual

2   that we were just talking about?

3   A.   It is not.

4        MR. SULLIVAN:  Your Honor, we addressed DCAA audit

5   manual language in one of our earlier briefs, and it is actually

6   an exhibit to one of our double recovery briefs back in 2009.

7        THE COURT:  I can assure you I am not going back there

8   to read those briefs.

9        MR. SULLIVAN:  We can find it for you.

10       THE COURT:  You have already, I assume, addressed some

11  things, right.  There is no way that I'm going to rely on

12  anything that hasn't been given to me during the course of this

13  trial, frankly, in terms of pleadings.  Okay.

14    What is Exhibit 2 now?  Chapter 7, Plaintiff's 1862.  Can

15  you just show that to the witness a minute.

16       MR. MURPHY:  He has it, Your Honor.

17       THE COURT:  This is the audit manual from 2012.  Okay.

18  This would apply to everything across the board, right?

19            You can't put it up there?  It's right there.

20       MR. SULLIVAN:  I can't see the provisions I'm looking

21  for.

22    MS. FLETCHER:  If you turn the page, it has the whole

23  section.

24       THE COURT:  Which section should I look at?  7 what?

25       MR. SULLIVAN:  What which provision are we looking at?

1          MR. MURPHY:  Nobody is looking at a provision, Your

2    Honor.

3          MR. SULLIVAN:  The provision he was testifying about,

4    do you know what this is?

5          THE COURT:  This is a different document I was

6    showing.  This is computer cost allocation.

7       Do you know what this document is?

8          THE WITNESS:  I think what you -- I'm looking at the

9    same thing on the screen.  That's just the header at the front

10   of the manual.  The section is at 7-2120, where it talks about

11   recoveries for environmental costs.

12         MR. SULLIVAN:  2120.

13         THE COURT:  Yes.  Then what?  7-2120 --

14         THE WITNESS:  7-2120.11.

15      In that section, it says, "Any insurance recoveries for

16   contamination cleanup will be applied as credits against any

17   costs which were or would be otherwise allowable for that

18   cleanup effort."

19         MR. SULLIVAN:  Different provision.

20         MR. MURPHY:  5-1014 --

21         THE WITNESS:  If I may, Your Honor, also, the 7-2120.5

22   is where DCAA talks about reasonableness.

23         THE COURT:  5?

24         THE WITNESS:  7-2120.5.

25         THE COURT:  You think it is .15?  I don't see a .5 in

1    what I have?  Is it missing?

2              MR. MURPHY:  It's on the screen.

3              THE COURT:  But this document just is what again?

4    This is the manual for the auditors that go out from DCAS.

5              THE WITNESS:  Yes, Your Honor.  This is the Defense

6    Contract Audit Agency contract audit manual.  They call it the

7    DCAM.

8              THE COURT:  Thank you.

9              THE WITNESS:  This is the guidance that is provided to

10   the field officers when they're conducting their audits for

11   allocability, et cetera.

12             THE COURT:  All right.

13             THE WITNESS:  They have sections in the manual that

14   deal with special items of cost, and environmental is one of

15   them.

16             THE COURT:  Is that a change, what is represented

17   here?  This is 2012.  But has it been fairly consistent, that

18   provision?

19             THE WITNESS:  Yes, it is fairly consistent.  I am not

20   aware of any -- I review these when they come out every year,

21   and they summarize the changes at the beginning.  I'm not aware

22   of any significant changes to the guidance in regards to

23   environmental costs.

24         But if you were to look at the last sentence under the

25   "Reasonableness of Environmental Costs," it talks about,

1    "For forward pricing purposes, the costs should be net of

2    reasonably available recoveries from insurance which would

3    offset the clean-up costs."

4         THE COURT:  Which one are you reading now?

5         THE WITNESS:  I'm sorry.  I'm reading -- I'm on

6    paragraph 7-2120.5, entitled "Reasonableness of environmental

7    cost," and I'm at the last sentence of the second paragraph.

8         THE COURT:  Okay.

9         THE WITNESS:  So under the standards of reasonableness

10   that we are required to operate, we would look to this and say,

11   well, what do the government auditors think we should be doing,

12   and it is to pursue available recoveries, and that's what we're

13   doing in this case.

14         BY MR. SULLIVAN:

15   Q.   But this doesn't say to sue the party that's paying you,

16   the United States; does it?

17   A.   It does not have that explicit language in it, no.

18         THE COURT:  Does the government take the position that

19   they can't sue?

20         MR. SULLIVAN:  Pardon me?

21         THE COURT:  Do you take the position that they

22   couldn't sue here?

23         MR. SULLIVAN:  No, we don't say they can't sue, but

24   all we're saying is that the audit manual doesn't require them

25   to sue to recover their costs under government contracts.

1    They're two different issues.

2            THE COURT:  Well, but if they can sue you, why in the

3    world shouldn't they sue you?  I'm not making moral judgments on

4    who should sue people.  As long as you didn't get them to waive

5    their rights, they're entitled to --

6            MR. SULLIVAN:  Well, they can --

7            THE COURT:  -- you.  It doesn't mean -

8            MR. SULLIVAN:  -- sue us, Your Honor, but we can also

9    bring all our defenses, including our double recovery defenses.

10   So the question is:  What is the point if double recovery

11   eliminates what they recovered?

12           THE COURT:  Well, they don't see it that way.  That's

13   why we're here.

14           MR. SULLIVAN:  And that's why we're here.

15           THE COURT:  Right.  But they're entitled to sue.  The

16   government, DOD, certainly isn't telling them not to sue.

17   That's for sure.  And I have no doubt that they would like them

18   to sue, and that's what Exhibits 2 and 3 tell me.  Okay.

19           BY MR. SULLIVAN:

20   Q.   Okay.  You talked earlier about a ceiling in the

21   discontinued operations settlement agreement that you said had

22   been met as of 2009, I think.

23   A.   It was not a ceiling.

24   Q.   Then how would you describe that?  I just quoted your

25   words, but go ahead.

1   A.   I believe I called it a trigger point.

2   Q.   A trigger point.

3   A.   It was not a ceiling.

4   Q.   Okay.  So the trigger point has been reached, and my

5   understanding from what you said is the DCAA can now audit the

6   environmental costs of Lockheed for reasonableness; correct?

7   A.   The requirement under the trigger was to notify the

8   government --

9   Q.   Yes.

10   A.   -- that we expected the costs to exceed the 389; and

11   therefore, the government could then assess the reasonableness

12   of the cost if they so chose to.

13   Q.   And in Lockheed's annual reports since then, Lockheed has

14   been projecting that it will continue recovering its

15   environmental costs under its government contracts; correct?

16   A.   Correct.

17   Q.   So I take it that Lockheed doesn't project that this

18   trigger point will pose a problem in the future for its recovery

19   of environmental costs under its government contracts?

20   A.   We're not aware of any problems.

21        MR. SULLIVAN:  Okay.  No further questions.

22        THE COURT:  Anything else?

23        MS. FLETCHER:  Your Honor, we only have two quick

24   questions.

25

1

2                        **REDIRECT EXAMINATION**

3              BY MS. FLETCHER:

4    Q.    First, may we also have 1862 back up, please?  And then

5    focusing back on that 2120.5 provision, please, would you

6    highlight that again?

7              Mr. Gatchel, in the first section, it talks about the key

8    concept for reasonableness.

9              Do you see where I'm reading?

10   A.    Yes.

11   Q.    It talks about the action expected of an ordinary

12   reasonable prudent businessperson.

13             Do you see that?

14   A.    Correct.

15   Q.    Is that what you were testifying about when you talked

16   about the reasonableness standard in the DCAA audit manual?

17   A.    Yes, I am.  And that language is mirroring, reciting the

18   overall requirement within the FAR that in order for costs to be

19   allowable and allocable, they have to be reasonable.  So that

20   same language, the reasonable prudent businessperson is found in

21   the preface to the FAR cost principles at 31.205.

22   Q.    Could you also go to Section 14, please 2120.14 in that

23   section.

24             Mr. Gatchel, could you please review question b, and I will

25   ask you a question about it.

1    A.    I'm sorry.  Paragraph b?

2    Q.    Paragraph b, sir.

3    A.    Okay.

4    Q.    Is that also consistent with your understanding that

5    recovery of environmental clean-up costs through contracts is

6    contingent on the government participating in recoveries at a

7    later date --

8    A.    Correct.

9    Q.    -- from PRPs specifically?

10   A.    Correct.  This invokes the operation of the credits clause,

11   which this government incorporated into the FAR cost principles

12   for the specific purpose of making sure that credits are treated

13   consistently and applied to the same contracts and customer

14   types as the originating costs.

15   Q.    Mr. Gatchel, you talked earlier with Mr. Sullivan regarding

16   the fixed-price backlog.

17         Do you recall that conversation?

18   A.    Yes.

19   Q.    Is that recorded in the deferred environmental asset

20   memorandum?

21   A.    It is not.

22   Q.    Is it recorded in the analysis that supports it as a

23   decrement factor?

24   A.    It is.

25   Q.    Okay.  So it is captured as a decrement factor to the

1     recoverability factor; correct?

2     A.   Yes, it is.

3          MS. FLETCHER:  Thank you, Your Honor.  No further

4     questions.

5          THE COURT:  Okay.  Anything else, Mr. Sullivan?

6          MR. SULLIVAN:  No questions.

7          THE COURT:  You're excused.

8     Any other evidence?

9          MS. FLETCHER:  No, Your Honor.

10         THE COURT:  For the government.

11         MR. SULLIVAN:  No, Your Honor.

12         THE COURT:  That concludes the evidence for the trial.

13    I would like to propose a couple of things.  I have

14    received tolling agreements.  I have received Procter litigation

15    materials.  I have received the -- the government has filed on

16    an indemnification, benefit recovery -- was there a fourth one?

17         MR. SULLIVAN:  Operator, Your Honor.

18         THE COURT:  Operator.  Was that it?

19    Did I get four pleadings?

20         MR. SULLIVAN:  Four, Your Honor.

21         THE COURT:  I have those.  The operator, you haven't

22    had an opportunity to respond.

23         MR. MURPHY:  You said tomorrow morning, Your Honor.

24         THE COURT:  That's fine, 9:00.

25    The other thing -- they may be in the exhibits, and you can

1    point me to the exhibits.  If not, I want to know when the

2    resolutions came up from the Water Board that required

3    cleanup -- I don't know whether you call them resolutions or

4    abatement orders.  I'm not sure where they are in any of the

5    exhibits.  If we have them, point them out to me; if we don't, I

6    would ask Lockheed to give them to me.

7            MR. MURPHY:  We went over them with Tom Blackman, Your

8    Honor, and it's in the Blackman binder, but we will get you

9    separate copies of them.

10           THE COURT:  Well, no, no, no.

11      Here is what has to be done -- unfortunately, although we

12   tried our best to make this work, we can't find exhibits the way

13   they're organized.  We have to have both sides give us ideally

14   an exhibit list and then numerically the exhibits.  We need to

15   look for exhibits.  When I say, if you can tell me it was PX

16   152, I can find that a lot faster than I can find the Blackman

17   document and then find somewhere in there where it is.  We're

18   going to give you back a clean set tomorrow.  When you come

19   tomorrow morning, you can file in person your operator.  I would

20   like everybody to come so we can set out a schedule.  I can give

21   you an outline.  I'm almost there.  You will take away as many

22   binders as we can get rid of.  I want a disk from each side of

23   your exhibits numerically and, hopefully, with an index.  So

24   that when we get to everything that is in evidence -- because

25   there have been things -- and I don't know whether they're in

1    evidence or not that have come in like we just talked about as

2    part of that filing.  I don't know if they're in evidence.  I

3    assume they are now.  We've talked about them, and I have seen

4    them.  But I need the final exhibit list numerically.

5    Otherwise, when you get up to talk, you're going to talk to me

6    about exhibit numbers, not going to talk to me, go to

7    so-and-so's binder and go to the cross-examination binder of

8    four days ago.  Hopefully, you'll agree that what either side

9    has put in are, in fact, in evidence.  A couple of things that

10   were given to me in binders never got into evidence.  I assume

11   that when you had cross-examination documents, not all of them

12   were offered for evidence or highlighted.  At least we will have

13   a final -- we will have three disks:  One for me, one for Jared,

14   and one for the record of what is exhibits.  The affidavits are

15   in.  We don't have to worry about that.

16            MR. MURPHY:  I guess the one question I have is that

17   we have the binders, and we put the binders on a disk.  In

18   addition, the parties, I think, have submitted revised disks

19   with everything that was cited.  So there is the binder stuff.

20   Then we got many more documents that were put on the disks that

21   were provided.  I guess the question is:  Are those extra

22   materials that were not in the binders that are on the disks?

23            THE COURT:  No, I want you to take the universe and

24   meld it and do it numerically.  Whenever anybody says Exhibit X,

25   all I have to do is look up the number and not go through which

1    binder it is.  There's been too many documents.  That has just

2    failed as a mechanism to be able to follow a closing argument,

3    or anything, really.  For me to find a binder to find the

4    affidavit that sends me to the exhibit or the cross-examination

5    binder of so-and-so that has an exhibit -- they have numbers --

6    if we can have an index and the number going 1 through --

7              MR. MURPHY:  You want us to renumber everything?

8              THE COURT:  Oh, no.

9              MR. MURPHY:  Okay, good, thank you.

10             THE COURT:  I just want to know what they are

11   numerically.  Not every document with every number has gotten

12   into evidence, certainly.  At least that way you can check each

13   other.  There is no way of knowing -- we haven't maintained an

14   exhibit list, really, none of us, because you don't -- half the

15   stuff that is attached to the cross-examination of John Jones,

16   you know, people say, well, it is already in evidence somewhere

17   else, but maybe there were a few that were added.  At least

18   we'll get a comprehensive list that is in order numerically with

19   an index.  The sooner, the better, because it is hopeless to

20   find exhibits anymore.  There have been three different dumps

21   and different methodologies.

22        Okay so I want to know about the cleanup costs.

23        Having outlined -- could we have a very short status

24   tomorrow, just to discuss how we're going to proceed.

25             MR. MURPHY:  Yes, Your Honor.

1          THE COURT:  In the morning.  Let's see, I have a

2     couple of things.  Do I have anything after 9:15.  I have a

3     9:00, 9:15, and one other thing.

4               (Off the record discussion)

5          THE COURT:  Why don't you come in at 9:45, please, and

6     maybe we'll send it out by just email, this sort

7     of -- obviously, if you want to argue other things, you can.

8     These are the things at a minimum I would like you to cover.

9     The memos that we have gotten have given me an enormous amount

10    of information, and so some of these topics may have been

11    sufficiently covered, but I've read most of the memos with the

12    exception of -- I hadn't seen the one about benefit, I think.

13        Okay?  Is there anything else that we need?

14        When we get to closing, if you can give me any better idea

15    of the past costs are X, and this is Redlands and this is

16    Beaumont and this is TCE and this is AP, if that's possible, and

17    the same for the future.  I think it is not necessarily the case

18    that everything is equal here; past, present and chemicals and

19    sites.  So far you have given me sort of percentages.  If those

20    are as good as you can get, I will live with them.

