UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,   .
                               .
          Plaintiff,           .
                               .  CA No. 08-1160 (ESH)
     v.                        .
                               .
UNITED STATES OF AMERICA,      .  Washington, D.C.
                               .  Tuesday, March 11, 2014
          Defendant.           .  9:45 a.m.
                               .
. . . . . . . . . . . . . . . .  Page 1715 - 1838

                   DAY 10 - A.M. SESSION
             BENCH TRIAL - CLOSING ARGUMENTS
         BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
              UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:              MICHAEL K. MURPHY, ESQ.
                                RAYMOND B. LUDWISZEWSKI, ESQ.
                                JUSTIN A. TORRES, ESQ.
                                STACIE B. FLETCHER, ESQ.
                                DAVID FOTOUHI, ESQ.

                                Gibson, Dunn & Crutcher, LLP
                                1050 Connecticut Avenue, NW
                                Washington, DC 20036-5306
                                (202) 955-8238

For the Defendant:              JOHN E. SULLIVAN, ESQ.
                                ERICA M. ZILIOLI, ESQ.
                                JESSICA O'DONNELL, ESQ.
                                JUSTIN D. HEMINGER, ESQ.
                                JENNIFER E. POWELL, ESQ.
                                WILLIAM D. JOHNSON, ESQ.

                                U.S. Department of Justice
                                ENRD / Environmental Defense
                                Section
                                601 D Street, NW
                                Suite 8000
                                Washington, DC 20026-3986
                                (202) 305-0365

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6714
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   (202) 354-3186

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

```
 1                      P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Civil case No. 08-1160, Lockheed

 3   Martin Corporation v. United States of America.

 4          THE COURT:  Good morning.  I think we're ready to go.

 5   Let me just make sure I can read this.  Okay.  Good morning.

 6   We're here for the closing arguments for the Lockheed versus

 7   United States CERCLA case.  Yesterday, out of an abundance of

 8   caution, I sent out an e-mail to both sides suggesting the way I

 9   would like us to proceed.

10          We had given you an outline of the topics that I would most

11   prefer you to cover.  Obviously, if you want to go beyond that,

12   that's fine, and you don't have to cover things you've already

13   covered.  I've read the PowerPoints in most of the documents

14   that were cited.  Both sides submitted PowerPoint presentations

15   of over a couple hundred pages.  I'm hoping that you won't stand

16   up and read to me from the PowerPoints.  I had this nightmare:

17   Between looking at geysers coming out of the ground, I started

18   thinking, my god, what if they start to read this stuff?

19          So I'm hoping that we will start with Lockheed and they

20   will respond to the thrust of the government's arguments,

21   whether it be in the government's PowerPoint or prior -- we had

22   a series of legal pleadings on arranger, on operator, liability,

23   indemnification, et cetera.  Then we'll switch to the government,

24   and we will start by covering the first four topics in the

25   outline and leave economic benefit, double recovery,
```

1    indemnification to -- we'll have that be the second part.  So

2    we'll going to cover issues 1 through 4 first, both sides.  That

3    way, it will perhaps keep us a little more focused.  I hope.

4        By the way, both sides, have you -- I learned two things:

5    one, that our clerk's office doesn't want to hold onto the disc,

6    so you have to hold onto them.  I know people dutifully said to

7    Mr. Johnson in the clerk's office that the judge ordered me to

8    turn these over, and he said we don't take them.  And he's

9    obviously right.  If he won't take them, the Court won't take

10   them.  So you have to maintain your own exhibits.

11       The discs that were submitted within the last two weeks

12   should represent all exhibits and all historical depositions.

13   I notice that I also have the declarations in one instance,

14   right?  On one side or both?  I can't remember.  I have the

15   declarations from Lockheed.  Or the government.  Yep, I have the

16   depositions, declarations, and all exhibits for both sides.

17       Lockheed is missing Exhibit 60.  PX... there's one not

18   here, believe it or not.  0560?

19       (The Court conferring with law clerk.)

20       It was admitted into evidence, and it was not listed on the

21   computer disc.  2060, Mr. Murphy?

22           MR. MURPHY:  2060?

23           THE COURT:  Just double-check your disc.  Otherwise,

24   does everybody agree that what's on the disc is in evidence?

25           MR. SULLIVAN:  We have a clarification.

```
1              THE COURT:  Okay.  Mr. Murphy, once you put in the

2    missing exhibit, everything you think that's in evidence is on

3    this disc?

4              MR. MURPHY:  Yes, Your Honor.

5              THE COURT:  Okay.  And you'll maintain it for

6    appellate purposes.

7              MR. HEMINGER:  Good morning, Your Honor.  Justin

8    Heminger for the United States.  The parties had discussed

9    clarifying three items that were on the discs that are not

10   admitted into evidence.

11             THE COURT:  Okay.

12             MR. HEMINGER:  The first is the deposition transcript

13   of Jorge Oliveras, J-O-R-G-E, O-L-I-V-E-R-A-S.

14             THE COURT:  And that's on whose?

15             MR. HEMINGER:  That's on Lockheed's --

16             MR. MURPHY:  Your Honor, one of our experts relied on

17   the deposition as part of his expert report.  So we just

18   included it because we included all such depositions.  We agree

19   with the government that that deposition is not in evidence.

20   It's hearsay that was relied upon by an expert.

21             THE COURT:  Okay.  Well, I see it here.  Are all the

22   rest of them in evidence?

23             MR. MURPHY:  Well, the United States has several

24   depositions on their discs that we believe are hearsay as well,

25   Your Honor, that their experts rely upon, and they're on their
```

 1    discs as well.

 2              THE COURT:  Well, you can tell me who they are in a

 3    minute.  I'm looking at this quickly.  I'm seeing lots of names

 4    that I'm not familiar with because they weren't designated in

 5    the initial trial memorandum.  So unless you used it in your

 6    PowerPoint, it would be preposterous for you to think that --

 7    there must be 20 depositions listed here.  I didn't pay any

 8    attention.  More than 20.

 9              MR. MURPHY:  Many of them are relied upon by experts,

10    Your Honor.  Some we had exchanged designations before trial.

11    I believe that they're on there.  Again, some of them are relied

12    upon by experts, so we followed procedure if our expert relied

13    upon them and put them in.  But I think we agree with the

14    defendant that Jorge Oliveras is not admitted.  It's hearsay, as

15    well as I think Granberry is one.

16              THE COURT:  Is he on your list?

17              MR. MURPHY: He's on the United States list, Your Honor.

18              MR. HEMINGER:  Your Honor, to clarify, the two items

19    on the United States disc would be the deposition of Edwin

20    Granberry, and that's U.S. Exhibit 905.

21              THE COURT:  Yours are done by exhibit number?

22              MR. HEMINGER:  Yes.  And again, that was a deposition

23    that was relied upon by an expert, but it is not admitted, and I

24    believe the United States exhibit list mistakenly indicated that

25    was admitted in evidence.  It is not.

1          Then the other exhibit is U.S. Exhibit 889, and that's an
2     exhibit from a deposition transcript.  Again, that was mistakenly
3     identified as being admitted, but it is not.
4          THE COURT:  So, Mr. Heminger, are you saying that
5     these two should -- what's the last, 889?
6          MR. HEMINGER:  889 is an exhibit to a deposition.
7     It's an exhibit to the deposition of Gaynor Dawson.
8     G-A-Y-N-O-R, D-A-W-S-O-N.
9          THE COURT:  And what is the upshot of these two, 905
10    and 889?
11         MR. HEMINGER:  I believe Lockheed had objected to
12    those during the pretrial.
13         MR. MURPHY:  They were depositions taken in a
14    different matter, Your Honor, that their experts relied upon.
15         THE COURT:  So we leave them in but not for the truth?
16         MR. MURPHY:  Yes.
17         THE COURT:  So Exhibit 905 for the government and 889
18    are actually -- they're in there because experts relied on them;
19    they're not in there as evidence.
20         MR. MURPHY:  Yes, Your Honor.
21         THE COURT:  All the rest are evidence, all the other
22    government exhibits?
23         MR. MURPHY:  Your Honor, they also put in deposition
24    transcripts from Peter Dull, since he testified at trial.  I
25    believe those are also hearsay at this point.  They weren't used

1    to impeach.

2              THE COURT:  So where does that appear?

3              MR. MURPHY:  U.S. 891 and 893.

4              THE COURT:  891 and 893.  Are you agreeing with that,

5    that they should be excluded, 891, 893?  He did testify.  He was

6    my favorite witness, was the only person who was actually on the

7    ground who remembered.  Okay.  891.  So what are you suggesting

8    we do with these two?

9              MR. MURPHY:  Your Honor, I guess, to the extent their

10   experts rely upon them, I think they would also be considered

11   hearsay or not admitted for the truth since they weren't used to

12   impeach.

13             THE COURT:  899 and 891?

14             MR. MURPHY:  891 and 893, I think are the two.

15             THE COURT:  I don't have an -- what did you say?

16             MR. MURPHY:  89 --

17             THE COURT:  Oh, yeah.  891 and 893, and Gaynor Dawson

18   is 899?  They're all the same?

19             MR. MURPHY:  I think so, Your Honor.

20             THE COURT:  So these are all there only because

21   they're relied on by experts.  So they're not going to be

22   considered as substantive evidence, correct?

23             MR. SULLIVAN:  Yes, Your Honor.

24             THE COURT:  So that's four government exhibits on the

25   exhibit list and one deposition on the Lockheed Martin.  For my

1    information, the government's exhibits include all the

2    deposition excerpts that you're interested in having?

3             MR. SULLIVAN:  Yes, Your Honor.

4             THE COURT:  All right.  It's very helpful to have

5    these linked.  Okay.  Are there any other clarifications?

6             MR. SULLIVAN:  Your Honor, we have a couple.  In

7    preparing for argument today and then going through Lockheed's

8    closing, we noticed that there were, I think, five slides that

9    had references to evidence that was not on their exhibit list.

10            THE COURT:  Oh, okay.  Let's see.  Can you tell me?

11            MR. SULLIVAN:  Yes.  The first one is slide 100 and

12   Plaintiff Exhibit 2060.

13            MR. MURPHY:  That's the one we just mentioned, I

14   think, that we need to put into evidence.

15            MR. SULLIVAN:  Right.

16            THE COURT:  And that was admitted, and I know what it

17   is because it's part of the cross-examination of Dr. Bauer.  So

18   I know exactly what it is.  But I agree.

19            MR. SULLIVAN:  The next one is slide 104.  It's a

20   reference to historic depositions.  There are several of those

21   depositions that are not on the exhibit list, and they are last

22   names Bonin, B-O-N-I-N, Carlstrom, C-A-R-L-S-T-R-O-M, Clarke,

23   C-L-A-R-K-E, Costelow, C-O-S-T-E-L-O-W, Culverhouse,

24   C-U-L-V-E-R-H-O-U-S-E.

25            THE COURT:  Where are you reading this from?

1    MR. SULLIVAN:  That was slide 104.

2        THE COURT:  Right.  One second.  Right.  They're not

3    in evidence; I know that.  You don't have to list them all.

4    Only one or two -- few are.  What's your position?

5        MR. MURPHY:  Your Honor, I'm relying on Federal Rule

6    of Evidence 1006 as a summary slide.  I'm not admitting them

7    into evidence.  I'm using them as a summary.  These have all been

8    designated and turned over to the government in this matter.

9        THE COURT:  Okay.  If you think that they've got some

10   misstatement, I'll take it for what it's worth.  Some people say

11   they didn't see others, didn't dump themselves.  I don't know

12   what precisely they said.  These citations are not in evidence,

13   but they're entitled to summarize it.  If you find any problem

14   with it, you can let me know.

15       MR. SULLIVAN:  Okay.

16       THE COURT:  As long as it's available to you, it's

17   like a summary chart.

18       MR. SULLIVAN:  Okay, Your Honor.  The next ones are

19   slides 151 and 152, and they reference Dr. Sterrett's

20   deposition, and I believe also -- Dr. Sterrett's deposition, and

21   the deposition is hearsay because he was brought in to testify

22   and testified here.

23       THE COURT:  I think I probably have his expert report.

24   Whether it's an exhibit or not, didn't it probably come in with

25   his --

1    MR. SULLIVAN:  This is actually his deposition

2  testimony.

3        THE COURT:  Oh.  It says "either."

4        MR. MURPHY:  Your Honor, this was on an issue that we

5  moved to strike.  He'd added what we thought was a new opinion

6  at trial in his expert affidavit that was submitted a week

7  before trial.  We're relying on -- again, we did not use it at

8  trial, Your Honor, but in his deposition I think we can explain

9  why he was putting something new in.  We would ask for a little

10  latitude on that issue.  This is a deposition in this case.  We

11  didn't get to it on cross of the witness.

12        THE COURT:  I'm not going to strike it.  I'll take it

13  for whatever it's worth.  Okay, moving on.  Anything else?

14        MR. SULLIVAN:  Your Honor, the point that they're

15  relying on Dr. Sterrett's deposition for we can refute, because

16  I think the point they're talking about is pouring solvent in

17  the same place.  During his deposition, he was actually cross-

18  examined for about four pages on that topic.  We can submit that

19  to you if you need it.

20        THE COURT:  All right.  That's fine.

21     Okay.  There is an observation by a judge in California --

22  is it Matz? -- about minutiae.  I echo it.  Let's try to rise

23  above the minutiae.

24     Go ahead, sir.  We'll hear from Lockheed first.

25        MR. MURPHY:  Thank you, Your Honor.  The first slide

I'm looking at right now, Your Honor, was the last summary slide

of our opening argument where we said we asked the Court for ██

██████ allocation.  We think we've proven what we said we were

going to prove at opening.  I think we've proved operator,

ownership, arranger.  We think we've talked about the standard

of care a little bit during trial, and we think we've made our

point on that.

THE COURT:  That actually wasn't my question.  It was

an interesting sleight-of-hand.  I asked you if they used sloppy

practices.  I'm not believing that -- I mean, I don't have a

basis to say that you violated the standard of care.  Did you

change the question for some reason?

MR. MURPHY:  Your Honor, I don't think -- "sloppy

practice" is an interesting term.

THE COURT:  It was intentional.

MR. MURPHY:  It's a question of whose definition of

sloppy.  Are we talking about the definition today of being

sloppy, or are we at what sloppy meant back in the '50s '60s,

and '70s?

THE COURT:  I'll give you a couple of examples the

reason why it comes up in a different context than standard of

care.  I think it may well be uncontested that for a few years

the pipe didn't connect to the evaporation pit early on.  So I

lump that in as being sloppy.  I don't know whether it was

negligent, intentional.  We can't make that determination in the

1    context of this case, but there are things that happened.

2         Or, if I were to find that an employee dumped directly on

3    the ground, your policies would have precluded that, but it

4    still may be that people were careless or not doing what was

5    required of them, and even that counts.  So "sloppy" is not

6    loosely chosen.

7              MR. MURPHY:  Yes, Your Honor.  Actually, can we go to

8    the start of slide 52?  We'll start there, Your Honor.  Let's go

9    to b.

10        So the question, Your Honor, I guess -- I understand your

11   point.  Actually, let's go to the summary slide.  Forgive me for

12   jumping around, but I just want to address this point.

13        At this site, Your Honor, we have four people that I think

14   that have claimed to have dumped solvents, and several witnesses

15   claim occasionally to have seen some dumping go on, but the

16   majority of people who looked at this didn't see any dumping.

17   And again, we're talking about practices here in the '50s and

18   the '60s.

19        Compare this to the AISLIC court, Your Honor, that looked

20   at their practices in the '70s and '80s where there were

21   actually illegal dumping going on.  There were actually

22   processes that were designed and followed by the company that

23   resulted in RCRA penalties, Your Honor.  So there were activities

24   that were going on that weren't, I guess, legal at the time.

25        Here, we believe, Your Honor, looking at the site, yes,

1    there are some employees that talk about dumping solvents in the

2    ground, and yes, we had procedures at the company to prohibit

3    that.  But putting this in the context in the '50s and '60s, I

4    hesitate to say that is sloppy given the time period.

5        Yes, some people dumped some solvents on the ground.  We

6    believe that solvent was TCA.  We don't believe that solvent is

7    in the groundwater.  But to term that "sloppy," look at a site

8    in the '50s and '60s and decide a couple of people putting

9    solvents in the ground is sloppy and should be taken into

10   account here in this CERCLA case when we don't believe those

11   practices caused the plume we have -- and clearly that's an

12   issue of dispute we have with the government -- I hesitate to

13   say it should be taken into major consideration in this case.

14       THE COURT:  Nobody tells me what percentage anything

15   is worth.  I'm not saying you folks; I'm just saying the law.

16   I don't know whether it's major or not major.  Otherwise, we'll

17   talk about the TCE for a minute.  You have two sources:  your

18   explanation and their explanation.  Nobody else offers any other

19   -- I guess there's some in the burn pits.

20       MR. MURPHY:  Well, the AP we would think -- the burn

21   pits is the major release of the AP.

22       THE COURT:  Yes, but there was some TCE in burn pits,

23   I think.

24       MR. MURPHY:  I don't think the record is that clear,

25   Your Honor.

1          THE COURT:  But for the TCE, as I've said more that

2    once, if I can't really fine-tune it for purposes of causation,

3    where am I?

4          MR. MURPHY:  On the TCE, Your Honor?

5          THE COURT:  Yeah.  If I can't say Dr. Feenstra's right

6    and I can't say that it's all caused by employee dumping,

7    although one certainly has enough evidence that there was some

8    dumping, whether it caused the plume or didn't cause the plume,

9    you can't make findings when you can't make findings.  What does

10   that tell me about TCE?  What should I look at?  The law is not

11   that helpful when it says, well, look at operator, arranger, and

12   owner liability.  That's not helpful.

13       That doesn't tell me -- TCE was found in the ground.  It

14   got there.  It was in Redlands.  We're not 100 percent -- we're

15   not even 55 percent sure how it happened or what was the

16   causative factor for the plume itself.  It could have been that

17   dumping caused X and there was TCE in the soil in various

18   places, but who knows what the plume is?  So, what do you do?

19         MR. MURPHY:  Well, Your Honor --

20         THE COURT:  Do I ignore it?

21         MR. MURPHY:  No, Your Honor.  You have to go back

22   to the idea that both parties were involved in the operation

23   at this site.  We have evidence from 1973 that lists

24   trichloroethylene for degreasing use as program-chargeable to

25   the SRAM program.  We have evidence in the record now that the

1    government reviewed and approved our process specifications as

2    to how to build a missile.  Those process specifications

3    included TCE, talked about solvents going to the evap pits.

4         So I think you have to pull back a little bit and say --

5    and again, we're dealing with a situation here where the

6    government has admitted to being a liable party.  So we start

7    with that.  So you're equitably allocating.  You're looking at

8    the totality of the circumstances.

9         So we have the government there.  We have the government

10   reviewing our process specifications.  We have TCE, at least at

11   one point in time being charged direct to a government contract.

12   So there's a question of whether they owned that TCE or not, and

13   they owned equipment that used the TCE and vapor degreaser, the

14   major piece of equipment that used TCE.  And again, all of these

15   products were done for the government, and the government was

16   there on-site monitoring what we were doing.

17        At one point, they suggested we look at using different

18   solvents for one of our processes, and we funded a study to

19   look at whether we should replace one of our solvents or not.

20   So we're seeing a situation here where the government is on the

21   ground, involved in our operations on a regular basis.

22        I think that has to be taken into account in terms of the

23   equitable allocations.  So whether they're officially an operator

24   for TCE or whether they owned a piece of equipment that released,

25   they admitted they're a responsible party here.  So again, we're

1    talking about equities.  In looking at the equitable factors --

2            THE COURT:  You know, they're not admitting -- when

3    you say "admitted liability," they said that they've owned some

4    equipment.

5            MR. MURPHY:  Their stipulation wasn't limited to just

6    ownership, Your Honor.  They admitted they were a liable party

7    in a 107(a).

8            THE COURT:  I understand at least that what they're

9    saying is that we did it based on facility ownership.  I don't

10   understand them to admitting much else.  If I don't feel

11   comfortable with Dr. Feenstra, what happens to the degreaser?

12   It's not particular relevant to me.

13           MR. MURPHY:  Well, Your Honor, degreasers are common

14   sources of TCE contamination all over the country, Your Honor.

15   It was the one piece of equipment that used TCE throughout the

16   entire -- you can look at the facts yourself.  There's process

17   specifications calling for the use of TCE in that degreaser

18   throughout the entire history of this site.

19           THE COURT:  Except for your admissions in litigation

20   that it wasn't used.

21           MR. MURPHY:  I admit that, Your Honor, but that was

22   again only a couple years after this site was determined -- was

23   ordered -- it was two years after it received all the board

24   orders to clean up out there.  It was very early on in our fact

25   development.  So it becomes a question of do we take that early

1    admission -- again, that litigation settled very shortly

2    afterwards, so there was not an obligation to update that

3    interrogatory response.  So you're taking a piece of evidence

4    very early on in the history of the fact development that

5    Lockheed Martin conducted here, and weighing that against the

6    weight of the documents.  You're weighing that against basically

7    only a couple of pieces of information that go the other way,

8    and two of those pieces of information are the same person,

9    Larry Borgelt.  They cite one handwritten notation, and let's go

10   to the handwritten notation.

11           THE COURT:  What's the exhibit number that's the

12   admission of the company?

13           MR. MURPHY:  It was an interrogatory response,

14   Your Honor, from 1996.

15           THE COURT:  I know, but it has a U.S. number.

16           MR. MURPHY:  It does, Your Honor.

17           THE COURT:  It has to have an exhibit number.  So to

18   say that documents indicating -- this is not entirely --

19           MR. MURPHY:  Well, Your Honor, yes.  We did not

20   include a litigation statement from 1996 on our chart.

21           THE COURT:  A litigation statement, under law, is an

22   admission.  You signed under oath by the company.

23           MR. MURPHY:  Yes, Your Honor, but there's obviously a

24   duty to supplement as you learn more information.  But again,

25   that case settled shortly there afterwards.  If we had learned

1    information, we would not have had anything to supplement or to

2    change.

3             THE COURT:  Do you think the government owned TCE

4    after '75?  Assuming that's when the contracts ended.

5             MR. MURPHY:  Did they own the -- I guess the question

6    is -- and this is obviously an issue we struggled with during

7    trial -- Do you have ownership over waste?  When do you

8    determine ownership of waste?

9       So if this was released either by the dumping or the vapor

10   degreaser, again, we believe the vapor degreaser is the most

11   likely story.  If it was released and in the ground at the time,

12   does the reversion in the Progress Payments Clause revert

13   ownership back to us once it's already been released and in the

14   ground?  I don't think that is what anybody anticipated to be

15   talking about when you have a reversionary interest in property.

16            THE COURT:  That's what the judge in California found.

17            MR. MURPHY:  I know, and I don't agree with him,

18   Your Honor.  I believe that the more appropriate question for

19   CERCLA in determining responsibility for waste is at the point

20   of release.  Who owned it when it was released?  Who owned it

21   when it was released into the environment?

22      Because again, I don't think either party realized this

23   stuff was in the ground at the time, so how does the reversion

24   happen?  I don't believe the property clause, the Government

25   Property Clause, anticipated the reversion of property that had

1     already been released during the process.

2              THE COURT:  What is the number, can you tell me, of

3     the interrogatory answer?

4              MR. MURPHY:  I'm sure it's in the government's

5     PowerPoint.

6              THE COURT:  You're suppressing certain things.

7        (Laughter)

8              MR. MURPHY:  Well, Your Honor, again --

9              THE COURT:  Well, you put up a chart and say these are

10    the documents that show --

11             MR. MURPHY:  These are the historical documents,

12    Your Honor; I would say historical documents.

13             THE COURT:  U.S. 22 and 120?

14             MR. MURPHY:  Yes, Your Honor.

15             THE COURT:  Thank you.  Let's assume you're right

16    about the degreaser for a moment.  Who's operating the degreaser?

17             MR. MURPHY:  Lockheed Propulsion Company.

18             THE COURT:  And if it's not operating properly, who

19    has the best chance of figuring it out?

20             MR. MURPHY:  I would imagine it's Lockheed Propulsion

21    Company, Your Honor.

22             THE COURT:  On a practical level, do you have any

23    evidence that the government actually went and looked at the

24    degreaser?  Is that the kind of thing that they were worried

25    about?

1           MR. MURPHY:  We have no evidence of that, Your Honor.

2    We have evidence where government inspectors were in Building 91

3    and commenting on solvent vapors and commenting on whether we

4    were properly operating our procedures.

5           THE COURT:  And if I may, the inspections come out

6    prominently in your document.  I looked at them, and correct me

7    if I'm wrong -- let's see.  Where does that start?

8           MR. MURPHY: I think they start, Your Honor, at slide 16.

9           THE COURT:  So if I look at them, there has obviously

10   been an inspection that followed on May 25, 1960, and there were

11   a couple of exchanges afterwards.  Then, as far as I can see, if

12   I trace yours, the next inspection is 1970.  Do you have any

13   evidence that they were doing much of anything for 10 years?

14          MR. MURPHY:  Your Honor, we don't -- first point is

15   that we don't have a complete documentary record here.

16          THE COURT:  Right.  I agree.

17          MR. MURPHY:  So we're basing this off of documents we

18   have.  There was testimony at trial about DCAS changing from the

19   various entities in 1964 into DCAS.  There's no evidence that

20   they would have changed their practices over time.  I do not

21   have any documents talking about inspections, though, after 1960

22   and before.  I think the late '60s, because I think one of those

23   documents talking about DCAS talked about regular inspections

24   before 1970.  But that's about the time period.

25          THE COURT:  There was a debate in 1970 about DCAS only

1  having a handful of mandatory inspection points, and there was a

2  suggestion within the government that they ought to step it up,

3  that they had been pretty lax; and that, I believe, was dated in

4  '70.  If you put it to the extent that one is able to piece

5  together a historical timeline and we are hampered by lack of

6  documents, we have a glaring gap.  Do we know from the testimony

7  when the DCAS -- when it really got going, or did they really

8  only start doing -- the other possibility is the production

9  contract kicked off DCAS's interest in the specifications.

10          MR. MURPHY:  Your Honor, I know we have evidence again

11  from the '60s time period, '58, about a couple of Army

12  inspections for safety.  Again, that was before DCAS.  I think

13  that in 1964 is when DCAS was formed.  I know we had a

14  production contract for Apollo, the launch escapement.  That's

15  the background of our slides that we're showing here is the

16  Apollo launch escape rocket.  The LSM was a big contract.  The

17  government had a lot of people on site looking at that program.

18          THE COURT:  When was that?

19          MR. MURPHY:  That was '66.  '65, '66, was the large

20  rocket motor testing, Your Honor.  Apollo was the mid-'60s as

21  well.  We don't have the records.  I think there's one document

22  from the '70s.  I think it may be the program evaluation that

23  talked about criticizing -- and there's a difference between

24  DCAS inspections, mandatory inspection points for when you're

25  building a missile and the difference between DCAS sort of

1    safety inspections.

2         There's one document, I think in 1970, that talks about --

3    criticizing the lack of formality in the DCAS process, citing

4    the fact that there had been visits before from DCAS safety

5    inspectors and criticizing them for not making written findings

6    and sort of cooperating with us in resolving issues.

7         Their criticism was that nothing had been put down in

8    writing.  It wasn't that they weren't happening; it's just that

9    it wasn't formalized.  I think that was one of their criticisms

10   in 1970.  I think that document is in there.

11        THE COURT:  If I buy your major tenet, which was

12   pretty well documented by your expert that nobody really paid

13   much attention to the issue, isn't it fair to agree that the

14   inspections were safety-related, meaning explosives, the idea of

15   contaminants and the inspections -- they were either worried

16   about the product being produced, consistent with specs on time,

17   or they were worried that people didn't blow each other up.

18        MR. MURPHY:  I think they were definitely worried

19   about a couple different things.  Making sure the products were

20   produced correctly, that's clearly one role that DCAS was there

21   inspecting, making sure our process specifications were met, and

22   clearly there were safety inspections as well.  I think the idea

23   of distinguishing between safety and waste --

24        THE COURT:  Environmental.

25        MR. MURPHY:  Environmental.  That distinction is sort

1   of a false distinction, Your Honor, because at the time, safety

2   meant disposal.  Remember, the AP and the solvents that were

3   contaminated with AP were considered explosive materials.  So

4   safely dealt with those waste activities.  So you had explosive

5   wastes, and the question was how you get rid of them safely.

6       Now, you're right, they weren't worried about groundwater

7   contamination at the time.  We do know they were worried about

8   air problems at the time because we had to get permits to burn

9   these materials.  There were limitations placed on LPC and the

10  government in terms of burning these materials at these sites.

11      So there was a concern about air pollution.  But again,

12  these materials were burned, and these materials were disposed

13  of on-site and sometimes at Army facilities because of safety

14  concerns.  So the safety drove the disposal procedures at the

15  time.

16      So when they're looking at our disposal practices, when

17  they're investigating our waste handling practices, it is from a

18  safety point of view.  But I don't believe you can say, well,

19  just because it's safety, it doesn't involve waste disposal.

20  Safety drove how we were disposing of these wastes at the time.

21          THE COURT:  In hindsight, we all seem to agree that

22  the burn pits were a really bad idea, but that probably didn't

23  present the same safety hazards that you're worried about,

24  people dropping things on the ground or on the surface.  So it

25  isn't quite the same motivation if you're willing to accept

1  throwing things in a burn pit.

2      MR. MURPHY:  Your Honor, if you make that distinction,

3  then you're going to be hard-pressed to find any CERCLA

4  liability pre recognition of groundwater contamination.

5      THE COURT:  I'm not worried about liability.  I'm way

6  past that.

7      MR. MURPHY:  Okay.

8      THE COURT:  I'm only on allocation, and I don't think

9  I have to find wrongdoing in the traditional sense.  It is a

10 curious sort of legal construct that's a little different than

11 what you're saying.  I mean, you're trying to make them an

12 operator based upon the fact that they did inspections, among

13 other things, and I'm saying I'm not sure the inspections are

14 terribly relevant to what we're worried about here, which is

15 remediation costs.

16     MR. MURPHY:  You asked the question, was the United

17 States an operator, and those inspections go to operations.

18 Through these inspections, they made recommendations that we

19 followed, that we took corrective action for.  It was though

20 these inspections that they exercised some management or control

21 over these processes.

22     Again, if you look at the Best Foods, the Best Foods

23 direction was if you're going to operate a facility, you have

24 to look at management, direction, participation in waste issues.

25 Here, the waste issues were driven by safety, and these safety

1    inspections drove how we handled waste.  So, again, if you're

2    looking at Best Foods, it was the corporate parent versus the

3    subsidiary.  Here, if you look at it that way, the government, as

4    the corporate parent, was on the site making sure its subsidiary,

5    its contractor, was doing things in accordance with its manuals.

6         THE COURT:  So is Boeing.

7         MR. MURPHY:  We have no evidence that Boeing was doing

8    safety inspections.  We have no evidence that Boeing took part

9    in -- I mean, for lack of a better word, Boeing was a

10   pass-through at times to get to the Air Force, but the Air Force

11   was the one doing direct inspections.

12        THE COURT:  There's documents that indicate that

13   Boeing had quality assurance people on there.

14        MR. MURPHY:  Again, quality assurance is different than

15   safety, Your Honor.  They might have had people on-site making

16   sure we were building the missile, and making sure we were doing

17   it in a way so it fit in.  Remember, Boeing is the systems-

18   integrator contractor here.  It was building the missiles.

19    So it had responsibility for making sure the propulsion

20   system fit together with the warhead, fit together with the rail

21   system, fit together with the guidance system, and to make sure

22   it all was able to get on a plane and be fired.  It was the

23   major contractor, so its role at the site was to make sure we

24   were building the missile in accordance so it could use the

25   missile and put it into the SRAM itself.

1       So we don't have any evidence, though, that the Boeing

2   people were on-site looking at safely, looking at the waste.

3   What we have is the Air Force, we have DCAS, we have those

4   reviews and those inspections of our site looking at safety

5   issues.  We don't see that from Boeing in this site.

6           THE COURT:  The latest I can find is 1970.  If you

7   have something else, let me know.

8           MR. MURPHY:  Well, Your Honor, we have -- in terms of

9   inspections, Your Honor?

10          THE COURT:  Yeah, by DCAS or otherwise.

11          MR. MURPHY:  Again, we don't have documents showing

12  it, and again, I don't know whether -- we don't know whether

13  that's because it didn't exist or because we just don't have

14  documents for it.  But again, there were very important

15  government programs going on at the time, Apollo being one.

16      We have a telegram from NASA to us, directing us to do more

17  AP-mixed batches to qualify the raw material during the '60s.

18  We have evidence that government people were on-site all the

19  time from the Air Force Propulsion Lab when we were building a

20  large solid rocket motor.

21          THE COURT:  Do you have any evidence that the

22  government knew about the hog procedures that went on at

23  Laborde?

24          MR. MURPHY:  The hog-out procedure, Your Honor?

25          THE COURT:  Yeah.

1    MR. MURPHY:  Back in 1962 we have a recommendation

2    from a government witness we introduced at a trial where he says

3    look into refurbishing the large solid rocket case.  Hog-out is

4    the way to refurbish the large solid rocket case, to use it

5    again.  A hog-out is a procedure that was common in the industry

6    that was used all over the country as a source of contamination

7    all over the country.  At this site, Your Honor, I believe --

8    I'm not sure if the documents are in evidence or not, so I'm not

9    sure if I can talk about it, but there was a DCA audit --

10    THE COURT:  Well, then don't talk about it.

11    MR. MURPHY:  It was something we were doing as part of

12    our contract performance.  Mr. Nagle talked about the fact that

13    we got paid for certain things at these procedures, and hog-out

14    is one of the things that we got paid for.  It was part of

15    refurbishing missiles.

16    Again, an important thing about hog-out is we did it to

17    save the government money.  These missiles, the casings

18    themselves were furnished to us as GFE, Government Furnished

19    Equipment.  These missiles came in as government-owned, and they

20    left as government-owned.  So if we wanted to reuse these

21    government missiles again, we hogged them out and used them

22    again in our process.  So I find it hard to believe that the

23    government wouldn't have known this was going on at the time.

24    THE COURT:  You say a government witness?  Is that

25    something that's in evidence?  You said that a government

1    witness wanted to know about -- back in 1962, we have a

2    recommendation from the government.  Is that a document?

3              MR. MURPHY:  Yes, Your Honor.

4              THE COURT:  Is that Bill Rice?

5              MR. MURPHY:  Yes.

6              THE COURT:  That's in evidence.

7              MR. MURPHY:  Yes.  There's a meeting that was going on

8    where the government recommended refurbishing missile casings,

9    and again, hog-out's a way to refurbish used missile casings.

10             THE COURT:  And do you have any evidence that they

11   went to both sites, or just Redlands?

12             MR. MURPHY:  In terms of the inspections, Your Honor?

13             THE COURT:  Yeah.

14             MR. MURPHY:  In our trial binder there are documents

15   detailing DCAS inspections of Potrero.  So again, Your Honor --

16   and it's not just the inspections on operator.  It's also

17   direction.  We have a couple documents where the government is

18   actually telling us to burn AP waste and not only directing us

19   to burn it, but also requiring it to be witnessed to it being

20   burned.  That's evidence that you don't find in these other

21   operator cases that you cited to us, Your Honor.  You don't see

22   the actual direction to use the burn pits.  You don't actually

23   see government people being basically made to watch to make sure

24   these things got burned.

25             THE COURT:  Their expert had an explanation for that.

1    I don't know that it was contradicted, but I think Nagle said
2    it's because it's classified and they want to make sure it's gone.
3         MR. MURPHY:  But again, Your Honor, even if that's
4    true, they're still telling us to burn AP propellant at the burn
5    pits and watching it happen.  If you put that in the operator
6    context of Best Foods, it would be as if a corporate parent
7    actually told a corporate subsidiary, Hey, you, go over and burn
8    it over there in your burn pit and I'm going to watch you do it.
9    I guarantee you Best Foods comes out differently if those facts
10   are in evidence.
11      Here their operator liability is because they saw, they
12   monitored, and they told us what to do with the waste at certain
13   points in time.  And again, under Best Foods, that is the very
14   definition of an operator.  The government makes their arguments
15   on an operator.  You read it and it's almost as if, to be an
16   operator, you have to actually turn the valve to light the thing
17   on fire yourself.  And again, that view is rejected in the Best
18   Foods case.  You have to participate in the management direction
19   of waste disposal, and here we have documents in record where
20   the government is telling us to dispose of waste at the site.
21        THE COURT:  When they're telling you to dispose of the
22   waste, is that part of the a shutdown in the late '70s.
23        MR. MURPHY:  The one that's up on the screen now,
24   Your Honor, that date is earlier, '71.
25        THE COURT:  But is that the end of the Apollo program?

1       MR. MURPHY:  This is the end of the Apollo program.

2       THE COURT:  Obviously, they're telling you to get rid

3   of stuff at the end of programs.

4       MR. MURPHY:  Yes, Your Honor, and we believe it's

5   because they owned the materials.  The Apollo program, we have

6   examples in the record where we have what we think is

7   government-owned AP.  At some point we were able to sell some of

8   it back to AMPOT, and credit the American Potash and credit that

9   against contract funds.  And again, we're asking for the

10  government's approval.  Actually, we're asking for the prime's

11  approval to do that at the time in North American Aviation, and

12  here we are being instructed by DCAS to dispose of certain

13  materials in the burn pits.

14      THE COURT: Is this the one that has the indemnification

15  clause in it?

16      MR. MURPHY:  No.  That's a different one, Your Honor.

17  That's the dispose of pit burning at Potrero that has about

18  5,000 pounds of AP.  And again, that indemnity, two points on

19  that indemnity.

