UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LOCKHEED MARTIN CORPORATION,.
                              .
          Plaintiff,          .
                              .  CA No. 08-1160 (ESH)
     v.                       .
                              .
UNITED STATES OF AMERICA,     .  Washington, D.C.
                              .  March 14, 2014
          Defendant.          .  9:43 a.m.
                              .
. . . . . . . . . . . . . .   .  Pages 1928 - 2027

REBUTTAL ARGUMENTS
DAY 11
TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:        MICHAEL K. MURPHY, ESQ.
                          JUSTIN A. TORRES, ESQ.
                          STACIE B. FLETCHER, ESQ.
                          DAVID FOTOUHI, ESQ.

                          Gibson, Dunn & Crutcher, LLP
                          1050 Connecticut Avenue, NW
                          Washington, DC 20036-5306
                          (202) 955-8238

For the Defendant:        JOHN E. SULLIVAN, ESQ.
                          ERICA M. ZILIOLI, ESQ.
                          JESSICA O'DONNELL, ESQ.
                          JUSTIN D. HEMINGER, ESQ.
                          JENNIFER E. POWELL, ESQ.
                          WILLIAM D. JOHNSON, ESQ.

                          U.S. Department of Justice
                          ENRD / Environmental Defense
                          Section
                          601 D Street, NW
                          Suite 8000
                          Washington, DC 20026-3986
                          (202) 305-0365

1929

**Court Reporter:**
**PATRICIA KANESHIRO-MILLER, RMR**
**Certified Realtime Reporter**
**U.S. Courthouse**
**333 Constitution Avenue, NW**
**Washington, DC 20001**
**(202) 354-3243**

1        **PROCEEDINGS**

2               THE DEPUTY CLERK:  Civil Action 08-1160, Lockheed

3     Martin Corporation versus United States of America.

4               THE COURT:  Okay.  I think we're ready to proceed.  I

5     think we decided that Lockheed goes first.

6               Okay.  Half an hour.  I will try to keep my mouth

7     shut.

8               Go ahead.

9               MR. MURPHY:  Half hour, Your Honor?  Did you say half

10    hour?

11              THE COURT:  Why, you've got less?

12              MR. MURPHY:  No, I had read the order that it was

13    going to be an hour each side this morning.

14              THE COURT:  That's fair.

15              MR. MURPHY:  Okay.

16              THE COURT:  I usually take up the time, so we're

17    shrinking the time.  Okay.

18              MR. MURPHY:  Thank you, Your Honor.

19              First, I want to hand out -- we have prepared some

20    trial slides, some additional slides for the presentation

21    today.

22              THE COURT:  Okay.

23              MR. MURPHY:  We can hand those out.

24              Thank you, Your Honor.

25              We started at opening, Your Honor, talking about the

1    partnership that we believe the parties entered into to run

2    the facility.  We talked about the fact that the parties

3    shared the responsibilities for building these missiles and we

4    should share in the environmental legacy that exists today.

5        We heard, Your Honor, on Tuesday talk about kind of

6    how to do this, how to set up this framework, what facts need

7    to be resolved here.  We've looked at different allocation

8    approaches in different contexts.  Here, you know, we looked

9    at the *United States v. Davis*, talked about in some cases a

10   per capita approach might have some merit.  When the parties

11   are all the same or you have the PRPs together, involved in

12   the same processes --

13       THE REPORTER:  Please slow down.

14       MR. MURPHY:  I will.  I will, yes.

15       THE COURT:  No, you won't.  You think you will.  Okay.

16   Try harder.

17       MR. MURPHY:  Yes, Your Honor.

18       We brought the PRPs together, and they were all

19   involved in the same activities.  So it's suggested that in

20   certain situations, in certain cases, with certain facts, a

21   per capita approach is the most appropriate.  So you would

22   start with a 50-50 and then look at equitable factors to move

23   up or down.  *Davis* suggested something they called the *Torres*

24   factors, other courts have used *Gore* factors, as a way to move

25   the allocation or down from a certain point in time.

1        We think that the facts here at Redlands and the

2   Beaumont facilities follow that in that you have here the

3   sources cannot be isolated or defined with certainty.  LPC and

4   United States both owned, they both had control, and they both

5   operated the facilities together.

6        So, again, following on from what we said at opening,

7   we believe that type of allocation, Your Honor, that type of

8   allocation fits better here than doing a matrix.  So you would

9   start at the 50-50 and then move up or down based on some

10   equitable factors here, because again, it is very difficult to

11   know here whether the burn pit's the source, whether other

12   sources are the primary source.

13        Even measuring at Beaumont, where you have the burn

14   pit and you have the wash-out facility, how much went in

15   there, what is going to drive the response costs here in the

16   future, right now it is just very difficult to tell.  So here

17   you've got this intertwined relationship, and it is very

18   difficult to untangle the parties.

19        Now, in their pretrial brief, the government started

20   with a zero allocation.  At opening, they came in with a 10 or

21   15.  In their closing slides, they introduced a matrix, and

22   they said a matrix is the way to solve this case, Your Honor.

23   And they presented their own matrix.

24        AISLIC had used a matrix.  Other CERCLA cases use a

25   matrix.  Again, we think a matrix here is very difficult to

1    use because you have to make factual findings.  A lot of the

2    government's matrix, for example, is based on a factual

3    finding that the TCE was solely caused by dumping or that it

4    looks at being able to measure with precision the amount of AP

5    that they owned that was disposed of at Potrero.  We don't

6    think the facts here support this at all.  In fact, I think

7    some of the measurements or calculations they put in their

8    matrix are just wrong on their face.

9         For example, DOJ asserts that in AISLIC the U.S. share

10   based on ownership of equipment was only 10 percent and that

11   the government's share on arranger was 20 percent.  That

12   doesn't really fully explain what the AISLIC court did.

13   Looking at the AISLIC court, the government actually received

14   80 percent of the arranger allocation in that case, so you're

15   looking at what the AISLIC court did with the AISLIC court

16   facts, and they gave the government an 80 percent allocation

17   for arranger.  For ownership, the government got a 40 percent

18   allocation.  What the court there was doing was splitting up a

19   set of marbles.  They had 25 marbles for arranger, and they

20   gave 20 of those marbles to the U.S. 5 to the contractor.  So

21   that, again, is an 80 to 20 split.  So that's how much the

22   court gave in AISLIC.  Of course, in AISLIC, they gave a zero

23   for operator.

24        Then, after that point, the AISLIC court looked at

25   these equitable factors, the *Torres* factors and the *Gore*

1    factors and then moved what they came up with up or down.

2    Again, we think those same equitable factors have a role here,

3    as well.

4         THE COURT:  You agree, though, I don't have to go by

5    the authority you're advocating?  I don't need to deal with

6    this matrix one bit.  I can go up or down or left or right,

7    whichever way I want without worrying about -- I've found this

8    to be somewhat sort of artificial and arbitrary as the

9    ultimate analysis has to be, in a way, but okay.  He did this

10   for whatever convenience, but it is not required.

11        MR. MURPHY:  I agree with Your Honor, it is not

12   required.  It is a way courts sometimes look at it.

13        THE COURT:  I haven't seen it anywhere else, to be

14   frank; maybe it is.

15        MR. MURPHY:  The law gives you the discretion.  In

16   some cases, it might be appropriate to use a matrix.  When you

17   can measure a party's -- the way I see matrix, Your Honor, is

18   in a multi-party landfill, where there's 20 parties and each

19   party has a different responsibility or sends a different

20   amount of waste to a facility, and you see matrix sometimes in

21   those types of cases, but I don't think it is necessary here.

22   To the extent you want to put a number or use a matrix to come

23   to our allocation here, you know, we've presented a matrix in

24   these slides; and again, it is not required, but this is a way

25   to illustrate what we think would be appropriate in this case,

1    Your Honor.

2         THE COURT:  How do you get where your preliminary

3    allocation comes from?  Where in the world do you come up with

4    that one?

5         MR. MURPHY:  Which one?

6         THE COURT:  52/48.

7         MR. MURPHY:  Well, Your Honor, that is just using the

8    matrix above and using the plus factors to get to our 60/40.

9    As you point out, it is somewhat outcome determinant, Your

10   Honor.

11        THE COURT:  How in the world do you get the U.S. at an

12   80 percent arranger when they -- obviously, at Potrero, they

13   have something to say.  Because you're saying that they told

14   you to put it in a burn pit?

15        MR. MURPHY:  That's the AISLIC split, Your Honor.

16   That's what the AISLIC court did.

17        THE COURT:  That's the top?

18        MR. MURPHY:  The arranger 80/20 split, Your Honor --

19   can we go back a couple of slides?

20        THE COURT:  You mean, you are just adopting their --

21        MR. MURPHY:  No, I'm adopting the AISLIC --

22        THE COURT:  That is what I mean by "their" --

23        MR. MURPHY:  Well, Your Honor, in AISLIC, the court

24   gave 20 percent to the government, 5 percent to Whittaker, so

25   that is an 80/20 split.  So I'm just saying in AISLIC -- and

1    the facts in AISLIC are similar here, correct, where you had

2    ownership of waste under the contracts.

3         THE COURT:  But AISLIC, they were asking them to do

4    the very thing they did, which was wash the motors.  Wasn't

5    that the contract?

6         MR. MURPHY:  Yes, Your Honor.  We had contracts for

7    wash-out, as well.

8         THE COURT:  That wasn't your only contract by any

9    means.

10        MR. MURPHY:  No.  In AISLIC I think they said they had

11   seven surviving contracts.  Each one was a

12   progress-payments-clause case -- had fixed price with progress

13   payments.  They had determined that all the ownership of AP

14   was -- during disposal -- was attributable to the government.

15   He looked at the safety standards and the disposal manuals and

16   said they should get an arranger liability.

17        It is very difficult to say that we should bear any

18   arranger liability here because arranger requires you to own

19   the waste and then dispose of it -- and then arrange for

20   somebody else to dispose of it.

21        THE COURT:  Third party, right?

22        MR. MURPHY:  Yes, Your Honor, a third party.

23        So the government --

24        THE COURT:  Who is the third party here?

25        MR. MURPHY:  Well, the government owned the waste, and

1    they contracted with us to dispose of it.  So we are -- so if

2    you look at arranger, it requires someone to own waste and

3    then give it to somebody else to dispose of.  And here the

4    government owned it and was contracting with us to dispose of

5    it at our facility.  To the extent you can say that we bear

6    some responsibility for that disposal, that is an operator

7    liability, Your Honor, because we're actually operating the

8    burn pits.  We believe they also operated the burn pits

9    through their inspections, through their manuals; but to the

10   extent that anybody is an arranger, you have to arrange for

11   the disposal -- so if we owned waste and we gave it to the

12   government and had the government dispose of it for us and

13   there was a transaction of money involved, then we would be

14   the arranger because we are giving our waste to somebody else.

15            Here, to the extent the government owned the waste --

16            THE COURT:  But the AISLIC court found that the

17   government didn't own the waste.  So how did that all work

18   out?

19            MR. MURPHY:  The Court found that they owned the

20   waste.

21            THE COURT:  After it became -- it reverted back, I

22   thought, when they determined allocation.

23            MR. MURPHY:  Yes.

24            THE COURT:  Yes, I agree.  You're in a liability

25   analysis --

1   MR. MURPHY:  Your Honor.

2   THE COURT:  -- that's where --

3   MR. MURPHY:  But in his allocation, Your Honor,

4   Judge Matz had a phrase in there and said the ownership

5   reverted.  He has that phrase in there, but he still gave 80

6   percent of all arranger liability to the federal government in

7   that case.

8   So, again, if you're looking at that type of split of

9   liability based on these liability categories, the AISLIC

10   court gave 80 percent of that liability to the federal

11   government, even with that phrase -- and I agree that phrase

12   is in -- but he still gave 80 percent of it to the government.

13   Maybe that's why he gave 30 percent -- I'm sorry -- 5 percent

14   to Whittaker -- excuse me -- 5 of the marbles, 20 percent to

15   Whittaker, because he determined that some of the waste

16   reverted back.

17   So move on back to our slide on our matrix.

18   So, Your Honor, again, everything that happens

19   above -- the two charts above talk about splitting up owner,

20   arranger, operator.  It fits down to the weight of the

21   factors.  And it flows down into the preliminary allocation.

22   And then we apply plus factors or equitable factors.

23   So if Your Honor doesn't want to use a chart or a

24   matrix, I believe you're still going to want to, as you said,

25   move the ball.  You're going to want to still look at the

1    equitable factors.  We have taken some of these equitable

2    factors:  knowledge, culpability, care and cooperation,

3    benefit, indemnities.  These are still some of the equitable

4    factors courts look to when they're just using the *Torres*

5    factors and the *Gore* factors.  And again, we've applied some

6    of them the way we would apply them.  Clearly, there are other

7    ways to apply them, but this is what we have done to move this

8    number one way or the other after reaching an initial

9    preliminary allocation.

10        The knowledge, for example, the AISLIC court looked at

11   knowledge and found the government, as the leader in the

12   industry, had more knowledge, and so he gave a bump to the

13   government's allocation because of that.

14        You know, we would argue culpability, no one was truly

15   culpable or negligent for what happened at these sites, so we

16   would think that would equal out.

17        Care and cooperation, again, I think the AISLIC court,

18   when they applied this, looked at this and said, well, AISLIC,

19   from '94 on, has been cooperating with the Water Board to

20   clean this stuff up, so they gave the government again a bump

21   in allocation because the contractor had been the one actually

22   out doing the work.

23        Benefit, Your Honor, we both submitted many briefs on

24   benefit where we've talked about whether LPC made money or

25   lost money as compared to the rockets that were being produced

1      for the cold war for the government.  That's another equitable

2      factor.

3              We've talked at length about indemnity, and I'm not

4      going to address it again today.

5              THE COURT:  Just briefly, why is there indemnity?

6      Didn't we go through this already?

7              MR. MURPHY:  Yes, Your Honor.

8              THE COURT:  Why is your indemnity so great and there's

9      is defective?  I don't understand that one at all.  That ought

10     to, at best, be a wash.

11             MR. MURPHY:  Well, it can be a wash in your decision,

12     Your Honor, but we do believe that the SRAM indemnity is the

13     one that was specifically negotiated that --

14             THE COURT:  But it didn't even cover the one that --

15     their facilities indemnity, for instance.  The problem we have

16     is we don't have any contracts.  We don't really know how much

17     SRAM indemnity is worth.  We don't even know what its umbrella

18     encompasses.  So, you know, you're shooting completely in the

19     dark on that one.

20             MR. MURPHY:  Well, again, Your Honor, it is a

21     situation where we have -- it's the largest production

22     contract we had.  It was the most -- you know, the latest one.

23     Again, it's a question -- and you're right, doing anything

24     with mathematical certainty here is very difficult.  It really

25     is because of the lack of information, the '50s, '60s, what

1    happened at the site, how much was released under certain

2    contracts, what processes caused it.  These are things that --

3    both parties through this trial have been trying to present

4    evidence that more likely or not or trying to get you to the

5    point where you understand our arguments as opposed to the

6    other party's arguments.  But again, it's our argument that

7    you don't need to make those factual findings here because,

8    again, we believe both parties sort of were together building

9    these missiles.  From that point, you can move, based on some

10   of these equitable factors.  And so today I want -- so that is

11   a possibility.  I'm not saying the matrix is the right way to

12   do it.  Again, I would think you would want a per capital type

13   split here as a recognition of the partnership and then use

14   equitable factors to move 50-50 or from that starting point of

15   a per capita-type allocation.

16           I want to just address some of the points that the

17   government raised in their slides on Tuesday, run through

18   these.

19           Again, here, the AISLIC court gave 80 percent of

20   arranger liability to the federal government based on --

21           THE COURT:  Slow down.

22           MR. MURPHY:  I'm sorry.

23           -- gave 80 percent of arranger liability.  The DOJ

24   matrix here gives zero arranger at Redlands and LaBorde and

25   only gives a small, like 2 percent at Potrero.  They cite some

1    reasons for that, and we don't believe those are appropriate

2    here.

3         Again, you talked about the reversion that the court

4    in AISLIC used, talked about the fact that after a contract's

5    reversion goes back -- we don't believe that's the right way

6    to look at it.  If it is released during contract performance,

7    if it is released before the contracts are over, it is in the

8    environment as waste, and the reversion that you mentioned and

9    the reversion they rely upon to say it was all ours shouldn't

10   be applied because the regs don't sort of talk about waste in

11   that way in terms of a reversion.

12        In AISLIC, there are only fixed-price contracts with

13   progress payments clause; and again, that's the property

14   clause that gives a reversionary interest at the end of the

15   contract.  But here we have strong evidence that there were

16   lots of cost contracts, as well, Your Honor.  And cost

17   contracts have a property clause that doesn't have that

18   reversionary interest.  So if material is purchased under a

19   cost contract, it remains the government's forever.

20        In addition, to the extent that materials were

21   provided by the government to LPC directly as

22   government-furnished property -- so here we know that the

23   government gave missile casings as what is called GFE or

24   government-furnished equipment, and that GFE remains owned by

25   the government throughout the entire time period.  So here,

1    because there is no title reversion in either GFE or cost

2    contracts, that argument under the progress payments clause

3    about reversion doesn't apply.

4         Here, in our record, we have plenty of contracts:

5    Apollo, large solid rocket motor, WASP motors.  Cost

6    contracts -- and these cost contracts span from 1958 all the

7    way through the '70s.  And these cost contracts have the

8    property clause and says anything that was purchased under

9    those contracts remains the government's forever.

10        Here the government accepts arranger liability because

11   it has just one inventory schedule where AP appears on it, and

12   so they argue by implication that that's the only time they

13   owned AP that was being disposed of.  That doesn't fit with

14   the record.  We have plenty of contracts -- or letters -- I

15   shouldn't say "contracts" -- letters or documents where the

16   contractor, LPC, is asking for permission or disposal

17   direction from the government, how to dispose of missile

18   casings, other materials that would have been owned by the

19   government.  While they don't appear on inventory schedules,

20   again, that is still an indication the government -- the

21   contractor here was seeking guidance from the government on

22   how to dispose of their materials.

23        Go to the next.

24        Here, it needs to be remembered that just because

25   they're not on inventory schedules doesn't mean that it's not

1    owned by the government.  Here's a government property clause

2    that was in these contracts, Your Honor, that basically says

3    that when you have scrap, cuttings, wastes, trimmings,

4    clippings, waste, you don't have to put it on an inventory

5    schedule.  You can just dispose of it in accordance with the

6    contractor's normal practice.  So, again, the whole idea that

7    it only appears on our inventory schedule once is proof of

8    anything is a red herring, Your Honor.  Basically, this clause

9    says it doesn't have to be on an inventory schedule, you can

10   just dispose of it.

11          THE COURT:  According to your normal practices.

12          MR. MURPHY:  According to our normal practices that

13   were guided by the DOD safety manuals, Your Honor, and that

14   were inspected --

15          THE COURT:  At a certain level.  I mean, the

16   day-to-day operation does not determine how you do it; it just

17   says what you do.

18          MR. MURPHY:  Yeah, Your Honor, but again, if you went

19   back to our matrix -- there is a split in operator here.  You

20   don't have to give -- one party -- there could be two

21   operators in a facility.  There could be two parties that are

22   engaged in the operations of a facility.  Yes, we were the

23   ones that were turning the valve or setting the things on

24   fire; but again, we were -- the government had some operator

25   liability because they helped manage, they imposed

1  specifications, the contractor manuals, they inspected to make

2  sure, they looked at our process specifications that dealt

3  with waste.  So, again, there is that cooperation going on.

4  Well, yes, we were the people on the ground actually doing it;

5  but at the same time, they had some management, direction,

6  control under *Best Foods* over those processes, making them an

7  operator.  So, again, I would think that -- you would be able

8  to split operator.  Whether it is -- we gave 60 percent to us,

9  we took more of the majority in our matrix.  But you could --

10  so, again, you don't have to give a zero -- you know, a zero

11  to us or zero to the United States if you find one party is

12  the operator or not.  Because they are a liable party here,

13  you have discretion to kind of split these, for lack of a

14  better word, marbles between the parties.  So, again, that is

15  part of your analysis here, who had more operator liability.

16  Again, we believe both parties have a substantial liability

17  for that because both parties were involved in waste

18  operations.  Again, they set the manuals.  They set the basic

19  how you dispose of this stuff.  They inspected to make sure we

20  were doing it.  We were doing it, and they were inspecting.

21         So if we look at ownership, Your Honor, they took a

22  zero ownership at LaBorde Canyon, a very small ownership at

23  Potrero, and a 40 percent, I think, at Redlands -- yes -- and

24  so here we believe they have grossly undervalued the amount of

25  ownership they had at Redlands, Potrero -- I'm sorry --

1    Potrero and LaBorde Canyon.  There is clear ownership at

2    Potrero of things that were important that caused waste

3    disposal.  You know, the government-owned facilities at

4    Potrero were blending and grinding mills, final oxidizer

5    process equipment.  There was a mixer that they owned there,

6    the large mixer that was used for the large solid rocket

7    motor.  And so again, Your Honor, we believe that this type of

8    equipment was the exact type of equipment that AISLIC relied

9    upon to give their ownership share.  And, again they said they

10   owned no equipment at LaBorde Canyon.  That is also called the

11   Beaumont test site.  Well, we have documents showing they

12   owned equipment there.  In addition to the test stands that

13   they owned at LaBorde Canyon, they also would have owned the

14   actual rocket casings that were being tested there, the actual

15   AP that was in those rocket casings, and they would have

16   dictated the testing procedures.  The fact that we were

17   testing out there at all was in compliance with the

18   government-imposed testing procedures.  So, again, we think

19   zeroing out ownership at LaBorde Canyon just doesn't comport

20   with the facts we have here, Your Honor.

21            So, again, we have talked about the operator

22   liability.  We've talked about the safety inspections that

23   DCAS gave.  We talked about the fact that -- the Air Force

24   direct reviews, the Air Force Rocket Propulsion Lab direct

25   reviews.  There's documents in the records talking about

1    review of our safety and disposal procedures, and those were

2    in our earlier closing slides, Your Honor.

3         On Tuesday, you asked me for a list of the process

4    specifications we have that show -- I'm sorry, I will get to

5    that in a minute -- that show that they oversaw waste, and we

6    talked about who approved process specifications for waste.  I

7    just want to make a quick point again that Don Ross, you know,

8    "Mr. Solid Rocket Motor" was at our site often reviewing, and

9    we have evidence in the record that he reviewed our process

10   specifications.

11        Mr. Dull himself testified that he had no discussions

12   of waste disposal at the site, but we've shown documents that

13   he was asking questions that implicated the disposal of

14   rockets at the site.

15        So, again, I believe that there is this sense that --

16   whether you call it safety or whether you talk about disposal,

17   there is a discussion going on between the parties about how

18   this is being done at the facility.

19        We talked again -- you asked evidence of approval of

20   process specifications.  I gave you the Dull testimony.  I

21   gave you the Dull notebooks that were taken down at the time

22   showing that Don Ross was reviewing.  We also talked about

23   Speers' declaration.  We talked a little bit about the fact

24   that Jim Nagle -- or there was some testimony that he gave in

25   7 W that said -- that contradicted his declaration.  We went

back and looked at that deposition transcript, Your Honor, and
I don't think it is clear on its face whether he is talking
about government review here or whether he is talking about
just LPC -- before LPC issued it or not.  He was never asked a
direct question whether the government reviewed it or not.
Rather, he was being asked questions about the review and
approval of process specifications before LPC issued them; and
again, his response there shows no indication about whether
the government then reviewed them after LPC issued them or
not.  So in his later declaration and in the deposition later,
when he is asked directly about it, he responds, yes, the
government reviewed them at some point in time.

Again, when we were talking about this, you asked
about a list of all the process specifications we have that
talk about waste.  And here's a list, Your Honor.  We have
given you a chart of all the process specifications that are
currently in evidence.  Out of the 28 we have in evidence, 10
of them talk about waste.  And in addition, Your Honor, there
is more than 28 that exist.  I mean, when we first submitted
our exhibit list, Your Honor, we had over 2000 relevant
documents.  We've selected what we thought were the most
relevant ones, and we selected 28 of them; and again, 10 of
those discuss waste-type procedures that were going on at the
facility.  Again, we believe this supports our view that both
parties here should bear a share of operator liability to the

1    extent that you're going to use operator as an equitable

2    factor here.

3          Again, I want to touch on some other of the equitable

4    factors that moves that number up or down.  We talked about

5    knowledge.  We think that the facts in the record show that no

6    party knew that the handling of AP or TCE could be a problem

7    here at the site.  We believe that, to the extent that anybody

8    had knowledge, it should have been the DOD here.

9          We talked about the fact that -- who is the one party

10   to Aerojet might have raised issues if they learned anything

11   from Aerojet?  The government.  The government was running the

12   nationwide rocket programs, Your Honor, so they had multiple

13   sites that were using these types of materials.  So, again, to

14   the extent that anybody should be held liable here for

15   knowledge or not applying knowledge to these materials, we

16   think DOD was in a much better position than we were.

17         In operating burn pits, Your Honor, I mean, they have

18   said many, many times -- even on Tuesday -- that what was

19   wrong with our burn pits was the disposal of liquids into the

20   burn pits; that that was somehow not appropriate at the time.

21   But again, the manuals themselves twice talk about thoroughly

22   soaking these burn pits with water and, at the close of every

23   day, wetting them down to make sure they weren't a safety

24   hazard.  So, again, there was clearly no prohibition of

25   putting liquids in these burn pits.  And to argue that our

1   burn pits are a source because we did them incorrectly, well,

2   burn pits are a source everywhere, Your Honor.  So you have to

3   have the presumption that everyone handled them incorrectly.

4           So, again, in terms of knowledge, in terms of

5   culpability, we don't think that should play a large role in

6   the Court's allocation.

7           THE COURT:  Did you read the latest news article?

8   Where was it, Afghanistan, the burn pits caused a problem --

9           MR. MURPHY:  The KBR case, Your Honor.

10          THE COURT:  Right.  There still seems to be problems

11  with burn pits.

12          MR. MURPHY:  Yes, Your Honor.

13          In addition, Your Honor, at the government's closing,

14  they mentioned this water from building 114, and they alleged

15  that -- or they cite testimony about 58 parts per million in

16  that water.  We don't believe that number is accurate, Your

17  Honor.  I don't believe that the testimony on that was clear

18  by Mr. Delaney.  He didn't mention that number.  But the most

19  important part is that both hydrogeologists that looked at

20  this, both hydrogeologists that talk about whether AP was in

21  that water, both look at the total dissolved solids, that

22  number, and both say that total dissolved solid number was

23  low.

24          THE COURT:  When you say hydrologists, who are you

25  talking about now?

1          MR. MURPHY:  Bob Sterrett, which was their

2     hydrologist --

3          THE COURT:  Who is the other one?

4          MR. MURPHY:  Stan Feenstra.

5          THE COURT:  Was he a hydrologist?

6          MR. MURPHY:  Yes, Your Honor.

7          So both hydrogeologists that looked at that letter

8     said it doesn't look like there is a lot of total dissolved

9     solids there.  Bob Sterrett said it was actually lower than

10     what you would find in groundwater.  Stan Feenstra said it's

11     consistent with the cleanest groundwater that is out there,

12     Your Honor.  So that we don't believe there was a lot of AP in

13     that letter -- or that letter doesn't indicate a lot of

14     contaminants in that water.  But more importantly, I think --

15          THE COURT:  But we don't know at what level they're

16     testing.

17          MR. MURPHY:  We don't know, Your Honor.  We don't

18     know.  It wasn't tested for specifically -- you're making

19     guesses based on what they did test for.  Both hydrologists

20     said, to the extent it was there, it would be a total

21     dissolved solid number, and that number is low.  So again --

22     but more importantly, that letter demonstrates we were trying

23     to cooperate with regulatory requirements.  Again, that was a

24     letter to the Army saying we don't think this stuff is going

25     to the waters of the United States, but more importantly, we

1952

1    think the water is fairly clean, and here is the testing that

2    shows it.

3         As a matter of interest, LPC has made the effluent

4    pump and tested it, and here are the results.  It is showing

5    the Army Corps of Engineers that we don't think this water is

6    a problem at the time.

7         So, again, on Tuesday, Mr. Sullivan mentioned the fact

8    that -- or made the argument that because there are higher

9    concentrations in the southern wells now, that means the burn

10   pit is not the major source at the Redlands site.  We don't

11   think the facts support that, Your Honor.  While Mr. Sullivan

12   can say it, no expert in this case testified to that, so -- no

13   expert testified to it.  Both Sterrett and Feenstra talked

14   about not being able to talk about the relative contributions

15   of AP from any source.  No expert testified that higher

16   concentrations -- that higher concentrations would not

17   indicate greater contributions from sources.  There are too

18   many variables in doing this.  The most important one is the

19   majority or the mass of contaminants have left the facility

20   and are miles down the road in the basin.  So looking at

21   current testing right now for relative contribution of what

22   actually went into the ground is impossible, Your Honor.

23   Again, both their expert and our expert say it is an

24   impossible thing to do.