21        I would like to know the legal fees.  I know them as 2012,

22    is that my last --

23          MR. MURPHY:  I think we're just missing last year,

24    Your Honor.

25          THE COURT:  It could be significant.

1      MR. MURPHY:  Last year was a busy year, Your Honor.

2      THE COURT:  Yeah, I know.  You'll update it to the

3 point you can.  That's it.

4      MR. MURPHY:  In terms of rough scheduling -- I know

5 we're talking about finalizing tomorrow -- are you still looking

6 at March 5th to 7th as the closing?

7      THE COURT:  I'm looking to have two days, and I would

8 like to do 5th and 7th, so that there is a break in between so

9 that the rebuttals on the 7th would be shorter than the

10 arguments on the 5th.  I think what we need to do is allow each

11 side about two hours.  It could be a little more because I

12 always have questions.  So I use up your time, I know that.

13     Is there any other issues that anybody feels they haven't

14 had the opportunity to brief legally?  I think we have covered

15 it; arranger, operator, indemnification.

16     MR. SULLIVAN:  I think we have covered it.

17     THE COURT:  I think so, too.  I think I know what the

18 law is.

19     Okay.  That's fine.  We will be back -- I think it would

20 take us no more than 15, 20 minutes.  If you have any

21 questions -- I will try to get this outline out, so you can ask

22 questions if you need to.

23     Could you bring some things to take away binders because we

24 run this courtroom for other reasons, as well.  You'd never know

25 it.  Okay.  Thank you.  Have a good day.

1    (Proceedings adjourned at 11:29 a.m.)

2

3                        *  *   *   *   *   *

4                          CERTIFICATE

5        I, PATRICIA KANESHIRO-MILLER, Official Court Reporter,

6   certify that the foregoing pages are a correct transcript from

7   the record of proceedings in the above-entitled matter.

8

9                        _____
                         PATRICIA KANESHIRO-MILLER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$300** [1] - 1675:2

## '

**'04** [1] - 1669:15
**'09** [1] - 1672:11
**'99** [1] - 1671:22

## 0

**08-1160** [1] - 1643:5

## 1

**1** [2] - 1656:10, 1697:6
**10** [1] - 1656:7
**100** [1] - 1664:18
**1050** [1] - 1643:16
**11** [3] - 1662:3, 1662:22, 1663:8
**114,000** [1] - 1674:17
**11:29** [1] - 1700:1
**126** [1] - 1684:3
**13** [4] - 1655:10, 1655:20, 1655:22, 1677:7
**136,000** [1] - 1674:15
**14** [1] - 1692:22
**15** [2] - 1687:25, 1699:20
**152** [1] - 1695:16
**1643** [1] - 1643:8
**1645** [1] - 1644:11
**1677** [1] - 1644:11
**1692** [1] - 1644:12
**17** [7] - 1656:7, 1656:14, 1677:10, 1677:11, 1677:13, 1677:15, 1677:16
**1858** [3] - 1683:21, 1685:3, 1685:10
**1862** [4] - 1683:19, 1683:24, 1686:14, 1692:4
**19** [2] - 1649:14, 1684:2
**1960s** [1] - 1681:17

## 2

**2** [3] - 1674:18, 1686:14, 1690:18
**20** [1] - 1699:20
**2000** [3] - 1651:16,
1671:22, 1672:13
**20001** [1] - 1644:3
**20026-3986** [1] - 1643:24
**2003** [1] - 1669:15
**20036-5306** [1] - 1643:17
**2005** [1] - 1684:2
**2006** [1] - 1684:1
**2009** [3] - 1672:6, 1686:6, 1690:22
**2012** [4] - 1670:11, 1686:17, 1688:17, 1698:21
**2013** [4] - 1662:1, 1663:6, 1663:8, 1670:11
**2014** [1] - 1643:7
**202** [3] - 1643:17, 1643:25, 1644:3
**2120** [1] - 1687:12
**2120.14** [1] - 1692:22
**2120.5** [1] - 1692:5
**24** [1] - 1643:7

## 3

**3** [3] - 1683:21, 1684:3, 1690:18
**3.1** [1] - 1684:4
**30-day** [3] - 1664:14, 1665:4, 1666:13
**305-0365** [1] - 1643:25
**31.205** [1] - 1692:21
**333** [1] - 1644:2
**354-3243** [1] - 1644:3
**389** [4] - 1671:24, 1672:4, 1672:14, 1691:10
**39** [2] - 1662:24, 1663:10

## 4

**4** [4] - 1649:15, 1684:3, 1684:4
**4,000** [1] - 1674:18
**40** [3] - 1660:25, 1679:24, 1680:2
**45** [1] - 1663:21

## 5

**5** [2] - 1687:23, 1687:25
**5-1014** [1] - 1687:20
**50** [7] - 1652:22, 1652:23, 1653:2,
1653:14, 1660:25, 1679:24, 1680:3
**5th** [3] - 1699:6, 1699:8, 1699:10

## 6

**6** [5] - 1656:9, 1661:8, 1661:18, 1680:8, 1680:11
**601** [1] - 1643:23

## 7

**7** [5] - 1649:4, 1653:3, 1653:7, 1686:14, 1686:24
**7-2120** [2] - 1687:10, 1687:13
**7-2120.11** [1] - 1687:14
**7-2120.5** [3] - 1687:21, 1687:24, 1689:6
**7th** [3] - 1699:6, 1699:8, 1699:9

## 8

**8** [1] - 1670:11
**80** [2] - 1665:8, 1674:11
**8000** [1] - 1643:24
**85-804** [2] - 1671:12, 1671:15
**87** [6] - 1655:3, 1655:6, 1655:11, 1655:13, 1668:4, 1668:17
**87-653** [1] - 1658:11

## 9

**9** [1] - 1643:9
**955-8238** [1] - 1643:17
**9:00** [2] - 1694:24, 1698:3
**9:15** [2] - 1698:2, 1698:3
**9:45** [1] - 1698:5
**9:57** [1] - 1643:7

## A

**a.m** [2] - 1643:7, 1700:1
**abatement** [1] - 1695:4
**ability** [1] - 1681:19
**able** [2] - 1664:2, 1697:2
**above-entitled** [1] - 1700:7
**accept** [2] - 1658:1, 1658:2
**accomplish** [1] - 1665:14
**accordance** [4] - 1647:20, 1647:24, 1655:15, 1659:7
**accordingly** [3] - 1655:19, 1670:22, 1674:12
**account** [1] - 1648:5
**accounting** [23] - 1646:22, 1646:23, 1647:18, 1647:21, 1647:23, 1648:13, 1649:11, 1649:14, 1649:18, 1649:19, 1659:8, 1661:21, 1663:20, 1664:12, 1667:3, 1668:5, 1669:18, 1678:13, 1680:24, 1681:15, 1681:24, 1682:9
**accumulate** [3] - 1647:8, 1657:6, 1678:17
**accumulated** [3] - 1664:12, 1664:13, 1664:20
**accumulating** [2] - 1649:16, 1667:14
**achieve** [1] - 1672:16
**acquisition** [2] - 1655:15, 1673:24
**act** [1] - 1658:12
**action** [1] - 1692:11
**actions** [6] - 1647:14, 1667:11, 1667:13, 1676:4, 1676:8, 1683:3
**activity** [2] - 1651:10, 1661:1
**actual** [1] - 1681:4
**added** [1] - 1697:17
**addition** [1] - 1696:18
**address** [1] - 1681:16
**addressed** [2] - 1686:4, 1686:10
**adjourned** [1] - 1700:1
**administer** [1] - 1668:16
**Administration** [1] - 1654:8
**Admiral** [1] - 1681:17
**advance** [3] - 1675:13,
1685:5, 1685:24
**advanced** [1] - 1683:25
**affect** [2] - 1650:13, 1657:25
**affidavit** [1] - 1697:4
**affidavits** [1] - 1696:14
**affordability** [4] - 1673:20, 1676:14, 1676:15, 1676:16
**agencies** [3] - 1646:5, 1684:7, 1685:16
**Agency** [7] - 1646:7, 1654:7, 1664:21, 1664:22, 1685:15, 1685:16, 1688:6
**ago** [2] - 1663:21, 1696:8
**agree** [1] - 1696:8
**agreed** [2] - 1669:17, 1671:23
**agreement** [17] - 1649:2, 1651:25, 1652:6, 1652:15, 1657:22, 1664:10, 1670:21, 1671:19, 1671:21, 1672:13, 1672:19, 1682:22, 1684:1, 1684:8, 1685:5, 1685:24, 1690:21
**agreements** [2] - 1646:14, 1694:14
**agrees** [2] - 1658:1, 1658:2
**ahead** [3] - 1645:2, 1645:9, 1690:25
**aided** [1] - 1668:7
**Air** [1] - 1671:12
**aircraft** [1] - 1681:21
**allies** [3] - 1656:2, 1656:5, 1656:10
**allocability** [4] - 1682:10, 1682:15, 1682:19, 1688:11
**allocable** [4] - 1650:23, 1667:5, 1681:5, 1692:19
**allocate** [2] - 1650:8, 1655:18
**allocated** [10] - 1648:6, 1654:23, 1654:25, 1656:24, 1657:1, 1666:7, 1667:5, 1671:4, 1682:21
**allocation** [1] - 1687:6
**allocations** [1] - 1677:19

**allow** [1] - 1699:10
**allowability** [2] - 1682:8, 1682:13
**allowable** [5] - 1652:16, 1671:14, 1671:15, 1687:17, 1692:19
**allows** [1] - 1671:19
**almost** [1] - 1695:21
**AMERICA** [1] - 1643:6
**amortize** [1] - 1666:1
**amortized** [5] - 1652:13, 1666:4, 1666:7, 1670:12, 1670:22
**amount** [13] - 1648:8, 1652:16, 1652:23, 1659:9, 1660:9, 1660:10, 1665:16, 1669:19, 1675:7, 1675:17, 1680:15, 1682:14, 1698:9
**amounted** [1] - 1670:11
**amounts** [1] - 1649:9
**analysis** [1] - 1693:22
**announced** [1] - 1674:17
**annual** [3] - 1661:25, 1677:8, 1691:13
**answer** [9] - 1653:4, 1660:18, 1665:20, 1673:11, 1677:24, 1678:6, 1678:19, 1679:18, 1679:21
**anticipated** [1] - 1672:6
**AP** [1] - 1698:16
**Apache** [2] - 1658:18, 1675:6
**Apaches** [1] - 1675:7
**APPEARANCES** [1] - 1643:12
**applicable** [1] - 1683:8
**applied** [8] - 1648:22, 1652:25, 1657:16, 1660:13, 1660:17, 1677:19, 1687:16, 1693:13
**applies** [2] - 1646:25, 1653:2
**apply** [10] - 1646:24, 1648:15, 1657:12, 1657:15, 1657:18, 1658:24, 1661:4, 1664:24, 1676:10, 1686:18
**appropriate** [4] - 1648:19, 1667:13,

1674:21, 1676:8
**approval** [1] - 1649:12
**approved** [1] - 1649:19
**area** [2] - 1670:6, 1673:17
**areas** [2] - 1673:20, 1674:19
**argue** [1] - 1698:7
**argument** [1] - 1697:2
**arguments** [1] - 1699:10
**arranger** [1] - 1699:15
**aside** [1] - 1661:22
**assess** [2] - 1672:1, 1691:11
**assessment** [2] - 1648:18, 1648:22
**asset** [2] - 1675:10, 1693:19
**assets** [1] - 1660:12
**assigned** [2] - 1661:16, 1662:6
**assignment** [1] - 1669:16
**associated** [2] - 1650:21, 1670:23
**assume** [4] - 1666:3, 1686:10, 1696:3, 1696:10
**assumption** [2] - 1661:9, 1679:15
**assure** [1] - 1686:7
**attached** [2] - 1683:21, 1697:15
**attachment** [1] - 1683:18
**attributable** [1] - 1652:19
**Audit** [4] - 1646:7, 1664:21, 1685:15, 1688:6
**audit** [13] - 1664:21, 1669:3, 1669:14, 1682:23, 1683:1, 1683:9, 1686:1, 1686:4, 1686:17, 1688:6, 1689:24, 1691:5, 1692:16
**audited** [1] - 1664:20
**auditing** [2] - 1669:25, 1670:4
**auditor** [3] - 1646:4, 1646:7, 1683:12
**auditors** [4] - 1669:4, 1669:12, 1688:4, 1689:11
**audits** [3] - 1665:2, 1681:25, 1688:10
**available** [3] -

1672:20, 1689:2, 1689:12
**Avenue** [2] - 1643:16, 1644:2
**avenues** [1] - 1673:23
**average** [1] - 1661:23
**Aviation** [1] - 1654:7
**award** [2] - 1673:11, 1681:21
**awarded** [1] - 1660:1
**aware** [8] - 1649:1, 1653:9, 1653:25, 1671:11, 1682:14, 1688:20, 1688:21, 1691:20
**awry** [1] - 1672:13

# B

**backlog** [5] - 1679:2, 1679:6, 1680:1, 1680:5, 1693:16
**BAE** [2] - 1673:7
**balance** [1] - 1678:18
**ball** [1] - 1675:22
**bar** [1] - 1666:22
**base** [8] - 1649:23, 1656:18, 1657:2, 1657:5, 1660:17, 1666:8, 1675:18, 1676:11
**based** [3] - 1655:7, 1665:23, 1675:17
**basis** [3] - 1648:12, 1649:21, 1679:21
**Beaumont** [1] - 1698:16
**becoming** [1] - 1645:20
**BEFORE** [1] - 1643:10
**beginning** [5] - 1648:5, 1652:24, 1671:22, 1678:11, 1688:21
**behalf** [1] - 1674:22
**BENCH** [1] - 1643:10
**benefit** [9] - 1650:5, 1650:6, 1653:19, 1654:4, 1656:15, 1658:10, 1677:16, 1694:16, 1698:12
**benefits** [2] - 1656:19, 1677:18
**best** [5] - 1663:6, 1670:23, 1672:12, 1674:9, 1695:12
**better** [7] - 1654:14, 1657:4, 1674:11, 1676:16, 1697:19,

1698:14
**between** [7] - 1652:8, 1664:3, 1664:9, 1671:11, 1681:19, 1684:21, 1699:8
**beyond** [1] - 1654:5
**bid** [3] - 1650:17, 1659:10, 1681:18
**big** [7] - 1652:6, 1658:18, 1672:23, 1673:7, 1674:2, 1682:10
**bill** [8] - 1652:21, 1665:3, 1665:7, 1666:11, 1667:18, 1680:18, 1681:18, 1682:4
**billing** [4] - 1647:1, 1664:17, 1665:4, 1667:14
**bills** [2] - 1647:10, 1680:16
**binder** [7] - 1695:8, 1696:7, 1696:19, 1697:1, 1697:3, 1697:5
**binders** [6] - 1695:22, 1696:10, 1696:17, 1696:22, 1699:23
**Blackman** [3] - 1695:7, 1695:8, 1695:16
**board** [2] - 1662:7, 1686:18
**Board** [1] - 1695:2
**Boeing** [4] - 1650:4, 1650:6, 1650:8, 1672:24
**booked** [2] - 1654:20, 1670:2
**books** [5] - 1648:4, 1648:23, 1652:12, 1652:24, 1672:19
**bottom** [1] - 1648:10
**bought** [1] - 1675:3
**break** [2] - 1663:3, 1699:8
**breakdown** [1] - 1661:5
**brief** [1] - 1699:14
**briefs** [3] - 1686:5, 1686:6, 1686:8
**bring** [4] - 1663:9, 1683:19, 1690:9, 1699:23
**bringing** [1] - 1682:24
**budgets** [1] - 1676:19
**build** [3] - 1663:18, 1674:10, 1674:11
**builders** [1] - 1681:20