20      THE COURT:  Why don't we save that till this afternoon.

21      MR. MURPHY:  Okay.

22      THE COURT:  So this is December '71.

23      MR. MURPHY:  And again, there's -- so we have evidence

24  in this record where we have direction from the government to

25  burn.  We have government inspections over, as you say, the

1    minutiae of the waste in terms of what waste canisters, or what

2    they should be that are on the way to the burn pit.  We have

3    inspections over solvent issues.  We have inspections over

4    various waste processes by DCAS, directly by DCAS or the Air

5    Force.

6         So, Your Honor, when we're talking about operator, you're

7    talking about cases.  The facts here are much different than

8    most of the cases that the Court cited to us.  This is not only

9    a situation where you have safety manuals or you only have

10   people on-site to make sure that the stuff was performed in the

11   right way.

12         THE COURT:  What case is closet to you on the

13   allocation based on being an operator?  There are a lot of

14   liability cases that both sides cite me, and I would cite those

15   too for liability.  But when it comes down to where the rubber

16   hits the road here, for allocation, what's your best case?

17   There aren't very many allocation cases, are there?

18         MR. MURPHY:  No, there are not, Your Honor.

19         THE COURT:  Nobody ever gets to that point.

20         MR. MURPHY:  No.  Cases usually settle by that point

21   in time.

22         THE COURT:  You can be liable, but it doesn't translate

23   into numbers for allocation purposes.

24         MR. MURPHY:  I would argue, Your Honor, that once

25   you're liable -- while ideas of operator, owner, arranger are

1    somewhat important, they're not necessarily determinative.  You

2    have to look at the equities.  We started broad here, looking at

3    the rocket industry in general and looking at the control the

4    government exercised over this industry.  And you take it down

5    from that industry generally, and you take it down to what

6    happened on the ground.  And we show that control -- generally,

7    we show that show control on the ground.

8        So again, I don't think you need to reach -- so look at

9    AISLIC, for example.  AISLIC had several operator-type issues:

10   the manual, the people on-site.  They didn't have the documents

11   we have or the evidence we have.  But they found that company

12   was not an operator, but it found they were an arranger and an

13   owner.  In the equitable allocation, they zeroed out all that

14   operator evidence in its allocation.

15       I don't think that's required, Your Honor.  That might not

16   even be appropriate or equitable, I should say, in some fashion,

17   because here, even if you don't find they are a quote-unquote,

18   an operator, if you don't find that they meet this magic trigger

19   point of liability -- I think we do.  I think we do in spades.

20   But at the same time, if you don't find that, you don't have to

21   give us all operator liability and them zero.

22       Again, they're a liable party here.  The direction once

23   we're both liable is equitably allocate.  So you don't have to

24   look at owner, operator, arranger.  You can look at other

25   issues.  You can look at other control issues.  The fact that

the government had some control at this site should play into

the equitable allocation.  So I believe that AISLIC gets close

to an equitable result at 40 percent.  I'm not exactly sure he

got there the correct way with his percentages, but --

THE COURT:  That's about the only case out there.

MR. MURPHY:  That is, that comes close to this site,

Your Honor.

THE COURT:  We agree that we're in a case -- first of

all, the allocation, when it comes to the government being the

customer for a government contract, is pretty rare?

MR. MURPHY:  Excuse me, Your Honor?  I'm sorry.

THE COURT:  Is the actual cases of allocation, other

than AISLIC, what other cases involve allocation where the

government is liable and they are the contractor?  I'm sorry,

they're the buyer.

MR. MURPHY:  The government has cited -- I think Litgo

is a case where the government was held, I think, officially

liable.

THE COURT:  I agree, but did that get to allocation?

MR. MURPHY:  Yes, Your Honor.  I think they received

-- it was a 3 percent allocation, Your Honor.  It was a World

War II site that had many, many people over the entire history,

and the government was only there for a short amount of time, if

I understand the facts correctly.  I'm sure John will correct me

if I'm wrong, but it's -- I think it's a very different

situation than having a sort of a government-only rocket

manufacturing plant that was making really advanced rockets for

the government during the Cold War, Your Honor.

If you're looking at that, AISLIC comes the closest, but

even AISLIC is not a complete parallel.  AISLIC happened later

in time.  Its missiles were more production contracts than R&D

like ours were.  I think you can look at their site and find

much more evidence of, if you want to say it, culpable

environmental wrongdoing than we had in our facility.  So I

believe that while AISLIC comes close, it's not a perfect

parallel.

THE COURT:  You say that you had all the necessary

permits.  Isn't that highly contested?

MR. MURPHY:  Your Honor, I think we can say -- we

tried to get the necessary permits.  There was an effort to --

if you go to -- I think we have a couple of slides on that

point.  I think they contest that we didn't get Dickey Act

permits for the burn pit.  They believe we should have had

Dickey Act permits for some sumps.

Again, though, their expert had no documents to prove that

people ever got Dickey Act permits for burn pits.  If you take

his opinion to its logical conclusion, anytime you placed any

amount of material on the ground that eventually contaminated

the ground, you were liable under the Dickey Act.  You turn it

into a strict liability statute.

1    Here the question under the Dickey Act is knowledge,

2  knowledge at the time that what you were doing could cause

3  pollution, could cause a nuisance.  So here you have to assume

4  that Lockheed Propulsion Company at the time knew what it was

5  doing, had the potential to cause groundwater contamination.

6  At the time, there were no prohibitions about liquids and burn

7  pits.  There were no prohibitions about some amount of dumping

8  on the ground.  And while, yes, we might have violated our own

9  internal standards, it was not out of the norm for the time

10  period.

11    So, again, you have to understand that LPC understood the

12  dangers of what was going on, and again, we did get permits.

13  We got all the refuse permits we needed.  We got all the air

14  permits we needed.  Whenever we had an evaporation pit that had

15  solvents in it, we got permits.  There's even an example in

16  record in 1971 --

17    THE COURT:  Could you go back to that slide one second?

18    MR. MURPHY:  I'm sorry.

19    THE COURT:  One more.  Go back one.

20    MR. MURPHY:  Here, Your Honor, they've talked about

21  Aerojet being a source of knowledge about AP at the time.

22  Again, there's no evidence, though, that anybody outside of the

23  Sacramento, that entity, that Region Water Quality Control Board,

24  was knowledgeable that AP could cause problems.  And again, you

25  have to look at what was going on at Aerojet.  It was a huge

facility.  It was dumping hundreds of pounds of AP in an
injection well or dredger pits on a daily basis.  It was an
engineered release to the groundwater, and again, they were
worried about it more from a danger to plant life than anything.

And again, there's no evidence that we knew at LPC -- in
fact, the only party that was involved at Redlands that was also
involved up at Aerojet was the United States government, and the
United States government wasn't warning its contractors at the
time about AP.

There's no evidence in any of the literature anywhere that
anybody knew that AP was a really big problem except at high
levels in the amount of boron, I guess is what the phrase is,
and boron is dangerous to plants in agriculture.  So again, we
have the Aerojet example.  But again, there's no evidence that
LPC should have known that what it was doing with AP could have
caused this groundwater contamination.

Going to the next slide, we did try to get all the permits
we needed.  We got refuse burns.  We've got rural burning
permits.  We've got evaporation permits.  We filed.  When we
thought our processes needed a Dickey Act permit, we applied for
the Dickey Act permit.  They allege that we violated the Dickey
Act permit because we didn't let everybody know that this burn
residue had AP in it.  But again, there's no evidence in the
record that we should have known that it had AP in it after a
burn, because that's what was burning.

```
1          THE COURT:  What was your response to the question of

2     whether you violated the permit for Laborde?

3          MR. MURPHY:  I don't think we did, Your Honor.

4          THE COURT:  I thought you got a permit to build two

5     ponds and you built five.

6          MR. MURPHY:  Well, Your Honor, we don't have the

7     evidence of whether we were allowed to build five or two.

8     Again, they allowed us to build two, so I don't understand why

9     -- and again, the evidence is the water board members inspected

10    our processes periodically, and there's documents in the record

11    that talk about them inspecting our procedures.

12        So -- here's the document.  Representatives of the Water

13    Quality Control Board in the Air Pollution District made periodic

14    inspections of the Redlands and Beaumont/Potrero facilities.

15         THE COURT:  This was '63?

16         MR. MURPHY:  I believe, yeah.  '67, Your Honor.

17         THE COURT:  Seems like the water board was asleep

18    along with everyone else.  There's something historical going on

19    that explains a shift in emphasis, but I don't know whether it's

20    political, frankly, with both the water board and the level of

21    sort of consciousness about water pollution was greater in the

22    '50s than the '60s or '70s.

23         MR. MURPHY:  Your Honor, I don't believe that to be

24    the case.  They identified certain things that were dangerous in

25    the 1950s.  They were worried about color, odor, taste.  They
```

1    had identified some very simple contaminants in the '50s that

2    were impacting -- so if you got your water and it was orange,

3    it's chromium.  So we've got to deal with chromium groundwater

4    contamination, or you get your water and it tastes really funny

5    like gasoline, that's clearly petroleum contamination.  If you

6    have a refuse dump that has lots of bad carbon and stuff going

7    into it, it gets into the groundwater.

8         So in the 1950s, they identified the obvious ones, the ones

9    that impact odor, taste --

10             THE COURT:  What about Aerojet?

11             MR. MURPHY:  Whenever they talk about Aerojet, there's

12   always a long list of problems with what they're doing.  Some of

13   those chemicals are in that list.  Now, AP is in the list in

14   1962, but again they identified it as a problem for plant

15   irrigation, not for drinking water.  In 1964 they did testing in

16   Sacramento and found that groundwater to be useful for all

17   beneficial use.

18             THE COURT:  At Aerojet.

19             MR. MURPHY:  At Aerojet.

20             THE COURT:  So was there something smelly or bad about

21   the taste in Aerojet?

22             MR. MURPHY:  No.  But again, they were looking at

23   their procedures, and they were putting a lot of AP in the

24   ground on a daily basis in gold dredger pits, and they made the

25   determination that that might impact the agriculture, so we're

1    going to have to put a limit not on what they're disposing of

2    but on the receiving waters.  And the receiving waters in that

3    area is the American River that runs right through Sacramento.

4    This was very close to that river, and that river is used for

5    agriculture.

6        So in the 1950s, they identified all the really bad stuff

7    that was impacting groundwater.  The problem with TCE, the

8    problem with AP, the problem with the stuff that didn't come to

9    light until the late '70s is it doesn't affect odor.  It doesn't

10   affect taste.  It doesn't affect color.  We came to understand

11   that at very low doses it becomes dangerous.  So that's when the

12   recognition of groundwater contamination of these types of

13   problems came to the forefront.

14       So that's why you see a renewed interest in the '70s and

15   '80s about new chemicals that they're starting to worry about.

16   And again, TCE is something you could have used to decaffeinate

17   coffee.  FDA didn't start looking at it until 1977.  So it's not

18   something that you would have known at the time was going to be

19   a big problem.  And again, AP was only known to be a problem in

20   very large amounts because it could kill plants.

21           THE COURT:  You made a point about the government's

22   finding of AP in the government sites, I think from the GAO.

23           MR. MURPHY:  Yeah, the GAO report.

24           THE COURT:  What was the highest level of AP in any of

25   those sites, if you know?  I know it's portrayed as above a bar.

```
 1              MR. MURPHY:  15 parts per billion, I think is the bar.

 2              THE COURT:  Do you know which ones came up higher than

 3      that?

 4              MR. MURPHY:  I don't, Your Honor.  Well, all the ones

 5      on the list, I think, are over 15 parts per billion.

 6              THE COURT:  Yes, but the question is how bad.

 7              MR. MURPHY:  I don't know if I know that, Your Honor.

 8              THE COURT:  There were parts of your facilities that

 9      were tested by Tetra Tech that were way over that.

10              MR. MURPHY:  Just the Beaumont facilities near the

11      burn pit, Your Honor, show very high concentration.  I think

12      also near the wash-out area there's very high amounts.

13              THE COURT:  You gave me a figure about the future for

14      AP cleanup versus TCE, I think.

15              MR. MURPHY:  Yes, Your Honor.

16              THE COURT:  But that isn't the real cost.

17              MR. MURPHY:  No.  That's a snapshot that you had

18      asked, what is in the record that would give me the ability to

19      compare cost in the future for AP and TCE, and that is using the

20      numbers that Lockheed and Tetra Tech developed as part of their

21      FS wrap in 2010 to estimate, to compare costs of alternatives,

22      moving forward to clean up the site.  So we just looked at the

23      O&M cost as an example.

24         Capital cost to treat up AP and TCE are very similar.  It's

25      the number of water treatment plants you have to build, mixing
```

```
1   basins, pipelines.  So the capital cost for actually building

2   the facilities themselves are pretty similar.  I think we've

3   built more AP treatment sites to date than TCE sites.

4            THE COURT:  Do you think that the future, whatever the

5   cost is, and you've estimated it at I think 200 million, maybe?

6            MR. MURPHY:  Yeah.

7            THE COURT:  We're working with a figure of about 500

8   million nominal dollars total, and then it's $300 million for

9   the past and $200 million for the future?

10           MR. MURPHY:  I think it's almost -- for all sites,

11  Your Honor, almost 300 for the past, and I think the estimate is

12  two, two something for the future.

13           THE COURT:  But is it fair that the theory is that

14  five times as much will be AP cleanup?

15           MR. MURPHY:  We don't know, Your Honor, and that's

16  the problem.  It all depends on regulatory limits.  Right now

17  there's talk about moving the AP limit down to one part per

18  billion in California.  It's clearly something that we don't

19  believe is appropriate, but if they move that down to one part

20  per billion, the cleanup costs will grow exponentially for AP.

21      Future AP costs will become the No. 1 cost driver because

22  we won't be able to use blending to supply clean water.  We'll

23  have to do a lot more treatment plants, Your Honor, and so the

24  costs will go up a lot in the future if it goes to 1 part per

25  billion.  So sitting here today, we have no idea what the
```

1    relative costs of -- and again, TCE might -- might reduce TCE as

2    well, and those costs might go up in the future.  Sitting here

3    today, we don't know what the cleanup costs are.

4         My associate, Mr. Fotouhi, just handed me -- here's the

5    relative cleanups of some the government -- it was part of the

6    GAO report.  It's Appendix 3, and it lists some highest parts

7    per billion numbers.  1229, Your Honor, is the exhibit number.

8              THE COURT:  This is the GAO report.

9              MR. MURPHY:  This is the GAO report, Appendix 3.

10             THE COURT:  Some of them are very low, and when you

11   get to Redstone -- where is that?

12             MR. MURPHY:  That's Alabama.  This is just the top

13   part of the list to share the title page.  California ones go

14   down even lower than McClellan.

15             THE COURT:  Can you move it down?

16             MR. MURPHY:  Just show the California ones.

17             THE COURT:  Is Camp Irwin here?

18             MR. MURPHY:  It's not, Your Honor.  I'm not sure

19   they've done sampling there.

20             THE COURT:  Sorry?

21             MR. MURPHY:  I'm not sure if they've done sampling

22   there or not, Your Honor.  They might have.

23             THE COURT:  Now, can I ask you to address that pump

24   issue for a moment?  Remember the south versus the north pump.

25   Can you bring up on the screen the diagram you rely on to say

1    that it goes north?

2            MR. MURPHY:  Yes, Your Honor.

3            THE COURT:  East, instead of the way that their expert

4    says.

5            MR. MURPHY:  I think there's a very easy explanation

6    for this, Your Honor, because neither party knows where the

7    water goes.

8            THE COURT:  Well, they have some evidence to show it

9    goes west.

10           MR. MURPHY:  Yes, Your Honor, but we have evidence to

11   show it goes the other way.

12           THE COURT:  What's your evidence?

13           MR. MURPHY:  Well, we put this up on the screen.

14   Your Honor, the problem we have is these are the sumps right here.

15           THE COURT:  Put aside this one piece, and let's focus

16   on the exhibit number which I -- is this 837?

17           MR. MURPHY:  Yeah.

18           THE COURT:  Now, I want you to take the notes and --

19           MR. MURPHY:  Blow up the notes?

20           THE COURT:  Yes, please.

21           MR. MURPHY:  Top right or bottom right?

22           THE COURT:  Bottom right.

23           MR. MURPHY:  Okay.

24           THE COURT:  And you see the star?  How do you read

25   that, No. 7?  That little cross...

1           MR. MURPHY:  "To culvert and road, sump drains over

2      dike."

3           THE COURT:  Indicates, "Earth dikes to close existing

4      drainage.  Top of dike shall be a minimum of two feet above

5      existing culvert and road."

6           MR. MURPHY:  Sump drains over dike.  So if we go --

7           THE COURT:  So you see those little crosses?  Yeah,

8      they're right there.

9           MR. MURPHY:  Yeah.

10          THE COURT:  Can that not reasonably be read to say

11     they're closing that down so the water won't go up there?

12          MR. MURPHY:  No, Your Honor.  I believe what this

13     said -- my reading of that, "Top of dike shall be a minimum of

14     two inches above existing culvert and roads.  Sump drains over

15     dike."  My understanding is there's a natural high at this

16     point.  So if you look at the Topo maps of this area, there's a

17     little bit of a high point in that area.

18          So the question I've always wondered, we don't know where

19     the pipe goes that comes out of the south sump.  If it releases

20     on the left side of that high, I think it would go to that

21     drainage -- we agreed that, generally, surface water should go

22     to the east -- no, I'm sorry, to the west.

23          THE COURT:  Downhill.

24          MR. MURPHY:  To the left.  It should go downhill, but

25     there's a natural high there.  So the question is where that

1    pipe goes, if it releases on the right side of that, it would go

2    along the existing drainage.  If it goes on the left side, it

3    would go to the other drainage.

4            THE COURT:  But you need to have the pump going to do

5    that.

6            MR. MURPHY:  Yes, you need the pump, and there's a

7    pipe, there's a 40-foot -- Mary Sitton's testimony was that

8    there's a 40-foot pipe that comes out of there.  The question is

9    whether it goes out of one side of the natural hill and goes to

10   the east or if it goes to one side and goes to the west.  They

11   look at that and say it goes to the west.

12           But even if it goes to the west, that little dot of

13   possibly water on the road, about a football field away from --

14   so Mary Sitton's point on this whole thing is that that little

15   dot that she sees is water, is not water?  What is it?  Darker

16   than water?  Of course, AP wouldn't make water darker than it

17   already is.

18           So do we know what that little dark spot is that's about a

19   football field away from the facility?  We don't.  Do we know

20   whether it's a source of contamination?  We don't.  Do we know

21   that the water from the south sump had AP in it?  Their experts

22   say we would have been lazy and just washed explosive wastes in

23   the south sump.

24           The facility was currently built to put wastes in the North

25   sump and take it to the evap pit in accordance with basic safety

1    procedures.  Mr. Cain, their expert, testified that these guys

2    would have known that if you let AP-contaminated wastewater get

3    out and get on the ground and let it crystallize, it was a

4    safety hazard.  It was a fire hazard.  It was little land mines

5    that could blow up.

6        THE COURT:  That's not so much letting it sit on the

7    ground as opposed to washing it down the wrong pipe.

8        MR. MURPHY:  He testified if you washed it on that

9    little south sump area and let it recrystallize and drove

10   machinery over it, you would get sparks, you would get little

11   pops, and he testified that these guys would have known.  And at

12   the same time, he said they would have been too lazy to slide

13   over the opening to the north sump and wash it properly.  This

14   is one of these areas where both parties are arguing based on

15   assumptions, based on not a lot of facts.

16       THE COURT:  I don't know how you distinguish that from

17   TCE, but anyway.  Don't go back there.

18       MR. MURPHY:  Okay.

19       THE COURT:  One last question, I think, on this

20   subject area.  You continually say that the government had

21   the duty as well as the opportunity to inspect, direct, manage.

22   I understand your argument on opportunity, but exactly where --

23   other than them telling them once in 1971 to dump in the burn

24   pit, and even that doesn't tell me that they had the duty, where

25   do I find duty?

1        MR. MURPHY:  Well, Your Honor, under operator, the

2    government has made its position in the slides that there's an

3    optioning duty doesn't matter.  The question under Best is

4    actual control.  So I think I would agree with them on that

5    point that if you're looking for owner/operator liability, the

6    first question is actual control, and that's taken from their

7    slides and I agree with them.

8        But here the duty comes from the duty of the fact that they

9    owned the waste.  There was testimony -- Grant Speer estimated

10   they owned 90 percent of the AP at the site.  Clearly the

11   government doesn't believe that.  They believe it's less, but

12   they owned a substantial portion of this AP through the contracts.

13   They had a duty, because it was their waste, to deal with

14   it properly, to make sure it was disposed of properly, either by

15   us or by them.  And again, all these contracts were with the

16   government.  The government was the ultimate party here running

17   the solid rocket industry.  They managed the solid rocket

18   industry as if it was theirs.

19       So, again, that duty comes from the idea that they owned

20   the waste, they were the contractor, they were the party buying

21   it, and so they wanted to assure that these materials were

22   disposed of properly.  You look at the way they managed the

23   industry, the SRAM.  As soon as LPC was able to build the SRAM,

24   the government came in, took all the intellectual property from

25   the SRAM, all the plans for it and pre-existing intellectual

property of LPC and gave it to our major competitor Thiokol and
tried to get them to -- qualify them as a second source to
either lower the price and create competition or to replace LPC
through several of the production contracts.

So I think duty comes from their view of these contractors
as doing their work.  And they owned some of this AP, and so
they had a responsibility to make sure --

THE COURT:  It was contracted for somebody to do the
work.  It's not as if they've hired you to provide workers who
work for the government.  They work for -- in the SRAM, you're
the subcontractor.  To say that they were doing the work, their
work, yeah.  But that's true under any contractual relationship.
You weren't out there doing it on your own.

MR. MURPHY:  Can't they take a duty to maintain or
dispose of their waste under contract?  I mean, if they're
imposing disposal in our contracts, if they impose safety
standards or disposal practices that they are then inspecting to
ensure we're following and to make sure it works properly --

THE COURT:  Where's the evidence that they actually
go to the burn pit and worry about whether or not the containers
are being properly burned and this and that?  You say they come
up with standards, yeah.  Put this stuff in the burner.  That's
pretty loose.  I don't know that there's any evidence that they
would go -- I know when they disposed of it at the end of the
day, at the end of the contracts.  There's witnesses.  But on a

1    day-to-day basis, when you're carrying on the activities of

2    putting things in a burn pit or an evaporation pit or in a

3    garbage disposal place like Laborde Canyon, how do we know the

4    government's paying any attention whatsoever?

5            MR. MURPHY:  Well, Your Honor, we have --

6            THE COURT:  You make it sound like the government is

7    everywhere.  There are plenty of documents that say that up to a

8    point, the government was not to be seen almost, and you call us

9    when you want us.

10           MR. MURPHY:  There's a difference between inspections

11   from a quality assurance standpoint and inspections for safety

12   standpoints, and I agree the government is not there all of the

13   time.  The question is whether they have some operator liability

14   from what they were doing at the site.

15       Here, I believe that there's plenty of evidence that they --

16   so, for example, I think it was the Air Force Program Management

17   Evaluation.  It was the bigwigs from the Air Force came to the

18   site and said, okay, how are you going to build the SRAM.

19   One of the things they looked at was disposal practices, and

20   they looked at how we disposed of waste, and they reviewed it.

21           THE COURT:  They have that big thing where they

22   discuss process specifications.

23           MR. MURPHY:  So we have evidence that they're looking

24   at our process specifications and reviewing them.  We have

25   evidence that they're looking at how we're handling solvents at

certain times and how they go through drains.  We have evidence
that they're telling us to take trimmings, use water in
trimmings and take them to the burn pits.

The one document you talk about is the containers.  They
said we should use metal containers with clasps, and we said,
no, we should use hamburger cartons.  In the follow-up letter
where they cite us for violation, they cite the 1968 manual --
here it is -- and they cite a paragraph, 1502i.  You're
violating this.  You should take these wastes -- and again, if
you look at that paragraph number, it's talking about containers
to burning grounds.

So here you have some interest or some involvement in DCAS
and Air Force people with our day-to-day operations.  And again,
were they there every day?  I'm not going to tell you they were
there every day.  Were they the ones that were there all the
time?  No.  But the question is whether they exerted enough
management and direction to be an operator under the Best Foods
case, and here we them telling us to burn.  We have them telling
us how to run our facility, through their inspections, telling
us how to handle certain wastes, telling us where to put them.

So, Your Honor, again, if you look at the contractor manual
that was incorporated into our contracts, it's very specific.
At one point, they say you can't put any buildings within
certain amount of feet of a burning area, and we had to get a
deviation to put our lunch room, where the burn pit was in

1    relation to our lunch room.

2         There is plenty of evidence in the record that they were

3    there, looking at how we ran our facility, trying to help us

4    manage, and managing, because we were doing their work all of

5    the time.  This work in the solid rocket industry was done by

6    contractors, and only a few contractors, for the government.

7    So there were inspectors there making sure we were operating the

8    plant correctly and making sure that we did what they required

9    us to do.

10        So again, am I saying that -- are we presenting a case

11   where the government was there all the time?  Not even close.

12   But they were there enough.  They were there managing our

13   procedures and our management of waste.

14        THE COURT:  You take the testimony from the one

15   gentleman who was there that would barely opened their mouths,

16   and were not there doing the kinds of inspections you're talking

17   about, plus the attitude of sort of stand back and wait until we

18   call, the frequency with which they exercise any control is

19   highly debated, contested.

20        MR. MURPHY:  Again, Your Honor, you have to go to the

21   fact that we don't have all of the documents.  What we have is

22   what we have.  You're never going to have a complete documentary

23   record from the '50s and '60s.  You're just not.  And we have

24   more SRAM documents than we have earlier documents because that

25   happened later in time.  So maybe people threw out documents in

1    the '50s and '60s.  We don't know.  What we have is what we have.

2              THE COURT:  You have this testimony of a policy under

3    McNamara of disengagement.

4              MR. MURPHY:  Yes, Your Honor.

5              THE COURT:  I don't think anybody contests that, that

6    the notion is that you're given a contract, produce a product;

7    the product's got to meet the specs and has to work and it's

8    supposed to be timely, and the government wants to make sure

9    they're getting their money's worth, however they figure that

10   out.  Beyond that, it becomes more debatable about the level of

11   day-to-day control over what's important, which are the waste

12   disposal practices.

13             MR. MURPHY:  And again, Your Honor, that was one

14   contract.  That was the SRAM contract.  It was our largest

15   contract, and it was the development part of that contract that

16   disengagement applied to.

17        Now, Mr. Dull, I think, testified that they stood back and

18   didn't say anything.  Even in his testimony he recognized that

19   certain documents seem to contradict that policy.  And again,

20   when the SRAM was starting to fail or not fail but LPC was having

21   trouble building this rocket, we have plenty of evidence the Air

22   Force stepped in and helped us build the rocket.

23        So disengagement, to the extent that it was applied to

24   SRAM, failed.  The Air Force was there.  Mr. Solid Rocket

25   himself, Mr. Ross, was visiting our site on a regular basis to

1    make sure we could build the rocket.  Now, Mr. Dull was based in

2    Ohio and came out every couple of weeks, he said.  Mr. Ross was

3    based 70 miles away, and if you read Mr. Dull's notebooks, he

4    documents the fact that Mr. Ross is there a lot, a lot more than

5    he was.

6         So again, the question remains, we have evidence that

7    disengagement was not applied.  We have evidence that the Air

8    Force took direct review and oversight over LPC.

9         THE COURT:  He did say that he had technical

10   discussions, talking about Ross.  I agree they're involved in

11   the technical side, and I don't think anybody is going to -- and

12   as you said, quality assurance, which is the technical side,

13   it's not the same thing as safety.

14        MR. MURPHY:  And there's no evidence that disengagement

15   applied to the DCAS reviews and DCAS safety inspections, Your

16   Honor, because we were doing other contracts beside SRAM.  I

17   mean, SRAM was one contract.  We had other contracts that were

18   going on at the same time.

19        THE COURT:  So in terms of any kind of -- you make no

20   distinctions among contracts in terms of responsibility, so to

21   speak.  You made no distinctions between sites?

22        MR. MURPHY:  Well, Your Honor, I think in terms of

23   costs, clearly Redlands is the cost driver.  It's the most

24   expensive one.  I mean, Beaumont --

25        THE COURT:  But in terms of the conduct of either

1    party, you don't think that there's any real distinctions to be

2    made.

3              MR. MURPHY:  It's hard to make those distinctions,

4    Your Honor, because you have an entity that's doing contracts

5    that used all three sites to perform those contracts.

6         The sources at Laborde Canyon and Potrero are much clearer.

7    You have the burn pits.  You have the wash-out area.  You have

8    the test stands.  You have a couple other areas as well that are

9    much smaller, lower level, but you know where the contamination

10   is because it doesn't move.  The groundwater in that area doesn't

11   move very fast and doesn't move very far.  So the contamination

12   still exists very near to where the disposal occurred.

13             THE COURT:  We're not in a TCE debate or a sump north

14   and south.  It's pretty easy.  It's fair to infer that the burn

15   pits -- how many burn pits were there at Redlands, do we know?

16             MR. MURPHY:  There's one burn pit area at Redlands in

17   the far north center part of the Redlands facility.

18             THE COURT:  This one?

19             MR. MURPHY:  I think there might have been two

20   different areas, but they're right next to each other.

21             THE COURT:  And there was one evaporation pit?

22             MR. MURPHY:  There were several evaporation pits,

23   Your Honor.  There's a major one we've talked about a lot, which

24   is Evaporation Pit 61, but there are several other ones.

25             THE COURT:  Did they stop using evaporation pits, or

1    just one of them?

2         MR. MURPHY:  At some point, they stopped getting

3    permits for the evap pits in like 1966.  So we believe that

4    that's the point in time where they stopped using the evap pits

5    for solvents and started burning the solvents more often at

6    Potrero, and we believe those evap pits were useful for

7    explosive wastes but not solvents, but we don't have a lot of

8    evidence on that issue.

9         THE COURT:  And evaporation pits were used basically

10   for --

11        MR. MURPHY:  It was a way to take liquid waste that

12   either had propellant in it, or propellant and solvent in it, or

13   just solvent --

14        THE COURT:  It's both TCE and AP.

15        MR. MURPHY:  Yes, Your Honor.  And you put it in the

16   evap pit, you let the liquid evaporate.  The thought is you

17   would scoop the sludge, take it to a burn pit, and burn it.

18        THE COURT:  Why is it not conceivable or just as

19   possible that the burn pits at Redlands are the main culprit as

20   opposed to worrying about degreasers and/or dumping?  Let's

21   assume that both of them may or may not have happened the way

22   you argue, even though both theories have some problems.

23   Everybody agrees that burn pits are evil now.  You can tell that

24   from the Beaumont sites.  I don't know why I'm looking for a

25   culprit over in Redlands.  I have an obvious one:  evaporation

1    pits and burn pits.

2         MR. MURPHY:  There's ways to investigate a site,

3    Your Honor, to look to see where contaminants are.  So when you

4    look at -- as you said, the Beaumont sites, it's clear the burn

5    pits, there's solvents, there's break-down products of solvents,

6    there's stuff in the soil, and there's stuff in the groundwater.

7    So when you look at a site, there's materials that can be either

8    in soil or in groundwater.

9         THE COURT:  You just flipped up page 156.  Is this an

10   exhibit?

11        MR. MURPHY:  This is an exhibit taken from the Stan

12   Feenstra report.  We've annotated it with names, but that's all.

13        THE COURT:  This is describing the process.

14        MR. MURPHY:  And this shows -- as I said, there's been

15   very few investigations on the site of Redlands, because the

16   early on-site investigations showed not a lot of contamination

17   at Redlands.  If you look along the west side of this map, there

18   are red dots.  Those are groundwater wells that go all the way

19   to the groundwater.  There's only one well on the site that has

20   had TCE ever found in it in the site investigations, and that's

21   the lower left-hand corner.

22        The burn pits are all the way up at the northern end.  You

23   see there's a red dot near that?  So you see there's no TCE in

24   the groundwater there, and the groundwater here moves pretty

25   much east to west.  So you would expect, if TCE was still hung

1    up in the soil or if TCE was still being released at the site,

2    you'd see it in those groundwater wells as it's moving from east

3    to west.  The only well that's ever shown TCE in it is the lower

4    left-hand corner.

5         So Dr. Feenstra, in his report, talks about the fact that

6    that indicates you are getting TCE only from that production

7    area at the site.  He also -- and this isn't TCE, but if you

8    look at AP, you're getting AP from both the north wells and the

9    south wells, meaning that there's probably --

10             THE COURT:  I don't know that.  Where are you talking

11   about AP?

12             MR. MURPHY:  It's not on this map, Your Honor.  It's

13   in his report, though.  It's in his affidavit.  He talks about it.

14             THE COURT:  And he says where is AP?

15             MR. MURPHY:  He says you're finding AP in the

16   groundwater wells in the north and in the south.

17             THE COURT:  All the way up and down?

18             MR. MURPHY:  No, just the north wells and the south

19   wells.  So I think he testifies that he believes that the burn

20   pits are a source because they're the only thing really in the

21   northern area as well as some other buildings.  But the burn pit

22   is a source of AP, and also he says in his report that there's

23   probably some AP coming off the production area as well.  But

24   for TCE, you're only getting it in that lower well.

25         Now, there's another way to determine where TCE is in the

1    soil, and it's called soil gas hits.  So you can do a soil gas

2    investigation of a site.  Here there's been a couple of soil gas

3    investigations done at the site, and the only place they find

4    TCE in the soil --

5              THE COURT:  You're now looking at 157.

6              MR. MURPHY:  Yes, Your Honor.  So the only place you

7    find TCE in the soil is around the northern part of Building 91

8    where the vapor degreaser was.  You don't find TCE anywhere else

9    at the site in the soil but there.

10             THE COURT:  Water goes to the west.  What's it doing

11   north and east of the building?

12             MR. MURPHY:  Your Honor, how you measure soil gas is

13   you take kind of almost a vacuum and put it on top of the ground

14   and you're sucking up the vapor, because TCE is a volatile

15   organic solvent.  We've talked about how it evaporates over

16   time.  Any TCE left in the soil will give off vapor, so you can

17   basically smell it, And that's what soil gas hits are.

18        So what you're doing is getting vapor, and vapor is

19   notoriously -- it's hard to make a determination about where

20   vapor is, because it moves through preferential pathways.  But

21   again, the soil hits are in the area near Building 91.  And

22   you're right.  It's on the other side of the building from where

23   we thought the pipe went, but again, we think that pipe was

24   moved at some point in time when they built the extension on

25   Building 91.  And that's, again, I think that's in Dr. Feenstra's

1    report.

2            THE COURT:  What pipe?  You mean the drain that's

3    contested whether there was one?

4            MR. MURPHY:  The drain went underneath the building to

5    the east until 1966.  In 1966 they built a building -- they put

6    an extension on the building.  We believe the pipe moved.  We're

7    talking about the minutiae here, Your Honor, but we put in --

8    there's a shop order that talks about moving the pipe to that

9    side of the building.  The government believes it's from another

10   building to that area.

11       It's one of the many factual disputes that we have about

12   the vapor degreaser.  But again, on this site we have TCE near

13   Building 91.  We have TCA hits in a lot more areas at the

14   facility.  It's not in this exhibit we put on our slide, but

15   it's in the record that those soil gas hits show TCA across the

16   facility, not in the groundwater but in the soil.

17       So again, these volatile organic solvents still exist in

18   very, very, very, very low amounts in the soil at this site, and

19   you can still find them through these soil gas investigations.

20   And the burn pits, if you had thought the burn pits were a

21   source, you would think you would find soil gas hits up at the

22   burn site --

23           THE COURT:  Well, do I?  I can't tell.

24           MR. MURPHY:  You do not.  You do not.  There are no

25   TCE hits at the burn pits for soil gas.  And again, there's no

1    wells west of the site that show TCE contamination in it.  So

2    that's why we don't think the burn pit is a source of TCE at

3    this site.  And again, we had evap pits for solvents up until

4    1966, and by 1966, Potrero became one of the major burn sites,

5    Your Honor, and we know we've got lots of solvents in the

6    groundwater at Potrero.

7           THE COURT:  It just seems to me what you know about

8    Potrero and the Beaumont sites can be extrapolated, which is the

9    burn pits.  And evaporation pits, maybe.  They didn't have any

10   evaporation pit.

11          MR. MURPHY:  At Potrero, no.

12          THE COURT:  Caused the problem.  I guess you should

13   wrap it up, and we'll then take a break.

14          MR. MURPHY:  Okay.  Well, are there any other issues

15   you want to cover, Your Honor?  I have a lot that I haven't

16   covered.

17          THE COURT:  Is there anything I haven't covered?

18   I think I've covered most of what I meant to.  One second.

19       (The Court conferring with law clerk.)

20       Sorry.

21          MR. MURPHY:  I want to just mention Building 52 for

22   a second.  It's one of the buildings we mentioned; we didn't

23   actually get into it.  Again, we have points in time for

24   Building 52 that we have documents talking about it.  The first

25   is November 6, 1958, where a memo, internal memo at LPC

1    basically recognizes that mixture parts are being cleaned

2    manually in Cyclohex and drained toward the large evap pit, and

3    he recommends not doing that anymore.

4         Now, Cyclohex is a petroleum-based solvent.  It's not TCE;

5    it's not TCA.  It's a petroleum-based solvent, and we don't know

6    whether those mixer parts had AP on them or not.  We don't know

7    whether this came after a cleaning or before a cleaning, so we

8    don't know how much AP was actually being released at the time

9    in 1958.  So go to the next slide.