25         We mentioned hog-out, Your Honor, or the washing out

```
 1      of motor casings at Potrero.  Hog-out was common DOD practice
 2      at contractor facilities across the country.  The government
 3      was one of the parties in 1962 that recommended that we might
 4      want to do wash-out in large solid rocket motor or -- I'm
 5      sorry -- didn't say "wash-out."  I don't want to misstate it.
 6      He said you should look into refurbishing these cases, and we
 7      know that there is a large solid motor wash-out area at
 8      Potrero, so they did eventually use hog-out for the large
 9      solid rocket motor.
10           In addition, LPC had process specifications that
11      actually called for high-pressure water washing to remove
12      propellant.  We have excerpted one here.  So we had process
13      specifications for hog-out.  I don't think there is any
14      question the government knew about it.  It was part of our
15      contract performance.  It was -- because these missiles were
16      GFE, meaning they were government-furnished equipment --
17           THE COURT:  What is the process -- I'm sorry.  Which
18      one are you looking at?
19           MR. MURPHY:  It's on the screen now, Your Honor.  It
20      is process spec -- it is -- we have two -- it is PX 1075.
21      Here it talks about the washing out of -- using high-pressure
22      water wash.  It talks about using it to remove live propellant
23      from missile casings, Your Honor.
24           THE COURT:  So that means hog-out?
25           MR. MURPHY:  Yes, Your Honor.  It's the -- yes.  Using
```

1    high-pressure water wash to remove live propellant from a

2    missile --

3           THE COURT:  Remind me, what is your position?  That

4    their process specs are not just quality assurance issues,

5    they incorporate both specifications for production as well as

6    safety, which encompasses disposal, that's your position?

7           MR. MURPHY:  Your Honor, the process specifications

8    talk about how you build the missile and how you basically

9    clean up from building the missile, and they incorporate both

10   into the process specifications.  Again, we believe the

11   evidence here shows a review and a constant sort of monitoring

12   of these process specifications by the government here, which

13   I believe -- again, putting that in the *Best Foods* situation,

14   when you have inspectors on site making sure you're following

15   process specifications, where we have evidence that they are

16   actually reviewing and approving these process specifications,

17   you put that in the *Best Foods context,* that makes the

18   government arranger for what's going -- excuse me, Your

19   Honor -- an operator for what is going on at this facility.

20          Again, it has to be noticed -- I mean, the AISLIC

21   court found the government liable for wash-out primarily

22   because they owned the motor casings and the government

23   actually owned the AP that was in the motor casings that were

24   being washed out, to begin with.

25          If we can go to the next.

1           Again, we've talked about the board actions.  In their

2    closing slides, they rely upon the McKee report for several

3    citations for knowledge.  Again, the McKee report doesn't meet

4    AP or TCE at all.  Mr. Bauer admitted that at trial, and it is

5    not in there.

6           Lastly, Your Honor, one of the more important things

7    here on sort of the main environmental points is that we have

8    led the cleanup effort.  Even during the times where we were

9    challenging --

10          THE COURT:  What about the case -- it's probably

11   Miami-Dade -- that nobody asked the government until you

12   decided to sue them?  I mean, does that matter to you?  Or

13   should they have been jumping in to clean it up?

14          MR. MURPHY:  You see -- Your Honor, the tolling

15   agreements, we came to them in '97 to try to settle this, Your

16   Honor, and at the time -- I mean, this is -- they knew about

17   this claim in '97, Your Honor.  We had tolling agreements

18   about it.  If you look at the letter accompanying the tolling

19   agreement, it talks about trying to resolve this issue very

20   quickly.  It was not resolved very quickly, Your Honor, but it

21   is not --

22          THE COURT:  You don't say?

23          MR. MURPHY:  But we haven't been sitting still, Your

24   Honor.  These are cases that Lockheed Martin has been trying

25   to resolve for years, Your Honor, and it is not something that

```
 1      we -- and making the decision to sue the federal government is

 2      a big step for Lockheed Martin.  It is not something they take

 3      lightly.  Lockheed didn't want to sue --

 4              THE COURT:  You don't bite the hand that feeds you.

 5              MR. MURPHY:  Yes, Your Honor.

 6              THE COURT:  Yeah.

 7              MR. MURPHY:  It is not a decision that we -- it is not

 8      something we jumped at, Your Honor.  It is not something we

 9      -- as John Sullivan said, it is not our dream to be here.

10      Believe me, it's not.

11              THE COURT:  I'll bite my tongue.

12              MR. MURPHY:  It was something we had to do to enforce

13      our -- to vindicate the rights we had under CERCLA, Your

14      Honor.  And so if we're not able to settle something, do we

15      just walk away and keep these costs in our contracts forever?

16      Or do we actually bring it to a court to resolve the

17      differences we have?

18              THE COURT:  Do you want me to answer that?

19              MR. MURPHY:  Well --

20              THE COURT:  I assume that's rhetorical.

21              MR. MURPHY:  It is rhetorical, Your Honor.

22              THE COURT:  All right.

23              MR. MURPHY:  But it is an important point here; that

24      there are real -- that the current system, the federal

25      government contracting regulations we have, incorporating the
```

1    DOSA, looking at the FAR, the reasonableness standards, we've

2    talked about them at this case, Your Honor, to the extent that

3    these costs, these environmental costs are Lockheed Martin's

4    costs, to the extent that we have an obligation and these are

5    our costs, our regular costs of doing business, and they are

6    allowable under federal contracts, everybody agrees with that

7    in this case, Your Honor.  Nobody disagrees.  To the extent

8    that these are our costs, they're allowable.

9         So what is the federal government arguing?  The

10   federal government is arguing that to the extent that these

11   costs have been put into our DOD contracts, they should get

12   credit for them.

13        THE COURT:  Can I go back for one second?  You would

14   agree that you didn't start any cleanup until the public

15   authorities in California issued an abatement order or several

16   abatement orders; correct?

17        MR. MURPHY:  Well, Your Honor, yes --

18        THE COURT:  You're not a volunteer here?  I just think

19   you have to be careful how far you try to gild the lily.

20        MR. MURPHY:  It's a question about -- other parties

21   fight, Your Honor.  I mean, other parties don't comply with

22   these orders.  I would point the Court to the *Goodrich* case,

23   Your Honor, where you look at a contractor who got a board

24   order and fought it and fought it and fought it, and actually

25   there was board order litigation about it, and they refused to

1    do anything during the pendency of that board order.  Lockheed

2    Martin, when they got this order, they started complying right

3    away.  Even when they disputed they were a source, they were

4    complying.  Even when they appealed it, they were complying.

5    The board has never complained once about Lockheed's

6    compliance and how well it's done to protect the public out

7    there, Your honor.

8              So, you know, there are instances -- Tom Blackman

9    talked about one.

10             THE COURT:  But it is also true, is it not, if I

11   assume '94 was the beginning of your payments, you have been

12   passing them through as overhead since then?  The DOSA is not

13   a recent sort of change in accounting practices?  It has been

14   consistent.

15             So I don't know whether *Goodrich* or not, whether they

16   had the same opportunity, if they were a government

17   contractor, but you were in a bit of a unique situation

18   insofar as it is not as if you have been sitting on

19   300 million of past costs without getting back, as we already

20   know, over 200 million of it.

21             MR. MURPHY:  Yes, Your Honor, but again the rules --

22             THE COURT:  I know, the rules allow it, but I'm just

23   saying you're tooting your horn a little bit much.

24             MR. MURPHY:  Look at the -- I mean if you look at

25   AISLIC and you looked at other cases --

1    THE COURT:  They weren't getting their money back, any

2   portion of it as they went along.

3    MR. MURPHY:  These are not direct recoveries --

4    THE COURT:  No --

5    MR. MURPHY:  -- getting our money back.

6    THE COURT:  You indirectly got your money back.  I

7   should say that.

8    MR. MURPHY:  Yes, Your Honor.

9    THE COURT:  Okay.  Sometimes, though, the bottom line

10   is you got some money back that you might not otherwise have

11   gotten but for the remediation costs.  It's unfortunate

12   anybody had to pay the remediation costs, but it is not, as an

13   accounting matter, a big a hit as it might otherwise be.

14    MR. MURPHY:  But think about any corporation, Your

15   Honor.  Any corporation -- let's look at a corporation that's

16   not a government contractor.  They all incur overhead on an

17   ongoing basis.  They all price their goods and services to, in

18   effect, recover that overhead.  So any corporation that has

19   made a profit while doing a cleanup you could argue has

20   recovered its overhead to some extent.  And CERCLA cases don't

21   look at that pass-through, don't look at those indirect costs,

22   to see how they have run their business.

23    And that's -- that -- we only -- you only know how

24   much of our overhead we have recovered here is because of the

25   federal government contracting rules.  So any other

1    corporation out there, like GE, for example, they have a huge

2    cleanup for the Hudson River, Your Honor.  They

3    don't -- because they're not as big of a government

4    contractor, they have a much larger commercial business --

5         THE COURT:  That's like the utility case.  What we

6    have that makes this so unique is the government on both sides

7    of the fence.  It does make it quite unique.

8         MR. MURPHY:  To a certain extent yes, Your Honor.

9         THE COURT:  You have your own customers, it just

10   happens that you have fewer non-government customers than many

11   corporations.  You are government-dependent.  And 15 percent,

12   let's say, are non-government.  And you do the same thing.

13   Your prices reflect the mediation costs, and those are not

14   passed through as a credit.  But, you know, if it had been

15   flipped, we would have a different situation.  It just so

16   happens that the vast majority of your business comes from the

17   United States government.

18        MR. MURPHY:  Your Honor, let's go to slide 31.

19        THE COURT:  One second.  Let me just read what you

20   have here.

21        MR. MURPHY:  I'm sorry.  Go back to slide 28, is where

22   you are, Your Honor.

23        THE COURT:  Wait a minute.  I just want to read it.

24        You know, the G&A, the overhead, does that include the

25   legal fees?

1961

```
 1            MR. MURPHY:  Yes, Your Honor.
 2            THE COURT:  Okay.  So it is not like the -- disc op?
 3            MR. MURPHY:  The disc op?
 4            THE COURT:  The disc op account.
 5            MR. MURPHY:  There are different cost pools that
 6   Lockheed Martin has in its corporate overhead level.  Disc ops
 7   is one.  There is something called the residual pool where
 8   they put all the -- for lack of a better word -- cats and
 9   dogs, and the legal fees go into that.  And I think it would
10   be --
11            THE COURT:  You're just asking for it --
12            MR. MURPHY:  Well --
13            THE COURT:  Cats and dogs?
14            MR. MURPHY:  Well, Your Honor, you're talking about --
15   you're talking --
16            THE COURT:  We're talking about pedigrees.
17            MR. MURPHY:  Well --
18            THE COURT:  Okay.  But that goes into the profits --
19            MR. MURPHY:  The things that aren't -- I take that
20   back, Your Honor.  Move to strike.
21            (Laughter)
22            THE COURT:  I should own so many cats and dogs.
23            MR. MURPHY:  I should put it this way:  It's the costs
24   that aren't specifically addressed in other cost pools --
25            THE COURT:  Right.
```

```
1              MR. MURPHY:  -- that don't have a specific --

2              THE COURT:  Right --

3              MR. MURPHY:  -- cost account.

4              THE COURT:  -- but it does flow into profits, the G&A

5      pool --

6              MR. MURPHY:  The pool flows down to its business

7      units.

8              THE COURT:  Yeah, right.

9              MR. MURPHY:  And then once it is in its business

10     units, they're combined with their G&A rate -- G&A, and those

11     are turned into rates and then are applied to contracting

12     actions, Your Honor.

13             THE COURT:  That would be a great quote in Legal

14     Times.

15             MR. MURPHY:  I'm sorry, Your Honor.

16             THE COURT:  You don't need to apologize to me.

17             MR. MURPHY:  The point was that it's where they put, I

18     think, all of the other costs that aren't specifically --

19             THE COURT:  Miscellaneous, okay.

20             MR. MURPHY:  Yeah, miscellaneous.

21             THE COURT:  Okay.  Wait a minute.

22             MR. MURPHY:  So I think that's where the legal costs

23     are.  I think that is also where they put their heating costs

24     or their rent.  You know, I don't know exactly.

25             THE COURT:  What do you mean by this line on 29,
```

1    "Judgment fund protected at expense of higher prices"?

2    Meaning the prices charged to the consumer?

3              MR. MURPHY:  Yeah, what they are asking for, Your

4    Honor, is a full credit, so they're asking -- and to

5    perpetuate this system into the future and to the extent that

6    profit is baked into this system, under the government's

7    theory, nothing changes, it all keeps getting baked into the

8    system, and that is not the most efficient result for the

9    taxpayers here, Your Honor.

10             THE COURT:  Are you aware of a historical event at one

11   point that the DOD tried to change this system and there was

12   an uproar among the contractors?

13             MR. MURPHY:  There was an attempt, I think, to impose

14   an environmental cost principle, a specific cost principle

15   under CAS to deal with these environmental costs in the early

16   '90s, Your Honor, I think it was like '93, '94 time period.

17   And there was an attempt to pass a cost principle about these

18   issues.  It never passed.  The decision was they should be

19   treated as normal, reasonable costs of doing business.  But if

20   it had passed --

21             THE COURT:  I would have liked to have known what your

22   lobbying fees were on that issue.  That probably went into

23   G&A, too.

24             MR. MURPHY:  Your Honor, I think if it would have

25   passed, it would have basically said we should hold these

1    costs in abeyance.  If I'm thinking -- if I remember the

2    language of the cost principle -- and it has been a long time

3    since I have read the proposed one -- I think what it would

4    have done is made these costs potentially not allowable

5    pending a CERCLA-type recovery.  So it would have made the

6    opposite decision that was made.  So these costs wouldn't have

7    been paid contingently over time; these costs would have been

8    kept out in sort of a holding pattern pending CERCLA cases.

9    And so it would have changed the time of order of things going

10   on here, Your Honor, but that's not the rule that was given or

11   the rule that was passed.

12           So here we have been living under the rules that were

13   in place and approved by our customers the entire time period.

14   We can't be penalized for that, Your Honor.  I mean, there is

15   a -- so, again, the question here is what is the most

16   efficient result under the rules that exist, and here these

17   costs are paid contingently by our customer, knowing that they

18   are going to receive credits in the future to the extent they

19   recover.  And we have seen evidence that they expect these to

20   be coming in these types of cases, Your Honor.  So here the

21   government's argument would basically leave the system as is.

22   They would not share directly at all.  We would still be

23   recovering indirectly.

24           Our system, though, Your Honor, the way we think the

25   rules work and the way the rules exist and the way CERCLA is

1    drafted is that both LMC and the United States should share

2    directly in the costs here to the extent possible.

3         THE COURT:  What I -- which I think you understand by

4    now -- am concerned with is that hypothetical utopia is not

5    possible to re-create for the past because of various things

6    we've discussed.  So, in theory, you might be right, but to

7    turn back the clock so to speak to correct the system as it

8    has been applied is not quite consistent with what would have

9    been done had the system worked as anticipated with credits.

10   The amortization makes a difference.  The profit factor makes

11   a difference.  Time value of money makes a difference.  There

12   are a lot of things that go on and now will be 30 years -- no,

13   20 -- sorry -- 20 years -- that make your analysis quite

14   imperfect.  Prejudgment interest is another one.  There are a

15   bunch of factors that change the calculus.  That's all.

16        MR. MURPHY:  Your Honor, a credit here is one of

17   the -- I guess the options are not to allow us to recover on

18   past costs or to allow us to recover and credit, and that

19   credit is the best way to resolve those past problems.  So

20   that credit -- so if we recover that past cost -- let's just

21   look at the past cost -- if we are able to recover -- let's

22   just throw out a figure of $100 million here, Your Honor.  If

23   there is a past cost recovery here of $100 million, Lockheed

24   Martin over the next five years will put in $20 million to

25   reduce its disc ops pool over the next five years, and that

1    reduction fixes the profit on a nominal value.  Your Honor is

2    right, that there is a time value of money problem that the

3    profit -- that we have had the profit for some amount of time

4    over the past 20 years, but on a nominal terms, Your Honor,

5    that reduction over the next five years in our cost to the

6    federal government are baked out of the system.  It is the

7    best way to resolve that profit issue on a nominal base.

8         THE COURT:  I wish you had given me numbers because

9    you never did.  I'm not sure --

10        MR. MURPHY:  Well, Your Honor, it's in -- later -- I

11   do give you a number.  On Tuesday we talked about it.  We went

12   back to Joan Meyer's models, and we do have a number now on

13   the time value of that profit over time.  It's in the slide.

14   I just tell you how you can do it using Joan Meyer's numbers.

15        THE COURT:  Okay.

16        MR. MURPHY:  So let's look at *TRW*.  This is a case,

17   Your Honor, after Tuesday -- the government mentioned unitary

18   executive a couple of times.  We went back to try to find some

19   case.  We found a case that is remarkably similar to this

20   case, Your Honor, on certain issues.  This is a case that I

21   think the Court should read a little bit.  Basically, what it

22   does is that *TRW* sued the IRS to recover costs.  *TRW* is a

23   federal government contractor.  It sued the IRS to recover

24   some costs.  IRS defended and said, no, no, no, you can't sue

25   us, you already get these costs through your G&A rates under

1    DOD, and so you can't sue us again, or you can't sue us to

2    recover these costs because you have already got them as G&A

3    indirect rates under your federal government contracts.  So

4    this was presented to the Court of Federal Claims, and the

5    Court of Federal Claims said, no, no, no, they have not

6    recovered directly those costs, they have only been indirect

7    costs through government contracts, so we're going to order

8    IRS to pay these costs, and then *TRW* will credit its DOD

9    customers with these costs.

10           THE COURT:  What is the CHEXS --

11           MR. MURPHY:  It's -- actually, that is the contract

12   they were bidding on.  And the B&P costs are bid and proposal

13   costs.  It is a distinction between --

14           THE COURT:  The CHEXS is a contract?

15           MR. MURPHY:  It is a contract, I think shorthand for

16   the contract they were suing under, Your Honor.  It's a

17   distinction between those B&P costs --

18           THE COURT:  I got it.

19           MR. MURPHY:  -- so we think this case is instructive

20   for a couple of points.  It refutes their unitary executive,

21   that somehow it is important to find this in this type of

22   situation.  *TRW,* obviously looked at IRS and DOD as different

23   funding sources and found that indirect costs in their

24   contracts weren't recoveries under a law here.

25           THE COURT:  Is this an equitable consideration by the

1968

1   federal circuit?

2   MR. MURPHY:  It is a --

3   THE COURT:  It's a Court of Claims case, I guess.

4   MR. MURPHY:  It is a Court of Federal Claims, Your

5   Honor, from '93.

6   THE COURT:  They're not exercising equity, though --

7   MR. MURPHY:  No.  No, Your Honor.  They are looking --

8   well, but it is remarkably similar here because some of the

9   government's arguments about -- I like to call it their full

10  double recovery case, Your Honor, that they're asking for

11  direct credit for everything that has gone into our contracts.

12  We believe this case goes to that point.

13  Also, I just wanted to talk about there's a *Hughes*

14  case.  We cited this is in our 12C motions long, long ago in

15  front of Judge Robertson.  Again, there is a distinction

16  between the United States acting in its commercial and

17  proprietary capacity and operating in its sovereign

18  capacity --

19  THE COURT:  I saw Judge Robertson yesterday.  It's

20  hard to feel good.  Okay.  If he weren't such a dear friend --

21  MR. MURPHY:  So --

22  THE COURT:  -- especially when he says, "What are you

23  doing?"

24  Where are you Judge Robertson when we need you?

25  Okay.  Okay.  Finish up.

1    MR. MURPHY:  Okay.  So let's go to the -- again, I

2 want to hit two quick slides before we talk about the profit

3 number we have in here.

4    Again, I think the question here on equity, Your

5 Honor -- and you have said it yourself -- what is the best

6 result?  What is the most efficient result here that protects

7 the taxpayer and makes sure the system works well in the

8 future?  And we believe here allowing us to recover our past

9 costs and crediting those costs to future contracts bakes out

10 or gets rid of the profit that possibly got in the system

11 before.  It resolves past price impacts.  It encourages

12 parties to share directly as they should under CERCLA, and it

13 encourages settlement by setting a clear rule that both

14 parties know what is going on.

15    Next slide.

16    Again, as all CERCLA cases do, you have to pull back

17 and say:  What encourages voluntary cleanup?  Or what

18 encourages cleanup early?  By voluntary, I'm not saying we

19 weren't there without prompting by the State of California,

20 but we cooperated.  And so what is the rule that best allows

21 contractors out in the field to protect the public and address

22 past contamination here?  And I believe that by saying that we

23 can't recover past costs once they're put into contracts, Your

24 Honor, it will discourage early cleanups by federal

25 contractors and will encourage early litigation that may delay

1     cleanups during the pendency of those litigations.  So, again,

2     here --

3              THE COURT:  In the future, the agreement won't cover

4     anything except for your sites that are closed.  They

5     don't -- there are various other ways to address this in the

6     future.  Disc op is only --

7              MR. MURPHY:  Disc ops I is for sites closed before

8     2000.

9              THE COURT:  Right.  Are there other of those

10    agreements floating around I don't know about?

11             MR. MURPHY:  Your Honor, my understanding of the

12    current situation is that disc ops II was negotiated, and the

13    parties decided eventually just to use disc ops I because it

14    was working well.  Our view is that under the law these costs

15    are allowable without a disc ops agreement.

16             In their mini brief --

17             THE COURT:  But the law can be changed.  Right.  An

18    agreement can't be abrogated other than by -- I don't even

19    know whether -- the law I guess could change the agreement

20    retroactively, but I doubt it.  So, I mean, the system may be

21    in place, but there are ways to address it.

22             MR. MURPHY:  There are, Your Honor, and that's another

23    reason why we believe future costs need to be treated very

24    differently if you're going to treat this issue within past

25    costs because we don't know what will happen in the future,

1    and so -- again, when I'm talking about promoting voluntary

2    cleanups, I'm not just talking for Lockheed Martin.  In their

3    mini brief on this issue, on double recovery, the government

4    dropped a footnote basically saying transaction costs here are

5    necessary because there are other federal government

6    contractors out there seeking recoveries under CERCLA.

7         THE COURT:  I'm sorry.  Transaction costs, I remember

8    this footnote now.  I meant to ask.  I will ask Mr. Sullivan

9    when he gets to it.  "We recognize that many of the

10   transaction costs . . ."

11        MR. MURPHY:  It says, "There are numerous other

12   pending and threatened CERCLA claims against the United States

13   by Lockheed and other major government contractors."

14        The point here, Your Honor, is they're trying to set a

15   rule, they're trying to set a rule that prohibits government

16   contractors from suing them under CERCLA.  That's how I read

17   this.

18        So, again, the question here is what is the best rule

19   to prohibit -- to promote cleanups by these major government

20   contractors at these types of sites?  And again, they're

21   happening all over.

22        THE COURT:  I thought you were the only one.

23        MR. MURPHY:  No.  No.  No.  No, Your Honor.  There's

24   several contract -- when you're looking at our industrial

25   base, Your Honor, a large --

1972

```
 1              THE COURT:  I thought you had sued, and you had sued,

 2      your firm, on behalf of GE, as a government contractor.

 3              MR. MURPHY:  No, Your Honor.  General Dynamics, Your

 4      Honor.  No, that is still in negotiations, Your Honor.  That

 5      is not a lawsuit.

 6              THE COURT:  The only suits out there are yours brought

 7      on behalf of Lockheed at the -- there is a site maybe in New

 8      York and --

 9              MR. MURPHY:  Great Neck site.  There are three cases

10      that Lockheed Martin currently has.

11              THE COURT:  Right.  Judge Leon in Great Neck and

12      -- are those the two?

13              MR. MURPHY:  Yes, Your Honor.

14              THE COURT:  Okay.

15              MR. MURPHY:  Harbor Island is in Seattle, which I

16      think it is Larson that is the name of the judge, if I'm

17      remembering correctly.

18              THE COURT:  And then Judge Leon.

19              MR. MURPHY:  And this one.

20              THE COURT:  Okay.

21              MR. MURPHY:  But that is just Lockheed Martin, Your

22      Honor.

23              THE COURT:  That's my point.  Are there other

24      government contractors suing the government as PRP?

25              MR. MURPHY:  I guarantee, Your Honor, if there are not
```

1   active litigations, there are negotiations going on all the

2   time with major government contractors, Your Honor.  But I

3   can't point to anything in court filings, but I believe there

4   are other lawsuits.

5           THE COURT:  What is PX 1788?

6           MR. MURPHY:  That is our tolling agreement from 1997,

7   Your Honor.

8           THE COURT:  Okay.

9           MR. MURPHY:  So going to the -- we talked about past

10  and future costs.  Again, there should be a difference here.

11  Again, the question is:  What's the best way to address these

12  impacts?

13          Go to the next one.

14          This is an issue, Your Honor, I don't know -- I don't

15  want to waste my time because I want to get to your point on

16  time value of money, but this is an issue we talked about, and

17  I read the transcript from Tuesday, and I think there is a

18  misunderstand about the DOSA --

19          THE COURT:  Go ahead.

20          MR. MURPHY:  -- about Section 3.1 and 3.2.

21          THE COURT:  Okay.  These are the costs that were

22  disallowed.

23          MR. MURPHY:  These are not disallowed, Your Honor.

24  Those provisions set the crediting provisions for the *Burbank*

25  consent decree, and basically it -- because the consent decree

1    crediting departed from their disclosed CAS accounting

2    procedures, they had to put it in the settlement agreement to

3    especially account for it, and what it does is that

4    it -- there was a $109 million past cost awarded by -- not

5    awarded -- set forth in the Burbank consent decree.  So that

6    $109 million that was recovered for past costs in the Burbank

7    consent decree had to be credited to Lockheed's disc ops pool

8    at the time.  What they did is they went back eight years and

9    applied about 40 million of it back to open contract years,

10   back to 1992, and then they credited the other 40 million

11   -- well, another 40 million forward five years, and so that's

12   how they credited the 80 million.  So that left 29 million,

13   Your Honor.  If you read down to Section 4, I think, or 3 in

14   that DOSA, it says that Lockheed Martin does not have to

15   credit that 29 million.  And they didn't have to credit that

16   29 million because in other places in the DOSA there was a

17   $96 million decrement that Lockheed Martin took.  So the

18   determination was, since they hadn't put that $96 million into

19   their government contracts, they didn't have to credit the

20   full amount back.  So that's what those provisions do.  It's a

21   special crediting provision, so they're not a disallowance.

22   They are just how Lockheed should credit these costs to its

23   pools.

24           THE COURT:  All right.

25           MR. MURPHY:  Here, Your Honor -- we talk about

1   economic benefit, and one quick point:  We talk about

2   recoveries.  The point needs to be made that these costs went

3   into Lockheed Martin's contracts at a time when their recovery

4   factors were lower than the credit will be going into the

5   disc ops pool.  So, again, using Joan Meyer's numbers, you can

6   look at the recovery factors in the past versus the recovery

7   factors in the future, and there is about a $9 million

8   difference.  So the government will receive about $9 million

9   more in credit than it paid in costs.  This is nominal values.

10  It doesn't take in time value of money.  That 9 million,

11  they're going to get more credit basically.

12          The next slide.

13          So what we've done, Your Honor, is we've looked at the

14  profit, and I'm going to give you the numbers behind, but I'm

15  going to explain it here.  Essentially, we figured out that

16  the 3.23 million is the amount of net present value of the

17  profit.  So that is the amount of the profit that was baked

18  into the system in the past that won't be solved by the credit

19  in the future.  So this amount is basically the time value of

20  money on the profit that we have earned in the past that the

21  credit won't deal with, and we did this by looking at Joan

22  Meyer's numbers, Your Honor.  It's very easy to do.

23          Essentially, the other point here is that because

24  CERCLA is done in nominal value, the prejudgment interest

25  award won't make up that full amount because it is much lower

1    than the WACC, it is charged at a much lower figure.  So

2    there's an amount of money if you're just looking at -- just

3    looking at this from a time value of money standpoint that

4    Lockheed Martin will not recover in these costs.

5            So go to the next slide.

6            How did we get that 120 million number?  You look at

7    total past costs.  Again, these are all taken from Joan

8    Meyer's charts.  The total nominal past costs was 262 million.

9    If you take that to net present value, like she does, it

10   becomes 4 million 60 -- 400 million -- 464 million.  Excuse

11   me.  464 million.  You can tell numbers aren't my strong suit.

12   So that leaves a difference in all the costs between the

13   nominal and the present value of 201 million.  If you take the

14   60 percent -- again, that is just a number that John Meyer's

15   uses, but again, that will have to be determined based on

16   whatever your allocation is -- we get the 120 million.  That

17   is the 120 million that is the portion of past costs of net

18   present value that is the difference between nominal past and

19   present value --

20           THE COURT:  Did you do the same thing with a high

21   profit?  You must have run --

22           MR. MURPHY:  Yeah, yeah, do that -- well, we didn't do

23   the 6 percent, Your Honor, because we were doing this

24   yesterday after reading the transcripts a little bit.