**building** [2] - 1647:10, 1657:8
**buildup** [2] - 1658:16, 1663:14
**built** [1] - 1659:10
**bunch** [1] - 1670:18
**Burbank** [6] - 1649:2, 1653:3, 1653:6, 1653:15, 1653:16, 1670:19
**burden** [5] - 1647:13, 1657:11, 1657:13, 1657:16, 1658:25
**burdening** [1] - 1667:19
**burdens** [1] - 1657:15
**business** [36] - 1645:23, 1646:14, 1646:19, 1646:25, 1647:13, 1648:10, 1651:11, 1651:20, 1653:25, 1654:22, 1654:23, 1655:1, 1655:8, 1656:18, 1657:10, 1657:11, 1658:25, 1659:15, 1662:9, 1666:8, 1667:11, 1667:12, 1671:2, 1673:4, 1675:15, 1675:18, 1676:4, 1676:5, 1676:11, 1680:1, 1680:2, 1680:3, 1680:6, 1681:12, 1682:11, 1683:7
**businessperson** [2] - 1692:12, 1692:20
**busy** [1] - 1699:1
**butter** [2] - 1657:4, 1671:3
**buy** [2] - 1673:25, 1674:23
**buying** [1] - 1676:24
**BY** [15] - 1645:11, 1646:1, 1649:10, 1653:13, 1656:23, 1663:12, 1671:9, 1674:25, 1675:24, 1677:4, 1684:11, 1685:25, 1689:14, 1690:19, 1692:3

# C

**cA** [1] - 1643:5
**CACO** [3] - 1664:22, 1672:7, 1685:6
**cannot** [2] - 1649:13, 1681:23

**capability** [1] - 1664:2
**capital** [1] - 1660:9
**captured** [1] - 1693:25
**carriers** [1] - 1681:22
**carries** [1] - 1675:6
**CAS** [4] - 1649:15, 1649:20, 1655:15, 1655:18
**case** [10] - 1647:5, 1647:17, 1668:19, 1675:8, 1676:1, 1677:16, 1678:10, 1678:21, 1689:13, 1698:17
**cases** [1] - 1666:16
**cash** [1] - 1666:4
**category** [1] - 1661:2
**caught** [1] - 1669:24
**ceiling** [4] - 1671:18, 1690:20, 1690:23, 1691:3
**CERCLA** [6] - 1649:2, 1666:23, 1677:16, 1678:10, 1678:21, 1684:6
**certain** [3] - 1659:23, 1665:16, 1670:3
**certainly** [2] - 1690:16, 1697:12
**CERTIFICATE** [1] - 1700:4
**Certified** [1] - 1644:1
**certify** [1] - 1700:6
**cetera** [4] - 1648:16, 1657:14, 1671:5, 1688:11
**change** [4] - 1652:6, 1658:5, 1688:16
**changed** [1] - 1672:17
**changes** [2] - 1688:21, 1688:22
**chapter** [1] - 1686:14
**charge** [1] - 1681:9
**chasing** [1] - 1673:5
**check** [1] - 1697:12
**chemicals** [1] - 1698:18
**choose** [1] - 1681:23
**chose** [1] - 1691:12
**chosen** [1] - 1673:14
**cited** [1] - 1696:19
**city** [1] - 1653:22
**civil** [1] - 1646:3
**claim** [1] - 1670:1
**claimed** [1] - 1682:14
**claims** [3] - 1646:16, 1647:3, 1684:6
**classification** [1] - 1669:18
**clause** [3] - 1648:14,

1676:9, 1693:10
**clean** [4] - 1672:16, 1689:3, 1693:5, 1695:18
**clean-up** [2] - 1689:3, 1693:5
**cleaned** [1] - 1667:10
**cleanup** [4] - 1687:16, 1687:18, 1695:3, 1697:22
**close** [2] - 1664:24, 1670:11
**close-out** [1] - 1664:24
**closed** [2] - 1664:25, 1665:9
**closing** [5] - 1646:20, 1674:18, 1697:2, 1698:14, 1699:6
**college** [1] - 1646:3
**colors** [1] - 1655:25
**COLUMBIA** [1] - 1643:1
**comfortable** [1] - 1675:5
**commands** [1] - 1673:25
**commercial** [9] - 1653:24, 1655:23, 1656:11, 1656:13, 1662:9, 1671:5, 1676:5, 1677:21
**communicate** [1] - 1646:18
**company** [3] - 1649:3, 1649:25, 1653:7
**company's** [1] - 1646:21
**comparability** [1] - 1667:7
**compare** [1] - 1681:3
**comparison** [1] - 1664:3
**comparisons** [1] - 1681:19
**compensation** [1] - 1648:20
**compete** [5] - 1656:13, 1672:22, 1672:25, 1673:2, 1681:21
**competitions** [2] - 1673:12, 1673:13
**competitive** [7] - 1650:13, 1650:18, 1651:13, 1667:12, 1673:4, 1673:6, 1673:10
**competitors** [2] - 1672:21, 1673:7

**complete** [1] - 1671:23
**completion** [1] - 1665:12
**complex** [2] - 1661:14, 1661:15
**compliant** [1] - 1649:20
**complied** [1] - 1668:20
**components** [1] - 1675:14
**composite** [1] - 1663:2
**comprehensive** [1] - 1697:18
**compute** [1] - 1675:16
**computed** [1] - 1655:7
**computer** [1] - 1687:6
**concept** [2] - 1680:23, 1692:8
**concert** [1] - 1676:17
**concludes** [1] - 1694:12
**concurrently** [1] - 1666:16
**conditions** [3] - 1664:8, 1665:21, 1665:24
**conduct** [4] - 1667:11, 1667:12, 1676:5, 1683:7
**conducting** [2] - 1672:9, 1688:10
**conflict** [1] - 1676:21
**conform** [1] - 1667:11
**conformance** [1] - 1676:5
**Connecticut** [1] - 1643:16
**consider** [2] - 1668:24, 1683:2
**consideration** [7] - 1658:14, 1659:24, 1660:3, 1660:16, 1660:20, 1662:21, 1685:4
**considerations** [1] - 1659:24
**considered** [3] - 1659:16, 1660:7, 1683:4
**considers** [1] - 1660:5
**consist** [1] - 1655:20
**consistency** [2] - 1649:15, 1667:6
**consistent** [10] - 1647:24, 1648:14, 1648:15, 1649:21, 1656:21, 1670:24,

1685:7, 1688:17, 1688:19, 1693:4
**consistently** [3] - 1663:22, 1685:23, 1693:13
**constantly** [1] - 1673:5
**Constitution** [1] - 1644:2
**contamination** [1] - 1687:16
**contemplated** [2] - 1684:22, 1684:23
**content** [1] - 1675:15
**CONTENTS** [1] - 1644:8
**contingent** [1] - 1693:6
**continually** [2] - 1673:22, 1674:7
**continue** [5] - 1659:12, 1664:15, 1666:24, 1680:10, 1691:14
**continues** [1] - 1671:4
**continuing** [1] - 1674:6
**Contract** [6] - 1646:7, 1664:21, 1664:22, 1685:15, 1688:6
**contract** [77] - 1648:1, 1649:22, 1649:23, 1650:4, 1650:18, 1650:24, 1651:1, 1651:3, 1651:10, 1651:12, 1652:5, 1653:25, 1655:17, 1656:5, 1656:20, 1657:2, 1657:5, 1657:12, 1657:21, 1657:25, 1658:15, 1659:15, 1659:23, 1659:25, 1660:1, 1660:9, 1660:10, 1661:1, 1661:11, 1661:15, 1663:15, 1664:6, 1664:8, 1664:11, 1664:13, 1664:18, 1665:3, 1665:6, 1665:7, 1665:9, 1665:10, 1665:12, 1665:20, 1665:21, 1666:3, 1666:11, 1666:21, 1666:22, 1666:25, 1667:5, 1667:7, 1667:8, 1668:16, 1668:25, 1669:3, 1669:10, 1673:15, 1677:21, 1679:12,

1679:17, 1679:19, 1679:20, 1681:3, 1681:4, 1681:6, 1685:21, 1688:6
**contracting** [12] - 1658:14, 1659:3, 1659:9, 1659:22, 1660:5, 1660:8, 1660:15, 1660:20, 1661:13, 1664:10, 1665:24, 1668:7
**contractor** [12] - 1649:13, 1658:7, 1660:9, 1663:23, 1667:1, 1669:6, 1671:25, 1676:4, 1679:16, 1681:3, 1681:4, 1681:18
**contractor's** [1] - 1660:6
**contractors** [5] - 1663:22, 1663:24, 1664:3, 1667:19, 1669:12
**contracts** [71] - 1646:20, 1647:1, 1647:8, 1647:15, 1647:18, 1648:17, 1649:17, 1650:14, 1652:13, 1654:24, 1655:2, 1655:5, 1655:14, 1656:25, 1657:1, 1657:13, 1657:17, 1657:19, 1659:18, 1660:2, 1660:22, 1660:23, 1660:25, 1661:2, 1661:5, 1661:19, 1661:20, 1661:23, 1662:17, 1663:23, 1664:5, 1664:7, 1664:24, 1665:1, 1665:5, 1665:17, 1665:19, 1666:6, 1666:8, 1666:14, 1667:15, 1668:3, 1673:9, 1673:16, 1678:22, 1678:23, 1678:25, 1679:2, 1679:3, 1679:6, 1679:9, 1679:24, 1680:4, 1680:6, 1680:9, 1680:16, 1680:19, 1681:2, 1681:8, 1681:21, 1683:11, 1689:25, 1691:15, 1691:19, 1693:5, 1693:13
**control** [4] - 1645:24, 1651:21, 1660:6

**controller** [1] - 1646:10
**controls** [2] - 1680:15, 1680:17
**conversation** [1] - 1693:17
**cooperation** [1] - 1672:9
**copies** [1] - 1695:9
**corporate** [9] - 1646:12, 1647:6, 1647:9, 1647:11, 1657:8, 1657:9, 1659:1, 1671:2, 1685:21
**CORPORATION** [1] - 1643:3
**corporation** [1] - 1674:15
**Corporation** [1] - 1645:17
**corporation's** [1] - 1647:7
**correct** [42] - 1650:15, 1653:15, 1656:16, 1661:6, 1661:9, 1662:8, 1666:2, 1668:14, 1668:22, 1669:2, 1670:12, 1670:13, 1670:14, 1674:4, 1677:9, 1677:17, 1677:24, 1678:2, 1678:6, 1678:12, 1678:14, 1678:15, 1678:16, 1678:20, 1678:22, 1679:1, 1679:8, 1679:10, 1679:18, 1682:4, 1682:24, 1684:13, 1684:14, 1685:13, 1691:6, 1691:15, 1691:16, 1692:14, 1693:8, 1693:10, 1694:1, 1700:6
**cost** [101] - 1646:16, 1646:21, 1646:23, 1646:25, 1647:3, 1647:11, 1647:17, 1647:21, 1647:23, 1648:2, 1648:12, 1648:13, 1648:17, 1648:19, 1648:23, 1649:14, 1649:17, 1649:19, 1650:8, 1650:9, 1650:21, 1650:24, 1652:13, 1652:25, 1654:13, 1654:16, 1654:17, 1654:18, 1654:25,

1656:19, 1657:9, 1657:14, 1657:17, 1657:24, 1658:4, 1658:13, 1658:16, 1658:21, 1658:22, 1659:2, 1659:7, 1659:17, 1660:4, 1660:6, 1660:13, 1660:14, 1660:17, 1660:19, 1661:2, 1661:16, 1663:14, 1663:20, 1664:3, 1664:11, 1665:3, 1666:4, 1666:9, 1666:10, 1666:20, 1667:2, 1668:5, 1669:19, 1670:1, 1670:4, 1670:5, 1670:12, 1670:22, 1672:17, 1673:11, 1673:13, 1673:15, 1674:12, 1675:1, 1677:19, 1677:23, 1678:13, 1678:22, 1679:4, 1679:14, 1679:19, 1680:7, 1680:24, 1681:5, 1681:13, 1681:15, 1681:24, 1682:8, 1682:11, 1683:3, 1683:8, 1684:25, 1687:6, 1688:14, 1689:7, 1691:12, 1692:21, 1693:11
**costing** [3] - 1667:2, 1667:4, 1680:24
**Costs** [1] - 1688:25
**costs** [122] - 1647:4, 1647:7, 1647:12, 1647:24, 1648:6, 1648:7, 1648:8, 1649:16, 1649:21, 1650:12, 1650:14, 1651:2, 1651:3, 1651:9, 1651:11, 1652:4, 1652:9, 1652:11, 1652:12, 1652:16, 1652:17, 1652:20, 1652:22, 1653:1, 1654:17, 1654:19, 1654:21, 1654:22, 1655:18, 1657:3, 1657:6, 1657:7, 1657:13, 1657:18, 1658:25, 1659:1, 1659:10, 1659:16, 1659:21, 1662:12, 1662:16, 1663:17, 1663:22, 1664:11, 1664:16, 1664:18, 1664:20,

1664:23, 1665:8, 1665:25, 1666:7, 1666:10, 1666:11, 1666:17, 1666:18, 1667:4, 1667:14, 1667:16, 1669:5, 1669:8, 1669:13, 1670:2, 1670:8, 1671:1, 1671:14, 1671:20, 1671:24, 1672:2, 1673:9, 1673:12, 1673:23, 1674:22, 1676:7, 1676:12, 1676:13, 1677:21, 1678:16, 1678:17, 1678:23, 1679:13, 1680:16, 1680:19, 1681:1, 1681:4, 1681:5, 1681:8, 1681:10, 1681:23, 1682:4, 1682:25, 1683:4, 1683:6, 1683:10, 1684:13, 1684:19, 1684:22, 1684:23, 1685:6, 1685:7, 1685:23, 1687:11, 1687:17, 1688:23, 1689:1, 1689:3, 1689:25, 1691:6, 1691:10, 1691:15, 1691:19, 1692:18, 1693:5, 1693:14, 1697:22, 1698:15
**counsel** [1] - 1683:4
**country** [1] - 1668:8
**county** [1] - 1653:22
**couple** [3] - 1694:13, 1696:9, 1698:2
**course** [7] - 1658:7, 1659:13, 1672:15, 1672:17, 1674:11, 1675:23, 1686:12
**COURT** [104] - 1643:1, 1645:2, 1645:9, 1645:25, 1649:7, 1649:25, 1650:4, 1650:11, 1650:16, 1650:25, 1651:4, 1651:8, 1651:15, 1651:19, 1651:22, 1652:1, 1652:3, 1652:18, 1653:2, 1653:5, 1653:3, 1655:10, 1655:20, 1655:24, 1656:14, 1656:17, 1656:22, 1660:21, 1661:4, 1661:7, 1661:10,