10        What we do know is that by May of 1960, there's an internal

11   letter again talking about this and talking about an Army

12   inspection that took place in 1958.  And again, this document is

13   referencing an Army inspection in 1960 and talking about

14   Mr. Brown, who is an Army inspector that had visited earlier in

15   1958.

16        So, "At that time, Mr. Brown, the Army inspector, doubted

17   the efficacy of our drain system at 52."  And again, he's not

18   talking about solvent at this point.  He's talking about the

19   closed drain.  There are prohibitions against closed drain for

20   explosives in some of the Army manuals.  The thought is if you

21   put explosives in that, it could explode because it would

22   accumulate over time and you wouldn't know it was accumulating.

23             THE COURT:  That's my point about safety.  He's not

24   worried about that; he's worried about combustion.

25             MR. MURPHY:  But again, Your Honor, safety at this

site meant disposal practises.  You have to dispose -- AP mixed

with anything, AP mixed with TCE becomes a fire and explosive

risk, so you have to manage it and dispose of it correctly.

So the safety inspections were talking about waste disposal

practices.  So here they're talking about the fact that that

closed drain goes westward under the barricade of the evap pit,

and it says "to the evap pit" here.  So here we have an

indication that that line went to the evap pit.

THE COURT:  They had a picture.

MR. MURPHY:  They do.  And their witness talks about

the fact that I think it was in 19 --

THE COURT:  63.

MR. MURPHY:  Or '62.  So here, this is in July of

1960, he's talking about -- there's a six-inch pipe that directs

water to the evap pit.  He talks about the procedure they use

where, during mixer cleanup operations, they take solvent, put

it in the mixer, run it, and then pour all that stuff in the

55-gallon drums that are taken to the evap pit directly, and

then only after that cleaning do they hose down things and that

wash water then goes to the evap pit in that six-inch line.

The point being that we don't know -- as soon as

Mr. Stickney figured this out in 1958, they might have stopped

putting the AP in the line right away.  We don't know.  But

there's clearly -- that 18-inch pipe that they're talking about

is a storm-water discharge.  It's designed to take water near

1    the evap pit.  The line that they built, that six-inch line they

2    put in that goes to the evap pit, I think even Ms. Sitton

3    recognizes that at some point it hooked into the evap pit.

4              THE COURT:  Yes, I agree.

5              MR. MURPHY:  The question is not only when did the

6    line go in there; the question is did they change their

7    practices right away to the point where they're only putting

8    wash water after they already cleaned, and cleaned up the

9    solvent into this pit, into the line or not.  And we don't know

10   when that happened.

11        So again, this is one of these areas where we recognized a

12   problem, we talked about a different problem about safety with

13   the Army, and we were working together to make sure we're

14   operating the facility correctly.

15             THE COURT:  We'll take a 10-minute recess, and the

16   government will go to twenty of 1:00 and resume at 2:30.  Okay.

17   Thank you.

18        (Recess from 11:18 a.m. to 11:40 a.m.)

19             THE COURT:  Mr. Sullivan.  Good morning.

20             MR. SULLIVAN:  Good morning, Your Honor.

21   John Sullivan from the Department of Justice for the United

22   States.  First of all, Your Honor, I'm just going to go

23   chronologically through Lockheed's presentation.

24        The United States is not an operator under Best Foods

25   because it did not manage, direct, or conduct operations

1    specifically related to pollution or waste disposal or

2    environmental compliance.  And I noted in one of your questions,

3    Your Honor, you were asking Mr. Murphy about sloppy practices,

4    and our position is that the most important thing is not whether

5    the practices were sloppy, average, or careful, but that they

6    happened and that Lockheed did them and that they caused the

7    contamination.

8            THE COURT:  Let's go to the heart of what bothers me,

9    which is, I'm assuming -- and maybe I'm wrong -- that burn pits

10   are certainly a big contributor at both sites, especially for

11   AP, and I don't know about TCE.  The last question and answer

12   raised some questions about TCE in burn pits.  But AP.  You tell

13   them to put the stuff in the burn pits.  So I know that much.

14       And at least up to a point, you, the government, own AP.

15   Maybe not all of it, maybe not all that landed up in the ground,

16   but we have a couple of uncontested facts:  Burn pits are the

17   sites of contamination, AP was in the burn pits, you owned AP at

18   both sites, and you told them to burn it in burn pits.  Do I

19   ignore that?

20           MR. SULLIVAN:  First of all, Your Honor, it's without

21   question that the burn pit is a major source of contamination at

22   Potrero, but at Redlands, Dr. Feenstra said that in terms of

23   groundwater monitoring, the highest level of perchlorate is

24   actually found in the southwest part of the site, which isn't

25   even close to the burn pit.  In fact, my recollection of the

```
 1    sampling done at the burn pit area demonstrated very little
 2    contamination.
 3              THE COURT:  That's helpful.  Certainly not true at
 4    Potrero.
 5              MR. SULLIVAN:  At Potrero, it's clear.  The evidence
 6    is very clear it's a major cause.
 7              THE COURT:  And Laborde Canyon.
 8              MR. SULLIVAN:  Laborde did not have a burn pit.  But
 9    basically at those two sites, the groundwater points to the area
10    that probably caused the contamination.
11              THE COURT:  And Laborde, what do you call it, a waste
12    disposal --
13              MR. SULLIVAN:  There's a waste discharge area.  I'd
14    have to look up my notes on the slides, but there was a rocket
15    testing area that appeared to have wash water dispersed around.
16    There was also another disposal area, and I think it might have
17    been in a sanitary landfill or a garbage disposal area.
18              THE COURT:  You, referring to the government, were
19    aware of the hog-out that was going on at various sites, right?
20              MR. SULLIVAN:  We never contracted with them to do
21    hog-outs, and I haven't seen evidence that we ever inspected the
22    hog-outs, saw the hog-outs, approved the design of the hog-outs
23    or anything.  I haven't seen anything about that.
24              THE COURT:  Well, isn't it a fair inference, if AISLIC
25    was doing hog-outs, you hired them to do that?
```

1           MR. SULLIVAN:  AISLIC is kind of different,

2    Your Honor.  In the AISLIC situation, we specifically contracted

3    with the operator at that site to do hog-outs with water, and we

4    specified hogging out with water, washing out with water.

5           In fact, Your Honor, something else happened there.  The

6    United States had rocket motors that they needed to have

7    refurbished, and so they sent them to Whittaker and specified

8    that they be cleaned out with the hog-out water process.

9           THE COURT:  Well, what did they do for hog-outs at the

10   Beaumont sites?

11          MR. SULLIVAN:  My understanding is they used high-

12   pressure water.

13          THE COURT:  Water is water.

14          MR. SULLIVAN:  The process was the same, but the

15   United States didn't specify that process here in this case.

16          THE COURT:  I don't know when AISLIC was, but it -- it

17   would have been subsequent, but I'm saying that was a normal,

18   acceptable, foreseeable process.

19          MR. SULLIVAN:  It was a procedure that developed.

20   Exactly when and how it developed is a little uncertain.  I know

21   that Mr. Heeseman actually testified that in the early '60s they

22   were removing the rocket motor casing material in a different

23   procedure.  They were actually soaking it out in -- they were

24   actually using the burn pits, putting motors in the burn pits in

25   solvent and soaking and pushing the residual material out.

1          THE COURT:  Both sides -- I don't find this whole

2     arranger, operator, owner or business particularly useful at

3     allocation.  I understand about liability better.  But putting

4     that aside, if hogging out was a source of AP contamination, why

5     are you not accountable to some extent?  You, the government.

6          MR. SULLIVAN:  Well, Your Honor, because, number one,

7     we didn't contract with them to do it.  That's number one.

8     Number two, they designed the whole process, including the part

9     of the process where the wash water went on bare ground.  They

10    didn't have to let that wash water go on bare ground.  In fact,

11    Your Honor, they didn't even bother to file a notice of waste

12    discharge under the Dickey Act with the water board, and if they

13    had, they probably would have faced tough issues with the water

14    board in terms of their wastewater complying, and they didn't

15    bother to do that.

16         THE COURT:  Do you have a permit for any of the

17    military sites where you did hog-outs at any point in time

18    before, say, 1980-something?

19         MR. SULLIVAN:  Your Honor, I don't know anything about

20    any of these other sites.

21         THE COURT:  Your witness testified that nobody had

22    permits for this, that he was aware of.

23         MR. SULLIVAN:  For what?

24         THE COURT:  For hog-outs, AP, TCE.

25         MR. SULLIVAN:  Well, in California, under the Dickey

1    Act, if you're going to dispose of liquid or solid industrial

2    waste, that's the law.  You were supposed to file a report of

3    waste discharge, which starts a permitting process.  I think

4    that's a unique law, Your Honor.  I don't think that was the

5    United States.

6            THE COURT:  But if the U.S. government wasn't

7    following it and he's unaware of anybody else doing it, other

8    than what happened to Aerojet, which is perhaps distinguishable,

9    I just don't see where the Dickey Act gets me.  Plus I have to

10   make findings regarding what they would have done.

11           They didn't seem like they cared a hoot.  They went out

12   there and investigated what they were doing in Beaumont, they

13   looked at the things that they did permit, and in 1980-something

14   they said, well, we didn't have any way to measure AP.  He can

15   say what he says about the Dickey Act, but if it's true, it

16   means, everybody, including the United States government, was

17   ignoring this.

18           MR. SULLIVAN:  Well, Your Honor, I don't have

19   information that the United States was ignoring it.  I don't

20   even have information whether they were subject to it in light

21   of sovereign immunity.  I just don't know these facts, Your Honor.

22           THE COURT:  All I can say is that the government, one

23   of your biggest problems on this area is that I don't see that

24   the government, in their own operations, operated, with some

25   exception, terribly differently.  So how can I find much to

1    complain about?

2           MR. SULLIVAN:  Well, Your Honor, all we can see from

3    the charts that have been put up is that there's contamination

4    at other sites, but we don't know how it happened.  And we just

5    don't have any evidence to compare those other sites to this

6    site, and we don't have evidence to compare it to what was known

7    at those sites or actually who did the work at those sites.

8           THE COURT:  Yeah, but I think we have enough evidence

9    to say that burn pits were used by the government; hog-out was

10   used by the government, or they contracted other people to do

11   it; and they had Superfund sites.  We know that.  And they had

12   AP -- I don't know about TCE, but they had AP at government sites.

13          MR. SULLIVAN:  Yes.  That's true, Your Honor, and we

14   are cleaning up those sites.

15          THE COURT:  That's not the point.  It seems a little

16   bit peculiar for us to stand on a pedestal and criticize

17   Lockheed Martin if they were doing what the U.S. government was

18   doing, because the simple explanation is I don't think people

19   really understood back then.

20          You're assuming a level of knowledge based on one witness

21   who has very little scientific evidence to support that position

22   that AP and TCE were known to be potential contaminants of

23   water, and that they were measurable, and, the third supposition

24   is that the board, the water board, would have done something

25   about it had Lockheed filed the right paperwork.  That's a lot

1    of conjecture.

2              MR. SULLIVAN:  Well, Your Honor, the bottom line is

3    the law's the law.  Lockheed was supposed to comply with it.

4    Lockheed failed to comply with it.  So we will never know what

5    happened if they had.

6              THE COURT:  What about the indirect discharge?  Up to

7    a point, it wasn't so clear about that either.

8              MR. SULLIVAN:  Indirect discharge?

9              THE COURT:  Yeah.  You're just saying you should have

10   reported it, but they wouldn't have done anything about it if it

11   were indirect.  We know that.

12             MR. SULLIVAN:  We'll, that's simply not true under

13   the law.  The law that applies to the notices of filing waste

14   discharge doesn't distinguish between indirect and direct.

15             THE COURT:  But up to a point, whether they would

16   regulate it, it did.

17             MR. SULLIVAN:  Well, you don't know until you file a

18   notice of waste discharge to the board.  And as Mr. Bauer said,

19   on the burn pits, since they were disposing solids, liquids,

20   semi-solids, and solvents, the water board did have authority to

21   impose requirements there, and they probably would have treated

22   those as Class 3 dumps, and that's what Mr. Bauer testified

23   based upon his experience in working before the water board.

24             THE COURT:  It would be better if you could point to

25   some instance other than Aerojet where they did something.  But

1   anyways.  Okay.  I think that you keep skirting the issue, which

2   is you tell them to burn, and burn pits are a problem.  So why

3   should I spend any time castigating anybody for that?  Why isn't

4   that just, for lack of a better word, no pun, a wash?

5            MR. SULLIVAN:  Well, Your Honor, we're not trying to

6   castigate.  The safety manuals provide two options: burn pits or

7   burn pans, and you're not allowed to burn to concrete because

8   it's very dangerous.  And it's not a matter of what they did;

9   it's how they did it.  It's not just burning propellant or AP in

10  the burn pits; it's dumping all these wastewaters, dumping drums

11  of solvent in there.  And you can see the pictures.  It's not

12  even orderly.  They're just all dumped on their sides.  It's the

13  way they operated it that caused the problems, and the United

14  States had absolutely no control over that.  They did it.  We

15  didn't.

16           THE COURT:  And what do you say about the hog-outs?

17           MR. SULLIVAN:  The same thing, Your Honor.  I have

18  seen absolutely no evidence that the United States ever

19  inspected the hog-out operation, ever saw the hog-out operation,

20  ever knew that they were discharging contaminated wastewater on

21  bare ground.  That's something that Lockheed knew, but I've seen

22  absolutely no evidence that the United States knew what they

23  were doing.

24       And, Your Honor, you can operate a hog-out operation

25  without causing contamination.  They had plenty of land out

1    there.  They could have built a large parking-lot type structure

2    for an evaporation pit and captured all the water, and that

3    wouldn't even be very expensive, Your Honor.  But they didn't.

4    They just dumped it on bare ground.

5         And, Your Honor, when you look at safety manuals, they do

6    not address how to design, construct, or operate the burn pits.

7    They don't say to dump TCE, chemicals or other solvent on bare

8    ground.  They don't say to dump wastewater on bare ground.  The

9    manuals don't say to ignore applicable state laws.

10        And it's interesting that Lockheed talks about being in

11   compliance.  They certainly didn't hesitate to get air permits.

12   Why they didn't get water permits for the water pollution

13   problems, we don't know.  They just didn't do it.  But they were

14   certainly trying to get their air permits.

15             THE COURT:  Their argument is that nobody knew to do

16   that because they didn't realize what was going on, including

17   you.  And I don't know how you respond to that GAO study, which

18   is -- what exhibit number is that?  1229.  Can you put that up

19   here?  I mean, everybody sort of after the fact is very

20   concerned about what they didn't know and how they created

21   problems.  Look at the quote from NASA.  Can you find that,

22   where they referred to NASA?

23             MR. SULLIVAN:  Is this where NASA said they didn't

24   understand the risks of what they were doing?

25             THE COURT:  Yeah.

1          MR. SULLIVAN:  Well, perhaps they didn't.

2          THE COURT:  Well, I don't see how I can apply a

3     different standard.

4          MR. SULLIVAN:  Well, Your Honor, we're not asking you

5     to apply a standard.  As I said in the beginning, the key thing

6     is *their* waste disposal practices caused the contamination, not

7     the United States.  So that's the most important thing to look

8     at:  What caused the contamination?  They did.

9          And in terms of care, the question is, what did Lockheed

10    know at the time?  What was going on at their site at the time?

11    What was going on in the State of California at the time after

12    the Montebello incident?

13         THE COURT:  That's what I keep telling you.  I'm going

14    to consider what was going on with the federal government, too.

15    This is the DoD, DOE, and NASA.  That's pretty much the federal

16    government.  So that's what's going on.  That's slide 187.

17         So if I took the context, I can't ignore that.  You're

18    saying, well, Lockheed's on better notice, should be smarter

19    than the U.S. government, should be more forthright than

20    everybody else?  Including the water board?

21         MR. SULLIVAN:  No.  All we're saying, Your Honor, is

22    what did they know and how did they behave based upon what they

23    knew.  I'm not even asking that they be compared to anybody

24    else.  What did they know truthfully?  And there's evidence

25    about that.  But again, the big thing is, even if you assume

```
 1        these practices were above standard, excellent practices --

 2                 THE COURT:  Legal.

 3                 MR. SULLIVAN:  Yeah, legal.  I'm not saying that

 4        they're not legal.  Even if you assume that these are all the

 5        correct practices, the issue is, did they cause the

 6        contamination, and we submit the evidence shows that these

 7        practices, whether they were good, bad, or ugly, caused the

 8        contamination.  And that's the key here, Your Honor, and in

 9        CERCLA cases, that's the key thing that courts tend to focus on:

10        Who conducted the operations that caused the pollution that's

11        causing cost to be incurred?  And it's very clear, the evidence

12        demonstrates that Lockheed did that.

13            So you could even ignore the Dickey Act and Lockheed still

14        did all these things.

15                 THE COURT:  Okay.  I understand that argument better

16        than trying to hang them on the Dickey Act.

17                 MR. SULLIVAN:  No, you don't have to hang them on the

18        Dickey Act; just hang them on what they did.

19                 THE COURT:  Okay.  So what did they -- let us examine

20        what did they do.  What do you say about who owns, to the extent

21        that's relevant -- or is it relevant?  -- that the ownership of

22        AP, TCE.

23                 MR. SULLIVAN:  The ownership of AP and TCE isn't

24        relevant as best I can tell to any of the standards of

25        liability.  The question is who owned or possessed the waste.
```

```
 1    It's our position based upon Mr. Nagle's testimony that the
 2    United States did not own, or possess the waste.
 3            THE COURT:  And what did he say about that?
 4            MR. SULLIVAN:  He said that there are simply no
 5    provisions under the applicable contracting laws that say that
 6    any of the title-vesting type provisions would cause the
 7    United States to own the waste.  Period.
 8            THE COURT:  So can you flip up the screen, Lockheed's
 9    170, please?  I want you to tell me what caused the pollution.
10    They say these are the things that did it.  You're not accepting
11    this, I don't think.
12            MR. SULLIVAN:  Okay.  I'll just go one for one.  We
13    believe, and I believe based upon what the experts testified to,
14    for AP the key sources of AP pollution would be AP dissolved in
15    water because it goes right into the ground.  None of the
16    experts indicated that fugitive dust being emitted from one of
17    the buildings at the site because of Lockheed's housekeeping
18    practices was a significant cause of dust.
19        And Mr. Cain testified that if dust was released through
20    vents or whatnot, the winds will tend to disperse it and prevent
21    it from being a concentrated plume.  And the experts don't
22    dispute that.  So in terms of dust, we do not believe based upon
23    the evidence that it's a significant cause.
24        In terms of what really caused the AP contamination, we
25    believe it's the wastewater discharges on the ground from
```

1     Building 77, from Building 114, into the --

2              THE COURT:  What's 114?

3              MR. SULLIVAN:  114 is the propellant research lab.

4     That's the place where they were discharging very high

5     concentrations of -- I'm sorry -- very high quantities of water

6     each week.  That was the Mr. Weedy letter.  And the problem

7     there is, Mr. Delaney did a calculation based upon the sampling,

8     and he estimated that it would have contained about 58 to 59

9     parts per million AP.  That's a pretty low concentration.  But

10    when you put pump that kind of concentration in water and with a

11    very, very my volume over a long period of time, it can cause

12    problems in the groundwater.  And when you look at the

13    groundwater plume, Your Honor, the concentrations you're seeing

14    at Redlands are somewhere in the range of about 3 to 40 parts

15    per billion.  If you convert 58 parts per million into billions,

16    my understanding is it's 58,000 parts per billion.  So that kind

17    of concentration in water from that facility with the quantity

18    that's being pumped could be a significant cause.  And as

19    Mr. Weedy said, it percolated right into the ground very

20    quickly.

21         So that's, we believe, based upon the evidence, a

22    significant problem.  And as Mr. Cain estimated, the evidence

23    indicates that approximately 20,000 pounds of dissolved AP were

24    pumped onto the rocks into that drainage ditch over at Building

25    77, and that's a very significant quantity of AP.  And then you

1    also have the Building 52 pipe that for at least a year or two

2    was pumping the water and solvent or whatnot from cleaning up

3    after mixing, which in all probability, contained a significant

4    quantity of AP, onto bare ground, and that would percolate into

5    that ground.

6         So you have those three big sources, and then you have the

7    disposal of wastewater contaminated with AP from perchlorate

8    ships that were also being disposed of in the burn pit.  So

9    Dr. Sterrett believes that those are the significant causes of

10   AP contamination at the Redlands site.  And the fact that you're

11   seeing contamination in groundwater down at the southwest

12   corner, Your Honor, is actually consistent with discharges from

13   Building 77 and Building 114, and Building 52, because they're

14   more in the central to southern location at the site.

15            THE COURT:  When I looked at maps with TCE, is there

16   similar -- when you say significant causes of contamination in

17   the southwest corner, is there something that shows that in a

18   map or a diagram?

19            MR. SULLIVAN:  Dr. Feenstra testified about that at

20   trial.  He said that's where the most significant concentration

21   of AP has been found in groundwater.

22            THE COURT:  And you say that's consistent with 77 and

23   114?

24            MR. SULLIVAN:  77, Building 52, Building 114, because

25   they are more down to the central to southern aspect of the

1    site.  They are not way up north where the burn pit is.

2            THE COURT:  So you agree with the government that burn

3    pits may not be the biggest source of AP.

4            MR. SULLIVAN:  At Redlands.  At Beaumont,

5    unquestionably.  And at Beaumont one of the problems is they

6    would leave material there for long periods of time, it was

7    exposed to the elements, that allows for things to percolate,

8    and they would actually bury material there.  And when they were

9    doing remediation 20, 30 years later, they actually excavated, I

10   think it was about 12.2 cubic yards of hazardous material and

11   took it to a hazardous waste facility.

12           THE COURT:  How do I know that?

13           MR. SULLIVAN:  That's I believe in the Radian report,

14   and we have actually sited that in our closing argument

15   PowerPoint.  We cited the documents to that.  So no question

16   about Potrero, Your Honor.

17           THE COURT:  Do you distinguish, for purposes of any

18   percent -- put aside what it is -- between the two sites?  Do

19   you think there's more to argue for low or high between the do?

20           MR. SULLIVAN:  Are you talking about allocation-wise?

21           THE COURT:  Yes.

22           MR. SULLIVAN:  Yes, Your Honor.  We believe that at

23   the Redlands site the United States should have only an owner's

24   share, and we had proposed about 10 percent.

25           THE COURT:  What's the ownership based on again?

1          MR. SULLIVAN:  It would be based upon the ownership of

2     the AP processing equipment that we listed in our closing.

3          THE COURT:  And 77.

4          MR. SULLIVAN:  There was a grinder that was installed

5     in Building 11, the original grinding building; there was a

6     blending mill in Building 77; and there was a mixer in Building

7     52.  And we believe, based upon -- you know, from a liability

8     standard, it's possible that we could be found liable based upon

9     that equipment.

10         THE COURT:  Liable?  You already admitted liability.

11         MR. SULLIVAN:  That's why we stipulated to liability.

12    It's based upon that equipment.

13         THE COURT:  Yeah, but that doesn't help me in

14    allocation.  You think these things caused the AP?

15         MR. SULLIVAN:  We think very little.  To be honest, we

16    think we're being generous saying 10 percent for that.  But we

17    think they probably had very little direct release to the

18    environment, Your Honor.

19         THE COURT:  And if I were to decide the critical point

20    is at the time of release and I say you owned it, what do you

21    say then?  You owned the substance.  Does that matter?

22         MR. SULLIVAN:  Well, Your Honor, it's not relevant for

23    allocation whether we owned the raw material.  The question is

24    did we ever own the waste.  Because the raw materials weren't

25    disposed of; waste was disposed of.

1          THE COURT:  I don't understand that.  You mean to tell

2    me when the sludge is in the evaporation pit, was that waste or

3    was that raw material?

4          MR. SULLIVAN:  That would be waste.  Once it's

5    discarded, Your Honor, it's waste, and once a material is done

6    with its useful process and discarded, it's waste.

7          THE COURT:  I thought that they recycled some and the

8    AP they used for hog-outs.

9          MR. SULLIVAN:  No, they did not.  In the hog-out

10   that's a different process.  They would wash the propellant out,

11   it would come out in chunks, and by the time it was laying there

12   in chunks, a lot of the AP had dissolved and you had these sort

13   of rubbery pieces of material sitting there that couldn't be

14   used.  So, no, that was not recycled there.  And at the

15   evaporation pit, Your Honor, the sludge that accumulated was

16   scraped up and taken to the burn pit for burning.  That's my

17   understanding of the evidence.

18         THE COURT:  So what did they do -- let's say they did

19   that.  Is there anything about that that is noteworthy?

20         MR. SULLIVAN:  Well, the United States doesn't own the

21   waste, and Lockheed is the one who was controlling all aspects

22   of the disposal there, not the United States.

23         THE COURT:  Was there anything wrong with the way they

24   executed the disposal from the evaporation pit to the burn pit?

25         MR. SULLIVAN:  Well, we have -- what we have noticed

1    is that distant evidence about dumping chemicals, solvents,

2    degreaser on bare ground when they knew it was porous soil and

3    it was --

4         THE COURT:  They said there were leaks from the

5    evaporation pit.  Do you agree with that?  I'm back on that 170.

6         MR. SULLIVAN:  If there were cracks in the evaporation

7    pit, they could leak.  We don't know whether there were cracks

8    in the evaporation pit.  I would say right now, based upon the

9    evidence, the extent to which they leaked is speculative because

10   I haven't seen any evidence of sampling underneath the

11   evaporation pits.  So right now we don't know, Your Honor.

12        THE COURT:  What is soak out of rocket motors?

13        MR. SULLIVAN:  The soak-out of rocket motors was a

14   procedure that Lockheed used in the '50s and early '60s as best

15   I can tell as described by Mr. Meese man, the former safety

16   manager.  What they would do is put the rocket motor casing with

17   the propellant and whatnot in it into a like a barrel of

18   solvent.  There was some solvent they used and they would let it

19   soak there for days.  After a while, it would soften and they

20   would just push the material out, the material they pushed out,

21   the propellant and whatnot, they would take to the burn pit.

22   That was the early procedure that Mr. Heeseman described that

23   they were using for removing propellant and whatnot from the

24   casings.  At some point they changed over to hogging out and

25   we're not exactly sure when that happened.

1          THE COURT:  So that's a precursor to hogging out?

2          MR. SULLIVAN:  That was the procedure they used before

3    hogging out. At some point, they changed and we don't know why.

4          THE COURT:  Did you say that Lockheed owned the waste

5    or no one owned the waste?

6          MR. SULLIVAN:  Lockheed owned the waste.

7          THE COURT:  How can you own waste?  Isn't that like

8    owning zero?

9          MR. SULLIVAN:  They had control of it, they had

10   possess of it.  So even under arranger liability, if they didn't

11   technically own it, they certainly possessed it.  So that would

12   make them arranger.  So we believe they owned it.

13         THE COURT:  And what about the Potrero site when you

14   tell them what to do with it?

15         MR. SULLIVAN:  Yes.  In 1975, Your Honor, at the end

16   of their operations, they had raw materials left over, and we

17   gave them instructions to burn that at Potrero.  That was about

18   5700, 50 pounds of AP.  And because of that, Your Honor, we have

19   agreed to accept an arranger-type share in the range of zero to

20   2 percent.  And the reason it's low is because of the sheer

21   volume of material they burned at Potrero was massive, about a

22   million pounds a year and this would have been tiny, tiny in

23   comparison.

24         THE COURT:  Do you know whether you did safety

25   inspections at Beaumont?

1        MR. SULLIVAN:  As I sit here right now, I'm not

2   positive whether we ever did, but I know I have never seen an

3   investigation of the burn pits, or I've never seen one of the

4   hog out operations either, and I've never seen any of the either

5   wastewater discharges or solvent dumping.  I've never seen that.

6   The closest I've seen to waste, we were concerned about a

7   container not having a lid on it.  That's the closest I've seen

8   to waste.

9        THE COURT:  They got a permit for Laborde, and they

10  didn't disclose those things.  If there was an inspection and

11  nobody -- it's hard to believe that anybody wouldn't know that

12  that's what they were dumping, would include things like

13  solvents, including AP.  I mean, it's well known at the time

14  that people were using AP.  Why are they in violation of the

15  permit for not telling them about the AP or TCE?

16       MR. SULLIVAN:  Your Honor, they're in violation for

17  the permit for not telling the water board that they were going

18  to dispose of AP and a whole -- and an as long as list of

19  solvents there the evidence indicates from the investigation of

20  the site that AP, very significant quantities and significant

21  quantities of solvents were disposed of there, and

22  unfortunately, that material, those chemicals are not listed in

23  their notice of waste discharge.

24       THE COURT:  But what else -- is there any other

25  problem with this?

1          MR. SULLIVAN:  The problem is under the law, the water

2    board relies on the waste discharger to tell them what they're

3    going to do.  If you don't tell the truth, the water board can't

4    regulate you properly.

5          THE COURT:  One assumes they would regulate.  This is

6    a direct discharge, correct?

7          MR. SULLIVAN:  Yes.  Well, it could be.  If it went

8    down the hill into the Potrero creek, it could be.  It's not

9    Potrero creek.  If it went into a waterway, it could be direct.

10          THE COURT:  But we don't know whether it is or isn't?

11          MR. SULLIVAN:  My understanding is this is probably

12    more indirect because it would have seeped into the ground.

13          THE COURT:  But I come back to that.  At a certain

14    point, it seems to be they wouldn't regulate the discharge.

15          MR. SULLIVAN:  Dr. Delaney was mischaracterizing the

16    law.  There was a provision, a separate provision, that related

17    to direct discharges.  But the attorney general opinion

18    distinguished it from the provision that relates to filing

19    reports of waste discharge.  Reports of waste discharge can

20    relate to either direct or indirect.  It doesn't distinguish

21    between the two.  The key criteria there is, is it a solid or

22    liquid industrial waste, and is it being disposed of on the

23    ground in a way that it could get to groundwater or surface

24    water:  That's it.

25          THE COURT:  A direct discharge in Section 13 does not

1    include a discharge into underground area or strata that

2    normally reaches water by intervening soil or rock.  They're

3    indirect.

4             MR. SULLIVAN:  That's the other provision.  The

5    provision for the reports of waste discharge is 13054, and that

6    talks about simply, if you're going to discharge industrial

7    waste, which is defined as solid or liquid waste coming from an

8    industrial process onto the ground so that it can contaminate

9    groundwater or surface water, then you must file a report of

10   waste discharge.  And at that point in time will, the water

11   board relied on industry to self-report.

12        If you didn't self-report, the water board didn't know

13   about you, and that's the problem here.  Aerojet self-reported.

14   Aerojet was a competitor of Lockheed's.  They were making the

15   same products.  Aerojet self-reported, and the water board

16   attempted to regulate them.  Unfortunately, up there Aerojet

17   ignored their permit and actually discharged significant

18   quantities of AP in the ground, and eventually it caused a

19   plume.

20             THE COURT:  What do you mean it discharged they

21   disregarded the plume?

22             MR. SULLIVAN:  Aerojet didn't comply with their

23   permit.  They weren't supposed to discharge AP-containing

24   wastewater in a manner that would reach groundwater or the

25   American River, and instead, they discharged and created one of

1    the worst AP plumes in the United States.  That's the bottom

2    line at Aerojet.  I can move on to another topic if you want,

3    Your Honor.

4              THE COURT:  One second.  I just want to look up one

5    thing.

6              MR. SULLIVAN:  Your Honor, we do have an exhibit for

7    leaving material in the Potrero burn pit, the Radian report that

8    you asked for.

9              THE COURT:  Okay.

10             MR. SULLIVAN:  It's Exhibit 49 and page 0.0076.  That

11   would be the 76th page of the exhibit.

12             THE COURT:  And it tells me what?  You want to

13   highlight what it's telling me?

14             MR. SULLIVAN:  Yeah, that's material that's being left

15   in the Potrero burn pit for significant periods of time.

16             THE COURT:  And when is this written and before whom?

17             MR. SULLIVAN:  Materials were burned on a frequency

18   which varied -- until 1966 they burned frequently.  From 1966 to

19   the plant closing, materials were only burned about four times a

20   year.  During this time, some of the waste propellant material

21   was trucked to the Redlands plant for incineration.  The rest of

22   the material was accumulated on-site with about 250,000 pounds

23   of waste burned during a single burn."  That's the accumulation.

24             THE COURT:  This is Redlands, or they're talking about

25   both sites?

1          MR. SULLIVAN:  That's Potrero they're talking about.

2          THE COURT:  Some of the waste was trucked to the

3    Redlands.

4          MR. SULLIVAN:  Some was trucked to Redlands for

5    incineration.

6          THE COURT:  And who is Radian?

7          MR. SULLIVAN:  Radian is a contractor for Lockheed,

8    one of the initial remediation for contractors.

9          THE COURT:  When was this?

10         MR. SULLIVAN:  I think it's 1986.  And, Your Honor,

11   there are also letters that we cited where Lockheed described

12   this process as well.

13         THE COURT:  What do you make of the fact that in that

14   letter from the lawyer in around 1971 that when they tested the

15   water, it didn't say anything about the particular things we're

16   interested in?

17         MR. SULLIVAN:  They didn't test for perchlorate.

18         THE COURT:  I know.  But if people weren't worried

19   about AP or weren't worried about TCE, they wouldn't have tested

20   for it.  At certain levels -- do you think they were trying to

21   hide the ball for not testing for it?

22         MR. SULLIVAN:  In that letter, no, Your Honor, because

23   that letter was a regulatory concern of the Corps of Engineers

24   under the Refuse Act of 1899, and the only issue there, was

25   Lockheed discharging something into a navigable water, and

1    Wehde's point was, no, it percolates into the ground and does

2    not get to navigable water.  The Santa Ana River was nearby,

3    although it's dry most of the time, but what Mr. Wehde was

4    saying, it doesn't get to the river.  So it doesn't get to

5    navigable water.  Just as a regulatory issue under that statute.

6         THE COURT:  Right.  But why wouldn't they have

7    disclosed that?  If it were there, they would have disclosed it.

8    The fact is they didn't test for it and they weren't thinking

9    about it.

10        MR. SULLIVAN:  Well, they didn't test for it, and the

11   cores didn't ask for it as best we can tell.  All they were

12   concerned about are you discharging wastewater into the

13   navigable water and Mr. Wehde's point was no, we are not.  It

14   doesn't make it to the navigable water.  But that's where

15   Dr. Delaney did calculations on the stand and concluded based

16   upon the constituents that were tested for, and I believe it was

17   either the chloride or the chlorine, he calculated about 49 to

18   59 parts per million ammonium perchlorate and he said that on

19   the stand.

20        THE COURT:  Let's just make the following assumption,

21   that they told the water board that they were putting this stuff

22   in the -- whether it be direct or indirect, TCE or AP -- had

23   they conducted a test, could they have figured it out what the

24   levels were at that time?  I'm talking '60s.

25        MR. SULLIVAN:  From this discharge, if it was like 58

1    parts for million, yes.  According to Mr. Bauer, yes.

2             THE COURT:  Well, would they have had to engage in

3    some special --

4             MR. SULLIVAN:  They would have to sample specifically

5    for perchlorate.  When you do a sample and you analyze it, you

6    have to tell the lab what you want them to analyze for.  If they

7    had told a lab to analyze for perchlorate, I believe the

8    sampling limit at the time was 1 part per million, if it was one

9    part per million, they could have detected it.

10            THE COURT:  That was the sampling standard back then?

11            MR. SULLIVAN:  According to Mr. Bauer, a lab, if

12   needed, could go lower, but the typical standard at the time it

13   was used was 1 part per million that they would sample for.

14            THE COURT:  In the '50s or '60s?

15            MR. SULLIVAN:  My understanding is at least in the

16   '60s because that was reflected I believe in Aerojet's 1962

17   permit.  They imposed a one part per million standard there for

18   perchlorate.

19            THE COURT:  All right.  Go ahead.  Did.

20            MR. SULLIVAN:  Did I answer your question, Your Honor?

21            THE COURT:  Yes.

22            MR. SULLIVAN:  Okay.  Your Honor, I'd like to go back

23   to operator issues and focus on some of the arguments that

24   Lockheed was making.  First of all, we talked about the manuals,

25   and I want to focus on they're blaming the United States because

1    of process specifications.  First of all, it's important to note

2    that it was Lockheed that wrote them, and it was Lockheed

3    personnel who signed off on them.

4    THE COURT:  I thought today Mr. Murphy said that at

5    least as far as quality assurance and process specifications

6    were not the issue as opposed to safety inspections.  Did I

7    understand that correctly?

8    MR. MURPHY:  Yes, Your Honor.

9    THE COURT:  I can draw a distinction between quality

10   assurance and process specifications for equipment.

11   MR. MURPHY:  Certain process specifications talk about

12   waste disposal practices, but there is a distinction between

13   inspecting for quality and inspecting for safety.

14   THE COURT:  Do you agree that the process standards

15   were reviewed, approved by the government?

16   MR. SULLIVAN:  I haven't seen evidence of that,

17   Your Honor, other than testimony that when a quality control

18   inspection was being performed about a specific process, an

19   inspector might put a stamp on that they had reviewed the

20   manufacturing process and had confirmed it was consistent with

21   the process for doing it.  But I haven't seen on any of the

22   process standards that Lockheed has submitted where there was a

23   place for the United States to review and sign off on them.  We

24   just haven't seen that evidence, Your Honor.

25   THE COURT:  Well, maybe when I hear from Lockheed they

1    can tell me what their evidence is that they approved these

2    process standards.