25           Go to the next slide.

1      So, again, here you can look at that 120 million.  You

2  apply the prejudgment interest that you told us about on

3  Tuesday.  You get a difference of 59 million that is not

4  potentially recovered through the prejudgment interest.  That

5  59 million is the difference.

6      But the point on profit, Your Honor, we used the

7  6 percent number -- and this is on the next slide, on

8  slide 42.

9      We used the 6 percent number because that is what Joan

10  Meyer has in her model, and we were just using the model.  And

11  if you look on a year-to-year basis, if you go back in her

12  charts, she has a difference between nominal profit and net

13  present value profit.  So you just take the difference between

14  those two, and that's the difference in net present value

15  year-to-year.  If you take the difference in those two, add

16  them up over time, you get 5.3 million in extra, I would say,

17  net present value profit that will not be covered by the

18  credit.  So that 5.3 million is the net present value of

19  profit earned on all costs.  Again, you can do that by just

20  using her charts by subtracting the two and adding them all

21  up.

22      Then, if we use that 60 percent figure, we get a

23  number of 3.23 million because that is the amount that should

24  not have been put into these contracts.  So, again, to your

25  point --

1      THE COURT:  What is 3.23 --

2      MR. MURPHY:  That is 60 percent of the 5.38.

3      Again, the question is what -- if this system had

4  worked going all the way back to when costs were being

5  performed and both parties directly participated in the

6  cleanup, the question is:  What profit would not have been in

7  the system before?  That's the profit that we would consider

8  to be potentially -- I don't know if you want to -- something

9  that needs to be taken into account possibly under the Court's

10 view.

11     THE COURT:  Okay.

12     MR. MURPHY:  But again, that number, that 3.23 million

13 is under the amount the government is going to receive, the

14 9 million we talked about earlier, about the difference in

15 recoveries.

16     Go to the next slide.

17     So, again, that number -- I don't have it again.  But

18 that number, that 3.23 million, is vastly different than the

19 9 million difference that we have here and how much

20 more -- how much more credit we're going to be giving the

21 government now than we did in the past.  So, again, these are

22 just examples of things that Joan Meyer -- by using her

23 baseline from the amount of judgment moving forward, it -- her

24 model doesn't take into account these types of other undue

25 economic problems in the past.

1    THE COURT:  The 120 million represents past --

2    MR. MURPHY:  The 120 million, Your Honor, is the

3    difference in -- it's the amount of -- go to the next slide.

4    It is the time value of money impact on LMC's past

5    share.  So what it is, if you look at the past cost on a

6    nominal basis, you bring it forward to net present value, and

7    then you look at the difference between the two, and you

8    multiply that by the recovery, 60 percent, and you get the

9    120.  And what you're doing there is trying to measure --

10   THE COURT:  Did you do the same analysis with, say,

11   10 percent recovery?  She did both 60 and 10.  You keep using

12   60.  What happens if you use the 10 percent?

13   MR. MURPHY:  I don't believe I did it at the

14   10 percent, Your Honor.

15   THE COURT:  You didn't do a different profit --

16   MR. MURPHY:  No, Your Honor, I was just doing this

17   based on her chart.

18   THE COURT:  I know, you were just using her figures.

19   Okay.  Thank you.  We'll take a 10-minute recess.

20   (Recess taken from 10:50 a.m. to 11:06 a.m.)

21   THE COURT:  Go ahead, Mr. Sullivan, it is your turn.

22   Tell me somewhere in your argument what do you mean by

23   transaction costs in that footnote, if you would please.  You

24   know, the ones that --

25   MR. SULLIVAN:  Is that the double recovery one?

1        John Sullivan from the Department of Justice for the

2  United States of American.

3        THE COURT:  R35, I meant to ask that last time.

4        MR. SULLIVAN:  Is that footnote 4, Your Honor?

5        THE COURT:  I believe so.  It's R35, footnote 4.

6        MR. SULLIVAN:  What we're talking about there are

7  Lockheed charging its legal fees and costs for pursuing this

8  lawsuit.  It is not a cost that they're seeking to recover in

9  this case, so technically there is nothing that this Court can

10  do about it except consider it is an equitable issue.  But I

11  mean, it is not something that should be subtracted from the

12  costs that they are seeking to recover in this case because it

13  is not something they're trying to recover.  I think that's

14  what we were talking about, that there's not much you can do

15  about it.

16        THE COURT:  I feel I can do a lot of things about a

17  lot of things.

18        MR. SULLIVAN:  Well, the Court has equitable

19  discretion to consider whatever it wants, so --

20        THE COURT:  I can consider a lot of things.

21        MR. SULLIVAN:  Yeah.

22        THE COURT:  I think this matrix everybody spent so

23  much time on is one of the least helpful analyses I have seen

24  to date given the fact that we're absolutely hampered by

25  historical lack of knowledge.  It's easy to make credibility

1       findings if you have anybody's credibility to judge, but we

2       don't, basically, and the documents are sketchy.

3               Okay.  Go ahead.

4               MR. SULLIVAN:  We have distributed some slides, Your

5       Honor.  No binders.

6               First of all, Your Honor, before I begin the argument,

7       I just wanted to let you know that there is a proposed

8       settlement of the AISLIC case, and a consent decree has been

9       lodged with a motion to enter, and I gave a copy to

10      Mr. Murphy.  We have a copy if you would like to see it, but

11      it is out there.  It is my understanding is it just happened

12      within the last couple of days.

13              THE COURT:  It is published?  It's public on a court

14      document of record of what --

15              MR. SULLIVAN:  I believe it is, Your Honor.  A consent

16      decree has been lodged with the Court, and there is a motion

17      on record to enter it.

18              THE COURT:  Okay.  Is it different -- he entered an

19      order --

20              MR. SULLIVAN:  There is an order -- there was an order

21      about allocation that was entered, and this settlement is

22      going to change some things.

23              THE COURT:  Okay.  You can submit it, if you don't

24      mind handing it up.  That's fine.  Otherwise, we can look it

25      up.

1    MR. SULLIVAN:  Okay.  I wanted to just discuss a few

2    things in response to Mr. Murphy's argument this morning.

3    First of all, right at the end, on his slides 38 to

4    42, we actually object to that because it appears that

5    Lockheed's counsel is trying to do calculations based upon

6    Mr. Kiefer's hypotheticals that Mr. Kiefer should have been

7    doing himself.  We have not had a chance to review that with

8    our experts or to cross-examine Mr. Kiefer about it; and as

9    best I can tell, I don't believe Mr. Murphy and his colleagues

10   are qualified to be giving that kind of expert testimony.

11   THE COURT:  He said he wasn't good at numbers.  I'm

12   not good enough to know.

13   MR. SULLIVAN:  But it is also not based on the real

14   world.  It is based upon an assumption that the United States

15   had been paying 60 percent since 1994.  The key thing here,

16   Your Honor, it is something that Mr. Kiefer said he did not

17   calculate.  So we're just seeing it for the first time, and we

18   think that is unfair.

19   The next issue I wanted to discuss was the issue

20   Mr. Murphy raised about process specifications, and they

21   showed plaintiff's exhibit -- I think it was 1075 -- about a

22   process standard for washing out motors; and there is no

23   evidence, first of all, that the United States ever reviewed

24   and approved it.  Moreover, when you review it, it appears

25   that it's a process standard that they actually wrote for

1    subcontractors.  It looks like they were going to subcontract

2    this work, and it required Lockheed to be reviewing lots of

3    things.  But I have seen no evidence that the United States

4    ever reviewed and approved this.  And it also appears that

5    this relates to the SRAM contract and they were merely a

6    subcontractor of Boeing on that contract.

7            THE COURT:  So the process standards, is it your

8    position, for SRAM, would have been drafted by you and

9    reviewed by Lockheed?  I mean Boeing?  Sorry.

10           MR. SULLIVAN:  My understanding is that they would

11   have been drafted by Lockheed --

12           THE COURT:  When I said "you," I didn't mean the

13   government.  I'm sorry.  Lockheed.  Drafted by Lockheed,

14   reviewed by Boeing --

15           MR. SULLIVAN:  They would be reviewed by Lockheed's

16   own personnel.  I'm not sure to what extent Boeing was

17   involved.  I haven't seen anywhere there was place for the

18   United States to review and sign off on that process.

19           The evidence indicates, when the United States is

20   doing quality control inspections, that they may inspect a

21   part of the manufacturing process and compare it to a

22   manufacturing process standard.  There's lots of different

23   standards that are out there.  And if they did that, they

24   might check off that they have approved that manufacturing

25   batch.  That's our understanding of how quality control

1     inspections work.

2           THE COURT:  I didn't focus when Mr. Murphy argued

3     about -- he said there were all these process standards that

4     are reviewed by the government, but I forgot that in SRAM,

5     there is this middle contractor, Boeing.  And I don't know if

6     anything -- certainly under Mr. Doll's testimony, there seems

7     to be some difference in involvement given the existence of

8     Boeing.

9           MR. SULLIVAN:  Yes.  Boeing was overseeing everything

10    that they did.  And as best I can tell, I have not seen

11    process standards where the United States -- there is a place

12    for the United States to actually review and sign off on them.

13          THE COURT:  In general.

14          MR. SULLIVAN:  In general.  It is not on this one,

15    either.  This appears to be all Lockheed people.  And this one

16    is a bit unique because I believe Lockheed subcontracted the

17    hogging-out.  At least that's what it appears.

18          Your Honor, moving on to Lockheed's citation of the

19    TRW case, that involves a lot of different facts and a

20    different advance agreement that we haven't seen, but it is

21    also not a CERCLA case where a Court is supposed to be looking

22    for whether a party has been receiving payments from another

23    source and should have those deducted.

24          THE COURT:  Yeah, but it does undercut your notion

25    about this unitary government.

1          MR. SULLIVAN:  I mean, our -- I haven't had a chance

2     to analyze the case, but our position on unitary government is

3     what the case law says; that when we're in court, we are one

4     executive branch, and we balance the interests of all of them.

5          On arranger liability, another point that Mr. Murphy

6     made this morning, he talked about Lockheed not being liable

7     as an arranger because they did not own waste.  Well,

8     section 107 requires an arranger to own or possess waste.  And

9     Lockheed possessed all the waste.  And we would also claim

10    that they owned all the waste, too.

11         THE COURT:  Let's say you owned waste, they possessed

12    it, and everybody decided burn pits, where does all this

13    matrix get me?  It gets me nowhere.

14         MR. SULLIVAN:  Well, we would say that with the

15    exception of the one limited thing in Potrero, that we did not

16    take any intentional steps to dispose of waste, which is

17    another requirement for arranger liability.  So our position

18    is, with that limited exception, we would not have been an

19    arranger for any waste at these sites, Your Honor.  And that's

20    based on the *Burlington Northern* case.

21         My final comment on Mr. Murphy's presentation this

22    morning is that he discussed burn pits and dumping liquids in

23    burn pits, and he cited a provision in a military manual that

24    talked about wetting down the burn pit with water after the

25    burning has taken place.  Your Honor, that is obviously for

1    putting out fires, especially if you're going to try to reuse

2    the burn pit, but that does not talk about pouring solvents

3    and chemicals and contaminated wastewater into the burn pit

4    before you have done a burn, especially when you're pouring

5    stuff over other wastes when all that material can leach into

6    the ground.

7            Your Honor, I would like to move on now to our

8    presentation this morning, and I would like to start with the

9    double recovery and economic benefit issue, and you raised

10   something this morning, and I think we're on the same

11   wavelength.  I wanted to point you to the history of where

12   contractor recovery of environmental costs dates back to, and

13   it dates back to the late 1980s, and there were actually

14   congressional hearings in 1993, which I think you referenced,

15   and we've cited the place on the internet where you can

16   actually see these hearings.  And in sum, contractor recovery

17   of these costs is based upon the FAR principle that

18   contractors may include ordinary and necessary costs of doing

19   business in their overhead.

20           If you look at those -- the congressional hearings,

21   there was a lot of discussion about the pros and cons of doing

22   that, and one of DOD's reasons for allowing recovery --

23   actually, two of them -- were the no-fault structure of CERCLA

24   and the fact that both the United States and its contractors

25   could be PRPs under CERCLA at contractor-related sites.

1      In addition, the contractors were arguing there --

2  they made a variety of arguments -- but one, they were arguing

3  in favor of contractor recovery under government contracts

4  based in part on the United States' responsibility for the

5  contamination that was being cleaned up.  So that was one of

6  the reasons why this all came to be.

7      Then, I wanted to show you the significance of the

8  DOSA in that historically.  In September 2000, the DOSA

9  resolved a dispute about recoverability of costs at

10  discontinued operations, and that was defined as a business

11  unit of the contractor no longer in existence as of

12  December 31, 1999.  The key thing here that was in dispute is

13  that the business unit was gone and there were no contracts to

14  allocate the overhead costs to, and that's what the DOSA

15  resolved.

16      THE COURT:  Wait a minute.  What does that say about

17  Lockheed?  What business unit of the contractor is no longer

18  in existence?

19      MR. SULLIVAN:  Lockheed propulsion, which was doing --

20  like, for example, just at Redlands.  Lockheed Propulsion,

21  which was running the Redlands site, no longer existed, and

22  there were no longer contracts with that business unit in the

23  1990s.  That company, my understanding, they went out of

24  business in the 1970s.  So from a FAR standpoint, how do you

25  allocate costs relating to that site that Lockheed Propulsion

—1988—

1       operated when that business is gone and when there are no

2       contracts related to it to allocate it to.

3              THE COURT:  Maybe this principle you're worried about

4       has limited applicability.

5              MR. SULLIVAN:  Well, it relates to discontinued

6       operations.  That's why this was an issue.  There were a bunch

7       of sites where the business units were gone and where there

8       were no contracts to allocate to.  And that's what the DOSA --

9              THE COURT:  Which way does that cut?  Let's assume

10      that is a historical fact.  How do you --  does that help you,

11      hurt you, or it is just a fact?

12             MR. SULLIVAN:  I just think it is a historical fact,

13      Your Honor, and it's just why the DOSA was entered, and it

14      relates to Redlands, and pursuant to this agreement, we are

15      paying under it.  That's what I think the significance of it

16      is.

17             THE COURT:  Okay.

18             MR. SULLIVAN:  Your Honor, I also wanted to talk about

19      Paragraph 4.18 of the DOSA, and that is the paragraph that you

20      expressed concerns about that says, "This settlement agreement

21      does not settle claims, if any, arising under CERCLA."  I

22      wanted to note about that that it does not settle CERCLA

23      claims that Lockheed could bring or that the United States

24      could bring, and that's important because DOD cannot take away

25      the United States' ability to bring CERCLA claims.  I can tell

1    you that Burbank, for example, was a claim that the United

2    States, through the EPA, brought against Lockheed.  So this

3    provision cuts both ways, and --

4         THE COURT:  No one is arguing that you don't have

5    defenses.

6         MR. SULLIVAN:  And it does not say we don't have

7    defenses.  Both parties retain all their defenses in these

8    cases, whether it's the United States suing them or they're

9    suing us.  Everybody has all the defenses.

10        So our point is that that provision isn't terribly

11   significant here, Your Honor.

12        Your Honor, the other day you were --

13        THE COURT:  It allows the status quo to continue

14   without any guidance to any court for anyone, which is

15   basically --

16        MR. SULLIVAN:  Well --

17        THE COURT:  -- I mean, it has significance, to say the

18   least.

19        MR. SULLIVAN:  The point of the DOSA was to resolve

20   something --

21        THE COURT:  In my view, you could have gotten that

22   concession from Lockheed in exchange for what you were giving,

23   but you didn't.  So Lockheed -- if they're entitled to sue

24   you, it is hard to argue -- this is the biggest problem with

25   your case -- that they get zero.  That's the problem.  Why in

1    the world would they have a right to sue with no remedy?

2         MR. SULLIVAN:  Well, there could be situations where

3    they could sue us and the United States' share exceeds what

4    they recover under contracts.  Or in the future, Your Honor,

5    their business may decrease, it may go down to 50 percent, and

6    there may be many cases where they could sue the United

7    States, and the United States would pay under CERCLA without

8    double recovery --

9         THE COURT:  The DOSA only applies to things that are

10   discontinued, so it's not quite so unknown.  It's pretty known

11   what's going on, unless whatever number of sites are --

12        MR. SULLIVAN:  Well, it applies to discontinued

13   operations, but there could be more sites that are discovered

14   in the future that even today haven't been discovered.  That's

15   been the problem under CERCLA.  You discover a site that

16   existed years ago.

17        I think that applies to many different things.  The

18   key thing is it was done by DOD, and they don't have the

19   authority to be releasing these can kinds of claims.  And the

20   United States has a vested interest in bringing claims.  In

21   any event, we don't think that is a terribly significant

22   provision, Your Honor.

23        THE COURT:  I wish we were on the same page.  It would

24   make it easier.

25        Okay.

1    MR. SULLIVAN:  The bottom line is it is what it is,

2    and there is really nothing we can do about it in this court

3    right now.  It is what it is.

4    Lockheed points to Plaintiff's Exhibit 1858 as

5    evidence of how the DOSA should be interpreted, and that was

6    that 2006 --

7    THE COURT:  That's the thing that wasn't signed --

8    MR. SULLIVAN:  It wasn't signed.

9    And the bottom line, it is what it is.  If the DCAA

10   auditor believed in 2006 that Lockheed should seek recovery

11   twice, you know, that's not --

12   THE COURT:  This is the unitary government working

13   together.

14   MR. SULLIVAN:  It is not position of the United States

15   here, which has been approved by DOD, and it is also not what

16   the DOSA says.  The DOSA doesn't say that.  Lockheed clearly

17   interprets it that way, but that is not what the DOSA says on

18   its face.  In any event, a January 2006 document should not be

19   used to interpret the parties' intent under the DOSA back in

20   2000.

21   THE COURT:  Can I put to rest -- you signed a tolling

22   agreement.  It is quite clear that everybody was

23   recognizing -- maybe you didn't want them to sue -- but they

24   were certainly acknowledging and acquiescing in suit.  So what

25   the document says is totally consistent with the notion that

1    these guys are going to come and sue you and you know they're

2    going to sue.  You don't sign a tolling agreement unless you

3    know you're going to be sued.  That's common sense.  So to say

4    that they should seek recovery, it doesn't matter whether they

5    should, but they could, and you knew it, and your defense

6    contracting people basically, by saying that what's

7    reasonable, is you've got to go -- reduce it by going to sue.

8    So I just -- I want -- I can't -- you can spend all the time

9    you want, but you can't convince me that you didn't give up

10   anything but you also got punched in the face knowingly.  I

11   don't know what to do about that.  That's what you have to

12   address, not to say it is what it is, but I'll deal with it.

13           MR. SULLIVAN:  What do you mean by "punched in the

14   face knowingly"?

15           THE COURT:  You knew they were going to sue, they

16   sued, and nobody got anything to stop that.

17           MR. SULLIVAN:  The key is, Your Honor, is that they

18   sued, but we have our defenses, and the defenses about

19   -- especially about double recovery have been evolving

20   significantly in the 2000s, especially since about 2003-ish I

21   think a lot of these cases have been coming out, and we have

22   learned a lot about this issue since about 2006, so, you know,

23   we have our defenses.  If they want to sue us, they can sue

24   us.  A tolling agreement certainly says they can sue us, but

25   that doesn't mean we don't have our defenses, Your Honor, and

1    that's what our position is.

2            The next issue here is:  Is Lockheed Martin profiting

3    from CERCLA?  And Lockheed claims that it is undisputed that

4    direct recoveries from CERCLA will somehow decrease Lockheed's

5    profit, but they cite no evidence in support of that.

6            THE COURT:  Well, you don't agree it will happen in

7    the future?

8            MR. SULLIVAN:  Pardon me?

9            THE COURT:  You don't agree that by having a credit

10   pass through that the profit margin will be decreased?  I

11   don't know about their actual bottom line, nobody knows, but

12   the profit margin will be decreased, we know that, that is

13   indisputable.

14           MR. SULLIVAN:  Well, also, what isn't taken into

15   account there is the impact that has on existing fixed-price

16   contracts every time they credit.

17           THE COURT:  What the decrease would be and how long

18   before it kicks in full-blown we don't know precisely, but we

19   know, under the crediting system, that the profit margin will

20   be decreased.

21           MR. SULLIVAN:  But we do know they're still going to

22   profit, and any profit they do have --

23           THE COURT:  Of course, they're going to profit.  The

24   shareholders would go bananas.

25           MR. SULLIVAN:  If they do what they want to do,

1    they're still going to profit.  And Dr. Meyer has provided

2    testimony as to what that future economic benefit to them and

3    economic detriment to the United States would be.

4        THE COURT:  You look at a chart, and the profit goes

5    down.  You look at that chart that goes up like a hill, a

6    mountain there, the profit does decrease over time.  It will

7    catch up at some point.

8        MR. SULLIVAN:  It would decrease over time.  The big

9    hit is when they get a past cost payment.  That would be the

10   huge hit.  And over time, if we're required to pay, those

11   payments would be smaller, and the amount of profit would be

12   less, that's true.

13       But the big thing here, Your Honor, is the cost to the

14   taxpayers of all of this.  And Lockheed's CERCLA suit results

15   in significant costs to the taxpayers in addition to what we

16   have already paid, and the only way to address that, Your

17   Honor, is to prevent Lockheed Martin from double recovering in

18   this case.

19       So what we have done here on this table is just add

20   the costs up.  And these are the taxpayers' costs to date.

21   You have $208 million that Lockheed has recovered through

22   government contracts as of the end of 2013.  You have their

23   legal bills through November of 2013, which are 9 million and

24   which we believe are going to get higher.  So that is at

25   least, to date, 217 million to the taxpayers for these sites.

1    And here are the additional costs to the taxpayers if

2    the Court does not prevent double recovery, and what we have

3    done here for you, Your Honor, is we have put two columns, one

4    for a 10 percent allocation, which is roughly what we have

5    proposed, and one for a 60 percent allocation, which is

6    roughly what Lockheed has proposed.  Basically, if you're

7    using the 10 percent allocation, you add Lockheed's economic

8    benefit from past costs is 4.1 million, their economic benefit

9    from future cost recoveries would be 1 million, Lockheed's

10   receipt of prejudgment interest would be 5.4 million on the

11   10 percent, which Lockheed indicated yesterday probably would

12   not be credited back or there is no agreement that it would be

13   credited back.  So the additional cost to the taxpayers of a

14   10 percent recovery would be more than 10.5 million.  And as

15   we say there, it doesn't even include the profits to Lockheed

16   on the existing fixed-price contracts, which is the effect of

17   a credit, which also amounts to a loss to the United States of

18   the benefit of the credit.

19         Then, if you look at a 60 percent allocation and you

20   add these numbers up, the big thing here that is significant,

21   in addition to the rest, is the receipt of prejudgment

22   interest, which we don't believe will be credited.  And for a

23   60 percent allocation, that would be about 32.3 million.  So

24   the total loss to the taxpayers under this scenario in

25   addition to what they have already paid would be about

1    63.6 million, and that also doesn't include the profits on

2    existing fixed-price contracts.

3         Your Honor, the United States is not asking the Court

4    to prevent Lockheed from recouping its cleanup costs under

5    government contracts or from recouping legal fees.  That is

6    the system under the Federal Acquisition Regulation.  What we

7    are asking is the Court, in equity, prevent Lockheed from

8    recouping its cleanup costs from the United States for a

9    second time here under CERCLA.

10        THE COURT:  Are you aware of any suits in the making

11   other than the two we have identified?  Government contractors

12   suing the government for cleanup costs.

13        MR. SULLIVAN:  We are aware that there are threatened

14   suits.  I don't know if that is the right word.  We are aware

15   of quite a few suits out there that are being threatened, Your

16   Honor.

17        THE COURT:  All right.

18        MR. SULLIVAN:  And I can't say anything more than

19   that, I don't think.

20        I have put in our slide presentation for your benefit

21   some issues about their characterization of evidence.

22        THE COURT:  Let me get back to this slide, so I know

23   what you're talking about.  The slides from the first time?

24   Is that 156?

25        MR. SULLIVAN:  Yeah.

1          THE COURT:  It has to be.

2          MR. SULLIVAN:  I'm going to skip over a bunch, but I

3     want to talk about this TCE slide, it's 156 and 157.

4          THE COURT:  Let me just put my hands on it.

5          Okay.  Oh, yeah.

6          MR. SULLIVAN:  Basically, what Lockheed was saying was

7     that they were trying to suggest that TCE had been detected

8     only around building 91, and that was sort of in support of

9     their argument that the vapor degreaser caused the

10    contamination.  And there were samples of groundwater that

11    were only taken at the western edge of the site.  But the key

12    here is, on slide 157, that's where Lockheed suggested that

13    TCE was found in soil gas only near building 91, but there are

14    other soil gas studies that found TCE in many places at the

15    site.  Here I presented a map of the site, and if you look for

16    the -- I think they are pink circles --

17         THE COURT:  818 --

18         MR. SULLIVAN:  Page 17, there is a map of the site.

19         THE COURT:  Yes.  This is an exhibit --

20         MR. SULLIVAN:  This is an exhibit from Dr. Feenstra's

21    report.

22         And the pink circles show where TCE has been found at

23    the site in his figure here.

24         THE COURT:  Why is that different?  I see it is

25    different, but what is the explanation for why it doesn't

1    coincide with --

2         MR. SULLIVAN:  Because all they showed you, Your

3    Honor, was building 91.  You can see the pink up at the top of

4    building 91, There were a lot of detections up at the

5    northeast corner of building 91, and the arrow is basically

6    pointing to the west side of building 91 right there, Your

7    Honor.  But the problem is -- the problem with that slide they

8    showed you is that there are numerous places at the site where

9    TCE has been found in soil gas, including if you look at

10   building 113, that is where Earl Wessman said he was dumping

11   solvent, and that's where the lab technicians were ladling it

12   onto the ground.

13        THE COURT:  Where is building 114?

14        MR. SULLIVAN:  Building 114 is just up to the right of

15   building 91 there.  I just put a little dot.

16        THE COURT:  Okay.

17        MR. SULLIVAN:  And then if you look down here at

18   building 30, there was a vapor degreaser in building 30 over

19   there, and you can see there is TCE outside building 30.

20        Then down over here we believe -- this is the area

21   roughly where Mr. Mulder was working, and you can also see

22   there's TCE detected over here, and I can't even remember what

23   is over there.

24        MR. MURPHY:  Your Honor, I believe there is a color

25   problem here.  I think if you look at the actual -- I think

1     those are TCA dots.

2              MR. SULLIVAN:  The TCA is in green.  The TCA is in

3     green.

4              MR. MURPHY:  Well, this is in Dr. Feenstra's report

5     where he talks about this.

6              MR. SULLIVAN:  We just --

7              THE COURT:  Who did the legend?  Did you do the legend

8     or did he?

9              MR. SULLIVAN:  This is from Dr. Feenstra's.  We didn't

10    do it.

11             THE COURT:  You reproduced it the way it is.

12             MR. SULLIVAN:  Yes.

13             THE COURT:  What does it appear in his report as?

14    Paragraph 17 that is cross referenced, is that the idea, or

15    95?

16             MR. MURPHY:  It is not in his affidavit, Your Honor.

17             MR. SULLIVAN:  This is our U.S. Exhibit 818, and it is

18    a reproduction of a figure from Dr. Feenstra's report.

19             THE COURT:  The only question is:  You've copied the

20    legend, that's not your legend, that's his --

21             MR. SULLIVAN:  Here's the actual -- here's the

22    actual --

23             MR. MURPHY:  U.S. Exhibit.

24             MR. SULLIVAN:  Exhibit, Your Honor.

25             Show the whole thing.

—2000—

1          It still has the pink dots versus the green dots.

2          THE COURT:  Those are the same.  Go ahead.

3          MR. SULLIVAN:  That's all we wanted to show, that

4     there was TCE found in soil gas 20-some years later at a

5     variety of places at the site, Your Honor, not just at

6     building 91.  And that's all we wanted to show.

7          THE COURT:  Well, you're showing it is more consistent

8     with your dumping theory --

9          MR. SULLIVAN:  It, in fact, is.

10          In addition here, on slide 143, Lockheed and

11     Dr. Feenstra were dismissing the difference in evaporation

12     rates between TCE and TCA as being modest in support of their

13     theory that the vapor degreaser must have been the thing that

14     released the TCE because dumping wouldn't cause it, but the

15     truth is the evaporation rates are pretty significant.  In

16     fact, we have an example here, at 40 degrees, which is the

17     average nighttime temperature in January, the TCE evaporation

18     rate is almost twice, and you can see the vapor pressures are

19     almost twice, TCA versus TCE.

20          My understanding, my recollection from looking at the

21     evaporation rates over different temperatures is that they

22     range anywhere from about 1.75 to about 1.8 or 1.9 times each

23     other.  So TCE evaporates much more slowly than TCA.