1661:12, 1661:20, 1662:4, 1662:7, 1662:11, 1662:19, 1662:22, 1663:1, 1663:3, 1663:7, 1667:20, 1667:23, 1668:2, 1668:12, 1668:17, 1668:23, 1669:11, 1669:21, 1669:24, 1670:8, 1670:15, 1670:17, 1671:6, 1673:17, 1673:19, 1674:3, 1683:15, 1683:20, 1683:25, 1684:15, 1684:17, 1685:1, 1685:3, 1685:9, 1685:17, 1686:7, 1686:10, 1686:17, 1686:24, 1687:5, 1687:13, 1687:23, 1687:25, 1688:3, 1688:8, 1688:12, 1688:16, 1689:4, 1689:8, 1689:18, 1689:21, 1690:2, 1690:7, 1690:12, 1690:15, 1691:22, 1694:5, 1694:7, 1694:10, 1694:12, 1694:18, 1694:21, 1694:24, 1695:10, 1696:23, 1697:8, 1697:10, 1698:1, 1698:5, 1698:25, 1699:2, 1699:7, 1699:17
**Court** [6] - 1644:1, 1653:17, 1666:22, 1671:10, 1671:18, 1700:5
**Courthouse** [1] - 1644:2
**courtroom** [1] - 1699:24
**cover** [1] - 1698:8
**covered** [3] - 1698:11, 1699:14, 1699:16
**covers** [1] - 1666:4
**credit** [27] - 1648:3, 1648:6, 1648:12, 1648:21, 1650:6, 1650:9, 1651:8, 1652:4, 1652:5, 1652:25, 1653:19, 1654:4, 1654:16, 1656:24, 1657:2, 1657:15, 1658:10, 1659:14, 1663:13, 1669:16, 1676:8,

1676:10, 1677:15, 1678:10, 1678:21, 1679:12, 1680:7
**credited** [3] - 1648:19, 1649:5, 1652:22
**credits** [33] - 1648:3, 1648:6, 1648:10, 1648:14, 1648:15, 1648:20, 1648:22, 1648:24, 1649:1, 1649:12, 1650:10, 1651:11, 1652:18, 1653:5, 1653:9, 1654:12, 1654:24, 1656:15, 1656:19, 1657:5, 1659:6, 1659:7, 1662:13, 1662:17, 1663:22, 1676:6, 1677:19, 1677:22, 1679:3, 1683:13, 1687:16, 1693:10, 1693:12
**criteria** [1] - 1673:10
**Cross** [1] - 1644:11
**cross** [5] - 1648:1, 1696:7, 1696:11, 1697:4, 1697:15
**CROSS** [1] - 1677:3
**cross-examination** [4] - 1696:7, 1696:11, 1697:4, 1697:15
**CROSS-EXAMINATION** [1] - 1677:3
**Cross-Examination..** ........................... [1] - 1644:11
**Crutcher** [1] - 1643:16
**crystal** [1] - 1675:22
**current** [7] - 1645:15, 1651:17, 1670:25, 1675:17, 1675:21, 1676:12, 1680:5
**customer** [15] - 1648:1, 1648:2, 1649:22, 1651:12, 1656:20, 1658:19, 1659:16, 1667:7, 1667:8, 1667:23, 1668:10, 1676:23, 1676:24, 1693:13
**customers** [16] - 1653:18, 1654:3, 1654:5, 1654:10, 1654:15, 1662:10, 1667:18, 1671:4, 1673:22, 1674:22, 1676:10, 1676:17, 1677:8, 1677:14,

1677:17, 1677:20
**cut** [1] - 1659:13
**cyber** [1] - 1656:12
**cycle** [4] - 1664:14,
1664:15, 1665:4,
1666:13

# D

**D.C** [1] - 1643:6
**data** [1] - 1658:13
**date** [7] - 1669:11,
1670:5, 1670:16,
1671:7, 1684:2,
1685:14, 1693:7
**DAVID** [1] - 1643:15
**DAY** [1] - 1643:9
**days** [2] - 1696:8,
1699:7
**DC** [3] - 1643:17,
1643:24, 1644:3
**DCAA** [12] - 1665:1,
1669:3, 1676:7,
1681:25, 1682:23,
1683:1, 1683:9,
1686:1, 1686:4,
1687:22, 1691:5,
1692:16
**DCAM** [1] - 1688:7
**DCAS** [1] - 1688:4
**DCMA** [2] - 1671:19,
1682:1
**deal** [3] - 1649:25,
1654:6, 1688:14
**dealings** [1] - 1651:4
**December** [1] -
1674:17
**decided** [1] - 1681:7
**decision** [1] - 1680:18
**decrement** [2] -
1693:23, 1693:25
**decremented** [2] -
1664:17, 1665:4
**dedicated** [1] -
1660:10
**Defendant** [2] -
1643:7, 1643:18
**defense** [2] - 1685:21
**Defense** [8] - 1643:22,
1646:6, 1646:7,
1664:21, 1664:22,
1685:15, 1688:5
**defenses** [2] - 1690:9
**deferred** [4] - 1648:4,
1675:9, 1678:17,
1693:19
**define** [1] - 1680:17
**defined** [1] - 1662:4
**delineate** [1] -

1653:11
**deliver** [3] - 1654:2,
1665:19, 1676:16
**delivery** [1] - 1665:17
**Department** [10] -
1643:22, 1646:5,
1646:6, 1654:6,
1654:8, 1654:10,
1655:16, 1684:7
**depreciation** [1] -
1657:8
**derived** [1] - 1680:3
**describe** [1] - 1690:24
**design** [1] - 1658:23
**despite** [1] - 1673:15
**destroyers** [1] -
1681:22
**determination** [2] -
1669:8, 1673:11
**determinations** [1] -
1661:14
**determine** [5] -
1648:8, 1667:6,
1669:6, 1672:2,
1679:20
**determined** [1] -
1683:6
**deviate** [1] - 1649:11
**differences** [1] -
1682:22
**different** [10] - 1646:4,
1661:14, 1662:20,
1677:12, 1681:18,
1687:5, 1687:19,
1690:1, 1697:20,
1697:21
**difficulty** [2] -
1659:25, 1669:11
**direct** [9] - 1656:4,
1657:14, 1657:16,
1658:20, 1658:22,
1666:11, 1673:22,
1673:25
**DIRECT** [1] - 1645:10
**Direct** [1] - 1644:11
**directly** [4] - 1656:5,
1656:6, 1656:9,
1668:7
**disallowed** [1] -
1652:9
**disc** [8] - 1649:2,
1649:5, 1669:16,
1670:22, 1683:25,
1684:5, 1684:12,
1684:24
**discipline** [1] -
1645:22
**disclose** [2] - 1659:3,
1659:9
**disclosed** [2] -

1647:20, 1649:18
**disclosure** [2] -
1646:22, 1681:25
**discontinued** [7] -
1648:24, 1651:24,
1663:13, 1671:19,
1672:5, 1684:12,
1690:21
**discrete** [1] - 1660:19
**discuss** [2] - 1682:20,
1697:24
**discussed** [1] -
1671:3
**discussion** [3] -
1682:18, 1682:21,
1698:4
**disk** [2] - 1695:22,
1696:17
**disks** [4] - 1696:13,
1696:18, 1696:20,
1696:22
**dispute** [4] - 1652:8,
1682:3, 1682:5,
1682:18
**distinction** [1] -
1656:20
**DISTRICT** [3] -
1643:1, 1643:1,
1643:11
**document** [12] -
1682:6, 1682:7,
1682:20, 1683:15,
1684:3, 1685:2,
1685:10, 1687:5,
1687:7, 1688:3,
1695:17, 1697:11
**documented** [1] -
1672:11
**documents** [3] -
1696:11, 1696:20,
1697:1
**DOD** [14] - 1649:24,
1654:3, 1654:5,
1655:4, 1661:4,
1662:9, 1662:10,
1671:5, 1673:22,
1676:17, 1685:11,
1690:16
**DOD-type** [1] - 1661:4
**DOJ** [1] - 1655:10
**dollar** [1] - 1652:23
**domestic** [1] -
1677:20
**done** [2] - 1663:25,
1695:11
**DOSA** [10] - 1651:25,
1652:1, 1682:2,
1682:5, 1682:16,
1684:19, 1684:22,
1684:23, 1685:6

**double** [3] - 1686:6,
1690:9, 1690:10
**doubt** [1] - 1690:7
**down** [11] - 1647:13,
1648:9, 1654:25,
1659:1, 1662:25,
1663:3, 1663:9,
1668:4, 1671:2,
1672:8, 1674:12
**drops** [1] - 1662:25
**due** [1] - 1673:9
**duly** [1] - 1645:6
**dumps** [1] - 1697:20
**Dunn** [1] - 1643:16
**during** [1] - 1686:12
**duties** [1] - 1646:9
**duty** [1] - 1667:1

# E

**effectively** [1] -
1663:17
**effort** [1] - 1687:18
**eight** [1] - 1662:25
**either** [7] - 1657:24,
1660:19, 1661:1,
1669:22, 1685:13,
1685:14, 1696:8
**elected** [1] - 1650:19
**electricity** [1] - 1657:9
**element** [3] - 1660:7,
1660:19
**elements** [2] -
1660:13, 1670:4
**eliminates** [1] -
1690:11
**ELLEN** [1] - 1643:10
**email** [1] - 1698:6
**emphasis** [1] - 1674:2
**employee** [1] -
1674:15
**encourage** [1] -
1673:22
**end** [2] - 1646:17,
1671:22
**ending** [1] - 1662:1
**ends** [1] - 1662:1
**Energy** [2] - 1646:5,
1654:6
**engineering** [1] -
1658:22
**enormous** [1] - 1698:9
**ENRD** [1] - 1643:22
**ensure** [2] - 1663:21,
1669:5
**enter** [2] - 1657:21,
1679:16
**entered** [1] - 1646:3
**entering** [1] - 1664:1

**entire** [1] - 1657:5
**entities** [1] - 1656:14
**entitled** [4] - 1689:6,
1690:5, 1690:15,
1700:7
**entity** [3] - 1650:1,
1650:12, 1663:23
**environment** [2] -
1673:6, 1676:12
**environmental** [18] -
1647:4, 1647:6,
1657:7, 1657:18,
1657:25, 1669:4,
1669:8, 1675:9,
1683:4, 1687:11,
1688:14, 1688:23,
1689:6, 1691:6,
1691:15, 1691:19,
1693:5, 1693:19
**Environmental** [2] -
1643:22, 1688:25
**equal** [1] - 1698:18
**equipment** [1] -
1660:11
**ERICA** [1] - 1643:19
**ESH** [1] - 1643:5
**ESQ** [10] - 1643:13,
1643:14, 1643:14,
1643:15, 1643:18,
1643:19, 1643:19,
1643:20, 1643:20,
1643:21
**essentially** [2] -
1679:9, 1679:18
**establish** [1] - 1658:5
**established** [7] -
1647:21, 1648:4,
1649:17, 1650:21,
1659:8, 1678:13,
1679:5
**establishes** [1] -
1659:22
**establishing** [8] -
1652:15, 1655:1,
1658:1, 1658:2,
1658:14, 1659:4,
1659:17, 1660:7
**estimate** [9] -
1658:24, 1661:7,
1663:1, 1671:23,
1672:2, 1672:13,
1674:9, 1675:16,
1675:18
**estimated** [1] -
1657:23
**estimates** [1] -
1672:12
**estimating** [1] -
1649:16
**et** [4] - 1648:16,

1657:14, 1671:5, 1688:11
**evaluate** [1] - 1660:16
**evaluating** [1] - 1669:4
**events** [1] - 1657:25
**evidence** [10] - 1694:8, 1694:12, 1695:24, 1696:1, 1696:2, 1696:9, 1696:10, 1696:12, 1697:12, 1697:16
**exact** [1] - 1662:2
**exactly** [4] - 1663:19, 1684:16, 1684:24, 1684:25
**EXAMINATION** [3] - 1645:10, 1677:3, 1692:2
**examination** [4] - 1696:7, 1696:11, 1697:4, 1697:15
**Examination**.............. ...............[1] - 1644:12
**Examination**............ ...............[1] - 1644:11
**Examination**............. ................[1] - 1644:11
**examined** [1] - 1645:7
**example** [2] - 1665:11, 1672:12
**exceed** [3] - 1665:8, 1671:24, 1691:10
**exception** [1] - 1698:12
**excuse** [5] - 1650:22, 1654:20, 1671:23, 1673:7, 1685:21
**excused** [1] - 1694:7
**execute** [1] - 1680:2
**executed** [1] - 1685:19
**execution** [1] - 1676:3
**executive** [2] - 1685:21, 1685:22
**exercising** [1] - 1668:24
**Exhibit** [5] - 1683:21, 1684:3, 1686:14, 1696:24
**exhibit** [7] - 1686:6, 1695:14, 1696:4, 1696:6, 1697:4, 1697:5, 1697:14
**exhibits** [9] - 1694:25, 1695:1, 1695:5, 1695:12, 1695:14,

1695:15, 1695:23, 1696:14, 1697:20
**Exhibits** [1] - 1690:18
**existence** [1] - 1682:12
**existing** [1] - 1679:6
**expect** [1] - 1675:16
**expectation** [1] - 1671:25
**expected** [3] - 1671:24, 1691:10, 1692:11
**expense** [5] - 1647:7, 1670:25, 1676:22, 1676:23, 1678:1
**expenses** [7] - 1646:12, 1647:8, 1647:9, 1650:22, 1660:15, 1660:16, 1662:6
**expertise** [1] - 1673:14
**explained** [1] - 1680:23
**explicit** [1] - 1689:17
**explosives** [1] - 1658:21
**extent** [5] - 1654:22, 1654:24, 1665:22, 1667:25, 1683:13
**extra** [1] - 1696:21
**eyed** [1] - 1658:4

## F

**facilitated** [2] - 1656:3, 1656:8
**fact** [8] - 1652:14, 1666:20, 1668:3, 1669:6, 1670:6, 1673:24, 1676:15, 1696:9
**factor** [8] - 1655:4, 1675:9, 1675:10, 1675:14, 1675:16, 1693:23, 1693:25, 1694:1
**failed** [1] - 1697:2
**fair** [2] - 1659:4, 1674:20
**fairly** [2] - 1688:17, 1688:19
**familiar** [1] - 1652:3
**FAR** [8] - 1646:24, 1648:14, 1655:18, 1667:10, 1683:4, 1692:18, 1692:21, 1693:11
**far** [4] - 1669:18,