3              MR. SULLIVAN:  And another thing about the process

4    standards, when you look at them, they usually just vaguely

5    discuss waste disposal.  For example, when they talk at building

6    71 about washing the filter bags, they simply say wash the

7    filter bags, or wash out at the sump and faucet area, but they

8    don't tell you what to do.  So if you're just reviewing process

9    specifications, for the most part they're not going to clue the

10   government in on the wastewater discharges on the ground or the

11   solvent dumping behind Building 119 and things like that.

12   They're just not going to show the government those types of

13   things.

14        And in fact, they also, the process specifications also

15   don't instruct Lockheed to ignore applicable law either.

16        I want to move on to the government inspection arguments

17   that Lockheed is making.

18              THE COURT:  Please do.

19              MR. SULLIVAN:  Again, those focused on quality or

20   safety, and, Your Honor, we have not seen --

21              THE COURT:  Or safety.  His point is that whatever you

22   say is safety, disposal practices encompass safety.  Or safety

23   encompasses disposal practices.  Put aside -- I agree.

24   Everybody agrees about quality assurance.  I'm not worried about

25   them worrying about hammering nails in this or that.

1         MR. SULLIVAN:  Safety can touch on waste disposal, but

2    we have not seen any evidence by any inspections of the

3    United States of a waste disposal process like the burn pits or

4    hogging out or operation of the evaporation pits or disposing

5    wastewater at various places or disposing of solvent on the

6    ground.  There is simply no evidence of United States inspection

7    of any of those kinds of waste disposal practices.

8         THE COURT:  Probably nobody was focusing on it.

9         MR. SULLIVAN:  The as far as we know, the closest they

10   got was a lid on a container.

11        THE COURT:  And rags.

12        MR. SULLIVAN:  And rags.  And propellant chips on a

13   floor or a broken grate on something.  That's about as close as

14   they got to waste disposal based upon the evidence, and that

15   does not qualify for operator-type liability or an operator-type

16   share of allocation under Best Foods.

17        THE COURT:  He makes the point that this engagement

18   only applied to SRAM.

19        MR. SULLIVAN:  That's my understanding, Your Honor.

20   It was a McMara doctrine that came into effect in the mid-1960s,

21   and my understanding is that one of the first contracts it

22   applied to was SRAM.

23        THE COURT:  Okay.  And does anyone have any idea what

24   proportion of the it was going on, whether it be in terms of

25   money or activities were SRAM-relate the at these two sites as

1    opposed to other government contracts?  SRAM is the only one,

2    frankly, I think we have contracts for.  No?  We have other

3    contracts that tell us something about title?

4              MR. MURPHY:  Yes, Your Honor.

5              THE COURT:  And indemnification.

6              MR. MURPHY:  Not indemnification.  SRAM is the only

7    one with an indemnification clause.

8              MR. SULLIVAN:  And we simply don't have enough

9    evidence to apportion that, Your Honor.

10             THE COURT:  So we don't know how much -- there is an

11   argument about these clauses that kick in with SRAM, but I don't

12   know about any other contract.  Okay.

13             MR. SULLIVAN:  Another point they made, very quickly,

14   is the occasional disposal offsite at Fort Irwin.  That has

15   nothing to do with on-site disposal.  That was the United States

16   extending a courtesy to a contractor.

17             THE COURT:  They cite it as an example of involvement,

18   not just that you're not disengaged, hands-off person.  They're

19   trying to say this is a cooperative endeavor and that you want

20   to get the product and they want to get the contract and that

21   you all worked together.

22             MR. SULLIVAN:  The evidence of Fort Irwin is sometimes

23   Lockheed sometimes said, can you help us?  Sometimes we could

24   take their material, and sometimes we couldn't, and that's all

25   there is.  But there's no evidence that says anything about

1    waste disposal at the site.

2         Lockheed has also cited the FMC case in an effort to argue

3    that the United States should be liable, and as you can see from

4    the evidence they've cited, they talk about all sorts of things,

5    operational things, other than control over waste disposal.

6    Your Honor, Best Foods narrowed the test for operator liability.

7    The FMC focus just is way too broad under Best Foods.  If you

8    don't satisfy Best Foods, you don't have operator liability.

9    FMC is way too broad now.

10        I'd like to move on to some of the arranger issues,

11   Your Honor.  And we've already talked about the exception to

12   that at Potrero we have agreed to accept and we have proposed a

13   zero to 2 percent arranger share based upon the abandonment of

14   the AP at the end of Lockheed's operations.

15             THE COURT:  But you're not relying, saying you're

16   indemnified.

17             MR. SULLIVAN:  We believe that the clause in the

18   contract should be an equitable factor that reduces the

19   United States share, and we think that a range of zero to 2

20   percent for that is fair in light of all the circumstances.

21             THE COURT:  Was this pursuant to the SRAM?

22             MR. SULLIVAN:  Your Honor, I don't believe it is.

23   There's a contract number on there I don't believe it's SRAM,

24   Your Honor.  But otherwise, Your Honor, under the Burlington

25   Northern case, in order to be arranger, the United States must

first either own or possess the waste, and take intentional

steps to dispose of a hazardous substance.  And as Mr. Nagle

testified, we did not own the waste under the applicable laws of

title vesting, and we never had possession of the waste.  So

other than the exception for the Potrero site, the

United States, it's our position that we are not an arranger.

THE COURT:  What makes you an arranger at Potrero?

You didn't own it and you didn't have possession of it.

MR. SULLIVAN:  We didn't have possession of it, but we

technically may have owned it at a time.  It was raw material,

Your Honor, and we abandoned the raw material and instructed

them to burn it at Potrero.  And from an equitable standpoint,

we think a bit on the generous side in light of the small nature

of it is a zero to 2 percent share for that.

Lockheed also cites -- they have a number of cites, 81 to

84 slides, where they talk about destruction of inventory at the

end of contracts, and some of that had to be done because

material was classified.  With the exception of this one letter

that talked about burning at Potrero, we can't tell what's being

destroyed or whether any AP waste is being disposed of.  So this

letter is the only one where we can tell that there is actual AP

disposal occurring.

So in conclusion, Your Honor, based upon all the evidence,

we do not believe that the United States should receive an

arranger share at the Redlands site.  The United States did not

1    own or possess waste there and did not take any steps to dispose

2    of waste there, and the same is true at Laborde Canyon.  And we

3    should receive only a very small share, if anything, at Potrero.

4        The next topic is, the sources of TCE and AP contamination.

5    We've already talked about the care issue.  In terms of TCE and

6    AP contamination, I wanted to point out that one of the

7    arguments Lockheed was making is that Lockheed, the predominant

8    solvent used was TCA.  Both Al Heeseman, the safety manager, and

9    Larry Borgelt, a safety engineer later, both testified that in

10   the later years both TCE was the safety solvent, and Mr. Borgelt

11   said that converted to TCA in the 1960s at some point.

12       In addition, Lockheed criticizes the testimony of its own

13   workers who worked there day after day, some of them for over a

14   decade, and says that they don't know what they're talking

15   about, they can't remember.  And we would submit, especially in

16   light of the details of what people like Earl Wessman and

17   Christian Mulder and Larry Borgelt and George Nelson White and

18   others testified about, a lot of detail.  This was something

19   they were doing day in, day out, and we believe that that

20   evidence is trustworthy.

21       In fact, I wanted to point out something about Larry

22   Borgelt that's unusual.  He was a safety engineer, and when he

23   left Lockheed Propulsion, he asked permission to take safety

24   records and standards that they were using at Lockheed with him

25   because he used those to teach industrial safety at the college

1    level.

2           THE COURT:  Is that in the evidence?

3           MR. SULLIVAN:  I believe it is.  I believe it's

4    designated testimony.  But it's the reliability of Mr. Borgelt.

5    He was reliving his experiences on a daily basis as a professor

6    in college on this.

7       Now, Dr. Feenstra's testimony that the Court should ignore

8    firsthand worker testimony and rely only on process documents,

9    we submit is unfounded and flawed, and in fact, at trial, even

10   Mr. Feenstra admitted there were inconsistencies in process

11   documents and that's on trial transcript page 846 to 47.

12      Your Honor, I'd like to move on to the Building 77

13   wastewater discharges and talk about just a few points.

14          THE COURT:  What do you think that that legend means

15   that I showed that chart of the drawing, the engineering

16   drawing, of the north versus south?

17          MR. SULLIVAN:  Your Honor, to be honest with you, I'm

18   not sure what that legend means, but I think what's clear from

19   looking at the aerial photographs is that the way they actually

20   built the building and the drainage area, there's a very clear

21   drainage path that comes from Building 77 and goes from east to

22   west.  It's very clear on aerial photography that goes for years

23   and years.  So we think that --

24          THE COURT:  She took three sets of pictures, sort of

25   -- she used pictures three years apart, so to speak, and found

1    the same thing each time?

2              MR. SULLIVAN:  There were pictures that -- I don't

3    know exactly how many years.  I know there was '59, '63, '66,

4    and even some later ones, and you can see the drainage ditch, I

5    believe, in all of them.  Yes.  You can see the drainage ditch

6    in all of them.  It was clearly being used, and there was

7    clearly disturbance in the drainage ditch that kept it clear.

8              THE COURT:  But how do we know that that has AP in it?

9              MR. SULLIVAN:  Well, Your Honor, there were basically

10   two options that we know about, and we're talking about

11   probability here.  We know that that south sump was intended to

12   collect storm water, and we know that the south sump, based upon

13   the evidence, also received wash water from cleaning the

14   grinding parts and bags.  We looked at the weather information,

15   and there had been no rain in that area for 14 days prior to the

16   big stain out back in the 1959 photo and prior to the stain at

17   the end of the ditch in the 1966 photo.

18        So the only logical conclusion based on probability is that

19   it's from washing operations back at the sumps, and that's based

20   on probability, Your Honor.

21        Your Honor, I wanted to talk just a minute about burial of

22   wastes.  They talk about that at slide 118, and this is at

23   Potrero.  I just want to emphasize that the 1963 letter said

24   that propellant was buried at Potrero in the watershed.

25   Lockheed, no matter what they're trying to say, can't deny that.

1        THE COURT:  What are you referring to, what document?

2        MR. SULLIVAN:  That is slide 118 of Lockheed's.

3   They're trying to argue there that the propellant that was

4   buried there was inert.  This letter doesn't say it was inert,

5   and if it was truly inert, why would they be concerned about it?

6   Why would they be saying that the areas of burial should be

7   flagged to warn people if they're going to be constructing in

8   the area?  That suggests that the propellant was live and

9   dangerous, and if the propellant was truly inert, why would you

10  need to remove it?  So we think, Your Honor, the letter speaks

11  for itself and in all probability indicates that live propellant

12  was buried there, Your Honor.

13       THE COURT:  Mr. Sullivan, about how much longer?  I

14  wanted to take a break for a little while.

15       MR. SULLIVAN:  Well, Your Honor, I can stop now, and

16  the question I have is if you have any other questions for me,

17  I'm happy to answer them.  And if not, I'm happy to stop.

18       THE COURT:  Let me see if I do.  I've asked a lot of

19  them.

20       MR. SULLIVAN:  I'm actually pretty close to the end

21  here.

22       THE COURT:  All right.  Take another five minutes and

23  that'll be it.

24       MR. SULLIVAN:  Okay.  I'll try to hurry this up,

25  Your Honor.  Actually, Your Honor, I'm done.  We've covered

1    everything.

2              THE COURT:  All right.  Let me just check.  (Pause.)

3        Okay.  I don't have anything further.  Just a quick

4    question if you have an answer now or afterwards, whether or not

5    what happened at Potrero which they're taking responsibility

6    for, the 1975, was that pursuant to a SRAM contract, if you

7    know?  You can look that up.

8              MR. MURPHY:  We'll look it up, Your Honor.

9              THE COURT:  The second one is what's your evidence

10   that the government approved the process documents.  If you have

11   something specific, we'll resume.  I'd like to resume at 2:30 so

12   I can sort of get myself organized a little bit and take a

13   break.  Okay.  Thank you very much.

14       (Lunch recess taken at 12:36 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.


_____
BRYAN A. WAYNE

**$**

**$200** [1] - 1756:9
**$300** [1] - 1756:8

**'**

**'50s** [10] - 1726:18, 1727:17, 1728:3, 1728:8, 1752:22, 1753:1, 1766:23, 1767:1, 1796:14, 1804:14
**'58** [1] - 1736:11
**'59** [1] - 1813:3
**'60s** [15] - 1726:18, 1727:18, 1728:3, 1728:8, 1735:22, 1736:11, 1741:17, 1752:22, 1766:23, 1767:1, 1781:21, 1796:14, 1803:24, 1804:14, 1804:16
**'62** [1] - 1777:13
**'63** [2] - 1752:15, 1813:3
**'65** [1] - 1736:19
**'66** [3] - 1736:19, 1813:3
**'67** [1] - 1752:16
**'70** [1] - 1736:4
**'70s** [7] - 1726:19, 1727:20, 1736:22, 1744:22, 1752:22, 1754:9, 1754:14
**'71** [2] - 1744:24, 1745:22
**'75** [1] - 1733:4
**'80s** [2] - 1727:20, 1754:15

**0**

**0.0076** [1] - 1801:10
**0560** [1] - 1718:18
**08-1160** [2] - 1715:5, 1717:2

**1**

**1** [5] - 1718:2, 1756:21, 1756:24, 1804:8, 1804:13
**10** [4] - 1715:9, 1735:13, 1793:24, 1794:16
**10-minute** [1] -

1778:15
**100** [2] - 1723:11, 1729:14
**1006** [1] - 1724:6
**104** [2] - 1723:19, 1724:1
**1050** [1] - 1715:17
**107(a)** [1] - 1731:7
**11** [2] - 1715:7, 1794:5
**114** [6] - 1791:1, 1791:2, 1791:3, 1792:13, 1792:23, 1792:24
**118** [2] - 1813:22, 1814:2
**119** [1] - 1806:11
**11:18** [1] - 1778:18
**11:40** [1] - 1778:18
**12.2** [1] - 1793:10
**120** [1] - 1734:13
**1229** [2] - 1757:7, 1787:18
**12:36** [1] - 1815:14
**13** [1] - 1799:25
**13054** [1] - 1800:5
**14** [1] - 1813:15
**15** [2] - 1755:1, 1755:5
**1502i** [1] - 1765:8
**151** [1] - 1724:19
**152** [1] - 1724:19
**156** [1] - 1771:9
**157** [1] - 1773:5
**16** [1] - 1735:8
**170** [2] - 1790:9, 1796:5
**1715** [1] - 1715:8
**18-inch** [1] - 1777:24
**1838** [1] - 1715:8
**187** [1] - 1788:16
**1899** [1] - 1802:24
**19** [1] - 1777:11
**1950s** [3] - 1752:25, 1753:8, 1754:6
**1958** [5] - 1775:25, 1776:9, 1776:12, 1776:15, 1777:22
**1959** [1] - 1813:16
**1960** [5] - 1735:10, 1735:21, 1776:10, 1776:13, 1777:14
**1960s** [1] - 1811:11
**1962** [4] - 1742:1, 1743:1, 1753:14, 1804:16
**1963** [1] - 1813:23
**1964** [3] - 1735:19, 1736:13, 1753:15
**1966** [8] - 1770:3, 1774:5, 1775:4,

**1801:18, 1813:17**
**1968** [1] - 1765:7
**1970** [6] - 1735:12, 1735:24, 1735:25, 1737:2, 1737:10, 1741:6
**1971** [3] - 1750:16, 1761:23, 1802:14
**1973** [1] - 1729:23
**1975** [2] - 1797:15, 1815:6
**1977** [1] - 1754:17
**1980-something** [2] - 1782:18, 1783:13
**1986** [1] - 1802:10
**1996** [2] - 1732:14, 1732:20
**1:00** [1] - 1778:16

**2**

**2** [4] - 1797:20, 1809:13, 1809:19, 1810:14
**20** [3] - 1720:7, 1720:8, 1793:9
**20,000** [1] - 1791:23
**200** [1] - 1756:5
**20001** [1] - 1716:3
**20026-3986** [1] - 1715:25
**20036-5306** [1] - 1715:17
**2010** [1] - 1755:21
**2014** [1] - 1715:7
**202** [3] - 1715:18, 1715:25, 1716:3
**2060** [3] - 1718:21, 1718:22, 1723:12
**22** [1] - 1734:13
**25** [1] - 1735:10
**250,000** [1] - 1801:22
**2:30** [2] - 1778:16, 1815:11

**3**

**3** [5] - 1748:21, 1757:6, 1757:9, 1785:22, 1791:14
**30** [1] - 1793:9
**300** [1] - 1756:11
**305-0365** [1] - 1715:25
**333** [1] - 1716:2
**354-3186** [1] - 1716:3

**4**

**4** [1] - 1718:2
**40** [2] - 1748:3, 1791:14
**40-foot** [2] - 1760:7, 1760:8
**47** [1] - 1812:11
**49** [2] - 1801:10, 1803:17

**5**

**5,000** [1] - 1745:18
**50** [1] - 1797:18
**500** [1] - 1756:7
**52** [8] - 1727:8, 1775:21, 1775:24, 1776:17, 1792:1, 1792:13, 1792:24, 1794:7
**55** [1] - 1729:15
**55-gallon** [1] - 1777:18
**5700** [1] - 1797:18
**58** [3] - 1791:8, 1791:15, 1803:25
**58,000** [1] - 1791:16
**59** [2] - 1791:8, 1803:18

**6**

**6** [1] - 1775:25
**60** [1] - 1718:17
**601** [1] - 1715:24
**61** [1] - 1769:24
**63** [1] - 1777:12
**6714** [1] - 1716:2

**7**

**7** [1] - 1758:25
**70** [1] - 1768:3
**71** [1] - 1806:6
**76th** [1] - 1801:11
**77** [9] - 1791:1, 1791:25, 1792:13, 1792:22, 1792:24, 1794:3, 1794:6, 1812:12, 1812:21

**8**

**8000** [1] - 1715:24
**81** [1] - 1810:15

**837** [1] - 1758:16
**84** [1] - 1810:16
**846** [1] - 1812:11
**889** [5] - 1721:1, 1721:5, 1721:6, 1721:10, 1721:17
**89** [1] - 1722:16
**891** [7] - 1722:3, 1722:4, 1722:5, 1722:7, 1722:13, 1722:14, 1722:17
**893** [5] - 1722:3, 1722:4, 1722:5, 1722:14, 1722:17
**899** [2] - 1722:13, 1722:18

**9**

**90** [1] - 1762:10
**905** [3] - 1720:20, 1721:9, 1721:17
**91** [5] - 1735:2, 1773:7, 1773:21, 1773:25, 1774:13
**955-8238** [1] - 1715:18
**9:45** [1] - 1715:7

**A**

**a.m** [3] - 1715:7, 1778:18
**A.M** [1] - 1715:9
**abandoned** [1] - 1810:11
**abandonment** [1] - 1809:13
**ability** [1] - 1755:18
**able** [5] - 1736:4, 1740:22, 1745:7, 1756:22, 1762:23
**above-entitled** [1] - 1816:5
**absolutely** [3] - 1786:14, 1786:18, 1786:22
**abundance** [1] - 1717:7
**accept** [3] - 1738:25, 1797:19, 1809:12
**acceptable** [1] - 1781:18
**accepting** [1] - 1790:10
**accordance** [3] - 1740:5, 1740:24, 1760:25
**according** [2] - 1804:1, 1804:11

**account** [2] - 1728:10, 1730:22
**accountable** [1] - 1782:5
**accumulate** [1] - 1776:22
**accumulated** [2] - 1795:15, 1801:22
**accumulating** [1] - 1776:22
**accumulation** [1] - 1801:23
**Act** [16] - 1749:17, 1749:19, 1749:21, 1749:24, 1750:1, 1751:20, 1751:21, 1751:22, 1782:12, 1783:1, 1783:9, 1783:15, 1789:13, 1789:16, 1789:18, 1802:24
**action** [1] - 1739:19
**activities** [4] - 1727:23, 1738:4, 1764:1, 1807:25
**actual** [5] - 1743:22, 1748:12, 1762:4, 1762:6, 1810:21
**added** [1] - 1725:5
**addition** [1] - 1811:12
**address** [3] - 1727:12, 1757:23, 1787:6
**admission** [3] - 1732:1, 1732:12, 1732:22
**admissions** [1] - 1731:19
**admit** [1] - 1731:21
**admitted** [14] - 1718:20, 1719:10, 1720:14, 1720:23, 1720:25, 1721:3, 1722:11, 1723:16, 1730:6, 1730:25, 1731:3, 1731:6, 1794:10, 1812:10
**admitting** [3] - 1724:6, 1731:2, 1731:10
**advanced** [1] - 1749:2
**aerial** [2] - 1812:19, 1812:22
**Aerojet** [17] - 1750:21, 1750:25, 1751:7, 1751:14, 1753:10, 1753:11, 1753:18, 1753:19, 1753:21, 1783:8, 1785:25, 1800:13, 1800:14, 1800:15, 1800:16, 1800:22, 1801:2

**Aerojet's** [1] - 1804:16
**affect** [3] - 1754:9, 1754:10
**affidavit** [2] - 1725:6, 1772:13
**afternoon** [1] - 1745:20
**afterwards** [4] - 1732:2, 1732:25, 1735:11, 1815:4
**agree** [9] - 1718:24, 1719:18, 1720:13, 1723:18, 1733:17, 1735:16, 1737:13, 1738:21, 1748:8, 1748:19, 1762:4, 1762:7, 1764:12, 1768:10, 1778:4, 1793:2, 1796:5, 1805:14, 1806:23
**agreed** [3] - 1759:21, 1797:19, 1809:12
**agreeing** [1] - 1722:4
**agrees** [2] - 1770:23, 1806:24
**agriculture** [3] - 1751:13, 1753:25, 1754:5
**ahead** [2] - 1725:24, 1804:19
**aided** [1] - 1716:25
**Air** [12] - 1740:10, 1741:3, 1741:19, 1746:4, 1752:13, 1764:16, 1764:17, 1765:13, 1767:21, 1767:24, 1768:7
**air** [5] - 1738:8, 1738:11, 1750:13, 1787:11, 1787:14
**AISLIC** [13] - 1727:19, 1747:9, 1748:2, 1748:13, 1749:4, 1749:5, 1749:10, 1780:24, 1781:1, 1781:2, 1781:16
**Al** [1] - 1811:8
**Alabama** [1] - 1757:12
**allege** [1] - 1751:21
**allocate** [1] - 1747:23
**allocating** [1] - 1730:7
**allocation** [19] - 1726:3, 1739:8, 1746:13, 1746:16, 1746:17, 1746:23, 1747:13, 1747:14, 1748:2, 1748:9, 1748:12, 1748:13, 1748:19, 1748:21, 1782:3, 1793:20,

1794:14, 1794:23, 1807:16
**allocation-wise** [1] - 1793:20
**allocations** [1] - 1730:23
**allowed** [3] - 1752:7, 1752:8, 1786:7
**allows** [1] - 1793:7
**almost** [5] - 1744:15, 1756:10, 1756:11, 1764:8, 1773:13
**alternatives** [1] - 1755:21
**America** [1] - 1717:3
**AMERICA** [1] - 1715:6
**American** [4] - 1745:8, 1745:11, 1754:3, 1800:25
**ammonium** [1] - 1803:18
**amount** [5] - 1748:23, 1749:23, 1750:7, 1751:12, 1765:24
**amounts** [3] - 1754:20, 1755:12, 1774:18
**AMPOT** [1] - 1745:8
**Ana** [1] - 1803:2
**analyze** [3] - 1804:5, 1804:6, 1804:7
**annotated** [1] - 1771:12
**answer** [5] - 1734:3, 1779:11, 1804:20, 1814:17, 1815:4
**anticipated** [2] - 1733:14, 1733:25
**anytime** [1] - 1749:22
**anyway** [1] - 1761:17
**anyways** [1] - 1786:1
**AP** [97] - 1728:20, 1728:21, 1738:2, 1738:3, 1741:17, 1743:18, 1744:4, 1745:7, 1745:18, 1750:21, 1750:24, 1751:1, 1751:9, 1751:11, 1751:15, 1751:23, 1751:24, 1753:13, 1753:23, 1754:8, 1754:19, 1754:22, 1754:24, 1755:14, 1755:19, 1755:24, 1756:3, 1756:14, 1756:17, 1756:20, 1756:21, 1760:16, 1760:21, 1761:2, 1762:10, 1762:12, 1763:6,

1770:14, 1772:8, 1772:11, 1772:14, 1772:15, 1772:22, 1772:23, 1776:6, 1776:8, 1777:1, 1777:2, 1777:23, 1779:11, 1779:12, 1779:14, 1779:17, 1782:4, 1782:24, 1783:14, 1784:12, 1784:22, 1786:9, 1789:22, 1789:23, 1790:14, 1790:24, 1791:9, 1791:23, 1791:25, 1792:4, 1792:7, 1792:10, 1792:21, 1793:3, 1794:2, 1794:14, 1795:8, 1795:12, 1797:18, 1798:13, 1798:14, 1798:15, 1798:18, 1798:20, 1800:18, 1800:23, 1801:1, 1802:19, 1803:22, 1809:14, 1810:20, 1810:21, 1811:4, 1811:6, 1813:8
**AP-containing** [1] - 1800:23
**AP-contaminated** [1] - 1761:2
**AP-mixed** [1] - 1741:17
**apart** [1] - 1812:25
**Apollo** [7] - 1736:14, 1736:16, 1736:20, 1741:15, 1744:25, 1745:1, 1745:5
**appear** [1] - 1722:2
**APPEARANCES** [1] - 1715:12
**appeared** [1] - 1780:15
**appellate** [1] - 1719:6
**Appendix** [2] - 1757:6, 1757:9
**applicable** [4] - 1787:9, 1790:5, 1806:15, 1810:3
**applied** [7] - 1751:20, 1767:16, 1767:23, 1768:7, 1768:15, 1807:18, 1807:22
**applies** [1] - 1785:13
**apply** [2] - 1788:2, 1788:5
**apportion** [1] - 1808:9
**appropriate** [3] - 1733:18, 1747:16,

1756:19
**approval** [2] - 1745:10, 1745:11
**approved** [5] - 1730:1, 1780:22, 1805:15, 1806:1, 1815:10
**area** [27] - 1754:3, 1755:12, 1759:16, 1759:17, 1761:9, 1761:20, 1765:24, 1769:7, 1769:10, 1769:16, 1772:7, 1772:21, 1772:23, 1773:21, 1774:10, 1780:1, 1780:9, 1780:13, 1780:15, 1780:16, 1780:17, 1783:23, 1800:1, 1806:7, 1812:20, 1813:15, 1814:8
**areas** [6] - 1761:14, 1769:8, 1769:20, 1774:13, 1778:11, 1814:6
**argue** [5] - 1746:24, 1770:22, 1793:19, 1809:2, 1814:3
**arguing** [1] - 1761:14
**argument** [7] - 1723:7, 1726:2, 1761:22, 1787:15, 1789:15, 1793:14, 1808:11
**arguments** [6] - 1717:6, 1717:20, 1744:14, 1804:23, 1806:16, 1811:7
**ARGUMENTS** [1] - 1715:10
**Army** [8] - 1736:11, 1738:13, 1776:11, 1776:13, 1776:14, 1776:16, 1776:20, 1778:13
**arranger** [16] - 1717:22, 1726:5, 1729:11, 1746:25, 1747:12, 1747:24, 1782:2, 1797:10, 1797:12, 1797:19, 1809:10, 1809:13, 1809:25, 1810:6, 1810:7, 1810:25
**arranger-type** [1] - 1797:19
**aside** [4] - 1758:15, 1782:4, 1793:18, 1806:23
**asleep** [1] - 1752:17
**aspect** [1] - 1792:25
**aspects** [1] - 1795:21

associate [1] - 1757:4
assume [5] - 1734:15, 1750:3, 1770:21, 1788:25, 1789:4
assumes [1] - 1799:5
assuming [3] - 1733:4, 1779:9, 1784:20
assumption [1] - 1803:20
assumptions [1] - 1761:15
assurance [1] - 1740:13, 1740:14, 1764:11, 1768:12, 1805:5, 1805:10, 1806:24
assure [1] - 1762:21
attempted [1] - 1800:16
attention [3] - 1720:8, 1737:13, 1764:4
attitude [1] - 1766:17
attorney [1] - 1799:17
audit [1] - 1742:9
authority [1] - 1785:20
available [1] - 1724:16
Avenue [2] - 1715:17, 1716:2
average [1] - 1779:5
Aviation [1] - 1745:11
aware [2] - 1780:19, 1782:22

**B**

background [1] - 1736:15
bad [6] - 1738:22, 1753:6, 1753:20, 1754:6, 1755:6, 1789:7
bags [3] - 1806:6, 1806:7, 1813:14
ball [1] - 1802:21
bar [2] - 1754:25, 1755:1
bare [8] - 1782:9, 1782:10, 1786:21, 1787:4, 1787:7, 1787:8, 1792:4, 1796:2
barely [1] - 1766:15
barrel [1] - 1796:17
barricade [1] - 1777:6
based [30] - 1731:9, 1739:12, 1746:13, 1761:14, 1761:15, 1768:1, 1768:3,

1776:4, 1776:5, 1784:20, 1785:23, 1788:22, 1790:1, 1790:13, 1790:22, 1791:7, 1791:21, 1793:25, 1794:1, 1794:7, 1794:8, 1794:12, 1796:8, 1803:15, 1807:14, 1809:13, 1810:23, 1813:12, 1813:18, 1813:19
basic [1] - 1760:25
basing [1] - 1735:17
basins [1] - 1756:1
basis [7] - 1726:11, 1730:21, 1751:2, 1753:24, 1764:1, 1767:25, 1812:5
batches [1] - 1741:17
Bauer [5] - 1723:17, 1785:18, 1785:22, 1804:1, 1804:11
Beaumont [10] - 1755:10, 1768:24, 1770:24, 1771:4, 1775:8, 1781:10, 1783:12, 1793:4, 1793:5, 1797:25
Beaumont/Potrero [1] - 1752:14
became [1] - 1775:4
become [1] - 1756:21
becomes [4] - 1731:25, 1754:11, 1767:10, 1777:2
BEFORE [1] - 1715:10
beginning [1] - 1788:5
behave [1] - 1788:22
behind [1] - 1806:11
believes [3] - 1772:19, 1774:9, 1792:9
BENCH [1] - 1715:10
beneficial [1] - 1753:17
benefit [1] - 1717:25
beside [1] - 1768:16
Best [14] - 1739:22, 1740:2, 1744:6, 1744:9, 1744:13, 1744:17, 1762:3, 1765:17, 1778:24, 1807:16, 1809:6, 1809:7, 1809:8
best [5] - 1734:19, 1746:16, 1789:24, 1796:14, 1803:11
better [6] - 1740:9, 1782:3, 1785:24, 1786:4, 1788:18,

1789:15
between [12] - 1717:17, 1736:23, 1736:25, 1737:23, 1764:10, 1768:21, 1785:14, 1793:18, 1793:19, 1799:21, 1805:9, 1805:12
beyond [2] - 1717:11, 1767:10
big [8] - 1736:16, 1751:11, 1754:19, 1764:21, 1770:10, 1788:25, 1792:6, 1813:16
biggest [2] - 1783:23, 1793:3
bigwigs [1] - 1764:17
bill [1] - 1743:4
billion [8] - 1755:1, 1755:5, 1756:18, 1756:20, 1756:25, 1757:7, 1791:15, 1791:16
billions [1] - 1791:15
binder [1] - 1743:14
bit [6] - 1726:6, 1730:4, 1759:17, 1784:16, 1810:13, 1815:12
blaming [1] - 1804:25
blending [2] - 1756:22, 1794:6
blow [3] - 1737:17, 1758:19, 1761:5
board [19] - 1731:23, 1752:9, 1752:17, 1752:20, 1782:12, 1782:14, 1784:24, 1785:18, 1785:20, 1785:23, 1788:20, 1798:17, 1799:2, 1799:3, 1800:11, 1800:12, 1800:15, 1803:21
Board [2] - 1750:23, 1752:13
Boeing [8] - 1740:6, 1740:7, 1740:8, 1740:9, 1740:13, 1740:17, 1741:1, 1741:5
Bonin [1] - 1723:22
BONIN [1] - 1723:22
Borgelt [6] - 1732:9, 1811:9, 1811:10, 1811:17, 1811:22, 1812:4
boron [2] - 1751:12, 1751:13

bother [2] - 1782:11, 1782:15
bothers [1] - 1779:8
bottom [4] - 1758:21, 1758:22, 1785:2, 1801:1
break [4] - 1771:5, 1775:13, 1814:14, 1815:13
break-down [1] - 1771:5
bring [1] - 1757:25
broad [3] - 1747:2, 1809:7, 1809:9
broken [1] - 1807:13
brought [1] - 1724:21
brown [2] - 1776:14, 1776:16
BRYAN [3] - 1716:1, 1816:3, 1816:7
build [9] - 1730:2, 1752:4, 1752:7, 1752:8, 1755:25, 1762:23, 1764:18, 1767:22, 1768:1
building [17] - 1736:25, 1740:16, 1740:18, 1740:24, 1741:19, 1756:1, 1767:21, 1773:11, 1773:22, 1774:4, 1774:5, 1774:6, 1774:9, 1774:10, 1794:5, 1806:5, 1812:20
Building [22] - 1735:2, 1773:7, 1773:21, 1773:25, 1774:13, 1775:21, 1775:24, 1791:1, 1791:24, 1792:1, 1792:13, 1792:24, 1794:5, 1794:6, 1806:11, 1812:12, 1812:21
buildings [4] - 1765:23, 1772:21, 1775:22, 1790:17
built [8] - 1752:5, 1756:3, 1760:24, 1773:24, 1774:9, 1778:1, 1787:1, 1812:20
burial [2] - 1813:21, 1814:6
buried [3] - 1813:24, 1814:4, 1814:12
Burlington [1] - 1809:24
burn [83] - 1728:19, 1728:20, 1728:22,

1738:8, 1738:22, 1739:1, 1743:18, 1743:19, 1743:22, 1744:4, 1744:7, 1744:8, 1745:13, 1745:25, 1746:2, 1749:18, 1749:21, 1750:6, 1751:22, 1751:25, 1755:11, 1761:23, 1763:20, 1764:2, 1765:3, 1765:18, 1765:25, 1769:7, 1769:14, 1769:15, 1769:16, 1770:17, 1770:19, 1770:23, 1771:1, 1771:4, 1771:22, 1772:19, 1772:21, 1774:20, 1774:22, 1774:25, 1775:2, 1775:4, 1775:9, 1779:9, 1779:12, 1779:13, 1779:16, 1779:17, 1779:18, 1779:21, 1779:25, 1780:1, 1780:8, 1781:24, 1784:9, 1785:19, 1786:2, 1786:6, 1786:7, 1786:10, 1787:6, 1792:8, 1793:1, 1793:2, 1795:16, 1795:24, 1796:21, 1797:17, 1798:3, 1801:7, 1801:15, 1801:23, 1803:3, 1810:12
burned [9] - 1738:12, 1743:20, 1743:24, 1763:21, 1797:21, 1801:17, 1801:18, 1801:19, 1801:23
burner [1] - 1763:22
burning [10] - 1738:10, 1745:17, 1751:18, 1751:25, 1765:11, 1765:24, 1770:5, 1786:9, 1795:16, 1810:19
burns [1] - 1751:18
bury [1] - 1793:8
business [1] - 1782:2
buy [1] - 1737:11
buyer [1] - 1748:15
buying [1] - 1762:20