24          I wanted to mention one thing before I moved onto the

25     SRAM indemnification.  I wanted to provide you a citation for

1    that.  But in slides 160 and 164 Lockheed seems to be trying

2    to discredit Larry Borgelt.  But I just wanted to say again

3    that their own witness Tom Blackman testified he actually

4    contacted and relied on Mr. Borgelt because he was someone who

5    had been on the ground and was involved in day-to-day

6    operations at the site.  So their own witness was relying on

7    him, so I think that just undercuts their discrediting.

8              On the SRAM indemnification, Your Honor, you had asked

9    for a citation to the legislative history, and I just wanted

10   to indicate to you it is in our trial binder at U.S. Exhibit

11   77, 03 to 04.

12             THE COURT:  What's the date of that cite, do you know?

13             MR. SULLIVAN:  It's in our trial binder, we have

14   a section called SRAM indemnification --

15             THE COURT:  I assume public law --

16             MR. SULLIVAN:  It was a cite to the legislative

17   history from this public law.

18             THE COURT:  Thank you.  I was looking for that.

19             Finally, Your Honor, I wanted to just conclude and

20   talk about our proposed allocation.  First of all, Lockheed

21   has been saying that we were partners.  Your Honor, we were

22   not partners with Lockheed relating to these sites.  It was a

23   simple buyer-seller arrangement, a typical government

24   contracting arrangement.  And in fact, on the biggest contract

25   they had, the SRAM, Lockheed was only a subcontractor of

1    Boeing, it wasn't even a direct contractor with the United

2    States.

3            THE COURT:  Do we have any way to say what did SRAM

4    represent of the whole -- we don't know what the contract

5    prices are, so we have no way to really understand the

6    magnitude of SRAM, right?

7            MR. SULLIVAN:  I know -- I don't have percentage

8    numbers for you, Your Honor.  I know it was probably their

9    most significant manufacturing contract, but I don't know the

10   numbers, Your Honor.

11           THE COURT:  That's the only one where you have -- does

12   Lockheed -- does Boeing also involve the research and

13   development for SRAM or only for the production?

14           MR. MURPHY:  Just the main contracts, Your Honor.

15           THE COURT:  Production.  Okay.  But the main contracts

16   kicked in sometime around '66?

17           MR. MURPHY:  '66 was the main -- yeah, the main

18   development contract.

19           THE COURT:  The first of five or so, right?

20           MR. SULLIVAN:  It was R&D at first until about

21   1970-ish.

22           MR. MURPHY:  There was a DDT&E contract from '66 to

23   '70, and then there were production contracts for '71, '72,

24   '73, and '74.

25           THE COURT:  Is Boeing only in the '71 to --

2003

1          MR. MURPHY:  No, Your Honor.  But there were also

2     direct contracts with RPL.  There are R&D contracts that took

3     place before that.  There were also direct contracts -- like a

4     SRAM aging contract we have evidence of.  There are other

5     add-ons that were direct with RPL at the time, as well.

6          THE COURT:  Okay.  Boeing was involved as early as

7     '66?

8          MR. MURPHY:  Yes, Your Honor.

9          THE COURT:  Okay.  Go ahead.

10          MR. SULLIVAN:  Okay.  So, Your Honor, in terms of an

11     allocation, it's -- you can use whatever equitable factors

12     that you see fit.  You don't have to use a matrix.  We have

13     been using a matrix because Lockheed had been pointing to the

14     AISLIC decision, and they used the matrix there.  But you

15     don't have to.  You can use whatever factors that you believe

16     are important.

17          So the question we raised is what are the key

18     allocation questions, and I think the most important question

19     is who caused the contamination, and the reason for that is

20     because this case is about paying for the contamination.  And

21     the answer to that, Your Honor, simply is Lockheed, not the

22     United States.

23          It is important to note several things here:  First of

24     all, Lockheed was not forced to contract with the United

25     States.  This was not like World War II.  They weren't forced

1    to do this.  They wanted to do this.  Second of all --

2              THE COURT:  You wanted them, though.

3              MR. SULLIVAN:  Pardon me?

4              THE COURT:  You wanted them, You wanted these missile

5    contracts.  I mean, at least, you, the unitary government,

6    DOD.  There weren't a whole lot of people out in the market

7    doing this.

8              MR. SULLIVAN:  Sure.

9              THE COURT:  I don't know the benefit went both ways, I

10   can't find that.

11             MR. SULLIVAN:  The bottom line is they weren't forced

12   to.  Unlike some situations during World War II, businesses

13   weren't forced to do something they didn't want to do, so this

14   was a whole different situation.

15             Lockheed selected the location for the Redlands site

16   next to drinking water recharge basins, and it was Lockheed,

17   not the United States, that built all the facilities.  It was

18   Lockheed, not the United States, that hired, trained, and

19   managed all the employees, including the employees who

20   discharged wastewater on the ground and dumped solvents on the

21   ground.  It was Lockheed, not the United States, who operated

22   and maintained all the equipment, including equipment that the

23   United States owned.  It was Lockheed, not the United States,

24   who generated, handled, managed, and conducted all waste

25   disposal activities.  There is simply no evidence the United

1    States participated in conducting any of these waste disposal

2    activities.  It was Lockheed, not the United States, who

3    designed, constructed and operated the burn pits and the

4    hog-out facilities.

5         THE COURT:  You did dispose of some things for them at

6    Camp Irwin.

7         MR. SULLIVAN:  There were times when we disposed of

8    wastes at Camp Irwin way off site for them.

9         THE COURT:  It came from Redlands.

10        MR. SULLIVAN:  It came from Redlands, but it has

11   nothing to do with costs at this site.  It was just a courtesy

12   to a contract to off-site disposal.

13        THE COURT:  It is not consistent to say that Lockheed

14   did all the disposal.

15        MR. SULLIVAN:  They did all the on-site disposal here.

16   We did none of the on-site disposal.

17        THE COURT:  What do you say about -- I mean, this is

18   what their major point is -- you told us to put them in burn

19   pits, everybody put them in burn pits.

20        MR. SULLIVAN:  Your Honor, burn pits -- I mean,

21   basically the manuals described safe ways of destroying

22   explosives, and they talked about burning on bare ground or

23   burn pans, but not on concrete pads.  So burning on bare

24   ground or burn pans was allowed.  Burning at a safe distance

25   from people, highways, and other buildings, clearing

1    vegetation to prevent fires, those kinds of things.  But we

2    did not tell them how to do it.  We didn't give them the

3    details of how to operate the burn pits, when to operate them,

4    when to put liquids or whether to put liquids on the ground,

5    what can be put on the ground, how long you leave it there.

6    They controlled all of that, Your Honor.

7          THE COURT:  You say that you didn't -- or how to

8    operate in compliance with California law, there wasn't any

9    law on the books that said what to do about burn pits, you're

10   just saying the Dickey Act, right.

11         MR. SULLIVAN:  The Dickey Act would have covered this

12   because they were discharging materials onto bare ground.  Mr.

13   Bauer testified that the Dickey Act would have covered burn

14   pits and the Water Board probably would have treated this as a

15   class III dump because of the dumping of liquids, semi-solids,

16   and solids on the ground.  Like we said before -- and I don't

17   want to raise the Dickey Act because I know it's sensitive to

18   you.

19         THE COURT:  I can sleep.  I can sleep.

20         Go ahead.

21         MR. SULLIVAN:  Okay.

22         THE COURT:  I'm not sensitive.  I just don't think it

23   carries very much.

24         MR. SULLIVAN:  Okay.  The bottom line, Your Honor, if

25   they had complied with the Dickey Act and submitted a waste

1    discharge notice, in all probability, they would have faced

2    some tough decisions about how to operate the burn pits, like

3    are they going to line them with clay or synthetic liners,

4    which is a possibility, or are they going to install burn

5    pans.  In all probability, according to Mr. Bauer, the water

6    board would probably not have allowed the dumping of all of

7    that kind of material on bare ground.

8              THE COURT:  If I don't credit that, why, we skip that

9    argument.

10             MR. SULLIVAN:  That's correct.  It's up to you, Your

11   Honor, in your discretion.

12             THE COURT:  Thank you.

13             MR. SULLIVAN:  Getting to U.S. quality control and

14   safety inspections, Your Honor, they did not deal with the

15   burn pit design, construction, or operations.  The safety

16   inspections and quality control did not deal with hog-out

17   facilities, the design or operations.  They didn't deal with

18   wastewater discharges, evaporation pits, solvent dumping, or

19   any other waste disposal activities, or the compliance with

20   the Dickey Act.

21             Also, the process specifications, like I said earlier,

22   do not evidence control over operations.  In fact, the best

23   evidence they have are specifications that have been signed

24   and approved by Lockheed, and most of these don't even talk

25   about the ultimate disposal, like are things being dumped on

1    the ground or whatnot.

2           As we said earlier, the United States review and

3    approval of these specifications was focused during the

4    quality control process, and our expert, Mr. Nagle, talked

5    about that.

6           And in addition, Your Honor, Lockheed retained control

7    over its own manufacturing operations; and in fact, they had

8    the -- the LPC board actually made decisions about any changes

9    to process specifications that did not affect the design or

10   performance of the rocket motors.  We would submit that waste

11   disposal things probably don't affect the design of the rocket

12   motor.

13          Your Honor, in conclusion, we have made a proposed

14   allocation to you in our closing argument slides 2 to 30.  We

15   think it is consistent with evidence and the equitable

16   factors, but as we've said, you can use whatever equitable

17   factors you see fit.

18          Here is our proposed allocation.  Again, it is

19   10 percent for the Redlands site for the United States for AP

20   costs based on ownership of equipment; it's 5 to 7 percent at

21   Potrero based on our ownership of motor casings and our

22   instruction to burn AP at the burn pit; and zero percent for

23   LaBorde Canyon.

24          In terms of the impact of double recovery, to

25   conclude, Your Honor, Lockheed has already recovered from the

2009

1   United States an estimated $208 million under government

2   contracts for cleanup costs, including the estimated profits

3   of 6 percent on those costs, and that represents more than

4   50 percent of total past and estimated future costs.

5        So we request that this Court exercise its equitable

6   power to prevent double recovery by decreasing the United

7   States' share because it was the United States, rather than a

8   third party as in the other double recovery cases, that was

9   actually the source of Lockheed's prior reimbursements.  And

10   we request that the Court issue a declaratory judgment that

11   ensures that Lockheed receives no future double recovery and

12   that the United States receive a full credit for all of its

13   cleanup costs and that the United States should not have to

14   pay any additional costs in this case unless our CERCLA share,

15   whatever it may be, exceeds our contract payments.

16        Thank you, Your Honor.

17        Unless you have questions.

18        THE COURT:  No.

19        Thank you.  I appreciate all the work everyone has

20   done.  I'm happy not to -- to have it done this way.  At least

21   I can ask questions as we go.

22        I will take it under advisement.

23        Thank you.

24        (Proceedings adjourned at 11:47 a.m.)

25

2010

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Patricia A. Kaneshiro-Miller, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7

8   ----------------------------------    -----------------------

9   PATRICIA A. KANESHIRO-MILLER                   DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [2] - 1965:22, 1965:23
**$109** [2] - 1974:4, 1974:6
**$20** [1] - 1965:24
**$208** [2] - 1994:21, 2009:1
**$96** [2] - 1974:17, 1974:18

**'**

**'50s** [1] - 1940:25
**'60s** [1] - 1940:25
**'66** [4] - 2002:16, 2002:17, 2002:22, 2003:7
**'70** [1] - 2002:23
**'70s** [1] - 1943:7
**'71** [2] - 2002:23, 2002:25
**'72** [1] - 2002:23
**'73** [1] - 2002:24
**'74** [1] - 2002:24
**'90s** [1] - 1963:16
**'93** [2] - 1963:16, 1968:5
**'94** [3] - 1939:19, 1958:11, 1963:16
**'97** [2] - 1955:15, 1955:17

**0**

**03** [1] - 2001:11
**04** [1] - 2001:11

**1**

**1** [1] - 1995:9
**1.75** [1] - 2000:22
**1.8** [1] - 2000:22
**1.9** [1] - 2000:22
**10** [13] - 1932:20, 1933:10, 1948:17, 1948:22, 1979:11, 1979:12, 1979:14, 1995:4, 1995:7, 1995:11, 1995:14, 2008:19
**10-minute** [1] - 1979:19
**10.5** [1] - 1995:14
**107** [1] - 1985:8
**1075** [2] - 1953:20,

1982:21
**10:50** [1] - 1979:20
**113** [1] - 1998:10
**114** [3] - 1950:14, 1998:13, 1998:14
**11:06** [1] - 1979:20
**11:47** [1] - 2009:24
**120** [7] - 1976:6, 1976:16, 1976:17, 1977:1, 1979:1, 1979:2, 1979:9
**12C** [1] - 1968:14
**143** [1] - 2000:10
**15** [2] - 1932:21, 1960:11
**156** [2] - 1996:24, 1997:3
**157** [2] - 1997:3, 1997:12
**160** [1] - 2001:1
**164** [1] - 2001:1
**17** [2] - 1997:18, 1999:14
**1788** [1] - 1973:5
**1858** [1] - 1994:4
**1958** [1] - 1943:6
**1962** [1] - 1953:3
**1970-ish** [1] - 2002:21
**1970s** [1] - 1987:24
**1980s** [1] - 1986:13
**1990s** [1] - 1987:23
**1992** [1] - 1974:10
**1993** [1] - 1986:14
**1994** [1] - 1982:15
**1997** [1] - 1973:6
**1999** [1] - 1987:12

**2**

**2** [2] - 1941:25, 2008:14
**20** [9] - 1933:11, 1933:20, 1933:21, 1934:18, 1935:24, 1938:14, 1965:13, 1966:4
**20-some** [1] - 2000:4
**200** [1] - 1958:20
**2000** [4] - 1948:20, 1970:8, 1987:8, 1991:20
**2000s** [1] - 1992:20
**2003-ish** [1] - 1992:20
**2006** [4] - 1991:6, 1991:10, 1991:18, 1992:22
**201** [1] - 1976:13
**2013** [2] - 1994:22, 1994:23

**217** [1] - 1994:25
**25** [1] - 1933:19
**262** [1] - 1976:8
**28** [4] - 1948:17, 1948:19, 1948:22, 1960:21
**29** [2] - 1962:25, 1974:12, 1974:15, 1974:16

**3**

**3** [1] - 1974:13
**3.1** [1] - 1973:20
**3.2** [1] - 1973:20
**3.23** [5] - 1975:16, 1977:23, 1978:1, 1978:12, 1978:18
**30** [6] - 1938:13, 1965:12, 1998:18, 1998:19, 2008:14
**300** [1] - 1958:19
**31** [2] - 1960:18, 1987:12
**32.3** [1] - 1995:23
**38** [1] - 1982:3

**4**

**4** [4] - 1974:13, 1976:10, 1980:4, 1980:5
**4.1** [1] - 1995:8
**4.18** [1] - 1988:19
**40** [6] - 1933:17, 1945:23, 1974:9, 1974:10, 1974:11, 2000:16
**400** [1] - 1976:10
**42** [2] - 1977:8, 1982:4
**464** [2] - 1976:10, 1976:11

**5**

**5** [5] - 1933:20, 1935:24, 1938:13, 1938:14, 2008:20
**5.3** [2] - 1977:16, 1977:18
**5.38** [1] - 1978:2
**5.4** [1] - 1995:10
**50** [2] - 1990:5, 2009:4
**50-50** [3] - 1931:22, 1932:9, 1941:14
**52/48** [1] - 1935:6
**58** [1] - 1950:15
**59** [2] - 1977:3, 1977:5

**6**

**6** [4] - 1976:23, 1977:7, 1977:9, 2009:3
**60** [12] - 1945:8, 1976:10, 1976:14, 1977:22, 1978:2, 1979:8, 1979:11, 1979:12, 1982:15, 1995:5, 1995:19, 1995:23
**60/40** [1] - 1935:8
**63.6** [1] - 1996:1

**7**

**7** [2] - 1947:25, 2008:20
**77** [1] - 2001:11

**8**

**80** [10] - 1933:14, 1933:16, 1933:21, 1935:12, 1938:5, 1938:10, 1938:12, 1941:19, 1941:23, 1974:12
**80/20** [2] - 1935:18, 1935:25
**818** [2] - 1997:17, 1999:17

**9**

**9** [6] - 1975:7, 1975:8, 1975:10, 1978:14, 1978:19, 1994:23
**91** [8] - 1997:8, 1997:13, 1998:3, 1998:4, 1998:5, 1998:6, 1998:15, 2000:6
**95** [1] - 1999:15

**A**

**a.m** [3] - 1979:20, 2009:24
**abatement** [2] - 1957:15, 1957:16
**abeyance** [1] - 1964:1
**ability** [1] - 1988:25
**able** [5] - 1933:4, 1945:7, 1952:14, 1956:14, 1965:21

**above-entitled** [1] - 2010:5
**abrogated** [1] - 1970:18
**absolutely** [1] - 1980:24
**accepts** [1] - 1943:10
**accompanying** [1] - 1955:18
**accordance** [1] - 1944:5
**according** [3] - 1944:11, 1944:12, 2007:5
**account** [6] - 1961:4, 1962:3, 1974:3, 1978:9, 1978:24, 1993:15
**accounting** [3] - 1958:13, 1959:13, 1974:1
**accurate** [1] - 1950:16
**acknowledging** [1] - 1991:24
**acquiescing** [1] - 1991:24
**Acquisition** [1] - 1996:6
**Act** [6] - 2006:10, 2006:11, 2006:13, 2006:17, 2006:25, 2007:20
**acting** [1] - 1968:16
**actions** [2] - 1955:1, 1962:12
**active** [1] - 1973:1
**activities** [4] - 1931:19, 2004:25, 2005:2, 2007:19
**actual** [6] - 1946:14, 1993:11, 1998:25, 1999:21, 1999:22
**add** [5] - 1977:15, 1994:19, 1995:7, 1995:20, 2003:5
**add-ons** [1] - 2003:5
**adding** [1] - 1977:20
**addition** [11] - 1942:20, 1946:12, 1948:18, 1950:13, 1953:10, 1987:1, 1994:15, 1995:21, 1995:25, 2000:10, 2008:6
**additional** [3] - 1995:1, 1995:13, 2009:14
**address** [8] - 1940:4, 1941:16, 1969:21, 1970:5, 1970:21,

1973:11, 1992:12, 1994:16

**addressed** [1] - 1961:24

**adjourned** [1] - 2009:24

**admitted** [1] - 1955:4

**adopting** [2] - 1935:20, 1935:21

**advance** [1] - 1984:20

**advisement** [1] - 2009:22

**advocating** [1] - 1934:5

**Aerojet** [2] - 1949:10, 1949:11

**affect** [2] - 2008:9, 2008:11

**affidavit** [1] - 1999:16

**Afghanistan** [1] - 1950:8

**aging** [1] - 2003:4

**ago** [2] - 1968:14, 1990:16

**agree** [7] - 1934:4, 1934:11, 1937:24, 1938:11, 1957:14, 1993:6, 1993:9

**agreement** [14] - 1955:19, 1970:3, 1970:15, 1970:18, 1970:19, 1973:6, 1974:2, 1984:20, 1988:14, 1988:20, 1991:22, 1992:2, 1992:24, 1995:12

**agreements** [3] - 1955:15, 1955:17, 1970:10

**agrees** [1] - 1957:6

**ahead** [6] - 1973:19, 1979:21, 1981:3, 2000:2, 2003:9, 2006:20

**Air** [2] - 1946:23, 1946:24

**AISLIC** [30] - 1932:24, 1933:9, 1933:12, 1933:13, 1933:15, 1933:22, 1933:24, 1935:15, 1935:16, 1935:21, 1935:23, 1935:25, 1936:1, 1936:3, 1936:10, 1937:16, 1938:9, 1939:10, 1939:17, 1939:18, 1941:19, 1942:4, 1942:12, 1946:8, 1954:20, 1958:25, 1981:8,

2003:14

**alleged** [1] - 1950:14

**allocate** [4] - 1987:14, 1987:25, 1988:2, 1988:8

**allocation** [30] - 1931:7, 1931:25, 1932:7, 1932:8, 1932:20, 1933:14, 1933:16, 1933:18, 1934:23, 1935:3, 1937:22, 1938:3, 1938:21, 1939:9, 1939:13, 1939:21, 1941:15, 1950:6, 1976:16, 1981:21, 1995:4, 1995:5, 1995:7, 1995:19, 1995:23, 2001:20, 2003:11, 2003:18, 2008:14, 2008:18

**allow** [3] - 1958:22, 1965:17, 1965:18

**allowable** [4] - 1957:6, 1957:8, 1964:4, 1970:15

**allowed** [2] - 2005:24, 2007:6

**allowing** [2] - 1969:8, 1986:22

**allows** [2] - 1969:20, 1989:13

**almost** [2] - 2000:18, 2000:19

**American** [1] - 1980:2

**amortization** [1] - 1965:10

**amount** [15] - 1933:4, 1934:20, 1945:24, 1966:3, 1974:20, 1975:16, 1975:17, 1975:19, 1975:25, 1976:2, 1977:23, 1978:13, 1978:23, 1979:3, 1994:11

**amounts** [1] - 1995:17

**analyses** [1] - 1980:23

**analysis** [5] - 1934:9, 1937:25, 1945:15, 1965:13, 1979:10

**analyze** [1] - 1985:2

**answer** [2] - 1956:18, 2003:21

**anticipated** [1] - 1965:9

**AP** [13] - 1933:4, 1936:13, 1943:11, 1943:13, 1946:15, 1949:6, 1950:20, 1951:12, 1952:15,

1954:23, 1955:4, 2008:19, 2008:22

**Apollo** [1] - 1943:5

**apologize** [1] - 1962:16

**appealed** [1] - 1958:4

**appear** [2] - 1943:19, 1999:13

**applicability** [1] - 1988:4

**applied** [6] - 1939:5, 1939:18, 1942:10, 1962:11, 1965:8, 1974:9

**applies** [3] - 1990:9, 1990:12, 1990:17

**apply** [5] - 1938:22, 1939:6, 1939:7, 1943:3, 1977:2

**applying** [1] - 1949:15

**appreciate** [1] - 2009:19

**approach** [2] - 1931:10, 1931:21

**approaches** [1] - 1931:8

**appropriate** [5] - 1931:21, 1934:16, 1934:25, 1942:1, 1949:20

**approval** [3] - 1947:19, 1948:7, 2008:3

**approved** [7] - 1947:6, 1964:13, 1982:24, 1983:4, 1983:24, 1991:15, 2007:24

**approving** [1] - 1954:16

**arbitrary** [1] - 1934:8

**area** [2] - 1953:7, 1998:20

**argue** [5] - 1939:14, 1943:12, 1949:25, 1959:19, 1989:24

**argued** [1] - 1984:2

**arguing** [5] - 1957:9, 1957:10, 1987:1, 1987:2, 1989:4

**argument** [10] - 1941:6, 1943:2, 1952:8, 1964:21, 1979:22, 1981:6, 1982:2, 1997:9, 2007:9, 2008:14

**arguments** [4] - 1941:5, 1941:6, 1968:9, 1987:2

**arising** [1] - 1988:21

**Army** [2] - 1951:24,

1952:5

**arrange** [2] - 1936:19, 1937:10

**arrangement** [2] - 2001:23, 2001:24

**arranger** [24] - 1933:11, 1933:14, 1933:17, 1933:19, 1935:12, 1935:18, 1936:16, 1936:18, 1937:2, 1937:10, 1937:14, 1938:6, 1938:20, 1941:20, 1941:23, 1941:24, 1943:10, 1954:18, 1985:5, 1985:7, 1985:8, 1985:17, 1985:19

**arrow** [1] - 1998:5

**article** [1] - 1950:7

**artificial** [1] - 1934:8

**asserts** [1] - 1933:9

**assume** [4] - 1956:20, 1958:11, 1988:9, 2001:15

**assumption** [1] - 1982:14

**assurance** [1] - 1954:4

**attempt** [2] - 1963:13, 1963:17

**attributable** [1] - 1936:14

**auditor** [1] - 1991:10

**authorities** [1] - 1957:15

**authority** [2] - 1934:5, 1990:19

**average** [1] - 2000:17

**award** [1] - 1975:25

**awarded** [2] - 1974:4, 1974:5

**aware** [4] - 1963:10, 1996:10, 1996:13, 1996:14

---

## B

**B&P** [2] - 1967:12, 1967:17

**baked** [4] - 1963:6, 1963:7, 1966:6, 1975:17

**bakes** [1] - 1969:9

**balance** [1] - 1985:4

**ball** [1] - 1938:25

**bananas** [1] - 1993:24

**bare** [4] - 2005:22, 2005:23, 2006:12,

2007:7

**base** [2] - 1966:7, 1971:25

**based** [17] - 1932:9, 1933:2, 1933:10, 1938:9, 1941:9, 1941:20, 1951:19, 1976:15, 1979:17, 1982:5, 1982:13, 1982:14, 1985:20, 1986:17, 1987:4, 2008:20, 2008:21

**baseline** [1] - 1978:23

**basic** [1] - 1945:18

**basin** [1] - 1952:20

**basins** [1] - 2004:16

**basis** [3] - 1959:17, 1977:11, 1979:6

**batch** [1] - 1983:25

**Bauer** [3] - 1955:4, 2006:13, 2007:5

**bear** [3] - 1936:17, 1937:5, 1948:25

**Beaumont** [3] - 1932:2, 1932:13, 1946:1

**became** [1] - 1937:21

**becomes** [1] - 1976:10

**begin** [2] - 1954:24, 1981:6

**beginning** [1] - 1958:11

**behalf** [2] - 1972:2, 1972:7

**behind** [1] - 1975:14

**benefit** [11] - 1939:3, 1939:23, 1939:24, 1975:1, 1986:9, 1994:2, 1995:8, 1995:18, 1996:20, 2004:9

**Best** [3] - 1945:6, 1954:13, 1954:17

**best** [10] - 1940:10, 1965:19, 1966:7, 1969:5, 1969:20, 1971:18, 1973:11, 1982:9, 1984:10, 2007:22

**better** [4] - 1932:8, 1945:14, 1949:16, 1961:8

**between** [11] - 1945:14, 1947:17, 1967:13, 1967:17, 1968:16, 1976:12, 1976:18, 1977:12, 1977:13, 1979:7, 2000:12

**bid** [1] - 1967:12

**bidding** [1] - 1967:12
**big** [6] - 1956:2, 1959:13, 1960:3, 1994:8, 1994:13, 1995:20
**biggest** [2] - 1989:24, 2001:24
**bills** [1] - 1994:23
**binder** [2] - 2001:10, 2001:13
**binders** [1] - 1981:5
**bit** [7] - 1934:6, 1947:23, 1958:17, 1958:23, 1966:21, 1976:24, 1984:16
**bite** [2] - 1956:4, 1956:11
**Blackman** [2] - 1958:8, 2001:3
**blending** [1] - 1946:4
**blown** [1] - 1993:18
**Board** [2] - 1939:19, 2006:14
**board** [7] - 1955:1, 1957:23, 1957:25, 1958:1, 1958:5, 2007:6, 2008:8
**Bob** [2] - 1951:1, 1951:9
**Boeing** [11] - 1983:6, 1983:9, 1983:14, 1983:16, 1984:5, 1984:8, 1984:9, 2002:1, 2002:12, 2002:25, 2003:6
**books** [1] - 2006:9
**Borgelt** [2] - 2001:2, 2001:4
**bottom** [6] - 1959:9, 1991:1, 1991:9, 1993:11, 2004:11, 2006:24
**branch** [1] - 1985:4
**brief** [3] - 1932:19, 1970:16, 1971:3
**briefly** [1] - 1940:5
**briefs** [1] - 1939:23
**bring** [5] - 1956:16, 1979:6, 1988:23, 1988:24, 1988:25
**bringing** [1] - 1990:20
**brought** [3] - 1931:18, 1972:6, 1989:2
**build** [1] - 1954:8
**building** [18] - 1931:3, 1941:8, 1950:14, 1954:9, 1997:8, 1997:13, 1998:3, 1998:4, 1998:5, 1998:6, 1998:10,

1998:13, 1998:14, 1998:15, 1998:18, 1998:19, 2000:6
**buildings** [1] - 2005:25
**built** [1] - 2004:17
**bump** [2] - 1939:12, 1939:20
**bunch** [3] - 1965:15, 1988:6, 1997:2
**Burbank** [4] - 1973:24, 1974:5, 1974:6, 1989:1
**Burlington** [1] - 1985:20
**burn** [36] - 1932:11, 1932:13, 1935:14, 1937:8, 1949:17, 1949:19, 1949:20, 1949:22, 1949:25, 1950:1, 1950:2, 1950:8, 1950:11, 1952:9, 1985:12, 1985:22, 1985:23, 1985:24, 1986:2, 1986:3, 1986:4, 2005:3, 2005:18, 2005:19, 2005:20, 2005:23, 2005:24, 2006:3, 2006:9, 2006:13, 2007:2, 2007:4, 2007:15, 2008:22
**burning** [4] - 1985:25, 2005:22, 2005:23, 2005:24
**business** [16] - 1957:5, 1959:22, 1960:4, 1960:16, 1962:6, 1962:9, 1963:19, 1986:19, 1987:10, 1987:13, 1987:17, 1987:22, 1987:24, 1988:1, 1988:7, 1990:5
**businesses** [1] - 2004:12
**buyer** [1] - 2001:23
**buyer-seller** [1] - 2001:23