1669:20, 1670:8, 1698:19
**faster** [1] - 1695:16
**February** [1] - 1643:7
**federal** [7] - 1653:18, 1653:20, 1654:3, 1654:14, 1655:15, 1663:9, 1664:4
**Federal** [1] - 1654:7
**fees** [5] - 1669:21, 1670:19, 1670:23, 1671:6, 1698:21
**feet** [1] - 1674:18
**few** [1] - 1697:17
**field** [2] - 1675:7, 1688:10
**fighter** [2] - 1676:14, 1681:14
**figure** [2] - 1650:25, 1661:21
**figuring** [1] - 1651:1
**file** [1] - 1695:19
**filed** [2] - 1684:3, 1694:15
**filing** [1] - 1696:2
**final** [4] - 1664:24, 1666:19, 1696:4, 1696:13
**finalized** [1] - 1647:20
**finalizing** [1] - 1699:5
**finance** [3] - 1645:16, 1645:21, 1646:8
**financial** [2] - 1662:1, 1677:13
**financing** [1] - 1665:18
**fine** [2] - 1694:24, 1699:19
**fire** [2] - 1645:23, 1651:21
**firm** [5] - 1659:18, 1660:2, 1679:2, 1696:9
**firms** [1] - 1673:2
**first** [4] - 1645:6, 1665:13, 1692:4, 1692:7
**fiscal** [1] - 1646:18
**five** [7] - 1648:7, 1666:1, 1672:23, 1678:12, 1680:12, 1680:14, 1681:8
**five-year** [1] - 1648:7
**fixed** [34] - 1656:25, 1657:12, 1657:17, 1657:20, 1657:21, 1658:1, 1658:3, 1658:9, 1659:18, 1660:2, 1660:22, 1660:24, 1661:8,

1661:15, 1661:22, 1665:5, 1665:6, 1665:7, 1665:10, 1665:12, 1666:14, 1678:22, 1678:24, 1678:25, 1679:2, 1679:3, 1679:6, 1679:17, 1679:24, 1680:3, 1680:6, 1680:9, 1693:16
**fixed-price** [28] - 1656:25, 1657:12, 1657:17, 1657:21, 1658:9, 1659:18, 1660:2, 1660:22, 1660:24, 1661:15, 1665:5, 1665:6, 1665:7, 1665:10, 1665:12, 1666:14, 1678:22, 1678:24, 1678:25, 1679:2, 1679:3, 1679:6, 1679:17, 1679:24, 1680:3, 1680:6, 1680:9, 1693:16
**fleet** [1] - 1681:21
**FLETCHER** [19] - 1643:14, 1645:3, 1645:11, 1646:1, 1649:10, 1651:24, 1653:13, 1656:23, 1663:12, 1671:9, 1674:25, 1675:24, 1677:1, 1683:24, 1686:22, 1691:23, 1692:3, 1694:3, 1694:9
**Florida** [2] - 1645:24, 1651:21
**flow** [3] - 1648:9, 1666:4, 1671:2
**flow-down** [1] - 1648:9
**FMS** [2] - 1656:1, 1668:14
**focusing** [1] - 1692:5
**follow** [14] - 1648:13, 1649:20, 1650:1, 1658:13, 1659:23, 1661:16, 1662:12, 1663:19, 1665:21, 1668:5, 1671:10, 1671:17, 1672:18, 1697:2
**follow-on** [1] - 1661:16
**follows** [1] - 1645:8
**footprint** [1] - 1674:19
**FOR** [1] - 1643:1
**Force** [1] - 1671:12

**forecast** [1] - 1655:7
**foregoing** [1] - 1700:6
**foreign** [10] - 1649:25, 1650:13, 1656:2, 1656:3, 1656:8, 1668:6, 1668:8, 1668:9, 1668:10, 1668:15
**forgetting** [1] - 1672:25
**forgot** [1] - 1673:8
**form** [1] - 1670:3
**format** [1] - 1670:3
**forth** [1] - 1664:9
**fortunately** [1] - 1674:16
**forward** [6] - 1646:13, 1647:3, 1652:21, 1684:20, 1689:1
**FOTOUHI** [1] - 1643:15
**four** [7] - 1659:24, 1660:13, 1673:25, 1675:6, 1694:19, 1694:20, 1696:8
**fourth** [2] - 1660:7, 1694:16
**frank** [1] - 1667:24
**frankly** [2] - 1683:16, 1686:13
**front** [1] - 1687:9
**fulfilling** [1] - 1668:24
**full** [4] - 1667:2, 1667:3, 1680:24, 1681:13
**fund** [1] - 1678:4
**funded** [1] - 1678:5
**funds** [2] - 1678:7, 1678:8
**future** [5] - 1655:8, 1658:9, 1659:14, 1691:18, 1698:17

## G

**G&A** [1] - 1657:10
**GATCHEL** [2] - 1644:10, 1645:5
**Gatchel** [29] - 1645:4, 1645:14, 1645:18, 1646:2, 1646:8, 1647:2, 1647:16, 1649:11, 1653:14, 1653:17, 1654:3, 1654:12, 1656:24, 1659:11, 1659:20, 1663:13, 1664:4, 1666:22, 1671:10, 1671:17, 1672:4,

1672:21, 1675:8,
1675:25, 1677:1,
1677:5, 1692:7,
1692:24, 1693:15
**gather** [1] - 1654:18
**general** [1] - 1664:11
**generated** [4] -
1685:11, 1685:12,
1685:13, 1685:14
**Gibson** [1] - 1643:16
**given** [6] - 1656:4,
1683:16, 1686:12,
1696:10, 1698:9,
1698:19
**goal** [1] - 1676:12
**goods** [6] - 1653:21,
1653:23, 1654:11,
1664:2, 1681:14
**governed** [2] -
1649:13, 1655:18
**government** [92] -
1645:16, 1645:20,
1646:2, 1646:4,
1646:8, 1646:17,
1646:20, 1647:18,
1648:17, 1649:13,
1649:17, 1649:18,
1649:19, 1650:1,
1651:5, 1651:6,
1652:8, 1652:21,
1653:18, 1653:20,
1655:2, 1655:5,
1655:8, 1655:9,
1655:14, 1656:3,
1656:4, 1656:6,
1656:9, 1657:22,
1658:1, 1658:6,
1660:23, 1661:20,
1661:23, 1663:20,
1663:23, 1663:25,
1664:5, 1664:16,
1666:25, 1667:4,
1667:6, 1667:14,
1668:1, 1668:3,
1668:7, 1668:8,
1668:11, 1668:12,
1668:13, 1668:15,
1669:5, 1669:12,
1669:17, 1669:22,
1670:10, 1671:25,
1672:1, 1673:3,
1675:15, 1676:17,
1677:8, 1677:17,
1677:18, 1678:5,
1679:16, 1680:19,
1681:2, 1681:13,
1681:19, 1682:2,
1683:11, 1685:6,
1685:10, 1689:11,

1689:18, 1689:25,
1690:16, 1691:8,
1691:11, 1691:15,
1691:19, 1693:6,
1693:11, 1694:10,
1694:15
**Government** [3] -
1649:23, 1649:24,
1675:17
**governments** [1] -
1653:23
**gross** [3] - 1651:1,
1651:2, 1651:3
**Grumman** [1] -
1672:24
**guaranteeing** [1] -
1668:23
**guess** [3] - 1662:25,
1696:16, 1696:21
**guidance** [6] -
1646:24, 1667:10,
1669:3, 1676:7,
1688:9, 1688:22
**guidelines** [2] -
1659:23, 1676:7

## H

**half** [2] - 1645:19,
1697:14
**handle** [3] - 1647:19,
1647:20, 1647:23
**handled** [8] - 1647:22,
1648:2, 1648:21,
1653:10, 1670:21,
1670:24, 1678:17,
1684:25
**handling** [2] -
1652:11, 1685:7
**header** [1] - 1687:9
**Health** [1] - 1654:9
**held** [2] - 1645:18,
1645:22
**helicopter** [2] -
1658:18, 1675:6
**Hellfire** [6] - 1658:17,
1665:11, 1674:9,
1674:23, 1675:2
**Hellfires** [1] - 1676:24
**HEMINGER** [1] -
1643:20
**high** [1] - 1673:12
**higher** [2] - 1660:3,
1661:16
**highlight** [1] - 1692:6
**highlighted** [1] -
1696:12
**highly** [2] - 1661:14
**history** [1] - 1676:9

**hold** [2] - 1645:21,
1678:17
**Homeland** [2] -
1654:7, 1655:11
**Honeywell** [1] -
1672:24
**Honor** [23] - 1645:3,
1649:8, 1650:3,
1650:7, 1660:24,
1684:18, 1686:4,
1686:16, 1687:2,
1687:21, 1688:5,
1690:8, 1691:23,
1694:3, 1694:9,
1694:11, 1694:17,
1694:20, 1694:23,
1695:8, 1697:25,
1698:24, 1699:1
**HONORABLE** [1] -
1643:10
**hopefully** [2] -
1695:23, 1696:8
**hopeless** [1] -
1697:19
**hours** [2] - 1674:10,
1699:11
**huge** [1] - 1673:20
**Human** [1] - 1654:9
**hundred** [4] - 1656:18,
1661:17, 1662:7,
1674:10
**hundreds** [1] - 1673:2
**HUVELLE** [1] -
1643:10
**hypothetically** [2] -
1655:12, 1681:7

## I

**idea** [1] - 1698:14
**ideally** [1] - 1695:13
**identified** [1] - 1653:6
**identify** [1] - 1684:7
**II** [4] - 1683:25,
1684:5, 1684:12,
1684:24
**image** [3] - 1663:17,
1677:22, 1678:16
**impact** [2] - 1657:6,
1669:17
**impacts** [1] - 1657:24
**implement** [1] -
1674:10
**implemented** [1] -
1663:21
**important** [1] -
1673:14
**improve** [1] - 1674:8
**include** [8] - 1647:4,

1648:9, 1655:10,
1655:11, 1662:8,
1681:1, 1681:7,
1681:11
**included** [6] -
1662:12, 1662:13,
1671:1, 1679:4,
1679:13, 1681:5
**includes** [1] - 1660:14
**including** [6] -
1650:22, 1653:22,
1663:9, 1669:9,
1678:23, 1690:9
**inclusion** [1] -
1662:16
**incorporate** [2] -
1647:14, 1659:6
**incorporated** [1] -
1693:11
**incorporating** [1] -
1669:9
**increase** [3] -
1657:17, 1672:17,
1679:9
**increased** [2] -
1673:9, 1679:13
**incur** [3] - 1647:7,
1652:20, 1682:25
**incurred** [11] -
1646:16, 1647:3,
1648:23, 1652:17,
1654:19, 1665:8,
1665:25, 1666:17,
1670:1, 1670:13,
1671:24
**incurrence** [1] -
1666:19
**indeed** [1] - 1660:17
**indemnification** [2] -
1694:16, 1699:15
**index** [3] - 1695:23,
1697:6, 1697:19
**indicated** [2] - 1678:9,
1679:23
**indirect** [39] - 1646:12,
1646:18, 1647:7,
1647:8, 1647:9,
1647:13, 1648:9,
1648:12, 1650:12,
1650:14, 1650:22,
1652:13, 1652:25,
1654:12, 1654:21,
1654:25, 1657:7,
1658:25, 1659:1,
1659:10, 1660:14,
1660:16, 1662:12,
1664:24, 1666:10,
1666:18, 1669:9,
1671:1, 1673:23,
1674:1, 1674:7,

1674:13, 1676:22,
1676:23, 1677:19,
1679:14
**indirectly** [1] -
1660:18
**individual** [1] -
1679:11
**industry** [3] - 1663:24,
1673:21, 1674:2
**information** [1] -
1698:10
**infrastructure** [1] -
1647:11
**initiatives** [1] -
1676:15
**inquiry** [1] - 1683:12
**instance** [2] -
1655:16, 1658:17
**instead** [1] - 1676:24
**instituted** [1] - 1670:9
**instructs** [1] - 1669:3
**insurance** [8] -
1649:4, 1653:3,
1653:7, 1653:8,
1653:11, 1684:6,
1687:15, 1689:2
**interest** [2] - 1678:15,
1678:18
**interested** [1] -
1681:13
**interesting** [1] -
1673:13
**interim** [1] - 1665:18
**international** [5] -
1655:22, 1655:25,
1656:1, 1677:14,
1677:20
**interpret** [1] - 1646:24
**investment** [1] -
1660:11
**invokes** [1] - 1693:10
**involve** [1] - 1670:18
**involved** [1] - 1651:22
**issue** [7] - 1647:4,
1669:14, 1681:16,
1682:7, 1682:10,
1682:13, 1682:15
**issues** [2] - 1690:1,
1699:13
**IT** [9] - 1654:11,
1656:12, 1673:2,
1673:3, 1673:17,
1673:18, 1673:19
**item** [3] - 1654:18,
1660:4, 1665:23
**items** [3] - 1654:21,
1656:11, 1688:14
**itself** [4] - 1659:25,
1660:1, 1663:24,
1680:18

## J

Jared [1] - 1696:13
JENNIFER [1] - 1643:20
JESSICA [1] - 1643:19
job [1] - 1646:9
jobs [1] - 1656:12
JOHN [1] - 1643:18
John [1] - 1697:15
JOHNSON [1] - 1643:21
Jones [1] - 1697:15
JUDGE [1] - 1643:11
judgment [9] - 1647:16, 1647:17, 1647:19, 1650:5, 1677:16, 1678:4, 1678:9, 1678:11, 1678:21
judgments [2] - 1652:5, 1690:3
June [1] - 1672:11
Justice [4] - 1643:22, 1654:10, 1655:16, 1684:8
Justin [1] - 1685:22
JUSTIN [2] - 1643:14, 1643:20

## K

KANESHIRO [3] - 1644:1, 1700:5, 1700:9
KANESHIRO- MILLER [3] - 1644:1, 1700:5, 1700:9
keep [2] - 1645:25, 1666:17
key [2] - 1673:10, 1692:7
kind [7] - 1650:17, 1657:3, 1669:18, 1671:19, 1674:24, 1675:22, 1684:25
knowing [2] - 1658:4, 1697:13
known [1] - 1657:23

## L

labor [2] - 1657:14, 1658:22
lack [2] - 1654:13, 1657:4
language [4] - 1686:5, 1689:17, 1692:17,

1692:20
large [1] - 1647:12
last [8] - 1670:10, 1672:25, 1673:24, 1688:24, 1689:7, 1698:22, 1698:23, 1699:1
latest [1] - 1677:13
launch [1] - 1658:17
law [4] - 1658:11, 1658:13, 1668:18, 1699:18
lawsuit [1] - 1670:9
layers [1] - 1658:24
laying [2] - 1674:14, 1674:18
leading [1] - 1673:3
least [5] - 1649:1, 1668:17, 1696:12, 1697:12, 1697:17
legal [8] - 1669:21, 1670:5, 1670:8, 1670:19, 1670:23, 1671:6, 1671:14, 1698:21
legally [1] - 1699:14
less [1] - 1660:4
level [10] - 1646:12, 1646:14, 1647:6, 1647:9, 1648:19, 1657:8, 1657:11, 1657:15, 1659:2, 1663:15
liability [1] - 1666:25
license [1] - 1656:4
line [1] - 1648:10
list [4] - 1695:14, 1696:4, 1697:14, 1697:18
litigation [6] - 1668:20, 1671:11, 1671:12, 1676:2, 1676:3, 1694:14
live [2] - 1652:16, 1698:20
LLP [1] - 1643:16
LMC [2] - 1684:6, 1684:8
local [1] - 1648:18
Lockheed [33] - 1645:3, 1645:16, 1645:21, 1645:23, 1647:16, 1651:11, 1651:15, 1651:20, 1654:13, 1658:2, 1659:20, 1664:4, 1664:9, 1664:25, 1666:24, 1670:19, 1671:12, 1673:21, 1678:10,