**C**

C-U-L-V-E-R-H-O-U-S-E [1] - 1723:24

cA [1] - 1715:5
Cain [3] - 1761:1, 1790:19, 1791:22
calculated [1] - 1803:17
calculation [1] - 1791:7
calculations [1] - 1803:15
California [7] - 1725:21, 1733:16, 1756:18, 1757:13, 1757:16, 1782:25, 1788:11
Camp [1] - 1757:17
canisters [1] - 1746:1
Canyon [4] - 1764:3, 1769:6, 1780:7, 1811:2
Capital [1] - 1755:24
capital [1] - 1756:1
captured [1] - 1787:2
carbon [1] - 1753:6
care [5] - 1726:6, 1726:11, 1726:22, 1788:9, 1811:5
cared [1] - 1783:11
careful [1] - 1779:5
careless [1] - 1727:4
Carlstrom [1] - 1723:22
CARLSTROM [1] - 1723:22
carrying [1] - 1764:1
cartons [1] - 1765:6
case [21] - 1717:2, 1717:7, 1725:10, 1727:1, 1728:10, 1728:13, 1732:25, 1742:3, 1742:4, 1744:18, 1746:12, 1746:16, 1748:5, 1748:8, 1748:17, 1752:24, 1765:18, 1766:10, 1781:15, 1809:2, 1809:25
cases [9] - 1743:21, 1746:7, 1746:8, 1746:14, 1746:17, 1746:20, 1748:12, 1748:13, 1789:9
casing [2] - 1781:22, 1796:16
casings [4] - 1742:17, 1743:8, 1743:9, 1796:24
castigate [1] - 1786:6
castigating [1] - 1786:3
causation [1] - 1729:2

causative [1] - 1729:16
caused [17] - 1728:11, 1729:6, 1729:8, 1729:17, 1751:16, 1775:12, 1779:6, 1780:10, 1786:13, 1788:6, 1788:8, 1789:7, 1789:10, 1790:9, 1790:24, 1794:14, 1800:18
causes [2] - 1792:9, 1792:16
causing [2] - 1786:25, 1789:11
caution [1] - 1717:8
center [1] - 1769:17
central [2] - 1792:14, 1792:25
CERCLA [5] - 1717:7, 1728:10, 1733:19, 1739:3, 1789:9
certain [12] - 1734:6, 1742:13, 1744:12, 1745:12, 1752:24, 1765:1, 1765:20, 1765:24, 1767:19, 1799:13, 1802:20, 1805:11
certainly [6] - 1729:7, 1779:10, 1780:3, 1787:11, 1787:14, 1797:11
CERTIFICATE [1] - 1816:2
certify [1] - 1816:3
cetera [1] - 1717:23
chance [1] - 1734:19
change [3] - 1726:12, 1733:2, 1778:6
changed [3] - 1735:20, 1796:24, 1797:3
changing [1] - 1735:18
chargeable [1] - 1729:24
charged [1] - 1730:11
chart [4] - 1724:17, 1732:20, 1734:9, 1812:15
charts [1] - 1784:3
check [2] - 1718:23, 1815:2
chemicals [5] - 1753:13, 1754:15, 1787:7, 1796:1, 1798:22
chips [1] - 1807:12
chloride [1] - 1803:17

chlorine [1] - 1803:17
chosen [1] - 1727:6
Christian [1] - 1811:17
chromium [2] - 1753:3
chronologically [1] - 1778:23
chunks [2] - 1795:11, 1795:12
circumstances [2] - 1730:8, 1809:20
citations [1] - 1724:12
cite [7] - 1732:9, 1746:14, 1765:7, 1765:8, 1808:17
cited [8] - 1717:14, 1743:21, 1746:8, 1748:16, 1793:15, 1802:11, 1809:2, 1809:4
cites [2] - 1810:15
citing [1] - 1737:3
Civil [1] - 1717:2
claim [1] - 1727:15
claimed [1] - 1727:14
clarification [1] - 1718:25
clarifications [1] - 1723:5
clarify [1] - 1720:18
clarifying [1] - 1719:9
Clarke [1] - 1723:22
CLARKE [1] - 1723:23
clasps [1] - 1765:5
Class [1] - 1785:22
classified [2] - 1744:2, 1810:18
Clause [2] - 1733:12, 1733:25
clause [4] - 1733:24, 1745:15, 1808:7, 1809:17
clauses [1] - 1808:11
clean [3] - 1731:24, 1755:22, 1756:22
cleaned [4] - 1776:1, 1778:8, 1781:8
cleaning [6] - 1776:7, 1777:19, 1784:14, 1792:2, 1813:13
cleanup [5] - 1755:14, 1756:14, 1756:20, 1757:3, 1777:16
cleanups [1] - 1757:5
clear [10] - 1728:24, 1771:4, 1780:5, 1780:6, 1785:7, 1789:11, 1812:18, 1812:20, 1812:22, 1813:7

clearer [1] - 1769:6
clearly [10] - 1728:11, 1737:20, 1737:22, 1753:5, 1756:18, 1762:10, 1768:23, 1777:24, 1813:6, 1813:7
CLERK [1] - 1717:2
clerk [2] - 1718:19, 1775:19
clerk's [2] - 1718:5, 1718:7
close [9] - 1748:2, 1748:6, 1749:10, 1754:4, 1759:3, 1766:11, 1779:25, 1807:13, 1814:20
closed [3] - 1776:19, 1777:6
closest [4] - 1749:4, 1798:6, 1798:7, 1807:9
closet [1] - 1746:12
CLOSING [1] - 1715:10
closing [6] - 1717:6, 1723:8, 1759:11, 1793:14, 1794:2, 1801:19
clue [1] - 1806:9
coffee [1] - 1754:17
Cold [1] - 1749:3
collect [1] - 1813:12
college [2] - 1811:25, 1812:6
color [2] - 1752:25, 1754:10
COLUMBIA [1] - 1715:1
combustion [1] - 1776:24
comfortable [1] - 1731:11
coming [3] - 1717:17, 1772:23, 1800:7
commenting [1] - 1735:3
common [2] - 1731:13, 1742:5
company [5] - 1727:22, 1728:2, 1732:12, 1732:22, 1747:11
Company [3] - 1734:17, 1734:21, 1750:4
compare [5] - 1727:19, 1755:19, 1755:21, 1784:5, 1784:6

compared [1] - 1788:23
comparison [1] - 1797:23
competition [1] - 1763:3
competitor [2] - 1763:1, 1800:14
complain [1] - 1784:1
complete [3] - 1735:15, 1749:5, 1766:22
compliance [2] - 1779:2, 1787:11
comply [3] - 1785:3, 1785:4, 1800:22
complying [1] - 1782:14
computer [2] - 1716:25, 1718:21
computer-aided [1] - 1716:25
conceivable [1] - 1770:18
concentrated [1] - 1790:21
concentration [5] - 1755:11, 1791:9, 1791:10, 1791:17, 1792:20
concentrations [2] - 1791:5, 1791:13
concern [2] - 1738:11, 1802:23
concerned [4] - 1787:20, 1798:6, 1803:12, 1814:5
concerns [1] - 1738:14
concluded [1] - 1803:15
conclusion [3] - 1749:22, 1810:23, 1813:18
concrete [1] - 1786:7
conduct [2] - 1768:25, 1778:25
conducted [3] - 1732:5, 1789:10, 1803:23
conferring [2] - 1718:19, 1775:19
confirmed [1] - 1805:20
conjecture [1] - 1785:1
connect [1] - 1726:23
Connecticut [1] - 1715:17
consciousness [1] -

1752:21
consider [1] - 1788:14
consideration [1] -
  1728:13
considered [3] -
  1722:10, 1722:22,
  1738:3
consistent [4] -
  1737:16, 1792:12,
  1792:22, 1805:20
constituents [1] -
  1803:16
Constitution [1] -
  1716:2
construct [2] -
  1739:10, 1787:6
constructing [1] -
  1814:7
contained [2] -
  1791:8, 1792:3
container [2] - 1798:7,
  1807:10
containers [4] -
  1763:20, 1765:4,
  1765:5, 1765:10
containing [1] -
  1800:23
contaminants [4] -
  1737:15, 1753:1,
  1771:3, 1784:22
contaminate [1] -
  1800:8
contaminated [5] -
  1738:3, 1749:23,
  1761:2, 1786:20,
  1792:7
contamination [32] -
  1731:14, 1738:7,
  1739:4, 1742:6,
  1750:5, 1751:16,
  1753:4, 1753:5,
  1754:12, 1760:20,
  1769:9, 1769:11,
  1771:16, 1775:1,
  1779:7, 1779:17,
  1779:21, 1780:2,
  1780:10, 1782:4,
  1784:3, 1786:25,
  1788:6, 1788:8,
  1789:6, 1789:8,
  1790:24, 1792:10,
  1792:11, 1792:16,
  1811:4, 1811:6
contest [1] - 1749:17
contested [3] -
  1749:13, 1766:19,
  1774:3
contests [1] - 1767:5
context [5] - 1726:21,
  1727:1, 1728:3,

1744:6, 1788:17
continually [1] -
  1761:20
contract [20] -
  1730:11, 1736:9,
  1736:14, 1736:16,
  1742:12, 1745:9,
  1748:10, 1763:15,
  1767:6, 1767:14,
  1767:15, 1768:17,
  1782:7, 1808:12,
  1808:20, 1809:18,
  1809:23, 1815:6
contracted [4] -
  1763:8, 1780:20,
  1781:2, 1784:10
contracting [1] -
  1790:5
contractor [8] -
  1740:5, 1740:18,
  1740:23, 1748:14,
  1762:20, 1765:21,
  1802:7, 1808:16
contractors [5] -
  1751:8, 1763:5,
  1766:6, 1802:8
contracts [18] -
  1733:4, 1749:6,
  1762:12, 1762:15,
  1763:4, 1763:16,
  1763:25, 1765:22,
  1768:16, 1768:17,
  1768:20, 1769:4,
  1769:5, 1807:21,
  1808:1, 1808:2,
  1808:3, 1810:17
contractual [1] -
  1763:12
contradict [1] -
  1767:19
contradicted [1] -
  1744:1
contributor [1] -
  1779:10
control [14] - 1739:20,
  1747:3, 1747:6,
  1747:7, 1747:25,
  1748:1, 1762:4,
  1762:6, 1766:18,
  1767:11, 1786:14,
  1797:9, 1805:17,
  1809:5
Control [2] - 1750:23,
  1752:13
controlling [1] -
  1795:21
convert [1] - 1791:15
converted [1] -
  1811:11
cooperating [1] -

1737:6
cooperative [1] -
  1808:19
cores [1] - 1803:11
corner [4] - 1771:21,
  1772:4, 1792:12,
  1792:17
corporate [4] -
  1740:2, 1740:4,
  1744:6, 1744:7
CORPORATION [1] -
  1715:3
Corporation [1] -
  1717:3
Corps [1] - 1802:23
correct [7] - 1722:22,
  1735:6, 1748:4,
  1748:24, 1789:5,
  1799:6, 1816:4
corrective [1] -
  1739:19
correctly [6] -
  1737:20, 1748:24,
  1766:8, 1777:3,
  1778:14, 1805:7
cost [9] - 1755:16,
  1755:19, 1755:23,
  1755:24, 1756:1,
  1756:5, 1756:21,
  1768:23, 1789:11
Costelow [1] -
  1723:23
COSTELOW [1] -
  1723:23
costs [9] - 1739:15,
  1755:21, 1756:20,
  1756:21, 1756:24,
  1757:1, 1757:2,
  1757:3, 1768:23
country [3] - 1731:14,
  1742:6, 1742:7
counts [1] - 1727:5
couple [15] - 1717:15,
  1723:6, 1726:20,
  1728:8, 1731:22,
  1732:7, 1735:11,
  1736:11, 1737:19,
  1743:17, 1749:16,
  1768:2, 1769:8,
  1773:2, 1779:16
course [1] - 1760:16
COURT [275] - 1715:1,
  1717:4, 1718:23,
  1719:1, 1719:5,
  1719:11, 1719:14,
  1719:21, 1720:2,
  1720:16, 1720:21,
  1721:4, 1721:9,
  1721:15, 1721:17,
  1721:21, 1722:2,

1722:4, 1722:13,
1722:15, 1722:17,
1722:20, 1722:24,
1723:4, 1723:10,
1723:16, 1723:25,
1724:2, 1724:9,
1724:16, 1724:23,
1725:3, 1725:12,
1725:20, 1726:8,
1726:15, 1726:20,
1728:14, 1728:22,
1729:1, 1729:5,
1729:20, 1731:2,
1731:8, 1731:19,
1732:11, 1732:15,
1732:17, 1732:21,
1733:3, 1733:16,
1734:2, 1734:6,
1734:9, 1734:13,
1734:15, 1734:18,
1734:22, 1735:5,
1735:9, 1735:16,
1735:25, 1736:18,
1737:11, 1737:24,
1738:21, 1739:5,
1739:8, 1740:6,
1740:12, 1741:6,
1741:10, 1741:21,
1741:25, 1742:10,
1742:24, 1743:4,
1743:6, 1743:10,
1743:13, 1743:25,
1744:21, 1744:25,
1745:2, 1745:14,
1745:20, 1745:22,
1746:12, 1746:19,
1746:22, 1748:5,
1748:8, 1748:12,
1748:19, 1749:12,
1750:17, 1750:19,
1752:1, 1752:4,
1752:15, 1752:17,
1753:10, 1753:18,
1753:20, 1754:21,
1754:24, 1755:2,
1755:6, 1755:8,
1755:13, 1755:16,
1756:4, 1756:7,
1756:13, 1757:8,
1757:10, 1757:15,
1757:17, 1757:20,
1757:23, 1758:3,
1758:8, 1758:12,
1758:15, 1758:18,
1758:20, 1758:22,
1758:24, 1759:3,
1759:7, 1759:10,
1759:23, 1760:4,
1761:6, 1761:16,
1761:19, 1763:8,
1763:19, 1764:6,

1764:21, 1766:14,
1767:2, 1767:5,
1768:9, 1768:19,
1768:25, 1769:13,
1769:18, 1769:21,
1769:25, 1770:9,
1770:14, 1770:18,
1771:9, 1771:13,
1772:10, 1772:14,
1772:17, 1773:5,
1773:10, 1774:2,
1774:23, 1775:7,
1775:12, 1775:17,
1776:23, 1777:9,
1777:12, 1778:4,
1778:15, 1778:19,
1779:8, 1780:3,
1780:7, 1780:11,
1780:18, 1780:24,
1781:9, 1781:13,
1781:16, 1782:1,
1782:16, 1782:21,
1782:24, 1783:6,
1783:22, 1784:8,
1784:15, 1785:6,
1785:9, 1785:15,
1785:24, 1786:16,
1787:15, 1787:25,
1788:2, 1788:13,
1789:2, 1789:15,
1789:19, 1790:3,
1790:8, 1791:2,
1792:15, 1792:22,
1793:2, 1793:12,
1793:17, 1793:21,
1793:25, 1794:3,
1794:10, 1794:13,
1794:19, 1795:1,
1795:7, 1795:18,
1795:23, 1796:4,
1796:12, 1797:1,
1797:4, 1797:7,
1797:13, 1797:24,
1798:9, 1798:24,
1799:5, 1799:10,
1799:13, 1799:25,
1800:20, 1801:4,
1801:9, 1801:12,
1801:16, 1801:24,
1802:2, 1802:6,
1802:9, 1802:13,
1802:18, 1803:6,
1803:20, 1804:2,
1804:10, 1804:14,
1804:19, 1804:21,
1805:4, 1805:9,
1805:14, 1805:25,
1806:18, 1806:21,
1807:8, 1807:11,
1807:17, 1807:23,
1808:5, 1808:10,

1808:17, 1809:15, 1809:21, 1810:7, 1812:2, 1812:14, 1812:24, 1813:8, 1814:1, 1814:13, 1814:18, 1814:22, 1815:2, 1815:9
**Court** [9] - 1716:1, 1716:1, 1718:9, 1718:19, 1726:2, 1746:8, 1775:19, 1812:7, 1816:3
**court** [1] - 1727:19
**courtesy** [1] - 1808:16
**Courthouse** [1] - 1716:2
**courts** [1] - 1789:9
**cover** [4] - 1717:11, 1717:12, 1718:2, 1775:15
**covered** [5] - 1717:13, 1775:16, 1775:17, 1775:18, 1814:25
**covering** [1] - 1717:24
**cracks** [2] - 1796:6, 1796:7
**create** [1] - 1763:3
**created** [2] - 1787:20, 1800:25
**credit** [2] - 1745:8
**creek** [2] - 1799:8, 1799:9
**criteria** [1] - 1799:21
**critical** [1] - 1794:19
**criticism** [1] - 1737:7
**criticisms** [1] - 1737:9
**criticize** [1] - 1784:16
**criticizes** [1] - 1811:12
**criticizing** [3] - 1736:23, 1737:3, 1737:5
**cross** [3] - 1723:17, 1725:11, 1725:17
**cross-examination** [1] - 1723:17
**cross..** [1] - 1758:25
**crosses** [1] - 1759:7
**CRR** [1] - 1716:1
**Crutcher** [1] - 1715:16
**crystallize** [1] - 1761:3
**cubic** [1] - 1793:10
**culpable** [1] - 1749:8
**culprit** [2] - 1770:19, 1770:25
**Culverhouse** [1] - 1723:23
**culvert** [3] - 1759:1, 1759:5, 1759:14
**curious** [1] - 1739:10
**customer** [1] -

1748:10
**Cyclohex** [2] - 1776:2, 1776:4

# D

**D-A-W-S-O-N** [1] - 1721:8
**D.C** [1] - 1715:6
**daily** [3] - 1751:2, 1753:24, 1812:5
**danger** [1] - 1751:4
**dangerous** [5] - 1751:13, 1752:24, 1754:11, 1786:8, 1814:9
**dangers** [1] - 1750:12
**dark** [1] - 1760:18
**darker** [2] - 1760:15, 1760:16
**date** [2] - 1744:24, 1756:3
**dated** [1] - 1736:3
**DAVID** [1] - 1715:15
**Dawson** [2] - 1721:7, 1722:17
**DAY** [1] - 1715:9
**day-to-day** [3] - 1764:1, 1765:13, 1767:11
**days** [2] - 1796:19, 1813:15
**DC** [3] - 1715:17, 1715:25, 1716:3
**DCA** [1] - 1742:9
**DCAS** [21] - 1735:18, 1735:19, 1735:23, 1735:25, 1736:7, 1736:12, 1736:13, 1736:24, 1736:25, 1737:3, 1737:4, 1737:20, 1741:3, 1741:10, 1743:15, 1745:12, 1746:4, 1765:12, 1768:15
**DCAS's** [1] - 1736:9
**deal** [2] - 1753:3, 1762:13
**dealing** [1] - 1730:5
**dealt** [1] - 1738:4
**debatable** [1] - 1767:10
**debate** [2] - 1735:25, 1769:13
**debated** [1] - 1766:19
**decade** [1] - 1811:14
**decaffeinate** [1] - 1754:16
**December** [1] -

1745:22
**decide** [2] - 1728:8, 1794:19
**declarations** [3] - 1718:13, 1718:15, 1718:16
**defendant** [1] - 1720:14
**Defendant** [2] - 1715:7, 1715:19
**Defense** [1] - 1715:23
**defined** [1] - 1800:7
**definitely** [1] - 1737:18
**definition** [3] - 1726:16, 1726:17, 1744:14
**degreaser** [11] - 1730:13, 1731:11, 1731:17, 1733:10, 1734:16, 1734:24, 1773:8, 1774:12, 1796:2
**degreasers** [2] - 1731:13, 1770:20
**degreasing** [1] - 1729:24
**Delaney** [3] - 1791:7, 1799:15, 1803:15
**demonstrated** [1] - 1780:1
**demonstrates** [1] - 1789:12
**deny** [1] - 1813:25
**Department** [2] - 1715:22, 1778:21
**deposition** [19] - 1719:12, 1719:17, 1719:19, 1720:19, 1720:22, 1721:2, 1721:6, 1721:7, 1721:23, 1722:25, 1723:2, 1724:20, 1724:21, 1725:1, 1725:8, 1725:10, 1725:15, 1725:17
**depositions** [8] - 1718:12, 1718:16, 1719:18, 1719:24, 1720:7, 1721:13, 1723:20, 1723:21
**DEPUTY** [1] - 1717:2
**described** [3] - 1796:15, 1796:22, 1802:11
**describing** [1] - 1771:13
**design** [2] - 1780:22, 1787:6
**designated** [3] -

1720:4, 1724:8, 1812:4
**designations** [1] - 1720:10
**designed** [3] - 1727:22, 1777:25, 1782:8
**destroyed** [1] - 1810:20
**destruction** [1] - 1810:16
**detail** [1] - 1811:18
**detailing** [1] - 1743:15
**details** [1] - 1811:16
**detected** [1] - 1804:9
**determination** [3] - 1726:25, 1753:25, 1773:19
**determinative** [1] - 1747:1
**determine** [2] - 1733:8, 1772:25
**determined** [1] - 1731:22
**determining** [1] - 1733:19
**developed** [3] - 1755:20, 1781:19, 1781:20
**development** [3] - 1731:25, 1732:4, 1767:15
**deviation** [1] - 1765:25
**diagram** [2] - 1757:25, 1792:18
**Dickey** [15] - 1749:17, 1749:19, 1749:21, 1749:24, 1750:1, 1751:20, 1751:21, 1782:12, 1782:25, 1783:9, 1783:15, 1789:13, 1789:16, 1789:18
**difference** [3] - 1736:23, 1736:25, 1764:10
**different** [15] - 1721:14, 1726:21, 1730:17, 1737:19, 1739:10, 1740:14, 1745:16, 1746:7, 1748:25, 1769:20, 1778:12, 1781:1, 1781:22, 1788:3, 1795:10
**differently** [2] - 1744:9, 1783:25
**dike** [5] - 1759:2, 1759:4, 1759:6,

1759:13, 1759:15
**dikes** [1] - 1759:3
**direct** [13] - 1730:11, 1740:11, 1761:21, 1768:8, 1778:25, 1785:14, 1794:17, 1799:6, 1799:9, 1799:17, 1799:20, 1799:25, 1803:22
**directing** [2] - 1741:16, 1743:18
**direction** [8] - 1739:23, 1739:24, 1743:17, 1743:22, 1744:18, 1745:24, 1747:22, 1765:17
**directly** [3] - 1727:2, 1746:4, 1777:18
**directs** [1] - 1777:14
**disc** [6] - 1718:5, 1718:21, 1718:23, 1718:24, 1719:3, 1720:19
**discarded** [2] - 1795:5, 1795:6
**discharge** [20] - 1777:25, 1780:13, 1782:12, 1783:3, 1785:6, 1785:8, 1785:14, 1785:18, 1798:23, 1799:6, 1799:14, 1799:19, 1799:25, 1800:1, 1800:5, 1800:6, 1800:10, 1800:23, 1803:25
**discharged** [3] - 1800:17, 1800:20, 1800:25
**discharger** [1] - 1799:2
**discharges** [6] - 1790:25, 1792:12, 1798:5, 1799:17, 1806:10, 1812:13
**discharging** [4] - 1786:20, 1791:4, 1802:25, 1803:12
**disclose** [1] - 1798:10
**disclosed** [2] - 1803:7
**discs** [4] - 1718:11, 1719:9, 1719:24, 1720:1
**discuss** [2] - 1764:22, 1806:5
**discussed** [1] - 1719:8
**discussions** [1] - 1768:10
**disengaged** [1] -

1808:18

**disengagement** [5] - 1767:3, 1767:16, 1767:23, 1768:7, 1768:14

**disperse** [1] - 1790:20

**dispersed** [1] - 1780:15

**disposal** [34] - 1738:2, 1738:14, 1738:16, 1738:19, 1744:19, 1763:16, 1763:17, 1764:3, 1764:19, 1767:12, 1769:12, 1777:1, 1777:4, 1779:1, 1780:12, 1780:16, 1780:17, 1788:6, 1792:7, 1795:22, 1795:24, 1805:12, 1806:5, 1806:22, 1806:23, 1807:1, 1807:3, 1807:7, 1807:14, 1808:14, 1808:15, 1809:1, 1809:5, 1810:22

**dispose** [11] - 1744:20, 1744:21, 1745:12, 1745:17, 1763:15, 1777:1, 1777:3, 1783:1, 1798:18, 1810:2, 1811:1

**disposed** [11] - 1738:12, 1762:14, 1762:22, 1763:24, 1764:20, 1792:8, 1794:25, 1798:21, 1799:22, 1810:20

**disposing** [5] - 1738:20, 1754:1, 1785:19, 1807:4, 1807:5

**dispute** [2] - 1728:12, 1790:22

**disputes** [1] - 1774:11

**disregarded** [1] - 1800:21

**dissolved** [3] - 1790:14, 1791:23, 1795:12

**distant** [1] - 1796:1

**distinction** [5] - 1737:25, 1738:1, 1739:2, 1805:9, 1805:12

**distinctions** [4] - 1768:20, 1768:21, 1769:1, 1769:3

**distinguish** [4] -

---

1761:16, 1785:14, 1793:17, 1799:20

**distinguishable** [1] - 1783:8

**distinguished** [1] - 1799:18

**distinguishing** [1] - 1737:23

**District** [1] - 1752:13

**DISTRICT** [3] - 1715:1, 1715:1, 1715:11

**disturbance** [1] - 1813:7

**ditch** [5] - 1791:24, 1813:4, 1813:5, 1813:7, 1813:17

**doctrine** [1] - 1807:20

**document** [9] - 1735:6, 1736:21, 1737:2, 1737:10, 1743:2, 1752:12, 1765:4, 1776:12, 1814:1

**documentary** [2] - 1735:15, 1766:22

**documented** [1] - 1737:12

**documents** [32] - 1717:13, 1732:6, 1732:18, 1734:10, 1734:11, 1734:12, 1735:17, 1735:21, 1735:23, 1736:6, 1740:12, 1741:11, 1741:14, 1742:8, 1743:14, 1743:17, 1744:19, 1747:10, 1749:20, 1752:10, 1764:7, 1766:21, 1766:24, 1766:25, 1767:19, 1768:4, 1775:24, 1793:15, 1812:8, 1812:11, 1815:10

**DoD** [1] - 1788:15

**DOE** [1] - 1788:15

**dollars** [1] - 1756:8

**done** [13] - 1720:21, 1730:15, 1757:19, 1757:21, 1766:5, 1773:3, 1780:1, 1783:10, 1784:24, 1785:10, 1795:5, 1810:17, 1814:25

**doses** [1] - 1754:11

**dot** [3] - 1760:12, 1760:15, 1771:23

**dots** [1] - 1771:18

**double** - 1717:25,

---

1718:23

**double-check** [1] - 1718:23

**doubted** [1] - 1776:16

**down** [16] - 1737:7, 1746:15, 1747:4, 1747:5, 1756:17, 1756:19, 1757:14, 1757:15, 1759:11, 1761:7, 1771:5, 1772:17, 1777:19, 1792:11, 1792:25, 1799:8

**downhill** [2] - 1759:23, 1759:24

**Dr** [14] - 1723:17, 1724:19, 1724:20, 1725:15, 1729:5, 1731:11, 1772:5, 1773:25, 1779:22, 1792:9, 1792:19, 1799:15, 1803:15, 1812:7

**drain** [6] - 1774:2, 1774:4, 1776:17, 1776:19, 1777:6

**drainage** [10] - 1759:4, 1759:21, 1760:2, 1760:3, 1791:24, 1812:20, 1812:21, 1813:4, 1813:5, 1813:7

**drained** [1] - 1776:2

**drains** [4] - 1759:1, 1759:6, 1759:14, 1765:1

**draw** [1] - 1805:9

**drawing** [2] - 1812:15, 1812:16

**dredger** [2] - 1751:2, 1753:24

**drinking** [1] - 1753:15

**driven** [1] - 1739:25

**driver** [2] - 1756:21, 1768:23

**dropping** [1] - 1738:24

**drove** [4] - 1738:14, 1738:20, 1740:1, 1761:9

**drums** [2] - 1777:18, 1786:10

**dry** [1] - 1803:3

**dull** [2] - 1767:17, 1768:1

**Dull** [1] - 1721:24

**dull's** [1] - 1768:3

**dump** [5] - 1724:11, 1753:6, 1761:23, 1787:7, 1787:8

---

**dumped** [5] - 1727:2, 1727:14, 1728:5, 1786:12, 1787:4

**dumping** [17] - 1727:15, 1727:16, 1727:21, 1728:1, 1729:6, 1729:8, 1729:17, 1733:9, 1750:7, 1751:1, 1770:20, 1786:10, 1796:1, 1798:5, 1798:12, 1806:11

**dumps** [1] - 1765:22

**Dunn** [1] - 1715:16

**during** [10] - 1721:12, 1725:17, 1726:6, 1733:6, 1734:1, 1741:17, 1749:3, 1777:16, 1801:20, 1801:23

**dust** [4] - 1790:16, 1790:18, 1790:19, 1790:22

**dutifully** [1] - 1718:6

**duty** [11] - 1732:24, 1761:21, 1761:24, 1761:25, 1762:3, 1762:8, 1762:13, 1762:19, 1763:5, 1763:14

---

# E

**e-mail** [1] - 1717:8

**Earl** [1] - 1811:16

**early** [8] - 1726:23, 1731:24, 1731:25, 1732:4, 1771:16, 1781:21, 1796:14, 1796:22

**Earth** [1] - 1759:3

**east** [8] - 1758:3, 1759:22, 1760:10, 1771:25, 1772:2, 1773:11, 1774:5, 1812:21

**easy** [2] - 1758:5, 1769:14

**echo** [1] - 1725:22

**economic** [1] - 1717:25

**Edwin** [1] - 1720:19

**effect** [1] - 1807:20

**efficacy** [1] - 1776:17

**effort** [2] - 1749:15, 1809:2

**either** [16] - 1725:3, 1733:9, 1733:22, 1737:15, 1762:14,

---

1763:3, 1768:25, 1770:12, 1771:7, 1785:7, 1798:4, 1799:20, 1803:17, 1806:15, 1810:1

**elements** [1] - 1793:7

**ELLEN** [1] - 1715:10

**emitted** [1] - 1790:16

**emphasis** [1] - 1752:19

**emphasize** [1] - 1813:23

**employee** [2] - 1727:2, 1729:6

**employees** [1] - 1728:1

**encompass** [1] - 1806:22

**encompasses** [1] - 1806:23

**end** [11] - 1744:25, 1745:1, 1745:3, 1763:24, 1763:25, 1771:22, 1797:15, 1809:14, 1810:17, 1813:17, 1814:20

**endeavor** [1] - 1808:19

**ended** [1] - 1733:4

**engage** [1] - 1804:2

**engagement** [1] - 1807:17

**engineer** [2] - 1811:9, 1811:22

**engineered** [1] - 1751:3

**engineering** [1] - 1812:15

**Engineers** [1] - 1802:23

**ENRD** [1] - 1715:23

**ensure** [1] - 1763:18

**entire** [3] - 1731:16, 1731:18, 1748:22

**entirely** [1] - 1732:18

**entities** [1] - 1735:19

**entitled** [2] - 1724:13, 1816:5

**entity** [2] - 1750:23, 1769:4

**environment** [2] - 1733:21, 1794:18

**Environmental** [1] - 1715:23

**environmental** [4] - 1737:24, 1737:25, 1749:9, 1779:2

**equipment** [9] - 1730:13, 1730:14, 1730:24, 1731:4,

1731:15, 1794:2, 1794:9, 1794:12, 1805:10
**Equipment** [1] - 1742:19
**equitable** [8] - 1730:23, 1731:1, 1747:13, 1747:16, 1748:2, 1748:3, 1809:18, 1810:12
**equitably** [2] - 1730:7, 1747:23
**equities** [2] - 1731:1, 1747:2
**ERICA** [1] - 1715:19
**escape** [1] - 1736:16
**escapement** [1] - 1736:14
**ESH** [1] - 1715:5
**especially** [2] - 1779:10, 1811:15
**ESQ** [11] - 1715:13, 1715:14, 1715:14, 1715:15, 1715:15, 1715:19, 1715:19, 1715:20, 1715:20, 1715:21, 1715:21
**estimate** [2] - 1755:21, 1756:11
**estimated** [4] - 1756:5, 1762:9, 1791:8, 1791:22
**et** [1] - 1717:23
**evaluation** [1] - 1736:22
**Evaluation** [1] - 1764:17
**evap** [17] - 1730:3, 1760:25, 1770:3, 1770:4, 1770:6, 1770:16, 1775:3, 1776:2, 1777:6, 1777:7, 1777:8, 1777:15, 1777:18, 1777:20, 1778:1, 1778:2, 1778:3
**evaporate** [1] - 1770:16
**evaporates** [1] - 1773:15
**evaporation** [20] - 1726:23, 1750:14, 1751:19, 1764:2, 1769:21, 1769:22, 1769:25, 1770:9, 1770:25, 1775:9, 1775:10, 1787:2, 1795:2, 1795:15, 1795:24, 1796:5, 1796:6, 1796:8,

1796:11, 1807:4
**Evaporation** [1] - 1769:24
**eventually** [2] - 1749:23, 1800:18
**everywhere** [1] - 1764:7
**evidence** [96] - 1718:20, 1718:24, 1719:2, 1719:10, 1719:19, 1719:22, 1720:25, 1721:19, 1721:21, 1722:22, 1723:9, 1723:14, 1724:3, 1724:7, 1724:12, 1729:7, 1729:23, 1729:25, 1732:3, 1734:23, 1735:1, 1735:2, 1735:13, 1735:19, 1736:10, 1740:7, 1740:8, 1741:1, 1741:18, 1741:21, 1742:8, 1742:25, 1743:6, 1743:10, 1743:20, 1744:10, 1745:23, 1747:11, 1747:14, 1749:8, 1750:22, 1751:5, 1751:10, 1751:14, 1751:23, 1752:7, 1752:9, 1758:8, 1758:10, 1758:12, 1763:19, 1763:23, 1764:15, 1764:23, 1764:25, 1765:1, 1766:2, 1767:21, 1768:6, 1768:7, 1768:14, 1770:8, 1780:5, 1780:21, 1784:5, 1784:6, 1784:8, 1784:21, 1786:18, 1786:22, 1788:24, 1789:6, 1789:11, 1790:23, 1791:21, 1791:22, 1795:17, 1796:1, 1796:9, 1796:10, 1798:19, 1805:16, 1805:24, 1806:1, 1807:2, 1807:6, 1807:14, 1808:9, 1808:22, 1808:25, 1809:4, 1810:23, 1811:20, 1812:2, 1813:13, 1815:9
**Evidence** [1] - 1724:6
**evil** [1] - 1770:23
**exactly** [6] - 1723:18, 1748:3, 1761:22,

1781:20, 1796:25, 1813:3
**examination** [1] - 1723:17
**examine** [1] - 1789:19
**examined** [1] - 1725:18
**example** [7] - 1747:9, 1750:15, 1751:14, 1755:23, 1764:16, 1806:5, 1808:17
**examples** [2] - 1726:20, 1745:6
**excavated** [1] - 1793:9
**excellent** [1] - 1789:1
**except** [2] - 1731:19, 1751:11
**exception** [4] - 1783:25, 1809:11, 1810:5, 1810:18
**excerpts** [1] - 1723:2
**exchanged** [1] - 1720:10
**exchanges** [1] - 1735:11
**excluded** [1] - 1722:5
**excuse** [1] - 1748:11
**executed** [1] - 1795:24
**exercise** [1] - 1766:18
**exercised** [2] - 1739:20, 1747:4
**exerted** [1] - 1765:16
**Exhibit** [6] - 1718:17, 1720:20, 1721:1, 1721:17, 1723:12, 1801:10
**exhibit** [21] - 1719:2, 1720:21, 1720:24, 1721:1, 1721:2, 1721:6, 1721:7, 1722:25, 1723:9, 1723:21, 1724:24, 1732:11, 1732:17, 1757:7, 1758:16, 1771:10, 1771:11, 1774:14, 1787:18, 1801:6, 1801:11
**exhibits** [6] - 1718:10, 1718:12, 1718:16, 1721:22, 1722:24, 1723:1
**exist** [2] - 1741:13, 1774:17
**existing** [5] - 1759:3, 1759:5, 1759:14, 1760:2, 1762:25
**exists** [1] - 1769:22
**expect** [1] - 1771:25
**expensive** [2] -

1768:24, 1787:3
**experience** [1] - 1785:23
**experiences** [1] - 1812:5
**expert** [11] - 1719:17, 1719:20, 1720:12, 1720:23, 1724:23, 1725:6, 1737:12, 1743:25, 1749:20, 1758:3, 1761:1
**experts** [12] - 1719:16, 1719:25, 1720:9, 1720:12, 1721:14, 1721:18, 1722:10, 1722:21, 1760:21, 1790:13, 1790:16, 1790:21
**explain** [1] - 1725:8
**explains** [1] - 1752:19
**explanation** [5] - 1728:18, 1743:25, 1758:5, 1784:18
**explode** [1] - 1776:21
**explosive** [5] - 1738:3, 1738:4, 1760:22, 1770:7, 1777:2
**explosives** [3] - 1737:14, 1776:20, 1776:21
**exponentially** [1] - 1756:20
**exposed** [1] - 1793:7
**extending** [1] - 1808:16
**extension** [2] - 1773:24, 1774:6
**extent** [6] - 1722:9, 1736:4, 1767:23, 1782:5, 1789:20, 1796:9
**extrapolated** [1] - 1775:8

**F**

**faced** [1] - 1782:13
**facilities** [5] - 1738:13, 1752:14, 1755:8, 1755:10, 1756:2
**facility** [14] - 1731:9, 1739:23, 1749:9, 1751:1, 1760:19, 1760:24, 1765:19, 1766:3, 1769:17, 1774:14, 1774:16, 1778:14, 1791:17, 1793:11
**fact** [23] - 1731:24,

1732:4, 1737:4, 1739:12, 1742:12, 1747:25, 1751:6, 1762:8, 1766:21, 1768:4, 1772:5, 1777:5, 1777:11, 1779:25, 1781:5, 1782:10, 1787:19, 1792:10, 1802:13, 1803:8, 1806:14, 1811:21, 1812:9
**factor** [2] - 1729:16, 1809:18
**factors** [1] - 1731:1
**facts** [7] - 1731:16, 1744:9, 1746:7, 1748:24, 1761:15, 1779:16, 1783:21
**factual** [1] - 1774:11
**fail** [2] - 1767:20
**failed** [2] - 1767:24, 1785:4
**fair** [2] - 1737:13, 1756:13, 1769:14, 1780:24, 1809:20
**false** [1] - 1738:1
**familiar** [1] - 1720:4
**far** [5] - 1735:11, 1769:11, 1769:17, 1805:5, 1807:9
**fashion** [1] - 1747:16
**fast** [1] - 1769:11
**faucet** [1] - 1806:7
**favorite** [1] - 1722:6
**FDA** [1] - 1754:17
**federal** [2] - 1788:14, 1788:15
**Federal** [1] - 1724:5
**Feenstra** [6] - 1731:11, 1771:12, 1772:5, 1779:22, 1792:19, 1812:10
**Feenstra's** [3] - 1729:5, 1773:25, 1812:7
**feet** [2] - 1759:4, 1765:24
**few** [5] - 1724:4, 1726:22, 1766:6, 1771:15, 1812:13
**field** [2] - 1760:13, 1760:19
**figure** [3] - 1755:13, 1756:7, 1767:9
**figured** [2] - 1777:22, 1803:23
**figuring** [1] - 1734:19
**file** [4] - 1782:11, 1783:2, 1785:17, 1800:9