---

# C

**calculate** [1] - 1982:17
**calculations** [2] - 1933:7, 1982:5
**calculus** [1] - 1965:15
**California** [3] - 1957:15, 1969:19, 2006:8

**Camp** [2] - 2005:6, 2005:8
**cannot** [2] - 1932:3, 1988:24
**Canyon** [6] - 1945:22, 1946:1, 1946:10, 1946:13, 1946:19, 2008:23
**capacity** [2] - 1968:17, 1968:18
**capita** [3] - 1931:10, 1931:21, 1941:15
**capita-type** [1] - 1941:15
**capital** [1] - 1941:12
**care** [2] - 1939:2, 1939:17
**careful** [1] - 1957:19
**carries** [1] - 2006:23
**CAS** [2] - 1963:15, 1974:1
**case** [34] - 1932:22, 1933:14, 1934:25, 1936:12, 1938:7, 1950:9, 1952:12, 1955:10, 1957:2, 1957:7, 1957:22, 1960:5, 1966:16, 1966:19, 1966:20, 1967:19, 1968:3, 1968:10, 1968:12, 1968:14, 1980:9, 1980:12, 1981:8, 1984:19, 1984:21, 1985:2, 1985:3, 1985:20, 1989:25, 1994:18, 2003:20, 2009:14
**cases** [17] - 1931:9, 1931:20, 1932:24, 1934:16, 1934:21, 1953:6, 1955:24, 1958:25, 1959:20, 1964:8, 1964:20, 1969:16, 1972:9, 1989:8, 1990:6, 1992:21, 2009:8
**casings** [9] - 1942:23, 1943:18, 1946:14, 1946:15, 1953:1, 1953:23, 1954:22, 1954:23, 2008:21
**catch** [1] - 1994:7
**categories** [1] - 1938:9
**cats** [3] - 1961:8, 1961:13, 1961:22
**caused** [6] - 1933:3, 1941:2, 1946:2, 1950:8, 1997:9,

2003:19
**CERCLA** [25] - 1932:24, 1956:13, 1959:20, 1964:5, 1964:8, 1964:25, 1969:12, 1969:16, 1971:6, 1971:12, 1971:16, 1975:24, 1984:21, 1986:23, 1986:25, 1988:21, 1988:22, 1988:25, 1990:7, 1990:15, 1993:3, 1993:4, 1994:14, 1996:9, 2009:14
**CERCLA-type** [1] - 1964:5
**certain** [8] - 1931:20, 1931:25, 1941:1, 1944:15, 1960:8, 1966:20
**certainly** [3] - 1984:6, 1991:24, 1992:24
**certainty** [2] - 1932:3, 1940:24
**CERTIFICATE** [1] - 2010:1
**certify** [1] - 2010:3
**challenging** [1] - 1955:9
**chance** [2] - 1982:7, 1985:1
**change** [5] - 1958:13, 1963:11, 1965:15, 1970:19, 1981:22
**changed** [2] - 1964:9, 1970:17
**changes** [2] - 1963:7, 2008:8
**characterization** [1] - 1996:21
**charged** [2] - 1963:2, 1976:1
**charging** [1] - 1980:7
**chart** [5] - 1938:23, 1948:16, 1979:17, 1994:4, 1994:5
**charts** [4] - 1938:19, 1976:8, 1977:12, 1977:20
**check** [1] - 1983:24
**chemicals** [1] - 1986:3
**CHEXS** [2] - 1967:10, 1967:14
**circles** [2] - 1997:16, 1997:22
**circuit** [1] - 1968:1
**citation** [3] - 1984:18, 2000:25, 2001:9
**citations** [1] - 1955:3

**cite** [5] - 1941:25, 1950:15, 1993:5, 2001:12, 2001:16
**cited** [3] - 1968:14, 1985:23, 1986:15
**claim** [3] - 1955:17, 1985:9, 1989:1
**Claims** [4] - 1967:4, 1967:5, 1968:3, 1968:4
**claims** [7] - 1971:12, 1988:21, 1988:23, 1988:25, 1990:19, 1990:20, 1993:3
**class** [1] - 2006:15
**clause** [8] - 1936:12, 1942:13, 1942:14, 1942:17, 1943:2, 1943:8, 1944:1, 1944:8
**clay** [1] - 2007:3
**clean** [4] - 1939:20, 1952:1, 1954:9, 1955:13
**cleaned** [1] - 1987:5
**cleanest** [1] - 1951:11
**cleanup** [12] - 1955:8, 1957:14, 1959:19, 1960:2, 1969:17, 1969:18, 1978:6, 1996:4, 1996:8, 1996:12, 2009:2, 2009:13
**cleanups** [4] - 1969:24, 1970:1, 1971:2, 1971:19
**clear** [5] - 1946:1, 1948:2, 1950:17, 1969:13, 1991:22
**clearing** [1] - 2005:25
**clearly** [3] - 1939:6, 1949:24, 1991:16
**clippings** [1] - 1944:4
**clock** [1] - 1965:7
**close** [1] - 1949:22
**closed** [2] - 1970:4, 1970:7
**closing** [5] - 1932:21, 1947:2, 1950:13, 1955:2, 2008:14
**coincide** [1] - 1998:1
**cold** [1] - 1940:1
**colleagues** [1] - 1982:9
**color** [1] - 1998:24
**columns** [1] - 1995:3
**combined** [1] - 1962:10
**coming** [2] - 1964:20, 1992:21

2013

comment [1] - 1985:21
commercial [2] - 1960:4, 1968:16
common [2] - 1953:1, 1992:3
company [1] - 1987:23
compare [1] - 1983:21
compared [1] - 1939:25
complained [1] - 1958:5
completely [1] - 1940:18
compliance [4] - 1946:17, 1958:6, 2006:8, 2007:19
complied [1] - 2006:25
comply [1] - 1957:21
complying [3] - 1958:2, 1958:4
comport [1] - 1946:19
concentrations [3] - 1952:9, 1952:16
concerned [1] - 1965:4
concerns [1] - 1988:20
concession [1] - 1989:22
conclude [2] - 2001:19, 2008:25
conclusion [1] - 2008:13
concrete [1] - 2005:23
conducted [1] - 2004:24
conducting [1] - 2005:1
congressional [2] - 1986:14, 1986:20
cons [1] - 1986:21
consent [6] - 1973:25, 1974:5, 1974:7, 1981:8, 1981:15
consider [4] - 1978:7, 1980:10, 1980:19, 1980:20
consideration [1] - 1967:25
consistent [7] - 1951:11, 1958:14, 1965:8, 1991:25, 2000:7, 2005:13, 2008:15
constant [1] - 1954:11
constructed [1] - 2005:3

construction [1] - 2007:15
consumer [1] - 1963:2
contacted [1] - 2001:4
contaminants [2] - 1951:14, 1952:19
contaminated [1] - 1986:3
contamination [5] - 1969:22, 1987:5, 1997:10, 2003:19, 2003:20
context [1] - 1954:17
contexts [1] - 1931:8
contingently [2] - 1964:7, 1964:17
continue [1] - 1989:13
contract [24] - 1936:5, 1936:8, 1940:22, 1942:6, 1942:15, 1942:19, 1953:15, 1967:11, 1967:14, 1967:15, 1967:16, 1971:24, 1974:9, 1983:5, 1983:6, 2001:24, 2002:4, 2002:9, 2002:18, 2002:22, 2003:4, 2003:24, 2005:12, 2009:15
contract's [1] - 1942:4
contracted [1] - 1937:1
contracting [6] - 1937:4, 1956:25, 1959:25, 1962:11, 1992:6, 2001:24
contractor [20] - 1933:20, 1939:21, 1943:16, 1943:21, 1945:1, 1953:2, 1957:23, 1958:17, 1959:16, 1960:4, 1966:23, 1972:2, 1984:5, 1986:12, 1986:16, 1986:25, 1987:3, 1987:11, 1987:17, 2002:1
contractor's [1] - 1944:6
contractor-related [1] - 1986:25
contractors [13] - 1963:12, 1969:21, 1969:25, 1971:6, 1971:13, 1971:16, 1971:20, 1972:24, 1973:2, 1986:18, 1986:24, 1987:1, 1996:11

contracts [49] - 1936:2, 1936:6, 1936:11, 1940:16, 1941:2, 1942:7, 1942:12, 1942:16, 1942:17, 1943:2, 1943:4, 1943:6, 1943:7, 1943:9, 1943:14, 1943:15, 1944:2, 1956:15, 1957:6, 1957:11, 1967:3, 1967:7, 1967:24, 1968:11, 1969:9, 1969:23, 1974:19, 1975:3, 1977:24, 1987:3, 1987:13, 1987:22, 1988:2, 1988:8, 1990:4, 1993:16, 1994:22, 1995:16, 1996:2, 1996:5, 2002:14, 2002:15, 2002:23, 2003:2, 2003:3, 2004:5, 2009:2
contradicted [1] - 1947:25
contribution [1] - 1952:21
contributions [2] - 1952:14, 1952:17
control [9] - 1932:4, 1945:6, 1983:20, 1983:25, 2007:13, 2007:16, 2007:22, 2008:4, 2008:6
controlled [1] - 2006:6
convenience [1] - 1934:10
convince [1] - 1992:9
cooperate [1] - 1951:23
cooperated [1] - 1969:20
cooperating [1] - 1939:19
cooperation [3] - 1939:2, 1939:17, 1945:3
copied [1] - 1999:19
copy [2] - 1981:9, 1981:10
corner [1] - 1998:5
corporate [1] - 1961:6
corporation [5] - 1959:14, 1959:15, 1959:18, 1960:1
corporations [1] - 1960:11
Corps [1] - 1952:5

correct [5] - 1936:1, 1957:16, 1965:7, 2007:10, 2010:4
correctly [1] - 1972:17
cost [25] - 1942:16, 1942:19, 1943:1, 1943:5, 1943:6, 1943:7, 1961:5, 1961:24, 1962:3, 1963:14, 1963:17, 1964:2, 1965:20, 1965:21, 1965:23, 1966:5, 1974:4, 1979:5, 1980:8, 1994:9, 1994:13, 1995:9, 1995:13
costs [85] - 1932:15, 1956:15, 1957:3, 1957:4, 1957:5, 1957:8, 1957:11, 1958:19, 1959:11, 1959:12, 1959:21, 1960:13, 1961:23, 1962:18, 1962:22, 1962:23, 1963:15, 1963:19, 1964:1, 1964:4, 1964:6, 1964:7, 1964:17, 1965:2, 1965:18, 1966:22, 1966:24, 1966:25, 1967:2, 1967:6, 1967:7, 1967:8, 1967:9, 1967:12, 1967:13, 1967:17, 1967:23, 1969:9, 1969:23, 1970:14, 1970:23, 1970:25, 1971:4, 1971:7, 1971:10, 1973:10, 1973:21, 1974:6, 1974:22, 1975:2, 1975:9, 1976:4, 1976:7, 1976:8, 1976:12, 1976:17, 1977:19, 1978:4, 1979:23, 1980:7, 1980:12, 1986:12, 1986:17, 1986:18, 1987:9, 1987:14, 1987:25, 1994:15, 1994:20, 1995:1, 1995:8, 1996:4, 1996:8, 1996:12, 2005:11, 2008:20, 2009:2, 2009:3, 2009:4, 2009:13, 2009:14
counsel [1] - 1982:5
country [1] - 1953:2
couple [4] - 1935:19,

1966:18, 1967:20, 1981:12
course [2] - 1933:22, 1993:23
COURT [180] - 1931:15, 1934:4, 1934:13, 1935:2, 1935:6, 1935:11, 1935:17, 1935:20, 1935:22, 1936:3, 1936:8, 1936:21, 1936:24, 1937:16, 1937:21, 1937:24, 1938:2, 1940:5, 1940:8, 1940:14, 1941:21, 1944:11, 1944:15, 1950:7, 1950:10, 1950:24, 1951:3, 1951:5, 1951:15, 1953:17, 1953:24, 1954:3, 1955:10, 1955:22, 1956:4, 1956:6, 1956:11, 1956:18, 1956:20, 1956:22, 1957:13, 1957:18, 1958:10, 1958:22, 1959:1, 1959:4, 1959:6, 1959:9, 1960:5, 1960:9, 1960:19, 1960:23, 1961:2, 1961:4, 1961:11, 1961:13, 1961:16, 1961:18, 1961:22, 1961:25, 1962:2, 1962:4, 1962:8, 1962:13, 1962:16, 1962:19, 1962:21, 1962:25, 1963:10, 1963:21, 1965:3, 1966:8, 1966:15, 1967:10, 1967:14, 1967:18, 1967:25, 1968:3, 1968:6, 1968:19, 1968:22, 1970:3, 1970:9, 1970:17, 1971:7, 1971:22, 1972:1, 1972:6, 1972:11, 1972:14, 1972:18, 1972:20, 1972:23, 1973:5, 1973:8, 1973:19, 1973:21, 1974:24, 1976:20, 1978:1, 1978:11, 1979:1, 1979:10, 1979:15, 1979:18, 1979:21, 1980:3, 1980:5, 1980:16, 1980:20, 1980:22, 1981:13,

1981:18, 1981:23, 1982:11, 1983:7, 1983:12, 1984:2, 1984:13, 1984:24, 1985:11, 1987:16, 1988:3, 1988:9, 1988:17, 1989:4, 1989:13, 1989:17, 1989:21, 1990:9, 1990:23, 1991:7, 1991:12, 1991:21, 1992:15, 1993:6, 1993:9, 1993:17, 1993:23, 1994:4, 1996:10, 1996:17, 1996:22, 1997:1, 1997:4, 1997:17, 1997:19, 1997:24, 1998:13, 1998:16, 1999:7, 1999:11, 1999:13, 1999:19, 2000:2, 2000:7, 2001:12, 2001:15, 2001:18, 2002:3, 2002:11, 2002:15, 2002:19, 2002:25, 2003:6, 2003:9, 2004:2, 2004:4, 2004:9, 2005:5, 2005:9, 2005:13, 2005:17, 2006:7, 2006:19, 2006:22, 2007:8, 2007:12, 2009:18, 2010:1

**Court** [16] - 1937:19, 1957:22, 1966:21, 1967:4, 1967:5, 1968:3, 1968:4, 1980:9, 1980:18, 1981:16, 1984:21, 1995:2, 1996:3, 1996:7, 2009:5, 2009:10

**court** [22] - 1933:12, 1933:13, 1933:15, 1933:18, 1933:22, 1933:24, 1935:16, 1935:23, 1937:16, 1938:10, 1939:10, 1939:17, 1941:19, 1942:3, 1954:21, 1956:16, 1973:3, 1981:13, 1985:3, 1989:14, 1991:2

**Court's** [2] - 1950:6, 1978:9

**courtesy** [1] - 2005:11

**courts** [3] - 1931:24, 1934:12, 1939:4

**cover** [2] - 1940:14,

1970:3

**covered** [3] - 1977:17, 2006:11, 2006:13

**create** [1] - 1965:5

**credibility** [2] - 1980:25, 1981:1

**credit** [26] - 1957:12, 1960:14, 1963:4, 1965:16, 1965:18, 1965:19, 1965:20, 1967:8, 1968:11, 1974:15, 1974:19, 1974:22, 1975:4, 1975:9, 1975:11, 1975:18, 1975:21, 1977:18, 1978:20, 1993:9, 1993:16, 1995:17, 1995:18, 2007:8, 2009:12

**credited** [6] - 1974:7, 1974:10, 1974:12, 1995:12, 1995:13, 1995:22

**crediting** [5] - 1969:9, 1973:24, 1974:1, 1974:21, 1993:19

**credits** [2] - 1964:18, 1965:9

**cross** [2] - 1982:8, 1999:14

**cross-examine** [1] - 1982:8

**culpability** [3] - 1939:2, 1939:14, 1950:5

**culpable** [1] - 1939:15

**current** [3] - 1952:21, 1956:24, 1970:12

**customer** [1] - 1964:17

**customers** [4] - 1960:9, 1960:10, 1964:13, 1967:9

**cut** [1] - 1988:9

**cuts** [1] - 1989:3

**cuttings** [1] - 1944:3

## D

**Dade** [1] - 1955:11

**dark** [1] - 1940:19

**date** [4] - 1980:24, 1994:20, 1994:25, 2001:12

**DATE** [1] - 2010:9

**dates** [2] - 1986:12, 1986:13

**Davis** [2] - 1931:9, 1931:23

**day-to-day** [2] - 1944:16, 2001:5

**days** [1] - 1981:12

**DCAA** [1] - 1991:9

**DCAS** [1] - 1946:23

**DDT&E** [1] - 2002:22

**deal** [7] - 1934:5, 1963:15, 1975:21, 1992:12, 2007:14, 2007:16, 2007:17

**dealt** [1] - 1945:2

**dear** [1] - 1968:20

**December** [1] - 1987:12

**decided** [3] - 1955:12, 1970:13, 1985:12

**decision** [6] - 1940:11, 1956:1, 1956:7, 1963:18, 1964:6, 2003:14

**decisions** [2] - 2007:2, 2008:8

**declaration** [3] - 1947:23, 1947:25, 1948:10

**declaratory** [1] - 2009:10

**decrease** [5] - 1990:5, 1993:4, 1993:17, 1994:6, 1994:8

**decreased** [3] - 1993:10, 1993:12, 1993:20

**decreasing** [1] - 2009:6

**decree** [6] - 1973:25, 1974:5, 1974:7, 1981:8, 1981:16

**decrement** [1] - 1974:17

**deducted** [1] - 1984:23

**defective** [1] - 1940:9

**defended** [1] - 1966:24

**defense** [1] - 1992:5

**defenses** [8] - 1989:5, 1989:7, 1989:19, 1992:18, 1992:23, 1992:25

**defined** [2] - 1932:3, 1987:10

**degreaser** [3] - 1997:9, 1998:18, 2000:13

**degrees** [1] - 2000:16

**Delaney** [1] - 1950:18

**delay** [1] - 1969:25

**demonstrates** [1] - 1951:22

**departed** [1] - 1974:1

**Department** [1] - 1980:1

**dependent** [1] - 1960:11

**deposition** [2] - 1948:1, 1948:10

**described** [1] - 2005:21

**design** [4] - 2007:15, 2007:17, 2008:9, 2008:11

**designed** [1] - 2005:3

**destroying** [1] - 2005:21

**details** [1] - 2006:3

**detected** [2] - 1997:7, 1998:22

**detections** [1] - 1998:4

**determinant** [1] - 1935:9

**determination** [1] - 1974:18

**determine** [1] - 1944:16

**determined** [4] - 1936:13, 1937:22, 1938:15, 1976:15

**detriment** [1] - 1994:3

**development** [2] - 2002:13, 2002:18

**Dickey** [6] - 2006:10, 2006:11, 2006:13, 2006:17, 2006:25, 2007:20

**dictated** [1] - 1946:16

**difference** [19] - 1965:10, 1965:11, 1973:10, 1975:8, 1976:12, 1976:18, 1977:3, 1977:5, 1977:12, 1977:13, 1977:14, 1977:15, 1978:14, 1978:19, 1979:3, 1979:7, 1984:7, 2000:11

**differences** [1] - 1956:17

**different** [18] - 1931:7, 1931:8, 1934:19, 1960:15, 1961:5, 1967:22, 1978:18, 1979:15, 1981:18, 1983:22, 1984:19, 1984:20, 1990:17, 1997:24, 1997:25, 2000:21, 2004:14

**differently** [1] - 1970:24

**difficult** [6] - 1932:10, 1932:16, 1932:18, 1932:25, 1936:17, 1940:24

**direct** [10] - 1946:24, 1948:5, 1959:3, 1968:11, 1993:4, 2002:1, 2003:2, 2003:3, 2003:5

**direction** [2] - 1943:17, 1945:5

**directly** [7] - 1942:21, 1948:11, 1964:22, 1965:2, 1967:6, 1969:12, 1978:5

**disagrees** [1] - 1957:7

**disallowance** [1] - 1974:21

**disallowed** [2] - 1973:22, 1973:23

**disc** [12] - 1961:2, 1961:3, 1961:4, 1961:6, 1965:25, 1970:6, 1970:7, 1970:12, 1970:13, 1970:15, 1974:7, 1975:5

**discharge** [1] - 2007:1

**discharged** [1] - 2004:20

**discharges** [1] - 2007:18

**discharging** [1] - 2006:12

**disclosed** [1] - 1974:1

**discontinued** [4] - 1987:10, 1988:5, 1990:10, 1990:12

**discourage** [1] - 1969:24

**discover** [1] - 1990:15

**discovered** [2] - 1990:13, 1990:14

**discredit** [1] - 2001:2

**discrediting** [1] - 2001:7

**discretion** [4] - 1934:15, 1945:13, 1980:19, 2007:11

**discuss** [3] - 1948:23, 1982:1, 1982:19

**discussed** [1] - 1965:6, 1985:22

**discussion** [2] - 1947:17, 1986:21

**discussions** [1] - 1947:11

**dismissing** [1] - 2000:11

**disposal** [21] -

1936:14, 1936:15, 1937:6, 1937:11, 1943:16, 1946:3, 1947:1, 1947:12, 1947:13, 1947:16, 1949:19, 1954:6, 2004:25, 2005:1, 2005:12, 2005:14, 2005:15, 2005:16, 2007:19, 2007:25, 2008:11

**dispose** [13] - 1936:19, 1936:20, 1937:1, 1937:3, 1937:4, 1937:12, 1943:17, 1943:22, 1944:5, 1944:10, 1945:19, 1985:16, 2005:5

**disposed** [3] - 1933:5, 1943:13, 2005:7

**dispute** [2] - 1987:9, 1987:12

**disputed** [1] - 1958:3

**dissolved** [4] - 1950:21, 1950:22, 1951:8, 1951:21

**distance** [1] - 2005:24

**distinction** [3] - 1967:13, 1967:17, 1968:15

**distributed** [1] - 1981:4

**document** [3] - 1981:14, 1991:18, 1991:25

**documents** [6] - 1943:15, 1946:11, 1946:25, 1947:12, 1948:21, 1981:2

**DOD** [13] - 1944:13, 1949:8, 1949:16, 1953:1, 1957:11, 1963:11, 1967:1, 1967:8, 1967:22, 1988:24, 1990:18, 1991:15, 2004:6

**DOD's** [1] - 1986:22

**dogs** [3] - 1961:9, 1961:13, 1961:22

**DOJ** [2] - 1933:9, 1941:23

**doll's** [1] - 1984:6

**Don** [2] - 1947:7, 1947:22

**done** [13] - 1939:7, 1947:18, 1958:6, 1964:4, 1965:9, 1975:13, 1975:24, 1986:4, 1990:18,

1994:19, 1995:3, 2009:20

**DOSA** [18] - 1957:1, 1958:12, 1973:18, 1974:14, 1974:16, 1987:8, 1987:14, 1988:8, 1988:13, 1988:19, 1989:19, 1990:9, 1991:5, 1991:16, 1991:17, 1991:19

**dot** [1] - 1998:15

**dots** [3] - 1999:1, 2000:1

**double** [12] - 1968:10, 1971:3, 1979:25, 1986:9, 1990:8, 1992:19, 1994:17, 1995:2, 2008:24, 2009:6, 2009:8, 2009:20

**doubt** [1] - 1970:20

**down** [20] - 1931:13, 1931:23, 1931:25, 1932:9, 1934:1, 1934:6, 1938:20, 1938:21, 1941:21, 1947:21, 1949:4, 1949:23, 1952:20, 1962:6, 1974:13, 1985:24, 1990:5, 1994:5, 1998:17, 1998:20

**Dr** [6] - 1994:1, 1997:20, 1999:4, 1999:9, 1999:18, 2000:11

**drafted** [4] - 1965:1, 1983:8, 1983:11, 1983:13

**dream** [1] - 1956:9

**drinking** [1] - 2004:16

**drive** [1] - 1932:15

**dropped** [1] - 1971:4

**dull** [1] - 1947:11

**Dull** [1] - 1947:20, 1947:21

**dump** [1] - 2006:15

**dumped** [2] - 2004:20, 2007:25

**dumping** [8] - 1933:3, 1985:22, 1998:10, 2000:8, 2000:14, 2006:15, 2007:6, 2007:18

**during** [7] - 1936:14, 1942:6, 1955:8, 1958:1, 1970:1, 2004:12, 2008:3

**Dynamics** [1] - 1972:3

**E**

**Earl** [1] - 1998:10

**early** [5] - 1963:15, 1969:18, 1969:24, 1969:25, 2003:6

**earned** [2] - 1975:20, 1977:19

**easier** [1] - 1990:24

**easy** [2] - 1975:22, 1980:25

**economic** [7] - 1975:1, 1978:25, 1986:9, 1994:2, 1994:3, 1995:7, 1995:8

**edge** [1] - 1997:11

**effect** [2] - 1959:18, 1995:16

**efficient** [3] - 1963:8, 1964:16, 1969:6

**effluent** [1] - 1952:3

**effort** [1] - 1955:8

**eight** [1] - 1974:8

**either** [2] - 1943:1, 1984:15

**employees** [2] - 2004:19

**encompasses** [2] - 1940:18, 1954:6

**encourage** [1] - 1969:25

**encourages** [4] - 1969:11, 1969:13, 1969:17, 1969:18

**end** [3] - 1942:14, 1982:3, 1994:22

**enforce** [1] - 1956:12

**engaged** [1] - 1944:22

**Engineers** [1] - 1952:5

**ensures** [1] - 2009:11

**enter** [2] - 1981:9, 1981:17

**entered** [4] - 1931:1, 1981:18, 1981:21, 1988:13

**entire** [2] - 1942:25, 1964:13

**entitled** [1] - 1989:23, 2010:5

**environment** [1] - 1942:8

**environmental** [6] - 1931:4, 1955:7, 1957:3, 1963:14, 1963:15, 1986:12

**EPA** [1] - 1998:9

**equal** [1] - 1939:16

**equipment** [11] -

1933:10, 1942:24, 1946:5, 1946:8, 1946:10, 1946:12, 1953:16, 2004:22, 2008:20

**equitable** [20] - 1931:22, 1932:10, 1933:25, 1934:2, 1938:22, 1939:1, 1939:3, 1940:1, 1941:10, 1941:14, 1949:1, 1949:3, 1967:25, 1980:10, 1980:18, 2003:11, 2008:15, 2008:16, 2009:5

**equity** [3] - 1968:6, 1969:4, 1996:7

**especially** [6] - 1968:22, 1974:3, 1986:1, 1986:4, 1992:19, 1992:20

**essentially** [2] - 1975:15, 1975:23

**estimated** [3] - 2009:1, 2009:2, 2009:4

**evaporates** [1] - 2000:23

**evaporation** [5] - 2000:11, 2000:15, 2000:17, 2000:21, 2007:18

**event** [3] - 1963:10, 1990:21, 1991:18

**eventually** [2] - 1953:8, 1970:13

**everywhere** [1] - 1950:2

**evidence** [20] - 1941:4, 1942:15, 1947:9, 1947:19, 1948:17, 1954:11, 1954:15, 1964:19, 1982:23, 1983:3, 1983:19, 1991:5, 1993:5, 1996:21, 2003:4, 2004:25, 2007:22, 2007:23, 2008:15

**evolving** [1] - 1992:19

**exact** [1] - 1946:8

**exactly** [1] - 1962:24

**examine** [1] - 1982:8

**example** [7] - 1933:2, 1933:9, 1939:10, 1960:1, 1987:20, 1989:1, 2000:16

**examples** [1] - 1978:22

**exceeds** [2] - 1990:3, 2009:15

**except** [2] - 1970:4, 1980:10

**exception** [2] - 1985:15, 1985:18

**excerpted** [1] - 1953:12

**exchange** [1] - 1989:22

**excuse** [3] - 1938:14, 1954:18, 1976:10

**executive** [3] - 1966:18, 1967:20, 1985:4

**exercise** [1] - 2009:5

**exercising** [1] - 1968:6

**Exhibit** [4] - 1991:4, 1999:17, 1999:23, 2001:10

**exhibit** [5] - 1948:20, 1982:21, 1997:19, 1997:20, 1999:24

**exist** [3] - 1948:19, 1964:16, 1964:25

**existed** [2] - 1987:21, 1990:16

**existence** [3] - 1984:7, 1987:11, 1987:18

**existing** [3] - 1993:15, 1995:16, 1996:2

**exists** [1] - 1931:4

**expect** [1] - 1964:19

**expense** [1] - 1963:1

**expert** [7] - 1952:12, 1952:13, 1952:15, 1952:23, 1982:10, 2008:4

**experts** [1] - 1982:8

**explain** [2] - 1933:12, 1975:15

**explanation** [1] - 1997:25

**explosives** [1] - 2005:22

**expressed** [1] - 1988:20

**extent** [19] - 1934:22, 1937:5, 1937:10, 1937:15, 1942:20, 1949:1, 1949:7, 1949:14, 1951:20, 1957:2, 1957:4, 1957:7, 1957:10, 1959:20, 1960:8, 1963:5, 1964:18, 1965:2, 1983:16