1680:15, 1680:18, 1681:7, 1682:3, 1682:24, 1682:25, 1683:9, 1683:17, 1691:6, 1691:13, 1691:17, 1695:6
LOCKHEED [1] - 1643:3
Lockheed's [6] - 1646:25, 1666:8, 1677:7, 1677:13, 1679:23, 1691:13
look [14] - 1661:20, 1666:5, 1670:4, 1670:6, 1672:14, 1683:1, 1683:20, 1685:14, 1686:24, 1688:24, 1689:10, 1695:15, 1696:25
looking [9] - 1674:16, 1685:2, 1685:10, 1686:20, 1686:25, 1687:1, 1687:8, 1699:5, 1699:7
looks [2] - 1684:1, 1685:18
lose [1] - 1675:25
lost [3] - 1673:9, 1673:12, 1673:16
low [1] - 1673:4
lower [1] - 1679:19
lowered [1] - 1659:16

## M

machines [1] - 1654:1
maintained [1] - 1697:13
maintaining [1] - 1684:21
maintenance [2] - 1647:10, 1657:8
major [5] - 1654:5, 1659:24, 1672:22, 1673:1, 1673:25
majority [1] - 1660:23
manage [1] - 1647:11
Management [2] - 1664:22, 1685:15
management [2] - 1660:5, 1660:6
manner [7] - 1647:21, 1647:24, 1648:2, 1648:15, 1653:10, 1657:1, 1671:3, 1677:18, 1683:1, 1684:25, 1685:8
manual [15] - 1669:3,

1682:23, 1683:2, 1683:9, 1683:23, 1683:25, 1686:1, 1686:5, 1686:17, 1687:10, 1688:4, 1688:6, 1688:13, 1689:24, 1692:16
manufacturing [1] - 1674:10
March [1] - 1699:6
margin [7] - 1661:8, 1661:22, 1661:23, 1662:2, 1662:14, 1663:8, 1673:4
mark [1] - 1672:4
market [2] - 1650:13, 1656:13
marketplace [1] - 1664:1
MARTIN [1] - 1643:3
Martin [15] - 1645:4, 1645:17, 1645:21, 1647:16, 1654:13, 1658:2, 1659:20, 1664:4, 1664:9, 1664:25, 1666:24, 1670:9, 1671:12, 1673:21, 1683:17
Martin's [3] - 1645:23, 1651:11, 1651:20
material [2] - 1657:14, 1661:3
materials [3] - 1658:20, 1694:15, 1696:22
math [1] - 1675:4
matter [3] - 1661:21, 1673:23, 1700:7
mean [7] - 1659:13, 1661:18, 1670:17, 1674:14, 1674:23, 1690:7
means [1] - 1664:19
mechanism [2] - 1651:6, 1697:2
median [1] - 1661:23
meld [1] - 1696:24
memo [2] - 1675:10, 1683:18
memorandum [1] - 1693:20
memos [2] - 1698:9, 1698:11
mentioned [3] - 1647:4, 1682:23, 1682:25
mentions [1] - 1684:5
met [2] - 1673:24, 1690:22
method [1] - 1652:11

methodologies [1] - 1697:21
MICHAEL [1] - 1643:13
might [5] - 1652:9, 1653:11, 1655:8, 1675:22
milestone [3] - 1665:10, 1665:15, 1665:17
milestones [1] - 1665:14
military [3] - 1656:2, 1656:8, 1668:10
MILLER [3] - 1644:1, 1700:5, 1700:9
million [5] - 1670:11, 1671:24, 1672:4, 1674:18, 1675:2
mind [2] - 1666:17, 1683:22
minimum [1] - 1698:8
minus [1] - 1662:6
minute [1] - 1686:15
minutes [1] - 1699:20
mirror [4] - 1663:17, 1677:22, 1678:16
mirroring [1] - 1692:17
Missile [2] - 1658:17, 1674:9
Missiles [2] - 1674:23, 1675:2
missiles [2] - 1645:23, 1651:21
missing [2] - 1688:1, 1698:23
money [6] - 1654:14, 1668:12, 1668:13, 1668:15, 1674:24, 1675:7
month [2] - 1666:6, 1666:16
moral [1] - 1690:3
morning [9] - 1645:2, 1645:3, 1645:9, 1645:12, 1677:5, 1677:6, 1694:23, 1695:19, 1698:1
most [1] - 1698:11
motor [1] - 1658:21
move [1] - 1665:16
MR [37] - 1677:4, 1683:19, 1684:11, 1685:25, 1686:4, 1686:9, 1686:16, 1686:20, 1686:25, 1687:1, 1687:3, 1687:12, 1687:19, 1687:20, 1688:2,

1689:14, 1689:20, 1689:23, 1690:6, 1690:8, 1690:14, 1690:19, 1691:21, 1694:6, 1694:11, 1694:17, 1694:20, 1694:23, 1695:7, 1696:16, 1697:7, 1697:9, 1697:25, 1698:23, 1699:1, 1699:4, 1699:16
**MS** [18] - 1645:3, 1645:11, 1646:1, 1649:10, 1651:24, 1653:13, 1656:23, 1663:12, 1671:9, 1674:25, 1675:24, 1677:1, 1683:24, 1686:22, 1691:23, 1692:3, 1694:3, 1694:9
**municipalities** [1] - 1653:22
**MURPHY** [15] - 1643:13, 1683:19, 1686:16, 1687:1, 1687:20, 1688:2, 1694:23, 1695:7, 1696:16, 1697:7, 1697:9, 1697:25, 1698:23, 1699:1, 1699:4
**must** [3] - 1681:5, 1683:10, 1684:4

**N**

**name** [2] - 1645:13, 1659:14
**NASA** [1] - 1654:5
**nations** [1] - 1676:21
**necessarily** [1] - 1698:17
**necessary** [1] - 1683:7
**need** [8] - 1667:9, 1685:8, 1685:24, 1695:14, 1696:4, 1698:13, 1699:10, 1699:22
**needed** [1] - 1685:5
**negotiate** [2] - 1650:11, 1665:12
**negotiated** [5] - 1651:14, 1658:5, 1659:18, 1664:9, 1664:23
**negotiating** [2] - 1650:20, 1655:2
**negotiation** [2] -

1665:23, 1685:18
**negotiations** [4] - 1652:10, 1658:12, 1663:15, 1682:6
**net** [3] - 1657:6, 1675:10, 1689:1
**never** [4] - 1664:17, 1685:19, 1696:10, 1699:24
**nevertheless** [1] - 1686:1
**new** [2] - 1658:9, 1659:14
**newly** [1] - 1679:3
**news** [1] - 1674:14
**next** [6] - 1665:17, 1675:19, 1678:12, 1680:10, 1681:8, 1681:21
**nobody** [2] - 1650:11, 1687:1
**non** [17] - 1649:24, 1650:1, 1650:12, 1651:5, 1653:18, 1653:20, 1654:3, 1654:14, 1662:9, 1671:5, 1673:17, 1673:19, 1677:8, 1677:17
**non-DOD** [4] - 1649:24, 1654:3, 1662:9, 1671:5
**non-federal** [3] - 1653:18, 1653:20, 1654:14
**non-government** [2] - 1651:5, 1677:17
**non-IT** [2] - 1673:17, 1673:19
**non-U.S** [4] - 1649:24, 1650:1, 1650:12, 1677:8
**non-United** [1] - 1677:17
**non-USG** [1] - 1671:5
**none** [1] - 1697:14
**nonetheless** [1] - 1658:6
**normal** [1] - 1648:12
**Northrop** [1] - 1672:24
**nothing** [1] - 1645:7
**notice** [1] - 1672:7
**notify** [3] - 1671:25, 1672:19, 1691:7
**November** [1] - 1684:2
**number** [11] - 1648:11, 1653:21, 1662:2, 1664:6, 1667:17, 1674:22,

1680:11, 1696:25, 1697:6, 1697:11
**numbers** [3] - 1663:6, 1696:6, 1697:5
**numerically** [6] - 1695:14, 1695:23, 1696:4, 1696:24, 1697:11, 1697:18
**NW** [3] - 1643:16, 1643:23, 1644:2

**O**

**O'DONNELL** [1] - 1643:19
**objective** [2] - 1648:2, 1660:8
**obligation** [1] - 1668:20
**obligations** [1] - 1668:25
**obtain** [1] - 1664:1
**obviously** [2] - 1668:21, 1698:7
**occurred** [1] - 1672:8
**OF** [3] - 1643:1, 1643:6, 1643:10
**offered** [3] - 1660:14, 1672:9, 1696:12
**office** [1] - 1671:2
**officer** [11] - 1658:14, 1659:3, 1659:9, 1659:22, 1660:5, 1660:8, 1660:15, 1660:20, 1661:13, 1664:10, 1665:24
**officers** [1] - 1688:10
**Official** [1] - 1700:5
**officials** [1] - 1673:25
**offset** [3] - 1657:3, 1679:12, 1689:3
**often** [2] - 1672:12, 1683:2
**once** [2] - 1649:17, 1674:9
**one** [28] - 1645:22, 1647:12, 1649:2, 1649:14, 1649:15, 1654:5, 1654:10, 1667:17, 1669:16, 1670:9, 1672:25, 1673:7, 1675:14, 1680:12, 1681:18, 1682:14, 1685:9, 1686:5, 1686:6, 1688:14, 1689:4, 1694:16, 1696:13, 1696:14, 1696:16, 1698:3, 1698:12

**ones** [3] - 1662:11, 1668:6, 1670:17
**open** [1] - 1658:3
**operate** [2] - 1663:14, 1689:10
**operating** [3] - 1662:2, 1662:14, 1663:8
**operation** [2] - 1682:11, 1693:10
**operational** [1] - 1665:13
**operations** [7] - 1648:24, 1651:24, 1663:14, 1671:19, 1672:5, 1684:12, 1690:21
**operator** [5] - 1694:17, 1694:18, 1694:21, 1695:19, 1699:15
**opinion** [1] - 1685:20
**opportunities** [1] - 1674:21
**opportunity** [3] - 1676:13, 1694:22, 1699:14
**ops** [8] - 1649:2, 1649:5, 1669:16, 1670:22, 1683:25, 1684:5, 1684:12, 1684:24
**order** [6] - 1646:18, 1668:16, 1676:7, 1683:10, 1692:18, 1697:18
**orders** [1] - 1695:4
**ordinary** [2] - 1683:6, 1692:11
**organization** [1] - 1646:10
**organized** [1] - 1695:13
**originally** [1] - 1663:18
**originating** [1] - 1693:14
**Orlando** [2] - 1645:24, 1651:21
**otherwise** [4] - 1653:1, 1681:20, 1687:17, 1696:5
**outcomes** [1] - 1657:23
**outline** [2] - 1695:21, 1699:21
**outlined** [1] - 1697:23
**overall** [6] - 1647:12, 1673:15, 1679:21, 1680:1, 1680:6, 1692:18

**overhead** [2] - 1646:12, 1666:25
**oversight** [1] - 1685:16
**own** [1] - 1661:11

**P**

**package** [1] - 1654:1
**page** [2] - 1684:4, 1686:22
**PAGE** [1] - 1644:9
**Pages** [1] - 1643:8
**pages** [1] - 1700:6
**paid** [7] - 1664:4, 1664:7, 1665:16, 1666:13, 1666:15, 1678:9, 1678:11
**Palmisano** [1] - 1685:22
**paragraph** [8] - 1684:3, 1684:4, 1685:18, 1689:6, 1689:7, 1693:1, 1693:2
**pardon** [1] - 1689:20
**part** [5] - 1652:10, 1669:7, 1670:11, 1670:22, 1682:6, 1696:2
**participating** [1] - 1693:6
**participation** [2] - 1668:1, 1675:18
**particular** [3] - 1649:15, 1654:18, 1673:15
**particularly** [2] - 1662:10, 1673:5
**parties** [9] - 1653:9, 1657:22, 1658:3, 1670:21, 1671:22, 1672:13, 1683:13, 1684:9, 1696:18
**party** [1] - 1689:15
**past** [4] - 1654:13, 1676:9, 1698:15, 1698:18
**PATRICIA** [3] - 1644:1, 1700:5, 1700:9
**pay** [5] - 1647:10, 1653:1, 1665:13, 1665:17, 1665:18
**payer** [1] - 1667:18
**paying** [4] - 1650:17, 1667:24, 1676:24, 1689:15
**payment** [6] - 1652:4,

1653:15, 1664:13, 1664:16, 1666:15, 1666:19

**payments** [5] - 1665:7, 1665:11, 1665:16, 1665:22, 1666:22

**peanut** [2] - 1657:4, 1671:3

**people** [4] - 1674:14, 1674:18, 1690:4, 1697:16

**per** [1] - 1670:21

**percent** [40] - 1652:22, 1652:23, 1653:2, 1653:14, 1655:3, 1655:6, 1655:10, 1655:11, 1655:13, 1655:20, 1655:22, 1656:7, 1656:9, 1656:10, 1656:14, 1656:18, 1660:25, 1661:8, 1661:18, 1662:3, 1662:7, 1662:22, 1662:24, 1663:8, 1663:10, 1664:18, 1665:9, 1668:4, 1668:17, 1677:7, 1677:10, 1677:11, 1677:13, 1677:15, 1677:16, 1679:24, 1680:3, 1680:8, 1680:11

**percentage** [8] - 1660:3, 1662:10, 1679:23, 1680:5, 1680:9, 1680:12, 1680:13, 1680:14

**percentages** [2] - 1677:12, 1698:19

**perform** [4] - 1655:14, 1672:10, 1683:1, 1683:12

**performance** [8] - 1657:24, 1665:15, 1665:22, 1666:20, 1674:6, 1674:8, 1680:11, 1681:2

**performed** [1] - 1664:19

**performing** [1] - 1681:4

**period** [7] - 1647:25, 1648:7, 1670:25, 1680:7, 1680:11, 1684:19

**permission** [1] - 1656:5

**person** [3] - 1667:12,

1667:24, 1695:19

**perspective** [1] - 1666:23

**pick** [1] - 1681:23

**pieces** [1] - 1656:11

**place** [2] - 1652:14, 1666:24

**placed** [2] - 1650:23, 1652:13

**Plaintiff** [2] - 1643:4, 1643:13

**Plaintiff's** [2] - 1683:20, 1686:14

**plan** [1] - 1675:21

**plant** [1] - 1660:11

**player** [1] - 1658:18

**pleading** [1] - 1683:21

**pleadings** [2] - 1686:13, 1694:19

**plus** [2] - 1657:7, 1675:21

**pocketed** [1] - 1654:14

**point** [12] - 1655:7, 1664:25, 1665:8, 1672:7, 1690:10, 1691:1, 1691:2, 1691:4, 1691:18, 1695:1, 1695:5, 1699:3

**pool** [21] - 1647:12, 1648:20, 1648:25, 1649:2, 1649:6, 1650:9, 1652:14, 1657:3, 1657:4, 1659:7, 1662:13, 1663:14, 1669:16, 1670:22, 1672:5, 1679:14, 1684:5, 1684:12, 1684:13, 1684:15, 1684:24