**filed** [2] - 1751:19, 1784:25
**filing** [2] - 1785:13, 1799:18
**filter** [2] - 1806:6, 1806:7
**findings** [4] - 1729:9, 1737:5, 1783:10
**fine** [3] - 1717:12, 1725:20, 1729:2
**fine-tune** [1] - 1729:2
**fire** [3] - 1744:17, 1761:4, 1777:2
**fired** [1] - 1740:22
**first** [16] - 1717:24, 1718:2, 1719:12, 1723:11, 1725:24, 1725:25, 1735:14, 1748:8, 1762:6, 1775:24, 1778:22, 1779:20, 1804:24, 1805:1, 1807:21, 1810:1
**firsthand** [1] - 1812:8
**fit** [4] - 1740:17, 1740:20, 1740:21
**five** [5] - 1723:8, 1752:5, 1752:7, 1756:14, 1814:22
**flagged** [1] - 1814:7
**flawed** [1] - 1812:9
**FLETCHER** [1] - 1715:15
**flip** [1] - 1790:8
**flipped** [1] - 1771:9
**floor** [1] - 1807:13
**FMC** [3] - 1809:2, 1809:7, 1809:9
**focus** [5] - 1758:15, 1789:9, 1804:23, 1804:25, 1809:7
**focused** [2] - 1718:3, 1806:19
**focusing** [1] - 1807:9
**folks** [1] - 1728:15
**follow** [1] - 1765:6
**follow-up** [1] - 1765:6
**followed** [4] - 1720:12, 1727:22, 1735:10, 1739:19
**following** [3] - 1763:18, 1783:7, 1803:20
**Foods** [13] - 1739:22, 1740:2, 1744:6, 1744:9, 1744:13, 1744:18, 1765:17, 1778:24, 1807:16, 1809:6, 1809:7, 1809:8

**football** [2] - 1760:13, 1760:19
**FOR** [1] - 1715:1
**Force** [11] - 1740:10, 1741:3, 1741:19, 1746:5, 1764:16, 1764:17, 1765:13, 1767:22, 1767:24, 1768:8
**forefront** [1] - 1754:13
**foregoing** [1] - 1816:4
**foreseeable** [1] - 1781:18
**forgive** [1] - 1727:11
**formality** [1] - 1737:3
**formalized** [1] - 1737:9
**formed** [1] - 1736:13
**former** [1] - 1796:15
**Fort** [2] - 1808:14, 1808:22
**forthright** [1] - 1788:19
**forward** [1] - 1755:22
**FOTOUHI** [1] - 1715:15
**Fotouhi** [1] - 1757:4
**four** [5] - 1717:24, 1722:24, 1725:18, 1727:13, 1801:19
**frankly** [2] - 1752:20, 1808:2
**frequency** [2] - 1766:18, 1801:17
**frequently** [1] - 1801:18
**FS** [1] - 1755:21
**fugitive** [1] - 1790:16
**funded** [1] - 1730:18
**funds** [1] - 1745:9
**funny** [1] - 1753:4
**furnished** [1] - 1742:18
**Furnished** [1] - 1742:18
**future** [8] - 1755:13, 1755:19, 1756:4, 1756:9, 1756:12, 1756:21, 1756:24, 1757:2

## G

**GAO** [6] - 1754:22, 1754:23, 1757:6, 1757:8, 1757:9, 1787:17
**gap** [1] - 1736:6
**garbage** [2] - 1764:3,

1780:17
**gas** [9] - 1773:1, 1773:2, 1773:12, 1773:17, 1774:15, 1774:19, 1774:21, 1774:25
**gasoline** [1] - 1753:5
**Gaynor** [2] - 1721:7, 1722:17
**GAYNOR** [1] - 1721:8
**general** [2] - 1747:3, 1799:17
**generally** [3] - 1747:5, 1747:6, 1759:21
**generous** [2] - 1794:16, 1810:13
**gentleman** [1] - 1766:15
**George** [1] - 1811:17
**geysers** [1] - 1717:17
**GFE** [1] - 1742:18
**Gibson** [1] - 1715:16
**given** [3] - 1717:10, 1728:4, 1767:6
**glaring** [1] - 1736:6
**god** [1] - 1717:18
**gold** [1] - 1753:24
**Government** [2] - 1733:24, 1742:18
**government** [93] - 1717:23, 1718:15, 1719:19, 1721:17, 1721:22, 1722:24, 1724:8, 1728:12, 1730:1, 1730:6, 1730:9, 1730:11, 1730:15, 1730:20, 1733:3, 1734:23, 1735:2, 1736:2, 1736:17, 1738:10, 1740:3, 1741:15, 1741:18, 1741:22, 1742:2, 1742:17, 1742:19, 1742:20, 1742:21, 1742:23, 1742:24, 1742:25, 1743:2, 1743:8, 1743:17, 1743:23, 1744:14, 1744:20, 1745:7, 1745:24, 1745:25, 1747:4, 1748:1, 1748:9, 1748:10, 1748:14, 1748:16, 1748:17, 1748:23, 1749:1, 1749:3, 1751:7, 1751:8, 1754:22, 1757:5, 1761:20, 1762:2, 1762:11, 1762:16, 1762:24,

1763:10, 1764:6, 1764:8, 1764:12, 1766:6, 1766:11, 1767:8, 1774:9, 1778:16, 1779:14, 1780:18, 1782:5, 1783:6, 1783:16, 1783:22, 1783:24, 1784:9, 1784:10, 1784:12, 1784:17, 1788:14, 1788:16, 1788:19, 1793:2, 1805:15, 1806:10, 1806:12, 1806:16, 1808:1, 1815:10
**government's** [7] - 1717:20, 1717:21, 1723:1, 1734:4, 1745:10, 1754:21, 1764:4
**government-only** [1] - 1749:1
**government-owned** [3] - 1742:19, 1742:20, 1745:7
**Granberry** [2] - 1720:15, 1720:20
**Grant** [1] - 1762:9
**grate** [1] - 1807:13
**greater** [1] - 1752:21
**grinder** [1] - 1794:4
**grinding** [2] - 1794:5, 1813:14
**ground** [41] - 1717:17, 1722:7, 1727:3, 1728:2, 1728:5, 1728:9, 1729:13, 1730:21, 1733:11, 1733:14, 1733:23, 1738:24, 1747:6, 1747:7, 1749:23, 1749:24, 1750:8, 1753:24, 1761:3, 1761:7, 1773:13, 1779:15, 1782:9, 1782:10, 1786:21, 1787:4, 1787:8, 1790:15, 1790:25, 1791:19, 1792:4, 1792:5, 1796:2, 1799:12, 1799:23, 1800:8, 1800:18, 1803:1, 1806:10, 1807:6
**grounds** [1] - 1765:11
**groundwater** [31] - 1728:7, 1738:6, 1739:4, 1750:5, 1751:3, 1751:16, 1753:3, 1753:7,

1753:16, 1754:7, 1754:12, 1769:10, 1771:6, 1771:8, 1771:18, 1771:19, 1771:24, 1772:2, 1772:16, 1774:16, 1775:6, 1779:23, 1780:9, 1791:12, 1791:13, 1792:11, 1792:21, 1799:23, 1800:9, 1800:24
**grow** [1] - 1756:20
**guarantee** [1] - 1744:9
**guess** [7] - 1722:9, 1727:10, 1727:24, 1728:19, 1733:5, 1751:12, 1775:12
**guidance** [1] - 1740:21
**guys** [2] - 1761:1, 1761:11

## H

**hamburger** [1] - 1765:6
**hammering** [1] - 1806:25
**hampered** [1] - 1736:5
**hand** [3] - 1726:9, 1771:21, 1772:4
**handed** [1] - 1757:4
**handful** [1] - 1736:1
**handle** [1] - 1765:20
**handled** [1] - 1740:1
**handling** [2] - 1738:17, 1764:25
**hands** [1] - 1808:18
**hands-off** [1] - 1808:18
**handwritten** [2] - 1732:9, 1732:10
**hang** [1] - 1789:16, 1789:17, 1789:18
**happy** [2] - 1814:17
**hard** [5] - 1739:3, 1742:22, 1769:3, 1773:19, 1798:11
**hard-pressed** [1] - 1739:3
**hazard** [2] - 1761:4
**hazardous** [3] - 1793:10, 1793:11, 1810:2
**hazards** [1] - 1738:23
**hear** [2] - 1725:24, 1805:25
**hearsay** [6] - 1719:20, 1719:24, 1720:14,

1721:25, 1722:11, 1724:21
**heart** [1] - 1779:8
**Heeseman** [3] - 1781:21, 1796:22, 1811:8
**held** [1] - 1748:17
**help** [3] - 1766:3, 1794:13, 1808:23
**helped** [1] - 1767:22
**helpful** [4] - 1723:4, 1729:11, 1729:12, 1780:3
**HEMINGER** [8] - 1715:20, 1719:7, 1719:12, 1719:15, 1720:18, 1720:22, 1721:6, 1721:11
**Heminger** [2] - 1719:8, 1721:4
**hesitate** [3] - 1728:4, 1728:12, 1787:11
**hide** [1] - 1802:21
**high** [11] - 1751:11, 1755:11, 1755:12, 1759:15, 1759:17, 1759:20, 1759:25, 1781:11, 1791:4, 1791:5, 1793:19
**higher** [1] - 1755:2
**highest** [3] - 1754:24, 1757:6, 1779:23
**highlight** [1] - 1801:13
**highly** [2] - 1749:13, 1766:19
**hill** [2] - 1760:9, 1799:8
**himself** [1] - 1767:25
**hindsight** [1] - 1738:21
**hired** [2] - 1763:9, 1780:25
**historic** [1] - 1723:20
**historical** [5] - 1718:12, 1734:11, 1734:12, 1736:5, 1752:18
**history** [3] - 1731:18, 1732:4, 1748:22
**hits** [8] - 1746:16, 1773:1, 1773:17, 1773:21, 1774:13, 1774:15, 1774:21, 1774:25
**hog** [26] - 1741:22, 1741:24, 1742:3, 1742:5, 1742:13, 1742:16, 1743:9, 1780:19, 1780:21, 1780:22, 1780:25,

1781:3, 1781:8, 1781:9, 1782:17, 1782:24, 1784:9, 1786:16, 1786:19, 1786:24, 1795:8, 1795:9, 1798:4
**hog-out** [12] - 1741:24, 1742:3, 1742:5, 1742:13, 1742:16, 1780:19, 1781:8, 1784:9, 1786:19, 1786:24, 1795:9
**hog-out's** [1] - 1743:9
**hog-outs** [11] - 1780:21, 1780:22, 1780:25, 1781:3, 1781:9, 1782:17, 1782:24, 1786:16, 1795:8
**hogged** [1] - 1742:21
**hogging** [6] - 1781:4, 1782:4, 1796:24, 1797:1, 1797:3, 1807:4
**hold** [2] - 1718:5, 1718:6
**honest** [2] - 1794:15, 1812:17
**Honor** [182] - 1719:4, 1719:7, 1719:16, 1719:25, 1720:10, 1720:17, 1720:18, 1721:14, 1721:20, 1721:23, 1722:9, 1722:19, 1722:23, 1723:3, 1723:6, 1724:5, 1724:18, 1725:4, 1725:8, 1725:14, 1725:25, 1726:1, 1726:13, 1727:7, 1727:8, 1727:10, 1727:13, 1727:19, 1727:23, 1727:25, 1728:25, 1729:4, 1729:19, 1729:21, 1731:6, 1731:13, 1731:14, 1731:21, 1732:14, 1732:16, 1732:19, 1732:23, 1733:18, 1734:8, 1734:12, 1734:14, 1734:21, 1735:1, 1735:8, 1735:14, 1736:10, 1736:20, 1738:1, 1739:2, 1740:15, 1741:8, 1741:9, 1741:24, 1742:7, 1743:3, 1743:12,

1743:15, 1743:21, 1744:3, 1744:24, 1745:4, 1745:16, 1746:6, 1746:18, 1746:24, 1747:15, 1748:7, 1748:11, 1748:20, 1748:21, 1749:3, 1749:14, 1750:20, 1752:3, 1752:6, 1752:16, 1752:23, 1755:4, 1755:7, 1755:11, 1755:15, 1756:11, 1756:15, 1756:23, 1757:7, 1757:18, 1757:22, 1758:2, 1758:6, 1758:10, 1758:14, 1759:12, 1762:1, 1764:5, 1765:21, 1766:20, 1767:4, 1767:13, 1768:16, 1768:22, 1769:4, 1769:23, 1770:15, 1771:3, 1772:12, 1773:6, 1773:12, 1774:7, 1775:5, 1775:15, 1776:25, 1778:20, 1778:22, 1779:3, 1779:20, 1781:2, 1781:5, 1782:6, 1782:11, 1782:19, 1783:4, 1783:18, 1783:21, 1784:2, 1784:13, 1785:2, 1786:5, 1786:17, 1786:24, 1787:3, 1787:5, 1788:4, 1788:21, 1789:8, 1791:13, 1792:12, 1793:16, 1793:22, 1794:18, 1794:22, 1795:5, 1795:15, 1796:11, 1797:15, 1797:18, 1798:16, 1801:3, 1801:6, 1802:10, 1802:22, 1804:20, 1804:22, 1805:8, 1805:17, 1805:24, 1806:20, 1807:19, 1808:4, 1808:9, 1809:6, 1809:11, 1809:22, 1809:24, 1810:11, 1810:23, 1812:12, 1812:17, 1813:9, 1813:20, 1813:21, 1814:10, 1814:12, 1814:15, 1814:25, 1815:8
**HONORABLE** [1] -

1715:10
**hooked** [1] - 1778:3
**hoot** [1] - 1773:11
**hope** [1] - 1718:3
**hoping** [2] - 1717:15, 1717:19
**hose** [1] - 1777:19
**housekeeping** [1] - 1790:17
**huge** [1] - 1750:25
**hundred** [1] - 1717:15
**hundreds** [1] - 1751:1
**hung** [1] - 1771:25
**hurry** [1] - 1814:24
**HUVELLE** [1] - 1715:10

# I

**idea** [7] - 1729:22, 1737:14, 1737:22, 1738:22, 1756:25, 1762:19, 1807:23
**ideas** [1] - 1746:25
**identified** [6] - 1721:3, 1752:24, 1753:1, 1753:8, 1753:14, 1754:6
**ignore** [1] - 1729:20, 1779:19, 1787:9, 1788:17, 1789:13, 1806:15, 1812:7
**ignored** [1] - 1800:17
**ignoring** [2] - 1783:17, 1783:19
**II** [1] - 1748:22
**illegal** [1] - 1727:21
**imagine** [1] - 1734:20
**immunity** [1] - 1783:21
**impact** [2] - 1753:9, 1753:25
**impacting** [2] - 1753:2, 1754:7
**impeach** [2] - 1722:1, 1722:12
**important** [7] - 1741:14, 1742:16, 1747:1, 1767:11, 1779:4, 1788:7, 1805:1
**impose** [2] - 1763:16, 1785:21
**imposed** [1] - 1804:17
**imposing** [1] - 1763:16
**inch** [3] - 1777:14, 1777:20, 1778:1
**inches** [1] - 1759:14

**incident** [1] - 1788:12
**incineration** [2] - 1801:21, 1802:5
**include** [4] - 1723:1, 1732:20, 1798:12, 1800:1
**included** [3] - 1719:18, 1730:3
**including** [5] - 1782:8, 1783:16, 1787:16, 1788:20, 1798:13
**inconsistencies** [1] - 1812:10
**incorporated** [1] - 1765:22
**incurred** [1] - 1789:11
**indemnification** [6] - 1717:23, 1718:1, 1745:14, 1808:5, 1808:6, 1808:7
**indemnified** [1] - 1809:16
**indemnity** [2] - 1745:18, 1745:19
**indicate** [1] - 1740:12
**indicated** [2] - 1720:24, 1790:16
**indicates** [5] - 1759:3, 1772:6, 1791:23, 1798:19, 1814:11
**indicating** [1] - 1732:18
**indication** [1] - 1777:8
**indirect** [8] - 1785:6, 1785:8, 1785:11, 1785:14, 1799:12, 1799:20, 1800:3, 1803:22
**industrial** [5] - 1783:1, 1799:22, 1800:6, 1800:8, 1811:25
**industry** [9] - 1742:5, 1747:3, 1747:4, 1747:5, 1762:17, 1762:18, 1762:23, 1766:5, 1800:11
**inert** [4] - 1814:4, 1814:5, 1814:9
**infer** [1] - 1769:14
**inference** [1] - 1780:24
**information** [8] - 1723:1, 1732:7, 1732:8, 1732:24, 1733:1, 1783:19, 1783:20, 1813:14
**initial** [2] - 1720:5, 1802:8
**injection** [1] - 1751:2
**inspect** [1] - 1761:21

**inspected** [3] - 1752:9, 1780:21, 1786:19
**inspecting** [5] - 1737:21, 1752:11, 1763:17, 1805:13
**inspection** [10] - 1735:10, 1735:12, 1736:1, 1736:24, 1776:12, 1776:13, 1798:10, 1805:18, 1806:16, 1807:6
**inspections** [35] - 1735:5, 1735:21, 1735:23, 1736:12, 1736:24, 1737:1, 1737:14, 1737:15, 1737:22, 1739:12, 1739:13, 1739:17, 1739:18, 1739:20, 1740:1, 1740:8, 1740:11, 1741:4, 1741:9, 1743:12, 1743:15, 1743:16, 1745:25, 1746:3, 1752:14, 1764:10, 1764:11, 1765:19, 1766:16, 1768:15, 1777:4, 1797:25, 1805:6, 1807:2
**inspector** [3] - 1776:14, 1776:16, 1805:19
**inspectors** [3] - 1735:2, 1737:5, 1766:7
**installed** [1] - 1794:4
**instance** [2] - 1718:13, 1785:25
**instead** [2] - 1758:3, 1800:25
**instruct** [1] - 1806:15
**instructed** [2] - 1745:12, 1810:11
**instructions** [1] - 1797:17
**integrator** [1] - 1740:18
**intellectual** [2] - 1762:24, 1762:25
**intended** [1] - 1813:11
**intentional** [3] - 1726:15, 1726:25, 1810:1
**interest** [4] - 1733:15, 1736:9, 1754:14, 1765:12
**interested** [2] - 1723:2, 1802:16
**interesting** [3] -

1726:9, 1726:14, 1787:10
**internal** [3] - 1750:9, 1775:25, 1776:10
**interrogatory** [3] - 1732:3, 1732:13, 1734:3
**intervening** [1] - 1800:2
**introduced** [1] - 1742:2
**inventory** [1] - 1810:16
**investigate** [1] - 1771:2
**investigated** [1] - 1783:12
**investigating** [1] - 1738:17
**investigation** [3] - 1773:2, 1798:3, 1798:19
**investigations** [5] - 1771:15, 1771:16, 1771:20, 1773:3, 1774:19
**involve** [2] - 1738:19, 1748:13
**involved** [5] - 1729:22, 1730:21, 1751:6, 1751:7, 1768:10
**involvement** [2] - 1765:12, 1808:17
**irrigation** [1] - 1753:15
**Irwin** [3] - 1757:17, 1808:14, 1808:22
**issue** [13] - 1725:4, 1725:10, 1728:12, 1733:6, 1737:13, 1757:24, 1770:8, 1786:1, 1789:5, 1802:24, 1803:5, 1805:6, 1811:5
**issues** [13] - 1718:2, 1737:6, 1739:24, 1739:25, 1741:5, 1746:3, 1747:9, 1747:25, 1775:14, 1782:13, 1804:23, 1809:10
**items** [2] - 1719:9, 1720:18
**itself** [3] - 1729:16, 1740:25, 1814:11

### J

**JENNIFER** [1] -

1715:21
**JESSICA** [1] - 1715:20
**John** [2] - 1748:24, 1778:21
**JOHN** [1] - 1715:19
**Johnson** [1] - 1718:7
**JOHNSON** [1] - 1715:21
**Jorge** [2] - 1719:13, 1720:14
**JORGE** [1] - 1719:13
**JUDGE** [1] - 1715:11
**judge** [3] - 1718:7, 1725:21, 1733:16
**July** [1] - 1777:13
**jumping** [1] - 1727:12
**Justice** [2] - 1715:22, 1778:21
**Justin** [1] - 1719:7
**JUSTIN** [2] - 1715:14, 1715:20

### K

**keep** [3] - 1718:3, 1786:1, 1788:13
**kept** [1] - 1813:7
**key** [5] - 1788:5, 1789:8, 1789:9, 1790:14, 1799:21
**kick** [1] - 1808:11
**kicked** [1] - 1736:9
**kill** [1] - 1754:20
**kind** [6] - 1734:24, 1768:19, 1773:13, 1781:1, 1791:10, 1791:16
**kinds** [2] - 1766:16, 1807:7
**knowledge** [4] - 1750:1, 1750:2, 1750:21, 1784:20
**knowledgeable** [1] - 1750:24
**known** [10] - 1742:23, 1751:15, 1751:24, 1754:18, 1754:19, 1761:2, 1761:11, 1784:6, 1784:22, 1798:13
**knows** [2] - 1729:18, 1758:6

### L

**Lab** [1] - 1741:19
**lab** [4] - 1791:3, 1804:6, 1804:7, 1804:11

**Laborde** [9] - 1741:23, 1752:2, 1764:3, 1769:6, 1780:7, 1780:8, 1780:11, 1798:9, 1811:2
**lack** [4] - 1736:5, 1737:3, 1740:9, 1786:4
**land** [2] - 1761:4, 1786:25
**landed** [1] - 1779:15
**landfill** [1] - 1780:17
**large** [7] - 1736:19, 1741:20, 1742:3, 1742:4, 1754:20, 1776:2, 1787:1
**largest** [1] - 1767:14
**Larry** [4] - 1732:9, 1811:9, 1811:17, 1811:21
**last** [6] - 1718:11, 1721:5, 1723:21, 1726:1, 1761:19, 1779:11
**late** [3] - 1735:22, 1744:22, 1754:9
**latest** [1] - 1741:6
**latitude** [1] - 1725:10
**Laughter** [1] - 1734:7
**launch** [2] - 1736:14, 1736:16
**law** [13] - 1718:19, 1728:15, 1729:10, 1732:21, 1775:19, 1783:2, 1783:4, 1785:3, 1785:13, 1799:1, 1799:16, 1806:15
**law's** [1] - 1785:3
**laws** [3] - 1787:9, 1790:5, 1810:3
**lawyer** [1] - 1802:14
**lax** [1] - 1736:3
**laying** [1] - 1795:11
**lazy** [2] - 1760:22, 1761:12
**leak** [1] - 1796:7
**leaked** [1] - 1796:9
**leaks** [1] - 1796:4
**learn** [1] - 1732:24
**learned** [2] - 1718:4, 1732:25
**least** [6] - 1730:10, 1731:8, 1779:14, 1792:1, 1804:15, 1805:5
**leave** [3] - 1717:25, 1721:15, 1793:6
**leaving** [1] - 1801:7
**left** [10] - 1742:20,

1759:20, 1759:24, 1760:2, 1771:21, 1772:4, 1773:16, 1797:16, 1801:14, 1811:23
**left-hand** [2] - 1771:21, 1772:4
**legal** [6] - 1717:22, 1727:24, 1739:10, 1789:2, 1789:3, 1789:4
**legend** [2] - 1812:14, 1812:18
**less** [1] - 1762:11
**letter** [11] - 1765:6, 1776:11, 1791:6, 1802:14, 1802:22, 1802:23, 1810:18, 1810:21, 1813:23, 1814:4, 1814:10
**letters** [1] - 1802:11
**letting** [1] - 1761:6
**level** [8] - 1734:22, 1752:20, 1754:24, 1767:10, 1769:9, 1779:23, 1784:20, 1812:1
**levels** [3] - 1751:12, 1802:20, 1803:24
**liability** [22] - 1717:22, 1729:12, 1731:3, 1739:4, 1739:5, 1744:11, 1746:14, 1746:15, 1747:19, 1747:21, 1749:25, 1762:5, 1764:13, 1782:3, 1789:25, 1794:7, 1794:10, 1794:11, 1797:10, 1807:15, 1809:6, 1809:8
**liable** [12] - 1730:6, 1731:6, 1746:22, 1746:25, 1747:22, 1747:23, 1748:14, 1748:18, 1749:24, 1794:8, 1794:10, 1809:3
**lid** [2] - 1798:7, 1807:10
**life** [1] - 1751:4
**light** [6] - 1744:16, 1754:9, 1783:20, 1809:20, 1810:13, 1811:16
**likely** [1] - 1733:11
**limit** [3] - 1754:1, 1756:17, 1804:8
**limitations** [1] - 1738:9

**limited** [1] - 1731:5
**limits** [1] - 1756:16
**line** [9] - 1777:8,
1777:20, 1777:23,
1778:1, 1778:6,
1778:9, 1785:2,
1801:2
**linked** [1] - 1723:5
**liquid** [5] - 1770:11,
1770:16, 1783:1,
1799:22, 1800:7
**liquids** [2] - 1750:6,
1785:19
**list** [13] - 1720:16,
1720:17, 1720:24,
1722:25, 1723:9,
1723:21, 1724:3,
1753:12, 1753:13,
1755:5, 1757:13,
1798:18
**listed** [4] - 1718:20,
1720:7, 1794:2,
1798:22
**lists** [2] - 1729:23,
1757:6
**literature** [1] - 1751:10
**Litgo** [1] - 1748:16
**litigation** [4] -
1731:19, 1732:1,
1732:20, 1732:21
**live** [2] - 1814:8,
1814:11
**LLP** [1] - 1715:16
**location** [1] - 1792:14
**Lockheed** [46] -
1717:2, 1717:6,
1717:19, 1718:15,
1718:17, 1721:11,
1722:25, 1725:24,
1732:5, 1734:17,
1734:20, 1750:4,
1755:20, 1779:6,
1784:17, 1784:25,
1785:3, 1785:4,
1786:21, 1787:10,
1788:9, 1789:12,
1789:13, 1795:21,
1796:14, 1797:4,
1797:6, 1802:7,
1802:11, 1802:25,
1804:24, 1805:2,
1805:22, 1805:25,
1806:15, 1806:17,
1808:23, 1809:2,
1810:15, 1811:7,
1811:12, 1811:23,
1811:24, 1813:25
**LOCKHEED** [1] -
1715:3
**Lockheed's** [9] -

1719:15, 1723:7,
1778:23, 1788:18,
1790:8, 1790:17,
1800:14, 1809:14,
1814:2
**logical** [2] - 1749:22,
1813:18
**look** [37] - 1728:7,
1729:10, 1729:11,
1730:17, 1730:19,
1731:16, 1735:9,
1739:22, 1739:24,
1740:3, 1742:3,
1747:2, 1747:8,
1747:24, 1747:25,
1749:7, 1750:25,
1759:16, 1760:11,
1762:22, 1765:10,
1765:21, 1771:3,
1771:4, 1771:7,
1771:17, 1772:8,
1780:14, 1787:5,
1787:21, 1788:7,
1791:12, 1801:4,
1806:4, 1815:7,
1815:8
**looked** [10] - 1727:16,
1727:19, 1734:23,
1735:6, 1755:22,
1764:19, 1764:20,
1783:13, 1792:15,
1813:14
**looking** [24] - 1717:17,
1720:3, 1726:1,
1727:25, 1730:7,
1731:1, 1736:17,
1738:16, 1740:2,
1741:2, 1741:4,
1747:2, 1747:3,
1749:4, 1753:22,
1754:17, 1762:5,
1764:23, 1764:25,
1766:3, 1770:24,
1773:5, 1812:19
**loose** [1] - 1763:23
**loosely** [1] - 1727:6
**low** [6] - 1754:11,
1757:10, 1774:18,
1791:9, 1793:19,
1797:20
**lower** [7] - 1757:14,
1763:3, 1769:9,
1771:21, 1772:3,
1772:24, 1804:12
**LPC** [10] - 1738:9,
1750:11, 1751:5,
1751:15, 1762:23,
1763:1, 1763:3,
1767:20, 1768:8,
1775:25

**LSM** [1] - 1736:16
**LUDWISZEWSKI** [1] -
1715:14
**lump** [1] - 1726:24
**Lunch** [1] - 1815:14
**lunch** [2] - 1765:25,
1766:1

# M

**machine** [1] - 1716:25
**machinery** [1] -
1761:10
**magic** [1] - 1747:18
**mail** [1] - 1717:8
**main** [1] - 1770:19
**maintain** [3] -
1718:10, 1719:5,
1763:14
**major** [12] - 1728:13,
1728:16, 1728:21,
1730:14, 1737:11,
1740:23, 1763:1,
1769:23, 1775:4,
1779:21, 1780:6
**majority** [1] - 1727:16
**man** [1] - 1796:15
**manage** [4] - 1761:21,
1766:4, 1777:3,
1778:25
**managed** [2] -
1762:17, 1762:22
**management** [5] -
1739:20, 1739:24,
1744:18, 1765:17,
1766:13
**Management** [1] -
1764:16
**manager** [2] -
1796:16, 1811:8
**managing** [2] -
1766:4, 1766:12
**mandatory** [2] -
1736:1, 1736:24
**manner** [1] - 1800:24
**manual** [3] - 1747:10,
1765:7, 1765:21
**manually** [1] - 1776:2
**manuals** [7] - 1740:5,
1746:9, 1776:20,
1786:6, 1787:5,
1787:9, 1804:24
**manufacturing** [2] -
1749:2, 1805:20
**map** [3] - 1771:17,
1772:12, 1792:18
**maps** [2] - 1759:16,
1792:15
**March** [1] - 1715:7

**Martin** [4] - 1717:3,
1722:25, 1732:5,
1784:17
**MARTIN** [1] - 1715:3
**Mary** [2] - 1760:7,
1760:14
**massive** [1] - 1797:21
**material** [23] -
1741:17, 1749:23,
1781:22, 1781:25,
1793:6, 1793:8,
1793:10, 1794:23,
1795:3, 1795:5,
1795:13, 1796:20,
1797:21, 1798:22,
1801:7, 1801:14,
1801:20, 1801:22,
1808:24, 1810:10,
1810:11, 1801:19
**materials** [13] -
1738:3, 1738:9,
1738:10, 1738:12,
1745:5, 1745:13,
1762:21, 1771:7,
1794:24, 1797:16,
1801:17, 1801:19
**matter** [7] - 1721:14,
1724:8, 1762:3,
1786:8, 1794:21,
1813:25, 1816:5
**Matz** [1] - 1725:22
**McClellan** [1] -
1757:14
**McMara** [1] - 1807:20
**McNamara** [1] -
1767:3
**mean** [11] - 1726:10,
1739:11, 1740:9,
1763:15, 1768:17,
1768:24, 1774:2,
1787:19, 1795:1,
1798:13, 1800:20
**meaning** [2] -
1737:14, 1772:9
**means** [3] - 1783:16,
1812:14, 1812:18
**meant** [4] - 1726:18,
1738:2, 1775:18,
1777:1
**measurable** [1] -
1784:23
**measure** [2] -
1773:12, 1783:14
**Meese** [1] - 1796:15
**meet** [2] - 1747:18,
1767:7
**meeting** [1] - 1743:7
**members** [1] - 1752:9
**memo** [2] - 1775:25
**memorandum** [1] -

1720:5
**mention** [1] - 1775:21
**mentioned** [2] -
1723:13, 1775:22
**met** [1] - 1737:21
**metal** [1] - 1765:5
**MICHAEL** [1] -
1715:13
**mid-'60s** [1] - 1736:20
**mid-1960s** [1] -
1807:20
**might** [12] - 1740:15,
1747:15, 1750:8,
1753:25, 1757:1,
1757:2, 1757:22,
1769:19, 1777:22,
1780:16, 1805:19
**miles** [1] - 1768:3
**military** [1] - 1782:17
**mill** [1] - 1794:6
**million** [13] - 1756:5,
1756:8, 1756:9,
1791:9, 1791:15,
1797:22, 1803:18,
1804:1, 1804:8,
1804:9, 1804:13,
1804:17
**mines** [1] - 1761:4
**minimum** [2] - 1759:4,
1759:13
**minute** [3] - 1720:3,
1728:17, 1813:21
**minutes** [1] - 1814:22
**minutiae** [4] -
1725:22, 1725:23,
1746:1, 1774:7
**mischaracterizing** [1]
- 1799:15
**missile** [5] - 1730:2,
1736:25, 1740:16,
1740:24, 1740:25,
1743:8, 1743:9
**missiles** [6] - 1740:18,
1742:15, 1742:17,
1742:19, 1742:21,
1749:6
**missing** [2] - 1718:17,
1719:2
**misstatement** [1] -
1724:10
**mistakenly** [2] -
1720:24, 1721:2
**mixed** [3] - 1741:17,
1777:1, 1777:2
**mixer** [4] - 1776:6,
1777:16, 1777:17,
1794:6
**mixing** [2] - 1755:25,
1792:3
**mixture** [1] - 1776:1

**moment** [2] - 1734:16, 1757:24
**money** [2] - 1742:17, 1807:25
**money's** [1] - 1767:9
**monitored** [1] - 1744:12
**monitoring** [2] - 1730:16, 1779:23
**Montebello** [1] - 1788:12
**morning** [5] - 1717:4, 1717:5, 1719:7, 1778:19, 1778:20
**most** [11] - 1717:10, 1717:13, 1733:10, 1746:8, 1768:23, 1775:18, 1779:4, 1788:7, 1792:20, 1803:3, 1806:9
**motivation** [1] - 1738:25
**motor** [4] - 1736:20, 1741:20, 1781:22, 1796:16
**motors** [4] - 1781:6, 1781:24, 1796:12, 1796:13
**mouths** [1] - 1766:15
**move** [9] - 1756:19, 1757:15, 1769:10, 1769:11, 1801:2, 1806:16, 1809:10, 1812:12
**moved** [3] - 1725:5, 1773:24, 1774:6
**moves** [2] - 1771:24, 1773:20
**moving** [5] - 1725:13, 1755:22, 1756:17, 1757:2, 1774:8
**MR** [277] - 1718:22, 1718:25, 1719:4, 1719:7, 1719:12, 1719:15, 1719:16, 1719:23, 1720:9, 1720:17, 1720:18, 1720:22, 1721:6, 1721:11, 1721:13, 1721:16, 1721:20, 1721:23, 1722:3, 1722:9, 1722:14, 1722:16, 1722:19, 1722:23, 1723:3, 1723:6, 1723:11, 1723:13, 1723:15, 1723:19, 1724:1, 1724:5, 1724:15, 1724:18, 1725:1, 1725:4, 1725:14,

1725:25, 1726:13, 1726:16, 1727:7, 1728:20, 1728:24, 1729:4, 1729:19, 1729:21, 1731:5, 1731:13, 1731:21, 1732:13, 1732:16, 1732:19, 1732:23, 1733:5, 1733:17, 1734:4, 1734:8, 1734:11, 1734:14, 1734:17, 1734:20, 1735:1, 1735:8, 1735:14, 1735:17, 1736:10, 1736:19, 1737:18, 1737:25, 1739:2, 1739:7, 1739:16, 1740:7, 1740:14, 1740:14, 1741:8, 1741:11, 1741:24, 1742:11, 1743:3, 1743:5, 1743:7, 1743:12, 1743:14, 1744:3, 1744:23, 1745:1, 1745:4, 1745:16, 1745:21, 1745:23, 1746:18, 1746:20, 1746:24, 1748:6, 1748:11, 1748:16, 1748:20, 1749:14, 1750:18, 1750:20, 1752:3, 1752:6, 1752:16, 1752:23, 1753:11, 1753:19, 1753:22, 1754:23, 1755:1, 1755:4, 1755:7, 1755:10, 1755:15, 1755:17, 1756:6, 1756:10, 1756:15, 1757:9, 1757:12, 1757:16, 1757:18, 1757:21, 1758:2, 1758:5, 1758:10, 1758:13, 1758:17, 1758:19, 1758:21, 1758:23, 1759:1, 1759:6, 1759:9, 1759:12, 1759:24, 1760:6, 1761:8, 1761:18, 1762:1, 1763:14, 1764:5, 1764:10, 1764:23, 1766:20, 1767:4, 1767:13, 1768:14, 1768:22, 1769:3, 1769:16, 1769:19, 1769:22, 1770:2, 1770:11, 1770:15, 1771:2, 1771:11, 1771:14, 1772:12,

1772:15, 1772:18, 1773:6, 1773:12, 1774:4, 1774:24, 1775:11, 1775:14, 1775:21, 1776:25, 1777:10, 1777:13, 1778:5, 1778:20, 1779:20, 1780:5, 1780:8, 1780:13, 1780:20, 1781:1, 1781:11, 1781:14, 1781:19, 1782:6, 1782:19, 1782:23, 1782:25, 1783:18, 1784:2, 1784:13, 1785:2, 1785:8, 1785:12, 1785:17, 1786:5, 1786:17, 1787:23, 1788:1, 1788:4, 1788:21, 1789:3, 1789:17, 1789:23, 1790:4, 1790:12, 1791:3, 1792:19, 1792:24, 1793:4, 1793:13, 1793:20, 1793:22, 1794:1, 1794:4, 1794:11, 1794:15, 1794:22, 1795:4, 1795:9, 1795:20, 1795:25, 1796:6, 1796:13, 1797:2, 1797:6, 1797:9, 1797:15, 1798:1, 1798:16, 1799:1, 1799:7, 1799:11, 1799:15, 1800:4, 1800:22, 1801:6, 1801:10, 1801:14, 1801:17, 1802:1, 1802:4, 1802:7, 1802:10, 1802:17, 1802:22, 1803:10, 1803:25, 1804:4, 1804:11, 1804:15, 1804:20, 1804:22, 1805:8, 1805:11, 1805:16, 1806:3, 1806:19, 1807:1, 1807:9, 1807:12, 1807:19, 1808:4, 1808:6, 1808:8, 1808:13, 1808:22, 1809:17, 1809:22, 1810:9, 1812:3, 1812:17, 1813:2, 1813:9, 1814:2, 1814:15, 1814:20, 1814:24, 1815:8
**Mulder** [1] - 1811:17
**MURPHY** [160] -