**extra** [1] - 1977:16

# F

face [5] - 1933:8, 1948:2, 1991:18, 1992:10, 1992:14
faced [1] - 2007:1
facilities [8] - 1932:2, 1932:5, 1940:15, 1946:3, 1953:2, 2004:17, 2005:4, 2007:17
facility [10] - 1931:2, 1932:14, 1934:20, 1937:5, 1944:21, 1944:22, 1947:18, 1948:24, 1952:19, 1954:19
fact [18] - 1931:2, 1933:6, 1942:4, 1946:16, 1946:23, 1947:23, 1949:9, 1952:7, 1980:24, 1986:24, 1988:10, 1988:11, 1988:12, 2000:9, 2000:16, 2001:24, 2007:22, 2008:7
factor [3] - 1940:2, 1949:2, 1965:10
factors [28] - 1931:22, 1931:24, 1932:10, 1933:25, 1934:1, 1934:2, 1935:8, 1938:21, 1938:22, 1939:1, 1939:2, 1939:4, 1939:5, 1941:10, 1941:14, 1949:4, 1965:15, 1975:4, 1975:6, 1975:7, 2003:11, 2003:15, 2008:16, 2008:17
facts [10] - 1931:6, 1931:20, 1932:1, 1933:6, 1933:16, 1936:1, 1946:20, 1949:5, 1952:11, 1984:19
factual [3] - 1933:1, 1933:2, 1941:7
fairly [1] - 1952:1
far [1] - 1957:19
FAR [3] - 1957:1, 1986:17, 1987:24
fault [1] - 1986:23
favor [1] - 1987:3
Federal [4] - 1967:4, 1967:5, 1968:4, 1996:6

federal [15] - 1938:6, 1938:10, 1941:20, 1956:1, 1956:24, 1957:6, 1957:9, 1957:10, 1959:25, 1966:6, 1966:23, 1967:3, 1968:1, 1969:24, 1971:5
feeds [1] - 1956:4
Feenstra [4] - 1951:4, 1951:10, 1952:13, 2000:11
Feenstra's [4] - 1997:20, 1999:4, 1999:9, 1999:18
fees [5] - 1960:25, 1961:9, 1963:22, 1980:7, 1996:5
fence [1] - 1960:7
few [2] - 1982:1, 1996:15
fewer [1] - 1960:10
field [1] - 1969:21
fight [1] - 1957:21
figure [5] - 1965:22, 1976:1, 1977:22, 1997:23, 1999:18
figured [1] - 1975:15
figures [1] - 1979:18
filings [1] - 1973:3
final [2] - 1946:4, 1985:21
finally [1] - 2001:19
findings [3] - 1933:1, 1941:7, 1981:1
fine [1] - 1981:24
finish [1] - 1968:25
fire [1] - 1944:24
fires [2] - 1986:1, 2006:1
firm [1] - 1972:2
first [10] - 1948:19, 1981:6, 1982:3, 1982:17, 1982:23, 1996:23, 2001:20, 2002:19, 2002:20, 2003:23
fit [3] - 1943:13, 2003:12, 2008:17
fits [2] - 1932:8, 1938:20
five [5] - 1965:24, 1965:25, 1966:5, 1974:11, 2002:19
fixed [5] - 1936:12, 1942:12, 1993:15, 1995:16, 1996:2
fixed-price [4] - 1942:12, 1993:15, 1995:16, 1996:2

fixes [1] - 1966:1
flipped [1] - 1960:15
floating [1] - 1970:10
flow [1] - 1962:4
flows [2] - 1938:21, 1962:6
focus [1] - 1984:2
focused [1] - 2008:3
follow [1] - 1932:2
following [2] - 1932:6, 1954:14
Foods [3] - 1945:6, 1954:13, 1954:17
footnote [5] - 1971:4, 1971:8, 1979:23, 1980:4, 1980:5
Force [2] - 1946:23, 1946:24
forced [4] - 2003:24, 2003:25, 2004:11, 2004:13
foregoing [1] - 2010:4
forever [3] - 1942:19, 1943:9, 1956:15
forgot [1] - 1984:4
forth [1] - 1974:5
forward [3] - 1974:11, 1978:23, 1979:6
fought [3] - 1957:24
framework [1] - 1931:6
frank [1] - 1934:14
friend [1] - 1968:15
front [1] - 1968:15
full [6] - 1963:4, 1968:9, 1974:20, 1975:25, 1993:18, 2009:12
full-blown [1] - 1993:18
fully [1] - 1933:12
fund [1] - 1963:1
funding [1] - 1967:23
furnished [3] - 1942:22, 1942:24, 1953:16
future [19] - 1932:16, 1963:5, 1964:18, 1969:8, 1969:9, 1970:3, 1970:6, 1970:23, 1970:25, 1973:10, 1975:7, 1975:19, 1990:4, 1990:14, 1993:7, 1994:2, 1995:9, 2009:4, 2009:11

# G

G&A [7] - 1960:24, 1962:4, 1962:10, 1963:23, 1966:25, 1967:2
gas [4] - 1997:13, 1997:14, 1998:9, 2000:4
GE [2] - 1960:1, 1972:2
general [2] - 1984:13, 1984:14
General [1] - 1972:3
generated [1] - 2004:24
GFE [4] - 1942:23, 1942:24, 1943:1, 1953:16
gild [1] - 1957:19
given [5] - 1948:16, 1964:10, 1966:8, 1980:24, 1984:7
Goodrich [2] - 1957:22, 1958:15
goods [1] - 1959:17
Gore [3] - 1931:24, 1933:25, 1939:5
government [94] - 1932:19, 1933:13, 1933:16, 1933:17, 1935:24, 1936:14, 1936:23, 1936:25, 1937:4, 1937:12, 1937:15, 1937:17, 1938:6, 1938:11, 1938:12, 1939:11, 1939:20, 1940:1, 1941:17, 1941:20, 1942:21, 1942:22, 1942:23, 1942:24, 1942:25, 1943:10, 1943:17, 1943:19, 1943:20, 1943:21, 1944:1, 1944:24, 1946:3, 1946:18, 1948:3, 1948:5, 1948:9, 1948:12, 1949:11, 1953:2, 1953:14, 1953:16, 1954:12, 1954:18, 1954:21, 1954:22, 1955:11, 1956:1, 1956:25, 1957:9, 1957:10, 1958:16, 1959:16, 1959:25, 1960:3, 1960:6, 1960:10, 1960:11, 1960:12, 1960:17,

1966:6, 1966:17, 1966:23, 1967:3, 1967:7, 1971:3, 1971:5, 1971:13, 1971:15, 1971:19, 1972:2, 1972:24, 1973:2, 1974:19, 1975:8, 1978:13, 1978:21, 1983:13, 1984:4, 1984:25, 1985:2, 1987:3, 1991:12, 1994:22, 1996:5, 1996:11, 1996:12, 2001:23, 2004:5, 2009:1
government's [9] - 1933:2, 1933:11, 1939:13, 1942:19, 1943:9, 1950:13, 1963:6, 1964:21, 1968:9
government-dependent [1] - 1960:11
government-furnished [3] - 1942:22, 1942:24, 1953:16
government-imposed [1] - 1946:18
government-owned [1] - 1946:3
great [2] - 1940:8, 1962:13
Great [2] - 1972:9, 1972:11
greater [1] - 1952:17
green [3] - 1999:2, 1999:3, 2000:1
grinding [1] - 1946:4
grossly [1] - 1945:24
ground [15] - 1945:4, 1952:22, 1986:6, 1998:12, 2001:5, 2004:20, 2004:21, 2005:22, 2005:24, 2006:4, 2006:5, 2006:12, 2006:16, 2007:7, 2008:1
groundwater [3] - 1951:10, 1951:11, 1997:10
guarantee [1] - 1972:25
guess [3] - 1965:17, 1968:3, 1970:19
guesses [1] - 1951:19
guidance [2] - 1943:21, 1989:14

**guided** [1] - 1944:13
**guys** [1] - 1992:1

# H

**hampered** [1] - 1980:24
**hand** [1] - 1956:4
**handing** [1] - 1981:24
**handled** [2] - 1950:3, 2004:24
**handling** [1] - 1949:6
**hands** [1] - 1997:4
**happy** [1] - 2009:20
**harbor** [1] - 1972:15
**hard** [2] - 1968:20, 1989:24
**harder** [1] - 1931:16
**hazard** [1] - 1949:24
**heard** [1] - 1931:5
**hearings** [3] - 1986:14, 1986:16, 1986:20
**heating** [1] - 1962:23
**held** [1] - 1949:14
**help** [1] - 1988:10
**helped** [1] - 1944:25
**helpful** [1] - 1980:23
**herring** [1] - 1944:8
**high** [4] - 1953:11, 1953:21, 1954:1, 1976:20
**high-pressure** [3] - 1953:11, 1953:21, 1954:1
**higher** [5] - 1952:8, 1952:15, 1952:16, 1963:1, 1994:24
**highways** [1] - 2005:25
**hill** [1] - 1994:5
**himself** [2] - 1947:11, 1982:7
**hired** [1] - 2004:18
**historical** [4] - 1963:10, 1980:25, 1988:10, 1988:12
**historically** [1] - 1987:8
**history** [3] - 1986:11, 2001:9, 2001:17
**hit** [4] - 1959:13, 1969:2, 1994:9, 1994:10
**hog** [7] - 1952:25, 1953:1, 1953:8, 1953:13, 1953:24, 2005:4, 2007:16
**hog-out** [7] - 1952:25,

1953:1, 1953:8, 1953:13, 1953:24, 2005:4, 2007:16
**hogging** [1] - 1984:17
**hogging-out** [1] - 1984:17
**hold** [1] - 1963:25
**holding** [1] - 1964:8
**Honor** [174] - 1931:5, 1931:17, 1932:7, 1932:22, 1934:11, 1934:17, 1935:1, 1935:7, 1935:10, 1935:15, 1935:18, 1935:23, 1936:6, 1936:22, 1937:7, 1938:1, 1938:3, 1938:18, 1938:23, 1939:23, 1940:7, 1940:12, 1940:20, 1942:16, 1944:2, 1944:8, 1944:13, 1944:18, 1945:21, 1946:7, 1946:20, 1947:2, 1948:1, 1948:15, 1948:18, 1948:20, 1949:12, 1949:17, 1950:2, 1950:9, 1950:12, 1950:13, 1950:17, 1951:6, 1951:12, 1951:17, 1952:11, 1952:22, 1952:25, 1953:19, 1953:23, 1953:25, 1954:7, 1954:19, 1955:6, 1955:14, 1955:16, 1955:17, 1955:20, 1955:24, 1955:25, 1956:5, 1956:8, 1956:14, 1956:21, 1957:2, 1957:7, 1957:17, 1957:21, 1957:23, 1958:21, 1959:8, 1959:15, 1960:2, 1960:8, 1960:18, 1960:22, 1961:1, 1961:14, 1961:20, 1962:12, 1962:15, 1963:4, 1963:9, 1963:16, 1963:24, 1964:10, 1964:14, 1964:20, 1964:24, 1965:16, 1965:22, 1966:1, 1966:4, 1966:10, 1966:17, 1966:20, 1967:16, 1968:5, 1968:7, 1968:10, 1969:5, 1969:24,

1970:11, 1970:22, 1971:14, 1971:23, 1971:25, 1972:3, 1972:4, 1972:13, 1972:22, 1972:25, 1973:2, 1973:7, 1973:14, 1973:23, 1974:13, 1974:25, 1975:13, 1975:22, 1976:23, 1977:6, 1979:2, 1979:14, 1979:16, 1980:4, 1981:5, 1981:6, 1981:15, 1982:16, 1984:18, 1985:19, 1985:25, 1986:7, 1988:13, 1988:18, 1989:11, 1989:12, 1990:4, 1990:22, 1992:17, 1992:25, 1994:13, 1994:17, 1995:3, 1996:3, 1996:16, 1998:3, 1998:7, 1998:24, 1999:16, 1999:24, 2000:5, 2001:8, 2001:19, 2001:21, 2002:8, 2002:10, 2002:14, 2003:1, 2003:8, 2003:10, 2003:21, 2005:20, 2006:6, 2006:24, 2007:11, 2007:14, 2008:6, 2008:13, 2008:25, 2009:16
**honor** [1] - 1958:7
**horn** [1] - 1958:23
**Hudson** [1] - 1960:2
**huge** [2] - 1960:1, 1994:10
**Hughes** [1] - 1968:13
**hurt** [1] - 1988:11
**hydrogeologists** [2] - 1950:19, 1950:20, 1951:7
**hydrologist** [2] - 1951:2, 1951:5
**hydrologists** [2] - 1950:24, 1951:19
**hypothetical** [1] - 1965:4
**hypotheticals** [1] - 1982:6

# I

**idea** [2] - 1944:6, 1999:14
**identified** [1] - 1996:11

**II** [3] - 1970:12, 2003:25, 2004:12
**III** [1] - 2006:15
**illustrate** [1] - 1934:25
**impact** [3] - 1979:4, 1993:15, 2008:24
**impacts** [2] - 1969:11, 1973:12
**imperfect** [1] - 1965:14
**implicated** [1] - 1947:13
**implication** [1] - 1943:12
**important** [10] - 1946:2, 1950:19, 1952:18, 1955:6, 1956:23, 1967:21, 1988:24, 2003:16, 2003:18, 2003:23
**importantly** [3] - 1951:14, 1951:22, 1951:25
**impose** [1] - 1953:13
**imposed** [2] - 1944:25, 1946:18
**impossible** [2] - 1952:22, 1952:24
**include** [4] - 1960:24, 1986:18, 1995:15, 1996:1
**including** [4] - 1998:9, 2004:19, 2004:22, 2009:2
**incorporate** [2] - 1954:5, 1954:9
**incorporating** [1] - 1956:25
**incorrectly** [2] - 1950:1, 1950:3
**incur** [1] - 1959:16
**indemnification** [3] - 2000:25, 2001:8, 2001:14
**indemnities** [1] - 1939:3
**indemnity** [6] - 1940:3, 1940:5, 1940:8, 1940:12, 1940:15, 1940:17
**indicate** [3] - 1951:13, 1952:17, 2001:10
**indicated** [1] - 1995:11
**indicates** [1] - 1983:19
**indication** [2] - 1943:20, 1948:8
**indirect** [4] - 1959:21, 1967:3, 1967:6,

1967:23
**indirectly** [2] - 1959:6, 1964:23
**indisputable** [1] - 1993:13
**industrial** [1] - 1971:24
**industry** [1] - 1939:12
**information** [1] - 1940:25
**initial** [1] - 1939:8
**insofar** [1] - 1958:18
**inspect** [1] - 1983:20
**inspected** [3] - 1944:14, 1945:1, 1945:19
**inspecting** [1] - 1945:20
**inspections** [6] - 1937:9, 1946:22, 1983:20, 1984:1, 2007:14, 2007:16
**inspectors** [1] - 1954:14
**install** [1] - 2007:4
**instance** [1] - 1940:15
**instances** [1] - 1958:8
**instruction** [1] - 2008:22
**instructive** [1] - 1967:19
**intent** [1] - 1991:19
**intentional** [1] - 1985:16
**interest** [10] - 1942:14, 1942:18, 1952:3, 1965:14, 1975:24, 1977:2, 1977:4, 1990:20, 1995:10, 1995:22
**interests** [1] - 1985:4
**internet** [1] - 1986:15
**interpret** [1] - 1991:19
**interpreted** [1] - 1991:5
**interprets** [1] - 1991:17
**intertwined** [1] - 1932:17
**introduced** [1] - 1932:21
**inventory** [6] - 1943:11, 1943:19, 1943:25, 1944:4, 1944:7, 1944:9
**involve** [1] - 2002:12
**involved** [7] - 1931:11, 1931:19, 1937:13, 1945:17, 1983:17, 2001:5, 2003:6

**involvement** [1] - 1984:7
**involves** [1] - 1984:19
**IRS** [5] - 1966:22, 1966:23, 1966:24, 1967:8, 1967:22
**Irwin** [2] - 2005:6, 2005:8
**Island** [1] - 1972:15
**isolated** [1] - 1932:3
**issue** [15] - 1955:19, 1963:22, 1966:7, 1970:24, 1971:3, 1973:14, 1973:16, 1980:10, 1982:19, 1986:9, 1988:6, 1992:22, 1993:2, 2009:10
**issued** [4] - 1948:4, 1948:7, 1948:9, 1957:15
**issues** [5] - 1949:10, 1954:4, 1963:18, 1966:20, 1996:21

### J

**January** [2] - 1991:18, 2000:17
**Jim** [1] - 1947:24
**Joan** [7] - 1966:12, 1966:14, 1975:5, 1975:21, 1976:7, 1977:9, 1978:22
**John** [3] - 1956:9, 1976:14, 1980:1
**Judge** [6] - 1938:4, 1968:15, 1968:19, 1968:24, 1972:11, 1972:18
**judge** [2] - 1972:16, 1981:1
**judgment** [3] - 1963:1, 1978:23, 2009:10
**jumped** [1] - 1956:8
**jumping** [1] - 1955:13
**Justice** [1] - 1980:1

### K

**Kaneshiro** [1] - 2010:3
**KANESHIRO** [1] - 2010:9
**Kaneshiro-Miller** [1] - 2010:3
**KANESHIRO-MILLER** [1] - 2010:9
**KBR** [1] - 1950:9

**keep** [2] - 1956:15, 1979:11
**keeps** [1] - 1963:7
**kept** [1] - 1964:8
**key** [6] - 1982:15, 1987:12, 1990:18, 1992:17, 1997:11, 2003:17
**kicked** [1] - 2002:16
**kicks** [1] - 1993:18
**Kiefer** [3] - 1982:6, 1982:8, 1982:16
**Kiefer's** [1] - 1982:6
**kind** [4] - 1931:5, 1945:13, 1982:10, 2007:7
**kinds** [2] - 1990:19, 2006:1
**knowing** [1] - 1964:17
**knowingly** [2] - 1992:10, 1992:14
**knowledge** [11] - 1939:2, 1939:10, 1939:11, 1939:12, 1949:5, 1949:8, 1949:15, 1950:4, 1955:3, 1980:25
**known** [2] - 1963:21, 1990:10
**knows** [1] - 1993:11

### L

**Lab** [1] - 1946:24
**lab** [1] - 1998:11
**LaBorde** [7] - 1941:24, 1945:22, 1946:1, 1946:10, 1946:13, 1946:19, 2008:23
**lack** [4] - 1940:25, 1945:13, 1961:8, 1980:25
**ladling** [1] - 1998:11
**landfill** [1] - 1934:18
**language** [1] - 1964:2
**large** [8] - 1943:5, 1946:6, 1950:5, 1953:4, 1953:7, 1953:8, 1971:25
**larger** [1] - 1960:4
**largest** [1] - 1940:21
**Larry** [1] - 2001:2
**Larson** [1] - 1972:16
**last** [2] - 1980:3, 1981:12
**lastly** [1] - 1955:6
**late** [1] - 1986:13
**latest** [2] - 1940:22,

1950:7
**laughter** [1] - 1961:21
**law** [10] - 1934:15, 1967:24, 1970:14, 1970:17, 1970:19, 1985:3, 2001:15, 2001:17, 2006:8, 2006:9
**lawsuit** [2] - 1972:5, 1980:8
**lawsuits** [1] - 1973:4
**leach** [1] - 1986:5
**leader** [1] - 1939:11
**learned** [2] - 1949:10, 1992:22
**least** [6] - 1980:23, 1984:17, 1989:18, 1994:25, 2004:5, 2009:20
**leave** [2] - 1964:21, 2006:5
**leaves** [1] - 1976:12
**led** [1] - 1955:8
**left** [3] - 1934:6, 1952:19, 1974:12
**legacy** [1] - 1931:4
**legal** [6] - 1960:25, 1961:9, 1962:22, 1980:7, 1994:23, 1996:5
**Legal** [1] - 1962:13
**legend** [4] - 1999:7, 1999:20
**legislative** [2] - 2001:9, 2001:16
**length** [1] - 1940:3
**Leon** [2] - 1972:11, 1972:18
**less** [1] - 1994:12
**letter** [6] - 1951:7, 1951:13, 1951:22, 1951:24, 1955:18
**letters** [2] - 1943:14, 1943:15
**level** [3] - 1944:15, 1951:15, 1961:6
**liability** [18] - 1936:16, 1936:18, 1937:7, 1937:24, 1938:6, 1938:9, 1938:10, 1941:20, 1941:23, 1943:10, 1944:25, 1945:15, 1945:16, 1946:22, 1948:25, 1985:5, 1985:17
**liable** [4] - 1945:12, 1949:14, 1954:21, 1985:6
**lightly** [1] - 1956:3
**likely** [1] - 1941:4

**lily** [1] - 1957:19
**limited** [3] - 1985:15, 1985:18, 1988:4
**line** [8] - 1959:9, 1962:25, 1991:1, 1991:9, 1993:11, 2004:11, 2006:24, 2007:3
**liners** [1] - 2007:3
**liquids** [6] - 1949:19, 1949:25, 1985:22, 2006:4, 2006:15
**list** [4] - 1947:3, 1948:14, 1948:15, 1948:20
**litigation** [2] - 1957:25, 1969:25
**litigations** [2] - 1970:1, 1973:1
**live** [2] - 1953:22, 1954:1
**living** [1] - 1964:12
**LMC** [1] - 1965:1
**LMC's** [1] - 1979:4
**lobbying** [1] - 1963:22
**location** [1] - 2004:15
**Lockheed** [69] - 1955:24, 1956:2, 1956:3, 1957:3, 1958:1, 1961:6, 1965:23, 1971:2, 1971:13, 1972:7, 1972:10, 1972:21, 1974:14, 1974:17, 1974:22, 1975:3, 1976:4, 1980:7, 1983:2, 1983:9, 1983:11, 1983:13, 1984:15, 1984:16, 1985:6, 1985:9, 1987:17, 1987:19, 1987:20, 1987:25, 1988:23, 1989:2, 1989:22, 1989:23, 1991:4, 1991:10, 1991:16, 1993:2, 1993:3, 1994:17, 1994:21, 1995:6, 1995:11, 1995:15, 1996:4, 1996:7, 1997:6, 1997:12, 2000:10, 2001:1, 2001:20, 2001:22, 2001:25, 2002:12, 2003:13, 2003:21, 2003:24, 2004:15, 2004:16, 2004:18, 2004:21, 2004:23, 2005:2, 2005:13, 2007:24, 2008:6,

2008:25, 2009:11
**Lockheed's** [10] - 1958:5, 1974:7, 1982:5, 1983:15, 1984:18, 1993:4, 1994:14, 1995:7, 1995:9, 2009:9
**lodged** [2] - 1981:9, 1981:16
**look** [34] - 1931:22, 1934:12, 1937:2, 1938:25, 1939:4, 1942:6, 1945:21, 1950:21, 1951:8, 1953:6, 1955:18, 1957:23, 1958:24, 1959:15, 1959:21, 1965:21, 1966:16, 1975:6, 1976:6, 1977:1, 1977:11, 1979:5, 1979:7, 1981:24, 1986:20, 1994:4, 1994:5, 1995:19, 1997:15, 1998:9, 1998:17, 1998:25
**looked** [13] - 1931:7, 1931:8, 1933:24, 1936:15, 1939:10, 1939:18, 1945:2, 1948:1, 1950:19, 1951:7, 1958:25, 1967:22, 1975:13
**looking** [14] - 1933:13, 1933:15, 1938:8, 1952:20, 1953:18, 1957:1, 1968:7, 1971:24, 1975:21, 1976:2, 1976:3, 1984:21, 2000:20, 2001:18
**looks** [2] - 1933:4, 1983:1
**loss** [2] - 1995:17, 1995:24
**lost** [1] - 1939:25
**low** [2] - 1950:23, 1951:21
**lower** [4] - 1951:9, 1975:4, 1975:25, 1976:1
**LPC** [11] - 1932:3, 1939:24, 1942:21, 1943:16, 1948:4, 1948:7, 1948:9, 1952:3, 1953:10, 2008:8

# M

**magnitude** [1] - 2002:6
**main** [5] - 1955:7, 2002:14, 2002:15, 2002:17
**maintained** [1] - 2004:22
**major** [5] - 1952:10, 1971:13, 1971:19, 1973:2, 2005:18
**majority** [3] - 1945:9, 1952:19, 1960:16
**manage** [1] - 1944:25
**managed** [2] - 2004:19, 2004:24
**management** [1] - 1945:5
**manual** [1] - 1985:23
**manuals** [7] - 1936:15, 1937:9, 1944:13, 1945:1, 1945:18, 1949:21, 2005:21
**manufacturing** [5] - 1983:21, 1983:22, 1983:24, 2002:9, 2008:7
**map** [2] - 1997:15, 1997:18
**marbles** [5] - 1933:19, 1933:20, 1938:14, 1945:14
**margin** [3] - 1993:10, 1993:12, 1993:19
**market** [1] - 2004:6
**Martin** [13] - 1955:24, 1956:2, 1958:2, 1961:6, 1965:24, 1971:2, 1972:10, 1972:21, 1974:14, 1974:17, 1976:4, 1993:2, 1994:17
**Martin's** [2] - 1957:3, 1975:3
**mass** [1] - 1952:19
**material** [3] - 1942:18, 1986:5, 2007:7
**materials** [6] - 1942:20, 1943:18, 1943:22, 1949:13, 1949:15, 2006:12
**mathematical** [1] - 1940:24
**matrix** [27] - 1932:8, 1932:21, 1932:22, 1932:23, 1932:24, 1932:25, 1933:2,

1933:8, 1934:6, 1934:16, 1934:17, 1934:20, 1934:22, 1934:23, 1935:8, 1938:17, 1938:24, 1941:11, 1941:24, 1944:19, 1945:9, 1980:22, 1985:13, 2003:12, 2003:13, 2003:14
**matter** [1] - 1952:3, 1955:12, 1959:13, 1992:4, 2010:5
**Matz** [1] - 1938:4
**McKee** [2] - 1955:2, 1955:3
**mean** [25] - 1935:20, 1935:22, 1943:25, 1944:15, 1948:19, 1949:17, 1954:20, 1955:12, 1955:16, 1957:21, 1958:24, 1962:25, 1964:14, 1970:20, 1979:22, 1980:11, 1983:9, 1983:12, 1985:1, 1989:17, 1992:13, 1992:25, 2004:5, 2005:17, 2005:20
**meaning** [2] - 1953:16, 1963:2
**means** [3] - 1936:9, 1952:9, 1953:24
**meant** [2] - 1971:8, 1980:3
**measure** [3] - 1933:4, 1934:17, 1979:9
**measurements** [1] - 1933:7
**measuring** [1] - 1932:13
**mediation** [1] - 1960:13
**meet** [1] - 1955:3
**mention** [2] - 1950:18, 2000:24
**mentioned** [5] - 1942:8, 1950:14, 1952:7, 1952:25, 1966:17
**merely** [1] - 1983:5
**merit** [1] - 1931:10
**Meyer** [3] - 1977:10, 1978:22, 1994:1
**Meyer's** [6] - 1966:12, 1966:14, 1975:5, 1975:22, 1976:8, 1976:14
**Miami** [1] - 1955:11
**Miami-Dade** [1] -

1955:11
**middle** [1] - 1984:5
**might** [8] - 1931:10, 1934:16, 1949:10, 1953:3, 1959:10, 1959:13, 1965:6, 1983:24
**miles** [1] - 1952:20
**military** [1] - 1985:23
**Miller** [1] - 2010:3
**MILLER** [1] - 2010:9
**million** [52] - 1950:15, 1958:19, 1958:20, 1965:22, 1965:23, 1965:24, 1974:4, 1974:6, 1974:9, 1974:10, 1974:11, 1974:12, 1974:15, 1974:16, 1974:17, 1974:18, 1975:7, 1975:8, 1975:10, 1975:16, 1976:6, 1976:8, 1976:10, 1976:11, 1976:13, 1976:16, 1976:17, 1977:1, 1977:3, 1977:5, 1977:16, 1977:18, 1977:23, 1978:12, 1978:14, 1978:18, 1978:19, 1979:1, 1979:2, 1994:21, 1994:23, 1994:25, 1995:8, 1995:9, 1995:10, 1995:14, 1995:23, 1996:1, 2009:1
**mills** [1] - 1946:4
**mind** [1] - 1981:24
**mini** [2] - 1970:16, 1971:3
**minute** [4] - 1947:5, 1960:23, 1962:21, 1987:16
**miscellaneous** [2] - 1962:19, 1962:20
**missile** [7] - 1942:23, 1943:17, 1953:23, 1954:2, 1954:8, 1954:9, 2004:4
**missiles** [3] - 1931:3, 1941:9, 1953:15
**misstate** [1] - 1953:5
**misunderstand** [1] - 1973:18
**mixer** [2] - 1946:5, 1946:6
**model** [3] - 1977:10, 1978:24
**models** [1] - 1966:12
**modest** [1] - 2000:12