**pooled** [2] - 1647:12, 1654:20

**pools** [7] - 1648:12, 1652:25, 1654:13, 1654:17, 1654:25, 1657:10, 1669:9

**pose** [1] - 1691:18

**position** [5] - 1645:15, 1645:18, 1651:17, 1689:18, 1689:21

**positions** [2] - 1645:21, 1645:22

**possible** [1] - 1698:16

**post** [1] - 1685:6

**post-2006** [1] - 1665:1

**post-DOSA** [1] - 1685:6

**Postal** [1] - 1654:2

**potential** [1] - 1684:9

**POWELL** [1] - 1643:20

**practice** [9] - 1649:11, 1649:18, 1649:19, 1649:21, 1652:14, 1652:15, 1670:25, 1678:13, 1682:9

**practices** [3] - 1646:23, 1647:21, 1659:8

**precisely** [3] - 1681:16, 1681:23, 1681:24

**predict** [2] - 1658:4, 1675:13

**preface** [1] - 1692:21

**premier** [1] - 1666:23

**preparation** [1] - 1646:11

**prepared** [1] - 1663:5

**preparing** [2] - 1646:15, 1646:21

**present** [1] - 1698:18

**president** [3] - 1645:16, 1645:20, 1646:8

**presumably** [1] - 1653:5

**presume** [1] - 1661:21

**price** [51] - 1650:19, 1650:20, 1651:3, 1656:25, 1657:12, 1657:17, 1657:20, 1657:21, 1658:2, 1658:3, 1658:5, 1658:6, 1658:7, 1658:9, 1658:15, 1659:5, 1659:17, 1659:18, 1660:2, 1660:22, 1660:24, 1661:8, 1661:15, 1661:22, 1662:12, 1664:10, 1665:5, 1665:6, 1665:7, 1665:10, 1665:12, 1666:14, 1669:10, 1676:16, 1678:22, 1678:24, 1678:25, 1679:2, 1679:3, 1679:6, 1679:7, 1679:17, 1679:24, 1680:3, 1680:6, 1680:9, 1693:16

**priced** [1] - 1679:3

**prices** [1] - 1679:4

**pricing** [12] - 1646:13, 1646:25, 1647:3, 1647:14, 1654:23, 1658:9, 1658:13, 1664:2, 1679:14, 1681:6, 1689:1

**primarily** [1] - 1654:11

**principle** [4] - 1667:3, 1683:3, 1683:5, 1683:8

**principles** [4] - 1646:25, 1668:5, 1692:21, 1693:11

**private** [3] - 1650:1, 1650:13, 1651:5

**problem** [3] - 1669:22, 1670:15, 1691:18

**problems** [1] - 1691:20

**procedures** [1] - 1650:2

**proceed** [1] - 1697:24

**PROCEEDINGS** [1] - 1645:1

**Proceedings** [1] - 1700:1

**proceedings** [1] - 1700:7

**process** [1] - 1674:11

**Procter** [2] - 1668:20, 1694:14

**producing** [1] - 1676:15

**product** [5] - 1658:23, 1659:5, 1659:25, 1665:23

**products** [2] - 1676:15, 1676:20

**profile** [6] - 1659:2, 1659:17, 1660:13, 1660:14, 1679:4

**profit** [19] - 1650:25, 1659:20, 1659:22, 1659:23, 1660:3, 1660:8, 1660:16, 1660:17, 1660:19, 1661:7, 1661:16, 1661:19, 1661:22, 1661:23, 1662:5, 1663:15, 1679:9, 1679:21

**profitability** [1] - 1674:3

**profits** [1] - 1675:25

**progress** [1] - 1665:7

**project** [2] - 1675:22, 1691:17

**projecting** [1] - 1691:14

**properly** [1] - 1667:4

**property** [2] - 1648:18, 1660:11

**proposal** [1] - 1681:11

**propose** [1] - 1694:13

**proposing** [1] - 1667:14

**provide** [8] - 1646:24, 1653:20, 1653:23, 1654:1, 1658:16, 1664:2, 1676:14, 1681:12

**provided** [6] - 1651:3, 1664:21, 1672:7, 1672:8, 1688:9, 1696:21

**provider** [1] - 1673:3

**provides** [1] - 1652:4

**providing** [2] - 1658:13, 1681:14

**provision** [6] - 1686:25, 1687:1, 1687:3, 1687:19, 1688:18, 1692:5

**provisions** [2] - 1672:18, 1686:20

**PRPs** [3] - 1669:7, 1684:9, 1693:9

**prudent** [4] - 1667:12, 1676:4, 1692:12, 1692:20

**public** [1] - 1658:11

**published** [1] - 1661:25

**purely** [3] - 1653:24, 1655:23, 1656:11

**purpose** [1] - 1693:12

**purposes** [3] - 1655:1, 1684:21, 1689:1

**pursue** [5] - 1673:23, 1674:21, 1676:6, 1684:8, 1689:12

**pursued** [1] - 1685:4

**pursuing** [2] - 1676:1, 1676:3

**push** [1] - 1672:6

**put** [13] - 1650:14, 1652:4, 1657:10, 1658:23, 1659:2, 1663:13, 1664:13, 1670:3, 1684:23, 1686:19, 1696:9, 1696:17, 1696:20

**putting** [1] - 1661:21

**PX** [3] - 1685:3, 1685:10, 1695:15

## Q

**qualified** [1] - 1681:20

**questioned** [3] - 1669:15, 1669:20, 1670:5

**questions** [5] - 1691:21, 1691:24, 1694:4, 1694:6,

1699:12, 1699:21, 1699:22
**quick** [1] - 1691:23
**quote** [2] - 1658:20, 1663:5
**quoted** [1] - 1690:24

## R

**racks** [1] - 1675:6
**range** [4] - 1660:25, 1661:19, 1675:20, 1679:25
**rate** [4] - 1646:13, 1647:13, 1662:24, 1664:17
**rates** [6] - 1646:18, 1655:1, 1664:24, 1665:4, 1666:18, 1674:1
**rather** [1] - 1676:24
**Raytheon** [1] - 1672:23
**reached** [3] - 1664:10, 1665:24, 1691:4
**read** [4] - 1682:6, 1682:16, 1686:8, 1698:11
**reading** [5] - 1683:23, 1683:25, 1689:4, 1689:5, 1692:9
**realistic** [1] - 1666:3
**realize** [1] - 1659:20
**really** [3] - 1651:4, 1697:3, 1697:14
**Realtime** [1] - 1644:1
**reason** [4] - 1675:20, 1680:19, 1681:15, 1682:23
**reasonable** [10] - 1659:5, 1667:13, 1669:10, 1676:4, 1676:8, 1683:1, 1683:3, 1692:12, 1692:19, 1692:20
**reasonableness** [13] - 1669:5, 1669:19, 1672:3, 1672:10, 1672:20, 1687:22, 1688:25, 1689:6, 1689:9, 1691:6, 1691:11, 1692:8, 1692:16
**reasonably** [2] - 1657:23, 1689:2
**reasons** [1] - 1699:24
**rebates** [1] - 1648:16
**rebuttals** [1] - 1699:9
**receipt** [1] - 1652:24

**receive** [7] - 1648:5, 1648:18, 1648:20, 1648:21, 1654:16, 1658:10, 1662:20
**received** [5] - 1648:3, 1648:16, 1694:14, 1694:15
**receives** [1] - 1647:16
**recent** [2] - 1674:4, 1682:16
**reciting** [1] - 1692:17
**recognition** [1] - 1664:16
**recognizing** [1] - 1670:25
**recollection** [2] - 1663:6, 1670:23
**reconciled** [1] - 1677:10
**record** [9] - 1645:13, 1648:3, 1648:4, 1652:23, 1660:5, 1660:6, 1696:14, 1698:4, 1700:7
**recorded** [3] - 1652:12, 1693:19, 1693:22
**records** [1] - 1672:20
**recoup** [1] - 1651:9
**recover** [2] - 1683:10, 1689:25
**recoverability** [3] - 1675:9, 1675:14, 1694:1
**recovered** [1] - 1690:11
**recoveries** [9] - 1649:5, 1653:11, 1684:6, 1684:9, 1687:11, 1687:15, 1689:2, 1689:12, 1693:6
**recovering** [1] - 1691:14
**recovery** [14] - 1649:3, 1650:10, 1655:4, 1666:23, 1669:6, 1675:10, 1676:1, 1683:18, 1686:6, 1690:9, 1690:10, 1691:18, 1693:5, 1694:16
**Recross** [1] - 1644:12
**Recross-Examination**...........
.................. [1] -
1644:12
**REDIRECT** [1] -
1692:2
**Redlands** [11] -

1652:19, 1659:21, 1665:25, 1669:13, 1675:1, 1680:16, 1680:19, 1681:8, 1682:11, 1684:13, 1698:15
**redoing** [1] - 1685:18
**reduce** [11] - 1650:17, 1652:25, 1657:16, 1663:14, 1673:23, 1674:1, 1674:7, 1674:22, 1676:12, 1676:13, 1676:22
**reduced** [1] - 1684:5
**reduces** [2] - 1678:22, 1678:23
**reduction** [4] - 1648:11, 1650:5, 1654:17, 1654:19
**references** [1] - 1682:7
**referred** [2] - 1649:4, 1684:18
**referring** [1] - 1684:4
**reflected** [1] - 1647:17
**refund** [1] - 1648:18
**refunds** [1] - 1648:16
**regard** [1] - 1677:20
**regarding** [1] - 1693:15
**regardless** [7] - 1649:23, 1650:20, 1651:12, 1651:13, 1659:15, 1671:5
**regards** [1] - 1688:22
**regulation** [1] - 1646:17
**regulations** [2] - 1655:15, 1655:16
**reimbursable** [4] - 1660:4, 1661:2, 1661:17, 1666:9
**reimbursement** [4] - 1664:11, 1665:3, 1668:19, 1669:1
**reimburses** [1] - 1664:18
**rejected** [1] - 1683:5
**relate** [1] - 1677:8
**related** [7] - 1648:17, 1654:16, 1669:13, 1670:9, 1672:18, 1679:14, 1683:3
**relates** [1] - 1649:2
**relating** [1] - 1682:11
**relook** [1] - 1671:20
**rely** [1] - 1686:11
**remainder** [1] - 1661:1
**remediation** [14] - 1648:7, 1648:8,

1650:9, 1650:23, 1653:1, 1654:20, 1659:21, 1665:25, 1669:13, 1675:1, 1676:25, 1679:14, 1681:5, 1683:5
**renumber** [1] - 1697:7
**repeatedly** [1] - 1673:1
**report** [2] - 1646:10, 1664:21
**Reporter** [3] - 1644:1, 1644:1, 1700:5
**reporting** [1] - 1649:16
**reports** [1] - 1691:13
**represent** [1] - 1652:6
**represented** [1] - 1688:16
**request** [1] - 1664:13
**require** [4] - 1647:23, 1667:11, 1684:8, 1689:24
**required** [20] - 1646:16, 1649:20, 1655:14, 1656:21, 1658:7, 1658:11, 1658:12, 1659:6, 1660:15, 1667:17, 1668:18, 1674:21, 1676:6, 1681:1, 1681:11, 1683:7, 1689:10, 1695:2
**requirement** [5] - 1667:1, 1667:2, 1682:25, 1691:7, 1692:18
**requirements** [1] - 1667:10
**requires** [2] - 1648:15, 1649:15
**resolutions** [2] - 1695:2, 1695:3
**resolve** [1] - 1652:8
**respect** [1] - 1669:12
**respond** [1] - 1694:22
**responsible** [3] - 1646:11, 1646:15, 1684:9
**result** [2] - 1650:10, 1674:5
**revenues** [1] - 1662:6
**review** [5] - 1659:4, 1672:9, 1672:20, 1688:20, 1692:24
**revised** [1] - 1696:18
**Rickover** [1] - 1681:17
**rid** [2] - 1650:12, 1695:22
**rights** [2] - 1668:24,

1690:5
**risk** [3] - 1658:1, 1658:2, 1679:15
**risks** [1] - 1660:2
**RMR** [1] - 1644:1
**ROBERT** [2] - 1644:10, 1645:5
**Robert** [2] - 1645:4, 1645:14
**robust** [1] - 1663:19
**rocket** [1] - 1658:21
**rough** [1] - 1699:4
**rounds** [1] - 1661:17
**routine** [1] - 1661:16
**run** [1] - 1699:24
**running** [1] - 1681:17

## S

**sale** [3] - 1656:6, 1656:12, 1668:10
**sales** [11] - 1655:23, 1655:25, 1656:1, 1656:2, 1656:4, 1656:8, 1668:14, 1677:8
**Saudis** [2] - 1650:16, 1650:19
**schedule** [1] - 1695:20
**scheduling** [1] - 1699:4
**screen** [2] - 1687:9, 1688:2
**second** [1] - 1689:7
**Section** [2] - 1643:23, 1692:22
**section** [6] - 1686:23, 1686:24, 1687:10, 1687:15, 1692:7, 1692:23
**sections** [1] - 1688:13
**Security** [3] - 1654:7, 1654:8, 1655:11
**see** [15] - 1668:25, 1674:5, 1682:18, 1683:12, 1683:15, 1684:2, 1684:10, 1685:1, 1685:23, 1686:20, 1687:25, 1690:12, 1692:9, 1692:13, 1698:1
**seek** [2] - 1668:18, 1668:25
**seeker** [1] - 1658:21
**seeking** [1] - 1669:6
**SEGAL** [1] - 1643:10
**sell** [1] - 1656:13
**send** [4] - 1652:21,

1667:16, 1698:6
**sends** [1] - 1697:4
**senior** [1] - 1673:24
**sense** [1] - 1663:25
**sent** [4] - 1647:12, 1654:21, 1654:25, 1657:9
**sentence** [2] - 1688:24, 1689:7
**separate** [6] - 1662:15, 1683:5, 1683:8, 1685:8, 1685:24, 1695:9
**separately** [1] - 1661:25
**separation** [1] - 1684:21
**service** [1] - 1646:3
**Service** [1] - 1654:2
**services** [6] - 1653:21, 1653:22, 1653:23, 1654:11, 1664:2, 1681:14
**Services** [1] - 1654:9
**set** [5] - 1649:14, 1663:20, 1664:9, 1695:18, 1695:20
**settle** [2] - 1646:18, 1666:18
**settled** [5] - 1664:19, 1664:23, 1665:5, 1684:19
**settlement** [3] - 1651:24, 1653:16, 1690:21
**settlements** [4] - 1647:22, 1670:20, 1670:21, 1684:6
**seven** [2] - 1645:19, 1662:25
**several** [1] - 1658:24
**share** [3] - 1650:23, 1666:23, 1666:25
**shares** [1] - 1656:19
**sheet** [1] - 1678:18
**ship** [1] - 1681:20
**short** [1] - 1697:23
**shorter** [1] - 1699:9
**show** [2] - 1677:13, 1686:15
**showing** [1] - 1687:6
**shrinking** [1] - 1676:19
**side** [6] - 1653:20, 1653:24, 1681:11, 1695:22, 1696:8, 1699:11
**sides** [1] - 1695:13
**significant** [2] - 1688:22, 1698:25