1715:13, 1718:22, 1719:4, 1719:16, 1719:23, 1720:9, 1720:17, 1721:13, 1721:16, 1721:20, 1721:23, 1722:3, 1722:9, 1722:14, 1722:16, 1722:19, 1723:13, 1724:5, 1725:4, 1725:25, 1726:13, 1726:16, 1727:7, 1728:20, 1728:24, 1729:19, 1729:21, 1731:5, 1731:13, 1731:21, 1732:13, 1732:16, 1732:19, 1733:5, 1733:17, 1734:4, 1734:8, 1734:11, 1734:14, 1734:17, 1734:20, 1735:1, 1735:8, 1735:14, 1735:17, 1736:10, 1736:19, 1737:18, 1737:25, 1739:2, 1739:7, 1739:16, 1740:7, 1740:14, 1741:8, 1741:11, 1741:24, 1742:1, 1742:11, 1743:3, 1743:5, 1743:7, 1743:12, 1743:14, 1744:3, 1744:23, 1745:1, 1745:4, 1745:16, 1745:21, 1745:23, 1746:18, 1746:20, 1746:24, 1748:6, 1748:11, 1748:16, 1748:20, 1749:14, 1750:18, 1750:20, 1752:3, 1752:6, 1752:16, 1752:23, 1753:11, 1753:19, 1753:22, 1754:23, 1755:1, 1755:4, 1755:7, 1755:10, 1755:15, 1755:17, 1756:6, 1756:10, 1756:15, 1757:9, 1757:12, 1757:16, 1757:18, 1757:21, 1758:2, 1758:5, 1758:10, 1758:13, 1758:17, 1758:19, 1758:21, 1758:23, 1759:1, 1759:6, 1759:9, 1759:12, 1759:24, 1760:6, 1761:8, 1761:18, 1762:1,

1763:14, 1764:5, 1764:10, 1764:23, 1766:20, 1767:4, 1767:13, 1768:14, 1768:22, 1769:3, 1769:16, 1769:19, 1769:22, 1770:2, 1770:11, 1770:15, 1771:2, 1771:11, 1771:14, 1772:12, 1772:15, 1772:18, 1773:6, 1773:12, 1774:4, 1774:24, 1775:11, 1775:14, 1775:21, 1776:25, 1777:10, 1777:13, 1778:5, 1805:8, 1805:11, 1808:4, 1808:6, 1815:8
**Murphy** [4] - 1718:21, 1719:1, 1779:3, 1805:4
**must** [3] - 1720:7, 1800:9, 1809:25

# N

**Nagle** [3] - 1742:12, 1744:1, 1810:2
**Nagle's** [1] - 1790:1
**nails** [1] - 1806:25
**names** [3] - 1720:3, 1723:22, 1771:12
**narrowed** [1] - 1809:6
**NASA** [5] - 1741:16, 1787:21, 1787:22, 1787:23, 1788:15
**natural** [3] - 1759:15, 1759:25, 1760:9
**nature** [1] - 1810:13
**navigable** [5] - 1802:25, 1803:2, 1803:5, 1803:13, 1803:14
**near** [7] - 1755:10, 1755:12, 1769:12, 1771:23, 1773:21, 1774:12, 1777:25
**nearby** [1] - 1803:2
**necessarily** [1] - 1747:1
**necessary** [2] - 1749:12, 1749:15
**need** [6] - 1723:14, 1725:19, 1747:8, 1760:4, 1760:6, 1814:10
**needed** [6] - 1750:13, 1750:14, 1751:18,

1751:20, 1781:6, 1804:12
**negligent** [1] - 1726:25
**Nelson** [1] - 1811:17
**never** [8] - 1766:22, 1780:20, 1785:4, 1798:2, 1798:3, 1798:4, 1798:5, 1810:4
**new** [3] - 1725:5, 1725:9, 1754:15
**next** [7] - 1723:19, 1724:18, 1735:12, 1751:17, 1769:20, 1776:9, 1811:4
**nightmare** [1] - 1717:16
**nobody** [8] - 1728:14, 1728:18, 1737:12, 1746:19, 1782:21, 1787:15, 1798:11, 1807:8
**nominal** [1] - 1756:8
**none** [1] - 1790:15
**norm** [1] - 1750:9
**normal** [1] - 1781:17
**normally** [1] - 1800:2
**North** [2] - 1745:11, 1760:24
**north** [11] - 1757:24, 1758:1, 1761:13, 1769:13, 1769:17, 1772:8, 1772:16, 1772:18, 1773:11, 1793:1, 1812:16
**northern** [3] - 1771:22, 1772:21, 1773:7
**Northern** [1] - 1809:25
**notation** [2] - 1732:9, 1732:10
**note** [1] - 1805:1
**notebooks** [1] - 1768:3
**noted** [1] - 1779:2
**notes** [3] - 1758:18, 1758:19, 1780:14
**noteworthy** [1] - 1795:19
**nothing** [2] - 1737:7, 1808:15
**notice** [5] - 1718:13, 1782:11, 1785:18, 1788:18, 1798:23
**noticed** [2] - 1723:8, 1795:25
**notices** [1] - 1785:13
**notion** [1] - 1767:6
**notoriously** [1] -

1773:19
**November** [1] - 1775:25
**nuisance** [1] - 1750:3
**number** [15] - 1720:21, 1732:11, 1732:15, 1732:17, 1734:2, 1755:25, 1757:7, 1758:16, 1765:10, 1782:6, 1782:7, 1782:8, 1787:18, 1809:23, 1810:15
**numbers** [3] - 1746:23, 1755:20, 1757:7
**NW** [3] - 1715:17, 1715:24, 1716:2

## O

**O&M** [1] - 1755:23
**O'DONNELL** [1] - 1715:20
**O-L-I-V-E-R-A-S** [1] - 1719:13
**oath** [1] - 1732:22
**objected** [1] - 1721:11
**obligation** [1] - 1732:2
**observation** [1] - 1725:21
**obvious** [2] - 1753:8, 1770:25
**obviously** [6] - 1717:11, 1718:9, 1732:23, 1733:6, 1735:9, 1745:2
**occasional** [1] - 1808:14
**occasionally** [1] - 1727:15
**occurred** [1] - 1769:12
**occurring** [1] - 1810:22
**odor** [3] - 1752:25, 1753:9, 1754:9
**OF** [2] - 1715:1, 1715:6
**offers** [1] - 1728:18
**office** [2] - 1718:5, 1718:7
**Official** [2] - 1716:1, 1816:3
**officially** [2] - 1730:23, 1748:17
**offsite** [1] - 1808:14
**often** [1] - 1770:5
**Ohio** [1] - 1768:2
**Oliveras** [2] - 1719:13,

1720:14
**on-site** [10] - 1730:16, 1738:13, 1740:15, 1741:2, 1741:18, 1746:10, 1747:10, 1771:16, 1801:22, 1808:15
**once** [8] - 1719:1, 1729:2, 1733:13, 1746:24, 1747:22, 1761:23, 1795:4, 1795:5
**one** [87] - 1718:5, 1718:13, 1718:14, 1718:17, 1719:16, 1720:15, 1722:25, 1723:11, 1723:13, 1723:19, 1724:2, 1724:4, 1729:7, 1730:11, 1730:17, 1730:18, 1730:19, 1731:15, 1732:9, 1735:22, 1736:4, 1736:21, 1737:2, 1737:9, 1737:20, 1740:11, 1741:15, 1742:14, 1744:23, 1745:14, 1745:16, 1750:17, 1750:19, 1756:17, 1756:19, 1758:15, 1760:9, 1760:10, 1761:14, 1761:19, 1764:19, 1765:4, 1765:23, 1766:14, 1767:13, 1768:17, 1768:24, 1769:16, 1769:18, 1769:21, 1769:23, 1770:1, 1770:25, 1771:19, 1774:3, 1774:11, 1775:4, 1775:18, 1775:22, 1778:11, 1779:2, 1782:6, 1782:7, 1783:22, 1784:20, 1790:12, 1790:16, 1793:5, 1795:21, 1797:5, 1798:3, 1799:5, 1800:25, 1801:4, 1802:8, 1804:8, 1804:17, 1807:21, 1808:1, 1808:7, 1810:18, 1810:21, 1811:6, 1815:9
**ones** [10] - 1724:18, 1753:8, 1755:2, 1755:4, 1757:13, 1757:16, 1765:15, 1769:24, 1813:4

**opened** [1] - 1766:15
**opening** [3] - 1726:2, 1726:4, 1761:13
**operate** [3] - 1739:23, 1786:24, 1787:6
**operated** [2] - 1783:24, 1786:13
**operating** [5] - 1734:16, 1734:18, 1735:4, 1766:7, 1778:14
**operation** [5] - 1729:22, 1786:19, 1786:24, 1807:4
**operational** [1] - 1809:5
**operations** [11] - 1730:21, 1739:17, 1765:13, 1777:16, 1778:25, 1783:24, 1789:10, 1797:16, 1798:4, 1809:14, 1813:19
**operator** [33] - 1717:22, 1726:4, 1729:11, 1730:23, 1739:12, 1739:17, 1743:16, 1743:21, 1744:5, 1744:11, 1744:14, 1744:15, 1744:16, 1746:6, 1746:13, 1746:25, 1747:9, 1747:12, 1747:14, 1747:18, 1747:21, 1747:24, 1762:1, 1764:13, 1765:17, 1778:24, 1781:3, 1782:2, 1804:23, 1807:15, 1809:6, 1809:8
**operator-type** [3] - 1747:9, 1807:15
**opinion** [3] - 1725:5, 1749:22, 1799:17
**opportunity** [2] - 1761:21, 1761:22
**opposed** [4] - 1761:7, 1770:20, 1805:6, 1808:1
**optioning** [1] - 1762:3
**options** [2] - 1786:6, 1813:10
**orange** [1] - 1753:2
**order** [2] - 1774:8, 1809:25
**ordered** [2] - 1718:7, 1731:23
**orderly** [1] - 1786:12
**orders** [1] - 1731:24
**organic** [2] - 1773:15,

1774:17
**organized** [1] - 1815:12
**original** [1] - 1794:5
**otherwise** [4] - 1718:23, 1728:16, 1741:10, 1809:24
**ought** [1] - 1736:2
**out's** [1] - 1743:9
**outline** [2] - 1717:10, 1717:25
**outs** [11] - 1780:21, 1780:22, 1780:25, 1781:3, 1781:9, 1782:17, 1782:24, 1786:16, 1795:8
**outside** [1] - 1750:22
**oversight** [1] - 1768:8
**own** [17] - 1718:10, 1733:5, 1750:8, 1763:13, 1779:14, 1783:24, 1790:2, 1790:7, 1794:24, 1795:20, 1797:7, 1797:11, 1810:1, 1810:3, 1810:8, 1811:1, 1811:12
**owned** [26] - 1730:12, 1730:13, 1730:24, 1731:3, 1733:3, 1733:20, 1742:19, 1742:20, 1745:5, 1745:7, 1762:9, 1762:10, 1762:12, 1762:19, 1763:6, 1779:17, 1789:25, 1794:20, 1794:21, 1794:23, 1797:4, 1797:5, 1797:6, 1797:12, 1810:10
**owner** [5] - 1729:12, 1746:25, 1747:13, 1747:24, 1782:2
**owner's** [1] - 1793:23
**owner/operator** [1] - 1762:5
**ownership** [10] - 1726:5, 1731:6, 1731:9, 1733:7, 1733:8, 1733:13, 1789:21, 1789:23, 1793:25, 1794:1
**owning** [1] - 1797:8
**owns** [1] - 1789:20

## P

**p.m** [1] - 1815:14
**page** [5] - 1757:13,

1771:9, 1801:10, 1801:11, 1812:11
**Page** [1] - 1715:8
**pages** [3] - 1717:15, 1725:18, 1816:4
**paid** [3] - 1737:12, 1742:13, 1742:14
**pans** [1] - 1786:7
**paperwork** [1] - 1784:25
**paragraph** [2] - 1765:8, 1765:10
**parallel** [2] - 1749:5, 1749:11
**parent** [3] - 1740:2, 1740:4, 1744:6
**parking** [1] - 1787:1
**parking-lot** [1] - 1787:1
**part** [23] - 1718:1, 1719:17, 1723:17, 1740:8, 1742:11, 1742:14, 1744:22, 1755:20, 1756:17, 1756:19, 1756:24, 1757:5, 1757:13, 1767:15, 1769:17, 1773:7, 1779:24, 1782:8, 1804:8, 1804:9, 1804:13, 1804:17, 1806:9
**participate** [1] - 1744:18
**participation** [1] - 1739:24
**particular** [2] - 1731:12, 1802:15
**particularly** [1] - 1782:2
**parties** [3] - 1719:8, 1729:22, 1761:14
**parts** [13] - 1755:1, 1755:5, 1755:8, 1757:6, 1776:1, 1776:6, 1791:9, 1791:14, 1791:15, 1791:16, 1803:18, 1804:1, 1813:14
**party** [10] - 1730:6, 1730:25, 1731:6, 1733:22, 1747:22, 1751:6, 1758:6, 1762:16, 1762:20, 1769:1
**pass** [1] - 1740:10
**pass-through** [1] - 1740:10
**past** [3] - 1739:6, 1756:9, 1756:11
**path** [1] - 1812:21

**pathways** [1] - 1773:20
**Pause** [1] - 1815:2
**pay** [1] - 1720:7
**paying** [1] - 1764:4
**Payments** [1] - 1733:12
**peculiar** [1] - 1784:16
**pedestal** [1] - 1784:16
**penalties** [1] - 1727:23
**people** [27] - 1718:6, 1724:10, 1727:4, 1727:13, 1727:16, 1728:5, 1728:8, 1736:17, 1737:17, 1738:24, 1740:13, 1740:15, 1741:2, 1741:18, 1743:23, 1746:10, 1747:10, 1748:22, 1749:21, 1765:13, 1766:25, 1784:10, 1784:18, 1798:14, 1802:18, 1811:16, 1814:7
**per** [15] - 1755:1, 1755:5, 1756:17, 1756:20, 1756:24, 1757:7, 1791:9, 1791:15, 1791:16, 1803:18, 1804:8, 1804:9, 1804:13, 1804:17
**percent** [12] - 1729:14, 1729:15, 1748:3, 1748:21, 1762:10, 1793:18, 1793:24, 1794:16, 1797:20, 1809:13, 1809:20, 1810:14
**percentage** [1] - 1728:14
**percentages** [1] - 1748:4
**perchlorate** [7] - 1779:23, 1792:7, 1802:17, 1803:18, 1804:5, 1804:7, 1804:18
**percolate** [2] - 1792:4, 1793:7
**percolated** [1] - 1791:19
**percolates** [1] - 1803:1
**perfect** [1] - 1749:10
**perform** [1] - 1769:5
**performance** [1] - 1742:12
**performed** [2] -

1746:10, 1805:18
**perhaps** [3] - 1718:3, 1783:8, 1788:1
**period** [6] - 1728:4, 1735:24, 1736:11, 1750:10, 1790:7, 1791:11
**periodic** [1] - 1752:13
**periodically** [1] - 1752:10
**periods** [2] - 1793:6, 1801:15
**permission** [1] - 1811:23
**permit** [13] - 1751:20, 1751:21, 1751:22, 1752:2, 1752:4, 1782:16, 1783:13, 1798:9, 1798:15, 1798:17, 1800:17, 1800:23, 1804:17
**permits** [18] - 1738:8, 1749:13, 1749:15, 1749:18, 1749:19, 1749:21, 1750:12, 1750:13, 1750:14, 1750:15, 1751:17, 1751:19, 1770:3, 1782:22, 1787:11, 1787:12, 1787:14
**permitting** [1] - 1783:3
**person** [3] - 1722:6, 1732:8, 1808:18
**personnel** [1] - 1805:3
**Peter** [1] - 1721:24
**petroleum** [3] - 1753:5, 1776:4, 1776:5
**petroleum-based** [2] - 1776:4, 1776:5
**photo** [2] - 1813:16, 1813:17
**photographs** [1] - 1812:19
**photography** [1] - 1812:22
**phrase** [1] - 1751:12
**picture** [1] - 1777:9
**pictures** [4] - 1786:11, 1812:24, 1812:25, 1813:2
**piece** [6] - 1730:14, 1730:24, 1731:15, 1732:3, 1736:4, 1758:15
**pieces** [3] - 1732:7, 1732:8, 1795:13
**pipe** [14] - 1726:23, 1759:19, 1760:1,

1760:7, 1760:8, 1761:7, 1773:23, 1774:2, 1774:6, 1774:8, 1777:14, 1777:24, 1792:1
**pipelines** [1] - 1756:1
**pit** [50] - 1726:23, 1739:1, 1744:8, 1745:17, 1746:2, 1749:18, 1750:14, 1755:11, 1760:25, 1761:24, 1763:20, 1764:2, 1765:25, 1769:16, 1769:21, 1770:16, 1770:17, 1772:21, 1775:2, 1775:10, 1776:2, 1776:6, 1777:7, 1777:8, 1777:15, 1777:18, 1777:20, 1778:1, 1778:2, 1778:3, 1778:9, 1779:21, 1779:25, 1780:1, 1780:8, 1787:2, 1792:8, 1793:1, 1795:2, 1795:15, 1795:16, 1795:24, 1796:5, 1796:7, 1796:8, 1796:21, 1801:7, 1801:15
**Pit** [1] - 1769:24
**pits** [54] - 1728:19, 1728:21, 1728:22, 1730:3, 1738:22, 1743:22, 1744:5, 1745:13, 1749:21, 1750:7, 1751:2, 1753:24, 1765:3, 1769:7, 1769:15, 1769:22, 1769:25, 1770:3, 1770:4, 1770:6, 1770:9, 1770:19, 1770:23, 1771:1, 1771:5, 1771:22, 1772:20, 1774:20, 1774:25, 1775:3, 1775:9, 1779:9, 1779:12, 1779:13, 1779:16, 1779:17, 1779:18, 1781:24, 1784:9, 1785:19, 1786:2, 1786:6, 1786:10, 1787:6, 1793:3, 1796:11, 1798:3, 1807:3, 1807:4
**place** [7] - 1725:17, 1764:3, 1773:3, 1773:6, 1776:12,

1791:4, 1805:23
**placed** [2] - 1738:9, 1749:22
**places** [2] - 1729:18, 1807:5
**Plaintiff** [3] - 1715:4, 1715:13, 1723:12
**plane** [1] - 1740:22
**plans** [1] - 1762:25
**plant** [6] - 1749:2, 1751:4, 1753:14, 1766:8, 1801:19, 1801:21
**plants** [4] - 1751:13, 1754:20, 1755:25, 1756:23
**play** [1] - 1748:1
**pleadings** [1] - 1717:22
**plenty** [5] - 1764:7, 1764:15, 1766:2, 1767:21, 1786:25
**plume** [9] - 1728:11, 1729:8, 1729:16, 1729:18, 1790:21, 1791:13, 1800:19, 1800:21
**plumes** [1] - 1801:1
**plus** [2] - 1766:17, 1783:9
**point** [50] - 1721:25, 1725:14, 1725:16, 1726:7, 1727:11, 1727:12, 1730:11, 1730:17, 1733:19, 1735:14, 1738:18, 1745:7, 1746:19, 1746:20, 1747:19, 1749:17, 1754:21, 1759:16, 1759:17, 1760:14, 1762:5, 1764:8, 1765:23, 1770:2, 1770:4, 1773:24, 1776:18, 1776:23, 1777:21, 1778:3, 1778:7, 1779:14, 1782:17, 1784:15, 1785:7, 1785:15, 1785:24, 1794:19, 1796:24, 1797:3, 1799:14, 1800:10, 1803:1, 1803:13, 1806:21, 1807:17, 1808:13, 1811:6, 1811:11, 1811:21
**points** [7] - 1736:1, 1736:24, 1744:13, 1745:18, 1775:23, 1780:9, 1812:13

**policies** [1] - 1727:3
**policy** [2] - 1767:2, 1767:19
**political** [1] - 1752:20
**pollution** [8] - 1738:11, 1750:3, 1752:21, 1779:1, 1787:12, 1789:10, 1790:9, 1790:14
**Pollution** [1] - 1752:13
**ponds** [1] - 1752:5
**pops** [1] - 1761:11
**porous** [1] - 1796:2
**portion** [1] - 1762:12
**portrayed** [1] - 1754:25
**position** [6] - 1724:4, 1762:2, 1779:4, 1784:21, 1790:1, 1810:6
**positive** [1] - 1798:2
**possess** [4] - 1790:2, 1797:10, 1810:1, 1811:1
**possessed** [2] - 1789:25, 1797:11
**possession** [3] - 1810:4, 1810:8, 1810:9
**possibility** [1] - 1736:8
**possible** [2] - 1770:19, 1794:8
**possibly** [1] - 1760:13
**Potash** [1] - 1745:8
**potential** [2] - 1750:5, 1784:22
**Potrero** [29] - 1743:15, 1745:17, 1769:6, 1770:6, 1775:4, 1775:6, 1775:8, 1775:11, 1779:22, 1780:4, 1780:5, 1793:16, 1797:13, 1797:17, 1797:21, 1799:8, 1799:9, 1801:7, 1801:15, 1802:1, 1809:12, 1810:5, 1810:7, 1810:12, 1810:19, 1811:3, 1813:23, 1813:24, 1815:5
**pounds** [6] - 1745:18, 1751:1, 1791:23, 1797:18, 1797:22, 1801:22
**pour** [1] - 1777:17
**pouring** [1] - 1725:16
**POWELL** [1] - 1715:21
**PowerPoint** [5] -

1717:14, 1717:21, 1720:6, 1734:5, 1793:15
**PowerPoints** [2] - 1717:13, 1717:16
**practical** [1] - 1734:22
**practice** [1] - 1726:14
**practices** [24] - 1726:10, 1727:17, 1727:20, 1728:11, 1735:20, 1738:16, 1738:17, 1763:17, 1764:19, 1767:12, 1777:5, 1778:7, 1779:3, 1779:5, 1788:6, 1789:1, 1789:5, 1789:7, 1790:18, 1805:12, 1806:22, 1806:23, 1807:7
**practises** [1] - 1777:1
**pre** [2] - 1739:4, 1762:25
**pre-existing** [1] - 1762:25
**precisely** [1] - 1724:12
**precluded** [1] - 1727:3
**precursor** [1] - 1797:1
**predominant** [1] - 1811:7
**prefer** [1] - 1717:11
**preferential** [1] - 1773:20
**preparing** [1] - 1723:7
**preposterous** [1] - 1720:6
**present** [1] - 1738:23
**presentation** [1] - 1778:23
**presentations** [1] - 1717:14
**presenting** [1] - 1766:10
**pressed** [1] - 1739:3
**pressure** [1] - 1781:12
**pretrial** [1] - 1721:12
**pretty** [10] - 1736:3, 1737:12, 1748:10, 1756:2, 1763:23, 1769:14, 1771:24, 1788:15, 1791:9, 1814:20
**prevent** [1] - 1790:20
**price** [1] - 1763:3
**prime's** [1] - 1745:10
**probability** [5] - 1792:3, 1813:11, 1813:18, 1813:20, 1814:11

**problem** [19] - 1724:13, 1751:11, 1753:14, 1754:7, 1754:8, 1754:19, 1756:16, 1758:14, 1775:12, 1778:12, 1786:2, 1791:6, 1791:22, 1798:25, 1799:1, 1800:13
**problems** [11] - 1738:8, 1750:24, 1753:12, 1754:13, 1770:22, 1783:23, 1786:13, 1787:13, 1787:21, 1791:12, 1793:5
**procedure** [9] - 1720:12, 1741:24, 1742:5, 1777:15, 1781:19, 1781:23, 1796:14, 1796:22, 1797:2
**procedures** [9] - 1728:2, 1735:4, 1738:14, 1741:22, 1742:13, 1752:11, 1753:23, 1761:1, 1766:13
**proceed** [1] - 1717:9
**proceedings** [1] - 1816:5
**Proceedings** [1] - 1716:25
**process** [39] - 1730:1, 1730:2, 1730:10, 1731:16, 1734:1, 1737:3, 1737:21, 1742:22, 1764:22, 1764:24, 1771:13, 1781:8, 1781:14, 1781:15, 1781:18, 1782:8, 1782:9, 1783:3, 1795:6, 1795:10, 1800:8, 1802:12, 1805:1, 1805:5, 1805:10, 1805:11, 1805:14, 1805:18, 1805:20, 1805:21, 1805:22, 1806:2, 1806:3, 1806:8, 1806:14, 1807:3, 1812:8, 1812:10, 1815:10
**processes** [6] - 1727:22, 1730:18, 1739:21, 1746:4, 1751:20, 1752:10
**processing** [1] - 1794:2
**produce** [1] - 1767:6

**produced** [3] - 1716:25, 1737:16, 1737:20
**product** [3] - 1737:16, 1767:6, 1808:20
**product's** [1] - 1767:7
**production** [6] - 1736:8, 1736:14, 1749:6, 1763:4, 1772:6, 1772:23
**products** [4] - 1730:15, 1737:19, 1771:5, 1800:15
**professor** [1] - 1812:5
**program** [7] - 1729:24, 1729:25, 1736:17, 1736:22, 1744:25, 1745:1, 1745:5
**Program** [1] - 1764:16
**program-chargeable** [1] - 1729:24
**programs** [2] - 1741:15, 1745:3
**Progress** [1] - 1733:12
**prohibit** [1] - 1728:2
**prohibitions** [3] - 1750:6, 1750:7, 1776:19
**prominently** [1] - 1735:6
**propellant** [16] - 1744:4, 1770:12, 1786:9, 1791:3, 1795:10, 1796:17, 1796:21, 1796:23, 1801:20, 1807:12, 1813:24, 1814:3, 1814:8, 1814:9, 1814:11
**properly** [9] - 1734:18, 1735:4, 1761:13, 1762:14, 1762:22, 1763:18, 1763:21, 1799:4
**property** [5] - 1733:15, 1733:24, 1733:25, 1762:24, 1763:1
**Property** [1] - 1733:25
**proportion** [1] - 1807:24
**proposed** [2] - 1793:24, 1809:12
**Propulsion** [5] - 1734:17, 1734:20, 1741:19, 1750:4, 1811:23
**propulsion** [1] -

1740:19
**prove** [2] - 1726:4, 1749:20
**proved** [1] - 1726:4
**proven** [1] - 1726:3
**provide** [2] - 1763:9, 1786:6
**provision** [5] - 1799:16, 1799:18, 1800:4, 1800:5
**provisions** [2] - 1790:5, 1790:6
**pull** [1] - 1730:4
**pump** [5] - 1757:23, 1757:24, 1760:4, 1760:6, 1791:10
**pumped** [2] - 1791:18, 1791:24
**pumping** [1] - 1792:2
**pun** [1] - 1786:4
**purposes** [4] - 1719:6, 1729:2, 1746:23, 1793:17
**pursuant** [2] - 1809:21, 1815:6
**push** [1] - 1796:20
**pushed** [1] - 1796:20
**pushing** [1] - 1781:25
**put** [33] - 1719:1, 1720:13, 1721:23, 1723:14, 1734:9, 1736:4, 1737:7, 1740:25, 1744:5, 1754:1, 1758:13, 1758:15, 1760:24, 1763:22, 1765:20, 1765:23, 1765:25, 1770:15, 1773:13, 1774:5, 1774:7, 1774:14, 1776:21, 1777:16, 1778:2, 1779:13, 1784:3, 1787:18, 1791:10, 1793:18, 1796:16, 1805:19, 1806:23
**putting** [10] - 1725:9, 1728:3, 1728:8, 1753:23, 1764:2, 1777:23, 1778:7, 1781:24, 1782:3, 1803:21
**PX..** [1] - 1718:17

## Q

**qualify** [3] - 1741:17, 1763:2, 1807:15
**Quality** [2] - 1750:23, 1752:13

**quality** [10] - 1740:13, 1740:14, 1764:11, 1768:12, 1805:5, 1805:9, 1805:13, 1805:17, 1806:19, 1806:24
**quantities** [4] - 1791:5, 1798:20, 1798:21, 1800:18
**quantity** [3] - 1791:17, 1791:25, 1792:4
**questions** [3] - 1779:2, 1779:12, 1814:16
**quick** [1] - 1815:3
**quickly** [3] - 1720:3, 1791:20, 1808:13
**quite** [1] - 1738:25
**quote** [2] - 1747:17, 1787:21
**quote-unquote** [1] - 1747:17

**R**

**R&D** [1] - 1749:6
**Radian** [4] - 1793:13, 1801:7, 1802:6, 1802:7
**rags** [2] - 1807:11, 1807:12
**rail** [1] - 1740:20
**rain** [1] - 1813:15
**raised** [1] - 1779:12
**ran** [1] - 1766:3
**range** [3] - 1791:14, 1797:19, 1809:19
**rare** [1] - 1748:10
**raw** [7] - 1741:17, 1794:23, 1794:24, 1795:3, 1797:16, 1810:10, 1810:11
**RAYMOND** [1] - 1715:14
**RCRA** [1] - 1727:23
**reach** [2] - 1747:8, 1800:24
**reaches** [1] - 1800:2
**read** [8] - 1717:5, 1717:13, 1717:16, 1717:18, 1744:15, 1758:24, 1759:10, 1768:3
**reading** [2] - 1723:25, 1759:13
**ready** [1] - 1717:4
**real** [2] - 1755:16, 1769:1
**realize** [1] - 1787:16

**realized** [1] - 1733:22
**really** [12] - 1729:2, 1736:7, 1737:12, 1738:22, 1749:2, 1751:11, 1753:4, 1754:6, 1772:20, 1784:19, 1790:24
**reason** [3] - 1726:12, 1726:21, 1797:20
**reasonably** [1] - 1759:10
**receive** [2] - 1810:24, 1811:3
**received** [3] - 1731:23, 1748:20, 1813:13
**receiving** [2] - 1754:2
**recess** [2] - 1778:15, 1815:14
**Recess** [1] - 1778:18
**recognition** [2] - 1739:4, 1754:12
**recognized** [2] - 1767:18, 1778:11
**recognizes** [2] - 1776:1, 1778:3
**recollection** [1] - 1779:25
**recommendation** [2] - 1742:1, 1743:2
**recommendations** [1] - 1739:18
**recommended** [1] - 1743:8
**recommends** [1] - 1776:3
**record** [14] - 1728:24, 1729:25, 1735:15, 1744:19, 1745:6, 1745:24, 1750:16, 1751:24, 1752:10, 1755:18, 1766:2, 1766:23, 1774:15, 1816:5
**records** [2] - 1736:21, 1811:24
**recovery** [1] - 1717:25
**recrystallize** [1] - 1761:9
**recycled** [2] - 1795:7, 1795:14
**red** [2] - 1771:18, 1771:23
**Redlands** [22] - 1729:14, 1743:11, 1751:6, 1752:14, 1768:23, 1769:15, 1769:16, 1769:17, 1770:19, 1770:25, 1771:15, 1771:17,

1779:22, 1791:14, 1792:10, 1793:4, 1793:23, 1801:21, 1801:24, 1802:3, 1802:4, 1810:25
**Redstone** [1] - 1757:11
**reduce** [1] - 1757:1
**reduces** [1] - 1809:18
**reference** [2] - 1723:20, 1724:19
**references** [1] - 1723:9
**referencing** [1] - 1776:13
**referred** [1] - 1787:22
**referring** [2] - 1780:18, 1814:1
**reflected** [1] - 1804:16
**refurbish** [2] - 1742:4, 1743:9
**refurbished** [1] - 1781:7
**refurbishing** [3] - 1742:3, 1742:15, 1743:8
**refuse** [3] - 1750:13, 1751:18, 1753:6
**Refuse** [1] - 1802:24
**refute** [1] - 1725:15
**regarding** [1] - 1783:10
**Region** [1] - 1750:23
**regular** [3] - 1730:21, 1735:23, 1767:25
**regulate** [5] - 1785:16, 1799:4, 1799:5, 1799:14, 1800:16
**regulatory** [3] - 1756:16, 1802:23, 1803:5
**rejected** [1] - 1744:17
**relate** [2] - 1799:20, 1807:25
**related** [3] - 1737:14, 1779:1, 1799:16
**relates** [1] - 1799:18
**relation** [1] - 1766:1
**relationship** [1] - 1763:12
**relative** [2] - 1757:1, 1757:5
**release** [5] - 1728:21, 1733:20, 1751:3, 1794:17, 1794:20
**released** [10] - 1730:24, 1733:9, 1733:11, 1733:13, 1733:20, 1733:21, 1734:1, 1772:1,

1776:8, 1790:19
**releases** [2] - 1759:19, 1760:1
**relevant** [6] - 1731:12, 1739:14, 1789:21, 1789:24, 1794:22
**reliability** [1] - 1812:4
**relied** [10] - 1719:16, 1719:20, 1720:9, 1720:11, 1720:12, 1720:23, 1721:14, 1721:18, 1722:21, 1800:11
**relies** [1] - 1799:2
**reliving** [1] - 1812:5
**rely** [4] - 1719:25, 1722:10, 1757:25, 1812:8
**relying** [4] - 1724:5, 1725:7, 1725:15, 1809:15
**remains** [1] - 1768:6
**remediation** [3] - 1739:15, 1793:9, 1802:8
**Remember** [2] - 1738:2, 1757:24
**remember** [3] - 1718:14, 1740:17, 1811:15
**remembered** [1] - 1722:7
**remove** [1] - 1814:10
**removing** [2] - 1781:22, 1796:23
**renewed** [1] - 1754:14
**replace** [2] - 1730:19, 1763:3
**report** [17] - 1719:17, 1724:23, 1754:23, 1757:6, 1757:8, 1757:9, 1771:12, 1772:5, 1772:13, 1772:22, 1774:1, 1783:2, 1793:13, 1800:9, 1800:11, 1800:12, 1801:7
**reported** [4] - 1716:25, 1785:10, 1800:13, 1800:15
**Reporter** [3] - 1716:1, 1716:1, 1816:3
**reports** [2] - 1799:19, 1800:5
**represent** [1] - 1718:12
**representatives** [1] - 1752:12
**required** [3] - 1727:5, 1747:15, 1766:8

**requirements** [1] - 1785:21
**requiring** [1] - 1743:19
**research** [1] - 1791:3
**residual** [1] - 1781:25
**residue** [1] - 1751:23
**resolving** [1] - 1737:6
**respond** [2] - 1717:20, 1787:17
**response** [3] - 1732:3, 1732:13, 1752:1
**responsibility** [5] - 1733:19, 1740:19, 1763:7, 1768:20, 1815:5
**responsible** [1] - 1730:25
**rest** [3] - 1719:22, 1721:21, 1801:21
**result** [1] - 1748:3
**resulted** [1] - 1727:23
**resume** [2] - 1778:16, 1815:11
**reuse** [1] - 1742:20
**reversion** [3] - 1733:12, 1733:23, 1733:25
**reversionary** [1] - 1733:15
**revert** [1] - 1733:12
**review** [2] - 1768:8, 1805:23
**reviewed** [4] - 1730:1, 1764:20, 1805:15, 1805:19
**reviewing** [3] - 1730:10, 1764:24, 1806:8
**reviews** [2] - 1741:4, 1768:15
**Rice** [1] - 1743:4
**rid** [2] - 1738:5, 1745:2
**rise** [1] - 1725:22
**risk** [1] - 1777:3
**risks** [1] - 1787:24
**River** [3] - 1754:3, 1800:25, 1803:2
**river** [3] - 1754:4, 1803:4
**road** [4] - 1746:16, 1759:1, 1759:5, 1760:13
**roads** [1] - 1759:14
**rock** [1] - 1800:2
**rocket** [19] - 1736:16, 1736:20, 1741:20, 1742:3, 1742:4, 1747:3, 1749:1,

1762:17, 1766:5,
1767:21, 1767:22,
1768:1, 1780:14,
1781:6, 1781:22,
1796:12, 1796:13,
1796:16
**Rocket** [1] - 1767:24
**rockets** [1] - 1749:2
**rocks** [1] - 1791:24
**role** [2] - 1737:20,
1740:23
**Room** [1] - 1716:2
**room** [2] - 1765:25,
1766:1
**Ross** [4] - 1767:25,
1768:2, 1768:4,
1768:10
**RPR** [1] - 1716:1
**rubber** [1] - 1746:15
**rubbery** [1] - 1795:13
**Rule** [1] - 1724:5
**run** [2] - 1765:19,
1777:17
**running** [1] - 1762:16
**runs** [1] - 1754:3
**rural** [1] - 1751:18

## S

**Sacramento** [3] -
1750:23, 1753:16,
1754:3
**safely** [3] - 1738:4,
1738:5, 1741:2
**safety** [47] - 1736:12,
1737:1, 1737:4,
1737:14, 1737:22,
1737:23, 1738:1,
1738:13, 1738:14,
1738:18, 1738:19,
1738:20, 1738:23,
1739:25, 1740:8,
1740:15, 1741:4,
1746:9, 1760:25,
1761:4, 1763:16,
1764:11, 1768:13,
1768:15, 1776:23,
1776:25, 1777:4,
1778:12, 1786:6,
1787:5, 1796:15,
1797:24, 1805:6,
1805:13, 1806:20,
1806:21, 1806:22,
1807:1, 1811:8,
1811:9, 1811:10,
1811:22, 1811:23,
1811:25
**safety-related** [1] -
1737:14