**money** [15] - 1937:13, 1939:24, 1939:25, 1959:1, 1959:5, 1959:6, 1959:10, 1965:11, 1966:2, 1973:16, 1975:10, 1975:20, 1976:2, 1976:3, 1979:4
**monitoring** [1] - 1954:11
**moreover** [1] - 1982:24
**morning** [5] - 1982:2, 1985:6, 1985:22, 1986:8, 1986:10
**most** [11] - 1931:21, 1940:22, 1948:21, 1950:18, 1952:18, 1963:8, 1964:15, 1969:6, 2002:9, 2003:18, 2007:24
**motion** [2] - 1981:9, 1981:16
**motions** [1] - 1968:14
**Motor** [1] - 1947:8
**motor** [10] - 1943:5, 1946:7, 1953:1, 1953:4, 1953:7, 1953:9, 1954:22, 1954:23, 2008:12, 2008:21
**motors** [4] - 1936:4, 1943:5, 1982:22, 2008:10
**mountain** [1] - 1994:6
**move** [10] - 1931:22, 1931:24, 1932:9, 1938:17, 1938:25, 1939:7, 1941:9, 1941:14, 1961:20, 1986:7
**moved** [2] - 1934:1, 2000:24
**moves** [1] - 1949:4
**moving** [2] - 1978:23, 1984:18
**MR** [185] - 1931:14, 1931:17, 1934:11, 1934:15, 1935:5, 1935:7, 1935:15, 1935:18, 1935:21, 1935:23, 1936:6, 1936:10, 1936:22, 1936:25, 1937:19, 1937:23, 1938:1, 1938:3, 1940:7, 1940:11, 1940:20, 1941:22, 1944:12, 1944:18, 1950:9, 1950:12, 1951:1,

1951:4, 1951:6, 1951:17, 1953:19, 1953:25, 1954:7, 1955:14, 1955:23, 1956:5, 1956:7, 1956:12, 1956:19, 1956:21, 1956:23, 1957:17, 1957:20, 1958:21, 1958:24, 1959:3, 1959:5, 1959:8, 1959:14, 1960:8, 1960:18, 1960:21, 1961:1, 1961:3, 1961:5, 1961:12, 1961:14, 1961:17, 1961:19, 1961:23, 1962:1, 1962:3, 1962:6, 1962:9, 1962:15, 1962:17, 1962:20, 1962:22, 1963:3, 1963:13, 1963:24, 1965:16, 1966:10, 1966:16, 1967:11, 1967:15, 1967:19, 1968:2, 1968:4, 1968:7, 1968:21, 1969:1, 1970:7, 1970:11, 1970:22, 1971:11, 1971:23, 1972:3, 1972:9, 1972:13, 1972:15, 1972:19, 1972:21, 1972:25, 1973:6, 1973:9, 1973:20, 1973:23, 1974:25, 1976:22, 1978:2, 1978:12, 1979:2, 1979:13, 1979:16, 1979:25, 1980:4, 1980:6, 1980:18, 1980:21, 1981:4, 1981:15, 1981:20, 1982:1, 1982:13, 1983:10, 1983:15, 1984:9, 1984:14, 1985:1, 1985:14, 1987:19, 1988:5, 1988:12, 1988:18, 1989:6, 1989:16, 1989:19, 1990:2, 1990:12, 1991:1, 1991:8, 1991:14, 1992:13, 1992:17, 1993:8, 1993:14, 1993:21, 1993:25, 1994:8, 1996:13, 1996:18, 1996:25, 1997:2, 1997:6, 1997:18, 1997:20, 1998:2, 1998:14,

1998:17, 1998:24, 1999:2, 1999:4, 1999:6, 1999:9, 1999:12, 1999:16, 1999:17, 1999:21, 1999:23, 1999:24, 2000:3, 2000:9, 2001:13, 2001:16, 2002:7, 2002:14, 2002:17, 2002:20, 2002:22, 2003:1, 2003:8, 2003:10, 2004:3, 2004:8, 2004:11, 2005:7, 2005:10, 2005:15, 2005:20, 2006:11, 2006:21, 2006:24, 2007:10, 2007:13
**Mulder** [1] - 1998:21
**multi** [1] - 1934:18
**multi-party** [1] - 1934:18
**multiple** [1] - 1949:12
**multiply** [1] - 1979:8
**Murphy** [5] - 1981:10, 1982:9, 1982:20, 1984:2, 1985:5
**MURPHY** [114] - 1931:14, 1931:17, 1934:11, 1934:15, 1935:5, 1935:7, 1935:15, 1935:18, 1935:21, 1935:23, 1936:6, 1936:10, 1936:22, 1936:25, 1937:19, 1937:23, 1938:1, 1938:3, 1940:7, 1940:11, 1940:20, 1941:22, 1944:12, 1944:18, 1950:9, 1950:12, 1951:1, 1951:4, 1951:6, 1951:17, 1953:19, 1953:25, 1954:7, 1955:14, 1955:23, 1956:5, 1956:7, 1956:12, 1956:19, 1956:21, 1956:23, 1957:17, 1957:20, 1958:21, 1958:24, 1959:3, 1959:5, 1959:8, 1959:14, 1960:8, 1960:18, 1960:21, 1961:1, 1961:3, 1961:5, 1961:12, 1961:14, 1961:17, 1961:19, 1961:23, 1962:1, 1962:3, 1962:6, 1962:9,

1962:15, 1962:17, 1962:20, 1962:22, 1963:3, 1963:13, 1963:24, 1965:16, 1966:10, 1966:16, 1967:11, 1967:15, 1967:19, 1968:2, 1968:4, 1968:7, 1968:21, 1969:1, 1970:7, 1970:11, 1970:22, 1971:11, 1971:23, 1972:3, 1972:9, 1972:13, 1972:15, 1972:19, 1972:21, 1972:25, 1973:6, 1973:9, 1973:20, 1973:23, 1974:25, 1976:22, 1978:2, 1978:12, 1979:2, 1979:13, 1979:16, 1998:24, 1999:23, 2002:14, 2002:17, 2002:22, 2003:1, 2003:8
**Murphy's** [2] - 1982:2, 1985:21
**must** [2] - 1976:21, 2000:13

## N

**Nagle** [2] - 1947:24, 2008:4
**name** [1] - 1972:16
**nationwide** [1] - 1949:12
**near** [1] - 1997:13
**necessary** [3] - 1934:21, 1971:5, 1986:18
**Neck** [2] - 1972:9, 1972:11
**need** [6] - 1931:6, 1934:5, 1941:7, 1962:16, 1968:24, 1970:23
**needs** [3] - 1943:24, 1975:2, 1978:9
**negligent** [1] - 1939:15
**negotiated** [2] - 1940:13, 1970:12
**negotiations** [2] - 1972:4, 1973:1
**net** [8] - 1975:16, 1976:9, 1976:17, 1977:12, 1977:14, 1977:17, 1977:18, 1979:6

**never** [4] - 1948:4, 1958:5, 1963:18, 1966:9
**New** [1] - 1972:7
**news** [1] - 1950:7
**next** [16] - 1943:23, 1954:25, 1965:24, 1965:25, 1966:5, 1969:15, 1973:13, 1975:12, 1976:5, 1976:25, 1977:7, 1978:16, 1979:3, 1982:19, 1993:2, 2004:16
**nighttime** [1] - 2000:17
**no-fault** [1] - 1986:23
**nobody** [4] - 1955:11, 1957:7, 1992:16, 1993:11
**nominal** [10] - 1966:1, 1966:4, 1966:7, 1975:9, 1975:24, 1976:8, 1976:13, 1976:18, 1977:12, 1979:6
**non** [2] - 1960:10, 1960:12
**non-government** [2] - 1960:10, 1960:12
**none** [1] - 2005:16
**normal** [4] - 1944:6, 1944:11, 1944:12, 1963:19
**northeast** [1] - 1998:5
**Northern** [1] - 1985:20
**note** [2] - 1988:22, 2003:23
**notebooks** [1] - 1947:21
**nothing** [4] - 1963:7, 1980:9, 1991:2, 2005:11
**notice** [1] - 2007:1
**noticed** [1] - 1954:20
**notion** [2] - 1984:24, 1991:25
**November** [1] - 1994:23
**nowhere** [1] - 1985:13
**number** [21] - 1934:22, 1939:8, 1949:4, 1950:16, 1950:18, 1950:22, 1951:21, 1966:11, 1966:12, 1969:3, 1976:6, 1976:14, 1977:7, 1977:9, 1977:23, 1978:12, 1978:17, 1978:18, 1979:6

1990:11
**numbers** [10] - 1966:8, 1966:14, 1975:5, 1975:14, 1975:22, 1976:11, 1982:11, 1995:20, 2002:8, 2002:10
**numerous** [2] - 1971:11, 1998:8

## O

**object** [1] - 1982:4
**obligation** [1] - 1957:4
**obviously** [3] - 1935:12, 1967:22, 1985:25
**OF** [1] - 2010:1
**off-site** [1] - 2005:12
**OFFICIAL** [1] - 2010:1
**often** [1] - 1947:8
**on-site** [2] - 2005:15, 2005:16
**once** [4] - 1944:7, 1958:5, 1962:9, 1969:23
**one** [48] - 1934:6, 1935:4, 1935:5, 1936:11, 1939:8, 1939:14, 1939:21, 1940:9, 1940:13, 1940:14, 1940:19, 1940:22, 1943:11, 1944:20, 1945:11, 1949:9, 1951:3, 1952:18, 1953:3, 1953:12, 1953:18, 1955:6, 1957:13, 1958:9, 1960:19, 1961:7, 1963:10, 1964:3, 1965:14, 1965:16, 1971:22, 1972:19, 1973:13, 1975:1, 1979:25, 1980:23, 1984:14, 1984:15, 1985:3, 1985:15, 1986:22, 1987:2, 1987:5, 1989:4, 1995:3, 1995:5, 2000:24, 2002:11
**ones** [3] - 1944:23, 1948:22, 1979:24
**ongoing** [1] - 1959:17
**ons** [1] - 2003:5
**op** [4] - 1961:2, 1961:3, 1961:4, 1970:6
**open** [1] - 1974:9

**opening** [2] - 1932:6, 1932:20
**operate** [4] - 2006:3, 2006:8, 2007:2
**operated** [5] - 1932:5, 1937:8, 1988:1, 2004:21, 2005:3
**operating** [3] - 1937:7, 1949:17, 1968:17
**operation** [1] - 1944:16
**operations** [10] - 1944:22, 1945:18, 1987:10, 1988:6, 1990:13, 2001:6, 2007:15, 2007:17, 2007:22, 2008:7
**operator** [13] - 1933:23, 1937:6, 1938:20, 1944:19, 1944:24, 1945:7, 1945:8, 1945:12, 1945:15, 1946:21, 1948:25, 1949:1, 1954:19
**operators** [1] - 1944:21
**opportunity** [1] - 1958:16
**opposed** [1] - 1941:5
**opposite** [1] - 1964:6
**ops** [8] - 1961:6, 1965:25, 1970:7, 1970:12, 1970:13, 1970:15, 1974:7, 1975:5
**options** [1] - 1965:17
**order** [10] - 1957:15, 1957:24, 1957:25, 1958:1, 1958:2, 1964:9, 1967:7, 1981:19, 1981:20
**orders** [2] - 1957:16, 1957:22
**ordinary** [1] - 1986:18
**otherwise** [3] - 1959:10, 1959:13, 1981:24
**ought** [1] - 1940:9
**outcome** [1] - 1935:9
**outside** [1] - 1998:19
**overhead** [9] - 1958:12, 1959:16, 1959:18, 1959:20, 1959:24, 1960:24, 1961:6, 1986:19, 1987:14
**oversaw** [1] - 1947:5
**overseeing** [1] - 1984:9

own [12] - 1932:23, 1936:18, 1937:2, 1937:17, 1960:9, 1961:22, 1983:16, 1985:7, 1985:8, 2001:3, 2001:6, 2008:7
owned [2] - 1932:4, 1933:5, 1936:25, 1937:4, 1937:11, 1937:15, 1937:19, 1942:24, 1943:13, 1943:18, 1944:1, 1946:3, 1946:5, 1946:10, 1946:12, 1946:13, 1954:22, 1954:23, 1985:10, 1985:11, 2004:23
owner [1] - 1938:19
ownership [14] - 1933:10, 1933:17, 1936:2, 1936:13, 1938:4, 1945:21, 1945:22, 1945:25, 1946:1, 1946:9, 1946:19, 2008:20, 2008:21
oxidizer [1] - 1946:4

**P**

pads [1] - 2005:23
page [2] - 1990:23, 1997:18
paid [5] - 1964:7, 1964:17, 1975:9, 1994:16, 1995:25
pans [3] - 2005:23, 2005:24, 2007:5
Paragraph [1] - 1988:19
paragraph [2] - 1988:19, 1999:14
pardon [2] - 1993:8, 2004:3
part [5] - 1945:15, 1950:19, 1953:14, 1983:21, 1987:4
participated [2] - 1978:5, 2005:1
parties [21] - 1931:1, 1931:2, 1931:10, 1932:18, 1934:18, 1941:3, 1941:8, 1944:21, 1945:14, 1945:16, 1945:17, 1947:17, 1948:25, 1953:3, 1957:20, 1957:21, 1969:12, 1969:14, 1970:13,

1978:5, 1989:7
parties' [1] - 1991:19
partners [2] - 2001:21, 2001:22
partnership [2] - 1931:1, 1941:13
parts [1] - 1950:15
party [12] - 1934:18, 1934:19, 1936:21, 1936:22, 1936:24, 1944:20, 1945:11, 1945:12, 1949:6, 1949:9, 1984:22, 2009:8
party's [2] - 1934:17, 1941:6
pass [3] - 1959:21, 1963:17, 1993:10
pass-through [1] - 1959:21
passed [5] - 1960:14, 1963:18, 1963:20, 1963:25, 1964:11
passing [1] - 1958:12
past [31] - 1958:19, 1965:5, 1965:18, 1965:19, 1965:20, 1965:21, 1965:23, 1966:4, 1969:8, 1969:11, 1969:22, 1969:23, 1970:24, 1973:9, 1974:4, 1974:6, 1975:6, 1975:18, 1975:20, 1976:7, 1976:8, 1976:17, 1976:18, 1978:21, 1978:25, 1979:1, 1979:4, 1979:5, 1994:9, 1995:8, 2009:4
Patricia [1] - 2010:3
PATRICIA [1] - 2010:9
pattern [1] - 1964:8
pay [5] - 1959:12, 1967:8, 1990:7, 1994:10, 2009:14
paying [3] - 1982:15, 1988:15, 2003:20
payment [1] - 1994:9
payments [8] - 1936:12, 1936:13, 1942:13, 1943:2, 1958:11, 1984:22, 1994:11, 2009:15
pedigrees [1] - 1961:16
penalized [1] - 1964:14
pendency [2] - 1958:1, 1970:1

pending [3] - 1964:5, 1964:8, 1971:12
people [5] - 1945:4, 1984:15, 1992:6, 2004:6, 2005:25
per [5] - 1931:10, 1931:21, 1941:12, 1941:15, 1950:15
percent [44] - 1933:10, 1933:11, 1933:14, 1933:16, 1933:17, 1935:12, 1935:24, 1938:6, 1938:10, 1938:12, 1938:13, 1938:14, 1941:19, 1941:23, 1941:25, 1945:8, 1945:23, 1960:11, 1976:14, 1976:23, 1977:7, 1977:9, 1977:22, 1978:2, 1979:8, 1979:11, 1979:12, 1979:14, 1982:15, 1990:5, 1995:4, 1995:5, 1995:7, 1995:11, 1995:14, 1995:19, 1995:23, 2008:19, 2008:20, 2008:22, 2009:3, 2009:4
percentage [1] - 2002:7
performance [3] - 1942:6, 1953:15, 2008:10
performed [1] - 1978:5
period [2] - 1942:25, 1963:16, 1964:13
permission [1] - 1943:16
perpetuate [1] - 1963:5
personnel [1] - 1983:16
phrase [4] - 1938:4, 1938:5, 1938:11
pink [4] - 1997:16, 1997:22, 1998:3, 2000:1
pit [8] - 1932:14, 1935:14, 1952:10, 1985:24, 1986:2, 1986:3, 2007:15, 2008:22
pit's [1] - 1932:11
pits [23] - 1937:8, 1949:17, 1949:19, 1949:20, 1949:22, 1949:25, 1950:1,

1950:2, 1950:8, 1950:11, 1985:12, 1985:22, 1985:23, 2005:3, 2005:19, 2005:20, 2006:3, 2006:9, 2006:14, 2007:2, 2007:18
place [7] - 1964:13, 1970:21, 1983:17, 1984:11, 1985:25, 1986:15, 2003:3
places [4] - 1974:16, 1997:14, 1998:8, 2000:5
Plaintiff's [1] - 1991:4
plaintiff's [1] - 1982:21
play [1] - 1950:5
plenty [2] - 1943:4, 1943:14
plus [2] - 1935:8, 1938:22
point [28] - 1931:25, 1933:24, 1935:9, 1941:5, 1941:9, 1941:14, 1947:7, 1948:12, 1956:23, 1957:22, 1962:17, 1963:11, 1968:12, 1971:14, 1972:23, 1973:3, 1973:15, 1975:1, 1975:2, 1975:23, 1977:6, 1977:25, 1985:5, 1986:11, 1989:10, 1989:19, 1994:7, 2005:18
pointing [2] - 1998:6, 2003:13
points [4] - 1941:16, 1955:7, 1967:20, 1991:4
pool [6] - 1961:7, 1962:5, 1962:6, 1965:25, 1974:7, 1975:5
pools [3] - 1961:5, 1961:24, 1974:23
portion [2] - 1959:2, 1976:17
position [8] - 1949:16, 1954:3, 1954:6, 1983:8, 1985:2, 1985:17, 1991:14, 1993:1
possess [1] - 1985:8
possessed [2] - 1985:9, 1985:11
possibility [2] - 1941:11, 2007:4

possible [2] - 1965:2, 1965:5
possibly [2] - 1969:10, 1978:9
potentially [3] - 1964:4, 1977:4, 1978:8
Potrero [12] - 1933:5, 1935:12, 1941:25, 1945:23, 1945:25, 1946:1, 1946:2, 1946:4, 1953:1, 1953:8, 1985:15, 2008:21
pouring [2] - 1986:2, 1986:4
power [1] - 2009:6
practice [2] - 1944:6, 1953:1
practices [3] - 1944:11, 1944:12, 1958:13
precisely [1] - 1993:18
precision [1] - 1933:4
prejudgment [6] - 1965:14, 1975:24, 1977:2, 1977:4, 1995:10, 1995:21
preliminary [3] - 1935:2, 1938:21, 1939:9
present [11] - 1941:3, 1975:16, 1976:9, 1976:13, 1976:18, 1976:19, 1977:13, 1977:14, 1977:17, 1977:18, 1979:6
presentation [3] - 1985:21, 1986:8, 1996:20
presented [4] - 1932:23, 1934:23, 1967:4, 1997:15
pressure [3] - 1953:11, 1953:21, 1954:1
pressures [1] - 2000:18
presumption [1] - 1950:3
pretrial [1] - 1932:19
pretty [2] - 1990:10, 2000:15
prevent [6] - 1994:17, 1995:2, 1996:4, 1996:7, 2006:1, 2009:6
price [7] - 1936:12, 1942:12, 1959:17, 1969:11, 1993:15,

1995:16, 1996:2
**prices** [4] - 1960:13, 1963:1, 1963:2, 2002:5
**primarily** [1] - 1954:21
**primary** [1] - 1932:12
**principle** [6] - 1963:14, 1963:17, 1964:2, 1986:17, 1988:3
**probability** [2] - 2007:1, 2007:5
**problem** [11] - 1940:15, 1949:6, 1950:8, 1952:6, 1966:2, 1989:24, 1989:25, 1990:15, 1998:7, 1998:25
**problems** [3] - 1950:10, 1965:19, 1978:25
**procedures** [5] - 1946:16, 1946:18, 1947:1, 1948:23, 1974:2
**proceedings** [2] - 2009:24, 2010:5
**process** [31] - 1945:2, 1946:5, 1947:3, 1947:6, 1947:9, 1947:20, 1948:7, 1948:14, 1948:16, 1953:10, 1953:12, 1953:17, 1953:20, 1954:4, 1954:7, 1954:10, 1954:12, 1954:15, 1954:16, 1982:20, 1982:22, 1982:25, 1983:7, 1983:18, 1983:21, 1983:22, 1984:3, 1984:11, 2007:21, 2008:4, 2008:9
**processes** [3] - 1931:12, 1941:2, 1945:6
**produced** [1] - 1939:25
**production** [5] - 1940:21, 1954:5, 2002:13, 2002:15, 2002:23
**profit** [34] - 1959:19, 1963:6, 1965:10, 1966:1, 1966:3, 1966:7, 1966:13, 1969:2, 1969:10, 1975:14, 1975:17, 1975:20, 1976:21, 1977:6, 1977:12,

1977:13, 1977:17, 1977:19, 1978:6, 1978:7, 1979:15, 1993:5, 1993:10, 1993:12, 1993:19, 1993:22, 1993:23, 1994:1, 1994:4, 1994:6, 1994:11
**profiting** [1] - 1993:2
**profits** [5] - 1961:18, 1962:4, 1995:15, 1996:1, 2009:2
**programs** [1] - 1949:12
**progress** [4] - 1936:12, 1942:13, 1943:2
**progress-payments-clause** [1] - 1936:12
**prohibit** [1] - 1971:19
**prohibition** [1] - 1949:24
**prohibits** [1] - 1971:15
**promote** [1] - 1971:19
**promoting** [1] - 1971:1
**prompting** [1] - 1969:19
**proof** [1] - 1944:7
**propellant** [3] - 1953:12, 1953:22, 1954:1
**property** [5] - 1942:13, 1942:17, 1942:22, 1943:8, 1944:1
**proposal** [1] - 1967:12
**proposed** [7] - 1964:3, 1981:7, 1995:5, 1995:6, 2001:20, 2008:13, 2008:18
**proprietary** [1] - 1968:17
**Propulsion** [3] - 1946:24, 1987:20, 1987:25
**propulsion** [1] - 1987:19
**pros** [1] - 1986:21
**protect** [2] - 1958:6, 1969:21
**protected** [1] - 1963:1
**protects** [1] - 1969:6
**provide** [1] - 2000:25
**provided** [2] - 1942:21, 1994:1
**provision** [5] - 1974:21, 1985:23, 1989:3, 1989:10, 1990:22
**provisions** [3] -

1973:24, 1974:20
**PRP** [1] - 1972:24
**PRPs** [3] - 1931:11, 1931:18, 1986:25
**public** [6] - 1957:14, 1958:6, 1969:21, 1981:13, 2001:15, 2001:17
**published** [1] - 1981:13
**pull** [1] - 1969:16
**pump** [1] - 1952:4
**punched** [2] - 1992:10, 1992:13
**purchased** [2] - 1942:18, 1943:8
**pursuant** [1] - 1988:14
**pursuing** [1] - 1980:7
**put** [25] - 1933:7, 1934:22, 1935:14, 1944:4, 1954:17, 1957:11, 1961:8, 1961:23, 1962:17, 1962:23, 1965:24, 1969:23, 1974:2, 1974:18, 1977:24, 1991:21, 1995:3, 1996:20, 1997:4, 1998:15, 2005:18, 2005:19, 2006:4, 2006:5
**putting** [3] - 1949:25, 1953:14, 1986:1
**PX** [2] - 1953:20, 1973:5

## Q

**qualified** [1] - 1982:10
**quality** [6] - 1954:4, 1983:20, 1983:25, 2007:13, 2007:16, 2008:4
**questions** [5] - 1947:13, 1948:6, 2003:18, 2009:17, 2009:21
**quick** [3] - 1947:7, 1969:2, 1971:5
**quickly** [2] - 1955:20
**quite** [6] - 1960:7, 1965:8, 1965:13, 1990:10, 1991:22, 1996:15
**quo** [1] - 1989:13
**quote** [1] - 1962:13

## R

**R&D** [2] - 2002:20, 2003:2
**R35** [2] - 1980:3, 1980:5
**raise** [1] - 2006:17
**raised** [5] - 1941:17, 1949:10, 1982:20, 1986:9, 2003:17
**range** [1] - 2000:22
**rate** [2] - 1962:10, 2000:18
**rates** [6] - 1962:11, 1966:25, 1967:3, 2000:12, 2000:15, 2000:21
**rather** [2] - 1948:6, 2009:7
**re** [1] - 1965:5
**re-create** [1] - 1965:5
**reaching** [1] - 1939:8
**read** [8] - 1950:7, 1960:19, 1960:23, 1964:3, 1966:21, 1971:16, 1973:17, 1974:13
**reading** [1] - 1976:24
**real** [2] - 1956:24, 1982:13
**really** [5] - 1933:12, 1940:16, 1940:24, 1991:2, 2002:5
**reason** [2] - 1970:23, 2003:19
**reasonable** [2] - 1963:19, 1992:7
**reasonableness** [1] - 1957:1
**reasons** [3] - 1942:1, 1986:22, 1987:6
**receipt** [2] - 1995:10, 1995:21
**receive** [4] - 1964:18, 1975:8, 1978:13, 2009:12
**received** [1] - 1933:13
**receives** [1] - 2009:11
**receiving** [1] - 1984:22
**recent** [1] - 1958:13
**recess** [1] - 1979:19
**Recess** [1] - 1979:20
**recharge** [1] - 2004:16
**recognition** [1] - 1941:13
**recognize** [1] - 1971:9
**recognizing** [1] - 1991:23

**recollection** [1] - 2000:20
**recommended** [1] - 1953:3
**record** [7] - 1943:4, 1943:14, 1947:9, 1949:5, 1981:14, 1981:17, 2010:4
**records** [1] - 1946:25
**recouping** [3] - 1996:4, 1996:5, 1996:8
**recover** [16] - 1959:18, 1964:19, 1965:17, 1965:18, 1965:20, 1965:21, 1966:22, 1966:23, 1967:2, 1969:8, 1969:23, 1976:4, 1980:8, 1980:12, 1980:13, 1990:4
**recoverability** [1] - 1987:9
**recovered** [7] - 1959:20, 1959:24, 1967:6, 1974:6, 1977:4, 1994:21, 2008:25
**recoveries** [7] - 1959:3, 1967:24, 1971:6, 1975:2, 1978:15, 1993:4, 1995:9
**recovering** [2] - 1964:23, 1994:17
**recovery** [25] - 1964:5, 1965:23, 1968:10, 1971:3, 1975:3, 1975:6, 1979:8, 1979:11, 1979:25, 1986:9, 1986:12, 1986:16, 1986:22, 1987:3, 1990:8, 1991:10, 1992:4, 1992:19, 1995:2, 1995:14, 2008:24, 2009:6, 2009:8, 2009:11
**red** [1] - 1944:8
**Redlands** [12] - 1932:1, 1941:24, 1945:23, 1945:25, 1952:10, 1987:20, 1987:21, 1988:14, 2004:15, 2005:9, 2005:10, 2008:19
**reduce** [2] - 1965:25, 1992:7
**reduction** [2] - 1966:1, 1966:5

**referenced** [2] - 1986:14, 1999:14
**reflect** [1] - 1960:13
**refurbishing** [1] - 1953:6
**refused** [1] - 1957:25
**refutes** [1] - 1967:20
**regs** [1] - 1942:10
**regular** [1] - 1957:5
**Regulation** [1] - 1996:6
**regulations** [1] - 1956:25
**regulatory** [1] - 1951:23
**reimbursements** [1] - 2009:9
**related** [2] - 1986:25, 1988:2
**relates** [3] - 1983:5, 1988:5, 1988:14
**relating** [2] - 1987:25, 2001:22
**relationship** [1] - 1932:17
**relative** [2] - 1952:14, 1952:21
**released** [4] - 1941:1, 1942:6, 1942:7, 2000:14
**releasing** [1] - 1990:19
**relevant** [2] - 1948:20, 1948:22
**relied** [2] - 1946:8, 2001:4
**rely** [2] - 1942:9, 1955:2
**relying** [1] - 2001:9
**remains** [3] - 1942:19, 1942:24, 1943:9
**remarkably** [2] - 1966:19, 1968:8
**remediation** [2] - 1959:11, 1959:12
**remedy** [1] - 1990:1
**remember** [3] - 1964:1, 1971:7, 1998:22
**remembered** [1] - 1943:24
**remembering** [1] - 1972:17
**remind** [1] - 1954:3
**remove** [3] - 1953:11, 1953:22, 1954:1
**rent** [1] - 1962:24
**report** [6] - 1955:2, 1955:3, 1997:21, 1999:4, 1999:13,