**similar** [4] - 1645:22, 1648:17, 1648:23, 1649:21
**sites** [3] - 1667:9, 1684:20, 1698:19
**situation** [2] - 1667:9, 1673:10
**six** [1] - 1663:1
**slow** [1] - 1665:1
**small** [3] - 1649:3, 1653:7, 1656:12
**so's** [1] - 1696:7
**so-and-so** [1] - 1697:5
**so-and-so's** [1] - 1696:7
**Social** [1] - 1654:7
**sold** [1] - 1656:9
**solidified** [1] - 1652:15
**somewhat** [2] - 1665:1, 1675:21
**somewhere** [2] - 1695:17, 1697:16
**sooner** [1] - 1697:19
**sorry** [4] - 1659:13, 1672:24, 1689:5, 1693:1
**sort** [5] - 1652:7, 1662:22, 1666:3, 1698:6, 1698:19
**sorting** [1] - 1654:1
**sought** [1] - 1683:13
**source** [2] - 1678:7, 1678:8
**sources** [3] - 1653:6, 1669:7
**special** [1] - 1688:14
**specific** [5] - 1649:9, 1664:8, 1683:3, 1683:16, 1693:12
**specifically** [3] - 1647:23, 1685:6, 1693:9
**spread** [1] - 1657:4
**square** [1] - 1674:18
**STACIE** [1] - 1643:14
**staff** [2] - 1647:11, 1657:9
**stand** [1] - 1672:25
**standard** [1] - 1692:16
**standards** [15] - 1646:22, 1647:23, 1647:25, 1648:14, 1649:14, 1659:8, 1663:20, 1663:21, 1667:3, 1672:16, 1672:17, 1680:24, 1681:15, 1681:24, 1689:9
**stands** [1] - 1661:11

**state** [4] - 1645:13, 1648:22, 1653:23, 1663:9
**statement** [3] - 1646:22, 1646:23, 1681:25
**statements** [2] - 1662:1, 1677:13
**States** [9] - 1649:12, 1670:10, 1673:3, 1677:17, 1678:1, 1678:9, 1681:9, 1683:10, 1689:16
**STATES** [3] - 1643:1, 1643:6, 1643:11
**status** [2] - 1679:11, 1697:23
**stay** [2] - 1679:1, 1679:7
**step** [2] - 1667:20, 1668:17
**stick** [1] - 1658:7
**sticking** [1] - 1658:6
**still** [2] - 1682:12, 1699:5
**Street** [1] - 1643:23
**strict** [1] - 1663:19
**strictly** [2] - 1655:4, 1665:22
**struck** [1] - 1671:21
**structure** [2] - 1674:7, 1674:13
**stuff** [2] - 1696:19, 1697:15
**subcontract** [2] - 1650:8, 1657:14
**subcontractor** [1] - 1650:7
**subject** [1] - 1660:3
**submit** [3] - 1646:17, 1664:16, 1670:1
**submittal** [1] - 1646:11
**submittals** [1] - 1646:13
**submitted** [1] - 1696:18
**submitting** [1] - 1646:15
**succeed** [1] - 1668:19
**sue** [13] - 1683:10, 1689:15, 1689:19, 1689:22, 1689:23, 1689:25, 1690:2, 1690:3, 1690:4, 1690:8, 1690:15, 1690:16, 1690:18
**sufficiently** [1] - 1698:11
**suit** [1] - 1682:24

**Suite** [1] - 1643:24
**suits** [1] - 1670:18
**Sullivan** [2] - 1693:15, 1694:5
**SULLIVAN** [24] - 1643:18, 1677:4, 1684:11, 1685:25, 1686:4, 1686:9, 1686:20, 1686:25, 1687:3, 1687:12, 1687:19, 1689:14, 1689:20, 1689:23, 1690:6, 1690:8, 1690:14, 1690:19, 1691:21, 1694:6, 1694:11, 1694:17, 1694:20, 1699:16
**summarize** [1] - 1688:21
**support** [1] - 1646:11
**supporting** [2] - 1646:16, 1646:21
**supports** [1] - 1693:22
**surpassed** [1] - 1672:4
**sworn** [1] - 1645:6
**system** [2] - 1653:15, 1664:12
**systems** [2] - 1672:22, 1673:1

# T

**talks** [5] - 1687:10, 1687:22, 1688:25, 1692:7, 1692:11
**tax** [6] - 1648:18, 1648:22, 1662:5, 1662:24, 1663:8, 1663:9
**taxes** [1] - 1662:23
**taxpayer** [2] - 1667:24, 1678:7
**taxpayers** [2] - 1675:2, 1678:2
**TCE** [1] - 1698:16
**technical** [3] - 1659:25, 1661:15, 1673:14
**term** [1] - 1654:14
**terms** [9] - 1651:4, 1664:8, 1665:21, 1665:23, 1666:15, 1669:21, 1680:6, 1686:13, 1699:4
**testified** [1] - 1645:8
**testifying** [2] - 1687:3, 1692:15
**testing** [1] - 1665:13

**THE** [172] - 1643:1, 1643:10, 1645:2, 1645:9, 1645:25, 1649:7, 1649:8, 1649:25, 1650:3, 1650:4, 1650:7, 1650:11, 1650:15, 1650:16, 1650:18, 1650:25, 1651:2, 1651:4, 1651:7, 1651:8, 1651:10, 1651:15, 1651:17, 1651:19, 1651:20, 1651:22, 1652:1, 1652:2, 1652:3, 1652:10, 1652:18, 1652:20, 1653:2, 1653:4, 1653:5, 1653:8, 1655:3, 1655:6, 1655:10, 1655:13, 1655:20, 1655:22, 1655:24, 1655:25, 1656:14, 1656:16, 1656:17, 1656:18, 1656:22, 1660:21, 1660:24, 1661:4, 1661:6, 1661:7, 1661:9, 1661:10, 1661:11, 1661:12, 1661:13, 1661:20, 1661:24, 1662:4, 1662:5, 1662:7, 1662:8, 1662:11, 1662:15, 1662:19, 1662:20, 1662:22, 1662:24, 1663:1, 1663:2, 1663:3, 1663:5, 1663:7, 1663:11, 1667:20, 1667:22, 1667:23, 1667:25, 1668:2, 1668:9, 1668:12, 1668:14, 1668:17, 1668:22, 1668:23, 1669:2, 1669:11, 1669:14, 1669:21, 1669:23, 1669:24, 1670:1, 1670:8, 1670:14, 1670:15, 1670:16, 1670:17, 1670:20, 1671:6, 1671:8, 1673:17, 1673:18, 1673:19, 1673:20, 1674:3, 1674:5, 1683:15, 1683:20, 1683:25, 1684:15, 1684:16, 1684:17, 1684:18, 1685:1, 1685:2, 1685:3, 1685:4, 1685:9,

1685:12, 1685:17, 1685:20, 1686:7, 1686:10, 1686:17, 1686:24, 1687:5, 1687:8, 1687:13, 1687:14, 1687:21, 1687:23, 1687:24, 1687:25, 1688:3, 1688:5, 1688:8, 1688:9, 1688:12, 1688:13, 1688:16, 1688:19, 1689:4, 1689:5, 1689:8, 1689:9, 1689:18, 1689:21, 1690:2, 1690:7, 1690:12, 1690:15, 1691:22, 1694:5, 1694:7, 1694:10, 1694:12, 1694:18, 1694:21, 1694:24, 1695:10, 1696:23, 1697:8, 1697:10, 1698:1, 1698:5, 1698:25, 1699:2, 1699:7, 1699:17

**theater** [1] - 1676:20
**theaters** [1] - 1658:19
**therefore** [6] - 1659:17, 1660:2, 1660:8, 1667:13, 1676:13, 1691:11
**third** [3] - 1660:4, 1661:2, 1670:20
**three** [9] - 1646:4, 1649:1, 1653:6, 1675:14, 1675:19, 1675:20, 1675:21, 1696:13, 1697:20
**today** [1] - 1670:24
**together** [5] - 1654:20, 1654:21, 1658:23, 1659:2, 1670:3
**tolling** [1] - 1694:14
**Tom** [1] - 1695:7
**tomorrow** [5] - 1694:23, 1695:18, 1695:19, 1697:24, 1699:5
**tools** [1] - 1674:11
**top** [1] - 1657:11
**topics** [1] - 1698:10
**TORRES** [1] - 1643:14
**total** [4] - 1648:8, 1651:11, 1661:1, 1682:14
**transcript** [1] - 1700:6
**TRANSCRIPT** [1] - 1643:10
**Treasury** [2] - 1646:5,

1654:8
**treat** [1] - 1663:22
**treated** [2] - 1670:19, 1693:12
**treating** [1] - 1685:23
**TRIAL** [1] - 1643:10
**trial** [2] - 1686:13, 1694:12
**tried** [1] - 1695:12
**tries** [1] - 1650:11
**trigger** [7] - 1671:18, 1672:7, 1691:1, 1691:2, 1691:4, 1691:7, 1691:18
**true** [3] - 1660:23, 1680:15, 1682:2
**truth** [4] - 1645:6, 1645:7, 1658:12
**try** [2] - 1674:7, 1699:21
**trying** [3] - 1672:16, 1681:20, 1685:13
**turmoil** [1] - 1676:19
**turn** [2] - 1681:9, 1686:22
**two** [15] - 1655:25, 1656:10, 1664:14, 1665:4, 1667:18, 1668:9, 1670:18, 1674:6, 1675:6, 1677:12, 1680:13, 1690:1, 1691:23, 1699:7, 1699:11
**two-week** [2] - 1664:14, 1665:4
**twofold** [1] - 1667:17
**type** [13] - 1648:1, 1650:10, 1651:13, 1656:20, 1659:15, 1659:16, 1660:1, 1661:4, 1664:6, 1665:6, 1672:9, 1677:21
**types** [11] - 1647:22, 1649:22, 1653:9, 1654:17, 1660:12, 1662:18, 1666:5, 1667:8, 1668:9, 1684:22, 1693:14
**typically** [2] - 1666:13, 1666:15

**U**

**U.S** [32] - 1643:22, 1644:2, 1646:20, 1649:23, 1649:24, 1650:1, 1650:12, 1652:21, 1654:2,

1655:8, 1655:9, 1655:13, 1656:3, 1656:6, 1656:8, 1663:20, 1663:22, 1666:11, 1667:14, 1667:25, 1668:8, 1668:11, 1668:12, 1668:13, 1668:15, 1675:15, 1675:17, 1677:8, 1677:18, 1679:16, 1681:2, 1681:19
**ultimate** [3] - 1667:18, 1667:23, 1668:10
**under** [26] - 1646:6, 1646:16, 1646:20, 1647:1, 1647:15, 1648:17, 1648:20, 1649:16, 1655:14, 1658:11, 1663:22, 1667:10, 1667:14, 1668:25, 1676:6, 1678:10, 1680:23, 1683:10, 1684:22, 1684:23, 1688:24, 1689:9, 1689:25, 1691:7, 1691:15, 1691:19
**underlying** [2] - 1667:3, 1672:2
**unfair** [2] - 1666:24, 1674:20
**unfairness** [1] - 1667:16
**unfortunately** [2] - 1674:15, 1695:11
**uniformity** [2] - 1664:1, 1667:6
**unique** [1] - 1665:20
**unit** [4] - 1646:14, 1651:20, 1657:11, 1658:25
**United** [9] - 1649:12, 1670:10, 1673:3, 1677:17, 1678:1, 1678:9, 1681:9, 1683:10, 1689:16
**UNITED** [3] - 1643:1, 1643:6, 1643:11
**units** [9] - 1645:23, 1646:19, 1647:13, 1648:10, 1654:22, 1654:23, 1655:1, 1657:10, 1671:2
**universe** [1] - 1696:23
**universities** [1] - 1653:21
**up** [23] - 1645:25, 1646:12, 1658:24, 1661:13, 1663:18,

1667:10, 1669:24, 1671:10, 1671:17, 1674:4, 1682:15, 1683:19, 1684:19, 1686:19, 1689:3, 1692:4, 1693:5, 1695:2, 1696:5, 1696:25, 1699:12
**update** [1] - 1699:2
**UPS** [2] - 1653:25, 1656:11
**USG** [2] - 1671:5
**utility** [1] - 1647:10

**V**

**valued** [2] - 1665:14, 1676:23
**variables** [1] - 1675:23
**variations** [1] - 1672:8
**vary** [2] - 1651:6, 1657:20
**varying** [1] - 1661:19
**versus** [1] - 1669:17
**via** [1] - 1652:13
**vice** [3] - 1645:16, 1645:20, 1646:8
**visibility** [4] - 1661:24, 1662:15, 1681:12, 1684:21
**voice** [1] - 1645:25
**voucher** [1] - 1664:14

**W**

**waive** [1] - 1690:4
**walk** [1] - 1672:8
**walk-down** [1] - 1672:8
**war** [2] - 1676:14, 1681:14
**Washington** [4] - 1643:6, 1643:17, 1643:24, 1644:3
**watches** [1] - 1682:1
**water** [1] - 1672:16
**Water** [1] - 1695:2
**ways** [1] - 1664:7
**weapons** [2] - 1672:22, 1673:1
**Wednesday** [2] - 1643:7, 1673:24
**week** [3] - 1664:14, 1665:4, 1673:24
**whereas** [1] - 1660:4
**whole** [2] - 1645:7, 1686:22

**wide** [3] - 1658:3, 1658:4, 1661:19
**wide-eyed** [1] - 1658:4
**wild** [1] - 1663:1
**WILLIAM** [1] - 1643:21
**win** [3] - 1668:21, 1668:23, 1680:1
**withstanding** [1] - 1670:6
**witness** [3] - 1677:2, 1683:20, 1686:15
**WITNESS** [68] - 1644:9, 1649:8, 1650:3, 1650:7, 1650:15, 1650:18, 1651:2, 1651:7, 1651:10, 1651:17, 1651:20, 1652:2, 1652:10, 1652:20, 1653:4, 1653:8, 1655:6, 1655:13, 1655:22, 1655:25, 1656:16, 1656:18, 1660:24, 1661:6, 1661:9, 1661:11, 1661:13, 1661:24, 1662:5, 1662:8, 1662:20, 1662:24, 1663:2, 1663:5, 1663:11, 1667:22, 1667:25, 1668:9, 1668:14, 1668:22, 1669:2, 1669:14, 1669:23, 1670:1, 1670:14, 1670:16, 1670:20, 1671:8, 1673:18, 1673:20, 1674:5, 1684:16, 1684:18, 1685:2, 1685:4, 1685:12, 1685:20, 1687:8, 1687:14, 1687:21, 1687:24, 1688:5, 1688:9, 1688:13, 1688:19, 1689:5, 1689:9
**word** [1] - 1657:4
**words** [2] - 1682:20, 1690:25
**workman's** [1] - 1648:20
**world** [6] - 1651:5, 1654:11, 1658:19, 1673:2, 1676:20, 1690:3
**worry** [1] - 1696:15
**writing** [1] - 1683:5
**written** [1] - 1646:23

## Y

**year** [24] - 1646:18,
  1647:25, 1648:5,
  1648:7, 1649:21,
  1649:22, 1652:24,
  1662:1, 1662:6,
  1665:25, 1666:4,
  1666:17, 1670:13,
  1678:11, 1680:2,
  1680:10, 1680:12,
  1688:20, 1698:23,
  1699:1
**years** [16] - 1645:19,
  1663:21, 1666:1,
  1666:19, 1666:20,
  1674:4, 1675:13,
  1675:19, 1675:20,
  1675:21, 1678:12,
  1680:12, 1680:13,
  1680:14, 1681:8,
  1682:16

## Z

**ZILIOLI** [1] - 1643:19