**sample** [3] - 1804:4,
1804:5, 1804:13
**sampling** [7] -
1757:19, 1757:21,
1780:1, 1791:7,
1796:10, 1804:8,
1804:10
**sanitary** [1] - 1780:17
**Santa** [1] - 1803:2
**satisfy** [1] - 1809:8
**save** [2] - 1742:17,
1745:20
**saw** [3] - 1744:11,
1780:22, 1786:19
**scientific** [1] -
1784:21
**scoop** [1] - 1770:17
**scraped** [1] - 1795:16
**screen** [4] - 1744:23,
1757:25, 1758:13,
1790:8
**second** [8] - 1718:1,
1724:2, 1750:17,
1763:2, 1775:18,
1775:22, 1801:4,
1815:9
**Section** [2] - 1715:23,
1799:25
**see** [25] - 1719:21,
1723:10, 1724:11,
1727:16, 1735:7,
1735:11, 1741:5,
1743:21, 1743:23,
1754:14, 1758:24,
1759:7, 1771:3,
1771:23, 1772:2,
1783:9, 1783:23,
1784:2, 1786:11,
1788:2, 1809:3,
1813:4, 1813:5,
1814:18
**seeing** [4] - 1720:3,
1730:20, 1791:13,
1792:11
**seem** [3] - 1738:21,
1767:19, 1783:11
**seeped** [1] - 1799:12
**sees** [1] - 1760:15
**SEGAL** [1] - 1715:10
**self** [4] - 1800:11,
1800:12, 1800:13,
1800:15
**self-report** [2] -
1800:11, 1800:12
**self-reported** [2] -
1800:13, 1800:15
**sell** [1] - 1745:7
**semi** [1] - 1805:23
**semi-solids** [1] -
1785:20

**sense** [1] - 1739:9
**sent** [2] - 1717:8,
1781:7
**separate** [1] - 1799:16
**series** [1] - 1717:22
**SESSION** [1] - 1715:9
**sets** [1] - 1812:24
**settle** [1] - 1746:20
**settled** [2] - 1732:1,
1732:25
**several** [7] - 1719:23,
1723:20, 1727:14,
1747:9, 1763:4,
1769:22, 1769:24
**shall** [2] - 1759:4,
1759:13
**share** [9] - 1757:13,
1793:24, 1797:19,
1807:16, 1809:13,
1809:19, 1810:14,
1810:25, 1811:3
**sheer** [1] - 1797:20
**shift** [1] - 1752:19
**ships** [1] - 1792:8
**shop** [1] - 1774:8
**short** [1] - 1748:23
**shorthand** [1] -
1716:25
**shortly** [2] - 1732:1,
1732:25
**show** [11] - 1734:10,
1747:6, 1747:7,
1755:11, 1757:16,
1758:8, 1758:11,
1774:15, 1775:1,
1806:12
**showed** [2] - 1771:16,
1812:15
**showing** [2] -
1736:15, 1741:11
**shown** [1] - 1772:3
**shows** [3] - 1771:14,
1789:6, 1792:17
**shutdown** [1] -
1744:22
**side** [12] - 1718:14,
1759:20, 1760:1,
1760:2, 1760:9,
1760:10, 1768:11,
1768:12, 1771:17,
1773:22, 1774:9,
1810:13
**sides** [8] - 1717:8,
1717:14, 1718:2,
1718:4, 1718:16,
1746:14, 1782:1,
1786:12
**sign** [1] - 1805:23
**signed** [2] - 1732:22,
1805:3

**significant** [13] -
1790:18, 1790:23,
1791:12, 1791:22,
1791:25, 1792:3,
1792:9, 1792:16,
1792:20, 1798:20,
1800:17, 1801:15
**similar** [3] - 1755:24,
1756:2, 1792:16
**simple** [2] - 1753:1,
1784:18
**simply** [6] - 1785:12,
1790:4, 1800:6,
1806:6, 1807:6,
1808:8
**single** [1] - 1801:23
**sit** [2] - 1761:6, 1798:1
**site** [62] - 1727:13,
1727:25, 1728:7,
1729:23, 1730:16,
1731:18, 1731:22,
1736:17, 1738:13,
1740:4, 1740:15,
1740:23, 1741:2,
1741:4, 1741:5,
1741:18, 1742:7,
1744:20, 1746:10,
1747:10, 1748:1,
1748:6, 1748:22,
1749:7, 1755:22,
1762:10, 1764:14,
1764:18, 1767:25,
1771:2, 1771:7,
1771:15, 1771:16,
1771:19, 1771:20,
1772:1, 1772:7,
1773:2, 1773:3,
1773:9, 1774:12,
1774:18, 1774:22,
1775:1, 1775:3,
1777:1, 1779:24,
1781:3, 1784:6,
1788:10, 1790:17,
1792:10, 1792:14,
1793:1, 1793:23,
1797:13, 1798:20,
1801:22, 1808:15,
1809:1, 1810:5,
1810:25
**sited** [1] - 1793:14
**sites** [31] - 1738:10,
1743:11, 1754:22,
1754:25, 1756:3,
1756:10, 1768:21,
1769:5, 1770:24,
1771:4, 1775:4,
1775:8, 1779:10,
1779:17, 1779:18,
1780:9, 1780:19,
1781:10, 1782:17,

1782:20, 1784:4,
1784:5, 1784:7,
1784:11, 1784:12,
1784:14, 1793:18,
1801:25, 1807:25
**sitting** [3] - 1756:25,
1757:2, 1795:13
**Sitton** [1] - 1778:2
**Sitton's** [1] - 1760:7,
1760:14
**situation** [5] - 1730:5,
1730:20, 1746:9,
1749:1, 1781:2
**six** [3] - 1777:14,
1777:20, 1778:1
**six-inch** [3] - 1777:14,
1777:20, 1778:1
**skirting** [1] - 1786:1
**sleight** [1] - 1726:9
**sleight-of-hand** [1] -
1726:9
**slide** [17] - 1723:11,
1723:19, 1724:1,
1724:6, 1725:25,
1726:1, 1727:8,
1727:11, 1735:8,
1750:17, 1751:17,
1761:12, 1774:14,
1776:9, 1788:16,
1813:22, 1814:2
**slides** [8] - 1723:8,
1724:19, 1736:15,
1749:16, 1762:2,
1762:7, 1780:14,
1810:16
**sloppy** [12] - 1726:9,
1726:13, 1726:17,
1726:18, 1726:24,
1727:5, 1728:4,
1728:7, 1728:9,
1779:3, 1779:5
**sludge** [3] - 1770:17,
1795:2, 1795:15
**small** [2] - 1810:13,
1811:3
**smaller** [1] - 1769:9
**smarter** [1] - 1788:18
**smell** [1] - 1773:17
**smelly** [1] - 1753:20
**snapshot** [1] -
1755:17
**soak** [3] - 1796:12,
1796:13, 1796:19
**soak-out** [1] - 1796:13
**soaking** [2] - 1781:23,
1781:25
**soften** [1] - 1796:19
**soil** [23] - 1729:17,
1771:6, 1771:8,
1772:1, 1773:1,

1773:2, 1773:4, 1773:7, 1773:9, 1773:12, 1773:16, 1773:17, 1773:21, 1774:15, 1774:16, 1774:18, 1774:19, 1774:21, 1774:25, 1796:2, 1800:2
**Solid** [1] - 1767:24
**solid** [9] - 1741:20, 1742:3, 1742:4, 1762:17, 1766:5, 1783:1, 1799:21, 1800:7
**solids** [2] - 1785:19, 1785:20
**solvent** [24] - 1725:16, 1728:6, 1735:3, 1746:3, 1770:12, 1770:13, 1773:15, 1776:4, 1776:5, 1776:18, 1777:16, 1778:9, 1781:25, 1786:11, 1787:7, 1792:2, 1796:18, 1798:5, 1806:11, 1807:5, 1811:8, 1811:10
**solvents** [23] - 1727:14, 1728:1, 1728:5, 1728:9, 1730:3, 1730:18, 1730:19, 1738:2, 1750:15, 1764:25, 1770:5, 1770:7, 1771:5, 1774:17, 1775:3, 1775:5, 1785:20, 1796:1, 1798:13, 1798:19, 1798:21
**sometimes** [5] - 1738:13, 1808:22, 1808:23, 1808:24
**somewhat** [1] - 1747:1
**somewhere** [1] - 1791:14
**soon** [2] - 1762:23, 1777:21
**Sorry** [1] - 1757:20
**sorry** [6] - 1748:11, 1748:14, 1750:18, 1759:22, 1775:20, 1791:5
**sort** [11] - 1736:25, 1737:6, 1737:25, 1739:10, 1749:1, 1752:21, 1766:17, 1787:19, 1795:12, 1812:24, 1815:12

**sorts** [1] - 1809:4
**sound** [1] - 1764:6
**source** [11] - 1742:6, 1750:21, 1760:20, 1763:2, 1772:20, 1772:22, 1774:21, 1775:2, 1779:21, 1782:4, 1793:3
**sources** [6] - 1728:17, 1731:14, 1769:6, 1790:14, 1792:6, 1811:4
**south** [12] - 1757:24, 1759:19, 1760:21, 1760:23, 1761:9, 1769:14, 1772:9, 1772:16, 1772:18, 1812:16, 1813:11, 1813:12
**southern** [2] - 1792:14, 1792:25
**southwest** [3] - 1779:24, 1792:11, 1792:17
**sovereign** [1] - 1783:21
**spades** [1] - 1747:19
**sparks** [1] - 1761:10
**speaks** [1] - 1814:10
**special** [1] - 1804:3
**specific** [3] - 1765:22, 1805:18, 1815:11
**specifically** [3] - 1779:1, 1781:2, 1804:4
**specifications** [14] - 1730:1, 1730:2, 1730:10, 1731:17, 1736:9, 1737:21, 1764:22, 1764:24, 1805:1, 1805:5, 1805:10, 1805:11, 1806:9, 1806:14
**specified** [2] - 1781:4, 1781:7
**specify** [1] - 1781:15
**specs** [2] - 1737:16, 1767:7
**speculative** [1] - 1796:9
**Speer** [1] - 1762:9
**spend** [1] - 1786:3
**spot** [1] - 1760:18
**SRAM** [22] - 1729:25, 1740:25, 1762:23, 1762:25, 1763:10, 1764:18, 1766:24, 1767:14, 1767:20, 1767:24, 1768:16, 1768:17, 1807:18,

1807:22, 1807:25, 1808:1, 1808:6, 1808:11, 1809:21, 1809:23, 1815:6
**SRAM-relate** [1] - 1807:25
**STACIE** [1] - 1715:15
**stain** [2] - 1813:16
**stamp** [1] - 1805:19
**Stan** [1] - 1771:11
**stand** [5] - 1717:15, 1766:17, 1784:16, 1803:15, 1803:19
**standard** [10] - 1726:5, 1726:11, 1726:21, 1788:3, 1788:5, 1789:1, 1794:8, 1804:10, 1804:12, 1804:17
**standards** [9] - 1750:9, 1763:17, 1763:22, 1789:24, 1805:14, 1805:22, 1806:2, 1806:4, 1811:24
**standpoint** [2] - 1764:11, 1810:12
**standpoints** [1] - 1764:12
**stands** [1] - 1769:8
**star** [1] - 1758:24
**start** [10] - 1717:18, 1717:19, 1717:24, 1727:8, 1730:6, 1735:7, 1735:8, 1736:8, 1754:17
**started** [3] - 1717:17, 1747:2, 1770:5
**starting** [2] - 1754:15, 1767:20
**starts** [1] - 1783:3
**state** [1] - 1787:9
**State** [1] - 1788:11
**statement** [2] - 1732:20, 1732:21
**States** [38] - 1717:3, 1717:7, 1719:8, 1719:23, 1720:17, 1720:19, 1720:24, 1739:17, 1751:7, 1751:8, 1778:22, 1778:24, 1781:6, 1781:15, 1783:5, 1783:16, 1783:19, 1786:14, 1786:18, 1786:22, 1788:7, 1790:2, 1790:7, 1793:23, 1795:20, 1795:22, 1801:1, 1804:25, 1805:23,

1807:3, 1807:6, 1808:15, 1809:3, 1809:19, 1809:25, 1810:6, 1810:24, 1810:25
**STATES** [3] - 1715:1, 1715:6, 1715:11
**statute** [2] - 1749:25, 1803:5
**step** [1] - 1736:2
**stepped** [1] - 1767:22
**steps** [2] - 1810:2, 1811:1
**Sterrett** [1] - 1792:9
**Sterrett's** [3] - 1724:19, 1724:20, 1725:15
**Stickney** [1] - 1777:22
**still** [8] - 1727:4, 1744:4, 1769:12, 1771:25, 1772:1, 1774:17, 1774:19, 1789:13
**stipulated** [1] - 1794:11
**stipulation** [1] - 1731:5
**stood** [1] - 1767:17
**stop** [3] - 1769:25, 1814:15, 1814:17
**stopped** [3] - 1770:2, 1770:4, 1777:22
**storm** [2] - 1777:25, 1813:12
**storm-water** [1] - 1777:25
**story** [1] - 1733:11
**strata** [1] - 1800:1
**Street** [1] - 1715:24
**strict** [1] - 1749:25
**strike** [2] - 1725:5, 1725:12
**structure** [1] - 1787:1
**struggled** [1] - 1733:6
**study** [2] - 1730:18, 1787:17
**stuff** [13] - 1717:18, 1733:23, 1745:3, 1746:10, 1753:6, 1754:6, 1754:8, 1763:22, 1771:6, 1777:17, 1779:13, 1803:21
**subcontractor** [1] - 1763:11
**subject** [2] - 1761:20, 1783:20
**submit** [4] - 1725:18, 1789:6, 1811:15, 1812:9

**submitted** [4] - 1717:14, 1718:11, 1725:6, 1805:22
**subsequent** [1] - 1781:17
**subsidiary** [3] - 1740:3, 1740:4, 1744:7
**substance** [2] - 1794:21, 1810:2
**substantial** [1] - 1762:12
**substantive** [1] - 1722:22
**sucking** [1] - 1773:14
**suggested** [1] - 1730:17
**suggesting** [2] - 1717:8, 1722:7
**suggestion** [1] - 1736:2
**suggests** [1] - 1814:8
**Suite** [1] - 1715:24
**Sullivan** [3] - 1778:19, 1778:21, 1814:13
**SULLIVAN** [113] - 1715:19, 1718:25, 1722:23, 1723:3, 1723:6, 1723:11, 1723:15, 1723:19, 1724:1, 1724:15, 1724:18, 1725:1, 1725:14, 1778:20, 1779:20, 1780:5, 1780:8, 1780:13, 1780:20, 1781:1, 1781:11, 1781:14, 1781:19, 1782:6, 1782:19, 1782:23, 1782:25, 1783:18, 1784:2, 1784:13, 1785:2, 1785:8, 1785:12, 1785:17, 1786:5, 1786:17, 1787:23, 1788:1, 1788:4, 1788:21, 1789:3, 1789:17, 1789:23, 1790:4, 1790:12, 1791:3, 1792:19, 1792:24, 1793:4, 1793:13, 1793:20, 1793:22, 1794:1, 1794:4, 1794:11, 1794:15, 1794:22, 1795:4, 1795:9, 1795:20, 1795:25, 1796:6, 1796:13, 1797:2, 1797:6, 1797:9, 1797:15, 1798:1,

1798:16, 1799:1, 1799:7, 1799:11, 1799:15, 1800:4, 1800:22, 1801:6, 1801:10, 1801:14, 1801:17, 1802:1, 1802:4, 1802:7, 1802:10, 1802:17, 1802:22, 1803:10, 1803:25, 1804:4, 1804:11, 1804:15, 1804:20, 1804:22, 1805:16, 1806:3, 1806:19, 1807:1, 1807:9, 1807:12, 1807:19, 1808:8, 1808:13, 1808:22, 1809:17, 1809:22, 1810:9, 1812:3, 1812:17, 1813:2, 1813:9, 1814:2, 1814:15, 1814:20, 1814:24

**summarize** [1] - 1724:13

**summary** [5] - 1724:6, 1724:7, 1724:17, 1726:1, 1727:11

**sump** [13] - 1759:1, 1759:6, 1759:14, 1759:19, 1760:21, 1760:23, 1760:25, 1761:9, 1761:13, 1769:13, 1806:7, 1813:11, 1813:12

**sumps** [3] - 1749:19, 1758:14, 1813:19

**Superfund** [1] - 1784:11

**supplement** [2] - 1732:24, 1733:1

**supply** [1] - 1756:22

**support** [1] - 1784:21

**supposed** [4] - 1767:8, 1783:2, 1785:3, 1800:23

**supposition** [1] - 1784:23

**suppressing** [1] - 1734:6

**surface** [4] - 1738:24, 1759:21, 1799:23, 1800:9

**switch** [1] - 1717:23

**system** [4] - 1740:20, 1740:21, 1776:17

**systems** [1] - 1740:17

---

# T

**talks** [8] - 1737:2, 1772:5, 1772:13, 1774:8, 1777:10, 1777:15, 1787:10, 1800:6

**taste** [4] - 1752:25, 1753:9, 1753:21, 1754:10

**tastes** [1] - 1753:4

**TCA** [6] - 1728:6, 1774:13, 1774:15, 1776:5, 1811:8, 1811:11

**TCE** [63] - 1728:17, 1728:22, 1729:1, 1729:4, 1729:10, 1729:13, 1729:17, 1730:3, 1730:10, 1730:12, 1730:13, 1730:14, 1730:24, 1731:14, 1731:15, 1731:17, 1733:3, 1754:7, 1754:16, 1755:14, 1755:19, 1755:24, 1756:3, 1757:1, 1761:17, 1769:13, 1770:14, 1771:20, 1771:23, 1771:25, 1772:1, 1772:3, 1772:6, 1772:7, 1772:24, 1772:25, 1773:4, 1773:7, 1773:8, 1773:14, 1773:16, 1774:12, 1774:25, 1775:1, 1775:2, 1776:4, 1777:2, 1779:11, 1779:12, 1782:24, 1784:12, 1784:22, 1787:7, 1789:22, 1789:23, 1792:15, 1798:15, 1802:19, 1803:22, 1811:4, 1811:5, 1811:10

**teach** [1] - 1811:25

**Tech** [2] - 1755:9, 1755:20

**technical** [3] - 1768:9, 1768:11, 1768:12

**technically** [2] - 1797:11, 1810:10

**telegram** [1] - 1741:16

**tend** [2] - 1789:9, 1790:20

**tenet** [1] - 1737:11

**term** [2] - 1726:14,

---

1728:7

**terms** [16] - 1730:22, 1738:10, 1741:8, 1743:12, 1746:1, 1768:19, 1768:20, 1768:22, 1768:25, 1779:22, 1782:14, 1788:9, 1790:22, 1790:24, 1807:24, 1811:5

**terribly** [2] - 1739:14, 1783:25

**test** [6] - 1769:8, 1802:17, 1803:8, 1803:10, 1803:23, 1809:6

**tested** [4] - 1755:9, 1802:14, 1802:19, 1803:16

**testified** [15] - 1721:24, 1724:22, 1761:1, 1761:8, 1761:11, 1767:17, 1781:21, 1782:21, 1785:22, 1790:13, 1790:19, 1792:19, 1810:3, 1811:9, 1811:18

**testifies** [1] - 1772:19

**testify** [2] - 1722:5, 1724:21

**testimony** [14] - 1725:2, 1735:18, 1736:6, 1760:7, 1762:9, 1766:14, 1767:2, 1767:18, 1790:1, 1805:17, 1811:12, 1812:4, 1812:7, 1812:8

**testing** [4] - 1736:20, 1753:15, 1780:15, 1802:21

**Tetra** [2] - 1755:9, 1755:20

**that'll** [1] - 1814:23

**THE** [277] - 1715:1, 1715:10, 1717:2, 1717:4, 1718:23, 1719:1, 1719:5, 1719:11, 1719:14, 1719:21, 1720:2, 1720:16, 1720:21, 1721:4, 1721:9, 1721:15, 1721:17, 1721:21, 1722:2, 1722:4, 1722:13, 1722:15, 1722:17, 1722:20, 1722:24, 1723:4, 1723:10, 1723:16, 1723:25,

---

1724:2, 1724:9, 1724:16, 1724:23, 1725:3, 1725:12, 1725:20, 1726:8, 1726:15, 1726:20, 1728:14, 1728:22, 1729:1, 1729:5, 1729:20, 1731:2, 1731:8, 1731:19, 1732:11, 1732:15, 1732:17, 1732:21, 1733:3, 1733:16, 1734:2, 1734:6, 1734:9, 1734:13, 1734:15, 1734:18, 1734:22, 1735:5, 1735:9, 1735:16, 1735:25, 1736:18, 1737:11, 1737:24, 1738:21, 1739:5, 1739:8, 1740:6, 1740:12, 1741:6, 1741:10, 1741:21, 1741:25, 1742:10, 1742:24, 1743:4, 1743:6, 1743:10, 1743:13, 1743:25, 1744:21, 1744:25, 1745:2, 1745:14, 1745:20, 1745:22, 1746:12, 1746:19, 1746:22, 1748:5, 1748:8, 1748:12, 1748:19, 1749:12, 1750:17, 1750:19, 1752:1, 1752:4, 1752:15, 1752:17, 1753:10, 1753:18, 1753:20, 1754:21, 1754:24, 1755:2, 1755:6, 1755:8, 1755:13, 1755:16, 1756:4, 1756:7, 1756:13, 1757:8, 1757:10, 1757:15, 1757:17, 1757:20, 1757:23, 1758:3, 1758:8, 1758:12, 1758:15, 1758:18, 1758:20, 1758:22, 1758:24, 1759:3, 1759:7, 1759:10, 1759:23, 1760:4, 1761:6, 1761:16, 1761:19, 1763:8, 1763:19, 1764:6, 1764:21, 1766:14, 1767:2, 1767:5, 1768:9, 1768:19, 1768:25, 1769:13, 1769:18, 1769:21,

---

1769:25, 1770:9, 1770:14, 1770:18, 1771:9, 1771:13, 1772:10, 1772:14, 1772:17, 1773:5, 1773:10, 1774:2, 1774:23, 1775:7, 1775:12, 1775:17, 1776:23, 1777:9, 1777:12, 1778:4, 1778:15, 1778:19, 1779:8, 1780:3, 1780:7, 1780:11, 1780:18, 1780:24, 1781:9, 1781:13, 1781:16, 1782:1, 1782:16, 1782:21, 1782:24, 1783:6, 1783:22, 1784:8, 1784:15, 1785:6, 1785:9, 1785:15, 1785:24, 1786:16, 1787:15, 1787:25, 1788:2, 1788:13, 1789:2, 1789:15, 1789:19, 1790:3, 1790:8, 1791:2, 1792:15, 1792:22, 1793:2, 1793:12, 1793:17, 1793:21, 1793:25, 1794:3, 1794:10, 1794:13, 1794:19, 1795:1, 1795:7, 1795:18, 1795:23, 1796:4, 1796:12, 1797:1, 1797:4, 1797:7, 1797:13, 1797:24, 1798:9, 1798:24, 1799:5, 1799:10, 1799:13, 1799:25, 1800:20, 1801:4, 1801:9, 1801:12, 1801:16, 1801:24, 1802:2, 1802:6, 1802:9, 1802:13, 1802:18, 1803:6, 1803:20, 1804:2, 1804:10, 1804:14, 1804:19, 1804:21, 1805:4, 1805:9, 1805:14, 1805:25, 1806:18, 1806:21, 1807:8, 1807:11, 1807:17, 1807:23, 1808:5, 1808:10, 1808:17, 1809:15, 1809:21, 1810:7, 1812:2, 1812:14, 1812:24, 1813:8, 1814:1, 1814:13,

1814:18, 1814:22, 1815:2, 1815:9
**theirs** [1] - 1762:18
**themselves** [3] - 1724:11, 1742:18, 1756:2
**theories** [1] - 1770:22
**theory** [1] - 1756:13
**they've** [7] - 1724:9, 1731:3, 1750:20, 1757:19, 1757:21, 1763:9, 1809:4
**thinking** [2] - 1717:18, 1803:8
**Thiokol** [1] - 1763:1
**third** [1] - 1784:23
**three** [5] - 1719:9, 1769:5, 1792:6, 1812:24, 1812:25
**threw** [1] - 1766:25
**throughout** [2] - 1731:15, 1731:18
**throwing** [1] - 1739:1
**thrust** [1] - 1717:20
**timeline** [1] - 1736:5
**timely** [1] - 1767:8
**tiny** [2] - 1797:22
**title** [4] - 1757:13, 1790:6, 1808:3, 1810:4
**title-vesting** [1] - 1790:6
**today** [5] - 1723:7, 1726:17, 1756:25, 1757:3, 1805:4
**together** [6] - 1736:5, 1740:20, 1740:21, 1778:13, 1808:21
**took** [8] - 1739:19, 1740:8, 1762:24, 1768:8, 1776:12, 1788:17, 1793:11, 1812:24
**top** [5] - 1757:12, 1758:21, 1759:4, 1759:13, 1773:13
**topic** [3] - 1725:18, 1801:2, 1811:4
**topics** [2] - 1717:10, 1717:24
**Topo** [1] - 1759:16
**TORRES** [1] - 1715:14
**total** [1] - 1756:8
**totality** [1] - 1730:8
**touch** [1] - 1807:1
**tough** [1] - 1782:13
**toward** [1] - 1776:2
**trace** [1] - 1735:12
**traditional** [1] - 1739:9
**transcript** [5] -

1716:25, 1719:12, 1721:2, 1812:11, 1816:4
**transcription** [1] - 1716:25
**transcripts** [1] - 1721:24
**translate** [1] - 1746:22
**treat** [1] - 1755:24
**treated** [1] - 1785:21
**treatment** [3] - 1755:25, 1756:3, 1756:23
**trial** [14] - 1720:5, 1720:10, 1721:24, 1725:6, 1725:7, 1725:8, 1726:6, 1733:7, 1735:18, 1742:2, 1743:14, 1792:20, 1812:9, 1812:11
**TRIAL** [1] - 1715:10
**trichloroethylene** [1] - 1729:24
**tried** [2] - 1749:15, 1763:2
**trigger** [1] - 1747:18
**trimmings** [2] - 1765:2, 1765:3
**trouble** [1] - 1767:21
**trucked** [3] - 1801:21, 1802:2, 1802:4
**true** [7] - 1744:4, 1763:12, 1780:3, 1783:15, 1784:13, 1785:12, 1811:2
**truly** [2] - 1814:5, 1814:9
**trustworthy** [1] - 1811:20
**truth** [3] - 1721:15, 1722:11, 1799:3
**truthfully** [1] - 1788:24
**try** [3] - 1725:22, 1751:17, 1814:24
**trying** [9] - 1739:11, 1766:3, 1786:5, 1787:14, 1789:16, 1802:20, 1808:19, 1813:25, 1814:3
**Tuesday** [1] - 1715:7
**tune** [1] - 1729:2
**turn** [3] - 1718:8, 1744:16, 1749:24
**turned** [1] - 1724:8
**twenty** [1] - 1778:16
**two** [28] - 1718:4, 1718:11, 1720:18, 1721:5, 1721:9, 1722:8, 1722:14,

1724:4, 1728:17, 1731:23, 1732:8, 1745:18, 1752:4, 1752:7, 1752:8, 1756:12, 1759:4, 1759:14, 1769:19, 1780:9, 1782:8, 1786:6, 1792:1, 1793:18, 1799:21, 1807:25, 1813:10
**type** [6] - 1747:9, 1787:1, 1790:6, 1797:19, 1807:15
**types** [2] - 1754:12, 1806:12
**typical** [1] - 1804:12

---

**U**

**U.S** [10] - 1715:22, 1716:2, 1720:20, 1721:1, 1722:3, 1732:15, 1734:13, 1783:6, 1784:17, 1788:19
**ugly** [1] - 1789:7
**ultimate** [1] - 1762:16
**unaware** [1] - 1783:7
**uncertain** [1] - 1781:20
**uncontested** [2] - 1726:22, 1779:16
**under** [25] - 1732:21, 1732:22, 1744:13, 1749:24, 1750:1, 1762:1, 1762:3, 1763:12, 1763:15, 1765:17, 1767:2, 1777:6, 1778:24, 1782:12, 1782:25, 1785:12, 1790:5, 1797:10, 1799:1, 1802:24, 1803:5, 1807:16, 1809:7, 1809:24, 1810:3
**underground** [1] - 1800:1
**underneath** [2] - 1774:4, 1796:10
**understood** [2] - 1750:11, 1784:19
**unfortunately** [2] - 1798:22, 1800:16
**unfounded** [1] - 1812:9
**unique** [1] - 1783:4
**UNITED** [3] - 1715:1, 1715:6, 1715:11
**United** [38] - 1717:3,

1717:7, 1719:8, 1719:23, 1720:17, 1720:19, 1720:24, 1739:16, 1751:7, 1751:8, 1778:21, 1778:24, 1781:6, 1781:15, 1783:5, 1783:16, 1783:19, 1786:13, 1786:18, 1786:22, 1788:7, 1790:2, 1790:7, 1793:23, 1795:20, 1795:22, 1801:1, 1804:25, 1805:23, 1807:3, 1807:6, 1808:15, 1809:3, 1809:19, 1809:25, 1810:6, 1810:24, 1810:25
**unless** [1] - 1720:5
**unquestionably** [1] - 1793:5
**unquote** [1] - 1747:17
**unusual** [1] - 1811:22
**up** [47] - 1717:16, 1726:21, 1731:24, 1734:9, 1736:2, 1737:17, 1744:23, 1751:7, 1755:2, 1755:22, 1755:24, 1756:24, 1757:2, 1757:25, 1758:13, 1758:19, 1759:11, 1761:5, 1763:22, 1764:7, 1765:6, 1771:9, 1771:22, 1772:1, 1772:17, 1773:14, 1774:21, 1775:3, 1775:13, 1778:8, 1779:14, 1779:15, 1780:14, 1784:3, 1784:14, 1785:6, 1785:15, 1787:18, 1790:8, 1792:2, 1793:1, 1795:16, 1800:16, 1801:4, 1814:24, 1815:7, 1815:8
**update** [1] - 1732:2
**upshot** [1] - 1721:9
**useful** [4] - 1753:16, 1770:6, 1782:2, 1795:6

---

**V**

**vacuum** [1] - 1773:13
**vaguely** [1] - 1806:4
**valve** [1] - 1744:16
**vapor** [10] - 1730:13,

1733:9, 1733:10, 1773:8, 1773:14, 1773:16, 1773:18, 1773:20, 1774:12
**vapors** [1] - 1735:3
**varied** [1] - 1801:18
**various** [5] - 1729:17, 1735:19, 1746:4, 1780:19, 1807:5
**vents** [1] - 1790:20
**versus** [5] - 1717:6, 1740:2, 1755:14, 1757:24, 1812:16
**vesting** [2] - 1790:6, 1810:4
**view** [3] - 1738:18, 1744:17, 1763:5
**violated** [4] - 1726:11, 1750:8, 1751:21, 1752:2
**violating** [1] - 1765:9
**violation** [3] - 1765:7, 1798:14, 1798:16
**visited** [1] - 1776:14
**visiting** [1] - 1767:25
**visits** [1] - 1737:4
**volatile** [2] - 1773:14, 1774:17
**volume** [2] - 1791:11, 1797:21

---

**W**

**wait** [1] - 1766:17
**wants** [1] - 1767:8
**War** [2] - 1748:22, 1749:3
**warhead** [1] - 1740:20
**warn** [1] - 1814:7
**warning** [1] - 1751:8
**wash** [13] - 1755:12, 1761:13, 1769:7, 1777:20, 1778:8, 1780:15, 1782:9, 1782:10, 1786:4, 1795:10, 1806:6, 1806:7, 1813:13
**wash-out** [2] - 1755:12, 1769:7
**washed** [2] - 1760:22, 1761:8
**washing** [4] - 1761:7, 1781:4, 1806:6, 1813:19
**Washington** [4] - 1715:6, 1715:17, 1715:25, 1716:3
**waste** [80] - 1733:7, 1733:8, 1733:19,

1737:23, 1738:4, 1738:17, 1738:19, 1739:24, 1739:25, 1740:1, 1741:2, 1743:18, 1744:12, 1744:19, 1744:20, 1744:22, 1746:1, 1746:4, 1762:9, 1762:13, 1762:20, 1763:15, 1764:20, 1766:13, 1767:11, 1770:11, 1777:4, 1779:1, 1780:11, 1780:13, 1782:11, 1783:2, 1783:3, 1785:13, 1785:18, 1788:6, 1789:25, 1790:2, 1790:7, 1793:11, 1794:24, 1794:25, 1795:2, 1795:4, 1795:5, 1795:6, 1795:21, 1797:4, 1797:5, 1797:6, 1797:7, 1798:6, 1798:8, 1798:23, 1799:2, 1799:19, 1799:22, 1800:5, 1800:7, 1800:10, 1801:7, 1801:23, 1802:2, 1805:12, 1806:5, 1807:1, 1807:3, 1807:7, 1807:14, 1809:1, 1809:5, 1810:1, 1810:3, 1810:4, 1810:20, 1811:1, 1811:2

**wastes** [8] - 1738:5, 1738:20, 1760:22, 1760:24, 1765:9, 1765:20, 1770:7, 1813:22

**wastewater** [12] - 1761:2, 1782:14, 1786:20, 1787:8, 1790:25, 1792:7, 1798:5, 1800:24, 1803:12, 1806:10, 1807:5, 1812:13

**wastewaters** [1] - 1786:10

**watch** [2] - 1743:23, 1744:8

**watching** [1] - 1744:5

**Water** [2] - 1750:23, 1752:12

**water** [68] - 1752:9, 1752:17, 1752:20, 1752:21, 1753:2, 1753:4, 1753:15,

1755:25, 1756:22, 1758:7, 1759:11, 1759:21, 1760:13, 1760:15, 1760:16, 1760:21, 1765:2, 1773:10, 1777:15, 1777:20, 1777:25, 1778:8, 1780:15, 1781:3, 1781:4, 1781:8, 1781:12, 1781:13, 1782:9, 1782:10, 1782:12, 1782:13, 1784:23, 1784:24, 1785:20, 1785:23, 1787:2, 1787:12, 1788:20, 1790:15, 1791:5, 1791:10, 1791:17, 1792:2, 1798:17, 1799:1, 1799:3, 1799:24, 1800:2, 1800:9, 1800:10, 1800:12, 1800:15, 1802:15, 1802:25, 1803:2, 1803:5, 1803:13, 1803:14, 1803:21, 1813:12, 1813:13

**waters** [2] - 1754:2

**watershed** [1] - 1813:24

**waterway** [1] - 1799:9

**WAYNE** [3] - 1716:1, 1816:3, 1816:7

**ways** [1] - 1771:2

**weather** [1] - 1813:14

**weedy** [2] - 1791:6, 1791:19

**week** [2] - 1725:6, 1791:6

**weeks** [2] - 1718:11, 1768:2

**Wehde** [1] - 1803:3

**Wehde's** [2] - 1803:1, 1803:13

**weighing** [2] - 1732:5, 1732:6

**weight** [1] - 1732:6

**wells** [8] - 1771:18, 1772:2, 1772:8, 1772:9, 1772:16, 1772:18, 1772:19, 1775:1

**Wessman** [1] - 1811:16

**west** [11] - 1758:9, 1759:22, 1760:10, 1760:11, 1760:12, 1771:17, 1771:25, 1772:3, 1773:10,

1775:1, 1812:22

**westward** [1] - 1777:6

**whatnot** [5] - 1790:20, 1792:2, 1796:17, 1796:21, 1796:23

**whatsoever** [1] - 1764:4

**White** [1] - 1811:17

**Whittaker** [1] - 1781:7

**whole** [4] - 1760:14, 1782:1, 1782:8, 1798:18

**WILLIAM** [1] - 1715:21

**willing** [1] - 1738:25

**winds** [1] - 1790:20

**wise** [1] - 1793:20

**witness** [8] - 1722:6, 1725:11, 1742:2, 1742:24, 1743:1, 1777:10, 1782:21, 1784:20

**witnessed** [1] - 1743:19

**witnesses** [2] - 1727:14, 1763:25

**wondered** [1] - 1759:18

**word** [2] - 1740:9, 1786:4

**worker** [1] - 1812:8

**workers** [2] - 1763:9, 1811:13

**works** [1] - 1763:18

**World** [1] - 1748:21

**worried** [16] - 1734:24, 1737:15, 1737:17, 1737:18, 1738:6, 1738:7, 1738:23, 1739:5, 1739:14, 1751:4, 1752:25, 1776:24, 1802:18, 1802:19, 1806:24

**worry** [2] - 1754:15, 1763:20

**worrying** [2] - 1770:20, 1806:25

**worst** [1] - 1801:1

**worth** [4] - 1724:10, 1725:13, 1728:15, 1767:9

**wrap** [2] - 1755:21, 1775:13

**writing** [1] - 1737:8

**written** [2] - 1737:5, 1801:16

**wrongdoing** [2] - 1739:9, 1749:9

**wrote** [1] - 1805:2

# Y

**yards** [1] - 1793:10

**year** [3] - 1792:1, 1797:22, 1801:20

**years** [10] - 1726:22, 1731:22, 1731:23, 1735:13, 1793:9, 1811:10, 1812:22, 1812:23, 1812:25, 1813:3

**yesterday** [1] - 1717:7

**yourself** [2] - 1731:16, 1744:17

# Z

**zero** [6] - 1747:21, 1797:8, 1797:19, 1809:13, 1809:19, 1810:14

**zeroed** [1] - 1747:13

**ZILIOLI** [1] - 1715:19