1999:18
**REPORTER** [2] - 1931:13, 2010:1
**represent** [1] - 2002:4
**represents** [2] - 1979:1, 2009:3
**reproduced** [1] - 1999:11
**reproduction** [1] - 1999:18
**request** [2] - 2009:5, 2009:10
**required** [5] - 1934:10, 1934:12, 1934:24, 1983:2, 1994:10
**requirement** [1] - 1985:17
**requirements** [1] - 1951:23
**requires** [3] - 1936:18, 1937:2, 1985:8
**research** [1] - 2002:12
**residual** [1] - 1961:7
**resolve** [6] - 1955:19, 1955:25, 1956:16, 1965:19, 1966:7, 1989:19
**resolved** [4] - 1931:7, 1955:20, 1987:9, 1987:15
**resolves** [1] - 1969:11
**responds** [1] - 1948:11
**response** [3] - 1932:15, 1948:8, 1982:2
**responsibilities** [1] - 1931:3
**responsibility** [3] - 1934:19, 1937:6, 1987:4
**rest** [2] - 1991:21, 1995:21
**result** [4] - 1963:8, 1964:16, 1969:6
**results** [2] - 1952:4, 1994:14
**retain** [1] - 1989:7
**retained** [1] - 2008:6
**retroactively** [1] - 1970:20
**reuse** [1] - 1986:1
**reversion** [7] - 1942:3, 1942:5, 1942:8, 1942:9, 1942:11, 1943:1, 1943:3
**reversionary** [2] - 1942:14, 1942:18
**reverted** [2] - 1937:21, 1938:5, 1938:16

**review** [9] - 1947:1, 1948:3, 1948:6, 1954:11, 1982:7, 1982:24, 1983:18, 1984:12, 2008:2
**reviewed** [10] - 1947:9, 1948:5, 1948:9, 1948:12, 1982:23, 1983:4, 1983:9, 1983:14, 1983:15, 1984:4
**reviewing** [4] - 1947:8, 1947:22, 1954:16, 1983:2
**reviews** [2] - 1946:24, 1946:25
**rhetorical** [2] - 1956:20, 1956:21
**rid** [1] - 1969:10
**rights** [1] - 1956:13
**River** [1] - 1960:2
**road** [1] - 1952:20
**Robertson** [3] - 1968:15, 1968:19, 1968:24
**rocket** [9] - 1943:5, 1946:6, 1946:14, 1946:15, 1949:12, 1953:4, 1953:9, 2008:10, 2008:11
**Rocket** [2] - 1946:24, 1947:8
**rockets** [2] - 1939:25, 1947:14
**role** [2] - 1934:2, 1950:5
**Ross** [2] - 1947:7, 1947:22
**roughly** [3] - 1995:4, 1995:6, 1998:21
**RPL** [2] - 2003:2, 2003:5
**rule** [7] - 1964:10, 1964:11, 1969:13, 1969:20, 1971:15, 1971:18
**rules** [7] - 1958:21, 1958:22, 1959:25, 1964:12, 1964:16, 1964:25
**run** [4] - 1931:1, 1941:17, 1959:22, 1976:21
**running** [2] - 1949:11, 1987:21

**S**

**safe** [2] - 2005:21,

2005:24
**safety** [9] - 1936:15, 1944:13, 1946:22, 1947:1, 1947:16, 1949:23, 1954:6, 2007:14, 2007:15
**samples** [1] - 1997:10
**saw** [1] - 1968:19
**scenario** [1] - 1995:24
**schedule** [4] - 1943:11, 1944:5, 1944:7, 1944:9
**schedules** [2] - 1943:19, 1943:25
**scrap** [1] - 1944:3
**screen** [1] - 1953:19
**Seattle** [1] - 1972:15
**second** [4] - 1957:13, 1960:19, 1996:9, 2004:1
**Section** [2] - 1973:20, 1974:13
**section** [2] - 1985:8, 2001:14
**see** [13] - 1934:17, 1934:20, 1955:14, 1959:22, 1981:10, 1986:16, 1997:24, 1998:3, 1998:19, 1998:21, 2000:18, 2003:12, 2008:17
**seeing** [1] - 1982:17
**seek** [2] - 1991:10, 1992:4
**seeking** [4] - 1943:21, 1971:6, 1980:8, 1980:12
**selected** [3] - 1948:21, 1948:22, 2004:15
**seller** [1] - 2001:23
**semi** [1] - 2006:15
**semi-solids** [1] - 2006:15
**sends** [1] - 1934:19
**sense** [2] - 1947:15, 1992:3
**sensitive** [2] - 2006:17, 2006:22
**September** [1] - 1987:8
**services** [1] - 1959:17
**set** [8] - 1931:6, 1933:19, 1945:18, 1971:14, 1971:15, 1973:24, 1974:5
**setting** [2] - 1944:23, 1969:13
**settle** [4] - 1955:15, 1956:14, 1988:21, 1988:22

**settlement** [5] - 1969:13, 1974:2, 1981:8, 1981:21, 1988:20
**seven** [1] - 1936:11
**several** [4] - 1955:2, 1957:15, 1971:24, 2003:23
**share** [12] - 1931:4, 1933:9, 1933:11, 1946:9, 1948:25, 1964:22, 1965:1, 1969:12, 1979:5, 1990:3, 2009:7, 2009:14
**shared** [1] - 1931:3
**shareholders** [1] - 1993:24
**shooting** [1] - 1940:18
**shorthand** [1] - 1967:15
**show** [8] - 1947:4, 1947:5, 1949:5, 1987:7, 1997:22, 1999:25, 2000:3, 2000:6
**showed** [3] - 1982:21, 1998:2, 1998:8
**showing** [4] - 1946:11, 1947:22, 1952:4, 2000:7
**shown** [1] - 1947:12
**shows** [3] - 1948:8, 1952:2, 1954:11
**side** [1] - 1998:6
**sides** [1] - 1960:6
**sign** [3] - 1983:18, 1984:12, 1992:2
**signed** [4] - 1991:7, 1991:8, 1991:21, 2007:23
**significance** [3] - 1987:7, 1988:15, 1989:17
**significant** [6] - 1989:11, 1990:21, 1994:15, 1995:20, 2000:15, 2002:9
**significantly** [1] - 1992:20
**similar** [3] - 1936:1, 1966:19, 1968:8
**simple** [1] - 2001:23
**simply** [2] - 2003:21, 2004:25
**site** [28] - 1941:1, 1946:11, 1947:8, 1947:12, 1947:14, 1949:7, 1952:10, 1954:14, 1972:7,

1972:9, 1987:21, 1987:25, 1990:15, 1997:11, 1997:15, 1997:18, 1997:23, 1998:8, 2000:5, 2001:6, 2004:15, 2005:8, 2005:11, 2005:12, 2005:15, 2005:16, 2008:19
**sites** [12] - 1939:15, 1949:13, 1970:4, 1970:7, 1971:20, 1985:19, 1986:25, 1988:7, 1990:11, 1990:13, 1994:25, 2001:22
**sitting** [2] - 1955:23, 1958:18
**situation** [7] - 1940:21, 1954:13, 1958:17, 1960:15, 1967:22, 1970:12, 2004:14
**situations** [3] - 1931:20, 1990:2, 2004:12
**sketchy** [1] - 1981:2
**skip** [2] - 1997:2, 2007:8
**sleep** [2] - 2006:19
**slide** [18] - 1938:17, 1960:18, 1960:21, 1966:13, 1969:15, 1975:12, 1976:5, 1976:25, 1977:7, 1977:8, 1978:16, 1979:3, 1996:20, 1996:22, 1997:3, 1997:12, 1998:7, 2000:10
**slides** [12] - 1932:21, 1934:24, 1935:19, 1941:17, 1947:2, 1955:2, 1969:2, 1981:4, 1982:3, 1996:23, 2001:1, 2008:14
**slow** [2] - 1931:13, 1941:21
**slowly** [1] - 2000:23
**small** [2] - 1941:25, 1945:22
**smaller** [1] - 1994:11
**soaking** [1] - 1949:22
**soil** [4] - 1997:13, 1997:14, 1998:9, 2000:4
**solely** [1] - 1933:3
**solid** [8] - 1943:5, 1946:6, 1947:8,

1950:22, 1951:21, 1953:4, 1953:7, 1953:9
**solids** [4] - 1950:21, 1951:9, 2006:15, 2006:16
**solve** [1] - 1932:22
**solved** [1] - 1975:18
**solvent** [2] - 1998:11, 2007:18
**solvents** [2] - 1986:2, 2004:20
**someone** [2] - 1937:2, 2001:4
**sometime** [1] - 2002:16
**sometimes** [3] - 1934:12, 1934:20, 1959:9
**somewhat** [2] - 1934:8, 1935:9
**somewhere** [1] - 1979:22
**sorry** [12] - 1938:13, 1941:22, 1945:25, 1947:4, 1953:5, 1953:17, 1960:21, 1962:15, 1965:13, 1971:7, 1983:9, 1983:13
**sort** [8] - 1934:8, 1941:8, 1942:10, 1954:11, 1957:5, 1958:13, 1964:8, 1997:8
**source** [9] - 1932:11, 1932:12, 1950:1, 1950:2, 1952:10, 1952:15, 1958:3, 1984:23, 2009:9
**sources** [4] - 1932:3, 1932:12, 1952:17, 1967:23
**southern** [1] - 1952:9
**sovereign** [1] - 1968:17
**span** [1] - 1943:6
**spec** [1] - 1953:20
**special** [1] - 1974:21
**specific** [2] - 1962:1, 1963:14
**specifically** [4] - 1940:13, 1951:18, 1961:24, 1962:18
**specifications** [22] - 1945:1, 1945:2, 1947:4, 1947:6, 1947:10, 1947:20, 1948:7, 1948:14, 1948:16, 1953:10,

1953:13, 1954:5, 1954:7, 1954:10, 1954:12, 1954:15, 1954:16, 1982:20, 2007:21, 2007:23, 2008:3, 2008:9
**specs** [1] - 1954:4
**Speers'** [1] - 1947:23
**spend** [1] - 1992:8
**spent** [1] - 1980:22
**split** [9] - 1933:21, 1935:15, 1935:18, 1935:25, 1938:8, 1941:13, 1944:19, 1945:8, 1945:13
**splitting** [2] - 1933:18, 1938:19
**SRAM** [13] - 1940:12, 1940:17, 1983:5, 1983:8, 1984:4, 2000:25, 2001:8, 2001:14, 2001:25, 2002:3, 2002:6, 2002:13, 2003:4
**Stan** [2] - 1951:4, 1951:10
**standard** [3] - 1982:22, 1982:25, 1983:22
**standards** [6] - 1936:15, 1957:1, 1983:7, 1983:23, 1984:3, 1984:11
**standpoint** [2] - 1976:3, 1987:24
**stands** [1] - 1946:12
**start** [4] - 1931:22, 1932:9, 1957:14, 1986:8
**started** [2] - 1932:19, 1958:2
**starting** [1] - 1941:14
**State** [1] - 1969:19
**States** [44] - 1931:9, 1932:4, 1945:11, 1951:25, 1960:17, 1965:1, 1968:16, 1971:12, 1980:2, 1982:14, 1982:23, 1983:3, 1983:18, 1983:19, 1984:11, 1984:12, 1986:24, 1988:23, 1989:2, 1989:8, 1990:7, 1990:20, 1991:14, 1994:3, 1995:17, 1996:3, 1996:8, 2002:2, 2003:22, 2003:25, 2004:17, 2004:18, 2004:21,

2004:23, 2005:1, 2005:2, 2008:2, 2008:19, 2009:1, 2009:7, 2009:12, 2009:13
**States'** [4] - 1987:4, 1988:25, 1990:3, 2009:7
**status** [1] - 1989:13
**step** [1] - 1956:2
**steps** [1] - 1985:16
**Sterrett** [3] - 1951:1, 1951:9, 1952:13
**still** [13] - 1938:5, 1938:12, 1938:24, 1938:25, 1939:3, 1943:20, 1950:10, 1955:23, 1964:22, 1972:4, 1993:21, 1994:1, 2000:1
**stop** [1] - 1992:16
**strike** [1] - 1961:20
**strong** [2] - 1942:15, 1976:11
**structure** [1] - 1986:23
**studies** [1] - 1997:14
**stuff** [4] - 1939:20, 1945:19, 1951:24, 1986:5
**subcontract** [1] - 1983:1
**subcontracted** [1] - 1984:16
**subcontractor** [2] - 1983:6, 2001:25
**subcontractors** [1] - 1983:1
**submit** [2] - 1981:23, 2008:10
**submitted** [3] - 1939:23, 1948:19, 2006:25
**substantial** [1] - 1945:16
**subtracted** [1] - 1980:11
**subtracting** [1] - 1977:20
**sue** [18] - 1955:12, 1956:1, 1956:3, 1966:24, 1967:1, 1989:23, 1990:1, 1990:3, 1990:6, 1991:23, 1992:1, 1992:2, 1992:7, 1992:15, 1992:23, 1992:24
**sued** [7] - 1966:22, 1966:23, 1972:1, 1992:3, 1992:16,

1992:18
**suggest** [1] - 1997:7
**suggested** [3] - 1931:19, 1931:23, 1997:12
**suing** [6] - 1967:16, 1971:16, 1972:24, 1989:8, 1989:9, 1996:12
**suit** [3] - 1976:11, 1991:24, 1994:14
**suits** [4] - 1972:6, 1996:10, 1996:14, 1996:15
**Sullivan** [6] - 1952:7, 1952:11, 1956:9, 1971:8, 1979:21, 1980:1
**SULLIVAN** [71] - 1979:25, 1980:4, 1980:6, 1980:18, 1980:21, 1981:4, 1981:15, 1981:20, 1982:1, 1982:13, 1983:10, 1983:15, 1984:9, 1984:14, 1985:1, 1985:14, 1987:19, 1988:5, 1988:12, 1988:18, 1989:6, 1989:16, 1989:19, 1990:2, 1990:12, 1991:1, 1991:8, 1991:14, 1992:13, 1992:17, 1993:8, 1993:14, 1993:21, 1993:25, 1994:8, 1996:13, 1996:18, 1996:25, 1997:2, 1997:6, 1997:18, 1997:20, 1998:2, 1998:14, 1998:17, 1999:2, 1999:6, 1999:9, 1999:12, 1999:17, 1999:21, 1999:24, 2000:3, 2000:9, 2001:13, 2001:16, 2002:7, 2002:20, 2003:10, 2004:3, 2004:8, 2004:11, 2005:7, 2005:10, 2005:15, 2005:20, 2006:11, 2006:21, 2006:24, 2007:10, 2007:13
**sum** [1] - 1986:16
**support** [5] - 1933:6, 1952:11, 1993:5, 1997:8, 2000:12
**supports** [1] - 1948:24

2026

**supposed** [1] - 1984:21
**surviving** [1] - 1936:11
**synthetic** [1] - 2007:3
**system** [18] - 1956:24, 1963:5, 1963:6, 1963:8, 1963:11, 1964:21, 1964:24, 1965:7, 1965:9, 1966:6, 1969:7, 1969:10, 1970:20, 1975:18, 1978:3, 1978:7, 1993:19, 1996:6

## T

**table** [1] - 1994:19
**talks** [4] - 1953:21, 1953:22, 1955:19, 1999:5
**taxpayer** [1] - 1969:7
**taxpayers** [7] - 1963:9, 1994:14, 1994:15, 1994:25, 1995:1, 1995:13, 1995:24
**taxpayers'** [1] - 1994:20
**TCA** [6] - 1999:1, 1999:2, 2000:12, 2000:19, 2000:23
**TCE** [17] - 1933:3, 1949:6, 1955:4, 1997:3, 1997:7, 1997:13, 1997:14, 1997:22, 1998:9, 1998:19, 1998:22, 2000:4, 2000:12, 2000:14, 2000:17, 2000:19, 2000:23
**technically** [1] - 1980:9
**technicians** [1] - 1998:11
**temperature** [1] - 2000:17
**temperatures** [1] - 2000:21
**terms** [6] - 1942:11, 1950:4, 1966:4, 2003:10, 2008:24
**terribly** [2] - 1989:10, 1990:21
**test** [3] - 1946:11, 1946:12, 1951:19
**tested** [3] - 1946:14, 1951:18, 1952:4

**testified** [6] - 1947:11, 1952:12, 1952:13, 1952:15, 2001:3, 2006:13
**testimony** [7] - 1947:20, 1947:24, 1950:15, 1950:17, 1982:10, 1984:6, 1994:2
**testing** [6] - 1946:16, 1946:17, 1946:18, 1951:16, 1952:1, 1952:21
**THE** [180] - 1931:13, 1931:15, 1934:4, 1934:13, 1935:2, 1935:6, 1935:11, 1935:17, 1935:20, 1935:22, 1936:3, 1936:8, 1936:21, 1936:24, 1937:16, 1937:21, 1937:24, 1938:2, 1940:5, 1940:8, 1940:14, 1941:21, 1944:11, 1944:15, 1950:7, 1950:10, 1950:24, 1951:3, 1951:5, 1951:15, 1953:17, 1953:24, 1954:3, 1955:10, 1955:22, 1956:4, 1956:6, 1956:11, 1956:18, 1956:20, 1956:22, 1957:13, 1957:18, 1958:10, 1958:22, 1959:1, 1959:4, 1959:6, 1959:9, 1960:5, 1960:9, 1960:19, 1960:23, 1961:2, 1961:4, 1961:11, 1961:13, 1961:16, 1961:18, 1961:22, 1961:25, 1962:2, 1962:4, 1962:8, 1962:13, 1962:16, 1962:19, 1962:21, 1962:25, 1963:10, 1963:21, 1965:3, 1966:8, 1966:15, 1967:10, 1967:14, 1967:18, 1967:25, 1968:3, 1968:6, 1968:19, 1968:22, 1970:3, 1970:9, 1970:17, 1971:7, 1971:22, 1972:1, 1972:6, 1972:11, 1972:14, 1972:18, 1972:20, 1972:23, 1973:5,

1973:8, 1973:19, 1973:21, 1974:24, 1976:20, 1978:1, 1978:11, 1979:1, 1979:10, 1979:15, 1979:18, 1979:21, 1980:3, 1980:5, 1980:16, 1980:20, 1980:22, 1981:13, 1981:18, 1981:23, 1982:11, 1983:7, 1983:12, 1984:2, 1984:13, 1984:24, 1985:11, 1987:16, 1988:3, 1988:9, 1988:17, 1989:4, 1989:13, 1989:17, 1989:21, 1990:9, 1990:23, 1991:7, 1991:12, 1991:21, 1992:15, 1993:6, 1993:9, 1993:17, 1993:23, 1994:4, 1996:10, 1996:17, 1996:22, 1997:1, 1997:4, 1997:17, 1997:19, 1997:24, 1998:13, 1998:16, 1999:7, 1999:11, 1999:13, 1999:19, 2000:2, 2000:7, 2001:12, 2001:15, 2001:18, 2002:3, 2002:11, 2002:15, 2002:19, 2002:25, 2003:6, 2003:9, 2004:2, 2004:4, 2004:9, 2005:5, 2005:9, 2005:13, 2005:17, 2006:7, 2006:19, 2006:22, 2007:8, 2007:12, 2009:18
**themselves** [1] - 1949:21
**theory** [4] - 1963:7, 1965:6, 2000:8, 2000:13
**thinking** [1] - 1964:1
**third** [4] - 1936:21, 1936:22, 1936:24, 2009:8
**thoroughly** [1] - 1949:21
**threatened** [3] - 1971:12, 1996:13, 1996:15
**three** [1] - 1972:9
**throughout** [1] - 1942:25

**throw** [1] - 1965:22
**title** [1] - 1943:1
**today** [4] - 1931:4, 1940:4, 1941:10, 1990:14
**together** [5] - 1931:11, 1931:18, 1932:5, 1941:8, 1991:13
**tolling** [7] - 1955:14, 1955:17, 1955:18, 1973:6, 1991:21, 1992:2, 1992:24
**Tom** [2] - 1958:8, 2001:3
**tongue** [1] - 1956:11
**took** [4] - 1945:9, 1945:21, 1974:17, 2003:2
**tooting** [1] - 1958:23
**top** [2] - 1935:17, 1998:3
**Torres** [3] - 1931:23, 1933:25, 1939:4
**total** [8] - 1950:21, 1950:22, 1951:8, 1951:20, 1976:7, 1976:8, 1995:24, 2009:4
**totally** [1] - 1991:25
**touch** [1] - 1949:3
**tough** [1] - 2007:2
**trained** [1] - 2004:18
**transaction** [5] - 1937:13, 1971:4, 1971:7, 1971:10, 1979:23
**transcript** [3] - 1948:1, 1973:17, 2010:4
**transcripts** [1] - 1976:24
**treat** [1] - 1970:24
**treated** [3] - 1963:19, 1970:23, 2006:14
**trial** [4] - 1941:3, 1955:4, 2001:10, 2001:13
**tried** [1] - 1963:11
**trimmings** [1] - 1944:3
**true** [2] - 1958:10, 1994:12
**truly** [1] - 1939:14
**truth** [1] - 2000:15
**TRW** [6] - 1966:16, 1966:22, 1967:8, 1967:22, 1984:19
**try** [3] - 1931:16, 1955:15, 1957:19, 1966:18, 1986:1
**trying** [12] - 1941:3, 1941:4, 1951:22,

1955:19, 1955:24, 1971:14, 1971:15, 1979:9, 1980:13, 1982:5, 1997:7, 2001:1
**Tuesday** [9] - 1931:5, 1941:17, 1947:3, 1949:18, 1952:7, 1966:11, 1966:17, 1973:17, 1977:3
**turn** [2] - 1965:7, 1979:21
**turned** [1] - 1962:11
**turning** [1] - 1944:23
**twice** [4] - 1949:21, 1991:11, 2000:18, 2000:19
**two** [13] - 1938:19, 1944:20, 1944:21, 1953:20, 1969:2, 1972:12, 1977:14, 1977:15, 1977:20, 1979:7, 1986:23, 1995:3, 1996:11
**type** [10] - 1932:7, 1938:8, 1941:12, 1941:15, 1946:7, 1946:8, 1948:23, 1964:5, 1967:21
**types** [5] - 1934:21, 1949:13, 1964:20, 1971:20, 1978:24
**typical** [1] - 2001:23

## U

**U.S** [7] - 1933:9, 1933:20, 1935:11, 1999:17, 1999:23, 2001:10, 2007:13
**ultimate** [2] - 1934:9, 2007:25
**umbrella** [1] - 1940:17
**under** [38] - 1936:2, 1941:1, 1942:18, 1943:2, 1943:8, 1945:6, 1956:13, 1957:6, 1963:6, 1963:15, 1964:12, 1964:16, 1966:25, 1967:3, 1967:16, 1967:24, 1969:12, 1970:14, 1971:6, 1971:16, 1978:9, 1978:13, 1984:6, 1986:25, 1987:3, 1988:15, 1988:21, 1990:4, 1990:7, 1990:15, 1991:19, 1993:19, 1995:24,

1996:4, 1996:6, 1996:9, 2009:1, 2009:22
**undercut** [1] - 1984:24
**undercuts** [1] - 2001:7
**undervalued** [1] - 1945:24
**undisputed** [1] - 1993:3
**undue** [1] - 1978:24
**unfair** [1] - 1982:18
**unfortunate** [1] - 1959:11
**unique** [4] - 1958:17, 1960:6, 1960:7, 1984:16
**unit** [4] - 1987:11, 1987:13, 1987:17, 1987:22
**unitary** [6] - 1966:17, 1967:20, 1984:25, 1985:2, 1991:12, 2004:5
**United** [48] - 1931:9, 1932:4, 1945:11, 1951:25, 1960:17, 1965:1, 1968:16, 1971:12, 1980:2, 1982:14, 1982:23, 1983:3, 1983:18, 1983:19, 1984:11, 1984:12, 1986:24, 1987:4, 1988:23, 1988:25, 1989:1, 1989:8, 1990:3, 1990:6, 1990:7, 1990:20, 1991:14, 1994:3, 1995:17, 1996:3, 1996:8, 2002:1, 2003:22, 2003:24, 2004:17, 2004:18, 2004:21, 2004:23, 2004:25, 2005:2, 2008:2, 2008:19, 2009:1, 2009:6, 2009:7, 2009:12, 2009:13
**units** [3] - 1962:7, 1962:10, 1988:7
**unknown** [1] - 1990:10
**unless** [4] - 1990:11, 1992:2, 2009:14, 2009:17
**unlike** [1] - 2004:12
**untangle** [1] - 1932:18
**up** [29] - 1931:6, 1931:23, 1932:9, 1933:18, 1934:1, 1934:6, 1935:3,

1938:19, 1939:20, 1949:4, 1954:9, 1955:13, 1968:25, 1975:25, 1977:16, 1977:21, 1981:24, 1981:25, 1987:5, 1992:9, 1994:5, 1994:7, 1994:20, 1995:20, 1998:3, 1998:4, 1998:14, 2007:10
**uproar** [1] - 1963:12
**uses** [1] - 1976:15
**utility** [1] - 1960:5
**utopia** [1] - 1965:4

## V

**value** [20] - 1965:11, 1966:1, 1966:2, 1966:13, 1973:16, 1975:10, 1975:16, 1975:19, 1975:24, 1976:3, 1976:9, 1976:13, 1976:18, 1976:19, 1977:13, 1977:14, 1977:17, 1977:18, 1979:4, 1979:6
**values** [1] - 1975:9
**valve** [1] - 1944:23
**vapor** [4] - 1997:9, 1998:18, 2000:13, 2000:18
**variables** [1] - 1952:18
**variety** [2] - 1987:2, 2000:5
**various** [2] - 1965:5, 1970:5
**vast** [1] - 1960:16
**vastly** [1] - 1978:18
**vegetation** [1] - 2006:1
**versus** [3] - 1975:6, 2000:1, 2000:19
**vested** [1] - 1990:20
**view** [4] - 1948:24, 1970:14, 1978:10, 1989:21
**vindicate** [1] - 1956:13
**voluntary** [3] - 1969:17, 1969:18, 1971:1
**volunteer** [1] - 1957:18

## W

**WACC** [1] - 1976:1

**wait** [3] - 1960:23, 1962:21, 1987:16
**walk** [1] - 1956:15
**wants** [1] - 1980:19
**War** [2] - 2003:25, 2004:12
**war** [1] - 1940:1
**wash** [11] - 1932:14, 1936:4, 1936:7, 1940:10, 1940:11, 1953:4, 1953:5, 1953:7, 1953:22, 1954:1, 1954:21
**wash-out** [6] - 1932:14, 1936:7, 1953:4, 1953:5, 1953:7, 1954:21
**washed** [1] - 1954:24
**washing** [4] - 1952:25, 1953:11, 1953:21, 1982:22
**WASP** [1] - 1943:5
**waste** [36] - 1934:20, 1936:2, 1936:19, 1936:25, 1937:2, 1937:11, 1937:14, 1937:15, 1937:17, 1937:20, 1938:15, 1942:8, 1942:10, 1944:4, 1945:3, 1945:17, 1946:2, 1947:5, 1947:6, 1947:12, 1948:15, 1948:18, 1948:23, 1973:15, 1985:7, 1985:8, 1985:9, 1985:10, 1985:11, 1985:16, 1985:19, 2004:24, 2005:1, 2006:25, 2007:19, 2008:10
**waste-type** [1] - 1948:23
**wastes** [3] - 1944:3, 1986:5, 2005:8
**wastewater** [3] - 1986:3, 2004:20, 2007:18
**water** [13] - 1949:22, 1950:14, 1950:16, 1950:21, 1951:14, 1952:1, 1952:5, 1953:11, 1953:22, 1954:1, 1985:24, 2004:16, 2007:5
**Water** [2] - 1939:19, 2006:14
**waters** [1] - 1951:25
**wavelength** [1] - 1986:11

**ways** [6] - 1939:7, 1970:5, 1970:21, 1989:3, 2004:9, 2005:21
**weight** [1] - 1938:20
**wells** [1] - 1952:9
**Wessman** [1] - 1998:10
**west** [1] - 1998:6
**western** [1] - 1997:11
**wetting** [2] - 1949:23, 1985:24
**whatnot** [1] - 2008:1
**whichever** [1] - 1934:7
**Whittaker** [3] - 1935:24, 1938:14, 1938:15
**whole** [6] - 1944:6, 1999:25, 2002:4, 2004:6, 2004:14
**wish** [2] - 1966:8, 1990:23
**witness** [2] - 2001:3, 2001:6
**word** [3] - 1945:14, 1961:8, 1996:14
**works** [1] - 1969:7
**world** [4] - 1935:3, 1935:11, 1982:14, 1990:1
**World** [2] - 2003:25, 2004:12
**worried** [1] - 1988:3
**worrying** [1] - 1934:7
**worth** [1] - 1940:17
**wrote** [1] - 1982:25

## Y

**year** [4] - 1977:11, 1977:15
**year-to-year** [2] - 1977:11, 1977:15
**years** [12] - 1955:25, 1965:12, 1965:13, 1965:24, 1965:25, 1966:4, 1966:5, 1974:8, 1974:9, 1974:11, 1990:16, 2000:4
**yesterday** [3] - 1968:19, 1976:24, 1995:11
**York** [1] - 1972:8
**yourself** [1] - 1969:5

## Z

**zero** [9] - 1932:20,

1933:22, 1941:24, 1945:10, 1945:11, 1945:12, 1989:25, 2008:22
**zeroing** [1] - 1946:19